SANJAY WADHWA
SENIOR ASSOCIATE REGIONAL DIRECTOR
Michael Paley
Charu Chandrasekhar
Nancy Brown
Katherine Bromberg
Jon Daniels
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

SECURITIES AND EXCHANGE COMMISSION, :
                                     :
                    Plaintiff,       :
                                     :          18 Civ. ____ (  )
            -- against --            :
                                     :          ECF CASE
BARRY C. HONIG, JOHN STETSON,        :
MICHAEL BRAUSER, JOHN R. O'ROURKE III, :
MARK GROUSSMAN, PHILLIP FROST,       :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER, :       COMPLAINT
JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG : AND JURY DEMAND
CAPITAL LLC, FROST GAMMA INVESTMENTS :
TRUST, GRQ CONSULTANTS, INC.,        :
HS CONTRARIAN INVESTMENTS, LLC,      :
GRANDER HOLDINGS, INC., MELECHDAVID, :
INC., OPKO HEALTH, INC.,             :
SOUTHERN BIOTECH, INC., and          :
STETSON CAPITAL INVESTMENTS INC.,    :
                                     :
                    Defendants.      :

------------------------------------------------------------ x

          Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Barry C. Honig ("Honig"), John Stetson ("Stetson"), Michael Brauser ("Brauser"),

John R. O'Rourke III ("O'Rourke"), Mark Groussman ("Groussman"), Phillip Frost ("Frost"),

Robert Ladd ("Ladd"), Elliot Maza ("Maza"), Brian Keller ("Keller"), John H. Ford ("Ford"),

Alpha Capital Anstalt ("Alpha"), ATG Capital LLC ("ATG"), Frost Gamma Investments Trust ("FGIT"), GRQ Consultants, Inc. ("GRQ"), HS Contrarian Investments, LLC ("HSCI"), Grander Holdings, Inc. ("Grander"), Melechdavid, Inc. ("Melechdavid"), OPKO Health, Inc. ("Opko"), Southern Biotech, Inc. ("Southern Biotech"), and Stetson Capital Investments Inc. ("SCI") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case involves three highly profitable "pump-and-dump" schemes perpetrated by Honig, Stetson, Brauser, O'Rourke, Groussman, and Frost, and their entities GRQ, SCI, Grander, HSCI, Melechdavid, ATG, Opko, FGIT, and Southern Biotech from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares.

2.      Across all three schemes, Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity.  In each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company.  In every scheme, Honig, and some combination of Stetson, Brauser, O'Rourke, Groussman and Frost, either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely.  Once Honig and his associates had secured substantial ownership of the issuer, they acted as an undisclosed control group, directing the issuer's management for their benefit, including orchestrating transactions designed to create market

interest in the company or to solidify their control.

3.      To profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendant Ford, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, Honig, Brauser, O'Rourke, Groussman, Melechdavid and ATG engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest.

4.      In connection with the Company B and Company C schemes, Honig, Brauser, Stetson, O'Rourke, Frost and Groussman, as well as certain of their entities, also violated beneficial ownership reporting requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did exercise) control over the issuers.

5.      Management of both Company A and Company B acted to further the schemes.  Defendants Maza (Company A's CEO), Keller (Company A's Chief Scientific Officer and a Director) and Ladd (Company B's CEO), acted separately at the direction of Honig and his confederates to take steps beneficial to that group at the expense of each company's public shareholders, and signed public filings they knew to be false to hide the group's beneficial ownership and existence.

6.      Maza and Keller signed Company A's public filings, in which they knowingly or recklessly omitted to disclose the share ownership as a group of Honig, Brauser, Frost, Stetson, and Groussman, or the size of each of their holdings.  Similarly, Company B's CEO, Ladd, also signed false public filings, making material misstatements in them about the

substantial group ownership of Company B shares held by Honig, Brauser, Stetson, O'Rourke, and Groussman.

7.      All told, the three schemes brought Defendants millions of dollars:  Company A's pump and dump generated for the Defendants more than $9.25 million in stock sales proceeds, and Company B's pump and dump generated more than $9.5 million.  And their most recent venture, the pump and dump scheme with respect to Company C, brought in over $8.3 million in stock sales proceeds.  In the wake of these schemes, public investors were left holding virtually worthless stock.

## **VIOLATIONS**

8.      By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

9.      Honig violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (2) of the Securities Exchange Act of 1934 ("Exchange Act") [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

10.     Stetson violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

11.     Brauser violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

12.     O'Rourke violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

13.     Groussman violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

14.    Frost violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

15.    Ladd violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

6

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and by aiding and abetting Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1].

16.     Maza violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

17.     Keller violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

18.     Ford violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

19.     Alpha violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

20.     ATG violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Sections 9(a)(1) and (2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

21.     GRQ violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

22.     HSCI violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

23.     Grander violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

24.     Melechdavid violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

25.     Opko violated:

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

26.     FGIT violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

27.     Southern Biotech violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

28.     SCI violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

29.     The Commission seeks final judgments permanently enjoining Defendants from violating the federal securities laws, requiring each Defendant to disgorge his or its ill-gotten gains and to pay prejudgment interest on those amounts; requiring Defendants to pay civil

monetary penalties; barring Defendants from participating in future penny stock offerings; barring Defendants Ladd, Maza, and Keller from serving as officers or directors of publicly traded companies; and seeking any other relief that the Court deems just and appropriate.

30.     Unless Defendants are permanently restrained and enjoined, they each will again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts and transactions of similar type and object.

## JURISDICTION AND VENUE

31.     The Commission brings this action pursuant to the authority conferred by Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

32.     This Court has jurisdiction over this action pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

33.     Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  Among other things, at all relevant times, Company B's principal place of business was in Harrison, New York, within this District, and Defendants solicited investments in securities from investors in this District and sold securities through a broker-dealer located in this District.

## THE DEFENDANTS

### Individual Defendants

34.     **Honig**, born in 1971, is a resident of Boca Raton, Florida and currently works at an office in Boca Raton with Stetson and O'Rourke, and at times, Groussman.  Honig owns GRQ, and co-owns, with Stetson, HSCI, and co-owns, with Brauser and Frost, Southern Biotech.

35.     **Stetson**, born in 1985, is a resident of Fort Lauderdale, Florida and currently works at an office there with Honig and O'Rourke, and at times, Groussman.  Stetson owns SCI, and co-owns, with Honig, HSCI, of which he is the managing member.

36.     **O'Rourke,** born in 1985, is a resident of Fort Lauderdale, Florida and currently works at an office in Boca Raton with Honig and Stetson, and at times, Groussman.  O'Rourke owns ATG.

37.     **Brauser**, born in 1956, is a resident of Lighthouse Point, Florida and currently works in an office in Miami in the same building as Frost.  Brauser owns Grander.

38.     **Groussman**, born in 1973, is a resident of Miami Beach, Florida and occasionally works at an office in Boca Raton with Honig, Stetson and O'Rourke.  Groussman owns Melechdavid.

