```
     J5FTSECC

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     SECURITIES AND EXCHANGE
 3   COMMISSION,

 4              Plaintiff,
             v.                              18 CV 8175 (ER)
 5
     BARRY C. HONIG, et al.,
 6
                Defendants.
 7   ------------------------------x
                                             May 15, 2019
 8                                           10:30 a.m.

 9   Before:
                        HON. EDGARDO RAMOS,
10
                                             District Judge
11
                             APPEARANCES
12
     SECURITIES AND EXCHANGE COMMISSION
13        Attorneys for Plaintiff
     BY:  NANCY BROWN
14        KATHERINE BROMBERG
          JON DANIELS
15
     SIMPSON THACHER & BARTLETT
16        Attorneys for Defendant Honig
     BY:  ANAR PATEL
17
     MILBANK
18        Attorneys for Defendant Stetson
     BY:  ADAM FEE
19
     RICHARD & RICHARD
20        Attorneys for Defendant Brauser
     BY:  DENNIS RICHARD
21
     ORRICK, HERRINGTON & SUTCLIFFE
22        Attorneys for Defendant O'Rourke
     BY:  GREGORY MORVILLO
23        NICOLE LLORET

24   COOLEY
          Attorneys for Defendant Ladd
25   BY:  RANDALL LEE
          MICHAEL BERKOVITZ
```

        (Case called)

        THE COURT:  Good morning to you all.  This matter is on for an initial conference.

        Ms. Brown, it's been a while since this was case filed, but why don't you give me, in a nutshell, what this case is about.

        MS. BROWN:  Well, your Honor, this case was filed, as you know, in September of 2018 against 20 defendants.  It encompasses allegations of three pump and dumps with respect to three different companies.  They are named as Company A, Company B, and Company C in the complaint, but I'm free to tell you that they are BioZone Pharmaceuticals, MGT Investments, and MabVax Therapeutics.

        THE COURT:  What's that third one?

        MS. BROWN:  MabVax, M-A-B-V-A-X.

        And we allege that over a period between 2010 and 2016 the defendants engaged in schemes to inflate the price of the securities.  They gained undisclosed control over companies, amassed millions of shares of securities, then engaged a promoter or promoters to publicize in a false and misleading way the rosy prospects of these issuers, and then cashed out when the price and the volume of the securities rose.  And we allege that that happened five times, two with respect to MabVax, two with respect to MGT Investments, and one with respect to BioZone.  We allege that they made millions of

1  dollars in these endeavors, and they violated numerous
2  provisions of the federal securities laws in doing so.
3      I think we're here today to talk about a discovery
4  schedule, and I'm happy to proceed there or give you more color
5  on the complaint.  I can tell you the status of various
6  settlements if that --
7      THE COURT:  Why don't you do that.  More than half of
8  this case or half of the defendants are gone at this point,
9  right?
10     MS. BROWN:  Either completely or partially.  So we
11 have three defendants with whom we have entered into partial
12 settlements by which they have consented to the imposition of
13 injunctive relief, monetary relief remains.  We will determine
14 that at a later point, usually at the end of the case,
15 hopefully on further consent and not for the motion practice.
16     We have also settled with numerous defendants
17 completely, so I think a total of nine out of the first 20 have
18 been settled either partially or completely.  They include
19 Mr. Groussman and his company, Dr. Frost and his two companies,
20 and various associated entities.
21     So now we would like to move into discovery.  We're
22 happy to do that.  We have proposed a schedule, the defendants
23 have proposed a different schedule.  Some of the defendants
24 agree with all of defendant Ladd's schedule and some do not.
25     THE COURT:  As I understand it, everyone agrees that

1   April 1 of 2020 is the cut-off date, correct?

2           MS. BROWN:  I believe actually defendant Ladd's last
3   proposal has an April 30 cut-off.  I think the two main issues
4   for discussion this morning are the timing of written
5   discovery, by which I mean interrogatories and requests to
6   admit.  The Commission believes after years of practice in this
7   area that those kinds of discovery should await the end of the
8   fact discovery period, and I'm happy to expand on that
9   position.

