UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━━━━━━━━━━━x

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-- against --                                  **Case No. 18-civ-08175-ER**

BARRY C. HONIG, et al.,

Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━━━x


**DEFENDANTS MICHAEL BRAUSER AND GRANDER HOLDINGS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
<u>FIRST AMENDED COMPLAINT</u>**

James D. Sallah, *Pro Hac Vice*        Dennis A. Richard, *Pro Hac Vice*
SALLAH ASTARITA COX LLC                RICHARD AND RICHARD, P.A.
3010 N. Military Trail                 Tower III, Suite 1748
Suite 210                              825 Brickell Bay Drive
Boca Raton, FL  33431                  Miami, FL  33131
T:  (561) 989-9080                     T: (305) 374-6688
F:  (561) 989-9020                     F: (305) 374-0384

Dated: June 19, 2019

# TABLE OF CONTENTS

I.     SECURITIES FRAUD CLAIMS MUST BE PLEADED WITH PARTICULARITY – EVEN BY THE SEC ................................................................................................ 1

II.    THE SEC FAILS TO ALLEGE WITH PARTICULARITY THAT BRAUSER VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (COUNT I), SECTION 17(a) OF THE SECURITIES ACT (COUNT II), AND SECTION 9(a) OF THE EXCHANGE ACT (COUNT IX) ................................................. 3

   A.  Company A's Alleged "Pump and Dump" ........................................................... 5

     1.  Misleading Promotion ................................................................................ 5

     2.  Manipulative Trading ................................................................................ 6

   B.  Company B's Alleged "Pump and Dump" ........................................................... 8

     1.  Misleading Promotion ................................................................................ 8

     2.  Manipulative Trading ................................................................................ 9

   C.  Company C's Alleged "Pump and Dump" ......................................................... 10

     1.  Misleading Promotion .............................................................................. 10

     2.  Manipulative Trading .............................................................................. 11

III.   THE SEC FAILS TO ADEQUATELY PLEAD THAT BRAUSER VIOLATED SECTION 13(d) AND RULE 13(d)-1(a) (COUNT XII) ................................................. 11

IV.   THE SEC FAILS TO ADEQUATELY PLEAD THAT BRAUSER VIOLATED SECTIONS 5(a) AND (c) OF THE SECURITIES ACT (COUNT XI) ........................... 16

V.    DISMISSAL OF THE SEC CLAIMS AGAINST BRAUSER SHOULD BE WITH PREJUDICE OR, ALTERNATIVELY, ONLY ALLOW A THIRD "BITE AT THE APPLE" ................................................................................................................. 18

CONCLUSION ................................................................................................................. 20

## Cases

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87 (2d Cir. 2007) ............................... 1, 2, 19

*Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) ...................... 4

*Cohen v. Stevanovich*, 722 F.Supp. 2d 416 (S.D. NY 2010); ................................................ 2, 9, 10

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F.Supp. 2d 169, 175 (S.D.N.Y. 2000) ................................................................................................................ 15

*IBEW Local v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 WL 1223844 (S.D.N.Y. 2013) ................................................................................................................ 4

*In re Blech Sec. Litig.*, 928 F.Supp. 1279 (S.D.N.Y.1996) .................................................... 1, 19

*In re Galectin Therapeutics, Inc. Securities Litigation*, 843 F.3d 1257 (11th Cir. 2016) ............. 4

*In re Urcarco Sec. Litig.*, 148 F.R.D. 561 (N.D.Tex.1993) .................................................... 3

*Kelly v. L.L. Cool J.*, 145 F.R.D. 32 (S.D.N.Y.1992) ........................................................... 2

*Log On America, Inc. v. Promethean Asset Mgmt., L.L.C.*, 223 F. Supp. 2d 435 (S.D.N.Y. 2001) ................................................................................................................ 15

*Management Assistance, Inc. v. Edelman*, 584 F.Supp. 1016 (S.D. NY 1984).............................. 2

*Rich v. Maidstone Financial, Inc.*, No. 98 CIV 2569 (DAB), 2001 WL 286757, *3 (S.D.N.Y 2001) ................................................................................................................ 2, 3, 20

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ............................................................... 3, 18, 19

*S.E.C. v. Blackburn,* No. CIV 15-2451, 2007 WL 5307424 at *5 (E.D. La. Sept. 10, 2015) ................................................................................................................ 3

*S.E.C. v. Collins,* 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ...................................................... 2

*S.E.C. v. DiMaria*, 207 F. Supp 3d 343 (S.D.N.Y. 2016)....................................................... 1

*S.E.C. v. Madsen*, No. 17-CV-8300 (JMF), 2018 WL 5023945 (S.D.N.Y. 2018) ...................... 3, 4

*S.E.C. v. National Banker Life Ins. Co.*, 324 F. Supp. 189 (N.D. Tex. 1971) ............................. 16

*Segal v. Gordon,* 467 F.2d 602,608 (2d Cir. 1972) .............................................................. 15

*Spier v. Erber*, 1990 WL 71502, at *10 n. 8 (S.D.N.Y. May 24, 1990)....................................... 20

*Trans World Corp v. Odyssey Partners*, 561 F.Supp. 1315, 1320 (S.D.N.Y. 1983)..................... 15

*U.S. ex rel. Clausen v. Lab Corp. of Am.*, 290 F.3d 1301 (11th Cir. 2002)................................... 2

Defendants, Michael Brauser and Grander Holdings, Inc. ("Brauser"), move to dismiss Plaintiff's First Amended Complaint ("FAC") against Brauser, Counts I, II, IX, XI and XII (ECF No. 105), for failure to state a claim upon which relief can be granted under Rules 8, 9(b) and 12(b)(6), Federal Rules of Civil Procedure.

