Randall R. Lee (*admitted pro hac vice*)
COOLEY LLP
1333 2nd Street
Santa Monica, CA 90401
randall.lee@cooley.com
Telephone: (310) 883-6485
Facsimile: (310) 883-6500

Christopher Johnstone (*admitted pro hac vice*)
WILMER CUTLER PICKERING HALE
  AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
chris.johnstone@wilmerhale.com
Telephone: (650) 858-6147
Facsimile: (650) 858-6100

*Attorneys for Defendant Robert Ladd*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:18-cv-08175-ER |
| v. | ) ) | |
| BARRY C. HONIG, *et al.*, | ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ROBERT LADD'S
MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL
PROCEDURE 12(b)(6) AND MOTION TO STRIKE PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 12(f)**

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................2

      A.   Robert Ladd and MGT .............................................................................2

      B.   The October 2012 Financing and Seeking Alpha Articles .......................3

      C.   The October 2015 Financing ....................................................................4

      D.   The February 2016 Article ........................................................................5

      E.   MGT's Agreement with John McAfee ......................................................5

III. LEGAL STANDARD ..........................................................................................8

IV.  ARGUMENT .......................................................................................................9

      A.   Allegations Outside the Statute of Limitations Should Be Struck
           from the Complaint Under Rule 12(f) or Dismissed Under Rule 12(b)(6)..............9

      B.   The SEC Fails to Allege Fraud in Connection with the February 2016
           Promotional Article ................................................................................12

      C.   The SEC Fails to State a Fraud Claim in Connection with the
           McAfee Announcement ..........................................................................15

      D.   The SEC Fails to State a Claim in Connection with
           MGT's Other Disclosures ......................................................................19

      E.   The SEC Has Not Adequately Alleged Negligence ...............................24

      F.   The Complaint Fails to State a Valid Claim for Aiding and Abetting..................25

V.   CONCLUSION...................................................................................................25

i

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)................................................................................14

*Antelis v. Freeman*,
  799 F. Supp. 2d 854 (N.D. Ill. 2011) ...............................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................8

*Barrett v. Forest Labs, Inc.*,
  39 F. Supp. 3d 407 (S.D.N.Y. 2014)................................................................10

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................22

*Brown v. E.F. Hutton Grp., Inc.*,
  991 F.2d 1020 (2d Cir. 1993)..........................................................................17

*Chechele v. Scheetz*,
  819 F. Supp. 2d 342 (S.D.N.Y. 2011)..............................................................22

*Corenco Corp. v. Schiavone & Sons, Inc.*,
  488 F.2d 207 (2d Cir. 1973)............................................................................21

*Cortina v. Anavex Life Scis. Corp.*,
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ..................................................13

*Decker v. Massey-Ferguson, Ltd.*,
  681 F.2d 111 (2d Cir. 1982)............................................................................18

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
  822 F.2d 1242 (2d Cir. 1987)........................................................................8, 18

*Dombek v. Adler*,
  2019 WL 459019 (D.S.C. Feb. 5, 2019) ..........................................................24

*Fantasy, Inc. v. Fogerty*,
  984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 17 (1994)....................10

*Forward Indus. v. Wise*,
  2014 WL 6901137 (S.D.N.Y. Sept. 23, 2014)..................................................22

*Gabelli v. SEC*,
  568 U.S. 442 (2013)......................................................................................10, 11

Page(s)

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................................16

*Garvey v. Arkoosh*,
    354 F. Supp. 2d 73 (D. Mass. 2005) ...............................................................13

*Harris v. U.S. Dep't of Veterans Affairs*,
    776 F.3d 907 (D.C. Cir. 2015) .........................................................................24

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
    2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012)..................................................17

*In re Cannavest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)..............................................................15

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)..............................................................23

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 544 (S.D.N.Y. 2014)..............................................................22

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
    843 F.3d 1257 (11th Cir. 2016) ..................................................................12, 13

*In re LaBranche Sec. Litig.*,
    405 F. Supp. 2d 333 (S.D.N.Y. 2005)........................................................14, 15

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...............................................................................15

*In re Yukos Oil Co. Sec. Litig.*,
    2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..................................................17

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
    564 U.S. 135 (2011)...........................................................................11, 12, 13

*Jones v. Bock*,
    549 U.S. 199 (2007)........................................................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..........................................................................................20

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)..............................................................14

Page(s)

*Morales v. Quintel Entm't, Inc*.,
  249 F.3d 115 (2d Cir. 2001) .............................................................................. 21

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. 2015) (Ramos, J.) ............................................ 9

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*,
  794 F. Supp. 1265 (S.D.N.Y. 1992) .................................................................. 12

*Robare Grp., Ltd. v. SEC*,
  922 F.3d 468 (D.C. Cir. 2019) ........................................................................... 24

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ............................................................................... 13

*Ross v. Licht*,
  263 F. Supp. 395 (S.D.N.Y. 1967) ..................................................................... 21

*Scone Invs., L.P. v. Am. Third Mkt. Corp.*,
  1998 WL 205338 (S.D.N.Y. Apr. 28, 1998) ....................................................... 8

*SEC v. Cohen*,
  332 F. Supp. 3d 575 (E.D.N.Y. 2018) ................................................................ 11

*SEC v. Cohmad Sec. Corp.*,
  2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ........................................................ 20

*SEC v. Espuelas*,
  579 F. Supp. 2d 461 (S.D.N.Y. 2008) .................................................. 9, 14, 18, 25

*SEC v. Glantz*,
  1995 WL 562180 (S.D.N.Y. Sept. 20, 1995) ...................................................... 9

*SEC v. Jean-Pierre*,
  2015 WL 1054905 (S.D.N.Y. Mar. 9, 2015) ...................................................... 8

*SEC v. Lee*,
  720 F. Supp. 2d 305 (S.D.N.Y. 2010) ................................................................ 9

*SEC v. Lyon*,
  529 F. Supp. 2d 444 (S.D.N.Y. 2008) ................................................................ 8

*SEC v. Pocklington*,
  2018 WL 6843663 (C.D. Cal. Sept. 10, 2018) ............................................. 24, 25

Page(s)

*SEC v. Rio Tinto plc*,
    2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ................................................................14

*SEC v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013) .........................................................................11

*SEC v. Thompson*,
    238 F. Supp. 3d 575 (S.D.N.Y. 2017) ...........................................................................8

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) .......................................................................9, 11

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) .......................................................................................18

*Solow v. Citigroup, Inc.*,
    2012 WL 1813277 (S.D.N.Y. May 18, 2012) ...............................................................16

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) .......................................................................................22

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) .........................................................................................13

*Sunstrand Corp. v. Sun Chem. Corp.*,
    553 F.2d 1033 (7th Cir. 1977) ...................................................................................14

*Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*,
    2019 WL 1368570 (S.D.N.Y. Mar. 26, 2019) .............................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .....................................................................................................9

*Tounget v. City of Hemet*,
    2009 WL 536835 (C.D. Cal. Feb. 24, 2009) ...............................................................10

