# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**Form 10–K**

**FOR ANNUAL AND TRANSITION REPORTS PURSUANT TO**
**SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

X **ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended: December 31, 2015**

**OR**

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from      to**

**MGT CAPITAL INVESTMENTS, INC.**
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 001-32698 | 13–4148725 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**500 Mamaroneck Avenue, Suite 320, Harrison, NY 10528, USA**
(Address of principal executive offices, including zip code)

**914–630–7430**
(Registrant's Telephone Number, Including Area Code)

Securities registered under section 12(b) of the Exchange Act: **Common stock, par value $0.001 per share**

Securities registered under section 12(g) of the Exchange Act: **Not applicable**

Name of each exchange on which registered: **NYSE MKT**

Indicate by check mark if the Registrant is a well–known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No X

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No X

Check whether the issuer: (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file), and (2) has been subject to such filing requirements for the past 90 days. Yes X   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S–T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes X   No ☐

Indicate by check mark if disclosure of delinquent filers is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non–accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b–2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large Accelerated Filer   ☐ | Accelerated filer   ☐ |
| Non–accelerated Filer   ☐ | Smaller reporting company   X |
| (Do not check if smaller reporting company) | |

Indicate by check mark whether the Registrant is a shell Company (as defined in Rule 12b–2 of the Act). Yes ☐ No X

As of June 30, 2015, the last day of the registrant's most recently completed second fiscal quarter; the aggregate market value of the registrant's Common stock held by non–affiliates of the registrant was approximately $7,800,000.

As of April 13, 2016, the registrant had outstanding 18,098,221 shares of Common stock, $0.001 par value. (the "Common stock")

**MGT CAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**INDEX**
**(in thousands, except share and per–share amounts)**

**PART I**

| Item 1 | Business | 1 |
|---|---|---|
| Item 1A | Risk Factors | 2 |
| Item 1B | Unresolved Staff Comments | 11 |
| Item 2 | Properties | 11 |
| Item 3 | Legal Proceedings | 11 |
| Item 4 | Mine Safety Disclosures | 11 |

**PART II**

| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 12 |
|---|---|---|
| Item 6 | Selected Financial Data | 12 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 20 |
| Item 8 | Financial Statements and Supplementary Data | 20 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 21 |
| Item 9A | Controls and Procedures | 21 |
| Item 9B | Other Information | 21 |

**PART III**

| Item 10 | Directors, Executive Officers and Corporate Governance | 22 |
|---|---|---|
| Item 11 | Executive Compensation | 24 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 26 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 28 |
| Item 14 | Principal Accountant Fees and Services | 28 |

**PART IV**

| Item 15 | Exhibits and Financial Statement Schedules | 29 |
|---|---|---|
| | SIGNATURES | 30 |

## NOTE REGARDING FORWARD LOOKING STATEMENTS

This Annual Report on Form 10–K, including the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7, contains forward–looking statements that involve risks and uncertainties, as well as assumptions that, if never materialize or prove incorrect, could cause the results of MGT Capital Investments, Inc. and its consolidated subsidiaries (the "Company") to differ materially from those expressed or implied by such forward–looking statements. The words "anticipates," "believes," "estimates," "expects," "intends," "may," "plans," "projects," "will," "would" and similar expressions are intended to identify forward–looking statements, although not all forward–looking statements contain these identifying words. All statements other than statements of historical fact are statements that could be deemed forward–looking statements, including any projections of revenue, gross margin, expenses, earnings or losses from operations, our ability to enforce and monetize our patents, synergies or other financial items; any statements of the plans, strategies and objectives of management for future operations, the execution of restructuring plans; any statements concerning the likelihood of success of our patent enforcement litigation; any statement concerning developments, any statements regarding future economic conditions or performance; any statements of expectation or belief; and any statements of assumptions underlying any of the foregoing. The risks, uncertainties and assumptions referred to above include the performance of contracts by partners; employee management issues; the difficulty of aligning expense levels with revenue changes; and other risks that are described herein, including but not limited to the specific risks areas discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of this report, and that are otherwise described from time to time in the Company's periodic disclosure statements and for reports filed with the Securities and Exchange Commission. The Company assumes no obligation and does not intend to update these forward–looking statements.

## PART I

### Item 1. Business

MGT Capital Investments, Inc. ("MGT," "the Company," "we," "us") is a Delaware corporation, incorporated in 2000. The Company was originally incorporated in Utah in 1977. MGT is comprised of the parent company, wholly–owned subsidiaries Medicsight, Inc. ("Medicsight"), MGT Sports, Inc. ("MGT Sports"), MGT Studios, Inc. ("MGT Studios"), an majority–owned subsidiary MGT Gaming, Inc. MGT Studios also owns a controlling minority interest in the subsidiary M2P Americas, Inc. Our corporate office is located in Harrison, New York.

MGT and its subsidiaries are principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry. MGT's portfolio includes a social casino platform Slot Champ and minority stakes in the skill–based gaming platform MGT Play and fantasy sports operator DraftDay Gaming Group, Inc. ("DDGG") (see September 8, 2015 development below).

In addition, MGT Gaming owns three patents covering certain features of casino slot machines. Two of the patents were asserted against alleged infringers in various actions in federal court in Mississippi. In July 2014, MGT Gaming dismissed its lawsuits against WMS Gaming Inc., and in August 2015, the Company and defendants Aruze America and Penn National Gaming agreed to settle all pending litigation and all proceedings at the U. S. Patent and Trademark Office. The Company received a payment of $90, which was recorded as licensing revenue. In an effort to monetize its gaming patent portfolio, the Company has engaged Munich Innovations GmbH, the patent monetization firm that sold MGT's medical patent portfolio to Samsung in 2013 for $1.5 million.

On September 8, 2015, the Company and MGT Sports entered into an Asset Purchase Agreement with Viggle, Inc. ("Viggle") and Viggle's subsidiary DDGG, pursuant to which Viggle acquired all of the assets of the DraftDay.com business ("DraftDay.com") from the Company and MGT Sports. In exchange for the acquisition of DraftDay.com, Viggle paid MGT Sports the following: (a) 1,269,342 shares of Viggle's common stock, since renamed Draftday Fantasy Sports, Inc. (NASDAQ: DDAY), (b) a promissory note in the amount of $234 paid on September 29, 2015, (c) a promissory note in the amount of $1,875 due March 8, 2016, and (d) 2,550,000 shares of common stock of DDGG (private entity). In addition, in exchange for providing certain transitional services, DDGG issued to MGT Sports a warrant to purchase 1,500,000 shares of DDGG common stock. Following consummation of the transaction, MGT Sports owns an 11% equity interest in DDGG, Viggle (since renamed Draftday Fantasy Sports, Inc.) owns 49%, and Sportech, Inc. owns 39%. As a result of the transaction, the Company has presented DraftDay.com as a discontinued operation. There can be no assurance that the Company will be able to realize full value of the above consideration, the Company has taken a reserve of $300 against the March 8, 2016 promissory note and continues to monitor for further possible impairment.

Medicsight owns U.S. Food and Drug Administration approved medical imaging software and has designed an automated carbon dioxide insufflation device on which it receives royalties from an international manufacturer.

### Strategy

MGT and its subsidiaries are principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space, as well as the casino industry. The Company's acquisition strategy is designed to obtain control of assets with a focus on risk mitigation coupled with large potential upside. We plan to build our portfolio by seeking

out large social and real money gaming opportunities via extensive research and analysis. Next, we will attempt to secure controlling interests for modest cash and/or stock outlays. MGT then budgets and funds operating costs to develop business operations and tries to motivate sellers with equity upside. While the ultimate objective is to operate businesses for free cash flow, there may be opportunities where we sell or otherwise monetize certain assets.

1

There can be no assurance that any acquisitions will occur at all, or that any such acquisitions will be accretive to earnings, book value and other financial metrics, or that any such acquisitions will generate positive returns for Company stockholders. Furthermore, it is contemplated that any acquisitions may require the Company to raise capital; such capital may not be available on terms acceptable to the Company, if at all.

Following the sale of DraftDay.com, the Company has been considering all methods to create value for shareholders, including potential mergers, spin–offs, distributions and other strategic actions.

## Competition

MGT encounters intense competition in all its businesses, in most cases from larger companies with greater financial resources such as the daily fantasy sports operators FanDuel, Inc. and DraftKings, Inc. or Zynga, Inc. (NASDAQ: ZNGA) an Caesars Acquisition Company (NASDAQ: CACQ) which focus on social and real money online gaming.

## Employees

Currently, the Company and its subsidiaries have 2 full–time employees. None of our employees is represented by a union and we believe our relationships with our employees are good.

## Available information

MGT maintains a website at www.mgtci.com. The Company makes available free of charge our annual report on Form 10–K, Quarterly Reports on Form 10–Q and current reports on Form 8–K, including any amendments to the foregoing reports, as soon as is reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission or the SEC. These materials along with our Code of Business Conduct and Ethics are also available through our corporate website at www.mgtci.com. A copy of this Annual Report on Form 10–K ("Annual report") is located at the Securities and Exchange Commission's Public Reference Room at 100 F Street, NE, Washington, D.C. 20549. Information on the operation of the Public Reference Room can be obtained by calling the SEC at 1–800–SEC–0330. The public may also download these materials from the Securities and Exchange Commission's website at http://www.sec.gov. Any amendments to, and waivers of, our Code of Business Conduct and Ethics will be posted on our corporate website. The Company is not including the information contained at mgtci.com as a part of this Annual Report.

## Item 1A. Risk factors

Discussion of our business and operations included in this Annual Report on Form 10–K should be read together with the risk factors set forth below. They describe various risks and uncertainties to which we are or may become subject. These risks and uncertainties, together with other factors described elsewhere in this report, have the potential to affect our business, financial condition, results of operations, cash flows, strategies or prospects in a material and adverse manner. New risks may emerge at any time, and we cannot predict those risks or estimate the extent to which they may affect our financial performance. Each of the risks described below could adversely impact the value of our securities. These statements, like all statements in this report, speak only as of the date of this Annual Report (unless another date is indicated), and we undertake no obligation to update or revise the statements in light of future developments.

We cannot assure you that we will be successful in commercializing any of the Company's products or if any of our products are commercialized, that they will be profitable for the Company.

The Company generates limited revenue from operations upon which an evaluation of our prospects can be made. The Company's prospects must be considered keeping in mind the risks, expenses and difficulties frequently encountered in the establishment of a new business in a constantly changing industry. There can be no assurance that the Company will be able to achieve profitable operations in the foreseeable future, if at all.

## Company specific risks

*Our financial results are highly concentrated in the online mobile and gaming business; if we are unable to grow online mobile and gaming revenues and find alternative sources of revenue, our financial results will suffer.*

Licensing accounted for substantially all of our revenues from continuing operations for the year ended December 31, 2015. Our success depends upon customers choosing to use, and search advertising partners choosing to advertise, on, our online, mobile and casino gaming products. Decisions by customers and our search advertising partners not to adopt our products at projected rates, or changes in market conditions, may adversely affect the use or distribution of our products. Because of our revenue concentration in the online, mobile and casino gaming business, such shortfalls or changes could have a

negative impact on our financial results, or with regard to some of our larger advertising partners specifically, our results of operations, financial condition and/or liquidity will suffer.

*Our acquisition activities may disrupt our ongoing business, may involve increased expenses and may present risks not contemplated at the time of the transactions.*

We have acquired, and may continue to acquire, companies, products and technologies that complement our strategic direction. Acquisitions involve significant risks and uncertainties, including:

- diversion of management time and a shift of focus from operating the businesses to issues related to integration and administration;

- inability to successfully integrate the acquired technology and operations into our business and maintain uniform standards, controls, policies and procedures;

- challenges retaining the key employees, customers and other business partners of the acquired business; inability to realize synergies expected to result from an acquisition;

- in the case of foreign acquisitions, the need to integrate operations across different cultures and languages and to address the particular economic, currency, political and regulatory risks associated with specific countries;

- liability for activities of the acquired companies before the acquisition, including violations of laws, rules and regulations, commercial disputes, tax liabilities and other known and unknown liabilities; and

- that any acquisitions will occur at all, or that any such acquisitions will be accretive to earnings, book value and other financial metrics, or that any such acquisitions will generate positive returns for Company stockholders. Furthermore, it is contemplated that any acquisitions may require the Company to raise capital; such capital may not be available on terms acceptable to the Company, if at all.

Because acquisitions are inherently risky, our transactions may not be successful and may, in some cases, harm our operating results or financial condition.

*The mobile game application business is still developing, and our efforts to develop mobile games may prove unsuccessful, or even if successful, it may take more time than we anticipate to achieve significant revenues from this activity because, among other reasons:*

- we may have difficulty optimizing the monetization of our mobile games due to our relatively limited experience creating games that include micro–transaction capabilities, advertising and offers;

- we intend to continue to develop substantially all of our games based upon our own intellectual property, rather than well–known licensed brands, and we may encounter difficulties in generating sufficient consumer interest in and downloads of our games, particularly since we have had relatively limited success generating significant revenues from games based on our own intellectual property;

- many well–funded public and private companies have released, or plan to release, mobile games, and this competition will make it more difficult for us to differentiate our games and derive significant revenues from them;

- mobile games have a relatively limited history, and it is unclear how popular this style of game will become or remain or its revenue potential;

- our mobile strategy assumes that a large number of players will download our games because they are free and that we will subsequently be able to effectively monetize the games; however, players may not widely download our games for a variety of reasons, including poor consumer reviews or other negative publicity, ineffective or insufficient marketing efforts, lack of sufficient community features, lack of prominent storefront featuring and the relatively large file size of some of our "thin–client games," which often utilize a significant amount of the available memory on a user's device.  Due to the inherent limitations of the most commonly–used smartphone platforms and telecommunications networks, which only allow applications that are less than 50 megabytes to be downloaded over a carrier's wireless network, players must download one of our thick–client games either via a wireless Internet (Wi–Fi) connection, or initially to their computer and then side–load the thick–client game to their device;

- even if our games are widely downloaded, we may fail to retain users or optimize the monetization of these games for a variety of reasons, including poor game design or quality, lack of community features, gameplay issues such as game unavailability, long load times or an unexpected termination of the game due to data server or other

technical issues, or our failure to effectively respond and adapt to changing user preferences through game updates;

3

- the billing and provisioning capabilities of some smartphones and tablets are currently not optimized to enable users to purchase games or make in–app purchases, which make it difficult for users of these smartphones and tablets to purchase our games or make in–app purchases and could reduce our addressable market, at least in the short term; and megabytes to be downloaded over a carrier's wireless network, players must download one of our thick–client games either via a wireless Internet (Wi–Fi) connection, or initially to their computer and then side–load the thick–client game to their device;

- the Federal Trade Commission has indicated that it intends to review issues related to in–app purchases, particularly with respect to games that are marketed primarily to minors, and the commission might issue rules significantly restricting or even prohibiting in–app purchases or name us as a defendant in a future class–action lawsuit.

If we do not achieve a sufficient return on our investment with respect to this business model, it will negatively affect our operating results and may require us to make change to our business strategy.

*The markets in which we operate are highly competitive, and many of our competitors have significantly greater resources than we do.*

Developing, distributing and selling mobile games is a highly competitive business, characterized by frequent product introductions and rapidly emerging new platforms, technologies and storefronts. For end users, we compete primarily on the basis of game quality, brand and customer reviews. We compete for promotional and storefront placement based on these factors, as well as our relationship with the digital storefront owner, historical performance, perception of sales potential and relationships with licensors of brands and other intellectual property. For content and brand licensors, we compete based on royalty and other economic terms, perceptions of development quality, porting abilities, speed of execution, distribution breadth and relationships with storefront owners or carriers. We also compete for experienced and talented employees.

We compete with a continually increasing number of companies, including Zynga, King Digital, Soul & Vibe Interactive, DeNA, Gree, Nexon, and Glu. In addition, given the open nature of the development and distribution for smartphones and tablets, we also compete or will compete with a vast number of small companies and individuals who are able to create and launch games and other content for these devices using relatively limited resources and with relatively limited start–up time or expertise.

Some of our competitors and our potential competitors have one or more advantages over us, either globally or in particular geographic markets, which include:

- significantly greater financial resources;

- greater experience with the mobile games business model and more effective game monetization;

- stronger brand and consumer recognition regionally or worldwide;

- stronger strategy which may reach our target audience better than our current strategy;

- greater experience integrating community features into their games and increasing the revenues derived from their users;

- the capacity to leverage their marketing expenditures across a broader portfolio of mobile and non–mobile products;

- larger installed customer bases from related platforms, such as console gaming or social networking websites, to which they can market and sell mobile games;

- more substantial intellectual property of their own from which they can develop games without having to pay royalties;

- lower labor and development costs and better overall economies of scale;

- greater platform–specific focus, experience and expertise; and

- broader global distribution and presence.

If we are unable to compete effectively or we are not as successful as our competitors in our target markets, our sales could decline, our margins could decline and we could lose market share, any of which would materially harm our business, operating results and financial condition.

*Inflation and future expectations of inflation influence consumer spending on entertainment such as online gaming and gambling.*

As a result, our profitability and capital levels may be impacted by inflation and inflationary expectations. Additionally, inflation's impact on our operating expenses may affect profitability to the extent that additional costs are not recoverable through increased cost of consumer acquisition for our portfolio of online, mobile gaming and casino gaming offerings.

*Consumer tastes are continually changing and are often unpredictable, and we compete for consumer discretionary spending against other forms of entertainment; if we fail to develop and publish new mobile games that achieve market acceptance, our sales would suffer.*

Our mobile game business depends on developing and publishing mobile games that consumers will want to download and spend time and money playing. We must continue to invest significant resources in research and development, analytics and marketing to introduce new games and continue to update our successful mobile games, and we often must make decisions about these matters well in advance of product release to timely implement them. Our success depends, in part, on unpredictable and volatile factors beyond our control, including consumer preferences, competing games, new mobile platforms and the availability of other entertainment activities. If our games and related applications do not meet consumer expectations, or they are not brought to market in a timely and effective manner, our business, operating results and financial condition would be harmed. Even if our games are successfully introduced and initially adopted, a failure to continue to update them with compelling content or a subsequent shift in the entertainment preferences of consumers could cause a decline in our games' popularity that could materially reduce our revenues and harm our business, operating results and financial condition. Furthermore, we compete for the discretionary spending of consumers, who face a vast array of entertainment choices, including games played on personal computers and consoles, television, movies, sports and the Internet. If we are unable to sustain sufficient interest in our games compared to other forms of entertainment, our business and financial results would be seriously harmed.

*If we do not successfully establish and maintain awareness of our brand and games, if we incur excessive expenses promoting and maintaining our brand or our games or if our games contains defects or objectionable content, our operating results and financial condition could be harmed.*

We believe that establishing and maintaining our brand is critical to establishing a direct relationship with end users who purchase our products from direct–to–consumer channels and to maintaining our existing relationships with distributors and content licensors, as well as potentially developing new such relationships. Increasing awareness of our brand and recognition of our games is particularly important in connection with our strategic focus of developing games based on our own intellectual property. Our ability to promote our brand and increase recognition of our games depends on our ability to develop high–quality, engaging games. If consumers, digital storefront owners and branded content owners do not perceive our existing games as high–quality or if we introduce new games that are not favorably received by them, then we may not succeed in building brand recognition and brand loyalty in the marketplace. In addition, globalizing and extending our brand and recognition of our games is costly and involves extensive management time to execute successfully, particularly as we expand our efforts to increase awareness of our brand and games among international consumers. Although we have significantly increased our sales and marketing expenditures in connection with the launch of our games, these efforts may not succeed in increasing awareness of our brand or the new games. If we fail to increase and maintain brand awareness and consumer recognition of our games, our potential revenues could be limited, our costs could increase and our business, operating results and financial condition could suffer.

*If we fail to deliver our games at the same time as new mobile devices are commercially introduced, our sales may suffer.*

Our business depends, in part, on the commercial introduction of new mobile devices with enhanced features, including larger, higher resolution color screens, improved audio quality, and greater processing power, memory, battery life and storage. For example, the introduction of new and more powerful versions of Apple's iPhone and iPad and devices based on Google's Android operating system, have helped drive the growth of the mobile games market. In addition, consumers generally purchase the majority of content, such as our games, for a new device within a few months of purchasing it. We do not control the timing of these device launches. Some manufacturers give us access to their mobile devices prior to commercial release. If one or more major manufacturers were to stop providing us access to new device models prior to commercial release, we might be unable to introduce games that are compatible with the new device when the device is first commercially released, and we might be unable to make compatible games for a substantial period following the device release. If we do not adequately build into our title plan the demand for games for a particular mobile device or experience game launch delays, we miss the opportunity to sell games when new mobile devices are shipped or our end users upgrade to a new mobile device, our revenues would likely decline and our business, operating results and financial condition would likely suffer.

*We will need additional capital to continue our operation.*

We may need to obtain additional financing for advertising, promotion and acquisition of additional products. The Company is constantly looking for new sources of revenue that will help fund our business. There can be no assurances that this will be achieved.

If we successfully raise additional funds through the issuance of debt, we will be required to service that debt and are

likely to become subject to restrictive covenants and other restrictions contained in the instruments governing that debt, which may limit our operational flexibility. If we raise additional funds through the issuance of equity securities, then those securities may have rights, preferences or privileges senior to the rights of holders of our Common stock, and holders of our Common stock will experience dilution.

We cannot be certain that such additional debt or equity financing will be available to us on favorable terms when required, or at all. If we cannot raise funds in a timely manner, or on acceptable terms, we may not be able to promote our brand, develop or enhance our products and services, take advantage of future opportunities or respond to competitive pressures or unexpected requirements, and we may be required to reduce or limit operations.

