UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,  :
                                     :
                   Plaintiff,        :
                                     :          18 Civ. 8175 (ER)
           – against –               :
                                     :          ECF CASE
BARRY C. HONIG, MICHAEL BRAUSER,     :
JOHN STETSON, JOHN R. O'ROURKE III,  :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER, :
JOHN H. FORD, ATG CAPITAL LLC, GRQ   :
CONSULTANTS, INC., HS CONTRARIAN     :
INVESTMENTS, LLC, GRANDER HOLDINGS, INC., :
and STETSON CAPITAL INVESTMENTS INC., :
                                     :
                   Defendants.       :

-------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANTS BRAUSER AND GRANDER HOLDINGS, INC.

SECURITIES AND EXCHANGE
COMMISSION
    Nancy A. Brown
    Jack Kaufman
    Katherine Bromberg
    Jon Daniels
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)

Attorneys for Plaintiff

August 2, 2019

TABLE OF CONTENTS

                                                                              **Page**

TABLE OF AUTHORITIES ............................................................................ iii

Preliminary Statement ................................................................................ 1

STATEMENT OF THE ALLEGATIONS IN THE COMPLAINT ................................. 1

    A. BioZone ....................................................................................... 3

    B. MGT .......................................................................................... 4

    C. MabVax ....................................................................................... 5

ARGUMENT .......................................................................................... 8

I. STANDARD OF REVIEW ......................................................................... 8

II. THE COMMISSION'S COMPLAINT STATES A CLAIM AGAINST
    BRAUSER AND GRANDER FOR VIOLATIONS OF SECURITIES ACT
    SECTIONS 5(a) AND (c) .......................................................................... 10

III. THE COMMISSION'S COMPLAINT STATES A CLAIM AGAINST
    BRAUSER FOR VIOLATIONS OF EXCHANGE ACT SECTION
    13(d) AND RULE 13d-1 THEREUNDER ...................................................... 13

    A. Because Brauser Acted in Concert with Honig and Others to Acquire, Hold,
    Vote and/or Dispose of Their Shares, His Failure to Disclose His Membership
    in a Group States a Section 13(d) Claim ...................................................... 13

        (1) Defendants Acquired and Disposed of Their Securities Together .............. 15

        (2) Defendants Shared a History of Co-Investing ................................... 16

        (3) In Frequent Communications, Brauser Was Apprised of Honig's
        Negotiations on Behalf of the Group ............................................. 17

        (4) The Issuers Viewed Honig, Brauser and Their Co-investors as a Group ...... 18

        (5) Brauser's Schedule 13G Filings Were False and Misleading .................. 18

    B. The Complaint Adequately Alleges that Brauser Improperly Made False and
    Misleading Schedule 13G Filings Instead of Proper Schedule 13D Filings .............. 19

IV. THE COMMISSION'S COMPLAINT STATES A CLAIM AGAINST BRAUSER
    AND GRANDER FOR VIOLATIONS OF EXCHANGE ACT SECTION 10(b)
    AND RULE 10b-5 THEREUNDER, SECURITIES ACT SECTIONS
    17(a)(1), (2) AND (3), AND, AS AGAINST BRAUSER, EXCHANGE ACT
    SECTION 9(a)(1)...........................................................................................................22

    A. Brauser Made Materially False Statements in Connection with the MGT and
    MabVax Pump-and-Dump Schemes...............................................................................23

    B. Brauser Violated Exchange Act Sections 9(a)(1) and 10(b) and
    Rule 10b-5 Thereunder and Securities Act Sections 17(a)(1), (2) and (3)
    in Engaging in Manipulative Trading in MGT Shares ......................................................26

    C. Brauser Violated Exchange Act Sections 10(b) and Rule 10b-5 thereunder
    and Securities Act Sections 17(a)(1), (2) and (3) in the Scheme to Pump
    and Dump the Shares of BioZone..................................................................................28

CONCLUSION...................................................................................................................30

**Page**

CASES

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ................................ 8, 26-27

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................ 8

*Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
      866 F. Supp. 2d 223 (S.D.N.Y 2012) ........................................................................ 9

*E.On AG v. Acciona, S.A.,* 468 F. Supp. 2d 537 (S.D.N.Y. 2006) ....................................... 13

*Fin. Guaranty Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395 (2d Cir. 2015) ....................... 27

*Forward Indus., Inc. v. Wise*, 14 Civ. 5365 (JSR),
      2014 WL 6901137 (S.D.N.Y. Sept. 23, 2014) ........................................................... 16

*Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706 (S.D.N.Y. 2018) ...................................... 31

*GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971) ....................................................... 13, 24-25

*Glob. Intellicom v. Thomson*, 99 Civ. 342 (DLC),
      1999 WL 544708 (S.D.N.Y. July 27, 1999) .............................................................. 16, 17

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
      95 F. Supp. 2d 169 (S.D.N.Y. 2000) ....................................................................... 16, 17

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
      286 F.3d 613 (2d Cir. 2002) ................................................................................ 14-15, 16

*K-N Energy, Inc. v. Gulf Interstate Co.*, 607 F. Supp. 756 (D. Colo. 1983) ....................... 21-22

*Lerner v. Millenco, LP*, 23 F. Supp. 2d 337 (S.D.N.Y. 1998) ......................................... 16

*Log On Am, Inc. v. Promethean Asset Mgmt., LLC*, 223 F. Supp. 2d 435 (S.D.N.Y. 2001) ......... 16

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160 (2d Cir. 2015) .......... 31

*Lorenzo v. SEC*, 139 S.Ct. 1094 (2019) ..................................................................... 24

*Meridian OHC Partners, LP v. Davis*, 16 Civ. 1161,
      2018 WL 1368266 (D. Nev. Mar. 15, 2018) ............................................................. 21

*Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999) .......................................................... 14, 15

*Morales v. New Valley Corp*, 999 F. Supp. 470 (S.D.N.Y. 1998),
    *aff'd sub nom. Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999)......................15

*Morales v. Quintel Entm't, Inc.*, 249 F.3d 115 (2d Cir. 2001) ......................14, 16, 18

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .............................................27

*Rosen v. Brookhaven Capital Mgmt. Co.,* 113 F. Supp. 2d 615 (S.D.N.Y. 2000).......................22

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ...................................... 13-14, 15

*Schaffer ex rel. Lasersight Inc. v. CC Inv., LDC*, 99 Civ. 2821 (VM),
    2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) ......................................17, 18

*SEC v. Aly*, 16 Civ. 3853 (PGG), 2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) .................. 23-24

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ...............................................10, 11

*SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421 (E.D.N.Y. 2016)................................8

*SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007)...........................26, 28-29

*SEC v. Farmer*, 14 Civ. 2345, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015)...........................25, 30

*SEC v. Fisher*, 07 Civ. 12552, 2008 WL 822135 (E.D. Mich. Mar. 27, 2008) .........................9

*SEC v. Ginder*, 752 F.3d 569 (2d Cir. 2014) ...............................................23

*SEC v. Husain*, 16 Civ. 3250, 2017 WL 810269 (C.D. Cal. Mar. 1, 2017)........................29, 30

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010)........................................26, 28, 29

*SEC v. Lek Secs. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017)...................................26, 28

*SEC v. Levin*, 12 Civ. 21917, 2013 WL 594736 (S.D. Fla. Feb. 14, 2013) ........................ 8-9

*SEC v. Longfin Corp.*, 316 F. Supp. 3d 743 (S.D.N.Y. 2018)................................12

*SEC v. Lybrand*, 200 F. Supp. 2d 384 (S.D.N.Y. 2002),
    *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005).............................. 11-12

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) .............................23

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)...............................................10, 11

*SEC v. Nat'l Bankers Life Ins. Co.*, 324 F. Supp. 189 (N.D. Tex. 1971) ........................11

*SEC v. Pentagon Capital Mgmt., PLC,* 725 F.3d 279, 285 (2d Cir. 2013).......................23

*SEC v. Phan*, 500 F.3d 895 (9th Cir. 2007) .........................................................................10

*SEC v. Savoy Indus., Inc.*, 587 F.2d 1149 (D.C. Cir. 1978).....................................17, 21

*SEC v. Sayid*, 17 Civ. 2630 (JFK), 2018 WL 357320 (S.D.N.Y. Jan. 10, 2018)......................8, 26

*SEC v. Seethruequity, LLC*, 18 Civ. 10375 (LLS),
  2019 WL 1998027 (S.D.N.Y. April 26, 2019) ................................................... 29-30

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007),
  *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008)........................11

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017).............................9, 22-23, 28-29, 30

