UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,   :

   :

               Plaintiff,   :

   :    18 Civ. 8175 (ER)

       – against –   :

   :    ECF CASE

BARRY C. HONIG, MICHAEL BRAUSER,   :

JOHN STETSON, JOHN R. O'ROURKE III,   :

ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,   :

JOHN H. FORD, ATG CAPITAL LLC, GRQ   :

CONSULTANTS, INC., HS CONTRARIAN   :

INVESTMENTS, LLC, GRANDER HOLDINGS, INC., :

and STETSON CAPITAL INVESTMENTS INC.,   :

   :

           Defendants.   :

-------------------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT ROBERT LADD'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) AND MOTION TO STRIKE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(f)

SECURITIES AND EXCHANGE
COMMISSION
    Nancy A. Brown
    Jack Kaufman
    Katherine Bromberg
    Jon Daniels
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0106 (Kaufman)

Attorneys for Plaintiff

August 2, 2019

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND – THE COMPLAINT ......................................................................2

ARGUMENT ...............................................................................................................6

I.   The Court Should Not Strike the 2012-2013 Seeking Alpha Allegations .......................6

II.  The Complaint States a Fraud Claim Based On Ladd's May 9, 2016
     Press Release ..........................................................................................................9

     A.  The False May 2016 Press Release Was Material .......................................9

     B.  The Complaint Alleges Ladd's Fraud Scienter ........................................13

III. The Complaint States Claims Based on Ladd's False MGT
     Forms 10-K and S-1 .............................................................................................14

     A.  MGT's Duty to Disclose Beneficial Owners of Over 5% of its Stock......................15

     B.  Exchange Act Section 13(d) Shareholder "Group" Disclosure
         Requirement .......................................................................................17

     C.  The Amended Complaint Adequately Pleads that the Honig Group
         Constituted an MGT Shareholder "Group" Under Section 13(d), and
         Ladd's Knowledge or Reckless Disregard of that Fact.............................18

IV.  The Complaint Adequately Pleads a Section 17(a)(2) Negligence Claim ......................23

V.   The Complaint States a Claim for Aiding and Abetting Liability ...................................24

CONCLUSION...........................................................................................................25

# **TABLE OF AUTHORITIES**

**Page**

**CASES**

*ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007).........................................11, 20

*Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020 (2d Cir. 1993)....................................................12

*Chechele v. Scheetz*, 819 F.Supp.2d 342 (S.D.N.Y. 2011)............................................................22

*Chin v. Port Authority of NY & NJ*, 685 F.3d 135 (2d Cir. 2012) .................................................7

*Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207 (2d Cir. 1973).......................................22

*Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds*,
    510 U.S. 17 (1994)..................................................................................................................8

*Forward Indus., Inc. v. Wise*, 14-cv-5365, 2014 WL 6901137
    (S.D.N.Y. Sept. 23, 2014)......................................................................................................22

*Ganino v. Citizens Utility Company*, 228 F.3d 154 (2d Cir. 2000) ..........................................9-11

*Global Intellicom v. Thomson*, No. 99 Civ. 342 (DLC), 1999 WL 544708
    (S.D.N.Y. July 27, 1999) .......................................................................................................21

*Goel v. Bunge, Ltd.*, 820 F.3d 554 (2d Cir. 2016) .......................................................................11

*Gruber v. Gilbertson,* 16-cv-9727 (WHP), 2018 WL 1418188
    (S.D.N.Y. March 20, 2018)....................................................................................................16

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169
    (S.D.N.Y. 2000).....................................................................................................................21

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 09-cv-5411 (PKC), 2012 WL 1353523
    (S.D.N.Y. Apr. 12, 2012).......................................................................................................12

*In re Charter Commc'ns*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................22

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 544 (S.D.N.Y. 2014)...............22

*In re Yukos Oil Company Securities Litigation,* 04-cv-5243 (WHP), 2006 WL 3026024
    (S.D.N.Y. Oct. 25, 2006) .................................................................................................11-12

*Lerner v. Millenco, LP*, 23 F. Supp. 2d 337 (S.D.N.Y. 1998).......................................................21

*Mathewson v. Nat'l Automatic Tool Co.*, *Inc.*, 807 F.2d 87 (7th Cir. 1986) .................................7

*Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 123 (2d Cir. 2001) ................17-18, 21-22

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ...................................................7

*SEC v. Blackburn*, 156 F. Supp. 3d 778 (E.D. La. 2015) ............................................................23

*SEC v. Blavin,* 760 F.2d 706 (6th Cir. 1985) ..............................................................................13

*SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) ................23

*SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587 (S.D.N.Y. 1993) ................................16

*SEC v. Egan*, 994 F.Supp.2d 558 (S.D.N.Y. 2014) ......................................................................14

*SEC v. Guardian Oil & Gas, Inc.*, 14-cv-1533 (BN), 2014 WL 7330451
    (N.D. Tex. Dec. 23, 2014) .................................................................23

*SEC v. Morgan*, 19-cv-661 (EAW), 2019 WL 2385395 (W.D.N.Y. June 5, 2019)....................13

*SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233 (11th Cir. 2012).................................... 12-13

*SEC v. Narayan*, 16-cv-1417-M, 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017).......................23

*SEC v. Pocklington*, 18-cv-701 (JGB), 2018 WL 6843663 (C.D. Cal. Sept. 10, 2018)...............24

*SEC v. Rana Research, Inc.,* 8 F.3d 1358 (9th Cir.1993) ..............................................................13

*SEC v. Straub*, No. 11-Civ.-9645 (RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016)...............7

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017)......................................................................23

*Solow v. Citigroup, Inc.*, 10-cv-2927 (RWS), 2012 WL 1813277
    (S.D.N.Y. May 18, 2012).............................................................. 11-12

*Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356 (S.D.N.Y. 1979) ....................................22

*United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977) ...................................................................6

## **STATUTES**

15 U.S.C. § 77o(b) ........................................................................................................................24

15 U.S.C. § 78t(e) ..........................................................................................................................24

## REGULATIONS AND RULES

17 C.F.R. § 229.10(a) ........................................................................................................ 15-16

17 C.F.R. § 229.403(a).......................................................................................................... 15-16

Fed. R. Evid. 404(b)(2) ...........................................................................................................7

Pursuant to the Court's April 29, 2019 scheduling Order, Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this opposition to the Motion to Dismiss and Strike ("MTD") of Defendant Robert Ladd ("Ladd").

## PRELIMINARY STATEMENT

The Commission's Amended Complaint ("Complaint") alleges in detail Ladd's participation in two 2016 pump-and-dump schemes involving MGT Capital Investments, Inc. ("MGT"), orchestrated by settled Defendant Barry Honig, and Defendants Michael Brauser, John Stetson, and John O'Rourke (collectively, the "Honig Group"). The Honig Group, with Ladd's participation and assistance, defrauded MGT investors and potential investors by secretly amassing large blocks of MGT stock and exercising control over MGT's management; artificially raising MGT's stock price through fraudulent marketing campaigns and manipulative trading; and dumping their MGT stock on unsuspecting investors in their rigged market for large personal profits.

