# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE

     COMMISSION, Plaintiff,

vs.                                    Case Number: 1:12-cv-00257-JB-LFG

LARRY GOLDSTONE,
CLARENCE G. SIMMONS,
III and JANE E. STARRETT,

     Defendants.


**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL**
**THE FURTHER PRODUCTION OF DOCUMENTS**

<u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...................................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND..........................................................2

III.   ARGUMENT ........................................................................................................7

     A.      Legal Standard ..........................................................................................7

     B.      The Documents Sought Are NOT "Directly Relevant" to the Defense
            of this Action.............................................................................................10

            1.      Accounting Principles.................................................................10

                 a.      OTTI .................................................................10

                 b.      Subsequent Events and Going Concern........................11

            2.      The Peloton Blow Up..................................................................12

            3.      SEC Staff Statements Regarding Market Disruption in 2008 ..................13

     C.      The Additional Documents Sought Are Either Unreasonably Cumulative
            or Do Not Exist. .........................................................................................14

            1.      Requests 1, 2, 6, and 7 Are Unreasonably Cumulative and
                 Duplicative of Abundant Evidence Readily Available to
                 Defendants. ..................................................................................15

            2.      There is No Evidence that the SEC had Advance Notice
                 that the Peloton Hedge Fund in Europe Was Blowing Up. .......................16

            3.      The 30(b)(6) Deposition the Court Ordered the SEC to
                 Give Adds to the Cumulative Nature of the Requests. ...........................17

     D.      The Additional Efforts Defendants Request Would Be Several
            Times More Expensive and Time Consuming than the Original Efforts
            and Thus, Unduly Burdensome..................................................................17

     E.      This Extraordinary Burden Is Not Justified By the Marginal Relevance
            of the Documents Uncovered in the Previous Search..............................18

     F.      Defendants' Expanded Date Ranges Are Unjustified and Unduly
            Burdensome. ............................................................................................20

IV.    CONCLUSION............................................................................................................21

TABLE OF AUTHORITIES

Cases

*Cabot v. Wal-Mart Stores, Inc.*, No. Civ 11-0260, 2012 WL 592874
 (D.N.M. Feb. 16, 2012)..........................................................................................7

*Finkelstein v. District of Columbia*, Civ. A. No. 85-2616,
 1987 WL 14976 (D.D.C.) .......................................................................................9

*Hartznett v. Papa John's Pizza, Inc.*, No. CIV 10-1105,
 2012 WL 3860739 (D.N.M. Aug. 28, 2012) ........................................................8

*McGee v. Hayes*, 43 F. App'x 214 (10th Cir. 2002)........................................................7

*S2 Automation LLC v. Micron Tech, Inc.*, No. CIV 11-0884,
 2012 WL 3656454 (D.N.M. Aug. 9, 2012) .....................................................9, 10

*Treppel v. Biovail Corp.*, 233 F.R.D. 363 (S.D.N.Y. 2006) ...........................................8

*Walker v. THI of New Mexico at Hobbs Center*, No. CIV 09-0060,
 2010 WL 552661 (D.N.M. Feb. 8, 2010) .........................................................8, 9

Statutes

Fed. R. Civ. P. 26(b)(2)(C) ............................................................................................15

## I.    INTRODUCTION

This is the second time Defendants have asked the Court to compel the SEC to provide documents in response to Defendants' First Set of Requests for the Production of Documents. Their first request was denied. *See* Transcript of Hearing held January 30, 2013. Their second request should also be denied, for similar reasons: the document requests are at best marginally relevant to the claims at issue; the requests are unduly burdensome; and Defendants have other avenues to obtain what they seek. In fact, Defendants' motion makes clear that for two categories of documents, they already have significant evidence to support their arguments, and for the third, there is none.

Defendants' Motion to Compel the Further Production of Documents by Plaintiff Securities and Exchange Commission ("Motion to Compel") opens with the statement that they "move to compel the production of documents from the SEC that are directly relevant to the central allegations of the Complaint." Motion to Compel at 1. That statement is absurd. Defendants seek to compel the *further* production of SEC e-mails commenting on accounting principles that the SEC has acknowledged can be complex, the financial crisis that the SEC agrees was unforeseen, and the collapse of a European hedge fund. *See Id*. at 2. The SEC objected to Defendants' First Set of Requests for the Production of Documents on the grounds that they were overbroad and unduly burdensome. Nonetheless, after extensive meet and confer discussions, the SEC agreed to conduct a limited search for documents containing agreed upon search terms for a limited set of custodians and time periods. It did so in an attempt to appease Defendants and demonstrate that the requested documents were not probative. That effort resulted in the production of over 18,000 pages of SEC e-mails. Of those, Defendants point to

five and claim they are "highly probative." *Id*. at 15. But, as discussed in Section III.E., those five documents only demonstrate the marginally relevant and cumulative nature of Defendants' requests. The purported importance of the documents Defendants seek is not only belied by the documents previously produced by the SEC in response to the document requests, but also by the fact that Defendants felt that the factual record was sufficiently complete without them to move for summary judgment. Docs. 201, 206.

