JB77SEC1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   SECURITIES AND EXCHANGE COMMISSION

4                    Plaintiff,

5            v.                              18 Civ. 8175 (ER)

6   BARRY C. HONIG, et al.,

7                    Defendants.

8   ------------------------------------x
                                          New York, N.Y.
9                                         November 7, 2019
                                          4:45 p.m.
10
    Before:
11
                        HON. EDGARDO RAMOS
12
                                          District Judge
13
                            APPEARANCES
14
    NANCY BROWN
15  JACK KAUFMAN
         Attorneys for Plaintiff SEC
16
    RICHARD & RICHARD P.A.
17       Attorneys for Defendants Michael Brauser and Grader
         Holdings, Inc.
18  BY:  DENNIS RICHARD

19  COOLEY LLP
         Attorneys for Defendant Robert Ladd
20  BY:  RANDALL LEE
         MICHAEL BERKOVITZ
21
    WILMER CUTLER PICKERING HALE & DORR LLP
22       Attorneys for Defendant Robert Ladd
    BY:  CHRIS JOHNSTONE
23

24

25

JB77SEC1

1          (In open court)

2          THE COURT:  Good afternoon everyone.  Please be

3     seated.

4          (Case called)

5          MS. BROWN:  Good afternoon, your Honor.  Nancy Brown

6     and Jack Kaufman for the plaintiff.

7          THE COURT:  Good afternoon.

8          MR. RICHARD:  Dennis Richard for the defendants

9     Michael Brauser and Grander Holdings.

10          MR. LEE:  Good afternoon, your Honor. Randall Lee and

11     Michael Berkovitz from Cooley for defendant Mr. Ladd.

12          MR. JOHNSTONE:  Good afternoon, your Honor.  Chris

13     Johnstone of WilmerHale for the defendant Mr. Ladd.

14          THE COURT:  And good afternoon to you all.  So, this

15     matter is on for premotion conferences.  There are a couple of

16     requests from Mr. Ladd and one from Mr. Brauser.  So, let me

17     begin with counsel for Mr. Ladd, Mr. Lee.

18          MR. LEE:  Thank you, your Honor.  There are

19     essentially two major categories of discovery requests at issue

20     here.  The first is SEC e-mails and documents, which I will

21     address; and the second are F.B.I. 302s, which Mr. Johnstone

22     will address.

23          So, on the first sort of category -- and I will go

24     through the buckets, the first category of requests -- I would

25     like to briefly address the regulatory background underlying

JB77SEC1

1   the purpose for the request, because I think the regulatory

2   background illustrates the relevance and the importance of the

3   particular requests that we've made.

4           The essence of the SEC's case against Mr. Ladd and

5   others arises from Section 13(d) of the Securities and Exchange

6   Act of 1934, which was adopted as part of the Williams Act,

7   which was essentially designed to put issuers and market

8   participants on notice of potential take-over attempts.

9           There is a section in Section 13, Section 13(d), which

10  requires any "person" who acquires more than five percent of a

11  class of equity securities to file a form known as a schedule

12  13(d) upon the acquisition of such ownership.  That

13  requirement, as the language makes clear, applies to any

14  person.  Section 13(d) then provides:  When two or more persons

15  act as a partnership, limited partnership, syndicate or other

16  group, for the purpose of acquiring, holding or disposing of

17  securities of an issuer, such syndicate or group shall be

18  deemed a person.

19          And then there is a rule promulgated under Section

20  13(d), Exchange Act Rule 13(d)(3), which includes a number of

21  provisions that define when a beneficial owner of a security,

22  who that beneficial owner is for purposes of the 13(d)

23  disclosure requirements.

24          So, for example, Rule 13(d)(3) specifies:  When two or

25  more persons agree to act together for the purpose of

JB77SEC1

acquiring, holding, voting, or disposing of equity securities

of an issuer, the group formed thereby shall be deemed to have

acquired beneficial ownership of the securities of all the

members of that group.

13(d)(3) also goes on to provide, however:  That a

group shall be deemed not to have acquired any equity

securities owned by other members of the group solely by virtue

of concerted actions relating to the purchase of equity

securities directly from an issuer, provided that certain

conditions are met.

The essence of the SEC's claim here as to one sort of

big chunk of their complaint is that certain of the defendants

led by defendant Barry Honig constituted a group as that term

is defined in Section 13(d), that those investors -- Mr. Honig

and others -- should have filed a schedule 13(d) disclosing

their aggregate holdings as a group, and that our client, Mr.

Ladd and MGT Capital -- the company of which he was CEO -- knew

or were reckless in not knowing that Mr. Honig and the other

defendants were a group and that they should have identified

them as such in their securities filings.

And the definition of a group is particularly

important or critical here because Barry Honig -- who has been

described by the SEC as really the orchestrator of the series

of fraudulent schemes that are alleged in the complaint --

Barry Honig did disclose that he was more than a five percent

JB77SEC1

1  shareholder.  So, the SEC's theory is that he and others should

2  have together disclosed an even greater percentage of share

3  ownership than the five percent that Mr. Honig already

4  disclosed.

5          So, really the reason for our request -- and the

6  regulatory and statutory scheme should make clear -- the law is

7  extremely complicated, it's ambiguous.

8          THE COURT:  Any case law?

9          MR. LEE:  There is case law on it.  So, the SEC has

10  promulgated virtually no guidance -- essentially we are been

11  able to find -- on how you define a group.  There is case law

12  on it; the case law is mixed.  The case law varies.

13          THE COURT:  What's the case law in this Circuit?  Is

14  it mixed in this Circuit?

