UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

– against –

BARRY C. HONIG, MICHAEL BRAUSER,
JOHN STETSON, JOHN R. O'ROURKE III,
ROBERT LADD, ELLIOT MAZA,
BRIAN KELLER, JOHN H. FORD,
ATG CAPITAL LLC, GRQ CONSULTANTS,
INC., HS CONTRARIAN INVESTMENTS,
LLC, GRANDER HOLDINGS, INC., *and*
STETSON CAPITAL INVESTMENTS INC.,

Defendants.

**AMENDED
OPINION & ORDER**

18 Civ. 8175 (ER)

RAMOS, D.J.:

On May 9, 2016, Robert Ladd announced that John McAfee, a prominent figure in the cybersecurity industry, would become the new CEO of his company, MGT Capital Investments, Inc.  In that same announcement, Robert Ladd claimed that McAfee had sold his previous firm to Intel Corp. for nearly $8 billion.  The Securities and Exchange Commission alleges that McAfee had not, in fact, sold his company to Intel for $8 billion, and that Ladd's statement amounts to securities fraud.  The SEC also alleges that Ladd fraudulently failed to disclose the existence of a group of investors who together owned more than five percent of his company, in violation of SEC rules.  The SEC brings these claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j, SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q.  In addition, the SEC alleges that Ladd aided and abetted the same group as that group defrauded investors through a "pump-and-dump"

scheme,[1] in violation of Section 15(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 20(e) of the Securities Exchange Act, 15 U.S.C. § 77o(e).

The Court finds that the SEC properly alleges Ladd's primary liability under both the Securities Exchange Act and the Securities Act as it relates to his misstatements concerning McAfee, and it finds that time-barred allegations may be included in the Amended Complaint as background for the timely allegations. But it also finds that the SEC has failed to properly allege that Ladd had a duty to disclose the beneficial ownership of a group of investors, or that the omission of the existence of the group was material. Finally, the Court finds that the SEC properly alleged liability under the aiding and abetting counts. Accordingly, Ladd's motion to dismiss is GRANTED in part and DENIED in part. His motion to strike time-barred allegations is DENIED. The SEC is granted leave to replead.

## I.    THE ALLEGATIONS

In this case, the SEC alleges that four individuals — Barry C. Honig, Michael Brauser, John Stetson, and John R. O'Rourke, III — and their companies[2] acted as a group to execute pump-and-dump schemes involving three companies: "Company A," "Company B," and "Company C." First Am. Compl. ("AC") ¶ 1–2, Doc. 105. It alleges

---

[1] The SEC describes a "pump and dump" scheme as a scheme wherein investors clandestinely purchase a large share of a thinly traded public company at a low price, collude among themselves or with company management to artificially "pump" the share price through heavy intra-group trading — otherwise known as "matched trading" — or arranged transactions — including mergers — and then "dump" the now-pricey shares on other investors. First Am. Compl. ("AC") ¶ 48, Doc. 105. Orchestrated trades by a group of investors can be unlawful if the group of traders collectively own more than five percent of the company and fail to disclose that in SEC filings as mandated by Section 13 of the Exchange Act, 15 U.S.C. § 78m, or if the investors otherwise engage in a manipulative or deceptive device or contrivance in violation of Section 10(b) and SEC Rule 10b-5, including, *inter alia*, matched trading.

[2] Honig and his company, GRQ Consultants, Inc., reached a settlement with the SEC in July 2019, Docs. 151, 152, wherein he is enjoined from violating the Securities and Exchange Acts, along with related SEC rules, and from owning, trading in, or participating in the offering of any security that has a price of less than five dollars. Settlements with Brauser, O'Rourke, Stetson, and their companies — Grander Holdings, Inc., ATG Capital LLC, and Stetson Capital Investments Inc., respectively — are pending. Doc. 208. A partial Final Judgment on Consent is pending with respect to HS Contrarian Investments, LLC — affiliated with Stetson — as well. Doc. 208.

that this "Honig Group" worked directly with the management of these companies to arrange for share-price-spiking activity, including acquisitions and hires, and that this group would also trade amongst itself in order to create the appearance of demand in the shares of these companies.  AC ¶¶ 3, 4, 6.

This Opinion concerns the motion to dismiss brought by Robert Ladd, the chief executive officer of MGT Capital Investments, Inc. — designated as "Company B" in the Amended Complaint.[3]  Doc. 146.  MGT has at times owned healthcare patents, casino gaming patents, and an online sports betting company.  *See* Decl. of Randall R. Lee, ("Lee Decl.")[4] Exs. C, D, E.  It currently owns bitcoin mining equipment and infrastructure.  *See* Lee Decl. Ex. F.  Ladd has served as CEO of MGT since February 2011.  AC ¶ 34.

### A.  Ladd's Experience with the Honig Group

In its Amended Complaint, by way of background, the SEC describes Ladd's involvement with the Honig Group prior to the events for which the Commission seeks to hold Ladd liable.  The SEC alleges that the Honig Group first targeted MGT in 2012.  AC ¶ 126.  At that time, the group purchased $4.5 million worth of shares in the company, and Honig included in the deal a guarantee that $300,000 of the investment would be used to promote MGT's stock.  AC ¶ 127.  Stetson, a member of the Honig Group, hired a writer, John H. Ford, to promote the company on the website *Seeking Alpha* in a November 2012 article.  AC ¶ 128.  Ford, whose piece predicted MGT's price could triple, did not disclose that he had been paid by the Honig Group, instead writing "that he

---

[3] The SEC has also sued Elliot Maza, the CEO of "Company A," and Brian Keller, the CEO of "Company C," in this action.  The Commission settled with both executives in March 2019.  Docs. 110, 113.

