**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,   :

   :

        Plaintiff,   :

   :   **18 Civ. 8175 (ER)**

     – against –   :

   :   **ECF CASE**

BARRY C. HONIG, ROBERT LADD,   :
ELLIOT MAZA, BRIAN KELLER,   :
JOHN H. FORD, GRQ CONSULTANTS, INC., and   :
HS CONTRARIAN INVESTMENTS, LLC,   :

   :

        Defendants.   :

-----------------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT ROBERT LADD'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

SECURITIES AND EXCHANGE COMMISSION
Nancy A. Brown
Jack Kaufman
Katherine Bromberg
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0106 (Kaufman)
Attorneys for Plaintiff

June 15, 2020

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND – THE RELEVANT SAC CLAIMS AGAINST LADD ..................................3

ARGUMENT ..............................................................................................................5

I.    The SAC States a Claim Regarding Ladd's False
      Statements and Omissions in the Form S-1 and Form 10-K ...........................5

      A.    The SAC Alleges Ladd's Regulatory Obligation to
            Disclose the Honig Group's Ownership of MGT Stock .........................6

      B.    The SAC Adequately Alleges Materiality Regarding
            Ladd's Form S-1 and Form 10-K Omissions...........................................8

II.   The SAC States Claims Regarding Ladd's False Forms 144 .......................11

      A.    Securities Act Section 5, Rule 144, and Form 144 ...............................12

      B.    Rule 144 Obligated Ladd to Submit Both Forms 144 ...........................12

            1.    Ladd Had an Obligation to Aggregate His Sales with Seymour's and
                  Disclose Them Because He and Seymour Were Acting in Concert..........13

            2.    Ladd's Use of Seymour's Account to Sell Shares for His Own
                  Benefit Made Seymour's Sales Subject Rule 144 ....................................17

      C.    Ladd Intentionally Executed Materially False Forms 144.....................19

III.  The SAC Adequately Alleges that Ladd
      Fraudulently Submitted False Forms 4 ........................................................23

CONCLUSION...........................................................................................................25

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*Blank v. Tripoint Global Equities, LLC,* No. 338 F. Supp. 3d 194 (S.D.N.Y. 2018) ...................22

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276 (2d Cir. 2011) .............. 23-24

*Howard v. Hui*, No. C 92–3742–CRB, 2001 WL 1159780 (N.D. Cal. Sept. 24, 2001)...............25

*In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ........................... 9-10

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ....................................................................... 21-22

*SEC v. Aly*, 16 Civ. 3853 (PGG), 2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) ........................21

*SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982) ....................................................15

*SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290 (S.D.N.Y. 2015) ..........................................12

*SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014)......................21

*SEC v. Czarnik*, No. 10 Civ. 745 (PKC), 2010 WL 4860678
   (S.D.N.Y. Nov. 29, 2010) ....................................................................................................... 20-21

*SEC v. Drucker*, No. 76 Civ. 2643 (MEL), 1983 WL 1369 (S.D.N.Y. Sept. 26, 1983)...............18

*SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019)............................................................... 21-22

*SEC v. Guenthner*, 395 F. Supp. 2d 835 (D. Neb. 2005)..............................................................10

*SEC v. Honig,* 18 Civ. 8175 (ER), 2020 WL 906383 (S.D.N.Y. Feb. 25, 2020) .....................5, 10

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)....................................................................................16

*SEC v. Laura*, 18-CV-5075 (NGG) (VMS), 2020 WL 1434114
   (E.D.N.Y. Mar. 24, 2020) ....................................................................................................21, 22, 24

*SEC. v. Longfin Corp.*, 316 F. Supp. 3d 743 (S.D.N.Y. 2018)......................................................13

*SEC v. Lyon*, 529 F. Supp. 2d 444 (S.D.N.Y. 2008)............................................................... 14-15

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010)........................................16

*SEC v. Shapiro*, 15 Civ. 7045 (RMB), 2018 WL 2561020 (S.D.N.Y. June 4, 2018)...................22

*SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321 (6th Cir. 2013) ...............................................16

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ...................................................................9

*United States v. Guterma*, 281 F.2d 742 (2d Cir. 1960) ...................................................................24

*United States ex rel. PCA Integrity Assoc., LLP v. NCO Fin. Sys., Inc.*,
    Civil Action No.: 15-750 (RC), 2020 WL 686009 (D.D.C. Feb. 11, 2020) ...........................22

*Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989 (2016) .......................................22

## STATUTES, REGULATIONS, AND RULES

Securities Act of 1933

      Section 5, 15 U.S.C. § 77e .................................................................. 4, 11-12, 19, 20

      Rule 144(a)(1), 17 C.F.R. § 230.144(a)(1) ............................................... 2-3, 16

      Rule 144(a)(2), 17 C.F.R. § 230.144(a)(2) ............................................ 13-14, 15

      Rule 144(b)(2), 17 C.F.R. § 230.144(b)(2) .......................................... 2-3, 14, 17-18

      Rule 144(e), 17 C.F.R. § 230.144(e) ................................................ 11-12, 13, 19-21, 23-24

      Rule 144(e)(3)(vi), 17 C.F.R. § 230.144(e)(3)(vi) ................................. 2-3, 13-15, 17, 19

      Rule 144(h), 17 C.F.R. § 230.144(h) ............................................... 12-13, 15, 17, 18-19

Securities Exchange Act of 1934

      Section 13(d), 15 U.S.C. § 78m(d) ......................................................9, 17

      Section 16(a), 15 U.S.C. § 78p(a) ..................................................... 23-24

      Rule 12b-2, 17 C.F.R. § 240.12b-2 ......................................................17

      Rule 16a-3, 17 C.F.R. § 240.16a-3 ....................................................23, 25

Fed. R. Civ. P. 9(b) ......................................................................................22

Fed. R. Civ. P. 12(b)(6) .............................................................................. 9-10

## OTHER AUTHORITIES

J. William Hicks, *Resales of Restricted Securities* (2013)..........................12, 14, 18, 20

Loss, Seligman and Paredes, *Securities Regulation*
(6th ed. 2018 (last updated:  December 2019))...................................................................... 13-14

SEC Rel. No. 33-8869, 2007 WL 4270700 (Dec. 6, 2007) ...........................................................14

SEC Rel. No. 33-5223, 1972 WL 121583 (Jan. 11, 1972) ...........................................................15

Pursuant to the May 5, 2020 scheduling Order (DE 249), Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this opposition to the Motion to Dismiss the Second Amended Complaint ("Motion") of Defendant Robert Ladd ("Ladd").

