UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

        – against –

BARRY C. HONIG, MICHAEL BRAUSER,
JOHN STETSON, JOHN R. O'ROURKE III,
ROBERT LADD, ELLIOT MAZA,
BRIAN KELLER, JOHN H. FORD,
ATG CAPITAL LLC, GRQ CONSULTANTS,
INC., HS CONTRARIAN INVESTMENTS,
LLC, GRANDER HOLDINGS, INC., *and*
STETSON CAPITAL INVESTMENTS INC.,

                              Defendants.

**<u>OPINION & ORDER</u>**

18 Civ. 8175 (ER)

<u>Ramos</u>, D.J.:

      At all times relevant to this motion, Robert Ladd was the CEO and director of

MGT Capital Investments, Inc.[1]  The SEC has alleged that he participated in a "pump and

dump" scheme with defendants Honig, Brauser, Stetson and O'Rourke (collectively the

"Honig Group") to unlawfully inflate MGT's stock price.  In an Order dated February 25,

2020, the Court granted in part and denied in part Ladd's previous motion to dismiss the

SEC's fraud claims against him.  *See SEC v. Honig*, No. 18 Civ. 8175 (ER), 2020 WL

906383 (S.D.N.Y. Feb. 25, 2020).  The Court denied Ladd's motion to dismiss regarding

allegedly false statements he made on May 9, 2016 about the appointment of John

McAfee as CEO of MGT.  However the Court granted his motion, with leave for the SEC

to replead, regarding his omission of the "true extent" of members of the Honig Group's

beneficial ownership of MGT stock in SEC filings.

---

[1] The SEC's Second Amended Complaint refers to MGT as "Company B."

In its Second Amended Complaint ("SAC"), the SEC re-alleges its securities fraud claims based both on Ladd's statement about McAfee and his failure to disclose the beneficial ownership interest of the Honig Group.  The SEC also adds new allegations of securities fraud in connection with unregistered stock sales in May 2016, and Ladd's failure to disclose changes to his own beneficial ownership of MGT on several occasions. *See* SAC, Doc. 233, at ¶¶ 247, 253.[2]  Ladd moves to dismiss all of these new fraud allegations except for those in connection with the McAfee announcement that the Court addressed in its February 25, 2020 Order.

For the reasons discussed below, Ladd's motion is GRANTED in part and DENIED in part.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The facts underlying this case are more fully set out in the Court's February 25, 2020 Order.  *See SEC v. Honig*, No. 18 Civ. 8175 (ER), 2020 WL 906383 (S.D.N.Y. Feb. 25, 2020).  The Court provides an abbreviated summary here.

### A.      The "Pump and Dump" Scheme

The SEC's allegations against Ladd arise from his connections to the Honig Group.  The SEC has alleged that defendants Honig, Brauser, Stetson and O'Rourke orchestrated schemes to buy large amounts of low-priced company stock, artificially boost the price of that stock by disseminating false or misleading statements about the company, and sell large holdings of that stock at a significant profit.  Such "pump and

---

[2] The SEC alleges that Ladd committed fraud by violating § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, § 17(a)(2) of the Securities Act, and by aiding and abetting other violations by the Honig Group.  *See* SAC at Fifth, Sixth, Seventh and Eighth Claims for Relief.  The SEC also alleges several other strict liability violations of the securities laws based on the same conduct.  *See* SAC at Eleventh, Thirteenth, Fourteenth, and Seventeenth Claims for Relief.  Ladd does not move to dismiss the non-fraud allegations.

dump" schemes may also include coordinated intra-group trading by groups of investors, including mergers, to create the appearance of inflated market demand, when that demand is in fact generated by the undisclosed group's coordination.  ¶ 55.[3]  The SEC alleges that the Honig Group engaged in three such schemes, one of which it coordinated with Ladd and MGT.[4]

### i.      The Honig Group's Acquisition of MGT Stock

The SEC alleges that Ladd's involvement with the Honig Group began in 2012, when Honig, Stetson and another unnamed individual affiliate purchased cheap MGT convertible preferred stock, contingent on, among other things, an agreement that MGT use $300,000 to "promote [MGT's] stock."  ¶ 129.  The group then allegedly paid Defendant Ford, a stock promoter, to write two articles promoting MGT, including one in which Ladd was interviewed.  ¶¶ 130–33.[5]

In late September 2015, Honig wrote to Stetson to initiate the drafting of a term sheet for another proposed investment deal with MGT.  ¶ 135.  The deal was allegedly structured to ensure that each of the four investors could convert and sell their shares while evading reporting requirements under Exchange Act § 13d, which requires public disclosure of holdings above 5%.  ¶ 136.  The SEC alleges that Ladd knew that Honig and others were acting as a group, and that they were doing so for the purpose of pumping the company's stock price.  ¶ 140.  On October 8, 2015, MGT filed a Form 8-K with the SEC

---

[3] Unless indicated otherwise Citations to "¶ _" refer to the Second Amended Complaint.

[4] The SEC has settled claims with all other defendants, although certain relief issues remain.  *See* Docs. 151, 152, 224–228.

[5] While the SEC does not bring charges for the 2012 events, it alleges that these events provide relevant context to the other allegations.  The Court allowed these events to be included in the pleadings as background in its February 2020 Order.  *See Honig*, 2020 WL 906383, at *6.

disclosing that the Company had "entered into separate subscription agreements . . . with accredited investors . . ."  ¶ 139.  After this financing closed, the SEC alleges that the Honig Group collectively owned at least 1.7 million shares, or over 12% of the shares outstanding, with warrants to obtain up to an additional 3.4 million shares, or 36% of the total common outstanding shares.  ¶ 156.

On November 6, 2015, MGT filed a Form S-1 registration statement with the SEC, which required disclosure of all beneficial owners of more than 5% outstanding common stock.  ¶ 163.  The Form S-1 listed Honig individually as a beneficial owner, but did not disclose the combined 12% group ownership of all group members.  *Id.*

### ii.    The Scheme to Inflate MGT Stock

The SEC alleges that on or around January 21, 2016, after the Honig Group amassed an undisclosed controlling interest in MGT, Honig directed Ladd to pay $125,000 to a stock promoter to write an article promoting MGT.  ¶ 144.  After the article was published on February 3, 2016, MGT's trading volume rose 7,000% from the previous day.  *Id.*  The article did not disclose that the author had been paid by Ladd to write the article.  The SEC alleges that Honig, Ladd, Stetson and O'Rourke thereafter sold over 430,000 shares of MGT stock.  ¶ 145.

In early March and April 2016, the Honig Group took steps to arrange a deal between MGT and John McAfee, who rose to fame as the founder of the cybersecurity company McAfee Associates.[6]  ¶ 147.  O'Rourke introduced Ladd to McAfee on April 4, 2016 to begin negotiations regarding a merger between MGT and McAfee's company at the time, D-Vasive, Inc.  *Id.*, *Honig*, 2020 WL 906383, at *3.  The SEC alleges that the

---

[6] McAfee is referred to as "Cybersecurity Innovator" in the SAC.

