# EXHIBIT B

### Page 73

1  don't know, sitting here, yes or no, but obviously if I
2  filed it, it would be on EDGAR.
3      Q.  Did you have an understanding of the
4  requirements of Exchange Act Section 16 as it relates to
5  the disclosure of purchases or sales that you've made in
6  MGT securities?
7      A.  Yes.
8      Q.  What was that understanding?
9      A.  That you were to report purchases or sales
10 within 48 hours and file form 4.
11     Q.  And how did you gain that understanding?
12     A.  That's something I knew -- I knew it.
13     Q.  Now, Mr. Kaplowitz didn't have access to your
14 trading records at either E-Trade or TD Ameritrade, did
15 he?
16     A.  I don't think so.
17         I guess that's a question for Mr. Kaplowitz,
18 but he wouldn't normally have that.
19     Q.  Fair enough.
20         Did you have an understanding of the purpose
21 of form 4, like what disclosure it was meant to provide?
22     A.  Yes.
23     Q.  And what was that?
24     A.  Well, as I said, it's to disclose purchases
25 and sales by section 16 officers and directors in the

### Page 74

1  sale of their securities.
2      Q.  All right.  Let's mark Ladd Exhibit 16, which
3  is found at tab 16.
4         (Deposition Exhibit 16 marked.)
5      Q.  And I'll just explain for the record that this
6  is a composite of three form 4s.  The first one we've
7  already looked at in Exhibit 7, which is the -- yeah.
8  No.  That's the second one.
9         The second one we've already looked at in
10 Exhibit 7, that's the 12/1/2015 form 4.  The first one
11 is a 10/9/15 form 4.  And the third one is a
12 May 31, 2016, form 4.
13        Do you recognize these, Mr. Ladd?
14     A.  Yes.
15     Q.  And are they form 4s that you signed?
16     A.  Well, it's, you know, how they do it
17 electronically, but yes, I approved its issuance.
18     Q.  That's your electronic signature.
19        All right.  And is it your testimony that
20 Mr. Kaplowitz or someone at Sichenzia actually filled
21 out these forms and you then reviewed them and approved
22 them?
23     A.  Right.
24        That was normally a certain printing
25 requirement -- like SIC codes and certain ways to get it

### Page 75

1  into EDGAR.  I never bothered figuring that out.  I
2  don't have a way to input into EDGAR myself.
3      Q.  You have a service that does that, right?
4      A.  We have a service for normal filings, and how
5  the lawyer gets it filed I can't tell you for sure, but
6  he probably uses that service, communicates with them,
7  but I'm not saying that this is wrong at all.  I mean
8  it's -- I'm sure I reviewed it, and I just say
9  personally I don't file.
10     Q.  Okay.  And where did Sichenzia get the
11 information to fill out these forms?
12     A.  I think I answered that before, that generally
13 they'll get it from the person.  And as far as certain
14 calculations that they may make, they do those either on
15 their own or, you know, kind of check the previous
16 form 4s and, you know, subtract or add as needed.
17     Q.  And how do they know how to subtract or add as
18 needed?
19     A.  Based on what I tell them that I did
20 trading-wise.
21     Q.  All right.  So let's look at the first page of
22 Exhibit 16 which is the form 4 dated 10/9, and that
23 shows -- if I'm reading this correctly -- an acquisition
24 of 200,000 shares on October 7, 2015, correct?
25     A.  Yeah.

### Page 76

1         It's letter code A, but it's a grant of stock.
2  A restricted grant of stock.
3      Q.  All right.  And then in column 5 it says,
4  "Amount of securities beneficially owned following
5  reported transactions," and what's listed there is
6  373,603 shares.
7         Do you see that?
8      A.  Yes.
9      Q.  All right.  And there's a Footnote 2, and it
10 says, "Does not include 622,471 shares owned by Laddcap
11 Value Partners III LLC."
12        Do you see that?
13     A.  Yes, I do.
14     Q.  And that was accurate as of -- that
15 information was accurate as of October 9, 2015?
16     A.  Yes.  I felt it was accurate.  Maybe it was
17 off by a few shares, but I believe it's accurate.
18     Q.  All right.  And then let's go to the next one,
19 which we've looked at before, which is the
20 December 1, 2015, and it reflects a sale of 100,000
21 shares on November 30, 2015, right?
22     A.  Which tab was that?  Is that still 16?
23     Q.  Yep.  Second page.
24     A.  Right.
25        And that's -- when I was referring to

