UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION


                         Plaintiff,                    Case No. 1:18-cv-08175-ER

v.


BARRY C. HONIG,
*et al.*


                         Defendants.

---------------------------------------------------------------x


**ROBERT LADD'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT**


                                        **FORD O'BRIEN LANDY LLP**
                                        Adam C. Ford
                                        Anjula S. Prasad
                                        275 Madison Avenue, 24th Floor
                                        New York, New York 10016
                                        *aford@fordobrien.com*
                                        (212) 858-0040

                                        *Attorneys for Defendant Robert Ladd*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................2

STATEMENT OF FACTS ....................................................................................................6

LEGAL ARGUMENT.........................................................................................................10

   I.    STANDARD ON SUMMARY JUDGMENT ...............................................................10

   II.   THE SEC FAILED ADDUCE ANY EVIDENCE OF A § 10(B)(5) OR § 17(A)(2) VIOLATION ......11

       A.  There Is No Material Misrepresentation in MGT's S-1 or 10-K Because Ladd Had No Duty to Disclose the "Honing Group's" Beneficial Ownership as they were not a Rule 13(d)(3) statutory group ....................................................................12

           1.  Ladd did not fail to comply with Item 403 of SEC Regulation S-K and thus did not violate any regulatory duty ...................................................13

           2.  MGT's reporting disclosure required it to report what Ladd knew ..........15

           3.  Ladd acted without scienter and all evidence establishes he acted in good faith ................................................................................................16

               a.  *The SEC's allegations of Honig and his co-investors' conduct in 2012 is unsubstantiated and does not support an inference of Ladd's scienter in 2016* ..................................................................................17

               b.  *Ladd acted without scienter, in good faith, in filing the S-1 and 10-K as proven by, among other things, his reliance on advice of counsel* .19

       B.  The SEC's Evidence Regarding MGT's May 2016 Press Release Cannot Establish a 10(b)(5) or 17(a)(2) Violation ...........................................................20

           1.  MGT's May 2016 Press Release did not contain any materially misleading information or omissions ........................................................................20

           2.  Ladd lacked scienter in publishing the May 2016 press release ...............23

       C.  There Is No Evidence to Support an Argument That the May 31, 2016 Form 4 Constitutes a Violation of 10(b)(5) or 17(a)(2) ....................................................23

           1.  The May 31, 2016 Form 4 cannot support a substantive securities fraud violation ................................................................................................24

D.  There Is No Evidence to Support an Argument That the May 25, 2016 Form 144 Constitutes a Violation of 10(b)(5) or 17(a)(2) ....................................................25

1.  The May 25, 2016 Form 144 cannot support a substantive fraud violation because it does not contain a material misstatement nor is there evidence of scienter .................................................................................................25

III.  THE SEC FAILED TO ADDUCE ANY EVIDENCE OF ANY AIDING AND ABETTING VIOLATIONS OF SECTIONS 10(B) AND RULE 10(B)-5(A), 17(A)(1) AND (A)(3) ........................................28

CONCLUSION ................................................................................................................28

TABLE OF AUTHORITIES

*Aaron v. S.E.C.,*
    446 U.S. 680 (1980)..................................................................................................11

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................................10, 11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................................11

*Binder & Binder PC v. Barnhart*,
    481 F.3d 141 (2d Cir. 2007)......................................................................................11

*C.D.T.S. v. UBS AG*,
    No. 12 CIV. 4924 KBF, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013)...............12,15

*Corenco Corp. v. Schiavone & Sons, Inc.*,
    488 F.2d 207 (2d Cir. 1973).................................................................................12, 13

*D'Amico v. City of N.Y.*,
    132 F.3d 145 (2d Cir. 1998).......................................................................................10

*Forward Indus. v. Wise*,
    No. 14-CV-5365 JSR, 2014 WL 6901137 (S.D.N.Y. Sept. 23, 2014) .....................13

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000).......................................................................................22

*Howard v. S.E.C.*,
    376 F.3d 1136 (D.C. Cir. 2004) ................................................................................19

*IBEW Local Union No. 58 Pension Trust Fund Annuity Fund v. The Royal Bank of Scotland
Grp., PLC*,
    783 F.3d 383 (2d Cir. 2015).......................................................................................21

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig*,
    2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012)...........................................................21

*In Re Yukos Oil Co. Sec. Litig.*,
    2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..........................................................21

*Markowski v. S.E.C.*,
    34 F.3d 99 (2d Cir.1994)............................................................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574 (1986) ..................................................................................................10

*Mayer v. Oil Field Systems Corp.,*
  803 F.2d 749 (2d Cir.1986) ..............................................................................17, 23

*Morales v. Exec. Telecard, Ltd,*
  No. 95 CIV. 10202 (KMW), 1998 WL 314734 (S.D.N.Y. June 12, 1998) ..............26

*Morales v. Quintel Ent., Inc.,*
  249 F.3d 115 (2d Cir. 2001) .............................................................................12, 13

*SEC v. Apuzzo,*
  689 F.3d 204 (2d Cir.2012) .....................................................................................28

*S.E.C. v. Caserta,*
  75 F.Supp.2d 79 (E.D.N.Y.1999) ............................................................................19

*SEC v. DiBella,*
  587 F.3d 553 (2d Cir. 2009) ....................................................................................28

*S.E.C. v. Ginder,*
  752 F.3d 569 (2d Cir. 2014) ....................................................................................11

*S.E.C. v. Im,*
  No. 17-CV-3613 (JPO), 2020 WL 4937465 (S.D.N.Y. Aug. 24, 2020) ...................11

*Shannon v. New York City Transit Auth.,*
  332 F.3d 95 (2d Cir. 2003) ......................................................................................11

*Stratte-McClure v. Morgan Stanley,*
  776 F.3d 94 (2d Cir. 2015) .................................................................................11, 12

*Transcon Lines v. A.G. Becker Inc.,*
  470 F. Supp. 356 (S.D.N.Y. 1979) ..........................................................................13

*United States v. Bilzerian,*
  926 F.2d 1285 (2d Cir. 1991) ..................................................................................24

*United States v. Peoni,*
  100 F.2d 401 (2d Cir.1938) .....................................................................................28

*United States Sec. & Exch. Comm'n v. DiMaria,*
  207 F. Supp. 3d 343 (S.D.N.Y. 2016) ......................................................................28

*Wellman v. Dickinson,*
  682 F.2d 355 (2d Cir. 1982) ....................................................................................13

*Whiting v. Dow Chem. Co.,*
   523 F.2d 680 (2d Cir. 1975)......................................................................................26


Statutes and Rules:

Section 17(a) of the Securities and Exchange Act of 1933, 15 U.S.C. § 77q(a) ..........................11

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) .....................................

