# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION, )
Plaintiff, )
v. ) Case No.
BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)
MAZA, BRIAN KELLER, JOHN H. FORD, )
GRQ CONSULTANTS, INC., AND HS )
CONTRARIAN INVESTMENTS, LLC, )
Defendants. )
____________________________________)

VOLUME 1

VIDEOTAPED DEPOSITION OF ARTHUR MARCUS

VIA VIDEOCONFERENCE

Tuesday, June 21, 2022

Diversified Reporting Services, Inc.
(202)467-9200

**works?**

A If you have a group, which I believe is defined as people who are buying, selling kind of as one together.

**Q Would that be buying, holding, voting, or selling together? Does that sound right?**

A Correct.

**Q Thank you. And then what do you have to do in that case?**

A You'd have to aggregate them as a group.

**Q And then I take it upon what you're saying, if the aggregate was over 5 percent, they'd have to be disclosed as a group owner of over 5 percent?**

A Well, if they were a group owner who was over 5 percent, they'd have to be disclosed. Correct. I'm not sure if that's the same, but yes.

**Q With respect to the 2012 MGT financing, did anyone at Sichenzia -- did you or anyone else at Sichenzia discuss with anyone at MGT whether Mr. Honig and any of the other investors in the financing were acting as a group for Section 13(d) purposes?**

A Mr. Kaplowitz asked me to ask Mr. Kesner if they were acting as a group.

**Q Let me come back to that. My question was whether -- well, withdrawn. Let me ask this way. I**

**asked you if MGT was asked that question and you said Mr. Kesner was asked. Is that right?**

A I said I asked Mr. Kesner.

**Q Why did you ask Mr. Kesner?**

A Because Mr. Kaplowitz advised me to.

**Q Did you understand Mr. Kesner to be representing MGT for that purpose?**

A No.

**Q So let me go back to my original question.**

A Sure.

**Q Did you or anyone at Sichenzia ask MGT whether it was directly or through MGT counsel that question about -- or discussed that question whether Mr. Honig and others were acting as a group with respect to the 2012 financing?**

A Not to my knowledge.

**Q And why is that?**

A I don't recall.

**Q Now you mentioned that Mr. Kaplowitz asked you to ask Mr. Kesner a question about that. What did Mr. Kaplowitz ask you to ask him?**

A If the investors were acting as a group.

**Q And then you did that?**

A Yes.

**Q When was that? When were these**

**conversations?**

A In 2012.

**Q Was it prior to the closing of the 2012 financing?**

A That, I don't recall the time.

**Q Did you discuss with Mr. Kaplowitz why he wanted you to ask that question?**

A No.

**Q Did you have any understanding of why you were asking Mr. Kesner that question?**

A Because Mr. Kesner had a familiarity with these -- with some of these investors having had represented them.

**Q But what I'm asking is -- I understand that. I'm asking something a little bit different. Did you have reason to believe that Mr. Honig might be acting as a group with other investors?**

A No.

**Q So I'm just trying to understand why ask that question.**

A Because -- you'd have to ask -- Mr. Kaplowitz asked me to ask it, so I asked it.

**Q And you didn't ask -- and you didn't have any further discussion about it with Mr. Kaplowitz?**

A No.

**Q And that lawyer was representing Mr. Ladd at the time?**
A I believe so.
**Q Was his name Sean Coffey?**
A I don't remember.
**Q And do you know what the context was of this lawyer asking you that question?**
A I understood that he was representing Mr. Ladd in the SEC matter against him.
MR. FORD: Jack, this is what I -- I think I've got to object into further inquiry because I think this is getting outside the waiver are.
A I'm a little -- so I think we're going to object. And I also think -- well I'll just leave it at that. We can have a further conversation if you need with that outside Mr. Marcus' presence, but I think I've said enough for now.
MR. KAUFMAN: Okay. All right.
**Q So and after you got this response from Mr. Kesner where he says no with an exclamation mark in this e-mail, did you have a further conversation with Mr. Kaplowitz about this subject?**
A I believe so, but I don't recall exactly.
**Q What makes you think you did have such a conversation?**

A It's a long time ago, but I have a memory of Jay asking me and him saying oh, what did he say, and I said he said no.

**Q And is that all you remember about the second conversation? Did -- was there any other exchange between you and Mr. Kaplowitz?**

A Not to my knowledge.

**Q Did you have an understanding -- was that response that Mr. Kesner gave to you that you relayed to Mr. Kaplowitz, did that affect anything you did, or Sichenzia did, going forward on this transaction?**

A No.

**Q Did -- I may have asked you this before, but after you got this response, do either you, or Mr. Kaplowitz, or anyone else at Sichenzia relay that information that Mr. Kesner had conveyed to anyone at MGT?**

A It looks like I did in the e-mail.

**Q But other than in the e-mail?**

A Not to my knowledge.

**Q If you could turn to number 12, tab number 12, which is -- it has been marked as AM 2.**

**(AM Exhibit 2 was marked for identification.)**

A Got it.

like that.

