# EXHIBIT 9

```
 1            UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF NEW YORK
 3                      --o0o--
 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
            Plaintiff,            )
 6                                ) Case No.
         vs.                      ) 18 Civ. 8175 (ER)
 7                                )
     BARRY C. HONIG, ROBERT LADD, )
 8   ELLIOT MAZA, BRIAN KELLER,   )
     JOHN H. FORD, GRQ CONSULTANTS,)
 9   INC. and HS CONTRARIAN       )
     INVESTMENTS, LLC,            )
10                                )
            Defendants.           )
11   _____)
12
13
14
15            DEPOSITION OF
16            HARVEY KESNER
17        VIA REMOTE VIDEOCONFERENCE
18         MONDAY, AUGUST 8, 2022
19
20
21
22
23
     Stenographically Reported by:
24   Victoria L. Valine, CSR, RMR, CRR, RSA
     California CSR License No. 3036
25   Job No. 220808VV
```

```
        REMOTE APPEARANCES:

FOR PLAINTIFF:
    SECURITIES AND EXCHANGE COMMISSION
    BY:  Nancy A. Brown, Esq.
         Jack Kaufman, Esq.
    100 Pearl Street, Suite 20-100
    New York, New York 10004
    212-336-1023
    BrownN@SEC.gov

FOR DEFENDANT ROBERT LADD:
    FORD O'BRIEN, LLP
        Attorneys at Law
    BY:  Adam Ford, Esq.
         Anjula Prasad, Esq.
    575 Fifth Avenue, Floor 17
    New York, New York  10017
    212-858-0040
    AFord@fordobrien.com

Also Present:  Robert Ladd


    (All parties appeared remotely via videoconference.)
```

```
                    INDEX
WITNESS:  HARVEY KESNER
EXAMINATION BY COUNSEL                          PAGE
Examination By Ms. Brown:                         9
```

```
                 E X H I B I T S
EXHIBIT NO.   DESCRIPTION                       PAGE
Exhibit 4    Convertible Note Original Issue     49
             Date:  May 5, 2016 Principal
             Amount:  $3,409.09
             Bates No. LADD-MGT-00042975 -
             LADD-MGT-00042991
             Confidential

Exhibit 5    Letter Dated July 24, 2012 from    67
             Anslow & Jaclin, LLP to Mr. Mike
             Turner, Globex Transfer, LLC with
             Attachments
             Bates No. SEC-FINRA-E-0000643 -
             SEC-FINRA-E-0000649

Exhibit 7    Letter Email Dated October 7, 2013  72
             from Sichenzia, Ross, Friedman,
             Ference, LLP to Equity Stock
             Transfer
             Bates No. COCP0082981 Confidential
             Treatment Requested by Cocrystal
             Pharma, Inc.

Exhibit 8    Letter Email and U.S. Mail Dated    74
             September 25, 2013 from Sichenzia,
             Ross, Friedman, Ference, LLP to
             Equity Stock Transfer
             Bates No.
             SD-SEC-(18Civ8175)-112151
             Confidential Treatment Requested
             by JS/SCI/HSCI

Exhibit 9    Letter Dated November 7, 2013 from  76
             Fuse Science to Securities
             Transfer Corporation
             Bates No.
             SD-SEC-(18Civ8175)-093829 -
             SD-SEC-(18Civ8175)-093830
             Confidential Treatment Requested
             by JS/SCI/HSCI

Exhibit 18   Email Thread                       123
             Bates No. LADD-MGT-00059628 -
             LADD-MGT-00059632
             Confidential
```

### Page 45

answers to that list of companies, that you may have invested individually or personally not necessarily through any of those three entities that we talked about. And so my question is: What guided your decision about whether to invest through your investment vehicles -- the three we mentioned, Paradox, Denville & Dover, and Darwin -- or investing on your own in your own name?

