# EXHIBIT 50

```
 1                  UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF NEW YORK

 3

 4    SECURITIES AND EXCHANGE COMMISSION,  )
                                           )
 5                   Plaintiff,            )
                                           )
 6         v.                              ) Case No.
                                           ) 18 Civ. 8175(ER)
 7    BARRY C. HONIG, ROBERT LADD, ELLIOT  )
      MAZA, BRIAN KELLER, JOHN H. FORD,    )
 8    GRQ CONSULTANTS, INC., and HS        )
      CONTRARIAN INVESTMENTS, LLC,         )
 9                                         )
                     Defendants.           )
10    _____)

11

12                          VOLUME 1

13         VIDEOTAPED DEPOSITION OF ROBERT LADD

14                    VIA VIDEOCONFERENCE

15                Thursday, October 15, 2020

16

17

18

19

20

21

22

23
      REPORTED BY:
24    GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR
      VICTORIA L. VALINE, CSR 3036, RMR, CRR
25    JOB NO. 201015GCH

                                                        1
```

1    please give it, but my question to you was:  Did
2    you entertain the possibility that what Mr. Einhorn
3    described could actually happen?  And I think your
4    answer is no.  Is that right?
5         A.   So good thing you said that.  My answer
6    is -- did I entertain the possibility?  Was I
7    vigilant?  The answer is not no; it's absolutely
8    yes.  I was aware that there are terms in
9    financings that create these death spirals in the
10   stock.  And I needed and wanted to avoid that so
11   that an investor would not have that control.
12            So while I considered it -- and David
13   Einhorn is a smart guy; I consider myself a very
14   smart guy.  And anything he opinionated in his letter
15   about being a recidivist or whatever you said, that
16   was not supported by any record of enforcement
17   whatsoever.  In fact, the opposite was true.
18            You know, of course, to issue any shares of
19   stock, we needed the New York stock Exchange
20   approval.  So if you are telling me I have to know
21   something that the New York stock exchange didn't
22   know or that FINRA didn't know, I would say that's a
23   pretty high burden, versus a suspicion by David
24   Einhorn that, based on other instances of companies
25   he's seen, we go into the toxic spiral.  So --

                                                        26

```
 1                Are you there?
 2       A.   Yes.
 3       Q.   Okay.  So the first line shows on 5/25/2016
 4  that there was a disposition of 465,171 shares.  In this
 5  footnote -- excuse me -- it says, "Laddcap Value made a
 6  pro rata distribution for no consideration of an
 7  aggregate 465,171 shares of Common Stock of the issuer
 8  to its limited partners on May 25, 2016."
 9                Do you see that?
10       A.   Yes.
11       Q.   Was that accurate?
12       A.   It was not entirely accurate.
13       Q.   How so?
14       A.   Some of the partners requested in-kind
15  distributions.  Others may have wanted sales.  So what I
16  tended to reflect was the fact that those shares were
17  out of my beneficial ownership.
18       Q.   All right.  Now, Laddcap Value Partners
19  prepares annual -- and distributes to its limited
20  partners annual K-1's at the end of its year, correct?
21       A.   It did, yes.
22       Q.   And you actually prepared them, right?
23       A.   Probably at that time, yes.  I had employed
24  outside services, but it got too expensive.
25       Q.   Those K-1's would reflect any distributions
```

78

```
 1   documents that we will all agree reflect the trades.
 2             Nancy, we seem to have lost your video.
 3             MS. BROWN:  Yep.  I'm trying to get back in.
 4   Hold on.  I'm sorry.
 5             Okay.  I seem to be back.
 6   BY MS. BROWN:
 7        Q.   So Mr. Ladd, will you agree with me that the
 8   527,000 shares -- if, in fact, that's correct -- from
 9   the E-Trade account that was sold in May 2016, except
10   for whatever may be in that line, 33,603 shares, none of
11   those sales are reflected in this form 4?
12             MR. FORD:  Nancy, your video still is not on.
13             MS. BROWN:  Now it's coming.
14             MR. FORD:  Great.  Thank you.
15             THE WITNESS:  I mean, should I take 10 minutes
16   to review this?
17             Will I need to take 10 minutes to review this
18   to see --
19   BY MS. BROWN:
20        Q.   Feel free, because I'm asking you the question
21   of whether those sales are reflected anywhere on form 4.
22   So if you need 10 minutes to be able to answer that
23   question, please take it.
24        A.   Okay.  So, I mean the form 4 does reflect
25   some, if not all, of the E-Trade shares.
```

96

1    Q.   Thank you.
2    A.   Again, the exact quantities might be wrong, as
3 well as the dates.
4    Q.   So why did you choose to file a form 4 on
5 May 31st?
6         What prompted you to do so?
7    A.   Excuse me.
8         Because I had realized I didn't, and I thought
9 that I should.
10   Q.   And is it true that you had also made
11 purchases and sales of your MGT stock in your E-Trade
12 account between November 2015 and April of 2016?
13   A.   I believe, from looking at the records, it was
14 purchase sales that netted out to minus 40,000 shares.
15   Q.   Really?  Okay.
16        Let's look at Exhibit 11.  Those are your
17 E-Trade statements from November 2015 through
18 April 2016.
19        Do you see that?
20   A.   Yeah.
21   Q.   And I think you've already said that you have
22 no reason to doubt that they accurately reflect your
23 trading in that account; is that right?
24   A.   Yes.
25   Q.   Okay.  So let's go through them.

97