UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

                                        *Plaintiff*,

                                                            18 Civ. 8175 (ER)

           – against –
                                                            ECF CASE

BARRY C. HONIG, ROBERT LADD,
ELLIOT MAZA, BRIAN KELLER,
JOHN H. FORD, GRQ CONSULTANTS, INC.,
and HS CONTRARIAN INVESTMENTS, LLC,

                                        *Defendants*.

-------------------------------------------------------------------------x

### DEFENDANT ROBERT LADD'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

    Defendant Robert Ladd hereby submits this Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 to set forth the material facts to which it contends there is no genuine issue to be tried.

1.  Prior to Ladd waiving his (and MGT Capital Investments, Inc.'s or "MGT"'s) attorney client privilege in compliance with this Court's Order, the SEC took five depositions. Two individuals, co-defendants Barry Honig and Drew Ciccarelli, asserted their rights under the Fifth Amendment of the Constitution, resulting in no evidence relevant to these proceedings. (Excerpts from the depositions of Barry Honig and Drew Ciccarelli). Adam Ford Declaration ("Ford Decl.") Exhibits 1 and 2.

2.  The SEC also deposed Michael Onghai (at the time, Mr. Onghai was an MGT Capital Investments, Inc. independent director), Hugh Holmes (at the time, Mr. Holmes was the MGT Capital Investments, Inc. Chairman of the Board), and Joshua Silverman (at

the time, Mr. Silverman was a MGT former board member). None of these three witnesses had any firsthand knowledge or were expected to have any involvement in the determination of whether Honig and others were required to file as a Rule 13(d)(3) group, nor did any of these individuals have any information related to the May 9, 2016 Press Release, or Ladd's Form 4 or Form 144. Ford Decl. Exhibits 3, 4, and 5.

3.  SRF attorney Perlman testified that, "I think we – usually, we – you know, we'd talk to investors about their ownership in – and I don't really do a 13(d) analysis. I mean it's really up to the investors to tell us how much they own." (Excerpt from deposition of Avital Perlman). Ford. Decl. Exhibit 6.

4.  SRF Attorney Marcus testified that, "There was – if you didn't know the reasons, you would assume that all those investors were acting as a group. And since we had asked the question and been told the answer was no, I don't think we ever had any further discussions on it actually." (Excerpt from deposition of Arthur Marcus). Ford Decl. Exhibit 8.

5.  SRF was counsel for both Honig and MGT in this transaction. (SRF Engagement letter). Ford Decl. Exhibit 52.

6.  In October 2015, MGT entered into separate stock subscription agreements with multiple accredited investors for the sale of common stock and warrants in an aggregate amount of $700,000. (October 9, 2015 Form 8-K). Ford Decl. Exhibit 12.

7.  On October 9, 2015, MGT issued a Form 8-K with a press release describing the terms of the financing and attaching forms of the relevant agreements. The Form 8-K disclosed that MGT had "entered into separate subscription agreements … with

accredited investors … relating to the issuance and sale of $700,000 of units," and the attached press release disclosed that the "*investment was led by Barry Honig*, a private investor and a specialist in corporate finance." (October 9, 2015 Form 8-K). Ford Decl. Exhibit 12 at Ex. 99.1.

8.  Weeks later, MGT filed a Form S-1 Registration Statement, which disclosed to the public a list of the investors and set forth "certain information regarding the selling stockholders and the shares of [MGT's] common stock offered by them in this prospectus." (November 6, 2015 Form S-1). Ford Decl. Exhibit 13.

9.  On May 9, 2016, MGT announced that it had entered into an agreement to acquire certain technology and assets relating to anti-spy software from a company named D-Vasive Inc. and to appoint John McAfee as its Executive Chairman and CEO. MGT also announced that it had entered into a consulting agreement with Future Tense Secure Systems Inc., a technology incubator. The agreements were fully disclosed in a Form 8-K filing. (May 9, 2016 Form 8-K). Ford Decl. Exhibit 14.

10. To publicize the transaction, MGT paid a stock promotion website, StockBeast.com, to publish a newsletter about the McAfee transaction. The newsletter disclosed that MGT had paid for its publication. A statement in the press release read that Mr. McAfee had "sold his anti-virus company to Intel for $7.6 billion." (Stock Beast Report of MGT Capital Investments, Inc.). Ford Decl. Exhibit 15.

11. In August 2010, Intel Corporation purchased McAfee Inc., the company founded by Mr. McAfee, for $7.68 billion. (August 19, 2010 Form 8-K). Ford Decl. Exhibit 16 at at Ex. 99.1.

12. Prior to MGT's press release including the phraseology at issue, numerous other news organizations, including but not limited to CNN, Newsweek, Business Insider, and IB Times had also publicized the same exact "false statement" that MGT included in its press release that "McAfee sold his company to Intel in 2010 for nearly $7.7 billion." Ford Decl. Exhibits 17, 18, 19.

