# EXHIBIT K

10-K 1 fl0k2015_mgtcapitalinvest.htm ANNUAL REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**Form 10-K**

**FOR ANNUAL AND TRANSITION REPORTS PURSUANT TO**
**SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

|Z| **ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended: December 31, 2015**

**OR**

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the transition period from             to

**MGT CAPITAL INVESTMENTS, INC.**
(Exact Name of Registrant as Specified in its Cha11er)

| **Delaware** | **001-32698** | **13--4148725** |
|---|---|---|
| (State or Other Jmisdiction of Incorporation or Organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**500 Mamaroneck Avenue, Suite 320, Harrison, NY 10528, USA**
(Address ofp1incipal executive offices, including zip code)

**914-630-7430**
(Registrant's Telephone Number, Including Area Code)

Securities registered under section 12(b) of the Exchange Act: **Common stock, par value $0.001 per share**

Securities registered under section 12(g) of the Exchange Act: **Not applicable**

Name of each exchange on which registered: **NYSE MKT**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No |Z|

Indicate by check mark if the Registrant is not required to file rep011s pursuant to Section 13 or 15(d) of the Act. Yes ☐ No |Z|

Check whether the issuer: (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file), and (2) has been subject to such filing requirements for the past 90 days. Yes |Z| No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, eve1y Interactive Data File required to be sub1nitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 ofthis chapter) during the preceding 12 months (or for such shmter pe1iod that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark if disclosure of delinquent filers is not contained herein, and will not be contained, to the best ofregistrant's knowledge, in definitive proxy or infonnation statements incorporated by reference in Pait ill of this Fo1m 10--K or any amendment to this Fonn 10--K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, a11 accelerated filer, a non-accelerated filer, or a smaller rep01ting company. See definitions of "large accelerated filer," "accelerated filer," and "smaller repmting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated Filer | ☐ | Smaller repo1ting company | |Z| |
| (Do not check if smaller repmting company) | | | |

**PLAINTIFF'S EXHIBIT**
**Ladd 40**

Indicate by check mark whether the Registrant is a shell Company (as defined in Rule 12b-2 of the Act). Yes ☐

No|8|

As of June 30, 2015, the last day of the registrant's most recently completed second fiscal qmuter; the aggregate market value of the registrant's Common stock held by non-affiliates of the registrant was approximately $7,800,000.

As of April 13, 2016, the registrant had outstanding 18,098,221 shares of Common stock, $0.001 par value. (the "Common stock")

**MGT CAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**INDEX**
**(in thousands, except share and per-share amounts)**

|  | PART I |  |
|---|---|---|
| Item 1 | Business | 1 |
| Item lA | Risk Factors | 2 |
| Item lB | Unresolved Staff Comments | 11 |
| Item 2 | Prope1ties | 11 |
| Item 3 | Legal Proceedings | 11 |
| Item 4 | Mine Safety Disclosures | 11 |
|  |  |  |
|  | PART II |  |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 12 |
| Item 6 | Selected Financial Data | 12 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 20 |
| Item 8 | Financial Statements and Supplementa1y Data | 20 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 21 |
| Item 9A | Controls and Procedures | 21 |
| Item 9B | Other Information | 21 |
|  |  |  |
|  | PART III |  |
| Item 10 | Directors, Executive Officers and Comorate Governance | 22 |
| Item 11 | Executive Compensation | 24 |
| Item 12 | Seemity Ownership ofCe1tain Beneficial Owners and Management and Related Stockholder Matters | 26 |
| Item 13 | Ce1tain Relationships and Related Transactions, and Director Independence | 28 |
| Item 14 | P1incipal Accom1tant Fees and Services | 28 |
|  |  |  |
|  | **PARTIV** |  |
| Item 15 | Exhibits and Financial Statement Schedules | 29 |
|  | SIGNATURES | 30 |

## NOTE REGARDING FORWARD LOOKING STATEMENTS

This Annual Rep01t on F01m 10-K, including the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7, contains forward-looking statements that involve risks and uncertainties, as well as assumptions that, if never materialize or prove inconect, could cause the results of MGT Capital Investments, Inc. and its consolidated subsidiaries (the "Company") to differ materially from those expressed or implied by such forward-looking statements. The words "anticipates," "believes," "estimates," "expects," "intends," "may," "plans," "projects," "will," "would" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words. All statements other than statements of hist01ica.l fact are statements that could be deemed forward-looking statements, including any projections of revenue, gross margin, expenses, earnings or losses from operations, our ability to enforce and monetize our patents, synergies or other financial items; any statements of the plans, strategies and objectives of management for fun1re operations, the execution of restmcnuing plans; any statements concerning the likelihood of success of our patent enforcement litigation; any statement concerning developments, any statements regarding funu·e economic conditions or performance; any statements of expectation or belief; and any statements of assmnptions underlying any of the foregoing. The risks, uncertainties and assmnptions refened to above include the performance of contracts by partners; employee management issues; the difficulty of aligning expense levels with revenue changes; and other risks that are described herein, including but not limited to the specific risks ar·eas discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of this rep01t, and that are otherwise described from time to time in the Company's periodic disclosne statements and for reports filed with the Securities and Exchange Commission. The Company assumes no obligation and does not intend to update these forward-looking statements.

## PART I

### Item 1. Business

MGT Capital Investments, Inc. ("MGT," "the Company," "we," "us") is a Dela ware corporation, incorporated in 2000. The Company was originally incorporated in Utah in 1977. MGT is comprised of the parent company, wholly-owned subsidiaries Medicsight, Inc. ("Medicsight"), MGT Sp01ts, Inc. ("MGT Sp01ts"), MGT Srudios, Inc. ("MGT Srudios"), and majority-owned subsidiary MGT Gaming, Inc. MGT Smdios also owns a controlling minority interest in the subsidiary M2P Americas, Inc. Our corporate office is located in Hanison, New York.

MGT and its subsidiaries ar·e principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry. MGT's portfolio includes a social casino platform Slot Champ and minority stakes in the skill-based gaming platform MGT Play and fantasy sp01ts operator DraftDay Gaming Group, Inc. ("DDGG") (see September 8, 2015 development below).

In addition, MGT Gaming owns three pa.tents covering certain fean1res of casino slot machines. Two of the patents were asserted against alleged infringers in various actions in federal comt in Mississippi. In July 2014, MGT Gaming dismissed its lawsuits against WMS Gaming Inc., and in August 2015, the Company and defendants Aruze An1erica and Penn National Gaming a.greed to settle all pending litigation and all proceedings at the U. S. Patent and Trademark Office. The Company received a payment of $90, which was recorded as licensing revenue. In an eff01t to monetize its gaining patent p01tfolio, the Company has engaged Munich Innovations GmbH, the patent monetization furn that sold MGT's medical patent p01tfolio to Samsung in 2013 for $1.5 million.

On September 8, 2015, the Company and MGT Sp01ts entered into an Asset Purchase Agreement with Viggle, Inc. ("Viggle") and Viggle's subsidia1y DDGG, pursuant to which Viggle acquired all of the assets of the DraftDay.com business ("DraftDay.com") from the Company and MGT Sp01ts. In exchange for the acquisition of DraftDay.com, Viggle paid MGT Sp01ts the following: (a) 1,269,342 shar·es of Viggle's common stock, since renamed Draftday Fantasy Sp01ts, Inc. (NASDAQ: DDAY), (b) a promissory note in the amount of $234 paid on September 29, 2015, (c) a promissory note in the amount of $1,875 due Mar·cl1 8, 2016, and (d) 2,550,000 shares of common stock of DDGG (private entity). In addition, exchange for providing certain transitional services, DDGG issued to MGT Sp01ts a wanant to purchase 1,500,000 shares of DDGG common stock Following consmnna.tion of the transaction, MGT Sp01ts owns an 11% equity interest in DDGG, Viggle (since renamed Dra.ftday Fantasy Sports, Inc.) owns 49%, and Sportech, Inc. owns 39%. As a result of the transaction, the Company has presented DraftDay.com as a discontinued operation. There can be no assurance that the Company will be able to realize full value of the above consideration, the Company has taken a reserve of $300 against the Mar·ch 8, 2016 promiss01y note and continues to monitor for further possible impanment.

Medicsight owns U.S. Food and Dmg Administration approved medical imaging software and has designed an automated carbon dioxide insuffiation device on which it receives royalties from an international manufacturer.

## Strategy

MGT and its subsidiaries are principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space, as well as the casino industty. The Company's acquisition stt·ategy is designed to obtain contt·ol of assets with a focus on1isk mitigation coupled with large potential upside. We plan to build our pmtfolio by seeking out large social and real money gaming oppmtunities via extensive research and analysis. Next, we will attempt to secure contt·olling interests for modest cash and/or stock outlays. MGT then budgets and funds operating costs to develop business operations and tries to motivate sellers with equity upside. While the ultimate objective is to operate businesses for free cash flow, there may be oppmtunities where we sell or othe1wise monetize certain assets.

There can be no assurance that any acquisitions will occur at all, or that any such acquisitions will be accretive to earnings, book value and other financial met1ics, or that any such acquisitions will generate positive returns for Company stockholders. Furthe1more, it is contemplated that any acquisitions may require the Company to raise capital; such capital may not be available on te1ms acceptable to the Company, if at all.

Following the sale of DraftDay.com, the Company has been considering all methods to create value for shareholders, including potential mergers, spin-offs, distiibutions and other st1·ategic actions.

## Competition

MGT encounters intense competition in all its businesses, in most cases from larger companies with greater financial resources such as the daily fantasy sp01ts operators FanDuel, Inc. and DraftKings, Inc. or Zynga, Inc. (NASDAQ: ZNGA) and Caesars Acquisition Company (NASDAQ: CACQ) which focus on social and real money on.line gaming.

## Employees

Clmently, the Company and its subsidiaries have 2 full-time employees. None of our employees is represented by a union and we believe our relationships with our employees are good.

## Available information

MGT maintains a website at www.mgtci.com. The Company makes available free of charge our annual rep01t on Fonn 10--K, Quaiterly Repo1ts on Form 10--Q and cunent rep01ts on Fo1m 8-K, including any amendments to the foregoing reports, as soon as is reasonably practicable after such material is electi·onically filed with, or furnished to, the Securities and Exchange Commission or the SEC. These materials along with our Code of Business Conduct and Ethics are also available through our corporate website at www.mgtci.com. A copy of this Annual Repo1t on Fonn 10--K ("Annual rep01t") is located at the Securities and Exchange Commission's Public Reference Room at 100 F St1·eet, NE, Washington, D.C. 20549. Infonnation on the operation of the Public Reference Room can be obtained by calling the SEC at 1-800--SEC--0330. The public may also download these materials from the Secmities and Exchange Commission's website at http://www.sec.gov. Any amendments to, and waivers of, our Code of Business Conduct and Ethics will be posted on our c01porate website. The Company is not including the inf01mation contained at mgtci.com as a paitof this Annual Rep01t.

## Item lA. Risk fact.ors

Discussion of our business and operations included in this Annual Repo1t on Fonn 10--K should be read together with the risk factors set fo1th below. They describe vai·ious risks and unce1tainties to which we are or may become subject. These 1isks and unce1tainties, together with other factors described elsewhere in this rep01t, have the potential to affect our business, financial condition, results of operations, cash flows, st1·ategies or prospects in a material and adverse manner. New 1isks may emerge at any time, and we cannot predict those risks or estimate the extent to which they may affect our financial pe1fonnance. Each of the 1isks desc1ibed below could adversely impact the value of our secmities. These statements, like all statements in this report, speak only as of the date of this Annual Repo1t (unless another date is indicated), and we m1de1take no obligation to update or revise the statements in light of future developments.

We cannot assure you that we will be successful in commercializing any of the Company's products or if any of our products are commercialized, that they will beprofitable for the Company.

The Company generates limited revenue from operations upon which an evaluation of our prospects can be made. The Company's prospects must be considered keeping in mind the risks, expenses and difficulties frequently encountered in the establishment of a new business in a constantly changing indust1y. There can be no assurance that the Company will be able to achieve profitable operations in the foreseeable future, if at all.

## Company specific risks

*Our financial results are highly concentrated in the online mobile and gaming business;* **if** *we are unable to grow online mobile and gaming revenues and find alternative sources of revenue, our financial results will suffer.*

Licensing accounted for substantially all of our revenues from continuing operations for the yeai· ended December 31, 2015. Our success depends upon customers choosing to use, and search adve1tising pa1tners choosing to adve1tise, on, our

online, mobile and casino gaming products. Decisions by customers and om search adve11ising pa11ners not to adopt our products at projected rates, or changes in market conditions, may adversely affect the use or distribution of our products. Because of om revenue concentration in the online, mobile and casino gaming business, such shortfalls or changes could have a negative impact on our financial results, or with regard to some of our larger advertising pai1ners specifically, our results of operations, financial condition and/or liquidity will suffer.

2

*Our acquisition activities may disrupt our ongoing business, may involve increased expenses and may present risks not contemplated at the time of the transactions.*

We have acquired, and may continue to acquire, companies, products and technologies that complement our strategic direction. Acquisitions involve significant risks and unce1tainties, including:

- diversion of management time and a shift of focus from operating the businesses to issues related to integration and administration;

- inability to successfully integrate the acquired technology and operations into our business and maintain uniform standards, controls, policies and procedures;

- challenges retaining the key employees, customers and other business pa1tners of the acquired business; inability to realize synergies expected to result from an acquisition;

- in the case of foreign acquisitions, the need to integrate operations across different cultures and languages and to address the pa11icular economic, cunency, political and regulatory risks associated with specific countries;

- liability for activities of the acquired companies before the acquisition, including violations of laws, rules and regulations, commercial disputes, tax liabilities and other known and unknown liabilities; and

- that any acquisitions will occur at all, or that any such acquisitions will be accretive to earnings, book value and other financial metrics, or that any such acquisitions will generate positive returns for Company stockholders. Furthe1more, it is contemplated that any acquisitions may require the Company to raise capital; such capital may not be available on terms acceptable to the Company, if at all.

Because acquisitions are inherently risky, our transactions may not be successful and may, in some cases, harm our operating results or financial condition.

*The mobile game application business is still developing, and our efforts to develop mobile games may prove unsuccessji,l, or even if successful, it may take more time than we anticipate to achieve significant revenues from this activity because, among other reasons:*

- we may have difficulty optimizing the monetization of our mobile games due to our relatively limited experience creating games that include micro-transaction capabilities, adve11ising and offers;

- we intend to continue to develop substantially all of our games based upon our own intellectual prope1ty, rather than well-known licensed brands, and we may encounter difficulties in generating sufficient consumer interest in and downloads of our games, pa1ticularly since we have had relatively limited success generating significant revenues from games based on our own intellectual prope1ty;

- many well-funded public and p1ivate companies have released, or plan to release, mobile games, and this competition will make it more difficult for us to differentiate our games and derive significant revenues from them;

- mobile games have a relatively limited hist01y, and it is unclear how popular this style of game will become or remain or its revenue potential;

- our mobile strategy assumes that a large number of players will download our games because they are free and that we will subsequently be able to effectively monetize the games; however, players may not widely download our games for a va1iety of reasons, including poor consumer reviews or other negative publicity, ineffective or insufficient marketing eff01ts, lack of sufficient community features, lack of prominent storefront featuting and the relatively large file size of some of our "thin-client games," which often utilize a significant amount of the available mem01y on a user's device. Due to the inherent limitations of the most commonly-used sma11phone platfo1ms and telecommunications networks, which only allow applications that are less than 50 megabytes to be downloaded over a canier's wireless network, players must download one of our thick-client games either via a wireless Internet (Wi-Fi) connection, or initially to their computer and then side-load the thick-client game to their device;

- even if our games are widely downloaded, we may fail to retain users or optimize the monetization of these games for a va1iety of reasons, including poor game design or quality, lack of c01nmunity features, gameplay issues such as game unavailability, long load times or an unexpected tennination of the game due to data server or other technical issues, or our failure to effectively respond and adapt to changing user preferences through game updates;

3

- the billing and provisioning capabilities of some smartphones and tablets are cmTently not optimized to enable users to purchase games or make in-app purchases, which make it difficult for users of these smartphones and tablets to purchase our games or make in-app purchases and could reduce our addressable market, at least in the short te1m; and megabytes to be downloaded over a canier's wireless network, players must download one of our thick-client games either via a wireless Internet (Wi-Fi) connection, or initially to their computer and then side-load the thick-client game to their device;

- the Federal Trade Commission has indicated that it intends to review issues related to in-app purchases, pa1ticularly with respect to games that are marketed prinlaiily to minors, and the commission might issue mles significantly restiicting or even prohibiting in-app purchases or name us as a defendant in a future class-action lawsuit.

Ifwe donotachieve a sufficient retm11on our investment with respect to this business model, it will negatively affect our operating results and may require us to make change to our business strategy.

*The markets in which we operate are highly competitive, and many of our competitors have significantly greater resources than we do.*

Developing, distributing and selling mobile games is a highly competitive business, characterized by frequent product introductions and rapidly emerging new platfo1ms, technologies and storefronts. For end users, we compete p1imarily on the basis of game quality, brand and customer reviews. We compete for promotional and storefront placement based on these factors, as well as our relationship with the digital storefront owner, historical perfmmance, perception of sales potential and relationships with licensors of brands and other intellecn1al prope1ty. For content and brand licensors, we compete based on royalty and other economic te1ms, perceptions of development quality, po1ting abilities, speed of execution, distribution breadth and relationships with storefront owners or caiTiers. We also compete for experienced and talented employees.

We compete with a continually increasing number of companies, including Zynga, King Digital, Soul & Vibe Interactive, DeNA, Gree, Nexon, and Glu. In addition, given the open natm·e of the development and distribution for sma1tphones and tablets, we also compete or will compete with a vast number of small companies and individuals who are able to create and lam1ch games and other content for these devices using relatively limited resources and with relatively limited stait-up time or expe1tise.

Some of our competitors and our potential competitors have one or more advantages over us, either globally or in paiticulai· geographic mai·kets, which include:

- significantly greater financial resources;

- greater experience with the mobile games business model and more effective game monetization;

- stronger brand and consmner recognition regionally or worldwide;

- stronger strategy which may reach our tai·get audience better than our cmTent strategy;

- greater experience integrating community featm·es into their games and increasing the revenues derived from their users;

- the capacity to leverage their marketing expenditm·es across a broader po11folio of mobile and non-mobile products;

- larger installed customer bases from related platfmms, such as console gaining or social networking websites, to which they can market and sell mobile games;

- more substantial intellecrual prope1ty of their own from which they can develop gan1es without having to pay royalties;

- lower labor and development costs and better overall economies of scale;

- greater platfonn-specific focus, expe1ience and expe1tise; and

- broader global distribution and presence.

If we are unable to compete effectively or we are not as successful as our competitors in our target markets, our sales could decline, our margins could decline and we could lose market share, any of which would materially harm our business, operating results and financial condition.

*Inflation and future expectations of inflation influence consumer spending on entertainment such as online gaming and gambling.*

As a result, our profitability and capital levels may be impacted by inflation and inflationary expectations. Additionally, inflation's impact on our operating expenses may affect profitability to the extent that additional costs are not recoverable through increased cost of consumer acquisition for our po1tfolio of online, mobile gaming and casino gaming offerings.

4

*Consumer tastes are continually changing and are often unpredictable, and we compete for consumer discretionary spending against other fonns of entertainment; if we fail to develop and publish new mobile games that achieve mark.et acceptance, our sales would suffer.*

Om mobile game business depends on developing and publishing mobile games that consumers will want to download and spend time and money playing. We must continue to invest significant resources in research and development, analytics and marketing to introduce new games and continue to update our successful mobile games, and we often must make decisions about these matters well in advance of product release to timely implement them. Our success depends, in pa1t, on unpredictable and volatile factors beyond our control, including consmner preferences, competing games, new mobile platfonns and the availability of other ente1tainment activities. If our games and related applications do not meet consumer expectations, or they are not brought to market in a timely and effective manner, our business, operating results and financial condition would be hanned. Even if our games are successfully introduced and initially adopted, a failure to continue to update them with compelling content or a subsequent shift in the ente1tainment preferences of consumers could cause a decline in our games' popularity that could materially reduce our revenues and ha1m our business, operating results and financial condition. Fmthennore, we compete for the discretionruy spending of consumers, who face a vast array of entertainment choices, including games played on personal computers and consoles, television, movies, spmts and the Internet. If we ru·e unable to sustain sufficient interest in our games compared to other fonns of ente1tainment, our business and financial results would be se1iously hrumed.

*If we do not successfully establish and maintain awareness of our brand and games, if we incur excessive expenses promoting and maintaining our brand or our games or if our games contains defects or objectionable content, our operating results and financial condition could be hanned.*

We believe that establishing and maintaining our brand is critical to establishing a direct relationship with end users who purchase our products from direct-to-consumer channels and to maintaining our existing relationships with disttibutors and content licensors, as well as potentially developing new such relationships. Increasing awareness of our brand and recognition of our games is pa1ticulru-ly imp01tru1t in connection with our strategic focus of developing games based on our own intellectual prope1ty. Our ability to promote our brand and increase recognition of our games depends on our ability to develop high-quality, engaging games. If consumers, digital storefront owners and branded content owners do not perceive our existing games as high-quality or if we intt·oduce new games that are not favorably received by them, then we may not succeed in building brand recognition and brand loyalty in the marketplace. In addition, globalizing and extending our brand and recognition of our games is costly and involves extensive mruiagement time to execute successfully, prutictllru·ly as we expand our effo1ts to increase awareness of our brand and games among international consmners. Although we have significantly increased our sales and marketing expenditures in connection with the launch of our games, these efforts may not succeed in increasing awareness of our brand or the new games. If we fail to increase and maintain brand awareness and consumer recognition of our grunes, our potential revenues cotlld be linlited, our costs could increase and our business, operating results and fmancial condition could suffer.

*If we fail to deliver our games at the same time as new mobile devices are commercially introduced, our sales may szdfer.*

Om business depends, in pa1t, on the commercial intt·oduction of new mobile devices with enhanced featm·es, including larger, higher resolution color screens, improved audio quality, and greater processing power, memo1y, batte1y life and storage. For example, the intt·oduction of new and more powerful versions of Apple's iPhone and iPad and devices based on Google's Android operating system, have helped drive the growth of the mobile games market. In addition, consumers generally purchase the majority of content, such as our games, for a new device within a few months of pmchasing it. We do not control the timing of these device launches. Some manufacturers give us access to their mobile devices prior to commercial release. If one or more major manufactm·ers were to stop providing us access to new device models prior to commercial release, we might be m1able to introduce games that are compatible with the new device when the device is first commercially released, and we might be unable to make compatible games for a substantial period following the device release. If we do not adequately build into our title plan the demand for games for a patticular mobile device or experience game launch delays, we miss the oppmtmlity to sell games when new mobile devices are shipped or our end users upgrade to a new mobile device, our revenues would likely decline and our business, operating results and financial condition would likely suffer.

*We will need additional capital to continue our operation.*

We may need to obtain additional financing for adve1tising, promotion and acquisition of additional products. The

Company is constantly looking for new sources of revenue that will help fund our business. There can be no assurances that this will be achieved.

If we successfully raise additional funds through the issuance of debt, we will be required to service that debt and are likely to become subject to restrictive covenants and other rest1ictions contained in the instrnments governing that debt, which may limit our operational flexibility. Ifwe raise additional funds through the issuance of equity secmties, then those securities may have rights, preferences or privileges senior to the rights of holders of our Common stock, and holders of our Common stock will expe1ience dilution.

5

We cannot be ce11ain that such additional debt or equity financing will be available to us on favorable te1ms when required, or at all. If we cannot raise funds in a timely manner, or on acceptable terms, we may not be able to promote our brand, develop or enhance our products and se1vices, take advantage of future opportunities or respond to competitive pressures or unexpected requirements, and we may be required to reduce or limit operations.

*The effect of the proposed "Unlawful Internet Gambling Funding Prohibition Act."*

During the 2003 fiscal year, the House Judiciary Committee of the US Government approved HR21 "Unlawful Internet Gambling Funding Prohibition Act". This bill creates a new c1ime of accepting financial instruments, such as credit cards or electronic fund transfers, for debts incurred in illegal internet gambling. The bill enables state and federal Attorneys General to request that injunctions be issued to any patty, such as financial institutions and internet se1vice providers, to assist in the prevention or restraint of illegal internet gan1bling. This bill still needs to be ratified by the Senate before it becomes passed as law. We may be affected by this bill and therefore the Company's revenue stream may be affected.

