EXHIBIT A

S-3 1 v329445 s3.htm REGISTRATION STATEMENT

As filed with the Secwities and Exchange Commission on November 30, 2012

Registrntion No. 333-_____

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORMS-3

## REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

### MGT CAPITAL INVESTMENTS, INC.
(Exact name of registrant as specified in charter)

**Delaware**
(State or jwisdiction of incorporation or organization)

**13-4148725**
(I.R.S. Employer Identification No.)

**500 Mamaroneck Avenue**
**Suite 204**
**HatTison, NY 10528 USA**
**914-630-7431**
(Address, including zip code, and telephone number, including area code,
ofregistrant's principal executive offices)

**Robert B. Ladd**
**President and Chief Executive Officer**
**MGT Capital Investments, Inc.**
500 **Mamaroneck Avenue**
Suite 204
**Harrison, NY 10528 USA**
**914-630-7431**

*Copies to:*

**Arthur Mat·cus, Esq.**
**Sichenzia Ross Friedman Ference LLP**
**61 Broadway**
**New York, New York 10006**

**Approximate date of proposed sale to the public:** From time to time, after this registration statement becomes effective.

If the only secwities being registered on this F01m are being offered pmsuant to dividend or interest reinvestment plans, please check the following box.  D

PLAINTIFF'S
EXHIBIT

Ladd 59

If any of the securities being registered on this F01m are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box.

If this Fonn is filed to register additional secmities for an offering pursuant to Rule 462(b) under the Secmities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Fonn is a post-effective amendment filed pursuant to Rule 462(c) under the Secmities Act, check the following box and list the Securities Act registrations statement number of the earlier effective registration statement for the same offering.  D

If this F01m is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Secmities Act, check the following box. ☐

If this F01m is a post-effective amendment to a registr·ation statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Secmities Act, check the following box.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer or a smaller reporting company. See definition of large accelerated filer", accelerated filer" and smaller repo1ting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller rep01ting company) | Smaller rep01ting company | |

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Secmities to be Registered | Amount to be Registered(l) | Proposed Maximum Offering Price per Unit(4) | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Shares of Common Stock, par value $0.001 per share | 1,380,362(2) | $ 4.51 | $ 6,225,433 | $ 849.15 |
| Shares of Common Stock, par value $0.001 per share | 2,760,724(3) | $ 4.51 | $ 12,450,865 | $-------- 1,698.30 |
| **Total** | 4,141,086 | | $ 18,676,298 | $ 2,547.45 |

(1)     Pursuant to Rule 416 under the Secmities Act of 1933, as amended, the shares being registered hereunder include such indetenninate number of shares of common stock, prefoned stock, debt securities, waiTants, lights and units as may be issuable with respect to the shares being registered herem1der as a result of stock splits, stock dividends or similar tr·ansactions.

(2)     Issuable upon the conversion of the 6% Cumulative Conve1tible Prefoned Stock.

(3)     Issuable upon the exercise ofwaiTants issued with the 6% Cumulative Conve1tible Prefoned Stock

(4)     Estin1ated solely for purposes of calculating the registr·ation fee pursuant to Rule 457(c) under the Securities Act of 1933, as amended, using the average of the high and low prices as repo1ted on the NYSE **MKT** NASDAQ on November 28, 2012, which was$ 4.51 per share.

**The registrant hereby amends this Registration Statement on such date 01· dates as may be necessary to delay its effective date until the registrant shall me a fm1her amendment which specifically states that this Registration Statement shall ther·eafter become effective in accordance with Section 8(a) of the Secudties Act or until the**

Registration Statement shall become effective on such date as the Securities and Exchange Commission acting pursuant to said Section 8(a), may determine.

---

11

**Information contained herein is not complete and may be changed. These securities may not be sold until the Registration Statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offe1· to sell and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED NOVEMBER 30, 2012**

**PROSPECTUS**

IV[G

**MGT Capital Investments, Inc.**

**4,141,086 shares of Common Stock**

We are registe1ing 4,141,086 shares of common stock, $0.01 par value per share (the "Common Stock") of MGT Capital Investments, Inc. (refened to herein as "we," "us," "our," "MGT," "Registrant," or the "Company"), for resale by ce1tain of our shareholders identified in this prospects (the "Selling Shareholders"), of which 1,380,362 Resale Shares are issuable upon the conversion of 6% Cumulative Conve1tible Prefened Stock and 2,760,724 shares are issuable upon the exercise of wanants (the "Resale Shares").  Please see *"Selling Shareholders"* beginning at page 10.

The Selling Shareholders may offer to sell the Resale Shares at fixed p1ices, at prevailing market prices at the time of sale, at va1ying p1ices or at negotiated prices, and will pay all brokerage commissions and disc1mmts att1ibutable to the sale of such shares plus brokerage fees. The Selling Shareholders will receive all of the net proceeds from the offering of their shares.

The Resale Shares may be sold by the Selling Shareholders to or through tmde1writers or dealers, directly to purchasers or through agents designated from time to time. For additional inf01mation on the methods of sale, you should refer to the section entitled "Plan of Distribution" in this prospectus. If any underwiiters are involved in the sale of the Resale Shares witl1 respect to which this prospectus is being delivered, the names of such unde1writers and any applicable discounts or commissions and over-allotment options will be set fo11h in a prospectus supplement. The p1ice to the public of the Resale Shares and the net proceeds we expect to receive from such sale will also be set fo11h in a prospectus supplement.

Our common stock is listed on tl1e NYSE MKT LLC exchange ("NYSE MKT") tmder the symbol "MGT.BC" On November 29, 2012; the last repmted sales price of our common stock was $4.52.

lll

**Investing** in **our securities involves a high degree of risk. Yon should carefully conside1· the risk factors beginning on page 9 of this prospectus and set forth** in **the documents incorporated by reference herein before making any decision to invest in our securities.**

**Neither the Securities and Exchange Commission nor any state securities comrmss1on has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the cont rary is a criminal offense.**

**The date of this prospectus is _____,2012.**

IV

## TABLE OF CONTENTS

| | Page |
|---|---|
| Special Note Regarding Forward-Looking Statements | 1 |
| Prospectus Summary | 2 |
| About This Offering | 8 |
| Risk Factors | 9 |
| Use of Proceeds | 9 |
| Selling Secmity Holders | 10 |
| Plan of Distribution | 13 |
| Legal Matters | 15 |
| Experts | 15 |
| Where You Can Find More Information | 15 |
| Incorporation of Certain Documents By Reference | 15 |

v

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

*This Registration Statement contains "fon11ard-lookdng statements" and information relating to our business that are based on our beliefs as well as assumptions made by us or based upon information currently m1ai/able to us. When used in this Registration Statement, the words anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "project," "should" and similar expressions are intended to identify fonvard-lookdng statements. These fon11ard-looking statements include, but are not limited to, statements relating to our pe,jonnance in "Business" and "Management's Discussion and AnaZysis of Financial Condition and Results of Operations" included in our Annual Report on Form 10-Kfor the fiscal year ended December 31, 2011, which was filed with the Commission on March 1, 2012. These statements reflect our current views and assumptions with respect to future events and are subject to risks and uncertainties. Actual and future results and trends could differ materially from those set forth in such statements due to various factors. Such factors include, among others: general economic and business conditions; industry capacity; industry trends; competition; changes in business strategy or development plans; project pe,jormance; availability, terms, and deployment of capital; and availability of qualified personnel. These fonvard-looking statements speak only as of the date of this Registration Statement. Subject at all times to relevant securities law disclosure requirements, we expressly disclaim any obligation or undertaldng to disseminate any update or revisions to any fonvard-looking statement contained herein to reflect any change in our expectations with regard thereto or any changes in events, conditions or circumstances on which any such statement is based. In addition, we cannot assess the impact of each factor on ourbusiness or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any fonvard-lookdng statements.*

---

## PROSPECTUS SUMMARY

The following summaiy highlights material infrmmation fom1d in more detail elsewhere in, or incorporated by reference in, the prospectus. It does not contain all of the info1mation you should consider. As such, before you decide to buy our common stock, in addition to the following summaiy, we urge you to carefully read the entire prospectus and documents incorporated by reference herein, especially the risks of investing in our common stock as discussed m1der "Risk Factors." The following summaiy is qualified in its entirety by the detailed infonnation appearing elsewhere in this prospectus.

