# EXHIBIT L

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3                     --o0o--

4  SECURITIES AND EXCHANGE           )
   COMMISSION,                       )
5                                    )
              Plaintiff,             )
6                                    ) Case No.
        vs.                          ) 18 Civ. 8175 (ER)
7                                    )
   BARRY C. HONIG, ROBERT LADD,      )
8  ELLIOT MAZA, BRIAN KELLER,        )
   JOHN H. FORD, GRQ CONSULTANTS,    )
9  INC. and HS CONTRARIAN            )
   INVESTMENTS, LLC,                 )
10                                   )
              Defendants.            )
11 _____)

12

13

14

15               DEPOSITION OF

16               HARVEY KESNER

17           VIA REMOTE VIDEOCONFERENCE

18            MONDAY, AUGUST 8, 2022

19

20

21

22

23
   Stenographically Reported by:
24 Victoria L. Valine, CSR, RMR, CRR, RSA
   California CSR License No. 3036
25 Job No. 220808VV

                                                    1

```
 1                    REMOTE APPEARANCES:

 2

 3   FOR PLAINTIFF:

 4           SECURITIES AND EXCHANGE COMMISSION
             BY:  Nancy A. Brown, Esq.
 5                Jack Kaufman, Esq.
             100 Pearl Street, Suite 20-100
 6           New York, New York 10004
             212-336-1023
 7           BrownN@SEC.gov

 8

 9   FOR DEFENDANT ROBERT LADD:

10           FORD O'BRIEN, LLP
             Attorneys at Law
11           BY:  Adam Ford, Esq.
                  Anjula Prasad, Esq.
12           575 Fifth Avenue, Floor 17
             New York, New York  10017
13           212-858-0040
             AFord@fordobrien.com

14

15   Also Present:  Robert Ladd

16

17

18

19      (All parties appeared remotely via videoconference.)

20

21

22

23

24

25
                                                             2
```

1                              INDEX

2    WITNESS:  HARVEY KESNER

3    EXAMINATION BY COUNSEL                        PAGE

4    Examination By Ms. Brown:                       9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                     3

1    was made in the same entity.  Not the same in terms of

2    amount, just the same parties were investing.

3         Q.   How about Mark Groussman, did you ever see his

4    name involved in transactions that involved Mr. Honig?

5         A.   Yes.

6         Q.   And who do you understand Mr. Groussman to be?

7         A.   Mr. Groussman is a -- I understand to be a

8    long-time family friend of the Honig family.

9         Q.   Did he also work out of Mr. Honig's offices?

10        A.   I think the answer is yes and no.  I think he

11   had a desk there, but rarely was there.

12        Q.   And did he have an entity called Melechdavid?

13   M-E-L-E-C-H-D-A-V-I-D.

14        A.   Again, did he have an entity?

15             I never saw the formation documents, as far as

16   I know, so I couldn't say for sure, but I do believe he

17   was the authorized signer for Melechdavid documents.

18        Q.   Did you see Melechdavid involved in

19   transactions that also involved Mr. Honig?

20        A.   Yes.

21        Q.   All right.  How about Mr. Brauser -- Michael

22   Brauser, who is he?

23        A.   A private investor.

24        Q.   And did you ever see his name involved in

25   transactions that involved Mr. Honig?

57

1        A.   Ever?  Yes.

2        Q.   And are you familiar with an entity called

3   Marlin Capital, M-A-R-L-I-N?

4        A.   There were, I believe, several Marlin Capital

5   iterations, but I do remember Marlin Capital.  I don't

6   know if it was an Inc., or partners, or something

7   like -- I don't know the full name, but there was a

8   Marlin Capital of some sort.

9        Q.   And do you know to whom it was associated?

10       A.   I do not.  As the other answers indicated, I

11  didn't have their incorporation, or formation, or

12  issuance documents.  My familiarity was that it was a

13  Michael Brauser entity, though.  I don't know who owned

14  it specifically.

