# EXHIBIT M

1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE COMMISSION,  )
                                         )
5                    Plaintiff,          )
                                         )
6        v.                              ) Case No.
                                         ) 18 Civ. 8175(ER)
7   BARRY C. HONIG, ROBERT LADD, ELLIOT  )
    MAZA, BRIAN KELLER, JOHN H. FORD,    )
8   GRQ CONSULTANTS, INC., and HS        )
    CONTRARIAN INVESTMENTS, LLC,         )
9                                        )
                     Defendants.         )
10  _____)

11

12                      VOLUME 1

13        VIDEOTAPED DEPOSITION OF ROBERT LADD

14                VIA VIDEOCONFERENCE

15             Thursday, October 15, 2020

16

17

18

19

20

21

22

23

    REPORTED BY:
24  GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR
    VICTORIA L. VALINE, CSR 3036, RMR, CRR
25  JOB NO. 201015GCH

                                                        1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF NEW YORK

3

   SECURITIES AND EXCHANGE COMMISSION,  )
4                                        )
                   Plaintiff,            )
5                                        )
   v.                                    )  Case No.
6                                        )  18 Civ. 8175(ER)
   BARRY C. HONIG, ROBERT LADD, ELLIOT  )
7  MAZA, BRIAN KELLER, JOHN H. FORD,    )
   GRQ CONSULTANTS, INC., and HS        )
8  CONTRARIAN INVESTMENTS, LLC,         )
                                         )
9                  Defendants.           )
   _____)
10

11

12

13

14

15            Videotaped deposition of ROBERT LADD,

16  taken on behalf of Plaintiff, all parties appearing

17  remotely via Webex, beginning at 10:07 a.m. EST and
    ending at 6:36 p.m. EST, on Thursday, October 15, 2020,
18  before GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR, and

19  VICTORIA VALINE, CSR No. 3036, RMR, CRR.

20

21

22

23

24

25

                                                          2

1                    A P P E A R A N C E S

2    (All appearances via videoconference.)

3

4    For the Plaintiff:

5    SECURITIES AND EXCHANGE COMMISSION
     BY: NANCY BROWN, ESQ.
6         JACK KAUFMAN, ESQ.
          KATHERINE BROMBERG, ESQ.
7    200 Vesey Street
     Suite 400
8    New York, New York 10281
     (212) 336-1023
9    BrownN@sec.gov

10

11   For the Defendant:

12   FORD O'BRIEN
     BY:  ADAM FORD, ESQ.
13        ANJULA PRASAD, ESQ.
     575 Fifth Avenue
14   Floor 17
     New York, New York 10017
15   (212) 858-0040
     aford@fordobrien.com
16

17

18   Also Present:   NANCY HOLMSTOCK, Videographer

19

20

21

22

23

24

25

                                                          3

1      Q.   And how did you first meet him?

2      A.   I was introduced through a guy, Adam

3  Selkin.  And maybe it's a good time to just refine

4  my description of Mr. Honig, which I know I

5  previously called "the scumbag."  In my vernacular,

6  "scumbag" means a greedy, pushy, arrogant, stupid,

7  little, you know, man.  So that's my definition of

8  what a scumbag is.

9      Q.   Thank you.  So when did you first meet

10  Mr. Honig through Mr. Selkin?

11      A.   I believe it was in 2010 or about then.

12      Q.   And when you met him, had you ever heard

13  of him before?

14      A.   I don't remember if I did or not.

15      Q.   What did you know about his reputation?

16      A.   I didn't know much about his reputation,

17  but he's a fast talker.  And, obviously, you know,

18  my radar is up always.  And in particular, I didn't

19  need a reputation to know that this is a guy you

20  need everything in writing with.

21      Q.   And in addition to calling him a scumbag,

22  did you also consider him to be a predatory lender?

23      A.   He is the least, at least in our dealings

24  with him, the least predatory of the predatory

25  lenders.  Most predatory are the ones that the SEC

12

1        Q.   And is it your testimony that you said

2   those words in your proffer session on March 28,

3   2018?

4        A.   It's going to be a long day.  So can you

5   read back the question you asked me regarding this?

6        Q.   I think I --

7        A.   I believe you asked me -- I answered

8   a question that said, Did you refer to or call

9   Barry Honig a predatory lender?  My answer was that

10  wasn't normally my description of him.  If you ask

11  me, did I consider him one of the group of

12  predatory lenders, my answer would be yes,

13  consistent with what I told the FBI.  That's why

14  I'd like a chance to rehear your question and

15  answer it.  There is no refreshing needed.  It's

16  just a matter of semantics.

17       Q.   Okay.  Understood.  Thank you.

18            Can you tell us who John Setson is?

19       A.   John is an investor and works -- worked

20  with Barry Honig, also in Boca.

21       Q.   And do you understand -- do you have an

22  understanding of what his relationship is to a

23  company called HS Contrarian?

24       A.   As I sit here now, yes.

25       Q.   What is that?

1          A.    Well, the allegations -- I don't know if
2      it's true.  The allegations are that he was merely
3      using his perceived ownership of that as a way to
4      disguise monies that Barry Honig actually
5      controlled.
6          Q.    Thank you.  So unless I instruct you
7      otherwise, what I'm interested is your knowledge,
8      not what you've read, not allegations.  So I think
9      the question was framed as, do you understand
10     Mr. Setson to have a connection or an association
11     with HS Contrarian?
12         A.    And I do have that connection as we are
13     speaking today?
14             MR. FORD:  Rob, the question is whether
15     you personally know, not what you read, but whether
16     you have independent personal knowledge of that
17     fact.
18         A.    Okay.  So what I know for facts are that
19     anytime HS invested in any deal, it was represented
20     to me that this was the investment vehicle of John
21     Setson, and any monies that were wired came from a
22     similarly named account.
23     BY MS. BROWN:
24         Q.    Thank you.  And do you have an
25     understanding of what Mr. Setson's connection is,

17

1    if any, to a company called Oban, O-B-A-N?

2         A.   I don't.  That's a name that I only saw

3    post complaint.  I have no idea who or what it is.

4         Q.   And I think you said that you understood

5    that Mr. Setson worked with Barry Honig.  What was

6    your understanding of the relationship between

7    Mr. Setson and Mr. Honig aside from their work

8    relationship, if any?

9         A.   As far as I know, they were just

10   professional workers together.  I didn't know of

11   any personal relationship.

12        Q.   Did you have an understanding of whether

13   they worked out of the same office?

14        A.   Yes.

15        Q.   And did you have an understanding that

16   they frequently coinvested?

17        A.   Yes.

18        Q.   How about Mr. John O'Rourke?  Do you know

19   who he is?

20        A.   Yes.

21        Q.   Who is he?

22        A.   He's the, quote, other John that works for

23   Honig.  I still get them mixed up to this day, but

24   it was always John and John that I think.  He was a

25   tall guy, and Barry is very short, so -- and I

                                                      18

1    think Setson was the short guy.

2        Q.   So the two Johns you are referring to are

3    John Setson and John O'Rourke; is that correct?

4        A.   Correct.

5        Q.   And what was your understanding, if you

6    had one, about John O'Rourke's relationship to a

7    company called ATG Capital?

8        A.   I believe that was his investment vehicle

9    that he used to make investments.

10        Q.   And did you have any understanding of the

11    relationship between O'Rourke and Honig other than

12    Mr. O'Rourke apparently worked for Mr. Honig?

13        A.   Not at all.

14        Q.   Did you have an understanding of whether

15    Mr. O'Rourke and Mr. Honig, and I guess also

16    Mr. Setson, worked out of the same office?

17        A.   Yes.

18        Q.   And did you have an understanding that all

19    three of those individuals frequently coinvested?

20        A.   Yes.

21        Q.   And do you know a man named Mike Brauser?

22        A.   Yes.  Now, just to amplify my prior

23    answer, my knowledge came from the fact that they

24    coinvested in MGT.  I don't want to say that I

25    looked at every investment they did to say that

                                                        19

```
 1     they invested together.  I'm aware that they
 2     invested together in our instance.
 3               (Reporter interruption for clarification
 4               of the record.)
 5          A.   "Instance."  Stupid word.
 6     BY MS. BROWN:
 7          Q.   Who is Mr. Brauser?
 8          A.   So Mr. Brauser, I don't believe I've ever
 9     met.  He was also a coinvestor with Honig, but
10     otherwise I don't really know him.  I know he filed
11     on our stock, a 13D or G. But I mean --
12          Q.   You don't have -- sorry.
13          A.   No, but I don't think -- like, I can't
14     even put a picture of that guy in my head, you
15     know, where O'Rourke and Setson, I can kind of
16     know.
17          Q.   Did you have any understanding whether
18     Mr. Brauser had invested, coinvested alongside
19     Mr. Honig in connection with other transactions
20     besides MGT?
21          A.   Not directly, no.
22          Q.   Okay.  How about indirectly?
23          A.   I can't say, sitting here now.  I believe
24     there were some short stories written about
25     Brauser/Honig as coinvestors, but I also believe
```

20

```
 1    they did different -- different investments

 2    separately.  That's all I really know.

 3              MR. FORD:  Rob, just to be clear, the

 4    timing of the articles that you just referenced?

 5              THE WITNESS:  Yes.  They would be sometime

 6    in the mid to 10s, like 2014 or whatever, I mean,

 7    2015, in that area.

 8    BY MS. BROWN:

 9        Q.   Now, what about Mr. Groussman, Mark

10    Groussman?  Do you know who he is?

11        A.   I do.  And, again, I hate to stereotype.

12    I believe he's the big goon.  I think I had dinner

13    with him.  And the truth is, until all my further

14    recollection on everything, the way I confused the

15    two Johns, I also couldn't picture -- I didn't know

16    who Brauser or Groussman were separately, but I

17    knew they were two different people, two different

18    entities.  They had different names of their

19    entities, different sources of capital, different

20    motivations, et cetera.

21        Q.   And are you aware of his association, if

22    any, with a company called Melechdavid?

23        A.   I believe that's his investment vehicle

24    also.  I mean, similar to the ones you mentioned

25    before with those, ATG or something.
```

21

1              I just want you to be appreciative that it was

2    an extremely complex calculation and form to fill out

3    for a -- and again, I'm not going to say to redesign,

4    but in essence, the information that it needed to convey

5    was conveyed, and at the end of the day, that's really

6    what I care about.

