# EXHIBIT N

1

1       UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE COMMISSION, )

5                    Plaintiff,          )

6    v.                                  ) Case No.

7    BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)

8    MAZA, BRIAN KELLER, JOHN H. FORD,   )

9    GRQ CONSULTANTS, INC., AND HS        )

10   CONTRARIAN INVESTMENTS, LLC,         )

11                   Defendants.          )

12   _____ )

13

14                   VOLUME 1

15    VIDEOTAPED DEPOSITION OF AVITAL PERLMAN

16              VIA VIDEOCONFERENCE

17              Wednesday, June 15, 2022

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25              (202)467-9200

2

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE COMMISSION, )

5                    Plaintiff,          )

6    v.                                  ) Case No.

7    BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)

8    MAZA, BRIAN KELLER, JOHN H. FORD,   )

9    GRQ CONSULTANTS, INC., AND HS       )

10   CONTRARIAN INVESTMENTS, LLC,        )

11                   Defendants.         )

12   _____ )

13

14

15          Videotaped deposition of Avital Perlman,

16   taken on behalf of the Plaintiff, all parties appearing

17   remotely via Webex, beginning at 10:12 a.m. EST and

18   ending at 1:25 p.m. EST, on Wednesday, June 15, 2022.

19

20

21

22

23

24          Diversified Reporting Services, Inc.

25                    (202)467-9200

3

1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4        JACK KAUFMAN, ESQ.

5        NANCY BROWN, ESQ.

6        100 Pearl Street

7        New York, New York

8

9    On behalf of the Witness:

10       SAMEER RASTOGI, ESQ.

11       Sichenzia Ross Ference

12       1185 Avenue of the Americas, 31st Floor

13       New York, NY 10036

14       212-930-9700

15       ADAM FORD, ESQ.

16       ANJULA PRASAD, ESQ.

17       Ford O'Brien Landy LLP

18       275 Madison, Floor 24

19       New York, NY 10016

20       212-858-0040

21

22   Also Present:

23       Robert Ladd

24

25

```
1    but feel well enough to continue.  Is that right?
2         A    Yes.
3         Q    But if you should feel poorly at any point,
4    please let me know.  We can stop and take a break and
5    adjust the situation.  Will that be fair?
6         A    Yes.
7         Q    Thank you.  All right.  So, let's jump into
8    your background.  How long have you practiced law?
9         A    Since 2005.
10        Q    And where did you start your practice of
11   law after graduation from law school?
12        A    At Drinker Biddle.
13        Q    And then where did you go and at what time?
14        A    In 2006, I went to Morrison & Foerster in
15   New York.  And then in 2008, I went to Haynes and Boone,
16   also in New York.  And then in 2011, I had a law
17   practice.  And in 2014, I started working at Sichenzia.
18        Q    And is that where you are today?
19        A    Correct.
20        Q    You mentioned that you had your own law
21   practice from 2011 to 2014.  In the course of that
22   practice, did you have occasion to write a Rule 144
23   opinion?
24        A    I did.
25        Q    And for whom?
```

1    he was representing?

2         A    No. I wasn't aware of that.

3         Q    What were the circumstances of your leaving

4    handbook?

5         A    I was laid off.

6         Q    Now how did you come to be associated with

7    Sichenzia?  Who hired you?

8         A    I would say the firm hired me.

9         Q    And how did you learn of the opportunity at

10   Sichenzia?

11        A    Through Harvey.

12        Q    And so Mr. Kesner was already at Sichenzia

13   by the time you got there?

14        A    Correct.

15        Q    And was he a partner?

16        A    He was.

17        Q    And when you started, what was your role?

18        A    I was an associate.

19        Q    And are you still an associate?

20        A    No. I'm a partner.

21        Q    And when did you become a partner?

22        A    In 2017.

23        Q    In the fall of 2015, what was your role at

24   Sichenzia?

25        A    I was an associate.

```
 1        Q     Thank you.  So, let me ask you this.  Are

 2   you familiar with a person named John Stetson?

 3        A     I am.

 4        Q     And who is he?

 5        A     I believe he used to work with Barry Honig.

 6        Q     In fact, did he work out of the same office

 7   as Barry Honig, to your understanding?

 8        A     That is my understanding.  Yeah.

 9        Q     Are you familiar with an entity called

10   Stetson Capital Investments?

11        A     I am.  Yes.

12        Q     And what's its connection, if anything, to

13   Mr. Stetson?

14        A     My understanding is that -- my

15   understanding, years ago, when I worked on these -- was

16   that he controlled Stetson Capital Investments and was

17   the owner.  That was my understanding.  And --

18        Q     Do you want to add something?

19        A     So I think I saw in some (inaudible) not

20   filing (inaudible) that maybe Barry consulted

21   (inaudible) --

22              (THE REPORTER asks THE WITNESS to repeat

23   answer.)

24              THE WITNESS:  I'm sorry --

25              THE REPORTER:  I didn't hear your answer.
```

