# EXHIBIT JJJ

1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE COMMISSION, )

5                    Plaintiff,          )

6    v.                                  ) Case No.

7    BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)

8    MAZA, BRIAN KELLER, JOHN H. FORD,   )

9    GRQ CONSULTANTS, INC., AND HS       )

10   CONTRARIAN INVESTMENTS, LLC,        )

11                   Defendants.         )

12   _____ )

13

14                   VOLUME 1

15    VIDEOTAPED DEPOSITION OF JAY KAPLOWITZ

16              VIA VIDEOCONFERENCE

17              Tuesday, June 14, 2022

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25              (202)467-9200

2

1           UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE COMMISSION, )

5                    Plaintiff,          )

6    v.                                  ) Case No.

7    BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)

8    MAZA, BRIAN KELLER, JOHN H. FORD,   )

9    GRQ CONSULTANTS, INC., AND HS       )

10   CONTRARIAN INVESTMENTS, LLC,        )

11                   Defendants.         )

12   _____ )

13

14

15           Videotaped deposition of Jay Kaplowitz,

16   taken on behalf of the Plaintiff, all parties appearing

17   remotely via Webex, beginning at 10:12 a.m. EST and

18   ending at 2:49 p.m. EST, on Tuesday, June 14, 2022.

19

20

21

22

23

24           Diversified Reporting Services, Inc.

25                   (202)467-9200

3

```
1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         JACK KAUFMAN, ESQ.

5         NANCY BROWN, ESQ.

6         Securities and Exchange Commission

7         100 Pearl Street, Suite 20-100

8         New York, NY 10004

9

10   On behalf of the Witness:

11        SAMEER RASTOGI, ESQ.

12        Sichenzia Ross Ference

13        1185 Avenue of the Americas, 31st Floor

14        New York, NY 10036

15        (212) 930-9700

16

17        ADAM FORD, ESQ.

18        ANJULA PRASAD, ESQ.

19        Ford O'Brien Landy LLP

20        275 Madison, Floor 24

21        New York, NY 10016

22        (212) 858-0040

23

24   Also Present:

25        Robert Ladd
```

1       A       Not with any certainty, but I can tell you

2    that there were a number of lawyers at the firm

3    involved and some to a greater or lesser extent.

4    Avital, I believe, was one.  Arthur Marcus, I believe,

5    was another.  Harvey Kesner, I think, got involved.

6    Beyond that, I can't think of anyone else off the top

7    of my head.

8       Q    Do you recall Mr. Kesner representing MGT?

9       A    Harvey represented Barry Honig.  Barry Honig

10   was doing one or more deals with MGT and so Harvey

11   would get involved in what was going on with MGT as

12   part  of his diligence, part of his negotiation on

13   behalf of Barry, et cetera.

14      Q    So with respect to -- well, withdrawn.  So

15   Mr. Kesner, I think you're saying, he didn't represent

16   MGT, but he represented Mr. Honig on some transactions

17   involving MGT?

18      A    No. I don't think that's fair because that's

19   asking me to tell you what was in Harvey's mind. I

20   think Harvey was involved in representing Barry, and

21   that, at some point, I think Harvey would say that,

22   that's all speculation of course, what was good for

23   Barry was good for the company, and what was good for

24   the company was good for Barry.  And, of course, Barry

25   had taken a substantial position at MGT although it

1    didn't last all that long, so he was involved.  And I

2    think that was the extent of it.

3         Q    Okay. But I guess what I'm trying to

4    understand is was there a clear division with respect,

5    to -- let's say, with respect to matters involving Mr.

6    Honig and MGT?

7         A    No.

8         Q    Is there a clear distin --

9         A    No.

10        Q    I want to be -- if you wouldn't mind, I'll

11   just finish the question and you may have answered

12   basically this, but was there a clear division at the

13   firm -- was there a clear division at the firm between

14   which Sichenzia lawyers represented Mr. Honig or his

15   side, or any affiliate of his on the one hand, and

16   MGT? Was there a clear delineation of that?

17        A    I don't know what you mean by a clear

18   delineation.  I will tell you that no matter who was

19   represented MGT, it was often me and other people I

20   asked for help, but if it involved Barry, then Harvey

21   would have his nose in it or have a say in it or want

22   to get involved in it.

23        Q    If it involved Mr. Honig you said?

24        A    Yes, Mr. Honig.

25        Q    But, I mean, I guess one thing that we're

1    loyalty is to the client.  So my duty of loyalty ran

2    to the client.

