# EXHIBIT OOO

1

1       UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE COMMISSION, )

5                     Plaintiff,           )

6    v.                                    ) Case No.

7    BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)

8    MAZA, BRIAN KELLER, JOHN H. FORD,    )

9    GRQ CONSULTANTS, INC., AND HS        )

10   CONTRARIAN INVESTMENTS, LLC,         )

11                     Defendants.         )

12   _____)

13

14                     VOLUME 1

15    VIDEOTAPED DEPOSITION OF ARTHUR MARCUS

16                VIA VIDEOCONFERENCE

17                Tuesday, June 21, 2022

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25                (202)467-9200

2

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE COMMISSION, )

5               Plaintiff,          )

6    v.                             ) Case No.

7    BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)

8    MAZA, BRIAN KELLER, JOHN H. FORD,   )

9    GRQ CONSULTANTS, INC., AND HS       )

10   CONTRARIAN INVESTMENTS, LLC,        )

11              Defendants.          )

12   _____ )

13

14

15          Videotaped deposition of Arthur Marcus,

16   taken on behalf of the Plaintiff, all parties appearing

17   remotely via Webex, beginning at 10:03 a.m. EST and

18   ending at 1:25 p.m. EST, on Tuesday, June 21, 2022.

19

20

21

22

23

24          Diversified Reporting Services, Inc.

25                 (202)467-9200

3

1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         JACK KAUFMAN, ESQ.

5         NANCY BROWN, ESQ.

6         100 Pearl Street

7         New York, New York

8

9    On behalf of the Witness:

10        SAMEER RASTOGI, ESQ.

11        Sichenzia Ross Ference

12        1185 Avenue of the Americas, 31st Floor

13        New York, NY 10036

14        212-930-9700

15

16        ADAM FORD, ESQ.

17        ANJULA PRASAD, ESQ.

18        Ford O'Brien Landy LLP

19        275 Madison, Floor 24

20        New York, NY 10016

21        212-858-0040

22

23    Also Present:

24        Robert Ladd

25

9

1   Q And what's your position there at

2 Sichenzia?

3   A I'm a nonequity partner.

4   Q And how long have you been with Sichenzia?

5   A Since 19 -- since 2012.

6   Q When in 2012 did you join Sichenzia?

7   A August of 2012 I believe.

8   Q I'm sorry, I just didn't hear the first

9 part of that answer.

10   A I believe August of 2012.

11   Q And when you joined, what was your position

12 at Sichenzia?

13   A The same.  A nonequity partner.

14   Q And when did you graduate law school?

15   A In 1989.

16   Q Can you just briefly take us through your

17 legal career from your postgraduate graduating law

18 school until Sichenzia?

19   A Sure.  I graduated law school and I worked

20 at Kramer Levin after law school in September of 1989.

21 And I worked there into 1991.  After that, I left Kramer

22 Levin and went to a firm called Gersten Savage at that

23 time.  I --

24   Q And how long were you there?

25   A I stayed there until 2012 when I joined

14

1       Q    And when was that?  Was that after 2012 or

2  in 2012?

3       A    It was right around 2012.  It was pretty

4  much when we got there.

5       Q    And what about Harvey Kesner?  Did he do

6  work for MGT?

7       A    I'm not sure.

8       Q    And when you were at Sichenzia, was there a

9  particular contact that Sichenzia had at MGT?

10      A    The same.  It was the CFO and the CEO at

11  MGT.

12      Q    So Mr. Traversa and Mr. Ladd?

13      A    Primarily.

14      Q    And was there -- was one of them more of a

15  regular contact?  Was there more contact with one of

16  them than the other?

17      A    Not necessarily, no.

18      Q    Were there particular types of matters that

19  Sichenzia contacted Mr. Ladd on as opposed to Mr.

20  Traversa?

21      A    Not to my knowledge.

22      Q    And did MGT have a principal contact at

23  Sichenzia during its representation of MGT?

24      A    Primarily probably Mr. Kaplowitz.

25      Q    And were you also a contact direct for --

1    number of years after the first one?

