# EXHIBIT WWW

```
 1                UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE           )
    COMMISSION,                       )
 5                                    )
                 Plaintiff,           )
 6                                    )
         -against-                    ) 18 Civ. 8175(ER)
 7                                    )
    BARRY C. HONIG, MICHAEL BRAUSER,  ) ECF CASE
 8  JOHN STETSON, JOHN R. O'ROURKE    )
    III, ROBERT LADD, ELLIOT MAZA,    )
 9  BRIAN KELLER, JOHN H. FORD, ATG   )
    CAPITAL LLC, GRQ CONSULTANTS,     )
10  INC., HS CONTRARIAN INVESTMENTS,  )
    LLC, GRANDER HOLDINGS, INC., and  )
11  STETSON CAPITAL INVESTMENTS,      )
    INC.,                             )
12                                    )
                 Defendants.          )
13  _____)
14
15
16           DEPOSITION OF HUGH ROBERT HOLMES
17                  January 28, 2020
18                Palm Springs, California
19
20
21
22
23
    Reported by:
24  Lori Arias
    CSR No. 9433
25  Job No. 200128ASC
```

1

1    Deposition of HUGH ROBERT HOLMES, taken on behalf
2  of the Plaintiff, before Lori Arias, a Certified
3  Shorthand Reporter, commencing at the hour of
4  10:00 a.m., Tuesday, January 28, 2020, at Courtyard by
5  Marriott, 1300 East Tahquitz Canyon Way, Palm Springs,
6  California.
7
8  APPEARANCES:
9  For the Plaintiff:
10     UNITED STATES SECURITIES AND EXCHANGE COMMISSION
11     BY:  NANCY A. BROWN, ESQ.
12          KATHERINE BROMBERG, ESQ.
13          JACK KAUFMAN (Appearing telephonically)
14     200 Vesey Street, Suite 400
15     New York, New York 10281
16     (212) 336-1023
17     brownn@sec.gov
18  For the Defendants MGT, Hugh Robert Holmes:
19     KRAMER LEVIN NAFTALIS & FRANKEL LLP
20     BY:  JOHN P. (SEAN) COFFEY, ESQ.
21     1177 Avenue of the Americas
22     New York, New York 10036
23     (212) 715-9456
24     scoffey@kramerlevin.com
25

2

```
 1  APPEARANCES (continued):
 2  For the Defendant Robert Ladd:
 3      COOLEY LLP
 4      BY:  RANDALL R. LEE, ESQ.
 5      1333 2nd Street, Suite 400
 6      Santa Monica, California 90401
 7      (310) 883-6485
 8      Randall.lee@cooley.com
 9
10  For the Defendants Michael Brauser and Grander
11  Holdings, Inc.:
12      RICHARD AND RICHARD, P.A.
13      BY:  MELISSA MACKIEWICZ, ESQ.
14      825 Brickell Bay Drive, 17th Floor
15      Miami, Florida 33131
16      (305) 374-6688
17      melissa@richardandrichard.com
18      (Appearing Telephonically)
19
20
21
22
23
24
25
```

3

1  everything we did by counsel.
2  BY MS. BROWN:
3     Q.   What's your understanding of the company's
4  obligation to disclose ownership by a group of
5  shareholders in any of its Form 10-Ks, 10-Qs, proxy
6  statements?
7          MR. COFFEY:  Objection to form.
8          THE WITNESS:  That's a very broad question.
9          My comment would be it was my personal
10 procedure, and my instructions to management, to always
11 err on the side of more disclosure rather than less.
12 So if there's any question whether something should be
13 disclosed, it was my practice to recommend that it be
14 disclosed.
15 BY MS. BROWN:
16    Q.   Did you ever have any discussions with
17 Mr. Ladd about a beneficial ownership table and a Form
18 10-K or a 10-Q during the period 2012 to 2016?
19    A.   I don't recall any.
20    Q.   Did you ever have any discussions with anybody
21 else at the company, either a board member or any other
22 officer of the company, about that topic?
23    A.   Not that I recall.
24    Q.   Okay.  So what happened with the dispute with
25 Iroquois?  How did it get resolved, if it did?

