**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :

    :

    **Plaintiff,**    :

    :    **18 Civ. 8175 (ER)**

    **– against –**    :

    :    **ECF CASE**

BARRY C. HONIG, ROBERT LADD,    :
ELLIOT MAZA, BRIAN KELLER,    :
JOHN H. FORD, GRQ CONSULTANTS, INC., and    :
HS CONTRARIAN INVESTMENTS, LLC,    :

    :

    **Defendants.**    :

-----------------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO
DEFENDANT LADD'S LOCAL CIVIL RULE 56.1(a) STATEMENT
PURSUANT TO LOCAL CIVIL RULE 56.1(b)**

Pursuant to Rule 56.1(b) of the Local Civil Rules of the Southern and Eastern Districts

of New York, Plaintiff Securities and Exchange Commission ("Commission" or "SEC")

respectfully submits this response to the Local Civil Rule 56.1(a) statement of Defendant

Robert Ladd, and in opposition to his motion for summary judgment ("Motion").  The

Commission also respectfully submits its own statement of additional material facts which

support the Commission's argument that a genuine issue of fact is to be tried precluding Ladd's

Motion. Those additional facts raise a genuine issue of fact as to (1) Honig' status as a member

of a "group" within the meaning of Section 13(d) of the Securities Exchange Act of 1934

("Exchange Act") together with entities of Michael Brauser, Mark Groussman, John Stetson

and John O'Rourke in connection with their 2015 investment in MGT Capital Investments, Inc.

("MGT"); (2) whether Ladd knew or recklessly disregarded facts that would have compelled

him to disclose their group status in certain MGT filings, in satisfaction of MGT's obligations

under Regulation S-K; and (3) whether it was reasonable for Ladd to rely on a single denial

from Honig's lawyer, Kesner, in determining that Honig et al. were not acting as a group.[1]

*      *      *

## I.   Commission Responses to Ladd's 56.1 Statement

1.   Prior to Ladd waiving his (and MGT Capital Investments, Inc.'s or "MGT"'s) attorney client privilege in compliance with this Court's Order, the SEC took five depositions. Two individuals, co-defendants Barry Honig and Drew Ciccarelli, asserted their rights under the Fifth Amendment of the Constitution, resulting in no evidence relevant to these proceedings. (Excerpts from the depositions of Barry Honig and Drew Ciccarelli). Adam Ford Declaration ("Ford Decl.") Exhibits 1 and 2.

**SEC Response:**   Disputed.  The Commission did not seek to depose either Honig or

Ciccarelli.  It is undisputed that both Honig and Ciccarelli asserted their Fifth Amendment rights

to refuse to testify against themselves.

2.   The SEC also deposed Michael Onghai (at the time, Mr. Onghai was an MGT Capital Investments, Inc. independent director), Hugh Holmes (at the time, Mr. Holmes was the MGT Capital Investments, Inc. Chairman of the Board), and Joshua Silverman (at the time, Mr. Silverman was a MGT former board member). None of these three witnesses had any firsthand knowledge or were expected to have any involvement in the determination of whether Honig and others were required to file as a Rule 13(d)(3) group, nor did any of these individuals have any information related to the May 9, 2016 Press Release, or Ladd's Form 4 or Form 144. Ford Decl. Exhibits 3, 4,and 5.

---

[1]   The Commission opposes Ladd's Motion in its entirety.  Since the Commission also moves for summary judgment on its fraud claims against Ladd for his false May 2016 press release, his false May 31, 2016 Form 4, and the false Form 144 he submitted to TD Ameritrade on May 25, 2016 (as well as his false new account form that he submitted to E*Trade on November 22, 2015) —statements as to which Ladd also moves for summary judgment—the Commission has addressed those undisputed material facts in its own Local Rule 56.1 statement in support of its motion for summary judgment.

The Commission provides these responses for purposes of Ladd's Motion only and not for all purposes in this action.  To the extent the Commission does not dispute a particular fact, the Commission does not thereby concede that any such undisputed fact constitutes a material fact, that the cited evidence is relevant, or that the cited evidence would be admissible at trial. To the extent the Commission does not dispute the fact that a witness testified to a particular fact or assertion, or included a particular statement in a declaration, the Commission does not thereby concede that the witness is credible on that topic or that the statement is accurate or admissible.

**SEC Response:**      Disputed.  Defendant has attached no evidence that Onghai, Holmes and Silverman lacked firsthand knowledge about any topic, that any or all of them "were [not] expected to have any involvement in the determination of whether Honig and others were required to file as a Rule 13(d)(3) group," or that none of them has "any information related to the May 9, 2016 Press Release, or Ladd's Form 4 or Form 144."  The support Defendant offers is merely the cover pages of those witnesses' deposition transcripts and that does not satisfy "citing to particular parts of materials in the record" that Rule 56(c)(1)(A) requires.  In fact, and for example, Holmes, MGT's Chairman, testified about disclosure of the group issue that his instruction to management was "to always err on the side of more disclosure rather than less.  So if there's any question whether something should be disclosed, it was my practice to recommend that it be disclosed."  (Declaration of Nancy A. Brown, executed January 31, 2023 ("Brown Decl."), Ex. WWW (Holmes Tr. 90:3-14).)  Holmes also testified that "as a matter of procedure," he "would have seen all press releases."  (*Id.*, 156:25-157:6.)  But in connection with the May 9, 2016 press release that Ladd drafted, Holmes recalled no one bringing the change from the draft to the final (in which the press release falsely claimed that McAfee sold his company to Intel for $7.6 billion) to his attention.  (*Id.*, 160:24-161:12.)  Holmes, who reviewed MGT's May 23, 2015 Form 10-Q, agreed that the disclosure about McAfee "says his company was acquired by Intel, but it doesn't say who sold it. . ." (*Id.*, 164:20-165:3.)  He agreed that the MGT May 9, 2016 press release, and the MGT *Stock Beast* article that MGT paid for made the same claim about McAfee selling his company to Intel for $7.6 billion.  (*Id.*, 167:14-20.)  When Holmes learned that Ladd had sold MGT stock after the May 9, 2016 press release was released, Ladd told him that he had lost money on those trades. (*Id.*, 186:9-16; 190:2-19.)

3.  SRF attorney Perlman testified that, "I think we – usually, we – you know, we'd talk to investors about their ownership in – and I don't really do a 13(d) analysis. I mean it's really up to the investors to tell us how much they own." (Excerpt from deposition of Avital Perlman). Ford. Decl. Exhibit 6.

**SEC Response.**         Undisputed that Perlman so testified.  As Perlman further testified, in her more than 15 years of practice, she had never considered the requirements of Section 13(d) as it relates to disclosure by an issuer of the group status of any group of investors.  (Brown Decl., Ex. N (Perlman Tr. 9:7-9:9; 62:14-64:3).)  Nor has she ever worked on a transaction where those issues were considered, even by someone else.  (*Id.*, 63:1-4.)  And in representing investors, she has never counseled a client about whether or not he had to check the group box on a Schedule 13D or 13G, or even considered the issue.  (*Id.*, 63:9-16.)

4.  SRF Attorney Marcus testified that, "There was – if you didn't know the reasons, you would assume that all those investors were acting as a group. And since we had asked the question and been told the answer was no, I don't think we ever had any further discussions on it actually." (Excerpt from deposition of Arthur Marcus). Ford Decl. Exhibit 8.

**SEC Response.**         Undisputed that Mr. Marcus so testified about his 2012 question to Harvey Kesner about Honig and his co-investors' group status.

5.  SRF was counsel for both Honig and MGT in this transaction. (SRF Engagement letter). Ford Decl. Exhibit 52.

**SEC Response:**         Disputed.  Undisputed that Ladd believed that Kesner and Tara Guarneri-Ferrara from the law firm, Sichenzia Ross Ference ("SRF"), represented Honig and that Jay Kaplowitz and Arthur Marcus from SRF represented MGT in the 2012 transaction, and that Ladd understood that conflicts existed in that representation.  Brown Decl., Ex. M (Ladd Tr. 354:1-3; 359:12-17; 368:3-8; 489:7-12; *id.*, Ex. I (Ladd October 17, 2012 email to Kaplowitz noting that the documents for the 2012 transaction "were prepared by the lead investor" [MGT-SEC-2022-006042]); *id.*, Ex. PPP (October 14, 2012 exchange between Ladd and Kaplowitz and Marcus in

which Ladd asks "[w]ho is Tara" [MGT-SEC-2022-005864]); *id.*, Ex. QQQ (Kaplowitz October

14, 2012 email to Ladd and Marcus, responding that Tara is the "associate working with

h[arvey]." [MGT-SEC-2022-005868]); *id.*, Ex. III (Conflict Waiver Letter, dated October 11,

2012).)  It is also undisputed that Ladd believed that Kesner from SRF represented Honig in the

2015 transaction. (*Id.*, Ex. M (Ladd Tr. 489:7-12).) Kaplowitz, Avital Perlman and Joan Wu

understood that they were representing MGT in the 2015 financing and, in the case of Kaplowitz

and Wu, the 2016 D-Vasive acquisition. (*Id.*, Ex. JJJ (Kaplowitz Tr. 25:3-6; 33:24-34:3); *id.*, Ex.

N (Perlman Tr. 16:23-25; 70:8-10); *id.*, Ex. RRR (Wu Tr. 33:14-22).)  Ladd understood conflicts

existed in that 2015/2016 representation. (*Id.*, Ex. KKK (Engagement Letter, dated December 4,

2015 [SEC-Sichenzia-E-0014767]).)  Also undisputed that Kaplowitz and Kesner testified that

SRF policy prohibited the firm's simultaneous representation of clients on the opposite side of a

transaction.  (*Id.*, Ex. JJJ (Kaplowitz Tr. 131:17-24; *id.*, Ex. L (Kesner Tr. 84:20-84:24).)

Disputed that Kaplowitz, Marcus, Perlman or Wu represented Honig.  Disputed that Kesner

represented MGT.  (*Id.*, Ex. YYY (Kesner pleading at ¶ 14 in which he asserts "Kesner has never

served as counsel for MGT.")

> 6.  In October 2015, MGT entered into separate stock subscription agreements with
> multiple accredited investors for the sale of common stock and warrants in an
> aggregate amount of $700,000. (October 9, 2015 Form 8-K). Ford Decl. Exhibit 12.

**SEC Response:**        Undisputed that MGT entered into stock subscription agreements with

seven investors in its 2015 financing:  a Honig entity, a Brauser entity, a Groussman entity, a

Stetson entity, an O'Rourke entity, LFR Trust LLC, and Iroquois Master Fund, Ltd. ("Iroquois").

(Brown Decl., Ex. II (Stetson October 7, 2015 email to Ladd with final allocations); Declaration

of Ricky Tong, executed January 19, 2023 ("Tong Decl."), Ex. O (MGT November 6, 2015

Form S-1, at 44).)

7. On October 9, 2015, MGT issued a Form 8-K with a press release describing the terms of the financing and attaching forms of the relevant agreements. The Form 8-K disclosed that MGT had "entered into separate subscription agreements … with accredited investors … relating to the issuance and sale of $700,000 of units," and the attached press release disclosed that the "*investment was led by Barry Honig*, a private investor and a specialist in corporate finance." (October 9, 2015 Form 8-K). Ford Decl. Exhibit 12 at Ex. 99.1.

**SEC Response:**        Undisputed that MGT furnished a Form 8-K on October 9, 2015 (which attached forms of some of the relevant documentation of the transaction), and included a press release describing the terms of the financing.  In material part relating to the participation of Honig, the press release stated:  "The investment was led by Barry Honig, a private investor and a specialist in corporate finance.  Mr. Honig . . . was a former founder and co-Chairman of interClick, which was acquired by Yahoo in 2011 for $280 million."  (Brown Decl., Ex. NN (MGT October 9, 2015 Form 8-K, Ex. 99.1 (press release)).)

8. Weeks later, MGT filed a Form S-1 Registration Statement, which disclosed to the public a list of the investors and set forth "certain information regarding the selling stockholders and the shares of [MGT's] common stock offered by them in this prospectus." (November 6, 2015 Form S-1). Ford Decl. Exhibit 13.

**SEC Response:**        Undisputed that the MGT November 6, 2015 Form S-1 made those disclosures.  Disputed that the Form S-1 made the required disclosures about the status of the selling shareholders (GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ Roth"), Melechdavid. Inc. ("Melechdavid"), Stetson Capital Investments, Inc. ("SCI"), ATG Capital LLC ("ATG") and Grander Holdings, Inc. 401K ("Grander")) as a group with Honig under Section 13(d)(3) of the Exchange Act, or that the share ownership of GRQ Roth, Honig, Grander, Melechdavid, SCI and ATG was properly aggregated and presented in that filing as required by Exchange Act Rule 13d-5(b)(1) and Regulation S-K.  (Tong Decl., Ex. O, at 42, 44.)

9. On May 9, 2016, MGT announced that it had entered into an agreement to acquire certain technology and assets relating to anti-spy software from a company named D-Vasive Inc. and to appoint John McAfee as its Executive Chairman and CEO. MGT

also announced that it had entered into a consulting agreement with Future Tense
Secure Systems Inc., a technology incubator. The agreements were fully disclosed in
a Form 8-K filing. (May 9, 2016 Form 8-K). Ford Decl. Exhibit 14.

**SEC Response:**        Undisputed that MGT announced its agreement to acquire D-Vasive, its

appointment of John McAfee as its Executive Chairman, and that this transaction was disclosed

in an MGT Form 8-K furnished to the Commission on May 9, 2016.  Disputed that the press

release announcing the agreement and appointment, and attached to the 8-K, accurately disclosed

the facts in claiming that McAfee "sold his company to Intel for $7.6 billion." (Brown Decl. Ex.

M (Ladd Tr.  275:7-19).)

10. To publicize the transaction, MGT paid a stock promotion website, StockBeast.com,
to publish a newsletter about the McAfee transaction. The newsletter disclosed that
MGT had paid for its publication. A statement in the press release read that Mr.
McAfee had "sold his anti-virus company to Intel for $7.6 billion." (Stock Beast
Report of MGT Capital Investments, Inc.). Ford Decl. Exhibit 15.

**SEC Response:**         Undisputed that the StockBeast.com newsletter made the same false

claim about McAfee as MGT's May 9, 2016 press release had, and did so in its first paragraph.

(Brown Decl., Ex. VV ("NYSE:  MGT Beastmode engaged – John McAfee driving the Bus,"

*Stock Beast Report*, May 9, 2016).)

11. In August 2010, Intel Corporation purchased McAfee Inc., the company founded by
Mr. McAfee, for $7.68 billion. (August 19, 2010 Form 8-K). Ford Decl. Exhibit 16 at
at Ex. 99.1.