39.     **Frost**, born in 1936, is a resident of Miami Beach, Florida.  Frost founded Opko, and is its CEO.  Frost is also the trustee for FGIT.  Frost enjoys a reputation as a successful biotech investor.

40.     **Maza**, born in 1955, is a resident of New York, New York.  He was the CEO of Company A from June 2011 to January 2014.  He is a CPA licensed in New York, as well as an attorney licensed in New York.

41.     **Keller**, born in 1956, is a resident of California.  He was Chief Scientific Officer of Company A from about March 2011 to January 2014, and was a member of its board

of directors.  He currently works as President of Sales and Senior Vice President of Research and Development at Company A's successor company.

42.     **Ladd**, born in 1959, is a resident of Raleigh, North Carolina.  At all relevant times, he was a resident of New York, New York.  He has been the CEO of Company B since February 10, 2011.

43.     **Ford**, born in 1956, is a resident of Bolinas, California.

**Entity Defendants**

44.     **Alpha** is a Lichtenstein corporation and hedge fund, managed by an unregistered investment adviser located in New York, New York.

45.     **ATG** is a Florida corporation that O'Rourke owns and operates with its principal place of business in Florida.  ATG was incorporated in or around 2012.

46.     **FGIT** is a Florida trust that was formed in or around 2002.  Frost is FGIT's Trustee.

47.     **GRQ** is a Florida corporation that Honig owns and operates with its principal place of business in Florida.  GRQ was incorporated in or around 2004.

48.     **Grander** is a Florida corporation that Brauser owns and operates with its principal place of business in Florida.  Grander was incorporated in or around 2010.

49.     **HSCI** is a Delaware corporation that Honig and Stetson co-own and of which Stetson is the managing member, with its principal place of business in Florida.  HSCI was established in or around 2011.

50.     **Melechdavid** is a Florida corporation that Groussman owns and operates with its principal place of business in Florida.  Melechdavid was incorporated in or around 2006.

51.     **Opko** is a Delaware corporation.  Its principal place of business is in Florida.

Frost is Opko's CEO.  Opko was incorporated in or around 2007.

52.     **Southern Biotech** is a Nevada corporation that Honig operates and co-owns with Brauser and Frost with its principal place of business in Florida.  Southern Biotech was incorporated in or around 2014.

53.     **SCI** is a Florida corporation that Stetson owns and operates with its principal place of business in Florida.  SCI was incorporated in or around 2011.

## OTHER RELEVANT PERSONS AND ENTITIES

54.     **Company A** is a Delaware corporation headquartered in Georgia.  Company A was controlled by Honig, Frost, and Brauser between March 2011 and December 2013.  It was incorporated in Nevada in 2006.  The company filed periodic reports, including Forms 10-K and 10-Q with the Commission.  Company A's stock was quoted on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc.  In early 2014, Company A engaged in a reverse merger with a company associated with Honig and his associates.  The successor company is currently quoted on OTC Link.  At all relevant times, Company A's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

55.     **Company B** is a Delaware corporation headquartered in Harrison, New York.  Its common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it files periodic reports, including Forms 10-K and 10-Q with the Commission.  Company B's common stock was listed on NYSE MKT from 2007 until its October 19, 2016 delisting.  Its stock is currently quoted on OTC Link.  At all relevant times, Company B's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

56.     **Company C** is a Delaware corporation headquartered in San Diego, California, and was incorporated in 1988.  Company C's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and its common stock is listed on NASDAQ.  At all relevant times, Company C's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

## FACTS

### A.  The Company A Scheme

#### 1.     *Honig, Frost and Brauser Obtain Control of Company A*

57.     In the Company A scheme, Honig and Brauser teamed up with Frost, a frequent collaborator in Honig and Brauser deals involving biotech issuers.  As alleged below, the three men caused the company to issue shares to themselves and their associates through a series of so-called "private investments in public equities," or "PIPE" financings, drove the price of the stock higher by secretly paying for a misleading promotional campaign and by virtue of Honig's and Brauser's manipulative trading, and then unlawfully sold their Company A shares into the inflated market for proceeds of approximately $9,260,000.

58.     In November 2010, Honig, along with his nominees including Stetson and Groussman, purchased one-third of a publicly-traded shell company.  In December 2010, Brauser and Frost each purchased one-half of the remaining two-thirds of the publicly-traded shell company.  Each of Honig, Stetson, Groussman, Brauser, and Frost, disguised their role in the acquisition by purchasing the shares from an entity used to make the purchase of the shell company.  Soon after they acquired the shell, Honig, Brauser, and Frost installed a Frost associate as the sole disclosed director of the company.

59.     In late 2010, Honig, Brauser, and Frost approached management of a private

16

biotech company ("Company A Labs"), including Keller, the Chief Scientific Officer and Director, and Company A Labs then-CEO ("Company A Labs CEO") with a proposal for taking the company public.  Honig, Brauser, and Frost proposed a reverse merger, by which Company A Labs, a privately-held California company then in the business of manufacturing over-the-counter pharmaceutical products, would be merged into Honig's, Brauser's, and Frost's publicly-traded shell.  At the time, Company A Labs and Keller were working on developing a formulation using a patented technology called "Qusomes" that Company A Labs hoped to use in large-scale drug markets, and the management of Company A Labs saw the deal as creating financing possibilities to fund the company's research.

60.     Indeed, Honig, Brauser, and Frost told Keller and Company A Labs CEO that the public company deal would include raising $8 to $15 million dollars to support research and development ("R&D") into Qusomes.  And they further persuaded Company A Labs CEO to go along with the merger by promising him 6,650,000 shares of the newly created public company.

61.     The proposed merger hit a snag, however, in March 2011.  Pursuant to a $3 million credit line Company A Labs had with a San Francisco bank, the bank had authority to approve all major transactions, and, in March 2011, it declined to approve the proposed merger. The merger nonetheless closed in June 2011, and the bank thereafter sent a default notice.  On September 8, 2011, Maza, who had been installed as the CFO and director of Company A Labs by Honig and Brauser, completed the payoff of the credit line thereby removing the obstacle to the merger, but saddling Company A Labs with short-term, high-interest rate notes that included a conversion option into equity of the company.

62.     In connection with the reverse merger, Honig, Brauser, and Frost arranged the sale of certain unprofitable Frost assets to the public company in exchange for 8,345,310 shares

and the obligation of the company to file a registration statement for these shares, providing further value to Frost.

63.     After the closing of the reverse merger of Company A Labs into the shell company in June 2011, the surviving public company became Company A.  Honig, Brauser, Frost, Groussman, and Stetson controlled the vast majority of the Company A's stock and were affiliates of Company A.

64.     After the merger, Company A listed its corporate address at 4400 Biscayne Boulevard in Miami, the same business address then shared by Honig, Brauser and Frost.