10           With respect to the other item that I think is up for
11  discussion is the postponement of the defendants' depositions.
12  The defendant Ladd's proposal has the defendants available for
13  deposition only in a three-week period at the end of fact
14  discovery, and we think that's inappropriate.  We think that
15  the defendants' depositions should be available as soon as the
16  document discovery is completed, which we anticipate will
17  happen very, very soon, and we don't see any reason for delay.
18  And frankly, defendants have offered none except that they want
19  to be better educated about our case.  I mean I understand that
20  position, but I don't think that's a reason to restrict the
21  depositions of the defendants.

22           THE COURT:  Why is it that you want to hold off on
23  turning over documents until later, or is has that issue been
24  resolved?

25           MS. BROWN:  I think that issue has been resolved.  We

1   have agreed with defendant Ladd and defendant Brauser to
2   respond to their requests in 30 days from the issuance of those
3   requests, which is in May.  So we will do that.
4         We had originally proposed, because the original
5   proposal required us to turn over documents at the same time we
6   were responding to motions to dismiss, and we simply proposed
7   what we thought was reasonable, which was to delay it until at
8   least our oppositions were filed.
9         Since that time Ladd and Brauser have both served
10  document requests, we have also served document requests, and
11  so we anticipate that that would go forward.
12        THE COURT:  Okay.  So I will hear from -- who
13  represents Mr. Ladd?
14        MR. LEE:  I do, your Honor.
15        THE COURT:  But before we get to that, I want to give
16  the defendants an opportunity to provide any additional color
17  that you want me to know at this time.  You are under no
18  obligation to revisit anything, but if there's something that
19  you want to put on the record, I'm happy to hear you.
20        MR. FEE:  No, thank you, your Honor.
21        THE COURT:  Seeing none, Mr. Lee, why is it that you
22  want to -- well, what is your position on these various issues,
23  on written discovery and the documents?
24        MR. LEE:  Thank you, your Honor.  First, I am glad to
25  hear from the SEC.  I think all the defendants are glad to hear

that the issue as to when requests for production can be promulgated and when those documents can be produced has been resolved. It has not been entirely clear what the SEC's position is on that, so that's why the Court saw sort of different positions taken up in our letters because there was a lack of transparency from the SEC as to what their position was actually going to be it, dispute numerous requests by us. And that's why I think counsel for at least one of the other parties has maintained the position that document discovery should be deferred, but we believe, obviously, that there is no reason to defer it.

On the issue of written discovery, it's our position that given the complexity of the charges, the number of charges, the number of different statutory provisions that the SEC has cited, which exceeds something like 15 or 20 different alleged statutory violations under various provisions of the securities laws, a number of different players and parties, we believe that written discovery requests, namely requests for admissions and interrogatories, is an appropriate way to try to identify what are truly the disputed issues, what are not, what issues are not disputed, to try to sort of make a discovery more streamlined.

That certainly applies to requests for admission and fact-based interrogatories. With respect to contention interrogatories, I think our position would be the same, that

it is a way of making discovery more streamlined and efficient, given the nature of the charges.

I would also sort -- just to back up for a second, I would like to clarify for the Court that the defendants in this case sort of occupy different roles.  There are a group of defendants who are alleged to have been essentially the orchestrators of the various alleged pump and dump schemes, and then there were the defendants who were charged who are officers of the companies that were allegedly the vehicles for the pump and dump schemes.

Mr. Ladd, my client, is the CEO -- he is currently the CEO of MGT Capital, which is a public company.  The evidence will show it is a longstanding, legitimate, public company with legitimate business interests.  And his role is solely with respect to the allegation that he allowed his company essentially -- he knowingly allowed his company to be used as one of the vehicles for this pump and dump scheme.  So I think it is inaccurate to characterize him as a perpetrator of this sort of broad manipulative scheme, as Ms. Brown has suggested.  So I just wanted to clarify for the Court that Mr. Ladd's position, we submit, is the quite different from some of the other defendants.

Finally, on the issue of depositions, it was not clear to us that the SEC was proposing depositions to occur -- party depositions only after the production of documents was

1  completed.  Certainly we think that's appropriate.  Our
2  proposal structuring and staging the case such that we have
3  document production, requests for admission and interrogatories
4  proceeding at the parties' discretion, everyone will have to
5  decide when they believe it is appropriate and useful to
6  promulgate those, to be followed by non-party depositions and
7  party depositions, at least in my experience is a perfectly
8  sort of logical and conventional way of making sure the
9  evidence has been produced and has been available to all
10 counsel and parties before party depositions start.  That was
11 the simple reason for our proposal.
12         THE COURT:  It certainly seems appropriate to hold off
13 on party depositions until all document and other productions
14 have been completed, but it sounded a little strange to me that
15 they would be confined to a three-week period fairly late in
16 the discovery schedule.
17         So given that the SEC has now agreed that document
18 production can begin immediately, I take it, Mr. Lee, that you
19 no longer stand on that position that it should be held off
20 until after the new year and confined to that three-week
21 period.
22         MR. LEE:  That would certainly address a large part of
23 our concern.  I know that the other defendants joined in our
24 proposal on that point, so I can't speak for all of the
25 defendants, but that would certainly address a big part of our

1    concern.