### Summary of Argument

The claims of the Plaintiff, Securities and Exchange Commission ("SEC"), against Brauser – under Section 10(b) of the Exchange Act and Rule 10b-5 (Count I), Section 17(a) of the Securities Act (Count II), Section 9(a) of the Exchange Act (Count IX), Sections 5(a) and (c) of the Securities Act (Count XI) and Section 13(d) of the Exchange Act (Count XII) – are legally insufficient.   The SEC's fraud claims fail to meet the heightened pleading requirements of Rule 9(b).   To the extent the SEC is pleading non-fraud claims they fail to meet the pleading requirements of Rules 8 and 12(b)(6) as they lump multiple defendants together and are pleaded in a conclusory fashion.

## I.    SECURITIES FRAUD CLAIMS MUST BE PLEADED WITH PARTICULARITY – EVEN BY THE SEC

The SEC is subject to the same heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b) as are all other plaintiffs.  *See S.E.C. v. DiMaria*, 207 F. Supp 3d 343, 352-53 (S.D.N.Y. 2016) (dismissing SEC securities fraud claims against one of two defendants for failure to "meet the particularity standard under Rule 9(b)"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 102 (2d Cir. 2007) ("[A] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants.") (citing *In re Blech Sec. Litig.*, 928 F.Supp. 1279, 1291 (S.D.N.Y.1996).  Indeed, the Second Circuit holds:

> Securities fraud claims are subject to heightened pleading requirements
> that the plaintiff must meet to survive a motion to dismiss . . . [A]

complaint alleging securities fraud must satisfy Rule 9(b), which requires that "the circumstances constituting fraud . . . shall be stated with particularity," Fed.R.Civ.P. 9(b).

*ATSI Communs.,* 493 F.3d 87 (2d Cir. 2007).  Furthermore, securities fraud claims extend "only to persons who actually made the material misstatements or employed deceptive devices." *S.E.C. v. Collins,* 524 F. Supp. 2d 477, 486 (S.D.N.Y. 2007).

The particularity requirement applies to SEC fraud claims under Exchange Act Section 10(b) and Rule 10b-5, Securities Act Section 17(a), Exchange Act Sections 9(a) and 13d.  *Id.* at 484-487, 490; *Cohen v. Stevanovich*, 722 F.Supp. 2d 416, 424 (S.D. NY 2010); *Management Assistance, Inc. v. Edelman*, 584 F.Supp. 1016, 1018 (S.D. NY 1984).

"The 'particularity requirement' contained in Rule 9(b) is substantial."  *Rich v. Maidstone Financial, Inc.*, No. 98 CIV 2569 (DAB), 2001 WL 286757, *3 (S.D.N.Y 2001) (dismissing complaint pursuant to Rule 9(b) and Rule 12(b)(6)).  "[A] complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements."  *Id.* at *4 (quoting *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 38 (S.D.N.Y.1992)) (internal citation omitted).

As is the case here, where the FAC includes allegations against multiple defendants, "[t]he courts are especially vigilant in applying Rule 9(b)." *Id.* at *6.  "A complaint may not simply 'clump defendants together in vague allegations' to meet the pleading requirements of Rule 9(b)."  *Id.*  (dismissing complaint which "impermissibly lumps all of the Defendants together." *Id.* at *9) (quoting *Blech Securities Litigation*, 928 F.Supp. at 1294) (internal brackets omitted).

One of the purposes of Rule 9(b) is to guard against "guilt by association." *U.S. ex rel. Clausen v. Lab Corp. of Am.*, 290 F.3d 1301, 1308 (11th Cir. 2002).  For this reason, general allegations that "lump all defendants

2

together, failing to segregate the alleged wrongdoing of one from those of
another," do not satisfy Rule 9(b). *In re Urcarco Sec. Litig.*, 148 F.R.D.
561, 569 (N.D.Tex.1993).

*S.E.C. v. Blackburn,* No. CIV 15-2451, 2007 WL 5307424 at *5 (E.D. La. Sept. 10, 2015).

The FAC is rife with such "clumping" allegations. *See*, *e.g.*, *FAC* p. 3, ¶ 3 ("Honig *and his associates* needed to . . . ." and "Honig *and his associates* would arrange . . . .") (emphasis added); *id.* at p. 4, ¶ 6 ("at the direction of Honig *and his confederates* . . . .") (emphasis added). As has been explicitly stated by this Court, when "fraud is alleged against multiple defendants, a plaintiff must set forth separately, the acts complained of by each defendant." *Rich*, 2007 WL 286757 at *6.