*Transcon Lines v. A.G. Becker Inc.*,
    470 F. Supp. 356 (S.D.N.Y. 1979) .............................................................................22

*Zagami v. Cellceutix Corp.*,
    2016 WL 3199531 (S.D.N.Y. June 8, 2016) ...............................................................11

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. § 77q(b) ..............................................................................................................13

15 U.S.C. § 78m(d)(1) ...................................................................................................19, 21

Page(s)

15 U.S.C. § 78m(d)(3) ...................................................................................................21, 22

17 C.F.R. § 240.10b-5 ......................................................................................................8, 19

28 U.S.C. § 2462 .....................................................................................................................10

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, § 929-O, 124 Stat. 1376 (2010)........................................25

Fed. R. Civ. P. 9(b) .................................................................................................................2, 8

Fed. R. Civ. P. 12(b)(6)..........................................................................................................8, 9

Fed. R. Civ. P. 12(f)...............................................................................................................9, 10

Securities Exchange Act, Pub. L. No. 73-291, § 10(b), 48 Stat. 881 (1934)............................8, 9

Securities Exchange Act, Pub. L. No. 73-291, § 13(d), 48 Stat. 881 (1934).....................2, 21, 23

Securities Exchange Act, Pub. L. No. 73-291, § 17(a)(2), 48 Stat. 881 (1934) ........8, 9, 19, 24, 25

Securities Exchange Act, Pub. L. No. 73-291, § 17(b), 48 Stat. 881 (1934)...............................13

I.      **INTRODUCTION**

In its press release announcing the filing of its complaint, the Securities and Exchange Commission proclaimed that "from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes."[1]  The SEC's complaint accuses Mr. Honig of being "the primary strategist" of an "undisclosed control group" that perpetrated a scheme marked by misleading promotions and manipulative trading, all in order to "dump[] their shares" at the expense of "unsuspecting retail investors."

Amidst these sweeping allegations, Defendant Robert Ladd, the CEO of MGT Capital Investments, Inc., a public company based in Durham, North Carolina, stands apart.  Mr. Ladd is not alleged to have been a member of the so-called "control group"; he is not alleged to have engaged in any false promotions; and he is not alleged to have engaged in any manipulative trading.  He has been CEO of MGT, a company with diverse business operations, since 2012, and today he remains one of MGT's largest shareholders.

Yet in its haste to tar him with the same brush, the SEC has filed a complaint against Mr. Ladd that is factually deficient, legally baseless, and illogical, based on nothing more than baseless assumption and speculation.  The complaint cannot withstand scrutiny for the following reasons.  First, it rests on allegations that are beyond the statute of limitations.  Second, it fails to allege that Mr. Ladd authored or authorized any of the statements in the supposedly misleading promotions.  Third, it accuses him of various "omissions" but fails to identify the requisite duty to disclose the allegedly omitted facts.  Fourth, it alleges that he committed fraud by misstating the Internet pioneer John McAfee's role in the namesake company he founded, but ignores the

---

[1] SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes, Litig. Release No. 24262, https://www.sec.gov/litigation/litreleases/2018/lr24262.htm (Sept. 7, 2018).

fact that his role had been known to the market for almost 25 years. Fifth, it alleges that MGT's SEC filings did not disclose that Mr. Honig and other investors were operating as a "group" within the meaning of Section 13(d) of the Securities Exchange Act of 1934, but fails to specify how those investors met the requisite legal elements of a "group" or that Mr. Ladd knew that those investors constituted a "group." And finally, it utterly fails to allege that Mr. Ladd acted with scienter in any respect—all the more so given the lack of any plausible motive for why he would seek to harm a company he led and in which he remains a major shareholder.

Mr. Ladd's career and reputation have been severely damaged by the filing of this case. And despite having already had an opportunity to amend its claims, the SEC's ill-conceived allegations against Mr. Ladd do not come close to meeting the heightened pleading standard of Rule 9(b). The complaint against Mr. Ladd should be dismissed with prejudice.

## II.   FACTUAL BACKGROUND

### A.   Robert Ladd and MGT

MGT Capital Investments, Inc.—described as "Company B" in the SEC's Amended Complaint—is a public company incorporated in Delaware and headquartered in Durham, North Carolina. *See* Amended Complaint, Dkt. 105 ("AC" or "Complaint") ¶ 42. Originally incorporated as a public company in Utah in 1977, *see* RJN Ex. A at 1, MGT was listed on the NYSE MKT stock exchange in 2007, continuing throughout the relevant time period, AC ¶ 42.[2] It remains a public company, and its stock is currently quoted on OTC Link. *Id.* Defendant Robert Ladd became President and CEO of MGT in January 2012 after having served as interim President and CEO since February 2011. *See id.* ¶ 34; RJN Ex. B at 9.

---

[2] Copies of materials cited in this brief that can be judicially noticed are attached as Exhibits to the Declaration of Randall Lee filed in support of the Request for Judicial Notice filed concurrently herewith ("RJN").

Prior to joining MGT, Mr. Ladd received a B.S. in Economics from the University of Pennsylvania's Wharton School in 1980 and an MBA from Northwestern University's Kellogg School in 1982. *See id.* After earning his MBA, he worked for Neuberger Berman, a large international money management firm, serving as a securities analyst and a portfolio manager for various high net worth clients before becoming Managing Director. *See id.* Mr. Ladd has also served on the boards of several other public companies. *See id.*

MGT has operated in a range of different industries. At the time Mr. Ladd joined MGT, it owned patents in the healthcare sector. *See* RJN Ex. C at E-7. In later years, MGT acquired patents in casino gaming, RJN Ex. D, and purchased DraftDay, then the third largest daily fantasy sports website, RJN Ex. E. MGT's current business focuses on bitcoin mining, and it owns bitcoin mining equipment and infrastructure. *See* RJN Ex. F at 3-6.

The Complaint alleges that Defendants Barry Honig, Michael Brauser, John Stetson, and John O'Rourke (collectively, the "Investor Defendants") invested in MGT twice—once in October 2012 and once in October 2015. *See* AC ¶¶ 127, 136.

**B.     The October 2012 Financing and *Seeking Alpha* Articles**

In October 2012, MGT raised $4.5 million of capital through a private investment in public equity ("PIPE") transaction, in which private investors buy shares of publicly traded stock at a price below the current market value per share. *See* AC ¶ 127. The capital was used to finance a lawsuit by MGT against several large gaming companies for infringing a patent owned by MGT relating to casino technology. *See* RJN Ex. D.

On November 5, 2012, John Ford, a stock promoter and investor, published an article on the *Seeking Alpha* website at Mr. Stetson's direction which described MGT's financial prospects. *See* AC ¶¶ 3, 72, 128. In April 2013, Mr. Ford was retained again, this time by either Mr. Stetson or Mr. O'Rourke, to write an article on MGT's potential recovery in its patent

3

infringement case.  *Id.* ¶¶ 129-30.  In exchange for these two articles, Mr. Stetson sold some of

his MGT shares and warrants to Mr. Ford at a discount.  *See id.* ¶¶ 75, 129.  The SEC does not

allege that Mr. Ladd had any role in retaining Mr. Ford to write either of these articles, that Mr.