*The effect of the proposed "Unlawful Internet Gambling Funding Prohibition Act."*

During the 2003 fiscal year, the House Judiciary Committee of the US Government approved HR21 "Unlawful Internet Gambling Funding Prohibition Act". This bill creates a new crime of accepting financial instruments, such as credit cards or electronic fund transfers, for debts incurred in illegal internet gambling. The bill enables state and federal Attorneys General to request that injunctions be issued to any party, such as financial institutions and internet service providers, to assist in the prevention or restraint of illegal internet gambling. This bill still needs to be ratified by the Senate before it becomes passed as law. We may be affected by this bill and therefore the Company's revenue stream may be affected.

*Compliance with state rules and regulations.*

Various states have laws restricting gambling. The Company believes that we are in compliance with the rules and regulations in the states we operate. However, there can be no assurance that the state officials will have the same view. In the event that we are accused of violating such gambling laws and restrictions, our gaming business may be disallowed or prohibited in these states. Furthermore, there can be no assurance that no new rules and regulations restricting our business will be adopted in the states we operate. If such restrictive rules and regulations are adopted, we may incur additional costs in complying with the rules and regulations or we may have to cease operation in these state(s).

*We have capacity constraints and system development risks that could damage our customer relations or inhibit our possible growth, and we may need to expand our management systems and controls quickly, which may increase our cost of operations.*

Our success and our ability to provide high quality customer service largely depends on the efficient and uninterrupted operation of our computer and communications systems and the computers and communication systems of our third party vendors in order to accommodate any significant numbers or increases in the numbers of consumers using our service. Our success also depends upon our and our vendors' abilities to rapidly expand transaction–processing systems and network infrastructure without any systems interruptions in order to accommodate any significant increases in use of our service.

We and our service providers may experience periodic systems interruptions and infrastructure failures, which we believe will cause customer dissatisfaction and may adversely affect our results of operations. Limitations of technology infrastructure may prevent us from maximizing our business opportunities.

We cannot assure you that our and our vendors' data repositories, financial systems and other technology resources will be secure from security breaches or sabotage, especially as technology changes and becomes more sophisticated. In addition, many of our and our vendors' software systems are custom–developed and we and our vendors rely on employees and certain third–party contractors to develop and maintain these systems. If certain of these employees or contractors become unavailable, we and our vendors may experience difficulty in improving and maintaining these systems. Furthermore, we expect that we and our vendors may continue to be required to manage multiple relationships with various software and equipment vendors whose technologies may not be compatible, as well as relationships with other third parties to maintain and enhance their technology infrastructures. Failure to achieve or maintain high capacity data transmission and security without system downtime and to achieve improvements in their transaction processing systems and network infrastructure could have a materially adverse effect on our business and results of operations.

*Increased security risks of online commerce may deter future use of our website, which may adversely affect our ability to generate revenue.*

Concerns over the security of transactions conducted on the internet and the privacy of consumers may also inhibit the growth of the internet and other online services generally, and online commerce in particular. Failure to prevent security breaches could significantly harm our business and results of operations. We cannot be certain that advances in computer capabilities, new discoveries in the field of cryptography, or other developments will not result in a compromise or breach of the algorithms used to protect our transaction data. Anyone who is able to circumvent our or our vendors' security measures could misappropriate proprietary information, cause interruptions in our operations or damage our brand and reputation. We may be required to incur significant costs to protect against security breaches or to alleviate problems caused by breaches. Any well–publicized compromise of security could deter people from using the internet to conduct transactions that involve transmitting confidential information or downloading sensitive materials, which would have a material adverse effect on our business.

*We face the risk of system failures, which would disrupt our operations.*

A disaster could severely damage our business and results of operations because our services could be interrupted for an indeterminate length of time. Our operations depend upon *our* ability to maintain and protect our computer systems.

6

Our systems and operations are vulnerable to damage or interruption from fire, floods, earthquakes, hurricanes, power loss, telecommunications failures, break–ins, sabotage and similar events. The occurrence of a natural disaster or unanticipated problems at our principal business headquarters or at a third–party facility could cause interruptions or delays in our business, loss of data or render us unable to provide our services. In addition, failure of a third–party facility to provide the data communications capacity required by us, as a result of human error, natural disaster or other operational disruptions, could cause interruptions in our service. The occurrence of any or all of these events could adversely affect our reputation, brand and business.

*We face risks of claims from third parties for intellectual property infringement that could adversely affect our business.*

Our services operate in part by making internet services and content available to our users. This creates the potential for claims to be made against us, either directly or through contractual indemnification provisions with third parties. These claims might, for example, be made for defamation, negligence, copyright, trademark or patent infringement, personal injury, invasion of privacy or other legal theories. Any claims could result in costly litigation and be time consuming to defend, divert management's attention and resources, cause delays in releasing new or upgrading existing services or require us to enter into royalty or licensing agreements.

Litigation regarding intellectual property rights is common in the internet and software industries. We expect that internet technologies and software products and services may be increasingly subject to third–party infringement claims as the number of competitors in our industry segment grows and the functionality of products in different industry segments overlaps. There can be no assurance that our services do not or will not in the future infringe the intellectual property rights of third parties. Royalty or licensing agreements, if required, may not be available on acceptable terms, if at all. A successful claim of infringement against us and our failure or inability to license the infringed or similar technology could adversely affect our business.

Our success and ability to compete are substantially dependent upon our technology and data resources, which we intend to protect through a combination of patent, copyright, trade secret and/or trademark law. We currently have no patents or trademarks issued to date on our technology and there can be no assurances that we will be successful in securing them when necessary.

*Our financial position and results of operations will vary depending on a number of factors, most of which are out of our control.*

We anticipate that our operating results will vary widely depending on a number of factors, some of which are beyond our control. These factors are likely to include:

- demand for our online services by consumers;

- costs of attracting consumers to our website, including costs of receiving exposure on third–party websites;

- costs related to forming strategic relationships;

- our ability to significantly increase our distribution channels;

- competition from companies offering same or similar products and services and from companies with much deeper financial, technical, marketing and human resources;

- the amount and timing of operating costs and capital expenditures relating to expansion of our operations;

- costs and delays in introducing new services and improvements to existing services;

- changes in the growth rate of internet usage and acceptance by consumers of electronic commerce; and

- changes and introduction of new software e.g. pop up blockers.

Because we have a limited operating history, it is difficult to accurately forecast the revenues that will be generated from our current and proposed future product offerings.

*If we are unable to meet the changing needs of our industry, our ability to compete will be adversely affected.*

We operate in an intensely competitive industry. To remain competitive, we must be capable of enhancing and improving the functionality and features of our online services. The internet gaming industry is rapidly changing. If competitors introduce new products and services embodying new technologies, or if new industry standards and practices emerge, our existing services, technology and systems may become obsolete. There can be no assurances that we will be successful in responding quickly, cost effectively and adequately to new developments or that funds will be available to respond at all. Any failure by us to respond effectively would significantly harm our business, operating results and financial condition.

Our future success will depend on our ability to accomplish the following:

- license and develop leading technologies useful in our business;

- develop and enhance our existing products and services;

- develop new services and technologies that address the increasingly sophisticated and varied needs of prospective consumers; and

- respond to technological advances and emerging industry standards and practices on a cost–effective and timely basis.

Developing internet services and other proprietary technology entails significant technical and business risks, as well as substantial costs. We may use new technologies ineffectively, or we may fail to adapt our services, transaction processing systems and network infrastructure to user requirements or emerging industry standards. If our operations face material delays in introducing new services, products and enhancements, our users may forego the use of our services and use those of our competitors. These factors could have a material adverse effect on our financial position and results of operations.

*Our business may be subject to government regulation and legal uncertainties that may increase the costs of operating our web portal, limit our ability to attract users, or interfere with future operations of the Company.*

There are currently few laws or regulations directly applicable to access to, or commerce on, the internet. Due to the increasing popularity and use of the internet, it is possible that laws and regulations may be adopted, covering issues such as user privacy, defamation, pricing, taxation, content regulation, quality of products and services, and intellectual property ownership and infringement. Such legislation could expose the Company to substantial liability as well as dampen the growth in use of the internet, decrease the acceptance of the internet as a communications and commercial medium, or require the Company to incur significant expenses in complying with any new regulations.

The applicability to the internet of existing laws governing issues such as gambling, property ownership, copyright, defamation, obscenity and personal privacy is uncertain. The Company may be subject to claims that our services violate such laws. Any new legislation or regulation in the United States or abroad or the application of existing laws and regulations to the internet could damage our business. In addition, because legislation and other regulations relating to online games vary by jurisdiction, from state to state and from country to country, it is difficult for us to ensure that our players are accessing our portal from a jurisdiction where it is legal to play our games. We therefore, cannot ensure that we will not be subject to enforcement actions as a result of this uncertainty and difficulty in controlling access.

In addition, our business may be indirectly affected by our suppliers or customers who may be subject to such legislation. Increased regulation of the internet may decrease the growth in the use of the internet or hamper the development of internet commerce and online entertainment, which could decrease the demand for our services, increase our cost of doing business or otherwise have a material adverse effect on our business, results of operations and financial condition.

*The protection of our intellectual property may be uncertain and we may face claims of others.*

Although we have received patents and have filed patent applications with respect to certain aspects of our technology, we generally do not rely on patent protection with respect to our products and technologies. Instead, we rely primarily on a combination of trade secret and copyright law, employee and third party non–disclosure agreements and other protective measures to protect intellectual property rights pertaining to our products and technologies. Such measures may not provide meaningful protection of our trade secrets, know how or other intellectual property in the event of any unauthorized use, misappropriation or disclosure. Others may independently develop similar technologies or duplicate our technologies. In addition, to the extent that we apply for any patents, such applications may not result in issued patents or, if issued, such patents may not be valid or of value. Third parties could, in the future, assert infringement or misappropriation claims against us with respect to our current or future products and technologies, or we may need to assert claims of infringement against third parties. Any infringement or misappropriation claim by us or against us could place significant strain on our financial resources, divert management's attention from our business and harm our reputation. The costs of prosecuting or defending an intellectual property claim could be substantial and could adversely affect our business, even if we are ultimately successful in prosecuting or defending any such claims. If our products or technologies are found to infringe the rights of a third party, we could be required to pay significant damages or license fees or cease production, any of which could have material adverse effect on our business. If a claim is brought against us, or we ultimately prove unsuccessful on the claims on our merits, this could have a material adverse effect on our business, financial condition, results of operations and future prospects.

*Any failure to maintain or protect our patent assets or other intellectual property rights could significantly impair*

*our return on investment from such assets and harm our brand, our business and our operating results.*

Our ability to compete in the intellectual property market largely depends on the superiority, uniqueness and value of our acquired patent assets and other intellectual property. To protect our proprietary rights, we will rely on a combination of patent, trademark, copyright and trade secret laws, confidentiality agreements with our employees and third parties, and protective contractual provisions. No assurances can be given that any of the measures we undertake to protect and maintain our intellectual property assets will have any measure of success.

8

Following the acquisition of patent assets, we will likely be required to spend significant time and resources to maintain the effectiveness of those assets by paying maintenance fees and making filings with the USPTO. We may acquire patent assets, including patent applications, which require us to spend resources to prosecute the applications with the USPTO. Further, there is a material risk that patent related claims (such as, for example, infringement claims (and/or claims for indemnification resulting therefrom), unenforceability claims, or invalidity claims) will be asserted or prosecuted against us, and such assertions or prosecutions could materially and adversely affect our business. Regardless of whether any such claims are valid or can be successfully asserted, defending such claims could cause us to incur significant costs and could divert resources away from our other activities.

Despite our efforts to protect our intellectual property rights, any of the following or similar occurrences may reduce the value of our intellectual property:

- our applications for patents, trademarks and copyrights may not be granted and, if granted, may be challenged or invalidated;

- issued trademarks, copyrights, or patents may not provide us with any competitive advantages versus potentially infringing parties;

- our efforts to protect our intellectual property rights may not be effective in preventing misappropriation of our technology; or

- our efforts may not prevent the development and design by others of products or technologies similar to or competitive with, or superior to those we acquire and/or prosecute.

Moreover, we may not be able to effectively protect our intellectual property rights in certain foreign countries where we may do business in the future or from which competitors may operate. If we fail to maintain, defend or prosecute our patent assets properly, the value of those assets would be reduced or eliminated, and our business would be harmed.

*We are in a developing industry with limited revenues from operations.*

We have incurred significant operating losses since inception and generate limited revenues from operations. As a result, we have generated negative cash flows from operations and have an accumulated deficit of $303,944 as of December 31, 2015. We are operating in a developing industry based on a new technology and our primary source of funds to date has been through the issuance of securities and borrowing funds. There can be no assurance that management's efforts will be successful or that the products we develop and market will be accepted by consumers. If our products are ultimately unsuccessful in the market, this could have a material adverse effect on our business, financial condition, results of operations and future prospects.

*We face financial risks as we are a developing company.*

We have incurred significant operating losses since inception and have limited revenue from operations. As a result, we have generated negative cash flows from operations and our cash balances continue to reduce. While we are optimistic and believe appropriate actions are being taken to mitigate this, there can be no assurance that attempts to reduce cash outflows will be successful and this could have a material adverse effect on our business, financial condition, results of operations.

*We may fail to attract and retain qualified personnel.*

There is intense competition from other companies, research and academic institutions, government entities and other organizations for qualified personnel in the areas of our activities. If we fail to identify, attract, retain and motivate these highly skilled personnel, we may be unable to continue our marketing and development activities, and this could have a material adverse effect on our business, financial condition, results of operations and future prospects.

*If we do not effectively manage growth or changes in our business, these changes could place a significant strain on our management and operations.*

To manage our growth successfully, we must continue to improve and expand our systems and infrastructure in a timely and efficient manner. Our controls, systems, procedures and resources may not be adequate to support a changing and growing company. If our management fails to respond effectively to changes and growth in our business, including acquisitions, this could have a material adverse effect on our business, financial condition, results of operations and future prospects.

*We need to manage growth in operations to maximize our potential growth and achieve our expected revenues. Our failure to manage growth can cause a disruption of our operations that may result in the failure to generate revenues at levels we expect.*

In order to maximize potential growth in our current markets, we may have to expand our operations. Such expansion will place a significant strain on our management and our operational, accounting, and information systems. We expect that we will need to continue to improve our financial controls, operating procedures and management information systems. We will also need to effectively train, motivate, and manage our employees. Our failure to manage our growth could disrupt our operations and ultimately prevent us from generating the revenues we expect.

9

**General market risks**

*We may not be able to access credit.*

We face the risk that we may not be able to access credit, either from lenders or suppliers. Failure to access credit from any of these sources could have a material adverse effect on our business, financial condition, results of operations and future prospects.

*We may not be able to maintain effective internal controls.*

If we continue to fail to maintain the adequacy of our internal accounting controls, as such standards are modified, supplemented or amended from time to time, we may not be able to ensure that we can conclude on an on–going basis that we have effective internal controls over financial reporting in accordance with Section 404 of the Sarbanes–Oxley Act of 2002. Failure to achieve and maintain an effective internal control environment could cause us to face regulatory action and also cause investors to lose confidence in our reported financial information, either of which could have a material adverse effect on our business, financial condition, results of operations and future prospects.

**Securities market risks**

*Our stock price and trading volume may be volatile, which could result in losses for our stockholders.*

The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our Common stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our Common stock. We cannot predict the potential impact of these periods of volatility on the price of our Common stock. The Company cannot assure you that the market price of our Common stock will not fluctuate or decline significantly in the future.

*If our Common stock is delisted from the NYSE MKT LLC, the Company would be subject to the risks relating to penny stocks.*

If our Common stock were to be delisted from trading on the NYSE MKT LLC and the trading price of the Common stock were below $5.00 per share on the date the Common stock were delisted, trading in our Common stock would also be subject to the requirements of certain rules promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These rules require additional disclosure by broker–dealers in connection with any trades involving a stock defined as a "penny stock" and impose various sales practice requirements on broker–dealers who sell penny stocks to persons other than established customers and accredited investors, generally institutions. These additional requirements may discourage broker–dealers from effecting transactions in securities that are classified as penny stocks, which could severely limit the market price and liquidity of such securities and the ability of purchasers to sell such securities in the secondary market. A penny stock is defined generally as any non–exchange listed equity security that has a market price of less than $5.00 per share, subject to certain exceptions.

*If we need additional capital to fund the growth of our operations, and cannot obtain sufficient capital, we may be forced to limit the scope of our operations.*

As we implement our growth strategies, we may experience increased capital needs. We may not, however, have sufficient capital to fund our future operations without additional capital investments. If adequate additional financing is not available on reasonable terms or at all, we may not be able to carry out our corporate strategy and we would be forced to modify our business plans (e.g., limit our expansion, limit our marketing efforts and/or decrease or eliminate capital expenditures), any of which may adversely affect our financial condition, results of operations and cash flow. Such reduction could materially adversely affect our business and our ability to compete.

Our capital needs will depend on numerous factors, including, without limitation, (i) our profitability or lack thereof, (ii) our ability to respond to a release of competitive products by our competitors, and (iii) the amount of our capital expenditures, including acquisitions. Moreover, the costs involved may exceed those originally contemplated. Cost savings and other economic benefits expected may not materialize as a result of any cost overruns or changes in market circumstances. Failure to obtain intended economic benefits could adversely affect our business, financial condition and operating performances.

*We do not anticipate paying any cash dividends on our Common stock in the foreseeable future and our stock may not appreciate in value.*

We have not declared or paid cash dividends on our Common stock to date. We currently intend to retain our future earnings, if any, to fund the development and growth of our business. In addition, the terms of any existing or future debt agreements may preclude us from paying dividends. There is no guarantee that shares of our Common stock will appreciate in value or that the price at which our stockholders have purchased their shares will be able to be maintained.

*If securities or industry analysts do not publish research or reports about our business, or publish inaccurate or unfavorable research reports about our business, our share price and trading volume could decline.*

The trading market for our Common stock will, to some extent, depend on the research and reports that securities or industry analysts publish about us or our business. We do not have any control over these analysts. If one or more of the analysts who cover us should downgrade our shares or change their opinion of our business prospects, our share price would likely decline. If one or more of these analysts ceases coverage of our company or fails to regularly publish reports on us, we could lose visibility in the financial markets, which could cause our share price and volume to decline.

## Item 1B. Unresolved staff comments

Not applicable.

## Item 2. Properties

Our principal corporate office is located at 500 Mamaroneck Avenue, Suite 320, Harrison, New York 10528, under a lease that expires on November 30, 2016. The Company believes our office is in good condition and is sufficient to conduct our operations.

## Item 3. Legal proceedings

On April 21, 2015, Gioia Systems, LLC ("Gioia") filed a complaint against the Company, the Company's majority owned subsidiary, MGT Interactive, LLC and Interactive directors with the United States District Court for the Southern District of New York. MGT Interactive, LLC was also included as a derivative plaintiff in the action. Gioia Systems, LLC's complaint asserts claims for breach of contract and breach of fiduciary duty relating to the September 3, 2013 Contribution Agreement and related agreements between Gioia, the Company and MGT Interactive, LLC. This litigation was settled on August 28, 2015 with the Company receiving cash consideration of $35.

On November 2, 2012, MGT Gaming filed a lawsuit (No. 3:12–cv–741) in the United States District Court for the Southern District of Mississippi alleging patent infringement against certain companies which either manufacture, sell or lease gaming systems alleged to be in violation of MGT Gaming's patent rights, or operate casinos that offer gaming systems that are alleged to be in violation of MGT Gaming's '088 patent, including Penn National Gaming, Inc. ("Penn"), and Aruze Gaming America, Inc. ("Aruze America"). An amended complaint added the '554 patent, a continuation of the '088 patent. In May 2014, Aruze America successfully sought a stay of the Mississippi action pending resolution of a Petition filed by a co–defendant for Inter Parties Review ("IPR") with the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office ("PTO"), challenging the'088 Patent. Aruze America and a related company, Aruze Macau, subsequently filed additional IPR Petitions seeking review of the '088 and '554 patents. Aruze America also filed a Request that was subsequently denied for Ex Parte Re–examination of the '088 patent. On July 29, 2015, MGT, Aruze America, Aruze Macau, and Penn agreed, through their respective counsel, to settle all pending disputes, including the Mississippi litigation and all proceedings at the PTO. The parties subsequently jointly terminated the Mississippi litigation and the PTO proceedings. The Company received a payment of $90, which was recorded as licensing revenue.

## Item 4. Mine safety disclosures

None.

# PART II

## Item 5. Market for registrant's common equity, related stockholder matters and issuer's purchases of equity securities

### Market information

Our Common stock is traded on the NYSE MKT LLC ("NYSE MKT") under the symbol "MGT."

The following table sets forth the high and low last reported sales prices of our Common stock for each quarterly period during 2015 and 2014.

|  | High | | Low | |
|---|---|---|---|---|
| **2015** | | | | |
| Fourth quarter | $ | 0.41 | $ | 0.22 |
| Third quarter | | 0.43 | | 0.18 |
| Second quarter | | 0.62 | | 0.35 |
| First quarter | | 0.79 | | 0.36 |
| | | | | |
| **2014** | | | | |
| Fourth quarter | $ | 1.08 | $ | 0.57 |
| Third quarter | | 1.90 | | 0.64 |
| Second quarter | | 2.00 | | 1.05 |
| First quarter | | 2.73 | | 1.78 |

On April 11, 2016, the Company's Common stock closed on NYSE MKT at $0.24 per share and there were 371 stockholders of record.

### Dividends

The Company has never declared or paid cash dividends on its Common stock and has no intention to do so in the foreseeable future.

For the years ending December 31, 2015, and 2014, the Company issued an aggregate of 615 and 580 shares of Convertible Preferred Series A stock respectively, as dividend shares. These issuances did not result in any proceeds to the Company.

### Securities authorized for issuance under equity compensation plans

No option grants were issued during the year ended December 31, 2015. Further reference is made to the information contained in the Equity Compensation Plan table contained in Item 12 of this Annual Report.