*Strauss v. Am. Holdings, Inc.*, 902 F. Supp. 475 (S.D.N.Y 1995)................................15

*Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.*, 18 Civ. 4201 (LGS),
  2019 WL 1368570 (S.D.N.Y. Mar. 26, 2019) ................................................19-20, 24

*Telenor E. Inv. AS v. Altimo Holdings & Inv. Ltd.*, 567 F. Supp. 2d 432 (S.D.N.Y. 2008) ......9, 13

*United States v. Wey*, 15 Cr. 0611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ..............24

*Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473 (S.D.N.Y. 2009)...........................21

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) ..............................................14, 17

STATUTES AND REGULATIONS

Securities Act of 1933

  Section 4(1), 15 U.S.C. § 77d(1) .......................................................................11

  Section 5(a), 15 U.S.C. § 77e(a) .................................................................. 10-11

  Section 5(c), 15 U.S.C. § 77e(c) .......................................................................10

  Sections 17(a)(1), (2) and (3), 15 U.S.C. §§ 77q(a)(1), (2), and (3)................22, 23, 24, 26, 28

Rule 144, 17 C.F.R. § 230.144 ..................................................................12

Rule 144(e), 17 C.F.R. § 230.144(e)..........................................................12

Rule 144(e)(3)(vi), 17 C.F.R. § 230.144(e)(3)(vi)......................................12

Securities Exchange Act of 1934

Section 10(b), 15 U.S.C. § 78j(b) ........................................................ *passim*

Rule 10b-5, 17 C.F.R. § 240.10b-5 ..................................................... *passim*

Section 13(d), 15 U.S.C. § 78m(d) ...................................................... *passim*

Rule 12b-2, 17 C.F.R. § 240.12b-2 ...........................................................20

Rule 13d-1(a), 17 C.F.R. § 240.13d-1(a) ....................................................9

Rule 13d-1(c), 17 C.F.R. § 240.13d-1(c)........................................ 19-20, 22

Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1) ...................................... 13-14

Schedule 13D, 17 C. F. R. § 240.13d-101 ............................................ *passim*

Schedule 13G, 17 C.F.R. § 240.13d-102 .............................................. *passim*

Section 13(d)(3), 15 U.S.C. § 78m(d)(3) ................................................ 13-14

## RULES

Fed. R. Civ. P. 9(b) .............................................................................. *passim*

Fed. R. Civ. P. 12(b)(6)...............................................................................8

## OTHER AUTHORITIES

"Rule 144: Selling Restricted and Control Securities," available at
   https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html
   (Jan. 16, 2013).........................................................................................12

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss the Commission's Complaint of Defendants Michael Brauser and Grander Holdings, Inc. ("Grander," collectively "Defendants").

<u>Preliminary Statement</u>

The Amended Complaint ("Complaint") alleges that Brauser took an active role in each of the three pump-and-dump schemes alleged. It alleges that Brauser made false and misleading Schedule 13G filings regarding MGT and MabVax; that he did so to conceal his and his group's control over those issuers; that he engaged in matched trading with Honig to artificially increase MGT's share price; and that he and Honig controlled BioZone's management and concealed their control from investors.

Brauser intones that "Defendants *other than Brauser*" engaged in various deceptive acts (MTD at 5-9, 11, 13, 14, 17),[1] but ignores entirely the Complaint's particularized allegations that *Brauser* himself engaged in deceptive acts to further the success of each scheme. To state a claim for securities fraud, the Commission need not allege that Brauser participated in every aspect of the scheme – only that he engaged in deceptive acts to further its success. Because the Complaint makes those allegations, with the specificity required by Fed. R. Civ. P. 9(b), Defendants'[2] Motion to Dismiss should be denied.

## STATEMENT OF THE ALLEGATIONS IN THE COMPLAINT

The three schemes alleged in the Complaint were not the only "deals" Brauser worked on

---

[1] "MTD at __" refers to citations to Defendants' Memorandum of Law in Support of their Motion to Dismiss. "¶____" refers to citations to the Amended Complaint (DE 105).

[2] Brauser controls Defendant Grander Holdings, Inc. ("Grander") and all of its investment decisions. (¶38.) Brauser makes no distinction between him and Grander in his Motion. For the purposes of this Opposition Brief, the Commission's references to Brauser include Grander, except where noted.

with Honig.[3] Over a seven year period, Brauser co-invested with Honig in over 40 different issuers. (¶60.) Those investments followed a pattern similar to the three schemes alleged in the Complaint: Honig or Brauser,, along with other favored investors (typically including Stetson and O'Rourke) (1) jointly acquired a controlling position in a target issuer's stock (¶55); (2) jointly voted their shares to control major business decisions (¶58) and otherwise dictated the issuer's management and policies (¶55); (3) at an opportune time for cashing out, engineered a publicity-generating transaction (*e.g.*, a merger, acquisition or a sizeable investment by Investor 1) (*id.*); (4) secretly compensated bloggers and promoters to write about the transaction to artificially increase the issuer's stock price (*id.*); and (5) sold their shares into the artificially inflated market. (*Id.*) At each of these stages, Brauser and Honig were in frequent contact, including face-to-face while they worked out of the same offices until 2013. (¶¶56, 89.) Key to the success of these schemes was concealment of Brauser's and Honig's control of the issuers. By as early as 2013, Brauser and Honig had been publicly branded "serial stock promoters," and their involvement in a company signaled that a pump-and-dump was in the offing. (¶60.) Brauser thus worked to keep his and Honig's stock positions in issuers undisclosed. For example, in March 2015, Brauser, and Honig increased their holdings in MabVax, but agreed that they should do so through an entity they owned with Investor 1, Southern Biotech, to hide the magnitude of their total investment from the market. (¶177.)

While the Complaint alleges a common pattern among the many schemes Brauser perpetrated with Honig, it focuses on three issuers: BioZone, MGT and MabVax.

---

[3] Honig has consented, on a no admit, no deny basis, to the entry of a partial judgment that imposes certain non-monetary relief and leaves open resolution of potential monetary relief against him. (DE 152.)

A.    BioZone[4]

In late 2010, Brauser, Honig (with Stetson and another investor), and Investor 1 each acquired one-third of a publicly traded shell company – through a corporate intermediary to disguise their control – and immediately installed an associate as the shell company's sole director (¶82.) By early 2011, Brauser had negotiated the acquisition of a private company, BioZone Labs Group, to reverse-merge into their public shell. (¶85.) Brauser and Honig then installed a puppet CEO, Maza,[5] who sought prior approval from Brauser, Honig and Investor 1 for material business decisions. (¶90.) Indeed, when Brauser and Honig decided to sell BioZone's assets to Company M in late 2013, they did not alert Maza, who learned of the sale only when it was announced. (¶121.) BioZone's Chief Scientific Officer – and one of three board members with Maza and Investor 1 Associate – put it bluntly: "The real power is with Barry Honig and Mike Brauser.  Elliot [Maza] is just a mouth piece." (¶91.)

Brauser and Honig also used their control to acquire cheap BioZone shares for themselves and other members of their group, and by September 2013, Honig, Brauser and other co-investors owned about 45% of its outstanding shares. (¶¶92, 94, 103.) Brauser's and Honig's daily influence over the management and policies of the company was not disclosed to the market; nor was their collective control of nearly half of the outstanding shares. (¶91.)

In September 2013, consistent with the pattern of Brauser's and Honig's investments (¶¶55, 56, 57, 76), Honig had O'Rourke – a co-investor and participant in all three schemes, and

---

[4] The Complaint refers to BioZone Pharmaceuticals, Inc. ("BioZone") as "Company A."

[5] Maza has consented, on a no admit no deny basis, to the entry of a partial judgment that imposes certain non-monetary relief and leaves open resolution of potential monetary relief against him. (DE 110.)

officemate with Stetson and Honig (¶¶62-63) – contact Ford[6] to write a false and misleading promotional piece on BioZone's rosy prospects, and to tout the involvement of Investor 1, a successful bio-tech investor with a large retail investor following. (¶¶44, 66, 103, 108-110.) Coupled with Honig's and O'Rourke's manipulative trading on September 23 and September 26, 2013 (¶¶106, 107), Ford's article on BioZone had the desired effect: trading volume grew from 1,100 shares on September 25 to over 4.5 million on September 27, and its stock price nearly doubled by mid-October. (¶111.) Between September 27, 2013 and December 23, 2013, Brauser and his entity, Grander, sold more than 2 million shares, and grossed over $1 million. (¶112.)