A crucial element of these schemes was the need to hide the Honig Group's accumulation of MGT stock and influence over MGT management, which they and Ladd achieved in part by illegally failing to disclose their collective beneficial ownership of over 16% of MGT's stock. A second crucial element was Defendants' use of fraudulent devices to artificially inflate MGT's stock price, and a third was Defendants' sales of their MGT stock to unsuspecting investors at inflated prices. The Commission charges Ladd with both primary and aiding-and-abetting fraud (and non-fraud) liability for his participation in all three stages. Ladd helped hide the Honig Group's collective MGT stock ownership and influence by illegally failing to disclose in MGT Commission filings the Honig Group's collective beneficial ownership over 16% of MGT's stock. Ladd also helped artificially inflate MGT's stock price by issuing a May 9, 2016 MGT

press release containing materially false promotional information. And Ladd also personally

reaped $516,554.08 in illicit profits by selling his own MGT stock to the public in May 2016,

shortly after issuing the false press release.

Ladd's motion to dismiss and strike asserts that: (1) the false statement in the May 2016

MGT press release was not "material" due to alleged publicly available corrective information;

(2) Ladd had no duty to disclose the Honig Group's 16% ownership of MGT and, even if he had

such a duty, the Complaint does not adequately allege the Honig Group's "group" status for such

purposes, and Ladd's knowledge of that fact; and (3) the Complaint's 2012-2013 "Seeking

Alpha" allegations are time-barred. The Court should deny Ladd's motion in its entirety, as his

arguments misconstrue both the law and its application to the Complaint's allegations. The

alleged "corrective" information falls woefully short – in both substance and degree of

dissemination – of the requirements necessary to satisfy Ladd's alleged materiality defense; the

federal securities laws plainly obligated Ladd (and the Honig Group) to disclose the Honig

Group's beneficial ownership of over 16% of MGT stock; the Complaint amply alleges the

Honig Group's shareholder status as a "group" for this purpose, and Ladd's scienter regarding

that fact; and the Seeking Alpha allegations, although not a separate claim against Ladd, are

highly probative of his (and his co-defendants') fraud scienter and, thus, should not be stricken.

Finally, all of Ladd's arguments, at best, merely raise fact disputes inappropriate for resolution at

the motion-to-dismiss stage of this case.

## BACKGROUND – THE COMPLAINT

The Complaint alleges that Ladd participated in two back-to-back MGT stock pump-and-

dump schemes in February and May 2016. Ladd's principal participation consisted of:

(1) his issuance of MGT's May 9, 2016 press release, which falsely exaggerated the past

2

financial success of John McAfee, whose company (and purported expertise) MGT announced that it was acquiring; and (2) MGT's November 6, 2015 Form S-1 registration statement and April 2016 Form 10-K, both signed by Ladd, and both of which falsely purported to list all beneficial owners of more than 5% of MGT's stock – and identified Honig as holding 8.6% – but falsely omitted the Honig Group's collective beneficial ownership of over 16% of MGT's stock. (¶¶137, 139, 144, 146, 149, 158, 214, 220, 235, 240, 268.)[1]

As important background to Ladd's participation in the 2015-2016 MGT pump-and-dump schemes, the Complaint first explains how, by 2012-2013, Ladd already had become familiar with the Honig Group's fraudulent methods. In October 2012, Honig negotiated a financing with MGT, headed by Ladd, whereby Honig, Stetson, and others purchased $4.5 million in discounted MGT stock, and 5-year warrants to purchase more stock in the future, on the condition that MGT use $300,000 of those funds to promote its stock. (¶127.) Shortly thereafter – in November 2012 and April 2013 – Honig and Stetson twice attempted to artificially inflate MGT's stock price – by paying for two materially false MGT promotional pieces published on the *Seeking Alpha* website. The second attempt was successful, raising MGT's stock price from $3.50 to almost $4.50 per share and increasing trading volume significantly. (¶¶128-130.) Taking advantage of this opportunity, Honig sold approximately 250,000 MGT shares for $967,224. (¶130.) Ladd was well aware of the Honig-led *Seeking Alpha* promotion, having been interviewed for the first publication, and having spoken with its author several times prior to publication. (¶131.) Ladd also knew or recklessly disregarded that the author of the fraudulent pieces was connected to the Honig Group, and that the second publication had successfully boosted MGT's stock price. (*Id.*) Finally, Ladd knew or recklessly

---

[1] References to "¶__" are to paragraphs of the Commission's First Amended Complaint (DE 105).

disregarded that the two Seeking Alpha promotional pieces were false – that is, Ladd knew that, contrary to the broad disclaimers in the articles, Honig had paid for the two promotional pieces, and that the articles' author was concealing this fact from his *Seeking Alpha* readers. (*Id.*) Ladd further knew that the second article's material prediction of a significant stock price increase – based on MGT's alleged imminent receipt of certain settlement funds – was false because Ladd knew that no such settlement was imminent. (¶130.)

It is with this 2012-2013 grounding in the Honig Group's fraud methods that Ladd received their September 2015 proposal for another MGT financing scheme – the start of the two 2015-2016 pump-and-dump schemes for which the Commission charges Ladd in this case. Honig and Stetson kicked off these schemes by proposing to Ladd that MGT issue 2.8 million shares to the Honig Group (this time including Brauser), and warrants to acquire an additional 5.6 million shares, all subject to a formula that would ensure that the individual Honig Group members could continuously sell MGT shares while each stayed below the 5% ownership public-reporting threshold. (¶134.) From the start of this scheme, the Honig Group also exercised control over Ladd and MGT's management and policies, directing Ladd on how to disclose the Honig Group's MGT stock acquisitions to the NYSE MKT exchange, and, later, negotiating on MGT's behalf the terms of McAfee's sale of his company to MGT. (¶¶135, 142-43, 152.)

Thus, from the outset and throughout their scheme, Ladd knew or recklessly disregarded that the Honig Group was acting collectively, and that the Honig Group members were trying to hide their collective ownership of MGT's stock. Emails that Ladd sent Honig in October and November 2015 further illustrate Ladd's knowledge of this cover-up. On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%." (¶135.) In addition, in a November 15, 2015 email to Honig, Ladd refers to the Honig

4

Group as an MGT shareholder "group": Ladd told Honig that MGT had "17.2 million common shares outstanding, including *your group's* 2.8 million" (emphasis added).[2] (¶137.)