The production of documents in this litigation has been entirely one-sided. The SEC has already produced over 2.5 million pages of documents to Defendants, including documents from Thornburg Mortgage, its lenders, and its outside accountant, KPMG, gathered in the SEC's investigation of Thornburg Mortgage, as well as SEC correspondence and subpoenas. It has also searched the e-mails of 19 SEC employees and produced over 18,000 pages in response to the document requests at issue. That production was made as a compromise and without waiver of the SEC's objection that the probative value of the discovery requests at issue outweighed by the burden of production. Enough is enough. The Motion to Compel should be denied.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Defendants served their First Set of Requests for the Production of Documents on October 5, 2012. Ex. A to Motion to Compel. The requests fell into seven categories, listed below. The last three are the subject of Defendants' Motion to Compel:

- **Documents produced to the SEC in its investigation**: Request No. 8 sought "[a]ll DOCUMENTS produced to the SEC by third parties in connection with the INQUIRY ...."

- **All COMMUNICATIONS with KPMG** in connection with the INQUIRY. (Request No. 3).

- **All transcripts, witness statements, or notes of interviews** that YOU conducted as part of YOUR INQUIRY (Request No. 9).

- **All DOCUMENTS received from the PCAOB or KPMG CONCERNING the PCAOB's INVESTIGATION of KPMG** (Request No. 10).

- **Accounting Principles**:  Requests 1 and 2 seek "[f]or the period January 1, 2007 through May 31, 2009, all COMMUNICATIONS with third parties …, all internal SEC DOCUMENTS or COMMUNICATIONS reflecting COMMUNICATIONS with third parties, and all public statements by the SEC, CONCERNING OTTI, SUBSEQUENT EVENTS, or GOING CONCERN EVALUATION" and "all internal SEC DOCUMENTS or COMMUNICATIONS with any GOVERNMENT ENTITY reflecting a final decision or conclusion CONCERNING OTTI, SUBSEQUENT EVENTS, or GOING CONCERN EVALUATION."

- **The Blow Up of the Peloton hedge fund**:  Requests 4 and 5 seek, without any restriction on time, "[a]ll COMMUNICATIONS with third parties …, all internal SEC DOCUMENTS or COMMUNICATIONS reflecting COMMUNICATIONS with third parties, and all public statements by the SEC, CONCERNING Peloton Partners" and "all internal SEC DOCUMENTS or COMMUNICATIONS with a GOVERNMENT ENTITY reflecting a final decision or conclusion CONCERNING Peloton Partners.

- **Disruption of the Financial Markets**:  Requests 6 and 7 seek "[f]or the period January 1, 2007 through May 31, 2009, all COMMUNICATIONS with third parties …, all internal SEC DOCUMENTS or COMMUNICATIONS reflecting COMMUNICATIONS with third parties, and all public statements by the SEC, CONCERNING dislocations or disruptions in the credit markets, markets for mortgage-backed securities, or the markets for reverse repurchase ('repo') lending" and "all internal SEC DOCUMENTS or COMMUNICATIONS with a GOVERNMENT ENTITY CONCERNING dislocations or disruptions in [those markets]."

Ex. A to Motion to Compel.

With regard to Request No. 8, the SEC responded that it had "already produced all non-privileged/ non-exempt documents," referring to its initial production of documents in compliance with Federal Rule of Civil Procedure 26(a)(1).  *See* Ex. B to Motion to Compel, at 14.  That production consisted of a searchable, electronic database of 152,186 documents

3

comprising nearly 2.5 million pages produced to the SEC by Thornburg Mortgage, two of its

lenders, and its outside auditor, KPMG.  Declaration of Stephen McKenna ("McKenna Decl."),

filed herewith, at ¶ 4.

With regard to Requests No. 3, 9, and 10, the SEC objected and ultimately moved for a

protective order, which the Court indicated at a January 30, 2013 hearing that it would grant.  *See*

Doc. 144.[1]

With regard to the six requests and three categories at issue here, the SEC objected on

multiple grounds, including that "the Request[s] seek documents unrelated to the claims and

defenses in this litigation, or so marginally related that the burden and cost of searching for and

producing the documents outweighs any potential benefit to DEFENDANTS."  *See, e.g.* Ex. B to

Motion to Compel at 7-8.[2]  The SEC quantified the burden involved by noting the size and

breadth of the agency and the burden involved in polling all members of the agency on these

topics.  *Id*.

In a letter to the SEC on November 16, 2012, Defendants offered to limit the number of

SEC employees who would search for documents from everyone in the agency to 162

individuals, and the time period from two and a half to two years.  *See* Exs. O and C to Motion to

Compel.  Following a meet and confer call on November 30, in a December 10 letter, the SEC

reiterated its objection that burden outweighed relevance and its offer to stipulate to what the

---

[1] As they have done here, Defendants sought this same discovery through both document requests and a Rule 30(b)(6) notice, and the SEC's Motion for Protective Order was captioned Motion for a Protective Order to Quash Defendants' Notice of 30(b)(6) Deposition and Second and Third Requests for the Production of Documents.  *See* Doc. 121.