15          MR. LEE:  The case law looks essentially at an inquiry

16  as to whether the alleged or purported members of the group

17  formed an agreement to vote, dispose of, and so on, their

18  shares, and it turns into a highly fact-specific analysis.  But

19  for an issuer of securities like MGT, what the SEC has not

20  explained -- and what the case law we have not been able to

21  find guidance on -- say absolutely nothing about what the level

22  of due diligence an issuer is supposed to conduct about its own

23  investments.

24          So, for example, is it sufficient for an issuer to

25  rely on representations from its investors if hypothetically

JB77SEC1

Mr. Honig had informed MGT that he was not part of a group, was

MGT required to look beyond that representation and do its own

due diligence to get behind his representations in the

application of the group?  There is no guidance on that from

the SEC, and there is very little case law on that issue as to

whether an issuer is required to look at and do due diligence

at a composition of a group of investors in that issuer.

THE COURT:  Let me ask it this way:  Are there cases

within the Second Circuit or the Southern District that address

the issue that you are talking about?

MR. LEE:  There may be.  Not that I'm immediately

aware of.

THE COURT:  There may be, and so there may be some

dispositive case out there that I would have to follow, and

would that take of this entire issue?

MR. LEE:  I would submit that is not the case, because

it's a fact that -- the case law is clear, it's a highly

fact-specific as to whether an agreement was formed.  And

that's the essence of sort of the group principle, that

investors who invest side by side with one another, the

presence of a lead investor, investors who share ideas,

investors who say, hey, what are you investing in, that sounds

look a great investment, I would like to do the same thing,

that is not a group.  A group requires a specific agreement to

vote together, to dispose of shares together, to buy shares

JB77SEC1

1    together.

2                  THE COURT:  So let me ask this:  As I understand it,

3    what you are looking for are statements of individual SEC

4    high-level employees or SEC commissioners concerning that

5    issue, correct?

6                  MR. LEE:  We're looking for essentially three

7    categories.  Number one is we're asking the SEC to prepare a

8    privilege log of internal communications concerning the SEC's

9    application and interpretation of the group rules.  The SEC has

10   declined to produce a privilege log.  They have objected on

11   grounds of relevance; they have objected on grounds of burden.

12                 As to relevance, it's plainly relevant to recklessness

13   and scienter; it's relevant to whether the defendants have a

14   fair notice defense; and it's relevant to injunctive relief.

15                 As to burden, we as recently as yesterday proposed to

16   the SEC a narrowing of search terms in order to try to generate

17   a more manageable number.  The SEC has claimed that the search

18   terms we initially discussed yielded 26,000 e-mails, all of

19   which were ostensibly covered by one single entry in that

20   privilege log.  The SEC said that's too burdensome.  We then

21   had a discussion with them a couple days ago about a proposal

22   to narrow that, under which proposal if the search term hits

23   were reasonable in number, the SEC would prepare a

24   document-by-document privilege log, which would then give us

25   the ability to challenge the privilege assertions.

JB77SEC1

1          THE COURT:  OK.

2          MR. LEE:  We made a proposal to the SEC yesterday, and

3     we have not heard back from them on a set of search terms.

4          THE COURT:  Ms. Brown?

5          MS. BROWN:  Your Honor, I actually thought this issue,

6     the latter one we're talking about about the e-mails and the

7     privilege log, was still under discussion with defendants, so

8     I'm prepared to discuss it with them.

9          THE COURT:  Great.  So, I don't have to engage in this

10    discussion any further.  Next issue.

11          You should still meet and confer concerning that

12    issue, and if you don't agree, then you can come back.

13          MR. LEE:  OK.

14          THE COURT:  Okay?

15          MR. LEE:  OK.  Next issue was a privilege log of

16    internal communications within the SEC's Division of Corporate

17    Finance -- which is the division that reviews public company

18    filings -- concerning MGT, the very company at issue here.  We

19    asked the SEC -- the SEC has again objected to the notion of

20    preparing a document-by-document privilege log.  In the last

21    meet and confer we had with them we asked them, well, how many

22    hits are there; is it unduly burdensome?

23          THE COURT:  So, what you want is documents concerning

24    internal communications within Corp Fin of MGT.

25          MR. LEE:  About MGT's filings during the relevant time

JB77SEC1

1    period.

2                THE COURT:  Ms. Brown?

3                MS. BROWN:  Yes, your Honor.  I also thought that was

4    the subject of further discussion.  But I will say that we also

5    objected on the grounds of relevance, and it was only yesterday

6    or the day before -- I may have the days wrong -- in which the

7    defendant Mr. Ladd offered the relevance ground that it again

8    was all about the uncertainty within the Commission about the

9    definition of group under 13(d).

10               So, now that I have that representation, we can come

11   with search terms related to that narrowed subsection, but

12   originally it was about all Corp Fin's internal e-mails about

13   MGT's filings.  And MGT's filings aren't at issue here except

14   with respect to the disclosure of the group issue.

15               THE COURT:  OK.  So, it sounds like we're making great

16   progress, just meet and confer some more.

17               MR. LEE:  Well, and the other issue that would be

18   relevant, the other component of the SEC's claim, relates to

19   certain press release about a deal that MGT entered into with

20   John McAfee, the internet security guru.  So, I think that

21   would be another set of search terms as to which communications

22   within Corp Fin, if they had commented on that particular issue

23   in the course of reviewing MGT's filings, would certainly be

24   relevant.

25               THE COURT:  I'm sorry.  How is Mr. McAfee relevant to

JB77SEC1

1    this case?

2              MR. LEE:  So, the SEC has alleged that MGT made a

3    false statement in a press release -- which was filed as part

4    of a form AK -- announcing a deal that MGT had entered into

5    with John McAfee.

6              THE COURT:  The individual.

7              MR. LEE:  The individual.  And the SEC's allegation is

8    that the press release described Mr. McAfee's professional

9    background in a false and misleading planner.  And that filing

10   would have been the subject of internal review in Corp Fin, and

11   so that's another -- the group rule and then the McAfee press

12   release are the two sort of substantive issues about which we

13   would be seeking internal communications if they exist.