[4] The Court takes judicial notice of the existence of the SEC filings and news reports contained in the Lee Declaration, as well as their contents, but not for the truth of the matters asserted therein.  *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009).

was 'express[ing] his own opinions,' and was not 'receiving compensation for it (other than from *Seeking Alpha*)."  AC ¶ 128.[5]

Ford's initial article did not result in the increase of the value of MGT stock that the Honig Group sought, so they paid for him to write a second article in *Seeking Alpha*. AC ¶ 129.  This time, Stetson compensated Ford by selling him some of Stetson's own MGT shares and warrants.  AC ¶ 129.  Ford wrote the article in April 2013, falsely claiming that a patent enforcement action then-pending against MGT was on the brink of settlement.  AC ¶ 130.  This article purportedly had the desired result, and the increase in the value of MGT shares allowed Honig to sell his shares at a profit of nearly $1 million. AC ¶ 130.

The Commission alleges that Ladd knew that the Honig Group was paying Ford for the favorable articles.  In particular, it alleges he knew or was reckless in not knowing that Ford was paid in shares prior to publication of the second article.  AC ¶ 129.  It alleges he knew this because Ford was listed as a selling shareholder in a November 2012 Form S-3 Registration Statement, which Ladd approved.  AC ¶ 129.  The SEC also alleges Ladd knew or was reckless in not knowing that Ford had failed to disclose his payments because Stetson had emailed Ladd in early 2013 about Ford's investment in MGT and because Ford interviewed Ladd in preparation for the second article.  AC ¶ 131.

### B.  The Honig Group's 2015 Acquisition of MGT Shares

A few years later, the Honig Group again targeted MGT.  According to the Amended Complaint, in September and October of 2015, Stetson, at Honig's direction, negotiated directly with Ladd to purchase 2.8 million shares, as well as warrants on an additional 5.6 million.  AC ¶ 134.

---

[5] The SEC sued Ford in this action and settled with him in September 2018.  Doc. 28.

On October 1, Ladd emailed Honig:  "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ."  Honig responded, copying Brauser and Stetson:  "[I'll] get back to you with names shortly[. F]or now use Barry Honig[,] Mike Brauser[, and] OBAN."[6]  AC ¶ 135.  Stetson followed up a few days later with additional names, including the Honig Group's companies and other investors.  AC ¶ 135.

The deal closed in early October, raising about $700,000.  AC ¶ 136.  MGT filed a Form 8-K indicating that MGT had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . . ." AC ¶ 136.  Although the form itself did not name any investors, an attached press release indicated that the "investment was led by Barry Honig, a private investor and a specialist in corporate finance."  Lee Decl. Ex. G at Ex. 99.1.

About a month after the deal closed, Ladd sent Honig an email, in which Ladd wrote, "In addition, *your group's* 25 cent warrants could bring in an additional $1.4 million once the S-1 goes Effective," and, "As for the cap table, we have 17.2 million common shares out-standing, including *your group's* 2.8 million." Pl.'s Mem. Ex. A ("Nov. 2015 Email"), Doc. 156 (latter sentence quoted at AC ¶ 137) (emphasis added). Two minutes later, Honig responded, "I am not part of a group.  I invested individually." Seconds later, Ladd replied, "I stand corrected."

By January 2016, the Honig Group had acquired more than 16 percent of MGT's stock.  AC ¶ 139.  Honig filed a Schedule 13G in October 2015, claiming he had a 6.59 percent beneficial ownership in MGT (amended to 9.1 percent in February 2016) and that the securities he owned "are not held for the purpose of or with the effect of changing or influencing the control of the issuer."  AC ¶ 155.  MGT filed a Form S-1 registration statement with the Commission in November 2015, in which it did not disclose that the Honig Group had a collective beneficial ownership of over five percent.

---

[6] The SEC alleges that OBAN is an LLC created by Stetson.  AC ¶ 135.

The Commission alleges that, in January 2016, Honig directed Ladd to wire $125,000 to a stock promoter, who, in turn, promoted the company in early February. AC ¶ 139. The article disclosed that the author had been compensated "by a third party (STAR Media LLC) for an investor awareness campaign regarding MGT," but did not disclose any direct compensation from Ladd or the Honig Group. Lee Decl. Ex. I. The SEC alleges that there was an intraday price increase of 60 percent and that trading volume increased 70 times over after the publication of the article. AC ¶ 139. It alleges that Ladd made approximately $39,000 from selling shares during this time period. AC ¶ 140.

### C. The McAfee Announcement

The Commission alleges that, in the spring 2016, the Honig Group again attempted to increase MGT's value in order to profit from the sale of its securities. It alleges that Honig directed O'Rourke to arrange a deal between MGT and John McAfee, the founder of the cybersecurity company McAfee Associates, which developed McAfee Antivirus.[7] AC ¶ 142. O'Rourke introduced Ladd and McAfee in April 2016.[8] AC ¶ 142. MGT and McAfee's company at the time, D-Vasive Inc., agreed in May to a merger and to have McAfee be appointed the new company's CEO. AC ¶ 143; Lee Decl. Ex. J.