## PRELIMINARY STATEMENT

The SEC's Second Amended Complaint ("SAC") alleges both fraud and non-fraud claims against Ladd for making materially false statements and omissions concerning MGT Capital Investments, Inc. ("MGT"), the public company for which Ladd then served as chief executive officer and director. Ladd did so to support two fraudulent pump-and-dump schemes orchestrated by settled Defendants Barry Honig, Michael Brauser, John Stetson, and John O'Rourke (collectively, the "Honig Group"). The SAC alleges that Ladd participated in those schemes by: (1) failing to disclose in MGT's November 2015 Form S-1 and April 2016 Form 10-K the Honig Group's "group" ownership of over 16% of MGT's stock, thus helping the Honig Group hide its control of MGT; and (2) issuing a false May 9, 2016 MGT press release to pump up MGT's stock price. The SAC also alleges that Ladd personally profited from the scheme by selling 775,000 shares of MGT stock through his and his father's accounts immediately after issuing the false MGT press release (from May 9-12, 2016), and another 77,563 shares through his own account later the same month. The SAC further alleges that Ladd executed two false SEC Forms 144 and a false Form 4 regarding his May 9-12 stock sales to avoid SEC trading-volume limitations that prohibited Ladd from selling half of the 775,000 shares he sold from May 9 to 12, 2016.

Ladd seeks dismissal only of the fraud claims, and only those claims concerning his false

SEC filings and Forms.[1] Ladd asserts that the SAC does not adequately allege: (1) Ladd's duty to disclose the Honig Group's "group" status in the Form S-1 and Form 10-K; (2) the materiality of Ladd's false statements and omissions in those filings; (3) Ladd's scienter regarding those false statements and omissions; (4) the materiality of Ladd's false Forms 144 and Forms 4 and his scienter regarding them; and (5) Ladd's obligation to submit one of those forms — the May 10, 2016 Form 144 that Ladd submitted for the MGT stock sales in the account of his father, Seymour Ladd ("Seymour"). The Court should deny Ladd's motion because the SAC adequately alleges each of those elements.

Regarding the Forms S-1 and 10-K, Ladd's argument ignores the SAC's new allegations, which amply address the issues the Court raised in its February 25, 2020 Order resolving Ladd's motion to dismiss the SEC's First Amended Complaint. The SAC's new allegations explain in detail Ladd's regulatory disclosure duties regarding those Forms, the precise manner in which Ladd knowingly breached those duties, and precisely why those breaches were material. The SAC thus complies with all pleading requirements regarding the SEC's claims arising from the Form S-1 and Form 10-K.

The SAC likewise alleges in detail precisely why Ladd's false Forms 144 and 4 were material, and Ladd's scienter regarding them — allegations that Ladd's Motion likewise all but ignores. Moreover, Ladd misconstrues Rule 144 and its application to the facts of this case and, thus, his legal obligation to submit the Form 144 on behalf of his father, Seymour. Contrary to Ladd's arguments, he was required to submit that Form 144 — and to provide truthful answers in response to all information requested by the Form — because: (1) under Rule 144(e)(3)(vi),

---

[1] Ladd does not seek dismissal of the fraud claim based on his false May 9, 2016 MGT press release. He also does not seek dismissal of any of the SEC's non-fraud claims (SAC Claims for Relief 11, 13, 14, and 17).

Ladd and Seymour were acting in concert to sell MGT shares from Seymour's account; and (2) under Rules 144(b)(2) and 144(a)(1), Ladd controlled Seymour's account and was making the sales both for himself and for Seymour, who was himself an MGT affiliate.

## BACKGROUND – THE RELEVANT SAC CLAIMS AGAINST LADD[2]

The SAC alleges that Ladd participated in two back-to-back MGT stock pump-and-dump schemes with the Honig Group in February and May 2016. Ladd principally participated in two ways. First, Ladd signed MGT's false November 6, 2015 Form S-1 registration statement ("Form S-1") and 2015 Form 10-K, filed on April 14, 2016 ("Form 10-K"). The Form S-1 and Form 10-K purported to list all beneficial owners of more than 5% of MGT's stock — and identified Honig as holding 8.6% — but falsely omitted the Honig Group's collective beneficial ownership of 12% and over 16%, respectively, of MGT's stock. (¶¶ 51, 56, 163-65, 247, 253, 258, 263.) Second, although relevant to Ladd's current Motion only for context, Ladd issued MGT's May 9, 2016 press release, which falsely exaggerated the past financial success of John McAfee, whose company (and purported expertise) MGT announced that it was acquiring. (¶¶ 146-54, 247, 253, 258, 263.)

An essential part of the Honig Group's fraud scheme was their collective control of a sizeable portion of MGT's stock and consequent influence over MGT's management and policies. (¶ 127.) The Honig Group acted in concert to effectuate their pump-and-dump schemes, and its members took steps to conceal the concerted nature of those efforts from the investing public — including by failing to file with the SEC required disclosures of their collective ownership of more than 16% of MGT's stock. (¶¶ 155-62.) Ladd, knowing of the Honig Group's collective MGT stock ownership, and its direction of MGT's management and policies, helped

---

[2] This section provides an overview of those SAC claims against Ladd relevant to his Motion. References to "(¶__)" are to paragraphs of the SAC (DE 233).

hide the Honig Group's control of MGT from the public by filing the false Form S-1 and Form 10-K. (¶¶ 155, 157, 163-65.)

The May 2016 pump-and-dump scheme culminated in Ladd's May 9 issuance of the false MGT press release about McAfee — which artificially raised MGT's stock price by 34% — and Ladd's and the Honig Group's collective dumping on the public of millions of shares of their MGT stock shortly thereafter. (¶¶ 149-54.) From May 9 to May 31, 2016, Ladd personally sold a total of 852,863 MGT shares, from both his own and his father's trading accounts, for total proceeds of $1,184,662.68. (¶ 153.) Ladd sold the bulk of those shares (775,000) from May 9-12, 2016, for total proceeds of $966,427.83. (¶ 172.)

In addition to these fraudulent acts, Ladd filled out, executed, and submitted false SEC Forms 144 and a Form 4 regarding his May 9-12 MGT stock sales in his and his father's accounts — intentionally creating for the SEC and the public the false appearance that those stock sales occurred weeks later than they actually did.[3] As further explained below, the SAC alleges that Ladd did so primarily to avoid certain stock sale volume restrictions applicable to him as MGT's CEO — imposed by Securities Act Section 5 and Rule 144. Those restrictions, which Ladd intentionally violated, prohibited Ladd from selling (without registering the sales) approximately half of the 775,000 MGT shares he sold from May 9-12. (¶¶ 166-83.)[4]

On February 25, 2020, the Court issued its Opinion and Order resolving Ladd's motion to dismiss the SEC's First Amended Complaint ("FAC"). Regarding the false Form S-1 and Form

---

[3] Ladd also failed to disclose his earlier MGT stock sales on both Forms 144 and Form 4 (¶¶ 178, 183).