Honig Group took an active role throughout these negotiations.  ¶ 148.  On April 14, 2016, MGT filed a Form 10-K with the SEC again disclosing Honig as an individual beneficial owner of more than 5% outstanding common stock, but without disclosing the Honig Group's combined group ownership.  ¶ 164.

On May 9, 2016, MGT issued a press release announcing the merger, which falsely claimed that McAfee had previously sold his former anti-virus company, McAfee Associates, to Intel for $7.6 billion.  ¶ 149.  While it was true that the company had been sold to Intel for this amount, this sale in fact occurred over a decade *after* McAfee's departure from the company.  ¶ 149.  Ladd also filed a Form 8-K with the SEC the same day.  *Id.*  On the day the merger was announced, *StockBeast.com*, a stock promotion website, published an unsigned article promoting MGT and the McAfee deal.  ¶ 151.  The article, entitled "MGT Beastmode engaged — John McAfee driving the Bus," had been paid for by Ladd and also falsely indicated that McAfee had "sold his startup company to Intel for $7.6 BB."  *Id.*  Honig also bought and sold small quantities of MGT stock dozens of times earlier that morning.  ¶ 150.

Soon after the announcement of the deal, MGT's market capitalization had increased nearly 12-fold and its trading volume peaked at an amount over 1,500 times what it was before the announcement.  ¶ 152.  In the days after the merger, members of the Honig Group sold over 9.2 million MGT shares.  ¶ 153.  The SAC alleges that Ladd facilitated the group's early exercise of their warrants, allowing them to sell more shares into the inflated market.  *Id.*  In late May 2016, after members of the Honig Group—and Ladd himself—had sold significant amounts of their shares, MGT filed a Form 10-Q that, contrary to the false suggestion in the May 9, 2016 press release, accurately stated that

"[McAfee] founded McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010." ¶ 149. However, the 10-Q still did not disclose that McAfee had left the company years before the Intel acquisition.

### iii.    Allegations Relating to Ladd's Unregistered May 2016 Stock Sales

The SEC also brings new allegations regarding Ladd's own stock sales and stock sales through his father's account in the relevant time period.[7]  In June 2015, Ladd and his parents executed a "Full Trading Authorization" on his father's online brokerage account, which gave Ladd authority to trade on the account and appointed him as "agent and 'attorney in fact for the purchase and sale of securities.'" ¶ 167. As a result, this account was designated as an "affiliate" of MGT by the online brokerage, TD Ameritrade. *Id.* Securities Act Rule 144(a)(1) defines an "affiliate" as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1).

In November 2015, Ladd also opened a new personal account through E*Trade, in which he did not disclose his affiliation with MGT. ¶ 166. At this time, the SEC alleges that he already had two other accounts through TD Ameritrade in which he *had* disclosed his position at MGT. *Id.* On the New E*Trade account, however, the SEC alleges that Ladd falsely stated he was "Retired," and that he responded "No" to the question "Director, or policy-making office [sic] at a publicly-owned company?" *Id.*

---

[7] In the SAC, the SEC alleges that this account was shared by both of Ladd's parents. *See* ¶ 167. However, the parties' briefs frequently refer to the May 10 Form 144 as having been filed on behalf of Ladd's "father," and the sales being made on his "father's" account. *See, e.g.*, Doc. 242, Def's Br., at 18–20; Doc. 264, Pls. Opp., at 19–20. For consistency, the Court will refer to this sale and accompanying regulatory filings as done on behalf of Ladd's "father," or on his "father's" account, as opposed to referring to both of Ladd's parents. This distinction does not impact the analysis in Section III.B.v., *infra*.

Ladd made several trades between May 9, 2016—the day the McAfee merger was announced—and May 12, 2016, through both his own and his father's accounts. ¶ 168. These trades collectively amounted to 775,000 shares, yielding $966,427.83 in sales. ¶ 172. Of these, 340,000 shares netting $551,979.44 were traded through Ladd's father's account on May 12, 2016. *Id.* The SEC alleges that on May 13, 2016, one of Ladd's parents wrote Ladd a $325,000 personal check. ¶ 169. No registration statement was in effect for any of these sales. ¶ 170.

Under Securities Act Rule 144(e), company "affiliates" (such as a CEO or other officers or directors) are permitted to sell their company's stock so long as they do not exceed certain volume limitations and reporting requirements. ¶ 171. Specifically, affiliates are prohibited from selling the greater of 1% of the company's shares of that class outstanding, or the greater of the stock's average weekly reported trading volume for that class during the four calendar weeks preceding the stock sale. *Id.* Affiliates relying on Rule 144 must, however, comply with certain conditions, such as filing an SEC Form 144 disclosing the amount they plan to sell in the event they plan to sell more than 5,000 shares, or shares exceeding $50,000 in value. *See* ¶ 174; 17 C.F.R. § 144(h)(1). Due to the increase in MGT's trading volume after the May 9 McAfee merger announcement, the volume sale limitation applicable to Ladd under Rule 144(e) grew significantly beginning on May 16, 2016. ¶ 173.

Ladd did not complete a Form 144 regarding the May 9–12 sales in his own account, and did not file another Form 144 until May 25, 2016. ¶ 176–77. On this form, he falsely indicated that he intended to sell by that day 41,000 MGT shares from his own

TD account, and 465,171 shares from his E*Trade account. *Id.*[8]  This Form 144 also failed to disclose the May 9–12 trades from his E*Trade account, as well as several other trades he made between February 26 and May 17, 2016.  ¶ 178.  He did, however, disclose the sales made through his father's account earlier that month. *Id.*  The SEC alleges that Ladd's belated filing of this form was part of a scheme to evade the volume trading limitations set forth in Rule 144(e).  ¶ 180.

While Ladd did not file this Form 144 regarding sales in own account until May 26, he did file a Form 144 on behalf of his father on May 10, 2016 in anticipation of the sales on his father's account.  ¶ 175.  On this Form, Ladd responded "NONE" to the question seeking his father's "relationship to issuer." *Id.*  The SEC alleges that Ladd also fraudulently failed to aggregate Ladd's *own* stock sales with those of his father in the previous four weeks, for the purpose of assessing whether they complied with the volume limitations set forth in Rule 144(e). *Id.*

Finally, the SEC alleges that Ladd failed to accurately disclose changes to his own beneficial interest in MGT throughout the relevant time period.  The SEC requires that company officers fill out a Form 4, a form disclosing any MGT transactions resulting in a change in one's beneficial ownership, within two business days of any such transaction. ¶ 181.  Ladd filed several Forms 4 within the relevant time period:  on October 7, 2015, December 1, 2015, and May 31, 2016.  ¶¶ 179, 182.   On the May 31, 2016 Form 4, Ladd stated that he had sold a total of 157,300 shares on May 25, 2016, when he in fact had not made any such sales on that date.  ¶ 179.  He also failed to disclose on this form that "over twenty [MGT] open market purchases and sales [had occurred] between

---

[8] Ladd did sell MGT stocks from his TD account, though only 11,000, on May 31, 2016.  ¶ 177.