**Page 237**

A. Okay. So the HS Contrarian is John Stetson whom -- I mean, he co-invests with Honig, but I may have met him.
Q. Okay. My question is not whether you'd met them, but whether any of these investors came to MGT to invest as a result of any efforts by you and independent of their relationship with Mr. Honig.
A. I said that would be then Iroquois and Hudson Bay.
Q. Okay. Thank you.
All right. So, did there come a time when Mr. Ford wrote another piece on "Seeking Alpha" about MGT?
A. Yes.
Q. And did you have any interactions with him in connection with that piece?
A. I do believe I spoke to him.
Q. All right. And that was in April of 2013 that his piece appeared?
A. I'll agree to that, yes.
Q. And did you speak to him in connection with that article the same few hours that you spoke to him with respect to the November article?
A. I -- I don't recall sitting here. I would assume, given his knowledge of the company at that

**Page 238**

point, that hopefully it was shorter, but I don't know.
Q. All right. And did you talk to Mr. Honig or Mr. Stetson about your interactions with Mr. Ford in connection with his article?
A. No.
Q. All right. So let's look at the exhibit behind tab 60, which is an exhibit we've previously marked as Holmes Exhibit 15.
Do you recognize that?
A. Yes. I see that, yes. I recognize it.
Q. Okay. That's a "Seeking Alpha" piece that's dated 11 -- sorry, April 11, 2013, by John H. Ford and it's title is, "Is MGT About to Receive a Big Settlement?"
So did you see this article at or about the time it was published, April 11, 2013?
A. Yes.
Q. Did you see any drafts of it prior to its publication?
A. I don't believe so.
Q. All right. The second full paragraph on the first page says, "Given the huge increase in MGT's recent trading volume, I'm speculating that settlement negotiations are occurring with one of the defendants, WMS Industries. If that is true, MGT's share price

**Page 239**

could double within the next couple of weeks."
Do you see that?
A. Yes.
Q. And what was your reaction to that when you read it?
A. It's false.
Q. In fact, you considered the premise of the whole piece to be completely false; isn't that right?
A. I considered the title. I don't know about everything else in there. It's a pretty -- it's quite a long article.
Q. Okay. I asked about the premise.
MR. FORD: Nancy, do you want to define the premise so that he could respond?
MS. BROWN: I'm sorry?
MR. FORD: Do you want to just define the premise?
The premise being that there's about to be a settlement or settlement discussions?
MS. BROWN: Why don't we look at your 302. So Ladd Exhibit 302.
THE WITNESS: Yes.
BY MS. BROWN:
Q. And if we can go to 152974 which, if it helps is page 4 of 9.

**Page 240**

A. Okay.
Q. And did you tell the FBI in words or substance -- I'm on the third paragraph here, second line -- the second sentence, "upon review Ladd advised that the premise of the article that MGT was in settlement talks regarding its online gaming patent was completely false"?
A. That would be true then and it's true now. So I would say the premise, if that's the word you want me to say is the premise of this article, then I would confirm that.
Q. Okay. Did you have an understanding of what was causing the huge increase in MGT's trading volumes that Mr. Ford refers to?
A. No. I didn't even know that. I guess I'm just reading here it increase -- no.
Q. You didn't understand --
A. My answer is no.
Q. You didn't understand that the --
A. My --
Q. -- sorry.
A. I just want you to repeat the question. I'm sorry.
Q. So you didn't understand that the trading volume was, in fact, caused by selling by Barry Honig

**Page 241**

1 and others?
2    A.  I did not know that.
3    Q.  Okay.  So after you saw this article, isn't it
4 true that you suspected that Ford might have been
5 compensated by Honig or some other MGT investor to write
6 it?
7    A.  It's a theoretical possibility.  I think he is
8 still long on the stock, so I don't know how much --
9 that he was a money manager or what, but, you know,
10 people -- journalists often exaggerate to, you know, to
11 play their own book.
12       MR. FORD:  Rob, the question was at the
13 time -- sorry.  I was trying to help Nancy.  The
14 question was at the time of this article, did you
15 believe or think that Honig was compensating John Ford?
16       I think I got that right, Nancy; is that fair?
17       THE WITNESS:  Absolutely not.
18       MS. BROWN:  I said -- I said suspected.
19       MR. FORD:  Okay.  Yes.  Suspected.
20 BY MS. BROWN:
21    Q.  And your answer is absolutely not?
22    A.  That I suspected Honig?  Or that I suspected
23 an investor?
24    Q.  Correct.  Had compensated Mr. Ford.
25    A.  I don't remember, but I think what I do know