SEC Form 10, 17 C.F.R. § 229.10(a)............................................................................................15

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ...........................................................................12, 20

SEC Rule 144, 17 C.F.R. § 230.144 ........................................................................................25

SEC Rule 13(d), 17 C.F.R. § 240.13d–5(b)........................................................................12, 13

Fed. R. Civ. P. 56(a) ...............................................................................................................10

Fed. R. Civ. P. 56(c) ...............................................................................................................10

Robert Ladd respectfully submits this Memorandum of Law in Support of his Motion for Partial Summary Judgment as to Counts Five, Six, Seven and Eight of the Second Amended Complaint. The SEC's fraud (Counts 5, 6) and aiding and abetting fraud (Counts 7, 8) allegations are unsupported by sufficient evidence and can be dismissed at this stage. While Ladd continues to deny the allegations addressing certain filings (Counts 11, 13, 14, 17), he acknowledges there exists triable issues of material fact as to them and does not move for summary judgment as to those four counts.

## PRELIMINARY STATEMENT

After four years of discovery, hundreds of thousands of pages of documents, over a dozen depositions—including each of the six lawyers involved in the relevant SEC filings—the SEC has failed to come forward with any evidence supporting its core fraud-based allegations against Ladd. The SEC alleges that Ladd himself committed fraud, and also that he aided and abetted in a "pump-and-dump" scheme, with co-Defendants Barry C. Honig, Michael Brauser, John Stetson, and John R. O'Rourke, III (and their corporate entities) (the "Honig Group"), though the SEC is careful not to allege that Ladd was part of the "Honig Group." But the allegations of Ladd's personal fraud have all been disproven in discovery. And with respect to the aiding and abetting allegations, all nineteen other Defendants have settled without admitting any wrongdoing, and the SEC has declined to obtain any evidence supporting its allegations of the underlying fraudulent scheme purportedly engaged in by Honig and the others. With no depositions taken of any witness to those actions, no witness who can admit to or provide admissible evidence regarding conduct, and no other evidence, aiding and abetting liability cannot attach here.

The SEC filed its original Complaint in which Ladd was one of 20 Defendants, principally alleging the Honig Group acted as a statutory group as defined under Section 13(d) ("13(d) Group") to execute three separate pump-and-dump schemes involving three companies: one of which Ladd served as CEO, MGT Capital Investments ("MGT"). [Dkt. 1]. That Complaint was amended twice, with the allegations as to Ladd trimmed further and further each time. The SEC's Second Amended Complaint ("SAC") in this matter alleges, *inter alia,* that Ladd committed fraud by violating 10(b) of the Exchange Act and 17(a)(2) of the Securities Act.[1] [Dkt. 233]. The fraud allegations that have survived Ladd's Second Motion to Dismiss allege that Ladd: (1) failed to disclose the Honig Group's collective ownership and control over MGT in the company's Form 2015 S-1 filed in November 2015 and 2015 Form 10-K; (2) made materially false statements about the McAfee merger in the May 9, 2016 press release; (3) omitted and/or misrepresented his previous MGT stock sales from his own account in a Form 4, filed in May 2016; and (4) failed to disclose in a timely manner sales of MGT stock in a Form 144 filed in May 2016. [Dkt. 275, pg. 12].

As Ladd has maintained since day one, he acted at all times in good faith, with the guidance and advice of counsel to ensure all of MGT's filings were properly made as required by the law. As this Court is well-aware, Ladd's good faith assertion was tested when this Court ordered him to either waive his attorney-client privilege or abandon that defense: Ladd chose to waive the privilege.  In response, the SEC took the depositions of six lawyers from Sichenzia, Ross Ference LLP ("Sichenzia" or "SRF")—the lawyers who represented MGT, Ladd, Honig, and all members of the "Honig Group." Ladd and MGT then produced every single email and

---

[1] Ladd is alleged to have violated 10b-5(b), which relates to an omission, whereas all the other alleged "Honig Group" Defendants were alleged to have violated 10b-5(a) and (c), which relates to scheme liability.

other relevant requested documents reflecting their privileged communications on these topics. No stone was left unturned. During the depositions, each lawyer, who individually and as a firm possessed knowledge and expertise of Rule 13(d) filing requirements, emphatically testified that they were fully aware of all material facts and did not believe that the "Honig Group" was acting as a Rule 13(d)(3) group, or that MGT had any obligation to state so in any filing. As such, there is no evidence in the record that could support the SEC's allegation that MGT violated Item 403 by failing to disclose a 13(d) group, decimating the SEC's fraud allegations.

The SEC's second core allegation supporting its 10(b) and 17(a)(2) causes of action against Ladd relates to a press release issued by MGT on May 9, 2016 (the "May 2016 Press Release"). The press release announced that the world-famous eccentric celebrity, John McAfee, was joining MGT as its new CEO. The SEC does not allege that Ladd made any misstatements about MGT's deal with McAfee—indeed, it was entirely truthful. Rather the SEC alleges Ladd misled the public with a false statement *about* McAfee's original company. Specifically, the SEC alleges that Ladd made a material misstatement by writing that "McAfee sold his company to Intel in 2010 for $7.6 billion," when in fact Intel purchased the company founded by McAfee in 2010 for $7.6 billion. (SAC ¶ 149). McAfee had left about a decade prior. But the imprecise draftsmanship could also have been found repeatedly stated in the popular press, long before Ladd made the same mistake. The internet is replete with examples of CNN, Newsweek and others making the same mistake without any allegations of attempted market manipulation. Regardless, the truth of this matter was already known to the market, making the misstatement immaterial by law, and precluding any finding of scienter, or even negligence, by Ladd.

The SEC also alleges that inaccuracies in Ladd's May 31, 2016 Form 4 and May 25, 2016 Form 144 also support its substantive securities law violations. Standing alone, however,

there is no evidence in the record that these inaccuracies constitute a material misstatement, or, for purposes of the 10(b) allegation, that Ladd made them with the requisites scienter. Taking them in reverse order, courts in this district routinely note that a Form 144 does not require the type of information that an investor could rely on. It is intended for insiders to disclose their "intent" to sell shares, not actual sales. As such, it cannot be used to form the basis of a substantive securities law violation.