**Q And did you ever discuss any of that with Mr. Ladd?**

A No, not to my knowledge. Or not to my recollection.

**Q And did you come to the same conclusion that Mr. Kesner came to that Mr. Honig and others were not acting as a group for 13(d) purposes?**

A I didn't challenge that at all.

**Q And why was that?**

A There was -- if you didn't know the reasons, you would assume that all those investors were acting as a group. And since we had asked the question and been told the answer was no, I don't think we ever had any further discussions on it actually.

**Q Do you have -- you should have number 39, I'll call it tab 39 which has been marked as AM 11.**

**(AM Exhibit 11 was marked for identification.)**

A Yes, I have.

**Q And this is an e-mail dated October 19, 2012. The top one is from Mr. Ladd, to you, copying Mr. Traversa.**

**Do you see that?**

A I do.

A Yeah, I'm just trying to find -- before it was much louder. I haven't been on one of these calls with this service.

MR. KAUFMAN: Why don't we go off the record for a second while Mr. Marcus figures that out.

(Whereupon a discussion was held off the record.)

**Q Mr. Marcus, I think you said you understood that Mr. Kesner had worked on other matters involving Mr. Honig. Is that right?**

A Correct.

**Q And did you know that Ms. Guarneri-Ferrara had also worked on other matters involving Mr. Honig?**

A At what time?

**Q At this time in October 2012, did you know that?**

A I knew she had worked for Mr. Kesner. I didn't know who exactly she'd worked for.

**Q And had you known at that time that Mr. Honig had been involved in buying and selling stock of other issuers together with the same group or a similar group of investors, would that have affected your analysis under 13(d) for the 5 percent requirement?**

A I'm not sure because these deals all have similar investors in them. Like I said, I never knew

this group, but I had dealt with Iroquois in the past and maybe -- and Hudson Bay but not -- so I don't know that it would have.

**Q Well would it have been something you would have wanted to take into account in analyzing the 13(d) group issue?**

A Perhaps.

**Q And why is that?**

A Just to see if there was a pattern of all these investors investing together. But again, I don't know how much I would have taken into it because you know, even today half these deals all still have the same investors in them. And I don't mean these investors. I mean, there are certain people that are in every deal.

**Q What deals are you referring to?**

A To every deal that I do today, every underwritten offering, if you looked at the syndicate, which we don't get into very often, but if you look at who the investors actually are, you know, the same people participate --

**Q You just -- you just cut out. Sorry, you said the same people?**

A Ah, the sound came back when I cut out. That was great. I said you get the same type of

A You're talking about in 2012? Or --

**Q No, 2015.**

A Sorry, 2015.

**Q No, that's fair.**

A In 2015, did I know anything about Mr. O'Rourke? Not particularly, no. I remember --

**Q What about Michael -- What about Michael Brauser?**

A Mark Groussman, his name. Right?

**Q Mark Groussman, that's right. Right. And now I'm asking you about Michael Brauser. Does that name ring a bell?**

A It does now, but it didn't, I don't think, then. But yes, I know who --

**Q How did you come to hear of Mr. Brauser?**

A I don't recall.

**Q Did you -- do you recall any of those individuals being involved with investors in the 2012 financing?**

A I don't recall, but I could look at the S-1 if there was one.

**Q Is the fact that if they were involved in the 2012 financing, would that affect your view as to whether now, in 2015, they're involved in this financing, Mr. Honig is acting or might be acting as a**

**the Seeking Alpha article that Mr. Honig paid for in promoting MGT and then selling shareholders -- selling their shares in 2013, is that information that you would have wanted to consider in determining in 2015 whether this group of investors was acting as a group for Section 13 purposes?**

A No, not necessarily.

**Q What do you mean by that?**

A Stock goes up. The stock goes down. If the stock is up, people sell their shares. I don't think that would have affected me to say oh, this guy sold the shares, that guy didn't, this guy did, this guy didn't. I don't think I would do that analysis. I've never done it before.

**Q Well what if the stock price went up because Mr. Honig engineered that to happen? Would that have affected your analysis?**

MR. RASTOGI: Objection to form, foundation.

**Q You can answer it if you understand.**

A I think the answer is that I had no knowledge of it.

**Q I understand that. I'm asking you a hypothetical question. If you had had that knowledge, would that have affected your analysis?**

A It can't really -- I can't answer as to what it might have or might not have done. Again, by itself, probably not.

**Q I'm not -- just to be clear, I'm not asking you by itself. I'm saying is that information that you would have wanted to take into account in doing a 13(d) group analysis?**

A They filed their own 13 -- investors file their own 13(d)s so I don't generally do a 13(d) analysis. So the answer's, I think, no.

**Q Did you ever discuss with Mr. Ladd whether or not you conducted a group 13(d) analysis?**

A No.

**Q Or whether it was your practice to do so?**

A No.

**Q We've asked you to look at tab 4. This is a document that was marked as JK 19.**

A Okay. I have it.