A. Where I had capital available at that moment in time.

Q. Did you ever discuss any of these investments with Mr. Ladd?

A. Not -- no. I don't believe so.

Q. Do you have any reason to know whether Mr. Ladd was otherwise aware of your investments in any of these issuers?

A. No. I don't think so. You know, there might have been a filing where I might have had a -- you know, an interest like, for example, in Spherix I was a reporting -- Section 16 reporting officer, and it might have had a footnote in it that said Paradox Lake is, you know, an affiliate of Harvey Kesner. Some kind of disclosure where it was in a public record. But I don't otherwise have any idea why or how Mr. Ladd might have known what connection those entities had with each

### Page 46

other.

And, of course, there's, you know, the very public MabVax lawsuit, and also the -- I don't think Darwin was formed at the time of the Haynes Boone lawsuit, so I don't think Darwin would have been mentioned, but Paradox probably -- most certainly was.

Q. Did you ever invest in MGT or D-Vasive?

A. I don't think MGT, but yes, D-Vasive.

Q. And what was the nature of your investment in D-Vasive?

A. There had come a time where I had met the person who was behind the creation of a series of opportunities, and thought that those opportunities were interesting in terms of putting a small amount of capital to work before these companies really had reached their trajectory, and through that coming together of those entities I thought it made sense to put a little bit of money into it.

Q. And --

A. I don't believe it was MGT directly. I think was D-Vasive or some holding company of D-Vasive that was to be acquired by MGT.

Q. And what was the nature of your investment, do you remember? What instrument was it?

A. Don't know.

### Page 47

Q. Does convertible bridge note ring a bell?

A. Don't recall.

Q. Okay. Do you recall that you invested in D-Vasive convertible bridge notes that were convertible into MGT shares?

A. I don't recall that, no.

Q. All right. In your prior answer you said you met the person behind a series of opportunities. Was that person Mr. McAfee?

A. Yes. It was Mr. McAfee.

Q. So just to sort of orient you to the timetable that was involved in the MGT 2016 transaction involving D-Vasive, that deal was announced on May 9, 2016.

Do you have a recollection of when it was that you met with Mr. McAfee?

A. I -- I can remember the incident. I can't tell you when it was.

Mr. Kaplowitz handled 99.9 percent of the relationships with Mr. Ladd, similar to what I mentioned earlier. And Mr. Kaplowitz was out of the country, I believe, or out of town, and on short notice I had heard that they -- that Mr. McAfee had wanted to have a meeting, and they used my conference room, and I sat in on that meeting and met him.

But, in terms of timing, I can tell you it was

### Page 48

during the primary because I had learned that he was a candidate for president in that sequence. They had just come off of a tour. So if that gives you any timeline, yes.

Q. And were the bridge notes discussed at that meeting?

A. I don't know. I have no recollection of that.

Q. Do you remember who else was there?

You said you were there, Mr. McAfee was there. Who else was there?

A. I know Mr. McAfee's body guard slash assistant was there. I don't know who else was there. It may have been Mr. Honig and maybe Mr. O'Rourke as well. I think they were there as well, but I can't say for sure.

Q. Was Mr. Ladd there?

A. I don't really recall. I don't know if he was there.

Q. And the purpose of the meeting was to discuss the MGT acquisition of D-Vasive?

A. The purpose of the meeting was to borrow my conference room, and I thought I would take an opportunity to meet a -- you know, a world stage figure, Mr. McAfee, for the first time.

Q. Okay. But what was the purpose of needing a conference room?

**Page 53**

would be a nod, or just I want to let you know, or I'm just making you generally aware, that kind of thing. We didn't have any formal policy or practice.

Q. All right. In the course of your work either for issuers or directly from Mr. Honig, but with respect to issuers in which Mr. Honig was investing, can you tell us how many of those transactions also involved investments by John Stetson?

A. Are you speaking about D-Vasive now or you went broader?

Q. I went way broad.

A. Way broad. No. I couldn't tell you how many.

Q. Who is John Stetson?

A. John Stetson is a -- an individual investor, business manager of sorts who served as an assistant, I believe, first for Mr. Brauser and then as an assistant to Mr. Honig.