13. On November 12, 2012, Nadine Deninno from IBTimes published an article, titled, "*John McAfee, Anti-Virus Creator, Wanted For Murder Of Gregory Faull*." When discussing McAfee's background, the article states, "**McAfee sold his company to Intel in 2010 for nearly $7.7 billion** and had been living in Belize where he reportedly engaged in 'intensive use of psychosis-inducing hallucinogens.'" Ford Decl. Exhibit 17.

14. On September 9, 2015, Newsweek published an article by Nick Winchester titled, "*Antivirus Pioneer John McAfee is Running for U.S. President*." In the article it states, "After escaping an abusive upbringing, he went on to found McAfee Associates, the antivirus software technology company **that he sold to Intel in 2010 for $7.68 billion**." Ford Decl. Exhibit 18.

15. On September 14, 2015, CNN Business published an article, written by Laurie Segall, titled, "*Why John McAfee believes he should be president*." The article states, "**McAfee sold his company to Intel in 2010**." Ford Decl. Exhibit 19.

16. On May 23, 2016, MGT filed a Form 10-Q clarifying that Mr. McAfee "founded [McAfee Associates] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010." (Form 10-Q). Ford Decl. Exhibit 20.

17. That McAfee was no longer at the company when it was sold to Intel had long been a matter of public record, as his departure had been disclosed in McAfee Associates' SEC filings. (Form 8-K filed by McAfee Associates, Inc. on January 11, 1994). Ford Decl. Exhibit 21 at 5; (Amendment No. 1 to Form S-4 filed by McAfee Associates, Inc. on July 18, 1995). Ford Decl. Exhibit 22 at 89.

18. On May 9, 2016, MGT stock closed at $0.49. On May 17, 2016, MGT stock closed at $4.15. On July 7, 2016, MGT stock closed at $4.37. At the end of September 2016, more than four months after MGT announced its partnership with McAfee, MGT stock price remained over four times higher than its closing price on the day the press release was published. (Table prepared by Yahoo! Finance showing daily opening, closing, high, and low prices and daily volume for the stock of MGT Capital Investments, Inc.). Ford Decl. Exhibit 23.

19. MGT's counsel, the law firm of Sichenzia, Ross, and Ference, represented Barry Honig "and or his affiliates and related entities …, as well as other potential groups of investors who have a pre-existing relationship with Mr. Honig and of which Mr. Honig may be deemed to be representative." MGT "specifically acknowledge that [SRF] has informed you that we have represented Barry Honig, Michael Brauser, John Stetson, John O'Rourke, Mark Groussman … their respective affiliates … and SRF may represent others who are investors in [MGT] …" (SRF Consent Letter). Ford Decl. Exhibit 24.

20. Avital Perlman testified:

Q. So let's start with MGT. Did you understand when you were working on MGT that 13D, a 13D analysis, what would be relevant to it would be the history of the investors you were considering a group and their co-investments together?

A.  No.

Q.  Do you have that understanding now?

A.  I don't know. I mean, I think it's a complicated issue. I don't know if it's because people invested in the same company before means they're a group. I don't know if I could say I have it.

Q.  Right. My question was, is it relevant to the analysis, the fact that they had been co-investors in the past?

A.  I mean, I think it can be one of many factors. I don't think it's really that relevant. I think that all – investors invest in companies together. I don't think that makes them a group.

Ford Decl. Exhibit 6.

21.  SRF attorney Kesner testified:

Q.   And your understanding was that he was a co-investor with Mr. Honig on certain transactions; is that right?

A.   I don't -- I wouldn't use the word "co-investor."  I would use the word he was a private investor who had an opportunity to look at certain transactions in which Mr. Honig might have been an investor with some other people as well.

Ford Decl. Exhibit 9.

22.  SRF attorney Marcus testified:

Q.  And had you known at the time that Mr. Honig had been involved in buying and selling stock of other issuers together with the same group or a similar group of investors, would that have affected your analysis under 13(d) for the 5 percent requirement?

A.  I'm not sure because these deals all have similar investors.

Q.  Well would it have been something you would have wanted to take into account in analyzing the 13(d) group issue?

A.  Perhaps. Just to see if there was a pattern of all these investors investing together. But again, I don't know how much I would have taken into it because you know, even today half of these deals all still have the same investors in them.

Q.  But in this transaction, did you understand that Mr. Honig was investing together with others?

A.  No

Ford Decl. Exhibit 8.