*Compliance with state rules and regulations.*

Va1ious states have laws rest1icting gambling. The Company believes that we are in compliance with the rules and regulations in the states we operate. However, there can be no assurance that the state officials will have the same view. In the event that we are accused of violating such gambling laws and rest1ictions, our ganling business may be disallowed or prohibited in these states. Fm1he1more, there can be no assurance that no new rules and regulations rest1icting our business will be adopted in the states we operate. If such rest1ictive rules and regulations are adopted, we may incur additional costs in complying with the 1ules and regulations or we may have to cease operation in these state(s).

*We have capacity constraints and system development risks that could damage our customer relations or inhibit our possible growth, and we may need to expand our management systems and controls quickly, which may increase our cost of operations.*

Our success and our ability to provide high quality customer se1vice largely depends on the efficient and mtinterrupted operation of our computer and commmlications systems and the computers and commmlication systems of our third party vendors in order to accommodate any significant numbers or increases in the numbers of consmners using our se1vice. Our success also depends upon our and our vendors' abilities to rapidly expand transaction-processing systems and network infrastructure without any systems intem.1ptions in order to accommodate any significant increases in use of our se1vice.

We and our se1vice providers may expe1ience periodic systems intenuptions and infrastructure failures, which we believe will cause customer dissatisfaction and may adversely affect our results of operations. Limitations of technology infrasttucture may prevent us from maxin1lizing our business opportunities.

We cannot assure you that our and our vendors' data reposit01ies, financial systems and other technology resources will be secure from security breaches or sabotage, especially as technology changes and becomes more sophisticated. In addition, many of our and our vendors' software systems are custom-developed and we and our vendors rely on employees and ce11ain third-patty contt·actors to develop and maintain these systems. If ce11ain of these employees or contl"actors become unavailable, we and our vendors may experience difficulty in improving and maintaining these systems. Furthe1more, we expect that we and our vendors may continue to be required to manage multiple relationships with va1ious softwai·e and equipment vendors whose technologies may not be compatible, as well as relationships with other third parties to maintain and enhance their technology infrasttuctures. Failure to achieve or maintain high capacity data tt·ansmission and secmity without system downtime and to achieve improvements in their tt·ansaction processing systems and network infrasttucture could have a materially adverse effect on our business and results of operations.

*Increased security risks of online commerce may deter future use of our website, which may adversely affect our ability to generate revenue.*

Concerns over the security of tt·ansactions conducted on the internet and the privacy of consumers may also inhibit the growth of the internet and other online se1vices generally, and online commerce in paiticular. Failure to prevent security breaches could significantly haim our business and results of operations. We cannot be ce1tain that advances in computer capabilities, new discoveries in the field of c1yptography, or other developments will not result in a compromise or breach of the algorithms used to protect our transaction data. Anyone who is able to circumvent our or our vendors' secmity measures could misappropriate prop1ietary information, cause intem1ptions in our operations or dainage our brand and reputation. We

may be required to incur significant costs to protect against secmity breaches or to alleviate problems caused by breaches. Any well-publicized compromise of security could deter people from using the internet to conduct transactions that involve transmitting confidential infonnation or downloading sensitive materials, which would have a material adverse effect on our business.

*We face the risk of system failures, which would disn;pt our operations.*

A disaster could severely damage our business and results of operations because our services could be intenupted for an indetenninate length of time. Our operations depend upon *our* ability to maintain and protect our computer systems.

6

Our systems and operations are vulnerable to damage or intenuption from fire, floods, earthquakes, hunicanes, power loss, telecommunications failures, break-ins, sabotage and similar events. The occU1Tence of a natural disaster or nnanticipated problems at our principal business headqruuters or at a third-pa1ty facility could cause inte1ruptions or delays in our business, loss of data or render us unable to provide our services. In addition, failure of a third-paity facility to provide the data commrnications capacity required by us, as a result of human e1rnr, natural disaster or other operational dismptions, could cause intenuptions in our service. The occU1Tence of any or all of these events could adversely affect our reputation, brand and business.

*We face risks of claims from third parties for intellectual property infringement that could adversely affect our business.*

Our services operate in pait by making internet services and content available to our users. This creates the potential for claims to be made against us, eitl1er directly or through contractual indemnification provisions with third parties. These claims might, for example, be made for defamation, negligence, copyright, trademark or patent infringement, personal injlllly, invasion of privacy or other legal theories. Any claims could result in costly litigation and be time conslllning to defend, divert management's attention and resources, cause delays in releasing new or upgrading existing services or require us to enter into royalty or licensing agreements.

Litigation regarding intellectual property rights is common in the internet and software industries. We expect that internet technologies and softwai·e products and services may be increasingly subject to third-paity infringement claims as the number of competitors in our industry segment grows and tl1e fonctionality of products in different industry segments overlaps. There can be no assurance that our services do not or will not in tl1e fotme infringe the intellectual property rights of third parties. Royalty or licensing agreements, if required, may not be available on acceptable terms, if at all. A successful claim of infringement against us and our failure or inability to license the infringed or similar technology could adversely affect our business.

Our success and ability to compete ai·e substantially dependent upon our technology and data resources, which we intend to protect through a combination of patent, copyright, trade secret and/or trademark law. We ClllTently have no patents or tr·ademai·ks issued to date on our technology and there can be no assurances that we will be successfol in securing them when necessary.

*Our financial position and results of operations will vary depending on a number of factors, most of which are out of our control.*

We anticipate tliat our operating results will vaiy widely depending on a nlllnber of factors, some of which ai·e beyond our contr·ol. These factors ai·e likely to include:

- demand for our online services by consumers;

- costs of attracting consumers to our website, including costs of receiving exposure on third-paity websites;

- costs related to fonning str·ategic relationships;

- our ability to significantly increase our distr·ibution channels;

- competition from companies offering same or similar products and services and from companies with much deeper financial, technical, mai·keting and huma1lresources;

- the amount and tiniing of operating costs a11d capital expenditures relating to expansion of our operations;

- costs and delays in introducing new services and improvements to existing services;

- changes in the growth rate of internet usage and acceptance by consumers of electronic commerce; and

- changes and introduction of new softwai·e e.g. pop up blockers.

Because we have a limited operating histmy, it is difficult to accurately forecast the revenues that will be generated from our current and proposed future product offerings.

*If we are unable to meet the changing needs of our industry, our ability to compete will be adversely affected.*

We operate in an intensely competitive industry. To remain competitive, we must be capable of enhancing and improving the functionality and features of our online services. The internet gaming industry is rapidly changing. If competitors introduce new products and services embodying new technologies, or if new industry standards and practices emerge, our existing services, technology and systems may become obsolete. There can be no assurances that we will be successful in responding quickly, cost effectively and adequately to new developments or that funds will be available to respond at all. Any failure by us to respond effectively would significantly harm our business, operating results and financial condition.

7

Our future success will depend on our ability to accomplish the following:

- license and develop leading technologies useful in our business;

- develop and enhance our existing products and services;

- develop new services and technologies that address the increasingly sophisticated and varied needs of prospective consumers; and

- respond to technological advances and emerging industry standards and practices on a cost-effective and timely basis.

Developing internet services and other proplietaty technology entails significant technical and business lisks, as well as substantial costs. We may use new technologies ineffectively, or we may fail to adapt our services, transaction processing systems and network infrastmcture to user requirements or emerging industly standards. If our operations face material delays in inti·oducing new services, products and enhancements, our users may forego the use of our se1vices and use those of our competitors. These factors could have a material adverse effect on our financial position and results of operations.

*Our business may be subject to government regulation and legal uncertainties that may increase the costs of operating our web portal, limit our ability to attract users, or inte.fere with future operations of the Company.*

There are currently few laws or regulations directly applicable to access to, or commerce on, the internet. Due to the increasing popularity and use of tl1e internet, it is possible that laws and regulations may be adopted, covering issues such as user plivacy, defamation, pticing, taxation, content regulation, quality of products and setvices, and intellectual property ownership and infringement. Such legislation could expose the Company to substantial liability as well as dampen the growth in use of tl1e internet, decrease the acceptance of tl1e internet as a c01mnunications and commercial medium, or require the Company to incur significant expenses in complying with any new regulations.

The applicability to the internet of existing laws governing issues such as gambling, property ownership, copyiight, defamation, obscenity and personal privacy is uncertain. The Company may be subject to claims that our setvices violate such laws. Any new legislation or regulation in the United States or abroad or the application of existing laws and regulations to the internet could damage our business. In addition, because legislation and other regulations relating to online games vaty by jurisdiction, from state to state and from countly to countly, it is difficult for us to ensure that our players are accessing our pottal from a jurisdiction where it is legal to play our games. We therefore, cannot ensure that we will not be subject to enforcement actions as a result of this uncettainty and difficulty in conti·olling access.

hi addition, our business may be indirectly affected by our suppliers or customers who may be subject to such legislation. Increased regulation of the internet may decrease ilie growth in the use of the internet or hamper ilie development of internet c01mnerce and online entettainment, which could decrease the demand for our setvices, increase our cost of doing business or oilietwise have a material adverse effect on our business, results of operations and financial condition.

*The protection of our intellectual property may be uncertain and we may face claims of others.*

Aliiough we have received patents and have filed patent applications with respect to cettain aspects of our technology, we generally do not rely on patent protection with respect to our products and technologies. Instead, we rely ptimarily on a combination of ti·ade secret and copylight law, employee and third patty non-disclosure agreements and other protective measures to protect intellectual propetty tights pettaining to our products and technologies. Such measures may not provide meaningful protection of our ti·ade secrets, know how or oilier intellectual property in the event of any unauthorized use, misappropriation or disclosure. Others may independently develop similar technologies or duplicate our technologies. In addition, to the extent iliat we apply for any patents, such applications may not result in issued patents or, if issued, such patents may not be valid or of value. Third patties could, in ilie future, assett infiingement or 1nisapproptiation claims against us wiili respect to our current or future products and technologies, or we may need to assett clain1Sof infringement against third patties. Any infi·ingement or misappropriation claim by us or against us could place significant sti·ain on our financial resources, divert management's attention from our business and harm our reputation. The costs of prosecuting or defending an intellectual propetl1y clain1could be substantial and could adversely affect our business, even if we ai·e ultimately successful in prosecuting or defending any such clai111S. If our products or technologies are found to infri·inge the rights of a thil·d patty, we could be reqtm·ed to pay significant damages or license fees or cease production, any of which could have material adverse effect on our business. If a claim is brought against us, or we ultimately prove unsuccessful on the clainlS on our metits, this

could have a material adverse effect on our business, financial condition, results of operations and future prospects.

*Any failure to maintain or protect our patent assets or other intellectual property rights could significantly impair our return on investment from such assets and harm our brand, our business and our operating results.*

Our ability to compete in the intellectual property market largely depends on the superiority, uniqueness and value of our acquired patent assets and other intellectual property. To protect our proprietary rights, we will rely on a combination of patent, trademark, copyright and trade secret laws, confidentiality agreements with our employees and third parties, and protective contractual provisions. No assurances can be given that any of the measures we undertake to protect and maintain our intellectual property assets will have any measure of success.

8

Following the acquisition of patent assets, we will likely be required to spend significant time and resources to maintain the effectiveness of those assets by paying maintenance fees and making filings with the USPTO. We may acquire patent assets, including patent applications, which require us to spend resources to prosecute the applications with the USPTO. Further, there is a material risk that patent related claims (such as, for example, infringement claims (and/or claims for indemnification resulting therefrom), unenforceability claims, or invalidity claims) will be asse11ed or prosecuted against us, and such asse11ions or prosecutions could materially and adversely affect our business. Regardless of whether any such claims are valid or can be successfully asse11ed, defending such claims could cause us to incur significant costs and could dive11 resources away from our other activities.

Despite our effo1ts to protect our intellectual prope11y rights, any of the following or similar occtrences may reduce the value of our intellectual prope11y:

- our applications for patents, trademarks and copyrights may not be granted and, if granted, may be challenged or invalidated;

- issued trademarks, copyrights, or patents may not provide us with any competitive advantages versus potentially infringing parties;

- our effo11s to protect our intellectual prope11y rights may not be effective in preventing misappropriation of our technology; or

- our effo11s may not prevent the development and design by others of products or technologies similar to or competitive with, or superior to those we acquire and/or prosecute.

Moreover, we may not be able to effectively protect our intellecnial prope11y rights in ce11ain foreign countiies where we may do business in the funrre or from which competitors may operate. Ifwe fail to maintain, defend or prosecute our patent assets properly, the value of those assets would be reduced or eliminated, and our business would be haimed.

*We are in a developing industry with limited revenues from operations.*

We have incmTed significant operating losses since inception and generate limited revenues from operations. A5 a result, we have generated negative cash flows from operations and have an accumulated deficit of $303,944 as of December 31, 2015. We are operating in a developing industiy based on a new technology and our prima1y source of funds to date has been through the isstiance of securities and bo1rnwing funds. There can be no assurance that management's efforts will be successful or that the products we develop and market will be accepted by consumers. If our products are ultimately unsuccessful in the mai·ket, this could have a mate1ial adverse effect on our business, financial condition, results of operations and future prospects.

*We face financial risks as we are a developing company.*

We have incmTed significant operating losses since inception and have limited revenue from operations. As a result, we have generated negative cash flows from operations and our cash balances continue to reduce. While we ai·e optimistic and believe appropriate actions are being taken to mitigate this, there can be no assurance that attempts to reduce cash outflows will besuccessful and this could have a material adverse effect on our business, financial condition, results of operations.

*We may fail to attract and retain qualified personnel.*

There is intense competition from other companies, research and academic institutions, government entities and other organizations for qualified personnel in the areas of our activities. If we fail to identify, attract, retain and motivate these highly skilled personnel, we may be unable to continue our marketing and development activities, and this could have a material adverse effect on our business, financial condition, results of operations and funrre prospects.

*Jfwe do noteffectivelcy manage growth or changes in our business, these changes could place a significant strain on our management and operations.*

To manage our growth successfully, we must continue to improve and expand our systems and infrastiucture in a timely and efficient manner. Our conti·ols, systems, procedures and resources may not be adequate to supp011 a changing and growing company. If our management fails to respond effectively to changes and growth in our business, including

acquisitions, this could have a material adverse effect on our business, financial condition, results of operations and future prospects.

*We need to manage growth in operations to maximize our potential growth and achieve our expected revenues. Our failure to manage growth can cause a disruption of our operations that may result in the failure to generate revenues at levels we expect.*

In order to maximize potential growth in our cmTent markets, we may have to expand our operations. Such expansion will place a significant strain on our management and our operational, accounting, and infotmation systems. We expect that we will need to continue to improve our financial controls, operating procedures and management infonnation systems. We will also need to effectively train, motivate, and manage our employees. Our failure to manage our growth could dismpt our operations and ultimately prevent us from generating the revenues we expect.

9

**General market risks**

*We may not be able to access credit.*

We face the 1isk that we may not be able to access credit, either from lenders or suppliers. Failure to access credit from any of these sources could have a material adverse effect on our business, financial condition, results of operations and future prospects.

*We may not be able to maintain effective internal controls.*

If we continue to fail to maintain the adequacy of our internal accounting controls, as such standards are modified, supplemented or amended from time to time, we may not be able to ensure that we can conclude on an on-going basis that we have effective internal controls over financial rep01ting in accordance with Section 404 of the Sarbanes--Oxley Act of 2002. Failure to achieve and maintain an effective internal control environment could cause us to face regulatory action and also cause investors to lose confidence in our rep01ted financial infonnation, either of which could have a mate1ial adverse effect on our business, financial condition, results of operations and future prospects.

**Securities market risks**

*Our stock price and trading volume may be volatile, which could result in losses for our stockholders.*

The equity markets may experience periods of volatility, which could result in highly vaiiable and m1predictable pricing of equity securities. The mai·ket p1ice of our Common stock could change in ways that may or may not be related to our business, our industry or our operating perfonnance and financial condition and could negatively affect our share price or result in fluctuations in the p1ice or trading volume of our Common stock. We cannot predict the potential impact of these periods of volatility on the p1ice of our Common stock. The Company cannot assure you that the mai"ket price of our Common stock will not fluctuate or decline significantly in the future.

*If our Common stock is de/isled from the NYSE MKT LLC, the Company would be subject to the risks relating to penny stocks.*

If our Common stock were to be delisted from trading on the NYSE MKT LLC and the trnding price of the Common stock were below $5.00 per share on the date the Common stock were delisted, trading in our Common stock would also be subject to the requirements of certain mies promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These mies require additional disclosure by broker-dealers in connection with any trades involving a stock defined as a "penny stock" and impose vai·ious sales practice requirements on broker-dealers who sell penny stocks to persons other than established customers and accredited investors, generally institutions. These additional requirements may discourage broker-dealers from effecting transactions in secmities that ai·e classified as penny stocks, which could severely limit the mai·ket price and liquidity of such securities and the ability of purchasers to sell such secmities in the secondary market. A penny stock is defined generally as any non-exchange listed equity secmity that has a mai·ket p1ice of less than $5.00 per share, subject to ce1tain exceptions.

*If we need additional capital to fund the growth of our operations, and cannot obtain sufficient capital, we may be forced to limit the scope of our operations.*

As we implement our growth strategies, we may experience increased capital needs. We may not, however, have sufficient capital to fund our future operations without additional capital investments. If adequate additional financing is not available on reasonable tenns or at all, we may not be able to can-y out our c01porate strategy and we would be forced to modify our business plans (e.g., limit our expansion, limit our mai·keting effo1ts and/or decrease or eliminate capital expenditures), any of which may adversely affect our finai1cial condition, results of operations and cash flow. Such reduction could materially adversely affect our business and our ability to compete.

Our capital needs will depend on numerous factors, including, without limitation, (i) our profitability or lack thereof, (ii) our ability to respond to a release of competitive products by our competitors, and (iii) the amount of our capital expenditures, including acquisitions. Moreover, the costs involved may exceed those originally contemplated. Cost savings and other economic benefits expected may not materialize as a result of any cost ovenuns or changes in market circumstances. Failure to obtain intended economic benefits could adversely affect our business, financial condition and operating perfonnances.

*We do not anticipate paying any cash dividends on our Common stock in the foreseeable future and our stock may not appreciate in value.*

We have not declared or paid cash dividends on our Common stock to date. We cmTently intend to retain our future earnings, if any, to fund the development and growth of our business. In addition, the terms of any existing or future debt agreements may preclude us from paying dividends. There is no guarantee that shares of our Common stock will appreciate in value or that the price at which our stockholders have purchased their shares will be able to be maintained.

---

*If securities or industry analysts do not publish research or reports about our business, or publish inaccurate or unfavorable research reports about our business, our share price and trading volume could decline.*

The trading market for our Common stock will, to some extent, depend on the research and reports that securities or industry analysts publish about us or our business. We do not have any control over these analysts. If one or more of the analysts who cover us should downgrade our shares or change their opinion of our business prospects, our share price would likely decline. If one or more of these analysts ceases coverage of our company or fails to regularly publish reports on us, we could lose visibility in the financial markets, which could cause our share price and volume to decline.

## Item lB. Unresolved staff comments

Not applicable.

## Item 2. Properties

Our principal corporate office is located at 500 Mamaroneck Avenue, Suite 320, Harrison, New York 10528, under a lease that expires on November 30, 2016. The Company believes our office is in good condition and is sufficient to conduct our operations.

## Item 3. Legal proceedings

On April 21, 2015, Gioia Systems, LLC ("Gioia") filed a complaint against the Company, the Company's majority owned subsidiary, MGT Interactive, LLC and Interactive directors with the United States District Court for the Southern District of New York. MGT Interactive, LLC was also included as a derivative plaintiff in the action. Gioia Systems, LLC's complaint asserts claims for breach of contract and breach of fiduciary duty relating to the September 3, 2013 Contribution Agreement and related agreements between Gioia, the Company and MGT Interactive, LLC. This litigation was settled on August 28, 2015 with the Company receiving cash consideration of $35.

On November 2, 2012, MGT Gaming filed a lawsuit (No. 3:12-cv-741) in the United States District Court for the Southern District of Mississippi alleging patent infringement against certain companies which either manufacture, sell or lease gaming systems alleged to be in violation of MGT Gaming's patent rights, or operate casinos that offer gaming systems that are alleged to be **in** violation of MGT Gaming's '088 patent, including Penn National Gaming, Inc. ("Penn"), and Amze Gaming America, Inc. ("Amze America"). An amended complaint added the '554 patent, a continuation of the '088 patent. In May 2014, Amze America successfully sought a stay of the Mississippi action pending resolution of a Petition filed by a co-defendant for Inter Parties Review ("IPR") with the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office ("PTO"), challenging the '088 Patent. Amze America and a related company, Aruze Macau, subsequently filed additional IPR Petitions seeking review of the '088 and '554 patents. Amze America also filed a Request that was subsequently denied for Ex Parte Re-examination of the '088 patent. On July 29, 2015, MGT, Amze America, Aruze Macau, and Penn agreed, through their respective counsel, to settle all pending disputes, including the Mississippi litigation and all proceedings at the PTO. The parties subsequently jointly terminated the Mississippi litigation and the PTO proceedings. The Company received a payment of $90, which was recorded as licensing revenue.

## Item 4. Mine safety disclosures

None.

11

PART II

**Item 5. Ma1·ket for registrant's common equity, related stockholder matters and issuer's purchases of equity securities**

**Market information**

Our Common stock is traded on the NYSE MKT LLC ("NYSE MKT") under the symbol "MGT."

The following table sets fo1th the high and low last repo11ed sales prices of our Common stock for each qua11erly period dmi.ng 2015 and 2014.

| | High | | Low | |
|---|---|---|---|---|
| **2015** | | | | |
| Fom1h qua11er | $ | 0.41 | $ | 0.22 |
| Third qua11er | | 0.43 | | 0.18 |
| Second qua11er | | 0.62 | | 0.35 |
| First qua11er | | 0.79 | | 0.36 |
| **2014** | | | | |
| Fom1h quai1er | $ | 1.08 | $ | 0.57 |
| Third qua11er | | 1.90 | | 0.64 |
| Second qua11er | | 2.00 | | 1.05 |
| First qua11er | | 2.73 | | 1.78 |

On Ap1il 11, 2016, the Company's Common stock closed on NYSE MKT at $0.24 per shai·e and there were 371 stockholders of record.

**Dividends**

The Company has never decla1·ed or paid cash dividends on its Common stock and has no intention to do so in the foreseeable fhture.

For the years ending December 31, 2015, and 2014, the Company issued an aggregate of 615 and 580 shares of Conve11ible Prefened Se1ies A stock respectively, as dividend shai·es. These issuances did not result in any proceeds to the Company.

**Securities authorized for issuance under equity compensation plans**

No option grants were issued during the yeai· ended December 31, 2015. Further reference is made to the infonnation contained in the Equity Compensation Plan table contained in Item 12 of this Annual Rep011.

**Issuer purchases of equity securities**

There were no repurchases of the Company's Common stock dming the year ended December 31, 2015.

**Item 6. Selected financial data.**

Not applicable.

Item 7. **Management's discussion and analysis of financial condition and results of operations**

**Executive summary**

MGT Capital Investments, Inc., a Delawai·e corporation ("MGT," "the Company," "we," "us"), was incorporated on November 27, 2000 as HTTP Technology, Inc. The Company was originally incorporated in Utah in 1977. MGT is comprised of the pai·ent company, its wholly---0wned subsidiaiies Medicsight, Inc. ("Medicsight"), MGT Spo11s, Inc. ("MGT Spo1ts"), MGT Studios, Inc. ("MGT Studios"), and its majority---0wned subsidia1y MGT Gaming, Inc. {"MGT Gaming"). MGT Studios also owns a controlling minority interest in the subsidiaiy M2P Americas, Inc. Our c01porate office is located in HaiTison,

New York.

MGT and its subsidiaries are principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industty. MGT's pmtfolio includes a social casino platfmm Slot Champ and minority stakes in the skill-based gaming platfmm MGT Play and fantasy spmts operator DraftDay Gaming Group, Inc. ("DDGG") (see Recent Development below).