**General**

MGT Capital Investments, Inc. ("MGT","the Company", "the Group", "we", "us") is a holding company comprised of MGT, the parent company and majority-owned subsidiaiy MGT Gaining, Inc. ("MGT Gaming"), a company in which we acquired a majmity interest on Jm1e 1, 2012. In addition, we also have a controlling interest in our operating subsidiaiy, Medicsight Ltd, including its wholly-owned subsidiaiies ("Medicsight"). The Company closed the following non-essential subsidiaries during the nine months ended, September 30, 2012, as pait of its expense reduction plan: Medicsight Nominees Limited, Medicsight UK Limited, MGT Investments (Gibraltai")Limited, MGT Capital Investments Limited and its wholly-owned subsidiary MGT Capital Investments (UK) Limited.

MGT Gaming holds ce1tain intellectual prope1ty patents focused in the casino gaining sector. The Company holds 55% of the issued share capital of MGT Garning. MGT Gaming is p1ivately held by MGT and J&S Gaming, Inc.

Medicsight is a medical technology compai1y focusing on medical imaging software development and medical hai·dware devices. Medicsight develops and commercializes Computer-Aided Detection ("CAD") applications that analyze Computer Tomography ("CT') scans to assist radiologists in the early detection and measurement of colorectal polyps. The Company has also developed an automated carbon dioxide insufflation device (MedicCO 2 LON) which it commercializes through a global distributor. As of September 30, 2012, the Compai1y holds 369 shares (77%) of the 478 issued shai·e capital of Medicsight. The Company continues to explore all strategic alternatives with respect to its majmity interest in Medicsight, including the sale or licensing of its global patent po1tfolio.

On May 11, 2012, the Company entered into a Contribution and Sale Agreement (the "Sale Agreement") with J&S Gaming, Inc. ("J&S"), and MGT Gaming, Inc. ("MGT Gaming" for the acquisition of U.S. Patent #7,892,088, entitled "Gaining Device Having a Second Separate Bonusing Event." Pursuant to the Sale Agreement and ce1tain ai1cillary agreements executed simultaneous thereto, (i) J&S sold ceitain patents to MGT Gaining in exchange for 1,000 shai·es (constituting 100% ownership) of MGT Gaining common stock, par value $0.001 (the "MGT Gaining Shai·es"); (ii) the Company purchased from J&S 550 MGT Gaming Shares constituting 55% ownership in exchange for $200,000 cash and a four (4) year waiTai1t to purchase 350,000 shai·es of the Company's common stock at a exercise pilce of $4.00 per share; (iii) the Company and J&S agreed to grant 1ights of first refusal, "tag-along" and "drag-along" rights to one another with respect to their respective MGT Gaining Shai·es; and (iv) Steven Brandstetter, the President of J&S, agreed to provide consulting services to MGT Gaming in exchange for a fee of $5,000 per month, for a period of one year. Pursuant to the Sale Agreement, the Company has the right to purchase an additional 250 MGT Gaining Shares from J&S in exchange for a cash payment of $1,000,000 and a four (4) year wanant to purchase 250,000 shares of the Company's common stock for an exercise price of the lower of (i) $6.00 per share and (ii) 110% of the closing p1ice of the common stock on the date of exercise. This option expired on August 31, 2012 due to the qualified financing, as defined in the securities purchase agreement tliat the Company entered into with Hudson Bay Fund Ltd. The Sale Agreement closed on May 24, 2012.

On May 24, 2012, the Company entered into a secmities purchase agreement (the "SPA") with Hudson Bay Fm1d Ltd. The SPA provides for the purchase of an 18 month promisso1y note at 8% interest per annum (the "Note") conveitible into up to 1,166,667 shares of common stock of MGT ("Common Stock") at a conversion price of $3.00 per share and a wanant (the "Wal·Tant") to purchase up to 875,000 shai·es of Common Stock at an exercise price of $3.00 per share for proceeds of $3,500,000 (the "Transaction"). On October 9, 2012, the Company executed two identical exchange agreements (collectively, the "Agreements") settling the Note for a cash payment of $3,500,000 and 100,000 shares of the Company's common stock. The stock was valued at $318,000, using the closing price on October 9, 2012. These shares were issued on November 6, 2012.

https://www.sec.gov/Archives/edgar/data/l001601/000114420412065798/v329445_s3.htm                    2/6/2019

On November 2, 2012 the Company closed two separate financing agreements with various institutional investors providing $5,900,000 of capital. The capital raise is comprised of the sale of $4,500,000 of 1,380,362 Series A Convertible Prefe1Ted Stock (which include 2,760,724 WalTants to purchase MGT common stock), plus a separate sale of $1,400,000 of 453,000 MGT Common Stock. On October 26, 2012, this transaction was approved by NYSE-MKT LLC. The PrefelTed Stock will be converiible into the Company's common stock at a fixed price of $3.26 per share and cany a 6% dividend. The Wairrnts have a five-year·life and ai·e exercisable at $3.85 per MGT share; the Company issued a total of 2,760,724 Warrants in the deal. The Common Stock was sold at $3.01 per share with a total of 453,000 shares sold, m1der its S-3 Registration Statement, which was declared effective on September 25, 2012.

On November 2, 2012, MGT Ga.nling filed a. lawsuit clainling pa.tent infringement against multiple compaiues believed to be violating MGT Ganling's patent No. 7,892,088 ("the '088 Patent") entitled "Gaming Device Having a Second Separate Bonusing Event." The 088 patent is directed to a ga.nling system in which a second game played on an interactive sign is triggered once specific events occur in a first game. The lawsuit, which was filed in tl1e Urlited States District Com1 for the Southern District of Mississippi (Jackson Division), alleges the defendants Caesars Enter1ainment, MGM Resmis International, Inc., WMS Ganling, Inc. - a subsidiary of WMS Industries, Inc., Penn National Gaming, Inc., and Arnze Gaming America, Inc. either manufacture, sell or lease gaming systems in violation of MGT Gaming's pa.tent rights, or operate casinos that offer gaming systems in violation of MGT Gaming's patent rights. The allegedly infringing products manufactured, distributed, used, sold and/or offered for sale by defendants include at least tl1ose identified under the trade names: "Pirate Battle," "Reel'em In Compete to Win," "Great and Powerfol Oz," "Battleship," "Clue," and "Pai·adise Fishing."

MGT Gaining is seeking prelinlinary and permai1ent injunctions against all defendants enjoining them from any continued acts of patent infringement, as well as to recover damages adequate to compensate for the infringement in ai1 amount to be proven at trial, arid to recover, in any event, a reasonable royalty from each defendant for its infringement, trebled, plus interest and costs as fixed by the com1.

MGT Ganling has entered into a contingent fee arrangement with Nixon & Vanderhye P.C. ("the law firm") representing MGT Gaming as plaintiff in the lawsuit. MGT Ganling will pay out-of-pocket expenses (as that term is defined in the retainer agreement) until such time, if ever, the lawsuit produces revenue. At that time, the law furn is entitled to a percentage of such revenue, after out-of-pocket expenses ai·e deducted. This contingent fee aiTai1gement reduces the potential value of any legal settlements or judgments, but also reduces the possibility of unpredictable and uncontrollable legal expenses.

**Of.her Information**

On Jtme 8, 2011, we received notice from the NYSE-MKT LLC notifying us that we are not in compliance with the following Exchange continued listing standards: Section 1003(a)(i) of the Company Guide, resulting from stockholders' equity on Mai·ch 31, 2011, of less than $2.0 million and losses from continuing operations and/or net losses in two of its three most recent fiscal years; Section 1003(a)(ii) of the Company Guide with stockholders' equity of less than $4.0 million and losses from continuing operations and/or net losses in tliree of its four most recent fiscal years; and Section 1003(a)(iii) with stockholders' equity of less than $6.0 nlillion and losses from continuing operations and/or net losses in its five most recent fiscal years.