15       Q.   What about Grander Holdings, G-R-A-N-D-E-R?

16       A.   I think it's the same answer.  I think it was

17  associated with Mr. Brauser, and I never saw the

18  incorporation documents so I don't know who actually

19  owned it or controlled it.

20       Q.   And did you see either Marlin Capital or

21  Grander Holdings involved in transactions that also

22  involved Mr. Honig?

23       A.   Yes.

24       Q.   And then Jonathan Honig, that's Mr. Honig's

25  brother; is that right?

58

1      A.    Correct.  As far as I know, yes.

2      Q.    And he had his own entity called Titan?

3      A.    I'm not familiar with that name.  I don't have

4  a recollection of that entity.

5      Q.    All right.  Did he also act as trustee for an

6  investment vehicle called Four Kids Investment?

7      A.    Again, trustee is sort of a formal title that

8  would be created from formation documents.  I don't know

9  if he was trustee.

10     Q.    Did you understand that he controlled the

11  investment decisions for Four Kids Investments?

12     A.    I don't -- the way you've asked it, you know,

13  do I understand that he controlled?  I have no

14  understanding who controlled.  I believe that he may

15  have signed as an authorized person for Four Kids.

16     Q.    And do you have an understanding of who the

17  beneficiaries were of the Four Kids Investment Trust?

18     A.    My understanding is they were Mr. Barry

19  Honig's four children.

20     Q.    And -- okay.

21           And did you see Mr. Jonathan Honig or Four

22  Kids Investment involved in transactions that also

23  involved Mr. Barry Honig?

24     A.    Yes.

25     Q.    Okay.  Is it fair to say, Mr. Kesner, that

59

1 Mr. Honig, Stetson, O'Rourke, Groussman, Jonathan Honig,

2 and Brauser were frequent co-investors?

3     A.    I think there's a continuum of time in which

4 that answer has to be qualified.  Certainly not in the

5 period when I was at Olshan Grundman.

6         Probably towards the end of my tenure at

7 Haynes and Boone some of those names would start to

8 appear.  And then during the period at Sichenzia those

9 names would frequently, but not always, be names that

10 were making available investment opportunities where

11 they would invest as a -- as individual investors into

12 an opportunity that was presented or developed by one or

13 more of them.

14     Q.    Thank you.

15         MS. BROWN:  If it's all right with everyone I

16 think we should take like a 10-minute break.  We've been

17 going for about an hour and 15 minutes, and I'm at a

18 stopping spot.

19         So why don't we reconvene at 11:25.

20         MR. FORD:  Okay.  Thank you.

21         THE WITNESS:  Perfect.

22         MS. BROWN:  All right.  So, Mr. Kesner, just

23 put yourself on mute, please.

24         (Off the record at 11:13 a.m.  Back on the

25 record at 11:28 a.m.)

                                                    60

1  Mr. Kaplowitz had an involvement in the 2012 MGT

2  financing?

3      A.   No.  Mr. Kaplowitz utilized various resources

4  of the firm like anyone would, and, you know, their

5  familiarity with deal terms, and the universe of

6  investors in the small cap space, you know, are people

7  that -- the firm was very good at doing that kind of

8  documentation, and Mr. Kaplowitz would have utilized the

9  associates that he met when he joined the firm.

10     Q.   And did you have any role in the 2012 MGT

11  financing?

12     A.   As little as possible, but I did -- I did

13  probably play a role in helping him transition into the

14  firm and accessing the people that had the appropriate

15  skillsets for the investor universe that were going to

16  participate in that deal.

17     Q.   Did you represent any of the investors in that

18  transaction?

19     A.   Ever?  Yes.

20     Q.   On that transaction?

21     A.   No.  I believe they would have their own

22  counsel.  We would never represent an investor in a

23  company at the same time that we were representing the

24  issuer.  That's something that we would not do.

25     Q.   All right.  So there was a conflict waiver

84

1    Sichenzia in 2012 prior to the issuance of this conflict

2    waiver?

3         A.   I don't -- I wouldn't know.  Specifically, I

4    wouldn't know.