7         Q.   So the next line reads that on May 25, 2016,

8    157,300 shares were sold, and the footnote says that

9    they were sold by Laddcap Value, correct?

10        A.   Yes.  That's what it says.

11        Q.   Okay.  Let's look at tab 19, which we've

12   marked as Ladd Exhibit 19.

13             (Deposition Exhibit 19 marked.)

14        Q.   And this is, just for the record, a document

15   we received from E-Trade which purports to reflect

16   trading activity in the Robert Ladd account during the

17   month of May 2016.

18             Do you recognize Ladd Exhibit 19?

19        A.   Yes.

20        Q.   All right.  So you can feel free to flip

21   through this, but you'll see that 147 -- the Bates

22   number 147, there are no trades in MGT stock on

23   May 25th.

24        A.   That's correct.

25        Q.   Okay.  And those shares weren't sold out of

                                                            84

1   your TD Ameritrade account, were they?

2       A.   I believe the dates were incorrect on the

3   form 4.

4       Q.   Well --

5       A.   The dates did not conform with the actual

6   trades at E-Trade, and yes that's an error.  But as I

7   said, by the time the form got filed, there was no

8   desire or need, frankly, to show the end result being

9   different than it is.

10      Q.   Okay.  Understood.

11           But in answering my question, those shares

12   weren't sold out of TD Ameritrade, right?

13           If they were sold, they were sold on a

14   different day out of the E-Trade account; is that right?

15      A.   That's my strong assumption right now, yes.

16      Q.   Well, again, you reviewed this form and you

17   signed it, did you not?

18      A.   Yes, I did.  But as I explained before it's

19   not as simple as it looks.  Believe me, it's complicated

20   with this pecuniary interest and all that.

21           So I was more focused on the actual economics.

22   I look at the bottom number, is that right that the

23   market knows I own that?  I'm basically out of all my

24   shares accept for 540,000 now that I own directly.

25   That's what the message --

85

1        A.   Yes.

2        Q.   All right.  And is it your understanding that

3   it accurately reflects the activity in your account --

4        A.   Yes.

5        Q.   -- in that period?

6        A.   Yes.

7        Q.   Thank you.

8             All right.  So if we go to TDA Bates

9   number 419.

10       A.   Okay.

11       Q.   Under "Trades Pending Settlement --"

12       A.   Mmmm-hmmm.

13       Q.   -- you see some trades on 5/31/2016, all sales

14   in MGT Capital, correct?

15       A.   Yes.

16       Q.   And that shows 11,000 shares sold on that

17   date; is that correct?

18       A.   Um -- yep.  Yes, it does.

19       Q.   Not 33,000?

20       A.   It shows 11,000 shares sold on that date.

21       Q.   Is there any other account from which you

22   would have sold MGT stock on May 31?

23       A.   No.  As I testified before, my thought would

24   be that would be part of the shares that were sold in

25   the crazy period of May.  And again, my state of mind

91

1  was to only get or mainly get the bottom line correct.

2       Q.   So it's your testimony the remainder of the

3  shares, the difference between 33,000 and 11,000, is it

4  was at least made up of some of the trades that you made

5  in your E-Trade account in May 2016?

6       A.   That's my suspicion right now.  I can't

7  confirm that, but it makes sense that that would be the

8  answer.

9       Q.   And is it your understanding that you only

10 sold 23,000 shares in May 2016 from your E-Trade

11 account?

12      A.   On May 31?

13      Q.   At any time.

14      A.   Oh, in the --

15           MR. FORD:  The original question was all

16 through May.

17           THE WITNESS:  I know I don't --

18           MR. FORD:  How much -- I know that was the

19 first question.

20           THE WITNESS:  Well, can we go back to the May

21 statement.  How many shares were left on May 31st?

22 BY MS. BROWN:

23      Q.   Zero.  But feel free to look.  Exhibit 19.

24      A.   All right.  So that would mean whatever it

25 shows, if my math is right, there were 700,000 shares

                                                        92

1     their request.

2            All right.  So did you have any discussions

3     with anyone about this letter and that response in

4     particular?

5         A.   Not that I recall.  I believe the cover page

6     says I sent it to Holmes to review, maybe not.

7         Q.   By the way, did Mr. Onghai ask you whether the

8     trading window was open before he made his sales of MGT

9     stock on May 18th?

10        A.   I don't believe so.

11        Q.   Had he ever done that before, called you up

12    and asked you whether the trading window was open?

13        A.   Well, again, he's also a Wall Street -- quite

14    a veteran as me, so he knows if and when he could sell,

15    without asking me.  I mean, he's on the board of

16    directors.  If he knew something, he would know.

17        Q.   Right.  Okay.

18             So my question was:  Did he ever do that?

19        A.   Ever do what?

20        Q.   Call you up and ask you whether the trading

21    window was open?

22        A.   I -- I don't remember -- I don't remember him

23    selling much stuff, frankly, but...

24        Q.   Did you file a form 5 at the end of 2016 to

25    disclose the full extent of your 2016 trading?

                                                        108

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3                    - - -

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                     Plaintiff,       )
6                                     ) Case No.
          vs.                         ) 18 Civ. 8175(ER)
7                                     )
     BARRY C. HONIG, ROBERT LADD,     )
8    ELLIOT MAZA, BRIAN KELLER,       )
     JOHN H. FORD, GRQ CONSULTANTS,   )
9    INC. and HS CONTRARIAN           )
     INVESTMENTS, LLC,                )
10                                    )
                     Defendants.      )
11   _____)

12

13

14

15          VOLUME 2 - PAGES (173 - 335)

16          VIDEOTAPED DEPOSITION OF

17                ROBERT LADD

18        VIA REMOTE VIDEOCONFERENCE

19         FRIDAY, OCTOBER 16, 2020

20

21

22

23
     Stenographically Reported by:
24   Victoria L. Valine, CSR, RMR, CRR, RSA
     California CSR License No. 3036
25   Job No. 201016VV

                                                      173

```
 1                      REMOTE APPEARANCES:

 2

 3   FOR PLAINTIFF:

 4           UNITED STATES SECURITIES AND EXCHANGE
             COMMISSION
 5           BY:   Nancy Brown, Esq.
                   Katherine Bromberg, Esq.
 6                 Jack Kaufman, Esq.
             200 Vessey Street, Suite 400
 7           New York, New York  10281
             BrownN@sec.gov
 8           BrombergK@sec.gov
             KaufmanJ@sec.gov

 9

10   FOR DEFENDANT ROBERT LADD:

11           FORD O'BRIEN
             Attorneys at Law
12           BY:  Adam Ford, Esq.
                  Anjula Prasad, Esq.
13           575 Fifth Avenue, Floor 17
             New York, New York 10017
14           (212) 858-0040
             Aford@fordobrien.com

15

16

17                      --o0o--

18

19

20

21   Videographer:  Sarah Howard

22

23     (All parties appeared remotely via videoconference.)

24

25

                                                      174
```

```
 1              THE WITNESS:  No.  I think she asked me what
 2     the outstanding balance is.  So --
 3              MS. BROWN:  Right.
 4              MR. FORD:  Nancy, not the monthly payment?
 5              THE WITNESS:  Right.  So what I was trying to
 6     say is that these loans are generally restricted to
 7     about 30,000 each, so I would say 90,000 potentially.
 8     The reason the payments are so high is because they have
 9     amortizations of only three years.
10     BY MS. BROWN:
11         Q.   Okay.  So you can put that aside.
12              All right.  So now we're going to move to the
13     next binder.  Do you have that?
14         A.   I think we have to open that now.
15              MR. FORD:  Nancy, do you want me to open the box?
16              MS. BROWN:  If you would, please.
17              I'm not sure you guys are aware we're not
18     going to be coming back to binder number 1 frequently,
19     but we may do so, so I would keep it not far away.
20              THE WITNESS:  Okay.  I have that binder.
21              MS. BROWN:  Great.  Thank you.
22     BY MS. BROWN:
23         Q.   So Mr. Ladd, who is Drew Cicciarelli?
24              MS. BROWN:  And for the Court Reporter, that's
25     C-I-C-C-I-A-R-E-L-L-I.
```

198

THE WITNESS: Drew Cicciarelli is a stock promoter. I believe his company is called -- I'm not sure, TSX -- TSX Media.

BY MS. BROWN:

Q. Okay. And how were you introduced to him?

A. By Barry Honig.

Q. And for what purpose, if you know, did Mr. Honig introduce you to Mr. Cicciarelli?

A. That I should hire him to get some visibility on the stock.

Q. To perform stock promotion services?

A. Yes. We have a contract that outlines what his services are, yes.

Q. And why is it that you decided to hire him?

A. Him specifically or...

Q. Him specifically?

A. Oh, because he was recommended by Honig.

Q. And did you feel like you could say no to Mr. Honig?

A. Well, I think the record shows very clearly I have no problem saying no to Mr. Honig. So yes, I could have said fuck you -- I'm sorry, I could have said something to the degree.