1      A     It sounds familiar but --

2      Q     I'm sorry.  I interrupted you, but --

3      A     I've heard of it, but I really -- don't

4  really recall anything about it.

5      Q     What, if anything, do you recall about its

6  connection to Mr. Stetson?

7      A     I don't know anything.  Don't recall

8  anything.

9      Q     And how did you become familiar with Mr.

10  Stetson and these entities that we've just talked about

11  that you think were connected to him in some respect?

12      A     I believe they were clients of Sichenzia at

13  some times.  They were investors in some of the firm's

14  clients.

15      Q     Did you ever do any legal work for any of

16  them?

17      A     I did.  Yes.

18      Q     And really, right now, I'm focusing on your

19  time period as a solo practitioner.  Did you do any work

20  when you were solo practitioner for any of these

21  entities or Mr. Stetson?

22      A     Yes.

23      Q     And how did you come to be retained by Mr.

24  Stetson or any of his entities when you were a solo?

25      A     Harvey introduced us.

1      Q    And did you write opinion letters for those

2    entities or Mr. Stetson concerning the removal of

3    restricted legends on shares owned by Mr. Stetson or

4    these entities?

5      A    I did.

6      Q    And were you aware when you were writing

7    these opinions that Mr. Stetson or his entities were

8    co-investors with Mr. Honig in the entities you were

9    writing the opinions about?

10     A    Yes.  I don't remember which issuers they

11   were co-investing in, but yes.

12     Q    Who is John O'Rourke?

13     A    He's also another investor.

14     Q    And did he have any relationship with Barry

15   Honig?

16     A    My understanding is they invested in a few

17   of the same transactions --

18     Q    And did you have an understanding of

19   whether he, too, worked out of the same offices as Barry

20   Honig?

21     A    I believe he did.

22     Q    Are you familiar with an entity called ATG

23   Capital?

24     A    Yes.

25     Q    And are you -- what connection, if any, did

28

1     it have to Mr. O'Rourke?

2           A     To my recollection, he controlled that

3     entity.

4           Q     And the same question I asked you with

5     respect to Mr. Stetson -- how did you become familiar

6     with Mr. O'Rourke or ATG?

7           A     Harvey introduced us.

8           Q     And when Mr. Kesner introduced you, this

9     was also during the period of your solo practitioner

10    role?

11          A     That is my recollection.

12          Q     I'm sorry.

13          A     Yes.

14          Q     I didn't hear you.

15          A     Yes.  Yes.  I mean, that's my recollection.

16    Yes.

17          Q     Thank you.  And who is Mark Groussman?

18          A     He is another investor.

19          Q     And what's your understanding of his

20    relationship, if any, to Mr. Honig?

21          A     I think they invested in the same issuers

22    from time to time.

23          Q     Are you familiar with an entity called

24    Melechdavid, M-E-L-E-C-H-D-A-V-I-D?

25          A     Yes.

29

1      Q    And what's your understanding of Mr.

2  Groussman's connection to Melechdavid?

3      A    My understanding is that he owns in it.

4      Q    And same question.  How did you become

5  familiar with Mr. Groussman and Melechdavid?

6      A    Through Harvey.

7      Q    And again, during the period when you were

8  acting as a solo practitioner?

9      A    Right.

10     Q    Are you familiar with a man named Michael

11 Brauser?

12     A    Yes.

13     Q    And do you have an understanding of his

14 relationship, if any, to Mr. Honig?

15     A    Yes.  Since he also invested in the firm

16 that they --

17     Q    And are you familiar with an entity called

18 Marlin Capital?

19     A    Yes, I am.

20     Q    And what's its connection, if any, to Mr.

21 Brauser?

22     A    My understanding is that he owns it.  I

23 don't really know if that's the case or not.

24     Q    How about Grander Investments [sic]?

25     A    My understanding is that Michael Brauser

1    owns that as well, to my knowledge.