3         Q    And who was that client in those instances

4    when MGT and Mr. Honig were both involved in the same

5    transaction?  That's what I'm trying to get at.

6         A    In my case, it was for MGT was the client.

7         Q    And with respect to Mr. Kesner, who was his

8    client?

9         A    Let me make life easy for you.

10        Q    Sure.

11        A    I've had very little to do with Barry.  So

12   he kept everyone but himself and, you know, people

13   like Harvey tell people about away from, in

14   particular, Barry.  And that suited everyone because

15   Barry wasn't a particularly pleasant person to deal

16   with.  So, you know, Harvey go and deal with Barry;

17   that was fine with me.

18        Q    And just for the record, whenever you say

19   Barry, you're referring to Mr. Honig?

20        A    I'm sorry.  I meant Harvey.  Yes, Harvey.

21        Q    Okay.

22        A    I had nothing -- I had very little to do

23   with Barry.  I had more to do with Stetson than Barry.

24        Q    When you say, Barry, you're referring to Mr.

25   Honig?  Barry Honig?

33

1      Q    I apologize if I asked you this before, but

2  can you explain how -- do you know how Sichenzia came

3  to represent MGT?

4      A    I don't recall actually.  I was thinking

5  about that the other day and I just -- I don't recall

6  who made that introduction.

7      Q    And can you tell me how Sichenzia came to

8  represent Mr. Honig?

9      A    Of that, I have no idea.  Honig was Harvey

10  Kesner's client.

11      Q    And he was someone who was brought in as a

12  client by Mr. Kesner.  Is that right?

13      A    That's right.

14      Q    And do you know how long before October 2012

15  that was?

16      A    No, that would just be pure speculation on

17  that one.

18      Q    Was Sichenzia's representation of Mr. Honig

19  limited to matters involving MGT?  Or did it also

20  involve other matters?  And I'm not asking --

21      A    Yeah.

22      Q    You mentioned Avital before?

23      A    What?

24      Q    Was that Avital Perlman?

25      A    Yes.

34

1       Q    And who did she represent with respect to --

2       A    Is a partner and I think from time to time

3   she represented MGT.

4       Q    Did she ever represent Mr. Honig?

5       A    I have no idea.

6       Q    And what about Tara Guarneri-Ferrara?  Are

7   you familiar with her?

8       A    I know who she is.  She was a lawyer at the

9   firm.

10      Q    And was she ever involved in representing

11  MGT?

12      A    Not to my knowledge, but it certainly

13  wouldn't have been impossible.

14      Q    And what about representing Mr. Honig?

15      A    I've no idea.

16      Q    Did Sichenzia ever receive MGT's stock as

17  payment for its services?

18      A    It did.

19      Q    And when was that?

20      A    I don't recall, but it would have been, you

21  know, after 2012.  Probably before 2015.

22      Q    And what were the services it received for

23  MGT's stock?

24      A    The services that we were representing them

25  on, but I don't remember specifically how that stock

45

1      Q    Can you tell me what that is showing or what

2   it's purporting to show?

3      A    Assume it's showing all this other that hold

4   more than 5 percent.

5      Q    And do you know where that information came

6   from?

7      A    No.

8      Q    Were you involved at all in making this

9   determination of 5 percent beneficial owners of MGT

10  stock for this S-1?

11     A    I don't recall.

12     Q    Was Sichenzia in general involved in that

13  determination in creating that table?

14     A    I don't recall.

15     Q    Did you have any discussion with anyone or

16  did Sichenzia have any communication with anyone at

17  MGT about this particular issue, the 5 percent

18  beneficial owners of MGT stock that's listed here?

19     A    I don't recall.

20     Q    Did you ever consider -- with respect to the

21  5 percent beneficial owners listed here, did you ever

22  consider whether any other investors -- I'm sorry, any

23  other of the selling shareholders cumulatively

24  constituted a group that held more than 5 percent or

25  that should have been included along with Barry Honig

46

1    as a group under 13D in this listing of 5 percent

2    shareholders of MGT?

3         A    I don't recall what I did or didn't consider

4    at the time.  It was quite a while ago.  I'm sure that

5    we discussed it and did a good job, but I don't recall

6    what we considered.

7         Q    When you say you're "sure we discussed it,"

8    who is the "we" that you're talking about?

9         A    People working on it.  You know, myself,

10   Tara, Rob Ladd, working on whoever was involved.

11        Q    Can you recall anything about those

12   discussions at all?

13        A    No. No, about who the 5 percent of

14   shareholders were.  I don't know discussions.

15        Q    Do you recall any questions that Mr. Ladd

16   may have asked about that topic?