2         A    A few years.

3         Q    And who from MGT worked on that second

4    financing?  I'm sorry.  Who from Sichenzia?  From

5    Sichenzia.

6         A    Mr. Kaplowitz, myself to a very small

7    degree, and I believe Avital Perlman.

8         Q    And you said yourself to a small degree on

9    the second financing.  What did you work on and what do

10   you mean by that?

11        A    I just kind of -- I oversaw certain aspects

12   of -- my memory is.  But I didn't draft everything, and

13   I wasn't that involved.

14        Q    And Mr. Kaplowitz was the main attorney at

15   Sichenzia involving the second financing?

16        A    I don't -- I wasn't that involved so I

17   don't know who was on all the calls.

18        Q    What was Ms. Perlman's role?

19        A    I believe she was drafting documents.

20        Q    And again, was -- were Mr. Ladd and Mr.

21   Traversa Sichenzia's principal contact at MGT for the

22   second financing?

23        A    I don't recall.

24        Q    What about the first financing in 2012?

25        A    I believe Mr. Traversa was there at that

22

1    recollection.

2         A    I was just going to say, yeah, it seems to

3    say that we represented on other matters.

4         Q    So you have no recollection of the firm

5    representing Mr. Honig with respect to these two MGT

6    financings?

7         A    Correct.

8         Q    Mr. Marcus, do you recall seeing this

9    letter before that's Ladd Exhibit 62?

10        A    I do not recall it.

11        Q    Do you recall any request for a waiver of

12   Conflict of Interest from MGT by Sichenzia?

13        A    I do not.

14        Q    Did you ever discuss any -- withdrawn.

15   Well let me ask you again.  And maybe you answered this

16   already and I've just forgotten.  Did Mr. Kesner have a

17   role with respect to the two financings we've been

18   discussing, 2012 and 2015?

19        A    No. I don't recall what his role was, but

20   I'd say yes.  But I don't recall what it was.

21        Q    Do you recall did he have a client?  Was he

22   representing someone on those financings?

23        A    Not to my knowledge.  I know that those

24   people were his clients or Barry Honig was a client of

25   his.

1    those financings, did you -- did you understand Mr.

2    Kesner to have any sort of conflict when he spoke to you

3    about those issues because Mr. Honig was also a client

4    of his?

5        A    I don't recall.

6        Q    You don't recall?  Do you ever recall

7    Sichenzia representing -- and I'm not talking about

8    these particular transactions, but do you ever recall

9    Sichenzia representing two different parties who were on

10   opposite sides of the same transaction?

11       A    Of the same transaction? No, I don't.

12       Q    Is that something that you would feel

13   comfortable doing?  I'm just asking you in general.

14       A    It would depend on the transaction and that

15   we got a waiver.  On other clients -- I'm trying to

16   think I've ever represented both sides.  And more -- my

17   familiarity directly was with clients that we

18   represented on transactions where the other side may be

19   clients that we've also represented in the past.  But

20   not on the particular.

21       Q    And would you say both of those situations

22   that we're talking about present a conflict, a potential

23   conflict, for Sichenzia?

24       A    If they did on both sides, yes.

25       Q    I'm sorry.  Can you just explain what you

1    mean by that?

2         A    If it was a situation where you represented

3    the investor and you represented a company, I think

4    there would clearly be a conflict of interest.

5         Q    And that particular kind of conflict, I

6    assume, would need to be disclosed to both clients?

7         A    Correct.

8         Q    And you would need to obtain both clients'

9    consent to proceed.  Correct?

10        A    Yes.

11        Q    On the 2012 financing were you aware of a

12   Honig being involved with a group of investors who were

13   investing together?

14        A    In the 2012 transaction?

15        Q    Yes.

16        A    There was a group of them.  A list of them.

17        Q    I'm sorry.  A list of them?

18        A    There was a list of investors that were in

19   the transaction.  It wasn't just Mr. Honig.