90

```
 1  BY MS. BROWN:
 2      Q.   What did you mean in this e-mail where you
 3  say, "We might not have always agreed on everything"?
 4      A.   I don't remember specifically, but generally,
 5  there were things that came up in terms of the company
 6  and the board that we had disagreements on.
 7      Q.   And nothing comes to mind?
 8      A.   No.
 9      Q.   So with respect to the draft press release
10  that Mr. Ladd forwarded to the board members for their
11  review about the McAfee transaction -- do you know what
12  I'm talking about?  We can look at it again, if you'd
13  like.
14      A.   I believe so.
15      Q.   Okay.  Well --
16           MR. COFFEY:  Exhibit 24.
17  BY MS. BROWN:
18      Q.   -- let's look at it again.  It's Exhibit 24.
19      A.   Okay.
20      Q.   Did the press release go out that way?
21           MR. LEE:  Objection --
22           MR. COFFEY:  Objection, foundation.
23           THE WITNESS:  I don't know.
24  BY MS. BROWN:
25      Q.   Did you have an awareness of what the press
```

156

```
 1  release looked like when it ultimately did go out?
 2      A.   I don't specifically recall the press release,
 3  but as a matter of procedure, I would have seen it.
 4      Q.   You would have seen it again?
 5      A.   I don't know "again."  I would have seen all
 6  press releases.
 7      Q.   Oh, you're saying once they're actually
 8  released, then you get a copy of the actual press
 9  release in its released form?
10      A.   No, that's not what I'm saying.
11      Q.   Okay.  Then I don't understand.
12      A.   I'm saying prior to the issuance of a press
13  release, the standard procedure was to circulate them
14  to board members.
15      Q.   Understood.  So I was asking about the final
16  press release that's actually issued.
17           My question was did you have an awareness of
18  what that press release said, the actual final released
19  press release?
20      A.   I'm sorry, I misunderstood your question.
21           I don't recall.  I don't know.
22           (Exhibit 26 marked for identification.)
23  BY MS. BROWN:
24      Q.   So, Mr. Holmes, I've put before you a document
25  we've marked as Exhibit 26, which on its face says it's
```

157

1       A.   Okay.
2       Q.   The second sentence of the second paragraph.
3  It starts, "Mr. McAfee" --
4       A.   Yes.
5       Q.   Okay.  So in the draft, it says, "Mr. McAfee,
6  the visionary pioneer of internet security, is actively
7  involved in the development of new measures to protect
8  individual freedoms and privacy."
9            Do you see that?
10      A.   I do.
11      Q.   Okay.  And then in the press release that is
12 attached to the filed 8-K, that sentence reads,
13 "Mr. McAfee, the visionary pioneer of internet
14 security, sold his antivirus company to Intel for
15 7.6 billion, and is actively involved in the
16 development of new measures to protect individual
17 freedoms and privacy."
18           Do you see that?
19      A.   I do.
20      Q.   And do you see the addition in the 8-K version
21 of the press release of the information that Mr. McAfee
22 sold his antivirus company to Intel for 7.6 billion?
23      A.   I do.
24      Q.   Did anyone bring that change to your attention
25 before the 8-K was filed?

160

```
 1      A.   Not that I recall.
 2      Q.   Did you have any discussions with anyone after
 3 the 8-K was filed about that addition?
 4      A.   Not that I recall.
 5      Q.   Do you know whether that phrase, that
 6 "Mr. McAfee sold his antivirus company to Intel for
 7 7.6 billion," is accurate?
 8      A.   Yes.
 9      Q.   You do know whether that's accurate?
10      A.   Yes.
11      Q.   Is it accurate?
12      A.   No.
13      Q.   And when did that first come to your attention
14 that it was inaccurate?
15      A.   During the proceedings that we're involved
16 with here today.  That's my recollection anyway.
17      Q.   Okay.  You approved the MGT 10-Q for the first
18 quarter of 2016, correct, as a member of the audit
19 committee?
20      A.   Yes.
21      Q.   You can put that away.
22           MR. COFFEY:  Are you going to need a break?
23           THE WITNESS:  No.
24           MR. COFFEY:  I do, but I'll hang on a little
25 bit longer.
```

161

```
 1  my recollection.
 2       Q.   That he had sold his company to Intel?
 3       A.   (No audible response.)
 4       Q.   Not that his company had been sold to Intel
 5  after he departed?
 6       A.   I sort of remember that he had sold his
 7  company.  That may or may not be accurate.
 8       Q.   Okay.  And do you remember when you had this
 9  understanding, when you had these discussions that led
10  to that view?
11       A.   No.
12       Q.   This doesn't say that he sold his company to
13  Intel.
14            Would you agree?  And I'm talking about
15  Exhibit 27.
16            MR. LEE:  Well, objection, the language speaks
17  for itself.
18            THE WITNESS:  No, it does not.
19  BY MS. BROWN:
20       Q.   So is that consistent with your current
21  understanding of his relationship to the company that
22  was sold to Intel?
23            MR. LEE:  Objection, relevance.
24            THE WITNESS:  I don't know.  I mean my
25  recollection is he sold his company to Intel.  This
```