**SEC Response:**        Disputed that the attached Intel Form 8-K and press release say anything

about John McAfee's relationship to McAfee, the company.  The phrase "the company founded

by Mr. McAfee" is not supported by this Exhibit as required by Rule 56(c)(1)(A).

12. Prior to MGT's press release including the phraseology at issue, numerous other
news organizations, including but not limited to CNN, Newsweek, Business Insider,
and IB Times had also publicized the same exact "false statement" that MGT
included in its press release that "McAfee sold his company to Intel in 2010 for
nearly $7.7 billion." Ford Decl. Exhibits 17, 18, 19.

**SEC Response:**      Undisputed that in November 2012, the *IB Times* published an article about McAfee, titled "John McAfee, Anti-Virus Creator, Wanted for Murder of Gregory Faull," that contained the same false statement as contained in MGT's May 9, 2016 press release; that on September 9, 2015, *Newsweek* published an article titled "Antivirus Pioneer John McAfee is Running for U.S. President," that contained the same false statement as contained in MGT's May 9, 2016 press release; and that on September 14, 2015, *CNN* published an article titled "Why John McAfee believes he should be president," that also contained the same false statement published by MGT in its May 9, 2016 press release.

13. On November 12, 2012, Nadine Deninno from IBTimes published an article, titled, "*John McAfee, Anti-Virus Creator, Wanted For Murder Of Gregory Faull.*" When discussing McAfee's background, the article states, "**McAfee sold his company to Intel in 2010 for nearly $7.7 billion** and had been living in Belize where he reportedly engaged in 'intensive use of psychosis-inducing hallucinogens.'" Ford Decl. Exhibit 17.

**SEC Response:**      Undisputed.

14. On September 9, 2015, Newsweek published an article by Nick Winchester titled, "*Antivirus Pioneer John McAfee is Running for U.S. President.*" In the article it states, "After escaping an abusive upbringing, he went on to found McAfee Associates, the antivirus software technology company **that he sold to Intel in 2010 for $7.68 billion**." Ford Decl. Exhibit 18.

**SEC Response:**      Undisputed.

15. On September 14, 2015, CNN Business published an article, written by Laurie Segall, titled, "*Why John McAfee believes he should be president.*" The article states, "**McAfee sold his company to Intel in 2010**." Ford Decl. Exhibit 19.

**SEC Response:**      Undisputed.

16. On May 23, 2016, MGT filed a Form 10-Q clarifying that Mr. McAfee "founded [McAfee Associates] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010." (Form 10-Q). Ford Decl. Exhibit 20.

**SEC Response:**      Undisputed that MGT's May 23, 2016 Form 10-Q made that disclosure,

but disputed that it was at all clarifying as to the falsity in the May 9, 2016 MGT press release, or

that it disclosed McAfee's 16-year absence from McAfee Associates at the time that company

was sold to Intel.

> 17. That McAfee was no longer at the company when it was sold to Intel had long been a matter of public record, as his departure had been disclosed in McAfee Associates' SEC filings. (Form 8-K filed by McAfee Associates, Inc. on January 11, 1994). Ford Decl. Exhibit 21 at 5; (Amendment No. 1 to Form S-4 filed by McAfee Associates, Inc. on July 18, 1995). Ford Decl. Exhibit 22 at 89.

**SEC Response:**      Disputed that fact "[t]hat McAfee was no longer at the company when it

was sold to Intel" had "long been a matter of public record."  *See* ¶¶ 12, 13, 14, 15, *supra.  See*

*also* DE 148 (Declaration of Randall Lee in Support of Ladd's First Motion to Dismiss), Ex. Y

(*Business Insider*, "John McAfee and Intel settle their lawsuits," July 6, 2017 ("[McAfee]

retained the right in other contexts to use his name . . ., including with regard to his role at

McAfee Associates, which he sold to Intel for $7.7 billion in 2010."; Ex. Z (*JD Journal*, "John

McAfee and Intel Settle Trademark Dispute," July 6, 2017 ("McAfee had sold Intel his company

in 2010 for $7.7 billion . . .").)

> 18. On May 9, 2016, MGT stock closed at $0.49. On May 17, 2016, MGT stock closed at $4.15. On July 7, 2016, MGT stock closed at $4.37. At the end of September 2016, more than four months after MGT announced its partnership with McAfee, MGT stock price remained over four times higher than its closing price on the day the press release was published. (Table prepared by Yahoo! Finance showing daily opening, closing, high, and low prices and daily volume for the stock of MGT Capital Investments, Inc.). Ford Decl. Exhibit 23.

**SEC Response:**      Undisputed that MGT's stock price was as reflected on Yahoo! during the

referenced periods.  Yet while stock price information can be one aspect of a materiality inquiry,

it is not relevant here, where the challenged misrepresentation has not been corrected and the

stock does not trade in an efficient market.  Here, MGT's May 23, 2016 Form 10-Q did not

correct the materially misleading May 9, 2016 press release, noting only that McAfee's company

was bought by Intel in 2010, with no detail about McAfee's long departure from the company prior to the sale.  (Brown Decl., Ex. XXX (MGT May 23, 2016 Form 10-Q), at 6.)  It also gave investors no notice of what had been false in the press release.  (*Id.*, Ex. M (Ladd Tr. 303:18-25; 304:4-7.)  In addition, stock price movement is only relevant where the stock is trading in an efficient market.  There is no evidence that MGT was an efficiently traded stock at any time.

19. MGT's counsel, the law firm of Sichenzia, Ross, and Ference, represented Barry Honig "and or his affiliates and related entities …, as well as other potential groups of investors who have a pre-existing relationship with Mr. Honig and of which Mr. Honig may be deemed to be representative." MGT "specifically acknowledge that [SRF] has informed you that we have represented Barry Honig, Michael Brauser, John Stetson, John O'Rourke, Mark Groussman … their respective affiliates … and SRF may represent others who are investors in [MGT] …" (SRF Consent Letter). Ford Decl. Exhibit 24.

**SEC Response:**        Undisputed that Kesner prepared and Kaplowitz forwarded to Ladd a "Honig Conflict Waiver" letter on October 11, 2012 that contained the disclosure quoted in the first sentence of Paragraph 19.  Disputed that this conflict waiver contained any of the quoted disclosure in the second sentence.  *See* Brown Decl., Ex. III (SRF's October 11, 2012 "Honig Conflict Waiver").)

20. Avital Perlman testified:

Q.  So let's start with MGT. Did you understand when you were working on MGT that 13D, a 13D analysis, what would be relevant to it would be the history of the investors you were considering a group and their co-investments together?
A.  No.
Q.  Do you have that understanding now?
A.  I don't know. I mean, I think it's a complicated issue. I don't know if it's because people invested in the same company before means they're a group. I don't know if I could say I have it.
Q.  Right. My question was, is it relevant to the analysis, the fact that they had been co-investors in the past?
A.  I mean, I think it can be one of many factors. I don't think it's really that relevant. I think that all – investors invest in companies together. I don't think that makes them a group.

Ford Decl. Exhibit 6.

**SEC Response:**     Undisputed that Perlman so testified.  As Perlman further testified, in all her years of practice, she had never considered the requirements of Section 13(d), either as it relates to disclosure by investors or issuers.  (Brown Decl. Ex. N (Perlman Tr. 9:7-9:9; 62:14-64:3).)

21. SRF attorney Kesner testified:

Q.   And your understanding was that he was a
co-investor with Mr. Honig on certain transactions; is that right?
A.   I don't -- I wouldn't use the word
"co-investor."  I would use the word he was a private investor who had an opportunity to look at certain transactions in which Mr. Honig might have been an investor with some other people as well.

Ford Decl. Exhibit 9.

**SEC Response:**     Undisputed that Kesner so testified.

22. SRF attorney Marcus testified:

Q.   And had you known at the time that Mr. Honig had been involved in buying and selling stock of other issuers together with the same group or a similar group of investors, would that have affected your analysis under 13(d) for the 5 percent requirement?
A.   I'm not sure because these deals all have similar investors.
Q.   Well would it have been something you would have wanted to take into account in analyzing the 13(d) group issue?
A.   Perhaps. Just to see if there was a pattern of all these investors investing together. But again, I don't know how much I would have taken into it because you know, even today half of these deals all still have the same investors in them.
Q.   But in this transaction, did you understand that Mr. Honig was investing together with others?
A.   No

Ford Decl. Exhibit 8.

**SEC Response:**     Undisputed that Marcus so testified.

Attorney Marcus further testified:

Q.   Is the fact that they were involved in the 2012 financing, would that affect your view as to whether now, in 2015, they're involved in this financing, Mr. Honig might be acting as a group for Section 13(d) purposes with others? Is that something you would have wanted to know?

A.  Not particularly. Not by itself certainly.

Q.  But would that at least be a factor you would want to know? That there was the same investors involved in different transactions?

A.  Not particularly.

Q.  Well would you want to – would that lead you to ask other questions?

A.  Not particularly, no.

Ford Decl. Exhibit 8.

**SEC Response:**          Undisputed that Marcus so testified.

23.  SRF attorney Kaplowitz testified Attorney Jay Kaplowitz testified that more than just acquiring shares together was required to form a 13(d) Group—an agreement to vote together was also required:

Q.  So just so I'm clear on your answer and I'm not trying to -- none of this is any attempt to put any words in your mouth, it could be sufficient that the fact alone is that more than one person has decided to acquire shares together, that could be, in certain circumstances, sufficient to trigger the group 5 percent disclosure requirement?

A.  So you're saying it could be that that's certain people agreed among themselves to acquire shares together?  Is that what you're asking?

Q.  Yes. And that's all you know. What I'm asking is are there circumstances where that could be sufficient, in your opinion, to trigger the disclosure requirement if together their ownership adds up to over 5 percent?

A.  I think I'd have to know something more than that.  I think I'd have to know what their relationships were; if they had any prior understanding.

Q.  And what do you mean by that?

A.  If they agreed to vote together.

Ford Decl. Exhibit 7.

**SEC Response:**          Undisputed that Kaplowitz so testified.  He also testified that he would have considered certain facts that he did not know in his group analysis had he known them, including that Honig, Stetson and O'Rourke worked out of the same office and had made prior investments together.  (Brown Decl., Ex. JJJ (Kaplowitz Tr. 62:14-21; 64:20-65:8; 66:6-67:6).)

24.  Harvey Kesner, who represented not just MGT, but also Barry Honig and the Honig Group, and who had a relationship with MGT investors prior to 2012 and through 2015, testified on the importance of needing an agreement to make "decisions collectively" qualify as a Section 13(d) "group."

Q.  How would you make a determination of that nature, whether a group of investors was acting as a group under Section 13(d)?

A.  I would rely on the SEC's historical statements, pronouncements, rules, and regulations regarding what constitutes a group.

Q.  Would you ask questions of the investors?

A.  Not necessarily.

Q.  But you might?

A.  Not necessarily.

Q.  Okay.  Under what circumstances would you not ask investors questions?

A.  Well, I think -- I think context is all important in responding to your question, and the group activity that triggers reporting is activity that's more attuned to after the point in time that they're investors, not when they're thinking about becoming investors. The literature and practice, of course, suggests that when five people choose to participate in an investment together, that is not indicative of a group. It's whether they're exercising -- choosing to exercise voting or – or investment -- making investment type of decisions collectively. Again, you know, let's go back to the example of an underwritten offering.  You have 200 investors. They're all investing on the exact same terms, at the exact same time, exact same instrument, exact same company, share, and counsel.  I don't think anyone would argue that makes a group. And I think that same principle would apply when 5, 6, 7, 10, 20 investors are coming together in a private placement to purchase securities in a company. It's what they do when they have that instrument, whether it's joining voting together, or electing to dispose, or -- or exit the transaction together that implicates whether they're a group for reporting purposes. And that's on their lap, not on my lap.  So I generally don't – wouldn't ask that question at this point in time regarding what – you know, what your question is directed to.

Ford Decl. Exhibit 9.

**SEC Response:**        Undisputed that Kesner so testified.  Disputed that Kesner represented MGT in any of its transactions with Honig and his co-investors.  *See* Response to Paragraph 5, *supra*.  *See also* Brown Decl., Ex. JJJ (Kaplowitz Tr. 22:8-22:13; 23:10-22; 87:19-88:3) (Kaplowitz believed Kesner represented and was loyal to Honig); *id.*, Ex. YYY (Kesner asserting in a different lawsuit that he had never represented MGT).).  Disputed that Ladd believed that Kesner represented MGT. (Brown Decl., Ex. M (Ladd Tr. 269:8-25).)

25.  SRF attorney Kesner testified that, "The going into the transaction isn't determinative for what is the group. It's the acting in concert for purposes of voting or disposition of securities that largely is the arbiter, based upon the literature, of what is a group."

Q. So if two investors decided to invest, and hold, and dispose of their shares together, but their agreement said that they were not acting together, that would be enough for

you to determine those two investors were not acting as a group?

A.  I'll – I'll repeat what I said before, maybe with some different words to help everyone understand. The going into the transaction isn't determinative for what is the group.  It's the acting in concert for purposes of voting or disposition of securities that largely is the arbiter, based upon the literature, of what is a group.

Ford Decl. Exhibit 9.

**SEC Response:**        Undisputed that Kesner so testified.


26. Attorney Perlman testified:

Q.  So, would information concerning Honig, Stetson, and O'Rourke's sales of stock in MGT been relevant to you assessing MGT's disclosures obligations under Section 13(d)?

A.  Well, I don't think MGT has a disclosure obligation under 13(d). It's my understanding the investor has to file the 13(d).

Q.  So, from your perspective, MGT has no Obligation under 13(d) to disclose whether its investors May be acting as a group?

A.  I don't think MGT has to file the Form 13D

Q.  Oh, sure. But with respect to, for example, the 5 percent beneficial ownership chart that appears in various filings that a company files, is a 13(d) analysis important to that disclosure?

A.  I hope so. I think we – usually, we – you know, we'd talk to investors about their ownership in – and I don't really do a 13(d) analysis. I mean it's really up to the investors to tell us how much they own.

Ford Decl. Exhibit 6.

**SEC Response:**        Undisputed that Perlman so testified.  As Perlman further testified, in all of

her years of practice, she had never considered the requirements of Section 13(d), either as it

relates to disclosure by investors or issuers.  (Brown Decl., Ex. N (Perlman Tr. 9:7-9:9; 62:14-

64:3).)

27. Attorney Marcus testified:

Q.  And did you come to the same conclusion that Mr. Kesner came to that Mr. Honig and others were not acting as a group for 13(d) purposes?