65.     In addition to controlling the vast majority of Company A's outstanding shares, Honig, Brauser, and Frost exercised control over the management of Company A.  Before the deal closed, Honig and Brauser, acting with the knowledge and consent of Frost, Stetson and Groussman, had installed their associate, Maza, as the CFO and a director of Company A Labs. After the merger, Maza became the CEO of Company A.  Thereafter, Maza sought approval from Honig and Brauser for every business decision. For example, at the direction of Honig and Brauser, Maza agreed to divert funds from Company A to pay rent for the office of an unrelated entity co-owned by Honig and Brauser.

66.     In their capacity as the three board members of Company A, Keller, Maza, and the Frost associate concealed Honig's and Brauser's control of Company A by signing off on public filings that failed to disclose the involvement of Honig, Brauser, Stetson and Groussman, omissions that made those filings materially misleading.  These filings included Company A's Form 10-K filed on April 16, 2012.

67.     At the time they signed these filings, Keller and Maza understood that Honig and Brauser, with Frost's knowledge and consent, controlled Company A's management, and not

Maza. As Keller explained in a February 12, 2012 email to a Company A colleague, "[t]he real power is with Barry Honig and Mike Brauser. Elliot [Maza] is just a mouth piece." Following the merger, Company A's filings nonetheless identified only Frost, but not Honig or Brauser, as a control person.

68.     Honig, Brauser, and Frost failed to keep their promises to invest money in Company A for R&D. Instead, in a series of PIPE financings, which included warrants for additional shares, done between February 24 and March 12, 2012, they limited their investment to keep the business operating at a minimal level and to fund Maza's and Keller's generous compensation, forcing Company A to abandon its R&D efforts entirely by mid-2012. Keller's compensation more than doubled once he began working with Honig and Honig's associates, whereas Maza's annual compensation ranged from $300,000 to $600,000.

69.     Honig, Brauser, and Frost also used the financings to amass more, ever-cheaper Company A shares, and although the financings did nothing to enhance Company A's continued growth, Maza and Keller went along with them because both were promised, and ultimately awarded, substantial salaries as well as millions of Company A shares, by Company A's real control persons, which included Honig, Brauser, Frost, Stetson and Groussman.

70.     By April 1, 2013, and pursuant to an agreement to acquire, hold or sell their shares in concert, Honig, Frost, Brauser, Maza, Keller, and the Frost associate had amassed 44,818,312 shares, or almost 71% of the Company A shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares. Yet, even though Company A filed an amendment to its Form 10-K annual report for the 2012 fiscal year on September 13, 2013, signed by Maza, Keller, and the third board member, for the specific purpose of updating the beneficial ownership table, the annual report failed to disclose the

existence of the Honig-allied group, which beneficially owned nearly three-quarters of Company A's outstanding shares.

71.     On July 16, 2012, Company A Labs CEO – who had been ousted from Company A by Honig and Brauser with Keller's assistance – sued Company A, Honig, Brauser, Maza, and Frost.  Brauser, who was not an officer or director of Company A, took the lead in negotiating a settlement on behalf of Company A, frequently updating Honig and Frost on his negotiations.  In September 2013, Brauser and Honig came to terms with Company A Labs CEO, agreeing to pay him $2 million in return for his relinquishing his claim to the Company A shares he had been promised in the merger, and that he had never received.  Maza then ratified the settlement terms on September 5, 2013.

### 2.     *The Company A Pump and Dump*

72.     In preparation for the Company A pump and dump, during August and September, 2013, Stetson, at Honig's direction, deposited in a brokerage account almost 4 million Company A shares that had been issued to Honig.  Stetson worked closely with Honig, Brauser, and Frost and knew how much Company A stock they controlled, and that Honig and Brauser were directing Company A's management and policies.  In connection with the deposit of these shares, Stetson submitted Honig's signed answers to the broker's questionnaire, falsely denying any relationship between Honig and Company A or its affiliates.  At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of Company A because Company A was under Honig's control.

73.     On September 4, 2013, Stetson facilitated the issuance of false attorney opinion letters to Company A's transfer agent in order to remove restrictive legends from Honig's share certificates.  These opinion letters contained the material misrepresentation that Honig was not

an affiliate of Company A, a representation that Stetson knew, or was reckless in not knowing,

was false, given what he knew about Honig's control over Company A's management and

polices.

74.     As part of the process for depositing Honig's shares with a broker, and in

preparation for the pump and dump, CEO Maza was also required to issue a letter to confirm the

authenticity of the stock certificates.  In a letter to the broker-dealer, dated September 10, 2013,

Maza wrote "[w]e further acknowledge and agree that there is no other agreement or

understanding between Barry Honig and [Company A] that would preclude Barry Honig from

selling or otherwise disposing of shares represented above."  Maza knew, or was reckless in not

knowing, that this statement was false because Honig was an affiliate of Company A, and that, as

an affiliate, Honig's ability to sell his Company A shares would be subject, under the federal

securities laws, to volume limitations.

75.     Once the restrictions were lifted from Honig's shares and the shares were

deposited into a brokerage account, Honig was ready to sell them.  In September 2013, Honig

directed his associate, O'Rourke, to reach out to Ford, a seasoned stock promoter who used his

platform on the *Seeking Alpha* website to share his purportedly independent investment analysis

of selected companies.  O'Rourke contacted Ford and proposed that Ford write an article on the

*Seeking Alpha* website promoting Company A in exchange for below-market price Company A

shares.  At that time, Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, Keller, Maza, and

the Frost associate board member owned about 71% of the outstanding Company A shares, and

the market for Company A was virtually nonexistent (with zero volume on September 20, 2013).

O'Rourke instructed Ford to write a favorable article about Company A emphasizing Frost's

involvement (because Frost was known as a billionaire and successful biotech investor) and the

21

supposed rosy prospects of Company A's R&D.

76.     On September 23, 2013, Honig and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article.  That day, the trading volume of Company A shares soared to 302,000 from zero volume the previous day.

77.     The September 23rd trading also gave Honig a way to surreptitiously pay Ford for his upcoming favorable article on Company A.  O'Rourke called Ford and told him to put in buy orders for Company A stock at $0.40 in order to ensure his order was executed against the corresponding sell order placed by Honig. Honig then sold 180,000 Company A shares to Ford at $0.40 in a coordinated trade, a price well below the price at which these shares otherwise traded during that day.

78.     O'Rourke joined the trading at the end of the trading day on September 23rd to "mark the close," *i.e.,* to ensure that the last price of the day would be higher, giving the false impression that Company A's share price was on an upward trajectory.  Specifically, at 3:58 pm that day, O'Rourke, through his entity ATG, placed a bid to buy Company A shares at $0.68, a significantly higher price than the prior buy order at $0.55, which had been entered at about 3:06 pm.  Another Honig associate, who had purchased shares from Honig earlier in the day, placed a corresponding sell order to complete the transaction at the inflated price.