2              THE COURT:  Does anyone else wish to speak on the
3    topic of depositions?

4              MR. MORVILLO:  Yes, your Honor, Gregory Morvillo.

5              If what we're saying is that party depositions don't
6    take place in the last three weeks, which seems to me to be a
7    tight schedule as well, but we could put them at the end of the
8    depositions.  That would be amenable to Mr. O'Rourke, and that
9    might put them out to the end -- or the beginning of the next
10   year.  If the deadline for the discovery is April 1st or
11   April 30, whatever it's going to be, there's no reason to take
12   those depositions at the beginning, we should take them at the
13   end when we have had an opportunity -- all the defendants have
14   had an opportunity to see everything and know everything.

15             The SEC knows everything.  They have had the
16   opportunity to talk to people and interview people.  They did
17   this whole investigation.  We are behind the eight ball at this
18   point.  We have nothing except the complaint.  So putting our
19   clients at the end, particularly in light of the fact that
20   there's a criminal investigation in San Francisco into the very
21   allegations that has been ongoing, makes sense and is
22   protective of my clients, so I would like to put our clients at
23   the end of process.  It doesn't have to be in a three-week
24   period, but wherever the end is, that's where they should be.
25             THE COURT:  I don't know about this San Francisco

investigation.  Does anyone have any insight they could share with the court?

MR. MORVILLO:  There is a criminal investigation, my understanding was a dual investigation with the SEC and San Francisco, although I wasn't privy to it, obviously.  And the SEC charge, San Francisco continues to investigate, my understanding is they now have a cooperating witness and things have slowed down.  There were tolling agreements in place, those have it expired, but my understanding is the cooperating witness, who is among the defendants in this group, I believe, has started to cooperate, and there may be a criminal case coming down the pike reasonably shortly.

If that's the case, and one or more of our clients get indicted, you can bet we'll be back asking for a full stay. But in the meantime, while San Francisco drags its feet on this, we don't think it's appropriate for the SEC to act as a stalking horse for the U.S. Attorney's Office.  I'm not suggesting that that is what they would want to do, I'm not suggesting that's what the plan is or I mean to cast no aspersions on Ms. Brown and the SEC, I just want a situation to evolve where my client is potentially under investigation and the SEC is taking his deposition and he is forced either to take the Fifth or give it, and then they give the deposition to San Francisco.  So I would like to avoid any of these possibilities if we can.

1            THE COURT:  Okay.

2            MS. BROWN:  Your Honor, may I be heard on that last
3    point?

4            THE COURT:  Absolutely.

5            MS. BROWN:  I'm sorry to interrupt.  I hoped that one
6    of the defendants would offer to the Court the information that
7    there is a parallel criminal investigation.  It's not a dual
8    investigation, it's a parallel investigation.

9            Because I think what defendants are trying do here,
10   and particularly by putting the depositions of the parties at
11   the end, is to get all the benefits of discovery and have none
12   of the obligations of discovery.  For example, you will see in
13   the 26(f) report that was filed with the Court there's a
14   reference to my request that the defendants let us know if they
15   will assert an active production privilege, because if they
16   are, it seems to us completely unfair that we would have to
17   turn over documents and yet the defendants would rely on their
18   active production privilege to withhold documents from us.

19           So I am happy to proceed with discovery.  I told
20   defendants that, they attached one of my emails which said I
21   was happy to proceed with document discovery, but I don't think
22   it's fair for us to be the only providers of discovery and the
23   defendants could sit back and enjoy the benefits of that.
24   That's just not the way that litigation is conducted in this
25   district.