The particularity requirement of Rule 9(b) additionally serves to "prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (dismissing fraud claims for failure to meet the heightened pleading standard of Rule 9(b)) (internal citation omitted).

## II. THE SEC FAILS TO ALLEGE WITH PARTICULARITY THAT BRAUSER VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (COUNT I), SECTION 17(a) OF THE SECURITIES ACT (COUNT II), AND SECTION 9(a) OF THE EXCHANGE ACT (COUNT IX)

There is a missing link in the SEC's claims of "pump and dump" schemes against Brauser. Basically, the SEC claims that Brauser was one of several defendants who participated in alleged "pump and dump" schemes with respect to three public companies, which are denominated in the FAC as "Company A", "Company B", and "Company C". *See FAC*, p. 2, ¶ 1 (ECF No. 105). A "pump and dump" scheme involves artificially inflating the price of owned stock through false and misleading positive statements to sell the cheaply purchased stock at a higher price. Critical to a claim alleging a "pump and dump" scheme is the "pump". *See S.E.C.*

*v. Madsen*, No. 17-CV-8300 (JMF), 2018 WL 5023945, * 3 (S.D.N.Y. 2018).  Here, however, the SEC's one-hundred-page pleading fails to include even one specific instance of Brauser's alleged "manipulative trading and/or paid promotional activity" with the particularity required by Rule 9(b).  Without the "pump" component, the SEC's claims against Brauser are legally insufficient.

Furthermore, pleading "scheme liability" is no substitute for the SEC's lack of particularity as to Brauser.  "Participation in a scheme can . . . be sufficient for liability under section 10(b) *only if* that participation took the form of actions or statements that were *independently* deceptive or fraudulent." *Collins*, 524 F. Supp. at 486 (emphasis added).  This is because "the statute extends only to persons who actually made *material misstatements* or employed *deceptive devices*." *Id.* (emphasis added).

While Section "10(b) is aptly described as a catchall provision, what it catches must be fraud." *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 174 (1994).  Here, the fraud claimed is the alleged "pump and dump" of three public companies.  *See FAC*, p. 2, ¶ 1 ("This case involves a series of . . . 'pump-and-dump' schemes . . .").  The "pump" part of a "pump and dump" scheme is essential to such claims.  *See Madsen*, 2018 WL 5023945, * 3; *see also In re Galectin Therapeutics, Inc. Securities Litigation*, 843 F.3d 1257, 1274 (11th Cir. 2016) ("This case is, at most, a 'pump' without a 'dump.'") (affirming dismissal).

With respect to any "scheme liability," courts look to the facts upon which the alleged fraud pivots.  For example, in *IBEW Local v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 WL 1223844, *1-2 (S.D.N.Y. 2013), the alleged fraud was a scheme to inflate the company's stock price through the sale of financial products promoted as carefully vetted blue chip securities, when the defendant had knowingly impregnated the products with "junk." *Id.*  Here,

the alleged frauds are schemes to inflate stock prices by paying for misleading promotional articles and engaging in manipulative trading to create the appearance of active markets before the release of the articles.   However, the SEC fails to allege, with particularity, a single instance of Brauser doing either one.   Ultimately, this is the "Achilles' heel" of the SEC's claims against Brauser.

A.      **Company A's Alleged "Pump and Dump"**

The SEC *generally* alleges that Brauser pumped up the stock value of Company A "by secretly paying for a misleading promotional campaign" and by "engaging in manipulative trading . . . ."   *FAC*, p. 26, ¶ 80.   However, all of the allegations that follow – of paying for a misleading promotional campaign and engaging in manipulative trading – specify persons *other than Brauser*.   There are *no* specific allegations of a single payment by Brauser, secret or non-secret, for a misleading promotional campaign.   Likewise, there are *no* specific allegations of a single manipulative trade by Brauser.   Indeed, what the SEC does allege as to each of the two supposed components of the pump of Company A – (1) misleading promotion and (2) manipulative trading – is especially revealing.

1.      **Misleading Promotion**

The SEC alleges that the misleading promotion of Company A stock was an internet article written by Defendant Ford.   *See FAC*, pp. 34-35, ¶¶ 102-105.   Noticeably, Brauser is nonexistent in the specific "pump" allegations, as follows:

a.      "In September 2013," defendants *other than Brauser* reached "out to Ford to arrange for him to post his purportedly independent investment analysis of Company A on the *Seeking Alpha* website . . . ."   *FAC*, p. 34, ¶ 102.

  b.  A defendant *other than Brauser* "contacted Ford and proposed that Ford write a Company A article in exchange for Ford obtaining" compensation. *Id.,* ¶ 103.

  c.  A defendant *other than Brauser* paid "Ford surreptitiously for his upcoming favorable article on Company A." *Id.* at pp. 34-35, ¶ 105.

  d.  Ford's promotional Company A article "bore the title" that defendants *other than Brauser* "had supplied to Ford . . . ." *Id.* at pp. 35-36, ¶ 108.

  e.  Ford's article was . . . materially false and misleading in failing to disclose that Ford had been compensated by" a defendant *other than Brauser* "for writing the article . . . ." *Id.* at p. 36, ¶ 110.