Ladd provided any false or misleading information to Mr. Ford, or that Mr. Ladd had any

involvement in Mr. Ford's acquisition of MGT shares.  *See id.* ¶¶ 129-31.

> ### C.     The October 2015 Financing

In October 2015, MGT entered into separate stock subscription agreements with multiple

accredited investors for the sale of common stock and warrants in an aggregate amount of

$700,000.  *See* AC ¶ 136.  On October 9, 2015, MGT issued a Form 8-K with a press release

describing the terms of the financing and attaching forms of the relevant agreements.  *See* RJN

Ex. G.  The Form 8-K disclosed that MGT had "entered into separate subscription

agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of

units," AC ¶ 136, and the attached press release disclosed that the "*investment was led by Barry*

*Honig*, a private investor and a specialist in corporate finance," RJN Ex. G at Ex. 99.1 (emphasis

added).  Though there was no requirement to disclose the names of the investors (and the SEC

does not so contend), weeks later MGT filed a Form S-1 Registration Statement, which disclosed

to the public a list of the investors and set forth "certain information regarding the selling

stockholders and the shares of [MGT's] common stock offered by them in this prospectus."  *See*

RJN Ex. H at 43; *see also id.* at 44-46 (noting that "Michael Brauser is the trustee of Grander

Holdings, Inc. 401K," "Barry Honig is the trustee of GRQ Consultants, Inc. Roth 401K FBO

Barry Honig," "John Stetson is the president of Stetson Capital Investments Inc.," and "John

O'Rourke is the manager of ATC Capital LLC").[3]

---

[3] The S-1 statement not only listed the names of all selling stockholders participating in the
agreement, but also the number of shares of common stock (a) beneficially owned by each

### D.    The February 2016 Article

Several months after the October 2015 financing, in February 2016, MGT paid for the

publication of an article in a stock newsletter.  AC ¶ 139.  Tracking the October 2015 Form 8-K,

the article announced, "In October, MGT announced that they entered into agreements with

several accredited investors providing $700,000 of equity capital.  The investment was led by

Barry Honig, a private investor and a specialist in corporate finance."  *See* RJN Ex. I.  It also

described several of MGT's recent ventures, including ownership of gaming sites and DraftDay,

as well as its intellectual property related to slot machines.  *Id.*  The article disclosed that the

author had been compensated "by a third party (STAR Media LLC) for an investor awareness

campaign regarding MGT.  Any compensation received constitutes a conflict of interest as to our

ability to remain objective in our communication regarding the profiled company."  *See id*.  The

Complaint does not allege that any facts in the article were false or misleading other than the

source of the payment.  Nor does the Complaint allege that Mr. Ladd knew that the author would

not disclose that he had been paid by MGT.

### E.    MGT's Agreement with John McAfee

On May 9, 2016, MGT announced that it had entered into an agreement to acquire certain

technology and assets relating to anti-spy software from a company named D-Vasive Inc. and to

appoint John McAfee, the well-known pioneer of internet security, as its Executive Chairman

and CEO.  *See* RJN Ex. J.  MGT also announced that it had entered into a consulting agreement

with Future Tense Secure Systems Inc., a technology incubator.  *Id.*  The agreements were fully

disclosed in a Form 8-K filing (and the SEC does not allege otherwise).  *See id.*

---

stockholder prior to the offering, (b) covered by the offering for each stockholder, and (c) owned
by each stockholder upon completion of the offering, as well as the percentage of common stock
owned by each stockholder upon completion of the offering.  RJN Ex. H at 44.  The SEC omits
MGT's disclosure of the identities and ownership stakes of each stockholder from the Complaint.

To publicize the transaction, MGT paid a stock promotion website, StockBeast.com, to publish a newsletter about the McAfee transaction.  *See* AC ¶ 146.  The newsletter clearly and accurately disclosed that MGT had paid for its publication (and the SEC does not allege otherwise).  *See* RJN Ex. K.

The SEC's claim against Mr. Ladd with respect to the McAfee transaction rests on a single statement in the press release announcing the transaction—that Mr. McAfee had "sold his anti-virus company to Intel for $7.6 billion," which the SEC claims was misleading because the sale of McAfee, Inc. (formerly known as McAfee Associates) had occurred over a decade after Mr. McAfee's departure from that company.  AC ¶ 144.  It is undisputed that in August 2010, Intel Corporation purchased McAfee, Inc., the company founded by Mr. McAfee, for nearly $7.7 billion, pursuant to which McAfee, Inc. became a wholly-owned subsidiary of Intel.  *See* RJN Ex. L at Ex. 99.1.  It is further undisputed that McAfee, Inc., which was valued at $4.2 billion in 2017, continues to bear Mr. McAfee's name to this day.  *See* RJN Ex. M.

On May 23, 2016, just two weeks after the initial press release, MGT filed a Form 10-Q clarifying that Mr. McAfee "founded [McAfee Associates] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010."  *See* AC ¶ 149.  That Mr. McAfee was no longer at the company when it was sold to Intel had long been a matter of public record, as his departure had been disclosed in McAfee Associates' SEC filings.  *See* RJN Ex. N at 5; RJN Ex. O at 89.[4]

Not surprisingly, the announcement of the McAfee transaction received widespread attention in the market.  As the SEC itself acknowledges, Mr. McAfee was "a well-known cybersecurity innovator who had created a popular antivirus software bearing his name."  AC

---

[4] Other allegations of fraud regarding the McAfee deal do not involve Mr. Ladd.  For instance, the SEC alleges that two *other* Defendants engaged in coordinated trading on the morning of May 9, 2016 to create the misleading appearance of an active market.  AC ¶ 145.  There are no allegations that Mr. Ladd participated in or even knew about this alleged manipulative trading.

¶ 141.  Following the announcement, MGT's stock price steadily rose.  *See id.* ¶ 147.  On May 9, the day of the announcement, MGT stock closed at $0.49.  *Id.*  On May 17, it closed at $4.15.  *Id.* MGT's stock then remained high for an extended period of time, including after MGT issued the Form 10-Q clarifying its statement about Mr. McAfee's previous company, *see id.* ¶ 149; RJN Ex. P.  On July 7, approximately two months after the press release was published and more than a month after MGT's clarifying statement, MGT's stock closed at $4.37, above the price on May 17 quoted by the SEC.  *Id.*  Even as late as the end of September 2016, more than four months after MGT announced its partnership with Mr. McAfee, MGT's stock price remained over four times higher than its closing price on the day the press release was published.  *Id.*  In fact, MGT's stock price closed above its May 9 closing price every single day until the SEC filed the complaint in this case in September 2018, more than two years after the McAfee deal was announced.  *Id.*  In its zeal to paint a nefarious picture, the SEC omits to disclose this context.