### Issuer purchases of equity securities

There were no repurchases of the Company's Common stock during the year ended December 31, 2015.

## Item 6. Selected financial data.

Not applicable.

## Item 7. Management's discussion and analysis of financial condition and results of operations

### Executive summary

MGT Capital Investments, Inc., a Delaware corporation ("MGT," "the Company," "we," "us"), was incorporated on November 27, 2000 as HTTF Technology, Inc. The Company was originally incorporated in Utah in 1977. MGT is comprised of the parent company, its wholly–owned subsidiaries Medicsight, Inc. ("Medicsight"), MGT Sports, Inc. ("MGT Sports"), MGT Studios, Inc. ("MGT Studios"), and its majority–owned subsidiary MGT Gaming, Inc. ("MGT Gaming"). MGT Studios also owns a controlling minority interest in the subsidiary M2P Americas, Inc. Our corporate office is located in Harrison, New York.

MGT and its subsidiaries are principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry. MGT's portfolio includes a social casino platform Slot Champ and minority stakes in the skill–based gaming platform MGT Play and fantasy sports operator DraftDay Gaming Group, Inc. ("DDGG") (see Recent Development below).

*MGT Sports*

MGT Sports owns a minority equity stake in DDGG, which operates a leading global business–to–business operator of daily fantasy sports. DDGG supplies a full white–label solution that allows businesses to participate in the fast growing skill–based game market. By using DDGG's white label solution, a business can offer a fantasy sports product to its customers without incurring the ongoing technology costs and other capital expenditures. DDGG also owns and operates the DraftDay.com platform in the U. S.

On May 20, 2013, MGT Sports completed the acquisition of 63% of the outstanding membership interests of FanTD LLC, a startup daily fantasy sports website. During the year ended December 31, 2014 the Company acquired the remaining 37% interest in FanTD.

On April 7, 2014, the Company completed the acquisition from Card Runners, Inc. of all business assets and intellectual property related to DraftDay.com. During it ownership, MGT transformed DraftDay with a series of improvements to the platform technology and player experience. In addition, the Company was able to significantly reduce operating expenses and improve gross margin. MGT Sports also became one of the first companies to introduce an enterprise quality B2B solution and signed several white label agreements. The Company also introduced transparent financial reporting and strong internal controls, employing highly reliable and scalable technology. To ensure security and regulatory compliance of the platform, MGT Sports instituted industry leading KYC (know–your–customer) controls approved by major credit card processors and gaming attorneys. At the same time, DraftDay and its white label partners maintained a user interface that is highly rated by players.

On September 8, 2015, the Company and MGT Sports entered into an Asset Purchase Agreement with Viggle, Inc. ("Viggle") and Viggle's subsidiary DDGG, pursuant to which Viggle acquired all of the assets of the DraftDay.com business ("DraftDay.com") from the Company and MGT Sports. In exchange for the acquisition of DraftDay.com, Viggle paid MGT Sports the following: (a) 1,269,342 shares of Viggle's common stock, since renamed Draftday Fantasy Sports, Inc. (NASDAQ: DDAY), (b) a promissory note in the amount of $234 paid on September 29, 2015, (c) a promissory note in the amount of $1,875 due March 8, 2016, and (d) 2,550,000 shares of common stock of DDGG. In addition, in exchange for providing certain transitional services, DDGG issued to MGT Sports a warrant to purchase 1,500,000 shares of DDGG common stock. Following consummation of the transaction, MGT Sports owns an 11% equity interest in DDGG, Viggle (since renamed Draftday Fantasy Sports, Inc.) owns 49%, and Sportech, Inc. owns 39%. As a result of the transaction, the Company has presented DraftDay.com as a discontinued operation. There can be no assurance that the Company will be able to realize full value of the above consideration, the Company has taken a reserve of $300 against the March 8, 2016 promissory note and continues to monitor for further possible impairment.

On March 24, 2016 (the "Effective Date"), the Company entered into an Exchange Agreement (the "Agreement") with DraftDay Fantasy Sports, Inc. ("DraftDay"). The purpose of the Agreement was to exchange that certain outstanding promissory note (the "Note") in the principal amount of $1,875 issued on September 8, 2015, for other equity and debt securities of DraftDay, after the Note went into default on March 8, 2016. On the Effective Date, the Note had an outstanding principal balance of $1,875 and accrued interest in the amount of $51 (the "Interest"). Pursuant to the Agreement, a portion consisting of $825 of the outstanding principal of the Note was exchanged for 2,748,353 shares of DraftDay's common stock, and an additional portion of $110 of the outstanding principal was exchanged for 110 shares (the "Preferred Shares") of a newly created class of preferred stock, the Series D Convertible Preferred Stock. The Preferred Shares are convertible into an aggregate of 366,630 shares of DraftDay's common stock, except that conversions shall not be effected to the extent that, after issuance of the conversion shares, MGT's aggregate beneficial ownership (together with that of its affiliates) would exceed 9.99%. Finally, DraftDay agreed to make a cash payment to MGT Sports for the total amount of Interest. In exchange for the forgoing, MGT Sports and the Company agreed to waive all Events of Default under the Note prior to the Effective Date and to release DraftDay from any rights, remedies and claims related thereto. After giving effect to the forgoing, the remaining outstanding principal balance of the Note is $940 (the "Remaining Balance"). The Remaining Balance of the Note shall continue to accrue interest a rate of 5% per annum, and all terms of the Note shall remain unchanged except that the maturity date is changed to July 31, 2016.

*MGT Gaming*

MGT Gaming owns U.S. Patents 7,892,088 and 8,550,554 (the "'088 and '554 patents," respectively), both entitled "Gaming Device Having a Second Separate Bonusing Event" and both relating to casino gaming systems in which a second game played on an interactive sign is triggered once specific events occur in a first game. On November 2, 2012, MGT Gaming filed a lawsuit (No. 3:12–cv–741) in the United States District Court for the Southern District of Mississippi alleging patent infringement against certain companies which either manufacture, sell or lease gaming systems in violation of MGT Gaming's patent rights, or operate casinos that offer gaming systems in violation of MGT Gaming's '088 patent, including WMS Gaming, Inc. – a subsidiary of Scientific Games, Inc. ("WMS")(NASDAQ: SGMS), Penn National Gaming, Inc. ("Penn") (NASDAQ GS: PENN), and Aruze Gaming America, Inc. ("Aruze America"). An amended complaint added the '554 patent, a continuation of the '088 patent. The allegedly infringing products include at least those identified under the trade names: "Amazon Fishing" and "Paradise Fishing."

On October 23, 2013 the U.S. District Court severed the originally filed action into three separate actions: The Defendants in all three actions filed counterclaims denying infringement and asserting invalidity of both patents–in–suit. MGT Gaming filed appropriate responses, reasserting the validity and infringement of the '088 and '554 patents.

13

On November 4, 2013, WMS filed a Petition for Inter Parties Review ("IPR") with the United States Patent and Trademark Office ("PTO" challenging the'088 patent–in–suit. On April 30, 2014 the Patent Trial and Appeal Board ("PTAB") instituted the IPR, allowing the IPR to proceed on all claims in suit. The IPR proceeding has subsequently been dismissed by agreement between WMS and MGT Gaming as part of a settlement of all claims between WMS and MGT, including a dismissal of MGT's court action against WMS.

Aruze Macau, a sister company of Aruze, Aruze America, subsequently filed its own IPR Petition seeking review of the '088 patent based on the same prior art cited by WMS in its IPR. Aruze America also filed a Request for Ex Parte Reexamination of that patent and a Petition for IPR of the '55 patent, both based on different prior art. Aruze America's Reexamination Request has been denied by the PTO. Its Petition for IPR remains pending, with MGT's Preliminary Response due on March 16, 2015.

MGT sought dismissal of Aruze Macau's IPR Petition based on the grounds that Aruze America, not Aruze Macau, was the real party in interest and/or was in privity with Aruze Macau, and that the Aruze entities delayed more than 12 months after the filing of MGT's infringement action against Aruze America based on the '088 patent and are therefore barred from filing an IPR against that patent. On February 20, 2015, the PTAB denied MGT's request for dismissal of the Aruze Macau IPR Petition, but granted MGT the right to conduct further discovery on the real party in interest, privity and one–year bar issues that it had raised in its dismissal request. MGT is pursuing such discovery and will reassert the one–year bar as well as addressing Aruze Macau's arguments on the merits. The PTAB held an initial conference call in that proceeding on March 16, 2015, the same day that MGT's Preliminary Response to Aruze America's concurrent IPR Petition directed to the '554 patent was filed. MGT is seeking denial of that latter Petition on the grounds that Aruze America has not made out a *prima facie* case of either anticipation or obviousness based on the prior art asserted in that proceeding.

By motions filed on May 12, 2014, Aruze sought a transfer of the Mississippi infringement action to Nevada as well as a stay pending resolution of IPR proceedings before the PTAB. Only the latter motion has been granted and the Mississippi action remains stayed at present.

In addition, MGT Gaming owns two U.S. patents covering certain features of casino slot machines. Both patents were asserted against alleged infringers in various actions in federal court in Mississippi. On July 29, 2015, MGT, Aruze America, Aruze Macau, and Penn agreed, through their respective counsel, to settle all pending disputes, including the Mississippi litigation and all proceedings at the PTO. The parties have subsequently jointly terminated the Mississippi litigation and the PTO proceedings. The Company received a payment of $90, which was recorded as licensing revenue.

*MGT Studios*

MGT Studios is publisher of social games and real money games of skill.

On November 11, 2013, the Company entered into an Agreement and Plan of Reorganization (the "Avcom Agreement") with MGT Capital Solutions, Inc., a wholly owned subsidiary of the Company, Avcom, Inc. and the stockholders and option holders of Avcom, Inc. ("Avcom"). Pursuant to the Avcom Agreement, the Company acquired 100% of the capital stock of Avcom. In consideration, the Preferred stockholders of Avcom received $550 in value of the Company's Common stock and the Common stockholders and option holders of Avcom will receive an aggregate of $1,000 in value of the Company's Common stock. The value of the Company's Common stock is based on the volume weighted average closing price for the 20 trading days prior to signing the Avcom Agreement. The acquisition contemplated by the Avcom Agreement closed on November 26, 2013.

On December 4, 2013, the Company entered into a Strategic Alliance Agreement with M2P Entertainment GmbH, a German corporation ("M2P") the newly formed Delaware corporation, M2P Americas, Inc. ("M2P Americas") and the Company's existing subsidiary MGT Studios. The purpose of the transaction is to allow M2P Americas to market and exploit MP2's gaming technology in North and South America through M2P Americas. As part of the transaction, the Company acquired 50.1% of M2P Americas and M2P acquired 49.9%. The Strategic Alliance Agreement provides that the Company and M2P will jointly cooperate to launch M2P's gaming technology in North and South America. It further provides M2P Americas with an exclusive royalty free license to M2P's gaming technology for North and South America.

Pursuant to the terms of the Strategic Alliance Agreement, the Company will advance certain expenses to M2P Americas and the Company and M2P will provide network and human resources support to M2P Americas. The parties also entered into a Stockholders Agreement dated the same date which, among other things, grants M2P an option to purchase 10% of the Company's ownership in M2P Americas at book value if the Company does not purchase equity in M2P prior to April 2, 2014.  This agreement was subsequently amended to extend the purchase date to May 31, 2014.

On May 31, 2014, M2P exercised its option to purchase 10% of the outstanding equity interests of M2P Americas from the Company. As a result, the Company's ownership of M2P Americas is now 40.1%, and M2P's ownership is 59.9%.

MGT filed a completed application for a New Jersey Casino Service Industry Enterprise License ("CSIE"). According to regulations promulgated by the New Jersey Division of Gaming Enforcement (NJDGE), companies providing Internet gaming software or systems, and vendors who manage, control, or administer games and associated wagers conducted through the Internet, must obtain a CSIE. The Company expects a determination from NJDGE after it reviews the Personal History Disclosure forms to be provided by a significant minority stockholder of the Company. Completion of this paperwork is beyond the control of MGT; therefore, the Company is unable to predict when or if a CSIE License will be granted.

 *MGT Interactive*

On September 3, 2013, the Company entered into a Contribution and Sale Agreement (the "Contribution Agreement") by and among the Company, Gioia Systems, and LLC ("Gioia") and MGT Interactive, LLC whereby MGT Interactive acquired certain assets from Gioia which was the inventor an owner of a proprietary method of card shuffling for the online poker market. Trademarked under the name Real Deal Poker, the technology uses patented shuffling machines, along with permutation re–sequencing, allowing for the creation of up to 16,000 decks per minute in real time. The acquisition includes seven (7) U.S. Patents and several Internet URL addresses, including www.RealDealPoker.com. Pursuant to the Contribution Agreement, Gioia contributed the assets to MGT Interactive in exchange for a 49% interest in MGT Interactive and MGT contributed $200 to MGT Interactive in exchange for a 51% interest in MGT Interactive. The $200 contributed by the Company has been utilized as working capital to cover the direct and associated costs relating to the achievement of a certification from Gaming Laboratories International ("GLI"). The Company has the right to acquire an additional 14% ownership interest in MGT Interactive from Gioia in exchange for a purchase price of $300 after GLI certification is obtained. Gioia, in turn, will have the right to re–acquire the 14% interest for a period of three years at a purchase price of $500. Gioia shall have the right to certain royalty payments from the gross rake payments, and any licensing or royalty income received by MGT Interactive after certain revenue targets are exceeded.

On August 28, 2015, the Company and MGT Interactive along with Gioia entered into an Assignment and Sale Agreement (the "Agreement"). MGT Interactive sold certain tangible and intellectual property assets in exchange for Gioia's 49% membership interest in Interactive along with a cash payment of $35. The Agreement also required Gioia to cause the Court to dismiss its complaint against the Company. As a result of the Agreement, the Company recognized a $144 loss on sale of assets.

 *Medicsight*

Medicsight owns medical imaging software that has received U.S. FDA approval and European CE Mark. The software is designed to detect colorectal polyps during a virtual colonoscopy performed using CT Tomography. Software sales have been very limited in the past two years. The Company also has developed an automated carbon dioxide insufflation device and receives royalties on a per–unit basis from an international manufacturer. On June 30, 2013, the Company completed the sale of Medicsight's global patent portfolio to Samsung Electronics Co., Ltd. for gross proceeds of $1.5 million.

## Results of operations

The Company currently has two operational segments, Gaming and Intellectual Property. Software, Devices, and Services are no longer considered separate business segments and have been merged into the Intellectual Property segment. Certain corporate expenses are not allocated to a particular segment.

*Years ended December 31, 2015 and 2014*

The Company achieved the following results for the years ended December 31, 2015, and 2014, respectively:

- Revenues from continuing operations totaled $104 (2014: $94);

- Operating expenses were $2,821 (2014: $4,114);

- Losses of $1,068 from discontinued operations (2014: $1,609);

- Net loss attributable to Common shareholders was $4,781 (2014: $5,330) and resulted in a basic and diluted loss per share of $0.35 (2014: $0.56). Net loss from continuing operations before non–controlling interest was $3,917 (2014: $4,156).

Our operating expenses decreased approximately 31% during the year ended December 31, 2015 compared to year ended December 31, 2014. The decrease is primarily attributed to reductions in headcount, professional fees, corporate governance and stock–based compensation expense.

*Intellectual property*

In the year ended December 31, 2015, the Company recognized $102 in revenue, primarily related to the non–recurring gaming patent licensing fee, compared to $86 for the same period last year, which was mostly attributed to the royalties on medical devices.

Selling, general and administrative expenses for the year ended December 31, 2015 were $365 (2014: $487), in both years consisting of legal and consulting costs and the amortization of intellectual property assets.

In the year ended December 31, 2015 the company recognized an impairment of $474 related to the gaming patent (2014: $nil).

*Gaming – Continuing operations*

During the year ended December 31, 2015, our selling, general and administrative expenses for this segment were $34 (2014: $1,199). In the prior year the expenses consisted of employee compensation, information technology and office related expenses of MGT Studios. The company did not incur any research and development costs for the year ended December 31, 2015, (2014: $188). The decreases are due to the headcount and overhead expense reductions in 2015 as the Company focused on monetizing DraftDay.com.

*Gaming – Discontinued operations (DraftDay.com)*

During the year ended December 31, 2015, the Company recognized $640 in revenues for this segment as compared to $963 for the same period last year. The revenues were lower in the current year as the Company sold the business in September 2015.

Our cost of revenue for the year ended December 31, 2015 was $225 (2014: $610), which primarily consisted of overlay incurred on the DraftDay.com website. Overlay is a promotional incentive for user activity with some contests paying out higher prize money than entry fees. The decrease in 2015 is attributed to lower promotional activity as well as the sale of the business in September 2015.

During the year ended December 31, 2015, our selling, general and administrative expenses were $1,483 (2014: $1,962), mainly consisting of marketing expenses, employee compensation, information technology and office related costs. The decrease is attributable to selling and discontinuing the operation during the year ended December 31, 2015.

*Unallocated corporate / other*

Selling, general and administrative expenses during the year ended December 31, 2015 were $2,422 (2014: $2,240).

For the year ended December 31, 2015, non–operating expenses mainly consisted of a loss of $144 on the sale of assets, and an impairment charge of $556 on notes receivable. During the comparable period ended December 31, 2014, the Company's main non–operating expense was an impairment of $135 on intangible assets.

**Liquidity and capital resources**

| | Year ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Working capital summary** | | |
| Cash and cash equivalents (excluding $39 and $138 of restricted cash as of December 31, 2015 and December 31, 2014 respectively) | $ 359 | $ 648 |
| Other current assets | 61 | 146 |
| Investments – current | 444 | – |
| Notes receivable | 1,575 | – |
| Current assets – Discontinued operations | – | 838 |
| Current liabilities | (79) | (391) |
| Current liabilities – Discontinued operations | – | (988) |
| **Working capital surplus** | **$ 2,360** | **$ 253** |

| | Year ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Cash (used in) / provided by** | | |
| Operating activities | $ (2,424) | $ (3,076) |
| Investing activities | (152) | 2 |
| Financing activities | 2,499 | 1,466 |
| Discontinued operations | (212) | (2,116) |
| **Net decrease in cash and cash equivalents** | **$ (289)** | **$ (3,724)** |

On December 31, 2015, MGT's cash and cash equivalents were $359 excluding $39 of restricted cash. The Company continues to exercise discipline with respect to current expense levels, as revenues remain limited. Our cash and cash equivalents decreased during the year ended December 31, 2015, primarily due to $2,424 used in operating activities, the purchase of a $250 note receivable and $38 for the purchase of property and equipment. The decrease was mostly offset by the release of restricted cash and security deposit of $101, the sale of intangible assets of $35 and the receipt of net proceeds $1,644 and $855 from the At–The–Market sales of common stock and a private placement sale of common stock, respectively.

*Operating activities*

Our net cash used in operating activities differs from the net loss predominantly because of various non–cash adjustments such as depreciation, amortization and impairment of intangibles, stock–based compensation, reserve for notes receivable, loss on sale of assets, and the movement in working capital.

*Investing activities*

On September 8, 2015, the Company and MGT Sports entered into an Asset Purchase Agreement with Viggle, Inc. ("Viggle") and Viggle's subsidiary DDGG, pursuant to which Viggle acquired all of the assets of the DraftDay.com business ("DraftDay.com") from the Company and MGT Sports. In exchange for the acquisition of DraftDay.com, Viggle paid MGT Sports the following: (a) 1,269,342 shares of Viggle's common stock, since renamed Draftday Fantasy Sports, Inc. (NASDAQ: DDAY), (b) a promissory note in the amount of $234 paid on September 29, 2015, (c) a promissory note in the amount of $1,875 due March 8, 2016, and (d) 2,550,000 shares of common stock of DDGG. In addition, in exchange for providing certain transitional services, DDGG issued to MGT Sports a warrant to purchase 1,500,000 shares of DDGG common stock. Following consummation of the transaction, MGT Sports owns an 11% equity interest in DDGG, Viggle (since renamed Draftday Fantasy Sports, Inc.) owns 49%, and Sportech, Inc. owns 39%. As a result of the transaction, the Company has presented DraftDay.com as a discontinued operation. There can be no assurance that the Company will be able to realize full value of the above consideration, the Company has taken a reserve of $300 against the March 8, 2016 promissory note and continues to monitor for further possible impairment.

*Financing activities*

During the year ended December 31, 2015, the Company sold approximately 3,155,000 shares of Common stock under the At–The–Market agreement for gross proceeds of approximately $1,644, net of related fees.

On October 8, 2015, the Company entered into separate subscription agreements (the "Subscription Agreement") with accredited investors (the "Investors") relating to the issuance and sale of $700 of units (the "Units") at a purchase price of $0.25 per Unit, with each Unit consisting of one share (the "Shares") of the Company's common stock, par value $0.001 per share (the "Common Stock") and a three year warrant (the "Warrants") to purchase two shares of Common Stock at an initial

exercise price of $0.25 per share (such sale and issuance, the "Private Placement").

17

The Warrants are exercisable at a price of $0.25 on the earlier of (i) one year from the date of issue or (ii) the occurrence of certain corporate events, including a private or public financing, subject to approval of the lead investor, in which the Company receives gross proceeds of at least $7,500; a spinoff; one or more acquisitions or sales by the Company of certain assets approved by the stockholders of the Company; or a merger, consolidation, recapitalization, or reorganization approved by the stockholders of the Company (each, a "Qualifying Transaction"). The Warrants may be exercised by means of a "cashless exercise" following the four–month anniversary of the date of issue, provided that the Company has consummated a Qualifying Transaction and there is no effective registration statement registering the resale of the shares of Common Stock underlying the Warrants (the "Warrant Shares"). The Company is prohibited from effecting an exercise of any Warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 4.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such Warrant, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. The Warrants are also subject to certain adjustments upon certain actions by the Company as outlined in the Warrants.

On December 22, 2015 the Company sold $172 of common stock at a price of $0.25 per share in a Registered Direct offering.