B.   MGT[7]

In the MGT scheme, Brauser acquired shares as part of the Honig-led October 2015 Financing, collectively owning with Honig and Stetson over 1.7 million shares, or over 12% of MGT's outstanding shares after that financing (¶¶151), and more than 16% as of late November 2016. (¶¶137, 139.) Honig and O'Rourke, acting on behalf of the group, negotiated the acquisition of D-Vasive, the John McAfee-associated entity, [8] which MGT announced on May 9, 2016. (¶¶142-43.) In anticipation of positive market reaction to that announcement, early that same morning, Brauser engaged in matched trading with Honig in an effort to "paint a false picture of legitimate market interest in the stock." (¶145.) Those efforts (along with Ladd's false and misleading press release (¶144)), successfully pushed the stock price more than 34 percent above the prior day's close. Brauser then joined Honig, Stetson, O'Rourke and Affiliate 1 in

---

[6] Ford has consented, on a no admit, no deny basis, to the entry of a partial judgment that imposes certain non-monetary relief and leaves open resolution of potential monetary relief against him. (DE 28.)

[7] The Complaint refers to MGT Capital Investments, Inc. ("MGT") as "Company B."

[8] The Complaint calls D-Vasive the "CI Company," and McAfee, the "Cybersecurity Innovator."

selling millions of shares of MGT into the inflated market; from May 9, 2016 until May 18, 2016; Brauser and Grander sold two million shares for more than $3.8 million. (¶¶147, 148.)

Brauser also made a false and misleading Schedule 13G filing on May 4, 2016, in which he claimed a passive 7.4% beneficial ownership interest in MGT through Grander. (¶155.) However, he never disclosed his membership in the Honig-led group that included O'Rourke, Stetson, and other Honig-selected investors, and never made the required disclosure of that group's collective control of over 12% – 16% (by late November 2015) – of MGT's outstanding shares. (¶151.) [9] And Brauser made no Schedule 13D filings disclosing his and his group's intention to influence the management and policies of MGT. (¶¶152, 154.)

Finally, the Complaint alleges that Brauser attempted to distance himself from the MGT scheme by lying about his contacts with Ladd and Honig. (¶153.) In a May 18, 2016 *Business Insider* interview, Brauser falsely denied having had any contact with Ladd, and further falsely claimed that he had had no contact with Honig "in some time." (*Id.*)

C.    MabVax[10]

Brauser's involvement in MabVax started soon after Honig identified a publicly traded shell company and a private pharmaceutical company to reverse merge into the shell. Prior to that merger, on June 1, 2014, Brauser made a substantial investment in the shell, in conjunction with Affiliate 1, Honig (through his and Stetson's entity, HS Contrarian Investments, LLC ("HSCI")), and Entity H, a frequent Honig co-investor. (¶164.) On or about July 8, 2014, when the reverse merger closed, Brauser, ATG Capital LLC ("ATG") (O'Rourke's entity) and Affiliate

---

[9] In a November 2015 email to Honig, MGT's CEO (Defendant Ladd), made clear that he understood that Honig, Brauser, Stetson and O'Rourke were a group: "As for the cap table, we have 17.2 million common shares outstanding, including your group's 2.8 million." (¶137.)

[10] The Complaint refers to MabVax Therapeutics Holdings, Inc. ("MabVax") as "Company C."

1 Entity made additional investments in the newly formed company, leaving the group with almost 48% of MabVax's authorized shares. (¶165.)[11]

Honig negotiated additional group financings and kept Brauser apprised. In a March 2015 email, consistent with their longstanding practice of coordinating investments, Honig outlined for Brauser his thoughts on their investing in two additional MabVax offerings, noting that he expected to make them "$35 million conservatively in 4 months . . . I will trade out of it for us." (¶167.)

Honig also involved Brauser in selecting the investors for each financing round. To ensure that the market was unaware of the size of their investments, Honig told Brauser that their participation in the Series D financing should be made through Southern Biotech, an entity co-owned by Honig, Brauser and Investor 1, and that each should contribute $1 million toward Southern Biotech's $3 million investment in the Series D financing. (¶¶177-78.) For the Series E round, Honig asked Brauser to forgo his participation so that shares could be made available to "our friends": Investor 1, Investor 1 Company and an executive at Investor 1 Company ("Investor 1 Co. Officer").) (¶176.)

Negotiations and documentation for the investments were led by Stetson and Brauser, on the group's behalf. Brauser and Stetson – rather than any MabVax representative – discussed the terms of and documentation for the investments in the Series E financing with Investor 1, Investor 1 Trust and Investor 1 Company. (¶182.) Stetson also discussed with Issuer's Counsel

---

[11] Like MGT's CEO, MabVax's CEO understood that Honig and his co-investors were acting as a group in acquiring and holding their MabVax shares. When discussing a potential investor in the March 2015 Series D financing round, MabVax's CEO deferred to Honig, writing to him on March 19, 2015: "He might be another party you might want to allow to invest along with the current group. Viewed this as your choice not mine." (¶170.)

whether language in the Series E documentation would work so that "we will get control of the board." (¶183.)

After the Series E financing, the group was ready to capitalize on Investor 1's retail following, using the playbook that had served them so well in the past. (¶¶55, 61.) In early April 2015, with Brauser's and Stetson's knowledge, Honig directed O'Rourke to write a promotional piece on the *Seeking Alpha* website touting Investor 1's substantial investment in MabVax. (¶186.) O'Rourke wrote under a pseudonym and did not disclose his relationship to Honig, Brauser, Stetson, or MabVax. (*Id.*) O'Rourke's piece had the intended effect, increasing MabVax trading volume and raising its price per share from $1.91 to a closing price of $4.30 on the day after publication. (¶188.) Brauser joined his group members – Honig's and Stetson's HSCI, O'Rourke and Affiliate 1 – in selling shares between April 13 and June 30, 2015; Brauser personally sold over 500,000 shares for proceeds of over $1.6 million. (*Id.*)

In June 2015, when the market for MabVax had sunk to just above $2 a share, O'Rourke recruited Ford to publish another promotional piece on his blog. In his July 1, 2015 blog, Ford made materially false claims about MabVax's supposedly imminent licensing deals, which he, Honig, Brauser, Stetson and O'Rourke all knew or were reckless in not knowing were false, and failed to disclose that he was being compensated for the post. (¶189.)

After Ford published his blog, MabVax's share price and trading volume rebounded. (¶190.) Beginning on July 1, 2015, Brauser, Stetson and Honig (through HSCI), O'Rourke and Affiliate 1 began selling their shares. Brauser sold over 300,000 shares, grossing nearly $750,000. (*Id.*)

Notwithstanding his extensive and collective ownership of MabVax stock by the end of the Series E financings, and the collective exercise of control by the group over the management

and policies of the company, Brauser failed to make the required Schedule 13D filings. (¶¶192-93.) Instead, on February 2, 2017, Brauser made a false and misleading Schedule 13G filing, which disclosed only his own purportedly passive 5.44% investment through Grander. (¶194.)

## ARGUMENT

### I. STANDARD OF REVIEW

Brauser moves to dismiss the Commission's Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and for failure to comply with the pleading requirements of Fed. R. Civ. P. 9(b). To survive Brauser's motion, the Commission need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In reviewing Brauser's Motion, the Court must accept as true all fact allegations in the Complaint and draw all reasonable inferences in the Commission's favor. *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Rule 9(b) imposes a heightened pleading standard for fraud claims. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," *id.*, defendant must have fair notice of the substance of the plaintiff's claim. *ATSI*, 493 F.3d at 99.

However, a "violation of Section 5 is a strict liability offense," requiring no showing that defendant "violated Section 5 with scienter." *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 451 n.34 (E.D.N.Y. 2016); *see also SEC v. Sayid*, 17 Civ. 2630 (JFK), 2018 WL 357320, at *3 (S.D.N.Y. Jan. 10, 2018) ("Scienter is not an element of a Section 5 claim."). Thus, Rule 9(b) is inapplicable to Section 5 claims. *SEC v. Levin*, 12 Civ. 21917, 2013 WL 594736, at *7 (S.D. Fla. Feb. 14, 2013) (denying Rule 9(b) motion to dismiss and noting that Section 5 claims, like

the one alleged against Brauser, include no allegations of misrepresentation). A Section 5 claim is sufficient where the allegations "inform [the defendant] of his registration violation" such that he may respond to the charges. *SEC v. Fisher*, 07 Civ. 12552, 2008 WL 822135, at *5 (E.D. Mich. Mar. 27, 2008).