Thus, Ladd also knew precisely what he was doing when, in November 2015 and April 2016, he failed to disclose in two MGT Commission filings that the Honig Group was acting as a shareholder group that controlled over 16% of MGT's voting stock. (¶¶137, 139, 158.) Ladd thereby assisted the Honig Group's efforts to hide their broader purpose from the public – namely, their February and May 2016 MGT stock pump-and-dump schemes. (¶¶138-49.)

Ladd further participated in the May 2016 pump and dump scheme by issuing a May 9, 2016 MGT press release falsely and misleadingly stating that John McAfee – the acquisition of whose company and expertise MGT announced that day – had "sold his [previous] anti-virus company to Intel for $7.6 billion" when, in fact, McAfee had left his company 10 years prior to that sale. (¶144.) The press release thus misleadingly implied to potential MGT investors that McAfee could or would achieve similar extraordinary success with MGT. (*Id.*) Two weeks later, Ladd perpetuated that McAfee falsity in an MGT Form 10-Q – publicly filed with the Commission and signed by Ladd – which stated, "[McAfee] founded McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010."  (¶149.) Read together, Ladd's press release and Form 10-Q statements created the ongoing material false impression that McAfee had sold his company to Intel in 2010 for $7.6 billion.

---

[2] Ladd's November 15, 2015 email to Honig twice refers to the Honig Group as "your group," and these references appear amidst Ladd's lengthy discussion of significant MGT budget and financing matters. Honig's terse response – which focuses solely on Ladd's use of the word "group" – is quite telling: "I am not part of a group. I invested individually." Ladd's reply is equally terse: "I stand corrected." (Exhibit A attached hereto.) This email exchange evinces Ladd's and Honig's shared understanding of the Securities Exchange Act Section 13(d)'s 5% "group" disclosure requirement (discussed *infra*), and their shared intent to avoid disclosure to the public that the Honig Group was a shareholder "group" that, they knew, collectively owned more than 16% of MGT's stock.

Finally, in May 2016, Ladd joined the Honig Group members in taking advantage of the artificially high market for MGT stock that they had created, selling his own stock into the market at inflated prices, and personally reaping $516,554.08 in illicit MGT stock sale proceeds. (¶ 148.)

## ARGUMENT

For the following reasons, the Court should deny Ladd's motion to dismiss, and to strike, in its entirety.

## I.    The Court Should Not Strike the 2012-2013 Seeking Alpha Allegations

Ladd's first argument concerns Complaint paragraphs 126-32 (the "*Seeking Alpha* allegations"), describing Ladd's 2012-2013 exposure to the Honig Group's fraudulent methods. (MTD at 9-12.) Ladd seeks to strike those allegations as failing to state a timely cause of action or, alternatively, as not probative of Defendants' 2015-2016 MGT pump-and-dump scheme. Ladd's arguments fail for at least two reasons. First, the Commission is not alleging an independent "cause of action" against Ladd based on the 2012-2013 *Seeking Alpha* allegations. Rather, the Commission's claims against Ladd arise directly from his 2015-2016 conduct. (¶¶214, 220, 235, 240, 268.) Second, it is well-established that a defendant's prior conduct – including conduct outside the applicable limitations period – is admissible to prove a defendant's intent (among other things). The *Seeking Alpha* allegations constitute highly probative evidence – both of the Honig Group's recurring pattern of illegal conduct (and, thus, of their own liability in this case), and of Ladd's fraud scienter regarding his participation in the Honig Group's fraudulent 2015-2016 pump-and-dump schemes. Thus, these allegations should not be stricken.

While "an act which is not made the basis for a timely charge" cannot support a monetary recovery, it "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). Thus, a statute

of limitations does not bar a plaintiff "from using the prior acts as background evidence in support of a timely claim." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also Chin v. Port Authority of NY & NJ*, 685 F.3d 135, 150 (2d Cir. 2012) (Court upheld admission of "evidence of an earlier alleged" violation, outside limitations period,  as relevant "background evidence in support of" plaintiff's "timely claim.") (quotations omitted); *Mathewson v. Nat'l Automatic Tool Co.*, *Inc.*, 807 F.2d 87, 91 (7th Cir. 1986) (same). As this Court noted in *SEC v. Straub*, No. 11-Civ.-9645 (RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016), "evidence of conduct and acts" that fall outside the limitations period "may still be admissible at trial to prove the existence of [Defendants'] scheme, its background, and the knowledge and intent of the Defendants." *Straub*, 2016 WL 5793398, at *20 n.7. These holdings are consistent with Fed. R. Evid. 404(b)(2), which provides that "[e]vidence of a crime, wrong, or other act," while "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" nonetheless "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

The Honig Group's and Ladd's 2016 MGT pump-and-dump scheme followed the same basic pattern as the Honig Group's 2012-2013 MGT pump-and dump scheme. In both schemes, the Honig Group (1) secretly amassed large MGT stock positions; (2) caused the issuance of materially false MGT promotional materials that artificially raised MGT's stock price; and (3) dumped their MGT stock on unsuspecting investors in the rigged market the Honig Group created. Ladd's knowledge of the Honig Group's 2012-2013 extremely similar MGT pump-and-dump scheme is highly probative evidence of Ladd's motive, intent, preparation, knowledge, and lack of any mistake regarding Ladd's active participation with the very same individuals in their

joint 2015-2016 MGT pump and dump scheme.[3]

Ladd relies upon *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 17 (1994) (MTD at 10), which is easily distinguished and, moreover, supports the Commission's position. The plaintiff in *Fogerty* had acquired the publishing rights to a 1970 John Fogerty song, and sued the musician for copyright infringement for Fogerty's 1985 publication of a new, allegedly similar song. *Id.* at 1526. Fogerty prevailed on that claim, but the District Court dismissed his counter-claim for rescission of his 1970 publishing-rights sale to the plaintiff's predecessor-in-interest. In so ruling, the District Court struck as time-barred Fogerty's unrelated allegation that, from 1969-1974, the predecessor-in-interest had fraudulently induced Fogerty to create an illegal tax shelter. *Id.* On appeal, Fogerty asserted that his tax-shelter allegations were "relevant background and foundational facts establishing a pattern of abuse." *Id.* at 1528. The Ninth Circuit disagreed, finding that those allegations (1) concerned individuals not party to the 1970 publishing contract sale; and (2) were otherwise entirely unrelated to Fogerty's rescission counter-claim. *Id*.