[2] The SEC has consistently maintained this and other initial objections to the document requests at issue.  *See*, *e.g.,* Exs. B, E, G, M, and N to Motion to Compel.

majority of the documents defendants were seeking might show.  Ex. E to Motion to Compel.[3]
Based on its well-founded objections, the SEC declined the Defendants' slightly narrowed offer
to search 74 individuals' files, but again offered to do a small initial sample search of the
electronic files of five individuals of Defendants' choosing, after which the parties "can discuss
whether additional searches are merited."  *Id*. at 2, 3.  The SEC believed that such a search would
show the lack of relevance of Defendants' inquiry (as the expanded search the Defendants
demanded has done).

Defendants would not agree to a small initial sample search, instead continuing to insist
that the SEC search the files of numerous individuals in various offices.  *See* Ex. F to Motion to
Compel.  In an effort at compromise, the SEC largely agreed to Defendants' proposed search
parameters, again reiterating that "[we] continue to believe that Defendants' document requests
1, 2, and 4-7 are largely irrelevant to the claims and defenses at issue in this litigation and the
burden of searching for such materials greatly outweighs any marginal relevance responsive
materials may have."  Ex. G to Motion to Compel at 2.

Compliance with Defendants' proposal required the SEC to run the first set of search
terms on ten individuals over a six month period and to run the second set of search terms on
nine individuals over a two and a half month period.  *See* Ex. M to Motion to Compel.  As we
told Defendants, this resulted in a data set of 6,286 e-mails and attachments, totaling 70,015

---

[3] The SEC stated: "We stand by our objections to those document requests that any marginal
relevance of the requests is outweighed by the burden complying would impose."  "We even
offered to stipulate that there was a severe financial crisis that began in 2007 and continued into
2008 when Thornburg filed the Form 10-K that is at the center of this dispute.  We reiterate that
offer."  "Insisting that the SEC search files of dozens of individuals to show what is readily
established and we have offered to stipulate to is wholly unnecessary."

pages.  Ex. A, May 6, 2013 e-mail from McKenna to Williams.[4]  These documents were reviewed for privilege by trial counsel and SEC counsel in Washington D.C.  From these the SEC produced 18,746 non-privileged or otherwise protected pages containing search terms, spending approximately 165 person-hours on the search, review, and production.  McKenna Decl. at ¶ 5.

As addressed in Section III. B. and E., below, this significant effort on the SEC's part yielded no meaningful evidence relevant to Defendants' defenses.

On April 29, 2013, Defendants came back and asked the SEC to run more searches on more individuals that have nothing to do with the facts of this case.  Ex. J to Motion to Compel. The SEC responded by detailing its extensive efforts in providing the first production and explaining that:

> Based on your expanded list of custodians and dates, you are now asking that the Commission run search 1 for 68 individuals for 6 months and search 2 for 73 individuals for a full year, as well as rerunning search 2 for 9 1/2 months for the 9 individuals originally searched.  Conservatively, this would require well over 1,000 person-hours of search, review, and production work.  We do not believe that there is a benefit to justify this enormous burden.

Ex. A.  Nonetheless, as before, the SEC offered to go "back to the well for some limited, additional searches, even though we do not believe there is a benefit to justify any additional burden, but we will not agree to go back to search for more innocuous e-mails from dozens of additional custodians."  *Id*.

Instead, Defendants proposed that the SEC expand both the individuals and the dates the SEC should search.  Their June 26, 2013 letter requested that the SEC:

---

[4] Exhibits referred to herein, other than exhibits cited as "Exhibits Ex. __ to Motion to Compel" are exhibits to the Declaration of Stephen McKenna, filed herewith.

- run Search 1 on 14 newly identified individuals for a 12 month period;
- run Search 1 on the originally identified 10 individuals for a further 6 month period;
- run Search 1 on another newly named individual (Commissioner Aguilar) for a six month period;
- run Search 2 on 7 newly identified individuals for a 6 month period;
- run Search 2 on the originally identified 9 individuals for a further 3 and one half month period; and
- identify "any members of task forces or working groups assembled to address, study, or deal with the financial crisis. [5]

*See* Exs. L and M to Motion to Compel. As the SEC explained, Defendants "new request would impose a burden of approximately 3.7 times [the SEC's] initial effort, or, conservatively, over 700 hours of effort, along with related expenses." Ex. M to Motion to Compel.[6] This enormous effort is not justified.

## III.    ARGUMENT

### A.    Legal Standard

The scope of discovery under Rule 26 is broad. "'A district court, however, is not 'required to permit [a party] to engage in a 'fishing expedition' in the hope of supporting his claim.'" *Cabot v. Wal-Mart Stores, Inc.*, No. Civ. 11-0260, 2012 WL 592874, *8 (D.N.M. Feb. 16, 2012) (Browning, J.), quoting *McGee v. Hayes*, 43 F. App'x 214, 217 (10th Cir. 2002). "[C]ourts do and should, remain concerned about 'fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests.'" *Id*. (internal citations quotation marks omitted.). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Id*.; s*ee*

---

[5] This last request is not a subject of the motion to compel, but it shows the never-ending nature of Defendants' demands. Presumably if the SEC were able to identify such members, Defendants would demand it search for their documents.