14             THE COURT:  Ms. Brown?

15             MS. BROWN:  That's a new one to me, your Honor.  That

16   was not raised in our call the other day.  I am having trouble

17   understanding how Corp Fin's reaction to a press release would

18   be relevant to the SEC's later claim that the press release was

19   false, unless it goes to a claim of laches or estoppel.  And

20   those are not appropriate affirmative defenses against the SEC.

21             MR. LEE:  Your Honor, it would certainly be relevant.

22   It could be.  We don't know because the SEC hasn't produced a

23   privilege log.  But if there were comment on the accuracy of

24   that press release, that could certainly be relevant to Mr.

25   Ladd's scienter.  If, for example, somebody at Corp Fin had

JB77SEC1

1    commented, hey, did John McAfee really do this and that, and

2    somebody else from Corp Fin wrote, you know, no, his background

3    is a matter of public knowledge, that would be --

4            THE COURT:  I have to say I'm having difficulty

5    following the relevance here.

6            MR. LEE:  I'm happy to break it down further, your

7    Honor.

8            THE COURT:  Take a minute to do that.

9            MR. LEE:  OK.  So the allegation in the complaint is

10   that MGT falsely stated that John McAfee had sold -- back up.

11   The backdrop is a deal that MGT and Mr. McAfee are entering

12   into.  The alleged false statement is a statement that John

13   McAfee, the visionary Internet security pioneer, sold his

14   company to Intel for $7.6 billion.  That statement was

15   inaccurate.  In truth the company that bore his name was sold

16   to Intel after Mr. McAfee had already left the company.  So

17   McAfee Associates was in fact sold to Intel for $7.6 billion.

18   Mr. McAfee the individual was no longer CEO of the company at

19   the time it was sold.  That's the essence of the SEC's false

20   statement allegation.

21           THE COURT:  I'm sorry.  Ms. Brown, how does all of

22   this fit in?

23           MS. BROWN:  I don't know, your Honor.  I mean I know

24   what the false statement is, and I know why we claim it's

25   false, and I know why we claim it's material, which is that Mr.

JB77SEC1

McAfee had left McAfee Associates many, many years prior to the
very successful sale of his company.  So, our theory is that
the press release was misstated in that way intentionally to
persuade investors that MGT would similarly have bestowed upon
it the magic of Mr. McAfee.

MR. LEE:  But the fact that Mr. McAfee had left McAfee
Associates was itself a matter of public record.  It had
already been publicly disclosed in McAfee Associates' own SEC
filings.

THE COURT:  So your defense is that it wasn't false,
and if it was inaccurate it was an innocent error?

MR. LEE:  It was certainly an innocent error.  I mean
if you read the language, we have conceded it is technically
inaccurate; he did not personally sell his company.  But, as
you say, it's an innocent error, and certainly not material,
and already had been publicly disclosed and therefore it cannot
be an actionable statement.

THE COURT:  And that is in the complaint against MGT?

MR. LEE:  That is in the complaint against Mr. Ladd.

MS. BROWN:  There is no claim against MGT, your Honor.

MR. LEE:  Against Mr. Ladd.

THE COURT:  So it's in a complaint against Ladd.

MR. LEE:  Yes, for having the signed filing that
contained that alleged false statement.

THE COURT:  OK.  So that appears to be somewhat

JB77SEC1

relevant.  Ms. Brown, why don't you give some documents about
that?

          MS. BROWN:  First of all, he is asking for internal
documents.  Corp Fin --

          THE COURT:  Well, any documents he is going to ask for
are internal documents, right?

          MS. BROWN:  For today's session, yes, I think.
Actually, no, there is a whole other area that isn't internal
documents.

          So, what Corp Fin employees said about the filing, I'm
not sure how that relates to Mr. Ladd's innocent mistake or his
intentional false statement.  If it's a matter of public
record, that's something that the defendant will prove, I'm
certain, by lots of other evidence.  I think that's the subject
of their motion to dismiss.  And I just am having trouble
understanding how Corp Fin's internal communications -- if
there are any -- about that filing have any relevance here.

          THE COURT:  Describe for me, if you will, the
relationship between Corp Fin and the Enforcement Division.  I
mean that might help me to understand why you think this is a
crazy request.

          MS. BROWN:  Sure.  So, Corp Fin is a world unto its
own.  We do communicate.  When they see things that they think
are troubling, they can make referrals to Enforcement, but
typically what they do is review mostly registration statements

JB77SEC1

1    and that kind of thing.  Their review of a case -- in fact I

2    don't even think AKs are filed with the Commission; I think

3    they're furnished to the Commission, which is a term of art

4    which does not necessarily require any review.  It is simply a

5    company making a public disclosure, and they furnish it to the

6    Commission attached to an AK.  So, I honestly sitting here

7    don't know what Corp Fin's view of what its review of those

8    are, but I suspect it's very limited.

9              Now, again, this was raised for the first time here,

10   so I'm happy to go ask somebody that question and discuss it

11   with the defendants further.

12             THE COURT:  OK.  Do Corp Fin and Enforcement talk?

13             MS. BROWN:  Yes.  As I said, if Corp Fin sees

14   something in a registration statement, for example, that they

15   think is a materially false statement for whatever reason, or

16   they feel that there is some need for enforcement to take

17   action, they can make referrals.

18             THE COURT:  And are the referrals typically

19   discoverable or turned over in discovery?

20             MS. BROWN:  No.

21             THE COURT:  Why not?

22             MS. BROWN:  It's part of our nonpublic investigative

23   process.  So until we decide to actually bring an action,

24   nothing that we do within the SEC's internal processes is

25   considered public.