MGT announced the deal in a press release and SEC Form 8-K, signed by Ladd and released on May 9, 2016.[9] AC ¶ 144. The press release falsely claimed that McAfee had "sold his anti-virus company [McAfee Associates] to Intel for $7.6 billion." AC ¶ 144. In fact, while it was true that McAfee Associates was sold to Intel for $7.6 billion in 2010, McAfee had left McAfee Associates and sold all his shares in 1994, more than

---

[7] John McAfee is identified as a "Cybersecurity Innovator" in the Amended Complaint.

[8] During this time, on April 11, MGT filed a Form 10-K with the SEC that did not identify the Honig Group as collectively having a beneficial ownership of over 5 percent.

[9] The week before, on May 4, Brauser filed a Schedule 13G with the Commission, indicating he owned 7.4 percent of MGT.

two decades prior.  The morning before the press release was issued, before the opening of the market, "Honig bought and sold small quantities of [MGT] stock dozens of times." AC ¶ 145.  After the market had opened, Honig coordinated trades with Brauser to allegedly "paint a false picture of legitimate market interest in the stock."  AC ¶ 145.

The same day MGT published the 8-K and press release, *StockBeast.com* published an unsigned article promoting MGT and the McAfee deal.  The article, entitled "MGT Beastmode engaged — John McAfee driving the Bus," indicated that the deal was "big big big!" and reported that McAfee had "sold his startup company to Intel for $7.6 BB."  AC ¶ 146.  The article did not disclose that Ladd, through MGT, had paid *StockBeast.com* to publish the article.  AC ¶ 146.

Soon after the announcement of the deal, MGT's market capitalization had increased nearly 12-fold and its trading volume peaked at an amount over 1500 times what it was before the announcement.  AC ¶ 147.  The SEC alleges that the four members of the Honig Group each negotiated with Ladd to allow them to exercise their warrants early.  AC ¶ 148.  Ladd, too, sold shares in the aftermath of the McAfee announcement, making over $500,000.  AC ¶ 148.

In late May 2016, after Ladd and the members of the Honig Group had sold their shares, MGT filed a Form 10-Q that accurately stated, "[McAfee] founded McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010." AC ¶ 149.

## II.    STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege

sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557). However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud with particularity. *See SEC v. Lyon*, 529 F. Supp. 2d 444, 449 (S.D.N.Y. 2008). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v.*

*Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'").  Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012).  Conditions of a person's mind — such as malice, intent, or knowledge — may be alleged generally.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).  These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd* 604 F. App'x 62 (2d Cir. 2015) (citing *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)).

## III.   ALLEGATIONS OF ACTIVITY PRIOR TO 2015

The Amended Complaint was filed on March 8, 2019.  Ladd therefore argues that any references to the pump and dump scheme centered on the *Seeking Alpha* articles should be stricken because those events occurred in 2012 and 2013, outside of the applicable five-year statute of limitations.[10]  *See* 28 U.S.C. § 2462 (setting five-year limitations period for "any civil fine, penalty, or forfeiture").  Federal Rule of Civil Procedure 12(f) allows a district court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  *See also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892 (2d Cir. 1976) (discussing the Rule).  The Court reads Ladd's briefing as arguing that evidence of conduct prior to 2015 is

---

[10] The Court reads Ladd's motion as requesting the Court strike section C.1 of the Amended Complaint, comprised of paragraphs 126 to 132, in which the SEC makes its allegations in reference to the 2012 *Seeking Alpha* articles.

irrelevant (i.e., "impertinent") to proving the conduct that does fall within the limitations period.

"[I]t is settled that [a motion to strike] will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky*, 551 F.2d at 893. Furthermore, Courts are discouraged from tampering with pleadings when the decision to strike hinges on an evidentiary question. *See id.* Here, the Commission argues that evidence of Ladd's involvement with the Honig Group in 2012 and 2013 would be relevant (and thus admissible) to prove Ladd's knowledge of the Group and its methods when they allegedly targeted MGT again in 2015 and 2016. Indeed, Ladd's past experience with the four members of the Honig Group provides critical context to his alleged communications and actions, potentially leading a factfinder to infer Ladd's knowledge of the Group and its aims. *See SEC v. Straub,* No. 11 Civ. 9645 (RJS), 2016 WL 5793398, at *20 n.7 (S.D.N.Y. Sept. 30, 2016) ("[E]vidence of conduct and acts [outside the statue of limitations] may still be admissible at trial to prove the existence of the scheme, its background, and the knowledge and intent of the [d]efendants.").

Ladd counters by citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993) *rev'd on other grounds* 510 U.S. 517 (1994). In *Fantasy*, the Ninth Circuit affirmed a district court's striking of allegations of time-barred activity from a complaint based on Rule 12(f). In that case, the panel affirmed the district court's finding that the plaintiff had not put forward *any* arguments for the stricken allegations' relevance. *Id.* at 1528. It further affirmed the lower court's ruling that the allegations would lead to prejudice against the defendant and would needlessly complicate the eventual trial. *Id.*

None of those circumstances are present here. The SEC has presented a straightforward argument for the relevance of the allegations. As the Commission tells it, Ladd was aware that the Honig Group had previously purchased shares in MGT, arranged for a promoter's help to increase price of the shares, allegedly concealed their involvement in the purchases and promotion, and, finally sold their shares, making a

profit on the sale.  The SEC further alleges that Ladd had assisted the *Seeking Alpha* writer, Ford, in his efforts, and that Ladd knew that Ford failed to reveal his compensation to his readers.  Evidence supporting these allegations could go toward proving, *inter alia*, Ladd's intent, plan, knowledge, or absence of mistake in his 2015 and 2016 conduct.  *See* Fed. R. Evid. 404(b).  Accordingly, the motion to strike is DENIED.