[4] For this reason, in addition to its fraud claims, the SAC alleges that Ladd violated Securities Act Section 5 regarding his May 9-12 MGT stock sales in his and his father's trading accounts. (¶¶ 166-73, 277.) Ladd's Motion does not challenge the adequacy of the SAC's allegations as to the Section 5 claim against him.

10-K, the Court ruled that the FAC did not adequately allege Ladd's regulatory obligation to disclose the Honig Group's collective ownership of MGT stock in those filings, and the materiality of such omissions. *SEC v. Honig,* No. 18 Civ. 8175 (ER), 2020 WL 906383, at *1, 10, 13 (S.D.N.Y. Feb. 25, 2020). The Court, however, granted the SEC leave to amend the FAC. *Id.* at 13. To address those deficiencies, as further explained below, the SAC includes new allegations (in addition to certain FAC allegations) regarding: (1) Ladd's regulatory obligations to disclose the Honig Group's collective ownership of MGT stock in the Forms S-1 and 10-K; (2) Ladd's breaches of those obligations by failing to make those disclosures; and (3) the materiality of Ladd's failure to make those disclosures. (¶¶ 51, 56, 159, 163-65.)

## **ARGUMENT**

### I.      **The SAC States a Claim Regarding Ladd's False Statements and Omissions in the Form S-1 and Form 10-K**

Contrary to Ladd's arguments, the SAC addresses the issues the Court raised in its February 25 Order regarding the SEC's claim that Ladd made false statements and material omissions in the Form S-1 and Form 10-K. The SAC alleges: (1) Ladd's specific regulatory obligation to disclose in those reports each MGT shareholder, including each shareholder "group," holding more than 5% of MGT's outstanding stock; (2) Ladd's breaches of that obligation — by falsely purporting to disclose each such shareholder while omitting the Honig Group's collective ownership of well over 5% of MGT's stock; and (3) the materiality of those false statements and omissions — which, as the SAC alleges, hid from potential MGT investors important information regarding both who controlled MGT and the likelihood of a rigged market in MGT stock.

**A.     The SAC Alleges Ladd's Regulatory Obligation to**
**         Disclose the Honig Group's Ownership of MGT Stock**

Ladd's first argument — that the SAC does not allege Ladd's regulatory obligation to disclose the Honig Group's collective MGT stock ownership (Ladd Br. at 9-11) — ignores the SAC's new allegations directly addressing that matter (¶¶ 51, 163-64). The SAC expressly alleges that Ladd, as MGT's CEO, violated his regulatory obligations to disclose the Honig Group's collective ownership of more than 12% of MGT's stock in the Form S-1 and more than 16% of MGT's stock in the later-filed Form 10-K.

First, the SAC alleges MGT's regulatory disclosure obligations. The SAC alleges that Item 403 of Regulation S-K obligated MGT to disclose in both its Form S-1 and Form 10-K each "person known by [MGT] to be the beneficial owner of more than 5% percent" of MGT's outstanding stock. (¶¶ 51, 163-64.) The SAC alleges this disclosure obligation both as to public companies in general (including MGT) (¶ 51) and specifically regarding the MGT Form S-1 and Form 10-K (¶¶ 163-64). The SAC further alleges that the term "person" in Item 403 includes "any 'group' as that term is used in section 13(d)(3) of the Exchange Act." (¶ 51.) The SAC also alleges that, based on those provisions, "potential investors reading an issuer's Form 10-K or registration statement on Form S-1 can expect to see a table describing all persons – and all 'groups' of persons – who beneficially own more than 5% of [MGT's] stock." (*Id.*) The SAC further alleges that "[o]fficers who sign public filings on behalf of their companies have a duty to ensure their completeness and accuracy." (*Id.*)

Next, the SAC alleges that Ladd violated those regulatory obligations by purporting to disclose each shareholder holding more than 5% of MGT's stock while failing to disclose the Honig Group's "group" ownership of far greater than 5%. In the Form S-1, the SAC alleges that Ladd failed to disclose the Honig Group's collective ownership of over 12% of MGT's stock:

> The Form S-1 purported to list 'each person known by [MGT] to be the beneficial owner of more than 5% of the outstanding Common stock' of [MGT], as it was required to pursuant to Item 403 of Regulation S-K. Although the table listed Honig as a 5% beneficial owner, it failed to disclose the combined group ownership of Honig, Brauser, Stetson and O'Rourke (or their entities). Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, but he signed the November 2015 Form S-1 without disclosing the Honig group's collective beneficial ownership of [MGT] stock, which amounted to more than 12% of [MGT's] outstanding stock.

(¶ 163.)

Likewise, the SAC alleges that Ladd violated his regulatory obligation to disclose in the Form 10-K the Honig Group's then "group" ownership of more than 16% of MGT's stock:

> [MGT's] 2015 Form 10-K, filed with the Commission on April 14, 2016 and signed by Ladd, contained a table that purported to disclose 'each person known by [MGT] to be the beneficial owner of more than 5% of the outstanding Common stock' of [MGT] as of April 11, 2016, also as required by Item 403 of Regulation S-K. Although the table disclosed Honig as a beneficial owner of 8.6%, it failed to disclose the combined group ownership of Honig, Brauser, Stetson and O'Rourke (or their entities). Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, but he failed to disclose in the Form 10-K their group's beneficial ownership of [MGT's] stock, which amounted to more than 16% of [MGT's] stock.

(¶ 164.)

Ignoring these detailed allegations as to why Ladd had a duty to disclose the Honig Group's collective ownership of MGT shares, Ladd repeatedly attacks as too general the allegation that he was obligated to disclose the "true extent" of the Honig Group's MGT share ownership (Ladd Br. at 1, 7, 9-11). That broad allegation in the SAC's final "claims" paragraphs (¶¶ 247, 253) does not negate the specific, new SAC allegations contained in the earlier factual paragraphs that address this issue (quoted above). Thus, contrary to Ladd's Motion, the SAC now alleges with precision his regulatory disclosure obligations and how he knowingly violated them, and these new allegations amply address the issues the Court raised in its February 25 Order. Neither that Order nor the cases that Ladd cites (Ladd Br. at 7-9) require the SEC to

allege more.

**B.     The SAC Adequately Alleges Materiality Regarding
        Ladd's Form S-1 and Form 10-K Omissions**

Ladd next contends that the SAC pleads materiality in only a "generic and conclusory

fashion" (Ladd Br. at 12). The SAC, however, adequately alleges the materiality of Ladd's false

statements and omissions in two distinct ways. First, the SAC alleges that such information is

material to investors in any public company to help them determine who actually controls the

company. Second, the SAC alleges that, for investors in microcap issuers such as MGT, such

information is particularly important to help ferret out potential stock manipulation schemes,

such as the pump-and-dump scheme that the SAC alleges Ladd and his cohort arranged.