December 2, 2015 and May 17, 2016." ¶ 182.  The SEC also alleges that, on the Forms 4 filed in October 2015 and December 2015, Ladd did not disclose over twelve such purchases and sales between August 20 and December 1, 2015.  *Id.*

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 557).  However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it."

*Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud with particularity. *See SEC v. Lyon*, 529 F. Supp. 2d 444, 449 (S.D.N.Y. 2008). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'"). Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements; (2) the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012). Conditions of a person's mind — such as malice, intent, or knowledge — may be alleged generally. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd* 604 F. App'x 62 (2d Cir. 2015) (citing *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)).

## III.   THE FRAUD ALLEGATIONS

The SEC alleges that Ladd is liable for securities fraud for violations of  Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5 promulgated thereunder, and Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q.  Section 10(b) prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), while SEC Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact" in connection with any such purchase or sale.  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5).  To establish a violation under these provisions, the SEC must show "that the defendant (1) made one or more misstatements of material fact, or omitted to state one or more material facts that the defendants had a duty to disclose; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).  Section 17(a)(2) of the Securities Act requires proving that the defendant "obtain[ed] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in

order make the statements made, in light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q(a)(2).  Section 17(a)(2) differs from Section 10(b) of the Exchange Act in that it does not require proof of scienter — only proof of negligent conduct.  *See SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

The SEC alleges that Ladd violated these provisions by:  (1) making materially false statements about the McAfee merger in the May 9, 2016 press release; (2) failing to disclose the Honig Group's collective ownership and control over MGT in the company's Form 2015 S-1 filed in November 2015 and 2015 Form 10-K; (3) omitting and/or misrepresenting Ladd's previous MGT stock sales from his own account in several Forms 4, filed in October 2015, December 2015, and May 2016; (4) failing to disclose recent sales of MGT stock in a Form 144 filed on May 25, 2016; and (5) falsely stating that his father had no "relationship" to MGT and failing to disclose his own prior stock sales on the Form 144 submitted on May 10, 2016 on his father's behalf.  The SEC also alleges that Ladd aided and abetted the Honig Group's violations in connection with the McAfee press release and the alleged misrepresentations in the company's November 2015 S-1 and 2015 10-K.

The Court previously denied Ladd's motion to dismiss claims regarding the McAfee press release.  *See Honig*, 2020 WL 906383, at *7–8.  These claims are realleged in the SAC and Ladd does not move to dismiss them.  However, Ladd does move to dismiss the remaining claims under Sections 10(b) and 17(a)(2).

**A.  Allegations Surrounding the Forms S-1 and 10-K**

As the Court noted in its February 25 Order, "[t]he Supreme Court has instructed that '[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5.'"  *Stratte-*

*McClure v. Morgan Stanley*, 776 F.3d 94, 100–01 (2d Cir. 2015) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).  Such a duty to disclose may arise when there is a "statute or regulation requiring disclosure."  *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992).  To adequately allege that a defendant is liable for failing to make a required regulatory disclosure, the SEC must plead that the "defendant failed to comply with [the regulation]" in a public filing and (2) that the "omitted information was material."  *Stratte-McClure*, 776 F.3d at 103.

### i.    The SEC Alleges that Ladd Had a Duty to Disclose the Honig Group's Beneficial Ownership

In its February 25, 2020 Order, the Court dismissed the SEC's fraud claims based on MGT's November 2015 S-1 and 2015 Form 10-K.  *See Honig*, 2020 WL 906383, at *10.  The Court found that the SEC's allegation that Ladd "fail[ed] to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over [MGT's] management and policies" failed to state a claim.  *Id.* (quoting the First Amended Complaint ¶ 214).  The Court found that the SEC had not alleged any regulatory duty that required Ladd to disclose "the true extent" of the stock held by those individuals, nor did the SEC adequately allege that any omission was material.  *Id.*

In the SAC, the SEC supplements these allegations against Ladd, arguing that the S-1 and 10-K filings failed to comply with Item 403 of SEC Regulation S-K, and thus violated a regulatory duty.  *See* 17 C.F.R. § 229.403; ¶¶ 51, 163–64.[9]  Item 403 sets forth instructions for the disclosure of security ownership of certain beneficial owners, and its

---

[9] The Court previously rejected this argument because the SEC had not mentioned Item 403 or alleged that Ladd violated Item 403's regulatory obligations in the First Amended Complaint.  *See Honig*, 2020 WL 906383, at *10.

provisions are applicable to parties making 10-K or S-1 filings.[10]  It requires that the issuer furnish information—such as the beneficial owner's name, address, and percent beneficial ownership—regarding anyone known to be a beneficial owner of more than 5% of any class of a company's stock.  The provision seeks this information "with respect to any *person* (including any "group" as that term is used in section 13(d)(3) of the Exchange Act) . . . ."  § 229.403(a) (emphasis added).[11]  Therefore, Item 403's disclosure requirements apply both to individuals and to people acting as a "group."

Ladd does not argue that the Honig Group was not a "group" under Item 403 or Section 13(d).  He does argue, however, that the SEC's fraud allegation fails because there is no duty under Item 403 to disclose "the true extent" of the beneficial ownership of the individual members of the Honig Group.  *See* Def's Brief at 10 (citing SAC ¶¶ 247, 253).  He further notes that Honig's *individual* beneficial ownership was accurately disclosed in both forms, and that the beneficial ownership of each individual member of the Honig Group was disclosed in the Form S-1, albeit in a different part of that Form. For example, the S-1 filed November 6, 2015 discloses not only Honig as a 5% beneficial owner, but also sales made to Brauser, Stetson and O'Rourke through their entities, as well as their respective beneficial ownerships, in a separate section describing the October 8, 2015 offering.  *See* Doc. 243-1 at 42, 44–46.[12]

---

[10] A "beneficial owner" refers to anyone who, directly or indirectly, holds shares permitting them to exercise voting or investment power.  *See* 17 C.F.R. § 240.13d-3(a).

[11] Section 13(d) in turn refers to a "group" to include "two or more persons act[ing] as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer . . . ."  15 U.S.C. § 78m(d)(3).

[12] The 2015 Form 10-K filed in May 2016 lists Honig as a 5% beneficial owner, but this Form does not independently disclose the beneficial ownership of the rest of the Group members, even as individuals. Doc. 243-2 at 27.