**Page 242**

1 is that that's a common approach of somebody long in the
2 stock to get an article written.
3    Q.  All right.  So let's turn to Ladd Exhibit 302
4 again.
5    A.  Mmmm-hmmm.
6    Q.  And directing your attention to page 5 of 9 --
7    A.  Mmmm-hmmm.
8    Q.  -- the first full paragraph reads, "When Ladd
9 first saw Ford's article in 2013, he suspected that Ford
10 may have been compensated by Honig or other MGT
11 investors to write the article."
12       Did you say that in words or substance to the
13 FBI in March 2018?
14    A.  Yeah.  I think it's -- right.  So this is how
15 the FBI took it down, and I don't think it's different
16 than what I just said now.
17    Q.  Okay.  And if we look at -- back to Holmes
18 Exhibit 15, which is the document behind tab 60,
19 Mr. Ford doesn't disclose that he's been compensated; is
20 that fair?
21    A.  Just from memory of reading these, I believe
22 he said he's long to the stock.
23    Q.  Okay.
24    A.  His disclosure.
25    Q.  If you turn to page 3 of 7 under "Disclosure"

**Page 243**

1 he says, "I am not receiving compensation for it --"
2 meaning the article -- "other than from 'Seeking
3 Alpha'."
4    A.  Yes.  "I am long MGT, PTNT, I wrote this
5 article myself."
6       Yep.  I see that.
7    Q.  Okay.  Did you ever talk to Mr. Honig about
8 your suspicions that he or some other MGT investor might
9 have paid Ford to write this piece?
10    A.  No.
11    Q.  Did you talk to anyone else about that
12 suspicion?
13    A.  Not to -- not that I recall.
14    Q.  Did you tell your board about that suspicion?
15    A.  I don't think so.
16    Q.  And at some point you believed that Ford may
17 have been receiving compensation from Honig for articles
18 he had written on other companies that Honig was
19 involved with; isn't that right?
20    A.  At that time or now after reading the
21 complaint?
22       After reading the complaint --
23    Q.  Well --
24    A.  -- as I said, everything you're implying makes
25 sense in hindsight, but I did not research all of John

**Page 244**

1 Ford's articles and see if they correlated with a Honig
2 ownership or anything.
3    Q.  Okay.  Well, prior to reading our complaint,
4 didn't you have that view that Mr. Ford might have been
5 compensated by Honig or others to write articles about
6 Honig's company?
7    A.  I think what I stated, it's a very common
8 practice, yes.
9    Q.  Okay.  And, in fact, in the ATG versus MGT
10 lawsuit, didn't you suggest that Mr. Ford had knowledge
11 of Honig's potential wrongdoing in connection with
12 promotions?
13    A.  ATG versus?
14    Q.  MGT.
15       (Deposition Exhibit 61 marked.)
16    Q.  Well, let's go to the exhibit behind tab 61,
17 which is the document we've marked as Ladd Exhibit 61.
18 And I'll just, for the record, state that it is an
19 initial disclosure made in a lawsuit captioned ATG
20 Capital LLC, et al. versus MGT Capital Investments, Inc.
21       Do you see that?
22    A.  Yes.
23    Q.  And did you have some role in working with the
24 lawyers in the preparation of filings and other
25 materials in that lawsuit?

## Page 340

| | | |
|---|---|---|
| Exhibit 102 | Email chain, with top email from Jonathan Schecter to Arthur Marcus, dated April 4, 2013 | 387 |
| Exhibit 104 | Form S-1 | 394 |

PREVIOUSLY MARKED EXHIBITS REFERENCED

| NO. | | PAGE |
|---|---|---|
| Exhibit 3 | Email chain, with top email from Robert Ladd, dated November 29, 2015 | 390 |
| Exhibit 8 | Onghai Exhibit 8 | 363 |
| Exhibit 49 | Email from Mr. Honig to Mr. Ladd | 376 |
| Exhibit 40 | Form 10-K | 399 |

## Page 341

Tuesday, November 10, 2020
10:04 a.m.

THE VIDEOGRAPHER: Here begins the videotaped deposition of Robert Ladd, Volume 3, in the matter of SEC versus Barry Honig, et al. This case is being heard in the United States District Court, Southern District of New York, Case Number 18 Civ. 8175 (ER) ECF.