  With respect to Form 4, while that filing does contain information which theoretically could be used to support a fraud claim, here, the SEC failed to adduce evidence supporting such a claim in this case. The Form 4 only takes on relevance to the SEC's fraud allegations on the premise that Ladd was otherwise engaged in prior misconduct aiming to manipulate MGT securities. Indeed, the SEC claims that Ladd's filing of his Form 4 was "the final step in his and his co-Defendants' fraudulent MGT pump and dump scheme" that "Ladd facilitated [] through his issuance of a materially false May 9, 2016 press release—designed to pump up artificially MGT's stock price." [Dkt. 271, SEC Ltr]. But the SEC's factual allegations were proven wrong. Ladd did disclose the roughly 457,300 shares that he disposed of. And as demonstrated herein, there was no prior misconduct. As such, the SEC was obligated to come forward with other evidence that any error in the Form 4 could form the basis of any fraud allegation. It failed.

  Finally, the SAC also alleges that Ladd aided and abetted the Honig Group Defendants' 10b-5(a) and (c) violations, allegations premised on the Honig Group engaging in a "pump-and-dump" scheme with respect to MGT by artificially pumping up the stock of MGT with material misrepresentations. But with no evidence of any underlying wrongdoing by the Honig Group, the SEC cannot prove any aiding and abetting violations.

## STATEMENT OF FACTS

Prior to Ladd waiving his (and MGT's) attorney-client privilege in compliance with this Court's Order, the SEC took five depositions. Two individuals, co-Defendant Barry Honig, and Drew Ciccarelli, asserted their rights under the Fifth Amendment to the Constitution, resulting in no evidence relevant to these proceedings. (R-56.1 ¶1).[2] The SEC also deposed Michael Onghai (at the time, MGT independent director), H. Robert Holmes (at the time, MGT Capital Investments' Independent Chairman of the Board), and Joshua Silverman (at the time, an MGT former board member). None of these three witnesses had any firsthand knowledge or were expected to have any involvement in the determination of whether Honig and others were required to file as a Rule 13(d)(3) group, nor did any of these individuals have any information related to the May 9, 2016 Press Release, or Ladd's Form 4 or Form 144. (R-56.1 ¶2). All nineteen co-Defendants settled the allegations against them without admitting or denying any allegations. [Dkt. 92, 229, 152, 113, 110, 76, 225, 151, 230, 28, 228, 227, 93, 94, 224, 78, 77, 226].

Following this Court's Order giving Ladd the option of foregoing his good faith defense or waiving his and MGT's attorney-client privilege as to specific topic areas, Ladd waived. As a result, the SEC obtained all relevant communications between MGT, Ladd and its counsel at SRF on these topics, and the SEC took the deposition of six current (and former) SRF attorneys, specifically, Avital Perlman, Jay Kaplowitz, Arthur Marcus, Harvey Kesner, Joan Wu, and Tara Guarneri-Ferrara. These lawyers all emphatically testified that they were aware of all material

---

[2] All citations to R-56.1 refer to Defendant Ladd's Rule 56.1 Statement of Undisputed Facts filed along with this Memorandum of Law.

facts necessary to determine that Honig and the others were not acting as a Rule 13(d) group, and MGT had no obligation to file as such. (R-56.1 ¶¶3-4).

Getting to the relevant allegations, the SEC alleges that the misconduct by Ladd (and others) started in October 2012, when MGT engaged in a $4.5 million capital raise through a private investment in a public equity transaction involving Barry Honig. (SAC ¶ 129). SRF was counsel for both Honig and MGT in this transaction (R-56.1 ¶5). Each lawyer testified all filings were appropriate in connection with this financing. While this Court has ruled that events from the October and November 2012 are beyond the statute of limitations and cannot form the basis of any causes of action, this Court has ruled that evidence from 2012 may be introduced to show "intent, plan, knowledge, or absence of mistake in his 2015 and 2016 conduct." [Dkt. 211, pg. 11]. The SEC can only establish that Ladd previously transacted with Honig, but not that such transaction was in any way improper.

Given the above, the SEC can establish that Ladd already knew Honig, when, in October 2015, MGT entered into separate stock subscription agreements with multiple accredited investors for the sale of common stock and warrants in an aggregate amount of $700,000. (R-56.1 ¶6). Indeed, on October 9, 2015, MGT issued a Form 8-K with a press release describing the terms of the financing and attaching forms of the relevant agreements. (R-56.1 ¶7). The Form 8-K disclosed that MGT had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units," and the attached press release disclosed that the "*investment was led by Barry Honig*, a private investor and a specialist in corporate finance." *Id.* (emphasis added). Though there was no requirement to disclose the names of the investors, weeks later MGT filed a Form S-1 Registration Statement, which disclosed to the public a list of the investors and set forth "certain information regarding the

selling stockholders and the shares of [MGT's] common stock offered by them in this prospectus" explicitly listing out the names of each investor and the entity they were connected with. (R-56.1 ¶8). According to each of the six lawyers who testified, all filings in connection with the October 2015 financing were proper.

On May 9, 2016, MGT announced that it had entered into an agreement to acquire certain technology and assets relating to anti-spy software from a company named D-Vasive, Inc. and to appoint John McAfee, the well-known pioneer of internet security, as its Executive Chairman and CEO. (R-56.1 ¶9). MGT also announced that it had entered into a consulting agreement with Future Tense Secure Systems Inc., a technology incubator. *Id.* The agreements were fully disclosed in a Form 8-K filing. *Id.*

To publicize the transaction, MGT paid a stock promotion website, StockBeast.com, to publish a newsletter about the McAfee transaction. (R-56.1 ¶10). The newsletter clearly and accurately disclosed that MGT had paid for its publication. *Id.* The SEC's claim against Ladd with respect to the McAfee transaction rests on a single statement in the press release announcing the transaction—that McAfee had "sold his anti-virus company to Intel for $7.6 billion," which the SEC claims was misleading because the sale of McAfee, Inc. (formerly known as McAfee Associates) had occurred over a decade after McAfee's departure from that company. (*Id.*, SAC ¶ 144). It is undisputed that in August 2010, Intel Corporation purchased McAfee, Inc., the company founded by McAfee, for nearly $7.7 billion, pursuant to which McAfee, Inc. became a wholly owned subsidiary of Intel. (R-56.1 ¶11). It is also undisputed that prior to MGT's May 2016 Press Release, numerous other news outlets, including but not limited to CNN, Newsweek, and IB Times, had also publicized the exact same "false statement" that

MGT included in its press release—that "McAfee sold his company to Intel in 2010 for nearly $7.7 billion." (R-56.1 ¶¶12-15).