**Q It's a September 29th, 2015 e-mail from Mr. Ladd to several people. Oh, I'm sorry. You're not actually on this one.**

A I'm not on it. I don't see my name.

**Q Let me ask you to look at -- okay, I'm going to withdraw that. Are you aware that as part of the -- or were you aware in 2015 that as part of the**

**2015 financing, Mr. Honig was going to find reverse takeover candidate for MGT?**

A Not the reverse takeover, but I thought there was a transaction in the works. If you just give me one second. There's someone at my door. Just give me one second. Sorry about that. Go ahead.

**Q So I think you were going to -- I had asked you about whether you knew anything about a Mr. Honig's being involved in finding a reverse takeover candidate for MGT.**

A Yeah, I don't know who was finding it, but that there was a transaction presented to them.

**Q Were you aware that that was something that Mr. Honig was spearheading?**

A No, I wasn't.

**Q Is that something that would have affected your view on whether Mr. Honig was acting as a group with other investors with respect to the 2015 Form S-1?**

A No, it wouldn't have. Maybe as a affiliate, but not as a group, no.

**Q What do you mean by that?**

A You know, 13(d) has other provisions in it as well. You know, you could be an affiliate and not be part of a group.

**Q And what would be the affect of that? Why**

**is that significant?**

A I think if you're an affiliate -- oh, if you're an affiliate, you know, you have different responsibilities, you're like the company. Besides having to make -- you can office -- who owns less than 5 percent of the company who still needs to make 13(d) filings because of their --

**Q Did Mr. Ladd -- did you ever hear from Mr. Ladd about his personal dues of Mr. Honig?**

A I don't recall exactly.

**Q What do you recall?**

A I recall that, you know, discussing that he was an investor in the company and that he had a mixed reputation, I guess, at that stage Robert determined.

**Q Mr. Honig had a mixed reputation?**

A That's what Mr. Honig -- I mean, that's what I think Mr. Ladd determined.

**Q Mr. Ladd told you that?**

A I don't recall.

**Q How did you come to understand that Mr. Honig had a mixed reputation?**

A I think it was -- and maybe it's because I'm sitting here today and not in 2015, if I saw an e-mail or something. I don't know if I was copied on that, but that was my understanding.

**Q You understood in 2015 that Mr. Honig had a mixed reputation?**
A By 2015, I think I did, yeah. And just in general people would make comments.
**Q What do you mean by mixed reputation?**
A What's that?
**Q What do you mean by mixed reputation?**
A I think some people thought he was a bad investor.
**Q What do you mean by that?**
A That somebody could hurt a company if you put him in there.
**Q I'm sorry. That he could hurt a company, you said?**
A Yeah, some investors are good investors, and some aren't. It's just the nature of the practice.
**Q Did you ever hear anything derogatory about Mr. Honig other than that he wasn't a good investor?**
A No, not really.
**Q Did Mr. Ladd ever tell you or did you ever hear Mr. Ladd -- that Mr. Ladd didn't trust Mr. Honig?**
A I didn't know that.
**Q Did you ever hear Mr. Ladd say -- or hear of Mr. Ladd saying anything else derogatory about Mr. Honig?**

A No.

**Q Did Mr. Ladd ever -- withdrawn. Did you ever -- did you ever hear that Mr. Ladd had an exchange with the hedge fund manager, David Einhorn?**

A I don't recall that. But I looked at e-mails and the exhibits and I did see that.

**Q I'll just direct your attention to tab 9.**

MR. RASTOGI: And you need to be testifying about your knowledge and not what you read.

THE WITNESS: Okay.

**Q Yeah, this is Honig Exhibit 10. It's an e-mail exchange between Robert Ladd and David Einhorn. And I understand you're not on this exchange. Mr. Marcus, you'll see there's an e-mail from Mr. Einhorn where he says some things about Mr. Honig. He calls him a recidivist stock promoter. Do you see that on the second page?**

A I do.

**Q Did you ever hear -- so I'm not asking you if you received this. But did you ever hear of an exchange like that that Mr. Ladd had with Mr. Einhorn?**

A No, I did not.

**Q Did you understand Mr. Honig at any time to have been a recidivist stock promoter?**

A No, I didn't.

**Q Did you understand him to be involved in pump and dump schemes?**
A Not in 2015, no.
**Q There came a time when you did understand that?**
A Well the SEC brought an action against him.
**Q And that's how you came to have some idea that that might be the case?**
A Well, certainly if the allegations were true, correct.
**Q And if you had -- if you had been aware of that reputation of Mr. Honig or if you had heard that Mr. Honig or had that view of Mr. Honig back in 2012, would that have affected your view as to whether he was acting with others of the group for Section 13 purposes?**
A No.
**Q Why is that?**
A It would lead me to think that he was a stock promoter. That he -- and that he had sold his position. I didn't know. Even if I had this e-mail in front of me, I don't see that it talks at all about a group.
**Q Do you -- do you have an understanding of what the purpose of the group disclosure requirement is on the 13(d)?**