Q. And did he work, to your understanding, out of Mr. Honig's offices?

A. He did.

Q. Okay.

A. Not always there. I think in the point in time that he worked with Mr. Brauser, it was Mr. Brauser's office. Then there was a point in time where I had seen him in Mr. Frost's suite at 4400

**Page 54**

Biscayne Boulevard. They all had offices in that building for a period of time as well.

And then Mr. Honig had another office in Boca Raton where Mr. Stetson had his main office as well.

Q. So in the period from of 2012 to 2016 did you have an understanding of where Mr. Stetson was working?

A. I can't tell you if it was Biscayne Boulevard in Miami or it was Mr. Honig's offices in Boca, but it was one of those two.

Q. And while Mr. Stetson was working at Biscayne Boulevard, was Mr. Honig also working at Biscayne Boulevard?

A. They had offices there. I don't know that they were there every day together. I'm based in New York, but I do know that I had attended some meetings both in Biscayne Boulevard as well as in -- later -- it was a later period of time in Boca Raton. But they all had offices there until Mr. Honig and Mr. Stetson moved up to Boca.

Q. And what about Mr. O'Rourke, where did he work?

A. It's the exact same answer. To my recollection they -- I believe, was originally assistant to Mr. Brauser. Then they each had individual offices

**Page 55**

in Biscayne Boulevard, and then later in Boca with Mr. Honig.

Q. In any of the deals that you worked on that involved Mr. Honig as an investor, did any of them also involve investments by Stetson Capital?

A. I certainly remember seeing that name on pieces of paper and in public filings, yes.

Q. And Stetson Capital was associated with whom?

A. Mr. Stetson, as far as I know. Although I can say specifically I never saw the incorporation or formation papers for Stetson Capital. But I'm going to assume it was John Stetson's entity.

Q. And how about a company called HS Contrarian?

A. I think it's the same answer. I don't think I ever saw formation papers for HS Contrarian. I, either through reading in court filings or otherwise, you know, came to be -- the understanding that it was somehow jointly owned between Mr. Stetson and/or Mr. Honig.

And I had no reason to -- I had no reason to doubt that was the case before reading any court filings either. So I just never -- I don't believe I ever saw the formation documents to be able to articulate who owned it.

Q. And in the transactions that you worked on that involved Mr. Honig was HS Contrarian also involved?

**Page 56**

A. I've certainly seen their names on investor lists where they're both on that.

Q. How about an entity called OBAN, O-B-A-N, Investments? Have you ever seen that name involved in deals that involve Mr. Honig?

A. I don't recall OBAN, no.

Q. All right. In any of those deals that involved Mr. Honig was Mr. O'Rourke also an investor?

A. I do recall seeing Mr. O'Rourke's name as well on front end, you know, onboarding documents in which investors were collectively investing in an entity or in several entities, yes, their names would appear together.

Q. And are you familiar with the name ATG Capital?

A. I am.

Q. And what did you understand that entity to be?

A. I believe it was an entity of Mr. O'Rourke's. Similarly, I never saw the formation papers, but I believe he signed as the authorized person just like Mr. Stetson would for HS.

Q. And did you see transactions involving Mr. Honig that also involved ATG Capital?

A. I believe I've seen them on the same list of investors or on documents in which the same investment

**Page 57**

was made in the same entity. Not the same in terms of amount, just the same parties were investing.

Q. How about Mark Groussman, did you ever see his name involved in transactions that involved Mr. Honig?

A. Yes.

Q. And who do you understand Mr. Groussman to be?

A. Mr. Groussman is a -- I understand to be a long-time family friend of the Honig family.

Q. Did he also work out of Mr. Honig's offices?

A. I think the answer is yes and no. I think he had a desk there, but rarely was there.

Q. And did he have an entity called Melechdavid? M-E-L-E-C-H-D-A-V-I-D.

A. Again, did he have an entity?

I never saw the formation documents, as far as I know, so I couldn't say for sure, but I do believe he was the authorized signer for Melechdavid documents.