Attorney Marcus further testified:

Q.  Is the fact that they were involved in the 2012 financing, would that affect your view as to whether now, in 2015, they're involved in this financing, Mr. Honig might be acting as a group for Section 13(d) purposes with others? Is that something you would have wanted to know?
A.  Not particularly. Not by itself certainly.
Q.  But would that at least be a factor you would want to know? That there was the same investors involved in different transactions?
A.           Not particularly.
Q.  Well would you want to – would that lead you to ask other questions?
A.  Not particularly, no.

Ford Decl. Exhibit 8.

23. SRF attorney Kaplowitz testified Attorney Jay Kaplowitz testified that more than just acquiring shares together was required to form a 13(d) Group—an agreement to vote together was also required:

Q.  So just so I'm clear on your answer and I'm not trying to -- none of this is any attempt to put any words in your mouth, it could be sufficient that the fact alone is that more than one person has decided to acquire shares together, that could be, in certain circumstances, sufficient to trigger the group 5 percent disclosure requirement?
A.  So you're saying it could be that that's certain people agreed among themselves to acquire shares together?  Is that what you're asking?
Q.  Yes. And that's all you know. What I'm asking is are there circumstances where that could be sufficient, in your opinion, to trigger the disclosure requirement if together their ownership adds up to over 5 percent?
A.  I think I'd have to know something more than that.  I think I'd have to know what their relationships were; if they had any prior understanding.
Q.  And what do you mean by that?
A.  If they agreed to vote together.

Ford Decl. Exhibit 7.

24. Harvey Kesner, who represented not just MGT, but also Barry Honig and the Honig Group, and who had a relationship with MGT investors prior to 2012 and through 2015, testified on the importance of needing an agreement to make "decisions collectively" qualify as a Section 13(d) "group."

Q.  How would you make a determination of that nature, whether a group of investors was acting as a group under Section 13(d)?
A.  I would rely on the SEC's historical statements, pronouncements, rules, and regulations regarding what constitutes a group.
Q.  Would you ask questions of the investors?
A.  Not necessarily.
Q.  But you might?
A.  Not necessarily.
Q.  Okay.  Under what circumstances would you not ask investors questions?
A.  Well, I think -- I think context is all important in responding to your question, and the group activity that triggers reporting is activity that's more attuned to after the point in time that they're investors, not when they're thinking about becoming investors. The literature and practice, of course, suggests that when five people choose to participate in an investment together, that is not indicative of a group. It's whether they're exercising -- choosing to exercise voting or – or investment -- making investment type of decisions collectively. Again, you know, let's go back to the example of an underwritten offering.  You have 200 investors. They're all investing on the exact same terms, at the exact same time, exact same instrument, exact same company, share, and counsel.  I don't think anyone would argue that makes a group. And I think that same principle would apply when 5, 6, 7, 10, 20 investors are coming together in a private placement to purchase securities in a company. It's what they do when they have that instrument, whether it's joining voting together, or electing to dispose, or -- or exit the transaction together that implicates whether they're a group for reporting purposes. And that's on their lap, not on my lap.  So I generally don't – wouldn't ask that question at this point in time regarding what – you know, what your question is directed to.

Ford Decl. Exhibit 9.

25. SRF attorney Kesner testified that, "The going into the transaction isn't determinative

for what is the group. It's the acting in concert for purposes of voting or disposition of

securities that largely is the arbiter, based upon the literature, of what is a group."

Q.  So if two investors decided to invest, and hold, and dispose of their shares together, but their agreement said that they were not acting together, that would be enough for you to determine those two investors were not acting as a group?
A.  I'll – I'll repeat what I said before, maybe with some different words to help everyone understand. The going into the transaction isn't determinative for what is the group.  It's the acting in concert for purposes of voting or disposition of securities that largely is the arbiter, based upon the literature, of what is a group.

Ford Decl. Exhibit 9.

26. Attorney Perlman testified:

    Q.  So, would information concerning Honig, Stetson, and O'Rourke's sales of stock in MGT been relevant to you assessing MGT's disclosures obligations under Section 13(d)?
    A.  Well, I don't think MGT has a disclosure obligation under 13(d). It's my understanding the investor has to file the 13(d).
    Q.  So, from your perspective, MGT has no Obligation under 13(d) to disclose whether its investors May be acting as a group?
    A.  I don't think MGT has to file the Form 13D
    Q.  Oh, sure. But with respect to, for example, the 5 percent beneficial ownership chart that appears in various filings that a company files, is a 13(d) analysis important to that disclosure?
    A.  I hope so. I think we – usually, we – you know, we'd talk to investors about their ownership in – and I don't really do a 13(d) analysis. I mean it's really up to the investors to tell us how much they own.

    Ford Decl. Exhibit 6.

27. Attorney Marcus testified:

    Q.  And did you come to the same conclusion that Mr. Kesner came to that Mr. Honig and others were not acting as a group for 13(d) purposes?
    A.  I didn't challenge that at all.
    Q.  And why was that?
    A.  There was – if you didn't know the reasons, you would assume that all those investors were acting as a group. And since we had asked the question and been told the answer was no, I don't think we ever had any further discussions on it actually.