12

*MGTSports*

MGT Spotts owns a minotity equity stake in DDGG, which operates a leading global business-to-business operator of daily fantasy spotts. DDGG supplies a foll white-label solution that allows businesses to patticipate in the fast growing skill-based game market. By using DDGG's white label solution, a business can offer a fantasy spotts product to its customers without incurring the ongoing technology costs and other capital expenditures. DDGG also owns and operates the DraftDay.com platfonn in the U. S.

On May 20, 2013, MGT Spotts completed the acquisition of 63% of the outstanding membership interests of FanTD LLC, a staitup daily fantasy spo1ts website. Dming the year ended December 31, 2014 the Company acquired the remaining 37% interest in FanTD.

On Ap1il 7, 2014, the Company completed the acquisition from Card Rmmers, Inc. of all business assets and intellectual propetty related to DraftDay.com. During it ownership, MGT transfonned DraftDay with a series of improvements to the platform technology and player experience. In addition, the Company was able to significantly reduce operating expenses and improve gross margin. MGT Spotts also became one of the first compatties to introduce an ente1p1ise quality B2B solution and signed several white label agreements. The Company also introduced transpai·ent financial reporting and strong internal controls, employing highly reliable and scalable technology. To ensure security and regulatoty compliance of the platfonn, MGT Spotts instituted industty leading KYC (know-your-customer) controls approved by major credit card processors and gaming attorneys. At the same time, DraftDay and its white label pattners maintained a user inte1face that is highly rated by players.

On September 8, 2015, the Compai1y and MGT Spotts entered into an Asset Purchase Agreement with Viggle, Inc. ("Viggle") and Viggle's subsidiaty DDGG, pursuant to which Viggle acquired all of the assets of the DraftDay.com business ("DraftDay.com") from the Company and MGT Spotts. In exchange for the acquisition of DraftDay.com, Viggle paid MGT Spotts the following: (a) 1,269,342 shares of Viggle's colillilon stock, since renamed Draftday Fantasy Spotts, hie. (NASDAQ: DDAY), (b) a promissoty note in the amount of $234 paid on September 29, 2015, (c) a promissoty note in the amount of $1,875 due Mai·ch 8, 2016, and (d) 2,550,000 shares of common stock of DDGG. In addition, in exchange for providing certain transitional se1vices, DDGG issued to MGT Spotts a waitrnt to purchase 1,500,000 shai·es of DDGG colillilon stock. Following consummation of the transaction, MGT Spotts owns an 11% equity interest in DDGG, Viggle (since renamed Draftday Fantasy Spotts, Inc.) owns 49%, and Spottech, Inc. owns 39%. As a result of the transaction, the Company has presented DraftDay.com as a discontinued operation. There can be no assurai1ce that the Company will be able to realize foll value of the above consideration, the Company has taken a reserve of $300 against the March 8, 2016 promissoty note and continues to monitor for fmther possible impairment.

On Mai·ch 24, 2016 (the "Effective Date"), the Company entered into an Exchange Agreement (the "Agreement") with DraftDay Fantasy Spotts, Inc. ("DraftDay"). The pmpose of the Agreement was to exchange that ce1tain outstanding protnissoty note (the "Note") in the principal amount of $1,875 issued on September 8, 2015, for other equity and debt securities ofDraftDay, after the Note went into default on March 8, 2016. On the Effective Date, the Note had an outstanding principal balance of $1,875 and accmed interest in the amount of $51 (the "Interest"). Pursuant to the Agreement, a pottion consisting of $825 of the outstanding principal of the Note was exchanged for 2,748,353 shai·es of DraftDay's common stock, and an additional pottion of $110 of the outstanding principal was exchanged for 110 shai·es (the "Preferred Shai·es") of a newly created class of prefetTed stock, the Series D Convettible PrefetTed Stock. The PrefetTed Shai·es are convertible into an aggregate of 366,630 shai·es of DraftDay's colillilon stock, except that conversions shall not be effected to the extent that, after issuance of the conversion shares, MGT's aggregate beneficial ownership (together with that of its affiliates) would exceed 9.99%. Finally, DraftDay agreed to make a cash payment to MGT Spotts for the total amom1t of Interest. In exchange for the forgoing, MGT Spotts at1d the Company agreed to waive all Events of Default under the Note prior to the Effective Date and to release DraftDay from any rights, remedies and claims related thereto. After giving effect to the forgoing, the remaining outstai1ding principal balance of the Note is $940 (the "Remaining Balance"). The Remaining Balance of the Note shall continue to accme interest a rate of 5% per annmn, and all tenns of the Note shall remain m1changed except that the maturity date is changed to July 31, 2016.

*MGTGaming*

MGT Gaining owns U.S. Patents 7,892,088 and 8,550,554 (the "'088 and '554 patents," respectively), both entitled "Ganling Device Having a Second Separate Bomising Event" and both relating to casino ganling systems in which a second game played on an interactive sign is triggered once specific events occur in a first game. On November 2, 2012, MGT Gaming filed a lawsuit (No. 3:12-cv-741) in the United States District Comt for the Southern District of Mississippi alleging

patent infringement against ce11ain companies which either manufacture, sell or lease gaming systems in violation of MGT Gaming's patent rights, or operate casinos that offer gaming systems in violation of MGT Gaming's '088 patent, including WMS Gaming, Inc. - a subsidia1y of Scientific Games, Inc. ("WMS")(NASDAQ: SGMS), Penn National Gaming, Inc. ("Penn") (NASDAQ GS: PENN), and Amze Gaming America, Inc. ("Amze America"). An amended complaint added the '554 patent, a continuation of the '088 patent. The allegedly infringing products include at least those identified under the trade names: "Amazon Fishing" and "Paradise Fishing."

On October 23, 2013 the U.S. District Corut severed the originally filed action into three separate actions: The Defendants in all three actions filed counterclaims denying infringement and asse1ting invalidity of both patents-in-suit. MGT Gaming filed appropriate responses, reasse1ting the validity and infringement of the '088 and '554 patents.

13

On November 4, 2013, WMS filed a Petition for Inter Patties Review ("IPR") with the United States Patent and Trademark Office ("PTO"), challenging the'088 patent-in-suit. On April 30, 2014 the Patent Trial and Appeal Board ("PTAB") instituted the IPR, allowing the IPR to proceed on all claims in suit. The IPR proceeding has subsequently been dismissed by agreement between WMS and MGT Gaining as pait of a settlement of all claims between WMS and MGT, including a dismissal of MGT's comt action against WMS.

Arnze Macau, a sister company of Amze, Arnze Ame1ica, subsequently filed its own IPR Petition seeking review of the '088 patent based on the same prior ait cited by WMS in its IPR. Aruze America also filed a Request for Ex Pa1te Reexamination of that patent and a Petition for IPR of the '554 patent, both based on different prior a1t. Amze Ame1ica's Reexamination Request has been denied by the PTO. Its Petition for IPR remains pending, with MGT's Preliminaiy Response dueon Mai·ch 16, 2015.

MGT sought distnissal of Aruze Macau's IPR Petition based on tl1e grounds tl1at Arnze Ame1ica, not Amze Macau, was the real patty in interest and/or was in privity with Amze Macau, and that the Amze entities delayed more than 12 months after the filing of MGT's infringement action against Amze America based on the '088 patent and are therefore batTed from filing an IPR against that patent. On Febrrnu.y 20, 2015, the PTAB denied MGT's request for disinissal of the Amze Macau IPR Petition, but granted MGT the right to conduct fi.u.1her discovery on the real patty in interest, privity and one-yeai· bat· issues that it had raised in its disinissal request. MGT is pursuing such discovery and will reasse1t the one-year bat·s well as addressing Amze Macau's ai·guments on the merits. The PTAB held an initial conference call in that proceeding on March 16, 2015, the same day that MGT's Prelimina1y Response to Aruze America's concmTent IPR Petition directed to the '554 patent was filed. MGT is seeking denial of that latter Petition on the grounds that Amze Ame1ica has not made out *aprimafacie* case of either anticipation or obviousness based on the p1ior a1t asse1ted in that proceeding.

By motions filed on May 12, 2014, Amze sought a transfer of the Mississippi infringement action to Nevada as well as a stay pending resolution of IPR proceedings before the PTAB. Only the latter motion has been granted and the Mississippi action remains stayed at present.

In addition, MGT Gaining owns two U.S. patents covering ce1tain features of casino slot machines. Both patents were asse1ted against alleged infringers in vaiious actions in federal comt in Mississippi. On July 29, 2015, MGT, Amze America, Amze Macau, and Penn agreed, through their respective counsel, to settle all pending disputes, including the Mississippi litigation and all proceedings at the PTO. The patties have subsequently jointly tenninated the Mississippi litigation and the PTO proceedings. The Company received a payment of $90, which was recorded as licensing revenue.

### *MGT St.udios*

MGT Studios is publisher of social gaines and real money gaines of skill.

On November 11, 2013, the Company entered into an Agreement and Plan of Reorgai1ization (the "Avcom Agreement") with MGT Capital Solutions, Inc., a wholly owned subsidia1y of the Compai1y, Avcom, Inc. and the stockholders and option holders of Avcom, Inc. ("Avcom"). Pursuant to the Avcom Agreement, the Company acquired 100% of the capital stock of Avcom. In consideration, the Prefened stockholders of Avcom received $550 in value of the Compai1y's Common stock and the Common stockholders and option holders of Avcom will receive an aggregate of $1,000 in value of the Company's Common stock. The value of the Company's Common stock is based on the volume weighted average closing p1ice for the 20 trading days p1ior to signing the Avcom Agreement. The acquisition contemplated by the Avcom Agreement closed on November 26, 2013.

On December 4, 2013, the Company entered into a Strategic Alliance Agreement with M2P Ente1tainment GmbH, a Geiman corporation ("M2P"), the newly fonned Delawai·e corporation, M2P Americas, Inc. ("M2P Ame1icas") and the Company's existing subsidiary MGT Studios. The purpose of the transaction is to allow M2P Ame1icas to market and exploit MP2's gaming technology in N01th and South America through M2P Americas. As pa1t of the transaction, the Company acquired 50.1% of M2P Americas and M2P acquired 49.9%. The Strategic Alliance Agreement provides that the Company and M2P will jointly cooperate to lam1ch M2P's gaming technology in No111l and South America. It fi.u.1her provides M2P Americas with an exclusive royalty free license to M2P's ganring technology for N011h and South America.

Pursuant to the tenns of the Strategic Alliance Agreement, the Company will advai1ce ce1tain expenses to M2P Americas and the Company and M2P will provide network and human resources supp011 to M2P Americas. The pa11ies also entered into a Stockholders Agreement dated the saine date which, among other things, grants M2P an option to purchase 10% of the Company's ownership in M2P Americas at book value if the Compai1y does not purchase equity in M2P prior to April

2, 2014.  This agreement was subsequently amended to extend the pmchase date to May 31, 2014.

14

On May 31, 2014, M2P exercised its option to purchase 10% of the outstanding equity interests of M2P Ame1icas from the Company. As a result, the Company's ownership of M2P Ame1icas is now 40.1%, and M2P's ownership is 59.9%.

MGT filed a completed application for a New Jersey Casino Service Industy Enterprise License ("CSIE"). According to regulations promulgated by the New Jersey Division of Gaming Enforcement (NJDGE), companies providing Internet gaming software or systems, and vendors who manage, conti·ol, or administer games and associated wagers conducted through the Internet, must obtain a CSIE. The Company expects a dete1m.ination from NJDGE after it reviews the Personal History Disclosure fo1ms to be provided by a significant minority stockholder of the Company. Completion of this pape1work is beyond the control of MGT; therefore, the Company is unable to predict when or if a CSIE License will be granted.

### *MGT Interactive*

On September 3, 2013, the Company entered into a Conti·ibution and Sale Agreement (the "Contlibution Agreement") by and among the Company, Gioia Systems, and LLC ("Gioia") and MGT Interactive, LLC whereby MGT Interactive acquired ce1tai11 assets from Gioia which was the inventor and owner of a proprietary method of card shuffling for the online poker market. Trademarked under the name Real Deal Poker, the technology uses patented shuffling machines, along with pe1mutatio11 re-sequencing, allowing for the creation of up to 16,000 decks per 1ninute in real time. The acquisition includes seven (7) U.S. Patents and several Internet URL addresses, including www.RealDealPoker.com. Pursuant to the Contl"ibution Agreement, Gioia conti·ibuted the assets to MGT Interactive in exchange for a 49% interest in MGT Interactive and MGT contributed $200 to MGT Interactive in exchange for a 51% interest in MGT Interactive. The $200 cont1ibuted by the Company has been utilized as working capital to cover the direct and associated costs relating to the achievement of a ce11ification from Gaming Laborat01ies International ("GLI"). The Company has the right to acquire an additional 14% ownership interest in MGT Interactive from Gioia in exchange for a purchase price of $300 after GLI ce11ification is obtained. Gioia, in tum, will have the right to re-acquire the 14% interest for a pe1iod of three years at a purchase p1ice of $500. Gioia shall have the right to ce1tain royalty payments from the gross rake payments, and any licensing or royalty income received by MGT Interactive after ce1tain revenue targets are exceeded.

On August 28, 2015, the Company and MGT Interactive along with Gioia entered into an Assignment and Sale Agreement (the "Agreement"). MGT Interactive sold ce1tain tangible and intellectual prope1ty assets in exchange for Gioia's 49% membership interest in Interactive along with a cash payment of $35. The Agreement also required Gioia to cause the Comt to dislniss its complaint against the Company. As a result of the Agreement, the Company recognized a $144 loss on sale of assets.

### *Medicsight*

Medicsight owns medical imaging software that has received U.S. FDA approval and European CE Mark. The software is designed to detect colorectal polyps dming a virtual colonoscopy performed using CT Tomography. Software sales have been ve1y 1ilnited in the past two years. The Company also has developed an automated carbon dioxide insufflation device and receives royalties on a per-unit basis from an international manufacturer. On June 30, 2013, the Company completed the sale of Medicsight's global patent pmtfolio to Samsung Electi·onics Co., Ltd. for gross proceeds of $1.5 1nillion.

15

**Results of operations**

The Company ctmently has two operational segments, Gaming and Intellectual Prope1ty. Software, Devices, and Services are no longer considered separate business segments and have been merged into the Intellectual Prope1ty segment. Ce1\1ain corporate expenses are not allocated to a paiticular segment.

*Years ended December 31, 2015 and 2014*

The Company achieved the following results for the yeai·s ended December 31, 2015, and 2014, respectively:

- Revenues from continuing operations totaled $104 (2014: $94);

- Operating expenses were $2,821 (2014: $4,114);

- Losses of $1,068 from discontinued operations (2014: $1,609);

- Net loss attributable to Common shareholders was $4,781 (2014: $5,330) and resulted in a basic and diluted loss per shai·e of $0.35 (2014: $0.56). Net loss from continuing operations before non-controlling interest was $3,917 (2014: $4,156).

Our operating expenses decreased approximately 31% during the yeai· ended December 31, 2015 compared to year ended December 31, 2014. The decrease is prima1ily attiibuted to reductions in headcount, professional fees, corporate governance and stock-based compensation expense.

*Intellectual property*

In tlte yeai· ended December 31, 2015, tlte Company recognized $102 in revenue, prin1a1ily related to tlte non-recuning gaming patent licensing fee, compai·ed to $86 for the same peliod last yeai·, which was mostly attlibuted to the royalties on medical devices.

Selling, general and administrative expenses for tlte yeai·ended December 31, 2015 were $365 (2014: $487), in both years consisting of legal and consulting costs and tlte amo1tization of intellectual prope1ty assets.

In the year ended December 31, 2015 the company recognized an impairment of $474 related to the gaming patent (2014: $nil).

*Gaming -  Continuing operations*

Dming the year ended December 31, 2015, our selling, general and administrative expenses for this segment were $34 (2014: $1,199). In tlte prior yeai· the expenses consisted of employee compensation, infonnation technology ai1d office related expenses of MGT Studios. The company did not incur any reseai·ch and development costs for tlte year ended December 31, 2015, (2014: $188). The decreases are due to tlte headcount and overhead expense reductions in 2015 as tlte Company focused on monetizing DraftDay.com.

*Gaming -  Discontinued operations (DraftDay.com)*

Dming the yeai·ended December 31, 2015, the Company recognized $640 in revenues for this segment as compared to $963 for tlte same pe1iod last year. The revenues were lower in tlte cmTent yeai· as tlte Company sold tlte business in September 2015.

Our cost of revenue for tlte year ended December 31, 2015 was $225 (2014: $610), which p1imaiily consisted of overlay incmTed on the DraftDay.com website. Overlay is a promotional incentive for user activity with some contests paying out higher prize money titan entry fees. The decrease in 2015 is attiibuted to lower promotional activity as well as tlte sale of the business in September 2015.

Dming tlte year ended December 31, 2015, our selling, general and administrative expenses were $1,483 (2014: $1,962), mainly consisting of marketing expenses, employee compensation, infonnation technology and office related costs. The decrease is attlibutable to selling and discontinuing tlte operation duling the year ended December 31, 2015.

*Unallocated corporate l other*

Selling, general and administrative expenses during the year ended December 31, 2015 were $2,422 (2014: $2,240).

For the year ended December 31, 2015, non-operating expenses mainly consisted of a loss of $144 on the sale of assets, and an impairment charge of $556 on notes receivable. Duril1g the comparable period ended December 31, 2014, the Company's main non-operating expense was an iln pailment of $135 on intangible assets.

16

**Liquidity and capital resources**

| | Year ended December 31, | |
| | 2015 | 2014 |
|---|---|---|
| **Working capital summary** | | |
| Cash and cash equivalents (excluding $39 and $138 ofrestricted cash as of December 31, 2015 and December 31, 2014 respectively) | $    359 | $    648 |
| Other c1ment assets | 61 | 146 |
| Investments -  cunent | 444 | |
| Notes receivable | 1,575 | |
| Ctment assets -  Discontinued operations | | 838 |
| CtuTent liabilities | (79) | (391) |
| Ctment liabilities -  Discontinued operations | | (988) |
| **Working capital sm·plus** | $  **2,360** | $    **253** |

| | Year ended December 31, | |
| | 2015 | 2014 |
|---|---|---|
| **Cash (used in)/ provided by** | | |
| Operating activities | $ (2,424) | $ (3,076) |
| Investing activities | (152) | 2 |
| Financing activities | 2,499 | 1,466 |
| Discontinued operations | (212) | (2,116) |
| **Net decrease in cash and cash equivalents** | $ **(289)** | $ **(3,724)** |

On December 31, 2015, MGT's cash and cash equivalents were $359 excluding $39 of restricted cash. The Company continues to exercise discipline with respect to cmTent expense levels, as revenues remain limited. Our cash and cash equivalents decreased dming the year ended December 31, 2015, p1imarily due to $2,424 used in operating activities, the purchase of a $250 note receivable and $38 for the purchase of property and equipment. The decrease was mostly offset by the release of restricted cash and secmity deposit of $101, the sale of intangible assets of $35 and the receipt of net proceeds $1,644 and $855 from the At-The-Market sales of common stock and a ptivate placement sale of common stock, respectively.

*Operating activities*

Our net cash used in operating activities differs from the net loss predominantly because of various non-cash adjustments such as depreciation, amo1tization and impaitment of intangibles, stock-based compensation, reserve for notes receivable, loss on sale of assets, and the movement in working capital.

*Investing activities*

On September 8, 2015, the Company and MGT Spotts entered into an Asset Purchase Agreement with Viggle, Inc. ("Viggle") and Viggle's subsidia1y DDGG, pursuant to which Viggle acquired all of the assets of the DraftDay.com business ("DraftDay.com") from the Company and MGT Spotts. In exchange for the acquisition of DraftDay.com, Viggle paid MGT Spotts the following: (a) 1,269,342 shares of Viggle's common stock, since renamed Draftday Fantasy Spotts, Inc. (NASDAQ: DDAY), (b) a promissoty note in the amount of $234 paid on September 29, 2015, (c) a promissoty note in the amount of $1,875 due March 8, 2016, and (d) 2,550,000 shares of common stock of DDGG. In addition, in exchange for providing certain transitional services, DDGG issued to MGT Spotts a wanant to purchase 1,500,000 shares of DDGG common stock. Following consmnmation of the transaction, MGT Spotts owns an 11% equity interest in DDGG, Viggle (since renamed Draftday Fantasy Spotts, Inc.) owns 49%, and Spottech, Inc. owns 39%. As a result of the transaction, the Company has presented DraftDay.com as a discontinued operation. There can be no assurance that the Company will be able to realize full value of the above consideration, the Company has taken a reserve of $300 against the March 8, 2016 promisso1y note and continues to monitor for fmther possible impaument.

*Financing activities*

Dming the year ended December 31, 2015, the Company sold approximately 3,155,000 shares of Common stock under the At-The-Market agreement for gross proceeds of approximately $1,644, net of related fees.

On October 8, 2015, the Company entered into separate subscription agreements (the "Subscription Agreement") with accredited investors (the "Investors") relating to the issuance and sale of $700 of units (tl1e "Units") at a purchase price of $0.25 per Unit, with each Unit consisting of one share (the "Shares") of the Company's common stock, par value $0.001 per share (the "Common Stock") and a three year wanant (the "Wanants") to purchase two shares of Common Stock at an initial exercise priceof $0.25 per share (such sale and issuance, tl1e "Private Placement").

17

The Wa1rnnts are exercisable at a price of $0.25 on the earlier of (i) one year from the date of issue or (ii) the occmrnnce of certain corporate events, including a private or public financing, subject to approval of the lead investor, in which the Company receives gross proceeds of at least $7,500; a spinoff; one or more acquisitions or sales by the Company of ce1tain assets approved by the stockholders of the Company; or a merger, consolidation, recapitalization, or reorganization approved by the stockholders of the Company (each, a "Qualifying Transaction"). The Wan-ants may be exercised by means of a "cashless exercise" following the four-month anniversary of the date of issue, provided that the Company has consmnnated a Qualifying Transaction and there is no effective registration statement registering the resale of the shares of Common Stock underlying the Wanants (the "WatTant Shares"). The Company is prohibited from effecting an exercise of any Wanant to the extent that, as a result of any such exercise, the holder would beneficially own more than 4.99% of the nmnber of shares of Common Stock outstanding inunediately after giving effect to the issuance of shai·es of Common Stock upon exercise of such WatTant, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. The Wammts ai·e also subject to ce11ain adjustments upon ce11ain actions by the Company as outlined in the Wanants.

On December 22, 2015 the Company sold $172 of common stock at a price of $0.25 per shai·e in a Registered Direct offering.

**Risks and uncertainties related to our future capital requirements**

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the n01mal course of business. As of December 31, 2015, the Company had incmTed significai1t operating losses since inception and continues to generate losses from operations and has an accmnulated deficit of $303,944. These matters raise substantial doubt about the Company's ability to continue as a going concem. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of asset amounts or the classification of liabilities that might be necessa1y should the Compai1y be Ullable to continue as a going concern.

Commercial results have been linlited and the Company has not generated significant revenues. The Company cannot assure its stockholders that the Company's revenues will be sufficient to fund its operations. If adequate funds are not available, the Company may be required to cm1ail its operations significantly or to obtain funds through entering into anangements with collaborative pa11ners or others that may require the Company to relinquish tights to ce11ain of om technologies or products that the Company would not othe1wise relinquish.

The Company's p1ima1y somce of operating funds since inception has been debt and equity financings. On December 30, 2013, and as amended on March 27, 2014, the Company entered into an At-The-Market Offering Agreement (the "ATM Agreement") with Ascendiai1t Capital Markets, LLC (the "Manager"). Pursuant to the ATM Agreement, the Company may offer and sell shares of its Conunon Stock (the "Shai·es") having an aggregate offe1ing price ofup to $8.5 million from time to time through the Manager. The Company can use the net proceeds from any sales of Shares in tl1e offering for working capital, capital expendinu·es, and general business purposes. For the year ended December 31, 2015, the Company sold approximately 3,155,000 Shai·es under tl1e ATM Agreement for gross proceeds of approximately $1,695 before related expenses. The ATM Agreement expired by its te1ms in August 2015.