On August 23, 2011, NYSE MKT accepted our plan of compliance submitted to it in response to the deficiency letter. NYSE MKT granted us an extension tmtil December 8, 2012 ("extension period"), to regain compliance with Sections 1003(a)(i) - (iii) of NY MK.T's Company Guide.

We were subsequently notified by NYSE MKT of our noncompliance with Section 1003(f)(v) of the Company Guide (low trading price) and Section 704 (failure to hold an annual meeting). We resolved these deficiencies as of April 13, 2012 and June 1, 2012, respectively.

We will be subject to periodic review by Exchange staff during the extension period and prior to compliance with 1003 (a)(i), (ii), (iii) of the NYSE MKT's Company Guide. Failure to make progress consistent with the plans of compliance or to regain compliance with the continued listing standai·ds by the end of the extension period could result in our being delisted from NYSE MKT.

3

Our stock trading symbol is cmTently "MGT.BC" to denote its noncompliance. The trading symbol will continue to bear this additional indicator until the Company regains its compliance with the NYSE MKT continued listing requirements.

On October 12, 2012, we announced in a Cunent Repo1t filed on Fonn 8-K, we have been operating under a Plan of Compliance approved by NYSE MKT on August 23, 2011 that allowed us until December 8, 2012 to regain compliance with the deficiencies noted above. During this period, the Company has been subject to periodic review by the staff of the NYSE MKT, and was info1med of the requirement to make progress consistent with the Plan or to regain compliance with the continued listing standards by the end of the extension period. On October 5, 2012, we were infonned that the Exchange staff concluded the Company has not made a reasonable demonstration of its ability to complete the initiatives and meet the equity standards by the end of the 18-montli Equity Plan Period, and has therefore begun the delisting process.

We info1med NYSE MKT of our intention to pursue the right of appeal and requested a hearing pursuant to Sections 1203 and 1009(d) of the Company Guide. The hearing is set on December 12, 2012. The Company has taken certain steps to improve its balance sheet including the closing of the transaction for which the underlying common stock is being registered herein. There can be no assurance that our request for continued listing will be granted at this hearing. In the event that our appeal is unsuccessful, we expect that our common stock will trade on OTC-QB no later than any official delisting from NYSEMKT.

## Product development

*ColonCAD*

Medicsight's core technology is the proprieta1y ColonCAD algorithm that is integrated (using application protocol inte1face (API") technology) into visualization workstations for radiologists to use when reviewing a patient's colon CT scan data.

The CAD algmithm assists the radiologist as they search for polyps in the CT scan image data. The radiologist uses the visualization software to review the patient's CT scan images on tl1e screen and searches for polyps (potentially pre-cancerous lesions on the wall of the colon). After a full review, the radiologist then activates the Medicsight ColonCAD software, which immediately displays "CAD marks" on the images, drawing the radiologist's attention to potential polyps and other regions of interest. The radiologist then assesses each marked region in order to make the final decision as to the presence or absence of a polyp.

Clinical studies have demonstrated that radiologists assisted by Medicsight's ColonCAD technology have a significantly higher sensitivity for the detection of patients with polyps in CT colonography compared to unassisted reading (i.e. traditional reading without the use ofColonCAD).

Medicsight launched ColonCAD 4.0 in Europe in March 2009. This release significantly reduced the m1mber of false-positive CAD marks presented to a radiologist reviewing a patient data set. In early 2011, Medicsight futther developed the ColonCAD technology by releasing an enhanced version (ColonCAD 4.1) in Europe. In the United States, Medicsight received marketing clearance from the FDA in May 2011 for an earlier version of ColonCAD (v. 3.5). Fwther improvements in sensitivity and reduction of false-positive CAD marks have been in development; however there are no cmTent plans to pursue regulatory approvals or commercialization of these newer versions.

In addition to cwrnntly approved products, Medicsight is continuing development of prone and supine registration technology. CmTently clinicians review two data sets for each patient, one in each body position of prone and supine. This registration project aims to register the two data sets, including polyps and other regions of interest into one patient data set, thereby reducing clinical review time.

Medicsight's ColonCAD has been developed and validated using a large database of CT scans from hospitals around the world and has been assessed in many clinical studies, the results of which have been published in peer-reviewed publications and presented at leading radiology conferences.

4

*Mediceo $_2$ LON*

In addition to the computer aided detection software applications, Medicsight has developed an automated CO 2 insufflation device called Mediceo 2 LON.

A patient undergoing a CT colon scan requires the colon to be insufflated (distended) with either CO2 gas or room air administered prior to the acquisition of their CT colonography images. MedicCO 2 LON is designed to provide good quality insufflation, which is essential for the acquisition of high quality images from the CT colonography examination.

*Intellectual Property*

Medicsight continues to develop its intellectual prope1ty p01tfolio to protect the core technology in its CAD and other products. During 2012 and 2011, no patents were granted. Medicsight ctmently has 12 patents granted and 20 pending in various tenitories.

**Regulatory approvals and submissions**

*US Food and Drug Administration clearance*

In November 2008, Medicsight submitted the ColonCAD 510(k) application to the Food and Drng Administration ("FDA") for clearance in the U.S. In December 2008, we received an Additional Infonnation ("AI') letter from the FDA and submitted our response to the FDA's inquires in March 2009. In May 2011, Medicsight received 510(k) marketing clearance by the FDA for its ColonCAD 3.5 software. This clearance followed 30 months of fo1mal and info1mal meetings and discussions with the FDA, and included the submission of data to satisfy FDA requests for additional information.

*Other regulatory, territories*

In 2010, we received regulat01y approval of MedicRead 3.0 (our visualization workstation which includes version 4.0 of the Medicsight ColonCAD API) from the Chinese State Food and Drng Administration.

In March 2011 version 4.1 of the Medicsight ColonCAD API received the CE Mark in Europe, which ce1tifies that the product has met European Union health, safety, and environmental standards.

In July 2011, Medicsight was inf01med by the Japanese Ministiy of Health Labor and Welfare ("MHLW") that several statistical data e1rnrs were encountered in their review of the application for approval of its MedicRead software for use in CT Colonography procedures. Following informal guidance from MHLW in August 2011, the Company decided to withdraw the CUlTent submission and is assessing the next course of action.

*Mediceo $_2$ LON*

In 2010, our Mediceo 2 LON automated CO 2 insufflation device received the CE Mark in Europe.

In paitnership with our disti·ibution paitner in 2010 we also submitted MedicCO 2 LON to the MHLW regulatory auth01ities in Japan for approval. We are ClllTently awaiting a decision from MHLW.

**Clinical Activity**

In 2011, Scientific presentations of Medicsight's CAD research were made at the annual European Congress of Radiology the 21st Annual Meeting of the European Society of Gastrnintestinal and Abdominal Radiology "ESGAR", and the annual Radiological Society of North America "RSNA" conference.

In addition, Medicsight sponsored of a number of international CT colonography ti·aining workshops. Medicsight's CUlTent clinical development activities ai·e ve1y limited.

5

**Commercial progress**

Medicsight sells its ColonCad software through distribution paitnerships with global advanced medical visualization companies, Picture Achieving ai1d Coll1111unication System suppliers, and other Original Equipment Maimfacturers.

Medicsight cmTently has partnership agreements with Vital Images, Inc. (acquired by Toshiba in 2011), TeraRecon Inc., Viatronix Inc., Toshiba Medical Visualization Systems, Infmitt, Qi Systems (fonnerly Ziosoft Inc.), and Int:ra:sense SAS.

We support our existing paitners with systems integration and to increase market awareness. In addition we continue to seek new pa1tners to bring the product to market.

In 2010, we signed a global distribution agreement with Medrad Inc. for our MedicCO 2 LON insuftlation device and began coll1111ercial sales. Insuftlators are manufactured by a third patty under contract from Medicsight and are generally produced upon receipt of purchase orders from Medrad.