5         Q.   Was there a person at Sichenzia to whom sort

6    of ethical questions were raised?

7         A.   Generally, that's Tom Rose.

8         Q.   And do you have a recollection of speaking to

9    Mr. Rose about that issue?

10        A.   I don't have a recollection about that.

11        Q.   Okay.

12        A.   In this particular circumstance.

13        Q.   Did you have any conversations with Mr. Ladd

14   about the conflict waiver?

15        A.   I don't have a recollection of that either.

16        Q.   Did you learn from anyone else at Sichenzia

17   that Mr. Ladd had asked any questions about it?

18        A.   I don't have a recollection of that.

19        Q.   Okay.  So we see from the documents that you

20   did have some involvement in the 2012 transactions.

21             So can you tell us how that is?

22             What were you doing on that transaction?

23        A.   Which document?  You just referred to some

24   documents.

25        Q.   Well, let me just ask it generally.  What was

                                                          101

1  your role in the 2012 transaction with MGT?

2       A.   Helping Mr. Kaplowitz acclimate to the firm

3  and utilize the people, and, perhaps, reviewing some

4  drafts for my input on whether or not terms seemed like

5  market terms based upon my skillsets and extensive

6  experience representing issuers and investors in deals.

7       Q.   And from whose benefit perspective did you

8  review the documents that you reviewed?

9       A.   From whose benefit perspective?  Probably to

10 assist Mr. Kaplowitz in what he was doing.

11      Q.   Right.

12           But whose interests did you have in mind when

13 you were reviewing the documents?

14      A.   I had no one's particular interest in mind

15 other than the interest of seeing a transaction get

16 documented for our client, MGT.

17      Q.   So you understood that your client was MGT,

18 that's to whom you owed the duty of loyalty; is that

19 right?

20      A.   This engagement letter says that we are being

21 engaged by MGT for the purposes of this particular

22 discrete transaction.

23      Q.   Well, this isn't an engagement letter, is it?

24      A.   It's a conflict waiver.  It would have gone

25 hand-in-hand with an engagement letter.

                                                      102

1          A.    It appears to be, yes.

2          Q.    And it reflects comments that you received

3    from Barry, meaning Mr. Honig, with respect to the MGT

4    transaction; is that correct?

5          A.    It appears to be.

6          Q.    All right.  And in what capacity are you

7    sharing these comments?

8          A.    Please clarify what you mean by "in what

9    capacity."

10          Q.    Well, I had understood you to testify that you

11    were involved in this transaction and just helping

12    Mr. Kaplowitz sort of onboard the client, but here you

13    seem to be conveying Mr. Honig's comments to deal

14    documents.  So I'm trying to clarify what role you were

15    playing.

16          A.    I was playing the role of a partner in a law

17    firm representing MGT.  I have no better answer than

18    that, other than communicating to Jay, who had the

19    client relationship, some communications that were

20    passed on through me.

21               Just like comments might have been given to

22    Tara or any other attorney at the firm, they were

23    communicated over to the partner in charge of the client

24    relationship.

25          Q.    So was there any reason that you were privy to

                                                              124

1  as to why Mr. Honig didn't communicate directly with

2  Mr. Kaplowitz?

3      A.   He dislikes Mr. Kaplowitz as far as my

4  recollection is.

5      Q.   And why was that?

6      A.   I can't communicate that.  I don't know why

7  people don't like each other.

8           Why do two dogs walk down the street and some

9  fight with each other and others are friendly?  I don't

10  know.  They don't have an affinity for each other.

11     Q.   And did that lack of affinity also carry over

12  to Mr. Marcus?

13     A.   I don't believe so, but I don't know.  I don't

14  think so.

15     Q.   Okay.  Did Mr. Honig ever share with you why

16  he was not sharing these comments directly to

17  Mr. Marcus?

18     A.   Mr. Marcus is a junior attorney in the firm.

19  Mr. Honig is a high functioning private investor who,

20  you know, I'm going to suppose doesn't want to deal with

21  an underling in the firm.  He wants to deal with a named

22  partner in a firm and high level people.