However, this case having some visibility of the company made sense. We were in a position where we

1      Q.   Did you tell the FBI, "when a big shareholder

2   asks you to do something, you do it," in connection with

3   your retention of Mr. Cicciarelli?

4      A.   It's in quotations, so I'm sure I said it.

5      Q.   Okay.  And further on down, you say -- it's

6   recorded here that you reiterated that you initiated the

7   payment to Mr. Cicciarelli because Honig told you to do

8   it and you did not feel like you could say no to him.

9           Is that what you told the FBI?

10      A.   That's what I told -- yes.

11      Q.   Okay.  All right.  So let's look at the

12   agreement that you entered into with Mr. Cicciarelli.

13   So turn to tab 47.

14      A.   Okay.

15           (Deposition Exhibit 47 marked.)

16      Q.   And tab 47, for the record, is -- the

17   beginning e-mail is from you dated January 21, 2016, to

18   Mr. Cicciarelli.  And then it has an attachment.

19           Do you recognize this e-mail and the

20   attachment?

21      A.   Yes.

22      Q.   And do you recognize it as an e-mail you sent

23   to Mr. Cicciarelli?

24      A.   Yes.  Yes, I do.

25      Q.   All right.  And do you recognize the

201

1    Mr. Cicciarelli, correct?

2        A.   Or, as you say, maybe to TSX Ventures, but

3    yes.

4        Q.   Right.  Right.  And it, in fact, wasn't you,

5    it was MGT who made that payment, right?

6        A.   Sorry.  Thanks for that, yes.  Yes.  Thank

7    you.

8        Q.   Okay.  Good.

9             All right.  So looking at Schedule A, which is

10   at 22868.

11       A.   Yes.

12       Q.   The services that Mr. Cicciarelli, through

13   TSX, was going to provide, include "Public relations

14   campaign that include:  Any content supplied by the

15   client, interviews and multi-media material, research

16   reports, filing, press releases, and other information

17   as determined by the client and the consultant."

18            Was that consistent with your understanding of

19   the services that Mr. Cicciarelli was to provide?

20       A.   Yes.  I would say Mr. Cicciarelli's strength

21   was in having a very large mailing list -- e-mail list

22   of people that followed his advice.  You know, they -- a

23   stock service, but that, just in general, is correct.

24       Q.   Okay.  And did you supply any content to him?

25       A.   I don't recall.

203

```
 1   in your letter, is, "The company engaged DF Media on
 2   May 4, 2016, in connection with a paid campaign to
 3   improve the company's visibility and awareness among
 4   small cap investors."
 5           Do you see that?
 6      A.   Yes.
 7      Q.   So my question to you is:  You didn't include
 8   the TSX contract, why not?
 9      A.   Just inadvertent, my opinion of this whole
10   letter, they just wanted to know what happened at the
11   trading when John McAfee joined the company, and I
12   wanted to be sure that they knew we -- we did retain
13   someone to increase that visibility, but I would say
14   it's an oversight that I didn't look to see that in the
15   prior 12 months it was also that guy, Drew Cicciarelli.
16      Q.   Okay.  So you're acknowledging that it did
17   request the contracts throughout the 12-month period,
18   right?
19      A.   Yes.
20      Q.   Okay.  Thank you.  You can put binder 1 aside
21   for right now.
22           All right.  So tell me, if you could, who John
23   Ford is?
24      A.   Who he is?  Or -- as of right now, he is a
25   journalist who is part of this complaint.
```

                                                            210

1    point, that hopefully it was shorter, but I don't know.

2        Q.   All right.  And did you talk to Mr. Honig or

3    Mr. Stetson about your interactions with Mr. Ford in

4    connection with his article?

5        A.   No.

6        Q.   All right.  So let's look at the exhibit

7    behind tab 60, which is an exhibit we've previously

8    marked as Holmes Exhibit 15.

9            Do you recognize that?

10       A.   Yes.  I see that, yes.  I recognize it.

11       Q.   Okay.  That's a "Seeking Alpha" piece that's

12   dated 11 -- sorry, April 11, 2013, by John H. Ford and

13   it's title is, "Is MGT About to Receive a Big

14   Settlement?"

15           So did you see this article at or about the

16   time it was published, April 11, 2013?

17       A.   Yes.

18       Q.   Did you see any drafts of it prior to its

19   publication?

20       A.   I don't believe so.

21       Q.   All right.  The second full paragraph on the

22   first page says, "Given the huge increase in MGT's

23   recent trading volume, I'm speculating that settlement

24   negotiations are occurring with one of the defendants,

25   WMS Industries.  If that is true, MGT's share price

                                                          238

1  could double within the next couple of weeks."

2        Do you see that?

3     A.   Yes.

4     Q.   And what was your reaction to that when you

5  read it?

6     A.   It's false.

7     Q.   In fact, you considered the premise of the

8  whole piece to be completely false; isn't that right?

9     A.   I considered the title.  I don't know about

10  everything else in there.  It's a pretty -- it's quite a

11  long article.

12     Q.   Okay.  I asked about the premise.

13        MR. FORD:  Nancy, do you want to define the

14  premise so that he could respond?

15        MS. BROWN:  I'm sorry?

16        MR. FORD:  Do you want to just define the

17  premise?

18        The premise being that there's about to be a

19  settlement or settlement discussions?

20        MS. BROWN:  Why don't we look at your 302.  So

21  Ladd Exhibit 302.

22        THE WITNESS:  Yes.

23  BY MS. BROWN:

24     Q.   And if we can go to 152974 which, if it helps

25  is page 4 of 9.

                                                      239

1        A.    Okay.

2        Q.    And did you tell the FBI in words or

3   substance -- I'm on the third paragraph here, second

4   line -- the second sentence, "upon review Ladd advised

5   that the premise of the article that MGT was in

6   settlement talks regarding its online gaming patent was

7   completely false"?

8        A.    That would be true then and it's true now.  So

9   I would say the premise, if that's the word you want me

10  to say is the premise of this article, then I would

11  confirm that.

12       Q.    Okay.  Did you have an understanding of what

13  was causing the huge increase in MGT's trading volumes

14  that Mr. Ford refers to?

15       A.    No.  I didn't even know that.  I guess I'm

16  just reading here it increase -- no.

17       Q.    You didn't understand --

18       A.    My answer is no.

19       Q.    You didn't understand that the --

20       A.    My --

21       Q.    -- sorry.

22       A.    I just want you to repeat the question.  I'm

23  sorry.

24       Q.    So you didn't understand that the trading

25  volume was, in fact, caused by selling by Barry Honig

                                                      240

 1  and others?

 2      A.   I did not know that.

 3      Q.   Okay.  So after you saw this article, isn't it

 4  true that you suspected that Ford might have been

 5  compensated by Honig or some other MGT investor to write

 6  it?

 7      A.   It's a theoretical possibility.  I think he is

 8  still long on the stock, so I don't know how much --

 9  that he was a money manager or what, but, you know,

10  people -- journalists often exaggerate to, you know, to

11  play their own book.

12          MR. FORD:  Rob, the question was at the

13  time -- sorry.  I was trying to help Nancy.  The

14  question was at the time of this article, did you

15  believe or think that Honig was compensating John Ford?

16          I think I got that right, Nancy; is that fair?

17          THE WITNESS:  Absolutely not.

18          MS. BROWN:  I said -- I said suspected.

19          MR. FORD:  Okay.  Yes.  Suspected.

20  BY MS. BROWN:

21      Q.   And your answer is absolutely not?

22      A.   That I suspected Honig?  Or that I suspected

23  an investor?

24      Q.   Correct.  Had compensated Mr. Ford.

25      A.   I don't remember, but I think what I do know

                                                        241

1  is that that's a common approach of somebody long in the

2  stock to get an article written.

3      Q.   All right.  So let's turn to Ladd Exhibit 302

4  again.

5      A.   Mmmm-hmmm.

6      Q.   And directing your attention to page 5 of 9 --

7      A.   Mmmm-hmmm.

8      Q.   -- the first full paragraph reads, "When Ladd

9  first saw Ford's article in 2013, he suspected that Ford

10  may have been compensated by Honig or other MGT

11  investors to write the article."

12          Did you say that in words or substance to the

13  FBI in March 2018?

14      A.   Yeah.  I think it's -- right.  So this is how

15  the FBI took it down, and I don't think it's different

16  than what I just said now.

17      Q.   Okay.  And if we look at -- back to Holmes

18  Exhibit 15, which is the document behind tab 60,

19  Mr. Ford doesn't disclose that he's been compensated; is

20  that fair?

21      A.   Just from memory of reading these, I believe

22  he said he's long to the stock.

23      Q.   Okay.

24      A.   His disclosure.

25      Q.   If you turn to page 3 of 7 under "Disclosure"

242

```
 1      A.   I believe so.  I mean I'm just --

 2      Q.   All right.

 3      A.   -- I don't see it right this second, but I

 4 don't dispute it.

 5           MR. FORD:  Nancy, where is it?

 6           MS. BROWN:  I'm in the last paragraph.  The

 7 sentence begins "Moreover, while we expect his help in

 8 finding a reverse takeover candidate --"

 9           MR. FORD:  Okay.  Thank you.

10           THE WITNESS:  I see that, yes.

11 BY MS. BROWN:

12      Q.   What was the source of those expectations,

13 just the fact that he was frequently bringing you

14 potential deals?

15      A.   Oh, certainly that was the reason.

16      Q.   Had you already had a discussion about

17 Mr. McAfee --

18      A.   No.

19      Q.   -- with Mr. Honig?

20      A.   No.

21      Q.   All right.  You also refer in that paragraph,

22 you say, "he is certainly controversial," referring to

23 Mr. Honig.

24           What did you mean by that?

25      A.   He's a high profile -- I mean, I don't know
```

253

1  how to say this, but I've tried to say it now for two

2  years or four years, but, I don't know how long we said

3  it, there's a public persona of Barry Honig, and that

4  would be broadly a promoter of crap.