2        Q    And did you become familiar with Mr.

3    Brauser and the entities through Mr. Kesner during the

4    time that you were a solo practitioner?

5        A    Yes.

6        Q    And who's Jonathan Honig?

7        A    I believe he's Barry's brother.

8        Q    And aside from being Mr. Honig's brother,

9    was he also trustee for a trust set up for Mr. Honig's

10   children?

11       A    I don't recall.

12       Q    Are you familiar with an entity called Four

13   Kids Investment?

14       A    Yes.

15       Q    And what did you understand that entity's

16   relationship to Jonathan Honig to be?

17       A    I don't remember.

18       Q    How about to Mr. Honig?

19       A    I thought it was a trust for his children.

20       Q    And was Jonathan Honig or Four Kids

21   Investment ever a co-investor with Mr. Honig in any

22   transactions he worked on?

23       A    I believe so, but I don't really recall.

24       Q    And did you become familiar with Jonathan

25   Honig through Mr. Kesner during the time of your solo

1    practitionership?

2         A    Yes.  But, I mean, I had very little

3    interaction.

4         Q    And is the same true in terms of the time

5    period with which you became familiar with Four Kids

6    Investment?

7         A    What do you mean by is the same true?

8         Q    Did you come to learn about Four Kids

9    Investment or have some familiarity about that entity

10   through Mr. Kesner?

11        A    Yes.

12        Q    Oh, do you have a recollection of ever

13   writing an opinion that Mr. Kesner used to have a

14   transfer agent removed or restricted legend from

15   securities that he bought?

16        A    Yes.

17        Q    How many times did that happen?

18        A    I don't remember.

19        Q    Let's look at the second exhibit.  And

20   we've marked this as AP Exhibit 2.

21             (Perlman Exhibit 2 was marked for

22   identification.)

23        Q    Do you have that up, Ms. Perlman?

24        A    I do.

25        Q    And this exhibit, AP Exhibit 2, is an

32

1   e-mail dated January 17, 2013, to Nora Markword from

2   you.  And I should note for the record that at the time,

3   you went by Avital Even-Shoshan.  Is that correct?

4       A    Yes.

5       Q    And can you tell us what this e-mail is

6   about?

7       A    I don't really -- I don't remember it.  It

8   looks like Harvey asked me to write him a 144 opinion to

9   buy his own shares, and it looks like I asked for what

10  else he needs in addition to the opinion to remove the

11  legend.

12      Q    And this legend was on shares actually

13  owned by Mr. Kesner's entity Paradox.  Is that right?

14      A    That's what it looks like.

15      Q    Well, do you have a recollection --

16           MR. RASTOGI:  And just a -- so --

17      A    I have no recollections of --

18           MS. BROWN:  All right.  Sam, were you going

19  to say something?

20           MR. RASTOGI:  No. I think you got to it.  I

21  was just going to say, you know, Ms. Perlman is simply

22  reading the document.  But you asked the question

23  yourself.

24           MS. BROWN:  Okay.  Great.

25      Q    Do you know what Biozone is?

1    Strauss.  Does that ring a bell?

2        A    It rings a bell, but I don't really recall

3    writing a new one.

4        Q    Well, let's look at number 7, which is AP

5    Exhibit 7.

6            (Perlman Exhibit 7 was marked for

7    identification.)

8        Q    And again, it's a document that has your

9    letterhead at the top and appears to be signed by you

10   dated October 4, 2013, and is written to Equity Stock

11   Transfer.  Do you recognize your signature on this

12   document?

13       A    I do.

14       Q    And is this an opinion, a Rule 144 opinion?

15       A    Yes.

16       Q    And it was issued to Mr. Stetson respecting

17   250,000 shares of Biozone.  Is that right?

18       A    Yes.

19       Q    And your conclusion in this opinion is that

20   the shares may be sold in accordance with Rule 144 under

21   the Securities Act of 1933.  Is that right?

22       A    Correct.

23       Q    Let's look at number 8.  Number 8 we've

24   marked as AP Exhibit 8.

25            (Perlman Exhibit 8 was marked for

42

1    identification.)

2         Q    Again, your letterhead is used, Law Offices

3    of Avital Even-Shoshan.  It's dated October 8, 2013.  Do

4    you recognize your signature on this document?