17        A    No.

18        Q    Do you recall how many -- let me ask you

19   this.  How many such discussions were there about this

20   topic, for the purpose of the Form S-1?

21             MR. RASTOGI:  I'm going to object to form.

22        Q    Do you understand the question?

23        A    I understand the question, but with all due

24   respect, it's an absurd question.  How do I remember

25   how many discussions we had about a narrow point?

47

1          MR. RASTOGI:  Jay, just do the best you can.

2     If you remember it, you remember it.

3          A    I have no idea.  I have no idea.  I'm sure

4     we discussed it, and if you tell me we discussed it or

5     someone tells me we discussed it more than once, I

6     certainly would believe that, but I don't know how

7     many times we discussed it.

8          Q    You say you're sure you discussed this

9     topic.  Why are you sure?

10         A    Because it normally comes up when you're

11    working on a registrations statement.

12         Q    In other words, when there's -- well, let

13    me ask you.  When you say, it normally comes up, was

14    there anything in particular about this registration

15    statement and the selling shareholders that would have

16    triggered that particular conversation?

17         A    No. I would have had that conversation no

18    matter what the registration statement was.

19         Q    And now I'm just asking you your general

20    practice, because I understand you're saying you don't

21    remember, but what kind of questions do you ask when

22    you have that discussion?  What are you looking for?

23    What information?

24         A    By the time it gets to me, it's pretty well

25    drafted.  So, you know, I might say to someone have we

1          A    Because I think it would be a natural

2   question to ask.

3          Q    And why is it a natural question to ask?

4          A    I think that's -- they're all here is

5   because we're -- part of a -- are you acting as a

6   group.

7          Q    But you don't have a specific recollection

8   of such questions, specific questions?

9          A    No.

10         Q    Do you have a recollection of receiving any

11  answers or being satisfied coming to a conclusion

12  about that or anything like that?

13         A    No.

14         Q    Were you aware at the time that Mr. Stetson

15  and Mr. Honig worked in the same office?

16         A    No.

17         Q    Were you aware that Mr. Stetson and/or his

18  entities that Mr. Honig and/or his entities had

19  coinvested in the past on -- with respect to other

20  issuers other than MGT?

21         A    No.

22         Q    And let me ask you about John O'Rourke. Does

23  that name ring a bell?

24         A    It does ring a bell.

25         Q    What are you -- do you recall Mr.

64

1      A      Footnote 23.  Is the manager of ATC Capital

2  over the shares held by ATC.  Right?

3      Q      So you see -- so does that help refresh your

4  memory of Mr. O'Rourke's connection to this

5  transaction?

6      A      No.

7      Q      Where do you recall -- do you recall

8  anything about Mr. O'Rourke and his relationship with

9  Mr. Honig?

10     A      No. As I --

11     Q      Were you aware --

12     A      -- of the name, but I don't -- it was a long

13  time ago, and I don't remember precisely in what

14  context.

15     Q      You don't recall hearing it in the context

16  of Mr. Honig?

17     A      No, not really.  I -- it could have been,

18  but I don't -- again, I have no specific recollection

19  linking Honig to ATC Capital or ATG Capital.

20     Q      Were you aware that Mr. O'Rourke -- excuse

21  me, O'Rourke also shared an office with Mr. Honig?

22     A      I was not.  I don't think I've ever been to

23  their office before.

24     Q      Were you aware that Mr. O'Rourke and/or his

25  entities were co-investors with Mr. Honig on prior

65

1    transactions?

2        A    I want to be as cooperative as I can be, so

3    if you're asking me was I aware looking back at what I

4    was aware of in 2015, I may have been, but I don't

5    remember.

6        Q    You don't have the specific recollection now

7    of that?

8        A    No.

9        Q    So I've asked you about Mr. Stetson and Mr.

10   O'Rourke and their relationship with Mr. Honig.  If

11   you had been aware -- this is a hypothetical question.

12   If you had been aware that they shared an office, and

13   had invested in the past together as co-investors, and

14   had a  business relationship, would that have been a

15   factor in considering whether they were acting as a

16   group with respect to this transaction that the S-1

17   discusses?

18       A    Look, I have said, and I will continue to

19   say that I inquired as to whether they were acting as

20   a group, whether they went out to lunch together every

21   day or they drove into work together every day, I

22   didn't get -- I don't think I got that granular about

23   it, but I did ask them very pointedly and very

24   precisely if they were asking as a group and the

25   answer was no.

66

1      Q    Let me just ask you, who did you ask those

2   questions of?