20        Q    And was there a particular relationship

21   between that list of investors and Mr. Honig?

22        A    Not to my knowledge at the time.

23        Q    Let me direct your attention back to --

24   withdrawn.  We'll come back to it.  Are you familiar

25   with Section 13(d) that -- of the Securities and

1    asked you if MGT was asked that question and you said

2    Mr. Kesner was asked.  Is that right?

3         A    I said I asked Mr. Kesner.

4         Q    Why did you ask Mr. Kesner?

5         A    Because Mr. Kaplowitz advised me to.

6         Q    Did you understand Mr. Kesner to be

7    representing MGT for that purpose?

8         A    No.

9         Q    So let me go back to my original question.

10        A    Sure.

11        Q    Did you or anyone at Sichenzia ask MGT

12   whether it was directly or through MGT counsel that

13   question about -- or discussed that question whether Mr.

14   Honig and others were acting as a group with respect to

15   the 2012 financing?

16        A    Not to my knowledge.

17        Q    And why is that?

18        A    I don't recall.

19        Q    Now you mentioned that Mr. Kaplowitz asked

20   you to ask Mr. Kesner a question about that.  What did

21   Mr. Kaplowitz ask you to ask him?

22        A    If the investors were acting as a group.

23        Q    And then you did that?

24        A    Yes.

25        Q    When was that?  When were these

1    conversations?

2        A    In 2012.

3        Q    Was it prior to the closing of the 2012

4    financing?

5        A    That, I don't recall the time.

6        Q    Did you discuss with Mr. Kaplowitz why he

7    wanted you to ask that question?

8        A    No.

9        Q    Did you have any understanding of why you

10   were asking Mr. Kesner that question?

11       A    Because Mr. Kesner had a familiarity with

12   these -- with some of these investors having had

13   represented them.

14       Q    But what I'm asking is -- I understand

15   that.  I'm asking something a little bit different.  Did

16   you have reason to believe that Mr. Honig might be

17   acting as a group with other investors?

18       A    No.

19       Q    So I'm just trying to understand why ask

20   that question.

21       A    Because -- you'd have to ask -- Mr.

22   Kaplowitz asked me to ask it, so I asked it.

23       Q    And you didn't ask -- and you didn't have

24   any further discussion about it with Mr. Kaplowitz?

25       A    No.

1    you have any understanding -- well, let me just ask it

2    this way.  Did you have an understanding at that time,

3    the time of this e-mail, that some of the other

4    investors in the 2012 financing had been co-investors

5    with Mr. Honig on previous transactions?

6        A    No. I knew some of the other investors

7    actually, but Mr. Honig.

8        Q    Let's go back to -- let's go back to the

9    e-mail chain.  Then the next e-mail is at 7:24 and Mr.

10    Kesner says no with an exclamation mark.

11        Do you see that?

12        A    Mm-hmm.

13        Q    Is that a yes?

14        A    I'm sorry, yes.

15        Q    And what is your understanding that he's

16    saying no to?

17        A    Are they acting as a group.

18        Q    And when you're talking about -- with Mr.

19    Kesner about whether Mr. Honig and any of the other

20    investors are acting as a group, for what purpose are

21    you having that exchange?

22        A    Mr. Kaplowitz asked me to find out if they

23    were acting as a group.