164

1  says his company was acquired by Intel, but it doesn't
2  say who sold it, so I'm -- I guess I'm confused.  I
3  don't know.
4  BY MS. BROWN:
5      Q.   Okay.  And do you recall any discussions about
6  any of those descriptions of his relationship to the
7  company that ultimately got sold to Intel?
8      A.   No.
9      Q.   Do you recall having brought to the board's
10 attention some kind of investor awareness campaign in
11 May 2016?
12     A.   That I personally brought?
13     Q.   No.  That the board discussed an investment
14 awareness -- investor awareness campaign for MGT in
15 May 2016.
16     A.   I don't recall specifically at that time, no.
17     Q.   Do you recall generally?
18     A.   I recall generally discussions about investor
19 relations, investor relation employees, investor
20 relation -- outside investor relations people.  I
21 recall discussing the subject generally, yes.
22     Q.   In or about the time of the McAfee
23 transaction?
24     A.   No, not necessarily.  I don't recall the time
25 period.

165

```
 1      Q.   Are you familiar with hotstocked.com?
 2      A.   I'm certainly not familiar with it, but
 3   hotstocked.com sounds familiar.
 4      Q.   All right.  On Page 5 of 8, the second full
 5   paragraph down, the last two sentences read, "John
 6   McAfee sold his last company for 7.6 billion.  This is
 7   big big big."
 8           Okay.  Is that consistent --
 9      A.   Excuse me.
10      Q.   I'm sorry.  Sorry, sorry, sorry.
11      A.   I'm not sure --
12      Q.   Got it?
13      A.   Okay.
14      Q.   So that sentence, "John McAfee sold his last
15   company for 7.6 billion," is consistent with certainly
16   the draft press release -- the final press release --
17   sorry -- issued on May 9th, but inconsistent with the
18   10-Q description.
19           Is that right?
20      A.   I believe so.
21           MR. LEE:  Objection to form and relevance.
22   BY MS. BROWN:
23      Q.   All right.  So look at the disclaimer, which
24   is the material in teeny-weeny type, beginning on
25   Page 6 of 8, and the third paragraph down reads,
```

167

```
 1  those facts; whether it was the day that this was
 2  received, whether it was sometime after that, I don't
 3  recall.
 4       Q.   Okay.  So paragraph 32 makes a specific
 5  allegation that Ladd was the person who sold the shares
 6  in his father's account.
 7       A.   I guess that's the way you could interpret it,
 8  yes.
 9       Q.   All right.  And does that refresh your
10  recollection in any respect about conversations you may
11  have had with Mr. Ladd about that fact?
12       A.   The only conversation that I recall about this
13  fact was certainly subsequent to the lawsuit where Ladd
14  told me -- I think -- that all the gross proceeds for
15  him -- I don't know about his father or whatever they
16  were -- that he actually didn't make any money.
17            MR. LEE:  And I want to register an objection
18  to the characterization by both counsel and the witness
19  of these as facts.  These are simply allegations in a
20  draft Complaint.
21            MS. BROWN:  Fair enough.  Factual allegations.
22       Q.   Okay.  But he did not, to your recollection,
23  dispute the factual allegation in this Complaint that
24  he was the one who sold the shares in his father's
25  account, did he?
```

186

1  A.  I presume so.
2  Q.  Okay.  And what discussions did you have with
3  Mr. Ladd about those allegations in the Complaint?
4      MR. COFFEY:  Objection, foundation.  You're
5  assuming he read the Complaint.
6      THE WITNESS:  I think my recollection
7  generally is that -- and that may have been the first
8  time I learned about a sale of stock, it may not have
9  been -- but the sale of stock came up, and I think he
10 was incredulous that he had sold stock and not made any
11 money and that anybody even cared.  I mean if you can't
12 profit, where's the crime, I guess is sort of the
13 mindset, No. 1.
14      No. 2, as I understand the SEC's point of
15 view, their concern was the use of the term "group" in
16 an e-mail as it referred to Barry Honig, et al.,
17 period.
18      That's my general recollection of the
19 discussion that we had about the Complaint.
20 Q.  And was there only one discussion?
21 A.  Pardon me?
22 Q.  Was there only one discussion?
23 A.  I'm sure that it came up again and again, but
24 I don't have any specific recollection.
25 Q.  And did you read the Complaint?

190