A.  I didn't challenge that at all.

Q.  And why was that?

A.  There was – if you didn't know the reasons, you would assume that all those investors were acting as a group. And since we had asked the question and been told the answer was no, I don't think we ever had any further discussions on it actually.

Ford Decl. Exhibit 8.

**SEC Response:**     Undisputed that Marcus so testified.

28. Attorney Guarneri-Ferrara testified:

Q.  So in preparing a Schedule 13(g) for Honig, it may be that you were actually preparing it for the issuer
A. No, no, no. I just mean that we would prepare filings related to the issuer for either Section 16 filings for directors or officers or 13 -- or for shareholders that had to file.

Ford Decl. Exhibit 11.

**SEC Response:**     Undisputed that Guarneri-Ferrara so testified.

29. Honig's lawyer, who made that filing, testified she believed it was appropriate at that time. Tara Guarneri-Ferrara testified:

Q.  Did 13 (d) ever come up in any of those transactions that you worked on for Mr. Barry Honig?
A.  Well, they certainly made 13 (g) and (d) filings where appropriate.

…
Q.  Sure. In connection with working on transactions that involved Mr. Barry Honig, do you recall there being issues in connection with filing 13 (d) s or 13 (g) s on his behalf?
A.  I don't recall any issues.
Q.  Did you ever have a situation where you had a discussion with anyone at Sichenzia about the group status of Mr. Honig?
A.  I don't recall having a discussion, no.

Ford Decl. Exhibit 11.

**SEC Response:**     Undisputed that Guarneri-Ferrara so testified.  She also testified, that, like

Perlman, she never performed a group analysis for Section 13(d) purposes while she was employed as

an associate at SRF.  (Brown Decl., Ex. O (Guarneri-Ferrara Tr. 47:4-9).)

30. On November 29, 2015, Ladd sent an email to Honig, writing, "In addition, your group's 25 cent warrants could bring in an additional $1.4 million once the S-1 goes Effective," and, "As for the cap table, we have 17.2 million common shares outstanding, including *your group's* 2.8 million." Two minutes later, Honig responded, "I am not part of a group. I invested individually." Seconds later, Ladd replied, "I stand corrected." (November 29, 2015 email). Ford Decl. Exhibit 25.

**SEC Response:**          Undisputed.

31. On October 18, 2012, Honig sent Kesner "the allocation for MGT []." Marcus wrote to Kesner, "Are they acting as a group," to which Kesner replied, "No!" (October 18, 2012 email). Ford Decl. Exhibit 26.

**SEC Response:**          Undisputed.

32. During his 2022 deposition, when the SEC showed Marcus this email and asked, "With respect to the 2012 MGT financing, [] did you or anyone else at Sichenzia discuss with anyone at MGT whether Mr. Honig and any of the other investors in the financing were acting as a group for Section 13(d) purposes," he responded plainly, "Mr. Kaplowitz asked me to ask Mr. Kesner if they were acting as a group." Ford Decl. Exhibit 8.

**SEC Response:**          Undisputed that Marcus so testified.  He also testified that he never

discussed with Kaplowitz why he wanted him to ask the question, (Brown Decl., Ex. OOO

(Marucs Tr. 29:6-8)), never questioned Kesner's response (*id.*, at 54:6-15), and did no

independent analysis of the group question, other than reviewing the investors' own

representations in the stock purchase agreements that they were acting independently.  (*Id.*, at

53:15-54:1.)  Kaplowitz recalled no specific conversation in connection with either the 2012 or

2015 transaction about the topic.  (*Id.*, Ex. JJJ at 62:7-62:13; 45:8-46:6.)

33. In follow up, the SEC inquired if Marcus had "reason to believe that Mr. Honig might be acting as a group with other investors." He responded, "No," further explaining that "Mr. Kaplowitz asked me to ask it, so I asked it." Marcus testified that his understanding of why he was asking Mr. Kesner that question was "[b]ecause Mr. Kesner had a familiarity with these – with some of these investors having had represented them." Ford Decl. Exhibit 8.

**SEC Response:**          Undisputed that Marcus so testified.  *See* Response to Paragraph 32,

*supra*, for further relevant Marcus testimony on this topic.

34. Marcus testified that he relayed this information back to Kaplowitz, Ladd's attorney in the 2012 MGT financing: "It's a long time ago, but I have a memory of Jay asking me and him saying, oh, what did he say, and I said he said no." Ford Decl. Exhibit 8.

**SEC Response:**          Undisputed that Marcus so testified.

35. When the SEC asked Mr. Kaplowitz during his 2022 deposition, did he "ever consider -- with respect to the 5 percent beneficial owners listed here, [] whether [] any other of the selling shareholders cumulatively constituted a group that held more than 5 percent or that should have been included along with Barry Honig as a group under 13D in this listing of 5 percent shareholders of MGT," although he could not recall specifics, he responded: "I don't recall what I did or didn't consider at the time. It was quite a while ago. I'm sure that we discussed it and did a good job, but I don't recall what we considered." Ford Decl. Exhibit 7.

**SEC Response:**      Undisputed that Kaplowitz so testified.  Kaplowitz also testified that there were several facts about Honig and his co-investors that he could not recall knowing.  (Brown Decl., Ex. JJJ (Kaplowitz Tr. 62:14-21; 64:20-65:8; 66:6-67:6 (Honig, Stetson and O'Rourke shared an office and had previously co-invested); *id.*, at 79:3-6 (Ladd distrusted Honig); *id.* at 83:8-84:13 (Ladd had been told by an investor that Honig was a recidivist stock promoter); *id.*, at 92:20-25 (Honig had paid John Ford to write a false promotional piece in April 2013); *id.*, at 100:24-101:5; 102:2-105:5 (Honig had told Ladd to pay a stock promoter to publish a piece about MGT in 2016, and that Honig had sold MGT shares after the piece pushed the stock higher)).)

36. Kaplowitz testified he knew about the payment for promotional materials. Ford Decl. Exhibit 7.

**SEC Response:**      Disputed.  Kaplowitz testified that he knew that Ladd had retained an Investor Relations firm to which MGT paid a fee, but did not recall knowing that Honig had told Ladd to pay a stock promoter to publish a piece about MGT in February 2016, and that Honig had sold MGT shares after the piece pushed the stock higher.  (Brown Decl., JJJ (Kaplowitz Tr.  100:6-11; 100:20-101:5).)  He also testified that he never heard that Honig had paid John Ford to write a promotional piece about MGT.  (*Id.*, at 92:20-25.)

37. Both Perlman and Kesner testified that they knew Honig and the others shared offices, but that was clearly not a significant factor in the 13(d) Group analysis. Perlman testified:

Q. And did you write opinion letters for those entities or Mr. Stetson concerning the

removal of restricted legends on shares owned by Mr. Stetson or these entities?

A.  I did.

Q.  And were you aware when you were writing these opinions that Mr. Stetson or his entities were co-investors with Mr. Honig in the entities you were writing opinions about?

A.  Yes. I don't remember which issuers they were co-investing in, but yes.

Q.  Who is John O'Rourke?

A.  He's also another investor.

Q.  And did he have any relationship with Barry Honig?

A.  My understanding is they invested in a few of the same transactions –

Q.  And did you have an understanding of whether he, too, worked out of the same offices as Barry Honig?

A.  I believe he did.

Q.  At any time in your work for MGT and in your communications with Ladd, did you ever disclose to him the work you had done for Honig, Brauser, Groussman, Stetson, O'Rourke?

A.  Not to my recollection.

Q.  Why not?

A.  It never came up. To my recollection, it never came up.

Q.  Did you not consider it relevant to MGT matters that were working on?

A.  No. I did not consider it relevant.

Ford Decl. Exhibit 6.

**SEC Response:**          Undisputed that Perlman so testified.  *See* Response to Paragraph 3, *supra*, for

further relevant Perlman testimony on this topic.

     38.  Kesner testified:

Q.  All right.  In the course of your work either for issuers or directly from Mr. Honig, but with respect to issuers in which Mr. Honig was investing, can you tell us how many of those transactions also involved investments by John Stetson?

A.  Are you speaking about D-Vasive now or you went broader?

Q.  I went way broad.

A.  Way broad.  No.  I couldn't tell you how many.

Q.  Who is John Stetson?

A.  John Stetson is a -- an individual investor, business manager of sorts who served as an assistant, I believe, first for Mr. Brauser and then as an assistant to Mr. Honig.

Q.  And did he work, to your understanding, out of Mr. Honig's offices?

A.  He did.

Q.  Okay.

A.  Not always there.  I think in the point in time that he worked with Mr. Brauser, it was Mr. Brauser's office.  Then there was a point in time where I had seen him in Mr. Frost's suite at 4400 Biscayne Boulevard.  They all had offices in that building for a period of time as well.  And then Mr. Honig had another office in Boca Raton where

Mr. Stetson had his main office as well.

Q.   So in the period from of 2012 to 2016 did you have an understanding of where Mr. Stetson was working?

A.   I can't tell you if it was Biscayne Boulevard in Miami or it was Mr. Honig's offices in Boca, but it was one of those two.

Q.   And while Mr. Stetson was working at Biscayne Boulevard, was Mr. Honig also working at Biscayne Boulevard?

A.   They had offices there. I don't know that they were there every day together. I'm based in New York, but I do know that I had attended some meetings both in Biscayne Boulevard as well as in -- later -- it was a later period of time in Boca Raton. But they all had offices there until Mr. Honig and Mr. Stetson moved up to Boca.

Q.   And what about Mr. O'Rourke, where did he work?

A.   It's the exact same answer.  To my recollection they -- I believe, was originally assistant to Mr. Brauser.  Then they each had individual offices in Biscayne Boulevard, and then later in Boca with Mr. Honig.

Ford Decl. Exhibit 9.

**SEC Response:**        Undisputed that Mr. Kesner so testified.  Disputed that Kesner testified (as stated in Paragraph 37, *supra*) that the fact that Honig shared offices with others was "clearly not a significant factor in the 13(d) Group analysis," or that he considered any group issues with MGT's interests in mind, given his representation of and loyalty to Honig.  *See* Brown Decl., Ex. L (Kesner Tr. 147:9-148:10).)

39. Perlman testified that she did not tell Ladd about the fact that she had previously done other work for Brauser, Groussman, Stetson, O'Rourke, but also explained that she did not think it was information Ladd needed to know:

Q.   And did you discuss the – you're familiar with each of those four investors if, in fact, it's Honig, Stetson, Brauser, and Groussman. Right?

A.   I have seen the names before. Yes.

Q.   In fact, you wrote opinions for each of 8 these people. Isn't that right?

A.   Right. Right. And I don't remember writing an opinion for Oban, but --

Q.   Well, Mr. Stetson you wrote an opinion for Correct?

A.   Yeah.

Q.   And so, did you discuss familiarity with any of these individuals with anyone at Sichenzia?

A.   Not to my recollection.

Q.   Did you discuss your familiarity with any of these individuals with anyone at Sichenzia?

A.   Not to my recollection.

Q.   Did you discuss your familiarity with any of these individuals with Ladd?

A.  Not to my recollection.
Q.  Why not?
A.  It never came up.
Q.  And you didn't think it was relevant?
A.  No.

Ford Decl. Exhibit 6.

**SEC Response:**     Undisputed that Perlman so testified that she told neither Ladd nor anyone

at SRF about her prior work for Honig, Brauser, Groussman, Stetson and O'Rourke.  *See*

Response to Paragraph 3, *supra*, for further relevant Perlman testimony on this topic.

40. Kesner similarly testified that Honig shared office space with Mr. Groussman:

Q.  And who do you understand Mr. Groussman to be?
A.  Mr. Groussman is a – I understand to be a long-time family friend of the Honig family.
Q.  Did he also work out of Mr. Honig's offices?
A.  I think the answer is yes and no. I think he had a desk there, but rarely was there.

Ford Decl. Exhibit 9.

And in regards to using his office for a meeting, Kesner testified:

Q.  Do you remember who else was there? You said you were there, Mr. McAfee was there. Who else was there?
A.  I know Mr. McAfee's body guard slash assistant was there. I don't know who else was there. It may have been Mr. Honig and maybe Mr. O'Rourke as well. I think they were there as well, but I can't say for sure.
Q.  Was Mr. Ladd there?
A.  I don't really recall. I don't know if he was there.
Q.  And the purpose of the meeting was to discuss the MGT acquisition of D-Vasive?
A.  The purpose of the meeting was to borrow my conference room, and I thought I would take an opportunity to meet a – you know, a world stage figure, Mr. McAfee, for the first time.

Ford Decl. Exhibit 9.

**SEC Response:**     Undisputed that Kesner so testified.

41. The SEC asked Marcus if he knew: (i) [Honig and the others] had been involved in buying and selling stock of other issuers together with the same group or a similar group of investors; (ii) that [Honig and the others] were involved in the 2012

financing; (iii) that Ladd was interviewed for the seeking Alpha article (in 2012) that Mr. Honig paid for in promoting MGT and then selling shareholders; (iv) that (what if, hypothetically) the stock price went up because Mr. Honig engineered that to happen; (v) Honig was involved in finding a reverse takeover candidate for MGT; and (vi) about Honig's reputation. The SEC questioned Attorney Marcus whether knowing any of the above facts would have impacted his 13(d) analysis. Attorney Marcus responded "No" to each of these assertions.

Marcus testified:

Q. And had you known at the time **that Mr. Honig had been involved in buying and selling stock of other issuers together with the same group or a similar group of investors**, would that have affected your analysis under 13(d) for the 5 percent requirement?
A. I'm not sure because these deals all have similar investors.
Q. Well would it have been something you would have wanted to take into account in analyzing the 13(d) group issue?
A. Perhaps. Just to see if there was a pattern of all these investors investing together. But again, **I don't know how much I would have taken into it** because you know, even today half of these deals all still have the same investors in them.
Q. But in this transaction, did you understand that Mr. Honig was investing together with others?
A. No

Ford Decl. Exhibit 8.

Q. **Is the fact that they were involved in the 2012 financing**, would that affect your view as to whether now, in 2015, they're involved in this financing, Mr. Honig might be acting as a group for Section 13(d) purposes with others? Is that something you would have wanted to know?
A. Not particularly. Not by itself certainly.
Q. But would that at least be a factor you would want to know? That there was the same investors involved in different transactions?
A. Not particularly.
Q. Well would you want to – would that lead you to ask other questions?
A. Not particularly, **no**.

Ford Decl. Exhibit 8.