79.     In further preparation for the publication of the Ford article touting Company A, and to enhance the false picture of an active market for the stock, near the end of the trading day on September 26th, Honig and his associates engaged in a series of coordinated trades.  For example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold Company A shares to a Honig associate at $0.68, and two minutes later Groussman's entity Melechdavid

executed a transaction against ATG, O'Rourke's entity, at $0.68.

80.     Less than half an hour before market close on September 26, 2013, as directed by O'Rourke and Honig, and after review by Keller, Ford published a materially misleading promotional article on *Seeking Alpha*, titled "Opko and Its Billionaire CEO Invested in Company A." Ford presented a bullish outlook for Company A and concluded that "Company A should be trading for more than twice today's valuation." In the article, which included a question and answer interview of Keller, Ford quoted Keller touting the benefits of Company A's Qusomes technology. Keller misleadingly stated that Company A had a formulation ready for testing to be brought to the billion-dollar injectable drug market. Yet, as Keller knew, as of summer 2012, all R&D efforts had been shut down without the successful formulation of an injectable drug and Company A had ceased all efforts to develop this technology in mid-2012.

81.     Ford's article failed to disclose that he had been compensated by Honig for writing the article, through Honig's sale to him of below-market Company A shares on September 23, a material omission. Instead, Ford included a disclaimer that merely disclosed "I am long [Company A]. I wrote this article myself, and it expresses my own opinions. <u>I am not receiving compensation for it (other than from Seeking Alpha)</u>. I have no business relationship with any company whose stock is mentioned in this article." (Emphasis added.)

82.     The market reacted strongly to the Company A promotion: the trading volume of Company A stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013. The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.

83.     Between the start of the promotion following the publication of Ford's article

on September 26, 2013 and December 31, 2013, Honig and his associates sold shares into the

inflated market for proceeds of approximately $9,260,000:

| Company A Pump and Dump Proceeds | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2013)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** | 9/23 – 12/16 | (5,892,689) | $3,416,455.17 |
| **Brauser** and **Grander** | 9/27 – 12/23 | (2,128,316) | $1,137,775.46 |
| **Frost** | 10/1 – 10/4 | (1,987,991) | $1,085,321.74 |
| **Groussman** and **Melechdavid** | 9/26 – 10/14 | (1,229,166) | $677,272.37 |
| **Stetson** and **SCI** | 9/27 – 12/18 | (500,000) | $279,859.68 |
| **O'Rourke** and **ATG** | 9/23 – 12/27 | (250,000) | $148,443.68 |
| **Alpha Capital** | 10/3 – 11/27 | (3,772,200) | $2,513,724.08 |
| **Total** | | **(15,760,362)** | **$9,258,852.18** |

84.     No registration statement was then in effect for any of Honig's, Brauser's,

Frost's or Groussman's sales in the September through December 2013 period.  No exemption

from registration was available to any of them, or their entities.  Moreover, since Company A did

not trade on a national securities exchange, as affiliates of Company A, these Defendants could

only lawfully sell 1% of the company's total shares outstanding in any three-month period.  As

of September 2013, Company A had approximately 63 million shares outstanding, and as of

November 15, 2013, it had approximately 75 million shares outstanding.  Because Honig,

Brauser, Frost, and Groussman, and their respective entities, were under common control with

Company A, each was an affiliate of Company A, and each sold shares in excess of the

applicable volume limitations.

### 3.     *Alpha's Company A Sales*

85.     Alpha frequently co-invested with Honig, and participated in several rounds of

the Company A PIPE financings, resulting in Company A's issuance of millions of shares to

Alpha at steeply discounted prices in January 2012, April 2013 and September 2013.

86.     On September 5, 2013, when Honig and Brauser reached their settlement with

Company A's CEO, by which he disavowed his ownership of the 6,650,000 shares to which he had been entitled, Alpha purchased 1.5 million of those shares at $0.15 per share, with the intention of selling the shares into the inflated market created by the Honig-orchestrated promotion.  Company A issued the shares to Alpha on September 23, 2013, days before the Ford article appeared on *Seeking Alpha*.  On October 29, 2013, Alpha obtained an attorney opinion letter that it supplied to Company A's transfer agent so that the transfer agent would remove the restrictive legend from the share certificate.  The attorney opinion letter – as Alpha knew or was reckless in not knowing – falsely represented that Alpha had held the shares for at least 6 months and that the shares could be sold in accordance with the Securities Act Rule 144 safe harbor, as exempt from the registration provisions.

87.      Between October 3, 2013 and November 18, 2013, Alpha, in lockstep with Honig, Brauser, Frost, Groussman, O'Rourke, and Stetson (and their respective entities), sold 3.7 million Company A shares for proceeds of $2,513,724, including virtually all of the shares Alpha had obtained in September 2013.

### B.  The Company B Scheme

#### 1.      *Honig and Associates Secretly Obtain Company B Shares*

88.      During 2015 and 2016, Honig and his associates used Company B, a publicly traded shell, as another vehicle for a pump-and-dump scheme.  Honig and his partners used many of the same tactics they had employed in the Company A scheme: they bought cheap shares, intending to exercise control over the management and polices of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the stock price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market.  Despite their control over various actions taken by Company B, and their agreement to buy, hold and/or sell their shares in concert, Honig and his associates – this time

including Groussman, Brauser, Stetson and O'Rourke – took numerous steps to conceal their involvement, and to perpetuate the false appearance that the company was actually being controlled by its CEO.

89.     In 2015, Honig and his associates began planning the pump-and-dump of Company B's shares. Honig set the scheme in motion on September 26, 2015 when he informed Stetson that "[w]e need to put together a term sheet for Company B," and outlined proposed terms of the arrangement. Honig directed Stetson to send the proposal to Ladd, Company B's CEO. The deal contemplated the issuance of 2.8 million Company B shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, Honig and his associates increased the likelihood that they could disguise their scheme to pump up the price of Company B's shares in anticipation of a profitable sell-off to unsuspecting investors.

90.     Ladd was fully aware of Honig and his associates' combined interest in, and control over, the company, but failed to disclose it in Company B's public filings. On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ." Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser OBAN [an LLC created by Stetson]." On October 5, 2015, Stetson provided Company B with the investors who would participate in the financing, which included GRQ (Honig), Melechdavid (Groussman), Grander (Brauser), ATG (O'Rourke) and SCI (Stetson).

91.     The Honig-led financing ultimately provided $700,000 to Company B (the "October 2015 Company B Financing").  On October 8, 2015, Company B filed a Form 8-K disclosing that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . ."  In keeping with Honig's desire to conceal the large ownership stake of his team, Ladd did not disclose the investors' names in the Form 8-K.

### 2.     The Company B Pump and Dump in February 2016

92.     Having coordinated the accumulation of stock with Groussman, Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then secretly paid for a promotion that included materially misleading information and was supported by his own manipulative trading activity.