1    THE COURT:  But you have issued the requests for
2    production of the documents to defendants, correct?
3    MS. BROWN:  Yes.
4    THE COURT:  And I take it that you have not heard as
5    of yet whether or not they intend to interpose any privilege.
6    MS. BROWN:  Correct, I have not.
7    THE COURT:  Okay.  Does anyone wish to make a
8    statement on the record as to whether they will or will not be?
9    Not holding you to it.
10   MR. RICHARD:  Your Honor, Dennis Richard for
11   Mr. Brauser.
12   We're not prepared to make a definitive statement,
13   however, we do not believe we will be asserting an active
14   production privilege.  And given that, if there is one or two
15   or three defendants that do not, what we're looking for here --
16   the parties have exchanged initial disclosures just days ago --
17   is to go ahead and exchange initial disclosures even before the
18   response date of -- this has pending for a long time, of the
19   production requests.
20   The SEC has their investigative files that we would
21   like to see.  They asked us if we'll produce emails.  We would
22   like to exchange so that there isn't any:  You got it, you
23   didn't.  And we would like to do that next week or the week
24   after just so we can get this under way, and by then we'll know
25   and be able to confirm we're not asserting any type of

1  production privilege.

2  MR. FEE: Briefly, your Honor, Adam Fee. Just on the
3  last point Ms. Brown made, Mr. Stetson individually I think is
4  still not yet ready to announce his position. There are
5  entities here that could not assert an active production
6  privilege and will not, at least speaking for ourselves.

7  Just with respect to her last point about the
8  unfairness, I think was the word she used, an invocation and
9  one side producing discovery. There is relief the SEC has,
10 obviously, if Mr. Stetson chooses to invoke his Fifth Amendment
11 rights, and that's an adverse inference that the judge could
12 instruct the jury about. I don't think there is case law that
13 would necessarily support the position that the SEC does not
14 need to produce to defendants who choose to invoke. I don't
15 know that she's saying, but I just want to clarify that there
16 is relief available, it's not stopping production.

17 MS. BROWN: Actually there is precedent. Judge Pauley
18 in this district issued an order that required all defendants
19 to participate in discovery who wanted discovery from the SEC
20 in a case that was pending and a parallel criminal
21 investigation was proceeding. So there is precedent for that,
22 and it makes sense to me -- I wonder, if we're not sure about
23 the document production, if we could at least set a date by
24 which the defendants' depositions could go forward.

25 THE COURT: Well, could I ask you, Ms. Brown, are you

1    able to make some estimate of how voluminous the discovery will
2    be?
3             MS. BROWN:  Yes.  So the number I have, and I checked
4    this morning, is that we have about a million documents to
5    produce, slightly over that, but I will say that's not entirely
6    indicative of what we have available because at least half of
7    those documents are actually operating system files, et cetera,
8    that we obtained from a hard drive that was produced to us by
9    the ex-husband of a former MGT Investment employee.
10            THE COURT:  Okay.
11            MS. BROWN:  So I don't think 1.2 really sort of gives
12   you a picture.
13            THE COURT:  So you think it's substantially fewer than
14   1.2 million.
15            MS. BROWN:  I would say about 600,000 documents.
16            MR. MORVILLO:  Do you think we could get the estimate
17   of page number?  One page, that's fine, it's a 50-page
18   document, that's entirely different.
19            MS. BROWN:  That's something that I don't have
20   available.
21            THE COURT:  So 600,000 documents.  Would you be in a
22   position to provide some guidance or index to the defendants as
23   to what documents pertain to what entities or individuals?
24            MS. BROWN:  The way our documents are produced, your
25   Honor, is they come with all sorts of metadata information that

1  allow defendants and anyone, including me, to review the
2  documents with that kind of information.  So for example, one
3  of the things that is provided is the producing party.  So if
4  the producing party is MGT, then you can sort the production by
5  just those documents produced by MGT.  They're all fully
6  searchable.  So if there is a particular word you want to
7  search, you can search that.  They're searchable by date,
8  they're searchable by Bates number, they're searchable in any
9  number of different ways that provides a user with information
10 about the source, the date.
11         THE COURT:  And they're electronic, all these
12 documents?
13         MS. BROWN:  Yes.
14         THE COURT:  And will you be able to produce your files
15 within the 30 days that you received the request?
16         MS. BROWN:  We're working on it.
17         THE COURT:  Okay.  So let me ask the parties --
18         MR. MORVILLO:  Sorry, Judge, I wanted to clarify, is
19 that a "no" on the index?  I think you asked whether there was
20 an index that will be provided to us, and we got, "they're
21 searchable terms."  I'm just trying to get an answer to that
22 question.
23         THE COURT:  I think that was a "no," but Ms. Brown?
24         MS. BROWN:  I don't know what he means by "index."  We
25 can print out the screen shot of who the producing parties are,

1   if that would be the useful.