### 2.  Manipulative Trading

Brauser is also conspicuously absent from the SEC's allegations of the manipulative trading component of the alleged pump. For instance, the SEC alleges:

  a.  "On Monday, September 23, 2013," a defendant *other than Brauser* "and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article." *FAC,* p. 34, ¶ 104.

  b.  "On the morning of Friday, September 20, 2013," a defendant *other than Brauser* "called Ford and told him to put in buy orders for Company A stock at $0.40 per share to ensure his order was executed against the corresponding sell order later placed by" a defendant *other than Brauser. Id.* at pp. 34-35, ¶ 105.

c.    On "Monday, September 23, 2013," a defendant *other than Brauser* "sold 180,000 Company A shares to Ford at $0.40 per share . . . ." *Id.* at pp. 34-35, ¶ 105.

d.    A defendant *other than Brauser* "joined the trading at the end of the trading day on September 23rd to 'mark the close,' *i.e.*, to ensure that the last price of the day would be higher, giving the false impression that Company A's share price was on an upward trajectory.  Specifically, at 3:58 p.m. that day," a defendant *other than Brauser* "placed a bid to buy Company A shares at $0.68 per share, a significantly higher price than the prior buyer order at $0.55 per share, which had been entered at about 3:06 p.m." An associate of a defendant *other than Brauser* "placed a corresponding sell order to complete the transaction at the inflated price." *Id.* at p. 35, ¶ 106.

e.    "[T]o enhance the false picture of an active market for the stock, near the end of the trading day on September 26" a defendant *other than Brauser* and the "associates" of a defendant *other than Brauser* "engaged in a series of coordinated trades.  For example," an entity *other than Brauser* "controlled by" a defendant *other than Brauser* "sold Company A shares to" an "associate" of a defendant *other than Brauser* "at $0.68 per share, and two minutes later another entity affiliated with" a defendant *other than Brauser*

"executed a transaction against" an entity of a defendant *other than Brauser*, "at $0.68 per share." *Id.* at p. 35, ¶ 107.

**B.     Company B's Alleged "Pump and Dump"**

The SEC generally alleges that Brauser "drove up the price and trading volume of the stock" of Company B "through manipulative trading and/or paid promotional activity . . . ." *FAC,* p.2, ¶ 1.  Again, Brauser is conspicuously absent from the specific "pump" allegations:

**1.     Misleading Promotion**

The SEC alleges that four misleading articles promoting Company B were published at the instance of defendants *other than Brauser* and paid for by defendants *other than Brauser.* These are the SEC's specific allegations with respect to Company B:

> a.     A defendant *other than Brauser* "enlisted Ford to write a promotional piece, published . . . on November 5, 2012, which touted Company B's prospects . . . . Ford's promotional piece failed to disclose the compensation he had received from" a defendant *other than Brauser. Id.* at pp. 41-42, ¶ 128.
>
> b.     A defendant *other than Brauser* "directed" two defendants *other than Brauser* "to retain Ford to write" an "article on Company B." At the "direction" of a defendant *other than Brauser*, "in November 2012," a defendant *other than Brauser* paid "for Ford's planned articles on Company B." *Id.* at p. 42, ¶ 129.
>
> c.     "In his . . . article, published on April 11, 2013, Ford touted" Company B, predicting "a significant stock price jump and again failed to disclose that he had been compensated pursuant to his

8

agreement with" a defendant *other than Brauser*.  *Id.* at p. 42, ¶ 130.

d.     "On or around January 21, 2016," a defendant *other than Brauser* "directed" a defendant *other than Brauser* "to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of Company B.  Shortly thereafter, the stock promoter paid a portion of the money he had received from Company B to a writer he instructed to publish a tout on Company B.  On February 3, 2016, the writer published his piece online.  In it, he described Company B's rosy prospects . . . .  The article did not disclose that the author had been paid by Company B – at [the] direction" of a defendant *other than Brauser* "– to write the article."  *Id.* at p. 45, ¶ 139.

e.     On May 9, 2016, in exchange for payment from a defendant *other than Brauser*, "a well-known internet stock promotion website" published another article containing allegedly misleading information touting Company B. *Id.* at p. 47, ¶ 146.

## 2.     Manipulative Trading

Detailed allegations on manipulative trading are ordinarily the hallmark of pump and dump cases.  *See Cohen,* 722 F. Supp.2d at 424.  The SEC *generally* alleges that *before* release of misleading articles promoting Company B stock, multiple defendants "engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock." *FAC,* p. 3, ¶ 3.  The SEC *specifically* alleges that on the morning of May 9, 2016, a defendant *other than Brauser* had advance knowledge that *later* that morning there would be a misleading

9

public announcement about Company B and, given that knowledge, the other defendant "traded in Company B stock dozens of times" *before* the public announcement "to create the misleading appearance of an active market . . . ." *Id.* at p. 47, ¶ 144-145.