Mr. Ladd's sales of MGT stock during this time were not out of line with his previous transactions.  Although the SEC alleges that Mr. Ladd made $516,554.08 on sales of MGT stock in May 2016, *see id.*, it omits to mention that he spent $1 million to acquire his initial stake in MGT in 2010, *see* RJN Ex. Q, and another $442,241.20 to acquire more shares of MGT on December 30, 2011, *see* RJN Ex. R.  Additionally, it was not unusual for Mr. Ladd to sell MGT stock when he needed personal capital, including when the stock price was low.  *See, e.g.*, RJN Ex. S (showing that on November 30, 2015, Mr. Ladd sold 100,000 shares of MGT stock for $0.25 per share).  Finally, although the SEC alleges that Mr. Ladd sold 471,000 shares in May 2016, *see* AC ¶ 148, it fails to mention that Mr. Ladd still owned 540,000 shares of MGT on May 31, 2016 (the date of the final sale of stock identified in the Complaint), *see* RJN Ex. T, or that he currently owns 1,773,334 shares of MGT stock, *see* RJN Ex. U at 2.

III.    **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id.*

Claims sounding in fraud are also subject to the heightened pleading standard set forth in Rule 9(b), which requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." *SEC v. Lyon*, 529 F. Supp. 2d 444, 449 (S.D.N.Y. 2008). The SEC must (1) specify the statements it contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Id.* Where multiple defendants are alleged to have engaged in fraud, the complaint must inform each defendant of the nature of his alleged participation in the fraud. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). "Courts are especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants." *Scone Invs., L.P. v. Am. Third Mkt. Corp.*, 1998 WL 205338, at *4 (S.D.N.Y. Apr. 28, 1998).

Cases brought under § 10(b) of the Exchange Act (and Rule 10b-5(b) thereunder) and § 17(a)(2) of the Securities Act premise liability on an allegedly material misrepresentation or omission. *SEC v. Jean-Pierre*, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015). To establish a Rule 10b-5(b) disclosure violation, the SEC must prove that the defendant (1) made a misstatement of material fact or omitted to state one or more material facts that he had a duty to disclose; (2) with scienter; (3) in connection with the purchase or sale of securities. *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017). A plaintiff must allege sufficient facts to

create a "strong inference" of scienter.  *SEC v. Espuelas*, 579 F. Supp. 2d 461, 470 (S.D.N.Y. 2008).  A "strong inference" of scienter is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 652 (S.D.N.Y. 2015) (Ramos, J.) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)); *SEC v. Lee*, 720 F. Supp. 2d 305, 335 (S.D.N.Y. 2010) (applying *Tellabs* standard to SEC enforcement action).

The required elements to state a claim under § 17(a)(2) are similar to those necessary for § 10(b), except that allegations of scienter are not required, and the SEC must allege that the defendant actually obtained money or property by means of the untrue statements.  *SEC v. Glantz*, 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20, 1995).  If the SEC bases a § 17(a)(2) claim on the defendant's negligence, it must show that the defendant failed "to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances." *SEC v. Wey*, 246 F. Supp. 3d 894, 912 (S.D.N.Y. 2017).

To survive a motion to dismiss a claim of aiding and abetting liability, the SEC must allege (1) a primary violation of the Exchange Act, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation. *Espuelas*, 579 F. Supp. 2d at 471.

## IV.  ARGUMENT

### A.  Allegations Outside the Statute of Limitations Should Be Struck from the Complaint Under Rule 12(f) or Dismissed Under Rule 12(b)(6)

The Complaint alleges that Mr. Ladd played a role in a "pump and dump perpetrated by Honig and his associates in 2012-2013" through his purported knowledge of two promotional articles about MGT written by John Ford for the website *Seeking Alpha*—one in November 2012

9

and another in April 2013. *See* AC ¶¶ 126-32 (referred to herein as the "*Seeking Alpha* allegations"). These allegations fall outside the statute of limitations and should be stricken from the Complaint or, at a minimum, dismissed as a basis for claims of securities fraud.

The limitations period for the SEC's fraud claims against Mr. Ladd is five years under 28 U.S.C. § 2462. Under § 2462, a claim based on fraud "accrues—and the five-year clock begins to tick—when a defendant's allegedly fraudulent conduct occurs." *Gabelli v. SEC*, 568 U.S. 442, 448 (2013). Federal Rule of Civil Procedure 12(f) allows the Court to strike "time-barred allegations in the complaint." *Tounget v. City of Hemet*, 2009 WL 536835, at *14 (C.D. Cal. Feb. 24, 2009); *see also Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 17 (1994) ("Superfluous historical allegations are a proper subject of a motion to strike."); *Barrett v. Forest Labs, Inc.*, 39 F. Supp. 3d 407, 460 (S.D.N.Y. 2014) (granting motion to strike portions of putative class definition because claims accruing before a certain date would be time-barred). Because the *Seeking Alpha* allegations fall outside the statute of limitations,[5] the Court should strike them from the Complaint.

The *Fantasy, Inc.* case is instructive. There, the Ninth Circuit affirmed a motion to strike allegations of fraudulent activity because any claim based thereon would be time-barred. 984 F.2d at 1527. The court noted that the untimely allegations created "serious risks of prejudice to [the defendant], delay, and confusion" and would "lead to unwarranted and prejudicial inferences" against the defendant. *Id.* at 1528. The court also rejected the plaintiff's attempt to recharacterize the allegations as "relevant background." *Id.* Similarly, this Court should strike the *Seeking Alpha* allegations from the Complaint as time-barred.

---

[5] The *Seeking Alpha* allegations were first made in the SEC's Complaint filed on March 8, 2019. Thus, the SEC may only base its claims on conduct occurring after March 8, 2014. The *Seeking Alpha* allegations, which are alleged to have occurred in 2012-13, therefore occurred outside the statute of limitations.

At a minimum, the *Seeking Alpha* allegations should be dismissed as a cause of action.  If the SEC's allegations "show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim."  *SEC v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)).  A claim for making false statements accrues when "the plaintiff has a complete and present cause of action."  *Gabelli*, 568 U.S. at 448 (internal quotation marks omitted).  To the extent Mr. Ladd is alleged to have made any false statements in 2012-13, the SEC's cause of action accrued at the time the statement was made, is time-barred, and should be dismissed.  *See Wey*, 246 F. Supp. 3d at 934; *see also SEC v. Cohen*, 332 F. Supp. 3d 575, 595 (E.D.N.Y. 2018) (dismissing claims based on conduct outside the statute of limitations on a motion to dismiss for failure to state a claim).