**Risks and uncertainties related to our future capital requirements**

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. As of December 31, 2015, the Company had incurred significant operating losses since inception and continues to generate losses from operations and has an accumulated deficit of $303,944. These matters raise substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of asset amounts or the classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

Commercial results have been limited and the Company has not generated significant revenues. The Company cannot assure its stockholders that the Company's revenues will be sufficient to fund its operations. If adequate funds are not available, the Company may be required to curtail its operations significantly or to obtain funds through entering into arrangements with collaborative partners or others that may require the Company to relinquish rights to certain of our technologies or products that the Company would not otherwise relinquish.

The Company's primary source of operating funds since inception has been debt and equity financings. On December 30, 2013, and as amended on March 27, 2014, the Company entered into an At–The–Market Offering Agreement (the "ATM Agreement") with Ascendiant Capital Markets, LLC (the "Manager"). Pursuant to the ATM Agreement, the Company may offer and sell shares of its Common Stock (the "Shares") having an aggregate offering price of up to $8.5 million from time to time through the Manager. The Company can use the net proceeds from any sales of Shares in the offering for working capital, capital expenditures, and general business purposes. For the year ended December 31, 2015, the Company sold approximately 3,155,000 Shares under the ATM Agreement for gross proceeds of approximately $1,695 before related expenses. The ATM Agreement expired by its terms in August 2015.

At December 31, 2015, MGT's cash, cash equivalents and restricted cash were $398. The Company intends to raise additional capital, either through debt or equity financings or through the continued sale of the Company's assets in order to achieve its business plan objectives. Management believes that it can be successful in obtaining additional capital; however, no assurance can be provided that the Company will be able to do so. There is no assurance that any funds raised will be sufficient to enable the Company to attain profitable operations or continue as a going concern. To the extent that the Company is unsuccessful, the Company may need to curtail or cease its operations and implement a plan to extend payables or reduce overhead until sufficient additional capital is raised to support further operations. There can be no assurance that such a plan will be successful.

**Off–balance sheet arrangements**

None.

**Critical accounting policies and estimates**

Our discussion and analysis of financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). The notes to the consolidated financial statements contained in this Annual Report describe our significant accounting policies used in the preparation of the consolidated financial statements. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and

disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Actual results could differ from those estimates. We continually evaluate our critical accounting policies and estimates.

We believe the critical accounting policies listed below reflect significant judgments, estimates and assumptions used in the preparation of our consolidated financial statements.

*Intangible assets*

Intangible assets consist of patents, trademarks, domain names, software and customer lists. Estimates of future cash flows and timing of events for evaluating long–lived assets for impairment are based upon management's judgment. If any of our intangible or long–lived assets are considered to be impaired, the amount of impairment to be recognized is the excess of the carrying amount of the assets over its fair value. Applicable long–lived assets are amortized or depreciated over the shorter of their estimated useful lives, the estimated period that the assets will generate revenue, or the statutory or contractual term in the case of patents. Estimates of useful lives and periods of expected revenue generation are reviewed periodically for appropriateness and are based upon management's judgment.

*Goodwill*

Goodwill represents the excess of the purchase price over the fair value of the assets acquired and liabilities assumed. The Company is required to perform impairment reviews at each of its reporting units annually and more frequently in certain circumstances. The Company performs the annual assessment on December 31.

In accordance with *ASC 350–20 "Goodwill",* the Company is able to make a qualitative assessment of whether it is more likely than not that a reporting unit's fair value is less than its carrying amount before applying the two–step goodwill impairment test. If the Company concludes that it is more likely than not that the fair value of a reporting unit is not less than its carrying amount it is not required to perform the two–step impairment test for that reporting unit.

*Revenue recognition*

The Company recognizes revenue when it is realized or realizable and earned. We consider revenue realized or realizable and earned when there is persuasive evidence of an arrangement and that the product has been shipped or the services have been provided to the customer, the sales price is fixed or determinable and collectability is probable. Our material revenue streams are related to the delivery of intellectual property license fees and gaming fees:

- *Licensing* – License fee revenue is derived from the licensing of intellectual property. Revenue from license fees is recognized when notification of shipment to the end user has occurred, there are no significant Company obligations with regard to implementation and the Company's services are not considered essential to the functionality of other elements of the arrangement.

- *Gaming* – Gaming revenue is derived from entry fees charged in contests minus prizes paid out in contests.

*Stock–based compensation*

The Company recognizes compensation expense for all equity–based payments in accordance with *ASC 718 "Compensation – Stock Compensation".* Under fair value recognition provisions, the Company recognizes equity–based compensation net of an estimated forfeiture rate and recognizes compensation cost only for those shares expected to vest over the requisite service period of the award.

Restricted stock awards are granted at the discretion of the Company. These awards are restricted as to the transfer of ownership and generally vest over the requisite service periods, typically over an eighteen–month period (vesting on a straight–line basis). The fair value of a stock award is equal to the fair market value of a share of Company stock on the grant date.

The fair value of option award is estimated on the date of grant using the Black–Scholes option valuation model. The Black–Scholes option valuation model requires the development of assumptions that are input into the model. These assumptions are the expected stock volatility, the risk–free interest rate, the expected life of the option, the dividend yield on the underlying stock and the expected forfeiture rate. Expected volatility is calculated based on the historical volatility of our Common stock over the expected option life and other appropriate factors. Risk–free interest rates are calculated based on continuously compounded risk–free rates for the appropriate term. The dividend yield is assumed to be zero as the Company has never paid or declared any cash dividends on our Common stock and does not intend to pay dividends on our Common stock in the foreseeable future. The expected forfeiture rate is estimated based on historical experience.

Determining the appropriate fair value model and calculating the fair value of equity–based payment awards requires the input of the subjective assumptions described above. The assumptions used in calculating the fair value of equity–based payment awards represent management's best estimates, which involve inherent uncertainties and the application of management's judgment. As a result, if factors change and the Company uses different assumptions, our equity–based compensation could be materially different in the future. In addition, the Company is required to estimate the expected forfeiture rate and recognize expense only for those shares expected to vest. If our actual forfeiture rate is materially different

from our estimate, the equity–based compensation could be significantly different from what the Company has recorded in the current period.

The Company accounts for share–based payments granted to non–employees in accordance with *ASC 505–40, "Equity Based Payments to Non–Employees".* The Company determines the fair value of the stock–based payment as either the fair value of the consideration received or the fair value of the equity instruments issued, whichever is more reliably measurable.  If the fair value of the equity instruments issued is used, it is measured using the stock price and other measurement assumptions as of the earlier of either (1) the date at which a commitment for performance by the counterparty to earn the equity instruments is reached, or (2) the date at which the counterparty's performance is complete. The fair value of the equity instruments is re–measured each reporting period over the requisite service period.

19

*Segment reporting*

Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision–making group in deciding how to allocate resources and in assessing performance. Our chief operating decision–making group is composed of the chief executive officer and chief financial officer. We operate in two operational segments, Gaming and Intellectual Property. Certain corporate expenses are not allocated to segments.

*Loss per share*

Basic loss per share is calculated by dividing net loss applicable to Common stockholders by the weighted average number of Common shares outstanding during the period. Diluted earnings per share is calculated by dividing the net earnings attributable to Common stockholders by the sum of the weighted average number of Common shares outstanding plus potential dilutive Common shares outstanding during the period. Potential dilutive securities, comprised of the convertible Preferred stock, unvested restricted shares and warrants, are not reflected in diluted net loss per share because such shares are anti–dilutive.

The computation of diluted loss per share for the year ended December 31, 2015, excludes 10,608 shares in connection to the Convertible Preferred stock and 3,820,825 warrants, as they are anti–dilutive due to the Company's net loss. For the year ended December 31, 2014, the computation excludes 9,993 shares in connection to the Convertible Preferred stock, 1,020,825 warrants and 110,000 unvested restricted shares, as they are anti–dilutive due to the Company's net loss.

*Recent accounting pronouncements*

In February 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-02, "Leases" (topic 842). The FASB issued this update to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The updated guidance is effective for annual periods beginning after December 15, 2018, including interim periods within those fiscal years. Early adoption of the update is permitted. The Company is currently evaluating the impact of the new standard.

In September 2015, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2015–16, simplifying the *Accounting for Measurement – Period Adjustments* that eliminates the requirement to restate prior period financial statements for measurement period adjustments. The new guidance requires that the cumulative impact of a measurement period adjustment (including the impact on prior periods) be recognized in the reporting period in which the adjustment is identified. The new guidance does not change what constitutes a measurement period adjustment. The Company does not expect the adoption of this ASU to significantly impact the consolidated financial statements.

In August 2015, the FASB issued *ASU 2015–15 "Interest – Imputation of Interest"*, final guidance that requires debt issuance costs related to a recognized debt liability to be presented in the balance sheet as a direct deduction from the debt liability rather than as an asset. This publication has been updated to reflect an SEC staff member's comment in June 2015 that the staff will not object to an entity presenting the cost of securing a revolving line of credit as an asset, regardless of whether a balance is outstanding. The Company does not expect the adoption of this ASU to significantly impact the consolidated financial statements.

In April 2015, the FASB issued *ASU 2015–05, "Intangibles – Goodwill and Other – Internal–Use Software" (Subtopic 350–40)*. This ASU provides guidance about whether a cloud computing arrangement includes a software license. If a cloud computing arrangement includes a software license, then the software license element of the arrangement should be accounted for consistent with the acquisition of other software licenses. If a cloud computing arrangement does not include a software license, the arrangement should be accounted for as a service contract. For public business entities, the amendments will be effective for annual periods, including interim periods within those annual periods, beginning after December 15, 2015. Early adoption is permitted. The Company is currently evaluating the impact of the adoption of *ASU 2015–05* on our financial statements and disclosures.

## Item 7A. Quantitative and qualitative disclosure about market risk

We are a smaller reporting company and therefore, we are not required to provide information required by this Item on Form 10–K.

**Item 8. Financial statements and supplementary data**

See Financial Statements and Schedules attached hereto.

**Item 9. Changes in and disagreements with accountants on accounting and financial disclosure**

None.

**Item 9A. Controls and procedures**

**(a) Evaluation of disclosure controls and procedures.**

Pursuant to Rule 13a–15(b) under the Exchange Act, the Company carried out an evaluation, with the participation of the Company's management, including the Company's Board of Directors and the Chief Executive Officer, of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a–15(e) under the Exchange Act) as of the end of the period covered by this Report. Based upon that evaluation, the Company's management concluded that the Company's disclosure controls and procedures were not effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act, is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management to allow timely decisions regarding required disclosure.

**(b) Management's annual report on internal control over financial reporting.**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as required under applicable United States securities regulatory requirements. Internal control over financial reporting is defined in Rule 13a–15(f) or 15d–15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, the company's chief executive and chief financial officers and effected by the company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use of disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements. A system of internal controls can provide only reasonable, not absolute, assurance that the objectives of the control system are met, no matter how well the system is conceived or operated. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2015. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 2013 in Internal Control Integrated Framework. Based on that evaluation under this framework, our management concluded that our internal control over financial reporting was not effective because of the following significant deficiencies in our internal control over financial reporting:

- Due to our small number of employees and resources, we have limited segregation of duties, as a result of which there is insufficient independent review of duties performed;

- As a result of the limited number of accounting personnel, we rely on outside consultants for the preparation of our financial reports, including financial statements and management discussion and analysis, which could lead to overlooking items requiring disclosure.

This annual report does not include an attestation report by our independent registered public accounting firm regarding internal control over financial reporting. As we are neither a large accelerated filer nor an accelerated filer, our management's report was not subject to attestation by our registered public accounting firm pursuant to rules of the Securities and Exchange Commission that permit us to provide only management's report in this annual report.

**(c) Changes in internal control over financial reporting.**

On November 30, 2015, our Chief Financial Officer left the Company following expiration of his employment agreement. At that time, our Chief Executive Officer was named Interim Chief Financial Officer.

**Item 9B. Other information.**

None.

21

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance**

| Name | Age | Position |
|------|-----|----------|
| H. Robert Holmes | 72 | Chairman of the Board, Chairman of the Nomination and Compensation Committee, Audit Committee Member, Independent Director |
| Michael Onghai | 46 | Chairman of the Audit Committee, Nomination and Compensation Committee Member, Independent Director |
| Robert B. Ladd | 57 | President, Chief Executive Officer, Principal Financial Officer and Director |
| Joshua Silverman | 45 | Audit Committee, Nomination and Compensation Committee Member, Independent Director |

Directors are elected based on experience, qualifications and in accordance with the Company's by–laws to serve until the next annual stockholders meeting and until their successors are elected in their stead. Officers are appointed by the Board and hold office until their successors are chosen and qualified, until their death or until they resign or have been removed from office. All corporate officers serve at the discretion of the Board. There are no family relationships between any director or executive officer and any other director or executive officer of the Company.

*H. Robert Holmes* was elected as a director in May 2012. From 2008 to 2012, Mr. Holmes has served on the board of Dejour Energies Inc. (NYSE–MKT: DEJ, 2008–2013). Mr. Holmes was the founder and general partner of Gilford Partners Hedge Fund. From 1980–1992, Mr. Holmes was the Co–Founder, President of Gilford Securities, Inc. Previously, Mr. Holmes served in various positions with Paine Webber and Merrill Lynch. Mr. Holmes has served on the Board of Trustees North Central College in Naperville, II; Board of Trustees of Sacred Heart Schools, Chairman of Development Committee in Chicago, IL; Board of Trustees of Crested Butte Academy where he was Chairman of Development Committee; and the Board of Trustees Mary Wood Country Day School, Rancho Mirage, CA. The board believes that Mr. Holmes has the experience, qualifications, attributes and skills necessary to serve as a director because of his years of business experience and service as a director for many companies over his career.

*Michael Onghai* was appointed a director in May 2012. Mr. Onghai has been the CEO of LookSmart (NASDAQ CM: LOOK), since February 2013. He has been the founder and Chairman of AppAddictive, an advertising and social commerce platform since July 2011. Mr. Onghai is the President of Snowy August Management LLC, a special situations fund concentrating on the Asian market, spin–offs and event–driven situations. Mr. Onghai is the founder of Stock Sheet, Inc., and Daily Stocks, Inc. – the web's early providers of financial information and search engine related content for financial information. Mr. Onghai has founded several other internet technology companies for the last two decades. Mr. Onghai is an advisor to several internet incubators and is a panelist who advises FundersClub on which companies to accept for its pioneering venture capital platform. Mr. Onghai has earned his designation as a Chartered Financial Analyst (2006) and holds a B.S. in Electrical Engineering and Computer Science from the University of California, Los Angeles and graduated from the Executive Management Certificate Program in Value Investing (The Heilbrunn Center for Graham & Dodd Investing) Graduate School of Business at Columbia Business School. The board believes that Mr. Onghai has the experience, qualifications, attributes and skills necessary to serve as a director and chairman of the Audit Committee because of his years of business experience and financial expertise.

*Robert B. Ladd* joined the Company in December 2010 as a Director. He was named Interim President and CEO in February 2011, and appointed President and CEO in January 2012. Mr. Ladd is the Managing Member of Laddcap Value Advisors, LLC, which serves as the investment manager for various private partnerships, including Laddcap Value Partners LP. Prior to forming his investment partnership in 2003, Mr. Ladd was a Managing Director at Neuberger Berman, a large international money management firm catering to individuals and institutions. From 1992 through November 2002, Mr. Ladd was a portfolio manager for various high net worth clients of Neuberger Berman. Prior to this experience, Mr. Ladd was a securities analyst at Neuberger from 1988 through 1992. Mr. Ladd is a former Director of InFocus Systems, Inc. (NASDAQ – INFS, 2007 to 2009), and served on the board of Delcat Systems, Inc. (NASDAQ – DCTH, 2006–2012). Mr. Ladd has earned his designation as a Chartered Financial Analyst (1986). Based on Mr. Ladd' familiarity with the Company in serving as our Chief Executive Officer since 2011 and his overall background and experience as an executive in the financial industry, the Nominating Committee of the Board concluded that Mr. Ladd has the requisite experience, qualifications, attributes and skill necessary to serve as a member of the Board.

*Joshua Silverman* is the Co–founder, and is a Principal and Managing Partner of Iroquois Capital Management, LLC, the Registered Investment Advisor to Iroquois Capital LP and Iroquois Capital (Offshore) Ltd. (collectively, Iroquois). Mr. Silverman has served as Co–Chief Investment Officer of Iroquois since inception in 2003. From 2000 to 2003, Mr. Silverman served as Co–Chief Investment Officer of Vertical Ventures, LLC, a merchant bank. Prior to forming Iroquois, Mr. Silverman was a Director of Joele Frank, a boutique consulting firm specializing in mergers and acquisitions. Previously, Mr. Silverman served as Assistant Press Secretary to The President of The United States. Mr. Silverman received his B.A. from Lehigh University in 1992. Based on Mr. Silverman's overall background and experience as an executive in the financial industry, Board believes that Mr. Silverman has the requisite experience, qualifications, attributes and skill necessary to serve as a member of the Board.

**Arrangements relative to appointment as Director**

Under an Amended and Restated Securities Purchase Agreement dated December 9, 2010 (the "Purchase Agreement") between the Company and Laddcap Value Partners, LP (the "Purchaser"), the Purchaser agreed to purchase 195,000 shares of the Company's Common stock for $1,000. The Company appointed Robert B. Ladd, as director to fill the vacancy caused by the resignation of Tim Paterson–Brown. The Purchase Agreement closed on December 13, 2010. On February 9, 2011, on 239,520 shares of the Company's Common stock held by the Purchaser were transferred from the Purchaser to Laddcap Value Partners III LLC ("Laddcap"). Mr. Ladd is the managing member of Laddcap.

22

On September 29, 2014, Iroquois Capital Management, LLC, Iroquois Master Fund and Joshua Silverman (collectively, "Iroquois") entered into a settlement agreement with the Company (the "Iroquois Settlement Agreement").  Pursuant to the Iroquois Settlement agreement, Iroquois dropped all claims against the Company, and the Company agreed to: (i) nominate Joshua Silverman, together with H. Robert Holmes, Robert B. Ladd, and Michael Onghai (collectively, the "2014 Nominees"), for election to the Board at the Company's 2014 annual meeting of stockholders (the "2014 Annual Meeting"); (ii) recommend a vote for the 2014 Nominees and solicit proxies from the Issuer's stockholders for the election of the 2014 Nominees at the 2014 Annual Meeting; (iii) immediately appoint Mr. Silverman as an observer to the Board until the 2014 Annual Meeting; (iv) hold the 2014 Annual Meeting no later than December 31,2014; and (v) appoint Mr. Silverman to at least one committee of the Board promptly following the 2014 Annual Meeting, but in no event later than fifteen (15) business days thereafter.

## Involvement in certain legal proceedings

To the best of our knowledge, during the past ten years, none of the following occurred with respect to any director, director nominee or executive officer:

(1) any bankruptcy petition filed by or against any business of which such person was a general partner or executive officer either at the time of the bankruptcy or within two years prior to that time;

(2) any conviction in a criminal proceeding or being subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

(3) being subject to any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting his or her involvement in any type of business, securities or banking activities;

(4) being found by a court of competent jurisdiction (in a civil action), the SEC or the Commodities Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended or vacated;

(5) being the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated, relating to an alleged violation of:

   (i) any federal or state securities or commodities law or regulation;

   (ii) any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease–and–desist order, or removal or prohibition order; or

   (iii) any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

(6) being the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self–regulatory organization (as defined in Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26))), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29))), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member (covering stock, commodities or derivatives exchanges, or other SROs).

## Corporate code of ethics

On June 25, 2012, the Board revised the Code of Conduct and Ethics which applies to all directors and employees including the company's principal executive officer, principal financial officer and principal accounting officer or persons performing similar functions. Prior to June 25, 2012, the Company's employees and directors were subject to the previous Code of Ethics adopted by the Board on December 28, 2007.

Copies of the Code of Business Conduct and Ethics, the Anti–Fraud Policy, the Whistleblower Policy and the MGT Share Dealing Code can be obtained, without charge by writing to the Corporate Secretary at MGT Capital Investments, Inc., 500 Mamaroneck Avenue, Suite 204, Harrison, NY 10528, or through our corporate website at mgtci.com.

23

**Section 16(a) beneficial ownership reporting compliance**

Section 16(a) of the Exchange Act requires the Company's directors, executive officers and persons who own more than 10% of the Company's stock (collectively, "Reporting Persons") to file with the SEC initial reports of ownership and changes in ownership of the Company's Common stock. Reporting Persons are required by SEC regulations to furnish the Company with copies of all Section 16(a) reports they file. Other than as disclosed below and based solely on a review of the reports furnished to us, or written representations from reporting persons that all reportable transaction were reported, we believe that during the fiscal year ended December 31, 2015, our officers, directors and greater than ten percent stockholders timely filed all reports and did not miss any filings as required to file under Section 16(a).

**Audit Committee and Audit Committee financial expert**

On November 25, 2004, the Board established an Audit Committee to carry out its audit functions. At December 31, 2015, the membership of the Audit Committee was Michael Onghai, H. Robert Holmes and Joshua Silverman.

The Board has determined that Michael Onghai, an independent director, is the Audit Committee financial expert, as defined in Regulation S–K promulgated under the Exchange Act, serving on its Audit Committee.

**Item 11. Executive compensation**

**Summary compensation table**

The following table summarizes Fiscal Years 2015 and 2014 compensation for services in all capacities of the Company's named executive officers and other individuals:

| Name | Principal Position | Year | Salary | Bonus | Stock awards [1] | All other compensation | Total compensation |
|---|---|---|---|---|---|---|---|
| Robert B. Ladd | Chief Executive Officer | 2015 | $   238 | $   – | $   50 | $   – | $   288 |
| | Interim Chief Financial Officer [2] | 2014 | $   285 | $   – | $   – | $   – | $   285 |
| Robert P. Traversa [3] | Chief Financial Officer | 2015 | $   252 | $   – | $   – | 21[4] | $   273 |
| | | 2014 | $   275 | $   – | $   – | $   – | $   275 |

(1)  This column discloses the dollar amount of the aggregate grant date fair value of restricted stock granted in the year.