Similarly, claims stating violations of § 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 13d-1(a), standing alone (*see* Twelfth Claim for Relief), are not subject to Rule 9(b) because neither requires a showing of scienter to establish liability. *Telenor E. Inv.. AS v. Altimo Holdings & Inv. Ltd.*, 567 F. Supp. 2d 432, 444 (S.D.N.Y. 2008) (Chin, J.) (declining to apply Rule 9(b) to complaint's Section 13(d) claims); *see also SEC v. Verdiramo*, 890 F. Supp. 2d 257, 274 n. 14 (S.D.N.Y. 2011) (Section 13(d) does not require "a showing of scienter to establish liability," and collecting cases).

Finally, the Court should not countenance Brauser's attempt to broaden the basis for his motion by "join[ing] in any part of the motions and supporting documents, filed by other defendants, that lend support to" their motion (MTD at 20), and to relieve himself of the burden of identifying the specific claimed deficiencies in the Complaint that entitle him to dismissal. *Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 237 (S.D.N.Y 2012) (burden is on defendant to establish why a complaint fails to state the claims for relief it alleges). Without specifying how any such unidentified motions lend support to Defendants' motion and to which part, Defendants leave the Commission unable to address those arguments. *See SEC v. Wey*, 246 F. Supp. 3d 894, 914 (S.D.N.Y. 2017) (denying motion to dismiss on materiality grounds where defendant did not argue that the challenged statement was immaterial).

## II.   THE COMMISSION'S COMPLAINT STATES A CLAIM AGAINST BRAUSER AND GRANDER FOR VIOLATIONS OF SECURITIES ACT SECTIONS 5(a) AND (c)

The Commission's Complaint states a claim against both Brauser and Grander for violations of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act"). It alleges that, between September 27 and December 23, 2013, Brauser and Grander sold millions of BioZone shares (¶112); that no registration statement was in effect for any of those sales (¶114); and that they sold the shares through use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails (¶¶26, 255). That is all that is needed to state a *prima facie* Section 5 claim. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

Brauser does not point to any deficiency in those allegations. Rather, he erroneously argues that the Complaint fails to allege that he was a "'necessary participant' and 'substantial factor' in the sales transaction," citing cases in which the defendant, unlike Brauser, played only a supporting role in the unregistered sale or offering. (MTD at 18 (citing *SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007) (defendant directed another to sell, provided the buyer, and instructed the seller where to send the proceeds); and *SEC v. Murphy*, 626 F.2d 633, 648-52 (9th Cir. 1980) (defendant devised the financing scheme that created the subject securities, prepared and reviewed offering memoranda, met with broker-dealers and investors, and spoke at sales seminars)).

Unlike the defendants in those cases, Brauser himself sold the shares at issue here and, thus by definition, was a direct, necessary participant and substantial factor in the Section 5 violation. In alleging that Brauser *sold* shares that he and Grander owned, the Complaint alleges the direct role that the statute itself makes unlawful: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person . . . to *sell* such security." 15 U.S.C.

§ 77e(a)(emphasis added). As the *Murphy* Court (MTD at 18) held, the necessary participant test is meant to expand the reach of Section 5 beyond those, like Brauser, who actually do the selling, to reach those who help them sell: "Despite the use of the term 'sell,' liability under § 5 is not confined only to the person who passes title to the security." *Id.*, 626 F.2d at 649; *accord SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008) ("An indirect participant, who has not himself passed title to an unregistered security, may nevertheless be liable for its offer or sale."). Thus, because it alleges that Brauser passed title to the securities, the Complaint's allegations plainly state a claim that Brauser violated Section 5, and no "necessary participant" analysis is required.

Once a *prima facie* case has been alleged, the burden shifts to the defendant to show an applicable exemption from Section 5. *Cavanagh*, 445 F.3d at 111 n.13. This Brauser makes no attempt to do. Nonetheless, the Complaint provides detailed allegations – none of which Defendants address – that Brauser's and Grander's status as affiliates of BioZone made any available exemptions unavailable to them, either under Rule 144 or Securities Act Section 4(1). (¶¶114-17.)

The exact magnitude of Brauser's holdings (MTD at 16) is irrelevant to a claim that he sold securities in an unregistered offering in violation of Section 5.[12] Nor does it impact whether he could satisfy Rule 144's safe harbor as an affiliate. Affiliate status does not turn on "a single factor such as stock ownership, but rather 'depends upon the totality of the circumstances, including an appraisal of the influence the individual has on the management and policies of a

---

[12] *SEC v. Nat'l Bankers Life Ins. Co.*, 324 F. Supp. 189, 197 (N.D. Tex. 1971) (MTD at 16) is not to the contrary. Indeed, the *dicta* that Brauser quotes at length about the way that case was pled was just that -- *dicta* – since the opinion was delivered after an evidentiary hearing. *Id.* at 191. Nor is it even relevant here, given the distinguishing plethora of allegations of Brauser's involvement and misconduct in each of the three schemes.

company.'" *SEC v. Lybrand*, 200 F. Supp. 2d 384, 395 (S.D.N.Y. 2002) (quotation omitted),

*aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005). The Complaint alleges that Brauser,

with Honig, controlled, not just influenced, the management and policies of BioZone, and is

sufficient to allege that Brauser was an affiliate, irrespective of the 2.3 million shares the

Complaint alleges he held, and sold in the dump. (¶¶90, 92, 96, 97, 112, 120, 121.) As an

affiliate, Brauser's shares were "control securities" and he was subject to a limitation on the

number of them he could sell pursuant to Rule 144(e). (¶117.) *See SEC v. Longfin Corp.*, 316 F.

Supp. 3d 743, 760 (S.D.N.Y. 2018) (citing "Rule 144: Selling Restricted and Control

Securities," available at https://www.sec.gov/reportspubs/investor-

publications/investorpubsrule144htm.html (Jan. 16, 2013) (defining "control securities").)[13]

Under Rule 144(e), an affiliate may only sell control securities over any 90-day period

amounting to "one percent of the shares or other units of the class outstanding as shown by the

most recent report or statement published by the issuer." As of September 2013, when Brauser

commenced selling his and Grander's shares, BioZone had approximately 69 million shares

outstanding, and as of November 15, 2013, it reported 75 million shares outstanding. (¶117.)

Thus the Complaint alleges that Brauser and Grander were entitled to sell – at most – 750,000

shares, but instead sold more than 2 million.[14]

---

[13] The Complaint also alleges that the shares Brauser sold were also restricted shares (¶114) because he had obtained them directly from BioZone, and that his sale of those shares was not exempt from registration. (*Id.*)

[14] Rule 144(e)(3)(vi) requires that, for the purpose of determining the number of shares sold in any 90 day period, all securities held by affiliates who "agree to act in concert for the purpose of selling securities of an issuer," shall be "aggregated." Because Brauser controlled Grander and its investment decisions, he necessarily agreed to act in concert with it, and therefore his and Grander's shares should be aggregated. Similarly, the Complaint alleges that both Brauser and Honig were affiliates of BioZone (¶116), and agreed to hold, dispose and vote their shares together. (¶57.) Thus, Brauser, Grander and Honig's shares should be aggregated, and the three sold in excess of 7 million shares more than they were entitled to sell under Rule 144.

**III.    THE COMMISSION'S COMPLAINT STATES A CLAIM AGAINST BRAUSER FOR VIOLATIONS OF EXCHANGE ACT SECTION 13(d) AND RULE 13d-1 THEREUNDER**

The Complaint states a claim that Brauser violated Exchange Act Section 13(d) and Rule 13d-1 thereunder by making false and misleading Schedule 13G filings regarding his MGT and MabVax holdings that failed to disclose his membership in a group of MGT and MabVax shareholders (Brauser, Honig, Stetson and O'Rourke). Indeed, Brauser's use of Schedule 13G rather than Schedule 13D violated Section 13(d), in light of his and his group's intent to influence the management and policies of MGT and MabVax.[15]

**A.    Because Brauser Acted in Concert with Honig and Others to Acquire, Hold, Vote and/or Dispose of Their Shares, His Failure to Disclose His Membership in a Group States a Section 13(d) Claim**

Section 13(d) of the Exchange Act requires beneficial owners of more than 5% of the equity securities of a class registered pursuant to Exchange Act Section 12[16] to disclose such ownership on a Schedule 13D or 13G filed with the SEC within ten days of their acquisition. 15 U.S.C. § 78m(d). Section 13(d) was "intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing." *E.On AG v. Acciona, S.A.*, 468 F. Supp. 2d 537, 549 (S.D.N.Y. 2006) (quoting *GAF Corp. v. Milstein*, 453 F.2d 709, 720 (2d Cir. 1971)).