By contrast, the Commission's allegations against Ladd and his co-Defendants establish an *identical* pattern of illegal conduct, as well as Ladd's personal knowledge of that conduct prior to his participation in the 2015-2016 MGT pump-and-dump scheme. Thus, unlike the tax-shelter allegations in *Fogerty*, the *Seeking Alpha* allegations establish a clear "pattern" of fraudulent conduct and are directly and highly probative of the Commission's claims – against

---

[3] The *Seeking Alpha* allegations also are highly probative of the Commission's claims against Defendants Brauser, Stetson, and O'Rourke and, for this additional reason, should not be stricken. As the Complaint alleges, the Honig Group engaged in precisely the same pattern of pump-and-dump schemes discussed above involving issuers other than MGT, (¶¶ 1-5, 80-124, 159-94). The *Seeking Alpha* allegations thus also provide additional highly probative background evidence against Ladd's co-Defendants.

both Ladd and his co-Defendants.[4]

## II.    The Complaint States a Fraud Claim Based On Ladd's May 9, 2016 Press Release

The Commission charges Ladd with securities fraud for, among other things, knowingly or recklessly issuing MGT's materially false May 9, 2016 MGT press release that greatly exaggerated the past financial success of John McAfee. Ladd's motion does not contest that he was responsible for the May 2016 press release, or that it contained false information. Rather, Ladd asserts that (1) the false information regarding McAfee was immaterial as a matter of law; and (2) the Complaint does not adequately allege Ladd's fraud scienter regarding that press release. (MTD at 15-19.) The Commission addresses each of these meritless arguments below.

### A.    The False May 2016 Press Release Was Material

Ladd claims that his false press release was immaterial because corrective information was publically available at the time of the announcement. (MTD at 15-17.) Ladd, however, misstates his burden regarding this defense, which requires far more than a showing that corrective information was publicly available. To assert such a "truth on the market" defense, Ladd must establish that the alleged "corrective information" was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino v. Citizens Utility Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (internal quotation marks omitted) (MTD at 16). Moreover, the "truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a

---

[4] Ladd also asserts that the SEC fails to state a separate fraud claim based on the false February 2016 MGT promotional article alleged at Complaint paragraphs 138-40. (MTD at 12-15.) Similar to the *Seeking Alpha* allegations, the Commission is not alleging a separate fraud claim against Ladd based on the February 2016 MGT promotional article. Rather, the Complaint's allegations of Ladd's involvement with that article – including his knowledge or reckless disregard of its falsity, and agreement to pay the promoter to publish them at Honig's direction (¶139) – likewise are relevant to Ladd's scienter regarding his charged fraudulent conduct.

§ 10(b) complaint for failure to plead materiality." *Id.* Indeed, as a general matter, "when presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at 161-62 (internal quotations omitted).

The alleged corrective information that Ladd cites was neither sufficiently "corrective," nor disseminated with the "degree of intensity" necessary, to establish Ladd's alleged "truth on the market" defense. The prior publications that Ladd cites merely stated that McAfee had resigned from his prior company in the mid-1990's, but they do not state (or, at the least, clarify) that McAfee did not sell his prior company to Intel for $7.6 billion. Perhaps more importantly, the alleged "corrective" information was published years before Ladd's false May 2016 MGT press release, in a very limited manner, and thus, was not conveyed to the public with the "degree of intensity" necessary to counterbalance his false 2016 release. Ladd relies solely on: (1) two McAfee Associates Commission filings made over *twenty years* prior to Ladd's false statements; (2) a four-line *Wall Street Journal* notice published over *twenty years* prior; (3) an (apparently) on-line Financial Times article published more than *three years* prior; and (4) a Wikipedia entry for McAfee. (Declaration of Randall Lee ("Lee Decl.") Exs. N, O, V, W, X.) None of those sources, either individually or cumulatively, was sufficient to "counter-balance effectively" Ladd's May 2016 false and misleading press release. The SEC filings and the two articles were far too old and obscure, and the Wikipedia article was not even "disseminated" in the usual sense of that word. Indeed, the 1994-95 Commission filings and the 1995 *Wall Street Journal* notice do not even appear to have been publicly available (or at least readily available to

the public) at the time of the 2016 MGT press release.[5]

Finally, and in any event, the mere fact that such corrective information might have appeared somewhere on the Internet or elsewhere cannot satisfy the requirement that such information be "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." Any other result would amount to a license to commit securities fraud – by permitting stock issuers to publish material false information to potential investors whenever corrective information existed somewhere. Indeed, when Ladd issued his false press release in May 2016, he was counting on the public's ignorance of McAfee's true past financial success. And Ladd continued to mislead the market three weeks later when he signed a revised, but still misleading, Form 10-Q that perpetuated his prior false statement. Ladd's "truth on the market" defense thus is fatally flawed and, at best, merely raises fact disputes inappropriate for resolution at the motion to dismiss stage.[6]

Furthermore, the cases Ladd cites (MTD at 16-17) support the Commission's position. First, those cases either found that fact disputes precluded dismissal,[7] or dismissed claims primarily on grounds *other than* a "truth on the market" defense.[8] Moreover, to the extent those

---

[5] The Declaration of Randall Lee in support of Ladd's MTD does not claim that those documents are currently publicly available. (Lee Decl. ¶¶16, 17, 24.)

[6] In addition, the exhibits Ladd attaches to support his "truth on the market" defense are extrinsic to the Complaint and, thus, inappropriate for consideration in resolving his Rule 12(b)(6) motion. *See ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 89 (2d Cir. 2007); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

[7] *See Ganino*, 228 F.3d at 167-68 (defendants' "truth on the market" defense was "dubious" and, in any event, fact disputes precluded dismissal of plaintiffs' fraud claims based on that defense).

[8] *See Solow v. Citigroup, Inc.*, 10-cv-2927 (RWS), 2012 WL 1813277, *6-10 (S.D.N.Y. May 18, 2012); *In re Yukos Oil Company Securities Litigation,* 04-cv-5243 (WHP), 2006 WL 3026024, *21 (S.D.N.Y. Oct. 25, 2006) (Complaint dismissed primarily because "there is nothing in the

cases even credited the defendant's "truth on the market" defense, the alleged "corrective information" (1) was conveyed contemporaneously with the plaintiffs' stock investments; and (2) was conveyed either by the stock issuer directly to potential investors, or so widely by the media – and regarding matters of such public interest – that, those Courts found, the market could not have been misled.[9] Here, by contrast, Ladd cites old information that is not clearly "corrective," was not widely disseminated, and that does not concern a matter of general public knowledge.

Ladd also erroneously relies upon *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) (MTD at 17), for the proposition that "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." This doctrine of "justifiable reliance" is inapplicable in this case because the Commission, unlike a private plaintiff, is not required to prove investor "reliance" on the false statement at issue. *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012) ("'Justifiable reliance' . . . is not an element of an SEC enforcement action because Congress designated the SEC as the

_____

Complaint to support Plaintiffs' allegation" of certain facts underlying its fraud claim); *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 09-cv-5411, *7-8 (PKC), 2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012) (fraud claims dismissed primarily because "[t]he Complaint does not plausibly allege a false and misleading statement by any defendant" regarding Bank of America's "pre-acquisition due diligence" in mortgage lender Countrywide Financial's "litigation and regulatory exposure").