[6] 3.7 times the initial 165 hour effort is 610.5 hours.

*also Hartznett v. Papa John's Pizza, Inc.*, No. CIV 10-1105, 2012 WL 3860739, *5 (D.N.M.

Aug. 28, 2012) (Browning, J.).  Federal Rule of Civil Procedure 26(b)(2)(C) provides that:

> the court must limit the frequency or extent of discovery otherwise allowed by
> these rules or by local rule if it determines that:
>
> > (i) the discovery sought is unreasonably cumulative or duplicative, or can
> > be obtained from some other source that is more convenient, less
> > burdensome, or less expensive;
> >
> > (ii) the party seeking discovery has had ample opportunity to obtain the
> > information by discovery in the action; or
> >
> > (iii) the burden or expense of the proposed discovery outweighs its likely
> > benefit, considering the needs of the case, the amount in controversy, the
> > parties' resources, the importance of the issues at stake in the action, and
> > the importance of the discovery in resolving the issues.

The cases cited by Defendants are not to the contrary and, in fact, support limiting

marginally relevant and unduly burdensome discovery.  In *Treppel v. Biovail Corp.*, plaintiff was

suing for defamation.  233 F.R.D. 363, 375 (S.D.N.Y. 2006).  The court found "highly relevant"

and ordered production of documents reflecting the steps defendants took to obtain plaintiff's

stock trading records because those records could show that defendant knew that its allegedly

defamatory statements about plaintiff's stock holdings and conflict of interest were false.  *Id*. at

375-76.  The *Treppel* Court, however, denied plaintiff's request to compel documents related to a

dismissed claim as irrelevant and also denied his request to compel the production of all

documents reviewed in preparing defendant's answer to the complaint as "both overbroad and

duplicative."  *Id*. at 376.

In *Walker v. THI of New Mexico at Hobbs Center*, this Court ordered defendant to

produce various documents directly related to plaintiff's wrongful termination claim.  No. CIV

09-0060, 2010 WL 552661, *8-13 (D.N.M. Feb. 8, 2010) (Browning, J.).  The documents

8

ordered produced were, *e.g.* requests for information about defendant's various corporate relationships (*id*.,*9); documents identifying plaintiff's supervisors and human-resources staff with responsibility over her, as well as those individuals' employer(s) (*id*.); and documents showing the performance goals defendant set for plaintiff during her employment (*id*., *12). The Court, however, stated that defendant was not required to produce "all documents," only "some." *Id*., *9.

> The Court does not believe that THI of Hobbs has to produce all documents that exist which identify Walker's supervisors, human-resources staff, or corporate employers of the relevant employees, but the Court orders that THI of Hobbs must produce some documents, if they have possession, custody, or control of them, which are responsive to Request for Production No. 2.

*Finkelstein v. District of Columbia*, Civ. A. No. 85-2616, 1987 WL 14976 (D.D.C.) also involved documents directly related to the claims at issue; as well as a much lighter discovery burden on the producing party. In *Finkelstein*, plaintiff, the administrator of a deceased prisoner's estate, brought claims for wrongful death and medical malpractice, among others. *Finkelstein*, 1987 WL 14976, *1. Plaintiff asked the Court to compel defendants to produce all of the forms and log books used by the Department of Corrections, which defendants were refusing to produce because they had produced all of the deceased prisoner's records and all of the log books used by the Mental Health Unit that had housed him. *Id*. at *6. The Court ordered production of all forms used by Mental Health Unit, but with respect to the broader request for all forms used by the Department of Corrections, the Court denied the motion to compel because the forms were "neither relevant to this lawsuit nor reasonably likely to lead to admissible evidence." *Id*.

*S2 Automation LLC v. Micron Tech, Inc.*, No. CIV 11-0884, 2012 WL 3656454 (D.N.M.

Aug. 9, 2012) (Browning, J.) is another decision by this Court wherein it ordered the production

of directly relevant documents, but limited the production to reduce the burden in responding.

The documents were directly relevant because they reflected payments that plaintiff had received

for its allegedly converted inventory that would eliminate or offset damages. *S2 Automation*

*LLC*, 2021 WL 3656454, *35. Nonetheless the Court limited the required production, stating:

"[l]imiting production in this manner will reduce S2 Automation's burden in responding." *Id*.

The documents Defendants seek are significantly less relevant than those sought by Micron, and

the burden of complying with the requests is great, justifying limiting the required production to

the significant volume of 18,746 pages already produced in response to the requests.

**B.      The Documents Sought Are NOT "Directly Relevant" to the Defense of this Action.**

Defendants claim that their document requests seek evidence "directly relevant to the

defense of this action." Motion to Compel at 8. This argument, however, mischaracterizes the

SEC's allegations and exaggerates the significance of the documents Defendants seek. The

documents sought are obviously not so critical to Defendants' defenses that they were necessary

to fill out the factual record before Defendants moved for summary judgment. *See* doc. 201,

206.