JB77SEC1

1          THE COURT:  OK.  Well, why don't you find out what

2     there is and let Mr. Lee know what you can.  OK?

3          MR. LEE:  That's all we've been asking.  At this

4     stage, in this category, all we're seeking is a privilege log.

5     And we understand that the issue of whether documents logged

6     are in fact protected by privilege and is going to be an issue

7     for another day.

8          THE COURT:  OK.

9          MR. LEE:  The next category -- I mentioned there were

10     essentially three categories.  The next category of documents

11     that we moved on were statements that SEC officials have made

12     publicly or to third parties about the issue of the

13     interpretation or application of the group rules.  And the

14     SEC's response was essentially that there are no such

15     statements because any statements by an SEC official are made

16     in his or her own individual capacity; and, number two, that

17     any public statement or presentation by an SEC official is

18     publicly available on the SEC's website in any event.

19          We submit that, number one, clearly SEC officials hold

20     themselves out as speaking on behalf of the SEC.  Not all

21     public statements include the disclaimer we cited in our reply

22     brief.  A number of aspects are elements of the SEC's own

23     website which include public statements that are clearly

24     attributable to the SEC as a whole.  And then, number two, it's

25     not in fact true that all public statements by SEC officials

JB77SEC1

are posted on their website.  SEC officials speak at
conferences, they speak to industry groups, they make public
statements all the time that are not put on the SEC's website.

          THE COURT:  Let me tell you what little information I
have on this topic.  I once upon a time was a member of the
Department of Justice, not the SEC, and I spoke on any number
of panels, and I spoke at any number of ADA white collar
conferences, and at each one of those events so did several
dozen others of my DOJ colleagues, and to a person whenever we
spoke we said I'm here in my individual capacity, I do not
speak for the Department of Justice; if you want the Department
of Justice view, go to the Attorney General.

          And I imagine the way that it's been described to me
that the same is true of the various SEC statements that you're
seeking, that any individual -- and, by the way, there were
also SEC members on some of those panels, and they said the
same thing.  And so, therefore, what does it matter what a
particular SEC employee said no matter how high within the
organization, if at the beginning he or she noted I am here not
as a representative of the SEC but as someone that is perhaps
knowledgeable on these issues and I am only giving my own
views?  How is that helpful, relevant, admissible, et cetera?
I mean I can see how it's helpful, but how is it relevant or
admissible?

          MR. LEE:  Well, I have several responses.  Number one,

JB77SEC1

1    certainly the public looks to and market participants look to

2    statements of at least high-ranking officials, whether it's DOJ

3    or the SEC, for guidance.  That's why they're posted on the

4    website.  If you go to the SEC's website, it's the same as the

5    DOJ website, at least for a certain category of official, their

6    speeches are on the website, and not just for idle curiosity,

7    it's because people look to those statements for guidance, and

8    people view those statements as being made on behalf of those

9    agencies not withstanding the disclaimer.

10         THE COURT:  Guidance has a particular definition,

11   correct?

12         MR. LEE:  I beg your pardon?

13         THE COURT:  The word guidance in SEC rules has a

14   particular definition.

15         MR. LEE:  No, not necessarily.  No, guidance just

16   means if the chairman of the SEC -- who clearly is somebody to

17   whom market participants would view as, you know, representing

18   the SEC's views -- said to an industry group, you know what, we

19   know that a lot of you are confused by how to apply Section

20   13(d), that is certainly relevant to our client's scienter, to

21   recklessness.

22         THE COURT:  Right, but that type of comment at that

23   level within the SEC organization you say is on their website?

24         MR. LEE:  Some are, some are not.  It is entirely up

25   to the speaker as to whether they choose to put it on their

JB77SEC1

website.  Not all speakers and presentations are put on the
website.  I know that from firsthand experience having been at
the SEC for a number of years.  Sometimes they're on the
website, sometimes they're not.  Obviously, we can search the
website ourselves.  What we have asked the SEC to do is for a
limited number of officials who are authorized to engage in
public speaking -- and it is not a large universe of
individuals; it's individuals at a certain rank -- to search
for speeches on this topic.  It's squarely relevant to at the
very least scienter and to recklessness, because the standard
of recklessness is defined as an extreme departure from a
standard of ordinary care, and so the standard of ordinary care
would include what do industry participants view as standard
practice.

          THE COURT:  Ms. Brown?

          MS. BROWN:  So, the limited number of people that Mr.
Ladd suggests we search through, the number of e-mail
custodians at my count currently is 96, and that is
currently --

          THE COURT:  But I guess he is not interested in
e-mails.

          MS. BROWN:  Oh, no, he is, your Honor.  He is
interested -- he wants us to search the e-mails of these
individuals for public statements, which I don't know how I
would even guarantee that what is in an e-mail is something

JB77SEC1

1   that was actually delivered as a public statement or saw the

2   light of day.

3          But on the other side of that is the fact that it

4   would be extraordinarily burdensome.  That's 96 e-mail

5   custodians today.  He has asked for it actually without a date

6   limitation, but if we applied a reasonable date limitation

7   that's seven years.  I don't know how many multiples of 96 we

8   would have to search in order to capture everyone who has ever

9   held the position that he suggested we search for.

10          THE COURT:  I mean it's 96 with no date restriction.

11   If there were a date restriction it would be fewer, right?

12          MS. BROWN:  No, it's 96 today.  So, there are 96

13   officers, senior officers and division heads that he has asked

14   for, and commissioner counsel and commissioners.  That's 96.

15   Those people change, so last year it's still 96 but it could be

16   completely different individuals, and we would have to go get

17   their e-mails.  And then I don't even know that their e-mails

18   will tell us whether the statements that are contained in there

19   are actually public statements.