## IV.    VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), while SEC Rule 10b-5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5).  "To establish a Rule 10b–5(b) disclosure violation, the SEC must prove that the defendant (1) made one or more misstatements of material fact, or omitted to state one or more material facts that the defendants had a duty to disclose; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).

The SEC alleges two violations of the Exchange Act and Rule 10b-5:  the false statements contained in the McAfee announcement and the failure to disclose the Honig Group's total beneficial ownership in a 2015 Form 10-K and a November 2015 Form S-1.

### A.  The McAfee Misrepresentation

Ladd argues that his actions in relation to the McAfee announcement fail to state a claim because the false statements contained therein were not sufficiently material and because the SEC failed to allege his scienter.  The Court disagrees with both points.

### 1.  Materiality

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have

considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  A complaint may only be dismissed on materiality grounds if the misstatements or omissions at issue are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Id.* at 162.

      With that standard in mind, Ladd's inflation of McAfee's credentials easily meets the materiality bar.  Ladd represented that the new CEO of MGT would be a man who founded and built a company that sold for billions of dollars, suggesting that McAfee would be able to deliver the same value to MGT shareholders.  Reasonable minds could differ on the question of this statement's importance, and therefore it would be improper to dismiss this claim based on materiality at this stage of the litigation.

      Ladd's primary defense, however, is that the falsity of the statement — that McAfee did not actually sell his company to Intel for nearly $8 billion — was already known to the market at the time of Ladd's press release.  Otherwise known as the "truth on the market" doctrine, this defense holds that "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."  *Ganino*, 228 F.3d at 167.  Only rarely is it appropriate to dismiss a complaint on the basis of this doctrine.  *See id.*

      Ladd relies on the following documents suggesting that the market was already aware of the true history of John McAfee in May 2016:

- A 1994 Form 8-K filed by McAfee Associates indicating that McAfee resigned from the company in 1993.  Lee Decl. Ex. N.

- A 1995 Form S-4 indicating the same.  Lee Decl. Ex. O.

- An untitled 63-word *Wall Street Journal* article published in 1995 reporting that McAfee had resigned from McAfee Associates "to pursue other interests."  Lee Decl. Ex. V.

- A 2012 article titled "Four Hours with John McAfee" in the *Financial Times* Weekend Magazine reporting that McAfee had "sold his remaining shares in the company that bears his name" in 1994.  Lee Decl. Ex. W.

- An archived screenshot of an entry about McAfee on Wikipedia from the time of the McAfee announcement that indicated he had left McAfee Associates in 1994 and had "sold his remaining stake in the company." Lee Decl. Ex. X.

While it may be true that this information was published and available to investors at the time of the May 2016 announcement, the Court must determine whether this information had "a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167.

It declines to do so. Ladd unambiguously declared in a press release that McAfee had sold his company for billions of dollars, implicitly linking that past successful transaction with the potential future success of MGT. Ladd then amplified this false message by paying a promoter to repeat it in a newsletter that same day. Decades-old SEC filings, a Wikipedia page without any evidence of promotion, and two aged news articles that focused on topics other than McAfee's departure cannot overcome these contemporaneous falsehoods. Indeed, in an attempt to show the innocuous nature of his misstatement, Ladd's own briefing points to two recent articles that indicate misinformation about John McAfee is still being reported, weakening any argument that this particular Wikipedia entry was sufficient to counterbalance Ladd's misinformation. *See* Doc. 147 at 17 n.8; Lee Decl. Ex. Y (2017 Reuters article reporting on McAffee Associates, "which he [McAffee] sold to Intel for $7.7 billion in 2010"); Lee Decl. Ex. Z (2017 JD Journal article reporting that "McAfee had sold Intel his company in 2010 for $7.7 billion"). If the corrective information unearthed by Ladd's attorney was not sufficient to prevent journalists in 2017 actively reporting on McAfee and his company from believing he had sold to Intel for billions, then the Court cannot say that there is no reasonable investor who would not have done the same. *See Ganino*, 228 F.3d at 168.

The cases cited by Ladd in which courts dismiss based on the truth-on-the-market doctrine are not to the contrary. In *Solow v. Citigroup, Inc.*, for example, the defendant bank disclosed truthful information in its first and second quarter 2008 10-Q's, a few months before the alleged misstatements were published in September 2008. No. 10 Civ.