The SAC first alleges that Item 403 of Regulation S-K and other federal securities law

provisions exist precisely to afford investors adequate information regarding who actually

controls a public company, and to "protect" them from potential "pump and dump schemes":

> Collectively, these and other provisions of the federal securities laws protect
> investors from pump-and-dump schemes and ensure that investors understand
> who is controlling a company and whether any large shareholders have
> amassed a position that will allow them to control or influence the company
> and its securities. When these required disclosures are evaded or issued in a
> misleading fashion, investors are deprived of material information about an
> issuer.

(¶ 56.)

Next, the SAC alleges that these materiality concepts applied specifically to Ladd's

failure to disclose the Honig Group's collective share ownership of well over 5% of MGT in the

MGT Forms S-1 and 10-K at issue:

> [MGT's] Form S-1 and Form 10-K thus hid from [MGT] investors material
> information regarding potential corporate control of [MGT]. Such information
> is especially important to investors evaluating microcap issuers such as
> [MGT], which are particularly susceptible to manipulation by undisclosed

control persons.[5]

(¶ 165.)

The SAC thus alleges precisely how Ladd's omissions at issue were material to potential

MGT investors: in violation of express regulatory obligations, Ladd hid information necessary to

determine who actually controlled MGT. Consistent with these allegations, the Second Circuit

has noted: "Section 13(d)'s purpose is to alert investors to potential changes in corporate control

so that they [can] properly evaluate the company in which they had invested or were investing."

*United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (internal quotation marks

omitted). Indeed, "the fact that the information is required to be revealed under [Exchange Act]

§ 13(d) is evidence of its materiality."[6] *Id.* at 1298.

The SAC's detailed materiality allegations more than suffice to state a fraud claim. "At

the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a

statement or omission that a reasonable investor would have considered significant in making

investment decisions." *In re JP Morgan Chase Secs. Regulation*, 363 F. Supp. 2d 595, 625

(S.D.N.Y. 2005). Furthermore, "[c]ourts do not grant motions to dismiss pursuant to Fed. R. Civ.

P. 12(b)(6) on grounds of immateriality, unless the misstatements are so obviously unimportant

---

[5] The SAC also alleges Ladd's prior knowledge of Exchange Act Section 13(d)'s group-disclosure requirements, including his knowledge that failure to make such disclosures can "create[] a materially misleading communication to [MGT's] stockholders," based upon a July 2014 MGT letter that Ladd reviewed and approved. (¶ 141.)

[6] The SAC alleges that Honig Group members Honig and Brauser understood that such group-ownership disclosure is material precisely because the SEC requires it. In February 2015, Honig and Brauser sued certain counter-parties in an unrelated transaction for allegedly failing to disclose their collective control of over 5% of an issuer in violation of Exchange Act Section 13(d). In their complaint, Honig and Brauser alleged that such information "is the kind of information that the SEC requires to be disclosed . . . precisely because of its materiality" and that "[p]laintiffs would not have purchased the [s]hares if they had known the undisclosed facts that [defendants] controlled such a large interest in [the issuer's] stock. . . ." (¶ 161.)

to a reasonable investor that reasonable minds could not differ on the question of their

importance." *Id.* at 625-26 (internal quotation marks omitted); *see also Honig,* 2020 WL 906383,

at *6. The SAC's materiality allegations easily satisfy this standard.

The two cases Ladd cites on this point (Ladd Br. at 7-9) do not support a contrary

conclusion. Neither case turns on whether the plaintiffs pleaded materiality in sufficient detail

but, rather, each case turns upon those courts' in-depth analyses of the particular facts and

circumstances before them. *SEC v. Guenthner*, 395 F. Supp. 2d 835, 847-48 (D. Neb. 2005)

(finding that company's stock price drop after its release of allegedly inflated earnings negated

materiality of accounting manipulations); *JP Morgan Chase,* 363 F. Supp. 2d at 630-31 (finding

not material improper accounting treatment that affected only 0.3% of investment bank's total

assets). Indeed, the *Guenthner* decision was not even at the motion-to-dismiss stage but on the

defendant's motion for judgment as a matter of law after a bench trial. *Guenthner*, 305 F. Supp.

2d at 837, 848. Here, the SAC alleges two specific materiality theories that must be taken as true

at this stage. Ladd cites no case, and the SEC is aware of none, requiring the SEC to allege more

regarding materiality.

Ladd further asserts that his group-ownership omission was not material based on certain

disclosures in the Forms S-1 and 10-K. Ladd first points to MGT's tabular disclosure in these

Forms that Honig, the group's leader, owned more than 5% of MGT's stock (7% in the Form S-1

and 8.6% in the Form 10-K). (Ladd Br. at 13.) Ladd next points to the Form S-1's disclosure in a

different table of the separate MGT ownership interests of other Honig Group members, each of

whom owned less than 5%. (*Id*.) The SAC, however, does not allege that Ladd failed to disclose

the Honig Group members' *individual* interests in MGT. Rather, the SAC alleges that Ladd

failed to disclose the Honig Group's *collective* ownership as a group of over 12%, and later over

16%, of MGT's stock. These omissions were material both because Ladd failed to disclose that the Honig Group members together controlled a much larger share of MGT's outstanding stock than any of them owned individually (approximately double Honig's individual percentage) and because Ladd failed to disclose that those shareholders were acting *together* to control MGT. As described above, the SAC alleges that the disclosure of such information would have suggested to investors the potential existence of a Honig Group manipulation of MGT stock, such as the pump-and-dump scheme the SAC alleges in fact occurred.

## II.    The SAC States Claims Regarding Ladd's False Forms 144

The SAC alleges additional fraud claims against Ladd for his misrepresentations and material omissions in two SEC Forms 144 regarding his MGT stock sales from May 9 to 12, 2016 in his and his father's trading accounts. On May 10, 2016, Ladd submitted the first of those false forms, regarding his MGT stock sales in his father, Seymour's, account. On May 25, Ladd submitted the second of those forms, regarding his MGT stock sales in his own trading account. (¶¶ 166-80.) The SAC alleges that Ladd made false statements and material omissions in those two forms aimed at creating the false appearance that his May 9-12 stock sales occurred weeks later than they actually did. The SAC further alleges that Ladd did so to avoid the stock sale volume restrictions applicable to him as MGT's CEO, imposed by Securities Act Section 5 and Rule 144(e). (¶¶ 166-83.) Those restrictions prohibited Ladd from selling (without registering the sales) 382,891 of the 775,000 MGT shares he sold from May 9-12, which generated illicit proceeds of $618,802.85 for Ladd and his parents. (¶ 172.) Ladd argues that (1) he was not obligated to file the Form 144 for the sales in his father's account; and (2) regarding the false statements in both Forms 144, the SAC does not adequately allege materiality and Ladd's scienter. Contrary to these arguments, Rule 144 obligated Ladd to submit Forms 144 regarding

his May 2016 stock sales in both his and his father's accounts, and the SAC adequately alleges

materiality and scienter regarding both of the Forms 144 that Ladd submitted.