At base, however, the SEC alleges that the disclosures did not reveal the full extent of Honig's beneficial ownership, or the total beneficial ownership of all of the Honig Group's members.  Indeed, Ladd's argument does not meaningfully grapple with the SEC's allegation that he was obligated to disclose the beneficial ownership of the Honig Group *as a whole*, pursuant to Item 403.  While Ladd understandably cites to ¶¶ 247 and 253 of the SAC, which use the same "true extent" language that was deemed insufficient to state a claim in the Court's February 25, 2020 Order, the SAC now makes clear that these allegations refer to the more specific regulatory duty created by Item 403. *See* ¶ 51 ("[P]otential investors reading an issuer's Form 10-K or registration statement on Form S-1 can expect to see a table describing all persons—and all "groups" of persons—who beneficially own more than 5% of [MGT's] stock."); *see also* ¶ 163 ("Nor did Ladd ensure that [MGT] made the required disclosure of Honig's, Brauser's, Stetson's and O'Rourke's group stock ownership. . ."); ¶ 164 ("Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, but he failed to disclose in the Form 10-K their group's beneficial ownership of [MGT's] stock").  These allegations sufficiently set forth the regulatory duty that Ladd allegedly breached:  his duty to disclose the collective beneficial ownership of the Honig Group, which it alleges was a "person" under Item 403.

With the allegations properly framed, it is clear that the SEC states a claim. Because Ladd does not argue that the SEC fails to plead that the Honig Group was a "group" under Rule 13(d)(3), the Court finds that the SEC has adequately pleaded its

group status under Rule 13(d)(3) and Rule 13-d5, promulgated thereunder.[13]  Moreover, the SEC has pleaded that Item 403 created a duty for the Honig Group to disclose its collective beneficial ownership when such ownership exceeded five percent of any class of MGT's securities.  *See* 17 C.F.R. § 229.403(a) (requiring disclosure of the "total number of shares" and "percentage of class" beneficially owned by any person, including any "group" when that percentage exceeds five percent); *see also* Harold S. Bloomenthal and Samuel Wolff, Going Public and the Public Corporation, § 7:68 ("In appropriate documents . . . a registrant must disclose . . . those owning beneficially 5 percent or more of the outstanding shares of the class (including Section 13(d)(3) groups for the purpose of determining 5 percent ownership))."

It is of no significance that the Form S-1 separately disclosed the individual ownerships of the other Honig Group members through its disclosure of their sales elsewhere in the document.  *See* Doc. 243-1 at 44–46.  This section did not purport to name any of Stetson, O'Rourke, or Brauser as greater than 5 percent beneficial owner due to their group membership—in fact, it listed each of their individual ownership percentages as "less than 1%" on the form.  *Id.* at 44.  Moreover, the S-1 only listed Honig (and another institutional investor not at issue here) as an individual 5% beneficial owner, based on his then 7% individual beneficial ownership, without any mention of the fact that he acted as a group with the others.  *Id.* at 42.  Thus, there is no way that an investor reading the Form S-1 would know that, at the time it was filed, Honig, Stetson, O'Rourke, and Brauser were a group that collectively owned over 12% of MGT's stock.

---

[13] *See* 17 C.F.R. § 240.13d–5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership . . .").

Nor—for the same reasons—would such an investor looking at the Form 10-K filed in April 2016 know about the existence of a group that at that time was exercising control over 16% of the company's stock.  Assuming, as the Court must, that the Honig Group had beneficial group ownership of approximately 12% and 16% of MGT's stock, at the times the S-1 and 10-K were filed, respectively, the SEC has adequately alleged that Ladd violated his duty to disclose this fact in those forms.

### ii.    The SEC Alleges That the Beneficial Ownership Omissions Were Material

 The SEC must also allege that the omission of the Honig Group's beneficial ownership was material.  As discussed in the February 25, 2020 decision, "a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  A complaint may only be dismissed on materiality grounds if the misstatements or omissions at issue are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Id.* at 162  (internal quotation marks and citations omitted).  Determination of materiality "is a mixed question of law and fact that the Supreme Court has stated is especially well suited for jury determination."  *U.S. v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

Ladd argues that the SEC insufficiently alleges that any omission of the Honig Group's beneficial ownership was material.  Doc. 242, Def's Br. at 12.  In support he cites ¶ 165 of the SAC, which alleges that the forms failed to disclose "material information regarding potential corporate control," which is "especially important to

17

investors evaluating microcap issuers such as [MGT], which are particularly susceptible to manipulation by undisclosed control persons." *Id.* Ladd argues that these allegations are insufficient because they do not set forth why the existence of an undisclosed control group would be significant to a reasonable investor. Ladd also argues that the mere fact that a particular disclosure is required under the securities laws does not necessarily make it "material" for the purposes of securities fraud liability under Section 10b or Section 17(a)(2).

While the paragraph Ladd invokes is somewhat conclusory when read in isolation, the SAC as a whole alleges that this information would be material to investors. The "potential corporate control" of MGT referenced in ¶ 165 referred to the fact that the Honig Group had beneficial ownership of 12% and 16% of MGT's stock as of the dates of the S-1 and 10-K filings, respectively.  ¶¶ 163, 164.  The SAC further alleges that these undisclosed facts are significant because they would put investors on notice that an undisclosed group may be exercising control over MGT policies.  ¶ 165, Pls. Opp. at 8. Thus, the question here is whether these undisclosed facts would be "so obviously unimportant to a reasonable investor that reasonable minds could not differ" on the need for their disclosure.  *Ganino*, 228 F.3d at 161.  Because reasonable minds certainly could differ on the importance of this information, the SEC adequately alleges that Ladd's omissions were material.

To be sure, Ladd is correct that the mere fact that this disclosure was required by the SEC does not make it "material *per se*" for securities fraud purposes. *Bilzerian*, 926 F.2d at 1298.  However, the SEC's disclosure requirements may still be considered as "evidence of [the omission's] materiality." *Id.* Here, the Honig Group's undisclosed

beneficial ownership was between two and three times the 5% threshold that the SEC has identified as sufficient to trigger its reporting requirements.  The Court declines to take the position that this degree of undisclosed ownership was immaterial as a matter of law, such that it could not have been important to a reasonable investor.  *Cf. In re JP Morgan Chase Securities Lit.*, 363 F. Supp. 2d 595, 630–31 (S.D.N.Y. 2005) (finding that allegations of fraudulent accounting, resulting in a 0.3% change in the categorization of a multi-billion dollar bank's assets, were immaterial given the totality of the circumstances).  The Court is especially reluctant to do so when the SAC alleges that the Honig Group's undisclosed beneficial ownership enabled it to exercise control over MGT policies in fact, such as through negotiating the McAfee transaction, from which they reaped significant profits.  *See* ¶¶ 154, 157.