This deposition is being held via Webex. Today's date is November 10th, 2020, and the time on the record is 10:04 a.m.

My name is Tim Hunter. I'm your legal videographer. Our court reporter today is Grace Chung. Counsel, would you please introduce yourselves and state whom you represent for the record, starting with the noticing counsel, and witness will be sworn.

MS. BROWN: Thank you. Nancy Brown for the Securities and Exchange Commission, and with me is Jack Kauffman and Katherine Bromberg.

MR. FORD: Adam Ford on behalf of defendant Robert Ladd. With me is my colleague, Anjula Prasad.

ROBERT LADD,
having been first duly sworn, was examined

## Page 342

and testified as follows:

EXAMINATION
BY MS. BROWN:
   Q.   Thank you.  Good morning, Mr. Ladd.
   A.   Good morning.
   Q.   So can you tell me, at any time between 2012 and 2016, if you ever considered Mr. Honig to be part of a group of investors who had agreed to buy, hold, vote, or sell MGT shares?
   A.   So I understood that there was a group of investors who invested together using a common subscription agreement.  However, all the individuals were separate.  They were represented to me to not be acting as a legal group nor acting in concert.
       All monies came from different named accounts, the same name as the person or the entity.  So that's a -- it's a longer answer than you asked, but since the question asked if bought or sold or voted or -- that they did commonly buy together.
   Q.   Thank you, sir.  You said in your answer that it had been represented to you that they weren't acting as a legal group or acting in concert.  Who made those representations to you?

## Page 343

   A.   So it was several.  I mean, the investors themselves and their subscription agreements contractually represented that.  Based on the advice of my counsel, that was also a conclusion that I was able to reach.
       My counsel had the luxury, if you will, of also having a partner who was counsel for that, for Barry Honig, and that advice, or the outcome of that advice, was also that they were not acting in concert.
       And then, lastly -- well, maybe not lastly, but additionally, the New York Stock Exchange reviews all issuances of stock.  And they were very aware of Mr. Honig and asked several questions of me, but there was no evidence, either by previous actions or by actions that I may have encountered personally, that they acted in what I would call legally a Section 13 group.
   Q.   Thank you.  So are you waiving privilege as to your communications with counsel about this topic?
       MR. FORD:  Let me -- I want to be clear.  He's actually not waiving privilege.  And I was listening very closely, and what he testified to was that he sought advice and that there was an

**Page 344**

outcome. And he was very careful to not describe what the advice was, only that there was advice obtained and an action occurred. So he's absolutely not waiving privilege.

MS. BROWN: Thank you.

Q. And did you make any inquiry on your own to determine whether or not Mr. Honig was acting as part of a group other than what you've described already, which is reviewing the subscription agreements in which you read that there was some sort of representation, that they were not, and your conversations with counsel, whatever they may have involved, and your comfort from the New York Stock Exchange's -- what you perceived to be their conclusion?

A. Did I do more than that, you're saying?

Q. Yes. Did you make any inquiry other than that?

A. Not that I recall.

Q. And other than the conversations -- or the consultation you had with counsel that you've already discussed, did you discuss the issue of whether Mr. Honig was acting as part of a group with anyone?

A. I mean, there was a topic that, for lack

**Page 345**

of a better term, is an elephant in the room in terms of all these investors, mainly for Section 13 purposes, need to be legally not a group; otherwise, a company like ours could disgorge them of any profits they make on a deal. And, unfortunately, there's been no determination in this case or in any other case that I'm aware of that Mr. Honig acted as a group that would, under securities laws, need to be disclosed.

Q. Okay. Thank you. So I just want to restate what you said so I understand it, so correct me if I've said it wrong. But from your perspective, this was a continuing and very important issue in your interactions with Mr. Honig and the two investments he made in MGT, whether he was part of a group?

A. I don't want to lead you to believe it was important to me. I believe it was important to them.

Q. Okay.

A. I was -- my concern would be that they can exert no control over me.

Q. All right. So you mentioned the New York Stock Exchange. Let's talk about that for a minute. In connection with the October 2012

**Page 346**

financing, what inquiry, if any, did the New York Stock Exchange make concerning any of the investors' relationship to each other?