On May 23, 2016, just two weeks after the initial press release, MGT filed a Form 10-Q clarifying that McAfee "founded [McAfee Associates] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010." (R-56.1 ¶16). That McAfee was no longer at the company when it was sold to Intel had long been a matter of public record, as his departure had been disclosed in McAfee Associates' SEC filings. (R-56.1 ¶17).

Not surprisingly, the announcement of the McAfee transaction received widespread attention in the market. As the SEC itself acknowledges, McAfee was "a well-known cybersecurity innovator who had created a popular antivirus software bearing his name." (SAC ¶ 141). Following the announcement, MGT's stock price steadily rose. (*See id.* ¶ 147). On May 9, the day of the announcement, MGT stock closed at $0.49. (R-56.1 ¶18). On May 17, it closed at $4.15. *Id.* MGT's stock then remained high for an extended period of time, including after MGT issued the Form 10-Q clarifying its statement about McAfee's previous company. *Id.* On July 7, approximately two months after the press release was published and more than a month after MGT's clarifying statement, MGT's stock closed at $4.37, above the price on May 17 quoted by the SEC. *Id.* Even as late as the end of September 2016, more than four months after MGT announced its partnership with McAfee, MGT's stock price remained over four times higher than its closing price on the day the press release was published. *Id.* In fact, MGT's stock price closed above its May 9 closing price every single day until the SEC filed the Complaint in this case in September 2018, more than two years after the McAfee deal was announced. *Id.*

## LEGAL ARGUMENT

### I.   STANDARD ON SUMMARY JUDGMENT

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *see* FED. R. CIV. P.  56(a), (c). To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). "Conclusory allegations, conjecture, and speculation," as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," are insufficient to create a genuinely disputed fact. *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003).

### II.   THE SEC FAILED TO ADDUCE ANY EVIDENCE OF A § 10(B)(5) OR § 17(A)(2) VIOLATION

Section 17(a) of the Securities Act is a general prohibition against fraud in the offer or sale of securities. 15 U.S.C. § 77q(a). Section 17(a)(2), the only section Ladd is alleged to have violated, makes it unlawful to obtain money or property through misstatements or omissions about material facts. *Id*. Scienter is not an element of a violation of Section 17(a)(2)—only proof of negligent conduct. *See SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014); *Aaron v. SEC,* 446 U.S. 680, 697 (1980). To prevail on its Section 10(b) and Rule 10b-5 claim, the SEC must establish that Ladd "(1) made a material misrepresentation or a material omission as to which he

had a duty to speak; (2) with scienter; (3) in connection with the purchase or sale" of securities. *S. E.C. v. Im*, No. 17-CV-3613 (JPO), 2020 WL 4937465, at *2 (S.D.N.Y. Aug. 24, 2020).

As this Court has noted in both its February 25, 2020 Order and again in its January 27, 2021 Order, "[t]he Supreme Court has instructed that '[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5,'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988). To succeed on a claim premised on a failure to make a required regulatory disclosure, the SEC must come forward with evidence that Ladd failed to comply with a regulation in a public filing and that the omitted information was material at the time it was made. *Stratte-McClure*, 776 F.3d 103.

A.    **There Is No Material Misrepresentation in MGT's S-1 or 10K Because Ladd Had No Duty to Disclose the "Honig Group's" Beneficial Ownership as They Were Not a Rule 13(d)(3) Statutory Group.**

The SEC has no evidence that proves the Honig Group was investing as a 13(d) group, as confirmed by no fewer than six lawyers who represented all of the relevant individuals. As such there was no violation of Item 403 or any other provision.[3] Section 13(d)(3) states: When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection. 15 U.S.C. § 78m(d)(3), 17 C.F.R. § 240.13d–5(b)(1) (2000). In determining whether a "group" exists under Section 13(d), one question is whether there was *an agreement* among the relevant individuals to act together for the purpose of acquiring, holding, or selling securities. *Morales v. Quintel Ent., Inc*., 249 F.3d

---

[3] It is undisputed that MGT's counsel, the law firm of SRF, also represented Barry Honig "and or his affiliates and related entities…, as well as other potential groups of investors who have a pre-existing relationship with Mr. Honig and of which Mr. Honig may be deemed to be representative." (R-56.1 ¶19). Indeed, MGT (through Ladd) "specifically acknowledge[d] that [SRFF] has informed you that we have represented Barry Honig, Michael Brauser, John Stetson, John O'Rourke, Mark Groussman. . . their respective affiliates. . . and SRFF may represent others who are investors in [MGT]…" *Id.*

115, 123-24 (2d Cir. 2001); *see Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir. 1973) (stating that "absent an agreement between them a 'group' would not exist"). The SEC has elaborated that a Rule 13(d) group is *not* deemed to have acquired shares owned by the other members of the group "solely by virtue of their concerted actions relating to the purchase of equity securities directly from an issuer in a transaction not involving a public offering." 17 C.F.R. § 240.13d-5(b)(2) (2000).

The critical question then is whether there was an agreement among the relevant individuals to act together for the purpose of acquiring, holding, voting, or selling securities. *Morales*, 249 at 123-24; *see Corneco Corp. v. Schiavone & Sons, Inc.*, at 217. In other words, "the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) "Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group which is deemed to be a statutory person." *Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 375 (S.D.N.Y. 1979) (internal quotation marks omitted). Similarly, "proof that defendants had jointly invested together in other transactions would not establish that they currently have an agreement with respect to [the company's] stock." *Forward Indus. v. Wise*, No. 14-CV-5365 JSR, 2014 WL 6901137, at *3 (S.D.N.Y. Sept. 23, 2014).