Q. Did you see Melechdavid involved in transactions that also involved Mr. Honig?

A. Yes.

Q. All right. How about Mr. Brauser -- Michael Brauser, who is he?

A. A private investor.

Q. And did you ever see his name involved in transactions that involved Mr. Honig?

**Page 58**

A. Ever? Yes.

Q. And are you familiar with an entity called Marlin Capital, M-A-R-L-I-N?

A. There were, I believe, several Marlin Capital iterations, but I do remember Marlin Capital. I don't know if it was an Inc., or partners, or something like -- I don't know the full name, but there was a Marlin Capital of some sort.

Q. And do you know to whom it was associated?

A. I do not. As the other answers indicated, I didn't have their incorporation, or formation, or issuance documents. My familiarity was that it was a Michael Brauser entity, though. I don't know who owned it specifically.

Q. What about Grander Holdings, G-R-A-N-D-E-R?

A. I think it's the same answer. I think it was associated with Mr. Brauser, and I never saw the incorporation documents so I don't know who actually owned it or controlled it.

Q. And did you see either Marlin Capital or Grander Holdings involved in transactions that also involved Mr. Honig?

A. Yes.

Q. And then Jonathan Honig, that's Mr. Honig's brother; is that right?

**Page 59**

A. Correct. As far as I know, yes.

Q. And he had his own entity called Titan?

A. I'm not familiar with that name. I don't have a recollection of that entity.

Q. All right. Did he also act as trustee for an investment vehicle called Four Kids Investment?

A. Again, trustee is sort of a formal title that would be created from formation documents. I don't know if he was trustee.

Q. Did you understand that he controlled the investment decisions for Four Kids Investments?

A. I don't -- the way you've asked it, you know, do I understand that he controlled? I have no understanding who controlled. I believe that he may have signed as an authorized person for Four Kids.

Q. And do you have an understanding of who the beneficiaries were of the Four Kids Investment Trust?

A. My understanding is they were Mr. Barry Honig's four children.

Q. And -- okay.

And did you see Mr. Jonathan Honig or Four Kids Investment involved in transactions that also involved Mr. Barry Honig?

A. Yes.

Q. Okay. Is it fair to say, Mr. Kesner, that

**Page 60**

Mr. Honig, Stetson, O'Rourke, Groussman, Jonathan Honig, and Brauser were frequent co-investors?

A. I think there's a continuum of time in which that answer has to be qualified. Certainly not in the period when I was at Olshan Grundman.

Probably towards the end of my tenure at Haynes and Boone some of those names would start to appear. And then during the period at Sichenzia those names would frequently, but not always, be names that were making available investment opportunities where they would invest as a -- as individual investors into an opportunity that was presented or developed by one or more of them.

Q. Thank you.

MS. BROWN: If it's all right with everyone I think we should take like a 10-minute break. We've been going for about an hour and 15 minutes, and I'm at a stopping spot.

So why don't we reconvene at 11:25.

MR. FORD: Okay. Thank you.

THE WITNESS: Perfect.

MS. BROWN: All right. So, Mr. Kesner, just put yourself on mute, please.

(Off the record at 11:13 a.m. Back on the record at 11:28 a.m.)

### Page 69

1  having invested in Superlight through Paradox?
2      A.  From 2012 I do not have any recollection of
3  it, no.
4      Q.  All right.  And turning back to the first page
5  of Kesner Exhibit 5 in the one, two, three, fourth
6  paragraph down, it refers to,
7          "It is our opinion that the shares are to
8           be issued without legend to the individuals
9           listed on Schedule 2, annexed hereto, in
10          accordance with Rule 144(b) and (d) under
11          the 1933 Act."
12         Do you see that?
13     A.  I do.
14     Q.  All right.  Does that refresh your
15 recollection in any respect that you and the individuals
16 listed on Schedule 2 were attempting to have the
17 restrictive legend removed from Superlight Securities in
18 connection with this transfer?
19     A.  I don't have any recollection of this.
20 Obviously the words speak for themselves.  It seems to
21 suggest that, but I don't recall this at all.
22     Q.  And do you have a recollection of whether, at
23 least you, on behalf of Paradox, were attempting to have
24 the restricted legend removed in order to prepare the
25 shares for sale -- resale?  Resale.