    Ford Decl. Exhibit 8.

28. Attorney Guarneri-Ferrara testified:

    Q.  So in preparing a Schedule 13(g) for Honig, it may be that you were actually preparing it for the issuer
    A.  No, no, no. I just mean that we would prepare filings related to the issuer for either Section 16 filings for directors or officers or 13 -- or for shareholders that had to file.

    Ford Decl. Exhibit 11.

29. Honig's lawyer, who made that filing, testified she believed it was appropriate at that time. Tara Guarneri-Ferrara testified:

Q.  Did 13 (d) ever come up in any of those transactions that you worked on for Mr. Barry Honig?
A.  Well, they certainly made 13 (g) and (d) filings where appropriate.

…
Q.  Sure. In connection with working on transactions that involved Mr. Barry Honig, do you recall there being issues in connection with filing 13 (d) s or 13 (g) s on his behalf?
A.  I don't recall any issues.
Q.  Did you ever have a situation where you had a discussion with anyone at Sichenzia about the group status of Mr. Honig?
A.  I don't recall having a discussion, no.

Ford Decl. Exhibit 11.

30. On November 29, 2015, Ladd sent an email to Honig, writing, "In addition, your group's 25 cent warrants could bring in an additional $1.4 million once the S-1 goes Effective," and, "As for the cap table, we have 17.2 million common shares outstanding, including *your group's* 2.8 million." Two minutes later, Honig responded, "I am not part of a group. I invested individually." Seconds later, Ladd replied, "I stand corrected." (November 29, 2015 email). Ford Decl. Exhibit 25.

31. On October 18, 2012, Honig sent Kesner "the allocation for MGT []." Marcus wrote to Kesner, "Are they acting as a group," to which Kesner replied, "No!" (October 18, 2012 email). Ford Decl. Exhibit 26.

32. During his 2022 deposition, when the SEC showed Marcus this email and asked, "With respect to the 2012 MGT financing, [] did you or anyone else at Sichenzia discuss with anyone at MGT whether Mr. Honig and any of the other investors in the financing were acting as a group for Section 13(d) purposes," he responded plainly, "Mr. Kaplowitz asked me to ask Mr. Kesner if they were acting as a group." Ford Decl. Exhibit 8.

33. In follow up, the SEC inquired if Marcus had "reason to believe that Mr. Honig might be acting as a group with other investors." He responded, "No," further explaining that "Mr. Kaplowitz asked me to ask it, so I asked it." Marcus testified that his understanding of why he was asking Mr. Kesner that question was "[b]ecause Mr. Kesner had a familiarity with these – with some of these investors having had represented them." Ford Decl. Exhibit 8.

34. Marcus testified that he relayed this information back to Kaplowitz, Ladd's attorney in the 2012 MGT financing: "It's a long time ago, but I have a memory of Jay asking me and him saying, oh, what did he say, and I said he said no." Ford Decl. Exhibit 8.

35. When the SEC asked Mr. Kaplowitz during his 2022 deposition, did he "ever consider -- with respect to the 5 percent beneficial owners listed here, [] whether [] any other of the selling shareholders cumulatively constituted a group that held more than 5 percent or that should have been included along with Barry Honig as a group under 13D in this listing of 5 percent shareholders of MGT," although he could not recall specifics, he responded: "I don't recall what I did or didn't consider at the time. It was quite a while ago. I'm sure that we discussed it and did a good job, but I don't recall what we considered." Ford Decl. Exhibit 7.

36. Kaplowitz testified he knew about the payment for promotional materials. Ford Decl. Exhibit 7.

37. Both Perlman and Kesner testified that they knew Honig and the others shared offices, but that was clearly not a significant factor in the 13(d) Group analysis. Perlman testified:

Q. And did you write opinion letters for those entities or Mr. Stetson concerning the removal of restricted legends on shares owned by Mr. Stetson or these entities?

A. I did.

Q. And were you aware when you were writing these opinions that Mr. Stetson or his entities were co-investors with Mr. Honig in the entities you were writing opinions about?

A. Yes. I don't remember which issuers they were co-investing in, but yes.

Q. Who is John O'Rourke?

A. He's also another investor.

Q. And did he have any relationship with Barry Honig?

A. My understanding is they invested in a few of the same transactions –

Q. And did you have an understanding of whether he, too, worked out of the same offices as Barry Honig?

A. I believe he did.

Q. At any time in your work for MGT and in your communications with Ladd, did you ever disclose to him the work you had done for Honig, Brauser, Groussman, Stetson, O'Rourke?