At December 31, 2015, MGT's cash, cash equivalents and restticted cash were $398. The Company intends to raise additional capital, either tlu-ough debt or equity financings or through the continued sale of the Company's assets in order to achieve its business plan objectives. Management believes that it can be successful in obtaining additional capital; however, no assurai1ce can be provided that the Company will be able to do so. There is no assurance that any funds raised will be sufficient to enable the Company to attain profitable operations or continue as a going concern. To the extent that the Company is unsuccessful, the Company may need to cm1ail or cease its operations and implement a plan to extend payables or reduce overhead until sufficient additional capital is raised to supp011 fut1her operations. There can be no assurance that such a plan will be successful.

**Off-balance sheet arrangements**

None.

**Ctitical accounting policies and estimates**

Our discussion and ai1alysis of financial condition and results of operations ai·e based upon om consolidated finai1cial statements, which have been prepai·ed in accordai1ce with accounting principles generally accepted in the United States of

Ame1ica ("GAAP"). TI1e notes to the consolidated financial statements contained in this Annual Rep01t desc1ibe our significant accounting policies used in the preparation of the consolidated financial statements. The preparation of these financial statements requires us to make estimates and assmnptions that affect tl1e rep01ted amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the rep01ted amounts of revenues and expenses dming tl1e rep01ting pe1iods. Actual results could differ from those estimates. We continually evaluate our critical accounting policies and estimates.

We believe the critical accounting policies listed below reflect significant judgments, estimates and assumptions used in the preparation of our consolidated financial statements.

18

*Intangible assets*

Intangible assets consist of patents, trademarks, domain names, software and customer lists. Estimates of future cash flows and timing of events for evaluating long-lived assets for impairment are based upon management's judgment. If any of our intangible or long-lived assets are considered to be impaired, the amount of impairment to be recognized is the excess of the canying amount of the assets over its fair value. Applicable long-lived assets are amo11ized or depreciated over the sho11er of their estin1ated useful lives, the estimated period that the assets will generate revenue, or the statut01y or contractual te1m in the case of patents. Estimates of useful lives and periods of expected revenue generation are reviewed periodically for appropriateness and are based upon management's judgment.

*Goodwill*

Goodwill represents the excess of the purchase price over the fair value of the assets acquired and liabilities assumed. The Company is required to pe1f01m impainnent reviews at each of its rep011ing units annually and more frequently in ce11ain circumstances. The Company perfonns the annual assessment on December 31.

In accordance with *ASC 350--20 "Goodwill",* the Company is able to make a qualitative assessment of whether it is more likely than not that a rep011ing unit's fair value is less than its canying amount before applying the tw<rstep goodwill impai.nnent test. If the Company concludes that it is more likely than not that the fair value of a rep011ing unit is not less than its carrying amount it is not required to perfonn the tw<rStep impainnent test for that rep011ing unit.

*Revenue recognition*

The Company recognizes revenue when it is realized or realizable and earned. We consider revenue realized or realizable and earned when there is persuasive evidence of an airnngement and that the product has been shipped or the services have been provided to the customer, the sales p1ice is fixed or detenninable and collectability is probable. Our material revenue streams are related to the delive1y of intellectual prope11Y license fees and gaming fees:

* *Licensing*-  License fee revenue is derived from the licensing of intellectual prope1fy. Revenue from license fees is recognized when notification of shipment to the end user has occuffed, there are no significant Company obligations with regai·d to implementation and the Company's services ai·e not considered essential to the functionality of other elements of the a1rnngement.

* *Gaming -*  Gaming revenue is derived from ently fees chai·ged in contests minus prizes paid out in contests.

*Stock-based compensation*

The Company recognizes compensation expense for all equity-based payments in accordance with *ASC 718 "Compensation - Stock Compensation".* Under fair value recognition provisions, the Company recognizes equity-based compensation net of an estin1ated forfeiture rate and recognizes compensation cost only for those shares expected to vest over the requisite service period of the awai·d.

Resti·icted stock awards are granted at the discretion of the Company. These awards are restricted as to the ti·ansfer of ownership and generally vest over the requisite service pe1iods, typically over an eighteen-month period (vesting on a sti·aight-line basis). The fair value of a stock award is equal to the fair market value of a share of Company stock on the grant date.

The fair value of option awai·d is estimated on the date of grant using the Black-Scholes option valuation model. The Black-Scholes option valuation model requires the development of assumptions that are input into the model. These assumptions are the expected stock volatility, the risk-free interest rate, the expected life of the option, the dividend yield on the underlying stock and the expected forfeiture rate. Expected volatility is calculated based on the histo1ical volatility of our Common stock over the expected option life and other appropriate factors. Risk-free interest rates are calculated based on continuously compormded 1isk-free rates for the appropriate tenn. The dividend yield is assumed to be zero as the Company has never paid or declared any cash dividends on our Common stock and does not intend to pay dividends on our Common stock in the foreseeable future. The expected fo1feiture rate is estin1ated based on historical experience.

Dete1mining the appropriate fair value model and calculating the fair value of equity-based payment awards requires the input of the subjective assumptions described above. The assmnptions used in calculating the fair value of equity-based

payment awards represent management's best estimates, which involve inherent UI1certainties and the application of management's judgment. As a result, if factors change and the Company uses different assumptions, our equity-based compensation could be materially different in the future. In addition, the Company is required to estimate the expected fmfeiture rate and recognize expense only for those shares expected to vest. If our actual forfeiture rate is materially different from our estimate, the equity-based compensation could be significantly different from what the Company has recorded in the cuuent period.

The Company accoUI1ts for share-based payments granted to non-employees in accordance with *ASC 505-40, "Equity Based Payments to Non-Employees"*. The Company determines the fair value of the stock-based payment as either the fair value of the consideration received or the fair value of the equity instmments issued, whichever is more reliably measurable. If the fair value of the equity instmments issued is used, it is measured using the stock price and other measurement assumptions as of the earlier of either (1) the date at which a commitment for pe1fo1mance by the coUI1terparty to earn the equity instruments is reached, or (2) the date at which the counte1paity's pe1fo1mance is complete. The fair value of the equity  instruments is re-measured each repmting period over  the requisite service period.

19

_Segment reporting_

Operating segments are defined as components of an enterprise about which separate financial infonnation is available that is evaluated regularly by the chief operating decision maker, or decision-making group in deciding how to allocate resources and in assessing performance. Our chief operating decision-making group is composed of the chief executive officer and chief financial officer. We operate in two operational segments, Gaming and Intellectual Prope1ty. Certain corporate expenses are not allocated to segments.

_Loss per share_

Basic loss per share is calculated by dividing net loss applicable to C01mnon stockholders by the weighted average number of Common shares outstanding dming the period. Diluted earnings per share is calculated by dividing the net earnings attributable to Co1mnon stockholders by the SIIII1 of the weighted average nmnber of Co1mnon shares outstanding plus potential dilutive Common shares outstanding dming the period. Potential dilutive securities, comprised of the conve1lible Prefened stock, unvested restricted shares and wanants, are not reflected in diluted net loss per share because such shares are anti-dilutive.

The computation of diluted loss per share for the year ended December 31, 2015, excludes 10,608 shares in connection to the Conve1tible Prefened stock and 3,820,825 wanants, as they are anti-dilutive due to the Company's net loss. For the year ended December 31, 2014, the computation excludes 9,993 shares in com1ection to the Conve1lible Prefened stock, 1,020,825 warrants and 110,000 unvested restricted shares, as they are anti-dilutive due to the Company's net loss.

_Recent accounting pronouncements_

In Februa1y 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-02, "Leases" (topic 842). The FASB issued this update to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The updated guidance is effective for annual periods beginning after December 15, 2018, including interim periods within those fiscal years. Early adoption of the update is pennitted. The Company is cmTently evaluating the impact of the new standard.

In September 2015, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") _2015-16,_ simplifying the _Accounting for Measurement - Period Adjustments_ that eliininates the requirement to restate prior period financial statements for measurement period adjustments. The new guidance requires that the cumulative impact of a measurement period adjustment (including the impact on prior periods) be recognized in the repo1ling pe1iod in which the adjustment is identified. The new guidance does not change what constitutes a measurement pe1iod adjustment. The Company does not expect the adoption of this ASU to significantly impact tl1e consolidated financial statements.

In August 2015, the FASB issuedASU _2015-15 "Interest-Imputation of Interest",_ final guidance that requires debt issuance costs related to a recognized debt liability to be presented in the balance sheet as a direct deduction from the debt liability rather than as an asset. This publication has been updated to reflect an SEC staff member's comment in June 2015 that the staff will not object to an entity presenting the cost of securing a revolving line of credit as an asset, regardless of whether a balance is outstanding. The Company does not expect the adoption of this ASU to significantly impact the consolidated financial statements.

In April 2015, the FASB issuedASU2015-05, "Intangibles - Goodwill and Other - _Internal-Use Software" (Subtopic 350--40)._ This ASU provides guidance about whether a cloud computing anangement includes a software license. If a cloud computing a1rnngement includes a software license, then the software license element of the anangement should be accounted for consistent with the acquisition of other software licenses. If a cloud computing anangement does not include a software license, the anangement should be accounted for as a service contract. For public business entities, the amendments will be effective for annual periods, including inte1in1 periods witlun those annual periods, beginning after December 15, 2015. Early adoption is pelTllitted. The Company is cmTently evaluating the impact of the adoption _ofASU 2015-05_ on our financial statements and disclosures.

**Item 7A. Quantitative and qualit.ative disclosure about.market risk**

We are a smaller repmting company and therefore, we are not required to provide infmmation required by this Item on Fonn 10-K.

**Item 8. Financial statements and supplementary data**

      See Financial Statements and Schedules attached hereto.

20

**Item 9. Changes in and disagreements with account.ants on accounting and financial disclosm·e**

None.

**Item 9A. Controls and procedures**

**(a) <u>Evaluation of disclosure controls and procedures</u>.**

Pursuant to Rule 13a-15(b) under the Exchange Act, the Company caiTied out an evaluation, with the participation of the Company's management, including the Company's Board of Directors and the Chief Executive Officer, of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) tmder the Exchange Act) as of the end of the pe1iod covered by this Repmt. Based upon that evaluation, the Compai1y's management concluded that the Company's disclosure controls and procedures were not effective to ensure that infonnation required to be disclosed by the Company in the repmts that the Company files or submits under the Exchange Act, is recorded, processed, smmnaiized and repmted, within the time peliods specified in the SEC's rules and fmms, and that such infonnation is accumulated and communicated to the Company's management to allow timely decisions regai·ding required disclosure.

**(b) <u>Management's annual 1·eport on internal control ove1· financial reporting</u>.**

Our management is responsible for establishing and maintaining adequate internal control over financial repmting as required tmder applicable United States securities regulatmy requirements. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, the company's chief executive and chief financial officers and effected by the company's boai·d of directors, management and other personnel, to provide reasonable assurance regarding the reliability of finai1cial repo1ting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pe11ain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company;

- provide reasonable assurance that transactions are recorded as necessaiy to pennit preparation of finai1cial statements in accordai1ce with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of mai1agement and directors of the company; and

- provide reasonable assurance regai·ding prevention or timely detection of unauthorized acquisition, use of disposition of the company's assets that could have a matelial effect on the financial statements.

Because of its inl1erent limitations, internal control over financial repmting may not prevent or detect all misstatements. A system of internal controls can provide only reasonable, not absolute, assurance that the objectives of the control system are met, no matter how well the system is conceived or operated. Projections of any evaluation of effectiveness to future pe1iods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteliorate.

Our management assessed the effectiveness of our internal control over financial rep011ing as of December 31, 2015. In making this assessment, our management used the criteria set fmth by the Com1nittee of Sponsoring Organizations of the Treadway Commission ("COSO") in 2013 in Internal Control Integrated Frainework. Based on that evaluation under this framework, our management concluded that our internal control over financial repo1ting was not effective because of the following significant deficiencies in our internal control over financial repo1ting:

- Due to our small number of employees and resources, we have li1nited segregation of duties, as a result of which there is insufficient independent review of duties pe1fonned;

- As a result of the litnited number of accountit1g personnel, we rely on outside consultants for the preparation of our financial repmts, it1cluding financial statements and management discussion and analysis, which could lead to overlooking items requit"ing disclosure.

This annual repo11 does not include a.ii attestation repo11 by our independent registered public accotmting fnm

regarding internal control over financial repo1ting. As we are neither a large accelerated filer nor an accelerated filer, our management's report was not subject to attestation by our registered public accounting fum pursuant to rules of the Securities and Exchange Commission that pennit us to provide only management's repo1t in this annual report.

**(c) <u>Changes in internal control over financial reporting</u>.**

On November 30, 2015, our Chief Financial Officer left the Company following expiration of his employment agreement. At that time, our Chief Executive Officer was named Interim Chief Financial Officer.

**Item 9B. Other information.**

None.

21

PART III

**Item 10. Directo1·s, Executive Office1·s and  Corporate Governance**

| N a m e | | Posit.ion |
|---|---|---|
| H. Robe1t Hohnes | 72 | Chai.Iman of the Board, Chai.Iman of the Nomination and Compensation Committee, Audit Committee Member, Independent Director |
| Michael Onghai | 46 | Chaitman of the Audit Committee, Nomination and Compensation Committee Member, Independent Di.t·ector |
| Robe1t B. Ladd | 57 | President, Chief Executive Officer, Principal Financial Officer and Di.t·ector |
| Joshua Silvennan | 45 | Audit Committee, Nomination and Compensation Committee Member, Independent Di.t·ector |

Di.t·ectors are elected based on experience, qualifications and in accordance with the Company's by-laws to serve until the next annual stockholders meeting and until thei.t· successors are elected in thei.t· stead. Officers are appointed by the Board and hold office until thei.t· successors are chosen and qualified, until thei.t· death or until they resign or have been removed from office. All corporate officers serve at the discretion of the Board. There are no family relationships between any director or executive officer and any other director or executive officer of the Company.

*H. Robert Holmes* was elected as a di.t·ector in  May 2012. From 2008 to 2012, Mr. Holmes hasserved on the board of Dejour Energies Inc. (NYSE-MKT: DEJ, 2008-2013). Mr. Hohnes was the founder and general pa1tner of Gilford Partners Hedge Fund. From 1980-1992, Mr. Hohnes was the Co-Founder, President of Gilford Securities, Inc. Previously, Mr. Hohnes served in  various positions with Paine Webber and Menill Lynch. Mr. Hohnes has se1ved on the Board of Tmstees N01th Central College in Naperville, II; Board of Tmstees of Sacred Hea1t Schools, Chai.Iman of Development Committee, in Chicago, IL; Board of Tmstees of Crested Butte Academy where he was Chairman of Development Committee; and the Board of Tmstees Maty Wood Counb.y Day School, Rancho Mirage, CA. The board believes that Mr. Hohnes has the experience, qualifications, attJ.ibutes and skills necessaty to se1ve as a di.t·ector because of his years of business experience and service as a di.t·ector for many companies over his career.

*Michael Onghai* was appointed a di.t·ector i.t1 May 2012. Mr. Onghai has been the CEO of LookSma1t (NASDAQ CM: LOOK), since Februa1y 2013. He has been the founder and chai.Iman of AppAddictive, an adve1tising and social commerce platfonn since July 2011. Mr. Onghai is the President of Snowy August Management LLC, a special situations fund concentrating on the Asian mat·ket, spin-offs and event-dtiven situations. Mr. Onghai is the founder of Stock Sheet, Inc., and Daily Stocks, hie. - tl1e web's early providers of finaticial information and search engine related content for financial inf01mation. Mr. Onghai has founded several other i.t1ternet technology companies for the last two decades. Mr. Onghai is an advisor to several internet incubators and is a panelist who advises FundersClub on which companies to accept for its pioneering venture capital platform. Mr. Onghai has earned his designation as a Chattered Financial Analyst (2006) and holds a B.S. in ElectJ.ical Engineering and Computer Science from the University of California, Los Angeles and graduated from the Executive Management Ce1tificate Program in Value Investing (The Heilbrunn Center for Graham & Dodd Investing) Graduate School of Busi.t1ess at Columbia Busi.t1ess School. The board believes that Mr. Onghai has the experience, qualifications, attJ.·ibutes and skills necessa1y to se1ve as a director and chaitman of the Audit Committee because of his years of business experience and financial expe1tise.

*Robert B. Ladd* joined the Company in December 2010 as a Di.t·ector. He was nained Interi.tnPresident and CEO in Febma1y 2011, and appointed President and CEO i.t1 Janua1y 2012. Mr. Ladd is the Managing Member of Laddcap Value Advisors, LLC, which se1ves as  the investJ.nent manager for various private pattnerships, including Laddcap Value Partners LP. Prior to fonni.t1g his investJ.nent company in 2003, Mr. Ladd was a Managing Di.t·ector at Neuberger Bennan, a large international money management furn cate1ing to individuals and institutions. From 1992 through November 2002, Mr. Ladd was a p01tfolio manager for va1ious high net w01th clients of Neuberger Bennan. P1ior to this experience, Mr. Ladd was a securities analyst at Neuberger from 1988 through 1992. Mr. Ladd is a f01mer Di.t·ector oflnFocus Systell1S, Inc. (NASDAQ-INFS, 2007 to 2009), and se1ved on the boai·d of Delcath Systell1S, Inc. (NASDAQ - DCTH, 2006--2012). Mr. Ladd has earned his designation as a Chattered Financial Analyst (1986). Based on Mr. Ladd's fatniliai·ity with the Company in se1ving as our Chief Executive Officer since 2011 and his overall background and experience as an executive in the financial industry, tl1e Nominating C01mnittee of the Boat·d concluded tliat Mr. Ladd has the requisite expe1ience, qualifications, atttibutes and skill necessa1y to se1ve as a member of the Board.

*Joshua Silverman* is the Co-founder, and is a Principal and Managing Pattner offroquois Capital Management, LLC, the Registered Investment Advisor to froquois Capital LP and froquois Capital (Offshore) Ltd. (collectively, **"Iroquois").** Mr. Silve1man has se1ved as  Co-ChiefInvestJ.nent Officer offroquois since i.t1ception in 2003. From 2000 to 2003, Mr. Silve1man

served as Co-Chief Investment Officer of Ve1tical Ventures, LLC, a merchant bank. Prior to fonning Iroquois, Mr. Silve1man was a Director of Joele Frank, a boutique consulting fum specializing in mergers and acquisitions. Previously, Mr. Silve1man served as Assistant Press Secreta1y to The President of The United States. Mr. Silvennan received his B.A. from Lehigh University in 1992. Based on Mr. Silve1man's overall background and experience as an executive in the financial industy, Board believes that Mr. Silve1man has the requisite experience, qualifications, attlibutes and skill necessa1y to serve as a member of the Board.

### Arrangements relative to appointment as Dfrector

Under an Amended and Restated Securities Purchase Agreement dated December 9, 2010 (the "Purchase Agreement") between the Company and Laddcap Value Pa1tners, LP (the "Purchaser"), the Purchaser agreed to purchase 195,000 shares of the Company's Common stock for $1,000. The Company appointed Robert B. Ladd, as director to fill the vacancy caused by the resignation of Tim Paterson-Brown. The Purchase Agreement closed on December 13, 2010. On Febrna1y 9, 2011, all 239,520 shares of the Company's Common stock held by the Purchaser were ti·ansfened from the Purchaser to Laddcap Value Pa1tners III LLC ("Laddcap"). Mr. Ladd is the managing member ofLaddcap.

---

22

On September 29, 2014, Iroquois Capital Management, LLC, Iroquois Master Fund and Joshua Silve1man (collectively, "Iroquois") entered into a settlement agreement with the Company (the "Iroquois Settlement Agreement"). Pursuant to the Iroquois Settlement agreement, Iroquois dropped all claims against the Company, and the Company agreed to: (i) nominate Joshua Silverman, together with H. Robert Holmes, Robe11 B. Ladd, and Michael Onghai (collectively, the "2014 Nominees"), for election to the Board at the Company's 2014 annual meeting of stockholders (the "2014 Annual Meeting"); (ii) recommend a vote for the 2014 Nominees and solicit proxies from the Issuer's stockholders for the election of the 2014 Nominees at the 2014 Annual Meeting; (iii) immediately appoint Mr. Silve1man as an observer to the Board until tl1e 2014 Annual Meeting; (iv) hold the 2014 Annual Meeting no later tl1an December 31,2014; and (v) appoint Mr. Silve1man to at least one committee of the Board promptly following the 2014 Annual Meeting, but in no event later than fifteen (15) business days thereafter.

**Involvement in cerfain legal proceedings**

To the best of our knowledge, during the past ten years, none of the following occu1Ted with respect to any director, director nominee or executive officer:

(l) any bankrnptcy petition filed by or against any business of which such person was a general pa11ner or executive officer either at the time of the bankruptcy or within two years p1ior to that time;

(2) any conviction in a c1iminal proceeding or being subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

(3) being subject to any order, judgment or decree, not subsequently reversed, suspended or vacated, of any com1 of competent jmisdiction, pe1manently or temporarily enjoining, baning, suspending or othe1wise limiting his or her involvement in any type of business, secmities or banking activities;

(4) being found by a com1 of competent jurisdiction (in a civil action), the SEC or the Commodities Futures Trading Commission to have violated a federal or state secmities or commodities law, and the judgment has not been reversed, suspended or vacated;

(5) being the subject of, or a pa11y to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated, relating to an alleged violation of:

    (i)    any federal or state securities or commodities law or regulation;

    (ii)    any law or regulation respecting financial institutions or insurance companies including, but not limited to, a tempora1y or pennanent injunction, order of disgorgement or restitution, civil money penalty or tempora1y or pe1manent cease-and-desist order, or removal or prohibition order; or

    (iii)    any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

(6) being the subject of, or a pat1y to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26))), any registered entity (as defined in Section l(a)(29) of the Commodity Exchange Act (7 U.S.C. l(a)(29))), or any equivalent exchange, association, entity or organization that has disciplinaiy authority over its members or persons associated with a member (covering stock, commodities or de1ivatives exchanges, or other SROs).

**Corporate code of ethics**

On June 25, 2012, the Board revised the Code of Conduct and Ethics which applies to all directors and employees including the company's p1incipal executive officer, p1incipal financial officer and principal accounting officer or persons perf01ming similar functions. Prior to June 25, 2012, the Company's employees and directors were subject to tl1e previous Code of Ethics adopted by the Board on December 28, 2007.

Copies of the Code of Business Conduct and Ethics, the Anti-Fraud Policy, the Whistleblower Policy and the MGT Shai·e Dealing Code can be obtained, without chai·ge by writing to the Corporate Secretai at MGT Capital Investments, Inc., 500 Mamaroneck Avenue, Suite 204, HaITison, NY 10528, or tl1rough our corporate website at mgtci.com.

23

## Section 16(a) beneficial ownership reporting compliance

Section 16(a) of the Exchange Act requires the Company's di.rectors, executive officers and persons who own more than 10% of the Company's stock (collectively, "Repo1ting Persons") to file with the SEC initial repo11s of ownership and changes in ownership of the Company's Common stock. Repmting Persons are required by SEC regulations to furnish the Company with copies of all Section l 6(a) repo11s they file. Other than as disclosed below and based solely on a review of the rep011s furnished to us, or w1itten representations from rep011ing persons that all repmtable transaction were repo11ed, we believe that dming the fiscal year ended December 31, 2015, our officers, directors and greater than ten percent stockholders timely filed all repmts and did not miss any filings as required to file under Section 16(a).

## Audit Committee and Audit Committee financial expe1·t

On November 25, 2004, the Board established an Audit Committee to cany out its audit functions. At December 31, 2015, the membership of the Audit Committee was Michael Onghai, H. Robe11 Holmes and Joshua Silvennan.

The Board has detennined that Michael Onghai, an independent director, is the Audit Committee financial expe11, as defined in Regulation S-K promulgated under the Exchange Act, serving on its Audit Committee.

## Item 11. Executive compensation

## Summary compensation table

The following table summarizes Fiscal Years 2015 and 2014 compensation for se1vices in all capacities of the Company's named executive officers and other individuals:

| N a m e | P_r.i.n_c._.in_a_l_P_o_sl_·t_io_n""""" | Y e a r | Salary | | Stock awards (1) | | All other compensation | | Total compensation |
|---|---|---|---|---|---|---|---|---|---|
| Robe11 B. Ladd | Chief Executive Officer | 2015 | $ 238 | $ | - | $ | 50 | $ | - | $ | 288 |
| | Interim Chief Financial Officer<2> | 2014 | $ 285 | $ | - | $ | - | $ | - | $ | 285 |
| Robe11 P. Traversa <3) | Chief Financial Officer | 2015 | $ 252 | $ | – | $ | – | $ | 21(4) | $ | 273 |
| | | 2014 | $ 275 | $ | – | $ | – | $ | - | $ | 275 |

(1) This column discloses the dollar amount of the aggregate grant date fair value of restricted stock granted in the year.