**Revenue and Growth Strategy**

Revenues remain litnited. Medicsight recorded revenues of $536,000 for the yeai· ended 2011 compared to $540,000 in the year ended 2010. Medicsight ended 2011 with net assets of $3,409,000 including $3,123,000 of cash ai1d short term deposits. During the nine months ended September 30, 2012 we recorded revenues of $336,000 compared to $431,000 for the nine months ended September 30, 2011. At December 31, 2011 all of our liquid assets were held as short tenn cash balances, mainly in US Dollars. Subsequent to the year ended December 31, 2011 we continue to hold our cash in short term deposits at major financial institutions.

As we rely totally on third patties to sell our products, the Company cannot accurately estimate ColonCAD license sales or Mediceo 2 LON device sales.

The Company continues to explore all strategic alternatives with respect to its majority interest in Medicsight Litnited.

The Company is also analyzing potential acquisition opporti.mities in healthcare rnai·ketit1g and technology, as well as va1ious it1tellectual property assets. As pait of this strategy, on June 1, 2012, the Company acquit·ed U.S. Patent #7,892,088, entitled "Gaming Device Having a Second Separate Bonusing Event." This invention relates to gaming systems linked to an interactive sign, and includes all filed continuation patents. The United States Patent and Trademark Office issued this patent on Februa1y 22, 2011; the conesponding patent application was filed on October 18, 2001.

On November 2, 2012, MGT Ganm1g filed a lawsuit claiming patent infringement agait1st multiple compaiues believed to be violating MGT Gaming's patent No. 7,892,088 ("the '088 Patent") entitled "Gaming Device Having a Second Sepai·ate Bonusing Event." The 088 patent is directed to a ganung system it1 which a second game played on an interactive sign is triggered once specific events occur in a first gaine. The lawsuit, which was filed in tl1e United States District Comt for the Southern District of Mississippi (Jackson Division), alleges the defendants Caesars Entertainment, MGM Resorts International, Inc., WMS Gaining, Inc. - a subsidiary of WMS Industries, Inc., Penn National Gaming, Inc., and Amze Gaming America, Inc. either manufacture, sell or lease ganung systems in violation of MGT Gaming's patent rights, or operate casinos that offer gaming systems in violation of MGT Gaming's patent rights. The allegedly infringing products manufactured, distributed, used, sold and/or offered for sale by defendants include at least those identified under the trade names: "Pit·ate Battle," "Reel'em In Compete to Win," "Great and Powerfol Oz," "Battleship," "Clue," and "Paradise Fishing."

MGT Gaining is seeking prelinunary and pe1manent injunctions agait1st all defendants enjoinit1g them from ai1y contitmed acts of patent infringement, as well as to recover damages adequate to compensate for the infingement in atl amount to be proven at trial, ai1d to recover, in ai1y event, a reasonable royalty from each defendant for its infringement, trebled, plus interest and costs as fixed by the comt.

6

MGT Gaming has entered into a contingent fee anangement with Nixon & Vanderhye P.C. ("the law fum") representing MGT Gaming as plaintiff in the lawsuit. MGT Gaming will payout-of-pocket expenses (as that te1m is defined in the retainer agreement) until such time, if ever, the lawsuit produces revenue. At that time, the law fum is entitled to a percentage of such revenue, after out-of-pocket expenses are deducted. This contingent fee anangement reduces the potential value of any legal settlements or judgments, but also reduces the possibility of unpredictable and uncontrollable legal expenses.

There can beno assurance that any future acquisitions will occur at all, or that any such acquisitions will be accretive to earnings, book value and other financial metrics, or that any such acquisitions will generate positive returns for Company shareholders. Fmthennore, it is contemplated that any acquisitions may require the Company to raise additional capital; such capital may not be available on te1ms acceptable to the Company, if at all.

7

## ABOUT THIS OFFERING

On October 22, 2012, pursuant to a subsc1iption agreement between us and the investors signatmy thereto, we sold 1,380,362 units, at $3.26 per unit, each unit consisting of one share of 6% Se1ies A Cumulative Convertible Prefe1Ted Stock conve11ible into one share of our common stock and a five-year wa1Tant to purchase up to 200% of the number of shares of common stock the Prefe1Ted Stock is conve1tible into that such investor purchased in the offe1ing at a per share warrant exercise p1ice of $3.85. We have agreed to register all shares of common stock underlying the Prefe1Ted Stock and the warrant under the Securities Act of 1933, as amended pursuant to the registration 1ight agreement between us a11d the Selling Shareholders. On October 26, 2012, the transaction was approved by the NYSE MKT. The transaction was closed on November 2, 2012.

Each 6% Series A Cumulative Conve11ible Prefe1Ted Stock is conve1tible at the option of the holder into one shai·e of common stock, subject to a 9.99% beneficial ownership ceiling for each Investor's ownership of common stock at any one time. The conversion rate of the Prefe1Ted Stock is subject to adjustment in the case of combination or subdivision of stock.

Each warrant share allows the investors to purchase up to 200% of the number of shares of common stock the 6% Series A Cumulative Conve11ible Prefe1Ted Stock is conve1tible into; subject to a 9.99% beneficial ownership ceiling for each Investor's ownership of common stock at any one time. The conversion rate of the wa1rnnt share is subject to adjustment in the case of combination or subdivision of stock.

The shai·es ofprefe1Ted stock and wairnnts were all offered and sold to "accredited investors", as such te1m is defined in the Secmities Act of 1933, as amended and were offered and sold in reliance on the exemption from registration afforded by Section 4(2) and Regulation D (Rule 506) under the Securities Act and co1Tesponding provisions of state securities laws.

This prospectus includes 1,380,362 shares of our common stock issuable upon conversion of the 6% Series A Cmnulative Conve1tible Prefe1Ted Stock and 2,760,724 shares of our common stock issuable upon the exercise of wa1Tants included within the 6% Se1ies A Cumulative Conve11ible Prefe1Ted Stock.

| | |
|---|---|
| Common stock outstanding prior to this offering | 3,037,187* |
| Common stock offered by the Selling Shareholders | 4,141,086 |
| Common stock to be outstanding aHer the offe1ing | 7,178,273** |

\* As of November 29, 2012.
\*\* Assun1es the conversion of 1,380,362 shares of common stock issuable upon the conversion of the 6% Se1ies A Cumulative Conve11ible Prefe1Ted Stock and 2,760,724 shares of common stock issuable upon the exercise ofwa1Tants included within the 6% Series A Cumulative Conve1tible Prefe1Ted Stock.

## RISK FACTORS

Except for the historical information contained in this prospectus or incorporated by reference, this prospectus (and the information incorporated by reference in this prospectus) contains fo1ward-looking statements that involve risks and unce1tainties. Om actual results could differ mate1ially from those discussed here or incorporated by reference. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in the section entitled "Risk Factors" contained under Item IA of Pait I of om most recent annual report on Fonn 10-K, and m1der "Risk Factors" under Item IA of Pait II of our subsequent quaiterly repo1ts on Fo1m 10-Q, as the same may be amended, supplemented or superseded from tin1e to time by our subsequent filings and reports under the Secmities Exchange Act of 1934, as amended, or the Exchange Act, each of which are inco1porated by reference in this prospectus. For more info1mation, see "Info1mation Incorporated by Reference."

Investing in our securities involves a high degree of risk. You should carefully review the risks and m1ce1tainties described under the heading "Risk Factors" contained under similar headings in the documents that are incorporated by reference into this prospectus, before deciding whether to purchase any of the secmities being registered pursuant to the registration statement of which this prospectus is a pait. Each of the1isk factors could adversely affect our business, operating results and financial condition, as well as adversely affect the value of an investment in our secmities, and the occunence of any of these risks might cause you to lose all or pait of your investment. Moreover, the 1isks described are not the only ones that we face. Additional risks not presently known to us or that we cm1ently believe ai·e in1material may also significantly impair our business operations.

## USE OF PROCEEDS

This prospectus relates to shares of our common stock that may be offered and sold from time to time by tlle Selling Shareholders. We will not receive any of the proceeds resulting from the sale of common stock by the Selling Shai·eholders, although we would receive the proceeds from the exercise of any wanants exercised for cash.