23          He had a good relationship with Tara, and he

24  communicated with Tara quite often, but he really didn't

25  know Mr. Marcus.

125

1      Q.   And then he writes to you at OlshanLaw.com.

2      A.   He does?

3      Q.   Was that an error?

4      A.   I have no idea.  I don't -- I don't know my

5  start date, but it certainly was before 2012.  It would

6  appear to be an error.

7      Q.   Okay.  So, notwithstanding the error, can you

8  tell me, looking down at this list of what Mr. Honig

9  calls the investor list for the preferred and the RD, if

10  you recognize any of these individuals or entities?

11     A.   I recognize Iroquois, Hudson Bay, HS

12  Contrarian, and Mr. Honig.  Bay Capital is a Tom Hunter

13  entity.  You mentioned him earlier.  Ron Lowe, I

14  don't -- I've heard the name, but I can't tell you how.

15  Suzanne Adams, I've heard the name, but I can't tell you

16  I remember how.  Jill Strauss, same answer as before.

17  White Trout, I'm not sure who that is.  Sandor Capital

18  is John Lemak.  And Melechdavid is Mr. Groussman.

19  Jonathan Honig we mentioned.  And Miramar I don't know.

20     Q.   All right.  So do you know who Hunter Adams

21  is?

22     A.   I do.

23     Q.   Who is he?

24     A.   Tom Hunter and -- I'm sorry.  I got that

25  wrong.

                                                        139

1          Hunter Adams is not related to Tom Hunter.

2  Hunter Adams, I believe, is a distant cousin or relative

3  of Barry Honig.

4      Q.   All right.  Did Mr. Ladd ever talk to you

5  about this list of investors and ask you what your

6  familiarity with them was?

7      A.   I don't -- I don't believe so, being that I

8  probably never got this email because it went to the

9  wrong firm -- you know, I -- I don't have any

10 recollection of speaking with Mr. Ladd or anyone about

11 this.  I don't remember the email.

12     Q.   Okay.  But you knew who the investors were,

13 right?

14          At some point you were made aware of who the

15 investors in this transaction was?

16     A.   I don't know that I was.

17     Q.   Okay.

18     A.   I was probably copied on closing statements,

19 but that doesn't mean I paid a lot of attention to them.

20     Q.   Fair enough.  All right.  Let's look at

21 number 25, which has been previously marked as

22 AM Exhibit 1.

23          And just for the record, it's an email from

24 Robert Ladd to Arthur Marcus.  But if you page through

25 it, you'll see that you're on a lot of the earlier

140

1   that question?

2        A.   No.

3        Q.   Did Mr. Kaplowitz?

4        A.   No.  Not that I recall.  Not that I recall we

5   had any dialogue about it whatsoever.

6        Q.   And how did you determine that the answer was

7   no?

8        A.   Well, Hudson Bay is, you know, one of the

9   larger investors.  They are a -- I don't know,

10  $50 billion fund.  I do not think that they would be

11  acting as a group.  And I'm well aware that their --

12  their documentation a thousand percent -- a hundred

13  percent prevents group formation by creating beneficial

14  ownership blockers with themselves and anyone else that

15  they could be deemed to be beneficial owners with.

16           So documentation-wise, contractually, SEC

17  rules and regulation-wise, one would be very safe in

18  concluding that Hudson Bay was not participating in the

19  control of the vote or investment decisions with Jill

20  Strauss.

21           Same answer for Iroquois.  Iroquois is a -- as

22  far as I know, a -- you know, a 10, or 50, or

23  $100 million private equity fund, and their document --

24  they're well represented.  I think I've known their

25  counsel over the years.  I don't recall his name right

                                                          142

1    now.

2           And they are very sophisticated, and I would

3    imagine that they would never enter into documentation

4    that would allow them to become a group and the

5    traditional notions, SEC rules and regulations, with any

6    other party on this list.