5          So his controversy is that he makes money only

6  for himself, not for stockholders.  And it's -- he was

7  the target of many, many articles by short sellers, and

8  unfortunately, not by any authorities.

9          That led me to believe that, aside from being

10  a loudmouth, you know, he did not violate securities

11  laws.  And in addition, I became, and always will,

12  always was, hyper-vigilant anything that we did with

13  Mr. Honig.

14          But if you want to make like a -- you could

15  just like raise your hand to tell me to stop.  I'm

16  sorry.  I'll answer the question now.  I'll get off the

17  soapbox.

18      Q.   So how -- so you've talked about the first

19  conversation you had with Honig about a possible

20  transaction in whatever form with Mr. McAfee, but when

21  did D-Vasive first enter the conversation?

22      A.   I don't remember exactly, but, you know,

23  sometime around then.

24      Q.   Okay.  And how was D-Vasive described to you?

25      A.   As a startup technology company that had some

                                                        254

1   you know, that was kind of the due diligence with the

2   attorneys, and structuring the deal, et cetera.

3       Q.   And did Mr. O'Rourke have his own connection

4   to Sichenzia?

5       A.   Yes.

6       Q.   And what was that?

7       A.   That would be Harvey Kesner.

8       Q.   So Mr. Kesner was Mr. O'Rourke's lawyer, as

9   you understood it?

10       A.   Yeah.  I know he represented Honig quite a

11   bit, maybe O'Rourke as well.

12       Q.   He never represented you, did he?

13       A.   No.

14       Q.   And did that meeting take place --

15            MR. FORD:  And by "you," do you mean MGT?

16            MS. BROWN:  MGT --

17            CERTIFIED STENOGRAPHER:  Counsel -- counsel --

18            (Simultaneous cross-talking.)

19            MS. BROWN:  Fair question.

20   BY MS. BROWN:

21       Q.   Did he represent you in your personal

22   capacity?

23       A.   Exactly.  The answer is no in both cases.

24       Q.   Thank you.

25       A.   Harvey Kesner -- okay.

                                                          269

1    A.   Yes.

2    Q.   And you knew that that was not, in fact, true,

3  correct?

4    A.   I know now that it -- when you read it, it is

5  incorrect.  At the time I put it in, I unfortunately

6  missed the mistake.

7    Q.   And what part of it do you now know to be

8  inaccurate?

9    A.   Well, the way it reads in this release, is if

10 John McAfee himself sold McAfee Associates to Intel for

11 7.6 billion all at once, like that he was at McAfee

12 Associates, and that when it was sold, he was at McAfee

13 Associates.

14   Q.   And at the time this press release was issued,

15 you knew that McAfee sold his interest in McAfee

16 Associates or Inc. in the 1990s well before the company

17 was sold to Intel; isn't that correct?

18   A.   I knew that.  I think everyone knew that, but

19 yes.

20        The funny story is the highest viewed YouTube

21 video was how to -- how to uninstall McAfee anti-virus

22 done by John McAfee.

23   Q.   Right.

24   A.   So...

25   Q.   All right.  So I think you've just described

275

1  sold his anti-virus company to Intel for 7.6 billion,"

2  right?

3       A.   Yes.

4       Q.   Is that when you added the language between

5  your last e-mail with Ms. Wu at -- late in the evening

6  the night before and 6:43 a.m.?

7       A.   I'll check for you if you'd like.  I thought

8  it was earlier, but I'm not sure.

9       Q.   Well, we just looked at a bunch of drafts that

10 did not have that language.  So I'm just trying to pin

11 down when it was that you added it.

12      A.   Then I think it's fair to say yes, it happened

13 sometime between the draft without it and the draft with

14 it, yes.

15      Q.   And do you recall why you added it?

16      A.   I don't, but I've revised things up until the

17 final moment.  There are times when I call PR Newswire

18 and make a change.

19           So the answer is -- I don't want to say I'm a

20 perfectionist because that's obviously the wrong term

21 here, but I'm a writer -- closet writer, I guess, and I

22 would like it to read correctly.

23      Q.   Did you expect the press release to have a

24 positive effect on MGT stock on its issuance?

25      A.   Yes.

                                                      287

1          A.    I know.

2          Q.    -- the person who's testifying.

3          A.    It's the other way around, I'm sorry.  Yeah.

4          Q.    So did you tell anyone, in the course of

5     providing that final press release, that McAfee had not

6     sold his company to Intel for $7.6 billion?

7          A.    Not that I recall.

8          Q.    All right.  So on May 9th you, at least I

9     think we saw referred to in the New York Stock Exchange

10    correspondence that we looked at, you had retained the

11    services of Stockbeast.com for investor relations

12    services; is that right?

13         A.    Yes.

14         Q.    Okay.  And if you look at the exhibit we've

15    got behind tab 79, it's an exhibit we marked as Holmes

16    Exhibit 28, and it's a May 9 Stockbeast piece, and I

17    asked if you recognize it?

18         A.    Yes.

19         Q.    And the first -- if you go to the actual text

20    of the piece which begins on 4 of 8, the first paragraph

21    contains this language -- I guess I'll read the whole

22    first paragraph because it doesn't make any sense if I

23    don't.

24               "When I was young I used to watch Jeopardy and

25    I would try to guess at the answers.  I was pretty good

295

1    two-month MGT contract."

2         Was that an accurate statement of how much MGT

3    had paid for Stockbeast services?

4         A.   Yes.

5         Q.   Did you review a draft of this Stockbeast

6    article, Holmes Exhibit 28, prior to its publication?

7         A.   No.

8         Q.   Did you have a discussion with anyone, prior

9    to its publication, that it was about to come out?

10        A.   No.

11        Q.   And how did you come to retain Stockbeast?

12        A.   Um --

13        Q.   Whose suggestion was it?

14        A.    I believe that was the suggestion of an

15   employee or consultant of ours named Steve Schaffer who

16   was a little more aware of the mailing lists that had

17   the biggest circulation.

18        Q.   And how do you --

19        A.   But that didn't matter much.

20        Q.   Okay.  Thank you.

21             How did you -- what was your understanding of

22   how it was that he was aware of which publications had,

23   I guess you're saying, a good mailing list?

24        A.   How Steve was?

25        Q.   Mmmm-hmmm.  Yes.

                                                          297

1  goes out, including attorney review, accounting review

2  before a 10 -- you know, any periodic filing goes out.

3      Q.   All right.  Did you discuss any disclosure

4  issues with the accountants with respect to the issues

5  around the McAfee press release -- the May 9th press

6  release?

7      A.   I don't recall any.

8      Q.   All right.  So at page 9 of 29, the

9  penultimate paragraph, one, two, three, four lines from

10  the bottom of that paragraph, all the way to the right

11  says, "John David McAfee is the cyber security

12  industry's pioneer and the developer of the world's

13  first commercial anti-virus software.  He founded McAfee

14  Associates in 1987 which was acquired by Intel

15  Corporation for 7.6 billion in 2010."

16          Do you see that?

17      A.   Yes.

18      Q.   So why does that language differ from the

19  press release in which -- the May 9th press release in

20  which the statement was that Mr. McAfee had sold his

21  company to Intel for 7.6 billion?

22      A.   So I think the first one was like in the

23  active voice versus passive voice, whatever, it's like

24  McAfee sold the company, and this one is the company

25  that he founded was sold to Intel.

303

1      Q.   And did you discuss that change with anyone?

2      A.   Oh, sure.  That was -- that was vetted inside

3  out.

4      Q.   Okay.  Did you make any additional disclosures

5  that would point out what had been erroneous in the

6  original press release?

7      A.   I did not.

8           And I should also state that, with the

9  exception of that one short seller, that no one else

10 brought that to our attention.

11          And we were doing it mainly because we know

12 that short seller contacted the SEC and tried to whistle

13 blow, you know, a giant fraud based on one small

14 misstatement.  That's why we took a lot of care and

15 effort into doing this language in the 10-Q.

16     Q.   I may have misunderstood your prior testimony,

17 but I thought you said that there were lots of short

18 sellers who wrote pieces about the error in the press

19 release; is that not your testimony?

20     A.   Oh, if I did, I'm not sure.

21          But short sellers are also notorious for

22 having brothers and sisters in six different languages,

23 but --

24     Q.   I'm sure they're notorious, Mr. Ladd, but what

25 I'm trying to find out is what you knew at the time.

                                                        304

1    filed."

2            And then skipping a sentence it says, "The

3    apparent concealment by Iroquois of the ownership

4    interests and trading activity of ACM, not only to the

5    company in the nomination letter, but to the SEC,

6    creates a materially misleading communication to the

7    company's stockholders."

8            Do you see that?

9    A.    Yep.

10    Q.    All right.  So what is ACM?

11    A.    I -- I believe ACM, then and now, was a

12    retirement vehicle for Iroquois, which is Rich --

13    Richard Abbe and Joshua Silverman.

14    Q.    So was it MGT's position that ACM was an

15    affiliate or associate of or acting in concert with

16    Iroquois Master Fund by virtue of its relationship to

17    Mr. Silverman, Mr. Abbe, and other members of Iroquois

18    Capital Management?

19    A.    Yes.  We believed -- excuse me -- it was

20    common voting principles, common economic interests that

21    everything was -- you know, it's like let's call it, you

22    know, Ladd and Ladd IRA account.