5         A    Yes.

6         Q    And it relates to ATG Capital shares in

7    Biozone.  Is that right?

8         A    Correct.

9         Q    And it's a Rule 144 opinion dated October

10   8, 2013.  Correct?

11        A    Correct.

12        Q    Let's look at Exhibit 9 or number, which

13   we've marked as Plaintiff's Exhibit -- AP Exhibit 9,

14   dated the same day, October 8th, 2013.

15             (Perlman Exhibit 9 was marked for

16   identification.)

17        Q    It's a equity stock transfer relating to

18   Biozone.  Do you recognize your signature on this

19   document?

20        A    I do.  Yeah.

21        Q    And this is also a Rule 144 opinion.  Is

22   that correct?

23        A    Yes.

24        Q    And the letter notes that you are special

25   counsel to Jill Strauss as the holder of the shares.

43

1   Correct?

2        A    Correct.

3        Q    And who is Ms. Strauss?

4        A    I don't know.

5        Q    Do you have an understanding of her

6   relationship to Mr. Honig?

7        A    Not at all.

8        Q    Let's look at number 10.  AP Exhibit 10 is

9   a letter dated the next day, October 9, 2013, on your

10  letterhead.

11            (Perlman Exhibit 10 was marked for

12  identification.)

13       Q    Do you recognize your signature on this

14  document?

15       A    I do.

16       Q    And this relates to a million shares of

17  Biozone owned by Mr. Honig.  Is that right?

18       A    Looks like a million and 751.  Yes.

19       Q    Thank you.  And it also is a Rule 144

20  opinion.  Is that correct?

21       A    Correct.

22       Q    Let's look at number 11.  AP Exhibit 11 is

23  a letter again on your letterhead dated November 6,

24  2013, relating to Biozone.

25            (Perlman Exhibit 11 was marked for

44

1    identification.)

2         Q    Do you recognize your signature on this

3    document?

4         A    I do.

5         Q    And this relates to shares held by GRQ

6    Consultants, Inc.  You see that?

7         A    Correct.

8         Q    And what is GRC Consultants, Inc.?

9         A    I -- my understanding, it's an entity

10   controlled by Barry Honig.

11        Q    And this is also a 144 opinion.  Is that

12   correct?

13        A    Yes.

14        Q    And then let's look at number 12.  The

15   document was marked as AP Exhibit 12, and it's dated

16   November 18th, 2013, related to Biozone on your

17   letterhead.

18             (Perlman Exhibit 12 was marked for

19   identification.)

20        Q    Do you recognize your signature at the

21   bottom?

22        A    Yes.

23        Q    And this relates to the shares of Biozone

24   held by Stetson Capital Investments.  Is that right?

25        A    Correct.

1        Q    And it also is a Rule 144 opinion.

2   Correct?

3        A    Correct.

4        Q    Are you familiar with a company called

5   WPCS?

6        A    Yes.

7        Q    How are you familiar with it?

8        A    They were a client of Sichenzia.

9        Q    Well, prior to them being a client of

10  Sichenzia, did you have any involvement in drafting

11  opinions related to shares in WPCS for any client?

12       A    Not to my recollection.  But I might have,

13  but I don't really remember.

14       Q    Let's look at number 13.

15       A    Okay.

16       Q    AP Exhibit 13 is, again, a letter on the

17  letterhead of your law offices dated December 20th,

18  2013, to Interwest Transfer Company.

19            (Perlman Exhibit 13 was marked for

20  identification.)

21       Q    That's a transfer agent.  Is that right?

22       A    It looks like it is.  Yeah.

23       Q    And it relates --

24            MR. RASTOGI:  Do you know that?

25       A    No. I mean, I don't know.

48

1    Contrarian Investments.   Correct?

2        A    Correct.

3        Q    And again, it's a Rule 144 opinion?

4        A    Right.

5        Q    Are you familiar with a company called

6    Spherix, S-P-H-E-R-I-X, with the ticker SPEX?

7        A    Yes, I am.

8        Q    And how are you familiar with it?

9        A    I know they were a client of Sichenzia's.

10       Q    Did you have any familiarity with it before

11   you arrived at Sichenzia?

12       A    I did.   I think I helped -- I represented

13   an entity that merged with Spherix.

14       Q    And what entity was that?

15       A    I believe it was called North South, but I

16   don't really remember the exact name.   That might not be

17   the exact name.   I don't remember.

18       Q    And how did you come to that

19   representation?   How were you introduced to that

20   company?