3      A    I'm pretty certain I asked them of Stetson.

4   And I probably asked them -- I asked -- probably asked

5   Rob Ladd --

6      Q    So my question was a little bit different.

7   My question -- I understand you're saying you asked

8   them, but if you had been given this information, and

9   I understand you may or not remember, but if you had

10  been given this information that Mr. Honig and Mr.

11  Stetson and Mr. Honig and Mr. O'Rourke had this

12  business relationship and prior investments together,

13  is that something that would have gone into your

14  calculations of whether they needed to be disclosed as

15  part of a group 5 percent investors in MGT?

16          MR. RASTOGI:  Object to the form.

17          THE WITNESS:  So I'm supposed to answer it

18  anyhow, though.  Right?

19          MR. RASTOGI:  I'm sorry.  Just objecting to

20  the form the question.  But you can answer, yes.

21      A    It's all hypothetical.  It depends on how

22  I -- how I came to that knowledge, it depends on what

23  conversations I had with them at about that time.  I

24  certainly am not going to tell you it wouldn't have

25  factored into -- thought, or decided, or did, but I

67

1    can't tell you definitively that it would have.

2         Q    Just to be clear, I'm not asking you whether

3    it would have caused you to have come to a different

4    outcome.  I'm just asking if it's something you would

5    have taken into account.

6         A    Yes.  I think so.

7         Q    And you see also listed on this same list of

8    selling shareholders on page 48 of -- I'm sorry.  Of

9    Ladd Exhibit 104.  It lists Melechdavid. Do you see

10   that?

11        A    Yes.

12        Q    And then if you look at footnote 17, you'll

13   see that that entity was associated with Mr. Mark

14   Groussman.

15             Do you see that?

16        A    Yes.

17        Q    Do you know who Mr. Groussman is?  Do you

18   recall that name?

19        A    I recall the name.  I can't tell you who he

20   was.  I do recall the name, though.

21        Q    Do you recall any relationship -- knowing

22   about any relationship between Mr. Groussman and Mr.

23   Honig?

24        A    No.

25        Q    Were you aware that Mr. Groussman or

1    Melechdavid had been a co-investor with Mr. Honig on

2    prior deals?

3         A    I don't recall being aware of that.

4         Q    And if you look at -- again, in the list it

5    has Grander Holdings Inc, the first selling

6    shareholder. Do you see that?

7         A    Mm-hmm.  Yes.

8         Q    And it refers to footnote 4, which

9    references Michael Brauser as a trustee of Grander

10   Holdings, et cetera.

11        Do you see that?

12        A    Yes.

13        Q    Do you know who Mr. Brauser was?

14        A    I know that he was, and I'm going to be

15   colloquial, but say that he was part of that Honig

16   group.

17        Q    And what do you mean by Honig group?

18        A    They knew each other.  They communicated

19   with each other.  I just -- I -- the name would often

20   come up in conversations with members of that --

21   that -- group or -- or people I talked to about it.

22   Brauser name --

23        Q    And --

24        A    -- came up frequently, yes.

25        Q    And when you say Honig group, who else was

79

1    seeing him in the office, but I am -- I -- that just

2    could be coincidence.

3        Q    Did Mr. Ladd ever tell you that he did not

4    trust Mr. Honig or consider him untrustworthy in any

5    way?

6        A    I don't recall a time, no.

7        Q    Did he ever tell you anything negative or

8    derogatory about Mr. Honig?

9        A    Yeah, that's very subjective.  And I don't

10   think it's fair for you to ask me how I interpreted

11   someone else's words.  You know, I don't think that

12   Rob was afraid that Barry was going to steal from him

13   or something like that.  Right?  But I do think that

14   guy had a lot of power.

15       Q    He had a lot of power, you said?

16       A    Yeah.

17       Q    What do you mean by that?

18       A    He knew a lot of people in this finance

19   community and -- that would finance these, you know,

20   small cap stocks, micro-cap stocks.  And he was a

21   good -- he was a good friend to have if you were

22   trying to finance your company.

23       Q    Did he have a lot of power with respect to

24   MGT?

25       A    Not particularly.

83

 1    who that Robert refers to unless it's Robert Traversa,

 2    who is a cc on this.

 3        Q    Mr. Kaplowitz, are you familiar with the

 4    hedge fund manager, David Einhorn?

 5        A    David Einhorn?

 6        Q    Yes.

 7        A    We're not friends, but yes, I know the name.

 8        Q    You've heard of him.  Okay.  Did Mr. Ladd

 9    ever tell you about a communication he had or

10    communications with Mr. Einhorn regarding Mr. Honig?