24        Q    Did it have anything to do with the 13(d) 5

25    percent requirement that we were talking about before?

```
1          Q    It looks like, if you look at the next

2     e-mail in the chain, that you forwarded this e-mail

3     chain to Mr. Ladd.  Do you see that?  At 6:11 a.m. on

4     October 19, 2012.  Do you see that?  Do you see that,

5     Mr. Marcus?

6          A    Not yet.  Give me a second.  Yes, I do.

7          Q    I'm sorry.  Before that, you first stated

8     Mr. Kesner, I found it so no need.  I'm sorry.  I found

9     it so need.  Do you see that?

10         A    It should have been no need.

11         Q    It should have been no need, okay.  What

12    did you mean by that?

13         A    He asked do I have a list of investors and

14    I said I have.

15         Q    And then after that, I'm sorry, you

16    forwarded to Mr. Ladd this e-mail chain.  Correct?  Do

17    you see that above your answer?  I found it, so need.

18         A    Yeah, I don't think I forwarded the chain.

19    I think I was working off my Blackberry -- my --

20    Blackberry.  My iPhone, so it like automatically

21    attached.  It was all chain e-mails to -- just got an

22    iPhone.  I had a lot of difficulty using it when I first

23    got it.  When I first got to Sichenzia was the first

24    time I used an iPhone as opposed to a Blackberry.  And I

25    think it syncs all the messages together in some manner
```

40

```
 1    like that.
 2         Q    So let me make sure I understand what
 3    you're saying.  Did you have any particular intention of
 4    forwarding to Mr. Ladd in this -- in this e-mail that
 5    you sent to him, your exchange with Mr. Kesner about
 6    whether Mr. Honig and others were acting as a group?
 7         A    I don't recall.
 8         Q    Why did you -- why did you e-mail Mr. Ladd
 9    here?  It looks like a forward but why did you e-mail
10    him and then say the list all but -- what was the
11    purpose of that?
12         A    I don't recall.
13         Q    Can you tell from reading any more of the
14    chain that that it goes on?
15         A    I'd be speculating, but I'd say that we had
16    to give a list of the investors to the New York Stock
17    Exchange.
18         Q    Before I get to that, let me ask you.  Mr.
19    Kesner, when he responded no he used and exclamation
20    mark.  You saw that.  Right?
21         A    Mm-hmm.
22         Q    Do you have any understanding of why he
23    responded with that strong response with an exclamation
24    mark to your question about groups?
25         A    No, I don't.
```

41

```
 1        Q    Did you consider that issue to be an issue

 2   of importance?

 3        A    I don't remember specifically, but yes, I

 4   would.

 5        Q    Why is that?

 6        A    Because of the 13(d) requirements.

 7        Q    Did you ever -- after receiving this e-mail

 8   from Mr. Kesner, did you ever discuss this group issue

 9   with Mr. Kesner in any -- in any way?

10        A    Not to my recollection.

11        Q    Did you ever discuss it with Mr. Ladd?

12        A    Not to my recollection.

13        Q    Did you ever discuss it with anyone else at

14   MGT other than Mr. Ladd?

15        A    Not to my recollection.

16        Q    Other than Mr. Kaplowitz asking you to ask

17   Mr. Kesner that question, did you have any other

18   discussions about this group requirement and Mr. Honig

19   with anyone else at Sichenzia?

20        A    Not to my recollection.

21        Q    When you sent this e-mail to Mr. Ladd, this

22   e-mail chain, did you intend for Mr. Ladd to rely in any

23   way on Mr. Kesner's statement about the Honig investors

24   not being a group?

25        A    No, but as I said, I think it's a chain of
```

42

1    e-mails that got linked together.

2        Q    So it -- the point of your sending that

3    e-mail, what I hear you testifying to, the point of it

4    was not to forward that exchange you had with Mr. Kesner

5    and Mr. Ladd?

6        A    That's correct.

7        Q    And did you -- did you ever have a sense

8    that Mr. Ladd was relying on that exchange you had with

9    Mr. Kesner regarding this 13(d) issue and Mr. Honig

10   being involved with a group?

11       A    Not to my --

12            MR. RASTOGI:  I object to the form.  I

13   don't know what sense --

14       Q    As you sit here today, do you think that it

15   was reasonable for Mr. Ladd to rely on that exchange

16   between you and Mr. Kesner with respect to whether Mr.

17   Honig and others were acting as a group regarding the

18   2012 financing?

19            MR. FORD:  I'm going to object to the

20   foundation of that question.