Q. So my question is if you **had been aware of that information about Ladd being interviewed for the seeking Alpha article that Mr. Honig paid for in promoting MGT and then selling shareholders** – selling their shares in 2013, is that information you would have wanted to consider in determining in 2015 whether this group of investors was acting as a group for Section 13 purposes?
A. **No**, not necessarily.
Q. Well **what if the stock price went up because Mr. Honig engineered that to**

**happen**? Would that have affected your analysis? If you had that knowledge, would that have affected your analysis?

A.  Again, by itself, **probably not**.

Q.  I'm saying is that information that you would have wanted to take into account in doing a 13(d) group analysis?

A.  They filed their own 13 – investors file their own 13(d)s so I don't generally do a 13(d) analysis. So the answer's, I think, no.

Q.  "I had asked you about whether you knew anything about a **Mr. Honig's being involved in finding a reverse takeover candidate for MGT**.

Q.  Were you aware that that was something that Mr. Honig was spearheading?

A.  No I wasn't.

Q.  Is that something that would have affected your view on whether Mr. Honig was acting as a group with other investors with respect to the 2015 Form S-1?

A.  No, it wouldn't have.

Q.  And if you had – if you had been aware of that **reputation** of Mr. Honig or if you had heard that Mr. Honig or had a view of Mr. Honig back in 2012, would that have affected your view as to whether he was acting with others of the group for Section 13 purposes?

A.  No.

Ford Decl. Exhibit 8.

**SEC Response:**          Undisputed that Marcus so testified as excerpted, but disputed that Marcus

answered "no" to whether the undisclosed facts would have been information he would have

considered for Section 13(d) purposes.  At best, Marcus testified that each such undisclosed fact

would not have been significant on its own, as illustrated above.

> 42.  As Ladd himself testified, he took great care to insure no one had control over MGT:
> "I was aware that there are terms in financings that create these death spirals in the
> stock. And I needed and wanted to avoid that so that an investor would not have that
> control." Ford Decl. Exhibit 50.

**SEC Response:**          Undisputed that Ladd so testified, but disputed that he took great care to

insure no one had control over MGT.  (Brown Decl., Ex. M (Ladd Tr. 201:1-4 ("[w]hen a big

shareholder asks you to do something, you do it"); *id.*, at 201:5-10 (acknowledging that he had

told the FBI that he paid a stock promoter "because Honig told [him] to do it and [he] did not

feel like [he] could say no to him.").)

    43. On May 9, 2016, MGT announced that John McAfee was joining MGT as its new CEO. Within this press release was the line that McAfee sold his company to Intel in 2010 for $7.6 billion—rather than the more accurate assertion that Intel purchased the company founded by McAfee in 2010 for $7.6 billion. (MGT Capital Investments, Inc. press release dated May 9, 2016). Ford Decl. Exhibit 27.

**SEC Response:**    Undisputed, but the Commission objects to the characterization that stating that Intel purchased the company founded by McAfee in 2010 for $7.6 billion is "more accurate," as improper argument violating Rule 56(c)(1)(A). *See Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 838 (S.D.N.Y. 2018) (striking argumentative statements from plaintiff's 56.1 statement as improper). Nor is the passive voice phrasing cited above (presumably taken from MGT's May 23, 2016 Form 10-Q disclosure) "more accurate" in any event. That disclosure (1) does nothing to alert investors that MGT's May 9, 2016 press release had been false; and (2) does not correct the misleading impression created by MGT's false press release that McAfee had been responsible for McAfee Associate's success 16 years after his departure from the company. (Brown Decl., Ex. XXX (MGT's May 23, 2016 Form 10-Q) at 6.)

    44. When (investor) plaintiffs' attorneys filed lawsuits against MGT Capital Investments, Inc. in connection with the McAfee deal, none alleged that this particular clause in the press release was materially false. (Article by Pomerantz LLP dated April 11, 2017). Ford Decl. Exhibit 53.

**SEC Response:**    Disputed. *See* Ford Decl. Ex. 53 (article speaks to a single lawsuit, not "lawsuits"). *See also Klingberg v. MGT Capital Investments, Inc.*, No. 18 Civ. 14380 (DE 1, ¶ 37.); *Oh v. MGT Capital Investments, Inc.*, 18 Civ. 9228 (S.D.N.Y.) (DE 48, ¶ 81); *In re MGT Capital Investments, Inc.*, Index No. 7031/2018 (Sup. Ct. Westchester Cty.) (DE 1, ¶ 108.) Each of these complaints alleges that MGT's May 9, 2016 press release was false.

    45. On December 5, 2012, Time published an article by Sam Gustin titled, "*Fugitive Software Guru John McAfee Arrested in Guatemala, Faces Expulsion Back to Belize,*" in which it states, "McAfee founded the anti-virus computer software firm

that bears his name in 1987, and his net worth is estimated to have been $100 million at its peak. McAfee sold his stake in the company in 1994 and hasn't been involved since. In 2010, McAfee Associates, Inc. was acquired by chip giant Intel for $7.7 billion." Ford Decl. Exhibit 28.

**SEC Response:**          Undisputed.

46. On December 20, 2012, CNN Business published an article by David Goldman titled, "*McAfee won't change its name because of John McAfee.*" In the article, it states, "John McAfee sold his security business in 1994 and has had nothing to do with the company since." Ford Decl. Exhibit 29.

**SEC Response:**          Undisputed.

47. On January 7, 2014, CNN Business published an article by Jose Pagliery titled, "*Intel renames its McAfee security brand*." In the article it states, "Intel (<u>INTC</u>), which bought McAfee in 2010, will rebrand its subsidiary as Intel Security." Ford Decl. Exhibit 30.

**SEC Response:**          Undisputed.

48. On January 8, 2014, CNN Business published an article by Jose Pagliery titled, "*John McAfee enjoying new life in Canada*." In the article it states, "Intel, the tech company that bought McAfee's antivirus software company in 2010, decide to rebrand to Intel Security earlier this week." Ford Decl. Exhibit 31.

**SEC Response:**          Undisputed.

49. On November 17, 2014, CBS News published an article titled, "*Security Industry Needs 'Passion and Expertise,' Says San Francisco VP*," in which it states that in an interview with CPO of Intel Security Michelle Dennedy, Dennedy said, "McAfee is now part of Intel Security." Ford Decl. Exhibit 32

**SEC Response:**          Undisputed.

50. On January 7, 2014, Jim Finkle of Thompson Reuters published an article titled "*John McAfee says glad Intel dropping his name from security software*." The article states that "John McAfee, the flamboyant millionaire who founded the eponymous anti-viral software pioneer that Intel Corp bought for $7.7 billion, says he is glad that the chipmaker plans to drop his name from the product." Ford Decl. Exhibit 33.

**SEC Response:**          Undisputed.

51. On September 8, 2015, a VentureBeat article reported that "John McAfee, the

provocative millionaire founder of antivirus software company McAfee Software, which Intel bought for $7.68 billion in 2010, today filed a document to officially designate himself a candidate in next year's U.S. presidential election." Ford Decl. Exhibit 34.

**SEC Response:** Undisputed.

52. On September 13, 2015, in an article titled "*Believe it or Not: McAfee Anti-Virus Founder in U.S. Presidential Run,*" Channel Futures reported that "questions about McAfee's eccentricity have been raised at times since he disassociated himself with the company he founded, which Intel subsequently acquired in 2010 for some $7.6 billion." Ford Decl. Exhibit 35.

**SEC Response:** Undisputed.

53. On October 2, 2015, Cybersecurity Ventures published an article titled, "*Cybersecurity Legend and Presidential Candidate John McAfee Takes on the Republican Frontrunners.*" The article opens, "McAfee has spent decades building up a large following from the tech industry – and the media who follow his personal antics have turned him into a celebrity. Millions of people know his name," clearly articulating that "[f]irst and foremost, John McAfee is a cybersecurity legend." In connection with his legendary status and presidential candidacy, the article described McAfee as "the pioneer and founder of the 80's namesake company he founded – McAfee Software – which became the leading antivirus company and ultimately sold to Intel Corporation (while still bearing his name) for $7.7 billion in 2010." Per the article, "In the past month, McAfee ha[d] been featured or interviewed by major media outlets including BBC, CNBC, CNET, CNNMoney, Fortune, FOX News, Inc., NBC News, New York Daily News, Time, Wired, USA Today, and others." Ford Decl. Exhibit 36.

**SEC Response:** Undisputed.

54. On December 30, 2015, CNN Business published an article by David Goldman titled, "*John McAfee says his new security product is a 'f---ing game changer.*'" In the article, it states, "McAfee, who no longer has ties to his namesake antivirus software that he founded in 1987, has had a turbulent past few years." Ford Decl. Exhibit 37.

**SEC Response:** Undisputed.

55. On April 21, 2016, Cybersecurity Ventures published an article titled, "*Intel's CEO Can't Seem to Shake John McAfee's Name.*" This press release reported that "John McAfee – founder of his namesake anti-virus company which ultimately sold to Intel in 2010 for more than $7.6 billion – responded by telling BBC News 'I am now everlastingly grateful to Intel for freeing me from this terrible association with the worst software on the planet,'" adding the customary nod to his celebrity status:

"They may have learned too that John McAfee has a reputation as a prankster – which comes along with his legendary status in the cybersecurity field." Ford Decl. Exhibit 38.

**SEC Response:**          Undisputed.

56. On May 9, 2016, the day the May 2016 Press Release was published, an article titled "*McAfee Named CEO of Gaming Company in Shift to Cybersecurity*" was published at 9:12 am EDT on Bloomberg. At the outset, the article bullet pointed: (i) MGT Capital Investments, Inc. to become John McAfee Global Technologies Inc., and (ii) McAfee is a presidential candidate for Libertarian Party. The article reported that "John McAfee has been named the chairman and chief executive officer of MGT Capital Investments, Inc., marking a return to public markets about five years after the eponymous anti-virus company he founded was sold to Intel Corp. for $7.68 billion." Ford Decl. Exhibit 39. Further, at 5:53 UTC the same day, another article broadcasted, "John McAfee Is Back in Business," reporting that "McAfee's former eponymous company, McAfee, a computer antivirus software firm, sold to Intel (INTC) for $7.7 billion in 2011. Intel dropped the McAfee name and became Intel Security in 2014." Ford Decl. Exhibit 54.

**SEC Response:**          Undisputed.

57. On May 19, 2016, CNN Business published an article by Paul R. La Monica titled, "*John McAfee has pushed this stock up 700%!*" In the article it states, "It's been a long road back to Wall Street for the 70-year-old McAfee, who left his eponymous firm in 1994. It was sold to Intel in 2010 for about $7.6 billion." Ford Decl. Exhibit 41.

**SEC Response:**          Undisputed.

58. On June 17, 2016, Business Insider published an article by Seth Archer titled, "*JOHN McAFEE: Intel buying McAfee never made sense*," in which it states, "Citing unnamed sources, the Financial Times reported that the chipmaker is looking at spinning off McAfee, which it bought in 2010 for $7.7 billion and incorporated into its Intel Security division." Ford Decl. Exhibit 42.

**SEC Response:**          Undisputed.

59. On September 7, 2016, the New York Times published an article by Michael J. de la Merced titled, "*Intel Sells Majority Stake in McAfee Security Unity to TPG*," in which it states, "Intel, which bough McAfee for $7.7 billion six years ago, said on Wednesday…" Ford Decl. Exhibit 43.

**SEC Response:**          Undisputed.

60. On September 7, 2016, CRN published an article by Sarah Kuranda titled, "*Intel*

*Security Spins Off To Private Equity In $4.2B Deal*." In the article it states, "The deal spins out Intel Security from parent company Intel, creating a stand-alone security vendor and essentially undoing the company's $7.7 billion acquisition of McAfee in 2010." Ford Decl. Exhibit 44.

**SEC Response:**         Undisputed.

61. On September 7, 2016, The Wall Street Journal published an article written by Dana Mattioli, titled, "*Intel Agrees to Sell Majority Stake in Security Unit to TPG.*" The article states, "Intel bought McAfee for $7.7 billion in 2011 as the chip giant sought to diversify." Ford Decl. Exhibit 45.

**SEC Response:**         Undisputed.

62. On September 7, 2016, TechCrunch published an article written by Johns Mannes, titled, "*Intel spins out Intel Security with TPG to form new McAfee valued at $4.2B.*" The article states, "Intel's security unit originated from its acquisition of McAfee. The $7.68 billion transaction closed in 2011 and in the years following, analysts have been keen to pressure Intel to sell the company back off." Ford Decl. Exhibit 46.

**SEC Response:**         Undisputed.

63. On September 15, 2016, CNN Business published an article by Paul R. La Monica titled, "*John McAfee is back ... and fighting Intel and CBS.*" In the article it states, "Yes, the same McAfee whose namesake antivirus firm was sold to Intel, then moved to Belize, and became embroiled in a bizarre murder mystery." Ford Decl. Exhibit 47.

**SEC Response:**         Undisputed.

64. On December 17, 2018, Yahoo! published an article, titled, "*Intel to Reportedly Offload McAfee Business: Key Takeaways*." The article states, "Intel had acquired the antivirus software maker back in 2010 with a view to secure its chips and improve their threat detection power. Notably, Intel concluded the acquisition of McAfee for approximately $7.68 billion in cash (or $48 per share)." Ford Decl. Exhibit 48.

**SEC Response:**         Undisputed.

65. PRNewswire published a press release announcing an upcoming six-part series titled "The John McAfee Project," with an expected release date in April 2016. The press release began, "Viewed by some as the godfather of online security and by others as the master manipulator of fear, McAfee announces earlier today he is running for President of the United States," stating immediately after that "McAfee continues to be a prophet of internet protection. In 2010, the company he founded (McAfee Associates) was sold to Intel for an incredible $7.8 billion. Ford Decl. Exhibit 40.

**SEC Response:**        Undisputed.

      66. Ladd's Form 4, Statement of Beneficial Ownership, provided that (i) on May 25, 2016, Ladd disposed of 465,171 shares, leaving him with 157,300 beneficially owned securities (entirely undercutting the SEC's allegations that these sales were hidden);(ii) on May 25, 2016, Ladd disposed of 157,300 shares, leaving 0 beneficially owned securities; (iii) on May 26, 2016, Ladd acquired 300,000 shares, leaving 573,603 beneficially owned securities; and (iv) on May 31, 2016, Ladd disposed of 33,603 shares, leaving 540,000 beneficially owned securities. Ford Decl. Exhibit 49.

**SEC Response:**        Undisputed that Ladd's May 31, 2016 Form 4 (Ford Decl., Ex. 49)

correctly reports that Ladd acquired 300,000 MGT shares on May 26, 2016 in a grant from

MGT;  the rest of the paragraph is disputed.  Ladd's May 31, 2016 Form 4 reports that on May

25, 2016, Ladd disposed of 465,171 MGT shares by distributing them for no consideration to the

limited partners in Laddcap, Ladd's fund, which was false.  (Brown Decl., Ex. M (Ladd Tr.