93.     On or around January 21, 2016, by which time Honig, Groussman, Brauser, Stetson and O'Rourke had acquired at least 16.3% of Company B's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of Company B.  Shortly after the payment for the stock promotion, on February 3, 2016, an article was published online touting Company B's positive prospects in social and real money gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by Company B – at Honig's direction – to write the article. After the article was published on February 3, 2016, there was a 7000% increase from the previous day's trading volume, and an intraday price increase of over 60%.  Honig, Ladd, Stetson, and O'Rourke sold over 430,000 shares into this inflated market for proceeds of approximately $198,800.

| Company B Pump and Dump Proceeds, Following February 2016 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2016)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** and **GRQ** | 2/3 – 4/6 | (231,050) | $123,154.87 |
| **Stetson** | 2/3 – 2/11 | (40,000) | $20,483.33 |
| **O'Rourke** and **ATG** | 2/3 – 2/9 | (64,366) | $15,960.72 |
| **Ladd** | 2/3 – 5/3 | (96,072) | $39,204.12 |
| **Total** | | **(431,488)** | **$198,803.04** |

### 3.   The Company B Pump and Dump in May 2016

94.     Honig soon identified a potential acquisition target for Company B that would give Honig and his associates another way to profit from their interest in Company B. The proposed deal involved a well-known cybersecurity innovator who had created a popular antivirus software bearing his name ("the Cybersecurity Innovator"). O'Rourke took the lead at Honig's direction (and with the knowledge and consent of Groussman, Brauser and Stetson) in arranging a deal between Company B and the Cybersecurity Innovator. On March 29, 2016, O'Rourke sent the Cybersecurity Innovator a term sheet for the asset purchase of Cybersecurity Innovator's company, "CI Company," by an "NYSE listed company." The CI Company indicated interest on April 3, 2016. O'Rourke wrote to Honig on April 3, 2016 and asked Honig if he would "still want to pursue [Cybersecurity Innovator] deal." After Honig replied to O'Rourke that same day "Yea!", O'Rourke introduced Ladd to the Cybersecurity Innovator on April 4, 2016, to begin negotiating a transaction between Company B and the Cybersecurity Innovator's various business interests.

95.     Subsequent correspondence between Ladd and O'Rourke and between O'Rourke and Honig, reflect the ongoing and significant role Honig and O'Rourke played in orchestrating the deal. Company B and the Cybersecurity Innovator agreed to terms on May 8, 2016.

96.     On May 9, 2016, at 8:30 a.m., Company B issued a press release announcing

its merger with CI Company.  In the release, Ladd misleadingly described the Cybersecurity Innovator's prior financial success.  He falsely claimed that the Cybersecurity Innovator had "sold his anti-virus company to Intel for $7.6 billion," suggesting that Company B might achieve similar success.  Yet, as Ladd knew or was reckless in not knowing, the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company.

97.     Knowing that Ladd's misleading announcement of the deal would be released later that morning, on May 9, 2016, Honig traded in Company B stock to create the misleading appearance of market liquidity.  In pre-market trading that morning, Honig bought and sold small quantities of Company B stock dozens of times.  Joining the effort to paint a false picture of legitimate market interest in the stock, Brauser, as well as Groussman, and his entity, Melechdavid, engaged in coordinated trades in Company B stock with Honig in pre-market trading that morning.

98.     That same day, StockBeast.com, a well-known internet stock promotion website, published an article by an unnamed author entitled "[Company B] Beastmode engaged – [Cybersecurity Innovator] driving the Bus."  The StockBeast.com article touted Company B and highlighted the Cybersecurity Innovator's involvement, repeating Ladd's materially false claim that the Cybersecurity Innovator had "sold his startup company to Intel for $7.6BB," and proclaiming: "This is big big big!"

99.     This promotion and Honig's, Brauser's and Groussman's manipulative trading on May 9 were effective in driving up both volume and price: on May 6, 2016 (the last day of trading prior to the promotion), Company B had trading volume of 71,005 shares and a closing price of $0.36.  On May 9, 2016, the stock closed at $0.49 (representing an increase of 34

percent over the prior day's close) with trading volume of more than 10 million shares.  The

trading volume for Company B stock peaked at 109,384,614 on May 17, 2016 with a closing

price of $4.15.

100.     In the days immediately following the announcement of the CI Company

acquisition, Honig, Brauser, Stetson, Groussman and O'Rourke, pursuant to their agreement to

buy, hold and/or sell their shares in concert, sold over 9.3 million Company B shares, resulting in

total proceeds of over $9.4 million:

| Company B Pump and Dump Proceeds, Following May 2016 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2016)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** and **GRQ** | 5/9 – 5/20 | (3,783,001) | $2,393,915.52 |
| **Brauser** and **Grander** | 5/9 – 5/18 | (2,137,668) | $3,839,295.64 |
| **Groussman** and Melechdavid | 5/9 – 5/11 | (1,415,870) | $999,873.56 |
| **Stetson** and **SCI** | 5/9 – 5/12 | (750,000) | $660,798.20 |
| **O'Rourke** and **ATG** | 5/9 – 5/16 | (750,000) | $990,661.97 |
| **Ladd** | 5/9 – 5/31 | (471,000) | $516,554.08 |
| **Total** | | **(9,307,539)** | **$9,401,098.97** |

### 4.     *False Statements by Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, and Ladd in Beneficial Ownership and Company B Filings*

101.     Although they were acting in concert, and pursuant to an agreement to do so,

Honig, Frost, Brauser, Stetson, Groussman and O'Rourke knowingly or recklessly concealed

their concerted efforts from the investing public.  Ladd, with full knowledge of both the Honig

group's ownership and their direction of the management and policies of Company B, also kept

their control a secret, signing Company B public filings that did not disclose the full extent of

their ownership or control.  After the October 2015 Company B Financing closed, Honig,

Groussman, Brauser, Stetson and O'Rourke as a group collectively owned at least 2.6 million

shares, or over 16% of the shares outstanding after the issuance, and their obligation to file a

Schedule 13D under Exchange Act Section 13(d) arose as of October 8, 2015. Moreover, they

each had warrants to obtain a total of an additional 4.6 million Company B shares, which, if they were all converted, would have resulted in Honig, Groussman, Brauser, Stetson and O'Rourke controlling at least 42% of the total common shares outstanding at that time.

102.     Honig, Groussman, Brauser, Stetson and O'Rourke exercised control over Ladd and the management and policies of Company B.  For example, on October 1, 2015, Ladd asked for and received Honig's direction with respect to how to disclose Honig's group's stock acquisitions to the NYSE MKT exchange.  O'Rourke, at Honig's direction, negotiated on Company B's behalf the terms on which the Cybersecurity Innovator would sell CI Company to Company B.  Indeed, in emails after the CI Company acquisition, Honig freely accepted credit for his role in the transaction.  On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on the recent transaction: "You're invovlved [sic] with [Company B]? Impressive!" Honig responded that he was the "[l]argest shareholder, fund and relationship with [the Cybersecurity Innovator]."  In early August 2016, Honig also admitted his undisclosed role at Company B in a chat conversation with Stetson: "its great in [Company B] because we are behind the scenes."