2            MR. MORVILLO:  That was the Court's word, I was just

3   using what you asked for, and --

4            THE COURT:  I don't think you're going to get a

5   document that says these documents pertain to your client and

6   these documents pertain to others, but it sounds like they're

7   fully searchable, so that should help substantially.

8            Let me ask the parties, if the document discovery

9   proceeds on the current schedule, 30 days from date of

10  production or something close to that, when does it make sense

11  to schedule depositions?  Because obviously I want to give

12  everyone an opportunity to review the documents.  I don't think

13  it has to be until next January, but something early fall,

14  September, maybe?

15           MS. BROWN:  I was thinking right after Labor Day, your

16  Honor.

17           THE COURT:  That seems to make sense to me.  So why

18  don't we do that, why don't we start depositions first week of

19  September after Labor Day.

20           And with respect to the written discovery,

21  interrogatories, et cetera, I am inclined to proceed under the

22  local rule.  I know Mr. Lee has pointed out to me that I have

23  allowed parties to stray from that rule on a couple of

24  occasions, but that's two or three of several thousand cases

25  that I presided over.  The rule seems to work just fine.  And

obviously, everyone still needs to get their feet wet with respect to -- at least on the defense side, with respect to the discovery. I wouldn't want parties to prematurely put any position on the line that they would have to change later on. So we will abide by the Local Rule 33.3.

I think that takes care of the discovery issues. Is there a controversy concerning April 1 versus April 30?

MS. BROWN: Yes.

MR. LEE: Your Honor, we proposed April 30. We believe given the number of parties, number of claims, number of documents, whether 600,000 documents or a million documents it will be a multiple of that in terms of pages. We propose April 30.

THE COURT: That makes sense. That's reasonable. So the cut-off for discovery will be April 30.

MR. LEE: Your Honor, just to clarify with respect to the local rule, does the Court's ruling apply to requests for admission as well?

THE COURT: Yes. By the way, these are the deadlines now, but from my perspective, as long as we keep the April 30 date, if you guys agree among yourselves to move those dates one way or the other, that does not matter to me. You are free to do that on consent.

MS. BROWN: I think we will have to because I know the April 30 date does to the interim dates, so we'll have to

1 confer and figure that out.

2 MR. LEE: One more question or clarification, all of
3 this, I think at least in terms of our ability to be prepared,
4 assumes that the SEC will be producing their documents if not
5 on the 30th day very close to 30th day. I know Ms. Brown said
6 they're working on it. That was somewhat vague, from our
7 perspective.

8 THE COURT: Yes, somewhat vague, but again, I'm
9 assuming that they will produce it within 30 days or sometime
10 shortly thereafter. If any of these dates become a problem and
11 you need to come back to me, just come back to me. Okay?

12 And with that guidance, can I ask the parties to
13 prepare a final version of the discovery schedule that I could
14 sign off on?

15 MR. LEE: Yes, your Honor.

16 MR. MORVILLO: Did you decide when the parties are
17 going to be deposed amid the depositions?

18 THE COURT: Well, depositions can start in the fall,
19 and if the parties are ready to be deposed the parties could be
20 deposed. If they notice your client, presumably they could be
21 deposed. I am not going to put them off at the end.

22 MS. BROWN: Thank you, your Honor.

23 THE COURT: By the end of the day today, business
24 today, you can submit that final discovery order.

25 Anything else that we need to do? Sir?

J5FTSECC

1  MR. RICHARD:  Yes, your Honor.  The Court recently
2  adjourned the briefing schedule on motions to dismiss with
3  motions due on June 19, and the order actually says shall be
4  filed on June 19, and then another part said by.  And the
5  reason I'm asking this question is because my client at least
6  wants to put his position on the record publicly through a
7  motion to dismiss, and if we filed it earlier, I understand
8  that they don't have to respond until a month later.
9  THE COURT:  You're free to file it today.
10  MR. RICHARD:  Thank you.
11  THE COURT:  Okay.  Unless there's anything else, we're
12  adjourned.
13  (Adjourned)