Indeed, there is no allegation that Brauser had advance knowledge of the public announcement or that he participated in the pre-announcement trading. Instead, the SEC *generally* alleges that Brauser traded "early that morning" (*FAC,* p. 47, ¶ 145) without specifying whether it was before or after the public announcement. This is not inadvertent. The SEC *knows* that Brauser's trades that day were sales *after* the public announcement. Given this knowledge, the SEC is unable to amend to allege that Brauser participated in the alleged "pump."

In the same paragraph, the SEC *generally* alleges that Brauser engaged in coordinated trades in Company B stock, but again fails to allege whether such trades occurred during the alleged "pump" phase. In fact, the SEC fails to identify *any* coordinated trades by Brauser as it purports to do as to defendants other than Brauser. *See, e.g., FAC, p. 35,* ¶ 107 (e) (alleging a Company A matched trade between persons and entities *other than Brauser* "at $0.68 per share"). "To state a claim for manipulation under Section 9(a)(1), plaintiffs must specifically identify particular washed sales or matched orders." *Cohen v. Stevanovich*, 722 F. Supp.2d 416, 424 (S.D.N.Y. 2010).

## C.    Company C's Alleged "Pump and Dump"

The SEC generally alleges that Brauser "drove up the price and trading volume of the stock" of Company C "through manipulative trading and/or paid promotional activity . . . ." *FAC,* p. 2, ¶ 1. But Brauser is conspicuously absent from the specific "pump" allegations, to wit:

### 1.    Misleading Promotion

10

The only "paid promotional activity" alleged by the SEC are two internet articles. However, the SEC alleges that defendants *other than Brauser* were responsible for the articles, to wit:

> a. On "April 8, 2015 at 11:13 a.m." – at the direction of a defendant *other than Brauser* – an article was published promoting Company C stock; the author falsely stated that he was "not receiving compensation for" writing the article. *FAC,* pp. 61-62, ¶ 186.
>
> b. "In June, 2015" a defendant *other than Brauser* "recruited Ford to publish another Company C tout on Ford's blog.  On July 1, 2015, Ford published an article" promoting the stock of Company C.  A defendant *other than Brauser* "compensated Ford for the blog post . . . ." *Id.* at p. 63, ¶ 189.

### 2. Manipulative Trading

The SEC alleges that – in anticipation of the April 8, 2015 article written by a defendant *other than Brauser* – a different defendant *other than Brauser* "engaged in early trading of Company C shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock.  That trading included at least one matched trade" between two persons *other than Brauser* with one "submitting the buy order" and the other "submitting the sell order for the same price at 9:38 a.m." *Id.* at p. 62, ¶ 187.

## III. THE SEC FAILS TO ADEQUATELY PLEAD THAT BRAUSER VIOLATED SECTION 13(d) AND RULE 13(d)-1(a) (COUNT XII)

"Claims alleging fraud in connection with violations of section[] 13(d)," as here, "must be pleaded with particularity."  *Management Assistance Inc. v. Edelman,* 584 F. Supp. 1016,

1018 (S.D.N.Y. 1984).   The SEC is alleging 13(d) violations as predicate acts for its fraud claims.   *FAC*, Count I, pp. 67-68, ¶ 198;  Count II, pp. 73-74, ¶ 206.

The SEC conclusorily claims that Brauser violated Section 13(d) of the Exchange Act and Rule 13(d)-1(a) by "either explicitly or tacitly" agreeing "to acquire, hold, vote and/or dispose of [his] shares in coordination with" other defendants and along with "Honig and/or other members of the" group "directed the issuer's management for their benefit, including orchestrating transactions designed to create market interest in the company or to solidify their control."   *Id.* at 2, ¶ 2.

The SEC generally alleges: "For some of the issuers in which Brauser co-invested alongside Honig, Brauser took an active role, at times directing the issuer's management, finding and negotiating transactions for the issuer or bringing additional investors." *FAC*, p. 19, ¶ 61. Foreshadowing its lack of detail as to Brauser's role, in the next sentence the SEC states that "Brauser was content to let Honig direct the steps in the scheme . . . ." *Id.*

When it comes to pleading supporting facts, with particularity, the SEC resorts to allegations as to persons *other than Brauser* while lumping Brauser in with the others.   For instance, the SEC alleges that: "Honig *and/or other members* of the particular investor group, with the knowledge and consent of the other group members, directed the issuer's management for their benefit, including orchestrating transactions designed to create market interest in the company or to solidify their control."   *FAC,* p. 2, ¶ 2 (emph. added); *see also, id.*, p. 52, ¶ 155 ("Honig *and his associates* exercised control over Company B's management and policies") (emph. added).

The SEC's 13(d) claims are limited to Companies B and C.  Its specific allegations as to each are reviewed below.