The SEC's *Seeking Alpha* allegations should also be dismissed because they do not plausibly allege that Mr. Ladd was the person who made the statements in the two articles published by John Ford.  *See* AC ¶¶ 128-32.  Mr. Ladd's only alleged role in those two articles is that he "agreed to be interviewed by Ford" for one of them.  *Id.* ¶ 131.  The SEC does not allege that Mr. Ladd had any control over Mr. Ford or *Seeking Alpha* or that he had ultimate authority over the publication of the articles in question.  The *Seeking Alpha* articles therefore cannot serve as the basis for a claim against Mr. Ladd, because he is not alleged to have "made" any allegedly misleading statements in those articles.  *See, e.g.*, *Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at *7 (S.D.N.Y. June 8, 2016) (dismissing securities fraud claim because, even though defendant "participated in an interview with the article's author," he did not "make the published statement in his own right" (internal quotation marks and alterations omitted)); *see also Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011) ("[T]he maker of a statement is the person or entity with ultimate authority over the statement.").

Nor has the SEC alleged that Mr. Ladd made the alleged false statements knowingly.  *See*

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1283 n.7

(S.D.N.Y. 1992) ("[T]here simply are no allegations in the instant action to serve as the basis for

an inference that [defendants] knowingly made statements that were false at the time they were

made.").  Indeed, the SEC's Complaint is devoid of any allegation of scienter as to Mr. Ladd

with respect to the *Seeking Alpha* allegations.

### B.    The SEC Fails to Allege Fraud in Connection with the February 2016 Promotional Article

The SEC's allegations as to Mr. Ladd's role in a purported pump and dump in February

2016 fail to state a claim.  The SEC merely alleges that Mr. Ladd wired funds to a stock

promoter as payment for a promotion of MGT, that Mr. Ladd knew that a promotional article

was "slated to appear," and that he knew or was reckless in not knowing that the article's author

had failed to disclose that he was being compensated by MGT.  *See* AC ¶¶ 139-40.[6]  What is

missing, however, is *any* allegation that is cognizable under the federal securities laws: the SEC

fails to allege that Mr. Ladd made any statements, that any such statements were false, that he

had any duty to ensure that the author disclose anything with respect to his compensation (let

alone the ability to control the content of the article), or that he acted with scienter.

First, the SEC fails to plead that Mr. Ladd was a "maker" of a false statement that would

support a fraud claim.  As the Supreme Court has made crystal clear, a defendant "must have

'made' the material misstatements" in order to be liable under the securities laws.  *Janus*, 564

U.S. at 141.  That Mr. Ladd is alleged to have wired money to a promoter who in turn paid a

---

[6] Of course, it is not unlawful for a company to pay third parties to promote its stock.  *See, e.g.*, *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1272-73 (11th Cir. 2016) ("[N]othing in the securities laws prohibits . . . a company [] from hiring analysts to promote [the company], circulating positive articles about its [business], or recommending the purchase of [its] stock.").  Such promotions are not uncommon among microcap companies to bring attention to stocks that ordinarily receive less attention.

writer is insufficient as a matter of law.  For instance, in *Galectin*, the plaintiffs attempted to base their securities fraud claims on the content of articles written by stock promoters.  843 F.3d at 1272.  The court held that the "Supreme Court has foreclosed that claim" because "[p]ayment for the promotional articles does not mean that [the defendant] is the maker of the statements in the articles."  *Id.* (citing *Janus*, 546 U.S. at 141).

Second, the SEC has not plausibly pleaded that the promotion contained material misrepresentations or omissions.  Although the Complaint alleges that the promotion "described [MGT's] rosy prospects in social and 'real money' gaming sites and intellectual property relating to slot machines," AC ¶ 139, it does not even allege with particularity that these statements were false when made (let alone describe how).  *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (upholding dismissal of fraud claims because, although "the complaint catalogs a number of statements made by the individual defendants, nothing in the complaint explains with adequate specificity how those statements were actually false or misleading").  And any omission theory against Mr. Ladd based on the allegation that the "article did not disclose that the author had been paid by [MGT] – at Honig's direction – to write the article," AC ¶ 139, fails as well.  An omission is actionable under the securities laws only when the defendant is subject to a duty to disclose the omitted facts.  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015).  Here, the SEC does not (and cannot) allege that Mr. Ladd had any duty to disclose who hired and paid the promoter.[7]

---

[7] Under § 17(b) of the Securities Exchange Act, it is the *promoter* who has the duty to disclose the receipt of payment for the promotion.  *See* 15 U.S.C. § 77q(b); *see also Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *5 (S.D.N.Y. Dec. 29, 2016); *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005) ("[T]he burden to disclose rests on the person who *publishes* the analyst's report; by contrast, there is no duty imposed by the statute on the *issuer* who has paid for the puffery." (emphasis in original)).  The SEC does not allege any violation of § 17(b) by any promoter in connection with MGT—an implicit concession that Mr. Ladd himself could not have violated any duty.

Finally, the SEC fails to plausibly allege that Mr. Ladd acted with scienter.  *See SEC v. Rio Tinto plc*, 2019 WL 1244933, at *13 (S.D.N.Y. Mar. 18, 2019) (the SEC must allege fraudulent intent "with respect to each statement or omission").  The SEC merely alleges that Mr. Ladd "either knew, or was reckless in not knowing, that the article's author failed to disclose that he was being compensated" by MGT to write it.  AC ¶ 140.  The law is clear that conclusory allegations of scienter are insufficient.  *See, e.g.*, *Espuelas*, 579 F. Supp. 2d at 477 ("The SEC's allegations that [Defendants] 'knew or [were] reckless in not knowing' . . . are conclusory and do not support a strong inference of fraudulent intent.").  What's more, the SEC fails to allege that Mr. Ladd knew anything about the content of the promotion *before* it was published.  AC ¶ 140.  The allegation that Mr. Ladd should have realized an omission *after the article had been published* fails as a matter of law to plead scienter.  *See Sunstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 & n.19 (7th Cir. 1977) (in evaluating scienter, the "circumstances must be viewed in their contemporaneous configuration rather than in the blazing light of hindsight").

Nor do Mr. Ladd's stock sales plausibly support an inference of scienter, because there are no allegations that these sales were out of character for Mr. Ladd.  *See* AC ¶ 140.  The "mere allegation of insider sales . . . does not, without more, properly allege motive"; rather, the SEC must "further allege adequately that the insider sales were 'unusual.'"  *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 354 (S.D.N.Y. 2005) (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)); *see also McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 127 (S.D.N.Y. 2013) ("[C]ourts have repeatedly held that executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." (internal quotation marks omitted)).  Further, selling shares while the stock price is high is not sufficient to allege scienter: courts in this district "have required 'suspicious or unusual' activity in connection with

stock sales." *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 244 (S.D.N.Y. 2018).  In

determining whether stock sales are unusual, courts look to factors such as the amount of profit

from the sales, the portion of stockholdings sold, and the change in volume of the defendant's

sales.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).  The SEC has not

alleged that Mr. Ladd's volume or pattern of stock sales were unusual in any way—only that Mr.