(2)  Mr. Ladd was appointed Interim Chief Financial Officer on December 8, 2015.

(3)  Mr. Traversa served as Chief Financial Officer through November 30, 2015.

(4)  Represents payments for accrued but unused vacation paid upon termination on November 30, 2015.

**Grants of Plan–Based Awards**

There were no plan–based awards in Fiscal 2015.

**Outstanding equity awards at December 31, 2015**

There were no outstanding equity awards at December 31, 2015.

**Employment agreements**

On November 19, 2012, the Company entered into an employment agreement with Robert B. Ladd, to act as its President and Chief Executive Officer. Upon execution of the agreement, Mr. Ladd was granted a $100 cash payment and 50,000 shares of restricted Common stock. The agreement provided for a two–year term, subject to automatic renewals. The agreement provided for a base salary of $285 per year. Pursuant to the employment agreement, Mr. Ladd is eligible for a cash and/or equity bonus as determined by the Compensation Committee. Pursuant to the agreement, in the event that Mr. Ladd dies or is permanently disabled or he is terminated without good cause or he resigns for Good Reason. Mr. Ladd is entitled to (i) a severance payment equal to the higher of his base salary for the remaining term of this agreement or twelve times the average monthly Base Salary paid or accrued during the three full calendar months immediately preceding such determination; (ii) expense compensation in an amount equal to twelve times the sum of the average Base Salary during the full calendar months preceding such termination; (iii) immediate vesting of all stock options; (iv) vacation pay for any vacations days earned but not taken; (v) medical insurance for 12 months; and (vi) the cost of office space, not to exceed $3 per month. Good Reason includes a change of control. If payments are subject to the excise tax imposed by Section 4999 of the Code, the Company will pay Mr. Ladd an additional amount so that the net amount retained by Mr. Ladd shall be equal to what his Total Payments would have been without the Excise Tax and any state and local income taxes. If the Company terminates Mr. Ladd for Cause or Mr. Ladd resigns without Good Reason, he shall only be entitled to any compensation earned but not paid at such time. Mr. Ladd's employment agreement was filed as an exhibit to the Current Report on Form 8–K we filed with the SEC on November 23, 2012; all defined terms not otherwise defined herein are defined in such employment agreement.

On January 28, 2014, the Company entered into an amendment to Mr. Ladd's employment agreement which extended the agreement's term for an additional year, through November 30, 2015. On September 28, 2015, the Company provided Mr. Ladd with written notice of its intent not to renew the employment agreement.

On October 7, 2015, the Company entered into an amended and restated employment agreement with Mr. Ladd, effective October 1, 2015. The agreement amends and restates in its entirety the employment agreement entered into between the Company and Mr. Ladd on November 19, 2012 as amended January 28, 2014. The term of the agreement shall expire on November 30, 2016, subject to automatic renewals of one year. Upon execution of the agreement, Mr. Ladd was granted 200,000 shares of restricted common stock. The agreement provides for a base salary of $199.5 per year. Pursuant to the employment agreement, Mr. Ladd is eligible for a cash and/or equity bonus as determined by the Compensation Committee. Pursuant to the agreement, in the event that Mr. Ladd dies or is permanently disabled or he is terminated without good cause or he resigns for Good Reason. Mr. Ladd is entitled to (i) a severance payment equal to the higher of his base salary for the remaining term of this agreement or twelve times the average monthly Base Salary paid or accrued during the three full calendar months immediately preceding such determination; (ii) expense compensation in an amount equal to twelve times the sum of the average Base Salary during the full calendar months preceding such termination; (iii) immediate vesting of all stock options; (iv) vacation pay for any vacations days earned but not taken; (v) medical insurance for 12 months; and (vi) the cost of office space, not to exceed $3 per month. Good Reason includes a change of control. If payments are subject to the excise tax imposed by Section 4999 of the Code, the Company will pay Mr. Ladd an additional amount so that the net amount retained by Mr. Ladd shall be equal to what his Total Payments would have been without the Excise Tax and any state and local income taxes. If the Company terminates Mr. Ladd for Cause or Mr. Ladd resigns without Good Reason, he shall only be entitled to any compensation earned but not paid at such time. Mr. Ladd's employment agreement was filed as an exhibit to the Current Report on Form 8–K we filed with the SEC on October 9, 2015; all defined terms not otherwise defined herein are defined in such employment agreement.

On November 19, 2012, the Company entered into an employment agreement with Robert P. Traversa to act as its Treasurer and Chief Financial Officer. The agreement provides for a two–year term, subject to automatic renewals. Upon execution of the agreement, Mr. Traversa was granted a $100 cash payment and 50,000 shares of restricted Common stock. The agreement provides for a base salary of $275 per year. Pursuant to the employment agreement, Mr. Traversa is eligible for a cash and/or equity bonus as determined by the Compensation Committee. Pursuant to the agreement, in the event that Mr. Traversa dies or is permanently disabled or he is terminated without good cause or he resigns for Good Reason. Mr. Traversa is entitled to (i) a severance payment equal to the higher of his base salary for the remaining term of this agreement or twelve times the average monthly Base Salary paid or accrued during the three full calendar months immediately preceding such determination; (ii) expense compensation in an amount equal to twelve times the sum of the average Base Salary during the full calendar months preceding such termination; (iii) immediate vesting of all stock options; (iv) vacation pay for any vacations days earned but not taken; (v) medical insurance for 12 months; and (vi) the cost of office space, not to exceed $3 per month. Good Reason includes a change of control. If payments are subject to the excise tax imposed by Section 4999 of the Code, the Company will pay Mr. Traversa an additional amount so that the net amount retained by Mr. Traversa shall be equal to what his Total Payments would have been without the Excise Tax and any state and local income taxes. If the Company terminates Mr. Traversa for Cause or Mr. Traversa resigns without Good Reason, he shall only be entitled to any compensation earned but not paid at such time. Mr. Traversa's employment agreement was filed as an exhibit to the Current Report on Form 8–K we filed with the SEC on November 23, 2012; all defined terms not otherwise defined herein are defined in such employment agreement.

On January 28, 2014, the Company entered into an amendment to Mr. Traversa's employment agreement which extended the agreement's term for an additional year, through November 30, 2015. On September 28, 2015, the Company provided Mr. Traversa with written notice of its intent not to renew the employment agreement. Mr. Traversa's employment with the Company terminated on November 30, 2015, in accordance with the terms of his employment agreement.

**Director compensation**

The following table sets forth the compensation of persons who served as a member of our Board of Directors during all or part of 2015, other than Robert B. Ladd and Robert P. Traversa whose compensations is discussed under "Executive Compensation" below and neither of whom is separately compensated for Board service.

| Name | Fees earned or paid in cash | | Stock awards | | All other compensation | | Total | |
|---|---|---|---|---|---|---|---|---|
| H. Robert Holmes | $ | 30 | $ | – | $ | – | $ | 30 |
| Michael Onghai | $ | 25 | $ | – | $ | – | $ | 25 |
| Joshua Silverman | $ | 25 | $ | – | $ | – | $ | 25 |

Directors are reimbursed for their out–of–pocket expenses incurred in connection with the performance of Board duties.

**Independent director compensation**

Our policy is each independent director receives annual compensation of $20. In addition, independent directors, receive $5 as total compensation for committee service. The Chairman of the Board receives an additional $5. For fiscal year 2015, the Company does not propose any change in fees for the independent directors.

**Item 12. Security ownership of certain beneficial owners and management and related stockholder matters**

**Securities authorized for issuance under equity compensation plans**

No option grants were issued during the year ended December 31, 2015. The table below provides information on our equity compensation plans as of December 31, 2015:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | | Weighted–average exercise price of outstanding options, warrants and rights | | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) | |
|---|---|---|---|---|---|---|
| | (a) | | (b) | | (c) | |
| Equity compensation plans approved by security holders | | – | $ | – | $ | 1,780,808(1) |
| Equity compensation plans not approved by security holders | | – | | – | | – |
| **Total** | | – | $ | – | $ | **1,780,808**(1) |

(1) On December 31, 2015, the Company's stockholders approved an increase of the number of shares of Common stock issuable under the Company's 2012 Stock Incentive Plan to 3,00,000 shares. As of December 31, 2015, the Company issued an aggregate of 1,219,192 restricted shares under the Company's 2012 Stock Incentive Plan, as amended.

**Security owner of certain beneficial owners**

The following tables set forth certain information regarding beneficial ownership and voting power of the Common stock as of March 30, 2016, of:

- each person serving as a director, a nominee for director, or executive officer of the Company;

- all executive officers and directors of the Company as a group; and

- all persons who, to our knowledge, beneficially own more than five percent of the Common stock or Series A Preferred stock.

"Beneficial ownership" here means direct or indirect voting or investment power over outstanding stock and stock which a person has the right to acquire now or within 60 days after March 30, 2016. See the accompanying footnotes to the tables below for more detailed explanations of the holdings. Except as noted, to our knowledge, the persons named in the tables beneficially own and have sole voting and investment power over all shares listed

Each share of Common stock has one vote per share of Common stock held and each share of Series A Preferred stock has one vote per share of Series A Preferred stock held.

26

The following table sets forth certain information regarding beneficial ownership of Common stock as of April 11, 2016:

- each person known by the Company to be the beneficial owner of more than 5% of the outstanding Common stock;

- each person serving as a director, a nominee for director, or executive officer of the Company; and

- all executive officers and directors of the Company as a group.

Percentage beneficially owned is based upon 18,098,221 shares of Common stock issued and outstanding as of April 11, 2016.

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| **Directors and officers** [1] | | |
| Robert B. Ladd [2] | 896,074 | 5.0% |
| Joshua Silverman [3][4][5] | 1,787,204 | 9.9% |
| H. Robert Holmes | 88,819 | * |
| Michael Onghai | 44,545 | * |
| **Total current officers and directors as a group (3 persons)** | **2,816,642** | **15.6%** |

*Less than 1%*

(1) Unless otherwise noted, the addresses for the above persons are care of the Company at 500 Mamaroneck Avenue, Suite 320, Harrison, NY 10528.

(2) Mr. Ladd owns 273,603 shares of Common stock directly. Mr. Ladd may also be deemed to be the beneficial owner of an additional 622,471 shares of Common stock held by Laddcap Value Partners III LLC, a Delaware limited liability company ("Laddcap") by virtue of his ability to vote or control the vote or dispose or control the disposition of the shares of Common stock held by Laddcap through his position as Managing Member of Laddcap.

(3) As reported on Amendment Number 4 to the Schedule 13D filed by, among others, Iroquois Capital Management, LLC ("Iroquois") Iroquois Master Fund Ltd. and Mr. Silverman with the SEC on October 2, 2014, Mr. Silverman is a managing member of Iroquois and Iroquois Master Fund Ltd. Iroquois Master Fund Ltd. directly owns 1,339,096 shares of Common stock. Iroquois is the investment advisor to Iroquois Master Fund Ltd. As a managing member of Iroquois, Mr. Silverman may be deemed the beneficial owner of the 1,339,096 shares of Common stock owned by Iroquois Master Fund Ltd.

(4) Included in Mr. Silverman's beneficial ownership are 10,608 shares of Common Stock issuable upon conversion of shares of Series A Convertible Preferred Stock and 437,500 shares of Common Stock issuable upon the exercise of warrants (exercisable at $3.00 per share until May 31, 2017), held by Iroquois Master Fund, Ltd. Excluded are 600,000 shares of common stock underlying warrants (exercisable at $0.25 per share until October 7, 2018) that are not exercisable to the extent an exercise by the holder would result in the holder's beneficial ownership of the Company exceeding 4.99% of the issued and outstanding common stock. The holder's ownership has been so adjusted.

(5) Mr. Silverman's address is 205 East 42nd St. 20th Fl, New York, New York 10017.

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| **5% beneficial owners** | | |
| Iroquois Capital Management, LLC [1][2] | 1,787,204 | 9.9% |
| Barry Honig [3] | 1,557,823 | 8.6% |
| Robert Ladd [4] | 896,074 | 5.0% |

(1) As reported on Amendment Number 4 to the Schedule 13D filed by, among others, Iroquois, Iroquois Master Fund Ltd. and Joshua Silverman with the SEC on October 2, 2014, Iroquois directly owns 48,378 shares of Common Stock and Iroquois Master Fund Ltd. directly owns 990,358 shares of Common Stock. Iroquois is the investment advisor to Iroquois Master Fund Ltd., such that Iroquois may be deemed the beneficial owner of the 990,358 shares of Common Stock owned by Iroquois Master Fund Ltd.

(2) Included in Iroquois Capital's beneficial ownership are 10,608 shares of Common Stock issuable upon conversion of shares of Series A Convertible Preferred Stock and 437,500 shares of Common Stock issuable upon the exercise of warrants (exercisable at $3.00 per share until May 31, 2017), held by Iroquois Master Fund, Ltd. Excluded are 600,000 shares of common stock underlying warrants (exercisable at $0.25 per share until October 7, 2018) that are not exercisable to the extent an exercise by the holder would result in the holder's beneficial ownership of the Company exceeding 4.99% of the issued and outstanding common stock. The holder's ownership has been so adjusted.

(3) As reported on Schedule 13G filed by among others, Barry Honig, Mr. Honig holds 305,889 shares of common stock directly, holds 246,855 shares of common stock indirectly through GRQ Consultants, Inc. 401K, for which Mr. Honig is Trustee and over which he holds voting and dispositive power, and holds 1,005,079 shares of common stock indirectly through GRQ Consultants, Inc. Roth 401K FBO Barry Honig, for which Mr. Honig is Trustee and over which he holds voting and dispositive power. Excludes 1,600,000 shares of common stock issuable upon exercise of outstanding warrants held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig. The warrants are not exercisable to the extent an exercise by the holder would result in the holder's beneficial ownership of the Company exceeding 4.99% of the issued and outstanding common stock. The holder's ownership has been so limited.  Mr. Honig's address is 555 South Federal Highway, #450, Boca Raton, FL 33432.

(4) Mr. Ladd owns 273,603 shares of Common stock directly.  Mr. Ladd may also be deemed to be the beneficial owner of an additional 622,471 shares of Common stock held by Laddcap Value Partners III LLC, a Delaware limited liability company ("Laddcap") by virtue of his ability to vote or control the vote or dispose or control the disposition of the shares of Common stock held by Laddcap through his position as Managing Member of Laddcap.

## Item 13. Certain relationships and related transactions and director independence

### Director independence

Each of the Company's current independent directors: H. Robert Holmes and Michael Onghai are considered independent under Section 803A of NYSE MKT rules, accordingly to which the Company must comply.

## Item 14. Principal accountant fees and services

Marcum LLP ("Marcum") served as our independent auditors for the fiscal year ended December 31, 2014. On January 25, 2016, we dismissed Marcum, and Friedman LLP ("Friedman") became our independent auditor. The following is a summary of the fees billed to the Company for professional services rendered for the fiscal years ended December 31, 2015 and 2014.

| | Year ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Audit | $ 193 | $ 218 |
| Tax | 74 | 32 |
| | $ 267 | $ 250 |

Audit fees consist of fees billed for services rendered for the audit of our financial statements and review of our financial statements included in our quarterly reports on Form 10–Q.

Tax fees consist of fees billed for professional services related to the preparation of our U.S. federal and state income tax returns and tax advice.

The Audit Committee pre–approved all audit–related fees. After considering the provision of services encompassed within the above disclosures about fees, the Audit Committee has determined that the provision of such services is compatible with maintaining Marcum's independence.

### Pre–approval policy of services performed by independent registered public accounting firm

The Audit Committee's policy is to pre–approve all audit and non–audit related services, tax services and other services. Pre–approval is generally provided for up to one year, and any pre–approval is detailed as to the particular service or category of services and is generally subject to a specific budget. The Audit Committee has delegated the pre–approval authority to its chairperson when expedition of services is necessary. The independent registered public accounting firm and management are required to periodically report to the full Audit Committee regarding the extent of services provided by the independent registered public accounting firm in accordance with this pre–approval and the fees for the services performed to date.

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules.**

<u>Financial statements</u>

The consolidated financial statements of the Company for the fiscal years covered by this Annual Report are located on pages F-1 to F-23 of this Annual Report.

| Exhibit No. | Description |
|---|---|
| 2.1 | Articles of Merger of Medicsight, Inc., a Utah corporation [1] |
| 2.2 | Certificate of Merger of Medicsight, Inc., a Delaware corporation [1] |
| 3.1 | Restated Certificate of Incorporation of MGT Capital Investments, Inc. [2] |
| 3.2 | Amended and Restated Bylaws of MGT Capital Investments, Inc. [3] |
| 10.10 | Common Stock Warrant dated May 9, 2012 [6] |
| 10.12 | Stockholder Agreement dated May 9, 2012, by and among J&S Gaming, Inc., MGT Gaming, Inc. and MGT Capital Investments, Inc. [6] |
| 10.16 | Form of Warrant [7] |
| 10.19 | Form of Certificate of Designation [9] |
| 10.22 | Employment Agreement dated November 19, 2012, by and between the Company and Robert Ladd [10] |
| 10.23 | Employment Agreement dated November 19, 2012, by and between the Company and Robert P. Traversa [10] |
| 10.24 | Amendment to Executive Employment Agreement of Robert B. Ladd as of January 28, 2014. [11] |
| 10.25 | Amendment to Executive Employment Agreement of Robert P. Traversa as of January 28, 2014. [11] |
| 10.26 | Asset Purchase Agreement by and between the Company and CardRunners Gaming, Inc. effective April 1, 2014. [12] |
| 21.1 | Subsidiaries* |
| 23.1 | Consent of Marcum LLP, independent registered public accounting firm, dated April 14, 2016* |
| 23.2 | Consent of Friedman LLP, independent registered public accounting firm, dated April 14, 2016* |
| 99.1 | Settlement Agreement, dated September 29, 2014, by and among MGT Capital Investments, Inc., Iroquois Capital Management L.L.C., Iroquois Master Fund Ltd. and Joshua Silverman [13] |
| 31.1 | Certification pursuant to Section 302 of the Sarbanes–Oxley Act of 2002 of Principal Executive Officer* |
| 31.2 | Certification pursuant to Section 302 of the Sarbanes–Oxley Act of 2002 of Principal Financial and Accounting Officer* |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 of Principal Executive Officer* |
| 32.2 | Certification pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 of Principal Financial and Accounting Officer* |
| 101.INS | XBRL Instance Document* |
| 101.SCH | XBRL Taxonomy Extension Schema* |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document* |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document* |
| 101.LAB | XBRL Taxonomy Extension Labels Linkbase Document* |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document* |

\*      Filed herewith

(1)      Incorporated herein by reference to the Company's Current Report on Form 8–K filed on January 19, 2007.
(2)      Incorporated herein by reference to the Company's Quarterly Report on Form 10–Q, filed November 13, 2013.
(3)      Incorporated herein by reference to the Company's Current Report filed on Form 8–K, filed January 30, 2014.
(4)      Incorporated herein by reference to the Company's Quarterly Report on Form 10–Q, filed November 12, 2009.
(5)      Incorporated herein by reference to the Company's Annual Report on Form 10–K filed April 15, 2011.
(6)      Incorporated herein by reference to the Company's Current Report on Form 8–K filed May 16, 2012.
(7)      Incorporated herein by reference to the Company's Current Report on Form 8–K filed May 30, 2012.
(8)      Incorporated herein by reference to the Company's Current Report on Form 8–K filed October 9, 2012.
(9)      Incorporated herein by reference to the Company's Current Report on Form 8–K filed October 26, 2012.
(10)      Incorporated herein by reference to the Company's Current Report on Form 8–K filed October 26, 2012.
(11)      Incorporated herein by reference to the Company's Current Report filed on Form 8–K, filed January 30, 2014.
(12)      Incorporated herein by reference to the Company's Current Report on Form 8–K filed April 7, 2014.
(13)      Incorporated herein by reference to the Company's Current Report on Form 8–K filed September 29, 2014.

**SIGNATURES**

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

April 14, 2016                                                                         MGT CAPITAL INVESTMENTS, INC

                                                                                          By:  /s/ ROBERT B. LADD
                                                                                              Robert B. Ladd
                                                                                              *Chief Executive Officer*
                                                                                              *(Principal Executive Officer,*
                                                                                              *Principal Financial Officer)*

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Robert B. Ladd<br>Robert B. Ladd | President, CEO and Director<br>(Principal Executive Officer, Principal Financial Officer) | April 14, 2016 |
| /s/ H. Robert Holmes<br>H. Robert Holmes | Director | April 14, 2016 |
| /s/ Michael Onghai<br>Michael Onghai | Director | April 14, 2016 |
| /s/ Joshua Silverman<br>Joshua Silverman | Director | April 14, 2016 |

30

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Audit Committee of the
Board of Directors and Shareholders
of MGT Capital Investments, Inc.

We have audited the accompanying consolidated balance sheet of MGT Capital Investments, Inc. and Subsidiaries (the "Company") as of December 31, 2014, and the related consolidated statements of operations, redeemable preferred stock and changes in stockholders' equity and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of MGT Capital Investments, Inc. and Subsidiaries, as of December 31, 2014, and the consolidated results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ Marcum LLP

New York, NY
April 15, 2015

(Except for the December 31, 2014 amounts appearing in the Reclassification of Discontinued Operations Section presented in Note 3 to the consolidated financial statements as to which the date is April 14, 2016.)

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and
Stockholders of MGT Capital Investments, Inc.