In calculating the 5% threshold, all shares owned by a group – as defined under Section 13(d)(3) and Rule 13d-5(b)(1) – are to be aggregated. 15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.13d-5(b)(1). Thus, under Section 13(d)(3) and Rule 13d-5(b)(1), if two or more persons

---

[15] And the Complaint makes these allegations with particularity, even though such particularity is not required for claims brought solely under Section 13(d). *Telenor*, 567 F. Supp. 2d at 444.

[16] The BioZone securities acquired by Defendants were not of a class registered under that provision, but the securities they acquired from both MGT and MabVax were. (¶¶42, 43.)

agree to act together "for the purpose of acquiring, holding, voting or disposing" of the securities, "the group formed thereby shall be deemed to have acquired beneficial ownership . . . of all equity securities of that issuer beneficially owned by any such persons." *Roth v. Jennings*, 489 F.3d 499, 507 (2d Cir. 2007) (quoting Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1)). As the legislative history confirms, the provision was meant to prevent evasion of the disclosure requirement when two or more persons act together, but keep their individual holdings below the reporting threshold. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 123 (2d Cir. 2001) ("*Quintel*") (quoting *Wellman v. Dickinson*, 682 F.2d 355, 366 (2d Cir. 1982)).

Whether two or more persons are acting as a group for Section 13(d) purposes – and whether their group purpose was the acquisition, holding, voting or disposition of an issuer's equity securities – are questions of fact. *Roth*, 489 F.3d at 508. The touchstone of a group is that "the members combined in furtherance of a common objective," *Wellman*, 682 F.2d at 363, but that objective need only be *one* of the enumerated purposes: acquisition, holding, voting or disposing. *Roth*, 489 F.3d at 508 (citing *Morales v. Freund*, 163 F.3d 763, 767 n.5 (2d Cir. 1999)). The agreement need not be unconditional or memorialized in writing, and the formation of the group "'may be formal or informal and may be proved by direct or circumstantial evidence.'" *Roth*, 489 F.3d at 508 (quoting *Quintel*, 249 F.3d at 124). Nor will evidence that group members "'might not always make identical investment decisions'" defeat an allegation of group action. *Id.*, at 508 (quoting *Quintel*, 249 F.3d at 127) (reversing dismissal of complaint that alleged coordinated purchases even where one group member later sold his securities while the other held its).

In determining whether a complaint adequately alleges a group under Section 13(d), courts have cited a number of factors indicating informal concerted activity. In addition to a

pattern of coordinated acquisition and disposition of shares, courts have looked at prior

relationships among members, including evidence of a particular *modus operandi*, and

discussions between the defendants, among other circumstantial evidence. *Hallwood Realty*

*Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 617-18 (2d Cir. 2002). All are present

here.

     (1)    Defendants Acquired and Disposed of Their Securities Together

The Complaint contains numerous allegations that Brauser was a member of a group with

Honig and others, and that that group shared a purpose to acquire, hold, vote or dispose of the

equity securities in MGT and MabVax. The Complaint alleges simultaneous acquisitions by

Brauser and Honig (and other group members) in each of the three issuers: BioZone (¶¶81, 82,

90, 92, 94, 95); MGT (¶¶134-35, 137, 139, 148); and MabVax (¶¶164, 165, 176-78, 181, 182). It

also alleges that the group sold their shares over the same period after successful promotions:

BioZone (¶112 (September through December 2013); MGT (¶148 (May 2016))[17]; MabVax

(¶¶188 (April through June 2015); 190 (July through December 2015).) And it alleges that

Brauser and the other group members acquired these issuers' securities with intentions to (1)

secretly gain control over their management; (2) effect a publicity-generating transaction for the

issuer; (3) covertly pay for promotions; and (4) cash in on the eventual stock price inflation they

had created. (¶¶1-4, 55.) Thus, the Complaint adequately alleges a pattern of acquiring and

disposing of the securities of an issuer in a concerted fashion.

---

[17] That Brauser did not sell in the first dump of MGT shares in February 2016 does not disqualify him from group membership. A group need only have just one of the enumerated purposes: acquiring, holding, voting or disposing. *Roth*, 489 F.3d at 508. As a result, group members need not "always march in lockstep." *Morales v. New Valley Corp*, 999 F. Supp. 470, 475 (S.D.N.Y. 1998), *aff'd sub nom. Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999); *see also Strauss v. Am. Holdings, Inc.*, 902 F. Supp. 475, 480-81 n.5 (S.D.N.Y. 1995) (denying motion to dismiss despite allegations of "inconsistency of [defendants'] respective trading patterns").

(2)    <u>Defendants Shared a History of Co-Investing</u>

Where, as here, the complaint alleges that defendants share a history of co-investing, it alleges evidence of group activity. *Quintel*, 249 F.3d at 127 (citing the group's pre-existing common relationship as sole shareholders of a closely held corporation); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 173 (S.D.N.Y. 2000) (noting the long-standing investing and personal relationships among defendants)[18]; *Glob. Intellicom v. Thomson*, 99 Civ. 342 (DLC), 1999 WL 544708, at *14 (S.D.N.Y. July 27, 1999) (citing allegation that "various of these Defendants have engaged in . . . similar transactions with other public companies" to deny motion to dismiss); *Lerner v. Millenco, LP*, 23 F. Supp. 2d 337, 344 (S.D.N.Y. 1998) (citing allegations that defendant had coordinated its investments with other members of the alleged group "on numerous prior occasions").

The Complaint alleges the specific history of Brauser's and Honig's co-investing, noting that they had co-invested in over 40 issuers over a seven-and-a-half year period. (¶60.) It details Brauser's role in each of the group's three pump-and-dump schemes, noting his most active role in BioZone, (¶¶80-117), which followed the same playbook as the group's investment in MGT and MabVax.[19]

---

[18] Although Judge Kaplan ultimately determined that plaintiff had not established that defendants were acting as a group, he did so after full discovery and a bench trial. *See Hallwood*, 286 F.3d at 615.

[19] Thus, the Complaint alleges much more than the vague conclusory allegations of prior relationships held insufficient in *Log On Am, Inc. v. Promethean Asset Mgmt., LLC*, 223 F. Supp. 2d 435, 449 (S.D.N.Y. 2001) (MTD at 15) (ruling allegations that two defendants in the past "have jointly invested in companies" insufficient to allege group activity) and *Forward Indus. v. Wise*, 14 Civ. 5365 (JSR), 2014 WL 6901137 at *1, 3 (S.D.N.Y. Sept. 23, 2014) (granting motion to dismiss complaint alleging that two defendants had "been business partners for many years in various capacities and have had several pooled investments together"). In contrast, this Complaint details the magnitude of the relationship (co-investing in 40 different issuers), and specifies how Brauser and Honig and their groups carried out their strategy with respect to each (¶¶55, 57, 58, 60, 61-66, 67-79), providing three separate examples of how those schemes were

   (3)  In Frequent Communications, Brauser Was Apprised of Honig's
      <u>Negotiations on Behalf of the Group</u>

   Another factor indicating concerted action is a group leader who makes decisions

regarding the group's acquisition, holding, voting and/or disposition of the securities. *E.g.,*

*Schaffer ex rel. Lasersight Inc. v. CC Inv., LDC*, 99 Civ. 2821 (VM), 2002 WL 31869391, at *5-

7 (S.D.N.Y. Dec. 20, 2002) (evidence that single law firm represented the interests of all

defendants (while separately represented) supported finding of agreement on summary

judgment); *Glob. Intellicom*, 1999 WL 544708, at *14 (allegations that one defendant brought

proposed transaction to group and negotiated its terms on behalf of all of them, among other

allegations, sufficient to plead group status). Similarly indicative are frequent communications

among the group's members, or shared offices. *E.g.*, *Hallwood*, 95 F. Supp. at 173, 176 (noting

extensive communications); *Glob. Intellicom*, 1999 WL 544708, at *14 (certain defendants used

the same mailing address); *cf. Wellman*, 682 F.2d at 363-65 (affirming trial court's findings that

defendants acted as a group based on their frequent exchanges regarding joint plan to dispose of

their shares); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1164-65 (D.C. Cir. 1978) (affirming trial

court's findings that defendant's communications with other group members evidenced

concerted action sufficient to support group finding).

   The Complaint details Honig's negotiations of share acquisitions on behalf of the groups

he assembled, and his engineering of the subsequent publicity-generating transactions. (¶¶2, 61,

127, 133, 134, 162, 180, 184.) Honig kept Brauser informed of those efforts: the Complaint

generally alleges that from 2013 through 2016, Honig, Stetson, O'Rourke and Brauser were in

frequent contact, and that all four shared an office until late 2013. (¶56.) With respect to

_____

carried out.