[9] *See Citigroup*, 2012 WL 1813277, at *6 (defendant bank itself had disclosed ample corrective information in its SEC filings prior to plaintiff's first purchase); *Yukos Oil,* 2006 WL 3026024, *5, *21-22 (even if plaintiff otherwise could allege actionable false statements, corrective information was so widely reported, and involved matters of such significant interest to the general public – *i.e.*, a well-known Russian oligarch's political contacts with Russian President Vladimir Putin – that plaintiffs could not reasonably assert that they had been unaware of those activities); *Bank of America*, 2012 WL 1353523, *7-8 (even if plaintiff otherwise could allege that Bank of America did not adequately disclose regulatory risks regarding its acquisition of infamous mortgage lender Countrywide Financial, extremely broad, contemporaneous national reporting regarding those risks provided the market sufficient corrective information).

primary enforcer of the securities laws, and a private plaintiff's 'reliance' does not bear on the determination of whether the securities laws were violated, only whether that private plaintiff may recover damages.") (citing *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir.1993); and *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir. 1985)).

### B.  <u>The Complaint Alleges Ladd's Fraud Scienter</u>

Ladd further asserts that the Complaint does not adequately plead Ladd's fraud scienter regarding the May 2016 false MGT press release. (MTD at 18-19.) Ladd's own "truth on the market" argument, and the Complaint's abundant additional allegations of circumstantial evidence showing Ladd's fraud scienter, wholly undermine this argument.

Ladd himself claims that the falsity of the May 2016 press release should have been obvious "because the circumstances of the sale of McAfee Associates had been known to the public for almost 25 years." (MTD at 16.) As discussed *supra* (pages 9-11), the publicly available information regarding these facts fails to support a "truth on the market" defense. But, by making this argument, Ladd effectively concedes that he acted at least recklessly. Unlike MGT investors, Ladd was the individual responsible for the content of the May 2016 MGT press release and, as such had an affirmative duty to ensure its accuracy. *See SEC v. Morgan*, 19-cv-661 (EAW), 2019 WL 2385395, *5 (W.D.N.Y. June 5, 2019) ("In addition to affirmative duties to disclose created by particular statutes and regulations, there is also a general duty for a corporation to disclose all facts necessary to ensure the completeness and accuracy of their public statements.") (internal quotation marks omitted). His failure to do so was at least reckless.

Moreover, the circumstances surrounding Ladd's issuance of the false MGT press release further establish that he did so intentionally. The Complaint alleges that: (1) at least by 2012-2013, Ladd was aware of the Honig Group's pump-and-dump methods, which involved false

MGT promotional materials; (2) Ladd assisted the Honig Group's 2015-2016 pump-and-dump schemes by helping them hide their collective MGT stock ownership in April 2016; (3) two weeks after issuing MGT's false May 2016 press release, Ladd filed a still-misleading Form 10-Q, containing a new statement regarding McAfee that, far from correcting his earlier false statement, exacerbated it;[10] and (4) Ladd personally benefited from the scheme by selling MGT stock for over $500,000 in May 2016, shortly after issuing the false press release. Thus, Ladd had a clear plan (identical to a previous MGT pump-and-dump he had witnessed) and personal pecuniary motive to mislead the public regarding McAfee's past financial success. Taken together, all of the above allegations more than adequately plead Ladd's fraudulent intent – his knowing or at least reckless conduct – in issuing the false May 2016 MGT press release. *See SEC v. Egan*, 994 F.Supp.2d 558, 565 (S.D.N.Y. 2014) ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business. Alternatively, a complaint adequately pleads a reckless omission if it alleges that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.") (internal quotations and citations omitted).

### III.   The Complaint States Claims Based on Ladd's False MGT Forms 10-K and S-1

Ladd also erroneously claims that the Complaint fails to state a claim under Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act") and Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") based on Ladd's false statements and omissions in

---

[10] Ladd's argument that the Form 10-Q "clarified" or "corrected" the earlier MGT press release (MTD at 19) is thus wrong on its face and, at best, merely raises a fact dispute inappropriate for resolution on Ladd's motion to dismiss.

MGT's 2015 Forms 10-K and S-1 regarding the Honig Group's collective ownership of over 5% of MGT's stock. Ladd misstates the law regarding both MGT's obligation to disclose this information, and the pleading necessary to establish the Honig Group's status as a "group" for this purpose. Under Exchange Act Sections 13(a) and 13(d)(3) – and Commission Rule 13d-5 promulgated thereunder – MGT plainly was required to disclose in its Forms 10-K and S-1 all MGT shareholders who, individually or collectively (as a "group"), beneficially held more than 5% of MGT's voting stock. Ladd, however, knowingly or recklessly signed MGT's Commission filings without disclosing that the Honig Group collectively owned more than 16% of MGT's voting stock and, thus, violated the anti-fraud provisions of Exchange Act Section 10(b), Rule 10b-5(b) thereunder, and Securities Act Section 17(a)(2).

### A. <u>MGT's Duty to Disclose Beneficial Owners of Over 5% of its Stock</u>

Contrary to Ladd's first argument, MGT had an affirmative duty to disclose in its Forms 10-K and S-1 any beneficial owner of more than 5% of its voting stock – including any "group" of persons or entities who collectively owned more than 5% as the term "group" is defined by Exchange Act Section 13(d).

Exchange Act Section 13(a) requires all issuers whose securities are registered pursuant to Exchange Act Section 12 (such as MGT) to file periodic reports with the Commission, and Exchange Act Rule 13a-1 requires issuers to file annual reports – *i.e.,* a "Form 10-K." Exchange Act Regulation S-K requires issuers to include in their Forms 10-K and S-1 a table listing:

> any person (including any 'group' as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.

17 C.F.R. §§ 229.10(a) and 229.403(a). Thus, any potential investor reading MGT's 2015-2016 Forms 10-K or S-1 should expect to see a table describing all persons – and all "groups" of persons – who beneficially owned more than 5% of MGT's stock.

Furthermore, an issuer's knowing or reckless material misrepresentation or omission in its Form 10-K or S-1 regarding such beneficial ownership constitutes a violation of Exchange Act Section 10(b) (and Rule 10b-5(b) thereunder), and Securities Act Section 17(a)(2). *Cf. Gruber v. Gilbertson,* 16-cv-9727 (WHP), 2018 WL 1418188, *9 and *13 (S.D.N.Y. March 20, 2018) (denying motion to dismiss Section 10(b) claim alleging a pump-and-dump scheme, Court found that "one of the [issuer's] more egregious misrepresentations [in its Form 8-K] is that no person [was] a beneficial owner of more than 5% of [the] common stock") (internal quotation omitted); *SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587, 608 (S.D.N.Y. 1993) ("A violation of section 13(d) may . . . constitute a violation of section 10(b) and Rule 10b–5 thereunder") (citations omitted).