**1.      Accounting Principles**

**a.      OTTI**

With respect to document requests 1 and 2 - concerning SEC employee statements about

OTTI accounting - Defendants' relevance argument hinges on the premise that the SEC is

claiming that OTTI accounting principles are "clear" and easily applied. Motion to Compel at

8. That is not the case. What the SEC alleges in its Complaint is that Starrett, in telling

Goldstone and Simmons that "selling some assets calls into question our intent and having to sell them to meet margin calls or reduce exposure, calls into question our ability to hold them" (Complaint ¶ 54), was providing "clear accounting guidance."

> Based on clear accounting guidance that Starrett provided to Goldstone and Simmons, the Defendants also knew, or were reckless in not knowing, that, under these circumstances, the company was required to recognize an impairment in excess of $400 million for these assets on its income statement, and that such impairment would have resulted in a loss, rather than a profit, for the fourth quarter of 2007.

(Complaint ¶ 12).

The relevant inquiry is whether Defendants were at least reckless in determining that, given the facts and circumstances applicable to Thornburg in February of 2008, it had the intent and ability to hold its impaired Purchased ARM Securities until they recovered their value. Defendants argue that they have obtained just such evidence on this point. But, a letter to the SEC from an investment bank asking the SEC to issue "guidance confirming that entities may employ other valuation techniques as a supplement to or substitute for market prices to determine fair values for assets" and "guidance confirming that entities may take into account current extraordinary circumstances in determining whether an impairment is other than temporary" is not directly relevant to Defendants' OTTI analysis. *See* Ex. I.  It is at best tangentially relevant, and, as discussed below, clearly cumulative of other evidence available to Defendants on this issue.

### b. Subsequent Events and Going Concern

It is even less clear how any random, unrelated statements SEC employees may have made about Type I or II subsequent events or going concern analysis are relevant to Defendants'

11

defense.  Contrary to Defendants' undisputed contention that OTTI analysis under GAAP can be complex, Defendants do not point to any SEC statements on these topics that support their contentions.  This exposes the "fishing expedition" nature of their requests.

Because KPMG partner John Taylor may have considered the post-filing margin calls made by Thornburg's lenders "Type I" subsequent event – in the absence of several key facts withheld by Defendants – it does not follow that generic SEC staff comments on subsequent events are important.  Taylor's statement does not impute relevance to SEC staff statements. Nor have Defendants demonstrated how any SEC staff statements about going concern analysis would bolster their claims.

### 2.    The Peloton Blow Up

Defendants' document request nos. 4 and 5 seek SEC documents about the Peloton hedge fund.  But what the SEC may or may not have known about Peloton's collapse is not relevant; what matters is what Goldstone and Simmons knew and the impact they expected Peloton's collapse to have on Thornburg Mortgage.  Goldstone wrote Simmons that he should know that a large "hedge fund in Europe is blowing up this afternoon" and that he expected Thornburg to get "hit with 20 point haircuts."  Ex. B.  Goldstone's and Simmons's knowledge and expectations are at issue, not the SEC's.  There is absolutely no evidence that Goldstone or Simmons had any information about what the SEC thought about Peloton, or would have cared if they did.  Thus, even if, as Defendants speculate, the documents sought were to demonstrate that the SEC did not believe Peloton's collapse would have any impact on Thornburg Mortgage, it would not be relevant to their state of mind.[7]

---

[7] The speculative nature of Defendants' fishing expedition is evident from their own motion

### 3. SEC Staff Statements Regarding Market Disruption in 2008

The SEC's failure to foresee the extent of the 2008 financial crisis is also not directly relevant to the claims at issue. It is Defendants' knowledge and scienter that is at issue, not the SEC's knowledge. There is no evidence that Defendants had any awareness of what the SEC was saying about market disruptions. Thus, while Defendants' awareness of what was happening in the markets Thornburg operated in could be directly relevant, SEC statements about those markets are not. Such statements, at best, merely provide an avenue for Defendants to attempt to embarrass the SEC about its failure to predict the extent of the credit crisis. *See* Ex. C at 42:19-21 (Court: "There is no doubt that [Defendants are] seeking some statements to embarrass the SEC and to play games at trial by saying, you've got commissioners saying this and that …."). Additional e-mails to this effect are not important evidence for Defendants justifying additional document searches, especially where they already have ample evidence to make their point.[8]

Defendants argue that "the Complaint effectively alleges that the Defendants' should have anticipated and considered as part of the OTTI analysis the 'wave of margin calls' received by Thornburg in the days after the 2007 Form 10-K was filed." Motion to Compel at 14. This is not true. The Complaint alleges that Defendants misled their auditors and based upon what Defendants knew at the time the Form 10-K was filed, their failure to recognize the $428 million

---

wherein they argue that "[s]uch document *could* demonstrate, for example, that the SEC was not aware of the rumor, that it did not view the rumor as credible, that it did not view the rumor as relevant to the U.S. financial markets, and/or that it was aware that the rumored collapse might be averted because of a buyout." Motion to Compel at 13 (emphasis added).