20          THE COURT:  Mr. Lee, that sounds burdensome to me.

21          MR. LEE:  We have not specified that the search for

22   public statements would need to include an e-mail review.

23   Certainly the SEC could reach out to -- you know, could make

24   inquiry of the relevant officials and ask them please provide

25   us copies of all speeches and public statements you made in the

JB77SEC1

1    last X number of years on the topic of Section 13(d).

2              THE COURT:  I had to do that when I went through the

3    confirmation process, find copies of all my public statements,

4    and it took me the better part of four months, and I'm just one

5    person.  I wasn't doing just that for four months, but I was

6    putting together the packet, and a lot of it was trying to

7    figure out when I spoke, where I spoke, what I said, do I have

8    notes, is there videotape of it, et cetera, et cetera.  It is

9    an incredibly burdensome process to do.  You know, there might

10   be some category of document out there that -- I don't know, I

11   suppose you could review their website as good as anyone else,

12   but I don't know how they might limit that search in a way that

13   would not be burdensome, including upon former SEC officials.

14             MR. LEE:  Again, your Honor, I think a couple things.

15   Number one, I think the vast majority of the so-called senior

16   officers -- which is the SEC's equivalent of the senior

17   executive service at the SEC -- they're going to know whether

18   they have ever given a speech on Section 13 or not.  And I am

19   fairly certain in saying that the vast majority of them have

20   never given a speech on Section 13.  So it's an easy inquiry.

21   And, number two, this inquiry is no different from the kind of

22   inquiry that people who prepare deponents for 30(b)(6)

23   depositions have to go through.  You have to make reasonable

24   inquiry.

25             THE COURT:  Yes, but when you a 30(b)(6) deposition

JB77SEC1

1    you have an individual or two that's identified as an

2    appropriate person to give testimony on that particular topic.

3         Look, I think at the end of the day even if we could

4    formulate -- and again I don't want to carry your water -- but

5    even if you were to formulate some sort of very limited search

6    or limited in terms of dates, limited in terms of individuals,

7    limited in terms of maybe even something less than 96

8    individuals, that at the end of the day that you're going to

9    get anything worthwhile, and therefore I find that that

10   request, given the nature of the case, is too broad, too

11   burdensome.

12        MR. LEE:  The last category -- before we get to

13   302s -- that we're seeking are additional searches of

14   communications with third parties by SEC officials about the

15   application or interpretation of Section 13.  This is again a

16   topic that we discussed a couple of days ago.  We made a

17   proposal.  We have not heard back from the SEC on their

18   response to our proposal as a way to narrow that search.  So

19   even after we filed our motion we continue to engage in a meet

20   and confer, but the SEC has not responded.

21        THE COURT:  OK.  Well, respond at some point.  OK.

22   What else?

23        MR. JOHNSTONE:  I can speak to the 302 issue

24   concisely.  As you heard from Mr. Lee, the SEC's case revolves

25   about Barry Honig, who the SEC says orchestrated a fraud

JB77SEC1

1    against three public companies.  As such, Mr. Honig is the

2    SEC's central witness in this case.  What is interesting is

3    that he is taking the Fifth, and thus we have no access to his

4    testimony about what happened.

5           So the parties on this issue have gone through great

6    lengths to narrow the issues, and it's not a lot of distance

7    between the two of us.  We agree with the SEC -- as they said

8    in their letter brief -- that an in camera review of its notes

9    of Mr. Honig's 302s would be an appropriate step forward.  The

10   only question is where should the Court draw the line between

11   the portions of those notes that should be produced to us and

12   those that can be withheld.

13          Our request here is very narrow, that the SEC produce

14   notes of what Mr. Honig said to the government.  And we have no

15   interest in their attorney impressions or anything, ideas about

16   what he said.

17          So, in drawing the line it's helpful to kind of step

18   back and understand why the SEC has notes of Mr. Honig's 302s

19   but doesn't have the 302s themselves.  The answer is that the

20   SEC has gone through great lengths here to keep Mr. Honig's

21   statements out of this case.  They requested review of the

22   302s.  They sat down, they reviewed them, they wrote their own

23   notes about them.  They gave the 302s back to the Department of

24   Justice and then now are withholding those notes from us.

25          But Mr. Honig's statements about what happened in this

JB77SEC1

1   case should be produced.  We're not seeking any attorney

2   impressions, but we have a substantial need for what he said

3   about what happened, and we have exhausted all other options --

4   which is an important point.  The SEC did not take any

5   testimony of Mr. --

6               THE COURT:  What have you done?

7               MR. JOHNSTONE:  First I'll say that the SEC did not

8   take investigative testimony of Mr. Honig in this case, so we

9   don't have his statements from that.  Second, we served a

10  subpoena on the Department of Justice, with whom we have met

11  and conferred, and they have refused to produce the Honig 302

12  to us.  So we have taken that big step, served the subpoena,

13  meet and conferred with federal prosecutors, and they will not

14  give it to us.

15              THE COURT:  Are there multiple 302s?

16              MR. JOHNSTONE:  There is one 302 listed in the

17  privilege log.  I would not be surprised if there are more.

18              THE COURT:  OK.  What else?

19              MR. JOHNSTONE:  Third, we have attempted to depose him

20  in this case, and we have heard from his attorney that he

21  intends to assert his Fifth Amendment rights.  So, there is no

22  other option for us to go to get his statements about what

23  happened in the case.  All we are asking for is what the SEC

24  wrote down about what he said, that's it.

25              THE COURT:  Ms. Brown?

JB77SEC1

1          MS. BROWN:  Yes, your Honor.  Mr. Honig hasn't been

2     deposed yet, so it's news to me that he plans to assert the

3     Fifth.  I did not know that.  And I'm not sure any of us know

4     that until he sits in the chair or he provides the declaration.