2927 (RWS), 2012 WL 1813277, at *6 (S.D.N.Y. May 18, 2012).  Here, the truthful information was much further in the past:  in the case of the SEC filings and the *Wall Street Journal* article, decades before, and, in the case of the *Financial Times* Weekend Magazine, four years before.  Similarly, in *White v. H&R Block, Inc.*, the court found that multiple court filings and 20 news articles reporting on the subject of the alleged misstatement published the same year as the misstatement was sufficient to establish the truth-on-the market defense — a much more "intense" counter than presented here.  No. 02 Civ. 8965 (MBM),  2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004).  The other cases Ladd cites deal with omissions (rather than the misstatement at issue here), similarly contemporaneous coverage, or both.  *See Garber v. Legg Mason, Inc.*, 347 F. App'x. 665, 668 (2d Cir. 2009); *In re Bank of Am. Corp. Sec., Derivative and ERISA Litig.*, Nos. 09 MD. 2058 (PKC), 09 Civ. 5411 (PKC), 2012 WL 1353523, at *8 (S.D.N.Y. Apr. 12, 2012).

The only case cited that involves reporting some amount of time removed from the misstatement or omission at issue is *In re Yukos Oil Co. Securities Litigation*, No. 04 Civ. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006).  The corrective information in that case, however, was more direct than the information in this case.  In *Yukos*, the defendant, a Russian oil company, issued a January 2003 press release stating employees were "prohibited from engaging in political activities . . . ."  *Id.* at *5.  The plaintiffs in that case argued that this statement was materially misleading because a top company executive, Mikhail Khodorkovsky, was in fact politically involved, as evidenced by his participating in a "secret meeting" with Russian Federation president Vladimir Putin and other Russian business leaders in 2000; his comments at a second such meeting in 2002 or 2003 during which the executive criticized Putin; and then a series of enforcement measures against Khodorkovsy and Yukos in the fall of 2003 taken by the Russian government that caused the company's stock to fall precipitously.  *Id.*  The *Yukos* court found that the company's press release, even if misleading, was not material

because "newspapers were saturated with references to" Khodorkovsky's political leanings in 2003[11] and because the *New York Times* and *Financial Times* had reported in 2000 on the secret meetings at which Khodorkovsky met with Putin.  2006 WL 3026024 at *22. "Given the detail with which these two major international newspapers reported on Putin's meeting with the oligarchs," the court held, "no reasonable investor could have been misled by Yukos' alleged failure to disclose that Putin threatened political retaliation if Khodorkovsky did not refrain from political activity." *Id.*

*Yukos* differs from this case in several respects.  *First*, the plaintiffs in that case admitted that "investors were aware that Khodorkovsy was politically active."   2006 WL 3026024 at *21.  There is no such admission that investors were aware of the timeline of McAfee's departure and the sale to Intel.  *Second*, the primary focus of each article was either the brewing tension between Yukos and the Russian government or on the meetings between Putin and Khodorkovsy.  In the articles presented to this Court, the discussion of McAfee's departure from the company amounts to a single line buried within a larger piece — hardly "intense" enough to balance the misinformation disseminated by Ladd in a press release and article focused on McAfee and the value he would bring to MGT. *Third*, the two articles discussing the 2000 meeting had been published three years before

---

[11] The *Yukos* court cited six news articles on this point:

- Arkady Ostrovsky, *Yukos Arrest Puts Pressure on Russian Oligarch: Putin's Confrontation with the Country's Business Leaders Appears to Have Entered a New Phase*, Fin. Times, July 4, 2003, at 8;

- Andrew Jack, *Suitors Turn Blind Eye to Yukos Crisis: Western Oil Groups Are Undeterred by Probes into the Russian Giant*, Fin. Times, Aug. 5, 2003, at 27;

- Andrew Jack, *Oil Giant Drills Directors in Using Good Governance*, Fin. Times, Mar. 24, 2003, at 11;

- Geoffrey T. Smith, *Khodorkovsky Raises the Stakes*, Dow Jones Int'l, July 29, 2003;

- Paul Starobin, *Five Years After the Great Ruble Crash, the Economy Is Booming. But How Much Is Russia Really Changing?* Bus. Week, Aug. 4, 2003, at 16;

- Andrew Jack, *Yukos Affair Has Russia's Oligarchs Squirming in Their Seats*, Fin. Times, Aug. 13, 2003, at 6.

2006 WL 3026024 at *21.

the alleged misstatement in 2003.  Here, the two SEC disclosures and the *Wall Street Journal* article concerning McAfee's 1993 departure from his company were filed over twenty years before the 2016 misstatement.  Even the single *Financial Times* Weekend Magazine article published more recently — in 2014 — was separated by more time from the disclosure in question than the articles in *Yukos*.  Accordingly, this Court need not follow the holding of *Yukos*.

In his final argument against the materiality of the announcement, Ladd argues that because the information was readily available for nearly 25 years, the market must have absorbed the information and become immune to Ladd's misstatement.  In support, he draws an analogy to *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993), where the Second Circuit held, in a suit brought in by a private plaintiff, "An investor may not justifiably rely on misrepresentation if, through minimal diligence, the investor should have discovered the truth."  But this argument about justified reliance is misplaced in the Court's analysis of materiality.  Unlike private plaintiffs, the SEC need not plead that any *particular* investor justifiably relied upon the information; it only need plead the materiality of the statement within the context of the entire market.  *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 84 (2d Cir. 1970); *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012); *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).  The Court accordingly does not find the availability of the corrective information sufficiently conclusive to dismiss this claim at this stage in the litigation.