### A.   <u>Securities Act Section 5, Rule 144, and Form 144</u>

As Ladd acknowledges, Securities Act Section 5 prohibits unregistered securities sales

unless a statutory or regulatory exemption exists.[7] (Ladd Br. at 16.) As the SAC alleges, one such

exemption is Securities Act Rule 144 (the "safe harbor" exemption), which permits persons

affiliated with a public company, such as its officers (Ladd, in this case), to engage in

unregistered stock sales, subject to a number of conditions and limitations. Those limitations

include Rule 144(e)'s limits on the volume of stock that an affiliate can sell at a given time — in

relevant part, a percentage of the company's average weekly reported trading volume during the

four-week period preceding the affiliate's stock sale. (¶¶ 170, 171.)

In addition, Rule 144(h) requires the seller to submit a "Form 144" notifying the SEC of

a proposed Rule 144 sale or sales, as well any recent sales by the affiliate of the same stock.

(¶ 174.) The Form 144 assists the SEC in monitoring Rule 144 stock sales of company insiders

(such as Ladd) for potential Section 5 violations. *See* J. William Hicks, *Resales of Restricted

Securities* § 4:252 (2013) (Rule 144(h) pre-sale notice requirement "was included in [Rule 144]

as an aid to the Commission in monitoring the operation of the rule, as an enforcement tool to

assist in the detection of abuses") (internal quotation marks omitted).

### B.   <u>Rule 144 Obligated Ladd to Submit Both Forms 144</u>

Ladd does not dispute that, as an MGT affiliate, Rule 144 obligated him to submit a Form

144 regarding his May 2016 MGT stock sales in his own account — which Ladd did, albeit

---

[7] "The registration requirements of Section 5 of the Securities Act ensure that investors receive
information sufficient to make informed investment decisions." *SEC v. Caledonian Bank Ltd.*,
145 F. Supp. 3d 290, 305 (S.D.N.Y. 2015).

fraudulently, on May 25, 2016. Ladd argues, however, that he was not obligated to disclose his own sales on his father's May 10 Form 144, even if they were acting in concert, because his father Seymour was not an MGT affiliate. (Br. at 21.) That argument misconstrues Rule 144 and its notification requirement, which applies to all "control" securities of an affiliate. *SEC. v. Longfin Corp.*, 316 F. Supp. 3d 743, 760 (S.D.N.Y. 2018) (discussing Rule 144's application to sales of "control shares").

### 1. Ladd Had an Obligation to Aggregate His Sales with Seymour's and Disclose Them Because He and Seymour Were Acting in Concert

Ladd, who held power of attorney for Seymour (¶ 167), was obligated to file a Form 144 to disclose both his intended sales of stock from Seymour's account and the sales he made from his own E*Trade account over the prior three months because he and Seymour were "acting in concert" under Rule 144(e)(3)(vi). Under that provision, sales of an issuer's stock by an individual who is not affiliated with the issuer must be aggregated with an affiliate's stock sales if the individual and affiliate are acting in concert — at least for purposes of Rule 144(e)'s volume limitations and Rule 144(h)'s requirement for submission of a Form 144. *See* 17 C.F.R. § 230.144(e)(3)(vi) ("When two or more affiliates *or other persons* agree *to act in concert for the purpose of selling securities of an issuer*, all securities of the same class sold for the account of all such persons during any three-month period shall be aggregated for the purpose of determining the limitation on the amount of securities sold." (emphasis added)). Put another way, if an issuer's officer (such as Ladd) — the quintessential affiliate — acts in concert with an acquaintance to sell the issuer's shares, the number of shares sold by both the officer and the acquaintance must be combined and treated as the officer's sales to determine whether his sales exceed Rule 144(e)'s volume limitations. *See* Loss, Seligman and Paredes, *Securities Regulation*, 3.D.2 (6th ed. 2018 (last updated Dec. 2019)) ("Even when separate individuals or entities would

not have their sales aggregated under Rule 144(a)(2), they may still *act in concert* and have their

sales aggregated under Rule 144(e)(3)(vi)" (emphasis in original)). This rule conforms to the

long-standing principle that all persons who act either for or on behalf of the affiliate, or at his

direction, are themselves affiliates. *See* 17 C.F.R. § 230.144(b)(2) (making Rule 144 applicable

to affiliates "or persons selling on behalf of affiliates").

The stock sales of both the affiliate and the person acting in concert with the affiliate

would then need to be reported on the Form 144. Indeed, each seller — in this example, the

officer and the acquaintance acting in concert — would then be required to file a Form 144

disclosing both his sales and those of the person with whom he is acting in concert. *See* Form

144 Instructions (cited in Ladd Br. at 19 & Lee Decl, Ex. G, at 2) ("In addition, information shall

be given as to sales by all persons whose sales are required by paragraph (e) of Rule 144 to be

aggregated with sales for the account of the person filing this notice.").

Ladd correctly notes that the SEC amended Rule 144 in 2007 to exempt non-affiliates

from the Rule. The SEC, however, did not change Rule 144(e)(3)(vi) — indeed the SEC did not

mention Rule 144(e)(3)(vi) in the Amendment's adopting release, Rel. No. 33-8869, 2007 WL

4270700 (Dec. 6, 2007). The aggregation requirement of that provision continues where an

affiliate is one of the "persons" acting in concert, making all of them "affiliates" for the purposes

of Rule 144. *See Resales of Restricted Secs.* § 4:231 (noting that, after the amendment, the

volume limitations do not apply where the agreement to act in concert is among a group

consisting solely of non-affiliates).[8]

---

[8] Whatever the relevance of Sullivan & Cromwell's comments to the proposed Rule 144 changes
in 2007 (Ladd Br. at 21 n.7), they have no application here because the final rule made no
changes to subsection (e)(3)(vi). In any event, the commenters plainly were not envisioning the
present situation — an affiliate using his relative's account to hide his own substantial sales.
Similarly inapplicable is *SEC v. Lyon*, 529 F. Supp. 2d 444 (S.D.N.Y. 2008) (Ladd Br. at 20).
There, the defendants were not affiliates, the securities were restricted, and the sole issue was

Ladd further argues that the non-affiliate "persons" whose sales must be aggregated with an affiliate's sales for purposes of Rule 144(e)(3)(vi) include only relatives who share a home with an affiliate under Rule 144(a)(2). (Ladd Br. at 21 n.6.) But Rule 144(e)(3)(vi) supplements the list of such "persons" with non-affiliates "acting in concert" with affiliates, as described above. Ladd's argument that the word "person" in Rule 144(e)(3)(vi) has the cohabitating-relative meaning ascribed in Rule 144(a)(2) would render 144(e)(3)(vi) superfluous — it would mean that the aggregation rule applies only to those who cohabitate, even though Rule 144(a)(2) already requires aggregation for those relatives.