The SEC therefore states a claim regarding the omission of beneficial ownership information in MGT's S-1 and 10-K statements.[14]

## B.   Allegations Based on Ladd's Forms 4 and Forms 144

### i.   Regulatory Background and Legal Standards

The SEC alleges that Ladd made a series of misstatements on several SEC disclosure forms regarding either his own MGT stock sales or a sale he made on his father's behalf.  ¶¶ 247, 253.  These include: (1) Ladd's omission of "over twelve open market purchases of MGT stock between August 20, 2015 and December 1, 2015 on two Forms 4 filed on October 7, 2015 and December 1, 2015";  (2) Ladd's false statement on

---

[14] The SEC brings claims alleging both primary and secondary liability regarding statements made on these forms.  Ladd does not raise an independent argument regarding the secondary liability claims in his briefs. However, to the extent he seeks dismissal of the secondary liability claims as well, the motion is denied, as the SEC has sufficiently pleaded that he knowingly or recklessly provided "substantial assistance" to the Honig Group by signing off on the S-1 and 10-K.  *See S.E.C. v. Apuzzo*, 689 F. 3d 204, 206 (2d Cir. 2012).

a Form 4 filed on May 31, 2016 that he had sold 157,300 shares of MGT stock several

days earlier; (3)  Ladd's false statement on a Form 144 filed May 25, 2016, which omitted

disclosure of 539,072 shares of his prior stock sales; and (4) misstatements made on a

Form 144 filed on May 10, 2016 by Ladd on his father's behalf.  ¶¶ 247, 253.  Ladd

moves to dismiss all of these claims on the basis that the SEC does not adequately allege

materiality or scienter.  Def's Br. at 13–15.  Ladd also argues that the SEC fails to plead

falsity or a duty to disclose regarding statements and omissions made on his father's

behalf on the Form 144 filed May 10, 2016.  *Id.* at 18–22.

As discussed in Section III.A., *supra*, to state a claim for securities fraud, the

plaintiff must allege "that the defendant (1) made one or more misstatements of material

fact, or omitted to state one or more material facts that the defendants had a duty to

disclose; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC*

*v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).   Such a duty to disclose may

arise when there is a "statute or regulation requiring disclosure," as there is in connection

with the Forms 4 and 144 in question.  *See Glazer v. Formica Corp.*, 964 F.2d 149, 157

(2d Cir. 1992).

To adequately allege materiality, the complaint must identify a "statement or

omission that a reasonable investor would have considered significant in making

investment decisions" and the Court will not dismiss a claim on that basis unless the

statements are "so obviously unimportant to a reasonable investor that reasonable minds

could not differ on the question of their importance."  *In re JP Morgan Chase Secs. Lit.*,

363 F. Supp. 2d at 625–26 (internal quotation marks omitted).  However, plaintiffs still

"must comply with the particularity requirements of Fed. R. Civ. P. 9(b) and the PSLRA;

the materiality of the alleged misstatements or omissions cannot be pled in a conclusory or general fashion." *Id.* at 626 (internal quotation marks omitted).

Under Rule 9(b), plaintiffs may allege scienter by "alleging facts to show that defendants had both motive and opportunity to commit fraud," or by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (internal quotation marks and citation omitted). Conclusory allegations "are sufficient if there exists a minimal factual basis giving rise to a strong inference of fraudulent intent." *SEC v. Alt. Green Techs., Inc.*, No. 11 Civ. 9056, 2012 WL 4763094, at *3 (S.D.N.Y. Sept. 24, 2012) (citations and internal quotation marks omitted) (alterations adopted).

With this background in mind, the Court turns to each of the material false statements or omissions at issue.

### ii.    The October and December 2015 Forms 4.

The SEC fails to plead that Ladd's omissions made on the October and December 2015 Forms 4 were material. Under 15 U.S.C. § 78p and 17 C.F.R § 240.16a-3, promulgated thereunder, the SEC requires certain corporate officers to file a Form 4 to disclose changes to their beneficial ownership of company stock. The SEC alleges that the purpose of these forms is to alert investors of sales by company insiders, and to "give[] investors an indication of the insider's private opinion as to the prospects of a company." Pls. Opp. at 23 (citing ¶ 52). The SEC alleges that Ladd "fil[ed] Forms 4 on October 7, 2015 and December 1, 2015 regarding Ladd's [MGT] stock transactions that omitted over twelve open market purchases of [MGT] stock between August 20, 2015 and December 1, 2015." ¶¶ 247, 253; *see also* ¶ 182.

However, the SAC includes no additional detail about the substance of these omitted sales. For example, the SEC does not plead the volume of these twelve purchases at all. Nor does it plead how significantly they impacted Ladd's total stock holdings. The SEC also does not put forth any arguments in its Opposition specific to why these twelve omissions were material, instead focusing its argument on the general importance of Forms 4, and the May 31, 2016 Form 4 discussed in Section III.B.iii., *infra*. *See* Pls. Opp. at 23–24.

This approach is too conclusory to plead materiality under the securities laws. The materiality inquiry is fact-specific and requires an assessment of whether it is plausible that a "reasonable investor" would have found the omissions in question "significant." *Ganino*, 228 F.3d at 161. However, without further detail about these omitted purchases, there is no basis for the Court to assess what a reasonable investor might think about them, or how they might have altered the "total mix" of information available about Ladd's stock sales. *See Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988). Because the Court has insufficient facts on which to make this assessment, the SEC fails to state a claim regarding the omissions on the October and December 2015 Forms 4. The SEC is granted leave to re-plead this claim.

### iii.      The May 31, 2016 Form 4

The SEC does, however, sufficiently allege that Ladd's omissions on the Form 4 filed May 31, 2020 were material. The form allegedly falsely claimed that Ladd had sold a total of 157,300 shares of MGT stock on May 25, 2016, when he had in fact not made

any sales that day.[15]  ¶ 179.  Ladd also omitted all other sales he had made since

December 1, 2015, which included sales of 435,000 shares in the May 9–12 period

immediately following MGT's press release about the McAfee merger.  ¶ 182.  Thus, the

Form 4 both omitted significant sales, and misrepresented the dates on which he *did* make

sales.  The SEC also alleges that this Form 4 was filed only in response to a May 22, 2016

NYSE inquiry into MGT sales by company officers.  ¶ 183.

Taking the SEC's allegations as true, Ladd would have been obligated to disclose

the May 9–12 sales of at least 435,000 shares that he omitted on his Form 4.  These sales

amounted to $414,448.39 in revenue and would have exceeded the average trading

volume in MGT securities for the previous four weeks, thus violating the volume trading

limitations of Rule 144(e).  ¶¶ 171–72.  While there is no sale amount that is *per se*

material, the fact that Ladd's trading volume spiked immediately after announcement of

the McAfee merger—and that he then acted to hide it—could, if disclosed, plausibly alter

the "total mix" of information available to investors interested in MGT's future prospects,

particularly in reference to the merger announcement.  *See Ganino*, 228 F.3d at 162

(noting that the numeric materiality of a given misrepresentation must be analyzed in its

full context).  In assessing its materiality, the SEC may also properly weigh the fact that a

false statement or omission bears on the legality of a transaction.  *See S.E.C. v. Czarnik*,

No. 10 Civ. 745 (PKC), 2010 WL 4860678, at *5 (denying motion to dismiss on

materiality grounds where an attorney made the false representation that unregistered

stock was not being offered with a view to resell).  While the SEC must still make its case

---

[15] He also disclosed a sale of 33,603 shares made on May 31, 2016, but the SEC does not allege that this statement is false.  ¶ 183.

on this point, the Court declines to find that no reasonable investor would find the omission of these sales insignificant as a matter of law.