A. Is there a document to look at on that one or --

Q. Can you just tell me what you recall first and then look at documents?

A. So what I recall is there was Hudson Bay, Iriquois, and Barry Honig investing as part of the same investment group. And I recall several discussions with our analysts at New York Stock Exchange to ensure that they were comfortable with the representations of those investors, as well as what other information they may have. And keep in mind that a guy like Mr. Honig was on the board of directors of several or at least few NASDAQ and New York Stock Exchange companies. So there was nothing that really jumped out at me to say that he was doing something undisclosed.

And, again, the impact would be one of Section 16. If they were deemed to be a group, they would become de facto affiliates by owning more than 10 percent. At that time, any short swing profits become the property of the company.

So from an economic model, that's something

**Page 347**

that New York Stock Exchange, I'm pretty certain, had under investigation. And in this specific case, again, it was Hudson Bay, Iriquois, and Barry Honig being the three together that would be considered a group under securities laws.

Q. Thank you. All right. Just one more question on the advice topic. I just want to nail down with whom you -- or from whom you received whatever advice you received on the group issue.

A. You mean what lawyer?

Q. Yes.

A. So there were -- I believe there were at Sichenzia, but they were the counsel of MGT, a guy by the name of Arthur Marcus and then Jay Kaplowitz as well.

Q. All right. You received this advice in 2012, prior to signing the stock purchase agreements with Mr. Honig and others?

A. Yes.

Q. Thank you. All right. So let's look at exhibit -- tab behind 86, which we marked as Ladd Exhibit 86.

(Deposition Exhibit 86 was marked for identification by the reporter and is attached hereto.)

**Page 352**

BY MS. BROWN:
Q. Right. So, in fact, Barry Honig's brother was also an investor; right?
A. Yes. And that was disclosed, that he was an investor. So maybe not on this email, but in a subsequent email.
    But as Mr. Ford stated, "related party," understanding at that time and then subsequently detailed, meant related party as it relates to MGT.
Q. Right. And you explained that in what was marked as Ladd Exhibit 88, which is behind Tab 88. So why don't you look at that.
A. Okay.
    (Deposition Exhibit 88 was marked for identification by the reporter and is attached hereto.)
BY MS. BROWN:
Q. So Ladd Exhibit 88, the first email is from you, dated October 24, 2012, to Mr. Machado and others.
    And do you recognize that email as an email from yourself to Mr. Machado?
A. Yes.
Q. And prior to that email, if you look down the page, is an email from Mr. Machado on

**Page 353**

October 24th. It looks like he's following up on your answers that we looked at in Ladd 87, and he says, "Rob, Is there any relationship between Jonathan Honig and Barry Honig?"
    And you respond, "In answer to your question yesterday, the answer to related party was no, using the definition of 'related' to mean insiders or affiliates of MGT." And then you write, "The company has been informed that Barry and Jonathan are separate investment entities with separate funding." Do you see that?
A. Uh-huh.
Q. All right. And what does that mean, that the company has been informed? From whom did the company get that information?
A. I believe from our attorneys. And, again, the attorneys are also the attorneys of Honig. I guess Honig is not that common a name. So it would be a pretty easy exercise to discern.
Q. Well, let's back up a minute. The attorneys that you are talking about who are also the attorneys of Barry Honig, who are they? Mr. Marcus and Mr. Kaplowitz?
A. I'm sorry. That's a guy by the name of Harvey Kesner.

**Page 354**

Q. Okay. So Mr. Kesner, as you understood it, was Barry Honig's attorney?
A. Correct.
Q. And did you do anything to verify that Jonathan Honig and Barry Honig were separate investment entities?
A. So, again, they represented to the company that they were separate. And in the case of funds, I believe this deal was --
    (Reporter interruption for clarification of the record.)
A. Funding. I believe this transaction closed in escrow, so Sichenzia would have seen if, for example, those two investments came from the same place and would have an obligation to tell me.
BY MS. BROWN:
Q. And did you ever speak to Jonathan Honig in connection with negotiation of the 2012 financing?
A. Not that I recall.
Q. Okay. So let's talk a little bit about that negotiation. So who put the investors together that participated in the 2012 financing?
A. I believe Chardan Capital was involved.
Q. Okay. Did they -- did they pull the