### 1. Ladd did not fail to comply with Item 403 of SEC Regulation S-K and thus did not violate any regulatory duty.

Counsel for MGT, Ladd, and the Honig Group that filed the relevant SEC filings have never believed the Honig Group constituted a Rule 13(d)(3) group and advised Ladd and MGT of this legal position. It is undisputed that MGT and Ladd had received legal advice on this exact issue and the advice was that the filings as made were legally sound and appropriate. During the deposition of six attorneys who were involved in either or both of the 2012 and 2016 transactions

alleged as fraudulent, each attorney made clear that no one believed or had any evidence to suggest that Honig and the others had an agreement to act as a 13(d) group at the time Ladd filed MGT's 10-K disclosing the investors. More specifically, while the SEC has alleged certain facts that they argue support a finding of a "group" (for example, that these individuals have co-invested together in the past, shared office space, paid for promotional materials), the actual lawyers advising Ladd, MGT, and Honig, who were aware of all such facts the SEC claims to be determinative, held (and presently hold) a different view. For example, when the Commission questioned the SRF attorneys about their knowledge of Honig and the others' investing together in the past, and its relevance to a 13(d) group analysis, the attorneys testified that it did not carry substantial weight. Perlman and Kesner explained that it was only one of many factors that would need to be considered, as individuals can invest in the same companies without making the mutual agreements to be bound as a group (where each member would have an interest in the group's communal holdings and the combined position would be managed as one investment). (R-56.1 ¶¶ 20, 21). Arthur Marcus also testified that the fact that Honig and others investing together in the past was not a fact central to the 13(d) group analysis, and whether Honig and others had been investing together in different companies at the same time was also not necessarily relevant to his inquiry either. (R-56.1 ¶ 22).

Attorney Jay Kaplowitz testified that more than just acquiring shares together was required to form a 13(d) group—an agreement to vote together was also required and critical. (R-56.1 ¶ 23). And Harvey Kesner, who represented not just MGT, but also Barry Honig and the Honig Group and who had a relationship with MGT investors prior to 2012 and through 2015, testified on the importance of needing an agreement to make "decisions collectively" to qualify as a Section 13(d) group. (R-56.1 ¶ 24). He emphasized: "going into the transaction isn't

determinative for what is the group. It's the acting in concert for purposes of voting or disposition of securities that largely is the arbiter, based upon the literature, of what is a group. (R-56.1 ¶ 25).

Ladd knew only what he and his attorneys (who also represented Honig) were told at the time of the October 2015 financing, and significantly, when MGT filed its S-1 and 10-K in connection therewith. The law is clear that "[a] violation of Rule 10b-5 cannot occur unless an alleged material misstatement or omission was false at the time it was made." *C.D.T.S., 2013* WL 6576031, at *3. MGT's S-1 and 10-K filings were accurate and truthful at the time they were filed, given Ladd's (and MGT's attorney's) information at the time, and the SEC has no evidence to the contrary with which to go to trial.

### 2.    MGT's reporting disclosure required it to report what Ladd knew.

Because Ladd is not alleged to have been a member of the "Honig Group," 13(a) confers on MGT (for which Ladd was responsible) the duty to file only Form 10-Ks and S-1s.[4] Significantly, Item 403 of Regulation S-K requires issuers to provide a table listing "any person (including any 'group' as that term is used in section 13(d)(3) of the Exchange Act) *who is known to the registrant* to be the beneficial owner of more than five percent of any class of the registrant's voting securities." (emphasis added). Similarly, Item 405 of Regulation S-K requires companies to report "*any known failure to file a required Form*" on the part of beneficial owners of more than 10% of stock. (emphasis added).

The evidence adduced in discovery leaves it undisputed that SRF was privy to all of the information required to make a determination as to whether Honig was acting as a 13(d) group,

---

[4] Exchange Act Regulation S-K at Item 10 sets out the information that an issuer is required to disclose in both forms. (17 C.F. R. § 229.10(a)).

so as to properly advise MGT. As several attorneys from SRF testified, Regulation S-K does not impose an obligation on a registrant to conduct an inquiry and make an independent assessment of another individual's group status, contrary to what the 13(d) filer (and/or his counsel) (*i.e.,* the investor) has actually filed. (R-56.1 ¶¶ 26-28). And here, it was the same law firm, SRF, that filed Honig's 13(d) statement which did not include him as being part of a group. Honig's lawyer, who made that filing, testified she believed it was proper at that time. (R-56.1 ¶29).[5]

In sum, there is simply no evidence in the record that Ladd—or any of the attorneys involved— knew, should have known, or even could have known, if Honig and the others were operating as a group as defined under Section 13(d).[6] As such, the SEC cannot establish a violation of either Section 10(b)(5) or 17(a)(2), because there was no material misstatement and no evidence that he obtained money or property through misstatements or omissions about material facts.

### 3.    Ladd acted without scienter and all evidence establishes he acted in good faith.

Even assuming all six lawyers from SRF got it wrong, there is no material dispute of fact as to Ladd's good faith and lack of scienter. The testimony of the six lawyers compels this Court to find that the SEC's claims of a 10(b)-5 violation also must fail because it failed to adduce any evidence of scienter. Although cases where state of mind is at issue sometimes are not susceptible to summary judgment, the Second Circuit has held that "[s]ummary judgment is

---

[5] What SRF believed is consistent with how Honig and Ladd spoke privately about the matter as well. On November 29, 2015, about a month after the deal closed, Ladd sent Honig an email, in which Ladd wrote, "In addition, *your group's* 25 cent warrants could bring in an additional $1.4 million once the S-1 goes Effective," and, "As for the cap table, we have 17.2 million common shares outstanding, including *your group's* 2.8 million." (R-56.1 ¶30) (emphasis added). Two minutes later, Honig responded, "I am not part of a group. I invested individually." *Id.* Seconds later, Ladd replied, "I stand corrected." *Id.*

[6] The SEC has also failed to adduce any evidence that this information, even if required to be disclosed— which it undoubtedly was not—would have been material to a reasonable investor.

appropriate when the non-moving party has come forward with no evidence from which a reasonable fact-finder could find that the defendant had the requisite state of mind." *Mayer,* 803 F.2d at 756. Since after extensive discovery—which included Ladd waiving his attorney-client privilege and the SEC's subsequent deposition of six attorneys—the SEC has nothing but conclusory allegations, summary judgment is appropriate here.

> a.   The SEC's allegations of Honig and his co-investors' conduct in 2012 is unsubstantiated and does not support an inference of Ladd's scienter in 2016.

The SEC alleged in its Complaint that the Honig Group "were well known to Company B's CEO Ladd – from an earlier pump and dump perpetrated by Honig and his associates in 2012-2013." (SAC ¶128). However, the SEC has produced no evidence to date to support its claim that Honig and his associates engaged in an earlier pump and dump or that Ladd knew of it. There have been no convictions or judgments to date concluding that Honig and "his associates" participated in securities fraud—just allegations by the SEC.