### Page 70

1      A.  No.  Again, no, but let me be a little bit
2  more specific, Ms. Brown.  They're not necessarily being
3  prepared for sale or resale, they're being prepared to
4  be able to be accepted in a brokerage account in the max
5  of undifferentiated securities that are represented by
6  the CD and company reference on a transfer agent's
7  record.
8          It does not connote any preparation for sale,
9  but it would be the first step in having a deposit made
10 into a brokerage account.  No reflection, whatsoever, on
11 a selling intention, or selling timing, or pricing, or
12 anything like that.  That's really a misdirection.
13         But, to the extent that you asked the question
14 about whether it refreshes my memory as to whether or
15 not I had made a request in Paradox Capital to remove a
16 legend in preparation for sale, the answer is no.  You
17 can surmise what you like from the words on the paper,
18 but it's not -- I have no recollection of making that
19 request.
20     Q.  In your experience can you sell securities on
21 the public market that bear a restricted legend?
22     A.  When you say "on the public market," I assume
23 you mean through the medium of a national stock exchange
24 or the bulletin board, one of those automated quotation
25 services.

### Page 71

1      No.  My recollection is you cannot sell
2  without having gone through the process to remove a
3  legend or remove the restriction, of which Rule 144 is
4  the safe harbor way to do it.  One way to do it.
5      Q.  Mr. Kesner, do you have any understanding of
6  how much Sichenzia charged for its issuance of Rule 144
7  opinions?
8      A.  There was a range of charges from, you know,
9  nothing -- absorbed in a company's monthly retainer,
10 where the company chose to do that on behalf of its
11 investor universe -- to a high of $750.  That's really
12 the range.
13     Q.  And how is the range determined?  Like what
14 would -- why would someone be charged $750?
15     A.  Some issuers, for example, in -- you mentioned
16 Hudson Bay.  I recall their documentation, I believe,
17 requires that the issuer pay the fees or assume the cost
18 of its investors with their 144 processes.  And if that
19 company happens to be on a monthly retainer, as is often
20 the case in 34 Act reporting work, there would be no
21 charge contractually because our engagement letter with
22 them might say including Rule 144 opinions, including
23 8-Ks, things like that.
24         But that's fundamentally between the issuer
25 and its investors at the time of onboarding an investor

### Page 72

1  or a series of investors.  In other cases it's
2  arbitrarily determined by the partner in charge and
3  responsible for the client.
4          And, you know, these kinds of -- the costs of
5  these kinds of opinions are not a real profit leader at
6  a firm so, you know, as a courtesy or relationship
7  building, one might say I'll do it for 250.  And if you
8  have an annoying client or annoying person that you
9  don't have a relationship with, you might say hey, it's
10 1500 -- I think it's more like 750, but it's very much
11 arbitrary.
12         The base rate at most firms today is 750.  So
13 I generally was charging 750.  But Mark, and Greg, and
14 other partners, Jay, I have no idea what they would have
15 charged.  And, you know, as a manager of the firm, I
16 didn't care.
17     Q.  All right.  Thank you.
18         So let's move to Kesner Exhibit 7, which is
19 number 7 on your list.
20         (Deposition Exhibit 7 marked.)
21 BY MS. BROWN:
22     Q.  For the record, while you're pulling that up,
23 Mr. Kesner, Kesner Exhibit 7 is an opinion on the
24 letterhead of Sichenzia, Ross, Friedman, Ference, LLP
25 dated October 7, 2013, "Re:  BioZone Pharmaceuticals,