A. Not to my recollection.

Q. Why not?

A. It never came up. To my recollection, it never came up.

Q. Did you not consider it relevant to MGT matters that were working on?

A. No. I did not consider it relevant.

Ford Decl. Exhibit 6.

38. Kesner testified:

Q. All right. In the course of your work either for issuers or directly from Mr. Honig, but with respect to issuers in which Mr. Honig was investing, can you tell us how many of those transactions also involved investments by John Stetson?

A. Are you speaking about D-Vasive now or you went broader?

Q. I went way broad.

A. Way broad. No. I couldn't tell you how many.

Q. Who is John Stetson?

A. John Stetson is a -- an individual investor, business manager of sorts who served as an assistant, I believe, first for Mr. Brauser and then as an assistant to Mr. Honig.

Q. And did he work, to your understanding, out of Mr. Honig's offices?

A. He did.

Q. Okay.

A. Not always there. I think in the point in time that he worked with Mr. Brauser, it was Mr. Brauser's office. Then there was a point in time where I had seen him in Mr. Frost's suite at 4400 Biscayne Boulevard. They all had

offices in that building for a period of time as well. And then Mr. Honig had another office in Boca Raton where Mr. Stetson had his main office as well.

Q.   So in the period from of 2012 to 2016 did you have an understanding of where Mr. Stetson was working?

A.   I can't tell you if it was Biscayne Boulevard in Miami or it was Mr. Honig's offices in Boca, but it was one of those two.

Q.   And while Mr. Stetson was working at Biscayne Boulevard, was Mr. Honig also working at Biscayne Boulevard?

A.   They had offices there. I don't know that they were there every day together. I'm based in New York, but I do know that I had attended some meetings both in Biscayne Boulevard as well as in -- later -- it was a later period of time in Boca Raton. But they all had offices there until Mr. Honig and Mr. Stetson moved up to Boca.

Q.   And what about Mr. O'Rourke, where did he work?

A.   It's the exact same answer.  To my recollection they -- I believe, was originally assistant to Mr. Brauser.  Then they each had individual offices in Biscayne Boulevard, and then later in Boca with Mr. Honig.

Ford Decl. Exhibit 9.

39. Perlman testified that she did not tell Ladd about the fact that she had previously done

other work for Brauser, Groussman, Stetson, O'Rourke, but also explained that she

did not think it was information Ladd needed to know:

Q.  And did you discuss the – you're familiar with each of those four investors if, in fact, it's Honig, Stetson, Brauser, and Groussman. Right?

A.  I have seen the names before. Yes.

Q.  In fact, you wrote opinions for each of 8 these people. Isn't that right?

A.  Right. Right. And I don't remember writing an opinion for Oban, but --

Q.  Well, Mr. Stetson you wrote an opinion for Correct?

A.  Yeah.

Q.  And so, did you discuss familiarity with any of these individuals with anyone at Sichenzia?

A.  Not to my recollection.

Q.  Did you discuss your familiarity with any of these individuals with anyone at Sichenzia?

A.  Not to my recollection.

Q.  Did you discuss your familiarity with any of these individuals with Ladd?

A.  Not to my recollection.

Q.  Why not?

A.  It never came up.

Q.  And you didn't think it was relevant?

A.  No.

Ford Decl. Exhibit 6.

40. Kesner similarly testified that Honig shared office space with Mr. Groussman:

Q.  And who do you understand Mr. Groussman to be?
A.  Mr. Groussman is a – I understand to be a long-time family friend of the
Honig family.
Q.  Did he also work out of Mr. Honig's offices?
A.  I think the answer is yes and no. I think he had a desk there, but rarely was
there.

Ford Decl. Exhibit 9.

And in regards to using his office for a meeting, Kesner testified:

Q.  Do you remember who else was there? You said you were there, Mr. McAfee was
there. Who else was there?
A.  I know Mr. McAfee's body guard slash assistant was there. I don't know who else
was there. It may have been Mr. Honig and maybe Mr. O'Rourke as well. I think they
were there as well, but I can't say for sure.
Q.  Was Mr. Ladd there?
A.  I don't really recall. I don't know if he was there.
Q.  And the purpose of the meeting was to discuss the MGT acquisition of D-Vasive?
A.  The purpose of the meeting was to borrow my conference room, and I thought I
would take an opportunity to meet a – you know, a world stage figure, Mr. McAfee,
for the first time.

Ford Decl. Exhibit 9.

41. The SEC asked Marcus if he knew: (i) [Honig and the others] had been involved in

buying and selling stock of other issuers together with the same group or a similar

group of investors; (ii) that [Honig and the others] were involved in the 2012

financing; (iii) that Ladd was interviewed for the seeking Alpha article (in 2012) that

Mr. Honig paid for in promoting MGT and then selling shareholders; (iv) that (what

if, hypothetically) the stock price went up because Mr. Honig engineered that to

happen; (v) Honig was involved in finding a reverse takeover candidate for MGT;

and (vi) about Honig's reputation. The SEC questioned Attorney Marcus whether

knowing any of the above facts would have impacted his 13(d) analysis. Attorney

Marcus responded "No" to each of these assertions.