(2) Mr. Ladd was appointed Interim Chief Financial Officer on December 8, 2015.

(³) Mr. Traversa se1ved as Chief Financial Officer through November 30, 2015.

(4) Represents payments for accmed but unused vacation paid upon tennination on November 30, 2015.

## Grants of Plan-Based Awards

There were no plan-based awards in Fiscal 2015.

## Outstanding equity awards at Decembe1·31, 2015

There were no outstanding equity awards at December 31, 2015.

## Employment agreements

On November 19, 2012, the Company entered into an employment agreement with Robe11 B. Ladd, to act as its President and Chief Executive Officer. Upon execution of the agreement, Mr. Ladd was granted a $100 cash payment and 50,000 shares of restricted Common stock. The agreement provided for a two-year te1m, subject to automatic renewals. The agreement provided for a base sala1y of $285 per year. Pursuant to the employment agreement, Mr. Ladd is eligible for a cash and/or equity bonus as dete1mi.ned by the Compensation Committee. Pursuant to the agreement, in the event that Mr. Ladd

dies or is pennanently disabled or he is terminated without good cause or he resigns for Good Reason. Mr. Ladd is entitled to (i) a severance payment equal to the higher of his base salaiy for the remaining tenn of this agreement or twelve times the average monthly Base Sala1y paid or accrned dming the three full calendar months immediately preceding such detennination; (ii) expense compensation in an amount equal to twelve tin1es the sum of the average Base Salaiy dming the full calendar months preceding such tennination; (iii) immediate vesting of all stock options; (iv) vacation pay for any vacations days eained but not taken; (v) medical insmance for 12 months; and (vi) the cost of office space, not to exceed $3 per month. Good Reason includes a change of control. If payments ai·e subject to the excise tax imposed by Section 4999 of the Code, the Compaiiy will pay Mr. Ladd ai1 additional amount so that the net amom1t retained by Mr. Ladd shall be equal to what his Total Payments would have been without the Excise Tax and any state and local income taxes. If the Compai1y tenninates Mr. Ladd for Cause or Mr. Ladd resigns without Good Reason, he shall only be entitled to any compensation earned but not paid at such time. Mr. Ladd's employment agreement was filed as an exhibit to the Cunent Repo11 on Fo1m 8-K we filed with the SEC on November 23, 2012; all defined te1ms not othe1wise defined herein are defined in such employment agreement.

24

On Janua1y 28, 2014, the Company entered into an amendment to Mr. Ladd's employment agreement which extended the agreement's tenn for an additional year, through November 30, 2015. On September 28, 2015, the Company provided Mr. Ladd with written notice of its intent not to renew the employment agreement.

On October 7, 2015, the Company entered into an amended and restated employment agreement with Mr. Ladd, effective October 1, 2015. The agreement amends and restates in its entirety the employment agreement entered into between the Company and Mr. Ladd on November 19, 2012 as amended Janua1y 28, 2014. The tenn of the agreement shall expire on November 30, 2016, subject to automatic renewals of one year. Upon execution of the agreement, Mr. Ladd was granted 200,000 shares of restiicted common stock. The agreement provides for a base sala1y of $199.5 per year. Pursuant to the employment agreement, Mr. Ladd is eligible for a cash and/or equity bonus as dete1mined by the Compensation Committee. Pursuant to the agreement, in the event that Mr. Ladd dies or is pennanently disabled or he is tenninated without good cause or he resigns for Good Reason. Mr. Ladd is entitled to (i) a severance payment equal to the higher of his base salaiy for the remaining tenn of this agreement or twelve times tl1e average monthly Base Sala1y paid or accrued during the three full calendai· months immediately preceding such detennination; (ii) expense compensation in an amount equal to twelve times the sum of the average Base Salaiy during the full calendar months preceding such tennination; (iii) inlmediate vesting of all stock options; (iv) vacation pay for any vacations days eained but not taken; (v) medical insurance for 12 months; and (vi) the cost of office space, not to exceed $3 per month. Good Reason includes a change of conti·ol. If payments are subject to the excise tax imposed by Section 4999 of the Code, the Company will pay Mr. Ladd an additional amount so that the net amount retained by Mr. Ladd shall be equal to what his Total Payments would have been without the Excise Tax and any state a11d local income taxes. If the Company tenninates Mr. Ladd for Cause or Mr. Ladd resigns without Good Reason, heshall only be entitled to any compensation earned but not paid at such time. Mr. Ladd's employment agreement was filed as an exhibit to the Current Repo1t on Form 8-K we filed with the SEC on October 9, 2015; all defined te1ms not othe1wise defined herein ai·e defined in such employment agreement.

On November 19, 2012, the Company entered into an employment agreement with Robe1t P. Traversa to act as its Treasurer and Chief Financial Officer. The agreement provides for a two-year tenn, subject to automatic renewals. Upon execution of the agreement, Mr. Traversa was granted a $100 cash payment and 50,000 shares of restiicted Common stock. The agreement provides for a base sala1y of $275 per yeai·. Pursuant to the employment agreement, Mr. Traversa is eligible for a cash and/or equity bonus as dete1mined by the Compensation Committee. Pursuant to the agreement, in the event that Mr. Traversa dies or is pennanently disabled or he is te1minated without good cause or he resigns for Good Reason. Mr. Traversa is entitled to (i) a severance payment equal to the higher of his base sala1y for the remaining te1m of this agreement or twelve times the average monthly Base Sala1y paid or accrued during the three full calendar months inlmediately preceding such detennination; (ii) expense compensation in an amount equal to twelve times the sum of the average Base Sala1y dming the full calendar months preceding such tennination; (iii) inlmediate vesting of all stock options; (iv) vacation pay for any vacations days eained but not taken; (v) medical insurance for 12 months; and (vi) the cost of office space, not to exceed $3 per month. Good Reason includes a change of control. If payments are subject to the excise tax imposed by Section 4999 of the Code, the Company will pay Mr. Traversa an additional amount so that the net amount retained by Mr. Traversa shall be equal to what his Total Payments would have been without the Excise Tax and any state and local income taxes. If the Company tenninates Mr. Traversa for Cause or Mr. Traversa resigns without Good Reason, he shall only be entitled to a11y compensation ea111ed but not paid at such time. Mr. Traversa's employment agreement was filed as a11 exhibit to the Cmrnnt Rep01t on Fonn 8-K we filed with the SEC on November 23, 2012; all defined tenns not othe1wise defined herein ai·e defined in such employment agreement.

On Janua1y 28, 2014, the Company entered into an ainendment to Mr. Traversa's employment agreement which extended the agreement's tenn for an additional yeai·, through November 30, 2015. On September 28, 2015, the Company provided Mr. Traversa with wiitten notice of its intent not to renew the employment agreement. Mr. Traversa's employment with the Company tenninated on November 30, 2015, in accordance with the terms of his employment agreement.

25

## Director compensation

The following table sets forth the compensation of persons who served as a member of our Board of Directors during all or part of 2015, other than Robert B. Ladd and Robert P. Traversa whose compensations is discussed under "Executive Compensation" below and neither of whom is separately compensated for Board service.

| Name | Fees earned or eaid in cash | Stock awards | All other comeensation | Total |
|---|---|---|---|---|
| H. Robert Hohnes | $ 30 | $ | $ | $ 30 |
| Michael Onghai | $ 25 | $ | $ | 25 |
| Joshua Silvennan | $ 25 | $ | $ | 25 |

Directors are reimbursed for their out-of-pocket expenses inctmed in connection with the perfo1mance of Board duties.

## Independent director compensation

Our policy is each independent director receives annual compensation of $20. In addition, independent directors, receive $5 as total compensation for committee service. The Chaitman of the Board receives an additional $5. For fiscal year 2015, the Company does not propose any change in fees for the independent directors.

## Item 12. Security ownership of certain beneficial owners and management and related stockholder matters

## Securities authorized for issuance under equity compensation plans

No option grants were issued during the year ended December 31, 2015. The table below provides infotmation on our equity compensation plans as of December 31, 2015:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, wanantsand rights (b) | Number of secm·ities remaining available for future issuance under equity compensation plans (excluding secm·ities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by secmity holders | - | $ - | $ 1,780,808<1) |
| Equity compensation plans not approved by secmity holders | | | |
| Total | - | $ - | $ 1,780,808(1) |

(1) OnDecember 31, 2015, the Company's stockholders approved an increase of the number of shares of Common stock issuable under the Company's 2012 Stock Incentive Plan to 3,00,000 shares. As of December 31, 2015, the Company issued an aggregate of 1,219,192 restticted shares under the Company's 2012 Stock Incentive Plan, as amended.

## Security owner of certain beneficial owners

The following tables set forth ce1tait1 infotmation regarding beneficial ownership and voting power of the Common stock as of March 30, 2016, of:

- each person serving as a director, a nominee for diJector, or executive officer of the Company;

- all executive officers and directors of the Company as a group; and

- all persons who, to our knowledge, beneficially own more than five percent of the Common stock or Series A Prefened stock.

"Beneficial ownership" here means direct or indirect voting or investment power over outstanding stock and stock which a person has the 1ight to acquire now or within 60 days after March 30, 2016. See the accompanying footnotes to the tables below for more detailed explanations of the holdings. Except as noted, to our knowledge, the persons named in the tables beneficially own and have sole voting and investment power over all shares listed

Each share of Common stock has one vote per share of Common stock held and each share of Se1ies A Preferred stock has one vote per share of Series A Prefe1Ted stock held.

26

The following table sets fo11h ce1tain infmmation regarding beneficial ownership of Common stock as of April 11, 2016:

- each person knovm by the Company to be the beneficial owner of more than 5% of the outstanding Colillilon stock;

- each person serving as a director, a nominee for director, or executive officer of the Company; and

- all executive officers and directors of the Company as a group.

Percentage beneficially owned is based upon 18,098,221 shares of Common stock issued and outstanding as of April 11, 2016.

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| **Directors and officers** (I) | | |
| Robe1t B. Ladd <2> | 896,074 | 5.0% |
| Joshua Silve1man (3)<4><5> | 1,787,204 | 9.9% |
| H. Robe1t Holmes | 88,819 | * |
| Michael Onghai | 44,545 | * |
| **Total cu1Tent officers and directors as a group (3 persons)** | **2,816,642** | **15.6%** |

*\* Less than 1%*

(1) Unless othe1wise noted, the addresses for the above persons are care of the Company at 500 Mamaroneck Avenue, Suite 320, Hanison, NY 10528.

<2> Mr. Ladd owns 273,603 shares of Common stock directly. Mr. Ladd may also be deemed to be the beneficial owner of an additional 622,471 shares of Colillilon stock held by Laddcap Value Pa1tners III LLC, a Delaware limited liability company ("Laddcap"), by virtue of his ability to vote or control the vote or dispose or control the disposition of the shares of Common stock held by Laddcap through his position as Managing Member of Laddcap.

(3) As repo1ted on Amendment Number 4 to the Schedule 13D filed by, among others, Iroquois Capital Management, LLC ("Iroquois"), Iroquois Master Fund Ltd. and Mr. Silvennan with the SEC on October 2, 2014, Mr. Silvennan is a managing member of Iroquois and Iroquois Master Fund Ltd. Iroquois Master Fund Ltd. directly owns 1,339,096 shares of Common stock. Iroquois is the investment advisor to Iroquois Master Fund Ltd. As a managing member of Iroquois, Mr. Silve1man may be deemed the beneficial owner of the 1,339,096 shares of Common stock owned by Iroquois Master Fund Ltd.

<4> Included in Mr. Silvennan's beneficial ownership are 10,608 shares ofColillilon Stock issuable upon conversion of shares of Series A Conve1tible PrefetTed Stock and 437,500 shares of Colillilon Stock issuable upon the exercise of wa1Tants (exercisable at $3.00 per share until May 31, 2017), held by Iroquois Master Fund, Ltd. Excluded are 600,000 shares of common stock m1derlying wa1Tants (exercisable at $0.25 per share until October 7, 2018) that are not exercisable to the extent an exercise by the holder would result in the holder's beneficial ownership of the Company exceeding 4.99% of the issued and outstanding common stock. The holder's ownership has been so adjusted.

<5> Mr. Silve1man's address is 205 East 42nd St. 20th Fl., New York, New York 10017.

| | Nmnbers of shares beneficially | Percentage of Common equity beneficially |
|---|---|---|

|  | owned | owned |
|---|---|---|
| **5% beneficial owners** | | |
| Iroquois Capital Management, LLC[1][2] | 1,787,204 | 9.9% |
| Bany Honig <[3] | 1,557,823 | 8.6% |
| Robert Ladd <[4] | 896,074 | 5.0% |

[1]  Asrep01ted on Amendment Number 4 to the Schedule 13D filed by, among others, Iroquois, Iroquois Master Fund Ltd. and Joshua Silve1man with the SEC on October 2, 2014, Iroquois directly owns 48,378 shares of Common Stock and Iroquois Master Fund Ltd. directly owns 990,358 shares of Common Stock. Iroquois is the investment advisor to Iroquois Master Fm1d Ltd., such that Iroquois may be deemed the beneficial owner of the 990,358 shares of Common Stock owned by Iroquois Master Fund Ltd.

27

<2)  Included in Iroquois Capital's beneficial ownership are 10,608 shares of Common Stock issuable upon conversion of shares of Series A Conve1tible Prefened Stock and 437,500 shares of Common Stock issuable upon the exercise of wanants (exercisable at $3.00 per share until May 31, 2017), held by Iroquois Master Fund, Ltd. Excluded are 600,000 shares of common stock underlying wanants (exercisable at $0.25 per share until October 7, 2018) that are not exercisable to the extent an exercise by the holder would result in the holder's beneficial ownership of the Company exceeding 4.99% of the issued and outstanding common stock. The holder's ownership has been so adjusted.

(3)  As reported on Schedule 13G filed by among others, Barry Honig, Mr.  Honig holds 305,889 shares of common stock directly, holds 246,855 shares of common stock indirectly through GRQ Consultants, Inc. 401K, for which Mr. Honig is Tmstee and over which he holds voting and dispositive power, and holds 1,005,079 shares of common stock indirectly ilirough GRQ Consultants, Inc. Roth 401K FBO Bany Honig, for which Mr. Honig is Trustee and over which he holds voting and dispositive power. Excludes 1,600,000 shares of common stock issuable upon exercise of outstanding wanants held by GRQ Consultants, Inc. Roth 401K FBO Bany Honig. The wanants are not exercisable to the extent an exercise by the holder would result in the holder's beneficial ownership of the Company exceeding 4.99% of the issued and outstanding common stock  The holder's ownership has been so adjusted. Mr. Honig's address is 555 Soutl1Federal Highway, #450, Boca Raton, FL 33432.

(4)  Mr. Ladd owns 273,603 shares of Common stock directly. Mr. Ladd may also be deemed to be the beneficial owner of an additional 622,471 shares of Common stock held by Laddcap Value Pa1tners III LLC, a Delaware limited liability company ("Laddcap"), by virtue of his ability to vote or control the vote or dispose or control ilie disposition of the shares of Common stock held by Laddcap through his position as Managing Member of Laddcap.

## Item 13. Certain relationships and 1·elated transactions and director independence

### Director independence

Each of the Company's cuffent independent directors: H. Robe1t Holmes and Michael Onghai are considered independent under Section 803A of NYSE MKT rules, accordingly to which ilie Company must comply.

## Item 14 . Principal accountant fees and services

Marcum LLP ("Marcum") served as our independent auditors for the fiscal year ended December 31, 2014. On Janua1y 25, 2016, we dislnissed Marcmn, and Friedman LLP ("Friedman") became our independent auditor. The following is a summa1y of the fees billed to ilie Company for professional services rendered for the fiscal years ended December 31, 2015 and 2014.

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| Audit | $ | 193 | $ | 218 |
| Tax | | 74 | | 32 |
| | $ | 267 | $ | 250 |

Audit fees consist of fees billed for services rendered for the audit of our financial statements and review of our financial statements included in our quaiterly repo1ts on Form 10--Q.

Tax fees consist of fees billed for professional services related to the prepai·ation of our U.S. federal and state income tax returns and tax advice.

The Audit Comlnittee pre-approved all audit-related fees. After considering ilie provision of services encompassed wiiliin ilie above disclosures about foes, ilie Audit Comlnittee has detennined iliat the provision of such services is compatible with maintaining Marcmn's independence.

### Pre-approval policy of services performed by independent registered public accounting firm

The Audit Committee's policy is to pre-approve all audit and non-audit related se1vices, tax se1vices and other

services. Pre-approval is generally provided for up to one year, and any pre-approval is detailed as to the pa1ticular service or categ01y of services and is generally subject to a specific budget. The Audit Committee has delegated the pre-approval authority to its chairperson when expedition of services is necessa1y. The independent registered public accounting fum and management are required to periodically rep01t to the full Audit Committee regarding the extent of services provided by the independent registered public accounting fnm in accordance with this pre-approval and the fees for the services perf01med to date.

28

**PARTIV**

**Item 15. Exhibits and Financial Statement Schedules.**

**Financial statements**

The consolidated financial statements of the Company for the fiscal years covered by this Annual Rep01t are located on pages F-1 to F-23 of this Annual Report.

**Exhibit No.  Description**

| | |
|---|---|
| 2.1 | Articles of Merger ofMedicsight, Inc., a Utah corporation(l) |
| 2.2 | Ce1tificate of Merger of Medicsight, Inc., a Delaware corporation Cl) |
| 3.1 | Restated Ce1tificate of Incorporation ofMGT Capital Investments, Inc.([2]) |
| 3.2 | A.mended and Restated Bylaws ofMGT Capital Investments, Inc.c[3] |
| 10.10 | Common Stock Wanant dated May 9, 2012 (6) |
| 10.12 | Stockholder Agreement dated May 9, 2012, by and among J&S Gaming, Inc., MGT Gaming, Inc. and MGT Capital Investments, Inc. (6) |
| 10.16 | F01m of WaiTant (7) |
| 10.19 | F01m ofCe1tificate of Designationc[9] |
| 10.22 | Employment Agreement dated November 19, 2012, by and between the Company and Robe1t Ladd(IO) |
| 10.23 | Employment Agreement dated November 19, 2012, by and between the Company and Robe1t P. Traversa (IO) |
| 10.24 | Amendment to Executive Employment Agreement ofRobe1t B. Ladd as of Janua1y 28, 2014. (II) |
| 10.25 | Amendment to Executive Employment Agreement ofRobe1t P. Traversa as of Janua1y 28, 2014. (II) |
| 10.26 | Asset Purchase Agreement by and between the Compai1y and CardRunners Gaming, Inc. effective April 1, 2014. (12) |
| 21.1 | Subsidiai'ies* |
| 23.1 | Consent of Marcum LLP, independent registered public accounting film, dated April **14,** 2016* |
| 23.2 | Consent of Friedman LLP, independent registered public accounting film, dated Api'il 14, 2016* |
| 99.1 | Settlement Agreement, dated September 29, 2014, by and among MGT Capital Investments, Inc., Iroquois Capital Management L.L.C., Iroquois Master Fund Ltd. and Joshua Silve1man(B) |
| 31.1 | Ce1tification pursuant to Section 302 of tl1e Sarbanes-Oxley A.ct of 2002 of Principal Executive Officer* |
| 31.2 | Ce1tification pursuant to Section 302 of the Sai·banes-Oxley A.ct of 2002 of P1·incipal Financial and Accounting Officer* |
| 32.1 | Ce1tification pursuant to Section 906 of the Sai·banes-Oxley A.ct of 2002 of P1·incipal Executive Officer* |
| 32.2 | Certification pursuant to Section 906 of the Sai·banes-Oxley A.ct of 2002 of Principal Financial and Accounting Officer* |
| 101.INS | XBRL Instance Document* |
| 101.SCH | XBRL Taxonomy Extension Schema* |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document* |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document* |
| 101.LAB | XBRL Taxonomy Extension Labels Linkbase Document* |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document* |

*    Filed herewith

(1)    Incorporated herein by reference to the Company's Cunent Report on Form 8-K filed on Janua1y 19, 2007.
(2)    h1c01porated herein by reference to the Company's Quarterly Repo1t on Fo1m 10-Q, filed November 13, 2013.
(3)    Inc01porated herein by reference to the Company's Cunent Repo1t filed on F01m 8-K, filed Janua1y 30, 2014.
(4)    lnco1porated herein by reference to the Company's Quarterly Repo1t on Fonn 10-Q, filed November 12, 2009.
(5)    h1c01porated herein by reference to the Company's Annual Report on Fo1m 10-K filed Api'il 15, 2011.
(6)    Inc01porated herein by reference to the Company's Cunent Rep01t on F01m 8-K filed May 16, 2012.
(7)    lnco1porated herein by reference to the Company's Cunent Rep01t on Fotm 8-K filed May 30, 2012.
(8)    lnc01porated herein by reference to the Company's Cunent Rep01t on Fo1m 8-K filed October 9, 2012.
(9)    lnc01porated herein by reference to fue Company's Cunent Report on F01m 8-K filed October 26, 2012.

(10)   Incorporated herein by reference to the Company's Clment Report on Fonn 8-K filed October 26, 2012.

(11)   Incmporated herein by reference to the Company's Cunent Repmt filed on Fmm 8-K, filed January 30, 2014.

(12)   Inco1porated herein by reference to the Company's Cunent Repmt on Fo1m 8-K  filed April 7, 2014.

(13)   Incmporated herein by reference to the Company's Cunent Report on Fmm  8-K  filed September 29, 2014.

---

29

---

## SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this rep01t to be signed on its behalf by the undersigned, thereunto duly authorized.

April 14, 2016

MGT CAPITAL INVESTMENTS, INC

By: */s/* ROBERT B. LADD

Robe11 B. Ladd
*Chief Executive Officer*
*(Principal Executive Officer,*
*Principal Financial Officer)*

In accordance with the Exchange Act, this repo1t has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| */s/* Robe11 B. Ladd<br>Robe11 B. Ladd | President, CEO and Director<br>(Principal Executive Officer, Principal Financial Officer) | Aplil14,2016 |
| */s/* H. Robert Holmes<br>H. Robe1t Holmes | Director | Ap1il 14, 2016 |
| */s/* Michael Onghai<br>Michael Onghai | Director | Ap1il 14, 2016 |
| */s/* Joshua Silve1man<br>Joshua Silve1man | Director | Ap1il 14, 2016 |

30

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Audit Committee of the
Board of Directors and Shareholders
of MGT Capital Investments, Inc.

We have audited the accompanying consolidated balance sheet of MGT Capital Investments, Inc. and Subsidiaries (the "Company") as of December 31, 2014, and the related consolidated statements of operations, redeemable prefe1Ted stock and changes in stockholders' equity and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perfonn the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perfonn, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial rep01ting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial rep01ting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supp011ing the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements refe1Ted to above present fairly, in all material respects, the consolidated financial position of MGT Capital hlvestments, Inc. and Subsidiaries, as of December 31, 2014, and the consolidated results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

*Isl* Marcum LLP

New York, NY
April 15, 2015

(Except for the December 31, 2014 amounts appearing in the Reclassification of Discontinued Operations Section presented in Note 3 to the consolidated financial statements as to which the date is April 14, 2016.)

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and
Stockholders of MGT Capital Investments, Inc.

We have audited the accompanying consolidated balance sheet of MGT Capital Investments, Inc. (the "Company") as of December 31, 2015, and the related consolidated statements of operations and comprehensive loss, redeemable prefened stock and changes in stockholders' equity, and cash flows for the year ended December 31, 2015. MGT Capital Investments, Inc.'s management is responsible for these financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perfom1, an audit of its internal control over financial rep01ting. Our audit included consideration of internal control over financial repmting as a basis for designing audit procedures that a.re appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial repmting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supp01ting the a.mounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements refened to above present fairly, in all material respects, the financial position of MGT Capital Investments, Inc. as of December 31, 2015 and the results of its operations and its cash flows for year ended December 31, 2015 in conf01mity with accounting p1inciples generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assmning the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has incuned operating losses during the year ended December 31, 2015, and has negative cash flows from operations of $2,424,000. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regards to these matters are also discussed in Note 2. The consolidated financial statements do not include any adjustments that 1night result from the outcome of these unce1tainties. If the Company is unable to successfully refinance or raise capital to fund ongoing operations there would be a material adverse effect to the consolidated financial statements.