9

## SELLING SECURITY HOLDERS

We are registering an aggregate of 4,141,086 Resale Shares for resale by the Selling Shareholders listed in the table below. All expenses incmrnd with respect to the registration of the Common Stock will be paid by us, but we will not be obligated to pay any unde1writing fees, discounts, commissions or other expenses incmred by the Selling Shareholders in connection with the sale of such shares.

The Selling Shareholders may also resell all or a. po1tion of their secmities in reliance upon Rule 144 under the Secmities Act provided that they meet the criteria and confo1m to the requirements of that mle or by any other available means.

The Selling Shareholders named below may from time to time offer and sell pmsuant to this prospectus up to 4,141,086 Resale Sha.res. The shares of om Common Stock included in the Resale Sha.res were issued to the Selling Shareholders in the transaction desc1ibed in the footnotes to the following table.

The following table sets fm1h:

- the name of the Selling Shareholders;

- the number and percent of shares of our Common Stock that the Selling Shareholders beneficially owned prior to the offering for resale of the shares under this prospectus;

- the number of shares of our Common Stock that may be offered for resale for the account of the Selling Shareholders under this prospectus; and

- the number and percent of shares of our Common Stock to be beneficially owned by the Selling Shareholders after the offering of the Resale Shares (assuming all of the offered Resale Shares are sold by the Selling Shareholders).

The nmnber of shares in the colmnn "Nlllllber of Shares Being Offered" represents all of the shares that ea.ch Selling Shareholder may offer m1der this prospectus. We do not know how long the Selling Shareholders will hold the shares before selling them or how many shares they will sell, and we cmTently have no agreements, anangements or understandings with any of the Selling Shareholders regarding the sale of any of the Resale Shares.

This table is prepared solely based on info1mation supplied to us by the Selling Shareholders, any Schedules 13D or 13G and Fo1ms 3 and 4, and other public documents filed with the SEC, and assmnes the exercise of all wan-ants, the conversion of notes or issuance of Resale Shares pursuant to the note and the sale of all of the Resale Shares and does not take into account any limitation on conversion or exercise of such wanants and notes. The applicable percentages of beneficial ownership a.re based on an aggregate of 3,037,187 shares of our common stock issued and outstanding on November 29, 2012.

Except as noted in the footnotes to the table below, to our knowledge, none of the Selling Shareholders has held any position or office or had any other material relationship with us or any of our predecessors or affiliates within the past three years other than as a result of the ownership of our secmities. None of the Selling Shareholders is a broker-dealer of affiliate of a broker-dealer. See "Plan of Disttibution" for additional info1ma.tion about the Selling Shareholders and the manner in which the Selling Shareholders may dispose of their shares. Beneficial ownership has been detelTilined in accordance with the mies of tl1e SEC, and generally means that a person has beneficial ownership of a security if he, she or it possesses sole or shares voting or investment power of that security, and includes option that a.re ctmently exercisable or exercisable within 60 days. Our registration of these securities does not necessarily mean that the Selling Shareholders will sell any or all of the securities covered by this prospectus.

| Name of Shareholder | Sha1·es Beneficially Owned Prior to Offe1'ing Number | Number of Shares Offered | Number of Shares Beneficially Owned After Offering | Percent |
|---|---|---|---|---|
| Richard J. Strauss | 18,402(1) | 18,402(1) | 0 | 0 |
| White Trout Lake LLC (2) | 27,606(3) | 27,606(3) | 0 | 0 |
| Melechdavid Inc. (4) | 55,212(5) | 55,212(5) | 0 | 0 |
| HS Contraiian Investments, LLC (6) | 389,795(7) | 389,795(7) | 0 | 0 |
| John Ford | 30,000(8) | 30,000(8) | 0 | 0 |
| Alpha Capital Anstalt (9) | 132,352(10) | 132,352(10) | 0 | 0 |
| Hudson Bay Master Flllld Ltd. (11) | 1,407,744(12) | 920,244(13) | 487.500(14) | 14% |
| Iroquois Master Fund Ltd. (15) | 1,407,744(12) | 920,244(13) | 487,500(14) | 14% |
| Bany Honig | 478,527(16) | 478,527(16) | 0 | 0 |
| Bank Gutenberg A.G. (17) | 920,244(18) | 920,244(18) | 0 | 0 |
| Sandor Capital Master Flllld (19) | 110,427(20) | 110,427(20) | 0 | 0 |
| Ronald B. Low | 55,212(21) | 55,212(21) | 0 | 0 |
| Suzanne Adams | 82,821(22) | 82,821(22) | 0 | 0 |

(1) Represents shares pmchased in the October 2012 subscription agreement, which includes 12,268 shares of COillIIIon stock issuable upon the exercise of wal1ants and 6,134 shares of common stock issuable upon the conversion of 6% Series A Cumulative Prefe1Ted Stock.

(2) AR Berger LLC is the managing member of White Trout Lake LLC. Alexander R. Berger is authorized signat01y of AR Berger LLC and as such has voting and investment power over the securities owned by the selling stockholder. Alexander R. Berger disclaims beneficial ownership of these securities.

(3) Represents shares purchased in the October 2012 subscription agreement, which includes 18,404 shares of co1llll1on stock issuable upon the exercise of wal1ants and 9,202 shares of common stock issuable upon the conversion of 6% Series A Cumulative Prefe1rnd Stock.

(4) Mark Groussman is president of Melechdavid Inc. and as such has voting and investment power over the securities owned by the selling stockholder. Mr. Groussman disclaims beneficial ownership of these shares.

(5) Represents shares pmchased in the October 2012 subscription agreement, which includes 36,808 shares of COillIIIon stock issuable upon the exercise of waiTants and 18,404 shares of common stock issuable upon the conversion of 6% Series A Cumulative Prefe1rnd Stock.

(6) John Stetson is the managing member of HS Contrarian Investments, LLC and as such has voting and investment power over the securities owned by the selling stockholder. Mr. Stetson disclaims beneficial ownership over these shares.

(7) Represents shares purchased in the October 2012 subscription agreement, which includes 286,922 shai·es of common stock issuable upon the exercise of wal1ants and 102,873 shares of common stock issuable upon the conversion of 6% Series A Cumulative PrefeITed Stock.

(8) Represents shares purchased from an investor in the October 2012 subsc1iption agreement, which includes 15,000 shares of common stock issuable upon the exercise ofwal1ants and 15,000 shares of common stock issuable upon the conversion of 6% Series A Cumulative Prefe1Ted Stock.

(9) Konrad Ackennan is the managing member of Alpha Capital Anstalt and as such has voting and investment power over the secmities owned by the selling stockholder. Mr. Acke1man disclaims beneficial ownership over these shares.

(10) Represents shai·es purchased from an investor in the October 2012 subscription agreement, which includes 66,176 shares of common stock issuable upon the exercise ofwal1ants and 66,176 shares of cotmnon stock issuable upon the conversion of 6% Se1ies A Cumulative PrefeITed Stock

(11) Hudson Bay Capital Management, the investment manager of Hudson Bay Master Flllld Ltd., has voting and investment power over the securities issued to Hudson Bay Mater Fund Ltd. Sander Gerber is the managing member of Hudson Bay

Capital GP LLC, which is the general pa1tner of Hudson Bay Capital Management LP. Sander Gerber disclaims beneficial ownership over these securities.

(12) Represents shares purchased in the October 2012 subscription agreement, which includes 613,496 shares of common stock issuable upon the exercise of warrants and 306,748 shares issuable upon the conversion of 6% Se1ies A Cumulative PrefetTed Stock. 437,500 shares of common stock are issuable upon the exercise of watTants included in the May 30, 2012 Securities Purchase Agreement as rep01ted on F01m 8K filed by us with the SEC on May 30, 2012. Remaining 50,000 shares of common stock represent shares issued in the October 2012 Conve1tible Note Repayment Agreement as rep01ted on F01m 8K filed by us with the SEC on October 9, 2012.