7           So knowing -- knowing those -- going into the

8    question like that, you know, it seems like a stupid

9    question.  And I think that that was the nature of the

10   exclamation mark, why I don't -- we rely on the

11   documentations, and the activities, and the contractual

12   provisions, as we said before, that limit the creation

13   of groups consistent with compliance with the SEC rules

14   and regulations and what beneficial ownership literature

15   says to do.

16       Q.   So if two investors decided to invest, and

17   hold, and dispose of their shares together, but their

18   agreement said that they were not acting together, that

19   would be enough for you to determine those two investors

20   were not acting as a group?

21       A.   I'll -- I'll repeat what I said before, maybe

22   with some different words to help everyone understand.

23   The going into the transaction isn't determinative for

24   what is the group.  It's the acting in concert for

25   purposes of voting or disposition of securities that

143

```
 1   largely is the arbiter, based upon the literature, of
 2   what is a group.
 3            So I would have no way of knowing.  But if
 4   Rich Abbe at Iroquois called Joe up and said hey, let's
 5   get rid of this guy, Rob Ladd.  At the upcoming meeting
 6   let's vote and let's waive our beneficial ownership
 7   blocker so that we can vote our 20 percent, rather than
 8   our 9.9 percent each, that would create a group.
 9            But that's -- you have no awareness of that
10   happening behind the curtain of their executive offices.
11   You would have no way of knowing it.  Nor would you
12   expect that to be the case, you know, logically in terms
13   of your practice when they're writing the check to buy
14   the instrument that says I am not a beneficial ownership
15   of more than 9.9 percent.  We're entitled to rely on
16   that.
17       Q.   Thank you.
18            So did you ever talk to any of the investors
19   listed on AM Exhibit 1 about whether they had any
20   agreements to vote, or dispose, or hold their shares in
21   concert?
22       A.   Which exhibit?
23       Q.   The one we're looking at.
24       A.   Oh, I'm sorry.
25       Q.   AM Exhibit 1.
```

144

1  I would communicate to Marcus if I knew that that?

2  Probably not.

3        If they -- if he said I have a written

4  agreement with them under which I have control of the

5  dispositive authority over their brokerage account, the

6  answer would definitely be yes.  So I think there's too

7  many other variables on that continuum to be able to

8  answer your question with any real accuracy.

9      Q.   Okay.  I appreciate that response, but I'm

10  asking sort of a very specific question, which is:  If

11  Mr. Honig came to you and said to you, I'm telling you

12  this, Mr. Kesner, in confidence.  I have an agreement

13  with John Stetson, and Jill Strauss, and Melechdavid to

14  hold and vote the shares of MGT going forward, would you

15  have disclosed that to Mr. Marcus?

16      A.   I don't know if I would have or would not

17  have.  Under those circumstances I might have to have a

18  consultation with Tom Rose and my partners what to do

19  because that would be a confidential piece of

20  information from one of my clients concerning another of

21  my clients.

22        And if it was -- if it created that kind of an

23  internal conflict in my mind as to whether I should tell

24  Marcus regarding his representation of another client,

25  it might be that we would have to resign from both --

147

1    from the MGT engagement.

2          I just can't tell you what I would have done

3    at that time if I knew that.  I don't think that there's

4    any indication that I knew that or I was told that.  If

5    there was, it would raise a difficult ethical dilemma,

6    and we would have to think about it really hard.

7          But I can't tell you sitting here today,

8    without any context, on a raw hypothetical question of

9    that nature, what I would have done.  I'm not sure I

10   would have told Mr. Marcus.

11        Q.   Was there any follow-up by Mr. Marcus or

12   Mr. Kaplowitz to your response?

13        A.   What does foul up mean?

14        Q.   Follow-up.  Did they ask you what the basis of

15   your response was?

16        A.   They fouled up all the time.  Follow-up, I'm

17   not so sure.  Just kidding.

18          I don't -- I don't believe so.  I don't know

19   what --

20        Q.   Did you ever learn --

21        A.   -- I don't know what they did.  I have no idea

22   what they did.