23    Q.    And that conclusion also supported your

24    conclusion that Iroquois had violated Section 13 of the

25    Exchange Act by failing to disclose ACM's holdings of

315

1    MGT stock; is that right?

2         A.   Yes.

3         Q.   And why is that?

4         A.   Well, because you would need to aggregate

5    ownership holdings like that as being controlled by the

6    single entity.

7         Q.   And is that what Section 13 requires?

8         A.   I believe, among other things, yes.

9         Q.   And what information does Section 13 -- what

10   is it intended to provide?  Or does --

11             CERTIFIED STENOGRAPHER:  Excuse me, Nancy --

12             MS. BROWN:  Yes.  Sorry.  My headphones just

13   died.

14             Can you hear me?

15             THE WITNESS:  Yes, I can.

16             MS. BROWN:  Okay.  Great.

17   BY MS. BROWN:

18        Q.   And what about the relationship between ACM

19   and Iroquois made that Section 13 filing by Iroquois

20   necessary?

21             Was it simply the common voting principles and

22   the common economic interests that you discussed

23   earlier?

24        A.   Yes.  And the fact that added together it

25   would exceed the threshold -- excuse me -- reporting

316

1    way -- the way I included MGT, and Ladd, and MGT Sports

2    in that previous one you showed me, is there anything

3    like that that I should disclose?

4          And the answer is no.

5    Q.   And did you discuss your understanding of the

6    purpose of the question with anyone?

7    A.   No.

8    Q.   Okay.  3.5, 5 percent holders.

9          "Do you know of any person or group of persons

10   which beneficially owns 5 percent or more of the common

11   stock of the company?"

12         And you answered, "Yes.  Iroquois Capital."

13         Correct?

14   A.   Yes.

15   Q.   And on what did you base that answer?

16   A.   I believe Iroquois filed a 13D and it was

17   public information.

18   Q.   So only public filings?

19   A.   Yeah.  And it depends how they held their

20   stock.  If they held it in their own name, I could tell

21   from the registrar, you know, the transfer agent or

22   whatever, but generally the holder is required to file.

23   Q.   Well, that sort of was my question.

24         Did you make any separate inquiry as to what

25   Iroquois owned?

330

1         Like, for example, asking the transfer agent

2    for a NOBO list or anything like that?

3         A.   Well, periodically, yes, we get NOBO lists.  I

4    think -- not to digress, but going back to the ACM, I

5    think ACM was actually on the NOBO list, which is how we

6    found out.

7         Q.   Okay.  Did you make that kind of inquiry for

8    any other of your shareholders or to answer this

9    question about who owned more than 5 percent?

10        A.   I don't recall exactly, but obviously you

11   don't want secret accumulation in your stock.  So if I

12   saw a NOBO list with, you know, Mr. Smith, and then

13   Mrs. Smith, and John Smith, and everything else, I mean,

14   you know, it was something I was aware of and have had

15   happen.  But I --

16             CERTIFIED STENOGRAPHER:  Excuse me, Mr. Ladd,

17   I cannot hear you.

18             MS. BROWN:  Yeah.  What's happening?  I cannot

19   hear you.

20             THE WITNESS:  He's closing the blinds again.

21   Just the daily closing of the blinds.

22             MS. BROWN:  None of us can hear anything while

23   he does that.

24             THE WITNESS:  Yes.  I see the background

25   noise.

                                                          331

10:09  1   outcome.  And he was very careful to not describe

10:09  2   what the advice was, only that there was advice

10:09  3   obtained and an action occurred.  So he's

10:09  4   absolutely not waiving privilege.

10:09  5          MS. BROWN:  Thank you.

10:09  6      Q.   And did you make any inquiry on your own

10:09  7   to determine whether or not Mr. Honig was acting as

10:09  8   part of a group other than what you've described

10:09  9   already, which is reviewing the subscription

10:10 10   agreements in which you read that there was some

10:10 11   sort of representation, that they were not, and

10:10 12   your conversations with counsel, whatever they may

10:10 13   have involved, and your comfort from the New York

10:10 14   Stock Exchange's -- what you perceived to be their

10:10 15   conclusion?

10:10 16      A.   Did I do more than that, you're saying?

10:10 17      Q.   Yes.  Did you make any inquiry other than

10:10 18   that?

10:10 19      A.   Not that I recall.

10:10 20      Q.   And other than the conversations -- or the

10:10 21   consultation you had with counsel that you've

10:10 22   already discussed, did you discuss the issue of

10:10 23   whether Mr. Honig was acting as part of a group

10:10 24   with anyone?

10:10 25      A.   I mean, there was a topic that, for lack

                                                        344

10:11  1    of a better term, is an elephant in the room in

10:11  2    terms of all these investors, mainly for Section 13

10:11  3    purposes, need to be legally not a group;

10:11  4    otherwise, a company like ours could disgorge them

10:11  5    of any profits they make on a deal.  And,

10:11  6    unfortunately, there's been no determination in

10:11  7    this case or in any other case that I'm aware of

10:11  8    that Mr. Honig acted as a group that would, under

10:11  9    securities laws, need to be disclosed.

10:12  10        Q.   Okay.  Thank you.  So I just want to

10:12  11   restate what you said so I understand it, so

10:12  12   correct me if I've said it wrong.  But from your

10:12  13   perspective, this was a continuing and very

10:12  14   important issue in your interactions with Mr. Honig

10:12  15   and the two investments he made in MGT, whether he

10:12  16   was part of a group?

10:12  17        A.   I don't want to lead you to believe it was

10:12  18   important to me.  I believe it was important to

       19   them.

       20        Q.   Okay.

10:12  21        A.   I was -- my concern would be that they can

10:12  22   exert no control over me.

10:12  23        Q.   All right.  So you mentioned the New York

10:12  24   Stock Exchange.  Let's talk about that for a

10:12  25   minute.  In connection with the October 2012

345

10:13 1    financing, what inquiry, if any, did the New York

10:13 2    Stock Exchange make concerning any of the

10:13 3    investors' relationship to each other?

10:13 4        A.   Is there a document to look at on that one

10:13 5    or --

10:13 6        Q.   Can you just tell me what you recall first

10:13 7    and then look at documents?

10:13 8        A.   So what I recall is there was Hudson Bay,

10:13 9    Iriquois, and Barry Honig investing as part of the

10:13 10   same investment group.  And I recall several

10:13 11   discussions with our analysts at New York Stock

10:13 12   Exchange to ensure that they were comfortable with

10:13 13   the representations of those investors, as well as

10:13 14   what other information they may have.  And keep in

10:14 15   mind that a guy like Mr. Honig was on the board of

10:14 16   directors of several or at least few NASDAQ and New

10:14 17   York Stock Exchange companies.  So there was

10:14 18   nothing that really jumped out at me to say that he

10:14 19   was doing something undisclosed.

10:14 20            And, again, the impact would be one of

10:14 21   Section 16.  If they were deemed to be a group, they

10:14 22   would become de facto affiliates by owning more than

10:14 23   10 percent.  At that time, any short swing profits

10:14 24   become the property of the company.

10:14 25            So from an economic model, that's something

346

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF NEW YORK

3

4     SECURITIES AND EXCHANGE          )
      COMMISSION,                      )
5                                      )
                      Plaintiff,       )
6                                      )
           vs.                         ) Case No.
7                                      ) 18 Civ. 8175(ER)
      BARRY C. HONIG, ROBERT LADD,     )
8     ELLIOT MAZA, BRIAN KELLER,       )
      JOHN H. FORD, GRQ CONSULTANTS,   )
9     INC., and HS CONTRARIAN          )
      INVESTMENTS, LLC,                )
10                                     )
                      Defendants.      )
11    _____)

12

13

14                          VOLUME 3

15              VIDEO DEPOSITION OF ROBERT LADD

16                   VIA VIDEOCONFERENCE

17              Tuesday, November 10, 2020

18

19

20

21

22

23
      REPORTED BY:
24    GRACE CHUNG, CSR No. 6246,
      RMR, CRR, CLR
25    JOB NO. 201110GCH

                                                        336

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF NEW YORK

3

4      SECURITIES AND EXCHANGE          )
       COMMISSION,                      )
5                                       )
                        Plaintiff,      )
6                                       )
            vs.                         ) Case No.
7                                       ) 18 Civ. 8175(ER)
       BARRY C. HONIG, ROBERT LADD,     )
8      ELLIOT MAZA, BRIAN KELLER,       )
       JOHN H. FORD, GRQ CONSULTANTS,   )
9      INC., and HS CONTRARIAN          )
       INVESTMENTS, LLC,                )
10                                      )
                        Defendants.     )
11     _____)

12

13

14

15          Videotaped deposition of ROBERT LADD, Volume 3,

16     taken via videoconference on behalf of Plaintiff,

17     beginning at 10:04 a.m. EST and ending at 11:54 a.m.

18     EST, on Tuesday, November 10, 2020, before GRACE CHUNG,

19     CSR No. 6246, RMR, CRR, CLR.

20

21

22

23

24

25

                                                            337

```
 1                    A P P E A R A N C E S

 2      (All appearances via videoconference.)

 3

 4      For the Plaintiff:

 5      SECURITIES AND EXCHANGE COMMISSION
        BY: NANCY BROWN, ESQ.
 6          JACK KAUFMAN, ESQ.
            KATHERINE BROMBERG, ESQ.
 7      200 Vesey Street
        Suite 400
 8      New York, New York 10281
        (212) 336-1023
 9      BrownN@sec.gov
        KaufmanJ@sec.gov
10      BrombergK@sec.gov

11

12      For the Defendant:

13      FORD O'BRIEN
        BY:  ADAM FORD, ESQ.
14           ANJULA PRASAD, ESQ.
        575 Fifth Avenue
15      Floor 17
        New York, New York 10017
16      (212) 858-0040
        aford@fordobrien.com

17

18

19      Also Present:   TIM HUNTER, Videographer

20

21

22

23

24

25
                                                        338
```

10:25  1          Q.   Okay.  So Mr. Kesner, as you understood

10:25  2     it, was Barry Honig's attorney?