21       A    Through Harvey Kesner.

22       Q    Is it fair to say that Mr. Kesner was the

23   main source of your work while you were a solo

24   practitioner?

25       A    Yeah.

1       A     It may be.  I really don't recall.

2       Q     And Mr. Stetson says, you can send them all

3    to the federal highway address to me.  You see that?

4       A     I do see that.

5       Q     So, does that indicate to you that Lynette

6    Marinas, HS Contrarian, ATG, Melechdavid and related

7    entities, Dustin Capital, Jonathan Honig, and Titan were

8    all purchasing securities of Yappn at the same time?

9       A     Not necessarily -- sometimes you can issue

10   stock certificates after the shares have been purchased.

11      Q     They were all receiving stock certificates

12   at or about the same time.  Is that right?

13      A     That's what it looks like.

14      Q     Thank you.  All right.  So I asked you a

15   few questions about whether you and Mr. Kesner had ever

16   discussed Section 13(d).  But now, I want to focus on

17   your work in that area.  So have you ever considered the

18   requirements of Section 13(d) as it relates to

19   disclosure of group status of any group of shareholders?

20      A     No, or not that I recollect --

21      Q     And you've never considered it in the

22   course of representing an issuer with respect to its

23   disclosure obligations and its filings with the SEC?

24            MS. PRESARD:  I'll object.

25      A     No, I have not.

63

1          Q     Have you ever been involved in a

2    transaction where those issues were considered maybe

3    even if you didn't consider them?

4          A     Not to my recollection.

5          Q     Have you ever been involved in a

6    conversation with anyone at Sichenzia about those

7    issues, Section 13(d)?

8          A     Not to my recollection.

9          Q     Have you ever counseled a client about

10   whether or not he has to check the group box on a

11   Schedule 13D or 13G?

12         A     Not to my recollection.

13         Q     Ever considered the issue of whether a

14   client had to check the group box on a Schedule 13D or

15   13G?

16         A     Not to my recollection.

17         Q     Did Mr. Ladd ever ask you or anyone else at

18   Sichenzia about whether Honig, Stetson, Groussman,

19   O'Rourke, and Brauser or any combination of them were

20   acting as a group?

21         A     To my recollection, he never spoke to me,

22   and I don't know if he spoke to anybody else.

23         Q     Were you aware that in 2012, Mr. Marcus

24   from Sichenzia had asked Mr. Kesner that question about

25   Honig and his co-investors in the 2012 financing?

```
 1        A    I was only aware of that, you know,

 2   recently in connection with this deposition.  I didn't

 3   know about that until --

 4        Q    So you learned that from reading materials

 5   involved in this litigation.  Is that right?

 6        A    Well, I think my attorney --

 7             MR. RASTOGI:  Let's, you know, honestly --

 8             MS. BROWN:  Okay.  Sorry.  Yes.

 9        Q    Don't tell me that.  Sorry.

10             MR. RASTOGI:  Yes.

11        Q    And I provoked you to tell me that, so I'm

12   sorry that I went there.

13             MR. RASTOGI:  Yeah.  Let's --

14        Q    Yeah.  Just be very careful not to tell me

15   anything your lawyer said to you.

16        A    Okay.

17        Q    And I'll try not to ask you questions that

18   provoke that answer.

19             MR. RASTOGI:  Did you understand that,

20   Avital?

21        A    Yes.

22        Q    Were you aware that Mr. Honig had made

23   clear to Mr. Ladd that he was sensitive about the group

24   issue under Section 13(d)?

25        A    I am not aware of that.
```

1    of that, but I don't think the purpose of the lunch is

2    revealing any privileged communication.

3              MR. RASTOGI:  Yeah.  I don't know.

4              MS. BROWN:  So --

5              MR. RASTOGI:  Can you describe the purpose

6    of the lunch in a general fashion, Avital?

7         A    It was social.  I think he's just being

8    social.

9         Q    And then, specifically, during the course

10   of your work on the 2015 transaction, you also conversed

11   with Mr. Ladd either by e-mail or by phone.  Is that

12   correct?

13        A    Yes.

14        Q    At any time in your work for MGT and in

15   your communications with Mr. Ladd, did you ever disclose

16   to him the work you had done for Honig, Brauser,

17   Groussman, Stetson, O'Rourke?

18        A    Not to my recollection.

19        Q    Why not?

20        A    It never came up.  To my recollection, it

21   never came up.