11        A    No. At least I don't remember.

12        Q    Well let me ask you to turn to Tab 9 so I

13    can just show you what I'm talking about.

14        A    At which one?

15        Q    The next Tab, 9.

16        A    9.  Robert Ladd.  David Einhorn.

17        Q    Now you're not on these e-mails so I'm not

18    going to ask you if you received them, but I just want

19    you to look at the second page and this is an e-mail

20    dated November 14th, 2012.  It was marked as Honig

21    Exhibit 10.  This is an e-mail dated November 14th,

22    2012, from Mr. Einhorn to Mr. Ladd.  And then about

23    halfway down the paragraph, you'll see there's a Honig

24    is a recidivist [sic] stock promoter. Do you see that?

25        A    Any involvement with Honig or Hudson Bay

1    sends a disturbing message to investors that MGT will

2    end up diluting -- acquisitions.  Honig is a

3    recidivist stock promoter, who as I have researched

4    seems to govern a great percentage of the company's

5    stock and then pump the stock on corporate news with a

6    strategy to the investment without ever going -- I can

7    go on.

8        Q    Right.  Right.  That's right.  And you --

9    feel free to read the rest of it to yourself.  I'm not

10   asking you to read it out loud, but my question is did

11   Mr. Ladd ever convey to you any of what Mr. Einhorn

12   told him about Mr. Honig?

13       A    Not that I recall.

14       Q    Did you ever hear such things about Mr.

15   Honig independently of Mr. Ladd?

16            MR. RASTOGI:  At what point?

17       Q    Any time.

18       A    It's a very difficult question to answer

19   because I never heard anything particularly nice about

20   Barry Honig, but I never -- I can't recall anything

21   specific.  In this company, he did that.  And then

22   shorted the stock and walked away with $3 million.  So

23   I know that a lot of people didn't like him, not that

24   I -- but I can't -- I can't claim to know

25   independently any of the things that are alleged in

1    your current answer that you discussed with Mr. Kesner

2    that Mr. Honig was not well liked or something to that

3    effect.  Is that correct?

4        A    I don't remember.  I do remember that Harvey

5    was quite loyal to Barry, and I don't think that

6    Harvey ever tried to force Barry down anyone's throat.

7    I think that, you know, he was who he was.  He was a

8    client to the firm.  He was a client of Barry's.  And

9    Barry got along with him and liked him.  And that

10   would be the one guy that seemed to.

11       Q    But if Mr. Kesner was aware of something --

12   withdrawn.  Give me a second.  Did you or anyone else

13   at Sichenzia explain to Mr. Ladd that Mr. Kesner was

14   loyal to Mr. Honig?

15       A    No one had to.  He was at a -- we didn't

16   find Barry.  Rob found Barry.

17       Q    I'm sorry.  Who found Mr. Honig?

18       A    I think Rob Ladd found Mr. Honig.

19       Q    Are you saying you didn't have to explain to

20   Mr. Ladd Mr. Kesner's loyalty to Mr. Honig?  Why do

21   you say that?

22       A    I don't know.  It's just a general

23   impression I had that Barry -- that Harvey Kesner was

24   very, very loyal to Barry.  And I -- that would have

25   been something I picked up in general conversations

88

1    and at times I can tell you that I didn't want to have

2    an argument with Harvey about anything.  Particularly

3    someone like Barry.

4         Q    Like Mr. Honig?

5         A    Yeah.

6         Q    And you're saying, as you understood it, Mr.

7    Ladd was aware of that?

8         A    I was aware of what?  The relationship that

9    Harvey had with Barry?  Is that what you're --

10        Q    Yes.

11        A    I --

12        Q    Yes, it's --

13        A    I assume so.  I was aware of it.  I --

14             MR. RASTOGI:  If you don't know, you don't

15    know.  Please, instead of going round and round in the

16    same direction, just say you don't know.

17        A    I don't know.

18             MR. RASTOGI:  I'd like to take a break.

19             MR. KAUFMAN:  Sure.

20             MR. RASTOGI:  I have to talk to Mr.

21    Kaplowitz.

22             MR. KAUFMAN:  That's fine.  That's fine.

23             MR. RASTOGI:  Thank you.  Give us five

24    minutes.

25             THE WITNESS:  If we could -- if we could,

1        A     I might have, but that in and of itself,

2    wouldn't be --

3        Q     Do you ever recall discussing that at all

4    with anyone at MGT the fact that Mr. Honig had

5    invested previously with MGT and with others?