21       Q    Do you understand the question?

22       A    I do.

23       Q    Can you please answer?

24       A    Could you ask it one more time?

25            MR. KAUFMAN:  Could the court reporter just

1    context was for that question with Mr. Kaplowitz?

2        A    I don't recall.

3        Q    And why do you recall that conversation at

4    all?

5        A    Well, I think partially because a while

6    back, a while back being right before the pandemic, I

7    had a conversation with a lawyer from Kramer Levin who

8    was representing Mr. Ladd and he kind of went back to

9    that same e-mail.  So I don't know if I really remember

10   it from the original or if I remember it because

11   somebody told me about it about sometime before COVID

12   like four years -- three, four years ago.

13       Q    So it was looking at the e-mail that

14   refreshed your memory about the conversation with Mr.

15   Kaplowitz?

16       A    I believe so.

17       Q    And who was the Kramer Levin attorney?

18       A    I don't know.

19       Q    What was the context in which he or she was

20   asking you that question?

21       A    It was similar to this was that, you know,

22   do you remember advising him on this or having a

23   conversation and I said I didn't.  And they said does

24   this refresh your memory and they sent the e-mail, the

25   same e-mail.

46

1      Q   And that lawyer was representing Mr. Ladd

2  at the time?

3      A   I believe so.

4      Q   Was his name Sean Coffey?

5      A   I don't remember.

6      Q   And do you know what the context was of

7  this lawyer asking you that question?

8      A   I understood that he was representing Mr.

9  Ladd in the SEC matter against him.

10      MR. FORD:  Jack, this is what I -- I think

11  I've got to object into further inquiry because I think

12  this is getting outside the waiver are.

13      A   I'm a little -- so I think we're going to

14  object.  And I also think -- well I'll just leave it at

15  that.  We can have a further conversation if you need

16  with that outside Mr. Marcus' presence, but I think I've

17  said enough for now.

18      MR. KAUFMAN:  Okay. All right.

19      Q   So and after you got this response from Mr.

20  Kesner where he says no with an exclamation mark in this

21  e-mail, did you have a further conversation with Mr.

22  Kaplowitz about this subject?

23      A   I believe so, but I don't recall exactly.

24      Q   What makes you think you did have such a

25  conversation?

50

1    standard.

2        Q    You had testified that Mr. Kaplowitz asked

3    you to ask Mr. Kesner if Honig was acting as a group

4    with others.  And then we saw that you asked him and

5    that he said no and then the next day, he's saying so

6    not acting as a group.  And so my question is is this

7    related to --

8        A    Who's -- who's saying?

9        Q    I'm sorry?

10       A    Who was --

11       Q    This e-mail that we're looking at now, Mr.

12   Kesner is saying need separate letters so not acting as

13   a group.

14           Do you see that?

15       A    Yep.

16       Q    Did you make any connection between that

17   and the question you had asked him the day before about

18   whether Honig and others were acting as a group?

19       A    No. Not to my knowledge.  My knowledge was

20   that there was a -- my memory was that there was some

21   type of a signed letter that all these investors were

22   going to have to execute.  And these are the things that

23   they want to be covered in it.

24       Q    When you received this e-mail from Mr.

25   Kesner, did you understand what his role was here in the

51

1    transaction?

2         A     He was kind of a go-between, my

3    understanding was.

4         Q     Between who and who?

5         A     Between Barry Honig, who was the lead

6    investor, and with company.

7         Q     And when you say a go-between, was -- I

8    mean I asked you this before but was he representing Mr.

9    Honig on the transaction?

10        A     Not to my knowledge.

11        Q     What does a go-between mean then?  I'm just

12   trying to understand.

13        A     The general -- he had the contact, so I

14   didn't pick up the phone and called Mr. Honig or there

15   were only people were have to sit in bed.  You know,

16   Harvey -- it was easy for Harvey to try and get that

17   information, I guess.

18        Q     Did you understand Mr. Honig -- did he

19   convey this information to you to have Mr. Honig's --

20        A     Mr. Honig didn't convey the information to

21   me.