484:3-485:2).)  In fact, as Ladd admitted, the shares had been sold by Ladd for hundreds of

thousands of dollars, and not on May 25, 2016, but in multiple sales since December 2015 out of

an E*Trade account in his own name.  (Tong Decl. ¶ 8 and Exs. E and F (Ladd's E*Trade

account statements, November 2015-May 2016).)  Ladd's Form 4 also reported that Ladd had

sold 157,300 shares on May 25, 2016.  That, too, was false, as Ladd admitted. Ladd sold no

MGT shares at all on May 25, 2016 (Brown Decl., Ex. M (Ladd Tr. 84:14-85:9)), and he had

sold his last MGT share out of the E*Trade account on May 17, 2016.  (Tong Decl. ¶ 8 and Ex.

F.)  Also false was the Form 4's reporting that Ladd sold 33,603 MGT shares on May 31, 2016.

As he admitted, Ladd sold only 11,000 MGT shares on May 31, 2016.  (Brown Decl., Ex. M

(Ladd Tr. 91:16-92:8); Tong Decl., Ex. B (Ladd's May 2016 IRA TD Ameritrade account

statement).)  Ladd explained that Line 4 actually reflected his sales of more shares in his

E*Trade account earlier in the month.  (Brown Decl., Ex. M (Ladd Tr. 91:16-92:8).)

67. Ladd conceded there were errors, testifying, "Again, the exact quantities might be wrong, as well as the dates." Ford Decl. Exhibit 50.

**SEC Response:**      Undisputed that Ladd admitted that his Form 4 contained falsities and that

he had been the source for the information included in it.  (Brown Decl., Ex. M (Ladd Tr.

478:10-19; 485:10-17).)

68. Ladd reported that he disposed of 465,171 shares on May 26, which resulted in an accurate reflection of his beneficially owned shares as of May 31, 2016. Ford Decl. Exhibit 50.

**SEC Response:**      Disputed.  Ladd's reporting that he "disposed of" rather than "sold"

465,171 MGT shares on May 26, 2016 was false, *see* Response to Paragraph 66, *supra*, and did

not result in the correct statement of his beneficial ownership on May 31, 2016 in any event,

since he claimed to have sold 33,603 shares on that date, when he in fact sold only 11,000.  (*Id.*)

69. On May 31, 2016, when Ladd filed the Form 144, Attorney Wu emailed him, "Also, you may already know this but the form 144 may be filed by paper instead of on Edgar." Ladd responded, "I already filed Form 144." Ford Decl. Exhibit 51.

**SEC Response:**      Undisputed.


II.   **Commission's Statement of Additional Material Facts that Preclude Granting Ladd's Motion for Summary Judgment Pursuant to Local Civil Rule 56.1(b)**

A.  **Honig, Groussman and Stetson Acted in Concert in Connection with Their 2012 MGT Investment**

70.      By November 30, 2012, Barry Honig, Mark Groussman, through his entity,

Melechdavid, Inc. ("Melechdavid") and John Stetson, through his entity, HS Contrarian

Investments, LLC ("HSCI"), held collective beneficial ownership of more than 12% of the MGT

common stock (based on the total outstanding shares MGT reported as of that date.).  (Brown

Decl., Ex. A (MGT November 30, 2012 S-3) at 8, 11 and nn. 4, 5, 6, 7, 12 n. 16); Tong Decl. ¶

40).)  HSCI was a fund that Stetson nominally controlled, but in which Honig was the primary

equity holder.  (*See* Brown Decl., Ex. B (Stetson December 7, 2011 email to Honig attaching

HSCI Balance Sheet and noting Honig's equity [SD-SEC-(18Civ8175)-124668]).)  Although

Honig, Groussman and Stetson were acting as a group under Section 13(d)(3), MGT's November

30, 2012 Form S-3 did not aggregate the shareholdings of Honig, Groussman and Stetson, but

listed their holdings individually.  (Brown Decl., Ex. A.)  Had it done so, the group's holdings

would have amounted to 923,534, or 12.8% of MGT's outstanding common stock. (Tong Decl. ¶

40.)

     71.    Honig, Groussman and Stetson acquired their MGT holdings in an October 2012

MGT offering.  Honig initiated that transaction in a  June 20, 2012 email to Ladd in which he

wrote:

> I will be in NY next week[.] lets meet.  Before then I would like you to
> think about how much money my group can come in with. I think
> $1,500,000 would be cool.  It would be 3-4 investors including myself.

(Brown Decl., Ex. C [SEC-FBI-E-0045334].)

     72.    As finally structured, the October 2012 financing resulted in MGT issuing

1,380,362 units, consisting of one convertible preferred MGT share, and a 5-year warrant

exercisable for two shares of MGT common stock at $3.85 per share, for total proceeds to the

company of about $4.5 million.  (Brown Decl., Ex. D (MGT October 26, 2012 Form 8-K).)

     73.    It also included a registered direct offering of 453,942 shares of MGT common

stock at $3.00 a share.  (Brown Decl., Ex. E (October 12, 2012 Term Sheet [SEC-Sichenzia-E-

0020725-26]).)

     74.    Honig led the negotiations for the investment on behalf of all of the investors but

two of them:  Hudson Bay Master Fund Ltd.  ("Hudson Bay") and Iroquois.  Hudson Bay had

been an earlier investor in MGT.  (Brown Decl., Ex. A (MGT November 30, 2012 Form S-3) at

11 n. 12.)  After a series of emails between Honig and Ladd on the terms, Honig had Stetson sign

and send a term sheet to Ladd on October 12, 2012.  (*Id.*, Ex. F (Ladd and Honig October 11,

2012 email exchange re terms of the deal [Ladd-MGT-00002330-32]); *id.*, Ex. G (Ladd and

Honig October 11, 2012 exchange re term sheets [Ladd-MGT-00002274-75]); *id.*, Ex. E (Stetson

October 12, 2012 email to Ladd with fully executed term sheets for both the private placement

and the registered direct [SEC-Sichenzia-E-0020720-26]).)  Later, whenever Hudson Bay or

Iroquois sought terms in the final documentation with which Ladd disagreed, Ladd turned to

Honig to resolve the dispute.  (*Id.*, Ex. H (Ladd October 14-15, 2012 email exchange with

Kesner re "early money" demand for ratchet provision; Ladd responds:  "Just had breakfast with

BH.  He agrees:  ROFR on any financing, including dilutive.  But no ratchets." [Ladd-MGT-

00077699-700]); *id.*, Ex. I (Ladd October 17, 2012 email to Kaplowitz responding to comments

Honig was passing on for Iroquois on deal documents:  "Barry needs to deal with Iroquois on

this" [MGT-SEC-2022-006042]); *id.*, Ex. J (Ladd October 19, 2012 email to MGT CFO,

Traversa:  "Barry just said to me to stay out of it.  The animals are just baiting me.  He will 'take

care of it.'").)

     75.     It was also Honig who determined who (apart from Hudson Bay and Iroquois)

would get to participate in the investment alongside him and at what levels.  (Brown Decl., Ex. K

(Honig October 21, 2012 email to Ladd with investor list for both the registered direct and the

convertible preferred offerings).)  In that email, Honig wrote:  "Below is the investor list for the

preferred and the R[egistered] D[irect]," and listed the investors by the investor's name, the

investor's contact information, and the allocation of the particular offering in which the investor

was participating. (*Id.*)  Suzanne Adams and Jill Strauss were both listed as "Hunter Adams"

contacts. (*Id.*)  Hunter Adams was Honig's cousin.  (*Id.*, Ex. L (Kesner Tr. 139:20-140:3).)  Ron

Low (spelled "Lowe" by Honig) was listed as a contact of Jonathan Honig, and Jonathan Honig was listed himself as a participant in the registered direct offering, (*Id.*, Ex K.)  Jonathan Honig is Honig's brother.  (*Id.*, Ex. L (Kesner Tr. 58:24-59:1).)  Ladd testified that Honig "chooses those people to invest with him."  (*Id.*, Ex. M (Ladd Tr. 358:4-13).)

76.     Honig and Stetson worked out of the same office in Florida, and Stetson worked for Honig.  (Brown Decl. Ex. M (Ladd Tr. 18:4-14); *id.*, Ex. N (Perlman Tr. 24:1-8); *id.*, Ex. O (Guarneri-Ferrara Tr. 14:20-15:3).) Groussman also had a desk in Honig's offices, and was a long-time Honig family friend.  (*Id.,* Ex. L (Kesner Tr. 57:6-11).)  Groussman and Stetson (or their entities), and Jonathan Honig (or his entity) were all frequent co-investors with Honig and/or his entities.  Declaration of Stephen Johnson, executed January 30, 2023 ("Johnson Decl."), Ex. D (showing the issuers in which Honig, Brauser, Groussman, Stetson, O'Rourke and Jonathan Honig all had investments at or around the same time); *see also id.*, Ex. L (Kesner Tr. 59:25-60:13).)  Brauser (and/or his entities) had investments in over 40 of the same issuers as Honig (and/or his entities) between 2011 and 2018.  In that same period, Stetson (and/or his entities) had investments in over 65 of the same issuers as Honig (and/or his entities); Groussman (and/or Melechdavid) had investments in over 35 of the same issuers as Honig (and/or his entities); and O'Rourke (and/or ATG) had investments in over 70 of the same issuers as Honig (and/or his entities). (Johnson Decl., Ex. D.)  The five of them—Brauser, Groussman, Stetson and O'Rourke—were invested together in 19 separate issuers during that same period. (*Id.*)

77.     MGT looked to Honig and Stetson for the information necessary to effect the purchases by each investor in the offerings (other than Hudson Bay and Iroquois).  (Brown Decl., Ex. P (Guarneri-Ferrara October 23, 2012 email to Kesner (and forwarded to Ladd), telling him

that she cannot keep separate escrow accounts for each offering because "I would have no idea

who is in for what –is this something Stetson is keeping track of" [Ladd-MGT-00078271])); *id.*,

Ex. Q (Traversa (MGT CFO) October 23, 2012 email to Stetson, cc'ing Ladd, thanking him for

his help with an investor's documentation and seeking help from him with missing wires from

other investors [SD-SEC-(18Civ8175)-090239]); *id.*, Ex. R (Sandor Capital October 22, 2012

email to Stetson attaching MGT subscription "docs"); *id.*, Ex. S (Stetson October 24, 2012 email

to Jill Strauss (asking her to sign and return escrow agreement)); *id.*, Ex. T (VP Bank November

2, 2012 emails with Stetson, cc'ing Ladd, regarding missing escrow agreement and needed

information [Ladd-MGT-00005257-58]); *id.* Ex. U (Ladd November 15, 2012 email to Stetson

asking for Bank Guttenberg and Bay Capital information).)

78.     Beginning on April 2, 2013, Honig, HSCI and Melechdavid all began submitting

notices of conversion of their preferred MGT stock into MGT common stock. (Brown Decl., Ex.

V (HSCI Notice of Conversion, April 2, 2013; Honig Notice of Conversion, April 4, 2013;

Melechdavid Notice of Conversion, April 8, 2013 [Ladd-MGT-00067538]); *see also id.*, Ex. W

(Jonathan Honig April 8, 2013 email to Averilla (MGT controller) re conversion for Ronald

Low).)

79.     In late March 2013, Honig told Ladd that he had an idea for getting rid of MGT's

warrant obligations from the October 2012 convertible preferred offering.  (Brown Decl., Ex. X

(Honig March 21, 2013 email to Ladd ("I have an idea how to clean up the structure and investor

base" [MGT_SEC_00007464]).)  Ladd rejected the idea (*id.* [MGT_SEC_00007463]), but on

April 26, 2013, Ladd sent out his own Exchange Offer for the warrants.  (*See id.*, Ex. Y (Ladd

April 26, 2013 email to warrant holders with Exchange Offer.)  Under the terms of the

Exchange Offer, if a warrant holder exercised one warrant for $3.85 (obtaining one share of

common stock), he would have the right to exchange two more warrants for 5/8ths of a share of restricted common stock per warrant exchanged.  (*Id.* [MGT_SEC_00010494].)  Ladd's offer noted that "[p]articipation is strictly voluntary," and gave the holders 20 business days to agree or reject the exchange.  (*Id.*)

80.     That same day, Stetson returned both Honig's and HSCI's agreement to the Exchange Offer.   (Brown Decl., Ex. Z (Stetson April 26, 2013 email to Averilla and Ladd attaching Honig's and HSCI's agreement to the modification).)  Groussman submitted his agreement and an exercise notice on May 9, 2013.  (*Id.*, Ex. AA (Groussman May 9, 2013 email to Averilla with attachments).)

81.     Whether the investors returned the documents to him directly, or not, Ladd was monitoring the investor's acceptance and exercise under the modified agreement.  (*See* Brown Decl., Ex. BB (Ladd May 20, 2013 email to transfer agent complaining about their delay in updating MGT's share count as a result of the Warrant exercises).)

82.     Honig, HSCI and Melechdavid were all selling MGT shares into MGT's stock price rise generated by the false April 11, 2013 *Seeking Alpha* article on MGT, forecasting that its stock price would soon increase (described more fully at ¶ 115, *infra*).  (Tong Decl. ¶ 35, and Ex. Q (MGT share price jumped from nearly $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and there was a significant volume increase in trading between the two periods); Johnson Decl. ¶ 7 and Ex. A.)

83.     In a late May 2013 email to Ladd, Honig reminded him of the actions Honig had taken throughout the prior six months to corral the members of his group to agree to terms Ladd wanted.  (Brown Decl., Ex. CC (Honig May 29, 2013 email to Ladd [SEC-FBI-E-0011917-18]).)  Among other things, Honig claimed that it was he who had put together the financing group, and

he who had ensured that the warrant holders executed the warrant exchange agreement. (*Id.*)  In response, Ladd did not disagree with Honig's claims.  (*Id.* [SEC-FBI-E-0011917].)