103.     Because they acted in concert for the purpose of acquiring, holding and disposing of Company B shares, each of Honig, Groussman, Brauser, Stetson and O'Rourke was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned.  However, none of Honig, Groussman, Brauser, Stetson or O'Rourke ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of

31

their group's position and their coordination and thereby to deceive investors.

104.    Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his own 6.59% beneficial ownership and falsely stating that the securities "are not held for the purpose of or with the effect of changing or influencing the control of the issuer" – a representation he knew, or was reckless in not knowing, to be false. Indeed, because Honig and his associates exercised control over Company B's management and policies – as Honig candidly acknowledged in emails – he was disqualified from making a 13G filing. In February 2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%. Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership via his entity Grander. In each of these filings, Honig and Brauser also falsely claimed that they were passive investors without any intention to influence or change control of the company and omitted the fact that each was a member of a group.

105.    Similarly, in Company B's 2015 Form 10-K filed on April 11, 2016, only Honig was disclosed as a beneficial owner, holding 8.6%. Notwithstanding that Ladd knew that Honig, Groussman, Brauser, Stetson and O'Rourke were working together, he signed the 2015 Form 10-K failing to disclose their group beneficial ownership. Ladd also signed a materially misleading S-1/A registration statement filed on January 13, 2016 for the 8,400,000 Company B shares issued in the October 2015 Company B Financing, failing to disclose the group beneficial ownership of GRQ, Grander, Melechdavid, ATG and SCI.

### C. The Company C Scheme

#### 1.    *Honig and Stetson Obtain Control of Company C*

106.    In early 2014, Honig identified a publicly-traded shell company that was unencumbered by debt or pre-existing convertible debt, and sought an appropriate private company for purposes of a reverse merger and pump-and-dump scheme.

107.    At or about the same time, the CEO of Company C ("Company C's CEO") was introduced to "Entity H," a frequent co-investor alongside Honig and Brauser.  At the time, Company C, a private company developing cancer therapies and diagnostic products, was looking for funding for its research and development efforts, and Entity H suggested to Company C's CEO that he turn Company C into a public company.  On July 8, 2014, Company C executed a reverse merger of Company C into the shell company Honig had identified.  Company C's CEO understood that the two lead investors in the transaction were Entity H and HSCI, both of which had signed the deal documents.  Stetson had described HSCI to Company C's CEO as his own investment vehicle.  In fact, while Stetson was the sole managing member of HSCI, Honig actually owned at least 94% of HSCI, a fact that Stetson did not disclose to Company C's CEO or the market.

108.    In an initial $3 million capital raise in February 2014, in connection with the contemplated merger, HSCI invested $1 million and Entity H invested $1.7 million in return for a substantial position in the shell. As a result, the stake of Entity H and HSCI (including conversion of all warrants) amounted to about 67% of the authorized shares of the newly public Company C. The terms of the merger included granting a "Consent Right" to Entity H and its affiliates, by which Entity H could block or approve many kinds of Company C transactions, including issuing additional shares, any change of control and other basic corporate actions.

109.    In March and April 2015, Honig orchestrated two private placement financings for Company C: Series D and Series E.  Honig determined the amount, source and structure of, and participants in, these financings.  For example, when deciding whether a potential investor could take part in the March 2015 financing round, Company C's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might

33

want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

110.     The Series D financing closed in late March 2015 and included a buyout of Entity H's notes, including the Consent Right, at a favorable purchase price. The investors who purchased the notes included various entities owned and controlled by Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman: HSCI, Southern Biotech, GRQ, ATG, Grander, and Melechdavid.

111.     The Series E financing, which closed April 6, 2015, included warrants, and raised $12 million for Company C on terms highly favorable to Honig and his chosen investors, including Southern Biotech, and Frost's FGIT and Opko.

## 2.     *The Company C Pump and Dump in April 2015*

112.     One of the goals of the private placement financings, as Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman knew, was to generate market interest in Company C stock in preparation for a planned stock promotion. On April 3, 2015, O'Rourke, acting at Honig's direction, drafted a press release (with input from Company C's CEO, Honig and Brauser) announcing the $12 million private placement in which Frost's entities had participated. Honig then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street Advisors" on *Seeking Alpha* on April 8, 2015 at 11:13 a.m. The article, titled "Opko Spots Another Overlooked Opportunity in Company C Therapeutics," highlighted Opko's and Frost's investment in Company C. Despite his involvement in facilitating the Company C financing and his extensive business relationships with Honig, Stetson, Brauser, and Frost, in his article, O'Rourke knowingly and falsely claimed that "[t]he author has no business relationship with [Company C]." He also knowingly and falsely claimed

that he was "not receiving compensation for [writing the article]."

113. Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG, Melechdavid, and O'Rourke engaged in early trading of Company C shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock. That trading included at least one matched trade, with Melechdavid submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m. The share price of Company C opened that day at $3.14 and reached $3.73 in the minutes before the promotion was released.

114. The promotion was successful. The trading volume of Company C shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement. The volume increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. Company C's share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015. The Defendants listed below, acting pursuant to their agreement to buy, hold or sell their Company C shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million, as detailed below:

| Company C Pump and Dump Proceeds, Following April 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| **Brauser** | 4/13 – 6/30 | (576,400) | $1,600,826.76 |
| **Groussman** and **Melechdavid** | 4/6 – 6/23 | (99,616) | $342,984.59 |
| **Stetson** and **HSCI** | 4/6 – 6/30 | (1,080,379) | $3,607,248.91 |
| **O'Rourke** and **ATG** | 4/8 – 6/30 | (30,064) | $69,744.51 |
| **Total** | | **(1,786,459)** | **$5,620,804.77** |

### 3. *The Company C Pump and Dump in June/July 2015*

115. In June 2015, when the market for Company C shares had cooled, O'Rourke recruited Ford to publish another Company C tout on Ford's blog. On July 1, 2015, Ford published an article titled "[Company C]: Near-Term Catalysts Could Push Shares from $2 to

over $5." The article contained materially false statements, including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were in early stages. Although, as before, Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid.

116.    Ford's article had the desired impact on the market: Company C trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise Company C's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015. Pursuant to their agreement to buy, hold or dispose of their shares in concert, the Defendants listed below sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million, as detailed below.

| Company C Pump and Dump Proceeds, Following June 2015 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2015)** | **Net Quantity Sold** | **Proceeds** |
| **Brauser** | 7/1 – 10/7 | (363,050) | $749,025.45 |
| **Groussman** and **Melechdavid** | 7/15 – 12/18 | (212,034) | $243,250.96 |
| **Stetson** and **HSCI** | 7/1 – 12/7 | (682,539) | $1,525,588.49 |
| **O'Rourke** and **ATG** | 7/1 – 12/31 | (179,690) | $235,253.20 |
| **Total** | | **(1,437,313)** | **$2,753,118.10** |

117.    Honig and Stetson continued to invest in Company C and directed critical business choices for Company C. For example, on more than one occasion, Honig or Stetson directed Company C's CEO to name Honig's choice to Company C's board. On January 15, 2015, Honig and Stetson decided that Company C needed to employ different attorneys and shortly thereafter directed Company C's CEO which counsel to retain in connection with Company C's corporate filings. And on August 15, 2016, at Honig's and Stetson's direction, as a condition to HSCI providing additional financing to Company C, HSCI and Company C's CEO executed a letter agreement requiring Company C to hire the public relations firm that Honig and Stetson had selected.