*Company B*

In alleging management control over Company B, the SEC alleges that "correspondence between" defendants *other than Brauser* ". . . reflect the ongoing significant role" defendants *other than Brauser* "played in orchestrating" a deal for Company B.  *FAC,*  p. 46, ¶ 143; *see also, id.*, pp. 43-44, ¶¶ 133-134 (emph. added):

> Honig set the scheme in motion on September 26, 2015 when he emailed [a defendant *other than Brauser*]: "We need to put together *a term sheet for . . . Company B . . . and . . . proposed terms of an investment deal . . . .*"

> On September 27, 2015, Honig directed [a defendant *other than Brauser*] to send the proposal to . . . Company B's CEO.

Where the SEC alleges that "Brauser . . . exercised control over . . . the management and policies of Company B," the specifics that follow are as to defendants *other than Brauser*. *FAC,* p. 50, ¶ 152 ("For example, on October 1, 2015," Company B's CEO "asked for and received . . . direction" from a defendant *other than Brauser* and, defendants *other than Brauser* "negotiated" a business transaction "on Company B's behalf . . . ."  *Id.*, p. 50, ¶ 152.

*Company C*

The SEC's Company C "control group" allegations are also lacking in specifics when it comes to Brauser.  *See, e.g., FAC*, p. 54, ¶ 162 (alleging that in April of 2014 defendant Honig called Company C's CEO, stated that he was the owner of Company C, and "you do what I tell you to do," followed by "frequent telephone calls demanding various corporate actions" favored by Honig); *id.*, p. 55, ¶ 163 ("Sometimes Honig worked with [a defendant *other than Brauser*] to exert his influence over management" of Company C); *id.*, p. 57, ¶ 171 (a defendant *other than Brauser* "kept up the pressure on Company C to close the financings on the terms he and Honig dictated.  On March 10, 2015, [a defendant *other than Brauser*] told Company C's CEO in an email that he needed to reach an understanding by the next day to proceed . . . "); *id.*, ¶ 172

("Honig and [a defendant *other than Brauser*] also made it a condition of the . . . financing . . .

that Company C retain Issuer's Counsel and Issuer's Counsel Partner after the closing . . . .   Not

only did Honig and [a defendant *other than Brauser*] insist that Issuer's Counsel represent

Company C, in a March 12, 2015 email to Company C's CFO, [a defendant *other than Brauser*]

also demanded that Company C set aside a year of prepaid legal fees as an additional condition

to doing the deal"); *id.*, ¶ 173 (a defendant *other than Brauser* "managed the financing

process . . . as though he were Company C management, and told Company C management

about substantive decisions, including, but not limited to, sending a March 18, 2015 email to

Company C management informing them which bank would be used for a contemplated escrow

agreement"); *id.,*   p. 58, ¶ 174 (a defendant *other than Brauser* "introduced Company C

management to his and Honig's chosen IR consultant on March 14, 2015, and at Honig's

direction, insisted that the financing include a grant of 300,000 Company C shares as a payment

to the consultant.   On March 23, 2015, Honig directed [a defendant *other than Brauser*] to

engage another IR consultant for Company C . . . ").   S*ee also, id.*, p. 64, ¶ 191:

> Honig and [a defendant *other than Brauser*] thereafter continued to invest
> in Company C and conferred benefits on members of their group and
> directed critical business decisions for Company C.  For example, on more
> than one occasion, Honig or [a defendant *other than Brauser*] directed
> Company C's CEO to appoint Honig's candidate to Company C's board.
> And on August 15, 2016, at Honig's [and a defendant *other than Brauser*]
> "direction . . . Company C's CEO executed a letter agreement requiring
> Company C to hire the public relations firm that Honig [and a defendant
> *other than Brauser*] had selected.  Honig even prevailed on Company C to
> pay [an entity *other than Brauser*] a six-figure "Investor Due Diligence"
> fee in August 2016.

*FAC*, p. 64, ¶ 191.

Thus, the SEC has failed to state a 13(d) "fraud" claim with the requisite particularity.

To the extent that the SEC is claiming a 13(d) regulatory violation, without fraud, it also fails to

state a claim under Federal Rules of Civil Procedure 8 and 12(b)(6) because its allegations are conclusory and it indiscriminately lumps Brauser in with other defendants.

As in *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F.Supp. 2d 169, 175 (S.D.N.Y. 2000), the SEC's claims

> may be conflating the averments of fraud with other averments that are not subject to such stringency in pleading. *But* there is no need to decide this question here. As this Court previously has held, a *conclusory* allegation of the existence of a group is insufficient *under any standard*.

(emph. added). And, as this Court held in *Trans World Corp v. Odyssey Partners*, 561 F.Supp. 1315, 1320 (S.D.N.Y. 1983):

> "[T]he complaint's repeated references to actions of the "defendants," without differentiation among the various defendants, is unacceptable. . . . Whether the standard applicable . . . is the Rule 9(b) standard requiring particularity in allegations of fraud, or simply the notice standard of Rule 8, each defendant is entitled to know precisely what [the adverse party] is alleging as to him or it.