Ladd sold shares over the course of three months and received $39,204.12 in proceeds.  *See* AC

¶ 140; *see also LaBranche,* 405 F. Supp. 2d at 354-55 (holding, in a case where a plaintiff

alleged insider transactions with sales of several million dollars in stock, scienter was not

properly alleged because plaintiffs did not allege other factors showing unusualness).

### C.    The SEC Fails to State a Fraud Claim in Connection with the McAfee Announcement

The SEC does not come close to alleging that Mr. Ladd engaged in fraud in connection

with the announcement of the McAfee deal.  Notably, the SEC does not allege that Mr. Ladd

misrepresented the McAfee transaction itself in any way.  Rather, the SEC bases its fraud claim

on a single statement in the press release concerning Mr. McAfee's prior role in his namesake

company—information that had been known by the investing public for almost 25 years.

In its May 9, 2016 Form 8-K, which included a press release as an exhibit, MGT

described the McAfee deal in great detail: it included the asset purchase and consulting

agreements for the deal (*see* Exhibits 10.1 and 10.2); it described the warranties and

representations of the parties (*see* Exhibit 10.1 at Articles IV & V); and it provided a breakdown

of the allocation of shares at closing (*see* Exhibit 10.1 at Annex A).  RJN Ex. J.  The SEC does

not allege that MGT's description of the actual transaction was false or misleading in any way.

The only language the SEC alleges was materially false was the statement in the one-

page press release exhibit that Mr. McAfee "sold his anti-virus company to Intel for $7.6

billion." AC ¶ 144.  The SEC claims that this statement misled investors about Mr. McAfee's

prior financial success because the sale of his company (McAfee Associates) "had occurred over

a decade after [Mr. McAfee's] departure from that company." *Id*.  But the SEC cannot plausibly

allege that this statement was material to investors because the circumstances of the sale of

McAfee Associates had been known to the public for almost 25 years.  The public filings of

McAfee Associates make it a matter of clear historical record that Mr. McAfee had resigned

from his executive positions by January 1994 and from the board of directors by June 1995.  *See*

RJN Ex. N at 5; RJN Ex. O at 89.  Mr. McAfee's departure from the company was also widely

reported at the time.  For example, the Wall Street Journal reported in 1995 that Mr. McAfee had

resigned from McAfee Associates "to pursue other interests."  RJN Ex. V.

Mr. McAfee's resignation continued to be disseminated to the public in the subsequent

years as Mr. McAfee remained a public figure.  *See, e.g.*, RJN Ex. W (2012 article reporting that

Mr. McAfee "sold his remaining shares in the company that bears his name" in 1994).  In fact,

Mr. McAfee's public biography on Wikipedia at the time of the press release made clear that Mr.

McAfee resigned from McAfee Associates in 1994 and shortly thereafter "sold his remaining

stake in the company."  RJN Ex. X.

The law is clear that a misrepresentation cannot be material if the truth is already known

to the market.  As the Second Circuit explained in *Ganino v. Citizens Utilities Co.*, 228 F.3d 154

(2d Cir. 2000), a defendant can rebut a presumption that its alleged misrepresentations have

affected the market price of a stock by showing that the truth of the matter was already known.

*Id.* at 167.  Likewise, this Court has repeatedly found that a "misrepresentation is immaterial if

the information is already known to the market because the misrepresentation cannot then

defraud the market."  *See, e.g.*, *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *6 (S.D.N.Y.

May 18, 2012) (internal quotation marks omitted); *see also In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *22 (S.D.N.Y. Oct. 25, 2006) (holding that plaintiffs failed to state a claim because "no reasonable investor could have been misled" by a failure to disclose information "[g]iven the detail with which . . . two major international newspapers reported" on that information); *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 2012 WL 1353523, at *8 (S.D.N.Y. Apr. 12, 2012) (granting dismissal on a claim that defendants failed to disclose state investigations into their company because "the plaintiff has not alleged with particularity the existence of any material information not disseminated to the market" in "numerous press accounts" about the investigations).  Because the information upon which the SEC's complaint relies was known to the market for almost a quarter century, it cannot support a claim of fraud. *Cf. Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth.").[8]

What's more, although the Complaint fails to articulate any theory of materiality, it implies that the statement in the press release was material to investors because of the "suggest[ion]" that MGT "might achieve similar success" to McAfee Associates.  AC ¶ 144. Aside from whether an unstated "suggestion" can even be an actionable misstatement, the alleged "suggestion"—that MGT had teamed up with a successful and well-known anti-virus entrepreneur and that it hoped he would achieve similar success with MGT as well—would have been no different even if the Form 8-K had made clear that Mr. McAfee had resigned from the company he founded by the time it was sold to Intel.  And if the "suggestion" being made to

_____

[8] Significantly, the media characterized Mr. McAfee's prior history in the same manner as MGT. *See* RJN Ex. Y (McAfee "retained the right in other contexts to use his name in advertising, promotions and presentations, including with regard to his role at McAfee Associates, which *he* sold to Intel for $7.7 billion in 2010." (emphasis added)); RJN Ex. Z ("McAfee had sold Intel his company in 2010 for $7.7 billion.").

investors would have been the same no matter how it was phrased, the statement cannot be actionable as a violation of the securities laws.

The SEC also fails plausibly to allege scienter in connection with the May 9, 2016 Form 8-K.  Once again, the Complaint does nothing more than repeat that Mr. Ladd "knew or was reckless in not knowing" that the statement in question was false.  AC ¶ 144.  There are no allegations surrounding the drafting of the Form 8-K that would support a strong inference that Mr. Ladd had the intent to deceive investors.  And while the Complaint alleges that certain Defendants engaged in coordinated trading on May 9, 2016, it does not (and could not) allege that Mr. Ladd engaged in this activity or knew that it was happening.  *Id*. ¶ 145; *see also DiVittorio*, 822 F.2d at 1247 (where multiple defendants are alleged to have engaged in fraud, the complaint must inform each defendant of the nature of his alleged participation in the fraud).  The SEC's conclusory allegations of scienter therefore fail as a matter of law.  *Espuelas*, 579 F. Supp. 2d at 477 ("The SEC's allegations that [Defendants] 'knew or [were] reckless in not knowing' . . . are conclusory and do not support a strong inference of fraudulent intent."); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[C]onclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing other things'—do not satisfy the requirements of Rule 9(b)."); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982) ("[C]onclusory allegations of fraudulent conduct are insufficient without specific allegations of fact.").

Nor can the SEC point to Mr. Ladd's stock sales following the May 9 press release as supporting an inference of scienter.  *See* AC ¶ 148.  Selling shares while the stock price is high is not sufficient to allege scienter without suspicious or unusual activity in connection with the sales.  *See supra* at 14-15.  The SEC does not allege any facts concerning the amount of profit

from the sales, the portion of stockholdings sold, or changes in volume of Mr. Ladd's sales.  *See id*.  Because the SEC does not allege any facts that would suggest that Mr. Ladd's stock sales were unusual, it cannot establish scienter.