We have audited the accompanying consolidated balance sheet of MGT Capital Investments, Inc.(the "Company") as of December 31, 2015, and the related consolidated statements of operations and comprehensive loss, redeemable preferred stock and changes in stockholders' equity, and cash flows for the year ended December 31, 2015. MGT Capital Investments, Inc.'s management is responsible for these financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of MGT Capital Investments, Inc. as of December 31, 2015 and the results of its operations and its cash flows for year ended December 31, 2015 in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has incurred operating losses during the year ended December 31, 2015, and has negative cash flows from operations of $2,424,000. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regards to these matters are also discussed in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties. If the Company is unable to successfully refinance or raise capital to fund ongoing operations there would be a material adverse effect to the consolidated financial statements.

/s/ Friedman LLP

East Hanover, New Jersey
April 14, 2016

F-2

**MGT CAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share and per–share amounts)**

| | Year ended December 31, | |
| --- | ---: | ---: |
| | 2015 | 2014 |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 359 | $ 648 |
| Accounts receivable | – | 5 |
| Prepaid expenses and other current assets | 61 | 141 |
| Current assets – Discontinued operations | – | 838 |
| Investments available for sale | 444 | – |
| Notes receivable | 1,575 | – |
| Total current assets | 2,439 | 1,632 |
| | | |
| Non–current assets | | |
| Restricted cash | 39 | 138 |
| Property and equipment, at cost, net | 35 | 11 |
| Property and equipment, at cost, net – Discontinued operations | – | 32 |
| Intangible assets, net | 730 | 1,608 |
| Intangible assets, net – Discontinued operations | – | 809 |
| Goodwill | 1,496 | 1,496 |
| Goodwill – Discontinued operations | – | 4,948 |
| Investments, at cost | 1,380 | – |
| Other non–current assets | – | 2 |
| Total assets | $ 6,119 | $ 10,676 |
| | | |
| **Liabilities and equity** | | |
| Current liabilities | | |
| Accounts payable | $ 63 | $ 199 |
| Accrued expenses | 15 | 180 |
| Current liabilities – Discontinued operations | – | 988 |
| Other payables | 1 | 12 |
| Total current liabilities | 79 | 1,379 |
| | | |
| Total liabilities | 79 | 1,379 |
| | | |
| **Commitments and contingencies** | | |
| Redeemable convertible Preferred stock – Temporary equity | | |
| Preferred stock, series A convertible preferred, $0.001 par value, 1,500,000 shares authorized at December 31, 2015 and 2014; 10,608 and 9,993 shares outstanding at December 31, 2015 and 2014, respectively | – | – |
| **Stockholders' equity** | | |
| Undesignated Preferred stock, $0.001 par value; 8,583,840 and 8,583,840 shares authorized at December 31, 2015 and 2014, respectively. No shares issued and outstanding at December 31, 2015 and 2014 respectively | – | – |
| Common Stock, $0.001 par value; 75,000,000 shares authorized; 17,928,221 and 10,731,160 shares issued and outstanding at December 31, 2015 and 2014, respectively | 18 | 11 |
| Additional paid–in capital | 311,167 | 308,288 |
| Accumulated other comprehensive loss | (1,206) | (281) |
| Accumulated deficit | (303,944) | (299,163) |
| Total stockholders' equity | 6,035 | 8,855 |
| Non–controlling interests | 5 | 442 |
| Total equity | 6,040 | 9,297 |
| | | |
| **Total equity, liabilities, redeemable convertible preferred stock and non–controlling interest** | $ 6,119 | $ 10,676 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**MGT CAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(In thousands, except share and per–share amounts)**

| | Year ended December 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| **Revenues** | | |
| Licensing | $ 102 | $ 86 |
| Gaming | 2 | 8 |
| | 104 | 94 |
| **Cost of revenues** | | |
| Licensing | 5 | – |
| **Gross margin** | **99** | **94** |
| **Operating expenses** | | |
| General and administrative | 2,821 | 3,926 |
| Research and development | – | 188 |
| | 2,821 | 4,114 |
| **Operating loss** | **(2,722)** | **(4,020)** |
| **Other non–operating expense** | | |
| Interest and other expense | (23) | (1) |
| Impairment of notes receivable | (556) | – |
| Impairment of intangible assets | (472) | (135) |
| Loss on sale of assets | (144) | – |
| | (1,195) | (136) |
| **Net loss from continuing operations** | **(3,917)** | **(4,156)** |
| **Discontinued operations – DraftDay.com** | | |
| Net loss from discontinued operations | (1,068) | (1,609) |
| Gain on termination of asset purchase agreement | 250 | – |
| Loss on sale of assets | (387) | – |
| | (1,205) | (1,609) |
| **Net loss** | **(5,122)** | **(5,765)** |
| Net loss attributable to non–controlling interest | 341 | 435 |
| **Net loss attributable to Common stockholders** | **$ (4,781)** | **$ (5,330)** |
| **Other comprehensive loss** | | |
| Realized loss on discontinued operations | 281 | – |
| Unrealized loss on investments | (1,206) | – |
| **Comprehensive loss** | **$ (5,706)** | **$ (5,330)** |
| **Per–share data** | | |
| Basic and diluted loss per share – continuing operations | $ (0.26) | $ (0.39) |
| Basic and diluted loss per share from discontinued operations | (0.09) | (0.17) |
| Basic and diluted loss per share | $ (0.35) | $ (0.56) |
| Weighted average number of Common shares outstanding | 13,894,355 | 9,493,057 |

The accompanying notes are an integral part of these consolidated financial statements.

**MGT CAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**REDEEMABLE PREFERRED STOCK AND CHANGES IN STOCKHOLDERS' EQUITY**
**(In thousands)**

| | Redeemable Convertible Preferred stock | | Common stock | | Additional paid–in capital | Accumulated comprehensive income / (loss) | Accumulated deficit | Total shareholders' equity | Non–controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | Shares | Amounts | | | | | | |
| **At January 1, 2014** | 9 | $ – | 8,849 | $ 9 | $ 304,886 | $ (281) | $ (293,833) | $ 10,781 | $ 2,107 | $ 12,888 |
| At–The–Market issuances | | | 1,403 | 2 | 1,464 | | | 1,466 | | 1,466 |
| Preferred share dividends issued | 1 | – | | | | | | – | | – |
| Acquisition of Draft Day | | | 95 | | 190 | | | 190 | | 190 |
| Acquisition of non–controlling interest | | | 53 | | 1,219 | | | 1,219 | (1,230) | (11) |
| Warrants issued for services | | | | | 80 | | | 80 | | 80 |
| Stock issued for services | | | 185 | | 159 | | | 159 | | 159 |
| Stock–based compensation | | | 147 | | 290 | | | 290 | | 290 |
| Net loss for the period | | | | | | | (5,330) | (5,330) | (435) | (5,765) |
| **At December 31, 2014** | 10 | $ – | 10,732 | $ 11 | $ 308,288 | $ (281) | $ (299,163) | $ 8,855 | $ 442 | $ 9,297 |
| At–The–Market issuances | | | 3,155 | 3 | 1,641 | | | 1,644 | | 1,644 |
| Preferred share dividends issued | 1 | – | | | | | | – | | – |
| Transfers from the non–controlling interest | | | | | 96 | | | 96 | (96) | – |
| Stock–based compensation | | | 186 | | 130 | | | 130 | | 130 |
| Stock issued for services | | | 366 | | 161 | | | 161 | | 161 |
| Sale of Common stock | | | 3,489 | 4 | 851 | | | 855 | | 855 |
| Net loss for the period | | | | | | | (4,781) | (4,781) | (341) | (5,122) |
| Other comprehensive loss | | | | | | (925) | | (925) | – | (925) |
| **At December 31, 2015** | 11 | $ – | 17,928 | $ 18 | $ 311,167 | $ (1,206) | $ (303,944) | $ 6,035 | $ 5 | $ 6,040 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**MGT CAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | Year ended December 31, | |
|---|---|---|
| | **2015** | **2014** |
| **Cash flows from operating activities** | | |
| Net loss | $ (5,122) | $ (5,765) |
| Net loss from discontinued operations | 1,205 | 1,609 |
| | (3,917) | (4,156) |
| **Adjustments to reconcile net loss to net cash used in operating activities** | | |
| Depreciation | 14 | 29 |
| Amortization of intangible assets | 227 | 325 |
| Stock–based expense | 291 | 449 |
| Impairment of notes receivable | 550 | – |
| Loss on sale of assets | 144 | – |
| Impairment of intangible assets | 472 | 135 |
| Warrant expense | – | 80 |
| **Change in operating assets and liabilities** | | |
| Accounts receivable | 5 | 38 |
| Prepaid expenses and other current assets | 80 | (57) |
| Accounts payable | (136) | (2) |
| Accrued expenses | (165) | 90 |
| Other payables | 11 | (7) |
| Net cash used in operating activities | (2,424) | (3,076) |
| | | |
| **Cash flows from investing activities** | | |
| Release of restricted cash and security deposit | 101 | 2 |
| Purchase of property and equipment | (38) | – |
| Sale of intangible assets | 35 | – |
| Purchase of note receivable | (250) | – |
| Net cash (used in) / provided by investing activities | (152) | 2 |
| | | |
| **Cash flows from financing activities** | | |
| Proceeds from At–The–Market sales of Common stock, net of fees | 1,644 | 1,466 |
| Proceeds from sale of Common stock, net of fees | 855 | – |
| Net cash provided by financing activities | 2,499 | 1,466 |
| | | |
| **Cash flows from discontinued operations – DraftDay.com** | | |
| Net cash used in operating activities | (212) | (2,013) |
| Net cash used in investing activities | – | (103) |
| Net cash used in discontinued operations | (212) | (2,116) |
| | | |
| Net change in cash and cash equivalents – Discontinued operations | (807) | 536 |
| Cash and cash equivalents, beginning of period – Discontinued operations | 807 | 271 |
| Cash and cash equivalents, end of period - Discontinued operations | – | 807 |
| | | |
| Net change in cash and cash equivalents – Continuing operations | (289) | (3,724) |
| Cash and cash equivalents, beginning of period – Continuing operations | 648 | 4,372 |
| **Cash and cash equivalents, end of period - Continuing operations** | $ 359 | $ 648 |

The accompanying notes are an integral part of these consolidated financial statements.

**MGT CAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(In thousands)**

| | Year ended December 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| Investments received in consideration for sale of DraftDay.com | $ 3,030 | $ – |
| Issuance of notes receivable in consideration for sale of DraftDay.com | 2,109 | – |
| Transfers from the non–controlling interest | 96 | 1,116 |
| Stock issued for acquisition of DraftDay.com | – | 190 |
| Stock issued for acquisition of non–controlling interest in FanTD | – | 103 |
| **Assets disposed and liabilities transferred through sale of assets** | | |
| Property and equipment – DraftDay.com | (16) | – |
| Intangible assets – DraftDay.com | (561) | – |
| Goodwill – DraftDay.com | (4,948) | – |
| Intangible assets – MGT Interactive | (180) | – |
| **Assets acquired and liabilities assumed through purchase of assets** | | |
| Intangible assets | – | 790 |
| Player deposit liability | – | (547) |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

**MGT CAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(In thousands, except share and per–share amounts)**

**Note 1. Organization**

MGT Capital Investments, Inc. ("MGT," "the Company," "we," "us") is a Delaware corporation, incorporated in 2000. The Company was originally incorporated in Utah in 1977. MGT is comprised of the parent company, wholly–owned subsidiaries Medicsight, Inc. ("Medicsight"), MGT Sports, Inc. ("MGT Sports"), MGT Studios, Inc. ("MGT Studios"), and majority–owned subsidiary MGT Gaming, Inc. MGT Studios also owns a controlling minority interest in the subsidiary M2P Americas, Inc. Our corporate office is located in Harrison, New York.

MGT and its subsidiaries are principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry.

<u>Gaming</u>

MGT's gaming portfolio includes a social casino platform Slot Champ and minority stakes in the skill–based gaming platform MGT Play and fantasy sports operator DraftDay Gaming Group, Inc. ("DDGG").

<u>*Sale of DraftDay.com*</u>

Effective September 3, 2015, the Company terminated the Asset Purchase Agreement with Random Outcome ("RO") ("RO Agreement") originally entered into on June 11, 2015, as amended to date. According to its terms, the RO Agreement could be terminated by the Company or RO if a closing had not occurred by August 31, 2015. The RO Agreement provided for the sale of the DraftDay.com Business to RO for a purchase price of (i) cash equal to the sum of (a) $4,000 and (b) $10 per day for the period starting July 15, 2015 and ending on the closing date and (ii) a three–year warrant to purchase 500,000 shares of RO Common stock at an exercise price of $1.00, a three–year warrant to purchase 500,000 shares of RO Common stock at an exercise price of $1.33, and a three–year warrant to purchase 500,000 shares of RO Common stock at an exercise price of $1.66. The non–refundable deposit of $250 was recorded as gain on termination of Asset Purchase Agreement in the income statement.

On September 8, 2015, the Company and MGT Sports entered into an Asset Purchase Agreement with Viggle, Inc. ("Viggle") and Viggle's subsidiary DDGG, pursuant to which Viggle acquired all of the assets of the DraftDay.com business ("DraftDay.com") from the Company and MGT Sports. In exchange for the acquisition of DraftDay.com, Viggle paid MGT Sports the following: (a) 1,269,342 shares of Viggle's common stock, since renamed Draftday Fantasy Sports, Inc. (NASDAQ: DDAY), (b) a promissory note in the amount of $234 paid on September 29, 2015, (c) a promissory note in the amount of $1,875 due March 8, 2016, and (d) 2,550,000 shares of common stock of DDGG. In addition, in exchange for providing certain transitional services, DDGG issued to MGT Sports a warrant to purchase 1,500,000 shares of DDGG common stock. Following consummation of the transaction, MGT Sports owns an 11% equity interest in DDGG, Viggle (since renamed Draftday Fantasy Sports, Inc.) owns 49%, and Sportech, Inc. owns 39%. As a result of the transaction, the Company has presented DraftDay.com as a discontinued operation. There can be no assurance that the Company will be able to realize full value of the above consideration, the Company has taken a reserve of $300 against the March 8, 2016 promissory note and continues to monitor for further possible impairment. The Company has presented the MGT Sports segment as a discontinued operation.

The following table summarizes fair values of the net assets assumed in consideration for the sale of the DraftDay.com Business assets:

| | | |
|---|---|---:|
| Viggle Common shares received at closing share price of $1.30 | $ | 1,650 |
| Viggle promissory notes | | 2,109 |
| DDGG Common shares received at fair market value of $0.40 per share [1] | | 1,020 |
| DDGG stock purchase warrants received [2] | | 360 |
| **Total consideration** | **$** | **5,139** |

The transaction resulted in a loss on the sale of $387.

(1) DDGG Common shares were valued based on recent equity sales by DDGG to Viggle. Viggle purchased shares of DDGG at a price of $0.40 per share.

(2) The Company determined fair value of the warrants received utilizing a Black–Scholes option pricing model. The Company utilized the following assumptions: fair value of Common share of DDGG stock – $0.40 per share, exercise price of $0.40, risk free rate of 0.65%, expected volatility of 98% which is the 3–year historical volatility of the Company's Common stock.

(3)   DraftDay.com assets consist of the following:

| | | |
|---|---|---|
| IT equipment | $ | 17 |
| Domain | | 39 |
| Player deposit liability | | (786) |
| Cash – Player deposits | | 786 |
| Customer list | | 101 |
| Source Code | | 420 |
| Goodwill | | 4,948 |
| **Total** | $ | **5,525** |

Note: Viggle subsequently changed their name to DraftDay.com Fantasy Sports, Inc. and its ticker symbol changed from VGGL to DDAY.

## Intellectual property

MGT Gaming owns two U. S. patents covering certain features of casino slot machines. MGT's wholly owned subsidiary Medicsight owns U.S. Food and Drug Administration ("FDA") approved medical imaging software and has designed an automated carbon dioxide insufflation device on which the Company receives royalties from an international distributor.

MGT Gaming owns U.S. Patents 7,892,088 and 8,550,554 (the "'088 and '554 patents," respectively), both entitled "Gaming Device Having a Second Separate Bonusing Event" and both relating to casino gaming systems in which a second game played on an interactive sign is triggered once specific events occur in a first game. On November 2, 2012, MGT Gaming filed a lawsuit (No. 3:12–cv–741) in the United States District Court for the Southern District of Mississippi alleging patent infringement against certain companies which either manufacture, sell or lease gaming systems alleged to be in violation of MGT Gaming's patent rights, or operate casinos that offer gaming systems that are alleged to be in violation of MGT Gaming's '088 patent, including Penn National Gaming, Inc. ("Penn") (NASDAQ GS: PENN), and Aruze Gaming America, Inc. ("Aruze America"). An amended complaint added the '554 patent, a continuation of the '088 patent. The allegedly infringing products include "Amazon Fishing" and "Paradise Fishing."

By motion filed on May 12, 2014, Aruze America sought a stay pending resolution of a Petition filed by a co–defendant for Inter Parties Review ("IPR") with the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office ("PTO"), challenging the '088 patent. As a result, the Mississippi action was stayed.

Aruze America and its sister company, Aruze Macau, subsequently filed additional IPR Petitions seeking review of the '088 and '554 patents. Aruze America also filed a Request for Ex Parte Re–examination of the '088 patent. Aruze America's Re–examination Request has been denied.

On July 29, 2015, MGT, Aruze America, Aruze Macau, and Penn agreed, through their respective counsel, to settle all pending disputes, including the Mississippi litigation and all proceedings at the PTO. The parties have subsequently jointly terminated the Mississippi litigation and the PTO proceedings. The Company received a payment of $90, which was recorded as licensing revenue.

### Sale of assets – MGT Interactive

On April 21, 2015, Gioia Systems, LLC ("Gioia") filed a complaint against the Company, the Company's majority owned subsidiary, MGT Interactive, LLC, Robert Ladd and Robert Traversa with the United States District Court for the Southern District of New York. MGT Interactive, LLC was also included as a derivative plaintiff in the action. Gioia's complaint asserts claims for breach of contract and breach of fiduciary duty relating to the Contribution Agreement and related agreements. On July 19, 2015, the Company and the other defendants filed an answer, in which they denied the allegations, raised affirmative defenses, and introduced several counterclaims against Gioia.

On August 28, 2015, the Company and MGT Interactive along with Gioia entered into an Assignment and Sale Agreement (the "Agreement"). MGT Interactive purchased the 49% membership interest that Gioia owned of MGT Interactive and sold the certain tangible and intellectual property assets that MGT Interactive previously acquired from Gioia. Effective as of August 28, 2015, MGT Interactive irrevocably sold all assets and Gioia accepts all assets free and clear of all liens etc. In exchange for such assets, Gioia is to transfer the 49% membership interest to Interactive along with a cash payment of $35. As a result of the Agreement, the Company recognized a $144 loss on sale of assets.

The following summarizes the recognition of the Agreement:

| | | |
|---|---|---|
| Cash | $ | 35 |
| Intangible assets | | (179) |
| **Loss on sale** | $ | **144** |

**Note 2. Going Concern and Management plans**

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. As of December 31, 2015, the Company had incurred significant operating losses since inception and continues to generate losses from operations and has an accumulated deficit of $303,944. These matters raise substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of asset amounts or the classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

Commercial results have been limited and the Company has not generated significant revenues. The Company cannot assure its stockholders that the Company's revenues will be sufficient to fund its operations. If adequate funds are not available, the Company may be required to curtail its operations significantly or to obtain funds through entering into arrangements with collaborative partners or others that may require the Company to relinquish rights to certain of our technologies or products that the Company would not otherwise relinquish.

The Company's primary source of operating funds since inception has been debt and equity financings. On December 30, 2013, and as amended on March 27, 2014, the Company entered into an At–The–Market Offering Agreement (the "ATM Agreement") with Ascendant Capital Markets, LLC (the "Manager"). Pursuant to the ATM Agreement, the Company may offer and sell shares of its Common Stock (the "Shares") having an aggregate offering price of up to $8.5 million from time to time through the Manager. The Company can use the net proceeds from any sales of Shares in the offering for working capital, capital expenditures, and general business purposes. For the year ended December 31, 2015, the Company sold approximately 3,155,000 Shares under the ATM Agreement for gross proceeds of approximately $1,695 before related expenses. The ATM Agreement expired by its terms in August 2015.

At December 31, 2015, MGT's cash, cash equivalents and restricted cash were $398. The Company intends to raise additional capital, either through debt or equity financings or through the continued sale of the Company's assets in order to achieve its business plan objectives. Management believes that it can be successful in obtaining additional capital; however, no assurance can be provided that the Company will be able to do so. There is no assurance that any funds raised will be sufficient to enable the Company to attain profitable operations or continue as a going concern. To the extent that the Company is unsuccessful, the Company may need to curtail or cease its operations and implement a plan to extend payables or reduce overhead until sufficient additional capital is raised to support further operations. There can be no assurance that such a plan will be successful.

**Note 3. Summary of significant accounting policies**

**Basis of presentation**

The Company's financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP") and the rules and regulations of the SEC.

**Use of estimates and assumptions and critical accounting estimates and assumptions**

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date(s) of the financial statements and the reported amounts of revenues and expenses during the reporting period(s).

Critical accounting estimates are estimates for which (a) the nature of the estimate is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change and (b) the impact of the estimate on financial condition or operating performance is material. The Company's critical accounting estimates and assumptions affecting the financial statements were:

(1) *Allowance for doubtful accounts:* Management's estimate of the allowance for doubtful accounts is based on historical sales, historical loss levels, and an analysis of the collectability of individual accounts; and general economic conditions that may affect a client's ability to pay. The Company evaluated the key factors and assumptions used to develop the allowance in determining that it is reasonable in relation to the financial statements taken as a whole.