MabVax, it alleges that Honig pitched the investment to Brauser in a March 2015 email. (¶167.)

Honig even asked Brauser to "do [him] a favor" by forgoing his participation in one tranche of

the financings so that he could offer the allocation to other favored members of the group.

(¶176.) Honig later notified Brauser that their co-investment in the Series D financing would be

through the entity they controlled (along with Investor 1). (¶¶178, 181.) That Brauser was a

knowing participant in the group is further confirmed in the allegations that Investor 1 Company

discussed its investment with, and transmitted deal documentation to, Brauser and Stetson, rather

than MabVax's officers. (¶182.)

Honig, with Brauser's knowledge, likewise led the group in the MGT pump-and-dump.

The Complaint cites an October 2015 email exchange between Honig, Ladd and Brauser, in

which Honig identified the investors he selected to participate in the October 2015 Financing

(including Brauser). (¶135.) It further alleges that, on the morning of May 9, 2016, Brauser and

Honig coordinated their trades to increase MGT's stock price in advance of a planned MGT

promotion. (¶145.) And it alleges that Brauser and Honig, Stetson and O'Rourke each negotiated

with Ladd the right to exercise their warrants early, to obtain more MGT shares to sell in the

May 2016 dump. (¶148.)

   (4) The Issuers Viewed Honig, Brauser and Their Co-investors as a Group

Courts have also been persuaded by allegations that the issuer, itself, viewed the

defendants as a group. For example, in *Schaffer*, the Court held that the issuer's reference to the

acquirers as the "group," together with other evidence of coordinated activity, sufficed to defeat

defendants' motion for summary judgment. *Id.*, 2002 WL 31869391, at *7 (noting that the

Second Circuit has accorded weight to this factor and citing *Quintel*, 249 F.3d at 127).

The Complaint alleges that both MGT's and MabVax's CEOs considered Honig to be

acting in agreement with others, including Brauser, as a "group." (¶137) (MGT's Ladd: "As for

the cap table, we have 17.2 million common shares outstanding, including your group's 2.8

million"); (¶170) (MabVax's CEO: "He might be another party you might want to allow to

invest along with the current group.") Indeed, MabVax's CFO understood that Honig structured

the financings to avoid his group's 13(d) filing obligations. (¶169.) Thus, the Complaint alleges

sufficient facts that Brauser was a member of a "group" for Section 13(d) purposes.

(5)   <u>Brauser's Schedule 13G Filings Were False and Misleading</u>

The Complaint alleges sufficient facts concerning Brauser's and his group's ownership of

more than 5% of the issuers' stock. After the October 2015 MGT Financing, Brauser, Honig,

Stetson and O'Rourke collectively held more than 1.7 million MGT shares, or over 12% of its

outstanding shares. (¶151), and over 16% by late November 2015. (¶¶137, 139.) After the

MabVax Series D and E Financings, Stetson and Honig (through HSCI), Brauser (through

Grander) and O'Rourke (through his entity, ATG) collectively held well in excess of 5% of

MabVax's outstanding shares. (¶193.) Brauser nonetheless filed Schedule 13Gs that said nothing

about this group ownership, in violation of Section 13(d) and Rule 13d-1. (¶155 (May 4, 2016

Schedule 13G in which Brauser claimed only his own 7.4% MGT beneficial ownership via

Grander); ¶194 (February 2, 2017 Schedule 13G disclosing only his own 5.44% investment in

MabVax through Grander).)

**B.**   **The Complaint Adequately Alleges that Brauser Improperly Made False and
Misleading Schedule 13G Filings Instead of Proper Schedule 13D Filings**

The Complaint alleges that Brauser's Schedule 13G filings were improper and

misleading for an additional reason: Brauser was disqualified from using Schedule 13G to

disclose his ownership. Rule 13d-1 permits a group member to make a Schedule 13G, instead of

a Schedule 13D, filing when that member "'[h]as not acquired the securities with any purpose, or

with the effect, of changing or influencing the control of the issuer.'"" *Tanzanian Royalty Explor. Corp. v. Crede CG III, Ltd.*, 18 Civ. 4201 (LGS), 2019 WL 1368570, at \*12 (S.D.N.Y. Mar. 26, 2019) (quoting 17 C.F.R. § 240.13d-1(c)). "Control," for purposes of Section 13(d), is the "'possession, direct or indirect, of the power to direct or cause the direction of the management and policies'" of the issuer. *Id.* (quoting 17 C.F.R. § 240.12b-2).

The Complaint contains ample allegations that the Honig and Brauser group acquired their MGT and MabVax securities, in part, to influence or direct the companies' management and polices. Indeed, it includes myriad allegations that Honig exercised such control over MGT by restricting its ability to raise funds from sources other than his group (¶133); instructing Ladd on how to respond to inquiries from regulators (¶135); directing Ladd to wire thousands of dollars to a stock promoter (¶139); and negotiating (with O'Rourke) the May 2016 merger between MGT and McAfee's company (¶¶142-43).

The Complaint similarly alleges Honig's and Stetson's influence over MabVax's management and policies. In April 2014, almost immediately after the first financing, Honig told MabVax's CEO, in words or substance, that he had "better do what I tell you to do." (¶162.) In frequent subsequent telephone calls to the CEO, Honig demanded various corporate actions – including changing the composition of the Board and replacing company counsel and public relations consultants with Honig's preferred hires. (¶¶162, 172.) Stetson, at Honig's direction, asked the CEO for updates on the company's promotional efforts. (¶163.) MabVax's CEO even deferred to Honig's choice of co-investors for the March 2015 Series D financing. (¶170.) Stetson also managed the Series D and (with Brauser) Series E financings, informing MabVax management of terms as he decided them, and of what kind of compensation his group's chosen IR consultant should receive from the company. (¶¶173, 174.) Honig even demanded that

MabVax allow group member Investor 1 Company to choose a board member, and that the company grant a consulting agreement to an officer of Investor 1 Company (¶180), and for another group member, Affiliate 1 Entity, a six-figure fee. (¶191.) Even after the June 2015 group sell-off, Honig continued to make demands on MabVax, including that it seat his chosen Board members. (*Id.*)[20]

Eventually, in February 2018, Honig and Stetson effectively conceded the group's intent to influence control over MabVax by filing Schedule 13Ds instead of Schedule 13Gs (reserved for passive investors). (¶194.) Because the group's actual exercise of control pre-dated their Schedule 13D filings, their belated disclosure of that intent is an admission that their prior Schedule 13G filings were improper. *See Meridian OHC Partners, LP v. Davis*, 16 Civ. 1161, 2018 WL 1368266, at *5 (D. Nev. Mar. 15, 2018) (refusing to dismiss claim against control group who made Schedule 13D filings in response to lawsuit charging their improper disclosures on Schedule 13G).

That the group exercised control of MGT and MabVax largely through individuals other than Brauser (*i.e.*, Honig, Stetson and O'Rourke) does not excuse Brauser's obligation to make a Schedule 13D filing. Where members of a group have demonstrated an intent to influence control, courts impute that intention to others in their group. *E.g., Savoy Indus.*, 587 F.2d at 1165 (finding that member of group failed to file Schedule 13D when other members of the group had announced their intention to influence the management and policies of the issuer); *K-N Energy,*

---

[20] The Complaint's detailed allegations of the group's exercise of influence over the management and policies of MGT and MabVax – drawn largely from emails cited and quoted throughout – distinguish this case from *Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473, 492-93 (S.D.N.Y. 2009). There, the Court dismissed the complaint because its allegations of intent to control were supplied by an unidentified source. *Id.* ("The Court therefore cannot credit any of these allegations that come from an alleged anonymous source").

*Inc. v. Gulf Interstate Co.*, 607 F. Supp. 756, 768 (D. Colo. 1983) (steps taken by various group members to gain influence over the affairs of company required all of the members to disclose that purpose on a Schedule D filing); *see also* 17 C.F.R. § 240.13d-1(c)(1) (reserving Schedule 13G for persons who have not acquired securities with the purpose or effect "of changing or influencing the control of the issuer, nor in connection with *or as a participant in any transaction having such purpose or effect*") (emphasis added). In any event, the question of intent to influence control -- and, thus, the propriety of making a Schedule 13G filing as opposed to a Schedule 13D filing -- is a factual one. Thus, it is inherently inappropriate for resolution on a motion to dismiss. *Rosen v. Brookhaven Capital Mgmt. Co.,* 113 F. Supp. 2d 615, 632 (S.D.N.Y. 2000) (denying motion to dismiss where plaintiff alleged that defendants' group held a purpose of influencing control, and noting that courts typically decide that issue after discovery).