Thus, contrary to Ladd's argument, the federal securities laws expressly obligated MGT to disclose in its 2015 Forms 10-K and S-1 any "group" of MGT shareholders who collectively owned more than 5% of MGT's voting stock, and MGT had a duty to do so accurately and not misleadingly. Moreover, MGT – and Ladd, as the individual who signed on MGT's behalf – is subject to liability under Exchange Act Sections 10(b), Rule 10b-5 thereunder, and Securities Act Section 17(a)(2), for knowingly, recklessly, or negligently (in the case of Section 17(a)(2)) failing to comply with those disclosure obligations.

### B.  Exchange Act Section 13(d) Shareholder "Group" Disclosure Requirement

Ladd also misconstrues the "group" disclosure requirement under Exchange Act Section

13(d), which is broader than Ladd claims, and which plainly applies to the collective actions of

the Honig Group regarding MGT.

Exchange Act "[Section] 13(d) encompasses not only the isolated shareholder who

accumulates shares of a corporation's common stock, but also a group of shareholders who

undertake the same activity as part of a collective effort." *Morales v. Quintel Entertainment, Inc.*,

249 F.3d 115, 123 (2d Cir. 2001). Congress enacted Section 13(d) in 1968 "[i]n response to

hostile corporate takeovers in the 1960s . . . to alert the marketplace to every large, rapid

aggregation or accumulation of securities, regardless of technique employed, which might

represent a potential shift in corporate control." *Id.*at 122-23 (internal quotations and citations

omitted).

"To implement § 13(d)(3), the Commission promulgated Rule 13d-5, which defines

beneficial ownership by a 'group'" as "two or more persons" who "agree to act together for the

purpose of acquiring, holding, voting or disposing of equity securities of an issuer." *Id.* at 123

(quoting 17 C.F.R. § 240.13d-5(b)(1)). The "key inquiry" in determining whether two or more

individuals act as a "group" for Section 13(d)(3) purposes is whether they "act together for the

purpose of acquiring, holding, voting or disposing of" the issuer's stock. *Id.* at 123-24. Such an

"agreement may be formal or informal and may be proved by direct or circumstantial evidence,"

and its existence is a "question of fact." *Id.* at 124. "Moreover, the alleged group members need

not be committed to 'acquiring, holding, voting, or disposing of equity securities' on certain

specified terms, but rather they need only have combined to further a common objective

regarding one of the just-recited activities." *Id.*  The purpose of the Section 13(d)(3) "group"

requirement is to "prevent evasion of the [5%] disclosure requirement." *Id.* at 123 (quoting legislative history).

As further explained below, and also contrary to Ladd's arguments, the Complaint amply alleges that the Honig Group constituted a "group" of individuals for Section 13(d) purposes – who collectively beneficially owned more than 5% of MGT's voting shares – as well as Ladd's knowledge or reckless disregard of that fact when he signed MGT's false 2015 and 2016 Forms 10-K and S-1.

> **C.    The Amended Complaint Adequately Pleads that the Honig Group Constituted an MGT Shareholder "Group" Under Section 13(d), and Ladd's Knowledge or Reckless Disregard of that Fact**

The Amended Complaint adequately pleads, by both direct and circumstantial evidence, that: (1) the Honig Group at a minimum agreed informally to act as a "group" to acquire, hold, vote, and dispose of MGT stock for the common purpose of engaging in pump-and-dump schemes involving MGT stock; and (2) Ladd's scienter regarding that fact. In particular, the Honig Group agreed collectively to acquire large amounts of MGT stock; to hold and use their MGT stock ownership to exercise influence over MGT management to further their scheme; to pump MGT's stock price artificially through false marketing and stock manipulation; and thereafter to dump their MGT stock on unsuspecting investors in the artificially price-inflated market that they created. Moreover, as Ladd knew or recklessly disregarded, the Honig Group's scheme would only work if the members acted together. Evading detection was central to their scheme and, precisely for this reason, the Honig Group violated Section 13(d) by failing to disclose that they collectively owned more than 16% of MGT's stock. As explained above, such undisclosed "group" stock control is precisely what Section 13(d) is intended to curb.

To support these claims, the Complaint first provides an overview of the Honig Group's

illicit schemes involving MGT – through which they "combined to further a common objective" of "acquiring, holding, voting or disposing of" MGT stock. The Complaint alleges that, "[d]uring 2015 and 2016," the Honig Group "used [MGT] . . . as another vehicle for their pump-and-dump schemes" by buying "millions of cheap shares, intending to exercise control over the management and policies of [MGT]; exercised that control; orchestrated a misleading promotion of [MGT] that drove up the price and trading volume of [MGT's] shares; and dumped their shares for a profit in the inflated market." (¶125.)  The Complaint then proceeds to detail exactly how the Honig Group, with Ladd's knowledge and assistance, collectively acquired, held, took advantage of, and disposed of their MGT stock, all in furtherance of their common fraudulent objectives. (¶¶133-148.) The Complaint details how, in September 2015, the Honig Group worked with Ladd collectively to acquire 2.8 million MGT shares through a coordinated issuance of MGT shares to the Honig Group (plus warrants for the Honig Group to acquire an additional 5.6 million MGT shares). (¶134.) The Complaint further alleges that the Honig Group and Ladd purposely structured the deal to conceal its ownership of more than 16% of MGT's shares and, thus, hide their scheme from the public. (¶¶134-35, 137, 139.) The Complaint further alleges the Honig Group's coordinated fraudulent promotional campaign in February 2016, Honig's and Brauser's manipulative stock trading in May 2016, and Ladd's May 2016 false press release, and explains how they were together intended to pump up artificially MGT's stock price. (¶¶138-40, 144-47.) The Complaint also alleges that the Honig Group exercised control over Ladd and MGT's management and policies by directing Ladd on how to disclose the Honig Group's MGT stock acquisitions to the NYSE MKT exchange, and by negotiating on MGT's behalf the terms of McAfee's sale of his company to MGT. (¶¶135, 142-43, 152.) Finally, the Complaint details the Honig Group's and Ladd's coordinated "disposing of" their MGT stock on unsuspecting

investors into their artificially-inflated market in both February and May 2016. (¶¶140, 148.)[11]

These detailed allegations constitute overwhelming circumstantial evidence that the Honig Group operated under, at the least, an informal agreement collectively to acquire more than 16% of MGT's voting stock for their common illicit purpose, and that Ladd knew of or recklessly disregarded that fact. But the Complaint also alleges strong *direct* evidence of the Honig Group's "group" status, and Ladd's knowledge of that fact – namely, Ladd's own November 2015 email explicitly characterizing the Honig Group as a distinct "group" of MGT shareholders who collectively held "2.8 million" MGT shares. (¶137.) Ladd characterizes the Commission's reading of that email as "rank speculation." (MTD at 23.) This argument fails on its face, particularly when Ladd's email is read in light of the Complaint's overwhelming additional circumstantial evidence, described above, that the Honig Group was operating as "group" for Section 13(d) purposes, Ladd's historic familiarity with their *modus operandi* (dating back to the Honig Group's 2012-2013 *Seeking Alpha* pump-and-dump scheme), and the Honig Group's exercise of control over Ladd and MGT's management and policies. In any event, in considering Ladd's Motion to Dismiss, the Court must accept all fact allegations in the Complaint and draw "all reasonable inferences" therefrom in favor of the Commission, not Ladd. *ATSI*, 493 F.3d at 98. Surely, in light of the circumstances alleged in the Complaint, the inference that the Commission asks the Court to draw – that Ladd knew of the Honig Group's "group" status – is more than "reasonable."