[8] The SEC recognizes that the Court stated that using SEC statements about not foreseeing the financial crisis to embarrass the SEC at trial is "fair game," however that use does not justify the additional burden entailed by the production of documents Defendants seek to compel.

in losses on Thornburg's Purchased ARM Assets was fraudulent.  *See, e.g.,* Complaint ¶ 51:

> Notwithstanding Thornburg's precarious financial condition, violation of lending
> agreements and reliance on its lenders' forbearance, and use of the I/O Strip
> Transactions to make late margin call payments during the two weeks leading to
> the filing of the company's Form 10-K, information that was critical to a proper
> OTTI analysis and should have led the Defendants to conclude that the losses
> associated with Thornburg's ARM Securities were other than temporary and
> needed to be recognized on the company's income statement, Goldstone,
> Simmons, and Starrett failed to properly consider this information in connection
> with their OTTI analysis of Thornburg's ARM Securities and misrepresented
> and/or failed to disclose this information to Thornburg's outside auditor.

Defendants' continued attempt to mischaracterize the SEC's allegations as "fraud by
hindsight" should not be permitted to falsely elevate the relevance of what are at best marginally
relevant SEC comments.  The Court, in its ruling on Defendants' Motions to Dismiss,
acknowledged that the SEC's allegations were based on what Defendants knew when they filed
the Form 10-K, not what happened afterwards.  Op. on MTD at *157 (finding that "[a]lthough
the OTTI analysis involves judgment, the Defendants' use of judgment is based upon objective
factors" including "margin calls received beginning in August 2007, Thornburg Mortgage's need
to sell assets at a loss to meet those margin calls, Thornburg Mortgage's current inability to
immediately meet margin calls, its reduced liquidity because of the I/O Strip Transactions, and
Goldstone and Simmons' knowledge of a collapsing European hedge fund").

## C.    The Additional Documents Sought Are Either Unreasonably Cumulative or Do Not Exist.

"[T]he court must limit the frequency or extent of discovery otherwise allowed ... if it
determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be
obtained from some other source that is more convenient, less burdensome, or less expensive; (ii)
the party seeking discovery had ample opportunity to obtain the information by discovery in the

14

action; ....” Fed. R. Civ. P. 26(b)(2)(C).

1.      **Requests 1, 2, 6, and 7 Are Unreasonably Cumulative and Duplicative of Abundant Evidence Readily Available to Defendants.**

Defendants’ Motion to Compel cites to no less than seven sources for the uncontroverted

contention that OTTI analysis under GAAP can be complex:

- Ex. I - Sandler O'Neill + Partners letter
- Ex. P - SEC Release Nos. 33-8941; 34-58097 “Roundtable on Fair Value Accounting Standards”
- Ex. Q - SEC Release Nos. 33-8980; 34-58813 “Roundtable on Mark-to-Market Accounting”
- Ex. R - SEC Press Release announcing “November 21, 2008 Roundtable on Mark-to-Market Accounting”
- Ex. S - SEC Press Release “SEC Office of the Chief Accountant and FASB Staff Clarifications on Fair Value Accounting”
- Ex. T – “Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-To-Market Accounting"
- Ex. U - FASB Staff Position “Recognition and Presentation of Other-Than-Temporary Impairments”

Motion to Compel at 8, 9.

Defendants’ Motion to Compel itself even acknowledges that this request is seeking

cumulative evidence:  “The purpose of Requests 1 and 2 is to obtain *further* evidence relevant to

the SEC’s OTTI accounting fraud claim.”  Motion to Compel at 9.  Similarly, there is no dispute

or lack of evidence relevant to Requests 6 and 7 seeking to “establish that the significant

disruption in the markets for credit, MBS, and repo lending that occurred shortly after the filing

of Thornburg’s Form 10-K was an unforeseeable event that the SEC itself failed to

anticipate.”  *Id*. at 13.  The Defendants already have two public statements from the former SEC

Chairman to support their claim.  *See* Exs. DD and EE to Motion to Compel.  There is also no

shortage of public commentary and literature to this effect.  *See, e.g.,* McLean and Nocera, All

15

the Devils Are Here, The Hidden History of the Financial Crisis (Penguin 2010).  The Court,

having no doubt followed the financial crisis, can take judicial notice of its unforeseen nature.

The SEC even offered to stipulate to this contention.  Thus Defendants have no need for

"[d]ocuments that *further* demonstrate that neither the SEC nor members of the business

community anticipated the market failures that caused mortgage companies like Thornburg to

falter in 2008 and 2009."  *See* Motion to Compel at 14 (emphasis added).[9]  Defendants continued

pressure for such unnecessary and burdensome discovery demonstrates the harassing nature of

their requests.  More cumulative evidence of uncontroverted propositions is unnecessary and

properly limited under Rule 26.