5     That's not to say we shouldn't discuss this issue now.

6          THE COURT:  Remind me, is he under criminal

7     investigation?  Has he been indicted?  Has he been convicted?

8          MS. BROWN:  I've seen no public record of his criminal

9     status, but he has become a cooperator.

10          THE COURT:  So he is cooperating.

11          MS. BROWN:  Yes.

12          THE COURT:  And you tell me if you -- you know more

13     about this than I do.  In such circumstances if the civil

14     related matter is not otherwise stayed, do cooperators testify

15     and give testimony, or do they ask that that deposition be

16     stayed for some period?

17          MS. BROWN:  I think it can vary with the

18     circumstances.  It depends what the status of their cooperation

19     is.  It depends upon the status of their criminal proceeding.

20     So, if they are sentenced already, they can testify.

21          So -- and I don't have any idea what he is doing to

22     cooperate, so I don't have much information to share with you.

23     All I know is he has not yet been deposed.

24          MR. JOHNSTONE:  Your Honor, Mr. Honig's attorneys have

25     represented to us that if he is deposed he will assert his

JB77SEC1

1    Fifth Amendment rights, so we know that.

2              THE COURT:  OK.  And I take it -- again this is more

3    out of curiosity -- that would not be a violation of his

4    cooperation agreement.

5              MS. BROWN:  I don't know, your Honor.  I will say so

6    that the Court is clear and so the record is clear, that our

7    notes of 302s -- which themselves as the Court knows are not

8    verbatim notes of what people say -- are highly selective

9    material.  We go in and we review the 302s, as Mr. Johnstone

10   just explained, but we don't write down everything that appears

11   in the 302, we write down what is of interest to us.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

JB7TSEC2

1          THE COURT:  Why won't you turn that over?

2          MS. BROWN:  Why wouldn't I turn it over?

3          THE COURT:  Yes.

4          MS. BROWN:  Because it's our work product.

5          MR. JOHNSTONE:  Your Honor, they represented in their

6    letter brief they would be prepared to submit it in camera.  I

7    think what would be appropriate here is for the SEC to take any

8    notes that they have taken of the Honig 302 and to highlight

9    the things that they believe should not be produced because

10   they are work product, and everything else should be produced

11   to the defense.  Mr. Honig is a significant witness in this

12   case.  If he ever testifies, we need those statements to

13   impeach him.

14         THE COURT:  If he ever testified, isn't it likely that

15   you would get those statements at some point; not now, but at

16   some point?

17         MR. JOHNSTONE:  We don't know.  We don't think we

18   would get them if we were to lose this motion.

19         Another way to put this is if the SEC were to certify

20   here today that it will not call Barry Honig and will not

21   elicit any sort of testimony from him, then we would reconsider

22   whether we need the notes at all, but we have no visibility

23   into what the SEC wants us to do, so we need his statements to

24   impeach him if he ever testifies.

25         THE COURT:  Ms. Brown, out of curiosity, in a criminal

JB7TSEC2

1      case, certainly once Mr. Honig takes the stand, the 302 gets
2      turned over, if not shortly before.  Does the same thing happen
3      in civil cases?
4                 MS. BROWN:  No.
5                 MR. JOHNSTONE:  Your Honor, it's a very interesting
6      issue.  In criminal cases you're exactly right.  Under Rule 16,
7      302s are produced to the defense, which are grist for
8      cross-examination in the regular course.  You see it here every
9      day.  The SEC has taken the position in cases across the
10     country that it does into the Brady obligation to provide
11     exculpatory material in a civil case.  This is a civil case.
12                THE COURT:  It's more in the nature of Jencks Act
13     material, not Giglio or Brady.  So the statement of any witness
14     that takes the stand, generally speaking, to the extent that
15     the notes contain the subject matter of the defendant's
16     testimony gets turned over.  Again, I don't know that the SEC
17     would have to turn over the 302s because they don't have the
18     302s, but I don't know that they would be able to withhold
19     their notes of 302s.
20                Ms. Brown, what is the typical practice, if you know?
21                MS. BROWN:  Your Honor, we have long held the position
22     that our notes of 302s are not producible.  They are our notes.
23     They are our work product.  We go to the FBI offices, we look
24     at the 302s, and we taken down non-verbatim notes of things
25     we're interested in.

JB7TSEC2

1          THE COURT:  I take it's SEC attorneys that do that?

2          MS. BROWN:  Yes.

3          THE COURT:  This is an issue upon which it might be

4   evident that I have very little knowledge about, so it would be

5   helpful to me in the first instance if the parties were to

6   submit letter briefs so that when I see the notes in camera I

7   would have a better idea as to what it is I'm supposed to be

8   doing.

9          MR. JOHNSTONE:  Your Honor, we're happy to submit a

10  letter brief on that.  We think it makes a lot of sense to

11  submit the notes in camera so you could see what you're looking

12  at.

13         THE COURT:  Ms. Brown, any objection to that?

14         MS. BROWN:  No, your Honor.

15         THE COURT:  Mr. Johnstone, correct?

16         MR. JOHNSTONE:  Yes, your Honor.

17         THE COURT:  When do you want to submit your letter?

18         MR. JOHNSTONE:  In a week.

19         THE COURT:  Okay.  Next Thursday.

20         And Ms. Brown, I will give you a week to respond and

21  submit the letters or the notes in camera.  I take it they're

22  not voluminous.

23         MS. BROWN:  No.

24         THE COURT:  Great.

25         MR. RICHARDS:  Your Honor, may I briefly clarify

JB7TSEC2

something on this issue?  So the Jencks at does not apply to
the SEC.

THE COURT:  I understand.