### 2.  Scienter

Ladd next argues that the Commission does not properly allege scienter in its Amended Complaint.  "The requisite state of mind in a Rule 10b–5 action is 'an intent to deceive, manipulate or defraud.'"  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976)).  A fraud plaintiff can establish this intent "either (a) by alleging facts to show that

defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino*, 228 F.3d at 168.  "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).  "Alternatively, a complaint adequately pleads a reckless omission if it alleges that defendants 'failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.'" *SEC v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

Here, the SEC has sufficiently alleged scienter "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  In particular, the Commission alleges that Ladd had been introduced to McAfee and therefore had access to the correct timeline of McAfee's career.  Furthermore, as Ladd concedes, information about when McAfee left his company was readily available through any number of public sources, further strengthening the inference that he knew or was reckless in not knowing this information prior to releasing the announcement.  *Cf. In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("[C]orporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements.").

Ladd argues that it is inconsistent to find that the public information about McAfee can be imputed to him for scienter purposes but not the market at large for materiality purposes.  Rather than being inconsistent, these findings illustrates the difference between the standard for dismissing on materiality and on scienter.  To dismiss this claim on materiality grounds, the Court must find that no investor could have been fooled by Ladd's misstatement — a finding foreclosed by the limited corrective power of

the sources presented to the Court.  *See supra* part IV.A.1.  To dismiss this claim for failure to plead scienter, the Court must find — taking all facts in the Amended Complaint as true (along with the facts of which the Court takes judicial notice) and drawing all inferences in favor of the Commission — that *Ladd* did not have the knowledge of McAfee's history or was not reckless in not knowing.  Like with materiality, the Court cannot do so at this stage in the litigation.[12]  The motion to dismiss as it relates to the McAfee announcement is DENIED.

### B.  The Beneficial Ownership Omission

"The Supreme Court has instructed that '[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5.'"  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100–01 (2d Cir. 2015) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).  Such a duty to disclose may arise when there is a "statute or regulation requiring disclosure." *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir.1992).  One of those regulations is Regulation S-K, promulgated by the SEC.  *See Stratte-McClure*, 776 F.3d at 101–02. When a plaintiff in a securities fraud action, including the SEC, attempts to hold a defendant liable under Rule 10b-5 for failing to make a disclosure required by a regulation, it must plead two things:  (1) that the "defendant failed to comply with [the regulation] in a 10-Q or other filing" and (2) that the "omitted information was material." *Id.* at 103.

With this controlling law in mind, the Court turns to the Commission's second theory of Ladd's liability:  that he "knowingly or recklessly fail[ed] to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over [MGT's] management and policies" in MGT's 2015

---

[12] Ladd's disclosure in the Form 10-Q a few weeks after the McAfee announcement — stating that "[McAfee] founded McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010" — does not undercut the SEC's case, either; this statement has no corrective power given that it does not acknowledge that the initial claim was false and is not at all inconsistent with the false claim that McAfee was still leading McAfee Associates, when it was purchased by Intel in 2010.

Forms 10-K and S-1. AC ¶ 214.[13] The SEC argues that this allegation is a reference to Item 403 of Regulation S-K, which requires that a filer disclose any "person" or "group" "who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities." 17 C.F.R. § 229.403(a). But the Amended Complaint only alleges that Ladd had a duty to disclose the "true extent" of the stock ownership of individuals; this is not the more specific duty imposed by Item 403.[14] Indeed, neither Regulation S-K nor the requirement it prescribes is ever mentioned in the Amended Complaint. Furthermore, the SEC does not allege at any point that Ladd's omission in reference to the Honig Group's ownership is material. Accordingly, Ladd's motion to dismiss the Third Claim for Relief as it relates to his omissions in the 2015 Form 10-K and the November 6, 2015 Form S-1 is GRANTED.[15]

* * *

Accordingly, Ladd's motion to dismiss the Third Claim for Relief as against him is GRANTED in part and DENIED in part. The Court sustains the SEC's allegations against Ladd as they relate to the McAfee announcement, but it dismisses without

---

[13] *See also* AC ¶ 158:

> Similarly, Company B's 2015 Form 10-K filed with the Commission on April 11, 2016 disclosed only Honig as a beneficial owner, holding 8.6%. Notwithstanding that Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, he signed the 2015 Form 10-K, failing to disclose their group's beneficial ownership. Ladd also signed a materially misleading November 6, 2015 Form S-1 registration statement, filed with the Commission, for the 8,400,000 Company B shares issued in the October 2015 Company B Financing, failing to disclose the group beneficial ownership of GRQ, Grander, ATG and SCI.

[14] Although *Stratte-McClure* dealt specifically with Item 303 in Regulation S-K, management's discussion and analysis, 776 F.3d at 101–02, the Court does not find *Stratte-McClure* or any other authority to suggest that the Second Circuit's analysis of Item 303 should not apply with equal force to Item 403, the disclosure of beneficial owners.

[15] Because the Court grants the SEC leave to replead these allegations, it does not address Ladd's alternative arguments — namely that the SEC has failed to plead the existence of a group as defined in SEC Rule 13-d5, promulgated under Section 13(d) of the Exchange Act, and that the SEC has failed to plead Ladd's knowledge thereof. For the reasons articulated in Part VI, however, it is likely that the SEC has successfully done so. Regardless, the Court reserves decision on this point.

prejudice claims based on Ladd's failures to disclose the beneficial ownership of the
Honig Group in the 2015 Form 10-K and Form S-1 filings.