Ladd's narrow reading of Rule 144(h) would also subvert its purpose: "to provide notice to investors of the character of securities sold in trading transactions." Adopting Release, Rel. No. 33-5223, 1972 WL 121583, at *4 (Jan. 11, 1972). Indeed, Ladd's reading would allow affiliates like Ladd to qualify for the Rule 144 safe harbor simply by using nominees to disguise their own trading. That interpretation would elevate form over substance, which would subvert a key purpose of the securities laws: protecting investors. *See SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) ("purposes of the securities laws . . . require disregarding form for substance and placing emphasis upon economic reality") (citations omitted).

Indeed, Ladd himself understood that the sales from his father's account had to be aggregated with his for Rule 144 reporting purposes, notwithstanding his argument here. On his May 25 Form 144 regarding his trading in his own accounts, Ladd disclosed the prior MGT sales in Seymour's account in the box labeled "securities sold during the past 3 months." (Lee Decl. Ex. C at 2). Thus, Ladd — as the person who filled out his father's May 10 Form 144 — was

---

whether a short sale constituted a sale or offer of the securities ultimately used to cover the sale. *Id.* at 447, 458-60.

obligated to disclose both his and his father's relationship to MGT, and Ladd's own sales, on Seymour's Form 144, and his failure to do so rendered that filing materially false.[9]

In any event, because Seymour was deemed an MGT affiliate by operation of law, even Ladd's narrow reading of the Rule required Ladd (acting on Seymour's behalf) to submit a Form 144 that disclosed both Ladd's and Seymour's sales.

Seymour was deemed an MGT affiliate himself because he and MGT were under common control with Ladd. Rule 144(a)(1) defines an "affiliate" as one who "directly, or indirectly . . . controls, or is controlled by, or is under common control with [the] issuer." Where an issuer's officer dominates a non-affiliate, even only with respect to certain securities or transactions, the non-affiliate is deemed to be under "common control" with the issuer controlled by the affiliate and, therefore, an affiliate himself. *SEC v. Kern*, 425 F.3d 143, 149-50 (2d Cir. 2005) (defendant affiliates' friends and families, who were holding shares at defendants' behest, were under common control with the issuer and, thus, affiliates); *see also SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 329-30 (6th Cir. 2013) (shareholders who had transferred stock powers to defendant who controlled issuer were under common control with issuer and, thus, affiliates); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1087-89 (9th Cir. 2010) (defendant's status as officer of issuer and of a second corporation rendered second corporation affiliate of issuer).

The SAC alleges that Ladd controlled MGT and aspects of its business as its CEO and a

---

[9] Ladd offers little in defense of his false answer of "None" to the Form 144 question of Seymour's relationship to MGT. He argues, for example, that the Form's instruction that the seller disclose whether he is a "member of immediate family" of an affiliate is "simply a mistake" (Br. at 19). But mistake or not, Ladd's answer to the question was false; his father was an immediate member of Ladd's family.

Director.[10] (¶¶ 32, 131, 133, 138, 147-49, 151, 154, 163-64.) It also alleges that Ladd controlled

Seymour's relevant account through the power of attorney he and Seymour executed. (¶ 167.)

Accordingly, because of Ladd's common control over MGT and Seymour, Seymour was an

MGT affiliate to the extent of his MGT stock sales, and Ladd, acting under power of attorney in

completing the Rule 144 Form, was required to disclose Seymour's relationship to him and

MGT, and to disclose the sales Ladd had made in the prior three months in his own account

because he and Seymour were acting in concert.

### 2. Ladd's Use of Seymour's Account to Sell Shares for His Own Benefit Made Seymour's Sales Subject to Rule 144

Even if Rule 144(e)(3)(vi) had not required Ladd to disclose his prior sales in his own

account on the May 10 Form 144 he filed for Seymour's sales, Rule 144(h) still required their

disclosure for an additional reason: under Rule 144(b)(2), Seymour was a person "sell[ing]

shares for the account" of an MGT affiliate (Ladd), requiring the aggregation and disclosure of

all of Ladd's and Seymour's sales on the May 10 Form 144.

Seymour's account sold MGT securities for Ladd's account, making the Rule 144

requirements applicable to Seymour's sales. In selling the MGT shares on May 12, 2016,

Seymour was selling them for Ladd's account because the proceeds from those sales — at least

up to $325,000 — went directly to Ladd. (¶ 169.) Under Rule 144(b)(2), therefore, the Rule's

requirements applied to all of those sales.

Rule 144(b)(2), titled "Affiliates or *persons selling on behalf of affiliates*," provides:

Any affiliate of the issuer . . , *or any person who sells . . . securities for the*

---

[10] Ladd's control of aspects of MGT's business is consistent with the SAC's allegations that the Honig Group controlled and "direct[ed] the management and policies" of MGT for the purposes of Exchange Act Section 13(d). (*E.g.*, ¶ 155.) "Control" under Section 13(d) is the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies" of the issuer, 17 C.F.R. § 240.12b-2, and the SAC alleges that the Honig Group exercised such control in various ways throughout the relevant period. (¶¶ 133, 135, 139, 142-43.)

> *account of an affiliate of the issuer of such securities* . . . shall be deemed not
> to be an underwriter of those securities within the meaning of Section 2(a)(11)
> of the Act *if all of the conditions of this section are met.*

17 C.F.R. § 230.144(b)(2) (emphases added). The SAC alleges that Ladd was using Seymour's account to buy and then sell MGT securities, that he profited from their sale, and that he used Seymour's account to avoid the volume limitations imposed by the Rule on his sales. (¶¶ 167-69, 170-73, 176.) Thus, all of the Rule's requirements, including the accurate completion of the Form 144 and the volume limitations, were directly applicable to Seymour's sales because he was "selling [MGT] shares for the account of an affiliate," his son Ladd.

It makes no difference that the account was in Seymour's, and not Ladd's, name. The Rule is designed to capture sales made by nominees on the affiliate's behalf, regardless of whose name is on the account. *SEC v. Drucker*, No. 76 Civ. 2643 (MEL), 1983 WL 1369, at *31-32 (S.D.N.Y. Sept. 26, 1983) (sales by defendant affiliate in accounts of others violated Rule 144's volume limitations); *see also Resales of Restricted Securities*, § 4:190 ("sales by a nominee, agent, or other person holding securities for the benefit of another person, who is an affiliate of the issuer, are deemed to be sales for the account of the beneficial owner"). Rule 144(h) requires that the "person for whose account the securities are to be sold" sign the Form 144. The Form itself requires that the signer disclose both the securities he intends to sell as well as "all securities of the issuer sold during the past 3 months by the person for whose account the securities are to be sold." (*See* Lee Decl., Ex. G, at 2.) Thus, Ladd was required to disclose his E*Trade sales on Seymour's Form 144, to sign it in his own name, and to disclose Seymour's and his relationship to MGT.