The SEC also adequately alleges scienter regarding the May 31, 2016 Form 4. The SEC must allege facts showing either that Ladd "had both motive and opportunity to commit fraud" or that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. The SEC's allegations are adequate under either test. The SEC alleges that Ladd's omissions and misstatements were made with the intent to avoid the volume trading limitations for company officers set forth in Rule 144(e)(1). *See* 17 C.F.R. § 230.144(e)(1); Pls. Opp. at 24. As discussed above, Rule 144 constitutes an exception to the general prohibition on selling unregistered securities. A company officer or "affiliate" such as Ladd may sell unregistered securities, so long as the sale complies with Rule 144. One requirement of Rule 144 is that the affiliate's prior sales during the three months preceding the sale in question may not exceed the greater of: (a) 1% of the company's shares outstanding of that class, or (b) the stock's average weekly reported trading volume of that class during the four preceding calendar weeks. *See* 17 C.F.R. § 230.144(e)(1). The SEC alleges that the 435,000 undisclosed shares sold from Ladd's account during the week of May 9–12, 2016 exceeded the volume limitation applicable to him. Thus, had Ladd fully disclosed all relevant changes in his beneficial ownership on the May 31, 2016 Form 4, this disclosure would have shown that he had made unlawful trades the week of May 9–12. However, because MGT's trading volume grew after the McAfee merger, the volume of stock that he could sell pursuant to Rule 144(e) "grew exponentially" in the coming

weeks.  ¶ 173.  This undoubtedly provided him a motive and opportunity to fraudulently hide the May 9–12 trades by omitting sales and falsifying relevant sale dates.

Moreover, the SAC alleges that Ladd filed no Form 4 at all in connection with his May 9–12 sales until he received an inquiry from the NYSE, after which he filed the allegedly fraudulent Form 4.  ¶ 183.  His response to this inquiry—filing a form that included sales which had not been made, while omitting sales that had been made—creates an inference of at least reckless behavior that is  "at least as compelling as an opposing inference of nonfradulent intent."  *See SEC v. Lee*, 720 F. Supp. 2d 305, 335 (S.D.N.Y. 2010) (*quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).  The SEC therefore states a claim for fraud regarding Ladd's May 31, 2016 Form 4.

### iv.    The May 25, 2016 Form 144

For similar reasons, the SEC also states a claim regarding Ladd's Form 144 filed May 25, 2016.  Under the SEC's Rule 144, a corporate officer or other "affiliate" must file an SEC Form 144 each time that affiliate has "a bona fide intention" to sell the issuer's securities.  *See* 17 C.F.R. § 230.144(h).[16]  Forms 144 are part of the SEC's Rule 144, a "safe harbor" provision that permits corporate affiliates to sell unregistered securities under certain circumstances.  As discussed *supra*, one of these conditions is that the trades of an affiliate such as Ladd may not exceed the greater of 1% of the company's shares of the class outstanding, or the stock's average weekly reported trading volume of that class during the four preceding calendar weeks.  *See* 17 C.F.R. § 230.144(e)(1).

---

[16] The parties agree that as a corporate officer, Ladd was an MGT "affiliate" as the term is used in Rule 144. *See* 17 C.F.R. § 230.144(a)(1).

The SEC alleges that the May 25 Form 144 falsely stated that Ladd intended to sell, by that day, a total of 506,171 MGT shares from two of his personal accounts. ¶ 177.  The SEC alleges that this was false because he made no sales that day, and sold only 11,000 shares after that day (on May 31, 2016).  *Id.*  The SEC also alleges that Ladd failed to disclose on the Form 144 sales of 539,072 shares of MGT stock he had made in the prior three months, in violation of Rules 144(e)(1) and (h).[17]  ¶ 178.  These sales generated $512,471.78 for Ladd.  *Id.*  The SEC further alleges that these misstatements and omissions were made to disguise the fact that Ladd's sales during the week of May 9–12 did not comply with Rule 144(e)'s trading volume limitations.  ¶ 176.

The SEC states a claim regarding this Form 144 for substantially the same reasons as it does regarding the May 31, 2016 Form 4 discussed *supra*.  Regarding materiality, the SEC alleges that both forms misrepresented the sale dates and volumes of hundreds of thousands of shares worth of stock, amounting to over $50,000 in sales, which Ladd was required to fully disclose under relevant regulations.  *See* 17 C.F.R. § 240.16a–3(a) (requiring a Form 4 filing upon changes of beneficial ownership); 17 C.F.R. § 230.144(h) (requiring a Form 144 filing whenever a proposed sale exceeds 5,000 shares or $50,000).  While the fact that the SEC required disclosure of these sales does not make them material *per se*, such disclosure requirements are relevant to the materiality analysis.  *See Bilzerian*, 926 F.2d at 1298; *see also Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996) (noting that the SEC's "expert view" on when disclosure is required constitutes evidence of materiality or immateriality).  Here, Ladd allegedly

---

[17] While Ladd did not sufficiently disclose sales made on his own account during the preceding three months, he did disclose sales he made on his father's behalf on May 10, 2016, presumably on the basis that he and his father were "acting in concert" under Rule 144(e)(3)(vi).  *See* Doc. 243-3.

omitted sales that yielded proceeds in excess of ten times the SEC's Form 144 disclosure threshold. These sales also allegedly revealed a violation of Rule 144(e)(1). The Court declines to find these facts immaterial as a matter of law.

Regarding scienter, the SEC alleges that Ladd had motive and opportunity to omit his sales because doing so would hide his violation of Rule 144(e)'s volume requirements. The SEC also provides an additional basis for inferring Ladd's motive and opportunity to commit fraud regarding the Form 144: Ladd's undisclosed sales were made from his personal E*Trade Account, as opposed to his other TD Ameritrade Account. Ladd opened this E*Trade Account in November 2015, and failed to disclose his association with MGT on it, describing his occupation as "retired." ¶ 166. When Ladd transferred stock from TD Ameritrade to this account on November 25, 2015, he informed TD Ameritrade customer service personnel that he did so because he "did not like SEC Form 144 handling" at TD Ameritrade. *Id.* These facts add to the inference that Ladd made trades on this E*Trade account to fraudulently evade the Rule 144 requirements.