**Page 355**

investors together?
A. Yes, as far as I remember.
Q. Let's look at Ladd Exhibit 91, just behind Tab 91.
    (Deposition Exhibit 91 was marked for identification by the reporter and is attached hereto.)
    MS. BROWN: And for the record, Ladd Exhibit 91 is an October 21, 2012, email from Barry Honig to Rob Ladd and others.
Q. Mr. Ladd, do you recognize Ladd Exhibit 91 as an email you received from Mr. Honig?
A. Yes.
Q. Apart from Hudson Bay and Iriquois, on this list of investors that you see Mr. Honig is forwarding to you with dollar amounts next to each, which of these were brought to the deal by Chardan?
A. So let me go back and speak to Chardan. And unless I go back and research it, I won't be sure, but Chardan provided the, I think, 2011 financing with Hudson Bay. When that was terminated, it was this next investment, which I believe I got mad at Chardan for bringing in money only to have us rescind or pay back that money, and then they wanted to get paid on this deal also.

**Page 356**

            And I think I refused to pay them, which led to bad blood, but I don't -- I don't remember exactly. But a firm like Chardan would have, you know, five customers to go to. Those three -- several others, I'm sure you are aware of. Heights or -- you know, there is a limited universe. But --

Q. Understood, but my question was not that. Do you recall my question? My question was --

A. Yes. So --

Q. -- which of this list of investors was brought to you by Chardan other than Hudson Bay and Iriquois?

A. So what I don't know is who White Trout is. I think Sandor is a Honig connection. Because of the names in the email, Mark Groussman, I know, is a coinvestor with Honig. Bay Capital, I don't know who they are. Ron Lowe -- well, it says it's Jonathan Honig's contact, so I guess it explains that. And I think Suzanne Adams may have been a relative, a cousin or something of Honig. Or maybe that was Jill Strauss. So -- and those two had the same contact information.

Q. Okay. Well, looking at Ladd Exhibit 91, Mr. Honig says, "Rob, Below is the investor list for the preferred and the RD." And what's the RD?

**Page 357**

A. That's registered direct.

Q. Okay. And so it's fair to say that he's putting together this list and sending it to you -- is that right? -- not Chardan?

A. Yes.

Q. And you understood that Hunter Adams was Mr. Honig's cousin. Is that right?

A. I don't think Hunter Adams. I thought it was Jill Strauss, but sitting here right now, I don't remember exactly.

Q. All right. And Alex Burger, that's not a name you are familiar with?

A. White Trout, no.

Q. Well, I asked you about Alex Burger. So is that a name you are familiar with?

A. Oh. No.

Q. All right. And John Stetson, he works with Barry Honig; correct?

A. Yes.

Q. All right. And turning the page, what about Jonathan Honig? We have already discussed him; right?

A. Right.

Q. He's related to Barry Honig?

A. Uh-huh.

**Page 358**

Q. And Miramar investors. Do you know who that is?

A. Not as I sit here.

Q. All right. And who determined the allocations of the investors who ultimately invested in the 2012 financing?

A. Well, as I recall, because of the success Honig has with investments, that he chooses those people to invest with him. So, as I said, they all invest with the common subscription agreement. But, you know, if we substitute the name "Honig" for "Chardan," you know, Honig operates as an investment banker, at least in his mind.

Q. Why would we substitute the name Honig for Chardan?

A. Because Honig fancied himself an investment banker, and Chardan is a pretty low-level investment banker.

Q. Okay. Let's look at Ladd Exhibit 92, which is behind Tab Exhibit 92.

        (Deposition Exhibit 92 was marked for identification by the reporter and is attached hereto.)

        MS. BROWN: It purports to be -- the top email purports to be from you to Harvey Kesner,

**Page 359**

Tara Guarneri-Ferrara, and Susanna Aronbayev, dated October 23, 2012.

Q. Do you recognize this as an email that you sent on or about that date?

A. Yes.

Q. And who's Tara Guarneri-Ferrara?

A. I think she's an attorney at Sichenzia.

Q. Does she work with Mr. Kaplowitz and Mr. Marcus?

A. So I think she worked with Harvey, but I'm not sure.

Q. But with Mr. Kesner?

A. And that reminded me. I wanted to point out that in this deal, I believe Kesner was representing investors. So that's why they were involved on it -- or involved, you know, in the email chains.

Q. Do you know who Susanna -- I'm not going to try to say her last name again, but also on the email, do you know who she is?

A. I don't.

Q. All right. So if we can turn the page on this exhibit and start with the second-to-last one, which is from Mr. Kesner to Ms. Guarneri-Ferrara and Susanna. And he writes, "Tara, you should