As discussed above, the SEC was unable to elicit testimony from a single attorney during depositions to confirm its allegations that Honig and the others were operating as a Section 13(d) group during the 2012 financing. This Court ruled in its February 2020 Order that "Ladd's past experience with four members of the Honig Group provides critical context to his alleged communications, potentially leading a fact finder to infer Ladd's knowledge of the [Section 13(d)] Group []." [Dkt. 211]. The evidence in the record now proves otherwise.

In an email dated October 18, 2012, Honig sent Kesner "the allocation for MGT []." MGT's counsel, Marcus, wrote to Honig's attorney, Kesner, "Are they acting as a group," to which Kesner responded, "No!" (R-56.1 ¶31). During his 2022 deposition, when the SEC showed Marcus this email and asked, "With respect to the 2012 MGT financing, [] did you or

anyone else at Sichenzia discuss with anyone at MGT whether Mr. Honig and any of the other investors in the financing were acting as a group for Section 13(d) purposes," he responded plainly, "Mr. Kaplowitz asked me to ask Mr. Kesner if they were acting as a group." (R-56.1 ¶32). In follow up, the SEC inquired if Marcus had "reason to believe that Mr. Honig might be acting as a group with other investors." He responded, "No," further explaining that "Mr. Kaplowitz asked me to ask it, so I asked it." Marcus testified that his understanding of why he was asking Mr. Kesner that question was "[b]ecause Mr. Kesner had a familiarity with these – with some of these investors having had represented them." (R-56.1 ¶33). Marcus testified that he relayed this information back to Kaplowitz, Ladd's attorney in the 2012 MGT financing: "It's a long time ago, but I have a memory of Jay asking me and him saying, oh, what did he say, and I said he said no." (R-56.1 ¶34).

When the SEC asked Kaplowitz during his 2022 deposition, did he "ever consider -- with respect to the 5 percent beneficial owners listed here, [] whether [] any other of the selling shareholders cumulatively constituted a group that held more than 5 percent or that should have been included along with Barry Honig as a group under 13D in this listing of 5 percent shareholders of MGT," although he could not recall specifics, he responded: "I don't recall what I did or didn't consider at the time.  It was quite a while ago.  I'm sure that we discussed it and did a good job, but I don't recall what we considered." (R-56.1 ¶35).

> b.    *Ladd acted without scienter, in good faith, in filing the S-1 and 10-K as proven by, among other things, his reliance on advice of counsel.*

"Good faith reliance on the advice of an accountant or an attorney has been recognized as a viable defense to scienter in securities fraud cases," *S.E.C. v. Caserta,* 75 F.Supp.2d 79, 94 (E.D.N.Y.1999) (citations omitted). Such "good faith reliance" is "not a complete defense,

[however,] but only one factor for consideration." *Markowski v. S.E.C.,* 34 F.3d 99, 105 (2d Cir.1994); *accord Howard v. S.E.C.,* 376 F.3d 1136, 1147–48 (D.C.Cir.2004).

The SEC probed the SRF attorneys as to whether Ladd made a complete disclosure of the facts surrounding Honig and the others' potential 13(d) group status to them, but depositions uncovered that Kesner and Perlman had more information than Ladd himself did. Kaplowitz testified he knew about the payment for promotional materials. (R-56.1 ¶36). Both Perlman and Kesner testified that they knew Honig and the others shared offices, but that was clearly not a significant factor in the 13(d) group analysis. (R-56.1 ¶¶37-38). Perlman testified that she did not tell Ladd about the fact that she had previously done other work for Brauser, Groussman, Stetson, or O'Rourke, but also explained that she did not think it was information Ladd needed to know. (R-56.1 ¶39). Kesner similarly testified that the fact that Honig shared office space with the others was well known and not relevant. (R-56.1 ¶40). When the SEC asked Perlman whether her past experience in writing opinion letters for those who were alleged to be in the Honig Group was a relevant factor in a 13(d) group analysis, she testified it did not suggest they were acting as a group. (R-56.1 ¶39).

The SEC asked Marcus if he knew: (i) [Honig and the others] had been involved in buying and selling stock of other issuers together with the same group or a similar group of investors; (ii) that [Honig and the others] were involved in the 2012 financing; (iii) that Ladd was interviewed for the seeking Alpha article (in 2012) that Honig paid for in promoting MGT and then selling shareholders; (iv) that (what if, hypothetically) the stock price went up because Honig engineered that to happen; (v) Honig was involved in finding a reverse takeover candidate for MGT; or (vi) about Honig's reputation. The SEC also questioned Marcus whether knowing

any of the above facts would have impacted his 13(d) analysis. Marcus responded "no" to each of these assertions. (R-56.1¶41).

The SEC alleges that the Honig Group's undisclosed beneficial ownership enabled it to exercise control over MGT's policies, in fact, such as through negotiating the McAfee transaction, from which they expected to reap significant profits. However, Kesner, who had a long-standing professional relationship with Honig and (some of) the others involved in the transaction, were aware of the investors' involvement in the McAfee transaction from the outset. Kesner was also keyed into the value that McAfee could bring to the deal. (R-56.1¶40). There is no evidence in the record that Honig or anyone else in the "group" exercised any control whatsoever over MGT. As Ladd himself testified, he took great care to ensure no one had control over MGT: "I was aware that there are terms in financings that create these death spirals in the stock. And I needed and wanted to avoid that so that an investor would not have that control." (R-56.1 ¶42). While the SEC has alleged control, there is no evidence to support it.

**B.    The SEC's Evidence Regarding MGT's May 2016 Press Release Cannot Establish a 10(b)(5) or 17(a)(2) Violation.**

**1.    MGT's May 2016 Press Release did not contain any materially misleading information or omissions.**

At the close of discovery, the SEC has no evidence supporting its claim that a single statement included in MGT's May 2016 Press Release was a material misstatement that a "reasonable investor" would consider how it would act for two undisputed reasons. First, evidence uncovered during discovery establishes that the actual truth of the statement pervaded the marketplace, and as such the "truth on the market" prevents a finding of a material

misstatement. Second, the exact imprecise wording Ladd used had also pervaded the marketplace without anyone suggesting that the slight difference in wording was a material misstatement.[7]

On May 9, 2016, MGT announced that John McAfee was joining MGT as its new CEO—an undisputed truthful announcement. Within this press release was the line that McAfee sold his company to Intel in 2010 for $7.6 billion—rather than the more accurate assertion that Intel purchased the company founded by McAfee in 2010 for $7.6 billion. (R-56.1 ¶43).