Harvey Kesner
8/8/2022

**Page 113**

1  that your understanding?
2    A.  I don't know about this particular
3  transaction, but I had been introduced to him as
4  somebody who managed some money and was a private
5  investor.
6    Q.  And your understanding was that he was a
7  co-investor with Mr. Honig on certain transactions; is
8  that right?
9    A.  I don't -- I wouldn't use the word
10 "co-investor."  I would use the word he was a private
11 investor who had an opportunity to look at certain
12 transactions in which Mr. Honig might have been an
13 investor with some other people as well.
14   Q.  And why do you tell Ms. Guarneri-Ferrara she
15 needs to send a separate email to him?
16   A.  I think they were circulating documents at
17 Mr. Kaplowitz's request or Mr. Ladd's request to
18 prospective investors.
19   Q.  Okay.
20   A.  I think it was just a courtesy.
21   Q.  So why not on the same email is my question?
22   A.  Why not what on the same email?
23   Q.  Well, you say,
24      "Send a full set of the unit offering to
25      Barry, Stetson, and Tom Hunter.  Send a

**Page 114**

1      separate email to Hunter."
2    A.  I -- they're not -- they're separate
3  investors.  I would tend not to, you know, share emails
4  of people with one another.  So I probably was saying
5  protect the confidential nature, and just send, you
6  know -- we don't show -- when we use -- when we send out
7  information to shareholders of a company or prospective
8  investors, we usually do it by bcc's, not cc's, so they
9  don't all get everyone else's mailing list.  It's just
10 sort of normal practice.
11     This specific case I can't speculate why,
12 other than Tom Hunter, didn't -- you know, he wasn't --
13 he was sort of new to me.  I didn't really know who he
14 was and wouldn't have wanted to communicate with him in
15 a group sense.  I would have wanted to communicate with
16 him in an individual sense.
17   Q.  Okay.  Understood.
18     MS. BROWN:  So I'm at a breaking point.  It's
19 12:44.  I suggest we take lunch now.  Back in an hour?
20     THE WITNESS:  I'd like to ask you a question
21 about timing.  I mean, if you have another half hour's
22 worth, we could push through it.  If you have a whole
23 day's worth, then let's take lunch.
24     MS. BROWN:  It's certainly not a half an hour.
25     THE WITNESS:  Okay.

**Page 115**

1     (The lunch recess was taken at 12:45 p.m.)
2                    --o0o--
3     (The proceedings resumed after the lunch break
4  at 1:49 p.m.)
5     MS. BROWN:  Back on the record.
6  BY MS. BROWN:
7    Q.  Mr. Kesner, could you turn to the document
8  marked number 17, which has previously been marked as
9  TGF Exhibit 7, which is an email from Mr. Ladd to
10 Ms. Guarneri-Ferrara, Mr. Marcus, Mr. Kaplowitz, you,
11 and Mr. Traversa.
12     Do you recognize TGF Exhibit 7?
13   A.  Not specifically.
14   Q.  All right.  Well, let's go through it a little
15 bit and see if it refreshes your recollection.
16     So Mr. Ladd is providing edits to the
17 documents that he's been provided, and he writes, "MGT
18 edits attached."
19     Below that he writes,
20     "Also section 9.  Is it the intention to
21     allow preferred holders to vote?  Or maybe
22     I'm reading this incorrectly.  My guess is
23     that none of the investors want to have a
24     vote to tank their Section 13 or Section 16
25     obligations."