Marcus testified:

Q.  And had you known at the time **that Mr. Honig had been involved in buying and selling stock of other issuers together with the same group or a similar group of investors**, would that have affected your analysis under 13(d) for the 5 percent requirement?
A.  I'm not sure because these deals all have similar investors.
Q.  Well would it have been something you would have wanted to take into account in analyzing the 13(d) group issue?
A.  Perhaps. Just to see if there was a pattern of all these investors investing together. But again, **I don't know how much I would have taken into it** because you know, even today half of these deals all still have the same investors in them.
Q.  But in this transaction, did you understand that Mr. Honig was investing together with others?
A.  No

Ford Decl. Exhibit 8.

Q.  **Is the fact that they were involved in the 2012 financing**, would that affect your view as to whether now, in 2015, they're involved in this financing, Mr. Honig might be acting as a group for Section 13(d) purposes with others? Is that something you would have wanted to know?
A.  Not particularly. Not by itself certainly.
Q.  But would that at least be a factor you would want to know? That there was the same investors involved in different transactions?
A.  Not particularly.
Q.  Well would you want to – would that lead you to ask other questions?
A.  Not particularly, **no**.

Ford Decl. Exhibit 8.

Q.  So my question is if you **had been aware of that information about Ladd being interviewed for the seeking Alpha article that Mr. Honig paid for in promoting MGT and then selling shareholders** – selling their shares in 2013, is that information you would have wanted to consider in determining in 2015 whether this group of investors was acting as a group for Section 13 purposes?
A.  **No**, not necessarily.
Q.  Well **what if the stock price went up because Mr. Honig engineered that to happen**? Would that have affected your analysis? If you had that knowledge, would that have affected your analysis?
A.  Again, by itself, **probably not**.

Q.  I'm saying is that information that you would have wanted to take into account in doing a 13(d) group analysis?
A.  They filed their own 13 – investors file their own 13(d)s so I don't generally do a 13(d) analysis. So the answer's, I think, no.

Q.  "I had asked you about whether you knew anything about a **Mr. Honig's being involved in finding a reverse takeover candidate for MGT**.
Q.  Were you aware that that was something that Mr. Honig was spearheading?
A.  No I wasn't.
Q.  Is that something that would have affected your view on whether Mr. Honig was acting as a group with other investors with respect to the 2015 Form S-1?
A.  No, it wouldn't have.

Q.  And if you had – if you had been aware of that **reputation** of Mr. Honig or if you had heard that Mr. Honig or had a view of Mr. Honig back in 2012, would that have affected your view as to whether he was acting with others of the group for Section 13 purposes?
A.  No.

Ford Decl. Exhibit 8.

42. As Ladd himself testified, he took great care to insure no one had control over MGT: "I was aware that there are terms in financings that create these death spirals in the stock. And I needed and wanted to avoid that so that an investor would not have that control." Ford Decl. Exhibit 50.

43. On May 9, 2016, MGT announced that John McAfee was joining MGT as its new CEO. Within this press release was the line that McAfee sold his company to Intel in 2010 for $7.6 billion—rather than the more accurate assertion that Intel purchased the company founded by McAfee in 2010 for $7.6 billion. (MGT Capital Investments, Inc. press release dated May 9, 2016). Ford Decl. Exhibit 27.

44. When (investor) plaintiffs' attorneys filed lawsuits against MGT Capital Investments, Inc. in connection with the McAfee deal, none alleged that this particular clause in the press release was materially false. (Article by Pomerantz LLP dated April 11, 2017). Ford Decl. Exhibit 53.

45. On December 5, 2012, Time published an article by Sam Gustin titled, "*Fugitive Software Guru John McAfee Arrested in Guatemala, Faces Expulsion Back to Belize*," in which it states, "McAfee founded the anti-virus computer software firm that bears his name in 1987, and his net worth is estimated to have been $100 million at its peak. McAfee sold his stake in the company in 1994 and hasn't been involved since. In 2010, McAfee Associates, Inc. was acquired by chip giant Intel for $7.7 billion." Ford Decl. Exhibit 28.

46. On December 20, 2012, CNN Business published an article by David Goldman titled, "*McAfee won't change its name because of John McAfee*." In the article, it states, "John McAfee sold his security business in 1994 and has had nothing to do with the company since." Ford Decl. Exhibit 29.