/s/ Friedman LLP

East Hanover, New Jersey
April 14, 2016

**MGTCAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share and per-share amounts)**

| | Year ended Decembe1· 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 359 | $ 648 |
| Accounts receivable | | 5 |
| Prepaid expenses and other cmTent assets | 61 | 141 |
| CtuTent assets – Discontinued operations | | 838 |
| Investments available for sale | 444 | |
| Notes receivable | 1,575 | |
| Total cmTent assets | 2,439 | 1,632 |
| | | |
| Non-cmTent assets | | |
| Restricted cash | 39 | 138 |
| Prope1ty and equipment, at cost, net | 35 | 11 |
| Prope1ty and equipment, at cost, net – Discontinued operations | | 32 |
| Intangible assets, net | 730 | 1,608 |
| Intangible assets, net – Discontinued operations | | 809 |
| Goodwill | 1,496 | 1,496 |
| Goodwill – Discontinued operations | | 4,948 |
| Investments, at cost | 1,380 | |
| Other non-cmTent assets | | 2 |
| Total assets | $ 6,119 | $ 10,676 |
| | | |
| **Liabilities and equity** | | |
| Ci.ment liabilities | | |
| Accounts payable | $ 63 | $ 199 |
| Accrued expenses | 15 | 180 |
| Ci.ment liabilities – Discontinued operations | | 988 |
| Other payables | 1 | 12 |
| Total cmTent liabilities | 79 | 1,379 |
| | | |
| Total liabilities | 79 | 1,379 |

**Commihnents and contingencies**
Redeemable conve1tible Preferred stock-Tempora1y equity
  Preferred stock, series A conve1tible preferred, $0.001 par value, 1,500,000 shares authorized at December 31, 2015 and 2014; 10,608 and 9,993 shares outstanding at December 31, 2015 and 2014, respectively

**Stockholders' equity**
  Undesignated Preferred stock, $0.001 par value; 8,583,840 and 8,583,840 shares authorized at December 31, 2015 and 2014, respectively. No shares issued and outstanding at December 31, 2015 and 2014 respectively

| | | |
| --- | --- | --- |
| Colllllllon Stock, $0.001 par value; 75,000,000 shares authorized; 17,928,221 and 10,731,160 shares issued and outstanding at December 31, 2015 and 2014, respectively | 18 | 11 |
| Additional paid-in capital | 311,167 | 308,288 |
| Accumulated other comprehensive loss | (1,206) | (281) |
| Accumulated deficit | (303,944) | (299,163) |
| Total stockholders' equity | 6,035 | 8,855 |
| Non-controlling interests | 5 | 442 |
| Total equity | 6,040 | 9,297 |

**Total equity, liabilities, redeemable convertible preferred stock and non--contrnlling**

**interest**                                                                $          **6,119** $          <u>**10,676**</u>

The  accompanying notes are an integral part of these Consolidated Financial Statements.

F-3

**MGTCAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(In thousands, except share and per-share amounts)**

| | Year ended December 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| **Revenues** | | |
| Licensing | $ 102 | $ 86 |
| Gaming | 2 | 8 |
| | 104 | 94 |
| **Cost of revenues** | | |
| Licensing | 5 | |
| **Gross margin** | **99** | **94** |
| **Operating expenses** | | |
| General and administrative | 2,821 | 3,926 |
| Research and development | | 188 |
| | 2,821 | 4,114 |
| **Operating loss** | **(2,722)** | **(4,020)** |
| **Other non-operating expense** | | |
| Interest and other expense | (23) | (1) |
| Impairment of notes receivable | (556) | |
| Impairment of intangible assets | (472) | (135) |
| Loss on sale of assets | (144) | |
| | (1,195) | (136) |
| **Net loss from continuing operations** | **(3,917)** | **(4,156)** |
| **Discontinued operations -  DraftDay.com** | | |
| Net loss from discontinued operations | (1,068) | (1,609) |
| Gain on termination of asset purchase agreement | 250 | |
| Loss on sale of assets | (387) | |
| | (1,205) | (1,609) |
| **Net loss** | **(5,122)** | **(5,765)** |
| Net loss attributable to non-controlling interest | 341 | 435 |
| **Net loss attributable to Common stockholders** | $ **(4,781)** | $ **(5,330)** |
| **Other comprehensive loss** | | |
| Realized loss on discontinued operations | 281 | |
| Unrealized loss on investments | (11206) | |
| **Comprehensive loss** | $ **(5,706)** | $ **(5,330)** |
| **Per-share data** | | |
| Basic and diluted loss per share -  continuing operations | $ (0.26) | $ (0.39) |
| Basic and diluted loss per share from discontinued operations | (0.09) | (0.17) |
| Basic and diluted loss per share | $ (0.35) | $ (0.56) |
| Weighted average number of Common shares outstanding | 13,894,355 | 9,493,057 |

The accompanying notes are an integral pa.ii of these consolidated financial statements.

F-4

## MGTCAPITAL INVESTMENTS, INC. AND SUBSIDIARIES
## REDEEMABLE PREFERRED STOCK AND CHANGES IN STOCKHOLDERS' EQUITY
### (In thousands)

| | Redeemable Convertible Preferred stock | | Common stock | | Additional paid-in C3£itaJ | Accumulated comprehensive income/ (loss) | Accumulated deficit | Total shareholders' e9ui!2' | Non-controlling interest | Total e9ui!2' |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | Shares | Amounts | | | | | | |
| **At January 1, 2014** | **9** | $ | **8,849** | $ | **9** | $ 304,886 | $ (281) | $ (293,833) | $ 10,781 | $ 2,107 | $ 12,888 |
| At-The-Market issuances | | | 1,403 | 2 | 1,464 | | | 1,466 | | 1,466 |
| Preferred share dividends issued | | | | | | | | | | |
| Acquisition of Draft Day | | | 95 | | 190 | | | 190 | | 190 |
| Acquisition of non-controlling interest | | | 53 | | 1,219 | | | 1,219 | (1,230) | (11) |
| Warrants issued for services | | | | | 80 | | | 80 | | 80 |
| Stock issued for services | | | 185 | | 159 | | | 159 | | 159 |
| Stock-based compensation | | | 147 | | 290 | | | 290 | | 290 |
| Net loss for the period | | | | | | | 51330) | 51330 | 435 | 5?65 |
| **At December 31, 2014** | **10** | $ | 10,732 | $ | 11 | $ 308,288 | $ (281) | $ (299,163) | $ 8,855 | $ 442 | $ 9,297 |
| At-The-Market issuances | | | 3,155 | 3 | 1,641 | | | 1,644 | | 1,644 |
| Preferred share dividends issued | | | | | | | | | | |
| Transfers from the non-controlling interest | | | | | 96 | | | 96 | (96) | |
| Stock-based compensation | | | 186 | | 130 | | | 130 | | 130 |
| Stock issued for services | | | 366 | | 161 | | | 161 | | 161 |
| Sale of Common stock | | | 3,489 | 4 | 851 | | | 855 | | 855 |
| Net loss for the period | | | | | | | (4,781) | (4,781) | (341) | (5,122) |
| Other comprehensive loss | | | | | | 925 | | 925 | | 925 |
| **At December 31, 2015** | **11** | $ | 17,928 | S | 18 | $ 311,167 | $ (1,206) | $ (303,944) | $ 6,035 | S $ | 6,040 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**MGTCAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | Year ended December 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| **Cash flows from operating activities** | | |
| Net loss | $ (5,122) $ | (5,765) |
| Net loss from discontinued operations | 1,205 | 1,609 |
| | (3,917) | (4,156) |
| **Adjustments to reconcile net loss to net cash used in operating activities** | | |
| Depreciation | 14 | 29 |
| Amortization of intangible assets | 227 | 325 |
| Stock-based expense | 291 | 449 |
| Impairment of notes receivable | 550 | |
| Loss on sale of assets | 144 | |
| Impairment of intangible assets | 472 | 135 |
| Wa1Tant expense | | 80 |
| **Change in operating assets and liabilities** | | |
| Accounts receivable | 5 | 38 |
| Prepaid expenses and other cu1Tent assets | 80 | (57) |
| Accounts payable | (136) | (2) |
| Accrned expenses | (165) | 90 |
| Other payables | 11 | (7) |
| Net cash used in operating activities | (2,424) | (3,076) |
| | | |
| **Cash flows from investing activities** | | |
| Release of restticted cash and security deposit | 101 | 2 |
| Purchase of property and equipment | (38) | |
| Sale of intangible assets | 35 | |
| Purchase of note receivable | (250) | |
| Net cash (used in)/ provided by investing activities | (152) | 2 |
| | | |
| **Cash flows from financing activities** | | |
| Proceeds from At-The-Market sales of Common stock, net of fees | 1,644 | 1,466 |
| Proceeds from sale of Common stock, net of fees | 855 | |
| Net cash provided by financing activities | 2,499 | 1,466 |
| | | |
| **Cash flows from discontinued operations - DraftDay.com** | | |
| Net cash used in operating activities | (212) | (2,013) |
| Net cash used in investing activities | | (103) |
| Net cash used in discontinued operations | (212) | (2,116) |
| | | |
| Net change in cash and cash equivalents - Discontinued operations | (807) | 536 |
| Cash and cash equivalents, beginning of period - Discontinued operations | 807 | 271 |
| Cash and cash equivalents, end of period - Discontinued operations | | 807 |
| | | |
| Net change in cash and cash equivalents - Continuing operations | (289) | (3,724) |
| Cash and cash equivalents, beginning of period - Continuing operations | 648 | 4,372 |
| **Cash and cash equivalents, end of period - Continuing operations** | $ **359** $ | **648** |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**MGTCAPITAL INVESTMENTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(In thousands)**

| | Year ended December 31, | |
|---|---|---|
| | **2015** | **2014** |
| Investments received in consideration for sale ofDraftDay.com | $ 3,030 | $ |
| Issuance of notes receivable in consideration for sale ofDraftDay.com | 2,109 | |
| Transfers from the non-controlling interest | 96 | 1,116 |
| Stock issued for acquisition ofDraftDay.com | | 190 |
| Stock issued for acquisition of non-controlling interest in FanTD | | 103 |
| **Assets disposed and liabilities h·ansferred through sale of assets** | | |
| Prope1ty and equipment - DraftDay.com | (16) | |
| Intangible assets - DraftDay.com | (561) | |
| Goodwill - DraftDay.com | (4,948) | |
| Intangible assets - MGT Interactive | (180) | |
| **Assets acquired and liabilities assumed through purchase of assets** | | |
| Intangible assets | | 790 |
| Player deposit liability | | (547) |

The accompanying notes are an integral part of these consolidated financial statements.

MGTCAPITAL INVESTMENTS, INC. AND SUBSIDIARIES
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(In thousands, except share and per-share amounts)

## Note 1. O1·ganization

MGT Capital Investments, Inc. ("MGT," "the Company," "we," "us") is a Delaware corporation, incorporated in 2000. The Company was originally incorporated in Utah in 1977. MGT is comprised of the parent company, wholly-owned subsidiaries Medicsight, Inc. ("Medicsight"), MGT Spo1ts, Inc. ("MGT Sports"), MGT Studios, Inc. ("MGT Studios"), and majority-owned subsidiary MGT Gaming, Inc. MGT Studios also owns a controlling minority interest in the subsidia1y M2P Americas, Inc. Our corporate office is located in HaITison, New York.

MGT and its subsidiaries are principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industy.

### Gaming

MGT's gaming pmtfolio includes a social casino platform Slot Champ and minority stakes in the skill-based gaming platfmm MGT Play and fantasy sports operator DraftDay Gaming Group, Inc. ("DDGG").

#### *Sale o(Dra(Way.com*

Effective September 3, 2015, the Company tenninated the Asset Purchase Agreement with Random Outcome ("RO") ("RO Agreement") originally entered into on June 11, 2015, as amended to date. According to its terms, the RO Agreement could be terminated by the Company or RO ifa closing had not occmTed by August 31, 2015. The RO Agreement provided for the sale of the DraftDay.com Business to RO for a purchase priceof (i) cash equal to the sum of (a) $4,000 and (b) $10 per day for the period starting July 15, 2015 and ending on the closing date and (ii) a three-year waITant to purchase 500,000 shares of RO Common stock at an exercise price of $1.00, a three-year waiTant to purchase 500,000 shares of RO Common stock at an exercise price of $1.33, and a three-year wa1Tai1t to pmchase 500,000 shares of RO Common stock at an exercise p1ice of $1.66. The non-refundable deposit of $250 was recorded as gain on termination of Asset Purchase Agreement in the income statement.

On September 8, 2015, the Company and MGT Spmts entered into an Asset Purchase Agreement with Viggle, Inc. ("Viggle") and Viggle's subsidia1y DDGG, pursuant to which Viggle acquired all of the assets of the DraftDay.com business ("DraftDay.com") from the Company and MGT Spmts. In exchange for the acquisition of DraftDay.com, Viggle paid MGT Spmts the following: (a) 1,269,342 shares of Viggle's common stock, since renamed Draftday Fantasy Spmts, Inc. (NASDAQ: DDAY), (b) a promissory note in the amount of $234 paid on September 29, 2015, (c) a promissory note in the amount of $1,875 due March 8, 2016, and (d) 2,550,000 shai·es of common stock of DDGG. In addition, in exchange for providing certain ti·ansitional services, DDGG issued to MGT Spmts a wainnt to pmchase 1,500,000 shares of DDGG common stock. Following consummation of the ti·ansaction, MGT Spmts owns an 11% equity interest in DDGG, Viggle (since renamed Draftday Fantasy Sports, Inc.) owns 49%, and Sportech, Inc. owns 39%. As a result of the ti·ansaction, the Company has presented DraftDay.com as a discontinued operation. There can be no assmance that the Company will be able to realize foll value of the above consideration, the Company has taken a reserve of $300 against the March 8, 2016 promissmy note and continues to monitor for fhither possible impairment. The Company has presented the MGT Spmts segment as a discontinued operation.

The following table summanzes fair values of the net assets assumed m consideration for the sale of the DraftDay.com Business assets:

| | | |
|---|---|---|
| Viggle Cormnon shares received at closing share priceof $1.30 | $ | 1,650 |
| Viggle promissory notes | | 2,109 |
| DDGG Common shares received at fail·mai·ket valueof $0.40 per share CI) | | 1,020 |
| DDGG stock purchase wa1Tants received (2) | | 360 |
| **Total consideration** | $ | **5,139** |

The transaction resulted iii a loss on the sale of $387.

(1)    DDGG Common shares were valued based on recent equity sales by DDGG to Viggle. Viggle purchased shares of DDGG at a price of $0.40 per share.

(2)    The Company determined fair value of the wanants received utilizing a Black-Scholes option pricing model. The Company utilized the following assumptions: fair value of Common share of DDGG stock - $0.40 per share, exercise price of $0.40, risk free rate of 0.65%, expected volatility of 98% which is the 3-year historical volatility of the Company's Common stock.

F-8

(3)   DraftDay.com assets consist of the following:

| | | |
|---|---|---:|
| IT equipment | $ | 17 |
| Domain | | 39 |
| Player deposit liability | | (786) |
| Cash - Player deposits | | 786 |
| Customer list | | 101 |
| Source Code | | 420 |
| Goodwill | | 4,948 |
| **Total** | $ | **5,525** |

Note: Viggle subsequently changed their name to Draft:Day.com Fantasy Spmts, Inc. and its ticker symbol changed from VGGL to DDAY.

**Intellectual property**

MGT Gaming owns two U. S. patents covering certain features of casino slot machines. MGT's wholly owned subsidia1y Medicsight owns U.S. Food and Dmg Administration ("FDA") approved medical imaging software and has designed an automated carbon dioxide insufflation device on which the Company receives royalties from an international distributor.

MGT Gaming owns U.S. Patents 7,892,088 and 8,550,554 (the "'088 and '554 patents," respectively), both entitled "Gaming Device Having a Second Separate Bonusing Event" and both relating to casino gaming systems in which a second game played on an interactive sign is triggered once specific events occur in a first game. On November 2, 2012, MGT Gaming filed a lawsuit (No. 3:12-cv-741) in the United States District Comt for the Southern District of Mississippi alleging patent infringement against ce1tain companies which either manufacture, sell or lease gaming systems alleged to be in violation of MGT Gaming's patent rights, or operate casinos that offer gaming systems that are alleged to be in violation of MGT Gaming's '088 patent, including Pellll National Gaming, Inc. ("Pellll") (NASDAQ GS: PENN), and Amze Gaming America, Inc. ("Amze Ame1ica"). An amended complaint added the '554 patent, a continuation of the '088 patent. The allegedly infringing products include "Amazon Fishing" and "Paradise Fishing."

By motion filed on May 12, 2014, Amze America sought a stay pending resolution of a Petition filed by a co-defendant for Inter Patties Review ("IPR") with the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office ("PTO"), challenging the'088 patent. As a result, the Mississippi action was stayed.

Aruze America and its sister company, Aruze Macau, subsequently filed additional IPR Petitions seeking review of the '088 and '554 patents. Amze America also filed a Request for Ex Pa1te Re-exa1nination of the '088 patent. Amze America's Re-examination Request has been denied.

On July 29, 2015, MGT, Aruze America, Aruze Macau, and Pellll agreed, through their respective counsel, to settle all pending disputes, including the Mississippi litigation and all proceedings at the PTO. The patties have subsequently jointly terminated the Mississippi litigation and the PTO proceedings. The Company received a payment of $90, which was recorded as licensing revenue.

*Sale of assets - MGT Interactive*

On Ap1il 21, 2015, Gioia Systems, LLC ("Gioia") filed a complaint against the Company, the Company's majority owned subsidia1y, MGT Interactive, LLC, Robe1t Ladd and Robe1t Traversa with the United States District Comt for the Southern District of New York. MGT Interactive, LLC was also included as a derivative plaintiff in the action. G.ioia's complaint asse1ts claims for breach of contract and breach of fiducia1y duty relating to the Contribution Agreement at1d related agreements. On July 19, 2015, the Company and the other defendants filed an at1swer, in which they denied the allegations, raised affumative defenses, and introduced several counterclaims against Gioia.

On August 28, 2015, the Company and MGT Interactive along with Gioia entered into an Assignment and Sale Agreement (the "Agreement"). MGT Interactive purchased the 49% membership interest that Gioia owned ofMGT Interactive and sold the certain tangible and intellectual prope1ty assets that MGT Interactive previously acquired from Gioia. Effective as of August 28, 2015, MGT Interactive il1evocably sold all assets and Gioia accepts all assets free and clea1· of all liens etc. In exchange for such assets, Gioia is to transfer the 49% membership interest to Interactive along with a cash payment of $35. As

a result of the Agreement, the Company recognized a $144 loss on sale of assets.

The following smmnarizes the recognition of the Agreement:

| | | |
|---|---|---|
| Cash | $ | 35 |
| Intangible assets | | (179) |
| **Loss on sale** | $ | **144** |

F-9

## Note 2. Going Concern and Management plans

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the n01mal course of business. As of December 31, 2015, the Company had incmTed significant operating losses since inception and continues to generate losses from operations and has an accumulated deficit of $303,944. These matters raise substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of asset amounts or the classification of liabilities that might be necessa1y should the Company be unable to continue as a going concern.

Commercial results have been limited and the Company has not generated significant revenues. The Company cannot assure its stockholders that the Company's revenues will be sufficient to fund its operations. If adequate funds are not available, the Company may be required to cmtail its operations significantly or to obtain funds through entering into arrangements with collaborative pa11ners or others that may require the Company to relinquish 1ights to ce1tain of our technologies or products that the Company would not othe1wise relinquish.

The Company's p1imary source of operating funds since inception has been debt and equity financings. On December 30, 2013, and as amended on March 27, 2014, the Company entered into an At-The-Market Offering Agreement (the "ATM Agreement") with Ascendiant Capital Markets, LLC (the "Manager"). Pursuant to the ATM Agreement, the Company may offer and sell shares of its Conunon Stock (the "Shares") having an aggregate offe1ing price ofup to$8.5 million from time to time through the Manager. The Company can use the net proceeds from any sales of Shares in the offering for working capital, capital expenditures, and general business purposes. For the year ended December 31, 2015, the Company sold approximately 3,155,000 Shares under the ATM Agreement for gross proceeds of approximately $1,695 before related expenses. The ATM Agreement expired by its tenns in August 2015.

At December 31, 2015, MGT's cash, cash equivalents and restiicted cash were $398. The Company intends to raise additional capital, either through debt or equity financings or through the continued sale of the Company's assets in order to achieve its business planobjectives. Management believes that it can be successful in obtaining additional capital; however, no assurance can be provided that the Company will be able to do so. There is no assurance that any funds raised will be sufficient to enable the Company to attain profitable operations or continue as a going concern. To the extent that the Company is unsuccessful, the Company may need to cmtail or cease its operations and implement a plan to extend payables or reduce overhead until sufficient additional capital is raised to suppo11 fmther operations. There can be no assurance that such a plan will be successful.

## Note 3. Summary of significant accounting policies

### Basis of presentation

The Company's financial statements have been prepared in accordance with accounting principles generally accepted in the United States of Ame1ica ("US GAAP") and the mies and regulations of the SEC.

### Use of estimates and assumptions and critical accounting estimates and assumptions

The preparation of financial statements in conf01mity with US GAAP requires management to make estimates and assumptions that affect the rep01ted amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date(s) of the financial statements and the rep01ted amounts ofrevenues and expenses during the repo1ting period(s).

Critical accounting estimates are estimates for which (a) the nature of the estimate is material due to the levels of subjectivity and judgment necessary to account for highly unce1tain matters or the susceptibility of such matters to change and (b) the impact of the estimate on financial condition or operating perfo1mance is material. The Company's critical accounting estimates and assumptions affecting the financial statements were:

(1) *Allowance for doubtful accounts:* Management's estimate of the allowance for doubtful accounts is based on historical sales, historical loss levels, and an analysis of the collectability of individual accounts; and general economic conditions that may affect a client's ability to pay. The Company evaluated the key factors and assumptions used to develop the allowance in dete1mining that it is reasonable in relation to the financial statements taken as a whole.

(2)  *Fair value of long-lived assets:* Fair value is generally determined using the asset's expected future discounted cash flows or market value, if readily determinable. If long-lived assets are determined to be recoverable, but the newly determined remaining estimated useful lives are shorter than originally estimated, the net book values of the long-lived assets are depreciated over the newly determined remaining estimated useful lives. The Company considers the following to be some examples of important indicators that may trigger an impairment review: (i) significant under-performance or losses of assets relative to expected historical or projected future operating results; (ii) significant changes it1 the manner or use of assets or it1 the Company's overall strategy with respect to the manner or use of the acquit·ed assets or changes in the Company's overall business strategy; (iii) significant negative .industry or economic trends; (iv) increased competitive pressures; (v) a significant decline in the Company's stock price for a sustained period of time; and (vi) regulatory changes. The Company evaluates acquit·ed assets for potential itnpaitment indicators at least annually and more frequently upon the occuITence of such events.

F-10

(3) *Valuation allowance for deferred tax assets:* Management assumes that the realization of the Company's net defe1Ted tax assets resulting from its net operating loss ("NOL") cany-fo1wards for Federal income tax purposes that may be offset against future taxable income was not considered more likely than not and accordingly, the potential tax benefits of the net loss cany-fo1wards are offset by a **full** valuation allowance. Management made this assumption based on (a) the Company has incm1Ted recm1Ting losses, (b) general economic conditions, and (c) its ability to raise additional funds to suppo1t its daily operations by way of a public or private offering, among other factors.

(4) *Estimates and assumptions used in valuation of equity instruments:* Management estimates expected tenn of share options and similar instrments, expected volatility of the Company's Common shares and the method used to estimate **it,** expected annual rate of qua1terly dividends, and 1isk free rate(s) to value share options and similar instruments.

These significant accounting estimates or assumptions bear the risk of change due to the fact that there are uncertainties attached to these estimates or assumptions, and certain estimates or assumptions are difficult to measure or value.