11

---

(13) Represents shares purchased in the October 2012 subscription agreement, which includes 613,496 shares of common stock issuable upon the exercise of wanants and 306,748 shares of common stock issuable upon the conversion of 6% Series A Cmnulative Prefened Stock

(14) Of this amount, 437,500 shares of common stock are issuable upon the exercise ofwairnnts included in the May 30, 2012 Securities Purchase Agreement as repo11ed on Fonn 8K filed by us with the SEC on May 30, 2012.

(15) Iroquois Capital Management L.L.C. ("Iroquois Capital") is the investment manager of Iroquois Master Fund, Ltd. ("IMF"). Consequently, Iroquois Capital has voting control and investment discretion over secmities held by IMF. As managing members of Iroquois Capital, Joshua Silve1man and Richard Abbe make voting and investment decisions on behalf of Iroquois Capital in its capacity as investment manager to IMF. As a result of the foregoing, Mr. Silverman and Mr. Abbe may be deemed to have beneficial ownership (as detennined under Section 13(d) of the Secmities Exchange Act of 1934, as amended) of the securities held by IMF.

(16) Represents shares purchased in the October 2012 subscription agreement, which includes 319,018 shares of common stock issuable upon the exercise of waiTants and 159,509 shares of common stock issuable upon the exercise of 6% Series A Cumulative Preferrnd Stock.

(17) Christoph Cajochen and Mai·cel Berchtold, each of who are Assistant VP of Bank Gutenberg ai1d has voting ai1d investment power over the securities owned by the selling stockholder. Christoph Cajochen and Marcel Berchtold each disclaini beneficial ownership over these shares.

(18) Represents shares purchased in the October 2012 subscription agreement, which includes 613,496 shares of common stock issuable upon the exercise of wanants and 306,748 shares of common stock issuable upon the conversion of 6% Series A Cumulative Prefened Stock.

(I9) John Lemak is the Manager of Sandor Capital Master Fund and has voting and investment power over the securities owned by the selling stockholder. Mr. Lemak disclaims beneficial ownership oftl1ese shares.

(20) Represents shares purchased in the October 2012 subscription agreement, which includes 73,618 shares of common stock issuable upon the exercise of wanants and 36,809 shares of common stock issuable upon the conversion of 6% Series A Cumulative Prefened Stock.

(21) Represents shares purchased in the October 2012 subscription agreement, which includes 36,808 shares of common stock issuable upon the exercise of wanants and 18,404 shares of common stock issuable upon the conversion of 6% Series A Cumulative Preferrnd Stock.

(22) Represents shares purchased in the October 2012 subscription agreement, which includes 55,214 shares of common stock issuable upon the exercise of wa1Tai1ts and 27,607 shares of common stock issuable upon the conversion of 6% Series A Cumulative Preferrnd Stock.

     With respect to the 6% Series A Cmnulative Prefened Stock and wanants, the shai·eholder may not exercise or convert, as the case may be, such 6% Series A Cumulative Prefened Stock or wanants if the number of shai·es of Common Stock to be issued pursuant to such exercise or conversion when aggregated with all other shares of Common Stock owned by the stockholder at such time, would result in the Holder beneficially owning (as determined in accordance with Section 13(d) of tl1e Exchange Act and tl1e mies therem1der) in excess of 9.99% of the then issued and outstanding shares of Common Stock outstai1ding at such time.

## PLAN OF DISTRIBUTION

The Selling Shareholders may sell the securities offered by this prospectus in any one or more of the following ways from time to time:

> directly to investors, including through a specific bidding, auction or other process or in privately negotiated transactions;

> to investors through agents;

> directly to agents;

> to or through brokers or dealers;

> to the public through unde1writing syndicates led by one or more managing unde1w1iters;

> to one or more unde1writers acting alone for resale to investors or to the public;

> through a block trade in which the broker or dealer engaged to handle the block trade will attempt to sell the securities as agent, but may position and resell a p01tion of the block as p1incipal to facilitate the transaction;

> through agents on a best-effo11s basis; and

> through a combination of any such methods of sale.

The Selling Shareholders may sell the Resale Shares pursuant to this prospectus. The Selling Shareholders may also sell all or a p011ion of the Resale Shares in reliance upon Rule 144 under the Secmities Act provided that they meet ilie criteria and confonn to the requirements of that rule or by any other available means.

To the best of our knowledge the Selling Shareholders have not entered into any agreements, understandings or aiTangements with any unde1writers, broker-dealersor agents regai·ding the sale of any secmities covered by this prospectus.

Broker-dealers engaged by the Selling Shareholders may ammge for other brokers-dealers to pa11icipate in sales. Broker-dealers may receive commissions or discounts from the Selling Shai·eholders (or, if any broker-dealer acts as agent for Purchaser of shares, from Purchaser) in amounts to be negotiated, but, except as set fo1th in a supplement to this Prospectus, in the case of an agency transaction not in excess of a customa1y brokerage commission in compliance with FINRA Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with FINRA IM-2440.

In connection with the sale of ilie common stock or interests therein, the Selling Shareholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in sh011 sales of the common stock in the course of hedging the positions they assume. The Selling Shareholders may also sell shares of the common stock sh011 and deliver these secmities to close out its sh011 position, or loan or pledge the common stock to broker-dealers that in tum may sell these securities. The Selling Shareholders may also enter into option or other transactions wiili broker-dealers or other financial institutions or create one or more de1ivative secmities which require the delive1y to such broker-dealer or other financial institution of shai·es offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

The Selling Shareholders may be deemed unde1wiiters within the meaning of the Securities Act and any broker-dealers or agents that are involved in selling the shai·es may be deemed to be "underwriters" within the meaning of the Securities Act in co1lllection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be unde1wiiting commissions or discounts under the Secmities Act. The Selling Shareholders have informed the Company that they do not have any written or oral agreement or m1derstanding, directly or indirectly, with any person to disti1bute the common stock. In no event shall any broker-dealer receive fees, commissions and markups which, in tl1e aggregate, would exceed five percent (5%).

13

Because the Selling Shareholders may be deemed "underwriters" within the meaning of the Securities Act, they will be subject to the prospectus delivery requirements of the Secmities Act including Rule 172 thereunder. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Secmities Act may be sold under Rule 144 rather than under this prospectus. There is no underwriter or coordinating broker acting in connection with the proposed sale of the resale shares by the Selling Shareholders.

We agreed to keep the registration statement that this prospectus forms a part of continuously effective under the Securities Act until all securities covered by such registration statement have been sold, or may be sold without the requirement to be in compliance with Rule 144(c)(l) and otherwise without restriction or limitation pursuant to Rule 144.

Under applicable rules and regulations under the Exchange Act, any person engaged in the distribution of the Resale Shares may not sinmltaneously engage in market making activities with respect to the common stock for the applicable restricted period, as defined in Regulation M, prior to the commencement of the disttibution. In addition, the Selling Shareholders will be subject to applicable provisions of the Exchange Act and the mies and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of shares of the common stock by the Selling Shareholders or any other person. We will make copies of this prospectus available to the Selling Shareholders and have infmmed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale.

14

## LEGAL MATTERS

Unless othe1wise indicated in the applicable prospectus supplement, the validity of the securities being offered herein has been passed upon for us by Sichenzia Ross Friedman Ference LLP. Legal counsel to any unde1writers may pass upon legal matters for such unde1writers.

## EXPERTS

The consolidated balance sheets ofMGT Capital Investments, Inc. as of December 31, 2011 and 2010 and the related consolidated statements of operations, stockholders' (deficit) equity and comprehensive income/loss, and cash flows for each of the years in the two year pe1iod ended December 31, 2011 and Schedule II- Valuation and Qualifying Accounts for each of the years in the two-year pe1iod ended December 31, 2011 have been audited by EisnerAmper LLP, independent registered public accounting furn, as stated in their rep01t which is incorporated herein by reference in reliance on the repo1t of such furn given upon their auth01ity as expe1ts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We file annual, qua1terly, and cmTent rep01ts, proxy statements and other inf01nation with the Securities and Exchange Commission ("SEC"). Our SEC filings are available to the public over the Internet at the SEC's web site at www.sec.gov and on the "Shareholder Info1mation," "SEC Filings" page of our website at www.mgtci.com. Info1mation on our web site is not pait of this prospectus, and we do not desire to incorporate by reference such infonnation herein. You may also read and copy any document we file with the SEC at the SEC's Public Reference Room at 100 F Street N.E., Washington, D.C. 20549. You can also obtain copies of the documents upon the payment of a duplicating fee to the SEC. Please call the SEC at 1-800-SEC-0330 for further info1mation on the operation of the Public Reference Room. The SEC maintains an Internet site that contains repo1ts, proxy and info1mation statements, and other info1mation regarding issuers that file electronically with the SEC like us. Our SEC filings are also available to tl1e public from the SEC's website at http://www.sec.gov.