23        Q.   Did you ever learn that Mr. Ladd asked anyone

24   else any follow-up questions about your response? .

25        A.   I -- I don't know.  I have no awareness of

                                                          148

1  whether or not he had any conversations.  You'd have to

2  ask him.

3      Q.  Did you ever discuss the issue with Mr. Ladd

4  directly?

5      A.  I have no recollection of whether I did or

6  didn't.  Again, unlikely.  I consciously, and

7  purposefully, left my communications with Mr. Ladd to a

8  minimum and tried to work through Jay and Mr. Kaplowitz

9  and Mr. Marcus where I could.

10      Q.  And why is that?

11      A.  It's their relationship.

12      Q.  Do you have any reason to believe that

13  Mr. Ladd relied on that email response?

14      A.  I have no reason to know that he ever saw it

15  or had any awareness of that response.  No, I don't.

16  This is a communication -- an internal communication

17  that, you know, would be, in my way of looking at it,

18  privileged amongst partners of the law firm regarding

19  the internal deliberations of the firm.  And I would not

20  have expected it to be provided to Mr. Ladd.

21      Q.  Do you recall the topic of the group issue

22  being addressed at any other time in the relationship

23  between Sichenzia and MGT?

24      A.  I don't have any specific recollection of

25  that, no.

149

1    filing a registration statement.  I may have been

2    included on emails and correspondence and not have a

3    drafting role.

4        Q.   And if Mr. Honig, Mr. Stetson, Mr. O'Rourke,

5    and Mr. Groussman were listed as selling shareholders in

6    that registration statement, and you had been made aware

7    of that fact, would that have been important to any

8    analysis you made of the group issue?

9        A.   The question I would have asked of one of my

10   team members, if Tara was doing that for me on a client

11   where I represented the issue was, do you have a selling

12   shareholder questionnaire back from that party with

13   which to prepare the selling shareholder table?

14            Again, we elicit information in the ordinary

15   course from the selling shareholders, either who have

16   the right to be registered under a contractual

17   obligation or who the company voluntarily elects to put

18   into a registration statement.

19            It's not guesswork, and it's a sliding scale

20   because you could have a thousand shares today, sell

21   them tomorrow, buy 50,000 on Tuesday.  At the time of

22   filing a registration statement you're obligated, I feel

23   as a law firm, to elicit that information from the

24   selling shareholders themselves as to what their

25   holdings are and whether they're, as you say, a group

153

1  with any other party for purposes of disclosure in the

2  footnotes to the selling shareholder table, et cetera.

3        And very often you ask do you disclaim

4  beneficial ownership despite what might look like

5  beneficial ownership?  You get that information from

6  them.  It's not static.

7   Q.  And is that a questionnaire that followed some

8  sort of template that Sichenzia used, the selling

9  shareholder questionnaire you just referred to?

10   A.  Every law firm I ever worked at has a standard

11  form, and it could be different partners use different

12  iterations of it, but I -- I would never expect Tara, or

13  Arthur, or anybody else to do anything else but get a

14  selling shareholder questionnaire from selling

15  shareholders if they're going to be included in a

16  registration statement.

17        That's kind of a professional way of

18  approaching this.  Do lesser law firms not?  Yes, I'm

19  aware lesser law firms do not.  But we are not a lesser

20  law firm and we should be doing it.  And if we didn't, I

21  would be very surprised.

22   Q.  Well, that was my next question.  Would you be

23  surprised if no selling shareholder questionnaire was

24  issued in connection with the registration statement

25  that followed the 2012 financing?

154

1        A.    I would be surprised because that's the only

2   nature of being able to rely, as a lawyer preparing a

3   SEC filing, on what you believe to be the case.  You

4   know, we've -- we issue opinions, and we also get

5   10(b)(5) rep letters from issuers that they -- they are

6   responsible for the information, we help to collect and

7   document, but we don't -- we're not the primary source.

8   We're a secondary source, and we get the information

9   from the primary sources.  That's -- at least in my

10  training as a young associate, that's not something you

11  would skip over.