10:25  3          A.   Correct.

10:25  4          Q.   And did you do anything to verify that

10:25  5     Jonathan Honig and Barry Honig were separate

10:25  6     investment entities?

10:25  7          A.   So, again, they represented to the company

10:25  8     that they were separate.  And in the case of funds,

10:26  9     I believe this deal was --

       10               (Reporter interruption for clarification

       11               of the record.)

10:26 12          A.   Funding.  I believe this transaction

10:26 13     closed in escrow, so Sichenzia would have seen if,

10:26 14     for example, those two investments came from the

10:26 15     same place and would have an obligation to tell me.

       16     BY MS. BROWN:

10:26 17          Q.   And did you ever speak to Jonathan Honig

10:26 18     in connection with negotiation of the 2012

10:26 19     financing?

10:26 20          A.   Not that I recall.

10:26 21          Q.   Okay.  So let's talk a little bit about

10:26 22     that negotiation.  So who put the investors

10:26 23     together that participated in the 2012 financing?

10:27 24          A.   I believe Chardan Capital was involved.

10:27 25          Q.   Okay.  Did they -- did they pull the

                                                              354

10:09   1    outcome.  And he was very careful to not describe

10:09   2    what the advice was, only that there was advice

10:09   3    obtained and an action occurred.  So he's

10:09   4    absolutely not waiving privilege.

10:09   5              MS. BROWN:  Thank you.

10:09   6        Q.   And did you make any inquiry on your own

10:09   7    to determine whether or not Mr. Honig was acting as

10:09   8    part of a group other than what you've described

10:09   9    already, which is reviewing the subscription

10:10  10    agreements in which you read that there was some

10:10  11    sort of representation, that they were not, and

10:10  12    your conversations with counsel, whatever they may

10:10  13    have involved, and your comfort from the New York

10:10  14    Stock Exchange's -- what you perceived to be their

10:10  15    conclusion?

10:10  16        A.   Did I do more than that, you're saying?

10:10  17        Q.   Yes.  Did you make any inquiry other than

10:10  18    that?

10:10  19        A.   Not that I recall.

10:10  20        Q.   And other than the conversations -- or the

10:10  21    consultation you had with counsel that you've

10:10  22    already discussed, did you discuss the issue of

10:10  23    whether Mr. Honig was acting as part of a group

10:10  24    with anyone?

10:10  25        A.   I mean, there was a topic that, for lack

                                                            344

```
10:11   1    of a better term, is an elephant in the room in
10:11   2    terms of all these investors, mainly for Section 13
10:11   3    purposes, need to be legally not a group;
10:11   4    otherwise, a company like ours could disgorge them
10:11   5    of any profits they make on a deal.  And,
10:11   6    unfortunately, there's been no determination in
10:11   7    this case or in any other case that I'm aware of
10:11   8    that Mr. Honig acted as a group that would, under
10:11   9    securities laws, need to be disclosed.
10:12  10        Q.   Okay.  Thank you.  So I just want to
10:12  11    restate what you said so I understand it, so
10:12  12    correct me if I've said it wrong.  But from your
10:12  13    perspective, this was a continuing and very
10:12  14    important issue in your interactions with Mr. Honig
10:12  15    and the two investments he made in MGT, whether he
10:12  16    was part of a group?
10:12  17        A.   I don't want to lead you to believe it was
10:12  18    important to me.  I believe it was important to
       19    them.
       20        Q.   Okay.
10:12  21        A.   I was -- my concern would be that they can
10:12  22    exert no control over me.
10:12  23        Q.   All right.  So you mentioned the New York
10:12  24    Stock Exchange.  Let's talk about that for a
10:12  25    minute.  In connection with the October 2012
```

345

10:13  1    financing, what inquiry, if any, did the New York

10:13  2    Stock Exchange make concerning any of the

10:13  3    investors' relationship to each other?

10:13  4        A.   Is there a document to look at on that one

10:13  5    or --

10:13  6        Q.   Can you just tell me what you recall first

10:13  7    and then look at documents?

10:13  8        A.   So what I recall is there was Hudson Bay,

10:13  9    Iriquois, and Barry Honig investing as part of the

10:13  10   same investment group.  And I recall several

10:13  11   discussions with our analysts at New York Stock

10:13  12   Exchange to ensure that they were comfortable with

10:13  13   the representations of those investors, as well as

10:13  14   what other information they may have.  And keep in

10:14  15   mind that a guy like Mr. Honig was on the board of

10:14  16   directors of several or at least few NASDAQ and New

10:14  17   York Stock Exchange companies.  So there was

10:14  18   nothing that really jumped out at me to say that he

10:14  19   was doing something undisclosed.

10:14  20        And, again, the impact would be one of

10:14  21   Section 16.  If they were deemed to be a group, they

10:14  22   would become de facto affiliates by owning more than

10:14  23   10 percent.  At that time, any short swing profits

10:14  24   become the property of the company.

10:14  25        So from an economic model, that's something

10:32  1        Q.   And Miramar investors.  Do you know who

10:32  2    that is?

10:32  3        A.   Not as I sit here.

10:32  4        Q.   All right.  And who determined the

10:32  5    allocations of the investors who ultimately

10:32  6    invested in the 2012 financing?

10:32  7        A.   Well, as I recall, because of the success

10:33  8    Honig has with investments, that he chooses those

10:33  9    people to invest with him.  So, as I said, they all

10:33 10    invest with the common subscription agreement.

10:33 11    But, you know, if we substitute the name "Honig"

10:33 12    for "Chardan," you know, Honig operates as an

10:33 13    investment banker, at least in his mind.

10:33 14        Q.   Why would we substitute the name Honig for

10:33 15    Chardan?

10:33 16        A.   Because Honig fancied himself an

10:34 17    investment banker, and Chardan is a pretty

10:34 18    low-level investment banker.

10:34 19        Q.   Okay.  Let's look at Ladd Exhibit 92,

10:34 20    which is behind Tab Exhibit 92.

      21             (Deposition Exhibit 92 was marked for

      22             identification by the reporter and is

      23             attached hereto.)

10:34 24             MS. BROWN:  It purports to be -- the top

10:34 25    email purports to be from you to Harvey Kesner,

                                                            358

10:34 1   Tara Guarneri-Ferrara, and Susanna Aronbayev, dated

10:34 2   October 23, 2012.

10:34 3        Q.   Do you recognize this as an email that you

10:34 4   sent on or about that date?

10:34 5        A.   Yes.

10:34 6        Q.   And who's Tara Guarneri-Ferrara?

10:34 7        A.   I think she's an attorney at Sichenzia.

10:35 8        Q.   Does she work with Mr. Kaplowitz and

10:35 9   Mr. Marcus?

10:35 10       A.   So I think she worked with Harvey, but I'm

10:35 11   not sure.

10:35 12       Q.   But with Mr. Kesner?

10:35 13       A.   And that reminded me.  I wanted to point

10:35 14   out that in this deal, I believe Kesner was

10:35 15   representing investors.  So that's why they were

10:35 16   involved on it -- or involved, you know, in the

10:35 17   email chains.

10:35 18       Q.   Do you know who Susanna -- I'm not going

10:35 19   to try to say her last name again, but also on the

10:35 20   email, do you know who she is?

10:35 21       A.   I don't.

10:35 22       Q.   All right.  So if we can turn the page on

10:35 23   this exhibit and start with the second-to-last one,

10:36 24   which is from Mr. Kesner to Ms. Guarneri-Ferrara

10:36 25   and Susanna.  And he writes, "Tara, you should

359

10:50  1    right?

10:50  2         A.   Yes.

10:50  3         Q.   So I think you've already testified that

10:50  4    in connection with the 2012 financing, you, as MGT,

10:50  5    on the one hand hired lawyers from Sichenzia, and

10:50  6    Honig, on the other hand, hired a different lawyer,

10:50  7    Mr. Kesner, from Sichenzia; is that right?

10:50  8         A.   That's my recollection, yes.

10:50  9         Q.   And in that connection, were you asked

10:50 10    about Sichenzia to waive conflicts?

10:50 11         A.   Yeah, I think so.  I'm pretty sure we

10:50 12    signed one, if not many, conflict waivers with

10:50 13    Sichenzia over time.

10:51 14         Q.   And did all those conflict waivers relate

10:51 15    to Sichenzia's -- different lawyers from Sichenzia

10:51 16    representing Honig and others?

10:51 17         A.   Yeah, it was more like others.  I think it

10:51 18    was a boilerplate-type conflict waiver.

10:51 19         Q.   Okay.  Let's look at what we've marked as

10:51 20    Ladd Exhibit 62, which is behind Tab 62.

      21              (Deposition Exhibit 62 was marked for

      22              identification by the reporter and is

      23              attached hereto.)