22        Q    Did you not consider it relevant to MGT

23   matters that were working on?

24        A    No. I did not consider it relevant.

25        Q    Did you ever consult with anyone about

1    whether it was relevant?

2         A    Not to my recollection.

3         Q    Did you ever disclose to Mr. Kaplowitz your

4    prior work for Mr. Honig, Mr. Groussman, Mr. Stetson,

5    Mr. Brauser, et cetera?

6         A    Not to my recollection, but my

7    understanding is he knew what I was working on for --

8    and his partners.

9         Q    And how do you know he knew?

10        A    I know.

11        Q    Well, what's your -- you just said your

12   understanding was that he knew.  So what's your

13   understanding --

14        A    Correct.  I mean, generally, partners know

15   what associates are working on.

16        Q    Well, okay.  And maybe I need to back up

17   and talk about what Honig transactions you worked on

18   while you were at Sichenzia, but I was speaking of the

19   transactions that you worked on that we just looked at

20   from your time as a solo practitioner.

21        A    I don't know if Jay Kaplowitz knew about

22   that work or not.

23        Q    Well, Mr. Kesner knew.  Right?

24        A    Correct.

25        Q    And he knew because he referred Mr. Honig,

1    was.  I think it's really a question for him.

2         Q    Right.  I'm asking you though if you have

3    an understanding because you've testified that you

4    thought he knew.  Tell me what that is based on.

5         A    It's based on that usually, partners know

6    what associates are working on, but as to his actual

7    knowledge, I mean, that would be a question for him.

8         Q    When you were working for MGT in the fall

9    of 2015, was Mr. Kaplowitz your supervisor?

10        A    Yes.

11        Q    Let's look at document 22, which we've

12   marked as AP Exhibit 22.

13             (Perlman Exhibit 22 was marked for

14   identification.)

15        Q    And I will tell this is a very, very long

16   compilation of e-mails.  I'm really only going to focus

17   you on the first two.  This is the way it was produced

18   to us by MGT and Mr. Ladd.  So, the top e-mail, just for

19   the record, is from Robert Ladd, and it's dated October

20   2nd, 2015, and it's to you and Mr. Kaplowitz and Mr.

21   Marcus.  Starting with a e-mail that appears below that

22   -- first of all, do you recognize this first page of

23   Exhibit 22?

24        A    No.

25        Q    Do you have any reason to doubt that you

1    about filling out a 13G for Mr. Honig?

2         A    I don't recall.

3         Q    So let's look at AP Exhibit 33.

4              (Perlman Exhibit 33 was marked for

5    identification.)

6         Q    Do you recognize this?

7         A    No.

8         Q    Do you recall filling out a Schedule 13GA

9    for Mr. Honig in or about February -- sorry -- last page

10   -- February 11, 2016?

11        A    No, I don't.

12        Q    So, just want to go back to something we've

13   already talked about, which is your understanding of

14   13D. So, at the time you were working for MGT as a

15   client, did you understand that 13D required the issuer

16   to disclose the group's status of investors if they were

17   acting in concert to acquire or hold those or dispose of

18   their shares?

19        A    I don't really recall what -- I don't

20   recall --

21        Q    Well, do you have that understanding now?

22        A    Yes.

23        Q    And how did you acquire it?

24        A    You practice it.

25        Q    Well, just to confirm, your testimony

1    earlier was that you don't recall ever having to

2    consider 13D issues with respect to an issuer.  Isn't

3    that what you testified to?

4        A    Yeah.  I was never asked to look into it.

5        Q    And in connection with considerations of

6    13D obligations, is the history of investors as

7    co-investors relevant to that analysis of whether their

8    shares need to be aggregated?

9             MR. RASTOGI:  So that question pertains to

10   now because she said she didn't recall at the time, in

11   the MGT time.  I just want to get a time frame as to the

12   question.

13       Q    So let's start with MGT. Did you understand

14   when you were working on MGT that 13D, a 13D analysis,

15   what would be relevant to it would be the history of the

16   investors you were considering a group and their

17   co-investments together?

18       A    No.

19       Q    Do you have that understanding now?

20       A    I don't know.  I mean, I think it's a

21   complicated issue.  I don't know if it's because people

22   invested in the same company before means they're a

23   group.  I don't know if I could say I have it.

24       Q    Right.  My question was, is it relevant to

25   the analysis, the fact that they had been co-investors