6        A     I don't recall discussing it.

7        Q     Were you aware at any time that the 2012

8    pipe, that one of the conditions of the financing was

9    that MGT used $300,000 of the money raised for -- to

10   promote MGT?

11       A     No.

12       Q     And were you aware at any time that Mr.

13   Honig was involved in promoting MGT stock after that

14   2012 pipe transaction closed not long after?

15       A     Not that I recall.

16       Q     Did you ever hear that Mr. Honig arranged

17   for Mr. Ladd to be interviewed for a November 2012

18   Seeking Alpha article on MGT?

19       A     I don't recall that.

20       Q     Did you ever hear that the writer of that

21   article was compensated by Mr. Honig to write the

22   piece?

23       A     Who was the author?

24       Q     Did you ever hear that?

25       A     I never heard that, no.

1      Q    Do you see Deo asking Mr. Ladd, there are

2  also some open questions that I sent last week and the

3  first one says please indicated if any of the

4  investors are acting in concert.

5           Do you see that?

6      A    Yes.

7      Q    And then you'll see on the first page Mr.

8  Ladd's response.  He says in number 1, not to the

9  company's knowledge.

10     A    Let me get to where you are.

11     Q    Sure.  Sorry.

12     A    I'm going now to the first page of -- okay.

13 So the answer to that is not to the company's

14 knowledge.

15     Q    Do you recall any discussion with Mr. Ladd

16 or with anybody about this inquiry from the New York

17 Stock Exchange and Mr. Ladd's response?

18     A    No.

19     Q    Do you recall an individual named Bob Prag?

20     A    Bob Prag with a P?

21     Q    Yeah, P-R-A-G?

22     A    No.

23     Q    Did you ever come to learn that MGT had

24 hired Mr. Prag as an investor relations specialist?

25     A    I think I just said I didn't know who he

97

1       Q     This is titled Form 10-K. It's for MGT

2   Capital Investments for the year -- fiscal year ended

3   December 31st, 2015.  And you'll see if you look at

4   the last page, there are actually several signature

5   pages that are dated April 14th, 2016.

6       A     Are you referring to the certifications?

7       Q     Yeah.  I'm just -- I'm just orienting you to

8   the date of the document and when it was issued. It's

9   for the fiscal year ended December 31st, 2015.  And

10  then it's signed April 14th, 2016.

11      A     All right.

12      Q     Can you tell me generally do you understand

13  what this document is?

14      A     I thought it was a 10-K.

15      Q     What is a 10-K?

16      A     10-K is an annual report that you submit to

17  the SEC.

18      Q     So this is MGT's Form 10-K annual report for

19  the fiscal year of 2015.  Correct?

20      A     Yes.

21      Q     And did -- was Sichenzia involved at all in

22  the drafting and preparation of this?

23      A     I don't recall.

24      Q     Do you recall generally whether MGT, as part

25  of its retainer, Sichenzia retained it to do this kind

98

1    of work?

2        A    The did from time to time.  Yes.

3        Q    But you can't say one way or the other

4    whether Sichenzia had any involvement with this

5    particular filing?

6        A    That's correct.

7        Q    Let me ask you to turn to tab 19.  Tab 19

8    was previously marked the exhibit here in Holmes

9    Exhibit 21.

10       A    Small caps.

11       Q    And it's titled -- small caps, all right.

12   And then if you turn the page, there's an article.

13   And you can see the date at the bottom is February

14   3rd, 2016.  And it says new alert, MGT Capital

15   Investments Inc.

16            Do you see that?

17       A    Yeah.

18       Q    And then the first line of the article says

19   MGT Capital Investments Inc is our new alert on the

20   New York Stock Exchange market, and we believe there's

21   a strong potential for upsides of current levels.

22            Do you see that?

23       A    Yes.

24       Q    And then it goes on to talk about MGT. Have

25   you ever seen this article before?

1     Q    Okay.  So let me rephrase that because I

2    said 2013.  I actually meant 2015 or 2016.  I actually

3    meant later.  So can you answer that question again,

4    Mr. Kaplowitz.  I know you answered it before but.

5         A    Why don't you repeat it?  I'm confused.

6         Q    Let me -- let me try wording this in a way

7    that will get us back.  Were you aware -- were you

8    ever aware of Mr. Honig -- were you ever aware of MGT

9    paying a promoter to promote MGT?

10        A    And I think my answer was I was aware that

11   MGT had an IR firm that they paid a fee to.

12        Q    And I think you said something about

13   $150,000.  Is that right?