22        Q     I'm sorry.  When Mr. Kesner conveyed this

23   information to you, was he acting mostly in the interest

24   of MGT?  Or was he acting in the interest of Mr. Honig?

25        A     I don't know.  I'd have to speculate.

1    don't know.

2        Q    When Mr. Kesner answered no to your

3    question of whether Honig was acting as a group, did you

4    understand that to be Mr. Kesner's own personal view?

5    Or what?

6            MR. FORD:  Object to form.

7        A    His own --

8        Q    Okay.

9            MR. FORD:  You can answer.  I'll -- but Mr.

10   Marcus, just going forward, if I object to form, it's

11   just for the record.  I'm not instructing you not to

12   answer.

13           MR. KAUFMAN:  Thank you, Adam.

14       A    Yes.  That was I think the view of it.

15       Q    Did you do any independent -- you or anyone

16   else at Sichenzia do any independent analysis of whether

17   Honig and others were acting as a group aside from what

18   Mr. Kesner told you?

19       A    Just that they believe the documents the

20   investor reps gave some representations that they

21   weren't -- if they were buying independently so their

22   only account that there was no proof.

23       Q    I'm sorry.  Who gave those representations?

24       A    Generally the investor gives some

25   representation like that in -- documents.  Something

54

```
1   like that.
2       Q    And did you ever discuss any of that with
3   Mr. Ladd?
4       A    No, not to my knowledge.  Or not to my
5   recollection.
6       Q    And did you come to the same conclusion
7   that Mr. Kesner came to that Mr. Honig and others were
8   not acting as a group for 13(d) purposes?
9       A    I didn't challenge that at all.
10      Q    And why was that?
11      A    There was -- if you didn't know the
12  reasons, you would assume that all those investors were
13  acting as a group.  And since we had asked the question
14  and been told the answer was no, I don't think we ever
15  had any further discussions on it actually.
16      Q    Do you have -- you should have number 39,
17  I'll call it tab 39 which has been marked as AM 11.
18          (AM Exhibit 11 was marked for
19  identification.)
20      A    Yes, I have.
21      Q    And this is an e-mail dated October 19,
22  2012.  The top one is from Mr. Ladd, to you, copying Mr.
23  Traversa.
24          Do you see that?
25      A    I do.
```

58

```
 1        Q    Did Mr. Ladd confer with anyone from
 2   Sichenzia before replying with that response?
 3        A    I don't recall, no.
 4        Q    Do you have any reason to believe that he
 5   did?
 6        A    No, I have no reason to believe that he
 7   did.
 8        Q    Do you know what Mr. Ladd based that
 9   response on?  No, not to the company's knowledge.
10        A    What he based it on?
11        Q    Yes.
12        A    No.
13        Q    Did you ever discuss this exchange with Mr.
14   Ladd or anyone else at MGT?
15        A    Which exchange?
16        Q    This e-mail exchange.  This response to the
17   New York Stock Exchange.
18        A    No. It looks like he answered pretty
19   instantly.
20        Q    Did you discuss it with anyone else other
21   than someone at MGT?
22        A    No.
23        Q    Let me ask you to look at tab 17, which has
24   been marked as JK 9.
25        A    Yes, I have it in front of me.
```

62

1    conversation we had at some point.

2         Q     You're saying you had the conversation

3    about those topics with Mr. Ladd?

4         A     Or Mr. Kaplowitz.  Somebody or maybe both

5    of them.  I don't remember.  I remember a conversation

6    as to why it had a 4.99 and 9.99 in there.

7         Q     But you're saying 4.99, was that -- was

8    that a provision in the financing?  The 2012 financing.

9         A     It was a beneficial ownership limitation

10   that you see.

11        Q     And you discussed that with Mr. Kaplowitz?

12   I'm sorry.  Are you still there?

13        A     Yes, I'm -- can you see me or no?

14        Q     We can see you now.

15        A     Okay. Good.

16        Q     Hear the question?

17        A     No, if you could repeat it.  I had a call.

18        Q     Did you discuss the 4.99 percent provision

19   with Mr. Kaplowitz?