### B.  Honig, Brauser, Groussman, Stetson and O'Rourke Acted in Concert in Connection with Their 2015 MGT Investment

84.     Honig and Ladd began discussing another financing for MGT in late September 2015.  In an October 1, 2015 email, Ladd told Honig the amount he needed to raise ($700,000), and set out the units to be sold for $0.25 each:  1 common MGT share, plus 2 warrants.  In that email he also set out the total number of shares outstanding, and how large a percentage of that outstanding stock would be delivered to the investors Honig brought with him:  19.9%  (Brown Decl., Ex. DD (Ladd October 1, 2015 email to Honig [MGT_SEC_00008034].)  When Ladd asked Honig who the buyers would be, Honig, copying Stetson and Brauser, responded:  Barry Honig, Mike Brauser and OBAN. (*Id.*)

85.     In an email to his Board of Directors, Ladd explained the serious near term cash flow issues MGT then faced, and concluded:  "Net-net we need some near term liquidity. . ." (Brown Decl., Ex. EE (Ladd October 4, 2015 email to Silverman, Holmes, and Onghai [ICM_SEC_000005588]).)  Attaching a draft term sheet prepared after his discussions with Honig, Ladd described the deal he had negotiated, and noted that the investors' percentage interest in the company would be 16.7% "post-issuance."  (*Id.*)  He continued:

> The investor group is led by Barry Honig. . . He is certainly controversial, but his m.o. [i]s normally to make money the old fashioned way with the share price going up. Moreover, while we expect his help in finding a reverse takeover candidate, the financing by itself has no "features" such as board rights, security interests, ratchets, or any non standard anti dilution measures.

(*Id.*)

86.     As in 2012, negotiations over the terms of the final documents were led on behalf of the investors by Honig.  Indeed, when Groussman proposed more favorable terms for the

exercise of the warrants, Ladd again turned to Honig to intercede: "I agreed with Barry on this deal. . . it is now being renegotiated. So I will leave it up to Barry whether we go with our original terms." (Brown Decl., Ex. FF (Ladd October 6, 2015 email to Honig, Groussman, Stetson and Perlman, Kaplowitz and Marcus [SEC-FBI-E-0088697-98].)

87. And as was true with the 2012 transaction, Honig named his co-investors and set their allocations. (*See* Brown Decl., Ex. GG (Stetson October 5, 2015 email to Ladd (attaching the names of five investors with allocations, an email he forwarded the next day to Groussman (*id.*, Ex. HH (Stetson October 6, 2015 email to Groussman)); *id.*, Ex. II (Stetson October 7, 2015 email to Ladd (listing as "final versions" GRQ Roth, Melechdavid, Grander Holdings Inc., 401K, Iroquois, Stetson Capital Investments, Inc., and ATG Capital, LLC).) GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ Roth") was Honig's entity. (*Id.*, Ex. M (Ladd Tr. 416:12-20).) Grander Holdings Inc., 401K ("Grander") was Brauser's entity. (Tong Decl, Ex. O (November 6, 2015 MGT Form S-1) at 44 n. 4.) Stetson Capital Investments, Inc. ("SCI") was Stetson's entity. (*Id.*, at 46 n. 20.) ATG Capital LLC ("ATG") was O'Rourke's entity. (*Id.,* at 46 n. 23.)[2] O'Rourke worked for Honig out of Honig's offices with Stetson. (*Id.*, Ex. M (Ladd Tr. at 18:21-19:20.) He and Brauser had been frequent co-investors with Honig in the past. (Johnson Decl., Ex. D; *see also* Brown Decl., Ex. L (Kesner Tr. 59:25-60:13) (testifying that Honig, Stetson, O'Rourke, Groussman, Jonathan Honig and Brauser were frequent co-investors).)

88. Stetson again acted as coordinator for collection and transfer of the investors' signed deal documents to MGT. (Brown Decl., Ex. JJ (Stetson October 8, 2015 email to Ladd, attaching Grander documents sent to him by Brauser's office); *id.*, Ex. KK (Ladd October 7,

---

[2] At the last minute, LFR Trust LLC was allowed to buy 200,000 shares. (Tong Decl., Ex. O (MGT November 6, 2015 Form S-1) at 44.)

2015 email to Stetson attaching counter-signed deal documents for Grander, GRQ Roth, SCI and Iroquois); *id.*, Ex. LL (Ladd October 7, 2015 email to Stetson attaching counter-signed deal documents for ATG); *id.*, Ex. MM (Ladd October 14, 2015 email to Stetson asking him to find out how Honig and Brauser wanted their shares delivered [SD-SEC-(18Civ8175)-041978]).)

89.    MGT's press release announcing the financing, issued on October 9, 2015, disclosed that the investment had been "led by Barry Honig," but did not otherwise disclose his co-investors.  (Brown Decl., Ex. NN (MGT October 9, 2015 8-K, signed by Ladd, attaching press release).)  It then noted that Honig is "a private investor and a specialist in corporate finance.  Mr. Honig . . . was a former founder and Co-Chairman of interClick, which was acquired by Yahoo in 2011 for $280 million." (*Id.* (press release).)

90.    On October 16, 2015, Honig filed a Schedule 13G disclosing his beneficial ownership through his GRQ Roth entity of 800,000 MGT shares that he had received in the October financing, plus 58,816 shares he was entitled to receive upon exercise of warrants (so long as such exercise did not push GRQ Roth above a 4.99% ownership interest in MGT). (Brown Decl., Ex. OO (Honig October 16, 2015 Schedule 13G).) He also disclosed his ownership of 333,611 shares of MGT common stock by his GRQ Consultants, Inc. 401K entity, bringing his total beneficial ownership to 1,133,611 shares, or 6.59% of MGT's then-outstanding total shares. (*Id.*)

91.    MGT filed a Form S-1 registration statement on November 6, 2015, signed by Ladd, in which it disclosed Honig as a beneficial owner of more than 5% of the company's outstanding common stock, and listed the same number of shares as Honig disclosed in his October 16, 2015 Schedule 13G.  (Tong Decl., Ex. O (MGT November 6, 2015 Form S-1) at 42.) Under "Selling Shareholders," MGT listed those investors who had bought common stock and

warrants in the October 2015 financing.  (*Id.*, at 44-46.)  MGT disclosed no group affiliation for any investor and did not aggregate any investor's holding with any other investor.  (*Id.*)

92.     Had MGT disclosed that Honig, Brauser, Groussman, Stetson and O'Rourke were acting in concert, and had aggregated their holdings, it would have disclosed that the group held more than 15% of MGT's outstanding shares.  (Tong Decl. ¶ 41.)

93.     After the close of the October 2015 financing, Ladd agreed to a registered direct offering of 344,278 MGT common shares each to two investors, Brauser's Grander entity and Four Kids Investment Fund, LLC ("Four Kids"), an investment vehicle managed by Jonathan Honig, Barry Honig's brother.  (Brown Decl., Ex. PP (Perlman December 17, 2015 email to NYSE attaching listing application (and investor list) [SEC-Sichenzia-E-0001200]).)  The beneficiaries of Four Kids were Barry Honig's children.  (*Id.*, Ex. L (Kesner Tr. 59:16-19).)  Jonathan Honig kept Barry Honig abreast of the Four Kids' investments.  (*E.g.*, *id.*, Ex. QQ (Jonathan Honig December 8, 2015 email to Honig attaching asset listing for Four Kids [SEC-FBI-E-0037097-98]).)

94.     In January 2016, Honig told Ladd to have MGT pay a stock promoter, Drew Ciccarelli, $125,000 to issue and send out a positive piece on MGT to his "very large mailing list – email list of people that followed his advice."  (Brown Decl., Ex. M (Ladd Tr. 203:12-23).)  Ladd did so because, in his view, "when a big shareholder asks you to do something, you do it," and because he did not feel like he could say no to Honig.  (*Id.*, at 201:1-4).)

95.     On February 3, 2016, Ciccarelli's piece on MGT was published in the *Small Cap Leader*.  (Brown Decl., Ex. RR ("New Alert:  MGT Capital Investments, Inc. (NYSE: MGT)," *Small Cap Leader*, February 3, 2016).)  There, the piece copies only that portion of Honig's biography from MGT's October 9, 2015 press release (*id.*, Ex. NN) that describes Honig as a

private investor and specialist in corporate finance, and his one time positions at interClick, "which was acquired by Yahoo in 2011 for **$280 million**." (*Id.*, Ex. RR (*Small Cap Leader*, at 3/7 (emphasis in original)).) While MGT paid for the promotion, the newsletter did not disclose that fact.

96.     After the close of the trading day on February 3, 2016, MGT's stock's daily trading volume saw a 7,000 percent increase from its prior day's volume, and an intraday price increase of over 60 percent.  (Tong Decl. ¶ 36.)  Honig, Brauser, Stetson, and O'Rourke all immediately began selling.  (Johnson Decl. ¶ 8 and Ex. B.)  So did Ladd.  (Tong Decl., Ex. E (Ladd February 2016 E*Trade Statement, showing Ladd's sale of 40,000 shares of MGT stock on February 3, 2016.)  Ladd filed no Form 4 reflecting those sales.  (Tong Decl. ¶16.)

97.     On April 14, 2016, MGT filed its annual report for 2015 on a Form 10-K, signed by Ladd.  (Tong Decl., Ex. K (MGT April 14, 2016 Form 10-K).)  While MGT included Honig (together with his GRQ Roth entity) in its 5% beneficial owners table, and reported that he held 8.6% of MGT shares as of April 11, 2016 (*id.*, at 27), it noted that it was reporting the number of shares he owned from Honig's own Schedule 13G.  (*Id.*, at 28 n.3.)  MGT did not aggregate Honig's holdings with any other investor in his group, nor did it disclose his membership in a group.  Had MGT correctly aggregated share ownership among the members of the group (Brauser/Grander, Groussman/Melechdavid, Stetson/SCI and O'Rourke/ATG), it would have reported that the group owned more than 15% of MGT's outstanding shares, based on the shares ascribed to each group member in MGT's November 6, 2015 Form S-1. (Tong Decl., Ex. O.) Indeed, in a late Schedule 13G filing Brauser made on May 3, 2016, Brauser disclosed that he and his Grander entity themselves owned more than 7.4% of MGT as of February 10, 2016. (Brown Decl., Ex. ZZZ (Brauser's May 3, 2016 Schedule 13G).)  MGT made no amendment to

its April Form 10-K to reflect Brauser's late filing.

98.     Earlier that month, O'Rourke and Honig proposed an acquisition to Ladd of a company associated with John McAfee, the founder of a famous cyber-security company that bore his name, McAfee Associates.  (*See* Brown Decl., Ex. SS (O'Rourke April 4, 2016 email to Ladd (forwarding his March 29, 2016 email to McAfee and attaching a term sheet for the purchase of the assets of D-Vasive)).)  After receiving the proposal, Ladd discussed it with Honig and wrote to O'Rourke:  "Barry called.  Game on."  (Brown Decl., Ex. TT (Ladd April 5, 2016 email to O'Rourke [MGT_SEC_00009374]).)  Ladd provided O'Rourke with details of MGT's cap table in an email that same day, at O'Rourke's request, even though as proposed, the transaction contemplated no involvement by Honig or O'Rourke, or any issuance of shares to them.  (*Id.* [MGT_SEC_00009373]; *see also id.*, Ex. SS (Term Sheet [MGT_SEC-00007083-7087]).)

99.     When the acquisition agreement was finalized, on May 9, 2016, Ladd issued a press release announcing it, titled "John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology." (Brown Decl., Ex. UU (MGT May 9, 2016 Form 8-K and Ex. 99.1 (press release)).)  In the press release, Ladd wrote:  "Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion . . . ." (*Id.* (press release);  *see also id.*, Ex. M (Ladd Tr. 287:4-22).)  That statement was false, as Ladd acknowledged he knew at the time. (*Id.*, Ex. M (Ladd Tr. 275:14-19.)

100.    Ladd authorized MGT to pay $125,000 to a stock promoter to publish a piece on May 9, 2016, which echoed in its first paragraph the MGT press release claim that McAfee had sold his company for $7.6 billion.  (*See* Brown Decl., Ex. VV ("NYSE:  MGT Beastmode engaged – John McAfee driving the Bus," *Stock Beast Report*, May 9, 2016); *id.*, Ex. M (Ladd

Tr. 295:8-13).)  Ladd chose *Stock Beast* at the suggestion of an MGT consultant who "was a little more aware of the mailing lists that had the biggest circulation."  (*Id.*, Ex. M (Ladd Tr. 297:11-17).)

101.    On May 6, 2016 (which was the last trading day prior to May 9, 2016), trading volume in MGT common stock was 71,005 shares, and that day's closing price was $0.36.  On May 9, 2016, MGT's stock closed at $0.49 (representing an increase of 34 percent over the prior day's close) with trading volume of more than 10 million shares.  (Tong Decl. ¶ 37.)

102.    Honig, Brauser, Groussman, Stetson and O'Rourke began selling their MGT shares on May 9, 2016 and continued selling them through that week.  (Johnson Decl. ¶ 9 and Ex. C.)  Ladd did too.  (Tong Decl. ¶¶ 21, 23.)

103.    On May 10, 2016, Ladd responded to inquiries from the 2015 financing investors about exercising their warrants.  He notified Honig, Brauser, Groussman, Stetson and O'Rourke (but not Iroquois) that the $.25 warrants issued in the October private placement were not exercisable under the terms of the Warrant Agreement.  (Brown Decl., Ex. WW (Ladd May 10, 2016 email to Brauser, Honig, Stetson, O'Rourke and Groussman re MGT Warrants).)  Ladd ultimately offered the group a modification of the Warrant Agreement:  if they would pay a premium to exercise them, he would allow it.  (*E.g.*, *id.*, Ex. XX (Ladd May 10, 2016 email to Honig agreeing to allow him to exercise the warrant at a premium of $0.10 a share).)

104.    Each of the Honig group— Honig, Brauser, Groussman, Stetson and O'Rourke — agreed to Ladd's modification terms and began sending in their Notices of Exercise on May 10, 2016 for whatever number of shares they could convert to without exceeding the 4.99% blockers they had inserted into the Warrant Agreements.  (Brown Decl., Ex. YY (May 10, 2016 Notice of Exercise from Groussman/Melechdavid); May 10, 2016 Notice of Exercise from Stetson on

behalf of Honig/GRQ Roth; May 10, 2016 Notice of Exercise from Stetson/SCI; May 12, 2016

Notice of Exercise from O'Rourke/ATG; May 12, 2016 Notice of Exercise from Paez on behalf

of Brauser/Grander); Tong Decl., Ex. O (MGT's November 6, 2016 Form S-1), at 33 (describing

the 4.99% exercise blockers that prohibit the exercise of any warrant that would bring the

investor to more than 4.99% ownership of MGT outstanding shares).)

      C.  **Ladd's Understanding of Section 13(d), the Group Issue, MGT's Reporting Obligations under Regulation S-K, the Relationships Among Honig, Brauser, Groussman, Stetson and O'Rourke, Honig's Desire to Avoid Being Labeled as a Member of a Group, and Honig and His Group's *Modus Operandi* in Making Investments**

     105.    Ladd views himself as an expert on Exchange Act Section 13(d).  (Brown Decl.,

Ex. M (Ladd Tr. at 423:9-24).)  He testified:  "I would modestly say I know more about 13(d)

than nearly anyone else on Wall Street."  (*Id.*, at 421:6-11.)