### 4.    *False Beneficial Ownership Reports by Honig and Associates*

118.    Given the agreement among Honig, Brauser, Groussman, Frost, Stetson, and O'Rourke to buy, hold and/or dispose of their Company C shares in concert; the group's direction of Company C management and policies; and their combined share ownership, all of the members of the group were required to make Schedule 13D filings that they did not make. They did not make the appropriate filings so that the investing public would not discover their control over Company C, and to obscure from investors their planned pump-and-dump scheme.

119.    Stetson and HSCI were obligated to make a Schedule 13D filing as of July 2014, after Company C became public and they acquired beneficial ownership of more than 5% of Company C shares.  Similarly, as of the closing of the private placement financings in April 2015, Groussman (Melechdavid) and O'Rourke (ATG) were each obligated to make a Schedule 13D filing, disclosing their own respective holdings and that each was a member of the group because they were acting with one another and with Stetson, Honig, and Frost for the purpose of acquiring, holding or disposing of Company C shares, and collectively owned greater than 5% of Company C's outstanding shares.

120.    Even though Frost and FGIT acquired the Company C shares with an intention to control management, Frost and FGIT made a Schedule 13G filing on April 10, 2015 incorrectly indicating that they were passive investors.  Moreover, the Schedule 13G stated that Frost and FGIT had a 6.86% ownership percentage, and did not disclose they were working with Honig, Stetson, O'Rourke, Brauser, and Groussman, and that they, with the other members of their group, sought to direct and control management.  Nor did Frost file a Schedule 13D for Opko or Southern Biotech, in which those companies should have disclosed both their own holdings and that they, too, were each a member of the group.  Instead, Frost improperly made

four Schedule 13G/A filings on April 10, 2015, February 8, 2016, February 3, 2017, and January 18, 2018, ignoring the fact that he was ineligible to file a Schedule 13G because he was not a passive investor.

121.     Other Defendants who invested in Company C also improperly made Schedule 13G filings, notwithstanding that these Defendants were not passive investors, and also failed to disclose their membership in the group, in violation of an express disclosure requirement.  For example, Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership through GRQ; Stetson filed a Schedule 13G on September 19, 2017, disclosing only his 5.64% ownership through HSCI, Brauser filed a Schedule 13G on February 2, 2017, disclosing only his 5.44% ownership through Grander.  Each of these Defendants should have made Schedule 13D filings because they were not passive investors, and each should have disclosed the existence of a group.  Additionally, a Schedule 13D filed by Stetson on February 12, 2018, a Schedule 13D filed by Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16, 2018 also failed to disclose the existence of a group.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza)**

122.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

123.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company

C securities, have: (a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon any person.

124.    By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, GRQ,

Grander, HSCI, and Maza, directly or indirectly, singly or in concert, violated Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
**Violations of Section 17(a)(1)-(3) of the Securities Act**
**(Against Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza)**

125.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

126.    By engaging in the acts and conduct described in this Complaint, Defendants

Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, directly or indirectly,

singly or in concert, by use of the means or instruments of transportation or communication in

interstate commerce, in the offer or sale of Company A, Company B, and/or Company C

securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; (b)

knowingly, recklessly or negligently obtained money or property by means of any untrue

statements of a material fact or omitted to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

or (c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon purchasers of securities of

Company A, Company B, and/or Company C.

127.     By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

### THIRD CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Frost, FGIT, Ford, Ladd, and Keller)**

128.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

129.     By engaging in the acts and conduct described in this Complaint, Defendants Frost, FGIT, Ford, Ladd, and Keller, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.     By reason of the foregoing, Frost, FGIT, Ford, Ladd, and Keller, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### FOURTH CLAIM FOR RELIEF
**Violations of Section 17(a)(2) of the Securities Act**
**(Against Frost, FGIT, Ford, Ladd, and Keller)**

131.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

132.     By engaging in the acts and conduct described in this Complaint, Defendants

Frost, FGIT, Ford, Ladd, and Keller, knowingly, recklessly or negligently, directly or indirectly, singly or in concert,  by use of the means or instruments of transportation or communication in interstate commerce,  in the offer or sale of Company A, Company B, and/or Company C securities, have obtained money or property by means of any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

133.    By reason of the foregoing, Frost, FGIT, Ford, Ladd, and Keller, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FIFTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Against ATG, Southern Biotech, and SCI)

134.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

135.    By engaging in the acts and conduct described in this Complaint, Defendants ATG, Southern Biotech, and SCI, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

136.    By reason of the foregoing, ATG, Southern Biotech, and SCI, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

41

## SIXTH CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (Against ATG, Southern Biotech, and SCI)

137.      The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

138.      By engaging in the acts and conduct described in this Complaint, Defendants

ATG, Southern Biotech, and SCI directly or indirectly,  singly or in concert, by use of the means

or instruments of transportation or communication in interstate commerce,  in the offer or sale of

Company A, Company B, and/or Company C securities, have (a) with scienter, employed

devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in

transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon purchasers of securities of Company A, Company B, and/or Company C.

139.      By reason of the foregoing, ATG, Southern Biotech, and SCI, directly or

indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined,

will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)

and (3)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section
### 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder
### (Against Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller)

140.      The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

141.      By engaging in the acts and conduct described in this Complaint, Defendants

Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller directly or indirectly, singly or

in concert, provided knowing and substantial assistance to Honig, Stetson, Brauser, and

O'Rourke, who, directly or indirectly, singly or in concert with others, in connection with the

42

purchase or sale of a security, with scienter, used the means or instrumentalities of interstate

commerce or of the mails or of a facility of a national securities exchange to (a) employ devices,

schemes, or artifices to defraud; and (b) engage in acts, practices, or courses of business which

operated or would operate as a fraud or deceit upon others.

142.　By reason of the foregoing, Frost, Groussman, FGIT, Melechdavid, Opko,

Ladd, and Keller, aided and abetted, and unless restrained and enjoined, will continue aiding and

abetting, Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-

5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 17(a)(1) and (3) of the Securities Act
(Against Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller)**

143.　The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

144.　By engaging in the acts and conduct described in this Complaint, Defendants

Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller directly or indirectly, singly or

in concert, provided knowing and substantial assistance to Honig, Stetson, Brauser, and

O'Rourke, who, directly or indirectly, singly or in concert with others, in the offer or sale of a

security, used the means or instruments of transportation or communication in interstate

commerce or used the mails to (a) with scienter employed devices schemes, and artifices to

defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses

of business which operated or would operate as a fraud or deceit upon purchasers of securities of

Company A, Company B, and/or Company C.