Indeed, in a case with allegations like those here, this Court dismissed the 13(d) claims finding such allegations legally insufficient. *See Log On America, Inc. v. Promethean Asset Mgmt., L.L.C.*, 223 F. Supp. 2d 435 (S.D.N.Y. 2001). The *Log On America* plaintiff, like the SEC here, alleged that "Defendants acted together by express or tacit agreement . . . ." *Id.* at 448. In an attempt to supply facts to support that conclusory allegation the *Log On America* plaintiff alleged that the defendants "in the past, have jointly invested in companies together," that the defendants had "used the same law firm," that "certain of the Defendants . . . have engaged in similar unlawful . . . conduct in connection with similar transactions with other companies." The court ruled that such "'unadorned allegation[s] that defendants are acting as a group [are] not adequate to sustain a Section 13(d) claim.'" *Id.* at 449, *citing Segal v. Gordon*, 467 F.2d 602,608 (2d Cir. 1972). The SEC includes virtually the same allegations in its complaint here. *See*, *e.g.*, *FAC* at p. 2, ¶ 2 (one of many instances where the SEC alleges that the

defendants "either explicitly or tacitly agreed to"); *id.* at p. 57, ¶ 172 (alleging that two of the defendants required Company C to retain the same law firm and partner that they required Companies A and B to retain); *id.*at pp. 17-23, ¶¶ 55-71 (outlining an alleged "pattern of investments" in which the defendants allegedly "schemed" in a manner similar to the actions alleged in the FAC from 2011 through the present).

## IV.   THE SEC FAILS TO ADEQUATELY PLEAD THAT BRAUSER VIOLATED SECTIONS 5(a) AND (c) OF THE SECURITIES ACT (COUNT XI)

The allegations in Count XI – claiming unregistered offering or sale of securities in violation of Sections 5(a) and (c) of the Securities Act – are entirely conclusory. *FAC*, pp. 91-92, ¶¶ 254-258.  The SEC does not assert otherwise.  The SEC sets forth its factual allegations, in earlier paragraphs beneath the heading "**FACTS**," which it realleges and incorporates by reference in Count XI, p. 91, ¶ 254.  However, the incorporated allegations – intended to provide factual support for Count XI – are also conclusory and fail to differentiate among multiple defendants.  For example, to support this count the SEC lumps Brauser in with seven other persons or entities alleging that their "beneficial ownership of 45% of the outstanding stock of Company A . . . gave them collective control" of the company and made Brauser "an affiliate of" Company A in the context of its allegation that Company A had not filed a registration statement for stock sales "in the September through December 2013 period." *FAC*, p. 38, ¶¶ 114, 116.

The SEC not only lumps Brauser in with multiple other defendants and entities; it alleges no breakdown as to Brauser.  The SEC does not even allege how much of the "almost 45% of the outstanding stock of Company A" was held by Brauser separate and apart from the seven other persons and entities with whom the SEC lumps Brauser in its allegation.  *Id.*

A case analogous to what the SEC has done here, in claiming sale of unregistered securities, is *S.E.C v. National Banker Life Ins. Co*., 324 F. Supp. 189, 197 (N.D. Tex. 1971),

where the court made the following observation "regarding the *general* approach to the suit by plaintiff Securities and Exchange Commission:"

> It is always possible in a complex lawsuit that a party may become unable to see the forest for the trees.  That appears to be the situation in the instant case with the SEC.  The SEC has brought suit against a *number of defendants* that allegedly committed a wide variety of acts.  The SEC has sought *to paint them all with the same broad brush* – claiming that the various activities have made each defendant part of a conspiracy *to sell unregistered stock* and part of the scheme to defraud.  Because of this alleged combined activity, the SEC sought to hold them all jointly liable.  In so doing, *the SEC, however, failed to distinguish one defendant from the other and failed to property delineate the individual violations*.

(emph. added).

The specific allegations in the FAC concerning the sale of unregistered securities are as to defendants *other than Brauser*.  The SEC alleges:

    a.    "On September 6, 2013," a defendant *other than Brauser* "was copied on the transmittal of false opinion letters to Company A's transfer agent in order to remove the restrictive legends from Honig's Company A share certificates," that "[t]hese opinion letters were sought by Honig because both he and" a defendant *other than Brauser* "knew that removal of the restrictive legend was a necessary step in readying Honig's Company A shares for sale to the public . . . " *Id.*, p. 33, ¶ 100.

    b.    "Once the restrictive legends were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them.   In September 2013, Honig directed" a defendant *other than Brauser* "to reach out to" a defendant *other than Brauser. Id.*, p. 34, ¶ 102.

17

To the extent the SEC is alleging the sale of unregistered securities, as part of a fraudulent scheme, it has – in addition to its conclusory and lumping allegations – failed to state the claim with particularity. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("Fraud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, and they are therefore properly subject to Rule 9(b) in every case.…").

To the extent the SEC is alleging that Brauser was a participant, his "role in the transaction must be a significant one before [Section 5] liability will attach." *SEC v. Murphy*, 626 F.2d 633, 648 (9th Cir. 1980). To play a "significant" role in a transaction, a party must be "both a 'necessary participant' and 'substantial factor' in the sales transaction." *SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007) (quoting *Murphy*, 626 F.2d at 648, 652). The FAC is devoid of such facts.