Finally, just two weeks after the May 9 release, MGT clarified the statement about Mr. McAfee to read that "[Mr. McAfee] founded [his company] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010."  AC ¶ 149.  This clarification further undermines any inference of scienter.  *See, e.g.*, *Antelis v. Freeman*, 799 F. Supp. 2d 854, 867 (N.D. Ill. 2011) (holding that prompt corrective disclosures suggested "that an innocent explanation for the defendants' statements was more compelling than that they acted with scienter").

### D.     The SEC Fails to State a Claim in Connection with MGT's Other Disclosures

The SEC alleges that Mr. Ladd violated Rule 10b-5(b) and § 17(a)(2) by omitting (a) the "true extent" of the Investor Defendants' ownership of MGT stock, and (b) the Investor Defendants' purported "collective control over [MGT's] management and policies" in MGT's 2015 Form 10-K and its November 6, 2015 Form S-1, which the company filed to register the sale of shares issued in connection with the October 2015 financing.  *See* AC ¶¶ 137, 158, 214, 220.  These allegations are insufficient to state a claim.

First, the SEC's allegations misstate and mischaracterize the purportedly misleading filings.  MGT's 2015 Form 10-K truthfully and accurately met all the requirements of that filing. 15 U.S.C. § 78m(d)(1) requires disclosure of the ownership of shares of persons who own more than five percent of a company's stock.  In the section of the Form 10-K entitled "Security Ownership of Certain Beneficial Owners," MGT plainly disclosed the shareholdings of the only three shareholders who owned more than five percent—Mr. Ladd, Mr. Honig, and Iroquois Capital Management, LLC.  RJN Ex. A at 26-27.  None of the other Investor Defendants owned more than five percent of MGT's shares.  Similarly, the Form S-1 filed November 6, 2015

specifically identified all four investors in the October 2015 financing (which the SEC fails to mention in the Complaint). RJN Ex. H at 44-46 (noting that "Michael Brauser is the trustee of Grander Holdings, Inc. 401K," "Barry Honig is the trustee of GRQ Consultants, Inc. Roth 401K FBO Barry Honig," "John Stetson is the president of Stetson Capital Investments Inc.," and "John O'Rourke is the manager of ATC Capital LLC"). The Form S-1 also detailed precisely how ownership is calculated, including the impact from convertible securities. *See id.* at 44. Simply put, the filings that form the centerpiece of the SEC's Complaint were truthful, accurate, and met all applicable regulatory requirements—and the SEC does not allege otherwise.

Faced with the reality that the filings at issue were in fact accurate, the SEC resorts to a vague omissions theory, claiming that Mr. Ladd signed MGT filings "that did not disclose the full extent of [the Investor Defendants'] ownership or control." AC ¶ 150. That theory is fatally flawed as well. The Supreme Court has repeatedly explained that the anti-fraud provisions of the federal securities laws "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). For an omission to be actionable, the SEC must allege a duty to disclose that Mr. Ladd breached, which it has failed to do. *See, e.g.*, *Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*, 2019 WL 1368570, at *8 (S.D.N.Y. Mar. 26, 2019) (dismissing securities fraud claims because the complaint "does not allege that [defendant] had a duty to disclose"). There is no generalized duty to disclose "the full extent" of certain investors' ownership or control. *Cf. SEC v. Cohmad Sec. Corp.*, 2010 WL 363844, at *4-5 (S.D.N.Y. Feb. 2, 2010) (finding "speculative and flimsy" fraud claims based on an alleged failure to disclose "the full extent" of the relationship between two companies in regulatory filings). Thus, the alleged failure to make such a disclosure is not actionable.[9]

---

[9] For the same reason, the SEC's claim that the company's October 8, 2015 Form 8-K, which it filed in connection with the October 2015 financing, "did not disclose the investors' identities,"

In the absence of either affirmative misstatements or a duty to disclose, the SEC attempts to manufacture a claim out of whole cloth by turning a regulatory reporting requirement into a fraud claim.  Section 13(d) of the Exchange Act requires any "person" who is the beneficial owner of more than five percent of a class of stock to disclose such ownership.  15 U.S.C. § 78m(d)(1).  Section 78m(d)(3) provides that when "two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes" of § 78m(d)(1).  The SEC does not allege that Mr. Ladd failed to disclose his own beneficial ownership under § 78m(d)(1).  Instead, it alleges that the Investor Defendants were all members of a "group" and should be considered a single "person" under § 78m(d)(3), AC ¶ 154, and that Mr. Ladd should have disclosed the group's beneficial ownership in two SEC filings, *id.* ¶ 158.

To begin, the allegation that the Investor Defendants constituted a "group" and thus a single person under Section 13(d) is purely conclusory, devoid of factual particularity and untethered to the actual legal standard.  The key question in determining whether a "group" exists under Section 13(d) is whether there was *an agreement* among the relevant individuals to act together for the purpose of acquiring, holding, or selling securities.  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 123-24 (2d Cir. 2001); *see Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir. 1973) (stating that "absent an agreement between them a 'group' would not exist").  "Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group which is deemed to be a statutory person." *Transcon*

---

AC ¶ 136, is not actionable.  As the SEC acknowledges, the Form 8-K accurately disclosed that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units."  *Id.*  It also accurately disclosed that Barry Honig was the lead investor.  RJN Ex. G.  The SEC has not alleged (nor could it) that Mr. Ladd had a duty to disclose the identities of all the investors, nor that he acted with scienter in not doing so.  *Cf. Ross v. Licht*, 263 F. Supp. 395 (S.D.N.Y. 1967) (identity of purchasers of corporate stock held not to be a material fact required to be disclosed by a corporate insider).

*Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 375 (S.D.N.Y. 1979) (internal quotation marks

omitted).  Similarly, "proof that defendants had jointly invested together in other transactions

would not establish that they currently have an agreement with respect to [the company's]

stock."  *Forward Indus. v. Wise*, 2014 WL 6901137, at *3 (S.D.N.Y. Sept. 23, 2014) (internal

quotation marks omitted).

Where a claim is premised on the existence of an agreement, "stating such a claim

requires a complaint with enough factual matter (taken as true) to suggest that an agreement was

made."  *Chechele v. Scheetz*, 819 F. Supp. 2d 342, 346 (S.D.N.Y. 2011) (quoting *Bell Atlantic

Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Thus, while assessing the facial plausibility of an

alleged shareholder group, this court has held that "bare allegations that the parties agreed that

they would maintain control of [the company] will not, without more, suffice."  *Id.* at 347

(internal quotation marks and alterations omitted); *see also In re Facebook, Inc., IPO Sec. &

Deriv. Litig.*, 986 F. Supp. 2d 544, 554 (S.D.N.Y. 2014) (granting motion to dismiss because

conclusory allegations of an agreement did not suffice to "plead any basis on which to infer the

formation of a 'group'").  Thus, the allegation that the Investor Defendants "collectively

exercised control over Ladd and the management and policies of" MGT, AC ¶ 152, is

insufficient, because exercising control over the management and policies of a company has no

bearing on whether a set of individuals qualifies as a "group" under § 78m(d)(3), which looks at

whether the individuals agreed to acquire, hold, or dispose of securities.  Here, the SEC has

pleaded <u>no</u> facts about the alleged agreement, and thus has not adequately pleaded the existence

of a group.  *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 319 n.2 (2d Cir. 2010) ("The

allegation that defendants agreed . . . is obviously conclusory, and is not accepted as true.").