(2) *Fair value of long–lived assets:* Fair value is generally determined using the asset's expected future discounted cash flows or market value, if readily determinable. If long–lived assets are determined to be recoverable, but the newly determined remaining estimated useful lives are shorter than originally estimated, the net book values of the long–lived assets are depreciated over the newly determined remaining estimated useful lives. The Company considers the following to be some examples of important indicators that may trigger an impairment review: (i) significant under–performance or losses of assets relative to expected historical or projected future operating results; (ii) significant changes in the manner or use of assets or in the Company's overall strategy with respect to the manner or use of the acquired assets or changes in the Company's overall business strategy; (iii) significant negative industry or economic trends; (iv) increased competitive pressures; (v) a significant decline in the Company's stock price for a sustained period of time; and (vi) regulatory changes. The Company evaluates acquired assets for potential impairment indicators at least annually and more frequently upon the occurrence of such events.

F-10

(3) *Valuation allowance for deferred tax assets:* Management assumes that the realization of the Company's net deferred tax assets resulting from its net operating loss ("NOL") carry–forwards for Federal income tax purposes that may be offset against future taxable income was not considered more likely than not and accordingly, the potential tax benefits of the net loss carry–forwards are offset by a full valuation allowance. Management made this assumption based on (a) the Company has incurred recurring losses, (b) general economic conditions, and (c) its ability to raise additional funds to support its daily operations by way of a public or private offering, among other factors.

(4) *Estimates and assumptions used in valuation of equity instruments:* Management estimates expected term of share options and similar instruments, expected volatility of the Company's Common shares and the method used to estimate it, expected annual rate of quarterly dividends, and risk free rate(s) to value share options and similar instruments.

These significant accounting estimates or assumptions bear the risk of change due to the fact that there are uncertainties attached to these estimates or assumptions, and certain estimates or assumptions are difficult to measure or value.

Management bases its estimates on historical experience and on various assumptions that are believed to be reasonable in relation to the financial statements taken as a whole under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.

Management regularly evaluates the key factors and assumptions used to develop the estimates utilizing currently available information, changes in facts and circumstances, historical experience and reasonable assumptions. After such evaluations, if deemed appropriate, those estimates are adjusted accordingly. Actual results could differ from those estimates.

**Principles of consolidation**

All intercompany transactions and balances have been eliminated. Non–controlling interest represents the minority equity investment in MGT subsidiaries, plus the minority investors' share of the net operating results and other components of equity relating to the non–controlling interest.

**Reclassification of discontinued operations**

In accordance with *ASC 205–20* regarding the presentation of discontinued operations the assets, liabilities and activity of the DraftDay.com business have been reclassified as a discontinued operation for all periods presented.

Assets and liabilities related to the discontinued operations of DraftDay.com are as follows:

|  | As of December 31, | |
|---|---|---|
|  | **2015** | **2014** |
| Cash and cash equivalents | $ – | $ 806 |
| Other current assets | – | 30 |
| Property and equipment | – | 32 |
| Intangible assets | – | 809 |
| Goodwill | – | 4,948 |
| **Total assets** | $ – | $ 6,625 |
|  |  |  |
| Accounts payable | $ – | $ 46 |
| Player deposits | – | 942 |
| **Total liabilities** | $ – | $ 988 |

DraftDay.com's losses for the years ended December 31, 2015 and 2014 are included in "Loss from discontinued operations" in the Company's Consolidated Statements of Operations and Comprehensive Loss.

Summarized financial information for DraftDay.com's operations for the years ended December 31, 2015 and 2014 are presented below:

| | Year ended December 31, | |
| | 2015 | 2014 |
|---|---|---|
| Revenue | $ 640 | $ 963 |
| Cost of revenue | (225) | (610) |
|    Gross margin | 415 | 353 |
| Operating expenses | (1,483) | (1,962) |
|    Net loss | $ (1,068) | $ (1,609) |

## Business combinations

As specified in *ASC 805 "Business Combinations."* the Company adheres to the following guidelines: (i) record purchase consideration issued to sellers in a business combination at fair value on the date control is obtained, (ii) determine the fair value of any non–controlling interest, and (iii) allocate the purchase consideration to all tangible and intangible assets acquired and liabilities assumed based on their acquisition date fair values. The Company commences reporting the results from operations on a consolidated basis effective upon the date of acquisition.

## Cash, cash equivalents and restricted cash

The Company considers investments with original maturities of three months or less to be cash equivalents. Restricted cash primarily represents cash not available for immediate and general use by the Company.

As of December 31, 2015, our cash balance was $359 (2014: $648). Of the total cash balance, $263 is covered under the US Federal Depository Insurance Corporation. We invest our cash in short–term deposits with major banks. Cash and cash equivalents consist of cash and temporary investments with original maturities of 90 days or less when purchased.

As of December 31, 2015 restricted cash was $39 (2014: $138), which included $nil (2014: $99) held in escrow relating to the sale of the Company's portfolio of medical imaging patents pending reclaim of foreign withholding tax. Proceeds from the patent sale were placed into escrow prior to receipt by the Company pursuant to an escrow agreement between the Company and Munich Innovations GmbH (Note5). The escrow agent distributed the escrow deposit in accordance with and subject to any deductions specified in the patent sale agreement. The remaining $39 of restricted cash supports a letter of credit, in lieu of a rental deposit, for our Harrison, NY office lease.

## Investments

Equity security investments available for sale, at market value, reflect unrealized appreciation and depreciation, as a result of temporary changes in market value during the period, in shareholders' equity, net of income taxes in "accumulated other comprehensive income (loss)" in the consolidated balance sheets. For non–publicly traded securities, market prices are determined through the use of pricing models that evaluate securities. For publicly traded securities, market value is based on quoted market prices or valuation models that use observable market inputs.

*Investments available for sale*

| | |
|---|---|
| Viggle Common shares valued at $0.35 per share | $ 444 |

For non–public, non–controlled investments in equity securities, the Company uses the cost–method of accounting.

*Investments at cost*

| | |
|---|---|
| DDGG Common shares received at fair market value of $0.40 per share | 1,020 |
| DDGG stock purchase warrants received | 360 |
|    Total | $ 1,380 |

## Property and equipment

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated using the straight–line method on the various asset classes over their estimated useful lives, which range from two to five years.

## Intangible assets

Intangible assets consist of patents, trademarks, domain names, software and customer lists. Estimates of future cash flows and timing of events for evaluating long–lived assets for impairment are based upon management's judgment. If any of our intangible or long–lived assets are considered to be impaired, the amount of impairment to be recognized is the excess of the carrying amount of the assets over its fair value. Applicable long–lived assets are amortized or depreciated over the shorter of their estimated useful lives, the estimated period that the assets will generate revenue, or the statutory or contractual term in the case of patents. Estimates of useful lives and periods of expected revenue generation are reviewed periodically for appropriateness and are based upon management's judgment.

**Goodwill**

Goodwill represents the excess of the purchase price over the fair value of the assets acquired and liabilities assumed. The Company is required to perform impairment reviews at each of its reporting units annually and more frequently in certain circumstances. The Company performs the annual assessment on December 31.

In accordance with *ASC 350–20 "Goodwill",* the Company is able to make a qualitative assessment of whether it is more likely than not that a reporting unit's fair value is less than its carrying amount before applying the two–step goodwill impairment test. If the Company concludes that it is more likely than not that the fair value of a reporting unit is not less than its carrying amount it is not required to perform the two–step impairment test for that reporting unit.

**Virtual currency accrual**

Users of the Company's website maintain virtual currency balances which are accumulated as users participate in the Company's online games. The amounts may become payable in cash by the Company once the user's virtual currency balance exceeds a certain minimum threshold; a virtual currency balance of $0.01 or $0.02 based upon initial date of enrollment on the site. User accounts expire after six months of inactivity. The Company records an accrual for potential virtual currency payouts at the end of each reporting period based on historical payout experience and current virtual currency balances. At December 31, 2015, and 2014, the Company recorded a liability of $nil and $10, respectively, relating to potential future virtual currency payouts.

**Revenue recognition**

The Company recognizes revenue when it is realized or realizable and earned. We consider revenue realized or realizable and earned when there is persuasive evidence of an arrangement and that the product has been shipped or the services have been provided to the customer, the sales price is fixed or determinable and collectability is probable. Our material revenue streams are related to the delivery of intellectual property license fees and gaming fees:

- *Licensing* – License fee revenue is derived from the licensing of intellectual property. Revenue from license fees is recognized when notification of shipment to the end user has occurred, there are no significant Company obligations with regard to implementation and the Company's services are not considered essential to the functionality of other elements of the arrangement.

- *Gaming* – Gaming revenue is derived from entry fees charged in contests minus prizes paid out in contests.

**Advertising costs**

The Company expenses advertising costs as incurred. During the years ended December 31, 2015 and 2014, respectively, the Company expensed $nil and $199 in advertising costs related to continuing operations.

**Stock–based compensation**

The Company recognizes compensation expense for all equity–based payments in accordance with *ASC 718 "Compensation – Stock Compensation".* Under fair value recognition provisions, the Company recognizes equity–based compensation net of an estimated forfeiture rate and recognizes compensation cost only for those shares expected to vest over the requisite service period of the award.

Restricted stock awards are granted at the discretion of the Company. These awards are restricted as to the transfer of ownership and generally vest over the requisite service periods, typically over an eighteen–month period (vesting on a straight–line basis). The fair value of a stock award is equal to the fair market value of a share of Company stock on the grant date.

The Company accounts for share–based payments granted to non–employees in accordance with *ASC 505–40, "Equity Based Payments to Non–Employees".* The Company determines the fair value of the stock–based payment as either the fair value of the consideration received or the fair value of the equity instruments issued, whichever is more reliably measurable. If the fair value of the equity instruments issued is used, it is measured using the stock price and other measurement assumptions as of the earlier of either (1) the date at which a commitment for performance by the counterparty to earn the equity instruments is reached, or (2) the date at which the counterparty's performance is complete. The fair value of the equity instruments is re–measured each reporting period over the requisite service period.

**Income taxes**

The Company applies the elements of *ASC 740–10 "Income Taxes — Overall"* regarding accounting for uncertainty in income taxes. This clarifies the accounting for uncertainty in income taxes recognized in financial statements and requires the impact of a tax position to be recognized in the financial statements if that position is more likely than not of being sustained by the taxing authority. As of December 31, 2015, the Company did not have any unrecognized tax benefits. The Company does not expect that the amount of unrecognized tax benefits will significantly increase or decrease within the next twelve months. The Company's policy is to recognize interest and penalties related to tax matters in the income tax provision in the Consolidated Statements of Operations. There was no interest and penalties for the years ended December 31, 2015 and 2014. Tax years beginning in 2012 are generally subject to examination by taxing authorities, although net operating losses from all years are subject to examinations and adjustments for at least three years following the year in which the attributes are used.

Deferred taxes are computed based on the tax liability or benefit in future years of the reversal of temporary differences in the recognition of income or deduction of expenses between financial and tax reporting purposes. The net difference, if any, between the provision for taxes and taxes currently payable is reflected in the balance sheet as deferred taxes. Deferred tax assets and/or liabilities, if any, are classified as current and non–current based on the classification of the related asset or liability for financial reporting purposes, or based on the expected reversal date for deferred taxes that are not related to an asset or liability. Valuation allowances are recorded to reduce deferred tax assets to that amount which is more likely than not to be realized.

Our effective tax rate for years 2015 and 2014, was 0% and 0%, respectively. The difference in the Company's effective tax rate from the Federal statutory rate is primarily due to a 100% valuation allowance provided for all deferred tax assets.

## Loss per share

Basic loss per share is calculated by dividing net loss applicable to Common stockholders by the weighted average number of Common shares outstanding during the period. Diluted earnings per share is calculated by dividing the net earnings attributable to Common stockholders by the sum of the weighted average number of Common shares outstanding plus potential dilutive Common shares outstanding during the period. Potential dilutive securities, comprised of the convertible Preferred stock, unvested restricted shares and warrants, are not reflected in diluted net loss per share because such shares are anti–dilutive.

The computation of diluted loss per share for the year ended December 31, 2015, excludes 10,608 shares in connection to the Convertible Preferred stock and 3,820,825 warrants, as they are anti–dilutive due to the Company's net loss. For the year ended December 31, 2014, the computation excludes 9,993 shares in connection to the Convertible Preferred stock, 1,020,825 warrants and 110,000 unvested restricted shares, as they are anti–dilutive due to the Company's net loss.

## Segment reporting

Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision–making group in deciding how to allocate resources and in assessing performance. Our chief operating decision–making group is composed of the chief executive officer and chief financial officer. We operate in two operational segments, Gaming and Intellectual Property. Certain corporate expenses are not allocated to segments.

## Recent accounting pronouncements

In February 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU" No. 2016-02, "Leases" (topic 842). The FASB issued this update to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The updated guidance is effective for annual periods beginning after December 15, 2018, including interim periods within those fiscal years. Early adoption of the update is permitted. The Company is currently evaluating the impact of the new standard.

In September 2015, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2015–16, simplifying the *Accounting for Measurement–Period Adjustments* that eliminates the requirement to restate prior period financial statements for measurement period adjustments. The new guidance requires that the cumulative impact of a measurement period adjustment (including the impact on prior periods) be recognized in the reporting period in which the adjustment is identified. The new guidance does not change what constitutes a measurement period adjustment. The Company does not expect the adoption of this ASU to significantly impact the consolidated financial statements.

In August 2015, the FASB issued *ASU 2015–15 "Interest– Imputation of Interest"*, final guidance that requires debt issuance costs related to a recognized debt liability to be presented in the balance sheet as a direct deduction from the debt liability rather than as an asset. This publication has been updated to reflect an SEC staff member's comment in June 2015 that the staff will not object to an entity presenting the cost of securing a revolving line of credit as an asset, regardless of whether a balance is outstanding. The Company does not expect the adoption of this ASU to significantly impact the consolidated financial statements.

In April 2015, the FASB issued *ASU 2015–05, "Intangibles – Goodwill and Other – Internal–Use Software"(Subtopic 350–40)*. This ASU provides guidance about whether a cloud computing arrangement includes a software license. If a cloud computing arrangement includes a software license, then the software license element of the arrangement should be accounted for consistent with the acquisition of other software licenses. If a cloud computing arrangement does not include a software license, the arrangement should be accounted for as a service contract. For public business entities, the amendments will be effective for annual periods, including interim periods within those annual periods, beginning after December 15, 2015. Early adoption is permitted. The Company is currently evaluating the impact of the adoption of *ASU 2015–05* on our financial statements and disclosures.

F-14

**Note 4. Asset purchases and acquisitions of businesses**

**DraftDay.com**

On April 7, 2014, the Company closed on an Asset Purchase Agreement ("Agreement") with CardRunners Gaming, Inc. to acquire business assets and intellectual property related to DraftDay.com for cash consideration of $600 and stock consideration of $190, consisting of 95,166 shares of Company's Common stock at $2.00 per share (valued on the date of close). The Company determined the acquisition constitutes a business in accordance with the guidance of ASC 805 *"Business Combinations."*

The following table summarizes the fair values of the net assets/liabilities assumed and the allocation of the aggregate fair value of the purchase consideration to assumed identifiable intangible assets:

| | | |
|---|---|---:|
| Cash | $ | 600 |
| Common stock – 95,166 shares at $2.00 per share | | 190 |
| **Total purchase price** | **$** | **790** |
| | | |
| Cash | $ | 547 |
| Customer list | | 51 |
| Domains | | 64 |
| Website | | 675 |
| Player deposit liability | | (547) |
| **Total purchase price allocation** | **$** | **790** |

**Pro–forma results**

The following tables summarize, on an unaudited pro–forma basis, the results of operations of the Company as though the acquisition of DraftDay.com had occurred as of January 1, 2014. The pro–forma amounts give effect to appropriate adjustments of amortization of intangible assets and interest expense associated with the financing of the acquisition. The pro–forma amounts presented are not necessarily indicative of the actual results of operations had the acquisition transaction occurred as of January 1, 2014.

| Year ended December 31, 2014 | | MGT | | DraftDay | | Pro–forma total |
|---|---|---:|---|---:|---|---:|
| Revenues | $ | 1,056 | $ | 192 | $ | 1,248 |
| Net loss | | (5,330) | | (240) | | 5,570 |
| Loss per share of Common stock | | (0.56) | | – | | (0.56) |
| Basic and diluted | | 9,493,057 | | – | | 9,493,057 |

Refer to Note 1 for sale of DraftDay.com.

**Note 5. Goodwill and intangible assets**

Goodwill represents the difference between purchase cost and the fair value of net assets acquired in business acquisitions. Indefinite lived intangible assets, representing trademarks and trade names, are not amortized unless their useful life is determined to be finite. Long–lived intangible assets are subject to amortization using the straight–line method. Goodwill and indefinite lived intangible assets are tested for impairment annually as of December 31, and more often if a triggering event occurs, by comparing the fair value of each reporting unit to its carrying value. As of December 31, 2015 and 2014, the Company assessed its intangibles for impairment and recognized a charge of $472 and $135, respectively. The Company concluded that a triggering event had occurred based on the overall deterioration of the market capitalization of the Company and evaluated the goodwill for possible impairment. After the evaluation, management concluded that no impairment existed based on the Company's current efforts to capitalize and execute its business plan relating to the asset.

The Company's intangible assets for continuing operations consisted of the following:

| | Goodwill |
|---|---|
| **Balance, December 31, 2013** | $ 1,496 |
| Additions (disposals) | — |
| **Balance, December 31, 2014** | 1,496 |
| Additions (disposals) | — |
| **Balance, December 31, 2015** | $ 1,496 |

| | Intangible assets |
|---|---|
| **Balance, December 31, 2013** | $ 1,714 |
| Disposals | — |
| Additions | 354 |
| Impairment | (135) |
| Amortization | (325) |
| **Balance, December 31, 2014** | 1,608 |
| Disposals | (179) |
| Impairment | (472) |
| Amortization | (227) |
| **Balance, December 31, 2015** | $ 730 |

| | Estimated remaining useful life | As of December 31, 2015 | As of December 31, 2014 |
|---|---|---|---|
| Intellectual property | 6 years | $ 1,440 | $ 2,105 |
| Software and website development | 1 year | 65 | 65 |
| Less: Accumulated amortization | | (775) | (562) |
| **Intangible assets, net** | | $ 730 | $ 1,608 |

For the years ended December 31, 2015 and 2014, the Company recorded amortization expense of $227 and $325, respectively.

The following table outlines estimated future annual amortization expense for the next five years and thereafter:

| | Intellectual property | Software and website development | Total |
|---|---|---|---|
| 2016 | $ 155 | $ 18 | $ 173 |
| 2017 | 153 | — | 153 |
| 2018 | 153 | — | 153 |
| 2019 | 153 | — | 153 |
| 2020 | 98 | — | 98 |
| **Balance, December 31, 2015** | $ 712 | $ 18 | $ 730 |

**Note 6. Notes receivable**

On February 26, 2015, the Company signed a letter of intent with Tera Group, Inc., owner of TeraExchange, LLC, a Swap Execution Facility regulated by the U.S. Commodity Futures Trading Commission, to negotiate a merger agreement. Since the merger agreement was not executed by the execution date, the merger was aborted. Simultaneous with the letter of intent, on February 26, 2015, the Company purchased a promissory note in the principal amount of $250 bearing interest at the rate of 5% per annum from the aggregate unpaid principal balance and all accrued and unpaid interest are due and payable upon demand at any time after August 15, 2015. As of December 31, 2015, the Company has fully reserved against the collectability of this note and the corresponding accrued interest.

On December 31, 2015, the Company carried a Note from Viggle in the amount of $1,875. Due to the credit worthiness of Viggle, the Company recognized an allowance of $300 (See "Note 17. Subsequent events" for restructured terms of the note receivable).

**Note 7. Property and equipment**

Property and equipment related to continuing operations consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | **2015** | **2014** |
| Computer hardware and software | $ 38 | $ 125 |
| Furniture and fixtures | – | 12 |
|  | 38 | 137 |
| Less: Accumulated depreciation | (3) | (126) |
| **Property and equipment, net** | $ 35 | $ 11 |

The Company recorded depreciation expense of $14 and $29 for the years ended December 31, 2015 and 2014, respectively.

**Note 8. Accrued expenses**

|  | As of December 31, | |
|---|---|---|
|  | **2015** | **2014** |
| Professional fees | $ – | $ 100 |
| Independent director fees | 15 | 56 |
| Other | – | 24 |
| **Total** | $ 15 | $ 180 |

**Note 9. Series A Convertible Preferred stock**

On November 2, 2012, the Company closed a private placement sale of 1,380,362 shares of Series A Convertible Preferred Stock ("Preferred Stock"), (including 2,760,724 warrants to purchase MGT Common Stock at a purchase price of $3.85 per share) for an aggregate of $4.5 million. This transaction was approved by the NYSE MKT on October 26, 2012. The Preferred Stock is convertible into the Company's Common Stock at a fixed price of $3.26 per share and carries a 6% dividend, payable in cash or additional Preferred Stock, at the election of the Company. As of December 31, 2015, no warrants from this transaction remain outstanding.

For the years ended December 31, 2015 and 2014, respectively, the Company issued 615 and 580 of Dividend Shares to the Preferred Stock holders.

**Significant terms of the Preferred stock, as specified in the Certificate of Designation**

*Conversion option*

At any time, the Preferred Stock shall be convertible (in whole or in part), at the option of the Holder, into such number of fully paid and non–assessable shares of Common stock as is determined by dividing (x) the aggregate Stated Value of $3.26 per shares ("Stated Value") of Preferred stock that are being converted plus any accrued but unpaid dividends thereon as of such date that the Holder elects to convert by (y) the Conversion Price ($3.26) then in effect on the date (the "Conversion Date").

For the years ending December 31, 2015 and 2014, no Preferred shares were converted into shares of the Company's Common stock.