## IV. THE COMMISSION'S COMPLAINT STATES A CLAIM AGAINST BRAUSER AND GRANDER FOR VIOLATIONS OF EXCHANGE ACT SECTION 10(b) AND RULE 10b-5 THEREUNDER, SECURITIES ACT SECTIONS 17(a)(1), (2) AND (3), AND, AS AGAINST BRAUSER, EXCHANGE ACT SECTION 9(a)(1)

In arguing that the Complaint fails to state claims with particularity under Exchange Act Sections 10(b), Rule 10b-5 thereunder and Securities Act Sections 17(a)(1), (2) and (3), Brauser ignores the Complaint's specific allegations that he knowingly participated in all three schemes, and that his false statements and other deceptive conduct contributed to the success of each. Indeed, Brauser took a lead role in the BioZone pump-and-dump scheme, and "was content to let Honig direct the steps" in their other schemes, knowing that Honig would call on Brauser to contribute to their success when needed. (¶61.) Contrary to Brauser's contention – that the "Achilles' heel" of the Complaint is its failure to allege that he either paid for "misleading promotional articles, [or] engag[ed] in manipulative trading," (MTD at 5) – it is not necessary that the Complaint allege that each scheme participant "participated in each and every aspect of

the fraudulent scheme." *Wey*, 246 F. Supp. 3d at 916. Instead, it is enough that the Complaint

alleges that Brauser committed deceptive acts that "contributed to the larger fraudulent scheme

orchestrated by" others. *Id.*

To state a claim for a violation of Section 10(b) and Rule 10b-5, the Complaint must

allege that a defendant "(1) made a material misrepresentation or a material omission as to which

he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the

purchase or sale of securities." *SEC v. Pentagon Capital Mgmt., PLC,* 725 F.3d 279, 285 (2d Cir.

2013) (quotations omitted). The elements of a claim under Section 17(a) of the Securities Act are

"essentially the same" as those required to prove fraud under Section 10(b). *SEC v. Monarch

Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).[21] The Complaint alleges each of those

elements with respect to its claims against Brauser, and it does so with the requisite

particularity.[22]

A.    **Brauser Made Materially False Statements in Connection with the MGT and
      MabVax Pump-and-Dump Schemes**

Brauser's false and misleading Schedule 13G filings – which fail to disclose his

membership in a group that had acquired, held and disposed of MGT and MabVax securities –

constitute false statements sufficient to support a claim that he violated Exchange Act Section

---

[21] To state a claim under Securities Act Sections 17(a)(2) and (3), the Commission need not
allege that Brauser acted with scienter; it need only allege Defendant's negligence. *SEC v.
Ginder*, 752 F.3d 569, 574 (2d Cir. 2014). The Complaint alleges that Brauser "fail[ed] to use the
degree of care" a reasonably careful person would use under the circumstances. (¶206.)

[22] Brauser has not named any deficiency in the Complaint's allegations that he acted with
scienter, that his conduct was in connection with the purchase and/or sale of securities, or that his
statements or acts were material. *Compare* Memorandum of Law in Support of Defendant Robert
Ladd's Motion to Dismiss (DE 147), at 15-17 (challenging Complaint's allegations that Ladd's
statements were material) and 18-19 (challenging Complaint's allegations that Ladd acted with
scienter). Nonetheless, the Complaint alleges each of those elements with particularity.

10(b), Rule 10b-5 thereunder, and Securities Act Sections 17(a)(1), (2) and (3).[23] *E.g., SEC v. Aly*, 16 Civ. 3853 (PGG), 2018 WL 1581986, at *19-24 (S.D.N.Y. Mar. 27, 2018) (granting summary judgment to plaintiff on its Exchange Act Section 10(b) and Rule 10b-5(b) and Securities Act Sections 17(a)(1), (2) and (3) claims on the basis of defendant's false Schedule 13D filings).

The Complaint alleges, with particularity, that MGT and MabVax were pump-and-dump schemes, and that a central component of their success was Brauser's and Honig's (and their group's) concealment of their involvement and control. (¶¶1, 48.) It alleges that, as early as 2013, Brauser and Honig had been publicly called out as "serial stock promoters" – in a short seller's report warning investors to avoid investing in a company in which the two were investors. (¶60.) It further alleges that Brauser and Honig used Southern Biotech, including with MabVax, to "shield[] the size of their individual investments from disclosure." (¶¶71, 177.) With respect to MGT, the Complaint alleges that, in a May 2016 *Business Insider* interview, Brauser sought to distance himself from both the company and Honig by lying about his contacts with Ladd and Honig. (¶153.)[24]

Thus, Brauser's motivation for making false Section 13(d) filings is clear, as is the filings' valuable contribution to the success of the scheme. Disclosure under Section 13(d) is

---

[23] After *Lorenzo v. SEC*, 139 S.Ct. 1094, 1100 (2019), Brauser's false filings can support claims under Rules 10b-5(a) and (c), as well as Rule 10b-5(b) ("dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5"); *see also United States v. Wey*, 15 Cr. 0611 (AJN), 2017 WL 237651, at *8 (S.D.N.Y. Jan. 18, 2017) (holding that failure to file Schedule 13D was a deceptive act).

[24] These allegations also support the Commission's allegations of Brauser's knowing or reckless participation in the schemes, and establish the concrete, personal benefit he would reap that gave him the motive and opportunity to engage in fraud. *Tanzanian Royalty*, 2019 WL 1368570, at *10-11 (holding that complaint adequately alleged manipulator's scienter in alleging that driving share prices down triggered warrant exercise rights to more shares at cheaper prices and alleged a sufficient motive).

meant to "alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing." *GAF*, 453 F.2d at 720. This is especially so with respect to microcap companies (such as MabVax and MGT) because of the ease and frequency with which they can be (and are) manipulated by undisclosed control persons. *SEC v. Farmer*, 14 Civ. 2345, 2015 WL 5838867, at *9 (S.D. Tex. Oct. 7, 2015).

Because the Complaint thus alleges with particularity the "circumstances constituting the fraud" (MTD at 2), it satisfies the pleading requirements under Rule 9(b). It "specif[ies] the statements it claims were false or misleading." (MTD at 2.) It alleges that Brauser failed to disclose his membership in a group that was acting together pursuant to an agreement to "acquire, hold, vote and/or dispose of [MGT] shares in coordination with one another" in the Schedule 13G he filed. (¶¶154, 155.) In alleging facts demonstrating their agreement to act as a group in acquiring, holding and disposing of their MGT shares (¶¶135, 137, 138, 139, 148, 151-54), the Complaint adequately alleges the "particulars as to the respect in which plaintiff contends the statements were fraudulent." (MTD at 2.) And it "state[s] when and where the statements were made, and identif[ies] those responsible for the statements" (MTD at 2) in its recital of when Brauser made his false and misleading Schedule 13G filings. (¶¶154, 155; *see also* ¶¶192-94 (relating to Brauser's false and misleading MabVax Schedule 13G filings, and the allegations supporting his membership in a group (¶¶164-67, 170, 176-78, 181-82).)[25] The Complaint further alleges that Brauser made his false and misleading Schedule 13G filings in furtherance of the fraud to conceal his, Honig's and their group's investment in MGT and MabVax. (¶¶60, 71, 153, 177-78.)

---

[25] The Complaint also alleges that Brauser's Schedule 13G filings were misleading as to both issuers because the group's intent to influence the management and polices of each disqualified all of them from filing as passive investors on Schedule 13G. (See Point III.B, *supra*.)

This is sufficient to state a claim with particularity under Exchange Act Section 10(b), Rules 10b-5(a), (b) and (c) and Securities Act Section 17(a). *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 486 (S.D.N.Y. 2007) (MTD at 2)("a person who, in concert with others, participates in a securities fraud scheme by making false statements does incur liability under Section 10(b)" and denying motion to dismiss); *see also Sayid*, 2018 WL 357320, at *7 (allegation that attorney wrote opinion letters that "he knew or should have known . . . would be used" to further scheme sufficient to defeat motion to dismiss Section 10(b) and Rule 10b-5(a), (b) and (c) claims); *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (denying motion to dismiss Rule 10b-5(a) and (c) claims against defendant who was alleged to know of fraud and acted to further it with deceptive acts).

### B. Brauser Violated Exchange Act Sections 9(a)(1) and 10(b) and Rule 10b-5 Thereunder and Securities Act Sections 17(a)(1), (2) and (3) in Engaging in Manipulative Trading in MGT Shares

The Complaint also alleges that Brauser contributed to the scheme by joining Honig in manipulating the price of MGT securities through matched trading in the early morning of May 9, 2016, in violation of Exchange Act Sections 9(a)(1) and 10(b).