---

[11] Contrary to Ladd's arguments regarding disclosures in MGT's November 2015 Form S-1 and April 2016 Form 10-K (MTD at 19-20), Honig is the only Honig Group member whose MTG share ownership is disclosed in the beneficial-ownership tables contained in those filings. (Lee Decl. Ex. A at 26-27, and Ex. H at 41-42.) Ladd's assertion that the Form S-1 *elsewhere* identifies other Honig Group members' MGT shareholdings (MTD at 19-20; Lee Decl. Ex. H at 43-46) is not a defense, as (1) the Form S-1 does not identify those individuals in its beneficial-ownership table; and (2) nowhere does the Form S-1 identify the individual Honig Group members as part of a collective "group" of MGT shareholders.

The Complaint alleges even more evidence establishing that the Honig Group acted as an MGT shareholder "group" for Section 13(d) purposes. The Complaint is replete with additional examples, involving issuers other than MGT, of the Honig Group's acting as such a "group," for similar illicit purposes. The Honig Group's identical pattern of conduct over a number of years furnishes additional powerful evidence that they agreed to act as a "group" (informally or otherwise) regarding their acquisition, holding, voting, and dumping of MGT stock in 2015 and 2016. *See Morales*, 249 F.3d at 127 (2d Cir. 2001) (citing group's pre-existing common relationship as sole shareholders of a closely-held corporation); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 173 (S.D.N.Y. 2000) (noting long-standing investing and personal relationships among defendants); *Global Intellicom v. Thomson*, No. 99 Civ. 342 (DLC), 1999 WL 544708, at *14 (S.D.N.Y. July 27, 1999) (citing allegation that "various of these Defendants have engaged in . . . similar transactions with other public companies" to deny motion to dismiss); *Lerner v. Millenco, LP*, 23 F. Supp. 2d 337, 344 (S.D.N.Y. 1998) (citing allegations that defendant had coordinated its investments with other members of the alleged group "on numerous prior occasions").

The cases Ladd relies upon fail to support his arguments (MTD at 21-23). None involves a group-coordinated pump-and-dump scheme, much less the carefully planned and executed MGT schemes that the Complaint alleges. The essence of the Honig Group's pump-and-dump schemes was the coordinated and hidden purchasing and selling of MGT stock by a distinct group of individuals who worked closely together to achieve their common goal of obtaining riches at the expense of defrauded markets. By contrast, the cases Ladd cites involved much closer questions as to whether the defendants in those cases had intended to act as a "group." In the cases where those Courts found insufficient allegations of such a "group agreement," it was

either because: (1) the defendant did not personally own the issuer's stock;[12] (2) the plaintiff's

"group agreement" allegations were "purely conclusory" (without *any* supporting evidence);[13] or

(3) such allegations consisted merely of "lock-up agreements" and/or agreements with third

parties (outside of the alleged "group").[14] The only other case that Ladd cites held that material

fact disputes *precluded* dismissal of the case.[15]

Here, by contrast, no such close question exists regarding the Honig Group's "group

agreement." The Complaint alleges in abundant detail that the Honig Group acted collectively

and repeatedly toward their common goal of executing pump-and-dump schemes. Thus, the

---

[12] *Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 375 (S.D.N.Y. 1979) (Section 13(d) claim dismissed because defendant did not personally own *any* company stock, and his mere "participation in, and assistance to," his co-defendants' venture was insufficient to render him part of their "group" for Section 13(d) purposes).

[13] *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217-18 (2d Cir. 1973) (Court dismissed § 13(d) suit due to "insufficient evidence of any agreement whatsoever" between defendants 4.8% shareholders and shareholder who owned 4.996%, whose own pecuniary interest ran *counter* to defendants'); *Chechele v. Scheetz*, 819 F.Supp.2d 342, 346-50 (S.D.N.Y. 2011) ) (Exchange Act § 16(b) short-swing profit suit dismissed for insufficient allegations of group "agreement," where allegations were "purely conclusory," "nearly devoid of factual content," and dependent on agreements with third parties (not members of the alleged "group")); *Forward Indus., Inc. v. Wise*, 14-cv-5365, 2014 WL 6901137, *1, 3-4 (S.D.N.Y. Sept. 23, 2014) (Section 13(d) claims dismissed against two individuals who had not reported their combined stock holdings – but who had separately disclosed their >5% ownership – due to insufficient allegations that two had "concocted a joint scheme to take control of the company"); *In re Charter Commc'ns*, 419 B.R. 221, 239-40 (Bankr. S.D.N.Y. 2009) (applying more stringent "group" test under private credit facility, Bankruptcy Court was "not convinced that . . . bondholders that found themselves by happenstance conscripted into the same restructuring were acting as a partnership, syndicate or other group for purposes of acquiring, holding or disposing securities. No agreements, express or implied, have been shown to exist").

[14] *Scheetz*, 819 F.Supp.2d at 346-50; *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 544, 552-54 (S.D.N.Y. 2014) (Section 16(b) suit dismissed because mere existence of "lock-up agreement" – without any allegation that defendants "combined . . . to acquire, hold or dispose of securities" – was insufficient to establish "group" for § 13(d) purposes).

[15] *Morales*, 249 F.3d at 126-30 (fact disputes precluded dismissal of § 16(b) suit where defendant and two other shareholders collectively owned more than 5% of the issuer's stock and had executed both joint-stock-purchase and lockup agreements).

Honig Group falls squarely within the definition of a "group" of shareholders for Section 13(d) purposes. At the very least, the Complaint pleads sufficient facts to establish that fact disputes preclude dismissal on this ground at the motion-to-dismiss stage.

## IV.   The Complaint Adequately Pleads a Section 17(a)(2) Negligence Claim

Ladd further erroneously asserts that the Complaint does not adequately plead a negligence claim under Securities Act § 17(a)(2). Ladd misconstrues the pleading requirements regarding such claims.