### 2. There is No Evidence that the SEC had Advance Notice that the Peloton Hedge Fund in Europe Was Blowing Up.

Defendants' speculative search for documents demonstrating that the SEC had advance

knowledge about Peloton's collapse is belied by the SECs earlier production.  That production of

over 18,000 pages included 39 documents containing the word "Peloton."  McKenna Decl. at

¶ 6.  None of those documents show that the SEC knew anything "regarding the potential

collapse of Peloton."  Motion to Compel at 13.  They are all dated February 28, 2008 or later –

after Goldstone's e-mail to Simmons and Thornburg Mortgage's Form 10-K was filed – and they

all, like Exhibit II, merely reflect public press accounts about Peloton's collapse.  McKenna

Decl. at ¶ 6.  There is absolutely no evidence that expanding the search will yield any different

results.

---

[9] *See also* Motion to Compel at 10 ("Requests 1 and 2 are also designed to develop *additional* evidence supporting the reasonableness of Defendants' (and KPMG's) conclusion that sudden disruptions  in the Alt-A market ...." (Emphasis added).

### 3. The 30(b)(6) Deposition the Court Ordered the SEC to Give Adds to the Cumulative Nature of the Requests.

On July 9, 2013, the parties were before the Court for a hearing on the SEC's Motion for a Protective Order To Quash Defendants' Notice of 30(b)(6) Deposition [Doc. 163], among other things. At that hearing, the Court denied the SEC's Motion and ordered it to poll numerous Commission employees in numerous divisions about these and other topics. In compliance with those instructions, the SEC has made inquiry of: 47 employees in the Division of Corporate Finance; 32 employees in the Division of Trading and Markets; 17 employees in the offices of the various commissioners; 6 employees in the Division of Enforcement, Office of Chief Accountant; 19 employees in the Division of Investment Management; and 8 employees in the Office of the Chief Accountant. McKenna Decl. at ¶ 9. It is presently compiling responses to those inquiries in order to prepare a 30(b)(6) witness. This forthcoming testimony, along with the previously produced documents, adds to the unduly cumulative and duplicative nature of Defendants' requests.[10]

### D. The Additional Efforts Defendants Request Would Be Several Times More Expensive and Time Consuming than the Original Efforts and Thus, Unduly Burdensome.

The SEC has produced over 2.5 million pages to Defendants. In its initial production in response to the document requests at issue the SEC ran a first set of search terms on the e-mails of ten individuals over a six month period and a second set of search terms on the e-mail of nine individuals over a two and a half month period. McKenna Decl. at ¶ 7. This resulted in a data set of 6,286 e-mails and attachments, totaling over 70,000 pages. *Id*. The SEC spent

---

[10] The SEC does not need to spend over 600 hours producing duplicative documents to "help the SEC in its preparation for the Rule 30(b)(6) deposition." *See* Motion to Compel at 17.

approximately 165 hours searching for, reviewing and producing non-privileged materials

containing the search terms.  *Id*.

Defendants now request that the SEC:

- run Search 1 on 14 newly identified individuals for a 12 month period;
- run Search 1 on the originally identified 10 individuals for a further 6 month period;
- run Search 1 on another newly named individual (Commissioner Aguilar) for a six month period;
- run Search 2 on 7 newly identified individuals for a 6 month period;
- run Search 2 on the originally identified 9 individuals for a further 3 and one half month period; and
- identify "any members of task forces or working groups assembled to address, study, or deal with the financial crisis." [11]

Based upon its initial search efforts, the SEC estimates that compliance with Defendants' further

request would require 3.72 times their initial effort, or approximately 614 additional hours.  *Id*. at

¶ 8.  The SEC also ran sample searches and extrapolated that running the additional searches

would result in approximately 12,000 e-mails that would need to be loaded onto Concordance,

reviewed for responsiveness and privilege, and then processed for production.  *Id*.  Running the

searches would take approximately 41 hours and the hard costs of loading onto Concordance and

processing would be approximately $10,000.  *Id*.  This would be a significant strain on limited

SEC resources and an unreasonable burden under the circumstances.

**E.**     **This Extraordinary Burden Is Not Justified By the Marginal Relevance of the Documents Uncovered in the Previous Search.**

Defendants cite to five documents from the SEC's initial production as "highly

probative."  Motion to Compel at 15.  An examination of those documents shows that they are

---

[11] This last request is not a subject of the motion to compel, but it shows the never-ending nature of Defendants' demands.  Presumably if the SEC were able to identify such members, Defendants would demand that it search for their documents as well.

not.  The first three documents Defendants list are two letters and an e-mail from third parties to

the SEC that refer to accounting standards that include OTTI analysis.  *See* Exs. I, FF, and GG to

Motion to Compel.  Assuming for the sake of argument that these documents show that Sandler

O'Neill + Partners, SunTrust Bank, and Bloomberg found OTTI accounting analysis to be

incredibly complex and told the SEC as much, how is this "highly probative."  That third parties

may have found accounting for OTTI under GAAP to be challenging during the financial crisis

of 2008 does not prove or disprove whether Defendants conducted their accounting analysis

fraudulently.  That determination depends on what Defendants knew and did.  Likewise a survey

response circulated at a Financial Accounting Standards Advisory Council meeting prioritizing

the elimination of challenges associated with identifying OTTI is not highly probative.  At best,

these documents show that the SEC was aware that some third parties found the analysis

challenging, an uncontroverted and well documented fact.