MR. RICHARDS:  And the SEC does not abide by Brady
either.  And so to the Court's question, even if Mr. Honig were
to testify in this enforcement action, we would not -- the SEC
would not produce any statements by Mr. Honig, any prior
statements.  So that's why we're seeking this in discovery.
It's the only way we can get it.

THE COURT:  So this is not new news to you that they
would not do that.

MR. RICHARDS:  Well, it is just we know from the
Jencks Act, it falls under the Federal Criminal Code.

THE COURT:  I understand that, but I guess my question
is:  This has been the SEC's longstanding policy.  Presumably,
therefore, they have been doing it for years, judges haven't
made them turn over these materials, and therefore, you are a
petitioner in this area, you should expect that in this case
you will likely also not get these materials.

Now I'm learning a lot of this for the first time, so
I'm happy to read up on it, but I understand that criminal
concepts don't apply to SEC proceedings, I was just
analogizing.

Okay.  So then we'll get your letter in a week,
Mr. Johnstone, and Ms. Brown's response.

JB7TSEC2

1          MS. BROWN:  Are there any replies, your Honor?

2          THE COURT:  Do you want to reply, Mr. Johnstone?

3          I don't need a reply.

4          MR. JOHNSTONE:  If we believe it's necessary.

5          THE COURT:  Very well.  Mr. Richard?

6          MR. RICHARD:  Yes, your Honor, my issues or my

7     client's issues are far simpler.

8          THE COURT:  I certainly hope so.

9          MR. RICHARD:  By way of background, Mr. Michael

10    Brauser is the subject of claims by the SEC that he essentially

11    did three things as to all three companies.  Number one, he

12    paid for misleading promotion that artificially increased the

13    sale of the stock.  All of the allegations in the complaint as

14    to actual payments of named defendants other than Brauser, so

15    that we're trying to get the evidence of the basis of their

16    saying that.  The second one is that he engaged in matched

17    trading, which is a term of art, i.e., he put in an offer to

18    buy stock of each of the three companies, for example, for 75

19    cents, and there was already another defendant buying it for 75

20    cents to create an artificial appearance of activity.  All of

21    these 75 cent exchanges that are detailed in the complaint are

22    between other defendants.  So we're looking for the evidence as

23    to Brauser.

24          The third thing that they're alleging is that Brauser

25    had an agreement to be part of the group, among whom they

JB7TSEC2

1    indicate this trading occurred.  The SEC's response to our

2    question and as to what we're seeking in discovery is that my

3    client's attorney should search through the 4.2 million pages

4    of documents that the SEC has produced.  And their position is

5    that it's our burden to see if I could find the evidence that

6    they needed to have under Rule 11 in order to make those

7    allegations, assuming that they could survive a motion to

8    dismiss without having -- which is before the Court --

9    specified those payments and those trades in the complaint.

10           Their position is that they have the right under the

11   production of electronically stored information, ESI, to merely

12   present it in the order in which they keep it.  However, in

13   making this argument they're conflating the order in which

14   documents are kept and how they received the documents.  So

15   what they're actually saying -- they conceded this -- is that

16   over a period of years we subpoenaed and demanded and asked for

17   documents from over 200 separate persons and entities, and

18   those documents came to us in a haphazard fashion.  And we're

19   giving them to you, these four and a half million documents, in

20   exactly the fashion that we received them, not how we keep

21   them.

22           Now surely the SEC, in all of the years that they have

23   had to go through these documents, and we have only had months,

24   of course, have separated out and organized these documents to

25   determine what claims they have or the basis for the claims

JB7TSEC2

1    against each defendant, and specifically the basis of the

2    claims against Michael Brauser that he paid promoters, that he

3    engaged in match trades, and that he was part of the aggrieved

4    group.  That's fundamentally what we're looking for.

5           There is a case in this district, in facts it's the

6    single most comprehensive case in the nation, I think it has 97

7    footnotes on this very issue, *SEC v. Collins*, where they reject

8    the SEC's position and they say that you can't just -- and

9    there I don't think there were 4.2 million documents either.

10   They say that you can't put on the defendant the burden to find

11   the evidence that you needed to know under Rule 11 in order to

12   make the claim, and that you need to be cooperative and you

13   can't basically hide the ball insofar as the defendant.  We're

14   a single defendant here that does not have the capacity.

15          I know they suggested in their letter brief that my

16   law firm has the software to somehow search through the 4.2

17   million documents.  We don't.  When you're dealing with

18   documents that are that large, you need substantial major

19   search engines, which means we have to pay outside vendors to

20   look through documents, most of which don't have anything to do

21   with our client.

22          Now what they say is what you asked for are our entire

23   investigative file, and therefore you got what you asked for.

24   And I said well, could you tell us which of our 14 or 16

25   requests these production relate to as to Mr. Brauser.  And

JB7TSEC2

their response is we're going to designate them all as

responsive to your request number one, which is the one that

asked for the designated file, and then they stopped sort of

the colon after which there are 14 categories of documents that

we want within their investigative file.  So that's basically

what we're looking for.

         The case in this district, *SEC v. Collins* also points

out that -- and I know that this is still a developing area,

because of the shortfalls of electronic discovery what used to

be a boxcar of documents can now be a hundred boxcars of

documents, and discovery can be weaponized going two ways, both

in a demand and in a production.  And essentially it's been

weaponized here in saying that the SEC will not designate in

response to each of our requests.

         They're pointing to the subsection of Rule 34 on

electronic discovery.  What that subsection says and what the

committee notes say is it was an effort to provide the same

production protection to the parties as paper discovery was.

And so basically you can either produce it as kept in the

ordinarily course of business, but also has to be reasonably

determinable as to what the party that is making the request is

looking for.  And if not --

         THE COURT:  Let me stop you, Mr. Richard, because I do

at some point have to leave.

         Ms. Brown, why can't you be a little more targeted

JB7TSEC2

with respect to Mr. Richard's client?