In addition to his arguments against these two claims, Ladd moves to dismiss
claims related to the *Seeking Alpha* articles in 2012 and 2013, and those related to MGT's
October 2015 8-K.  The SEC does not contest the motion on either of these bases, and so
the Third Claim for Relief is dismissed as to those allegations with prejudice.

## V.   VIOLATIONS OF THE SECURITIES ACT

A suit brought under Section 17(a)(2) of the Securities Act requires proving that
the defendant "obtain[ed] money or property by means of any untrue statement of a
material fact or any omission to state a material fact necessary in order make the
statements made, in light of the circumstances under which they were made, not
misleading."  15 U.S.C. § 77q(a)(2).  Accordingly, Section 17(a)(2) is notably different
from Section 10(b) of the Exchange Act in that Section 17(a)(2) does not require proof of
scienter — only proof of negligent conduct.  *See SEC v. Ginder*, 752 F.3d 569, 574 (2d
Cir. 2014).

The SEC argues that the same allegations that support claims under Section 10(b)
with a scienter of knowledge or recklessness can also support claims under Section 17(a),
which only requires negligent conduct.  *See, e.g.*, *SEC v. Wey*, 246 F. Supp. 3d 894, 913
(S.D.N.Y. 2017).  In response, Ladd argues that the Commission must choose one theory
— recklessness under Section 10(b) or negligence under Section 17(a).  It may not have
both, Ladd argues, because "[i]ntent and negligence are regarded as mutually exclusive
grounds for liability."  *Robare Group, Ltd. v. SEC*, 922 F.3d 468, 479 (D.C. Cir. 2019)
(internal quotation removed).

But Ladd has pointed to no authority binding on this Court for that proposition.
And, even if *Robare* were binding, it would be inapplicable to this case.  In *Robare*, the
SEC found that respondents had acted "negligently but not intentionally or recklessly" in
regards to one violation, but then found the same conduct to be "willful" for the purposes

of a different violation.  922 F.3d at 479 (internal quotation removed).  In that case,
"negligence" described the defendant's requisite state of mind.  Not so, here.  In the
context of Section  17(a), "negligence" only refers to the *conduct* of the defendant, not
the defendant's state of mind.  *See SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL
5737275, at *6 (S.D.N.Y. Sept. 19, 2015) (defining negligence as "the failure to use
reasonable care, which is the degree of care that a reasonably careful person would use
under like circumstances").  Indeed, the distinguishing feature of Section 17(a) is the
absence of a requirement that the plaintiff prove *any* state of mind; allegations under this
Section may stand alongside allegations under Section 10(b) of the Exchange Act with no
conflict.  *See, e.g.*, *Wey*, 246 F. Supp. 3d at 910, 917.[16]

The remainder of Ladd's arguments against supporting the negligence counts
overlap with arguments discussed in *supra* Parts IV.A.1 and IV.B regarding the
materiality of the statements alleged in the fraud counts; the same analysis holds.
Accordingly, Ladd's motion to dismiss the Fourth Claim for Relief against him as it
relates to the McAfee announcement is DENIED and his motion to dismiss the Claim
against him as it relates to the 2015 10-K and S-1 filings is GRANTED, without
prejudice.  As with the claims under the Securities Act, allegations regarding the 2012
and 2013 *Seeking Alpha* articles and the October 2015 8-K are dismissed with prejudice.

## VI.   SECONDARY LIABILITY
##        UNDER THE SECURITIES AND EXCHANGE ACTS

To state a claim for aiding and abetting under Section 20(e) of the Exchange Act
and Section 15(b) of the Exchange Act, the Commission must allege that Ladd
"knowingly or recklessly provid[ed] substantial assistance to another person" in

---

[16] Ladd also argues that the SEC has failed to plead a specific standard of care, citing *SEC v. Pocklington*,
No. 18 Civ. 701 (JGB), 2018 WL 6843663 (C.D. Cal. Sept. 10, 2018).  But in *Pocklington*, the SEC alleged
that a defendant "failed to exercise reasonable care . . . particularly in light of his background as an
accountant."  *Id.* at *16.  The court in that case required the SEC to plead with particularity whether it was
pleading a general standard of care or some higher standard in light of his specialized knowledge.  *See id.*
Here, the SEC, through its pleadings, has given Ladd notice that he is alleged to have breached a general
standard of care, i.e., that of a reasonable person.

violations of the securities laws.  15 U.S.C. §§ 78t(e), 77o(b).  For behavior occurring prior to the passage of the Dodd-Frank Act in 2010 — which added the "or recklessly" language to the Acts — the Second Circuit has required the SEC to plead three elements: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) "substantial assistance' by the aider and abettor in the achievement of the primary violation."  *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012).   When determining whether an act qualifies as substantial assistance, courts look to whether the defendant "associate[d] himself with the venture," whether he "participate[d] in it as in something that he wishe[d] to bring about," and whether "he [sought] by his action to make it succeed."  *Id.* (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.)).  In its analysis, the Court must view all three requirements — the primary violation, the defendant's knowledge of the violation, and the nature of the assistance — in context with each other.  *See id.* at 214.[17]