For the foregoing reasons, the SAC properly alleges that Ladd made false statements on the May 10, 2016 Form 144 for the MGT stock sales from Seymour's account, a form required

to be filed under Rule 144(h).

### C.      Ladd Intentionally Executed Materially False Forms 144

Ladd further erroneously asserts that the SAC fails to allege materiality and scienter regarding Ladd's false statements and omissions in the May 10 and 25, 2016 Forms 144. To the contrary, the SAC amply satisfies those elements by alleging that Ladd intentionally submitted those two false forms to evade Securities Act Section 5's stock sale registration requirements — and the related Rule 144(e) stock trading volume limitations — regarding his May 2016 MGT stock sales in his and his father's accounts.

Ladd's May 2016 MGT stock sales violated Section 5, as "[n]o registration statement was in effect" for those sales, "and no applicable exemption from registration existed."[11] (¶ 170.) Thus, "Ladd could not rely upon" Rule 144 (among other potential exemptions) for those stock sales because, taken together, they "exceeded the volume limitations of Rule 144(e)."[12] (*Id.*) The SAC thus alleges that Ladd tried to evade Rule 144(e)'s volume limitations by submitting the two false Forms 144 regarding his May 9-12 stock sales — to create the false appearance that those sales occurred two weeks later than they had — by which time MGT's larger trading volume would have brought the sales into compliance with the volume limitations.[13] (¶¶ 173, 175, 176, 180.)

---

[11] As noted above, Ladd's Motion does not challenge the adequacy of the SAC's additional claim that Ladd's May 2016 MGT stock sales violated Securities Act Section 5. (Claim for Relief 11.)

[12] As discussed above, and as the SAC alleges, Rule 144(e)(3)(vi) required Ladd to aggregate his and his father's stock sales for Rule 144(e) volume limitation purposes. (¶ 175.)

[13] In this regard, the SAC further alleges: "During the week of May 9, 2016, due largely to [MGT's] announcement of its pending transaction with CI Company, average trading volume in [MGT] stock exploded to approximately 31 million shares for that week. Consequently, the number of shares Ladd could sell pursuant to Rule 144 in the weeks beginning May 16, 2016 grew exponentially." (¶ 173.)

The SAC alleges that, on May 10, 2016, Ladd "signed . . . and submitted . . . a Form 144 stating [his father's] intent to sell by May 30, 2016, 382,863 [MGT] shares" from his father's account. (¶ 175.) The SAC further alleges that Ladd failed, however, to disclose in that May 10 form required information regarding both his prior and intended MGT stock sales, including his own sales between May 9 and 12, which were critical for Section 5 volume-limitation purposes. (¶¶ 171-73, 175-76.) The SAC further alleges that "Ladd filed no Form 144" notice of his May 9-12 stock sales, but that, "[t]wo weeks later [on May 25] . . . Ladd knowingly or recklessly filed a false Form 144" that "falsely indicated that Ladd was selling [his own MGT] stock later in May and, thus created the false appearance that his May 2016 [MGT] stock sales satisfied Rule 144(e)'s volume restrictions." (¶ 176.) Thus, the SAC alleges, "[b]y failing to file a Form 144 that accurately reflected his May 9-12, 2016, [MGT] stock sales," and by filing false Forms 144 regarding his trading in his and his father's accounts, "Ladd knowingly or recklessly stated falsely that his May 2016 [MGT] stock sales were in compliance with the stock sale volume limitations of Securities Act Rule 144(e) when they were not."[14] (¶ 180.) As noted above, Forms 144 assist the SEC in monitoring Rule 144 stock sales of company insiders (such as Ladd) for such potential Section 5 violations. *See Resales of Restricted Securities* § 4:252.

The SAC thus alleges in detail the materiality of Ladd's false Forms 144. Indeed, courts have recognized that such false statements can be material for Exchange Act Section 10(b) purposes even if not made directly to investors: "[a] misstatement made in any phase of the selling transaction can be material if a reasonable investor would have considered the defendant's alleged misrepresentations important, even if the statement is not made directly to the investor. Investor reliance is not a necessary predicate for a finding of materiality." *SEC v.*

---

[14] In addition to Ladd's false Forms 144 — and toward his same fraudulent end — on May 31, 2016, Ladd filed a false Form 4 (¶¶ 180, 183), discussed below.

*Czarnik*, No. 10 Civ. 745 (PKC), 2010 WL 4860678, at *5 (S.D.N.Y. Nov. 29, 2010).

The SAC also amply alleges Ladd's scienter — by alleging both his opportunity and motive for intentionally filing his false Forms 144: to hide from regulators the fact that his May 2016 MGT stock sales violated Rule 144(e)'s volume limitations. (¶¶ 170-73, 180); *see also SEC v. Laura*, No. 18-CV-5075 (NGG) (VMS), 2020 WL 1434114, at *6 (E.D.N.Y. Mar. 24, 2020) (properly pleading scienter "can be accomplished either by alleging facts to show that defendants had both motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness") (internal quotation marks omitted). In this regard, the SAC alleges that Rule 144(e) limited Ladd to selling only 392,109 of the 775,000 MGT shares he sold from May 9-12, 2016, and that that smaller sales volume would have generated for Ladd (and his relatives) a total of only $347,624.98, instead of the $966,427.83 total sales proceeds they actually received. (¶¶ 171, 172.) As the SAC alleges, Ladd knew that he could not attempt to evade those volume limitations, and receive the excess sales proceeds, without submitting false Forms 144 (and filing a false Form 4).

Such scienter allegations — of a defendant's false statements tied closely to his receipt of concrete benefits — are exactly the type that courts in this district have found sufficient against corporate officers such as Ladd. *See, e.g., SEC v. Aly*, No. 16 Civ. 3853 (PGG), 2018 WL 1581986, at *23 (S.D.N.Y. Mar. 27, 2018) (scienter established based upon "temporal proximity between [defendant's] filing" of a false Schedule 13D and his "sale of his call options"); *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014) (allegations of corporate officer's failure to disclose transactions by which he siphoned offering proceeds to his relatives sufficiently pleaded scienter).[15] Thus, as the Second Circuit has required, the SAC

---

[15] *See also SEC v. Fiore*, 416 F. Supp. 3d 306, 324 (S.D.N.Y. 2019) (denying motion to dismiss where defendant allegedly sold stock after paying for its promotion and engaging in other

alleges far more than the "motives possessed by virtually all corporate insiders," such as the desire for the corporation to appear profitable or "to maintain a high stock price in order to increase executive compensation." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). The SAC alleges unlawful securities sales and personal profits that Ladd directly and proximately facilitated through his false statements.