### v.     The May 10, 2016 Form 144 Filed on Ladd's Father's Behalf

The SEC, however, does not adequately state a claim regarding the Form 144 filed on Ladd's father's behalf. The SEC alleges two fraudulent statements or omissions regarding this form: First, it alleges that Ladd unlawfully responded "NONE" to the question "relationship to issuer," in violation of the form's express instruction to specify whether he was a "member of immediate family" of an "officer, director, [or] 10% stockholder" of MGT. ¶ 175. Second, it alleges that Ladd failed to disclose any of his own sales made within the preceding three months on his father's Form 144. *Id.* The

SEC alleges that this omission violated SEC Rule 144(e)(3)(vi), which requires the aggregation of recent stock sales for those who "agree to act in concert" to sell securities of an issuer—as the SEC alleges that Ladd and his father had done. *Id.*

As a threshold issue, Ladd argues that the SEC has inadequately alleged that his statements on the Form 144—which were made while acting in his capacity as his father's attorney—were false. He argues that he and his father had no legal "relationship" as relevant to the "relationship to issuer" question, because this question was designed only to assess whether Ladd's father was an MGT affiliate by operation of Rule 144(a)(2). He also argues that Ladd's father had no regulatory duty to disclose the information required by the Form 144 at all. Without an underlying regulatory duty, he argues, any omissions from the form cannot be considered "misleading" and therefore cannot constitute a basis for fraud. *See Basic Inc v. Levinson*, 485 U.S. 224, 239 n. 17 (1988). Finally, Ladd also argues that the SEC fails to allege materiality and scienter regarding these claims.

1. *Ladd's Failure to Disclose his Familial Relationship*

Some additional detail regarding Rule 144 is necessary to contextualize the parties' arguments regarding these alleged misstatements. As discussed in Section III.B.iv., Forms 144 must be filed by those seeking to benefit from the SEC's "safe harbor" rule, as set forth in SEC Rule 144. *See* 17 C.F.R. § 230.144. Rule 144 constitutes an exception to general prohibition against selling unregistered securities, so long as the person selling is not an "issuer, underwriter, or dealer." *See* 15 U.S.C. §§ 77e(a); 77d(a)(1). As relevant here, a person is not an "underwriter" if they are an "affiliate" of the issuer and meet the other requirements of Rule 144. *See* 17 C.F.R. §

230.144(a)(1).  An affiliate is a "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  *Id.*  The parties agree that Ladd is an MGT affiliate.

Rule 144(a)(2) also sets forth several people or entities that, for Rule 144 compliance purposes, are considered so closely connected with someone seeking the protection of Rule 144 that they are considered the same "person."  As relevant here, this includes "any relative or spouse of such person, or any relative of such spouse, *any one of whom has the same home as such person*."  17 C.F.R. § 230.144(a)(2)(i) (emphasis added).  Thus, under Rule 144(a)(2), an affiliate's relative would be functionally the same "person" as that affiliate—and thus subject to the same Rule 144 obligations—but only if the relative and affiliate share the same home.

Ladd argues that, because the Form 144 is meant to be filed only by affiliates, issuers or underwriters, the question seeking information about his "relationship to issuer" is designed to assess whether Ladd's father was an affiliate under Rule 144(a)(2)—that is, whether his father was a relative who "has the same home as [Ladd]." The SEC does not allege that Ladd and his father shared a home.  Therefore, Ladd is correct that his father is not the type of relative referenced by Rule 144(a)(2).  Ladd thus argues that he truthfully answered that his father had no relationship to MGT because the "relationship to issuer" question is designed only to elicit a relationship that triggers Rule 144(a)(2) compliance.

Ladd may well be correct about the intention behind the "relationship to issuer" question.  However, the Form 144 does not explicitly state that it seeks this information solely for Rule 144(a)(2) purposes—it simply asks for the person's "relationship to the

issuer (e.g., officer, director, 10% stockholder, or member of immediate family of any of the foregoing)." Therefore, the Court must find that Ladd's answer of "NONE" to this question was literally false, even if Ladd is right that the question may be designed to elicit the more specific information of whether he was a relative living in the same *household* as an officer. The SEC therefore adequately pleads falsity regarding this claim.[18]

However, for substantially the same reasons, the SEC does not sufficiently plead that this statement was materially misleading. The SEC's argument for *why* disclosure of Ladd's relationship to his father might be material is predicated on the idea that their relationship was legally significant, and thus that this sale bore on Ladd's legal obligations. *See* Pls. Opp. at 19–20 (arguing that the sale in Ladd's father's account helped hide from investors the fact that Ladd exceeded his volume trading limitations under Rule 144(e)).[19] However, as discussed above, the SEC has not adequately pleaded that Ladd's father was the same "person" as Ladd (and thus functionally an affiliate) by operation of Rule 144(a)(2). Moreover, as will be discussed in the following subsection,

---

[18] Nor does Ladd's argument that his father had no underlying duty to fill out the Form 144 at all make this statement not false. It is true that "silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17. However, "[o]nce a corporation has elected to speak . . . Rule 10b–5 mandates that its speech must be truthful, accurate, and complete." *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159–60 (S.D.N.Y. 2008). Ladd's answer of "NONE" does not meet this standard. Therefore, while the SEC does not allege facts sufficient to support a claim that Ladd's father had a *duty* to file a Form 144 in the first instance, this does not automatically make his false statement on this Form 144 "true" as a matter of law. Nevertheless, Ladd's lack of an underlying duty to disclose this information is evidence that the information was not material. *See Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996).

[19] In other words, the SEC does not allege that Ladd's designation as his father's attorney, without more, was inherently improper. Rather, the SEC alleges this designation helped Ladd to fraudulently evade Rule 144 requirements.

the SEC also fails to plead that Ladd's father was required to aggregate his sales with Ladd's based on other provisions of Rule 144.

The SEC alleges no other basis as to why this disclosure would be material. Accordingly, the SEC fails to allege that Ladd's father's response of "NONE" on the Form 144's question regarding his "relationship to issuer" was material.

2.   *Ladd's Failure to Aggregate His Recent Sales on His Father's Form 144*

The SEC also argues that Ladd is liable for fraud because he failed to disclose his own recent sales on the Form 144, alleging that this violated Rule 144(e)(3)(vi).  As discussed *supra*, Rule 144(e) more generally sets forth stock volume trading limitations for affiliates acting on reliance thereof.  *See* 17 § C.F.R. 230.144(e)(1).  To assess compliance with this limitation, Rule 144(e)(3)(vi) provides that:

> When two or more affiliates or other persons agree to *act in concert* for the purpose of selling securities of an issuer, *all securities of the same class sold for the account of all such persons during any three-month period shall be aggregated* for the purpose of determining the limitation on the amount of securities sold.

17 C.F.R. § 230.144(e)(3)(vi) (emphasis added).

Thus, the SEC's argument is that, even if Ladd's father was not an affiliate, he was obligated to disclose Ladd's stock sales on the Form 144 pursuant to this provision, because they were "acting in concert."  ¶ 175 (citing Rule 144(e)(3)(vi)).  The SEC argues that this is so because the Rule requires "affiliates or *other persons*" who act in concert to aggregate their stock purchases "for the purpose of determining the limitation on the amount of securities sold."  It thus argues that Ladd's father is an "other person[]" within this provision and therefore must aggregate his sales with Ladd's.