Only a *material* misstatement or omission can give rise to liability under Section 10(b) and Rule 10b-5. 17 C.F.R. § 240.10b-5. In determining materiality, the misstatement or omission is not viewed in a vacuum. A statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" *IBEW Local Union No. 58 Pension Trust Fund Annuity Fund v. The Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("*IBEW*"). In other words, there must be a "substantial likelihood" that the misstated or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 390. The "truth on the market" doctrine instructs that "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 at 167 (2d Cir. 2000).[8]

---

[7] Perhaps most telling, when (investor) plaintiffs' attorneys filed lawsuits against MGT in connection with the McAfee deal, none alleged this particular clause in the press release was materially false. (R-56.1 ¶44).

[8] *See also In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *22 (S.D.N.Y. Oct. 25, 2006) (plaintiffs failed to state a claim because "no reasonable investor could have been misled" by a failure to disclose information "[g]iven the detail with which . . . two major international newspapers reported" on that information).

Because John McAfee was a world-famous eccentric celebrity, hailed as a tech genius in the cybersecurity world, by May 9, 2016, facts surrounding John McAfee's departure from Intel were in the public and known to the reasonable investor—the 'total mix' of information available regarding Intel's purchase of the company McAfee founded pervaded the market. Dozens of articles were in the press that provided the statement that McAfee founded the company that was sold to Intel for $7.7 billion. (R-56.1 ¶¶45-64). Just as importantly, however, numerous top-tier newspapers mistakenly printed exactly what MGT did. By way of limited example, On November 12, 2012, Nadine Deninno of the IB Times wrote an article titled, "*John McAfee, Anti-Virus Creator, Wanted For Murder Of Gregory Faull.*" (R-56.1 ¶13). When discussing McAfee's background, the article states, "McAfee sold his company to Intel in 2010 for nearly $7.7 billion. *Id.* On September 9, 2015, Nick Winchester of Newsweek wrote an article titled, "*Antivirus Pioneer John McAfee is Running for U.S. President.*" In the article it states, "After escaping an abusive upbringing, he went on to found McAfee Associates, the antivirus software technology company that he sold to Intel in 2010 for $7.68 billion." (R-56.1 ¶14). On September 14, 2015, Laurie Segall of CNN Business, wrote an article titled, "Why John McAfee Believes He Should Be President," stating, "McAfee sold his company to Intel in 2010." (R-56.1 ¶15). Also in September 2015, PR Newswire published a press release stating "*In 2010, the company he founded (McAfee Associates) was sold to Intel for an incredible $7.8 billion.*" (R-56.1 ¶65).

## 2.   Ladd lacked scienter in publishing the May 2016 Press Release.

The Second Circuit has held that "[s]ummary judgment is appropriate when the non-moving party has come forward with no evidence from which a reasonable fact-finder could find that the defendant had the requisite state of mind." *Mayer*, 803 F.2d at 756. Given the above, and in conjunction with the SEC's failure to obtain any evidence tending to suggest Ladd included

this statement—the same statement made by numerous other news organizations—with scienter, summary judgment is appropriate.

### C.   There Is No Evidence to Support an Argument that the May 31, 2016 Form 4 Constitutes a Violation of 10(b)(5) or 17(a)(2).

Nor can Ladd's mistakes made in his Form 4 and Form 144 *standing alone* be material in the "total mix" of information available to the investor. Without any wrongdoing in connection with MGT's S-1 or 10-K, or the May 2016 Press Release, these forms cannot be the basis of a securities fraud violation. Even according to the SEC's own allegations, Ladd was permitted to sell 392,109 shares between May 9-12. He sold 435,000.  (SAC ¶172, Dkt. 275). In other words, the SEC bases a fraud allegation on Ladd selling roughly 50,000 shares, or 10% more than Rule 144 permitted him to. There is no evidence in the record that a reasonable investor would have believed that Ladd selling an additional 50,000 shares was material. Moreover, Ladd had actually disclosed the full number of shares that he had disposed of in his Form 4, and that amount was actually below the amount permitted. As the Court in *Bilzerian* articulated, "we decline to hold that the information required to be disclosed in [form] is material *per se* for purposes of § 10(b) simply because such disclosure is required under the securities laws," and where the SEC has no other evidence of materiality, dismissal is appropriate. *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991).

### 1.   The May 31, 2016 Form 4 does not contain any material misstatements.

The SEC alleges that Ladd violated 10(b)(5) and 17(a)(2) because his May 31, 2016 Form 4 included two inaccuracies. (SAC ¶182). First, the SEC alleges that he wrongfully attested to selling 157,300 shares of MGT stock on May 25, 2016—which wasn't the correct date, although those shares were previously sold. Second, the SEC alleges that he omitted other sales

he had made since December 1, 2015, which included sales of 435,000 shares in the May 9–12 period immediately following MGT's press release about the McAfee merger. *Id.* But the SEC's allegations are factually wrong.

In fact, Ladd's Form 4 Statement of Beneficial Ownership, provided that (i) on May 25, 2016, Ladd disposed of 465,171 shares, leaving him with 157,300 beneficially owned securities (entirely undercutting the SEC's allegations that these sales were hidden); (ii) on May 25, 2016, Ladd disposed of 157,300 shares, leaving 0 beneficially owned securities; (iii) on May 26, 2016, Ladd acquired 300,000 shares, leaving 573,603 beneficially owned securities; and (iv) on May 31, 2016, Ladd disposed of 33,603 shares, leaving 540,000 beneficially owned securities. (R-56.1 ¶66). Even if the sale of the 157,300 shares was off by two weeks, the SEC has not come forward with any evidence that such an error was material.[9] The purpose of Form 4 is for a corporate insider to report changes in beneficial ownership. Ladd accurately reflected to the market that those shares were out of his beneficial ownership.[10] (R-56.1 ¶67).

> **D.   There Is No Evidence to Support an Argument That the May 25, 2016 Form 144 Constitutes a Violation of 10(b)(5) or 17(a)(2).**

Finally, the SEC bases it 10(b)(5) or 17(a)(2) violations on allegations that Ladd stated on his May 25, 2016 Form 144 that he intended to sell MGT stock that day, and omitted his MGT stock sales during the previous three months. But these allegations are an even more tenuous

---

[9] Ladd reported that he disposed of 465,171 shares on May 26, which resulted in an accurate reflection of his beneficially owned shares as of May 31, 2016. (R-56.1 ¶68).