**Page 116**

1     Do you see that?
2    A.  I see that.
3    Q.  All right.  Do you have an understanding what
4  Mr. Ladd was saying there?
5    A.  I understand what he's saying, yes, now -- at
6  this time -- I understand it now, yes.
7    Q.  Okay.  What is he saying?
8    A.  Yeah.  I think he's inquiring whether
9  preferred stockholders would vote on an as-converted
10 basis with common stockholders.
11   Q.  And what implication did you understand there
12 to be with a vote on Section 16 or Section 13
13 obligations?
14   A.  I did not have any understanding that I am
15 recalling now.  I can say that it is my understanding,
16 at this time, today, that the beneficial ownership rules
17 relating to Section 13 or Section 16 reporting -- and as
18 you mentioned, potentially disgorgement -- are
19 inapplicable to non-voting shares.
20   Q.  What did you do after you received this email
21 and that comment, if anything?
22   A.  I just opened the exhibit and read it with you
23 and responded to your question.
24     What do you mean?
25   Q.  No, I meant when you got it --

**Page 117**

　A.　I don't know what you mean.
　Q.　-- when you got it in 2012.
　A.　I have no idea.  I don't recall getting it in 2012.
　Q.　Do you recall a conversation with Mr. Honig about that comment?
　A.　No, I do not.
　Q.　How about any other investors?
　A.　No recollection of receiving it or having conversations about it.
　Q.　All right.  Have you -- had you ever considered the notion of group status under Section 13(d) prior to 2012?
　A.　Ever?  Um -- I think when I was a staff member, routinely questions came up regarding group status.  I think at every one of my law firms previously -- whether it was Akin Gump, Stroock, ownership interest of my executives and directors at American Banknote when I assisted them with their reporting obligations, Olshan, Haynes Boone, my own personal reporting -- I have for 35 years considered -- if that's the word you're asking me to respond to -- considered Section 13 -- Section 16, 13 type reporting allegations.
　Q.　And particularly the concept of group?

**Page 118**

　A.　I'm familiar with the SEC literature around group reporting obligations through rules, regulations, releases, commentary, and litigation.
　Q.　And in those various contexts, have you ever made a decision that the investors you were considering were acting as a group?
　A.　I think you're asking me to share with you legal advice I may or may not have given.  I'm going to decline.
　Q.　I'm not asking about to whom you gave that advice.  I'm simply asking if you ever determined that a group of investors that you were considering were acting as a group under Section 13(d)?
　A.　In MGT or ever in 35, 40 years of practice?
　Q.　In -- ever in your 35 or 40 years of practice.
　A.　I believe I made some enforcement division referrals, when I was in Division of Corporation Finance, regarding group-type issues.  Other than that, I have no specific recollection, no.
　Q.　How would you make a determination of that nature, whether a group of investors was acting as a group under Section 13(d)?
　A.　I would rely on the SEC's historical statements, pronouncements, rules, and regulations regarding what constitutes a group.

**Page 119**

　Q.　Would you ask questions of the investors?
　A.　Not necessarily.
　Q.　But you might?
　A.　Not necessarily.
　Q.　Okay.  Under what circumstances would you not ask investors questions?
　A.　Well, I think -- I think context is all important in responding to your question, and the group activity that triggers reporting is activity that's more attuned to after the point in time that they're investors, not when they're thinking about becoming investors.
　　The literature and practice, of course, suggests that when five people choose to participate in an investment together, that is not indicative of a group.  It's whether they're exercising -- choosing to exercise voting or -- or investment -- making investment type of decisions collectively.
　　Again, you know, let's go back to the example of an underwritten offering.  You have 200 investors. . They're all investing on the exact same terms, at the exact same time, exact same instrument, exact same company, share, and counsel.  I don't think anyone would argue that makes a group.
　　And I think that same principle would apply

**Page 120**

when 5, 6, 7, 10, 20 investors are coming together in a private placement to purchase securities in a company.  It's what they do when they have that instrument, whether it's joining voting together, or electing to dispose, or -- or exit the transaction together that implicates whether they're a group for reporting purposes.
　　And that's on their lap, not on my lap.  So I generally don't -- wouldn't ask that question at this point in time regarding what -- you know, what your question is directed to.
　　At the point in time that 10 investors are coming together to invest under a term sheet, I wouldn't have to think hard about whether or not that makes them a group because I don't know what else they're doing.  I don't know what voting they have decided among themselves, and it's not something I would inquire about.
　Q.　And if you were representing an issuer, and an issue arose to your attention about whether certain investors were acting as a group for Section 13(d) purposes, how would you handle that situation?  How would you answer the question of whether they are acting as a group?
　A.　I don't -- I wouldn't approach it as to

**Page 141**

emails, including one from Mr. Honig dated October 18, in which he writes,

"Below is the allocation for MGT. Rich Abbe will give you his friend's name for the shelf."