47. On January 7, 2014, CNN Business published an article by Jose Pagliery titled, "*Intel renames its McAfee security brand*." In the article it states, "Intel (INTC), which bought McAfee in 2010, will rebrand its subsidiary as Intel Security." Ford Decl. Exhibit 30.

48. On January 8, 2014, CNN Business published an article by Jose Pagliery titled, "*John McAfee enjoying new life in Canada*." In the article it states, "Intel, the tech company that bought McAfee's antivirus software company in 2010, decide to rebrand to Intel Security earlier this week." Ford Decl. Exhibit 31.

49. On November 17, 2014, CBS News published an article titled, "*Security Industry Needs 'Passion and Expertise,' Says San Francisco VP*," in which it states that in an interview with CPO of Intel Security Michelle Dennedy, Dennedy said, "McAfee is now part of Intel Security." Ford Decl. Exhibit 32

50. On January 7, 2014, Jim Finkle of Thompson Reuters published an article titled
"*John McAfee says glad Intel dropping his name from security software*." The article
states that "John McAfee, the flamboyant millionaire who founded the eponymous
anti-viral software pioneer that Intel Corp bought for $7.7 billion, says he is glad that
the chipmaker plans to drop his name from the product." Ford Decl. Exhibit 33.

51. On September 8, 2015, a VentureBeat article reported that "John McAfee, the
provocative millionaire founder of antivirus software company McAfee Software,
which Intel bought for $7.68 billion in 2010, today filed a document to officially
designate himself a candidate in next year's U.S. presidential election." Ford Decl.
Exhibit 34.

52. On September 13, 2015, in an article titled "*Believe it or Not: McAfee Anti-Virus
Founder in U.S. Presidential Run,*" Channel Futures reported that "questions about
McAfee's eccentricity have been raised at times since he disassociated himself with
the company he founded, which Intel subsequently acquired in 2010 for some $7.6
billion." Ford Decl. Exhibit 35.

53. On October 2, 2015, Cybersecurity Ventures published an article titled,
"*Cybersecurity Legend and Presidential Candidate John McAfee Takes on the
Republican Frontrunners.*" The article opens, "McAfee has spent decades building up
a large following from the tech industry – and the media who follow his personal
antics have turned him into a celebrity. Millions of people know his name," clearly
articulating that "[f]irst and foremost, John McAfee is a cybersecurity legend." In
connection with his legendary status and presidential candidacy, the article described
McAfee as "the pioneer and founder of the 80's namesake company he founded –

McAfee Software – which became the leading antivirus company and ultimately sold to Intel Corporation (while still bearing his name) for $7.7 billion in 2010." Per the article, "In the past month, McAfee ha[d] been featured or interviewed by major media outlets including BBC, CNBC, CNET, CNNMoney, Fortune, FOX News, Inc., NBC News, New York Daily News, Time, Wired, USA Today, and others." Ford Decl. Exhibit 36.

54. On December 30, 2015, CNN Business published an article by David Goldman titled, "*John McAfee says his new security product is a 'f---ing game changer.*'" In the article, it states, "McAfee, who no longer has ties to his namesake antivirus software that he founded in 1987, has had a turbulent past few years." Ford Decl. Exhibit 37.

55. On April 21, 2016, Cybersecurity Ventures published an article titled, "*Intel's CEO Can't Seem to Shake John McAfee's Name.*" This press release reported that "John McAfee – founder of his namesake anti-virus company which ultimately sold to Intel in 2010 for more than $7.6 billion – responded by telling BBC News 'I am now everlastingly grateful to Intel for freeing me from this terrible association with the worst software on the planet,'" adding the customary nod to his celebrity status: "They may have learned too that John McAfee has a reputation as a prankster – which comes along with his legendary status in the cybersecurity field." Ford Decl. Exhibit 38.

56. On May 9, 2016, the day the May 2016 Press Release was published, an article titled "*McAfee Named CEO of Gaming Company in Shift to Cybersecurity*" was published at 9:12 am EDT on Bloomberg. At the outset, the article bullet pointed: (i) MGT Capital Investments, Inc. to become John McAfee Global Technologies Inc., and (ii)

McAfee is a presidential candidate for Libertarian Party. The article reported that "John McAfee has been named the chairman and chief executive officer of MGT Capital Investments, Inc., marking a return to public markets about five years after the eponymous anti-virus company he founded was sold to Intel Corp. for $7.68 billion." Ford Decl. Exhibit 39. Further, at 5:53 UTC the same day, another article broadcasted, "John McAfee Is Back in Business," reporting that "McAfee's former eponymous company, McAfee, a computer antivirus software firm, sold to Intel (INTC) for $7.7 billion in 2011. Intel dropped the McAfee name and became Intel Security in 2014." Ford Decl. Exhibit 54.