Management bases its estimates on historical experience and on various assmnptions that are believed to be reasonable in relation to the financial statements taken as a whole under the circumstances, the results of which fmm the basis for making judgments about the canying values of assets and liabilities that are not readily apparent from other sources.

Management regularly evaluates the key factors and assumptions used to develop the estimates utilizing ctUTently available info1mation, changes in facts and circmnstances, historical expe1ience and reasonable assmnptions. After such evaluations, if deemed approp1iate, those estimates are adjusted accordingly. Actual results could differ from those estimates.

## Principles of consolidation

All intercompany transactions and balances have been eliminated. Non-controlling interest represents the minority equity investment in MGT subsidia1ies, plus the minority investors' share of the net operating results and other components of equity relating to the non-controlling interest.

## Reclassification of discontinued operations

In accordance with *ASC 205-20* regarding the presentation of discontinued operations the assets, liabilities and activity of the DraftDay.com business have been reclassified as a discontinued operation for all periods presented.

Assets and liabilities related to the discontinued operations ofDraftDay.com are as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| Cash and cash equivalents | $ | - | $ | 806 |
| Otl1er cmTent assets | | | | 30 |
| Prope1ty and equipment | | | | 32 |
| Intangible assets | | | | 809 |
| Goodwill | | | | 4,948 |
| **Total assets** | $ | - | $ | **6,625** |
| | | | | |
| Accounts payable | $ | | $ | 46 |
| Player deposits | | | | 942 |
| **Total liabilities** | $ | - | $ | **988** |

DraftDay.com's losses for the years ended December 31, 2015 and 2014 are included in "Loss from discontinued operations" in the Company's Consolidated Statements of Operations and Comprehensive Loss.

F-11

Summarized financial infmmation for DraftDay.com's operations for the years ended December 31, 2015 and 2014 are presented below:

| | Year ended December 31, | |
|---|---|---|
| | **2015** | **2014** |
| Revenue | $ 640 | $ 963 |
| Cost of revenue | (225) | (610) |
| Gross margin | 415 | 353 |
| Operating expenses | (1,483) | (1,962) |
| **Net loss** | $ **(1,068)** | =$==(1,;;:::;:.6=0=9) |

## Business combinations

As specified in *ASC 805 "Business Combinations."* the Company adheres to the following guidelines: (i) record purchase consideration issued to sellers in a business combination at fair value on the date control is obtained, (ii) determine the fair value of any non-<:ontrolling interest, and (iii) allocate the purchase consideration to all tangible and intangible assets acquired and liabilities assumed based on their acquisition date fair values. The Company cmmnences repmting the results from operations on a consolidated basis effective upon the date of acquisition.

## Cash, cash equivalents and restricted cash

The Company considers investments with original maturities of three months or less to be cash equivalents. Restricted cash primarily represents cash not available for immediate and general use by the Company.

As of December 31, 2015, our cash balance was $359 (2014: $648). Of the total cash balance, $263 is covered under the US Federal Depository Insurance Corporation. We invest our cash in short-term deposits with major banks. Cash and cash equivalents consist of cash and temporary investments with original maturities of 90 days or less when purchased.

As of December 31, 2015 restricted cash was $39 (2014: $138), which included $nil (2014: $99) held in escrow relating to the sale of the Company's portfolio of medical imaging patents pending reclaim of foreign withholding tax. Proceeds from the patent sale were placed into escrow prior to receipt by the Company pursuant to an escrow agreement between the Compai1y and Munich Innovations GmbH (Note5). The escrow agent distributed the escrow deposit in accordance with and subject to any deductions specified in the patent sale agreement. The remaining $39 of restricted cash suppmts a letter of credit, in lieu of a rental deposit, for our Harrison, NY office lease.

## Investments

Equity security investments available for sale, at market value, reflect unrealized appreciation and depreciation, as a result of temporary changes in market value dming the period, in shareholders' equity, net of income taxes in "accumulated other comprehensive income (loss)" in the consolidated balance sheets. For non-publicly traded securities, market prices are detennined through the use of pricing models that evaluate securities. For publicly traded securities, market value is based on quoted market prices or valuation models that use observable mai·ket inputs.

*Investments available for sale*

| | |
|---|---|
| Viggle Common shai·es valued at $0.35 per shai·e | $ 444 |

For non-public, non-<:ontrolled investments in equity securities, the Compai1y uses the cost-method of accounting.

*Investments at cost*

| | |
|---|---|
| DDGG Common shai·es received at fair mai·ket value of $0.40 per shai·e | 1,020 |
| DDGG stock purchase wammts received | 360 |
| **Total** | $ **1,380** |

## Propel·ty and equipment

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated using the straight-line method on the various asset classes over their estimated useful lives, which range from two to five years.

**Intangible assets**

Intangible assets consist of pa.tents, trademarks, domain names, software and customer lists. Estimates of funue ca.sh flows and timing of events for evaluating long-lived assets for impaitment are based upon management's judgment. If any of our intangible or long-lived assets are considered to be impaired, the amount of impa.itment to be recognized is the excess of the canying amount of the assets over its fa.it· value. Applicable long-lived assets are am01tized or depreciated over the sho1ter of theit· estimated useful lives, the estimated period that the assets will generate revenue, or the sta.n1t01y or contracnial tenn in the case of pa.tents. Estirna.tes of useful lives and periods of expected revenue generation are reviewed pe1iodically for appropriateness and are based upon management's judgment.

F-12

## Goodwill

Goodwill represents the excess of the purchase p1ice over the fair value of the assets acquired and liabilities assmned. The Company is required to perfonn impainment reviews at each of its reporting units annually and more frequently in ce1tain circmnstances. The Company performs the annual assessment on December 31.

In accordance with *ASC 350-20 "Goodwill",* the Company is able to make a qualitative assessment of whether it is more likely than not that a repo1ting unit's fair value is less than its carrying amount before applying the two-step goodwill impainment test. If the Company concludes that it is more likely than not that the fair value of a repmting unit is not less than its canying amom1t it is not required to perfonn the two-step impairment test for that reporting unit.

## Virtual cuITency accrual

Users of the Company's website maintain virtual cmTency balances which are accumulated as users paiticipate in the Company's online gaines. The amounts may become payable in cash by the Company once the user's viltual cun-ency balance exceeds a ce1taitt minimmn threshold; a viltual cmTency balance of \$0.01 or \$0.02 based upon initial date of emollment on the site. User accounts expil·e after six months of inactivity. The Compai1y records an accrual for potential viltual cmTency payouts at the end of each repmting pe1iod based on histmical payout expe1ience and cmTent viltual cmTency balances. At December 31, 2015, and 2014, the Company recorded a liability of \$nil and \$10, respectively, relating to potential futm·e viltual cun-ency payouts.

## Revenue recognition

The Compai1y recognizes revenue when it is realized or realizable and earned. We consider revenue realized or realizable and earned when there is persuasive evidence of ai1 airnngement and that the product has been shipped or the services have been provided to the customer, the sales p1ice is fixed or detennitiable and collectability is probable. Our material revenue streams are related to the delive1y of intellectual prope1ty license fees and gaming fees:

- *Licensing-* License fee revenue is derived from the licensing of intellectual prope1ty. Revenue from license fees is recognized when notification of shipment to the end user has occun-ed, there are no significant Company obligations with regai·d to implementation and the Company's services ai·e not considered essential to the functionality of other elements of the a1rnngement.

- *Gaming -* Gaming revenue is derived from ently fees chai·ged in contests minus p1izes paid out in contests.

## Advertising costs

The Company expenses adve1tising costs as inc1med. During the yeai·s ended December 31, 2015 and 2014, respectively, the Company expensed \$nil and \$199 ili adve1tisil1g costs related to contilming operations.

## Stock-based compensation

The Company recognizes compensation expense for all equity-based payments in accordance with *ASC 718 "Compensation - Stock Compensation".* Under fair value recognition provisions, the Company recognizes equity-based compensation net of an estilnated forfeiture rate and recognizes compensation cost only for those shares expected to vest over the requisite service period of the awai·d.

Restt·icted stock awards are granted at the discretion of the Company. These awards ai·e restricted as to the tt·ansfer of ownership and generally vest over the requisite service periods, typically over an eighteen-month period (vesting on a stt·aight-line basis). The fail·value of a stock award is equal to the fail· market value of a share of Company stock on the grant date.

The Company accounts for share-based payments granted to non-employees in accordance with *ASC 505-40, "Equity Based Payments to Non-Employees".* The Company detennines the fail· value of the stock-based payment as either the fair value of the consideration received or the fail· value of the equity instluments issued, whichever is more reliably measurable. If the fair value of the equity instluments issued is used, it is measured using the stock price and other measurement assUlllptions as of the earlier of either (1) the date at which a committnent for perfo1mance by the counterpaity to earn the equity inst111ments is reached, or (2) the date at which the counterpa1ty's pe1f01mai1ce is complete. The fair value of

the equity instruments is re-measured each reporting period over the requisite service period.

**Income taxes**

       The Company applies the elements of *ASC 740-10 "Income Taxes - Overall"* regarding accounting for uncertainty in income taxes. This clarifies the accounting for uncertainty in income taxes recognized in financial statements and requires the impact of a tax position to be recognized in the financial statements if that position is more likely than not of being sustained by the taxing authority. As of December 31, 2015, the Company did not have any unrecognized tax benefits. The Company does not expect that the amount of unrecognized tax benefits will significantly increase or decrease within the next twelve months. The Company's policy is to recognize interest and penalties related to tax matters in the income tax provision in the Consolidated Statements of Operations. There was no interest and penalties for the years ended December 31, 2015 and 2014. Tax years beginning in 2012 are generally subject to examination by taxing authorities, although net operating losses from all years are subject to examinations and adjustments for at least three years following the year in which the attributes are used.

F-13

Defened taxes are computed based on the tax liability or benefit in foture years of the reversal of temponuy differences in the recognition of income or deduction of expenses between financial and tax rep01ting pmposes. The net difference, if any, between the provision for taxes and taxes cmTently payable is reflected in the balance sheet as defened taxes. Defened tax assets and/or liabilities, if any, are classified as cunent and non--cmTent based on the classification of the related asset or liability for financial rep011ing pmposes, or based on the expected reversal date for defened taxes that are not related to an asset or liability. Valuation allowances are recorded to reduce defened tax assets to that amount which is more likely than not to be realized.

Our effective tax rate for years 2015 and 2014, was 0% and 0%, respectively. The difference in the Company's effective tax rate from the Federal statutoty rate is primarily due to a 100% valuation allowance provided for all defened tax assets.

## Loss per share

Basic loss per share is calculated by dividing net loss applicable to Common stockholders by the weighted average number of Common shares outstanding dming the period. Diluted earnings per share is calculated by dividing the net earnings attributable to Common stockholders by the smn of the weighted average number of Common shares outstanding plus potential dilutive Common shares outstanding dming the period. Potential dilutive securities, comprised of the conve1tible Prefened stock, unvested restricted shares and wanants, are not reflected in diluted net loss per share because such shares are anti-dilutive.

The computation of diluted loss per share for the year ended December 31, 2015, excludes 10,608 shares in connection to the Conve1tible Prefened stock and 3,820,825 wanants, as they are anti-dilutive due to the Company's net loss. For the year ended December 31, 2014, the computation excludes 9,993 shares in connection to the Conve1tible Prefened stock, 1,020,825 wanants and 110,000 unvested restricted shares, as they are anti-dilutive due to the Company's net loss.

## Segment reporting

Operating segments are defined as components of an ente1prise about which separate financial infonnation is available that is evaluated regularly by the chief operating decision maker, or decision-making group in deciding how to allocate resources and in assessing performance. Our chief operating decision-making group is composed of the chief executive officer and chief financial officer. We operate in two operational segments, Gaming and Intellectual Propetty. Cettain c01porate expenses are not allocated to segments.

## Recent accounting pronouncements

In Februa1y 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-02, "Leases" (topic 842). The FASB issued this update to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key infonnation about leasing arrangements. The updated guidance is effective for annual periods beginning after December 15, 2018, including interim periods within those fiscal years. Early adoption of the update is pennitted. The Company is cmTently evaluating the impact of the new standard.

In September 2015, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") *2015-16,* simplifying the *Accounting for Measurement-Period Adjustments* that eliminates the requirement to restate p1ior period financial statements for measurement period adjustments. The new guidance requires that the cmnulative in1pact of a measurement period adjustment (including the impact on prior periods) be recognized in the rep01ting period in which the adjustment is identified. The new guidance does not change what constitutes a measurement period adjustment. The Company does not expect the adoption of this ASU to significantly impact the consolidated financial statements.

In August 2015, the FASB issuedASU *2015-15 "Interest-Imputation of Interest",* final guidance that requires debt issuance costs related to a recognized debt liability to be presented in the balance sheet as a direct deduction from the debt liability rather than as an asset. This publication has been updated to reflect an SEC staff member's comment in June 2015 that the staff will not object to an entity presenting the cost of securing a revolving line of credit as an asset, regardless of whether a balance is outstanding. The Company does not expect the adoption of this ASU to significantly impact the consolidated financial statements.

In April 2015, the FASB issued ASU 2015-05, *"Intangibles - Goodwill and Other - Internal-Use*

*Software" (Subtopic 35G-40).* Titis ASU provides guidance about whether a cloud computing an-angement includes a software license. If a cloud computing a1rnngement includes a software license, then the software license element of the anangement should be accounted for consistent with the acquisition of other software licenses. If a cloud computing arrangement does not include a software license, the an-angement should be accounted for as a service contract. For public business entities, the amendments will be effective for annual periods, including interim periods within those annual pe1iods, beginning after December 15, 2015. Early adoption is pennitted. The Company is cmTently evaluating the impact of the adoption of *ASU 2015-05* on our financial statements and disclosures.

F-14

## Note 4. Asset purchases and acquisitions of businesses

### DraftDay.com

On April 7, 2014, the Company closed on an Asset Purchase Agreement ("Agreement") with CardRunners Gaming, Inc. to acquire business assets and intellectual property related to Draft:Day.com for cash consideration of $600 and stock consideration of $190, consisting of 95,166 shares of Company's Common stock at $2.00 per share (valued on the date of close). The Company determined the acquisition constitutes a business in accordance with the guidance of *ASC 805 "Business Combinations."*

The following table summarizes the fair values of the net assets/liabilities assumed and the allocation of the aggregate fair value of the purchase consideration to assumed identifiable intangible assets:

| | | |
|---|---|---:|
| Cash | $ | 600 |
| Common stock- 95,166 shares at $2.00 per share | | 190 |
| **Total purchase price** | $ | **790** |
| | | |
| Cash | $ | 547 |
| Customer list | | 51 |
| Domains | | 64 |
| Website | | 675 |
| Player deposit liability | | (547) |
| **Total purchase price allocation** | $ | **790** |

### Pro-forma results

The following tables summarize, on an unaudited pro-forma basis, the results of operations of the Company as though the acquisition of DraftDay.com had occurred as of January 1, 2014. The pro-forma amounts give effect to appropriate adjustments of amortization of intangible assets and interest expense associated with the financing of the acquisition. The pro-forma amounts presented are not necessarily indicative of the actual results of operations had the acquisition transaction occurred as of January 1, 2014.

| Year ended December 31, 2014 | | MGT | | DraftDay | | Pro-forma total |
|---|---|---:|---|---:|---|---:|
| Revenues | $ | 1,056 | $ | 192 | $ | 1,248 |
| Net loss | | (5,330) | | (240) | | 5,570 |
| Loss per share of Common stock | | (0.56) | | | | (0.56) |
| Basic and diluted | | 9,493,057 | | | | 9,493,057 |

Refer to Note 1 for sale of DraftDay.com.

## Note 5. Goodwill and intangible assets

Goodwill represents the difference between purchase cost and the fair value of net assets acquired in business acquisitions. Indefinite lived intangible assets, representing trademarks a.rid trade names, a.i·e not amortized unless their useful life is determined to be finite. Long-lived intangible assets a.i·e subject to amortization using the straight-line method. Goodwill a.rid indefinite lived intangible assets are tested for impairment annually as of December 31, and more often if a triggering event occurs, by comparing the fair value of each reporting unit to its carrying value. As of December 31, 2015 and 2014, the Company assessed its intangibles for impairment and recognized a charge of $472 and $135, respectively. The Company concluded that a triggering event had occurred based on the overall deterioration of the market capitalization of the Company and evaluated the goodwill for possible impairment. After the evaluation, management concluded that no impairment existed based on the Company's current efforts to capitalize and execute its business plan relating to the asset.

The Company's intangible assets for continuing operations consisted of the following:

|  | Goodwill |
|---|---|
| **Balance, December 31, 2013** | $ 1,496 |
| Additions (disposals) | |
| **Balance, December 31, 2014** | 1,496 |
| Additions (disposals) | |
| **Balance, December 31, 2015** | $ 1,496 |

|  | Intangible assets |
|---|---|
| **Balance, December 31, 2013** | $ 1,714 |
| Disposals | |
| Additions | 354 |
| Impaiiment | (135) |
| Amo1tization | 325) |
| **Balance, December 31, 2014** | 1,608 |
| Disposals | (179) |
| Impaiiment | (472) |
| Amo1tization | 227) |
| **Balance, December 31, 2015** | $ 730 |

|  | Estimated remaining useful life | As of December 31, | |
|---|---|---|---|
|  |  | 2015 | 2014 |
| Intellectual prope11y | 6 years | $ 1,440 | $ 2,105 |
| Software and website development | 1 year | 65 | 65 |
| Less: Accumulated amortization |  | (775) | (562) |
| **Intangible assets, net** |  | $ 730 | $ 1,608 |

For the years ended December 31, 2015 and 2014, the Company recorded amortization expense of $227 and $325, respectively.

The following table outlines estimated future annual am01tization expense for the next five years and tl1ereafter:

|  | Intellectual l!rol!erty | Software and website develo(!ment | Total |
|---|---|---|---|
| 2016 | $ 155 | $ 18 | $ 173 |
| 2017 | 153 | | 153 |
| 2018 | 153 | | 153 |
| 2019 | 153 | | 153 |
| 2020 | 98 | | 98 |
| **Balance, December 31, 2015** | $ 712 | $ 18 | $ 730 |

## Note 6. Notes receivable

On Februaiy 26, 2015, the Company signed a letter of intent with Tera Group, Inc., owner of TeraExchange, LLC, a Swap Execution Facility regulated by the U.S. Commodity Futures Trading Commission, to negotiate a merger agreement. Since the merger agreement was not executed by the execution date, the merger was ab01ted. Simultaneous with the letter of mtent, on February 26, 2015, the Company purchased a promisso1y note in the principal amount of $250 bearmg interest at the rate of 5% per annum from the aggregate unpaid principal balance and all accmed and unpaid interest ai·e due and payable upon demand at any time after August 15, 2015. As of December 31, 2015, the Company has fully reserved against the collectability of this note and the conesponding accmed interest.

On December 31, 2015, the Company canied a Note from Viggle in the amount of $1,875. Due to the credit w011hiness ofViggle, the Company recognized an allowance of$300 (See "Note 17. Subsequent events" for restrnctured terms of the note receivable).

F-16

**Note 7. Property and equipment**

Property and equipment related to continuing operations consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Computer hardware and software | $ 38 | $ 125 |
| Furniture and fixtures | | 12 |
| | 38 | 137 |
| Less: Accumulated depreciation | 3) | 126) |
| **Property and equipment, net** | $ 35 | $ 11 |

The Company recorded depreciation expense of $14 and $29 for the years ended December 31, 2015 and 2014, respectively.

**Note 8. Accrued expenses**

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Professional fees | $ - | $ 100 |
| Independent director fees | 15 | 56 |
| Other | | 24 |
| **Total** | $ 15 | $ 180 |

**Note 9. Sel"ies A Convertible Preferred stock**

On November 2, 2012, the Company closed a private placement sale of 1,380,362 shares of Series A Conve11ible Prefened Stock ("Preferred Stock"), (including 2,760,724 wa1rnnts to purchase MGT Common Stock at a purchase price of $3.85 per share) for an aggregate of $4.5 million. This transaction was approved by the NYSE MKT on October 26, 2012. The Prefened Stock is convertible into the Company's Common Stock at a fixed price of $3.26 per share and canies a 6% dividend, payable in cash or additional Prefened Stock, at the election of the Company. As of December 31, 2015, no wammts from this transaction remain outstanding.

For the years ended December 31, 2015 and 2014, respectively, the Company issued 615 and 580 of Dividend Shares to the Prefened Stock holders.

**Significant te1·ms of the P1·eferred stock, as specified in the Certificate of Designation**

*Conversion option*

At any time, the Prefened Stock shall be convertible (in whole or in part), at the option of the Holder, into such nmnber of fully paid and non-assessable shares of Common stock as is determined by dividing (x) the aggregate Stated Value of $3.26 per shares ("Stated Value") of PreferTed stock that are being converted plus any accrued but unpaid dividends thereon as of such date that the Holder elects to convert by (y) the Conversion Price ($3.26) then in effect on the date (the "Conversion Date").

For the years ending December 31, 2015 and 2014, no Prefened shares were converted into shares of the Company's Common stock.

*Liquidation preference*

Upon the liquidation, dissolution or winding up of the business of the Corporation, whether volunta1y or involuntary, each holder of Prefened Stock shall be entitled to receive, for each share thereof, a preferential amount in cash equal to (and not more than) the Stated Value (the "Liquidation Amount") plus all accrued and unpaid dividends. As of December 31, 2015 and 2014, the liquidation preference value of the outstanding redeemable series A prefened stock is not material.

The PrefeITed Stock Certificate of Designation contains a fundamental transactions clause that provides for the conditional redemption of this secmity m1der certain circumstances that are not within the Company's sole control. Management has therefore concluded that the PrefeITed Stock requires temponuy equity classification in accordance with ASC 480-10-899 "Accounting for Redeemable Equity Instmments" at its allocated value. The canying amount of the PrefeITed Shares requires no adjustment unless and until the conditional redemption events are probable. The Company does not consider the conditional redemption events to be probable, as these events refer to fundamental change of control situations that do not cmTently exist, in the opinion of management. Accordingly, management concluded that the conversion option embedded in the prefeITed shares does not require bifurcation from the host contract, as the PrefeITed Stock has the characteristics of a residual interest and therefore are clearly and closely related to the Common stock issuable upon the exercise of the conversion option.

F-17

**Note 10. Sale of Common stock**

On December 30, 2013, and as amended on March 27, 2014, the Company entered into an At-The-Market Offering Agreement (the "ATM Agreement") with Ascendant Capital Markets, LLC (the "Manager"). Pursuant to the ATM Agreement, the Company may offer and sell shares of its Common Stock (the "Shares") having an aggregate offering price of up to $8.5 million from time to time through the Manager. The Company can use the net proceeds from any sales of Shares in the offering for working capital, capita.I expenditures, and general business purposes. For the year ended December 31, 2015, the Company sold approximately 3,155,000 Shares under the ATM Agreement for gross proceeds of approximately $1,695 before related expenses. The ATM Agreement expired by its te1ms in August 2015.

On October 8, 2015, the Company entered into separate subsc1iption agreements (the "Subscription Agreement") with accredited investors (the "Investors") relating to the issuance and sale of $700 of units (the "Units") at a purchase price of $0.25 per Unit, with each Unit consisting of one share (the "Shares") of the Company's common stock, par value $0.001 per share (the "Common Stock") and a three year wanant (the "Wanants") to purchase two shares of Common Stock at an initial exercise priceof $0.25 per share (such sale and issuance, the "Private Placement").

The Wanants are exercisable at a price of $0.25 on the earlier of (i) one year from the date of issue or (ii) the occmTence of ce1lain corporate events, including a p1ivate or public financing, subject to approval of the lead investor, in which the Company receives gross proceeds ofat least $7,500; a spinoff; one or more acquisitions or sales by the Company of ce11ain assets approved by the stockholders of the Company; or a merger, consolidation, recapitalization, or reorganization approved by the stockholders of the Company (each, a "Qualifying Transaction"). The Wanants may be exercised by means of a "cashless exercise" following the four-month anniversary of the date of issue, provided that the Company has consunuated a Qualifying Transaction and there is no effective registration statement registering the resale of the shares of Common Stock m1derlying the Wanants (the "Wairnnt Shares"). The Company is prohibited from effecting an exercise of any Wanant to the extent that, as a result of any such exercise, the holder would beneficially own more than 4.99% of the number of shai·es of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such WaiTant, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. The Wairnnts are also subject to ce1tain adjustments upon ce11ain actions by the Company as outlined in the Warrants. Prior to receipt of shareholder approval, the wanants, when aggregated with the shai·es of common stock issued in the offering, shall not be exercisable into more than 19.99% of the number of shares of Common Stock outstanding as of the closing date.