This prospectus is part of the registration statement and does not contain all of the inf01mation included in the registration statement. Whenever a reference is made in this prospectus to any of our contracts or other docmnents, the reference may not be complete and, for a copy of the contract or document, you should refer to the exhibits that are a part of tl1e registration statement.

This prospectus omits some infom1ation contained in the registration statement in accordance with SEC mies and regulations. You should review the info1mation ai1d exhibits included in the registration statement for fmther infonnation about us and tl1e securities we ai·e offe1ing. Statements in this prospectus concerning any docmnent we filed as an exhibit to the registration statement or that we otherwise filed with fue SEC are not intended to be comprehensive and ai·e qualified by reference to these filings and docmnents. You should review the complete document to evaluate these statements.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Securities and Exchange Commission allows us to "incorporate by reference" into this prospectus fue infonnation we file wifu it, which means fuat we can disclose imp01tant infonnation to you by refeITing you to fuose docmnents. The inf01mation incorporated by reference is considered to be part of this prospectus from the date on which we file that document. Any reports filed by us wifu fue SEC (i) on or after fue date of filing of the registration statement and (ii) on or after the date of this prospectus and before the te1mination of tl1e offering of the securities by means of this prospectus will automatically update and, where applicable, supersede infonnation contained in this prospectus or incorporated by reference into this prospectus.

15

We incorporate by reference the documents listed below, all filings filed by us pursuant to the Exchange Act after the date of the registration statement of which this prospectus fonns a pru1 prior to effectiveness of such registration statement, and any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, prior to the time that all securities covered by this prospectus have been sold; provided, however, that we are not incorporating any information furnished under either Item 2.02 or Item 7.01 of any ctment rep011on Form 8-K:

- Our Annual Rep011on Form 10-K for the fiscal year ended December 31, 2011, filed with the SEC on March 1, 2012.

- Our Definitive Proxy Statement on Schedule 14A for an Annual Meeting of Shareholders, filed with the SEC on May 11, 2012.

- Our Quru1erly Repm1s on Fmm 10-Q for the quru1erly periods ended (a) September 30, 2012, filed with the SEC on November 14, 2012, (b) June 30, 2012, filed with the SEC on August 14, 2012, together with Amendment No. 1, filed with the SEC on September 11, 2012 ru1d Amendment No. 2 filed with the SEC on September 12, 2012, (c) March 31, 2012, filed with the SEC on May 14, 2012.

- Our Cunent Repo11s on Fo1m 8-K filed with the SEC on November 23, 2012, November 9, 2012, October 26, 2012, October 26, 2012 (as runended by Amendment No. 1 filed on November 8, 2012), October 12, 2012, October 9, 2012, August 1, 2012, June 27, 2012 (2), June 1, 2012, May 31, 2012, May 30, 2012, May 16, 2012, March 27, 2012, March 20, 2012, March 16, 2012, March 12, 2012, Febmary 24, 2012, Janua1y 31, 2012, Janua1y 12, 2012 and Janua1y 9, 2012.

- The description of our common stock contained in our registration statement on (a) Fmm S-3 and Fmm S-3/A filed with the SEC on September 25, 2012, September 21, 2012, July 31, 2012 and June 22, 2012. (b) Fonns S-1 and S-1/A filed with the SEC on October 3, 2011, November 10, 2011, November 14, 2011, and November 16, 2011.

- All docmnents filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and prior to the tennination of the offering of our common stock hereunder.

- All documents filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, other than any info1mation pursuant to Item 2.02 or Item 7.01 ofF01m 8-K, after the date of the initial registration statement and prior to the effectiveness of the registration statement of which this prospectus fo1ms a pa11 shall be deemed to be incorporated by reference in this prospectus and to be a pa11 of this prospectus from the date they are filed.

16

These documents contain impmtant information about us, our business and our financial condition. You may request a copy of these filings, at no cost, by writing or telephoning us at:

MGT Capital Investments, Inc.
500 Mamaroneck Avenue
Suite 204
Hanison, NY 10528
Phone: (914) 630-7431

All documents filed by us pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Act or the Exchange Act, excluding any information in those documents that are deemed by the mles of the SEC to be furnished but not filed, after the date of this filing and before the termination of this offering shall be deemed to be incorporated in this prospectus and to be a part hereof from the date of the filing of such document. Any statement contained in a docmnent incmporated by reference herein shall be deemed to be modified or superseded for all pmposes to the extent that a statement contained in this prospectus, or in any other subsequently filed document which is also incmporated or deemed to be incmporated by reference, modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this prospectus. You will be deemed to have notice of all information incmporated by reference in this prospectus as if that infmmation was included in this prospectus.

We maintain an Internet website at www.mgtci.com where the incmporated reports listed above can be accessed. Neither this website nor the infonnation on this website is included or incorporated in, or is a part of, this prospectus.

17

PART II

**INFORMATION NOT REQUIRED IN PROSPECTUS**

## ITEM 14. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

The following table sets forth the vaiious expenses, all of which will be borne by us, in connection with the sale and distribution of the secmities being registered, other than the unde1writing discounts and commissions. All amounts shown are estimates except for the Securities and Exchange Commission registration fee.

| *Description* | | *Amount to be Paid* |
|---|---|---|
| Filing Fee - Secmities and Exchange Commission | $ | 2,547.45 |
| Attorney's fees and expenses | $ | 40,000.00* |
| Accountant's fees and expenses | $ | 7,500.00* |
| Printing and engraving expenses | $ | 1,000.00* |
| **Total** | $ | **51,047.45** |

* Estimated expenses that ai·e not presently known because they depend upon, among other things, the number of offerings that will be made pursuant to this registration statement, the amount and type of securities being offered and the timing of such offerings.

## ITEM 15. INDEMNIFICATION OF DIRECTORS AND OFFICERS

Atticle NIN1H of our Ce1tificate of Incorporation states: To the fullest extent that the General Corporation Law of the State of Delawai·e as it exists on the date hereof or as it may hereafter be amended pennits the limitation or elimination of the liability of directors, no director of the Corporation shall be liable to the C01poration or its stockholders for moneta1y damages for breach of fiduciaty duty as a director. No ainendment to this Ce1tificate of lnco1poratio11, directly or indirectly by merger, consolidation or othe1wise, having the effect of amending or repealing any of the provisions of this ARTICLE NINTH shall apply to, or have any effect on the liability or alleged liability of, any director of the Cotporation for or with respect to any acts or omissions of such director occm1ing p1ior to such amendment or repeal, unless such amendment shall have the effect of futther limiting or elimination such liability.

Article IX of our By-Laws provides in pe1tinent patt that the Company shall to the fullest extent pennitted by applicable law as then in effect indemnify any person who was or is involved in any mam1er in any legal proceeding by reason of the fact that he is or was a director or officer of the Company, or is or was serving at the request of the Company as a director or officer of another cmporation or of a partnership, joint venture, trust or other ente1prise or in any other capacity while se1ving as a director or officer, against all expenses, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties and atnounts paid or to be paid in settlement) actually and reasonably incurred by him in connection with such legal proceeding.

Section 145 of the Delaware General C01poration Law authorizes us to indemnify any director or officer under presc1ibed circU1UStances and subject to certain limitations against certain costs and expenses, including attorneys' fees actually and reasonably incmTed in connection with any action, suit or proceedings, whether civil, crinlinal, administrative or investigative, to which such person is a patty by reason of being one of our directors or officers if it is detennined that the person acted in accordance with the applicable standard of conduct set forth in such statut01y provisions.