12       Q.    All right.  Let's move to 2015.

13             Do you remember being involved with MGT's PIPE

14  financing in the fall of 2015?

15       A.    Not specifically.

16       Q.    Okay.  Let's look at the next document on your

17  list, number 26, which has been previously marked as

18  plaintiff's -- as Ladd Exhibit 99.

19       A.    Okay.  I'm there.

20       Q.    Okay.  That's an email from Mr. Ladd to

21  Mr. Kaplowitz, you, John Stetson, and Barry Honig dated

22  September 29, 2015, "Re:  PIPE Deal."

23             Do you recognize this exhibit?

24       A.    I do not.

25       Q.    Can you tell me why you're copied?

155

1  sometimes file on behalf of the investors their

2  beneficial holdings, their forms, as a matter that they

3  assume the cost of.

4          So without looking at the -- you know, the

5  other documentation, the purchase agreement for the RD,

6  or any side letter, I mean I just -- I can't say.

7          I do know that Hudson Bay routinely asks that.

8  And if they were the genesis of this documentation set,

9  it's very possible that they have -- the issuer has an

10  obligation to, you know, assist or at least to help

11  assist in these filings.

12  Q.   Okay.  So in the circumstances you're

13  recounting right there where Hudson Bay has a

14  contractual obligation with the issuer for the issuer to

15  file Schedule 13Gs on its behalf, and you carry out that

16  filing for Hudson Bay and the issuer, whose interests

17  are you representing when you fill out the Schedule 13G

18  for Hudson Bay?

19  A.   You're pursuing the interest of truth and

20  accuracy.  This is not an advocacy situation.  You're

21  not -- you're not taking a position for anybody.  You're

22  receiving inputs from people, and because the

23  familiarity with the form, you're putting numbers in a

24  form and helping people understand the answers to the

25  questions that represent the instructions to the form.

168

1          So I -- you know, I -- I don't know that

2     anyone has ever determined or argued that that means

3     that you're pursuing one -- advocating one interest over

4     another interest.

5          I mean, I see -- given the SEC's position and,

6     of course, the case history, how that would be

7     significant -- a significant question to you, but I

8     don't know if I have a good answer for you if that means

9     that we're representing Honig's interest or MGT's

10    interests.  I just don't have a good answer for you

11    there.

12         And, also, this is Jennifer Rodriguez, an

13    associate at my firm, who might have been contacted

14    directly by Mr. Honig to do a form, and I just got

15    copied on it.  I just don't know.  I don't know what the

16    genesis of this was.

17         Or more likely what happens in these scenarios

18    is there's a previously existing filing that needs to be

19    updated, and 98 percent of the information is in that

20    previously made filing, whether it was filed independent

21    of us or not, and the nature of those 86,000 shares just

22    needs to be added.

23         A question would be asked, did you own -- did

24    you buy or sell anything else for updating, the answer

25    is yes or no, and you just update the numbers and push

                                                        169

1  the button -- tell the printer to push the button.  It's

2  not an advocacy.

3       Q.   And who would you ask that question of?

4       A.   Who would I ask what question of?

5       Q.   You said you'd ask the question, do you own

6  this --

7       A.   One would -- one would expect that my

8  associate, Jennifer Rodriguez, would have inquired

9  whether it was just the shares that were in that

10 particular registered direct that we knew about

11 indicated on that -- you referred to it as the listing

12 application -- that needed to be updated on the direct

13 ownership aspect of that form, if it was a direct

14 ownership position that was being updated, knowing that

15 that triggers this kind of filing and was accommodating

16 the interests of accurate and truthful filings with the

17 commission, and so Jennifer would most likely have

18 communicated with somebody, is this the only updates

19 required?

20      Q.   Right.

21           And so my question is:  Who is the somebody?

22 Is it Mr. Honig?

23      A.   If it's Mr. Honig's form, it would have been

24 Mr. Honig, yeah.

25      Q.   Okay.  And Mr. Ladd isn't copied on this

                                                      170