10:51 24              MS. BROWN:  And Ladd Exhibit 62, for the

10:51 25    record, purports to be an email from you dated

                                                              368

| | | |
|---|---|---|
| 11:31 | 1 | is this is an email that was sent to me from |
| 11:31 | 2 | Jonathan Schechter.  It includes at least two |
| 11:31 | 3 | attorneys from buyer and seller and my CFO, and it |
| 11:32 | 4 | doesn't mean anything to me unless it was a |
| 11:32 | 5 | transaction. |
| 11:32 | 6 | Q.  Do you recall any of the buyers in the |
| 11:32 | 7 | 2012 financing selling their units to an entity |
| 11:32 | 8 | called Savvy Capital in 2013?  Does that refresh |
| | 9 | your recollection? |
| 11:32 | 10 | A.  To who? |
| 11:32 | 11 | Q.  Savvy. |
| 11:32 | 12 | A.  Can you spell -- |
| 11:32 | 13 | Q.  S-A-V-V-Y. |
| 11:32 | 14 | A.  Yes.  Okay.  Savvy, they ended up busting |
| 11:32 | 15 | the deal.  Honig busted the deal, and Savvy, I |
| 11:32 | 16 | think, went short to stock in anticipation.  It was |
| 11:32 | 17 | a pretty ugly situation.  But, as I said, that deal |
| 11:32 | 18 | never closed.  And if it had closed, it would have |
| 11:32 | 19 | been correctly reported if necessary. |
| 11:33 | 20 | But that's the time when I got the |
| 11:33 | 21 | expression of Honig.  Over the weekend, he DK'd the |
| 11:33 | 22 | deal, and he said, "Sometimes you feel like a hot |
| 11:33 | 23 | dog, and then sometimes you feel like a hamburger." |
| 11:33 | 24 | So another reason why everything needs to be in |
| 11:33 | 25 | writing with Honig. |

389

406

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF NEW YORK

3                          --o0o--

4     SECURITIES AND EXCHANGE          )
       COMMISSION,                     )
5                                      )
                  Plaintiff,           )
6                                      ) Case No.
          vs.                          ) 18 Civ. 8175 (ER)
7                                      )
       BARRY C. HONIG, ROBERT LADD,    )
8     ELLIOT MAZA, BRIAN KELLER,       )
       JOHN H. FORD, GRQ CONSULTANTS,  )
9     INC. and HS CONTRARIAN           )
       INVESTMENTS, LLC                )
10                                     )
                  Defendants.          )
11    _____)

12

13

14

15                      DEPOSITION OF

16                      ROBERT LADD

17              VOLUME 4 - PAGES (406-506)

18              VIA REMOTE VIDEOCONFERENCE

19                 FRIDAY, AUGUST 5, 2022

20

21

22

23
       Stenographically Reported by:
24    Victoria L. Valine, CSR, RMR, CRR, RSA
       California CSR License No. 3036
25    Job No. 220805VV

407

1                    REMOTE APPEARANCES:

2


3    FOR PLAINTIFF:

4            SECURITIES AND EXCHANGE COMMISSION
             BY:  Nancy A. Brown, Esq.
5                  Jack Kaufman, Esq.
              100 Pearl Street, Suite 20-100
6            New York, New York  10004
                212-336-1023
7            BrownN@SEC.gov

8

     FOR DEFENDANT ROBERT LADD:
9
                FORD O'BRIEN, LLP
10           Attorneys at Law
               BY:  Adam Ford, Esq.
11                 Anjula Prasad, Esq.
              575 Fifth Avenue, Floor 17
12           New York, New York  10017
                212-858-0040
13           AFord@fordobrien.com

14

15

16

17

18
        (All parties appeared remotely via videoconference.)
19

20

21

22

23

24

25

416

1    been any number of things.

2        Q.   Do you remember meeting her more than once?

3        A.   No.

4        Q.   Did you ever meet any of his children?

5        A.   Never, no.

6        Q.   You were aware he had children, though, right?

7        A.   I mean, I'm aware now.  Let's put it this way,

8    he was not a paternal person who would talk about his

9    kids the way I might, you know, being proud of my kids

10   going to Stanford, et cetera.  I never heard anything

11   like that.

12       Q.   Wasn't the genesis of the Four Kids Investment

13   Fund Mr. Honig's children?

14       A.   I really have no idea.  I don't know today

15   whether it's his kids or -- I thought maybe it was his

16   brother's kids or something.  I'm not really sure.  I've

17   seen that name.

18            So if he controlled it, then it would show up

19   on his ownership list.  So I know GRQ was an entity he

20   controlled.  Get Rich Quick, GRQ.

21       Q.   Now, we talked a little bit last time we were

22   together about the Iroquois nomination letter in

23   July 2014.

24            Do you remember that?

25       A.   Yes.

417

1          Q.   And you told us then that MGT had retained

2     Mr. Freedman, F-R-E-E-D-M-A-N, at Olshan, O-L-S-H-A-N,

3     because of his M&A expertise.

4               Do you recall that?

5          A.   I think it was because of his expertise in

6     hostile takeover situations, but, yes, he was retained

7     for that reason.

8          Q.   Okay.  And you thought Iroquois was about to

9     launch a hostile takeover, right?

10         A.   I believe they sent a letter to that effect.

11    There was a series that -- we filed an 8-K to alert the

12    market as to their intent.

13              SEC never followed up on it, but we tried to

14    get some protection from a shakedown from Iroquois, and,

15    unfortunately, that fell on deaf ears.  So they followed

16    that up with a -- you know, a threat to nominate

17    directors at a meeting.

18         Q.   Did you believe that Mr. Freedman also had

19    expertise in Section 13(d) disclosure matters?

20         A.   I assume he did.  I mean, that's part of

21    anti-takeover measures.  It's a very common -- unlike

22    this proceeding, the only time 13(d) becomes an issue is

23    when a raider is accused by another company of forming

24    an illegal group.

25              I think you probably are aware that I've been

421

```
 1        Q.   And did he tell you that if correspondence
 2   from one shareholder were sent to the attention of
 3   another shareholder, that would be a factor in the group
 4   analysis?
 5        A.   I don't recall that.
 6        Q.   Did he tell you that if an employee of one
 7   shareholder is a managing member of another, that would
 8   be a factor in the group analysis?
 9        A.   I really can't recall any specific
10   information.  I would modestly say I know more about
11   13(d) than nearly anyone else on Wall Street.
12        Q.   And did he tell you if they were acting as a
13   group and didn't properly disclose that in Section 13(d)
14   filings, such an omission would cause a materially
15   misleading communication to the company stockholders?
16        A.   No.  I don't remember anything like that.
17        Q.   Now, on page 4 of the letter -- and that's,
18   just for your reference, Holmes Exhibit 12, which we've
19   sent to you -- you mention that in the paragraph -- the
20   last full paragraph on page 4 of the letter it begins,
21             "Notwithstanding ongoing direct
22        questioning by the company..."
23             Do you see that?
24        A.   Unfortunately, I pulled up Holmes 10.  Let me
25   find Holmes -- Ladd, Ladd, Ladd -- yeah.  I see it.  It
```

423

```
 1        A.   I can't remember that.  I'm sorry.

 2        Q.   Well, did you ask any questions of Iroquois

 3   before you sent this letter?

 4        A.   I don't remember.  But to reiterate what I

 5   said, until this litigation Section 13 was a private

 6   action among warring parties in a takeover battle.  So,

 7   you know, anything I would read on a commercial lawsuit

 8   I wouldn't put too much stock in.

 9        Q.   All right.  I'm simply asking about the

10   letter, Mr. Ladd.

11        So did you consult with any attorney,

12   including Mr. Freedman, about what questions you should

13   ask of Iroquois in connection with their nomination

14   letter?

15        A.   Notwithstanding, like I said, that I'm the --

16   considered, humbly, a very good expert in 13 --

17   Section 13.  You know, attorneys do go to school for

18   this and get paid very high rates.  So I rely on

19   attorneys and listen to what they say.

20        But, you know, to this minute today, I don't

21   remember what he asked me, what he told me to do,

22   whether he did it, whether someone else did it,

23   Traversa, you know, I don't get -- I don't remember the

24   specifics.

25        Q.   And do you recall what answers you received in
```

425

1      A.    Yes.

2      Q.    So my question is:  If you had the SEC filings

3  that Iroquois made disclosing its ownership, why didn't

4  you trust them?

5            MR. FORD:  I'm going to object to form and

6  lack of foundation.

7            THE WITNESS:  So to go back on memory alone,

8  there's other sources of stock ownership that a company

9  has access to, such as DTC records or Broadridge, and I

10  believe in one of those shareholder lists it came up

11  that American Capital owned the shares in addition to

12  Iroquois.

13            And, as I mentioned, I certainly believed at

14  the time, and still believe, that American Capital was

15  the retirement vehicle of Abbe and Silverman.  So they,

16  obviously, the same way Honig would disclose GRQ or his

17  401K, that would need to be disclosed as owner -- as

18  common owner.

19  BY MS. BROWN:

20      Q.    Were you distrustful of any other investors'

21  SEC filings?

22      A.    I distrust every investor.

23      Q.    And after your issue with Iroquois was

24  resolved, you continued to have doubts about the

25  accuracy of their SEC disclosures about their ownership

428

1    have here in AP Exhibit 31?

2         A.   Not to my knowledge or recollection.

3         Q.   Did you ever suggest that any other investor

4    make updated SEC filings with respect to their ownership

5    of MGT shares?

6         A.   I don't remember.  And, generally speaking,

7    there are -- it's the obligation of the investor to file

8    correctly.  And if they don't file, in the absence of me

9    knowing some way -- some other way, there would be no

10   way for me to know if someone owned five percent or more

11   right now.

12        Q.   Well, so let me ask you this.  Why are you, in

13   January 2016, concerned with whether Iroquois's filings

14   are accurate?

15        A.   Why wouldn't I?

16        Q.   Well, I guess my question is:  What was in it

17   for you?

18             You mention in this email that this

19   information will go into the S-1 with your beneficial

20   ownership equal to 9.9 percent.

21        A.   Mmmm-hmmm.

22        Q.   Was that your concern, that your S-1 had to

23   reflect accurately Iroquois's beneficial ownership of

24   MGT shares?

25        A.   That is probably a very good reason.  We

429

1    wanted to have an accurate S-1 so that, yes, would make

2    sense.  But when you imply something in it for me, that

3    was uncalled for.