14        A    If I recall, that was the number, yes.

15        Q    And I'm just going to ask you these

16   questions again because I'm not sure what we got on

17   the record, but and what can you tell us about that?

18   Do you know how that came about?

19        A    No idea.

20        Q    And did you ever come to any understanding?

21   Did anyone ever tell you that Mr. Honig had any

22   involvement in that promotion in any way?

23        A    Not that I recall.

24        Q    Do you recall Mr. Ladd, or Mr. Honig, or any

25   of the other of the group of investors who were

101

1    selling shareholders on the 2015 S-1, do you recall

2    them ever selling stock in MGT after the promotional

3    piece came out?

4              Do you recall anything like that?

5        A    I do not.

6        Q    I'm sorry.  You do not?

7        A    I do not.  Right.

8        Q    If you had been aware of that activity or

9    promotional piece coming out that Mr. Honig had asked

10   MGT to pay for and then after that, the stock rising,

11   Mr. Honig and some of his other group of investors

12   selling stock, is that information that you would have

13   wanted to know or would have been a factor in

14   determining whether Mr. Honig was acting as a group

15   with  others for 13(d) purposes?

16             MR. RASTOGI:  Objection, form.

17       A    Now what?

18       Q    I'm sorry.

19             MR. RASTOGI:  I'm sorry, Mr. Kaplowitz.  If

20   I object to form, it's just for the record.  I'm not

21   instructing you not to answer so after I say -- I say

22   it, I'm going to be quiet and then you can answer the

23   question if you're able to.

24       A    Okay.  So let me see if I remember the

25   question.  The question was about selling stock after

102

1    the report came out?  Is that the idea?

2        Q    If Mr. Honig and others who were selling

3    shareholders got MGT to do a promotional piece and

4    then sold stock afterwards after the stock price went

5    up, is that something you would have wanted to know in

6    determining whether they were acting as a group for

7    section 13(d) purposes?

8        A    I find these hypothetical questions

9    troubling.  If you put enough hypotheticals in it,

10   I --

11       Q    If we put enough hypotheticals what, Mr.

12   Kaplowitz?

13       A    You're going to get the answer you want.

14       Q    What is that?  What are you talking about,

15   Mr. Kaplowitz?

16       A    I think -- I think -- I don't know that they

17   sold stock, when they sold stock.  I don't remember.

18   I don't remember this -- if it was in connection with

19   any promotion.  And I certainly don't remember if

20   Barry had anything to do with it.

21       Q    But what we're getting at is there may be

22   things that you didn't know.  There may be things you

23   weren't privy to.  We understand that.

24           MR. FORD:  Objection.  Are you testifying,

25   Jack?  Or --

1        MR. KAUFMAN:  No, I'm trying -- I'm trying

2    to get an answer to the question.

3        MR. FORD:  But that was -- whatever you just

4    started was not in the form of the question.  I'm

5    really going to object to that and ask that you start

6    over on that one.

7        Q    So my question is had you known about

8    this -- had you known about this promotion and had you

9    known that Mr. Honig was selling shares with others

10   after it, after the stock price went up, is that

11   something that would have been information you would

12   have wanted to know or significant in any way in

13   determining whether Mr. Honig was acting as a group

14   with others for section 13(d) purposes?

15       MR. FORD:  Objection. Asked and answered.

16   It's the same exact question you just asked him.

17       Q    It's a yes-or-no question.  Do you have a

18   yes-or-no answer, Mr. Kaplowitz?

19       A    It's not a question that lends itself well

20   to yes or no.  So I guess the question is would I be

21   troubled if I learned that selling shareholders were

22   promoting the stock -- prior to their selling.  Is

23   that the question?

24       MR. FORD:  That --

25       Q    No, it's not whether you would be troubled.

```
 1    Not whether you would be troubled.  I didn't use the
 2    word troubled.  It's for 13(d) purposes for whether
 3    they were acting as a group for 13(d) purposes for the
 4    disclosure of --
 5         A    I'd have to know more than that.  I would
 6    have to know who created the material that was being
 7    disseminated, what the material that was being
 8    disseminated was, the timelines involved, all sorts of
 9    things like that.
10         Q    But I take it from your answer that you
11    would want to have more information.
12              MR. FORD:  Objection, form.
13         Q    Can you answer that?
14         A    I would want to have --
15              MR. FORD:  The problem was it wasn't a
16    question.  You're testifying again.
17         A    You're phrasing -- you're putting a
18    question --
19         Q    I'm trying to understand the answer.  Is the
20    answer that you would ask other questions and gather
21    more information?  Is that your answer?
22              MR. FORD:  To what question?
23              MR. KAUFMAN:  The question I asked was
24    whether that information would be significant in
25    determining 13(d) group and I think the answer was,
```

1   for Mr. Kaplowitz, it wasn't an easy yes or no answer.