20        A     I don't recall.

21        Q     What about with Mr. Ladd?

22        A     I don't recall.

23        Q     And is the 9.99 percent issue, is that

24   related to Section 16?

25        A     That's right.  Yes.

78

```
 1        Q    And were you aware that Honig then was
 2   involved in promoting MGT stock after the 2012
 3   financing?
 4        A    I don't have any recollection of that.
 5        Q    Were you aware that Mr. Honig arranged for
 6   Mr. Ladd to be interviewed for a November 2012 Seeking
 7   Alpha article about MGT?
 8        A    I have no recollection of that.
 9        Q    And did you know that Mr. Honig compensated
10   the Seeking Alpha, the author of that piece, to write
11   that piece?
12        A    I have no knowledge of that.
13        Q    And were you aware that after the piece
14   came out, this was in 2013, that MGT's stock price rose?
15        A    No, I don't.
16        Q    And are you aware that then some of these
17   same investors sold their MGT stock in 2013?
18        A    I don't recall when they sold their shares.
19        Q    And you're saying you didn't know any of
20   that in 2015 at the time of this S-1 that we've been
21   looking at?
22        A    I generally wouldn't know when anybody sold
23   their shares unless --
24        Q    So my question is if you had been aware of
25   that information about Mr. Ladd being interviewed for
```

79

1    the Seeking Alpha article that Mr. Honig paid for in

2    promoting MGT and then selling shareholders -- selling

3    their shares in 2013, is that information that you would

4    have wanted to consider in determining in 2015 whether

5    this group of investors was acting as a group for

6    Section 13 purposes?

7         A    No, not necessarily.

8         Q    What do you mean by that?

9         A    Stock goes up.  The stock goes down.  If

10   the stock is up, people sell their shares.  I don't

11   think that would have affected me to say oh, this guy

12   sold the shares, that guy didn't, this guy did, this guy

13   didn't.  I don't think I would do that analysis.  I've

14   never done it before.

15        Q    Well what if the stock price went up

16   because Mr. Honig engineered that to happen?  Would that

17   have affected your analysis?

18             MR. RASTOGI:  Objection to form,

19   foundation.

20        Q    You can answer it if you understand.

21        A    I think the answer is that I had no

22   knowledge of it.

23        Q    I understand that.  I'm asking you a

24   hypothetical question.  If you had had that knowledge,

25   would that have affected your analysis?

83

1        Q    You understood in 2015 that Mr. Honig had a

2   mixed reputation?

3        A    By 2015, I think I did, yeah.  And just in

4   general people would make comments.

5        Q    What do you mean by mixed reputation?

6        A    What's that?

7        Q    What do you mean by mixed reputation?

8        A    I think some people thought he was a bad

9   investor.

10       Q    What do you mean by that?

11       A    That somebody could hurt a company if you

12   put him in there.

13       Q    I'm sorry.  That he could hurt a company,

14   you said?

15       A    Yeah, some investors are good investors,

16   and some aren't.  It's just the nature of the practice.

17       Q    Did you ever hear anything derogatory about

18   Mr. Honig other than that he wasn't a good investor?

19       A    No, not really.

20       Q    Did Mr. Ladd ever tell you or did you ever

21   hear Mr. Ladd -- that Mr. Ladd didn't trust Mr. Honig?

22       A    I didn't know that.

23       Q    Did you ever hear Mr. Ladd say -- or hear

24   of Mr. Ladd saying anything else derogatory about Mr.

25   Honig?

84

1        A     No.

2        Q     Did Mr. Ladd ever -- withdrawn.  Did you

3   ever -- did you ever hear that Mr. Ladd had an exchange

4   with the hedge fund manager, David Einhorn?

5        A     I don't recall that.  But I looked at

6   e-mails and the exhibits and I did see that.