     106.    In 2006, Ladd himself was accused of acting with others as an unlawful,

undisclosed group under Exchange Act Section 13(d) in a case captioned *Delcath Sys., Inc. v.

Robert Ladd, et al.*, 06 Civ. 6420 (LAP) (S.D.N.Y.) (DE 13 (Amended Complaint, Count I).)

     107.    More recently, in 2014, MGT accused one of its investors, Iroquois, of violating

Exchange Act Section 13(d) by failing to disclose that it was acting in concert with another MGT

shareholder— American Capital Management, LLC ("ACM").  In response to Iroquois' launch

of a hostile takeover, MGT's CFO wrote a letter to Iroquois, in which he noted that Iroquois

shared an office with ACM and that ACM's investments were managed by employees of the

same investment adviser that managed the investments of Iroquois.  (Brown Decl., Ex. ZZ (MGT

CFO's July 3, 2014 email to J. Silverman at Iroquois and attached MGT letter to Iroquois

[MGT_SEC_00015492]); *see also id.*, Ex. M (Ladd Tr. 417:8-17; 436:6-14 (Ladd explaining that

while MGT's CFO signed the letter, he reviewed it and would not have "let a letter go out that

was factually incorrect").)   Ladd explained that in MGT's view, Iroquois and ACM shared "common voting principles, common economic interests," and should have disclosed that the two entities were acting as a group under Section 13(d).  (*Id.*, Ex. M (Ladd Tr. 315:14-316:8).)

108.    Ladd understood that MGT had an obligation to disclose those MGT investors who held more than 5% of the company's outstanding shares in its 5% beneficial ownership tables in its Registration Statements and Forms 10-K.  (Brown Decl., Ex. M (Ladd Tr. 428:16-429:3).)  His concern with the accuracy of MGT's disclosures in that regard informed his decision to question the accuracy of at least one investor's reported holdings in 2016.  (*Id.*, Ex. M (Ladd Tr. 428:22-429:3); *id.*, Ex. AAA (Ladd January 11, 2016 email to Silverman re Iroquois holdings, questioning the accuracy of Iroquois' public disclosures).)  And he knew that he could not just rely on the accuracy of the investor's own filings for their ownership.  (*Id.*; Ex. M (Ladd Tr. 425:2-22.) (Ladd discovered the Iroquois/ACM issue by reviewing other sources available to him on MGT stock ownership, such as "DTC records or Broadridge," and noting that he "distrusts every investor['s]" SEC filings.)

109.    Ladd knew that Stetson, Honig and O'Rourke shared an office and that Stetson and O'Rourke worked for Honig.  (Brown Decl., Ex. M (Ladd Tr. 16:18-20; 18:12-14; 18:18-19:4; 19:14-17).)  Ladd also understood that the three often co-invested.  (*Id.*, at 19:18-20.)  Ladd understood from news articles that Honig and Brauser had co-invested in the past.  (*Id.*, at 20:17-21:2.)

110.    Ladd periodically reviewed MGT's Transfer Agent records, and other sources of information about who his investors were.  (Brown Decl., Ex. M (Ladd Tr. 330:24-331:15; 425:2-12).)  Those records recorded the holdings of various investors (*id.*), and the number of shares issued to them at various times. (*E.g.*, *id.*, Ex. BB (Ladd May 20, 2013 email to transfer

agent complaining about their delay in updating MGT's share count as a result of Warrant exercises).)  Ladd understood that he could not solely rely on an investor's public disclosures of what he owned and review of Transfer Agent records was a way to prevent a "secret accumulation" of MGT stock by an investor.  (*Id.*, Ex. M (Ladd Tr. 330:24-331:15).)

111.    Both Ladd and Honig referred to Honig and his investors as a "group."  *E.g.*, Brown Decl., Ex. C (June 21, 2012 Honig email to Ladd [SEC-FBI-E_0045334] (Honig asking Ladd "to think about how much money my group can come in with.")); *id.*, Ex. EE (Ladd October 4, 2015 email to MGT Board [ICM_SEC_00005588] (Ladd describing the term sheet for the 2015 financing and noting that "[t]he investor group is led by Barry Honig" and that the group's ownership will be "16.7 %"); *id.*, Ex. BBB (Ladd November 29, 2015 email to Honig) [SEC-FBI-E-0059787] (Ladd reporting that MGT's total common shares outstanding includes "your group's 2.8 million [shares]").)

112.    Ladd knew that Honig was sensitive to the group issue, and wanted no one to refer to him and his co-investors as a group.  Ladd understood that Honig wanted to avoid liability for short swing profits under Exchange Act Section 16(b), which allows the disgorgement of profits from purchases and then sales of an issuer's stock by 10% owners, with the 10% ownership trigger calculated using the Section 13(d)(3) principles that aggregate the holdings of members of any group under Section 13(d).  (Brown Decl., Ex. M (Ladd Tr. 344:20-345:19) ("[T]here was a topic that, for lack of a better term, is an elephant in the room in terms of all these investors, mainly for Section 13 purposes, need to be legally not a group;  otherwise, a company like ours could disgorge them of any profits they make on a deal.. . .I believe [the issue] was important to them.")); *see also id.* (Ladd Tr. 346:6-24 ("And, again the impact would be one of Section 16.  If they were deemed to be a group, they would become de facto affiliates

by owning more than 10 percent.  At that time, any short swing profits become the property of the company.")).)

113.    Ladd's comments on deal documents from as far back as the 2012 financing evidence his understanding of that issue.  *See* Brown Decl., Ex. CCC (Ladd questioning deal provision that would give the investors voting rights:  "My guess is that none of the investors want to have a vote to taint their Section 13 or Section 16 obligations.")  And Honig, himself, made his desire to avoid the "group" label clear in his response to Ladd's November 29, 2015 email, in which Ladd twice called Honig and his co-investors, "your group."  (*Id.*, Ex. BBB ([SEC-FBI-E-0059787-88]).  Ignoring the substance of Ladd's email in which Ladd had detailed MGT's current and projected financial condition, Honig responded:  "I am not part of a group.  I invested individually." (*Id.* [SEC-FBI-E-0059787].)

114.    Ladd—who refers to himself as a Wall Street veteran (Brown Decl., Ex. M (Ladd Tr. 108:11-16)) — also understood that Honig's intentions were to gain control of a large quantity of MGT stock by his group of investors, to then engineer some publicity generating event, and to sell the shares at the resulting inflated prices.  As early as November 2012, Ladd corresponded with a person he believed to be the famous investor, David Einhorn, about Honig's recently announced investment in MGT.  (*Id.*, Ex. DDD (Ladd November 14, 2012 email exchange with David Einhorn).)  In that exchange, Mr. Einhorn told Ladd:  "Any involvement with Honig or Hudson Bay sends a disturbing message to investors that MGT will end up diluting thru acquisition [sic] financing with these guys.  Honig is a recidivous [sic] stock promotor who as I have researched seems to govern a great % of the companies [sic] stock and then Pump the stocks on corporate news with a strategy to hedge their investments, without any regard for shareholders value.  Hence I did and will again short your stock. . ." (*Id.*, Ex. DDD

(Einhorn November 14, 2012 email to Ladd [Ladd-MGT-00005511]).)

115.    Ladd later suspected that Einhorn had accurately predicted Honig's behavior. After the 2012 financing, John Ford wrote a piece on MGT for *Seeking Alpha* touting the likely prospect that MGT would soon settle its ongoing patent litigation, resulting in a possible doubling of MGT's share price "within the next couple of weeks."  (Brown Decl., Ex. EEE (April 11, 2013 *Seeking Alpha*, "Is MGT About to Receive a Big Settlement?").)  Ladd thought the article was false.  (*Id.*, Ex. M (Ladd Tr. at 238:11-239:6; 240:2-240:11).)  And when he saw it, Ladd suspected that Honig or another MGT investor had paid Ford to write it. (*Id.*, at 241:3-242:16.)  In fact, as Ladd knew, Ford had received MGT stock in an assignment from Stetson soon after Ford wrote his first MGT article in November 2012.  (*Id.*, Ex. FFF (November 5, 2012 *Seeking Alpha*, "Why MGT Lawsuit Could Provide a 2X Near-term Return"); *id.*, Ex. GGG (Ladd November 21, 2012 email to MGT Controller, forwarding Stetson request for help in assigning MGT preferred stock and warrant to John Ford); *id.*, Ex. A (November 30, 2012 MGT Form S-3, at 11 (listing John Ford among selling stockholders)).)  Ladd knew that Honig, Groussman and Stetson had all begun converting their MGT preferred shares into common stock immediately prior to the publication of Ford's April 11, 2013 piece.  (*See* ¶ 82, *supra.*)

116.    In January 2016, after the 2015 financing had closed, Ladd agreed to Honig's demand that he send $125,000 to a stock promoter to promote MGT to the public.  (Brown Decl., Ex. M (Ladd Tr. at 198:23-199:3; 201:1-10).)  That payment resulted in a piece about MGT and Honig's investment published in a newsletter called the *Small Cap Leader*, on February 3, 2016.  (*Id.*, Ex. RR (February 3, 2016 the -*Small Cap Leader*, "New Alert:  MGT Capital Investments, Inc.").)  MGT's payment for the promotion was not disclosed in its disclaimer.  (*Id.*)  When Ladd was asked by the New York Stock Exchange ("NYSE") to list all promotions MGT had paid for

during 2016, he omitted MGT's payment to the stock promoter in January 2016.  (*Id.*, Ex. HHH (June 10, 2016 MGT Response to May 23, 2016 NYSE request for comments and further information [MGT_SEC_00024987]).)  Ladd testified that the omission was inadvertent.  (*Id.*, Ex. M (Ladd Tr. 210:7-19).)

117.    Ladd had an unfavorable view of Honig's integrity.  He testified that Honig was a "scumbag," which he defined as a "greedy, pushy, arrogant, stupid, little, you know man." (Brown Decl., Ex. M (Ladd Tr. at 12:1-8).)  He understood Honig to have a "public persona . . . [as] a promoter of crap."  (*Id.*, at 253:21-254:4.)  From his review of "many, many articles by short sellers," Ladd understood that Honig's reputation was that "he makes money only for himself, not for stockholders."  (*Id.*, at 254:5-8.)  Ladd believed that "everything needs to be in writing with Honig."  (*Id.*, at 389:13-25.)  In Ladd's view, as he dealt with Honig, he "became, and always will, always was, hyper-vigilant [sic] anything we did with Mr. Honig."  (*Id.*, at 254:11-13.)

118.    On the specific question of whether Honig was acting with his co-investors as a group, Ladd learned early on that Honig was possibly being investigated by the SEC for acting as a member of an undisclosed group.  As Ladd was seeking NYSE approval for issuance of shares in connection with the 2012 financing, he learned of a rumor that the SEC was investigating the group status of Honig, Hudson Bay and Iroquois, and Ladd discussed that rumor with his NYSE contact, Mr. Machado.  (Brown Decl., Ex. M (Ladd Tr. at 468:22-470:22).)

**D.  The Roles of Kaplowitz, Marcus, Perlman[3], Wu, Kesner and Guarneri-Ferrara**

119.    From Ladd's perspective, Harvey Kesner, a partner at SRF, represented Honig

---

[3]    At the time, Perlman was known as Avital Even-Shoshan.  (Brown Decl., Ex. N (Perlman Tr. 31:25-32:4).)

and the investors (other than Hudson Bay and Iroquois) in the 2012 financing, and Honig and all of the investors in the 2015 financings.  (Brown Decl., Ex. M (Ladd Tr. 354:1-3; 359:12-17; 368:3-8; 489:7-12).)  Ladd understood that Kesner did not represent him or MGT.  (*Id.*, at 269:8-25.)  Contemporaneous Ladd emails confirm that understanding.  (*E.g.*, *id.*, Ex. I (Ladd October 17, 2012 email to Kaplowitz noting that the documents for the 2012 transaction "were prepared by the lead investor"); *id.* (Kesner October 17, 2012 email to Kaplowitz and Marcus conveying "the comments on the documents below" from his meeting with Honig [MGT-SEC-2022-006042-43]).)  One example that confirms Ladd's understanding that Kesner's interests were aligned with Honig, and not MGT, is the Ladd October 1, 2015 email to Honig and Stetson in which he declares:  "Harvey just killed the deal . . . he insists on a make whole if we ever sell stock lower than 25 cent . . . i.e., ratch[]et."  (Brown Decl., Ex. DD.)  As both Kesner and Ladd knew, ratchets were provisions that protected investors, and gave no benefit to the issuer.  (*See* Brown Decl., Ex. H (Kesner October 14, 2012 email to Ladd among others [Ladd-MGT-00077700] ("If the company values itself less than is indicated by the $3 per unit this raise and accepts lower money, the investors 'arguably' overpaid and are being penalized for coming in early and helping the co.").)

120.    SRF confirmed for Ladd that Kesner's loyalties lay with Honig and not him in getting Ladd to execute a conflict waiver in 2012 and again in 2015.  In the 2012 conflict waiver letter, SRF disclosed that the firm was currently representing Barry Honig, "and/or his affiliates and related entities (the "Affiliates"), as well as other potential groups of investors who have a pre-existing relationship with Mr. Honig and of which Mr. Honig may be deemed to be representative. . . . In light of our ongoing representation of the Honig Investors, we are requesting your consent on behalf of the Company to our firm's representation of the Company

and the Honig Investors." (Brown Decl., Ex. III (SRF October 11, 2012 email to Ladd [Ladd-MGT-00002466]).)

121. SRF asked Ladd to sign a similar, but different letter, in 2015, one that Kaplowitz remembered was drafted by Kesner. (Brown Decl., Ex. JJJ (Kaplowitz Tr. 129:18-130:8); *id.*, Ex. KKK (Engagement Letter, dated December 4, 2015.) In that letter, which Ladd signed, SRF told Ladd: "[W]e have informed you that we have represented Barry Honig, Michael Brauser, John Stetson, John O'Rourke, Mark Groussman, . . ., their respective affiliates, and certain other investors in [MGT] and [SRF] may represent others who are investors in [MGT] and [you acknowledge] that [MGT] waives any and all conflicts with respect thereto . . . that could exist or arise as a result of such representation or ownership (subject to the above prohibition of representation of parties wherein an interests [sic] that may be directly adverse to you exist [sic]." (*Id.* (December 5, 2015 Engagement Letter [SEC-Sichenzia-E-0014767]).)