145.　By reason of the foregoing, Frost, Groussman, FGIT, Melechdavid, Opko,

Ladd, and Keller, aided and abetted, and unless restrained and enjoined, will continue aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## NINTH CLAIM FOR RELIEF
### Violations of Section 9(a)(1) of the Exchange Act
### (Against Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid)

146.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

147.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid, directly or indirectly, singly or in concert , by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange for the purpose of creating a false or misleading appearance of active trading in Company A, Company B and/or Company C securities, or a false or misleading appearance with respect to the market for Company A, Company B and/or Company C securities, entered an order or orders for the purchase and/or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale and/or purchase of such security, had been or would be entered by or for the same or different parties.

148.     By virtue of the foregoing, Honig, Stetson, Brauser, O'Rourke, Groussman, ATG, and Melechdavid violated, and unless restrained and enjoined, will continue violating Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

### TENTH CLAIM FOR RELIEF
#### Violations of Section 9(a)(2) of the Exchange Act
#### (Against Honig, O'Rourke, and ATG)

149.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

150.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, O'Rourke, and ATG, directly or indirectly, singly or in concert , by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange effected, alone or with one or more other persons, a series of transactions in the securities of Company A and/or Company B creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

151.     By virtue of the foregoing, Honig, O'Rourke, and ATG violated, and unless restrained and enjoined, will continue violating Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

### ELEVENTH CLAIM FOR RELIEF
#### Sale of Unregistered Securities in Violation of Sections 5(a) and (c) of the Securities Act
#### (Against Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha)

152.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

153.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer or sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate

45

commerce, by means or instruments of transportation, securities for the purpose of sale or for

delivery after sale, when no registration statement had been filed or was in effect as to such

securities, and when no exemption from registration was applicable.  The shares of Company A

that Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha offered and sold as

alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

154.     By reason of the foregoing, Honig, Brauser, Groussman, Frost, Grander,

Melechdavid, and Alpha have violated and unless restrained and enjoined will continue to violate

Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

### TWELTH CLAIM FOR RELIEF
**Violations of Section 13(d) of the Exchange Act and Rule 13d-1(a) Thereunder
(Against Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ,
Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI)**

155.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

156.     Pursuant to Exchange Act Section 13(d)(1) and Rule 13d-1(a) thereunder,

persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-

registered class of equity securities are required to file a Schedule 13D, or, in limited

circumstances, a Schedule 13G. Section 13(d)(3) plainly states that "act[ing] as a … group" in

furtherance of acquiring, holding, or disposing of equity securities is enough to establish the

group as a single "person." When a group is required to make a Schedule 13D filing, that group

must "identify all members of the group."

157.     Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, ATG, GRQ,

Grander, Melechdavid, and SCI acquired and held beneficial ownership of more than 5% shares

in Company B from on or about October 8, 2015 to at least on or about May 20, 2016.

158.     Honig, Stetson, and HSCI acquired and held beneficial ownership of more than

5% shares in Company C from on or about February 2014.

159.    Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about April 2015 to at least on or about December 2015.

160.    Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI were sufficiently interrelated that they constituted a group for the purposes of Exchange Act Section 13(d).

161.    By engaging in the acts and conduct described in this Complaint, Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the Company B and Company C securities, and failed to do so.

162.    By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI violated, and unless enjoined and restrained will continue to violate, Section 13(d)(1) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

### THIRTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 13(a) of the Exchange Act and
Rules 12b-20 and 13a-1 Thereunder
(Against Ladd)**

163.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

164.    By engaging in the acts and conduct described in this Complaint, Company B violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. §

240.12b-20] and 13a-1 [17 C.F.R. § 240.13a-1(a)] thereunder, which require issuers of registered securities under the Exchange Act to file annual reports on Form 10-K with the Commission that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the required statements, in the light of the circumstances under which they are made, not misleading.

165.     By engaging in the acts and conduct described in this Complaint, Defendant Ladd provided knowing and substantial assistance to Company B's filing of a materially false and misleading annual report on Form 10-K.

166.     By reason of the foregoing, Ladd aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1(a) thereunder [17 C.F.R. § 240.13a-1(a)], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### FOURTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 15(d) of the Exchange Act and
Rule 15d-1 Thereunder
(Against Maza and Keller)**

167.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

168.     By engaging in the acts and conduct described in this Complaint, Company A violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1], which require issuers of registered securities under the Securities Act to file annual reports on Form 10-K with the Commission that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the required statements, in the light of the circumstances under which they are made, not

misleading.

169.    By engaging in the acts and conduct described in this Complaint, Defendants

Maza and Keller provided knowing and substantial assistance to Company A's filing of a

materially false and misleading annual report on Form 10-K.

170.    By reason of the foregoing, Maza and Keller aided and abetted, and unless

restrained and enjoined, will continue aiding and abetting, Company A's violations of Section

15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. §

240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## FIFTEENTH CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act
### (Against Ford)

171.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

172.    By engaging in the acts and conduct described in this Complaint, Defendant

Ford directly or indirectly, singly or in concert,  by use of the means or instruments of

transportation or communication in interstate commerce, or by the use of the mails, in the offer

or sale of Company A, and/or Company C securities, has published, given publicity to, or

circulated any notice, circular, advertisement, newspaper, article, letter, investment service, or

communication which, though not purporting to offer a security for sale, described such security

for a consideration received or to be received, directly or indirectly, from an issuer, underwriter,

or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration

and the amount thereof.

173.    By reason of the foregoing, Ford, directly or indirectly, has violated, is

violating, and unless restrained and enjoined, will continue to violate Section 17(b) of the

Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Honig, Brauser, Frost, Groussman, Grander, Melechdavid, and Alpha, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### III.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, Ladd, Maza, Keller, Ford, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### IV.

Permanently restraining and enjoining Ford, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

### V.

Permanently restraining and enjoining Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

### VI.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, Ladd, Maza, Keller, Ford, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### VII.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or

51

otherwise, and each of them, from future violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)];

## VIII.

Permanently restraining and enjoining Ladd, his respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1];

## IX.

Permanently restraining and enjoining Maza and Keller, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting future violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1];

## X.

Permanently barring Ladd, Maza and Keller from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## XI.

Permanently prohibiting all Defendants from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## XII.

Ordering Defendants to disgorge all of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay prejudgment interest thereon;

## XIII.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

## XIV.

Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury as to all issues so triable.

Dated:  September 7, 2018
         New York, New York

By:    *Sanjay Wadhwa*
       _____
       Sanjay Wadhwa
       Michael Paley
       Charu Chandrasekhar
       Nancy Brown
       Katherine Bromberg
       Jon Daniels
       Attorneys for Plaintiff
       SECURITIES AND EXCHANGE COMMISSION
       New York Regional Office
       200 Vesey Street, Suite 400
       New York, New York 10281-1022
       (212) 336-1023 (Brown)
       Email: BrownN@sec.gov