## V. DISMISSAL OF THE SEC CLAIMS AGAINST BRAUSER SHOULD BE WITH PREJUDICE OR, ALTERNATIVELY, ONLY ALLOW A THIRD "BITE AT THE APPLE"

The SEC is on its second complaint. Another amendment, if permitted, will be its third. The SEC has already doubled the size of its first complaint from 50 to 100 pages. Notwithstanding its prolixity, the SEC continues to lump Brauser in with other defendants, to charge him with violating securities laws based on generalized conclusory allegations, and fails to plead fraud with particularity. The SEC enjoyed years of discovery before even filing this lawsuit. The SEC informed the Court, at the initial scheduling conference, that it had collected over 600,000 documents. *Hrg. Trans.*, 5/15/19, p. 14 (ECF No. 136)

The SEC compounded its failure to adequately plead its claims against Brauser, by its chest-thumping public announcement mixing Brauser in with others as a securities "fraudster." *SEC Press Release*, 9/17/18, https://www.sec.gov/news/press-release/2018-182. In that press release the SEC's counsel of record proclaimed that "Honig *and his associates* engaged in

brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets . . . . They failed to appreciate, however, the SEC's resolve to relentlessly pursue and punish participants in . . . fraud schemes" – further stating that the SEC had "charged" Brauser as one of the associated "fraudsters") (emph. added).

The SEC failed to responsibly provide Brauser with the customary "Wells" notice designed to allow prospective defendants to show the SEC, pre-filing, the lack of merit in such claims before they become public. "Although not an absolute legal right, the Wells notification requirement is a matter of long- standing SEC policy [*See* Exchange Act Release No. 9796 (Sept. 27, 1972).] Exceptions to the Wells notification requirement apply where there are exigent circumstances . . . ." *MNYM Guide to SEC Investigations,* § 1020, p. 10. Here, the SEC does not allege any exigent circumstances justifying a preemptive filing. The Wells "submission is a critical mechanism for assembling the facts and the law to persuade the staff not to recommend an enforcement action." *Id.*

As the SEC well knows, it has already exacted a prejudgment penalty against Brauser by using the imprimatur of its governmental status to subject him to public ostracism in business affairs. The Rule 9(b) "stricture . . . serves to prevent the abuse of process and the gratuitous disruption of normal business activity." *In re Blech Securities Litigation*, 928 F.Supp. 1279, 1293 (S.D.N.Y. 1996). By failing to comply with the Rule 9(b) stricture the SEC has already imposed upon Brauser the "enormous social and economic costs absent" the factual basis that it knew was required to plead with particularity. *Rombach*, 355 F.3d at 171. As the Second Circuit observed in *ATSI Communs., Inc.,* 493 F.3d at 99, the "Rule 9(b) pleading

constraint serves to provide a defendant with fair notice of a plaintiff's claim, [and] safeguard his reputation from improvident charges of wrongdoing . . . ."

Under the circumstances it is respectfully requested that the FAC be dismissed with prejudice or, if leave to amend is given, cautioning the SEC that its *third* complaint may be its last opportunity.  *See Rich,* 2001 WL 286757,  * 3 (cautioning that "[a]n amended complaint which fails to replead with sufficient particularity after a finding of lack of specificity may well be regarded by the Court as a frivolous filing in violation of Fed.R.Civ. 11") (quoting *Spier v. Erber*, 1990 WL 71502, at *10 n. 8 (S.D.N.Y. May 24, 1990)).

## CONCLUSION

Brauser joins in any part of the motions and supporting documents, filed by other defendants, that lend support to Brauser's motion to dismiss.

The SEC's claims against Brauser – under Section 10(b) of the Exchange Act and Rule 10(b)-5 (Count I), Section 17(a) of the Securities Act (Count II), Section 9(a) of the Exchange Act (Count IX), Sections 5(a) and (c) of the Securities Act (Count XI) and Section 13(d) of the Exchange Act (Count XII) – should be dismissed.

Respectfully submitted,

*Attorneys for Defendants Brauser and Grander Holdings, Inc.*

SALLAH ASTARITA COX LLC
3010 N. Military Trail
Suite 210
Boca Raton, FL  33431
T:  (561) 989-9080
F:  (561) 989-9020

By: /s/ *James D. Sallah*
    JAMES D. SALLAH
    jds@sallahlaw.com
    JOSHUA A. KATZ

RICHARD AND RICHARD, P.A.
Tower III, Suite 1748
825 Brickell Bay Drive
Miami, FL  33131
T: (305) 374-6688
F: (305) 374-0384

By: /s/ *Dennis A. Richard*
    DENNIS A. RICHARD
    dennis@richardandrichard.com
    MELISSA L. MACKIEWICZ

jak@sallahlaw.com                    melissa@richardandrichard.com

*Admitted Pro Hac Vice*                *Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing motion has been electronically filed this 19th day of June, 2019 with the Court via CM/ECF, which will serve an electronic copy on all counsel of record.

/s/ *Dennis Richard*
DENNIS RICHARD

W:\WDOX\CLIENTS\512\4467\00128140.DOCX