Even if the SEC had adequately alleged that the Investor Defendants were a "group"

under Section 13(d), the Complaint contains an additional fatal defect—namely, it does not

allege that Mr. Ladd *knew* that they acted in concert for the purpose of acquiring, holding, and

disposing of shares such that he acted with scienter when he signed forms that did not disclose

the alleged group.  The SEC alleges only that Mr. Ladd knew that the Investor Defendants were

"working together."  AC ¶ 158.  But the mere fact that individuals are working together does not

establish a "group" under Section 13(d).  *See In re Charter Commc'ns*, 419 B.R. 221, 239

(Bankr. S.D.N.Y. 2009) ("Apollo, Oaktree, and Crestview certainly are members of a group in

the sense that they are working together to maximize their investments in Charter and to achieve

common economic goals, but they do not fit the definition of a group as used in Section 13(d).").

What's more, the very filings that the SEC claims were misleading—the Form 10-K and

the Form S-1—specifically identified Mr. Honig as a large investor (in the case of the Form 10-

K) and the identities of all four investors in the October 2015 financing (in the case of the Form

S-1).  RJN Ex. A at 26-27; RJN Ex. H at 44-46.  This transparent and accurate disclosure of who

was investing plainly undermines any plausible inference of scienter on the part of Mr. Ladd

with respect to the so-called "true extent" of the Investor Defendants' shareholdings.

In the absence of any actual evidence of scienter, the SEC seizes on the word "group" in

a single email that Mr. Ladd sent to Mr. Honig.  *See* AC ¶ 137 ("In November 2015, Ladd wrote

Honig: 'As for the cap table, we have 17.2 million common shares outstanding, including *your*

*group's* 2.8 million.'" (emphasis in original)).  The SEC has pleaded no facts establishing that

when Mr. Ladd used the word "group" in this email, he was not using it colloquially, and the

inference that Mr. Ladd knew the Investor Defendants were operating as a group within the

precise meaning of Section 13(d) is nothing more than rank speculation.  *Cf. Dombek v. Adler*,

2019 WL 459019, at *4 (D.S.C. Feb. 5, 2019) (party could not rely on documents that referred to a "partnership" because "the mere use of the term 'partner' in the colloquial sense does not suffice to allege a partnership").  The SEC's threadbare allegations of scienter fail to state a claim and demonstrate the weakness of its theory of fraud.

### E.    The SEC Has Not Adequately Alleged Negligence

It is not clear whether the SEC is pursuing a theory of negligence.  To the extent the SEC premises its § 17(a)(2) claim on negligence as well as scienter, *see* AC ¶ 220 ("knowingly, recklessly, or negligently"), it has not adequately alleged negligence beyond a stray reference in its claim for relief.  Indeed, other than that reference, the SEC has pleaded an intent case, not a negligence case.  *See, e.g.*, AC ¶ 144 ("Ladd knew or was reckless in not knowing . . ."); ¶ 150 ("Ladd, with full knowledge . . ."); ¶ 158 ("Notwithstanding that Ladd knew . . .").  "Intent and negligence are regarded as mutually exclusive grounds for liability."  *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 479 (D.C. Cir. 2019) (quoting *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 916 (D.C. Cir. 2015)).  "Any given act may be intentional or it may be negligent, but it cannot be both."  *Id.*  Thus, a plaintiff does not properly plead a claim for negligence by a stray reference to negligence in its complaint because "[m]erely using the term negligence does not raise a cognizable claim of negligence."  *Harris*, 776 F.3d at 916; *see also id.* (dismissing negligence claim because the complaint did not "distinguish between negligent and intentional acts" and did not "identify any specific act that was allegedly negligent").

If the SEC were trying to plead a negligence case, it has failed to allege the applicable standard of care.  *SEC v. Pocklington* is instructive.  2018 WL 6843663 (C.D. Cal. Sept. 10, 2018).  There, the court dismissed a negligence claim because the complaint was unclear as to whether the defendant was negligent under a general standard of reasonableness or a specialized standard of care applicable to his profession.  *Id.* at *16.  The court held that, because the SEC

24

"alleges no facts regarding the proper standard of care for a CPA, it is unclear what duty of care

[defendant] allegedly breached by his conduct." *Id.* Because the SEC does not allege what

standard of care would apply to Mr. Ladd's actions as a non-lawyer CEO of a microcap

company—or allege a negligence theory in the Complaint at all—its § 17(a)(2) claim should be

dismissed to the extent it is predicated on negligence.

### F.   The Complaint Fails to State a Valid Claim for Aiding and Abetting

The SEC's claims that Mr. Ladd aided and abetted others' securities violations fail as a

matter of law. The SEC contends that Mr. Ladd "provided knowing and substantial assistance"

to the Investor Defendants' securities fraud violations. *See* AC ¶¶ 235, 240. In order to establish

knowledge for an aiding and abetting claim, the SEC must allege *actual* knowledge. *Espuelas*,

579 F. Supp. 2d at 471.[10] For the reasons set forth above with respect to Mr. Ladd's lack of

scienter, nothing in the Complaint plausibly demonstrates that Mr. Ladd had actual knowledge

that he was substantially assisting anyone in the commission of alleged securities fraud. *See,

e.g.*, *id.* at 485 (dismissing aiding and abetting claims because the court "has already found that

the Complaint does not adequately plead scienter").

## V.   CONCLUSION

For the foregoing reasons, Mr. Ladd respectfully requests that this Court dismiss the

SEC's claims against him with prejudice.

---

[10] Although Section 929O of the Dodd-Frank Act changed the state of mind for aiding and abetting under Section 20(e) from "knowingly" to "knowingly or recklessly," the SEC does not plead that Mr. Ladd acted recklessly in his alleged aiding and abetting. *See* AC ¶¶ 233-42.

Dated:  June 19, 2019                     Respectfully submitted,


                                          /s/ Randall R. Lee
                                          Randall R. Lee (*admitted pro hac vice*)
                                          COOLEY LLP
                                          1333 2nd Street
                                          Santa Monica, CA 90401
                                          randall.lee@cooley.com
                                          Telephone: (310) 883-6485
                                          Facsimile: (310) 883-6500


                                          Christopher Johnstone (*admitted pro hac vice*)
                                          WILMER CUTLER PICKERING HALE
                                             AND DORR LLP
                                          950 Page Mill Road
                                          Palo Alto, CA 94304
                                          chris.johnstone@wilmerhale.com
                                          Telephone: (650) 858-6147
                                          Facsimile: (650) 858-6100

                                          *Attorneys for Defendant Robert Ladd*