*Liquidation preference*

Upon the liquidation, dissolution or winding up of the business of the Corporation, whether voluntary or involuntary, each holder of Preferred Stock shall be entitled to receive, for each share thereof, a preferential amount in cash equal to (and not more than) the Stated Value (the "Liquidation Amount") plus all accrued and unpaid dividends. As of December 31, 2015 and 2014, the liquidation preference value of the outstanding redeemable series A preferred stock is not material.

The Preferred Stock Certificate of Designation contains a fundamental transactions clause that provides for the conditional redemption of this security under certain circumstances that are not within the Company's sole control. Management has therefore concluded that the Preferred Stock requires temporary equity classification in accordance with ASC 480–10–S99 "Accounting for Redeemable Equity Instruments" at its allocated value. The carrying amount of the Preferred Shares requires no adjustment unless and until the conditional redemption events are probable. The Company does not consider the conditional redemption events to be probable, as these events refer to fundamental change of control situations that do not currently exist, in the opinion of management. Accordingly, management concluded that the conversion option embedded in the preferred shares does not require bifurcation from the host contract, as the Preferred Stock has the characteristics of a residual interest and therefore are clearly and closely related to the Common stock issuable upon the exercise of the conversion option.

**Note 10. Sale of Common stock**

On December 30, 2013, and as amended on March 27, 2014, the Company entered into an At–The–Market Offering Agreement (the "ATM Agreement") with Ascendant Capital Markets, LLC (the "Manager"). Pursuant to the ATM Agreement, the Company may offer and sell shares of its Common Stock (the "Shares") having an aggregate offering price of up to $8.5 million from time to time through the Manager. The Company can use the net proceeds from any sales of Shares in the offering for working capital, capital expenditures, and general business purposes. For the year ended December 31, 2015, the Company sold approximately 3,155,000 Shares under the ATM Agreement for gross proceeds of approximately $1,695 before related expenses. The ATM Agreement expired by its terms in August 2015.

On October 8, 2015, the Company entered into separate subscription agreements (the "Subscription Agreement") with accredited investors (the "Investors") relating to the issuance and sale of $700 of units (the "Units") at a purchase price of $0.25 per Unit, with each Unit consisting of one share (the "Shares") of the Company's common stock, par value $0.001 per share (the "Common Stock") and a three year warrant (the "Warrants") to purchase two shares of Common Stock at an initial exercise price of $0.25 per share (such sale and issuance, the "Private Placement").

The Warrants are exercisable at a price of $0.25 on the earlier of (i) one year from the date of issue or (ii) the occurrence of certain corporate events, including a private or public financing, subject to approval of the lead investor, in which the Company receives gross proceeds of at least $7,500; a spinoff; one or more acquisitions or sales by the Company of certain assets approved by the stockholders of the Company; or a merger, consolidation, recapitalization, or reorganization approved by the stockholders of the Company (each, a "Qualifying Transaction"). The Warrants may be exercised by means of a "cashless exercise" following the four–month anniversary of the date of issue, provided that the Company has consummated a Qualifying Transaction and there is no effective registration statement registering the resale of the shares of Common Stock underlying the Warrants (the "Warrant Shares"). The Company is prohibited from effecting an exercise of any Warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 4.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such Warrant, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. The Warrants are also subject to certain adjustments upon certain actions by the Company as outlined in the Warrants. Prior to receipt of shareholder approval, the warrants, when aggregated with the shares of common stock issued in the offering, shall not be exercisable into more than 19.99% of the number of shares of Common Stock outstanding as of the closing date.

On December 22, 2015 the Company sold $172 of common stock at a price of $0.25 per share in a Registered Direct offering.

**Note 11. Stock incentive plan and stock–based compensation**

**Stock incentive plan**

The Company's board of directors established the 2012 Stock Incentive Plan (the "Plan") on April 15, 2012, and the Company's shareholders ratified the Plan at the annual meeting of the Company's stockholders on May 30, 2012. The Company has 415,000 shares of Common Stock that are reserved to grant Options, Stock Awards and Performance Shares (collectively the "Awards") to "Participants" under the Plan. The Plan is administered by the board of directors or the Compensation Committee of the board of directors, which determines the individuals to whom awards shall be granted as well as the type, terms and conditions of each award, the option price and the duration of each award.

At the annual meeting of the stockholders of MGT held on September 27, 2013, stockholders approved an amendment to the Plan (the "Amended and Restated Plan") to increase the amount of shares of Common Stock that may be issued under the Amended and Restated Plan to 1,335,000 shares from 415,000 shares, an increase of 920,000 shares and to add a reload feature.

At the annual meeting of the stockholders of MGT held on December 31, 2015, stockholders approved an amendment to the Plan (the "Amended and Restated Plan") to increase the amount of shares of Common Stock that may be issued under the Amended and Restated Plan to 3,000,000 shares from 1,335,000 shares, an increase of 1,665,000 shares.

Common Stock and options granted under the Plan vest as determined by the Company's Compensation and Nominations Committee and expire over varying terms, but not more than seven years from date of grant. In the case of an Incentive Stock Option that is granted to a 10% shareholder on the date of grant, such Option shall not be exercisable after the expiration of five years from the date of grant. No option grants were issued during the years ended December 31, 2015, and 2014.

**Issuance of restricted shares – directors, officers and employees**

A summary of the Company's employee's restricted stock as of December 31, 2015, is presented below:

| | Number of shares | | Weighted average grant date fair value |
|---|---|---|---|
| **Non–vested at January 1, 2014** | **52,667** | $ | **4.56** |
| Granted | 147,000 | | 1.72 |
| Vested | (77,000) | | 3.77 |
| Forfeited | (12,667) | | 3.68 |
| **Non–vested at December 31, 2014** | **110,000** | | **1.42** |
| Granted | 255,000 | | 0.31 |
| Vested | (309,500) | | 0.53 |
| Forfeited | (55,500) | | 1.28 |
| **Non–vested at December 31, 2015** | **–** | $ | **–** |

For the years ended December 31, 2015 and 2014, the Company has recorded $130 and $290, respectively, in employee and director stock–based compensation expense, which is a component of selling, general and administrative expense in the Consolidated Statement of Operations.

In the years ended December 31, 2015 and 2014, the Company did not allocate any stock–based compensation expense to non–controlling interest.

**Unrecognized compensation cost**

As of December 31, 2015, unrecognized compensation costs related to non–vested stock–based compensation arrangements, was $0 and (2014: $101) and is expected to be recognized over a weighted average period of 0 (2014: 0.66) years.

**Stock–based compensation – non–employees**

For the year ended December 31, 2015 the Company granted and issued a total of 366,624 shares to non–employees for services rendered. The shares were recorded at $161 using the closing market value on respective dates of issuance.

Subsequent to December 31, 2015, and through the date of filing the Annual Report on Form 10–K, the Company granted and issued a total of 170,000 shares to non–employees for services rendered. The shares were recorded at $51 using the closing market value on respective dates of issuance.

**Warrants**

As of December 31, 2015 the Company had 3,820,825 warrants outstanding at weighted average exercise price of $1.11 and an intrinsic value of $nil. As of December 31, 2015, all issued warrants are exercisable and expire through 2018.

The following table summarizes information about warrants outstanding at December 31, 2015:

| | Warrants outstanding | | Weighted average exercise price |
|---|---|---|---|
| **At January 1, 2014** | **920,825** | $ | **3.44** |
| Issued | 100,000 | | – |
| Exercised | – | | 3.75 |
| Expired | – | | – |
| **At December 31, 2014** | **1,020,825** | $ | **3.47** |
| Issued | 2,800,000 | | 0.25 |
| Exercised | – | | – |
| Expired | – | | – |
| **At December 31, 2015** | **3,820,825** | $ | **1.11** |

F-19

**Note 12. Non–controlling interest**

At December 31, 2015 the Company's non–controlling interest was as follows:

| | MGT Gaming | FanTD | MGT Interactive | M2P Americas | Total |
|---|---|---|---|---|---|
| **Non–controlling interest at January 1, 2014** | $ 585 | $ 1,431 | $ 96 | $ (5) | $ 2,107 |
| Acquisition of non–controlling interest in FanTD | – | (1,230) | – | – | (1,230) |
| Non–controlling share of losses | (215) | (201) | (4) | (15) | (435) |
| **Non–controlling interest at December 31, 2014** | $ 370 | $ – | $ 92 | $ (20) | $ 442 |
| Non–controlling share of losses | (342) | – | 4 | (3) | (341) |
| Transfers from non–controlling interest | – | – | (96) | – | (96) |
| **Non–controlling interest at December 31, 2015** | $ 28 | $ – | $ – | $ (23) | $ 5 |

**Note 13. Operating leases, commitments and security deposit**

**Operating leases**

In August 2014, the Company entered into a lease modification agreement, extending its existing office lease in Harrison, NY for a period of one year. Total rent payments over the 12–month period were $73 and the lease expired on November 30, 2015. A refundable rental deposit of $39 was held in a restricted cash account as of December 31, 2015.

On October 26, 2015, the Company entered into an Office License Agreement commencing December 1, 2015. The term expires on November 30, 2016 and carries a monthly fee of $4, with one month (January) rent free. The Company paid a refundable service retainer of $6 and a non–refundable set up fee of $1.

Total lease rental expense for the years ended December 31, 2015 and 2014, was $77 and $113, respectively.

**Commitments**

On October 7, 2015, the Company entered into an amended and restated employment agreement with Robert Ladd, its Chief Executive Officer and President, effective October 1, 2015. The agreement amends and restates in its entirety the employment agreement entered into between the Company and Mr. Ladd in November 2012, as amended January 28, 2014. The term of the agreement expires on November 30, 2016, subject to automatic renewals of one year. The agreement provides for a base salary of $199 per year. Pursuant to the agreement, the Company also granted Mr. Ladd 200,000 shares of unregistered Common Stock. Mr. Ladd is eligible for bonus compensation and equity awards as may be approved in the discretion of the Compensation Committee and the Board of Directors.  Upon termination of his employment for reasons other than death, disability, or cause or upon resignation for good reason, Mr. Ladd will be entitled to a severance payment equal to the higher of the aggregate amount of his base salary for the then remaining term of the agreement or twelve times the average monthly base salary paid or accrued during the three full calendar months immediately preceding such termination. All unvested stock options shall immediately vest and the exercise period of such options shall be extended to the later of the longest period permitted by the Company's stock option plans or ten years following the termination date. The agreement also contains non–compete and change of control provisions.

**Note 14. Income taxes**

Significant components of deferred tax assets were as follows as of December 31:

| | 2015 | 2014 |
|---|---|---|
| U.S. federal tax loss carry–forward | $ 14,229 | $ 10,779 |
| U.S. State tax loss carry–forward | 1,137 | 1,498 |
| U.S. federal capital loss carry–forward | 188 | 188 |
| U.S. foreign tax credit carry–forward | – | – |
| Equity–based compensation, fixed assets and other | – | 1,598 |
| Total deferred tax assets | 15,554 | 14,063 |
| Less: valuation allowance | (15,554) | (14,063) |
| **Net deferred tax asset** | $ – | $ – |

As of December 31, 2015, the Company had the following tax attributes:

| | Amount | Begins to expire |
|---|---|---|
| U.S. federal net operating loss carry–forwards | $ 36,306 | Fiscal 2023 |
| U.S. State net operating loss carry–forwards | 20,739 | Fiscal 2031 |
| U.S. federal capital loss carry–forwards | 553 | Fiscal 2015 |

As it is not more likely than not that the resulting deferred tax benefits will be realized, a full valuation allowance has been recognized for such deferred tax assets. For the year ended December 31, 2015, the valuation allowance increased by $1,491. Federal and state laws impose substantial restrictions on the utilization of tax attributes in the event of an "ownership change," as defined in Section 382 of the Internal Revenue Code. Currently, the Company does not expect the utilization of tax attributes in the near term to be materially affected as no significant limitations are expected to be placed on these tax attributes as a result of previous ownership changes. If an ownership change is deemed to have occurred as a result of equity ownership changes or offerings, potential near term utilization of these assets could be reduced.

The provision for/(benefit from) income tax differs from the amount computed by applying the statutory federal income tax rate to income before the provision for/(benefit from) income taxes. The sources and tax effects of the differences are as follows for the years ended December 31:

| | 2015 | 2014 |
|---|---|---|
| Expected Federal Tax | (34.00)% | (34.00)% |
| State Tax (Net of Federal Benefit) | (5.48) | (5.48) |
| Permanent differences | — | 0.12 |
| Loss of NOL benefit of closed foreign entity | — | — |
| Write–off of deferred tax asset | — | 4.29 |
| Adjustments to deferred tax balances | — | (8.34) |
| Foreign tax credit | — | — |
| Other | — | 0.05 |
| Change in valuation allowance | 39.48 | 43.36 |
| **Effective rate of income tax** | **0%** | **0%** |

The Company files income tax returns in the U.S. federal jurisdiction, New York State and New Jersey jurisdictions. With few exceptions, the Company is no longer subject to U.S. federal, state and local, or non–U.S. income tax examinations by tax authorities for years before 2012.

**Note 15. Segment reporting**

Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision–making group in deciding how to allocate resources and in assessing performance. The Company's chief operating decision–making group is composed of the Chief Executive Officer. The Company operates in two segments, Gaming and Intellectual Property. Medicsight's Software and Devices and Services are no longer considered separate business segments and have been merged into the Intellectual Property segment. Certain corporate expenses are not allocated to segments.

The Company evaluates performance of its operating segments based on revenue and operating loss. Segment information as of December 31, 2015 and 2014, are as follows:

| | Intellectual property | Gaming – Continuing Operations | Unallocated corporate/other | Total | Discontinued Operations |
|---|---|---|---|---|---|
| **Year ended December 31, 2015** | | | | | |
| Revenue | $ 102 | $ 2 | $ – | $ 104 | $ 640 |
| Cost of revenue | (5) | – | – | (5) | (225) |
| Gross margin | 97 | 2 | – | 99 | 415 |
| Operating loss | (268) | (32) | (2,422) | (2,722) | (1,068) |
| **Year ended December 31, 2014** | | | | | |
| Revenue | $ 86 | $ 8 | $ – | $ 94 | $ 963 |
| Cost of revenue | – | – | – | – | (610) |
| Gross margin | 86 | 8 | – | 94 | 353 |
| Operating loss | (401) | (1,379) | (2,240) | (4,020) | (1,609) |
| **December 31, 2015** | | | | | |
| Cash and cash equivalents (excludes $39 of restricted cash) | $ – | $ – | $ 359 | $ 359 | $ – |
| Property and equipment | – | – | 35 | 35 | – |
| Intangible assets | 710 | 20 | – | 730 | – |
| Goodwill | – | 1,496 | – | 1,496 | – |
| Additions: | | | | | |
| Property and equipment | – | – | 35 | 35 | – |
| Intangible assets | – | – | – | – | – |
| Goodwill | – | – | – | – | – |
| **December 31, 2014** | | | | | |
| Cash and cash equivalents (excludes $138 of restricted cash) | $ 11 | $ 12 | $ 625 | $ 648 | $ 806 |
| Property and equipment | – | 6 | 5 | 11 | 32 |
| Intangible assets | 1,577 | 31 | – | 1,608 | 809 |
| Goodwill | – | 1,496 | – | 1,496 | 4,948 |
| Additions: | | | | | |
| Property and equipment | – | – | – | – | 41 |
| Intangible assets | – | – | – | – | 790 |
| Goodwill | – | – | – | – | – |

F-22

**Note 16. Investments and Fair Value**

The authoritative guidance for fair value measurements defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or the most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Market participants are buyers and sellers in the principal market that are (i) independent, (ii) knowledgeable, (iii) able to transact, and (iv) willing to transact. The guidance describes a fair value hierarchy based on the levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value which are the following:

- *Level 1* – Quoted prices in active markets for identical assets or liabilities

- *Level 2* – Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or corroborated by observable market data or substantially the full term of the assets or liabilities

- *Level 3* – Unobservable inputs that are supported by little or no market activity and that are significant to the value of the assets or liabilities

The following table provides the liabilities carried at fair value measured on a recurring basis as of December 31, 2015 and 2014:

| December 31, 2015 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Investments – Viggle Common shares | $ 444 | $ – | $ – | $ 444 |

**Note 17. Subsequent events**

On March 24, 2016 (the "Effective Date"), the Company entered into an Exchange Agreement (the "Agreement") with DraftDay Fantasy Sports Inc. ("DraftDay"). The purpose of the Agreement was to exchange that certain outstanding promissory note (the "Note") in the principal amount of $1,875 issued on September 8, 2015, for other equity and debt securities of DraftDay, after the Note went into default on March 8, 2016.

On the Effective Date, the Note had an outstanding principal balance of $1,875 and accrued interest in the amount of $51 (the "Interest"). Pursuant to the Agreement, a portion consisting of $825 of the outstanding principal of the Note was exchanged for 2,748,353 shares of DraftDay's common stock, and an additional portion of $110 of the outstanding principal was exchanged for 110 shares (the "Preferred Shares") of a newly created class of preferred stock, the Series D Convertible Preferred Stock. The Preferred Shares are convertible into an aggregate of 366,630 shares of DraftDay's common stock, except that conversions shall not be effected to the extent that, after issuance of the conversion shares, MGT's aggregate beneficial ownership (together with that of its affiliates) would exceed 9.99%. Finally, DraftDay agreed to make a cash payment to MGT Sports for the total amount of Interest. In exchange for the forgoing, MGT Sports and the Company agreed to waive all Events of Default under the Note prior to the Effective Date and to release DraftDay from any rights, remedies and claims related thereto. After giving effect to the forgoing, the remaining outstanding principal balance of the Note is $940 (the "Remaining Balance"). The Remaining Balance of the Note shall continue to accrue interest a rate of 5% per annum, and all terms of the Note shall remain unchanged except that the maturity date is changed to July 31, 2016.

EX-21.1 2 f10k2015ex21i_mgtcapital.htm SUBSIDIARIES

Exhibit 21.1

**SUBSIDIARIES OF MGT CAPITAL INVESTMENTS, INC.**

| Name of subsidiary | Jurisdiction of organization |
|---|---|
| MGT Gaming, Inc. | Delaware, USA |
| Medicsight, Inc. | Delaware, USA |
| MGT Studios, Inc. (f/k/a MGT Capital Solutions, Inc.) and subsidiary: | Delaware, USA |
| – M2P Americas, Inc. | Delaware, USA |
| MGT Interactive, LLC | Delaware, USA |
| MGT Sports, Inc. | Delaware, USA |

EX-23.1 3 f10k2015ex23i_mgtcapital.htm CONSENT OF MARCUM LLP, INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM, DATED APRIL 14, 2016

Exhibit 23.1

**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM'S CONSENT**

We consent to the incorporation by reference in the Registration Statement of MGT Capital Investments, Inc. on Form S-3 (No. 333-185214 and No. 333-182298) of our report dated April 15, 2015 (except for the December 31, 2014 amounts appearing in the Reclassification of Discontinued Operations Section presented in Note 3 to the consolidated financial statements as to which the date is April 14, 2016), with respect to our audit of the consolidated financial statements of MGT Capital Investments, Inc. and Subsidiaries as of December 31, 2014 and for the year then ended December 31, 2014, which report is included in this Annual Report on Form 10-K of MGT Capital Investments, Inc. for the year ended December 31, 2015.

/s/ Marcum LLP

Marcum LLP
New York, NY
April 14, 2016

EX-23.2 4 f10k2015ex23ii_mgtcapital.htm CONSENT OF FRIEDMAN LLP, INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM, DATED APRIL 14, 2016

**Exhibit 23.2**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Forms S-3 (No. 333–185214 and No. 333–182298) of MGT Capital Investments, Inc. of our report dated April 14, 2016 relating to the consolidated financial statements of MGT Capital Investments, Inc. as of December 31, 2015, which appear in this Form 10-K.

/s/ Friedman LLP

East Hanover, New Jersey
April 14, 2016
EX-31.1 5 f10k2015ex31i_mgtcapital.htm CERTIFICATION

**Exhibit 31.1**

### CERTIFICATION PURSUANT TO SARBANES–OXLEY ACT OF 2002

I, Robert B. Ladd, certify that:

1.   I have reviewed this annual report on Form 10–K of MGT Capital Investments, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

April 14, 2016                                     By:  /s/ ROBERT B. LADD
                                                   Robert B. Ladd
                                                   President and Chief Executive Officer
                                                   (Principal Executive Officer)

EX-31.2 6 f10k2015ex31ii_mgtcapital.htm CERTIFICATION

**Exhibit 31.2**

### CERTIFICATION PURSUANT TO SARBANES–OXLEY ACT OF 2002

I, Robert B. Ladd, certify that:

1. I have reviewed this annual report on Form 10–K of MGT Capital Investments, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

April 14, 2016      By: /s/ ROBERT B. LADD

Robert B. Ladd
Interim Chief Financial Officer
(Principal Financial and Accounting Officer)

EX-32.1 7 f10k2015ex32i_mgtcapital.htm CERTIFICATION

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO SECTION 906
OF THE SARBANES–OXLEY ACT OF 2002**

I, Robert B. Ladd, President and Chief Executive Officer of MGT Capital Investments, Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, 18 U.S.C. Section 1350, that to the best of my knowledge:

(1) the Annual Report on Form 10–K of the Company for the year ended December 31, 2015, (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 14, 2016      By: /s/ ROBERT B. LADD

Robert B. Ladd
President and Chief Executive Officer
(Principal Executive Officer)

EX-32.2 8 f10k2015ex32ii_mgtcapital.htm CERTIFICATION

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO SECTION 906
OF THE SARBANES–OXLEY ACT OF 2002**

I, Robert B. Ladd, Interim Chief Financial Officer of MGT Capital Investments, Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, 18 U.S.C. Section 1350, that to the best of my knowledge:

(1) the Annual Report on Form 10–K of the Company for the year ended December 31, 2015, (the "Report") fully complies with the requirements

of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 14, 2016

By:  /s/ ROBERT B. LADD
Robert B. Ladd
Interim Chief Financial Officer
(Principal Financial and Accounting Officer)