To plead a claim of market manipulation that satisfies Fed. R. Civ. P. 9(b), a plaintiff need only "'plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants.'" *SEC v. Lek Secs. Corp.*, 276 F. Supp. 3d 49, 57 (S.D.N.Y. 2017) (quoting *ATSI*, 493 F.3d at 102).) More specifically, the complaint must set forth "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.* Because market manipulation claims "can involve facts that are 'solely within the defendant's knowledge,' the Second Circuit has recognized that the plaintiff 'need not plead manipulation to

the same degree of specificity as a plain misrepresentation claim.'" *Id.* (quoting *ATSI*, 493 F.3d at 102).

The Complaint alleges that, in connection with Honig's, Brauser's, Stetson's, O'Rourke's and Ladd's May 2016 plans to pump up the price and volume of MGT stock (¶¶141-49), Ladd issued a false and misleading press release regarding MGT's acquisition of a company associated with McAfee, a well-known innovator in cybersecurity. (¶144.) It further alleges that, knowing of the imminent press release, Honig engaged in dozens of pre-market buys and sells of small quantities of MGT stock to create the misleading appearance of an active market. It further alleges that Brauser joined Honig's efforts to "paint a false picture of legitimate market interest in the stock" by engaging in coordinated or matched trades with Honig early that morning. (¶¶145, 246.) Finally, the Complaint alleges that those trades "were effective in driving up both [MGT's] trading volume and stock price," resulting in a 34% rise in the share price and volume that went from 71,000 shares to 10 million shares. (¶147.)

Brauser does not explain in what sense these allegations lack "particularity." Instead, he improperly argues with their merits, claiming that whatever coordinated trades he did with Honig that morning occurred "*after* the public announcement" of MGT's acquisition of the CI Company. (MTD at 10.) Whether that fact (if true) would mitigate Brauser's culpability is a question for later resolution, but whether it is true or not cannot be resolved on this motion. *Fin. Guaranty Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 405 (2d Cir. 2015) (factual disputes are "inappropriate for resolution on a motion to dismiss").[26]

---

[26] Brauser's argument with the timing of his trades evinces his fair notice of the Commission's claim, and that the Complaint is sufficient under Rule 9(b). "The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground on which it is based." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (citation omitted).

Similarly, Brauser argues that, whatever coordinated trading he did on that date with Honig, there is no allegation that he "had advance knowledge of the public announcement" of MGT's acquisition. (MTD at 10.) Whether Brauser knew of the press release, and regardless of when he placed the matched trades, the Complaint's allegations that he coordinated trading with Honig "to paint a false picture of legitimate market interest in the stock" is sufficient to allege his manipulative intent. *Lek*, 276 F. Supp. 3d at 57, 64 (rejecting defendants' factual argument on a motion to dismiss that open market trading was lawful where the SEC alleged "coordinated patterns of trading . . . designed to mislead the market"). As alleged in the Complaint, Brauser understood what the goal of the scheme was, and he was contributing to its success.

### C. Brauser Violated Exchange Act Sections 10(b) and Rule 10b-5 thereunder and Securities Act Sections 17(a)(1), (2) and (3) in the Scheme to Pump and Dump the Shares of BioZone

The Complaint alleges that Brauser and Honig engineered the BioZone pump-and-dump scheme, deploying undisclosed control over the company to secretly acquire millions of shares that they later sold into an inflated market. Brauser concealed his and Honig's control over BioZone to further that scheme.

Section 10(b) and Rules 10b-5(a) and (c) impose liability on any defendant who substantially participates in a manipulative or deceptive scheme by "directly or indirectly employing a manipulative or deceptive device . . . intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market." *Lee*, 720 F. Supp. 2d at 334. The deceptive act need not itself be unlawful. *Wey*, 246 F. Supp. 3d at 918 (defendant's conduct in placing shares into nominee accounts "may not have been inherently unlawful, but it was deceptive")[27]; *see also Collins & Aikman*, 524 F. Supp. 2d at

---

[27] In *Wey*, the Court dismissed the claims against the defendant because the Commission had

494-95 (refusing to dismiss complaint charging defendants with (1) supervising employees who negotiated sham transactions; and (2) drafting side letters used to perpetrate the sham transactions); *accord Lee*, 720 F. Supp. 2d at 333, 334 (refusing to dismiss complaint charging defendant with handling and supervising the mechanics of conveying fraudulent pricing information to client in furtherance of scheme).

Where a defendant exercises undisclosed control over an entity as part of a larger scheme, he has engaged in a deceptive act sufficient to support a Section 10(b) and Rules 10b-5(a) and (c) claim against him. *See SEC v. Husain*, 16 Civ. 3250, 2017 WL 810269, at *1 (C.D. Cal. Mar. 1, 2017) (identifying step one in the scheme as the defendant's recruitment of puppet CEO's for his fraudulent shell companies "to conceal his total control over the entity"). The Complaint alleges that Brauser and Honig gained secret control over BioZone in 2011 by surreptitiously acquiring the shell into which they merged the private company. (¶¶80-88.) They then secretly exercised that control by installing a puppet CEO and board of directors, and by making all material business decisions -- including the terms by which Brauser, Honig and their group would be awarded millions of cheap shares, the terms of the settlement of a major litigation against the company, and even the sale of all of the company's assets. (¶¶82, 88, 90-92, 94, 95, 97, 121.) Brauser disclosed none of that control to investors, although the Complaint alleges that Brauser and Honig exercised sufficient authority over Maza (who omitted their control in company filings) to ensure that it would be. (*Id.*)

More to the point, where a complaint alleges that defendants' entire enterprise is deceptive, it suffices to allege the deceptive acts necessary to state a claim under Exchange Act

---

failed to identify which company's shares defendant had suggested be moved to nominee accounts, but granted leave to replead. 246 F. Supp. 3d at 916, 937.

Section 10(b), Rule 10b-5, and Securities Act 17(a). *SEC v. Seethruequity, LLC*, 18 Civ. 10375 (LLS), 2019 WL 1998027, at *5 (S.D.N.Y. April 26, 2019) (denying motion to dismiss "scheme liability" claims on the basis that no deceptive conduct had been alleged where complaint charged that "the defendants' entire business model, beyond any misstatements or omissions, is deceptive"); *Husain*, 2017 WL 810269, at *9 (denying motion to dismiss and holding that defendant's shell company factory involved "a scheme in the most fundamental sense," and defendants "deceitful activities [were] in furtherance of the scheme"); *Farmer*, 2015 WL 5838867 at *16 (granting summary judgment against defendant who "played a leading role in every aspect of [company's] affairs that were pertinent to setting up and executing a pump-and-dump scheme")(internal quotations omitted).

Finally, the Complaint alleges that Brauser's own deceptive acts "contributed to the larger fraudulent scheme." *Wey*, 246 F. Supp. 3d at 916. It alleges that Brauser and Honig had co-invested 40 times in a seven-year period, and that Brauser was well versed in the pump-and-dump playbook that would be used to increase the value of the group's holdings. (¶¶60, 61.) And it alleges that Brauser knew, or was reckless in not knowing, that that playbook included the use of the group's retained promoter to write materially false and misleading articles about issuers in which the group was invested. (¶¶78-79.) Thus, the Complaint adequately alleges that his role in concealing his and Honig's control over BioZone contributed to the larger scheme to pump the price of BioZone securities through a false and misleading promotion with the goal of dumping their cheaply acquired shares at inflated prices.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be denied. If the Court grants any part of Defendants' Motion, the Commission respectfully requests leave to

amend to address those deficiencies identified by the Court in ruling on this Motion.[28]

Dated: New York, New York
       August 2, 2019

SECURITIES AND EXCHANGE
COMMISSION

By: _____
       Nancy A. Brown
       Jack Kaufman
       Katherine Bromberg
       Jon Daniels
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)

Attorneys for Plaintiff

---

[28] The Commission does not believe its Complaint is deficient in any respect, and cannot therefore cite with any specificity those amendments it could make at this time. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190-91 (2d Cir. 2015) (reversing District Court's dismissal without leave to amend where plaintiff could not anticipate the defects prior to full briefing and a decision and could not therefore propose specific amendments); *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 723 (S.D.N.Y. 2018) (dismissing complaint but granting leave to amend where the case involved "a complex commercial reality with a long, multi-prong complaint that has not had the benefit of a ruling that highlights the precise defects of the complaint") (quotations omitted)).