At least as a general matter, "[u]nder [Securities Act §§ 17(a)(2) and (3)], the definition of negligence is the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances." *SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, *6 (S.D.N.Y. Sept. 19, 2015) (internal quotation omitted). "Such negligence may consist either of *doing* something that a reasonably careful person *would not do* under like circumstances, or in *failing* to do something that a reasonably careful person *would do* under like circumstances." *Id.* (internal quotation omitted; emphasis in original); *see also SEC v. Wey*, 246 F. Supp. 3d 894, 912-13 (S.D.N.Y. 2017). Thus, "[t]o plead violations of Sections 17(a)(2)-(3), [the Commission] is not required to provide any evidence on mental state but only unreasonable conduct (negligence)." *SEC v. Guardian Oil & Gas, Inc.*, 14-cv-1533 (BN), 2014 WL 7330451, *7 (N.D. Tex. Dec. 23, 2014). "And the same allegations may be used to support both a finding that Defendants acted with scienter and that their actions were negligent." *Id.* Thus, where, as here, the Commission adequately pleads the higher standard of fraud scienter, it necessarily also adequately pleads Section 17(a)(2) negligence. *See, e.g., id.*; *Wey*, 246 F. Supp. 3d at 913; *SEC v. Narayan*, 16-cv-1417-M, 2017 WL 4652063, *13 (N.D. Tex. Aug. 28, 2017); *SEC v. Blackburn*, 156 F. Supp. 3d 778, 794 (E.D. La. 2015).

As Ladd points out, Complaint paragraph 220 alleges that Ladd violated Section 17(a)(2) by "knowingly, recklessly or negligently" engaging in wrongful conduct. Thus, if the Court finds that the Complaint adequately pleads Ladd's fraud intent (for the reasons set forth above), the Court likewise should find it adequately pleads that Ladd acted at least negligently under the circumstances.

Ladd's reliance upon *SEC v. Pocklington*, 18-cv-701 (JGB), 2018 WL 6843663, *16 (C.D. Cal. Sept. 10, 2018) (MTD 24-25), is misplaced. That case stands for the discrete proposition that, where the Commission pleads that a special standard of care applies to a defendant's negligent conduct – due, for example, to a defendant's expertise in a particular area – the Commission should plead such special standard of care. Here, however, the SEC does not allege a special "expertise" on Ladd's part but, rather, Ladd's "simple negligence." Therefore, the *Pocklington* decision is inapplicable here. *See id.*

## V.     The Complaint States a Claim for Aiding and Abetting Liability

Finally, Ladd erroneously asserts that the Complaint does not state a claim for aiding and abetting liability because it does not allege his "actual knowledge" of defendants' securities fraud violations. The Commission, however, need not allege Ladd's "actual knowledge." Rather, under Securities Act Section 15(b) and Exchange Act Section 20(e), Ladd is liable for aiding and abetting liability if he either "knowingly or recklessly provide[d] substantial assistance to" the Honig Group's fraudulent scheme. 15 U.S.C. §§ 77o(b) & 78t(e). As explained above, the Complaint amply alleges that Ladd at least recklessly provided substantial assistance to the Honig Group's fraudulent pump-and-dump schemes charged in the Complaint. Also contrary to Ladd's argument (MTD at 25 n.10), the Complaint's "aiding and abetting" charging sections expressly allege that Ladd acted "knowingly or recklessly." (¶¶235, 240.)

24

## **CONCLUSION**

For the foregoing reasons, the Court should deny Ladd's motion to dismiss the Complaint

as to Ladd, as well as Ladd's motion to strike the Complaint's *Seeking Alpha* allegations.

Dated: August 2, 2019
    New York, N.Y.

Respectfully submitted,

/s/ Jack Kaufman
Nancy A. Brown
Jack Kaufman
Katherine Bromberg
Jon Daniels
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0106 (Kaufman)
Attorneys for Plaintiff Securities and Exchange
Commission

# EXHIBIT A

**From:**      Robert Ladd
**To:**        Barry Honing
**Subject:**   Re: MGT
**Date:**      Sunday, November 29, 2015 3:56:58 PM
**Attachments:**  013BABDF-AFCA-419C-A4BD-E63CF477052E[12].png

I stand corrected.

Thanks,
Rob


 **(NYSE MKT: MGT)**

**Robert B. Ladd  CFA**
**President and CEO**
**500 Mamaroneck Avenue – Suite 204**
**Harrison, NY  10528**

 **www.mgtci.com**

**(914) 630-7430 office**
**(914) 643-6855 cell**

**AIM:      laddcap**
**Skype:  laddcapvalue**

---

**From:** Barry Honing <brhonig@aol.com>
**Date:** Sunday, November 29, 2015 at 3:56 PM
**To:** Robert Ladd <rladd@mgtci.com>
**Subject:** Re: MGT

I am not part of a group.  I invested individually

Sent from my iPhone

On Nov 29, 2015, at 3:54 PM, Robert Ladd <rladd@mgtci.com> wrote:

> Attached is a the 2016 budget for MGT….about $85,000 per month burn, without any deal
> costs (acquisitions or financing).  I anticipate beginning the year with no less than $350,000 in
> cash, and no more than $50,000 in payables.  We have no other liabilities or contingencies.
>
> That money is enough to last until the end of April, by which time we have availability to sell
> registered stock off our S-3 (with the limitation of one-third of our float in a 12 month
> period).  That limitation is estimated as low as $1.2 million, unless the stock goes up.  In
> addition, your group's 25 cent warrants could bring in an additional $1.4 million once the S-1

goes Effective.

We also have about 1.3 million VGGL common shares, salable beginning 3/8/16.  On that same date, VGGL owes us $1.9 million on the maturity of a note.  Obviously both items are speculative.

As for the cap table, we have 17.2 million common shares outstanding, including your group's 2.8 million, Iroquois at 1.3 million and my family at 1.3 million.  That puts under 12 million shares in public float ($3.0 million), with only a handful of holders over 100k shares (see attached NOBO list).  We have 75 million common shares authorized, and are seeking board approval to do a reverse split  of outstanding shares in a range of 1 for 8 to 1 for 40.

There are 2.8 million warrants exercisable at $0.25, and about 800,000 warrant exercisable at $3.00, all without ratchets or resets.

We have unlimited blank check preferred stock already authorized by stockholders, and none outstanding.

See you at 7pm.


Thanks,
Rob


<013BABDF-AFCA-419C-A4BD-E63CF477052E[11].png> (NYSE MKT: MGT)
**Robert B. Ladd  CFA**
**President and CEO**
**500 Mamaroneck Avenue – Suite 204**
**Harrison, NY  10528**

 **www.mgtci.com**

**(914) 630-7430 office**
**(914) 643-6855 cell**

**AIM:    laddcap**
**Skype:  laddcapvalue**

<NOV 2015 budget Final.pdf>

<top 50 NOBO.png>