The March 3, 2008 e-mails amongst SEC staffers circulating a March 1, 2008 Wall

Street Journal article noting the collapse of Peloton is not probative at all.  The article notes that

Peloton had collapsed; "lenders have seized assets" and "Peloton is shutting down the fund."  Ex.

II.  That SEC staffers found the collapse of a European hedge fund noteworthy does not indicate

that they knew anything about the collapse before it occurred.  And even if the SEC could be

said to have "monitored press accounts regarding the dissolution of Peloton" based on this e-

mail, which is a stretch, that does not in any way show "that the SEC was not aware of the

rumor, that it did not view the rumor as credible, that it did not view the rumor as relevant to the

U.S. financial markets, and/or that it was aware that the rumored collapse might be averted

because of a buyout."  *See* Motion to Compel at 13, 15.  The documents cited by Defendants in

19

their Motion to Compel thus only demonstrate that their request to compel additional burdensome document production is not justified.

## F.     Defendants' Expanded Date Ranges Are Unjustified and Unduly Burdensome.

Defendants propose that the time period for the first set of search terms be expanded from six months to a year.  That expansion not only would require the SEC to search the 14 newly identified individuals for twice as long as it searched the previous set, it would also require it to go back and search the original 10 custodians (and one more) for another six month period.  The purported justification for this additional effort is found in footnote 3:  "to capture documents regarding the SEC's Mark-to-Market Report, which was issued on December 30, 3008.  Motion to Compel at 5, n. 3.  Defendants have the final report and thus have an SEC report that "discussed in detail the complexities of a need for modifications to the OTTI accounting guidance."  *Id*.  Defendants' Motion to Compel does not explain why additional, non-privileged e-mails discussing that report are necessary.

Defendants also propose expanding the time period for the second set of search terms from two and a half months to six months.  This expansion would not only require the SEC to search for e-mails of the seven newly identified custodians for over twice the date range they searched the original custodians, it would also have to re-search the original nine custodians for a further three and a half month period.  The purported justification for this expansion is found in footnote 4: "to capture e-mails sent as the financial crisis began to build through mid-2008."  *Id*., n. 4.  This cursory justification for a known and undisputed event is insufficient for the additional burden it would entail.

## IV.    CONCLUSION

For all of these reasons, Defendants' Motion to Compel should be denied.


Dated:  September 6, 2013

/s/ Stephen C. McKenna
Stephen C. McKenna
Gregory A. Kasper
Dugan Bliss
*Attorneys for Plaintiff*
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202
Ph. (303) 844-1000
email: mckennas@sec.gov
        kasperg@sec.gov
        blissd@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2013, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system that will send notification of such filing to all counsel of record.

Michael Hoses
Assistant United States Attorney
P.O. Box 607
Albuquerque, NM
87103 (505) 346-7274
E-mail: Michael.hoses@usdoj.gov
*Local Counsel for Plaintiff Securities and Exchange Commission*

Alanna G. Buchanan
(alanna.buchanan@wilmerhale.com) Joel Fleming
(joel.fleming@wilmerhale.com)
Chris Johnstone
(chris.johnstone@wilmerhale.com) Wilmer
Cutler Pickering Hale and Dorr LLP
950 Page Mill Road
Palo Alto, CA 94304
Phone: (650) 858-6000
Fax: 650-858-6100

Randall R. Lee (Randall.lee@wilmerhale.com)
Jessica F. Kurzban
(Jessica.kurzban@wilmerhale.com)
Wilmer Cutler Pickering Hale and Dorr LLP
350 S. Grand Avenue, Suite 2100
Los Angeles, CA 90071
Phone: (213) 443-5360

John A. Valentine (john.valentine@wilmerhale.com)
Lauren R. Yates (lauren.yates@wilmerhale.com)
Michael A. Lamson
(michael.lamson@wilmerhale.com) Wilmer Cutler
Pickering Hale and Dorr LLP
1875 Pennsylvania Ave.,
NW Washington, DC
20006
Phone:  (202) 663-6131
Fax:  (202) 663-6363

*Attorneys for Defendant Larry Goldstone and Clarence Simmons, III*

22

Andrew G. Schultz (aschultz@rodey.com)
Bruce D. Hall (bhall@rodey.com)
Melanie B. Stambaugh (mstambaugh@rodey.com)
Rodey, Dickason, Sloan, Akin & Robb, P.A.
201 3rd Street NW, Suite 2200
P.O. Box 1888
Albuquerque, NM 87102
*Attorneys for Defendants Larry Goldstone, Jane E. Starrett and Clarence Simmons, III*

Jerry L. Marks (jmarks@milbank.com)
Alisa Schlesinger (aschlesinger@milbank.com)
Elena Kilberg (ekilberg@milbank.com)
Robert J. Liubicic (rliubicic@milbank.com)
Paul M. Torres
Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017
Phone (213) 892-4000
Fax: (213) 892-5063

Thomas Arena (tarena@milbank.com)
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
Phone: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Defendant Jane Starrett*

/s/ Marla Pinkston
Marla Pinkston