MS. BROWN:  Well, it's interesting, your Honor, we did try.  So he told your Honor and he told us that the most important thing was he needed to know where the documents were that related to our allegation that his clients engaged in matched trading.  We offered to give him the Bates numbers of those very documents and he declined.  So I am happy to certainly meet halfway with defendant to try to help him find documents.

THE COURT:  Did he tell you why he was declining your --

MS. BROWN:  Because I said I'm trying to make sure that we don't actually have to bother the judge with this, let me give you what you say you really need, which is those documents, and he declined.

I think the reason he declined is because -- and this is my fear about what he's proposing -- is that this is only the first of many requests.  So, for example, today we have heard for the first time he wants evidence of our supposed allegation that his client paid promoters.  Well, that's not an allegation in our complaint.  We never alleged that.  But it's a new one that he is suggesting we provide him documents for.

So I turn to the rules, because I think it's important, but I also turn to his own request where he asked us to produce the documents we had in the form that we kept them,

JB7TSEC2

1    and that's what we did.

2              THE COURT:  So he asked for --

3              MS. BROWN:  He asked for --

4              THE COURT:  What he's complaining about is precisely I

5    what he asked for?

6              MS. BROWN:  Yes.  That asked that we produce ESI in

7    the form that we maintained them, and that's what we did.  In

8    fact, we told him, consistent with the rules, that we were

9    producing it in that form in a searchable format.

10             You have not heard him say that all of these documents

11   are not searchable, because they are.  So what I fear here is

12   that we were turning the rules on their heads to create a

13   situation where if the producing party has thousands and

14   thousands and thousands of documents, as I admit we do, then

15   the other side just gets to throw up their hands and say it's

16   too expensive for us to look through them, and you tell us

17   where the documents are that we want.

18             THE COURT:  Is it true that the index for this case is

19   11,000 pages?

20             MS. BROWN:  No, it is not.  The index I attached to my

21   letter, your Honor.  It was produced by our systems but redone

22   by me to give them what they wanted, which is a Bates number

23   range for every single producing party.

24             So for example, if he wanted to know where his broker

25   was and figure out what those documents were, I invited him to

JB7TSEC2

1    do that.  And let's not forget that I invited him, before he

2    even made his request, to tell me what he was interested in,

3    and he chose to serve a request that asked for everything we

4    have.

5              THE COURT:  In the manner in which you --

6              MS. BROWN:  In the manner in which we kept them.

7              THE COURT:  Mr. Richard, is anything that she said

8    inaccurate.

9              MR. RICHARD:  Virtually everything that she said is

10   inaccurate.

11             THE COURT:  Did she offer to give you the Bates

12   numbers for the documents concerning -- I forget the particular

13   issue.

14             MR. RICHARD:  With a significant condition, which she

15   omitted.  First she declined to tell me where they were, then

16   she gave me 20,000 pages that I could look at to find them,

17   then finally she said that if I agreed to withdraw this letter

18   motion and not come to this hearing on the other issues and I

19   just accepted a single matched trade that she was going to show

20   me, even though it's not on the complaint, then she would show

21   if to me, but otherwise she would not.  So I wouldn't call that

22   completely accurate.

23             We have served since then two interrogatories within

24   the rule, and we have also been told they're not going to

25   answer these interrogatories in which we asked them to identify

JB7TSEC2

1    the specific Bates numbers of where these matched trades are

2    and the specific payments of where the evidence -- I know

3    counsel just said that they did not allege that Brauser made

4    these payments.  I can tomorrow file something with the Court

5    quoting the page, chapter, and verse where they allege that so

6    that I just -- we're not seeking a lot here, and what we're

7    seeking is we have a series of categories of information, all

8    of which are tied to the allegations in the complaint.

9         THE COURT:  Let me ask you this, she said also you're

10   complaining that you received these materials in the manner

11   apparently in which the SEC received it, but she says that

12   that's the way you asked for it.  Is that inaccurate?

13        MR. RICHARD:  That is inaccurate.  What she's doing is

14   conflating "received" with how they're kept in the ordinary

15   course, and the cases talk about this, too.  We didn't ask for

16   it as received over the last three years for 220 sources, we

17   asked for them to show it to us as they keep it.

18        They're not denying that over the years in order to

19   make the claims against my client they went through all of

20   these documents, these millions of pages of documents from

21   these 220 sources and they have organized them in some fashion,

22   they just want us to have the disorganized fashion that they

23   received them in over several years.  So there's a distinction.

24   What the rule says is --

25        THE COURT:  I get it.  I listen very carefully to what

JB7TSEC2

1    people tell me, and when someone tells me X and other person

2    tells me Y, I try to determine:  Is someone not being

3    completely truthful or accurate or careful enough?  Which is

4    why I have been going back and forth and asking you very

5    specific questions about precisely what she said.

6           So let me go to you again, Ms. Brown.  How did he

7    request these documents?

8           MS. BROWN:  I'm reading from Exhibit A of my letter to

9    you, which is their document request, and it says:  Unless the

10   parties agree otherwise, all electronically stored information

11   shall be produced in the form in which it is kept in its usual

12   course.  And that is how we produced it.

13          I think Mr. Richard doesn't believe me that we keep

14   the documents according to producing party the way they were

15   produced to us, but we do.  And so we have to search for them.

16   If we need something, we have to search for them.

17          Your Honor, there's a time and a place for exchanging

18   trial exhibits and exchanging contention interrogatories, and

19   I'm happy to talk about that, and to do that at that time, but

20   this isn't it.

21          THE COURT:  Okay.  Your request is denied,

22   Mr. Richard.

23          I think that's it.  I need to go.  We're adjourned.

24          MS. BROWN:  Thank you.

25          MR. RICHARD:  Thank you.