### A.  The Underlying Violations

The SEC has alleged violations of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act by each member of the Honig Group arising from the pump and dump scheme as it related to MGT.  Of these, Ladd has only contested whether the Commission properly alleged the existence of a "group" under Section 13(d) of the Exchange Act and Rule 13-d5, promulgated thereunder.  If the members of the Honig Group were a group, defined as "two or more persons who agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer," 17 C.F.R. § 240.13d-5(b)(1), then the group would be required to file a Schedule 13G or 13D

---

[17] Ladd argues that the SEC has raised the bar for itself in its pleadings by only pleading that Ladd provided "knowing" — rather than "reckless" — assistance to the Honig Group's violations.  Because the Court finds that the SEC has properly pleaded knowing assistance, the Court does not consider the impact of the SEC's choice in language or how the "or recklessly" language added by Dodd-Frank may changes the analysis of *Apuzzo*'s three elements.

with the SEC when the Honig Group acquired five percent or more of the beneficial ownership of MGT, 17 C.F.R. § 240.13d-1(b)(1).  The SEC alleges that the group never did so and therefore violated the securities laws.

Ladd argues that the Commission has not properly alleged the agreement that is necessary for a group to come into existence, as defined in SEC rules.  *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 123–24 (2d Cir. 2001); *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir. 1973) ("[A]bsent an agreement between them a 'group' would not exists.").  But the Court finds the Commission has amply done so at the pleading stage.  The Amended Complaint describes a deal that came together through negotiations between Stetson and Ladd that resulted in at least four investors each owning 4.9% of the company.  Stetson pursued that deal at Honig's direction.  The deal eventually included each member of the Honig Group, including Honig and Stetson, resulting in the Honig Group owning more than 16% of the company in January 2016.  These facts alone make it plausible that at least Honig and Stetson comprised a group that triggered the need to file a Schedule 13G or 13D as a group.

This finding is buttressed by the bevy of circumstantial evidence surrounding the Honig Group's manipulation of MTG and its stock, including Honig and O'Rourke's collaboration in orchestrating the McAfee deal in March 2016, the alleged coordination between Honig and Brauser to match trades and create the appearance of an active market in the early morning of the day the deal was announced, and the simultaneous negotiation between Ladd and each member of the Honig Group to allow the group to exercise their warrants immediately after the successful stock bump from the McAfee announcement.  Placed in context with all of the pre-2015 conduct alleged as background, it is more than plausible that the four men had agreed to work in concert on their schemes.  Ladd does not dispute whether the conduct alleged against the members of the Honig Group would otherwise be a violation of the securities laws, and so, accordingly, the SEC has properly alleged the first element of aiding and abetting liability against him.

23

### B.  Ladd's Knowledge of the Violations

Ladd next argues that the Commission has failed to show his knowledge of the underlying violations.  But the Commission has successfully done so here.  The Commission alleges as direct evidence that Ladd, in two separate emails to Honig, acknowledges that Honig is not working alone.  In his October 2015 email, Ladd wrote, "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ," and he received the names of several members of the Honig Group in a reply from Honig.  A month later, in November 2015, Ladd referred to Honig's "group" twice in an email discussing the deal to purchase a large number of MGT's shares.  Even though the email chain includes an immediate and terse response from Honig that he is investing as an individual, when accepting the allegations within the Amended Complaint as true and drawing all inferences in favor of the SEC, the Court must decline to take Honig's denial at face value.

As circumstantial evidence, the SEC alleges a long history between Ladd and the Honig Group, during which Ladd is alleged to have knowingly participating in the scheme to have the writer, Ford, promote MGT in *Seeking Alpha* without revealing his compensation to readers.  The SEC alleges facts that suggest that Ladd knew of Ford's connection to the Honig Group and the falsity of Ford's reporting.  With this history behind him, Ladd's knowledge of the Honig Group's continuing violations of the securities laws because even more plausible.  This in-depth collaboration with the four members of the Honig Group continued through the violations alleged for 2015 and 2016.

Again, taking all facts alleged in the Amended Complaint as true and drawing all inferences in favor of the Commission, the Court finds that the SEC has properly alleged Ladd's knowledge of the Honig Group's violations.

\* \* \*

Ladd has not contested whether, if he knew about the Honig Group's violations, his actions amounted to "substantial assistance."  Accordingly, the Court finds that the

SEC has properly pleaded the Seventh and Eighth Claims for Relief as against Ladd. The motion to dismiss these counts is DENIED.

## VII.    CONCLUSION

For the foregoing reasons, Ladd's motion to dismiss the Third and Fourth Claims for Relief as against him is DENIED in part — as to the allegations relating to the McAfee announcement — and GRANTED in part — as to all other allegations. His motion to dismiss the Seventh and Eighth Claims for Relief as against him is DENIED. His motion to strike is DENIED. The SEC is granted leave to file a Second Amended Complaint repleading the Third and Fourth Claims for Relief only as they pertain to Ladd's failure to report the Honig Group's alleged beneficial ownership in MGT's 10-K and S-1 filings. Should the Commission wish to file a Second Amended Complaint, it must do so by March 16, 2020, and Ladd is directed to file an answer or any objections to the complaint by April 6, 2020. The Clerk of Court is respectfully directed to terminate the motions, Docs. 146 and 161.[18]

It is SO ORDERED.

Dated:   February 25, 2020
         New York, New York

EDGARDO RAMOS, U.S.D.J.

---

[18] Ladd's motion for oral argument, Doc. 161, is DENIED as moot.