Without legal support, Ladd argues that the SAC must separately allege materiality and scienter for each of Ladd's two false Form 144 statements at issue. (Ladd Br. at 14.) First, as explained above, the SAC does separately allege the materiality of each Form 144. In any event, no case that Ladd cites requires that the SAC plead materiality or scienter with any greater specificity than it does. To the contrary, a complaint satisfies the Rule 9(b) particularity requirement for materiality simply by "'pleading facts to support allegations of materiality.'" *United States ex rel. PCA Integrity Assoc., LLP v. NCO Fin. Sys., Inc.*, Civ. Action No. 15-750 (RC), 2020 WL 686009, at *11 (D.D.C. Feb. 11, 2020) (quoting *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2004 n.6 (2016)). Likewise regarding scienter: "'[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *PCA Integrity Assoc.,* 2020 WL 686009, at *11 (quoting Fed. R. Civ. P. 9(b)); *see also Laura*, 2020 WL 1434114, at *6 ("[c]onclusory allegations of scienter are sufficient if there exists a minimal factual basis giving rise to a strong inference of fraudulent intent") (internal quotation marks omitted). The SAC satisfies these requirements by pleading such materiality and scienter facts

---

manipulative acts); *SEC v. Shapiro*, No. 15 Civ. 7045 (RMB), 2018 WL 2561020, at *7 (S.D.N.Y. June 4, 2018) (denying motion to dismiss and finding motive where defendant's compensation was causally related to his false statements); *Blank v. Tripoint Global Equities, LLC,* No. 338 F. Supp. 3d 194, 214 (S.D.N.Y. 2018) (allegation that defendant earned commissions on money raised in Ponzi scheme satisfied scienter element as specific concrete benefit).

regarding Ladd's two alleged false Forms 144.

## III.     **The SAC Adequately Alleges that Ladd Fraudulently Submitted False Forms 4**

The SAC further alleges that, on May 31, 2016, Ladd publicly filed a Form 4 with the

SEC that falsely reported his sale of 157,300 shares of MGT stock on May 25 —a falsity that

was part of Ladd's attempt to hide his actual sales of MGT stock two weeks earlier (May 9-12),

in violation of Rule 144(e)'s volume limitations. Ladd's arguments regarding his May 2016

Form 4 thus fail because the SAC adequately alleges that that form was materially false, and that

Ladd filed it with the requisite fraud scienter.

As the SAC alleges, Exchange Act Section 16(a) and SEC Rule 16a-3 thereunder

required MGT's officers (including Ladd) to file periodically "certain forms with the

Commission disclosing their [MGT] stock holdings and any of their purchases or sales of [MGT]

stock." (¶ 181.) Thus, for example, Ladd was required to file a Form 4 for "any [MGT] stock

transactions that resulted in a change in Ladd's beneficial ownership of [MGT] stock within two

business days following the execution date of any such transaction." (*Id.*) The SAC further

alleges that Rule 16a-3 disclosures (including Form 4) serve at least two purposes: (1) to guard

against any potential "abuse" of a public company officer's trading on "inside information"; and

(2) to give investors important information about how an insider views the company's prospects:

> As reflected in the legislative history of the enactment of Exchange Act
> Section 16(a), 'the most potent weapon against the abuse of inside information
> is full and prompt publicity.' H.R. Rep. 73-1383, at 13, 24 (1934). Disclosure
> of an insider's purchases and sales gives investors an indication of the
> insider's private opinion as to the prospects of the company.

(¶ 52); *see also CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 290 (2d Cir.

2011) ("The purpose of Section 16 is generally said to be to reveal transactions by insiders, so

defined, and to prevent short-swing profit making based on non-public, material information, *i.e.*,

insider trading."). As the Second Circuit has noted, Forms 4 thus serve "the important purpose of achieving the timely filing of current information which Congress considered necessary for the protection of investors." *United States v. Guterma*, 281 F.2d 742, 752 (2d Cir. 1960). Thus, as a matter of law, accurate and timely Form 4 filings by public company officers (such as Ladd) are material to investors and potential investors.

Moreover, in addition to the generally-accepted materiality of all Forms 4, the particular false Form 4 that Ladd filed on May 31, 2016 was material — and Ladd acted with scienter regarding it — for the reasons set forth in section II.C. above. As the SAC alleges, on May 31, 2016 (after receiving an inquiry from the New York Stock Exchange regarding MGT stock sales by its officers), Ladd filed the false Form 4. The Form 4 falsely reported his sale of 157,300 shares of MGT stock on May 25, when, "[a]s Ladd knew, he made no [MGT] stock sales on or about May 25, 2016." (¶¶ 179, 183.) Ladd made this misrepresentation to hide his actual sales of MGT stock two weeks earlier (from May 9 to 12) in violation of Rule 144(e)'s volume limitations. (¶ 180.) Ladd's false May 31, 2016 Form 4 also hid his sales of thousands of MGT shares from his E*Trade account during the three months prior to May 2016. (¶ 182.)

Ladd's scienter is further evinced by his false October 7 and December 1, 2015 Forms 4, in which he knowingly or recklessly omitted more than twelve open-market purchases of MGT stock that he had made between August 20 and December 1, 2015. (¶¶ 182, 247.) Ladd's repeated failure to make those mandated MGT stock purchase disclosures in 2015 evince, at least, his reckless disregard for the truth — as to both those false 2015 Forms 4 and his later false May 2016 Form 4 and Forms 144. *See Laura*, 2020 WL 1434114, at *6 (scienter element can be satisfied "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness") (internal quotation marks omitted).

The only case upon which Ladd relies (Ladd Br. at 14), *Howard v. Hui*, No. C 92–3742–CRB, 2001 WL 1159780 (N.D. Cal. Sept. 24, 2001), supports the SEC's position, not Ladd's. The *Howard* court dismissed the plaintiff's complaint alleging false Form 144 filings on materiality grounds — not because plaintiff alleged inaccurate trading information but, rather, because plaintiff's fraud claims rested on Form 144's allegedly false "boilerplate" representation that defendants were unaware of any "material adverse information" regarding the company. *Id.* at *5. In holding that that language was not sufficiently material to state a fraud claim — and directly contrary to Ladd's argument — the *Howard* court noted: "[I]t is the sale of stock by a major shareholder that is a material event." *Id.* In this case, the SAC alleges fraud based precisely on Ladd's false statements regarding his purchases and sales of MGT stock. That is a "material event" as a matter of law, given Ladd's role as MGT's CEO, and the investor-protection purposes of Rule 16a-3 and its required Form 4 stock trading disclosures by corporate insiders.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Ladd's Motion to Dismiss the Second Amended Complaint.

Dated:  June 15, 2020            Respectfully submitted,
      New York, NY

                                       /s/ Jack Kaufman
                                       Nancy A. Brown
                                       Jack Kaufman
                                       Katherine Bromberg
                                       200 Vesey Street, Suite 400
                                       New York, NY 10281
                                       (212) 336-0106 (Kaufman)
                                     Attorneys for Plaintiff Securities and Exchange
                                     Commission