The SEC's argument fails because, in 2007, Rule 144 was amended to exempt non-affiliates from Rule 144(e)'s volume trading restrictions.  *See* Revisions to Rules 144 and 145, Release No. 8869, 92 SEC Docket 110, 2007 WL 4270700, at n.157 ("Under the amendments that we are adopting, the volume trading limitations would apply only to affiliates.").  While the 2007 revisions made no substantive change to the text of Rule 144(e)(3)(vi) more specifically, Rule 144's structure suggests that this change extends to the aggregation provision set forth in subsection (e)(3)(vi).  This is because Rule (e)(3)(vi) merely sets forth a *methodology* for assessing what the numeric limitation on the amount of securities sold for account of an affiliate will be.  *See* 17 C.F.R. § 230.144(e)(3)(vi) (stating that certain securities must be aggregated . . . "for the purpose of determining the limitation on the amount of securities sold").  This requisite "limitation on the amount of securities sold," however, refers back to Rules 144(e)(1) and (e)(2), which outline baseline volume limitations that, after the 2007 revisions, pertain only to affiliates.  *See* Rule 144(e)(1) (setting forth volume restrictions that apply "[i]f any securities are sold for the account of an affiliate . . .").  Thus, while Rule 144(e)(3)(vi) provides guidance as to the applicable methodology for calculating the volume trading restrictions applicable to *affiliates*, it imposes no independent volume trading restrictions on *non-affiliates*.[20]  *See also* William Hicks, *Resales of Restricted Securities* § 4:225 ("Prior to the 2007 amendments to Rule 144, aggregation of sales under Rule 144(e)(3)(vi) extended to both affiliates and non-affiliates.  But as a result of the 2007

---

[20] Rule 144(e) would still, however, have required aggregation if an otherwise non-affiliate entity sells "for the account of an affiliate" pursuant to Rule 144(b)(2), or if Ladd's father himself was an affiliate in the first instance.  However, as discussed *infra*, the SEC does not adequately allege that Ladd's sales should have been disclosed on either of these bases.

amendments . . . it appears, Rule 144(e)(3)(vi) is limited to resales by affiliates who act in concert.").

For his part, Ladd advocates an even narrower interpretation of subsection (e)(3)(vi), arguing that its phrase "or other persons" refers only to those who are the same "person" under Rule 144(a)(2)—i.e., relatives who share a home and certain other entities not relevant here. *See* 17 C.F.R. § 230.144(a)(2).[21]  It is not necessary to determine whether Ladd's interpretation is correct here, because, even if the phrase "or other persons" referred generically to all sellers (as opposed to only all "persons" under Rule 144(a)(2)), this would only impact the universe of people with whom an *affiliate* must aggregate their sales if acting in concert.[22]  It would not change the fact that Ladd's father, as a *non-affiliate*, was exempted from Rule 144(e)'s volume limitations altogether.

In its Opposition Brief, the SEC proffers two alternative arguments regarding Ladd's regulatory duty to disclose his sales on this Form 144.  First, it argues that Ladd's father was himself an "affiliate" because he and Ladd both were under "common control" with MGT, based on Ladd's trading authorization on his father's account.  Pls. Opp. 16–17.  Second, it argues that Ladd's father was selling securities "for the account" of Ladd himself under Rule 144(b)(2).  *See* Pls. Opp. at 17–18.

While these theories might have merit were they fully pleaded, the SAC itself does not sufficiently set forth these allegations.  SEC Rule 405 defines "control" as "the

---

[21] While the Court reserves decision on this matter, it notes that Ladd's proposed interpretation of Subsection (e)(3)(vi) would render its phrase "or other persons" meaningless, as anyone who is a "person" under Subsection (a)(2) is already required to aggregate sales with an affiliate by operation of (a)(2), regardless of whether they act in concert.

[22] In other words, Ladd's proposed interpretation would mean that Rule 144(e)(3)(vi) functionally applies only to affiliates who act in concert with other affiliates (or with those who are the same legal "person" as another affiliate), whereas a more general reading would maintain a unidirectional aggregation obligation on affiliates when they act in concert with non-affiliates.

possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through ownership of voting securities, contract, or otherwise." 17 C.F.R. § 230.405. An individual may be under an issuer's "common control" when a controlling person (i.e., Ladd) "dominated those controlled" so as to, for example, gain an overwhelming proportion of their stock. *See SEC v. Kern*, 425 F.3d 143, 150 (2d Cir. 2005). However, the SAC does not include any allegation that Ladd's father was an affiliate of or controlled by MGT, nor does it reference Rule 405. For instance, SAC states that Ladd's father's account was designated as having affiliate status by TD Ameritrade, but does not allege that the law required this designation. ¶ 167. Similarly, while Ladd's trading authorization on his father's account could certainly lend support to an allegation of common control, the SAC does not set forth additional facts about how Ladd exerted this power vis-à-vis his father, or cite authority showing that such power of attorney is sufficient to constitute "control" as a matter of law.

For substantially the same reasons, the SEC's argument that Ladd's father made sales "for the account of" Ladd also fails. The SAC does not reference Rule 144(b)(2) or any legal standards governing it. And the SEC cites no authority showing why Ladd's payment from his father was sufficient to make the sale "for the account of" Ladd.

Thus, the SEC has failed to allege that Ladd, acting as his father's attorney, had a regulatory obligation to aggregate Ladd's own sales with those of his father pursuant to Rule 144(e)(3)(vi) or other applicable law. The Form 144 requested disclosure only of sales whose aggregation was "required by paragraph (e) of Rule 144." Doc. 243-7. Because the SEC has not adequately alleged that Ladd's father was subject to Rule 144(e)'s volume limitation, it fails to plead falsity regarding his failure to aggregate

Ladd's sales with his own.  Fraud claims based on this omission are therefore DISMISSED.  The SEC may re-plead.

## IV.    CONCLUSION

For the reasons set forth above, Ladd's motion to dismiss is GRANTED in part and DENIED in part.  Regarding the Fifth and Sixth Causes of action, Ladd's motion to dismiss claims related to (1) his failure to disclose stock sales on Forms 4 filed on October 7 and December 1, 2015; and (2) statements and omissions made on his father's Form 144 filed May 10, 2016 are GRANTED, but his motion to dismiss claims stemming from all other alleged events under these causes of action are DENIED.  To the extent Ladd seeks to dismiss claims relating to the Seventh and Eighth Causes of Action, these are DENIED.

The parties are instructed to appear before the Court for a pre-motion conference on the SEC's proposed motion for summary judgment on January 29, 2021 at 10am.  The parties shall dial (877) 411-9748 and enter access code 3029857# when prompted.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 241.

It is SO ORDERED.

Dated:    January 27, 2021
              New York, New York

_____
EDGARDO RAMOS, U.S.D.J.