[10] The SEC incorrectly asserts that MGT's average weekly trading volume for the four preceding weeks was 392,109 because the relevant four weeks are those that precede May 9, 2016. However, Ladd filed his Form 144 on May 25, 2016. (Dkt. 243-3), which is the date the calculation is to be based on. The average weekly trading volume for MGT stock during the four-week period preceding May 25, 2016, was 122,111,6289. The number of MGT outstanding shares during this period was 23,798,517 (Dkt. 243-3). Ladd sold 435,000 MGT shares, which does not exceed the greater of the two (122,111,628). Thus, Ladd's sales of MGT stock did not exceed the greater of the two metrics for the relevant four-week period, and therefore Ladd is protected under the "safe harbor" exemption available under Rule 144.

basis for a 10(b)-5(b) or 17(a)(2) claim than the Form 4 allegations. There is no evidence in the record that Ladd's Form 144 would have been material for a reasonable investor, or that Ladd filled out the form with the intent to deceive.

>1.    **The May 25, 2016 Form 144 cannot support a substantive securities fraud violation because it does not contain a material misstatement nor is there evidence of scienter.**

A Form 144 is a "notice of proposed sale" that is filed pursuant to 17 C.F.R. § 230.144 ("Rule 144") under the Securities Act of 1933 (the "Securities Act") when an affiliate of an issuer (as defined in Rule 144) has "a bona fide intention to sell the securities referred to in the notice within a reasonable time after the filing of such notice." 17 C.F.R. § 230.144(h)(2).

On May 25, 2016, Ladd submitted a Form 144 disclosing his intent to sell shares of MGT stock. The SEC alleges that the May 25 Form 144 statement that Ladd intended to sell, by that day, a total of 506,171 MGT shares from two of his personal accounts was false, because he made no sales that day, and sold only 11,000 shares after that day on May 31, 2016. But the SEC has no evidence in its possession that Ladd did not intend to sell the shares as listed, thereby making that statement false at the time it was made. Further, 144(h)(2) provides that the seller intends to sell within a reasonable time after the filing of such notice. Although Ladd indicated to the market that he intended to sell the shares on May 25, he actually sold shares six day later—a reasonable time after filing the notice. Ladd did not make a misstatement under the statute.

But even if it were considered a misstatement, there is no evidence in the record for a jury to find it is a material one. As the Court in *Morales* articulated: "Neither a Form 144 nor a Form 10–Q is the functional equivalent of the Form 4. The Form 144 is submitted to comply with the Securities and Exchange Commission's ("SEC") Rule 144 which "requires that certain sales by 'control' persons be reported to the SEC in advance." *Morales v. Exec. Telecard, Ltd*., No. 95

CIV. 10202 (KMW), 1998 WL 314734, at *3 (S.D.N.Y. June 12, 1998) (citing *Whiting v. Dow Chem. Co.,* 523 F.2d 680, 683 n. 4. (2d Cir.1975)). The SEC's Form 144 does not require disclosure of the price per share for either the purchase or sale of securities, nor does Form 144 require that transactions be reported in an individualized manner to allow a shareholder to determine whether some, any or all as discrete trades that match to one or more purchases within six months. *Morales*, at *3. ("Form 144 disclosure simply does not provide the same relevant information as Form 4.") There is simply no evidence in the record that this would have been material to any investor.

Lastly, the SEC has produced no evidence to substantiate its claim that Ladd failed to disclose on the Form 144 sales of 539,072 shares of MGT stock he had made in the prior three months, in violation of Rules 144(e)(1) and (h), (SAC ¶178) and with the intent to conceal any of his past sales of shares from investors. (SAC ¶ 176). All of the evidence uncovered in discovery establishes that Ladd simply made a mistake. Indeed, because Ladd actually aggregated his sales with his parents' sales—which he was not required to do—Ladd reported *more* sales in his Form 144 than he was required to make. Plainly, he was not intending to deceive the market by hiding sales, as he disclosed more than he was required to under the law.

Moreover, there is no evidence that Ladd had the requisite scienter. The SEC issued a final rule, effective July 11, 2022, on "Updating EDGAR Filing Requirements and Form 144 Filings." The new rule would require mandatory electronic filing of Forms 144. In addressing the public comments in support of the new change, the memo emphasized that "a number of commenters noted that filing Form 144 in paper makes it difficult for investors and other users of the disclosures (such as researchers and other regulatory bodies) to access the information contained in these filings." On May 31, 2016, when Ladd filed the Form 144, Attorney Wu

emailed him, "Also, you may already know this but the form 144 may be filed by paper instead of on Edgar." Ladd responded, "I already filed Form 144." (R-56.1 ¶69). Based on the SEC's own rules in effect in 2016, Ladd could have avoided investor scrutiny by simply filing Form 144 by paper. He did not do that. There is simply no evidence in the record that Ladd acted with scienter in filing his Form 144, and the Commission's 10(b)-5(b) claims on the basis Ladd's Form 144 filing must fail as well.

III.   **THE SEC FAILED TO ADDUCE ANY EVIDENCE OF ANY AIDING AND ABETTING VIOLATIONS OF SECTION 10(B) AND RULE 10(B)-5(A) OR SECTION 17(A)1 AND (A)3**

"In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.'" *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir.2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir.2009)). To satisfy the "substantial assistance" element, the SEC must establish that the aider and abettor "in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Id.* (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)). *United States Sec. & Exch. Comm'n v. DiMaria*, 207 F. Supp. 3d 343, 358–59 (S.D.N.Y. 2016).

As detailed above, the SEC has not obtained any evidence in this case to establish an underlying violation of the securities laws by Honig or anyone who co-invested with him. As such, this Court should dismiss Counts Seven and Eight as well.

## CONCLUSION

For the foregoing reasons, Ladd respectfully requests this Court dismiss Counts Five through Eight. In the alternative, Ladd respectfully requests that the Court dismiss the allegations

regarding the Rule 13(d)(3) group and the May 9, 2016 Press Release as stand-alone securities

law violations in Counts Five and Six and permit the SEC to proceed on Counts Five and Six

only with respect to the Form 4 and Form 144 allegations.


Dated: November 21, 2022
       New York, NY

                                             Respectfully submitted,

                                             FORD O'BRIEN LANDY LLP

                                             By:     /s/ Adam C. Ford
                                                     Adam C. Ford
                                                     Anjula S. Prasad
                                                     aford@fordobrien.com
                                                     275 Madison Ave, Fl. 24
                                                     New York, New York 10017
                                                     (212)-858-0040
                                                     *Attorneys for Robert Ladd*