Do you see that?

**A.** I do.

**Q.** So does that refresh your recollection of knowing who the investors were in the 2012 MGT transaction?

**A.** I -- I don't -- unless I saw who actually wired money and a closing statement, I wouldn't be certain that these are a list of people who actually invested, but it's not a far reach to say that this is the universe of people who were being shown the deal for purposes of investing.

**Q.** And the email right above the one we were just looking at from Mr. Marcus, in which he writes,

"Are they acting as a group?"

**A.** I see that.

**Q.** And you write, "no --"

**A.** I see that.

**Q.** -- with an exclamation point.

**A.** I see that.

**Q.** So did Marcus ever tell you why he was asking

**Page 142**

that question?

**A.** No.

**Q.** Did Mr. Kaplowitz?

**A.** No. Not that I recall. Not that I recall we had any dialogue about it whatsoever.

**Q.** And how did you determine that the answer was no?

**A.** Well, Hudson Bay is, you know, one of the larger investors. They are a -- I don't know, $50 billion fund. I do not think that they would be acting as a group. And I'm well aware that their -- their documentation a thousand percent -- a hundred percent prevents group formation by creating beneficial ownership blockers with themselves and anyone else that they could be deemed to be beneficial owners with.

So documentation-wise, contractually, SEC rules and regulation-wise, one would be very safe in concluding that Hudson Bay was not participating in the control of the vote or investment decisions with Jill Strauss.

Same answer for Iroquois. Iroquois is a -- as far as I know, a -- you know, a 10, or 50, or $100 million private equity fund, and their document -- they're well represented. I think I've known their counsel over the years. I don't recall his name right

**Page 143**

now.

And they are very sophisticated, and I would imagine that they would never enter into documentation that would allow them to become a group and the traditional notions, SEC rules and regulations, with any other party on this list.

So knowing -- knowing those -- going into the question like that, you know, it seems like a stupid question. And I think that that was the nature of the exclamation mark, why I don't -- we rely on the documentations, and the activities, and the contractual provisions, as we said before, that limit the creation of groups consistent with compliance with the SEC rules and regulations and what beneficial ownership literature says to do.

**Q.** So if two investors decided to invest, and hold, and dispose of their shares together, but their agreement said that they were not acting together, that would be enough for you to determine those two investors were not acting as a group?

**A.** I'll -- I'll repeat what I said before, maybe with some different words to help everyone understand. The going into the transaction isn't determinative for what is the group. It's the acting in concert for purposes of voting or disposition of securities that

**Page 144**

largely is the arbiter, based upon the literature, of what is a group.

So I would have no way of knowing. But if Rich Abbe at Iroquois called Joe up and said hey, let's get rid of this guy, Rob Ladd. At the upcoming meeting let's vote and let's waive our beneficial ownership blocker so that we can vote our 20 percent, rather than our 9.9 percent each, that would create a group.

But that's -- you have no awareness of that happening behind the curtain of their executive offices. You would have no way of knowing it. Nor would you expect that to be the case, you know, logically in terms of your practice when they're writing the check to buy the instrument that says I am not a beneficial ownership of more than 9.9 percent. We're entitled to rely on that.

**Q.** Thank you.

So did you ever talk to any of the investors listed on AM Exhibit 1 about whether they had any agreements to vote, or dispose, or hold their shares in concert?

**A.** Which exhibit?

**Q.** The one we're looking at.

**A.** Oh, I'm sorry.

**Q.** AM Exhibit 1.