57. On May 19, 2016, CNN Business published an article by Paul R. La Monica titled, "*John McAfee has pushed this stock up 700%!*" In the article it states, "It's been a long road back to Wall Street for the 70-year-old McAfee, who left his eponymous firm in 1994. It was sold to Intel in 2010 for about $7.6 billion." Ford Decl. Exhibit 41.

58. On June 17, 2016, Business Insider published an article by Seth Archer titled, "*JOHN McAFEE: Intel buying McAfee never made sense*," in which it states, "Citing unnamed sources, the Financial Times reported that the chipmaker is looking at spinning off McAfee, which it bought in 2010 for $7.7 billion and incorporated into its Intel Security division." Ford Decl. Exhibit 42.

59. On September 7, 2016, the New York Times published an article by Michael J. de la Merced titled, "*Intel Sells Majority Stake in McAfee Security Unity to TPG*," in which it states, "Intel, which bough McAfee for $7.7 billion six years ago, said on Wednesday…" Ford Decl. Exhibit 43.

60. On September 7, 2016, CRN published an article by Sarah Kuranda titled, "*Intel Security Spins Off To Private Equity In $4.2B Deal*." In the article it states, "The deal spins out Intel Security from parent company Intel, creating a stand-alone security vendor and essentially undoing the company's $7.7 billion acquisition of McAfee in 2010." Ford Decl. Exhibit 44.

61. On September 7, 2016, The Wall Street Journal published an article written by Dana Mattioli, titled, "*Intel Agrees to Sell Majority Stake in Security Unit to TPG.*" The article states, "Intel bought McAfee for $7.7 billion in 2011 as the chip giant sought to diversify." Ford Decl. Exhibit 45.

62. On September 7, 2016, TechCrunch published an article written by Johns Mannes, titled, "*Intel spins out Intel Security with TPG to form new McAfee valued at $4.2B.*" The article states, "Intel's security unit originated from its acquisition of McAfee. The $7.68 billion transaction closed in 2011 and in the years following, analysts have been keen to pressure Intel to sell the company back off." Ford Decl. Exhibit 46.

63. On September 15, 2016, CNN Business published an article by Paul R. La Monica titled, "*John McAfee is back ... and fighting Intel and CBS.*" In the article it states, "Yes, the same McAfee whose namesake antivirus firm was sold to Intel, then moved to Belize, and became embroiled in a bizarre murder mystery." Ford Decl. Exhibit 47.

64. On December 17, 2018, Yahoo! published an article, titled, "*Intel to Reportedly Offload McAfee Business: Key Takeaways*." The article states, "Intel had acquired the antivirus software maker back in 2010 with a view to secure its chips and improve their threat detection power. Notably, Intel concluded the acquisition of McAfee for approximately $7.68 billion in cash (or $48 per share)." Ford Decl. Exhibit 48.

65. PRNewswire published a press release announcing an upcoming six-part series titled "The John McAfee Project," with an expected release date in April 2016. The press release began, "Viewed by some as the godfather of online security and by others as the master manipulator of fear, McAfee announces earlier today he is running for President of the United States," stating immediately after that "McAfee continues to be a prophet of internet protection. In 2010, the company he founded (McAfee Associates) was sold to Intel for an incredible $7.8 billion. Ford Decl. Exhibit 40.

66. Ladd's Form 4, Statement of Beneficial Ownership, provided that (i) on May 25, 2016, Ladd disposed of 465,171 shares, leaving him with 157,300 beneficially owned securities (entirely undercutting the SEC's allegations that these sales were hidden); (ii) on May 25, 2016, Ladd disposed of 157,300 shares, leaving 0 beneficially owned securities; (iii) on May 26, 2016, Ladd acquired 300,000 shares, leaving 573,603 beneficially owned securities; and (iv) on May 31, 2016, Ladd disposed of 33,603 shares, leaving 540,000 beneficially owned securities. Ford Decl. Exhibit 49.

67. Ladd conceded there were errors, testifying, "Again, the exact quantities might be wrong, as well as the dates." Ford Decl. Exhibit 50.

68. Ladd reported that he disposed of 465,171 shares on May 26, which resulted in an accurate reflection of his beneficially owned shares as of May 31, 2016. Ford Decl. Exhibit 50.

69. On May 31, 2016, when Ladd filed the Form 144, Attorney Wu emailed him, "Also, you may already know this but the form 144 may be filed by paper instead of on Edgar." Ladd responded, "I already filed Form 144." Ford Decl. Exhibit 51.

Dated: New York, New York
        November 21, 2022

FORD O'BRIEN LANDY LLP

  /s/ Adam Ford
Adam Ford
Anjula Prasad
275 Madison Avenue, 24th Floor
New York, NY 10016
aford@fordobrien.com
aprasad@fordobrien.com

*Attorneys for Defendant Robert Ladd*