On December 22, 2015 the Company sold $172 of common stock at a p1ice of $0.25 per share in a Registered Direct offering.

**Note 11. Stock incentive plan and stock-based compensation**

**Stock incentive plan**

The Company's board of directors established the 2012 Stock Incentive Plan (the "Plan") on Ap1il 15, 2012, and the Company's shareholders ratified the Plan at the annual meeting of the Company's stockholders on May 30, 2012. The Company has 415,000 shai·es of Common Stock that are rese1ved to grant Options, Stock Awards and Perfo1mance Shai·es (collectively the "Awards") to "Paiticipants" under the Plan. The Plan is administered by the boai·d of directors or the Compensation Committee of the boai·d of directors, which dete1mines the individuals to whom awards shall be granted as well as the type, te1ms and conditions of each awai·d, the option p1ice and the duration of each award.

At the annual meeting of the stockholders of MGT held on September 27, 2013, stockholders approved a.11 amendment to the Plan (the "Amended and Restated Plan") to increase the amount of shares of Common Stock that may be issued under the Amended and Restated Plan to 1,335,000 shares from 415,000 shares, an increase of920,000 shares and to add a reload feature.

At the annual meeting of the stockholders of MGT held on December 31, 2015, stockholders approved an amendment to the Plan (the "Amended and Restated Plan") to increase the amount of shares of Common Stock that may be issued under the Amended and Restated Plan to 3,000,000 shai·es from 1,335,000 shares, an increase of 1,665,000 shares.

Common Stock and options granted under the Plan vest as dete1mined by the Company's Compensation and Nominations Committee and expire over va1ying tenns, but not more than seven years from date of grant. In the case of an Incentive Stock Option that is granted to a 10% shareholder on the date of grant, such Option shall not be exercisable after the expiration of five yeai·s from the date of gra11t. No option grants were issued dming the years ended December 31, 2015, a11d

2014.

F-18

**Issuance of restricted shares - directors, office1·s and employees**

A summary of the Company's employee's restricted stock as of December 31, 2015, is presented below:

| | Number of shares | Weighted average grant date fair value |
|---|---|---|
| **Non-vest ed at January 1, 2014** | **52,667** | $ **4.56** |
| Granted | 147,000 | 1.72 |
| Vested | (77,000) | 3.77 |
| Forfeited | (12,667) | 3.68 |
| **Non-vested at Decembe1·31, 2014** | **110,000** | **1.42** |
| Granted | 255,000 | 0.31 |
| Vested | (309,500) | 0.53 |
| Forfeited | (55,500) | 1.28 |
| **Non-vested at December 31, 2015** | **-** | $ |

For the years ended December 31, 2015 and 2014, the Company has recorded $130 and $290, respectively, in employee and director stock-based compensation expense, which is a component of selling, general and administrative expense in the Consolidated Statement of Operations.

In the years ended December 31, 2015 and 2014, the Company did not allocate any stock-based compensation expense to non-controllinginterest.

**Unrecognized compensation cost**

As of December 31, 2015, unrecognized compensation costs related to non-vested stock-based compensation arrangements, was $0 and (2014: $101) and is expected to be recognized over a weighted average period of 0 (2014: 0.66) years.

**Stock-based compensation - non-employees**

For the year ended December 31, 2015 the Company granted and issued a total of366,624 shares to non-employees for services rendered. The shares were recorded at $161 using the closing market value on respective dates of issuance.

Subsequent to December 31, 2015, and through the date of filing the Annual Rep011 on F01m 10-K, the Company granted and issued a total of 170,000 shares to non-employees for services rendered. The shares were recorded at $51 using the closing market value on respective dates of issuance.

**Warrants**

As of December 31, 2015 the Company had 3,820,825 wanants outstanding at weighted average exercise price of $1.11 and an inninsic value of $nil. As of December 31, 2015, all issued wanants are exercisable and expire through 2018.

The following table summarizes infomiation about warrants outstanding at December 31, 2015:

| | Warrants outstanding | Weighted average exercise price |
|---|---|---|
| **At January 1, 2014** | **920,825** | $ **3.44** |
| Issued | 100,000 | |
| Exercised | | 3.75 |
| Expired | | |
| **At December 31, 2014** | **1,020,825** | $ **3_4_7** |
| Issued | 2,800,000 | 0.25 |
| Exercised | | |
| Expired | | |

**At December 31, 2015**                                                                 **3,820,825** $        **1.11**

F-19

**Note 12. Non-controlling interest**

At December 31, 2015 the Company's non-controlling interest was as follows:

| | MGT Gamin | FanTD | MGT Interactive | M2P Ameticas | Total |
|---|---|---|---|---|---|
| **Non-controlling interest at January 1, 2014** | $ 585 | $ 1,431 | $ 96 | $ (5) $ | 2,107 |
| Acquisition of non-controlling interest in FanTD | | (1,230) | | | (1,230) |
| Non-controlling share of losses | 215) | 201) | 4) | 15) | 435) |
| **Non-controlling interest at December 31, 2014** | $ 370 $ | - $ | 92 $ | !20) $ | 442 |
| Non-controlling share of losses | (342) | | 4 | (3) | (341) |
| Transfers from non-controlling interest | | | 96) | | 96) |
| **Non-controlling interest at December 31, 2015** | $ 28 $ | - $ | - $ | (23) $ | 5 |

**Note 13. Operating leases, commitments and security deposit**

**Operating leases**

In August 2014, the Company entered into a lease modification agreement, extending its existing office lease in Hanison, NY for a period of one year. Total rent payments over the 12-month period were $73 and the lease expired on November 30, 2015. A refundable rental deposit of $39 washeld in a restricted cash account as of December 31, 2015.

On October 26, 2015, the Company entered into an Office License Agreement commencing December 1, 2015. The te1m expires on November 30, 2016 and canies a monthly fee of $4, with one month (January) rent free. The Company paid a refundable service retainer of $6 and a non-refundable set up fee of $1.

Total lease rental expense for the years ended December 31, 2015 and 2014, was $77 and $113, respectively.

**Commitments**

On October 7, 2015, the Company entered into an amended and restated employment agreement with Robert Ladd, its Chief Executive Officer and President, effective October 1, 2015. The agreement amends and restates in its entirety the employment agreement entered into between the Company and Mr. Ladd in November 2012, as amended January 28, 2014. The term of the agreement expires on November 30, 2016, subject to automatic renewals of one year. The agreement provides for a base salary of $199 per year·. Pursuant to the agreement, the Company also granted Mr. Ladd 200,000 shares of unregistered Common Stock. Mr. Ladd is eligible for bonus compensation and equity awar·ds as may be approved in the discretion of the Compensation Committee and the Board of Directors. Upon te1mination of his employment for reasons other than death, disability, or cause or upon resignation for good reason, Mr. Ladd will be entitled to a severar1ce payment equal to the higher of the aggregate amount of his base sala1y for the then remaining te1m of the agreement or twelve times the average monthly base sala1y paid or accrued during the three full calendar months immediately preceding such tennination. All unvested stock options shall immediately vest and the exercise pe1iod of such options shall be extended to the later of the longest period pennitted by the Company's stock option plans or ten years following the te1mination date. The agreement also contains non-compete and change of control provisions.

**Note 14. Income taxes**

Significant components of defeITed tax assets were as follows as of December 31:

| | 2015 | 2014 |
|---|---|---|
| U.S. federal tax loss car1y-forward | $ 14,229 $ | 10,779 |
| U.S. State tax loss cany-fo1war·d | 1,137 | 1,498 |
| U.S. federal capital loss cany-forward | 188 | 188 |
| U.S. foreign tax credit cany-fo1ward | | |
| Equity-based compensation, fixed assets and other | | 1,598 |
| Total defened tax assets | 15,554 | 14,063 |
| Less: valuation allowance | (15,554) | (14,063) |

**Net defened tax asset**                                                   $        -    $
                                                                         ====         ====

As of December 31, 2015, the Company had the following tax attributes:

|  | Amount | Begins to expire |
|---|---|---|
| U.S. federal net operating loss cany-fo1wards | $      36,306 | Fiscal 2023 |
| U.S. State net operating loss cany-fmwards | 20,739 | Fiscal 2031 |
| U.S. federal capital loss carry-forwards | 553 | Fiscal 2015 |

F-20

As it is notmore likely than not that the resulting defened tax benefits will be realized, a full valuation allowance has been recognized for such defened tax assets. For the year ended December 31, 2015, the valuation allowance increased by $1,491. Federal and state laws impose substantial rest:J.ictions on the utilization of tax atllibutes in the event of an "ownership change," as defined in Section 382 of the Internal Revenue Code. Cunently, the Company does not expect the utilization of tax att·ibutes in the near te1m to be materially affected as no significant limitations are expected to be placed on these tax at1:1·ibutes as a result of previous ownership changes. If an ownership change is deemed to have occmTed as a result of equity ownership changes or offerings, potential near te1m utilization of these assets could be reduced.

The provision for/(benefit from) income tax differs from the amount computed by applying the statut01y federal income tax rate to income before the provision for/(benefit from) income taxes. The sources and tax effects of the differences are as follows for the years ended December 31:

|  | 2015 | 2014 |
|---|---|---|
| Expected Federal Tax | (34.00)% | (34.00)% |
| State Tax (Net of Federal Benefit) | (5.48) | (5.48) |
| Pe1manent differences |  | 0.12 |
| Loss of NOL benefit of closed foreign entity |  |  |
| Write-off of defened tax asset |  | 4.29 |
| Adjust:J.nents to defened tax balances |  | (8.34) |
| Foreign tax credit |  |  |
| Other |  | 0.05 |
| Change in valuation allowance | 39.48 | 43.36 |
| **Effective rate of income tax** | **0%** | **0%** |

The Company files income tax returns in the U.S. federal jurisdiction, New York State and New Jersey jurisdictions. With few exceptions, the Company is no longer subject to U.S. federal, state and local, or 11011-U.S. income tax examinations by tax authorities for years before 2012.

**Note 15. Segment reporting**

Operating segments are defined as components of an enterp1ise about which separate financial info1mation is available that is evaluated regularly by the chief operating decision maker, or decision-making group in deciding how to allocate resources and in assessing perfo1mance. The Company's chief operating decision-making group is composed of the Chief Executive Officer. The Company operates in two segments, Gaming and Intellectual Prope1ty. Medicsight's Software and Devices and Services are no longer considered separate business segments and have been merged into the Intellectual Prope1ty segment. Certain corporate expenses are not allocated to segn1ents.

F-21

The Company evaluates performance of its operating segments based on revenue and operating loss. Segment inf01mation as of December 31, 2015 and 2014, are as follows:

| | Intellectual J?rOJ?er | Gaming-Continuing OJ?erations | Unallocated corl!orate/other | Total | Discontinued OJ?erations |
|---|---|---|---|---|---|
| **Year ended December 31, 2015** | | | | | |
| Revenue | $ 102 | $ 2 | $ - | $ 104 | $ 640 |
| Cost of revenue | (5) | | | (5) | (225) |
| Gross margin | 97 | 2 | | *99* | 415 |
| Operating loss | (268) | (32) | (2,422) | (2,722) | (1,068) |
| **Year ended December 31, 2014** | | | | | |
| Revenue | $ 86 | $ 8 | $ - | $ 94 | $ 963 |
| Cost of revenue | | | | | (610) |
| Gross margin | 86 | 8 | | 94 | 353 |
| Operating loss | (401) | (1,379) | (2,240) | (4,020) | (1,609) |
| **December 31, 2015** | | | | | |
| Cash and cash equivalents (excludes $39 of restricted cash) | $ - | $ - | $ 359 | $ 359 | $ |
| Property and equipment | | | 35 | 35 | |
| Intangible assets | 710 | 20 | | 730 | |
| Goodwill | | 1,496 | | 1,496 | |
| Additions: | | | | | |
| Property and equipment | | | 35 | 35 | |
| Intangible assets | | | | | |
| Goodwill | | | | | |
| **December 31, 2014** | | | | | |
| Cash and cash equivalents (excludes $138 of restricted cash) | $ 11 | $ 12 | $ 625 | $ 648 | $ 806 |
| Property and equipment | | 6 | 5 | **11** | 32 |
| Intangible assets | 1,577 | 31 | | 1,608 | 809 |
| Goodwill | | 1,496 | | 1,496 | 4,948 |
| Additions: | | | | | |
| Prope1ty and equipment | | | | | 41 |
| Intangible assets | | | | | 790 |
| Goodwill | | | | | |

F-22

## Note 16. Investments and Fair'Value

The authoritative guidance for fair value measurements defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or the most advantageous market for the asset or liability in an orderly transaction between market paiticipants on the measurement date. Mai·ket paiticipants ai·e buyers and sellers in the principal market that are (i) independent, (ii) knowledgeable, (iii) able to transact, and (iv) willing to transact. The guidance desc1ibes a fair value hierarchy based on the levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value which are the following:

- *Level 1* - Quoted p1ices in active mai·kets for identical assets or liabilities

- *Level 2* - Inputs other than Level 1 that ai·e observable, either directly or indirectly, such as quoted p1ices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or conoborated by observable market data or substantially the foll term of the assets or liabilities

- *Level 3* - Unobservable inputs that are suppmted by little or no market activity and that are significant to the value of the assets or liabilities

The following table provides the liabilities canied at fair value measured on a recuning basis as of December 31, 2015 and 2014:

| December 31, 2015 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Investments - Viggle Common shares | $    444 | $    – | $    – | $    444 |

## Note 17. Subsequent events

On March 24, 2016 (the "Effective Date"), the Company entered into an Exchange Agreement (tl1e "Agreement") with DraftDay Fantasy Spmts, Inc. ("DraftDay"). The purpose of the Agreement was to exchange that ce1tain outstanding promisso1y note (the "Note") in the principal amount of $1,875 issued on September 8, 2015, for other equity and debt secmities ofDraftDay, after the Note went into default on March 8, 2016.

On the Effective Date, the Note had an outstanding principal balance of $1,875 and accmed interest in the amount of $51 (the "Interest"). Pursuant to the Agreement, a pottion consisting of $825 of the outstanding principal of the Note was exchanged for 2,748,353 shares of DraftDay's common stock, and an additional pmtion of $110 of the outstanding principal was exchanged for 110 shares (the "Prefened Shares") of a newly created class of prefened stock, the Se1ies D Conve1tible Prefened Stock. The Prefened Shares are convertible into an aggregate of 366,630 shares of DraftDay's common stock, except that conversions shall not be effected to the extent that, after issuance of the conversion shares, MGT's aggregate beneficial ownership (together with that of its affiliates) would exceed 9.99%. Finally, DraftDay agreed to make a cash payment to MGT Spo1ts for the total amount of Interest. In exchange for the forgoing, MGT Spo1ts and tl1e Company agreed to waive all Events of Default under the Note prior to the Effective Date and to release DraftDay from any rigl1ts, remedies and claims related thereto. After giving effect to the forgoing, the remaining outstanding principal balance of the Note is $940 (the "Remaining Balance"). The Remaining Balance of the Note shall continue to accrue interest a rate of 5% per annum, and all te1ms of the Note shall remain unchanged except that the matmity date is changed to July 31, 2016.

F-23

EX-21.1 2 fl 0k2015ex2li_mgtcapita1.htm SUBSIDIARIES

**Exhibit 21.1**

**SUBSIDIARIES OF MGT CAPITAL INVESTMENTS, INC.**

| Name of subsidiary | Jurisdiction of organization |
| --- | --- |
| MGT Gaming, Inc. | Delaware,  USA |
| Medicsight, Inc. | Delaware,  USA |
| MGT Studios, Inc. (f/k/a MGT Capital Solutions, Inc.) and subsidiary: | Delaware,  USA |
| - M2P Americas, Inc. | Delaware,  USA |
| MGT Interactive, LLC | Delaware,  USA |
| MGT Spotts, Inc. | Delaware, USA |

EX-23.1 3 fl0k2015ex23i_mgtcapita1.htm CONSENT OF MARCUM LLP, INDEPENDENT REGISTERED PUBLIC
ACCOUNTING FIRM, DATED APRIL 14, 2016

**Exhibit 23.1**

### INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM'S CONSENT

        We consent to the incorporation by reference in  the Registration Statement of MGT Capital Investments, Inc. on
Fonn S-3 (No. 333-185214 and No. 333-182298) of our repmt dated April 15, 2015 (except for the December 31, 2014
amounts appearing in the Reclassification of Discontinued Operations Section presented in Note 3 to the consolidated
financial statements as to which the date is April 14, 2016), with respect to our audit of the consolidated financial statements
ofMGT Capital Investments, Inc. and Subsidiaries as of December 31, 2014 and for the year then ended December 31, 2014,
which repmt is included in this Annual Repmt on Form 10-K ofMGT Capital Investments, Inc. for the year ended December
31, 2015.


/s/ Marcum LLP

MarcmnLLP
NewYork,NY
April 14, 2016

EX-23.2 4 fl 0k2015ex23ii_mgtcapital.htm CONSENT OF FRIEDMAN LLP, INDEPENDENT REGISTERED PUBLIC
ACCOUNTING FIRM, DATED APRIL 14, 2016

**Exhibit 23.2**

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

    We hereby consent to the incorporation by reference in the Registration Statements on Fonns S-3 (No. 333-185214
and No. 333-182298) of MGT Capital Investments, Inc. of om repmt dated April 14, 2016 relating to the consolidated
financial statements ofMGT Capital Investments, Inc. as of December 31, 2015, which appear in this Fmm 10-K.

/s/ Friedman LLP

East Hanover, New Jersey
April 14, 2016

EX-31.1 5 fl0k2015ex3li_mgtcapita1.htm CERTIFICATION

**Exhibit 31.1**

## CERTIFICATION PURSUANT TO SARBANES-OXLEY ACT OF 2002

I, Robert B. Ladd, certify that:

1.    I have reviewed this annual repmt on Fmm 10-K ofMGT Capital Investments, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessa1y to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this repmt;

3.    Based on my knowledge, the fmancial statements, and other financial information included in this repmt, fairly present in all material respects the financial condition, results of operations and cash flows of the registi·ant as of, and for, the periods presented in this repmt;

4.    The registi·ant's other certifying officer and I are responsible for establishing and maintaining disclosure conti·ols and procedmes (as defined in Exchange Act Rules 13a,-l5(e) and 15d-15(e)) and internal conti-ol over financial reporting (as defmed in Exchange Act Rules 13a,-l5(f) and 15d-15(f)) for the registi·ant and have:

    (a)    Designed such disclosure conti·ols and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registi·ant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this repmt is being prepar·ed;

    (b)    Designed such internal control over fmancial reporting, or caused such internal conti·ol over fmancial repmting to be designed tmder our supervision, to provide reasonable assurance regar·ding the reliability of financial repmting and tlie prepar·ation of fmaricial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registi·ant's disclosure conti·ols and procedures and presented in this report our conclusions about the effectiveness of the disclosure conti·ols and procedures, as of the end of the period covered by this report based on such evaluation; arid

    (d)    Disclosed in this repmt any change in the registi·ant's internal conti·ol over financial repmting that occuned during the registrant's most recent fiscal quarter (the registrant's fomth fiscal quarter in the case of an annual repmt) that has materially affected, or is reasonably likely to materially affect, the registi·ant's internal conti·ol over financial reporting; and

5.    The registi·ant's other certifying officer arid I have disclosed, based on our most recent evaluation of internal conti·ol over fmancial repmting, to the registrant's auditors and the audit committee of the registi·ant's boar·d of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal conti·ol over financial reporting which are reasonably likely to adversely affect the registi·ant's ability to record, process, sunllllarize and repmt fmancial infmmation; and

    (b)    Any fraud, whether or not material, that involves management or oilier employees who have a significant role in the registi·ant's internal control over fmancial reporting.

April 14, 2016                                      By:  _/s/ ROBERT B. LADD_
                                                   Robert B. Ladd
                                                   President and Chief Executive Officer
                                                   (Principal Executive Officer)

EX-31.2 6 fl0k2015ex3lii_mgtcapital.htm CERTIFICATION

**Exhibit 31.2**

### CERTIFICATION PURSUANT TO SARBANES-OXLEY ACT OF 2002

I, Robert B. Ladd, certify that:

1.   I have reviewed this annual repmt on Fmm 10-K ofMGT Capital Investments, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessa1y to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this repmt;

3.   Based on my knowledge, the fmancial statements, and other financial information included in this repmt, fairly present in all material respects the financial condition, results of operations and cash flows of the registi·ant as of, and for, the periods presented in this repmt;

4.   The registi·ant's other ce1tifying officer and I are responsible for establishing and maintaining disclosure conti·ols and procedmes (as defined in Exchange Act Rules 13a,-l5(e) and 15d-15(e)) and internal conti-ol over financial reporting (as defmed in Exchange Act Rules 13a,-l5(f) and 15d-15(f)) for the registi·ant and have:

   (a)   Designed such disclosure conti·ols and procedures, or caused such disclosure controls and procedures to be designed under our supe1vision, to ensure that material info1mation relating to the registi·ant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this repmt is being prepar·ed;

   (b)   Designed such internal control over fmancial repo1ting, or caused such internal conti·ol over financial repmting to be designed tmder our supe1vision, to provide reasonable assurance regar·ding the reliability of financial repmting and tlie prepar·ation of fmaricial statements for external purposes in accordance with generally accepted accounting p1inciples;

   (c)   Evaluated the effectiveness of the registi·ant's disclosure conti·ols and procedures and presented in this report our conclusions about the effectiveness of the disclosure conti·ols and procedures, as of the end of the period covered by this report based on such evaluation; arid

   (d)   Disclosed in this repmt any change in the registi·ant's internal conti·ol over financial repmting that occuned during the registrant's most recent fiscal quarter (the registrant's fomth fiscal qua1ter in the case of an annual repmt) that has mate1ially affected, or is reasonably likely to mate1ially affect, the registi·ant's internal conti·ol over financial repo1ting; and

5.   The registi·ant's other ce1tifying officer arid I have disclosed, based on our most recent evaluation of internal conti·ol over fmancial repmting, to the registrant's auditors and the audit committee of the registi·ant's boar·d of directors (or persons pe1f01ming the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal conti·ol over financial repo1ting which are reasonably likely to adversely affect the registi·ant's ability to record, process, sunllllarize and repmt fmancial infmmation; and

   (b)   Any fraud, whether or not material, that involves management or oilier employees who have a significant role in the registi·ant's internal control over fmancial reporting.

April 14, 2016                                               By:   _/s/ ROBERT B. LADD_
                                                                   Robe1t B. Ladd
                                                                   Interim Chief Financial Officer
                                                                   (Principal Financial and Accounting Officer)

EX-32.1 7 fl 0k2015ex32i_mgtcapita1.htm CERTIFICATION

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

    I, Robert B. Ladd, President and Chief Executive Officer of MGT Capital Investments, Inc. (the "Company"), ce11ify, pmsuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that to the best of my knowledge:

    (1)  the Annual Rep011 on Form 10-K of the Company for the year ended December 31, 2015, (the "Rep011") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

    (2)  the inf01mation contained in the Rep011 fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 14, 2016

By:  /s/ ROBERT B. LADD
Robe11 B. **Ladd**
President and Chief Executive Officer
(Principal Executive Officer)

EX-32.2 8 fl0k2015ex32ii_mgtcapital.htm CERTIFICATION

**Exhibit 32.2**

### CERTIFICATION PURSUANT TO SECTION 906
### OF THE SARBANES-OXLEY ACT OF 2002

I, Robe1t B. Ladd, Interim Chief Financial Officer of MGT Capital Investments, Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes--Oxley Act of 2002, 18 U.S.C. Section 1350, that to the best of my knowledge:

(1) the Annual Rep01t on Fonn 10-K of the Company for the year ended December 31, 2015, (the "Rep01t") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the infonnation contained in tl1e Repo1t fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 14, 2016                                               By: /s/ ROBERT B. LADD

Robett B. Ladd
Interim Chief Financial Officer
(Principal Financial and Accounting Officer)