Insofar as indemnification for liabilities aiising under the Secmities Act of 1933 may be pennitted to directors, officers and controlling persons of MGT pursuant to the foregoing provisions, or othe1wise, we have been advised that, in the opinion of the Secmities and Exchange Commission, such indemnification is against public policy as expressed in such Act and is, tl1erefore, m1enforceable.

18

## ITEM 16. EXIIIBITS AND FINANCIAL STATEMENT SCHEDULES

The Exhibit Index beginning on page 22 is hereby incorporated by reference.

## ITEM 17. UNDERTAKINGS

The undersigned registrant hereby unde11akes:

(1)     To file, dming any pe1iod in which offers or sales are being made, a post-effective amendment to this registration statement to:

(i)     Include any prospectus required by Section 10(a)(3) of the Securities Act;

(ii)     Reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the info1mation set fo11h in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of secmities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the fonn of prospectus filed with the Conunission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and p1ice represent no more than a 20% change in the maximum aggregate offe1ing p1ice set fo11h in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii)     Include any material information with respect to the plan of distiibution not previously disclosed in the registration statement or any mate1ial change to such infonnation in the registi·ation statement;

provided, however, that paragraphs (l)(i), (l)(ii) and (i)(iii) above do not apply if the inf01mation required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registi·ant pursuant to sections 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") that are incorporated by reference in the registi·ation statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) of this chapter that is pa11 of the registration statement.

(2)     That, for the pmpose of dete1mining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registi·ation statement relating to the securities offered therein, and the offe1ing of such securities at that time shall be deemed to be the initial *bona fide* offe1ing thereof.

(3)     To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the tennination of the offe1ing.

(4)     That, for the pmpose of dete1mining liability under the Secmities Act to any purchaser:

(A)     Each prospectus filed by the registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registi·ation statement as of the date the filed prospectus was deemed pa11 of and included in the registi·ation statement; and

(B)     Each prospectus required to be filed pursuant to Rule 424(b)(2), (b)(5), or (b)(7) as pa11 of a registi·ation statement in reliance on Rule 430B relating to an offering made pursuant to Rule 415(a)(l)(i), (vii), or (x) for the pmpose of providing the infonnation required by section 1O(a) of the Secmities Act shall be deemed to be pa11 of and included in the registi·ation statement as of the earlier of the date such fonn of prospectus is first used after effectiveness or the date of the first contract of sale of secmities in the offering described in the prospectus. As provided in Rule 430B, for liability pmposes of the issuer ai1d any person that is at that date an unde1writer, such date shall be deemed to be a new effective date of the registration statement relating to the secmities in the registi·ation statement to which that prospectus relates, and the offering of such secmities at that time shall be deemed to be the initial bona fide offe1ing thereof. Provided, however, that no statement made in a registration statement or prospectus that is pa11of the registi·ation statement or made in a document incmporated or deemed inc01porated by reference into the registi·ation statement or prospectus that is pai1 of the registi·ation statement will, as to a purchaser with a time of contract of sale prior to such effective date, supersede or modify any statement that was made in the registration statement or prospectus that was pai1of the registration statement or made in any such document immediately prior to such effective date.

19

(5)      That, for the pmpose of detennining liability of the registrant under the Securities Act to any purchaser in the initial distribution of the secmities:

The undersigned registrant undertakes that in a p1ima1y offering of secmities of the undersigned registrant pursuant to this registration statement, regardless of the unde1writing method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the m1designed registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i)      Any prelitnina1y prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii)      Any free wiiting prospecn1s relating to the offering prepared by or on behalf of the undersigned registrant or used or refetTed to by the undersigned registrant;

(iii)      The p011ion of any other free wiiting prospectus relating to the offering contammg material infonnation about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv)p      Any other communication that is an offer in the offering made by the undersigned registrant to the urchaser.

The undersigned registrant hereby m1de11akes that, for pmposes of detennining any liability under the Secmities Act, each filing of the registrant's annual repot1 pursuant to Section 13(a) or Section 15(d) of the Exchange Act (and, where applicable, each filing of an employee benefit plan's annual rep011 pursuant to Section 15(d) of the Exchange Act) that is incotporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

The undersigned registrant hereby 1mde11akes to deliver or cause to be delivered with the prospectus to each person to whom the prospecn1s is sent or given, the latest annual report to security holders that is incorporated by reference in the prospectus and furnished pursuant to and meeting the requirements of Rule 14a-3 or Rule 14c-3 under the Secmities Exchange Act of 1934; and, where interim financial info1mation required to be presented by Article 3 of Regulation S-X is not set fo11h in the prospectus, to deliver, or cause to be delivered to each person to whom the prospectus is sent or given, the latest qua1terly repot1 that is specifically incotporated by reference in the prospecn1s to provide such interim financial infotmation.

Insofar as indemnification for liabilities atising m1der the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or othe1wise, the registrant has been advised that in the opinion of the Securities and Exchange Cormnission such indemnification is against public policy as expressed in the Act and is, therefore, m1enforceable. In the event that a claini for indemnification against such liabilities (other than the payment by the registrant of expenses incmTed or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asse11ed by such director, officer or controlling person in connection with the secmities being registered, the registrant will, unless in the opinion of its collllSel the matter has been settled by controlling precedent, submit to a com1of appropriate jurisdiction the question whether such indelllllification by it is against public policy as expressed in the Securities Act and will be governed by the fmal adjudication of such issue.

The undersigned registrant hereby unde11akes to file an application for the pmpose of dete1mining the eligibility of the tmstee to act under subsection (a) of section 310 of the Trust Indennire Act (the "Act") in accordance with the mies and regulations prescribed by the Commission under section 305(b)(2) of the Act.

20

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned thereunto duly authorized on November 30, 2012.

**MGT CAPITAL INVESTMENTS, INC.**

/s/Robert B. Ladd
    Robert B. Ladd
    President and Chief Executive Officer
    (Principal Executive Officer)

Date: November 30, 2012

/s/Robert P. Travesa
    Robert P. Traversa
    Chief Financial Officer
    (Principal Financial Officer)

Date: November 30, 2012

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Robert B. Ladd and Robert P. Traversa, as his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this Registration Statement, and any subsequent registration statements pursuant to Rule 462 of the Securities Act of 1933 and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that each of said attorney-in-fact or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Robert B. Ladd<br>Robert B. Ladd | President, CEO and Director<br>(Principal Executive Officer) | November 30, 2012 |
| /s/ Robert P. Travesa<br>Robert P. Traversa | Chief Financial Officer and Director<br>(Principal Financial Officer) | November 30, 2012 |
| /s/ H. Robert Hohnes<br>H. Robert Hohnes | Director | November 30, 2012 |
| /s/ Michael Onghai<br>Michael Onghai | Director | November 30, 2012 |

21

## EXHIBIT INDEX

| Exhibit No. | Desc.-iption |
|---|---|
| 2.1 | Alticles of Merger ofMedicsight, Inc., a Utah corporation (1) |
| 2.2 | Ce1tificate of Merger ofMedicsight, Inc., a Delaware c01poration (1) |
| 3.1 | Certificate oflnc01poration ofMedicsight, Inc. and amendments thereto (1) |
| 3.2 | By-Laws ofMedicsight, Inc. (1) |
| 4.1 | F01m of Subsc1iption Agreement(2) |
| 4.2 | Fonn ofWairnnt (2) |
| 4.3 | Fo1m of Registration Rights Agreement(2) |
| 4.4 | Ce11ificate of Designation of Prefened Stock(2) |
| **5.1 | Opinion of Sichenzia Ross Friedman Ference LLP |
| **23.1 | Consent of EisnerAlnper LLP |
| 23.2 | Consent of Sichenzia Ross Friedman Ference LLP (included in Exhibit 5.1) |
| 24.1 | Power of Attorney |

(1) Denotes previously filed exhibits: filed on Janua1y 19, 2007 with MGT Capital Investments Inc.'s F01m 8-K.
(2) Denotes previously filed exhibits: filed on October 26, 2012 as pa11 of the Company's Fo1m 8-K.

** Filed herewith.