4        Q.   So, I'm sorry.  I really was trying to get to

5    the bottom of what your interest in his accurate filings

6    was, and I think you've explained that.

7             MR. FORD:  That's the basis of my --

8    BY MS. BROWN:

9        Q.   So if there was any inference that you drew, I

10   apologize.

11            MR. FORD:  That was the basis of my objection

12   as well.

13            MS. BROWN:  Thank you.

14            (Deposition Exhibit 106 marked.)

15   BY MS. BROWN:

16       Q.   All right.  So let's turn to, if we could,

17   Ladd Exhibit 106.  And Ladd Exhibit 106, for the record,

18   is a Schedule 13D filed with respect to events occurring

19   on June 27, 2014 by Iroquois with respect to ownership

20   of MGT Capital Investments, Inc.

21            Mr. Ladd, do you recognize Ladd Exhibit 106?

22       A.   Yes.  I see it.  Yes.

23       Q.   All right.

24       A.   It's exactly what you said it was.

25       Q.   Okay.  Thank you.

436

1    Iroquois dispute?

2        A.   I don't remember specifically.  Jay Kaplowitz

3    was our attorney since 2011.  Jay knew everything about

4    what happens at MGT.  So my assumption would be he would

5    know about this.

6        Q.   Well, irrespective of which lawyer you

7    consulted with respect to Holmes Exhibit 12, you

8    believed, at the time that this letter was issued by

9    MGT, everything that's in it, right?

10            You believed that was all true?

11       A.   Well, again, as I say, given the fact that I

12   had more assistants back then between Traversa and

13   Van Leenen, I -- let's put it this way, I wouldn't let a

14   letter go out that was factually incorrect.

15       Q.   Okay.

16       A.   But I don't know that all the contents in here

17   were confirmed by me at that time.

18       Q.   At any time after this letter was sent to

19   Iroquois, did you consider whether Iroquois's failure to

20   disclose its group holdings with ACM gave MGT any

21   responsibility to amend its own disclosures?

22       A.   Well, as I said, the actions in private

23   litigation on Section 13 are merely for leverage, and

24   this case is highly unusual in its scope, but,

25   generally, it's an onus on the investor to -- to

468

1    couldn't rely on investors' Schedule 13D disclosures?

2        A.    Not that I recall.

3        Q.    So is it fair to say that, other than the

4    October 18, 2012 e-mail, you have no recollection of

5    having discussed the group status of Honig and his

6    co-investors again?

7        A.    You said we're back to 2012 again?  Which

8    email?  I have that widely circulated --

9        Q.    AM --

10       A.    -- email --

11       Q.    AM number 1.

12       A.    Right.  Okay.  All right.  And the question,

13   please?

14       Q.    Is other than this email from

15   October 18, 2012, do you have a recollection of any

16   further discussions with Mr. Kaplowitz or Mr. Marcus

17   about Honig's group status?

18       A.    I don't recall.  It's not a -- it's a given

19   that you're not a group unless proven otherwise.  So

20   you're asking like if he was a pedophile, would I keep

21   asking or something?

22       Q.    In your prior testimony you mentioned due

23   diligence into the group status of Honig and his

24   co-investors that you conducted arising out of the

25   rumors you heard in 2012 that the SEC was investigating

469

1    Honig, Iroquois, and Hudson Bay as an investment group.

2         Do you recall that?

3         A.   I recall the New York Stock Exchange

4    approving, but questioning, the deals where those three

5    investors co-invested.

6         Q.   Well, tell me about that rumor.  Where did you

7    hear that rumor that the SEC was investigating the group

8    status?

9         A.   Well, I mean, I believe the New York Stock

10   Exchange and I or Deo discussed it.  I'm sure he didn't

11   tell me if there was an ongoing investigation, but, you

12   know, Wall Street is full of rumors.

13        Q.   And I think you just said Deo in your last

14   response, that's Mr. Machado, M-A-C-H-A-D-O?

15        A.   Yes.

16        Q.   All right.  And who brought up the rumor?  Was

17   it you or Mr. Machado?

18        A.   That, I don't remember.

19        Q.   And this was prior to the 2012 financing?

20        A.   I don't recall.  It was probably coincident

21   with that.

22        Q.   And -- and the substance of the rumor was that

23   the SEC was investigating whether Honig, Iroquois, and

24   Hudson Bay were investing as an undisclosed group; is

25   that -- was that your understanding?

470

1      A.   Yes.  And, again, the -- I guess, interest

2  from people is related to Section 16, so that it would

3  regard -- it would influence the ability of short-term

4  profits.

5      Q.   And did you have an understanding of the basis

6  of the rumor?

7      A.   I didn't start it, let's put it that way.

8      Q.   Well, was it past deals that the three of them

9  were involved in?

10     A.   It may have.  I have no idea.  There's common

11  investors in a lot of these small cap companies.

12     Q.   Did you have an understanding of whether there

13  were others in the rumored group?

14     A.   At that time, those are the three names I

15  recall.

16     Q.   Okay.  And you told us that you conducted due

17  diligence about that rumor.

18          Do you recall that?

19     A.   I don't recall specifically what I did.  In

20  reality, each one is so separately greedy that they do

21  not work together in terms of any coordinated efforts.

22  They're all, you know, self-enriching.

23     Q.   And -- so can you tell us why you were

24  concerned about that issue?

25     A.   I think I've testified that my concern is

478

1      A.    -- at the time.

2      Q.    I apologize.

3            Did you ever come to learn that she had worked

4      for Mr. Kesner at his prior firm?

5      A.    Again, at the -- her testimony a few weeks

6      ago.

7      Q.    All right.  So let's talk about your Form 4

8      filings.

9      A.    Mmmm-hmmm.

10      Q.    Did you ever deliver trading records to Joan

11     Wu or anyone else at Sichenzia for the preparation of

12     your May 31, 2016 Form 4?

13      A.    Deliver trading records?  I don't remember.

14      Q.    What documents did you give Ms. Wu to fill out

15     the Form 4?

16      A.    I don't remember.  I think just emails.

17      Q.    You mean you just had email correspondence

18     with her, is that what your recollection is?

19      A.    Yes.

20      Q.    Do you recall in any of those emails actually

21     conveying to her records of your trading or other

22     records in connection with your 2016 trading in MGT

23     securities?

24      A.    I don't remember.

25      Q.    Can you name the investors in Laddcap Value

484

1    incorrectly, B-U-K-I-E-T, and that appears on 87850.

2        A.   Yes.

3        Q.   All right.  And so if, in fact, I'm correct

4    and there are no other indications of distributions in

5    2016 for any of these investors, that would mean that in

6    2016 Laddcap Value Partners did not make any

7    distributions to any investors other than the two I've

8    mentioned; is that right?

9        A.   Correct.

10       Q.   All right.  So if we could look at Ladd

11   Exhibit 16.

12       A.   Yes.

13       Q.   If you look at the last page of the exhibit,

14   that's your Form 4 for May 31, 2016, correct?

15       A.   The last page?  Yes.

16       Q.   All right.  So can you explain how it is that

17   Footnote 1 describes a distribution of 465,171 shares of

18   MGT to limited partners that do not appear in the K-1s?

19       A.   So the only partners that demanded cash got

20   paid those cash payments in 2016.  It was subsequently

21   paid out in future years, and they were not -- I think,

22   as I've testified before, they were not distributed the

23   shares in kind, but rather it was a mistake in the

24   filing.  They were sold by the --

25       Q.   All right.

485

```
 1        A.    -- partnership, and the cash proceeds were

 2    held and then distributed over the ensuing years.

 3        Q.    Okay.  And so your understanding in filling

 4    out the K-1s is that the distributions should not be

 5    reflected until they're actually paid out; is that

 6    right?

 7        A.    I -- that is how they are filled out, that

 8    they're taxable or otherwise change the basis of the

 9    person when they're paid out.

10        Q.    All right.  So -- so the information that

11    Ms. Wu included on Form 4 was all information that you

12    provided her orally; isn't that right?

13        A.    Or in email.  I don't recall.

14        Q.    But is it your recollection that you provided

15    her no trading records or other documents in order for

16    her to fill out the Form 4?

17        A.    Correct.

18        Q.    I'm sorry?

19        A.    Correct.

20        Q.    Thank you.

21             Now, you previously testified that Form 4's

22    purpose was to disclose purchases and sales by

23    Section 16 officers and directors in the sale of their

24    security.

25             Do you recall that?
```

489

1    record.

2            (Off the record at 11:49 a.m.  Back on the

3    record at 12:00 p.m.)

4                        --oOo--

5            CERTIFIED STENOGRAPHER:  Back on the record.

6    BY MS. BROWN:

7        Q.   Mr. Ladd, can you tell me whom Mr. Kesner was

8    representing in the 2012 transaction with MGT?

9        A.   I believe he was representing the investor

10   group.  The investors of the investors.

11       Q.   Okay.  And who was he representing in 2015?

12       A.   I believe the investors.

13       Q.   Okay.

14           MS. BROWN:  All right.  So I don't have any

15   more questions today.  I appreciate your time, Mr. Ladd.

16           Mr. Ford, do you have any questions you'd like

17   to ask of the witness?

18           MR. FORD:  I do.  And I'm -- I guess, I'm

19   prepared to go now.

20                        EXAMINATION

21   BY MR. FORD:

22       Q.   Good afternoon, Mr. Ladd.  In this case, you

23   haven't -- let me step back.

24           You've previously testified that you don't

25   recall having certain conversations with Mr. Marcus and