2   That he would need more information.

3        Q    Is that accurate?  Or is that not accurate,

4   Mr. Kaplowitz?

5        A    That is accurate.

6             MR. KAUFMAN:  Thank you.  I'm going to

7   switch to another topic, and I don't have a -- I have

8   maybe an hour more.  Let's take a five-minute break.

9   I think it's a good moment for that.

10            (A brief recess was taken.)

11            MR. KAUFMAN:  All right.  Back on the

12   record.

13            EXAMINATION BY MR. KAUFMAN:

14        Q    If you could turn to Tab 20.  This is a

15   document titled, US Securities and Exchange Commission

16   Form 8-K dated May 9th, 2016, MGT Capital Investments.

17   And it was marked as Holmes Exhibit 26.

18            And, Mr. Kaplowitz, if you could turn to the

19   second page of it, of this exhibit.  Just want to

20   orient you to what it's talking about.  The item 101,

21   you said on May 9th, 2016, MGT Capital Investments, a

22   Delaware corporation, et cetera, entered into an asset

23   purchase agreement for the purchase of certain

24   technology and assets of D-Vasive.

25            Do you see that?

129

1    came up at this time in December of 2015?

2         A    I don't know.  As I say, Harvey drafted the

3    letter.  And those people in the -- mentioned in the

4    letter -- O'Rourke, Groussman, Silverman, Ed Karr --

5    those are all Harvey people.

6         Q    Did you have any discussion with Mr. Kesner

7    about any particular conflict he was aware of at that

8    time?

9         A    Not that I recall.

10        Q    If you look at -- let me see if I can get

11   this on screen for you.  Oh, it's this paragraph.  It

12   says, the nature of the firm's practice is such that

13   the firm may, from time to time, represent one client

14   in a matter while also representing the client's

15   adversary in another unrelated matter.

16             Do you see that?

17        A    Yes.

18        Q    Was that standard language that the firm

19   used in its conflict letters?

20        A    I didn't.  This was --

21        Q    What do you mean by that?

22        A    I didn't put it in my conflict.  Well, this

23   letter was drafted by Harvey.

24        Q    Right.  But you're saying this all came from

25   Mr. Kesner?

130

1      A    Yeah.  You can see the people involved --

2   Michael Onghai, John O'Rourke, Stetson, Josh

3   Silverman. All those people were people that were in

4   Harvey's circle.

5      Q    And again, you have no idea why this letter

6   was sent at this particular time?

7      A    No, I don't.  He certainly didn't consult

8   me.

9      Q    Well, I mean, your name is on the signature

10  line.  That's one of them reasons I'm asking you all

11  these questions.

12     A    Yeah.  Because I was the responsible lawyer

13  for MGT, I suspect.  I don't know the reason.

14     Q    I see.  And did you advise MGT with respect

15  to this letter?

16     A    I don't recall.

17     Q    Did you advise Mr. Ladd at all?

18     A    Well, if I advised MGT, I would have advised

19  Ladd as well.

20     Q    The letter says -- you mention Mr. Honig's

21  circle.  What did you mean by that?

22     A    That whole group -- Stetson, O'Rourke,

23  Groussman, Silverman, Ed Karr -- they all seem to be,

24  at least to my recollection, people that were involved

25  with, associated with, friends with Barry.

1   Q    Mr. Honig?

2   A    Yes.  Barry.  Right.  Mr. Honig.

3   Q    Do you recall?  Did Mr. Ladd ask you any

4   questions about the letter when you sent it for his

5   signature?

6   A    I don't.

7   Q    If you look at the paragraph that I'm hoping

8   you can see on the screen, it says, the nature of the

9   firm's practice --

10   A    Yeah.

11   Q    -- is such that the firm may, from time to

12   time, represent one client in a matter while also

13   representing that client's adversary in another

14   unrelated matter.

15        Do you see that?

16   A    I do.

17   Q    At that time, December 2015, was it

18   Sichenzia's practice not to represent two different

19   clients on the same transaction, which is not what

20   this  is talking about?

21   A    Yeah.  That's not what this is talking

22   about.  It was our practice to avoid that if we could.

23   And if we couldn't, we would be scrupulous in getting

24   a waiver.

25   Q    And when you say you'd be scrupulous in