7        Q     I'll just direct your attention to tab 9.

8             MR. RASTOGI:  And you need to be testifying

9   about your knowledge and not what you read.

10            THE WITNESS:  Okay.

11       Q     Yeah, this is Honig Exhibit 10.  It's an

12   e-mail exchange between Robert Ladd and David Einhorn.

13   And I understand you're not on this exchange.  Mr.

14   Marcus, you'll see there's an e-mail from Mr. Einhorn

15   where he says some things about Mr. Honig.  He calls him

16   a recidivist stock promoter.  Do you see that on the

17   second page?

18       A     I do.

19       Q     Did you ever hear -- so I'm not asking you

20   if you received this.  But did you ever hear of an

21   exchange like that that Mr. Ladd had with Mr. Einhorn?

22       A     No, I did not.

23       Q     Did you understand Mr. Honig at any time to

24   have been a recidivist stock promoter?

25       A     No, I didn't.

87

1    for that disclosure requirement to try to alert the

2    public to people controlling the company for the purpose

3    of doing a pump and dump?

4        A    No.

5        Q    You don't understand that?

6        A    I understand it.  I don't -- that's not the

7    way I interpreted the purpose of 13(d).

8        Q    Let me ask you to turn to tab 18, which is

9    Ladd Exhibit 40.

10       A    Okay. I have it in front of me.  The 10-K.

11       Q    This is a Form 10-K for the fiscal year

12   ended December 31st, 2015, for MGT. Do you see that?

13       A    I do.

14       Q    Did you have any involvement in drafting or

15   filing this document?

16       A    Not that I recall.

17       Q    Did you have any discussion with anybody

18   about the disclosure of 5 percent owners that was made

19   in this document?

20       A    No. Not that I recall.

21       Q    Were you -- if you could turn to tab 19.

22   This is Holmes Exhibit 21.

23       A    I have it.

24       Q    And you'll see it's a copy of an article in

25   Small Cap Reader dated February 23rd, 2016.  And if you

88

1    turn to the second page, the first sentence says MGT

2    Capital Investments is our new alert on the New York

3    Stock Exchange market, and we believe there's a strong

4    potential for upsides in current levels.

5             Do you see that?

6    A    I do.

7    Q    Have you ever seen this or heard of this

8    article before?

9    A    No.

10   Q    Did you have any knowledge of Mr. Honig

11   asking Mr. Ladd to pay a promoter to promote MGT stock

12   in 2015?

13   A    Not that I recall.

14   Q    Are you aware that after this article came

15   out, MGT stock price rose considerably?

16   A    I'm not.

17   Q    You're not?  And are you aware that this

18   piece was paid for by MGT?

19   A    No, I'm not.

20   Q    And are you aware that after the piece came

21   out and the stock price rose, Mr. Ladd, Mr. Honig, Mr.

22   Stetson, and Mr. O'Rourke all sold MGT stock at a

23   profit?

24   A    No, I wasn't.

25   Q    Is that kind of information something that

1    full half hour to 45 minutes.

2              MR. KAUFMAN:  Okay.

3              (Whereupon a short recess was taken.)

4              EXAMINATION BY MR. KAUFMAN:

5         Q    Mr. Marcus, do you recall MGT entering into

6    an asset purchase agreement in 2015 with a company

7    called D-Vasive?

8         A    Yes.

9         Q    And did you have any involvement in that

10   transaction?

11        A    Very limited.  I dealt with a Joe Laxague

12   on some Nevada issue.  I don't remember the issue

13   exactly, but that was kind of my limited role in the

14   D-Vasive transaction.

15        Q    Do you recall MGT announcing the

16   transaction in 2016?

17        A    No, I don't.

18        Q    Let me see if this refreshes your memory.

19   I don't know, but if you could look at tab 20.  Oh, I'm

20   sorry.

21             Holmes Exhibit 26.

22        A    Okay. I have that.

23        Q    Yep.  The document titled Form 8-K for MGT

24   Capital --

25        A    Correct.