122. Email traffic around both transactions reflects that Honig, too, thought he and his investors were represented by Kesner. *See, e.g.,* Brown Decl., Ex. LLL (Honig October 16, 2012 email to Stetson directing him to have Kesner put certain terms in the deal documentation with MGT); *id.*, Ex. I (Kesner October 17, 2012 email to Kaplowitz and Marcus reporting comments on deal documents made to him by Honig [MGT-SEC-2022-006043-45]). While Kesner appears to have had less of a role in the 2015 financing, Honig called on him to make his October 2015 Schedule 13G filing on his behalf, disclosing his MGT holdings, showing that he believed Kesner represented him in at least that aspect of the 2015 investment. (*Id.*, Ex. MMM (Honig October 9, 2015 email to Kesner (advising that he needs "MGT . . . holding filed"); *id.*, Ex. OO (Honig October 16, 2015 Schedule 13G filing); *id.*, Ex. NNN (SRF October 15, 2015 email to SEC printer attaching draft Schedule 13G for Honig, and cc'ing Kesner and Perlman, but not

Ladd).)  Kesner could not answer the question of whose interests he represented in reviewing a Schedule 13G —whether it was the filer's or the issuer's who might have paid for the submission—but he acknowledged that the information to complete the form (including whether the filer was a member of a group) would have come from Honig, not MGT.  (*Id.*, Ex. L (Kesner Tr. 168:12-170:2).)

123.    Kaplowitz, MGT's longstanding counsel, understood that Kesner represented Honig (Brown Decl., Ex. JJJ (Kaplowitz Tr. 22:8-22:13)), calling Kesner "very, very loyal to Barry [Honig]."  (*Id.*, at 87:19-88:3.)  As Kaplowitz put it:   "I will tell you that no matter who was represented [sic] MGT, it was often me and other people I asked for help, but if it involved Barry, then Harvey would have his nose in it or have a say in it or want to get involved in it." (*Id.*, at 23:10-22.)

124.    Marcus, a non-equity SRF partner (Brown Decl., Ex. OOO (Marcus Tr. 9:1-13)), understood that simultaneous representation of opposite sides of a transaction was "clearly . . . a conflict of interest."  (*Id.*, at 24:25-25:10.)  Perhaps as a result, and because he did not recall knowing about the conflict waiver that SRF sought from Ladd in the 2012 transaction (*id.*, at 22:8-13), Marcus saw Kesner as merely acting as a go-between between Honig and MGT, in 2012.  (*Id.*, at 50:24-51:6; *see also id.*, at 14:5-7 (testifying that he was not "sure" if Kesner did any work for MGT).)  Marcus had only a limited role in the 2015 financing and the D-Vasive acquisition in 2016. (*Id.*, at 17:3-7; 90:5-14.)

125.    Like Marcus, Kesner understood that SRF policy prohibited simultaneous representation of the two sides of a transaction. (Brown Decl., Ex. L (Kesner Tr. 84:20-24 ("We would never represent an investor in a company at the same time that we were representing the issuer.  That's something we would not do.")).)  Kesner testified that his role in the 2012

financing was limited to helping Kaplowitz acclimate to the firm after his recent arrival (*id.*, at 101:25-102:6), and that he was acting as go-between between Honig and Kaplowitz since he understood that Honig did not like Kaplowitz. (*Id.*, 124:2-9; 124:25-125:4.)  Kesner maintained that as he reviewed the deal documents, he had no party's interest in mind.  (*Id.*, at 102:12-16 ("I had no one's particular interest in mind other than the interest of seeing a transaction get documented for our client, MGT.").)

126.    But Kesner made clear that his loyalties throughout the 2012 and 2015 financings lay with Honig.  When asked whether he would have revealed to MGT confidential information supplied to him by Honig about whether Honig was acting in concert with other MGT investors, Kesner acknowledged that he was not sure that he would have.  (Brown Decl., Ex. L (Kesner Tr. 147:9-148:10).)

127.    In an Amended Complaint that Kesner filed in a defamation action he brought against two journalists (and which was transferred from the Southern District of Florida to the Southern District of New York), *Kesner v. Buhl,* No. 20 Civ. 3454 (PAE) (S.D.N.Y), Kesner asserted: "Kesner has never served as counsel for MGT."  (Brown Decl., Ex. YYY (Excerpts from Amended Complaint (DE 36)) at Paragraph 14.)  Besides attesting to the truth of all the facts alleged in the Amended Complaint (*id.* (DE 49-1), Kesner added to them in a subsequent filing, maintaining that no one from SRF represented MGT during the period alleged by the Commission in this action; that Kaplowitz had represented the company during that period, and that he had only joined SRF later; and that when Kaplowitz arrived at SRF, he was instructed by the executive committee of the firm to decline further representation of MGT.  (*Id.* (DE 150-1, at Paragraph 15a) (relevant excerpts from Kesner's Local Rule 56.1 Response in opposition to Defendant's motion for summary judgment).)

128.     Ladd, Kaplowitz and Marcus believed that Tara Guarneri-Ferrara—the associate

on the 2012 transaction —was Kesner's associate.  *See* Brown Decl., Ex. PPP (October 14, 2012

email exchange between Ladd and Kaplowitz and Marcus (Ladd at 5:21 a.m.:  "[W]ho is Tara?"

[MGT-SEC-2022-005864]); *id.*, Ex. QQQ (Kaplowitz October 14, 2012 email to Ladd at 7:03

a.m.: she is the "associate working with h[arvey]." [MGT-SEC-2022-005868]); *see also id.*, Ex. I

(Ladd October 17, 2012 email to Kaplowitz (noting that the documents for the 2012 transaction

"were prepared by the lead investor.") [MGT-SEC-2022-006042]; *see also id.*, Ex. M (Ladd Tr.

359:6-17).)

129.     Perlman testified that she represented MGT, but she did not disclose to Ladd or

Kaplowitz the years of work for Honig, Stetson, O'Rourke, Groussman and Brauser that Kesner

had brought her while she was a solo practitioner. (Brown Decl., Ex. N (Perlman Tr. 26:18-

31:11; 41:8- 45:3; 67:14-24; 68:3-22).)  As she testified, Kesner was the main source of her work

while she was a solo practitioner.  (*Id.*, Ex. N (Perlman Tr. 48:22-25.).)

130.     Wu joined the MGT team in 2016 and represented MGT on the D-Vasive

acquisition.  (Brown Decl., Ex. RRR (Wu Tr. 33:14-22).)  She had worked on very few

transactions with Kesner while at SRF. (*Id.*, at 34:16-18.)

### E.  MGT's Lawyers (and Ladd) Relied on a Single 2012 Email from Kesner in Determining Whether Honig Was Acting with Others as a Group

131.     In response to an October 18, 2012 email from Honig to Kesner (which Kesner

forwarded to Marcus) in which Honig identified all those investors who would be participating

with him in the October 2012 financing, and their allocations (Brown Decl., Ex. SSS), Marcus

asked Kesner:  "Are they acting as a group?"  (*Id.*  [MGT-SEC 2022-000086]).  Less than a

minute later, Kesner responded "No!"  (*Id.*)  Marcus forwarded the email exchange to Ladd the

next day, although he said he did so inadvertently, and did not intend Ladd to rely on it.  (*Id.*

[MGT-SEC-2022-000085-86]; Brown Decl., Ex. OOO (Marcus Tr. 39:15-40:1; 41:21-42:1).)

132.    Marcus testified that he asked the question because Kaplowitz asked him to, (Brown Decl., Ex. OOO (Marcus Tr. 36:18-23)), but he never discussed with Kaplowitz why he wanted Marcus to ask the question.  (*Id.*, at 29:6-8.)  Marcus understood that Kesner was expressing his personal view (*id.*, at 53:2-53:7), and, in answering the question, Marcus believed that Kesner did not act as a lawyer for MGT.  (*Id.*, at 28:4-8.)  Marcus did not challenge Kesner's response (*id.*, at 54:6-15), and he did no independent analysis of the group question, other than reviewing the investors' own representations in the stock purchase agreements that they were acting independently.  (*Id.*, at 53:15-54:1.)  Marcus testified that, to his recollection, there were no further discussions with anyone about Kesner's response or the issue.  (*Id.*, at 41:7-20.)

133.    Although Kaplowitz testified that it was part of his practice to discuss the group issue in connection with reviewing a client's registration statement (Brown Decl., Ex. JJJ (Kaplowitz Tr. 47:8-47:11)), he recalled no specific conversation in connection with either of Honig's investments or the MGT registration statements that followed.  (*Id.*, at 62:7-62:13; 45:8-46:6.)  Kaplowitz recalled nothing about the Firm's work on MGT's 2015 Form 10-K, filed April 14, 2016 (Tong Decl., Ex. K), or whether the Firm had even been retained to review it. (Brown Decl., Ex. JJJ (Kaplowitz Tr. 97:18-98:6).)

134.    Kesner explained that his emphatic "No!" in response to Marcus' group question was a reaction to what he thought was a "stupid question."  (Brown Decl., Ex. L (Kesner Tr. 142:6-143:15).)  He testified that he determined the answer was no because of the involvement of Hudson Bay and Iroquois in the 2012 financing; according to Kesner, those two investors "would never enter into documentation that would allow them to become a group. . .with any other party on this list."  (*Id.*)  Later, Kesner insisted that the group determination cannot be

made at the investment stage.  It is "acting in concert for purposes of voting or disposition of securities that largely is the arbiter, based upon the literature, of what is a group." (*Id.*, at 143:16-144:16.)  Kesner offered that MGT's lawyers should have asked questions about group membership of the investors in preparing the November 30, 2012 Form S-3 (*id.*, Ex. A) by issuing a selling shareholder questionnaire. (*Id.*, Ex. L (Kesner Tr. 153:4-155:11).)  The selling shareholder questionnaire provided to investors in the 2012 financing asked no questions about whether the investors were acting in concert with others. (*Id.*, Ex. TTT (Hudson Bay October 22, 2012 Selling Securityholder Notice and Questionnaire).)  Even so, there is no evidence that any such questionnaire was sent out by SRF or MGT in connection with the November 6, 2015 Form S-1 Registration statement.  (Tong Decl., Ex. O.)

135.    Kesner had no recollection of ever discussing the group issue after Marcus' October 18, 2012 inquiry— which was when Honig, Groussman and Stetson were acquiring the MGT stock. (Brown Decl., Ex. L (Kesner Tr. 149:21-25).)  But Kesner also testified that if he had had confidential information from Honig that Honig was acting as a group with any of the investors, he might have not shared that information with Marcus or Kaplowitz in any event because it "would be a confidential piece of information from one of my clients concerning another of my clients . . .it would raise a difficult ethical dilemma. . . . " (*Id.* (Kesner Tr. 147:9-148:6).)

136.    When Ladd was asked by the NYSE in October 2012 whether any of the investors in the October 2012 financing were acting in concert, in an email on which Marcus was copied, Ladd answered "no, not to the company's knowledge," less than 20 minutes after receiving the NYSE's inquiry. (Brown Decl., Ex. UUU (Ladd October 23, 2012 email to Machado at the NYSE, cc'ing Marcus [Ladd-MGT-00004736]; *id.* (Machado October 23, 2012 email to Ladd,

cc'ing Marcus, asking whether any investors were "acting in concert" [Ladd-MGT-00004736-37].)  Neither Kaplowitz nor Marcus could recall any consultation with Ladd prior to Ladd's response to the NYSE.  (*Id.*, Ex. JJJ (Kaplowitz Tr. 95:15-18);  *id.*, Ex. OOO (Marcus Tr. 58:1-22).)

137.    Neither associate, Tara Guarneri-Ferrara (from the 2012 transaction) or Avital Perlman (from the 2015 transaction, including the November 6, 2015 MGT S-1 and the MGT 2015 Form 10-K),[4] could remember any discussions about the group issue.  (Brown Decl., Ex. O (Guarneri-Ferrara Tr. 23:21-24); *id.*, Ex. N (Perlman Tr. 62:14-25; 111:25-112:4).)  Neither associate ever performed a group analysis for Section 13(d) purposes while at the firm.  (*Id.*, Ex. O (Guarneri Ferrara Tr. 47:4-9); *id.*, Ex. N (Perlman Tr. 62:14-25).)

### F.  Ladd Failed to Disclose Information to MGT's Lawyers That Was Relevant to an Analysis of the Group Issue

138.    Kaplowitz did not know that Honig, Stetson and O'Rourke worked out of the same office.  (Brown Decl. Ex. JJJ (Kaplowitz Tr. 62:14-16; 64:20-23).)  Nor could he recall knowing that the three had co-invested together on earlier transactions.  (*Id.*, at 62:17-21; 64:24-65:8; *see also id.*, at 67:25-68:3 (no recollection of knowing that Groussman had co-invested with Honig.).)  And he testified that both sets of facts would have been incorporated in his group analysis if he had known them.  (*Id.*, at 67:2-6.)  Kaplowitz also testified that he did not know that Ladd distrusted Honig (*id.*, at 79:3-6); he did not recall knowing that Ladd had been told by David Einhorn that Honig was a recidivist stock promoter (*id.*, at 83:8-11); he did not know that Honig had paid John Ford to write a promotional piece about MGT (*id.*, at 92:20-25); and he did

---

[4]      As reflected in contemporaneous emails (Brown Decl., Ex. VVV), Perlman worked on Amendment No. 2 to MGT's 2015 Form S-1 (Perlman January 8, 2016 email to MGT auditors re amendment to MGT's November 6, 2015 Form S-1 [Ladd-MGT-00098909]), and saw at least one draft of MGT's 2015 Form 10-K (MGT auditors April 14, 2014 email to Perlman and others [SEC-Sichenzia-E-0001119].)

not recall knowing that Honig had told Ladd to pay a stock promoter to publish a piece about MGT in February 2016, and that Honig had sold MGT shares after the piece pushed the stock higher.  (*Id.*, at 100:6-101:7; 102:2-105:5.)

139.   Marcus, too, testified that he did not know about Ladd's distrust of Honig (Brown Decl., Ex. OOO (Marcus Tr. 83:20-22)), about his exchange with Einhorn (*id.*, at 84:2-22), about Honig's payment to John Ford to write favorably about MGT and the later sale of stock in April 2013 (*id.*, at 78:24-79:22), or about Honig's demand that Ladd pay a promoter in 2016 to write an article about MGT that pushed the stock's price up. (*Id.*, at 87:24-88:24).

Dated:  January 31, 2023
            New York, NY

Respectfully submitted,

s/ Nancy A. Brown
            Nancy A. Brown
            Jack Kaufman
            Katherine Bromberg

100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1023 (Brown)
Attorneys for Plaintiff Securities and Exchange
Commission