**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,     :

       :

      **Plaintiff,**     :

       :     **18 Civ. 8175 (ER)**

    **– against –**     :

       :     **ECF CASE**

BARRY C. HONIG, ROBERT LADD,     :

ELLIOT MAZA, BRIAN KELLER,     :

JOHN H. FORD, GRQ CONSULTANTS, INC., and     :

HS CONTRARIAN INVESTMENTS, LLC,     :

       :

      **Defendants.**     :

-----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT AGAINST
## DEFENDANT ROBERT LADD AND IN
## <u>OPPOSITION TO LADD'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

SECURITIES AND EXCHANGE COMMISSION
Nancy A. Brown
Jack Kaufman
Katherine S. Bromberg
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Attorneys for Plaintiff

January 31, 2023

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................ iv

PRELIMINARY STATEMENT .............................................................................1

**STATEMENT OF UNDISPUTED FACTS** ..........................................................5

    A.  Background ....................................................................................................5

    B.  Facts Concerning Ladd Section 5 Violations ...............................................6

        (1)      Ladd's May 9-12, 2016 E*Trade Account MGT Stock Sales ................6

        (2)      Ladd's Additional MGT Stock Sales in His Parents' TD Ameritrade Account ......8

    C.  Facts Concerning Ladd's Materially False Forms 4 and 144 and New Account Form.....10

        (1)      Ladd's Materially False Form 4....................................................10

        (2)      Ladd's Materially False Forms 144 and New Account Form...............13

    D.  Facts Concerning Ladd's Section 16(a) and Rule 16a-3 Violations.................13

    E.  Facts Concerning Ladd's Section 13(d) and Rule 13d-2 Violation .................14

    F.  Facts Concerning Ladd's May 9, 2016 Materially False Press Release ...........14

**STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION
TO LADD'S MOTION FOR SUMMARY JUDGMENT** .......................................16

    A.  Honig, Groussman and Stetson Acted in Concert in Connection with Their
        2012 MGT Investment ...............................................................................17

    B.  Honig, Brauser, Groussman, Stetson and O'Rourke Acted in Concert in
        Connection with Their 2015 MGT Investment ............................................18

    C.  Ladd's Understanding of MGT's Regulation S-K Disclosure Obligations
        in its Form S-1 and Form 10-K and His Knowledge of Section 13(d)'s Disclosure
        Requirements for Investors Who Are Acting in Concert...................................20

    D.  Ladd's Knowledge that Honig Was Acting in Concert with Brauser, Groussman,
        Stetson and O'Rourke in 2015 and 2016 ....................................................21

i

E.  The Involvement of the Lawyers from SRF ....................................................25

  (1)   Who Represented Whom ....................................................................25

  (2)   Consideration of the Group Issue ......................................................26

  (3)   The Facts Ladd Failed to Disclose to His Lawyers .............................27

**SUMMARY JUDGMENT STANDARD** ...................................................................27

**ARGUMENT** .............................................................................................................28

**I.   SUMMARY JUDGMENT SHOULD BE GRANTED TO THE SEC ON ITS
      STRICT LIABILITY CLAIMS AGAINST LADD** ...........................................28

  A.  Ladd Violated Securities Act Section 5 ..........................................................28

    (1)   Ladd's E*Trade Account MGT Stock Sales Violated Section 5 ...........28

    (2)   Ladd's Stock Sales in His Parents' TD Ameritrade Account Violated
          Section 5 .............................................................................................31

  B.  Ladd Violated Exchange Act Section 16(a) and Rule 16a-3 Thereunder .........32

  C.  Ladd Violated Section 13(d) and Rule 13d-2 Thereunder ...............................33

**II.  SUMMARY JUDGMENT SHOULD BE GRANTED TO THE SEC ON ITS
      FRAUD CLAIMS AGAINST LADD FOR MGT'S FALSE PRESS RELEASE AND
      LADD'S OWN FALSE FORMS 4 AND 144 AND NEW ACCOUNT FORM** .........35

  A.  Ladd's May 9, 2016 Press Release Was Materially False ................................36

  B.  Ladd's May 31, 2016 Form 4 Was Materially False .......................................39

  C.  Ladd's Form 144 Was Materially False, As Was His E*Trade New Account Form ........40

  D.  Ladd Made Each of His False Statements Intentionally or with Reckless Disregard
      for Their Truth .................................................................................................43

**III. SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S CLAIMS THAT
      WHEN LADD SIGNED MGT'S 2015 FORM S-1 AND 2016 FORM 10-K, LADD
      KNEW, OR WAS RECKLESS IN DISREGARDING, THAT HONIG, BRAUSER,
      GROUSSMAN, STETSON, AND O'ROURKE WERE ACTING AS AN
      UNDISCLOSED GROUP** ................................................................................46

A. Ample Evidence Would Support a Jury Finding that Honig, Brauser, Groussman, Stetson and O'Rourke Acted as a Group in Acquiring, Holding, Voting and Disposing MGT Stock in 2015 and 2016 .........................................................47

    (1)   Honig, Brauser, Groussman, Stetson and O'Rourke Were Frequent Co-Investors, and Honig, Groussman, Stetson and O'Rourke Shared Offices...........................................................................................................49

    (2)   Honig Directed the Negotiations of Deal Terms for both the 2012 and 2015 Financings ....................................................................................................49

    (3)   The Group Members Communicated About the Investments ..............................50

    (4)   MGT and Ladd Considered Honig, Brauser, Groussman, Stetson and O'Rourke as a Group in the 2015 Financing ........................................................50

    (5)   Honig and His Co-Investors Converted and Sold Their Shares, and Exercised Their Warrants at or About the Same Time, and All Agreed to the Terms of Ladd's Warrant Exchange and Warrant Modification ..........................................51

B. Ample Evidence Would Support a Jury Finding That Ladd Knew or Recklessly Disregarded that Honig and His Co-Investors Were Acting as a Group in 2015, but Ladd's Scienter Is Classically a Jury Question..............................................52

C. Any Reliance Ladd Placed on SRF's Failure to Advise Him to Disclose Honig's Group Status Was Misplaced and Unreasonable ................................................55

    (1)   After Kesner's 2012 Email Denial of Honig's Group Status, There Is No Evidence that the Topic Was Ever Discussed or Considered by Anyone Again...57

    (2)   Neither Ladd, Marcus Nor Kaplowitz Could Rely on Honig's Lawyer for Advice ................................................................................................................57

    (3)   Ladd Did Not Make Full Disclosure to Kaplowitz of What He Knew About Honig and His Group .............................................................................................59

D. The Evidence that Supports the Commission's Primary Violation Claims Against Ladd for Intentional or Reckless Failure to Disclose Honig's Group Status Also Supports Its Claim for Aiding and Abetting the Violations Asserted Against Honig, Brauser, Groussman, Stetson and O'Rourke .....................................................60

CONCLUSION    .............................................................................................62

**TABLE OF AUTHORITIES**

**Page**

CASES

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ...........................................37

*Glob. Intellicom v. Thomson*, 99 Civ. 342 (DLC),
    1999 WL 544708 (S.D.N.Y. July 27, 1999) ............................................................48

*Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14 Civ. 5226 (DLC),
    2015 WL 2212215 (S.D.N.Y. May 12, 2015) ..........................................................48

*Gruber v. Gilbertson*, No. 16 Civ. 9727 (WHP),
    2021 WL 2482109 (S.D.N.Y. June 17, 2021) .........................................................53

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
    95 F. Supp. 2d 169 (S.D.N.Y. 2000)........................................................................48

*In re Joseph John VanCook*, SEC Rel. No. 34-61039A,
    2009 WL 4026291(SEC Nov. 20, 2009), *pet. denied VanCook v. SEC*,
    653 F.3d 130 (2d Cir. 2011)......................................................................................42

*In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113 (2d Cir. 2011)............................ 58-59

*In re Lek Secs. Corp.*, No. 17 Civ. 1789 (DLC),
    2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019) ..........................................................58

*In re Petrobras Secs.*, 862 F.3d 250 (2d Cir. 2017)......................................................39

*In re Yukos Oil Co. Secs. Litig.*, No. 04 Civ. 5243 (WHP),
    2006 WL 3026024 (S.D.N.Y.  Oct. 25, 2006) .........................................................38

*Jeffreys v. City of NY*, 426 F.3d 549 (2d Cir. 2005)......................................................28

*Lerner v. Millenco, LP*, 23 F. Supp. 2d 337 (S.D.N.Y. 1998)......................................48

*Markowski v. SEC*, 34 F.3d 99 (2d Cir. 1994)...............................................................56

*Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245 (S.D.N.Y. 2008)...............58

*Morales v. New Valley Corp*, 999 F. Supp. 470 (S.D.N.Y. 1998),
    *aff'd sub nom. Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999)............................51

*Morales v. Quintel Ent., Inc.*, 249 F.3d 115 (2d Cir. 2001)......................................47-48

*Nagelberg v. Meli*, No. 17 Civ. 2524 (LLS),
  2022 WL 2078010 (S.D.N.Y. June 9, 2022) ..................................................................52

*Nokaj v. N. E. Dental Mgmt., LLC,* No. 16 Civ. 3035 (KMK),
  2019 WL 634656 (S.D.N.Y. Feb. 14, 2019)..................................................................56

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007)..................................................................47, 51

*Rubenstein v. Int'l Value Advisers,* LLC, 959 F.3d 541 (2d Cir. 2020) ........................................22

*Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, No. 99 Civ. 2821 (VM),
  2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) ...............................................................48

*SEC v. Aly*, No. 16 Civ. 1581986 (PGG), 2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018)....... 35-36

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ..................................................................61

*SEC v. AT&T, Inc.*, No. 21 Civ. 1951 (PAE), 2022 WL 411466 (S.D.N.Y.  Sept. 8, 2022).........52

*SEC v. Blackburn*, No. 15 Civ. 2451, 2020 WL 565551 (E.D. La. Feb. 5, 2020)........................30

*SEC v. Bronson*, 14 F. Supp. 3d 402 (S.D.N.Y. 2014) ..................................................29

*SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290 (S.D.N.Y. 2015) ...........................................29

*SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421 (E.D.N.Y. 2016)................................ 53-54

*SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475 (S.D.N.Y. 2002) ...........................................54

*SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587 (S.D.N.Y. 1993) ...................................34

*SEC v. Druffner*, 517 F. Supp. 2d 502 (D. Mass. 2007),
  *aff'd sub nom. SEC v. Ficken*, 546 F.3d 45 (1ˢᵗ Cir. 2008).....................................................42

*SEC v. E-Smart Tech., Inc.*, 85 F. Supp. 3d 300 (D.D.C. 2015)....................................................32, 33

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) .........................................................................41, 43

*SEC v. Gallison*, 588 F. Supp. 3d 509 (S.D.N.Y. 2022)................................................. 43-44, 45

*SEC v. Gann*, No. 05 Civ. 0063, 2008 WL 857633 (N.D. Tex. Mar. 31, 2008),
  *aff'd*, 565 F.3d 932 (5ᵗʰ Cir. 2009)...............................................................................42

*SEC v. Greenstone Holdings, Inc.*, No. 10 Civ. 1302 (MGC),
  2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012), *aff'd sub nom.*
  *SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) .................................................................41, 42

*SEC v. Honig*, No. 18 Civ. 1875 (ER),
    2020 WL 906383 (S.D.N.Y. Feb. 25, 2020) .................................................. 35, 37, 38-39, 46

*SEC v. Jammin Java Corp.*, Case No. 2:15-cv-08921,
    2016 WL 6595133 (C.D. Cal. July 18, 2016) ................................................... 33-34

*SEC v. Longfin Corp.*, 316 F. Supp. 3d 743 (S.D.N.Y. 2018) ...................................... 29

*SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391 (S.D.N.Y. 2016) ............................... 36

*SEC v. O'Meally*, No. 06 Civ. 6483 (LTS),
    2010 WL 3911444 (S.D.N.Y. Sept. 29, 2010) ................................................. 56, 58

*SEC v. Penthouse Int'l Inc.*, 390 F. Supp. 2d 344 (S.D.N.Y. 2005) ............................... 39

*SEC v. Savoy Indus., Inc.* 665 F.2d 1310 (D.C. Cir. 1981) .............................................

*SEC v. Sayid*, 17 Civ. 2630 (JFK), 2019 WL 6307367 (S.D.N.Y. Nov. 25, 2019),
    *aff'd*, 860 F. App'x 18 (2d Cir. 2021) ....................................... 27-28, 29, 41-42, 44

*SEC v. Sayid,* 860 F. App'x 18 (2d Cir. 2021) ......................................................... 42, 44

*SEC v. Sierra Brokerage Servs.*, 712 F.3d 321 (6th Cir. 2013) ............................... 31-m32

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL),
    2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ...................................................... 35-36

*SEC v. Tourre*, 950 F. Supp. 666 (S.D.N.Y. 2013) ...................................................... 56

*SEC v. Verdiramo,* 890 F. Supp. 2d 257 (S.D.N.Y. 2011) ............................................ 34

*S. Cherry St., LLC v. Hennessee Grp. LLC* 573 F.3d 98 (2d Cir. 2009) ....................... 53

*Stone v. Sutton View Capital LLC*, No. 17 Civ. 1574 (VEC),
    2017 WL 6311692 (S.D.N.Y. Dec. 8, 2017) ...................................................... 58

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) ................. 56

*United States v. Naftalin*, 441 U.S. 768 (1979) ........................................................... 36

*Wechsler v. Steinberg*, 733 F.2d 1054 (2d Cir. 1984) .................................................. 52

*Weinstock v. Columbia Univ.*, 224 F.3d 33 (2d Cir. 2000) ............................................ 28

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) ................................................... 48

*White v. H&R Block, Inc.*, No. 02 Civ. 8965 (MBM),
2004 WL 1698628 (S.D.N.Y. July 28, 2004) ........................................................38

STATUTES, REGULATIONS AND RULES

Securities Act of 1933

Section 4(a)(4), 15, U.S.C. § 77d(a)(4) .......................................................... 40-41, 42

Section 5, 15 U.S.C. § 77e ............................................................................. *passim*

Rule 144(b)(2), 17 C.F.R. § 230.144(b)(2) ..............................................41

Rule 144(e), 17 C.F.R. § 230.144(e) ...............................29, 30, 31, 32

Rule 144(e)(1)(i), 17 C.F.R. § 230.144(e)(1)(i) ....................... 29-30

Rule 144(e)(1)(ii), 17 C.F.R. § 230.144(e)(1)(ii) ..................... 29-30

Rule 144(g), 17 C.F.R. § 230.144(g) .............................40, 41, 42

Rule 144(g)(4), 17 C.F.R. § 230.144(g)(4) ...............................40

Rule 144(h), 17 C.F.R. § 230.144(h) .............................30, 31, 41

Section 17(a)(2), 15 U.S.C. § 77q(a)(2) ............................1, 4, 35, 46

Regulation S-K, Item 403, 17 C.F.R. § 229.403 ...................20, 27, 46

Instructions to Item 403, No. 3 .............................................53

Securities Exchange Act of 1934

Section 10(b), 15 U.S.C. § 78j(b) ................................1, 35, 46, 60

Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) ...........................1, 4, 35, 46

Section 12(b), 15 U.S.C. § 78l(b) ..........................................5

Section 12(g), 15 U.S.C. § 78l(g) ..........................................5

Section 13(d), 15 U.S.C. § 78m(d) ................................... *passim*

Section 13(d)(2), 15 U.S.C. § 78m(d)(2) ...............................2-3, 34

Section 13(d)(3), 15 U.S.C. § 78m(d)(3). ................................................................. 20, 46, 47

    Rule 13d-1(a), 17 C.F.R. § 240.13d-1(a)...........................................................34

    Rule 13d-1(b)(1)(ii)(A)-(J), 17 C.F.R. § 240.13d-1(b)(1)(ii)(A)-(J) ...............................47

    Rule 13d-2(a), 17 C.F.R. § 240.13d-2(a)...................................................2, 34

    Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1))..................................................... 47

    Rule 13d-5(b)(2)(i), 17 C.F.R. § 240.13d-5(b)(2)(i)...........................................47

Section 16(a), 15 U.S.C. § 78p(a).......................................................1, 2, 13, 32, 33

    Rule 16a-3, 17 C.F.R. § 240.16a-3 .................................................1, 2, 13, 32, 33


Fed. R. Civ. P. 56....................................................................................................1

## OTHER AUTHORITIES

J. William Hicks, *Resales of Restricted Securities*, § 4.80 (March 2022 Update)........................41

"Resales of Restricted and Other Securities," SEC Rel. No. 6099,
    1979 WL 174360 (Aug. 2, 1979)..............................................................29

*SEC Rule 144 Compliance and Disclosure Interpretation*,
    http://sec.gov/corpfin/securities-act-rules, at Question 136.09
    (last updated Nov. 16, 2017)....................................................................30

Pursuant to the Court's Orders, entered September 15, 2022 (DE 307), and January 24, 2023 (DE 314), Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this Memorandum of Law in support of its Motion for Partial Summary Judgment against Defendant Robert Ladd pursuant to Fed. R. Civ. P. 56 and in Opposition to Ladd's Motion for Partial Summary Judgment.

## PRELIMINARY STATEMENT

### The Commission's Affirmative Motion for Partial Summary Judgment

The Commission seeks summary judgment against Ladd for his violations of Section 5 of the Securities Act of 1933 ("Securities Act"), and Sections 13(d) and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act") (and Rules 13d-2 and 16a-3 thereunder). The Commission also seeks summary judgment on its Exchange Act Section 10(b), and Rule 10b-5(b) and Securities Act Section 17(a)(2) claims against Ladd for his false statements in the May 9, 2016 press release issued by MGT Capital Investments, Inc. ("MGT"), his May 25, 2016 Form 144, his November 22, 2015 new account form submitted to E*Trade, and his May 31, 2016 Form 4. The Commission is entitled to summary judgment on its strict liability claims because there is no dispute that Ladd violated those provisions as a matter of law. The Commission is entitled to summary judgment on its fraud claims because there is no dispute that each false statement was material and Ladd has admitted that he knew each statement was false when he made it.

### Strict Liability Claims

Summary judgment is appropriate on the Securities Act Section 5, and Exchange Act Sections 13(d) and 16(a) claims because they all sound in strict-liability—requiring no scienter showing—and because no genuine dispute of material fact exists regarding them. To make out

its *prima facie* Section 5 claim, the Commission need only establish that Ladd engaged in unregistered MGT stock sales. The burden then shifts to Ladd to prove an express exemption from registration applicable to the particular sales at issue. No genuine dispute exists that, from May 9-12, 2016, Ladd engaged in unregistered sales of MGT stock sales for which no registration exemption applied and that, thus, Ladd violated Section 5.

Section 16(a) and Rule 16a-3 require a public company officer (such as Ladd) to file a Form 4 with the SEC disclosing any purchase or sale of the company's stock by the officer — within two business days of the trade execution date. To establish Ladd's violation of Section 16(a) and Rule 16a-3, the Commission need only show that Ladd was an officer or director of MGT, and that he failed to file the requisite Form 4 after trading MGT stock. No dispute exists that, from August 20, 2015 through May 17, 2016, Ladd made dozens of purchases and sales of MGT stock in his personal trading accounts for which he filed no Form 4. Thus, the Court should find as a matter of law that Ladd violated Section 16(a) and Rule 16a-3 thereunder.

Section 13(d)(1) requires any person who acquires more than 5% of a public company's stock to file with the SEC a "Schedule 13D" disclosing such ownership within 10 days of acquiring that amount. Section 13(d)(2) and Rule 13d-2(a) further require such persons to file "promptly" with the SEC an amended Schedule 13D regarding any material change to any prior such disclosure. Under Rule 13d-2, a "material" change includes an increase or decrease of 1% or more of stock. No dispute exists that, from June to October 2015: (1) Ladd held over 5% of MGT's outstanding stock; (2) Ladd's ownership percentage increased by more than 1%; and (3) Ladd filed no amended Schedule 13D regarding that increase. Thus, no genuine dispute exists that Ladd violated Section 13(d) and Rule 13d-2 thereunder, and the Court should grant the SEC summary judgment against Ladd on its Section 13(d) and Rule 13d-2 claims as well.

**Fraud Claims**

The Commission's fraud claims, in part, arise from the same May 2016 trading by Ladd in MGT stock. In that connection, it is undisputed that Ladd intentionally or recklessly authored a May 9, 2016 MGT press release, announcing the arrival at MGT of John McAfee, the famous cyber-security pioneer. In his press release, Ladd claimed that McAfee had sold his McAfee company for $7.6 billion. Ladd knew that statement was false when he made it, but he included it to persuade investors that McAfee would bring the same success to MGT that he had earned at his own company and to push MGT's share price higher. The press release was material, as affirmed by an MGT investor who saw it and was persuaded by the false claim that McAfee could achieve the same success in his new role at MGT.

It is also undisputed that Ladd made false and misleading disclosures to disguise the nature, extent and impropriety of his May 9-May 12 stock sales: his Form 4, filed May 31, 2016, and his Form 144 submitted May 25, 2016, as well as the new account form he submitted to E*Trade in November 2015. In his Form 4, Ladd lied about the nature of his disposal of MGT shares, claiming they had been distributed to his fund's investors for no consideration, rather than sold in unregistered sales between May 9 and May 12 for hundreds of thousands of dollars. He did so to hide his massive sell-off from the investing public. Investors who saw the Form 4 believed that they reflected Ladd's net acquisition of MGT shares; one investor has affirmed that information about an insider's sales would have been important to his decision to invest.

In his Form 144, Ladd lied to TD Ameritrade ("TDA") about those same sales, contending they had not yet occurred. He did so to hide from TDA that he had already exceeded his Rule 144 volume limitations so that his violations would evade detection and he could

continue selling the remaining MGT shares left in his TDA IRA Account. And in his new account form submitted to E*Trade, Ladd lied about his employment so that E*Trade would not monitor his compliance with the volume limitations imposed on sales of insiders' stock under Section 5. Those false statements were material to TDA and E*Trade because they were statements that informed them about their compliance with their own obligations under Section 5.

**The Commission's Opposition to Ladd's Motion for Partial Summary Judgment**

The Commission opposes Ladd's motion for partial summary judgment in its entirety.[1] In particular, Ladd's motion for summary judgment cannot be granted on the SEC's claim that Ladd violated Exchange Act Rule 10b-5(b) and Securities Act Section 17(a)(2) by failing to disclose in MGT's November 2015 Form S-1 and its April 2016 Form 10-K that Honig, Brauser, Groussman, Stetson and O'Rourke were acting as a "group" as that term is defined by Exchange Act Section 13(d). First, the Commission has provided a wealth of evidence that Honig, *et al*., did act in concert in 2015 and 2016—just as Honig, Groussman and Stetson had acted in their 2012 investment in MGT—and that Ladd knew it, creating triable issues of fact that defeat Ladd's motion for summary judgment. Second, any reliance Ladd placed on his lawyers from Sichenzia, Ross Ference ("SRF") fails as a matter of law to defeat the substantial evidence of scienter. Irrespective of what advice SRF lawyers did or did not provide him, Ladd understood why Honig wanted to conceal his group ownership, and because his and Honig's interests in

---

[1]     Ladd's motion for partial summary judgment on the SEC's fraud claims for the May 2016 press release and his false Forms 4 and 144 all argue that the misstatements were immaterial and not made with scienter. (Ladd's Memorandum of Law in Support of his Motion for Partial Summary Judgment ("Br. __"), at 20-25.) The Commission addresses those elements in its argument in support of its affirmative motion for summary judgment on those claims.

pushing MGT's stock price higher were aligned so that they could each sell their shares, Ladd

ignored what he knew and concealed Honig and his co-investors' group interest in MGT stock.[2]

For the same reasons, the Commission has raised a triable issue of fact as to Ladd's

liability for aiding and abetting the violations of Honig, Brauser, Groussman, Stetson and

O'Rourke in failing to disclose their group status and in engaging in a fraudulent pump-and-

dump of MGT shares.  Ladd's motion for summary judgment on the Commission's aiding and

abetting claim should be denied as well.

**STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF THE COMMISSION'S MOTION**

These facts are undisputed—either Ladd admitted them in his Answer or at his

deposition, or they are from indisputable documentary evidence, or both.

**A.     Background**

During the period at issue (October 2015-May 2016), MGT was a Delaware corporation

headquartered in Durham, North Carolina. (Plaintiff Securities and Exchange Commission's

Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of

Plaintiff's Motion for Partial Summary Judgment against Defendant Robert Ladd ("56.1 ¶__"),

¶1.) At all relevant times, MGT's common stock was registered with the Commission pursuant

to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it is now registered under Exchange Act

Section 12(g) [15 U.S.C. § 78l(g)]. (*Id.*) MGT's common stock was listed on NYSE-MKT from

2007 until October 19, 2016, and it is currently quoted on OTC Link. (*Id.*)

As Ladd reported in MGT's May 2016 quarterly financial disclosure filing with the SEC

---

[2]     Ladd's Motion on this claim is limited to challenging (1) that Honig, Brauser, Groussman, Stetson and O'Rourke were acting in concert; and (2) that Ladd acted with scienter when he concealed that fact from investors. Ladd does not challenge the materiality of these omissions.

— which Ladd signed as MGT's CEO—Ladd joined MGT in December 2010 as a Director, became its Interim President and CEO in February 2011, and its President and CEO in January 2012. As of May 2016, Ladd continued to act as MGT's President and CEO. (56.1 ¶3.)

## B.    Facts Concerning Ladd Section 5 Violations

### (1)    Ladd's May 9-12, 2016 E*Trade Account MGT Stock Sales

Beginning in November 2015, Ladd held three brokerage accounts in his own name through which he traded MGT securities: an IRA account at TDA, which he opened in December 2008 ("Ladd TDA IRA"); another TDA account, which he opened in January 2013 ("Ladd TDA"); and an account at E*Trade, which he opened in November 2015 ("Ladd E*Trade"). (56.1 ¶4.)

On his 2013 Ladd TDA account opening application, Ladd accurately stated that he was MGT's "President." (56.1 ¶5.) Thus, TDA designated Ladd's account as associated with an MGT "affiliate." (*Id.* ¶7.)

In November and December 2015, Ladd transferred his MGT stock from his TDA account to his newly opened Ladd E*Trade Account. (56.1 ¶12.) According to TDA records, Ladd did so because he "did not like [TDA's] SEC 144 form handling." (*Id.*)  On his account opening application for his new Ladd E*Trade Account—apparently to try to avoid Rule 144 trading restrictions—Ladd falsely omitted his affiliation with MGT: he described his "Occupation" as "Retired," and answered "No" to the question: "Director, or policy-making office of publicly-owned company?" (*Id.* ¶8.) These statements to E*Trade were false, as Ladd was MGT's CEO, President, its "Principal Financial Officer," and a Director.[3] (*Id.* ¶14.)

---

[3]    Ladd admitted that the statements he made to E*Trade on his account application were false. (56.1 ¶9.) Ladd also admitted that, at the time, he understood that, as an officer or director of MGT, Section 5's Rule 144 required him submit a Form 144 reporting his MGT stock sales

As of May 2016, Ladd was suffering financial difficulties. (56.1 ¶15.) Thus, for example, Ladd was more than 60 days past due on his home mortgage payments, and his monthly credit card bills included payments on several installment loans that he had taken from on-line lenders. (*Id.*)

From May 9 to 12, 2016—to benefit from a sudden spike in MGT's stock price that Ladd helped to orchestrate—Ladd sold a total of 435,000 shares of MGT stock from his Ladd E*Trade Account. (56.1 ¶18.) On May 9, MGT's stock price surged due to its issuance of a press release that morning announcing MGT's agreement to acquire the assets of a provider of anti-spy software, and the arrival of John McAfee as Executive Chairman and Chief Executive Officer of MGT (described more fully below). (*Id.* ¶17.) From May 9-12, 2016, while Ladd continuously sold his MGT shares, MGT's stock price jumped, from its May 6 closing price of $.36 per share to $1.52 per share at the close on May 12—a 317% increase.[4] (*Id.*)  Consequently, Ladd's sales of 435,000 MGT shares from May 9-12 garnered total sales proceeds of $414,448.39. (*Id.* ¶18.)

As of the week of May 9-12, 2016, 1% of MGT's outstanding stock—as reported in its then most-recent SEC filing—equaled 180,982 shares. (56.1 ¶16.)[5] MGT's average weekly

---

"contemporaneously with—or before" any such sales. (*Id.* ¶10.) Ladd further understood that, because he was an MGT officer, he was considered an MGT "affiliate" and thus was subject to Rule 144 trading volume limitations regarding his sales of MGT stock. (*Id.*) Ladd also understood the specific contours of those limitations; namely, that his total MGT sales during any 90-day period could not exceed the greater of: (1) 1% of MGT's outstanding stock; or (2) MGT stock's average weekly trading volume for the four calendar weeks before such stock sales. (*Id.* ¶11.)

[4]     MGT's trading volume likewise jumped the week of May 9—from an average weekly volume of 392,109 shares for the prior four weeks to over 31,000,000 shares the week of May 9. (56.1 ¶17.)

[5]     According to MGT's 2015 annual report (or "Form 10-K")—which MGT filed with the SEC on April 14, 2016—as of April 13, 2016, MGT had 18,098,221 shares of common stock outstanding. (56.1 ¶16.)

trading volume during the four calendar weeks before the week of May 9, 2016 was 392,109 shares. (*Id.*) Thus, Ladd's May 9-12, 2016 sales of 435,000 MGT shares from his E*Trade Account exceeded both 1% of the number of MGT's then-outstanding shares, and its average weekly trading volume during the four preceding calendar weeks.[6] (56.1 ¶16.)

### (2)    Ladd's Additional MGT Stock Sales in His Parents' TD Ameritrade Account

On May 12, 2016, Ladd sold an additional 340,000 MGT shares from Ladd's parents' account at TDA ("Ladd Parents' TDA Account"). (56.1 ¶28.) Ladd personally sold those shares, and he received 75% of his parents' pre-tax realized gains—all of their post-tax gains—from those sales.

In June 2015, when Ladd's parents were in their late 80's, they granted Ladd authority to trade stock in their TDA Account. (56.1 ¶22.)  As Ladd understood it, his parents granted him "full discretion" to trade in the Ladd Parents' TDA Account, including the right to direct cash payments out of the account. (*Id.* ¶23) After receiving that authorization, Ladd was the only person who traded in the Ladd Parents' TDA Account. (*Id.*)

From July through November, 2015 Ladd acquired a total of 382,863 shares of MGT stock in the Ladd Parents' TDA Account. (56.1 ¶24.) The average purchase price of those shares was $0.35 per share. (*Id.*) Ladd did not resell any of those MGT shares prior to May 12, 2016. (*Id.*)

On May 12, 2016—to take advantage MGT's stock price spike that week—Ladd sold 340,000 of the 382,863 MGT shares in the Ladd Parents' TDA Account, for total proceeds of

---

[6]    Indeed, when Ladd's sales in the prior 90-day period are added in, as required under Rule 144(e), Ladd's sales exceeded the volume limitations by an additional 84,072 shares. (56.1 ¶19.)

$551,979.44.[7] (56.1 ¶28.) The next day, May 13, 2016, Ladd's mother paid Ladd $325,000 by

personal check. (*Id.*) The same day, TDA sent Ladd's parents $325,000 in cash from their TDA

Account. (*Id.*, ¶29.) At his deposition, Ladd admitted that the $325,000 that his mother paid him

on May 13, 2016 "represented a big part of the profits of" Ladd's May 12 sale of 340,000 shares

of MGT stock in the Ladd Parents' TDA Account (*Id.* ¶30.) Indeed, as Ladd further admitted, the

$325,000 that his mother paid him constituted all of his parents' post-tax realized gains from the

May 12 MGT stock sales in their TDA Account. (*Id.* ¶31.)

      The gross proceeds of Ladd's May 12 stock sales from the Ladd Parents' TDA Account

totaled $551,979.44. The cost basis of those shares was about $119,000 (340,000 shares x $.35

average price per share), leaving Ladd's parents with realized capital gains (pre-tax) of about

$432,979.44 from those sales. (56.1 ¶32.) The $325,000 that Ladd's parents paid him from the

sales proceeds thus constituted 75% of those pre-tax gains, leaving Ladd's parents with

$107,979, or 25% of the gains. (*Id.*) Ladd further admitted that the cash that ultimately remained

in the Ladd Parents' TDA Account could not satisfy their 2015-2106 tax liabilities resulting from

their realized capital gains in that account. (*Id.*) Indeed, Ladd testified that he had to return over

$18,000 to them to cover that tax liability. (*Id.*) Ladd further admits that, but for his parents'

anticipated tax liabilities, they would have given him the entire $551,979.44 gross proceeds from

the May 12 stock sales in the Ladd's Parents' TDA Account: "My parents would have given me

---

[7]    Ladd had intended to sell those shares on May 9, the same day he began selling MGT
shares from his Ladd E*Trade Account (and the same day MGT issued its press release
discussed below). (56.1¶25.) TDA, however, refused to permit Ladd to sell MGT shares from his
parents' account on May 9 because Ladd (an MGT affiliate) had not submitted the requisite
Form 144 for those sales. (*Id.* ¶26.)  When Ladd asked TDA for an explanation, the bank cited
Ladd's "full trading authorization" over the Ladd Parents' TDA Account. (*Id.*) On May 11, Ladd
submitted the Form 144 to TDA, but falsely claimed "May 30, 2016" as the "approximate date of
sale." In fact, Ladd sold the 340,000 shares the next day, May 12. (*Id.*  ¶28.)

the entire amount of money. You know, they were thrilled, but that would have put them in a

negative position. That was not fair." (*Id.* ¶33.)  In any event, Ladd's parents gave Ladd their

entire post-tax gains from the May 12, 2016 MGT stock sales that Ladd made in their TDA

account.

Thus, in 2015 and 2016, Ladd exercised sole use of his parents' TDA Account, he

personally sold MGT stock from that account on May 12, 2016, and those sales inured solely to

his personal pecuniary benefit.

**C.    Facts Concerning Ladd's Materially False Forms 4 and 144 and New Account Form**

Ladd materially misstated his trading in MGT stock in both his Form 4, filed May 31,

2016, and the Forms 144 he submitted to TDA on May 24, 2016 and May 25, 2016, and he did

so to hide the fact that he had sold hundreds of thousands of shares for hundreds of thousands of

dollars, and that he had done so in violation of Securities Act Section 5.

**(1)    Ladd's Materially False Form 4**

On May 31, 2016, Ladd filed a Form 4 that materially misstated his trading in MGT.

Line 1:  Ladd identified 465,171 MGT shares that he claimed to have distributed "for no

consideration" pro rata to the "limited partners of Laddcap Value" on May 25, 2016. (56.1 ¶41.)

Laddcap Value Partners III LLC ("Laddcap") was the fund Ladd set up to acquire and hold MGT

shares, and for which Ladd acted as Managing Member. (*Id.* ¶42.) Laddcap had about 17 limited

partners or members. (*Id.* ¶43.)

Ladd admitted that Laddcap had made only two distributions to its investors in 2016 (in

cash, not MGT stock) and that the Form 4 was wrong when it recorded that the 465,171 MGT

shares had been distributed pro rata to Laddcap's investors for no consideration. (56.1 ¶44.)  In

fact, the shares had been sold by Ladd for hundreds of thousands of dollars, and not on May 25,

2016, but in multiple sales since December 2015 out of the Ladd E*Trade account in his own name. (*Id.* ¶¶45, 46.)[8]  Ladd sold no MGT shares at all on May 25, 2016 and he had sold his last MGT share out of the E*Trade account on May 17, 2016. (*Id.* ¶47.)[9]

Line 2:  Ladd claimed that Laddcap had sold 157,300 shares of MGT stock on May 25. But because Ladd sold no shares at all on May 25, and he had sold his last MGT share out of the Ladd E*Trade account where his Laddcap shares were held on May 17, 2016, Line 2 was also false, as Ladd admitted. (56.1 ¶¶48, 49.)

Line 4:  Nor was Ladd's representation on Line 4 of the shares he claimed to have sold on May 31, 2016 correct. On his Form 4, Ladd recorded that he had sold 33,603 shares on that date. But his account statements for his Ladd TDA IRA Account reflect that he sold only 11,000 MGT shares on May 31, 2016. (56.1 ¶50.)

Prior to waiving his attorney-client privilege, Ladd assigned the Form 4 errors to his SRF lawyers. (56.1 ¶54.) SRF lawyer, Joan Wu, however, testified that if she had known that Ladd had sold his MGT shares rather than distributed them for no consideration, she would have included the dates of sale, reflected their sale price and coded them as a "sale."  (*Id.* ¶51.) After Ms. Wu testified, Ladd admitted that he was the source of information for the Form 4 and that he had conveyed his trading activity to Ms. Wu via email or orally. (*Id.* ¶54.)

Ladd testified that the purpose of the Form 4 is to disclose purchases and sales of an issuer's stock by that issuer's officers and directors. (56.1 ¶55.) Although disclosure of an

---

[8]     Although the shares belonged to Laddcap, Ladd deposited them in an account at E*Trade that he opened in his own name. (56.1 ¶45.)

[9]     Ladd's account statements reflect, as he admitted, that he sold 466,600 MGT shares between May 1 and May 17, 2016 in his E*Trade account, and that only some of those sales are reflected on his Form 4. (56.1 ¶56.) He also admitted that none of his earlier purchases and sales since December 2, 2015 in his E*Trade account were disclosed on any Form 4 at all. (*Id.*)

officer's sale of stock, as well as his purchases, is required by Exchange Act Section 16 on Form 4, Ladd testified that "insider sales are less relevant" to investors. (*Id.*) Ladd testified that investors were more interested in whether insiders were acquiring shares "as a method for finding undervalued stocks." (*Id.*)

Ladd's Form 4 gave investors the misleading impression that Ladd was a net acquirer of MGT stock. Because he concealed his sale of hundreds of thousands of shares in his E*Trade account – calling them a distribution for no consideration to Laddcap's investors – it appeared that he had sold only 157,300 shares on behalf of Laddcap, and 33,000 shares of his own, while acquiring 300,000 restricted shares (56.1 ¶57) in a grant from the company, making him a net acquirer. The impression that insiders were acquiring, not selling, their shares was furthered by the Forms 4 filed by Robert Holmes and Michael Onghai, MGT's other directors, showing a stock grant of 400,000 shares and 300,000 shares respectively, with Onghai's noting just 6,500 in stock sales. (*Id.*). And investors reacted accordingly, seeing the Forms 4 as reflecting insider confidence in the company's prospects, just as Ladd knew they would. (*Id.* ¶58.)

In any event, Christopher Petranis, who bought MGT stock on May 16, 2016, affirms that knowing the truth about Ladd's sales of stock would have been material to him. He has affirmed that had he known that Ladd had sold hundreds of thousands of shares in May and earlier for hundreds of thousands of dollars, that would have been important information to him because it would have showed that Ladd was less than confident about MGT's prospects. (56.1 ¶59.)[10]

---

[10]     At least one other investor interpreted Ladd's stock sales the same way. After seeing Ladd's sale of MGT stock in 2017, the investor emailed Ladd: "[w]hat kind of confidence can investors have when the president of mgti is dumping his shares. . . Why cash out now if you believe in what can be accomplished in the near future." (56.1 ¶60.)

(2)     **Ladd's Materially False Forms 144 and New Account Form**

Ladd submitted two materially false Forms 144 to TDA on May 24 and May 25, 2016. (56.1 ¶63.)[11]  In both, Ladd misstated the number of shares he intended to sell and the dates on which he intended to sell them. On his May 25 Form 144, Ladd recorded an intention to sell 41,000 MGT shares from his Ladd TDA Account on May 25, 2016, and 465,171 shares from his E*Trade Account on the same date. But Ladd had no intention to sell any shares from his E*Trade Account because that account had no MGT shares left to sell by May 25, 2016. (*Id.*) On the second page of the May 24, 2016 Form 144 under Table II – Securities Sold in the Past 3 Months – Ladd falsely wrote, "NONE." And on the second page of the May 25, 2016 Form 144, under Table II – Securities Sold in the Past 3 Months – Ladd listed none of the sales he had made in the month of May, prior to May 25, 2016, out of his E*Trade Account, or the 77,472 shares he had sold between February 12, 2016 and April 30, 2016. (*Id.*) He only listed the sales that TDA already knew about—the sales out of his Parents' TDA Account.  (*Id.*)

Similarly, Ladd sought to evade the oversight of E*Trade in monitoring his compliance with the volume limitations governing insiders' sales of stock by submitting a materially false new account application to E*Trade in November 2015. In that application, Ladd denied being an officer or director of a public company and falsely claimed that he was "retired." (56.1 ¶¶8, 9.) As a result, E*Trade had no knowledge that it was effecting trades in violation of Section 5 when Ladd made his May 2016 sales that exceeded the volume limitations applicable to him under Rule 144.

**D.     Facts Concerning Ladd's Section 16(a) and Rule 16a-3 Violations**

Between August 20 and October 2, 2015, Ladd made 25 individual open-market MGT

---

[11]     Ladd filed no Form 144 before any of his sales from his E*Trade account.

stock purchases in his own TDA Account. (56.1 ¶64.) Ladd filed no Form 4 for any of those

purchases (and did not otherwise publicly disclose them).[12] (*Id.*)

From November 29, 2015 to May 17, 2016, Ladd made purchases and sales of MGT

stock in the Ladd E*Trade Account on over 26 different trading days. (56.1 ¶66.) Ladd filed a

Form 4 regarding the first of those trades (a sale of 97,790 shares on November 30, 2015), but he

did not file a Form 4 for any of the other trades, and he did not otherwise publicly disclose them.

(*Id.* ¶67.) Those unreported trades included the 435,000 MGT shares that Ladd sold in his

E*Trade Account from May 9-12, 2016. (*Id.*)

**E.     Facts Concerning Ladd's Section 13(d) and Rule 13d-2 Violation**

On January 10, 2012, Ladd filed a Schedule 13D/A with the SEC reporting that he owned

over 30% of MGT's outstanding stock. (56.1 ¶68.) From June 16, 2015 to October 7, 2015,

Ladd's percentage ownership of MGT's outstanding shares increased from 5.67% to 6.9%. (56.1

¶69.) This percentage increase occurred because Ladd acquired additional MGT stock during this

period. Indeed, Ladd acquired enough additional MGT shares during this period to increase his

MGT ownership percentage by more than 1%, even though the number of MGT's outstanding

shares also increased during this same period. (*Id.*)

Despite these material changes in Ladd's ownership of MGT's outstanding stock, Ladd

has never filed an amended Schedule 13D (after filing his January 2012 Schedule 13D/A). (56.1

¶69.)

**F.     Facts Concerning Ladd's May 9, 2016 Materially False Press Release**

Barry Honig and John O'Rourke brought the acquisition of a company associated with

---

[12]     On October 9, 2015, Ladd filed a Form 4 reporting his October 7, 2015 receipt of
200,000 MGT shares. The Form 4 states that he received those shares "as partial compensation
for the [sic] Mr. Ladd's services as President and Chief Executive Officer of [MGT]." (56.1¶65.)

McAfee, D-Vasive, to Ladd in April 2016. (Commission's Statement of Additional Material Facts Pursuant to Local Civil Rule 56.1(b) ("Resp.¶ __"), ¶98.) As the parties were finalizing the documentation of that acquisition, Ladd began working on a press release announcing it and the arrival of John McAfee as Chief Executive Chairman and CEO of MGT. (56.1 ¶35.) On May 7, 2016, Ladd circulated his draft press release to the Board, SRF attorneys Jay Kaplowitz and Joan Wu, and others. (*Id.*) That press release said nothing about McAfee's sale of his company to Intel or that it was sold for $7.6 billion. (*Id.*)

Late on the night of May 8, 2016, as Ladd was working with Wu and D-Vasive's lawyers to finalize the necessary documents, Ladd told Wu that he would handle getting the press release to the printers if she wanted to go to bed. (56.1 ¶36.)

At various times early in the morning on May 9, 2016, Ladd circulated his revised press release that now read: "Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion . . ." He sent it to the D-Vasive team at 5:19 a.m.; he sent it to his Board at 6:09 a.m.; and he sent it to Kaplowitz and Wu at the same time he sent it to the printers at 6:43 a.m. In none of those emails did Ladd highlight the change he had made to the description of McAfee, and he admitted that his attorneys had no responsibility for fact checking his press releases. (56.1 ¶37.)

Ladd knew the statement about McAfee selling his company to Intel was false at the time he put it in the press release. (56.1 ¶38.) He knew then that McAfee had left his company more than a decade prior to its sale to Intel. He claims he mistakenly drafted the insert. (*Id.*) But when a short-seller drew his attention to the "mistake" (*id.*), Ladd issued no retraction or corrective disclosure. Instead, in MGT's May 23, 2016 Form 10-Q, which Ladd signed, MGT included a slightly different description of McAfee:  "[McAfee] founded McAfee Associates in 1987, which

was acquired by Intel Corporation for $7.6 billion in 2010." (*Id.*)  Ladd admitted that the Form 10-Q disclosure told investors nothing about what had been misstated in the May 9, 2016 press release. (*Id.*) As for the role counsel played in crafting MGT's Form 10-Q disclosure, neither Wu nor Kaplowitz could recall anything about it. (*Id.*) Kaplowitz believed that he did not even know about the press release falsity issue until weeks later. (*Id.*)

The same day Ladd issued the false MGT press release, he had MGT pay $125,000 to a stock promoter, *Stock Beast*, to publish a piece heralding McAfee's arrival, titled "NYSE:  MGT Beastmode engaged —John McAfee driving the Bus." (56.1 ¶39.) Ladd chose *Stock Beast* at the suggestion of an MGT consultant who "was a little more aware of the mailing lists that had the biggest circulation." (*Id.*) In its first paragraph, the *Stock Beast* article echoed the press release's false claim that McAfee had sold his company for $7.6 billion. (*Id.*)

Mr. Petranis, who bought MGT stock on May 16, 2016, recalls the press release's claim that McAfee sold his company to Intel for $7.6 billion. (56.1 ¶40.) That statement was important to his decision to invest because it conveyed to him that McAfee had enjoyed a huge success at his prior company and that he might be able to bring his talents for creating successful companies to MGT. (*Id.*)

### STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO LADD'S MOTION FOR SUMMARY JUDGMENT

Ladd's first argument for partial summary judgment seeks judgment against the Commission on its fraud claim arising out of Ladd's failure to disclose that Honig, Brauser, Groussman, Stetson and O'Rourke were acting as a group, and his failure to aggregate their holdings as required in the beneficial ownership tables of MGT's November 2015 Form S-1 and April 2016 Form 10-K. These additional undisputed facts demonstrate that Honig, *et al.*, were in fact acting in concert to acquire, hold, vote and sell their MGT shares, that Ladd knew that, and

16

that Ladd's good faith or advice-of-counsel defense is meritless.

**A. Honig, Groussman and Stetson Acted in Concert in Connection with Their 2012 MGT Investment**

By November 30, 2012, Barry Honig, Mark Groussman, through his entity, Melechdavid, Inc. ("Melechdavid") and John Stetson, through his entity, HS Contrarian Investments, LLC ("HSCI"), held collective beneficial ownership of more than 12% of the MGT common stock (based on the total outstanding shares MGT reported as of that date). (Resp. ¶70.)[13]

Honig, Groussman and Stetson acquired their MGT holdings in an October 2012 MGT offering. Honig initiated that transaction in a June 20, 2012 email to Ladd in which he wrote:

> I will be in NY next week[.] lets meet. Before then I would like you to think about how much money my group can come in with. I think $1,500,000 would be cool. It would be 3-4 investors including myself.

(Resp. ¶71.)  As the deal was finally structured, MGT issued 1,380,362 units, consisting of one convertible preferred MGT share, and a 5-year warrant, for total proceeds to the company of about $4.5 million. (*Id.* ¶72.)

Honig led the negotiations with Ladd on the terms of the transaction for all of the investors but two of them:  Hudson Bay Master Fund Ltd. ("Hudson Bay") and Iroquois Master Fund Ltd. ("Iroquois"). (Resp. ¶74.)[14]  When Hudson Bay or Iroquois suggested terms Ladd disliked during the documentation process, Honig interceded to resolve the dispute. (*Id.*)

It was also Honig who dictated to Ladd who (apart from Hudson Bay and Iroquois) his co-investors would be and at what levels. (Resp. ¶75.)  Stetson coordinated all of the investors' delivery of documentation or information that MGT needed to close the October 2012 financing

---

[13]     Stetson worked for Honig and they worked out of the same offices. Groussman, a long-time Honig family friend, also had a desk in Honig's office. All three had an extensive co-investment history from 2011 to 2018. (Resp. ¶76.)

[14]     Hudson Bay had been an earlier investor in MGT. (*Id.*).

(other than Hudson Bay and Iroquois). (Resp. ¶77.)

Honig, Stetson and Groussman continued to act in concert after the 2012 financing closed. Beginning on April 2, 2013, for example, Honig, HSCI and Melechdavid all began submitting notices of conversion of their preferred MGT shares into saleable MGT common stock. (Resp. ¶78.)  All three sold their shares at or about the same time after a promotional article was published on April 11, 2013. (Resp. ¶82.) And in late April 2013, when Ladd made a Warrant Exchange Offer to the 2012 investors, Honig and Stetson accepted immediately; Groussman accepted less than two weeks later. (*Id.* ¶¶79-80.)

In late May 2013, Honig summarized for Ladd all the things that he had done for him to bring him the 2012 financing investors and then corral them to accept Ladd's terms, including ensuring that the warrant holders all voted to accept Ladd's Warrant Exchange Offer. Ladd disputed none of Honig's claims of accomplishment. (Resp. ¶83.)

## B. Honig, Brauser, Groussman, Stetson and O'Rourke Acted in Concert in Connection with Their 2015 MGT Investment

MGT had nearly run out of cash when Honig resurfaced in 2015. As Ladd told his Board of Directors in an October 4, 2015 email: "Net-net we need some near term liquidity . . . ." Attaching a draft term sheet prepared after his discussions with Honig, Ladd described for the Board the deal he had negotiated, and noted that the investors' percentage interest in the company would be 16.7% "post-issuance."  He acknowledged that "the investor group was led by Barry Honig."  (Resp. ¶85.)

As was true with the 2012 transaction, Honig named his co-investors in the 2015 financing and set their allocations:  GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ Roth") (Honig's entity); Grander Holdings, Inc. 401K ("Grander") (Brauser's entity); Melechdavid (Groussman's entity); Stetson Capital Investments, Inc. ("SCI") (Stetson's entity);

ATG Capital LLC ("ATG") (O'Rourke's entity) and Iroquois. (Resp. ¶88.)[15]  Stetson again assumed the duties of coordinator for the transaction, collecting and conveying signed deal documents to MGT. (*Id.* ¶88.)

In January 2016, Honig directed Ladd to pay a stock promoter $125,000 to get a piece published about MGT in the promoter's newsletter. The *Small Cap Leader* piece on MGT came out on February 3, 2016, titled "*New Alert:  MGT Capital Investments, Inc. (NYSE:  MGT).*" From MGT's October press release about the transaction, the *Small Cap Leader* article reprinted that Honig was a private investor and specialist in corporate finance, and pointed to his past positions at interClick "which was acquired by Yahoo in 2011 for **$280 million**."  (Resp. ¶¶94-96 (emphasis in original).[16] Right after that newsletter was released, MGT's stock price and trading volume jumped. Honig, Brauser, Stetson and O'Rourke all immediately began selling. (Resp. ¶96.)  So did Ladd. (*Id.*)

Honig arranged to push MGT's stock price even higher with an acquisition he brought Ladd through O'Rourke in early April 2016: McAfee's D-Vasive. O'Rourke requested, and Ladd provided, details of MGT's cap table in an email that same day, even though as proposed, the transaction contemplated no involvement by Honig or O'Rourke, or any issuance of shares to them. (Resp. ¶98.)

The D-Vasive acquisition agreement was finalized on May 9, 2016. After MGT issued the press release that included the false statement that McAfee had sold his company to Intel for $7.6 billion, MGT's stock price jumped and its trading volume increased. Honig, Brauser,

---

[15]    Like Stetson, O'Rourke also worked for Honig out of the same office. O'Rourke was a long-time and frequent co-investor with Honig. Brauser was also a long-time, frequent co-investor with Honig. (Resp. ¶87.)

[16]    When the NYSE asked Ladd about any promotions MGT had paid for during 2016, he omitted this one, inadvertently, he testified. (Resp. ¶116.)

Groussman, Stetson and O'Rourke began selling their MGT shares on May 9, 2016 and continued selling them through that week. (Resp. ¶102)  Ladd did too. (*Id.*)

On May 10, 2016, Honig sought to exercise the $.25 warrants that had been part of the units he and his group bought in the October 2015 financing. Ladd refused to honor the exercise, but later that day, and after a call with Honig, Ladd offered all the 2015 investors the option of exercising those warrants early for a premium. Right after, Honig, Brauser, Groussman, Stetson and O'Rourke accepted Ladd's modification terms, and began submitting Notices of Exercise to MGT.  (Resp. ¶¶103-04.)

## C. Ladd's Understanding of MGT's Regulation S-K Disclosure Obligations in its Form S-1 and Form 10-K and His Knowledge of Section 13(d)'s Disclosure Requirements for Investors Who Are Acting in Concert

Ladd understood that MGT had an obligation to disclose those MGT investors who held more than 5% of the company's outstanding shares in its 5% beneficial ownership tables in its Forms S-1 and Forms 10-K, and that he had to disclose any group of investors' aggregate holdings above that 5% threshold. He also knew that he could not rely on investors' own filings to inform the Company's disclosure obligations, as he admitted that he distrusts every investors' SEC filings. (Resp. ¶108.) That distrust led him to challenge the accuracy of at least one investor's Schedule 13G disclosures in January 2016. (*Id.* (Ladd questioning Iroquois's reported share ownership).)

Ladd views himself as an expert on the group issue under Section 13(d)(3), testifying that he "knows[s] more about 13(d) than nearly anyone else on Wall Street." (Resp. ¶105.) Much of that expertise comes from his own experience. In 2006, he was sued for violating Section 13(d) for failing to disclose that he was allegedly acting as a member of an undisclosed group with others. *See Delcath Sys., Inc. v. Ladd*, 06 Civ. 6420 (LAP) (S.D.N.Y.). And in 2014, Ladd

participated in MGT's battle against a hostile take-over of MGT by its investor Iroquois. As part

of MGT's take-over defense, MGT accused Iroquois of a failure to disclose that it was acting in

concert with another MGT shareholder – American Capital Management, LLC ("ACM"). In

MGT's letter to Iroquois, it noted that Iroquois shared an office with ACM and that ACM's

investments were managed by employees of the same investment adviser that managed the

investments of Iroquois. Ladd explained that he saw Iroquois and ACM as sharing "common

voting principles, common economic interests," as evidence of their acting in concert. (*Id.*

¶¶105-07.)

### D.  Ladd's Knowledge that Honig Was Acting in Concert with Brauser, Groussman, Stetson and O'Rourke in 2015 and 2016

As he began negotiations with Honig in 2015, Ladd brought with him what he had

learned about Honig from the 2012 financing: that Honig had rounded up the investors (apart

from Hudson Bay and Iroquois) and dictated their allocations; that Honig had led the

negotiations of the terms of the investment on behalf of all investors; that Stetson coordinated the

investors' execution of the deal documents; that Honig, Groussman and Stetson converted their

shares in near lockstep in April 2013; that Honig, Groussman and Stetson agreed to Ladd's

Warrant Exchange modification, and each executed Notices of Exercise of their Warrants at or

near the same time. (Resp. ¶¶71-83.)

Ladd also knew what Honig's "m.o." was. As a self-described Wall Street veteran, Ladd

understood that Honig's intentions were to gain control of a large quantity of MGT stock by his

group of investors, to then engineer some publicity generating event, and to sell the shares at the

resulting inflated prices. As early as November 2012, Ladd corresponded with a person he

believed to be the famous investor, David Einhorn, about Honig's recently announced

investment in MGT. In that exchange, Einhorn warned Ladd that Honig was a recidivist stock

promoter who pumped and dumped the stock of the companies in which he invested. (Resp. ¶114.)[17]

If Ladd doubted those warnings then, he himself suspected that that is exactly what Honig did in April 2013. On April 11, 2013, Ladd saw an article in *Seeking Alpha,* written by John Ford, that predicted a doubling of MGT's stock price in the next two weeks. Ladd thought the premise of the article was false and he suspected that Honig or another large MGT shareholder had paid Ford to write it. And Ladd knew that Honig, Groussman and Stetson were converting their preferred shares into saleable common shares prior to the article's release, and likely knew from MGT's trading volume increase that the three were selling their shares into the stock price rise generated from the Ford false article. (Resp. ¶¶78, 82, 115.)

Ladd also knew that Honig wanted to avoid any reporting of his ownership together with anyone else's. Ladd understood that Honig's motivation was to avoid Exchange Act Section 16(b) liability for short swing profits as a 10% holder. [18] As Ladd put it: "I believe [the group issue] was important to them." (Resp. ¶112.) Ladd acknowledged Honig's goal to avoid creating any evidence of his and his co-investors' acting in concert in his comments on deal documents as early as 2012. (*Id.* ¶113.) Ladd's exceedingly unfavorable view of Honig's general integrity, his dedication to being hyper-vigilant in his dealings with Honig (*id.* ¶117), and his knowledge that Honig wanted to avoid any "group" association must have colored Ladd's view of the accuracy of Honig own reporting of his group status in Honig's Schedules 13G.

---

[17]    Ladd had also heard a rumor in 2012 that the SEC was investigating Honig's membership in an undisclosed group with Hudson Bay and Iroquois.  (Resp. ¶118.)

[18]    Exchange Act Section 16(b) provides for the disgorgement to the issuer of any profits insiders realize from trading in the issuer's stock within a less than six-month period. *Rubenstein v. Int'l Value Advisers,* LLC, 959 F.3d 541, 543 (2d Cir. 2020). Insiders are defined as any holder, including a group of holders, of 10 percent of the issuer's stock. *Id.*, 959 F.3d at 543-44. Group status is assessed under Exchange Act 13(d)(3). *Id.*, 959 F.3d at 544.

Thus, by 2015, when Honig reappeared to offer MGT a life-line of cash (Resp. ¶85), Ladd already knew that Honig had acted in concert with at least two of the 2012 investors that he was bringing to this deal—Groussman and Stetson—to buy, hold, sell and vote their MGT shares in and after the 2012 financing. (*Id.* ¶¶71-83.)

Little was different in the negotiation of the 2015 financing from Ladd's perspective. Honig led the negotiations for the investors; Honig named his co-investors and set their allocations; and Stetson acted as coordinator for collection and transfer of the investors' executed deal documents. (Resp. ¶¶86-88.) Yet Ladd appears never to have questioned whether Honig was acting as a group with Brauser, Groussman, Stetson and O'Rourke. He accepted Honig's October 16, 2015 Schedule 13G representation that he was not acting as a member of a group and quoted Honig's Schedule 13G in disclosing Honig's ownership of 6.59% of MGT shares in the Form S-1 MGT filed on November 6, 2015. (*Id.* ¶¶90-91.) Had MGT properly aggregated Honig's, Brauser's, Groussman, Stetson and O'Rourke's group holdings, it would have listed them as owning more than 15% of MGT's outstanding common stock. (*Id.* ¶92.)

Honig reiterated to Ladd what Ladd already knew—that Honig wanted to avoid being labeled as a group with his co-investors— in an October 19, 2015 email exchange. After Ladd twice referred to Honig, Brauser, Groussman, Stetson and O'Rourke as "your group," in an email to Honig with information about MGT's budget, its cash burn, and its cap table, Honig responded:  "I am not part of a group. I invested individually."  (Resp. ¶¶111-12.)

Actions by Honig, Brauser, Groussman, Stetson and O'Rourke after the acquisition in 2015 demonstrated their continued acting in concert. In February 2016, after Ladd agreed to Honig's demand that MGT pay $125,000 to a stock promoter to promote MGT to the public,[19]

---

[19]     Ladd explained his decision to accede to this demand despite MGT's limited resources:

and the stock price rose, Honig, Brauser, Stetson, and O'Rourke all immediately began selling. (Resp. ¶96.) So did Ladd. (*Id.*) Ladd filed no Form 4 reflecting those sales. (*Id.* ¶¶95-96.)

Despite all of the evidence of group activity, and Honig's clear desire to conceal it, Ladd did not question any investor's disclosure in preparing MGT's 2015 Form 10-K. While MGT included Honig (together with his GRQ Roth entity) in its 5% beneficial owners table, and reported that Honig held 8.6% of MGT shares as of April 11, 2016 ((Resp. ¶97), it noted that it was reporting the number of shares he owned from Honig's own Schedule 13G. (*Id.*) MGT did not aggregate Honig's holdings with any other investor in his group, nor did it disclose his membership in a group. Had MGT correctly aggregated share ownership among the members of the group (Brauser/Grander, Groussman/Melechdavid, Stetson/SCI and O'Rourke/ATG), it would have reported that the group owned more than 15% of MGT's outstanding shares, based on the shares ascribed to each group member in MGT's November 6, 2015 Form S-1. (*Id.*) Indeed, in a late Schedule 13G filing Brauser made on May 3, 2016, he disclosed that he and his Grander entity themselves owned more than 7.4% of MGT as of February 10, 2016, meaning that Honig and Brauser alone owned more than 15% of MGT stock. (*Id.*)

As described above, Ladd wrote MGT's May 9, 2016 press release about the McAfee/D-Vasive transaction, and included in it a statement he knew was false: that McAfee had sold his company to Intel for $7.6 billion. (Resp. ¶98-99.) Ladd then had MGT send $125,000 to a stock promoter to publish a piece on May 9, 2016, which echoed in its first paragraph the same false claim from the MGT press release. (*Id.* ¶100.) The press release and stock promotion did what Ladd hoped they would do. On May 9, 2016, MGT's stock closed at $0.49 (representing an increase of 34 percent over the prior day's close) with trading volume of more than 10 million

"When a big shareholder asks you to do something, you do it."  (Resp. ¶94.)

shares, compared with 71,005 shares of volume the previous trading day. (*Id.* ¶101.)

Honig, Brauser, Groussman, Stetson and O'Rourke all began selling their MGT shares on May 9, 2016 and continued selling them through that week. Ladd did too. (Resp. ¶102.)

On May 10, 2016, after Ladd notified Honig and his group that the $.25 warrants issued in the October private placement were not exercisable, but offered them the right to exercise for a premium, each of Honig, Brauser, Groussman, Stetson and O'Rourke agreed to Ladd's modification terms and immediately began sending in their Notices of Exercise.  (Resp. ¶¶103-04.)

**E.  The Involvement of the Lawyers from SRF**

**(1)      Who Represented Whom**

While Ladd now contends that all the SRF lawyers represented MGT (Br. at 10, n.3), during the period 2012-2015, as he testified, Ladd understood that certain SRF lawyers represented him (Kaplowitz, Marcus, Perlman and Wu), and SRF's Harvey Kesner represented Honig and his co-investors. (Resp. ¶119.)  SRF spelled out those divided loyalties in its conflict waiver letters that it demanded Ladd sign in 2012 and 2015. (*Id.* ¶120-21.)  Kesner has affirmed that he never represented MGT while at SRF. (*Id.* ¶127.) Kaplowitz agreed. From Kaplowitz' perspective, Kesner's loyalties ran solely to Honig. Honig, too, thought Kesner was representing him. Even Marcus thought Kesner's role was to act as a mere go-between between Honig and MGT. (Resp. ¶¶123-24.)[20]

_____

[20]      Ladd, Kaplowitz and Marcus believed that Tara Guarneri-Ferrara—the associate who prepared all of the deal documents on the 2012 transaction —was Kesner's associate. (Resp. ¶128.) Perlman testified that she represented MGT, but she did not disclose to Ladd or Kaplowitz the years of work for Honig, Stetson, O'Rourke, Groussman and Brauser that Kesner had brought her while she was a solo practitioner. (*Id.* ¶129.) Wu joined the MGT team in 2016 and represented MGT on the D-Vasive acquisition. (*Id.* ¶130.)

### (2)    Consideration of the Group Issue

None of the lawyers could recall any specific discussion about whether Honig and his co-investors were acting as a group.[21] Only one email —from 2012—shows that the issue ever even came up. In that email, from October 18, 2012, after Honig shared his list of co-investors and allocations, Marcus asked Kesner: "Are they acting as a group?" Less than a minute later, Kesner responded, "No!"  (Resp. ¶131.) Marcus asked the question at Kaplowitz's request but knew nothing about why Kaplowitz wanted him to ask it. Marcus thought Kesner was responding in his personal capacity, not as a lawyer for any client, and recalled no further discussions internally at SRF about Kesner's response. Marcus did not challenge Kesner and did no independent analysis of the group question other than to review the investor's own representations in their stock purchase agreements that they were acting independently. Like Marcus, Kaplowitz could recall no specific discussion about the group issue, although he testified that it was his practice to discuss the group issue in connection with reviewing a client's registration statement or Form 10-K.[22] (*Id.* ¶¶132-33.)

Kesner explained that he based his response to Marcus on his understanding that Hudson Bay and Iroquois would never have engaged in a transaction in which the documentation allowed them to become a group with any other investor. Like Marcus and Kaplowitz, Kesner could recall no further discussion of the issue after Marcus's October 18, 2012 inquiry. But Kesner also testified that if he had known from Honig that Honig was acting in concert with others, he might not have disclosed that information to Marcus. (Resp. ¶¶134-35.)

---

[21]     Two of the lawyers—Perlman and Guarneri-Ferrara— could not recall ever considering any issues about group ownership under Exchange Act Section 13(d) for any client while at the firm. (Resp. ¶ 137.)

[22]     Kaplowitz recalled nothing from the firm's review of MGT's 2015 Form 10-K, and was not even sure that the company had retained the Firm for that purpose. (*Id.*)

There is no evidence that Ladd ever asked any SRF lawyer if Honig and his co-investors were acting as a group or what he needed to do to satisfy his Regulation S-K obligations to investigate and disclose any acting in concert among them—either before the single 2012 email exchange or at any time after that. When Ladd responded to a question from the NYSE about whether any of his 2012 investors were acting in concert, he took less than 20 minutes to answer "no." While he copied Marcus on the email, neither Marcus nor Kaplowitz could recall any consultation with Ladd on that question prior to his response. Marcus testified that he sent Kesner's "No!" response to Ladd inadvertently and with no intention that he rely on it. (Resp. ¶¶131, 136.)

### (3)   The Facts Ladd Failed to Disclose to His Lawyers

Ladd disclosed none of these facts he knew to Kaplowitz or Marcus:

- That Ladd distrusted Honig
- That Ladd had been warned by David Einhorn that Honig was a recidivist stock promoter and pump and dumper
- That Ladd suspected that Honig or another MGT investor had paid Ford to write a false touting piece for *Seeking Alpha* in April 2013
- That Honig had demanded that Ladd have MGT pay $125,000 to a stock promoter in January 2016

Kaplowitz did not even know that Honig and Stetson shared offices or that they had co-invested in other issuers. (Resp. ¶¶138-39.) There is no evidence that Ladd told Kaplowitz or Marcus that Honig had taken credit for corralling his group in 2012-2013 to invest and vote together, or that Honig, Stetson and Groussman were converting their MGT preferred shares at or about the same time in 2013 just before the publication of the Ford April 2013 piece in *Seeking Alpha*. (*Id.* ¶¶83, 78, 115.)

### SUMMARY JUDGMENT STANDARD

"Summary judgment may be granted if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." *SEC v. Sayid*,

17 Civ. 2630 (JFK), 2019 WL 6307367, at *4 (S.D.N.Y. Nov. 25, 2019) (internal quotations

omitted), *aff'd*, 860 F. App'x 18 (2d Cir. 2021). "Summary judgment is appropriate when there

can be but one reasonable conclusion as to the verdict, i.e., it is quite clear what the truth is, and

no rational factfinder could find in favor of the nonmovant." *Id.* A court must "construe the facts

in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Id.* Yet the non-moving party "must do more than

simply show that there is some metaphysical doubt as to the material facts" and "may not rely on

conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of NY*, 426 F.3d 549, 554

(2d Cir. 2005) (internal citations and quotations omitted). Rather, the nonmoving party must

come forward with "specific facts showing that there is a genuine issue for trial." *Weinstock v.

Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal citations and quotations omitted).

## ARGUMENT

## I.    SUMMARY JUDGMENT SHOULD BE GRANTED TO THE SEC ON ITS STRICT LIABILITY CLAIMS AGAINST LADD

### A.    Ladd Violated Securities Act Section 5

#### (1)    Ladd's E*Trade Account MGT Stock Sales Violated Section 5

No genuine dispute exists that Ladd violated Section 5 by selling 435,000 shares of MGT

stock from his E*Trade account from May 9-12, 2016. No registration statement existed for

those sales, and no exemption from registration applied.

Section 5 protects potential investors by requiring stock sellers to file with the SEC a pre-

sale registration statement containing disclosures of the proposed sale and the company that

issued the securities. *See SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 305 (S.D.N.Y.

2015). To make out its *prima facie* Section 5 case, the SEC need only establish that Ladd

"directly or indirectly" sold unregistered stock sale and used the means of interstate commerce, such as telephone or email. *See Sayid*, 2019 WL 6307367, at *4. The SEC need not establish Ladd's scienter because "Section 5 imposes strict liability on . . . sellers of unregistered securities regardless of any degree of fault, negligence or intent on the seller's part." *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

No genuine dispute exists that, from May 9-12, 2016, Ladd sold a total of 435,000 MGT shares from his E*TRADE account (and received sale proceeds of $414,448.39), and that no registration statement existed for those sales. These indisputable facts establish the SEC's *prima facie* Section 5 claim against Ladd.

Once the SEC establishes its *prima facie* case, the burden shifts to Ladd to prove an applicable Section 5 exemption from registration. *See SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 756 (S.D.N.Y. 2018). For his May 2016 MGT stock sales, Ladd purported to rely on the "safe harbor" exemption of Securities Act Rule 144 (17 C.F.R. § 230.144). However, Ladd could not rely on that exemption because the 435,000 MGT shares he sold exceeded Rule 144's trading-volume limitation for company officers such as Ladd. Under Rule 144(e), Ladd's May 9-12, 2016 sales (plus any sales in the prior three-month period)[23] could not exceed the greater of: (a) 1% of MGT's most recently reported stock outstanding; or (b) subject to certain inapplicable exceptions, the stock's "average weekly reported volume of trading . . . during the four calendar weeks preceding the filing of the notice required by paragraph (h) [of Rule 144]." 17 C.F.R. § 230.144(e)(1)(i) and (ii).

Rule 144(h) required Ladd to file with the SEC "a notice" of the sale "on Form 144," and

---

[23]     *See* Rule 144(e) and "Resales of Restricted and other Securities," SEC Rel. No. 6099 (Aug. 2, 1979), at 43 (Question 37), 1979 WL 174360, at *13 (requiring aggregation of all sales in three months prior to intended sale to assess volume limitation applicable to intended sale).

Ladd was required to transmit the Form 144 for filing "concurrently with . . . the placing of an

order to execute" his sales with E*Trade. *See* 17 C.F.R. § 230.144(h); *see also SEC Rule 144*

*Compliance and Disclosure Interpretation*, http://sec.gov/corpfin/securities-act-rules, at

Question 136.09) (last updated Nov. 6, 2017) (stating that the Form 144 is to be filed "the same

day as the placing of a sale order or the execution of the sale"). Indeed, Ladd admits that he was

aware of this requirement at the time. (56.1 ¶10.) Thus, Ladd was required to file a Form 144, at

the latest, the same day as his May 9-12 stock sales from his E*Trade account, and to calculate

the Rule 144(e) volume limitation based on average trading volume for the four calendar weeks

before those sales.

Ladd's sale of 435,000 shares, together with his sales of 84,072 shares over the prior

three months in that account, exceeded both 1% of MGT's outstanding shares (180,982) and

MGT's average weekly trading volume during the preceding four calendar weeks (392,109

shares). (56.1 ¶16.) And Ladd filed no Form 144 concurrently with those sales, and can therefore

not even claim the safe harbor provided by the Rule. *SEC v. Blackburn*, No. 15 Civ. 2451, 2020

WL 565551, at *7 (E.D. La. Feb. 5, 2020) (Rule 144(e) exemption not available where seller

fails to file Form 144). Thus, Ladd failed to comply both with Rule 144(e)'s volume limitation,

and the Rule 144(h) Form filing requirement. For both these reasons, Ladd could not rely on the

Rule 144 registration exemption for his May 9-12 MGT stock sales from his E*Trade account.

Moreover, no other registration exemption applied to Ladd's May 2016 MGT stock sales. Thus,

summary judgment is appropriate on the SEC's Section 5 claim against Ladd.

In his Brief, Ladd erroneously argues that the four-week period to use in calculating

MGT's average weekly trading volume under Rule 144(e) is not the four calendar weeks

preceding the week of May 9, 2016 but the four calendar week weeks preceding Ladd's later

(May 25, 2016) submission of his Form 144. (Br. at 22, n.10.) This argument is wrong as a matter of law. Ladd was required to file his Form 144 *concurrently* with (the same day as) his May 9-12 stock sales, not two weeks later. Thus, Ladd needed to calculate his permissible trading volume based on the four weeks preceding the date Ladd actually sold the shares, which is also the required date for the Form 144 filing, not based on a convenient later date of Ladd's own choosing. In any event, even if Ladd's tortured reading of Rule 144(e) were correct, Ladd's late filing of his Form 144 for his May 9-12 stock sales in his E*Trade Account nonetheless violated Rule 144(h), thus disqualifying Ladd from relying on the Rule 144 exemption for those trades.

### (2) Ladd's Stock Sales in the Ladd Parents' TDA Account Violated Section 5

In addition to his MGT stock sales from his E*Trade account, during that same week, Ladd further violated Section 5 by selling an additional 340,000 MGT shares through the Ladd Parents' TDA Account—over which Ladd possessed trading authority and for which Ladd received $325,000 of the proceeds from those sales (at least 75% of the realized gains).

Although the TDA account was in his parents' name, Ladd admits that he fully controlled it, and that he immediately reaped the benefits of his May 12, 2016 MGT stock sales through that account. The day after Ladd made the sales, his mother sent him a check for $325,000, which Ladd admits constituted proceeds of his May 12 MGT stock sales in that account. Indeed, that $325,000 constituted 59% of the $551,979.44 proceeds of those sales, and at least 75% of the realized gains (and 100% of those gains post-tax). (56.1 ¶32.) Thus, Ladd used his parents' TDA account to trade MGT stock for his own pecuniary benefit, and the Court should hold that Ladd sold that stock either "directly or indirectly" for Section 5 purposes. *See SEC v. Sierra Brokerage Servs.*, 712 F.3d 321, 329-330 (6th Cir. 2013) (affirming summary judgment for SEC and holding

where nominee shareholders' stock was controlled by affiliate, and affiliate retained profits from ultimate sale, sales of nominees' stock violated Section 5). Any other result would permit Ladd to do indirectly what he was prohibited from doing directly: sell MGT stock in excess of Rule 144's volume limitations.

If Ladd attempts to rely again on the Rule 144 exemption for his MGT stock sales through his parents' TD Account, he likewise cannot do so for the reasons set forth in the previous section above. Under Rule 144(e), Ladd's MGT sales through the Ladd Parents' TDA account—when added to his sales through his Ladd E*Trade account—well exceeded his permissible volume limitation for the week of May 9. Thus, Ladd could not rely on the Rule 144 exemption for the TDA account sales either.

## B.   Ladd Violated Exchange Act Section 16(a) and Rule 16a-3 Thereunder

No genuine dispute exists that Ladd violated Section 16(a) and Rule 16a-3 thereunder, by failing to file certain required reports with the SEC regarding his purchases and sales of MGT stock in 2015 and 2016.

Section 16(a) requires every person "who is a director or an officer of the issuer of" a "security . . . registered pursuant to section 78l of this title" to "file ownership statements with the SEC.'" *SEC v. E-Smart Tech., Inc.*, 85 F. Supp. 3d 300, 326 (D.D.C. 2015) (quoting 15 U.S.C. § 78p(a)(1)). "These include initial ownership statements on Form 3, statements disclosing changes in beneficial ownership on Form 4, and annual statements on Form 5." *Id.* (citing Section 16(a)(2) and Rule 16a-3 thereunder, 17 C.F.R. § 240.16a–3). The Form 4 disclosures of changes in beneficial ownership must be filed within two business days of execution of the "subject transaction." 17 C.F.R. § 240.16a–3(g)(1). Ladd admits that he was

aware of this requirement. (56.1 ¶55.)[24] To establish a violation of these provisions, the SEC must show that Ladd was an officer or director of MGT, "and that he did not file Section 16(a) disclosures after an applicable triggering event" (*e.g.*, his individual purchases or sales of MGT stock). *See E-Smart Tech.*, 85 F. Supp. 3d at 326. No showing of scienter or materiality is required to establish Ladd's Section 16(a) liability. *See id.*

Thus, under Section 16(a) and Rule 16a-3, MGT's officers (including Ladd) were required to file a Form 4 within two business days of each purchase or sale they made of MGT stock. No dispute exists that Ladd filed no such form regarding the over 25 open-market purchases of MGT stock that he made between August 20 and October 2, 2015 in his TDA account; and regarding the many other purchases and sales of MGT stock that Ladd made in his E*Trade Account on over 26 different trading days from November 29, 2015 to May 17, 2016. (56.1 ¶¶64, 66.) Thus, the Court should grant the SEC summary judgment against Ladd for his violations of Exchange Act Section 16(a) and Rule 16a-3 thereunder.

## C.   Ladd Violated Section 13(d) and Rule 13d-2 Thereunder

Finally, Ladd violated Exchange Act section 13(d) and Rule 13d-2 by failing to report to the SEC material changes in the percentage of his ownership of MGT stock during time periods when he owned over 5% of MGT's outstanding stock.

"Section 13(d) requires any person who has accumulated more than 5% of a company's stock to file a public disclosure with the SEC that details the owner's background, how they acquired the stock, and any 'arrangements or understandings' regarding the 'transfer of any of the securities.'" *SEC v. Jammin Java Corp.*, No. 2:15-cv-08921-SVW-MRW, 2016 WL

---

[24]     In addition, within forty-five days of the end of the company's fiscal year, officers or directors are required to file a Form 5 with the SEC reporting, for example, "[a]ll holdings and transactions that should have been reported during the most recent fiscal year, but were not." 17 C.F.R. § 240.16a–3(f)(1)(iii).  There is no evidence that Ladd ever filed a Form 5 for 2016.

6595133, *18 (C.D. Cal. July 18, 2016) (quoting 15 U.S.C. § 78m(d)(1)). "Rule 13d-1,

implementing Section 13(d)(1)," requires such person "to disclose his ownership to the SEC." *Id.*

(citing 17 C.F.R. § 240.13d-1(a)). "Rule 13d-2, implementing Section 13(d)(2) of the Exchange

Act, requires that the stock holder amend their beneficial ownership report promptly whenever

there is a 'material change' in ownership." *Id.* (quoting 17 C.F.R. § 240.13d-2(a)). Under Rule

13d-2, such a "material" change included Ladd's purchase or sale of 1% or more of MGT stock.

17 C.F.R. § 240.13d-2(a); *see also SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 590

(S.D.N.Y. 1993).

"The purpose of [the Section 13(d)] disclosure is to protect companies and the investing

public by giving them notice of such accumulations because of their potential effect on control of

the company or the price of the company's securities." *Drexel*, 837 F. Supp. at 590.

"Section 13(d) is a strict liability statute." *Jammin Java,* 2016 WL 6595133, *18. Thus,

Section 13(d) does not "require a showing of scienter to establish liability." *SEC v. Verdiramo*,

890 F. Supp. 2d 257, 274 and n. 14 (S.D.N.Y. 2011) (granting summary judgment to SEC on

finding that defendant had not filed an amended Schedule 13D to disclose his more than 1%

increase in ownership) (quotations omitted).

No dispute exists that: (1) from June 16, 2015 to October 7, 2015, Ladd's ownership of

MGT's stock outstanding increased from 5.67% to 6.9%; (2) this ownership percentage change

was material (greater than 1%); and (3) Ladd filed no amended Schedule 13D disclosing this

material change (or any other amended Schedule 13D). (56.1 ¶¶69, 70.) Thus, no genuine dispute

exists that Ladd violated Section 13(d) and Rule 13d-2 thereunder, and the Court should grant

the SEC summary judgment against Ladd on its Section 13(d) claim as well.

II.     **SUMMARY JUDGMENT SHOULD BE GRANTED TO THE SEC ON ITS FRAUD CLAIMS AGAINST LADD FOR MGT'S FALSE PRESS RELEASE AND LADD'S OWN FALSE FORMS 4 AND 144 AND NEW ACCOUNT FORM**

To prevail on its claims against Ladd for violating Exchange Act Section 10(b), and Rule 10b-5(b) thereunder, the Commission must show that Ladd "(1) made one or more misstatements of material fact, or omitted to state one or more material facts that the defendants had a duty to disclose; (2) with scienter; (2) in connection with the purchase of sale of securities." *SEC v. Honig*, No. 18 Civ. 1875 (ER), 2020 WL 906383, at *6 (S.D.N.Y. Feb. 25, 2020) (quotations omitted). Ladd's May 9, 2016 press release, his May 25, 2016 Form 144, his May 31, 2016 Form 4, and his November 22, 2015 E*Trade new account form each contained indisputably false statements of material fact, and there is no dispute that Ladd made each false statement with scienter, or with reckless disregard for the truth.

The undisputed facts also support summary judgment for the SEC on its claim that each of those false statements violated Securities Act Section 17(a)(2). To establish that claim, the Commission must show that Ladd "'obtain[ed] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Honig,* 2020 WL 906383, at *10 (quoting 15 U.S.C. § 77q(a)(2)). The SEC need not prove Ladd's scienter, only his negligence, to show a violation of Section 17(a)(2). *Id.*

There is no dispute that the press release and the Form 4 were each disseminated by Ladd in connection with the purchase or sale, or in the offer, of securities. *E.g.*, *SEC v. Aly*, No. 16 Civ. 1581986 (PGG), 2018 WL 1581986, at *24 (S.D.N.Y. Mar. 27, 2018) (holding false statements in public filings while issuer's stock was actively trading satisfies both the "in connection with" and "in the offer" elements) (citing *SEC v. Stanard*, No. 06 Civ. 7736 (GEL),

2009 WL 196023, at *27 (S.D.N.Y. Jan. 27, 2009)). Ladd's Form 144 and new account form were also submitted "in connection with" the purchase of sale or in the offer or sale of securities since Ladd submitted them so that he could sell his MGT shares. *United States v. Naftalin*, 441 U.S. 768, 772-73 (1979) (placing sales orders with brokers satisfies the "in the offer or sale" element). Nor can there be any dispute that each of these false statements was transmitted using the means of interstate commerce. *SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391, 398 (S.D.N.Y. 2016) (statements transmitted by mail, email and over the internet are transmitted using the means of interstate commerce). Ladd used email to transmit the press release to the printer for filing with the SEC (56.1 ¶37), Ladd submitted his Form 144 to TDA via email and mail, and submitted his new account form on line to E*Trade. *(Id.* ¶¶ 8, 63), and his Form 4 was filed on EDGAR, and available on the internet.

A.   **Ladd's May 9, 2016 Press Release Was Materially False**

It is undisputed that Ladd knew that McAfee had not sold his company to Intel for $7.6 billion because he knew at the time he was writing the press release that McAfee had left his company over a decade prior to its sale. (56.1 ¶38.) It is also undisputed that that statement was material. (*Id.* ¶40 (MGT investor Mr. Petranis citing his review of the press release and the importance he placed on the claim about McAfee's success when deciding to invest).) Indeed, the fact that Ladd recalls a short-seller raising the falsity of the press release publicly is additional evidence that Ladd's false claim was material to investors.[25]

Ladd's arguments (Br.at 18-20) that the false statement was immaterial as a matter of law—either because some articles told the truth about McAfee's departure from his company

---

[25]   So, too, is the prominent placement of the claim in the first paragraph of the *Stock Beast* piece that MGT paid for. The author of that piece apparently deduced that investors would consider that information important. (56.1 ¶39.)

prior to the sale *or* because some articles made the same false claim as Ladd did— should be rejected for the same reasons the Court already rejected them on Ladd's first motion to dismiss. *See Honig*, 2020 WL 906383, at *7-8. Ladd has produced no new evidence that would warrant the Court's reconsideration of the same arguments and he offers nothing to create a genuine issue of material fact.

Ladd first argues that the claim that McAfee had sold his company to Intel for $7.6 billion was immaterial because the true facts— that McAfee had left his company more than 15 years prior to its sale—were already available to investors. But Ladd offers no new evidence that the true information had been disseminated into the market with a "'degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.'" *Honig*, 2020 WL 906383, at *7 (quoting *Ganino v. Citizens Utils., Co.*, 228 F.3d 154, 227 (2d Cir. 2000).) Of the new "evidence uncovered in discovery" that pre-dates the press release (Br. at 18), only three articles are of a more recent vintage than 2012 (Ford Decl., Exs. 30, 34, 35) and correctly note that McAfee had disassociated himself from his company prior to its sale.[26] The article closest in time to the press release, from an apparent on-

---

[26]     Most of those cited by Ladd are irrelevant to the "truth on the market" issue since they use the passive voice to describe the sale, and so offer no "truth" about McAfee's connection to the company at the time of the sale. *E.g.*, Ladd 56.1 ¶ 55 ("Intel's CEO Can't Seem to Shake John McAfee's Name," *Cyber Security Market Report*, April 21, 2016 ("McAfee—founder of his namesake anti-virus company which ultimately sold to Intel in 2010 for more than $7.6 billion . . .")); *id.* ¶ 65 ("'The John McAfee Project' to Debut on Spike in April 2016," *PR Newswire*, September 9, 2015 ("In 2010, the company he founded (McAfee Associates) was sold to Intel. . .)). *See also id.* ¶¶ 53, 56, 64. Other articles Ladd cites note that McAfee is no longer associated with the company, but say nothing about the company's sale to Intel. *Id.* ¶ 54 ("John McAfee says his new security product is a 'f___ing game changer'," *CNN Business*, December 30, 2015); *see also id.* ¶¶ 47, 48, 49, 50, 51 63. Or they say nothing about McAfee, the man, at all. *E.g.*, *id.* ¶¶ 59, 60, 62, 64. Thus, none of these articles does anything to clarify McAfee's role at the company at the time it was sold. Others post-date the press-release, and are irrelevant to the question of what facts were widely available to those who read the press release on May 9,

line source called "Channel Futures," was published in September 2015, eight months before

Ladd issued MGT's May 9, 2016 press release, and the article as a whole related to McAfee's

libertarian party presidential run, not his business dealings. (Ford Decl. Ex. 35 ("Believe it or

Not:  McAfee Anti-Virus Founder in U.S. Presidential Run"). *Compare In re Yukos Oil Co. Secs.*

*Litig.*, No. 04 Civ. 5243 (WHP), 2006 WL 3026024, at *22 (S.D.N.Y. Oct. 25, 2006) (pointing to

articles from "two major international newspapers" that focused on and detailed the matters

allegedly undisclosed by the company, the court held that "no reasonable investor could have

been misled"); *White v. H&R Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *6

and n.3 (S.D.N.Y. July 28, 2004) (citing "the torrent of articles published around the country"

four months prior to allegedly false press release that should have put investors on inquiry notice

of truth). Thus, for all the reasons it already cited, the Court should decline to revisit its rejection

of Ladd's "truth-on-the-market" defense because the articles Ladd cites to now are just as

insufficient to counter-balance the falsity of MGT's May 9, 2016 press release.

Ladd's other argument —that there were articles from September 2015 (before MGT's

misleading press release) that included the *same* falsity (Br. at 20)— undercuts, rather than

supports, Ladd's "truth-on-the- market defense." Those articles prove that the market was not

"saturated" *Yukos Oil*, 2006 WL 3026024, at *21, with the true facts of McAfee's separation

from his company long before the sale. *See Honig*, 2020 WL 906383, at *7 (noting that Ladd's

proffer of two articles posted in 2017 —after the false May 9 press release— that included the

same falsity "weaken[ed] any argument that [McAfee's 2016] Wikipedia entry was sufficient to

---

2016.  *E.g.*, *id.* ¶¶ 42, 57, 60, 62.

counterbalance Ladd's misinformation").[27]  As a result, Ladd's truth-on-the-market defense fails as a matter of law and gives him no grounds for summary judgment on the Commission's fraud claim against him for his materially misleading May 9, 2016 press release, and cannot defeat the Commission's motion for summary judgment.[28]

**B.**   **Ladd's May 31, 2016 Form 4 Was Materially False**

Ladd's misstatements on his Form 4 were material. By misrepresenting his sales of hundreds of thousands of shares of MGT stock in and before May 2016 as "a distribution" to Laddcap investors for zero consideration, Ladd gave investors the false impression that he was a net acquirer of MGT stock in that period. Instead, he was huge seller of the stock.

Investors track Forms 4 to gain insight into how a company's officers may view their company's prospects. Mr. Petranis confirmed that the trading by an issuer's officer in the issuer's stock is important to him when he is deciding to buy or sell that company's stock because it conveys to him what kind of confidence that officer has in the company's future. (56.1 ¶59.) In a

---

[27]    Ladd's claim that none of the investor actions against MGT alleged the falsity of Ladd's misstatement in the press release is mistaken. (Br. at 19 n.7)  *See, e.g.*, *Klingberg v. MGT Capital Investments, Inc.*, No. 18 Civ. 14380 (DE 1, ¶ 37); *Oh v. MGT Capital Investments, Inc.*, 18 Civ. 9228 (S.D.N.Y.) (DE 48, ¶ 81); *In re MGT Capital Investments, Inc.*, Index No. 7031/2018 (Sup. Ct. Westchester Cty.) (DE 1, ¶ 108.)  If some did not, it may have been because they were misled by the same false information that Ladd cites.

[28]    The relative strength of MGT's stock price until the Commission filed its Complaint in September 2018 does not dictate that summary judgment be entered in Ladd's favor. (Br. at 8.) First, that evidence is relevant only if MGT traded in an efficient market, a showing Ladd makes no attempt to make. *See United States v. Schiff*, 602 F.2d 152, 171 (3rd Cir. 2010)(stock price movement is "used as evidence [of materiality] if the market is efficient"); *see also In re Petrobras Secs.*, 862 F.3d 250, 276 (2d Cir. 2017) (listing the evidence to support efficiency as including high trading volume, extensive analyst coverage, multiple market makers, large market capitalization.)  Second, there was no corrective disclosure, which is necessary to make stock price movement relevant to materiality. *See SEC v. Penthouse Int'l Inc.*, 390 F. Supp. 344, 354 (S.D.N.Y. 2005) (rejecting motion to dismiss for lack of materiality based on lack of stock price movement where there had been no corrective disclosure). Here, MGT's May 23, 2016 Form 10-Q (56.1 ¶35) failed to correct the misleading press release.

similar vein, Twitter commenters read Ladd (and other MGT officer's) Form 4 disclosures with interest on May 31, 2016 and the next day. One commented enthusiastically on the award of shares to insiders. Another determined that the Forms 4 showed that insiders had largely acquired shares and that "Ladd sold *only* 190,903" shares. (56.1 ¶5.)

## C.     **Ladd's Form 144 Was Materially False, As Was His E\*Trade New Account Form**

Ladd's misstatements on his Form 144 submitted to TDA on May 25, 2016 and on his new account application form submitted to E\*Trade on November 22, 2015 were material as a matter of law.

Rule 144 and Securities Act Section 4(a)(4) impose obligations on brokers who execute trades for affiliates, providing the brokers with their own safe harbor from Section 5 liability if they comply with its provisions. Under Rule 144(g), a broker is required to conduct a "reasonable inquiry" to ensure that it is unaware of circumstances showing that the seller "is an underwriter with respect to the securities or that the transaction is a part of a distribution of securities of the issuer." Rule 144(g). The Rule further imputes to the broker all the information required by Form 144, deeming it "to be aware of any facts or statements contained in the notice required by paragraph (h) below [Form 144]." 17 C.F.R. § 230.144(g)(4). If the broker complies with the requirements of Rule 144(g), Securities Act 4(a)(4) exempts it from Section 5 liability for its part in effecting the transactions.

Thus Section 4(a)(4) and Rule 144 impose obligations on the broker independent of those imposed on its customer. If the broker obtains information on a Form 144 that shows that the seller is an underwriter, or is engaged in a distribution, it may not itself claim any exemption for its role in sales that violate Section 5 and subjects itself to liability. *See* Securities Act Section 4(a)(4) (exempting "brokers transactions" (as defined in Rule 144(g)) from the provisions of

Section 5); *see also* J. William Hicks, *Resales of Restricted Securities*, § 4.80 (March 2022 Update) (because a broker "faces the possibility that it will be deemed to be an underwriter" of the affiliate's securities if it sells them for his account, Rule 144(b) protects the broker "if all the conditions of Rule 144 are met. For such a broker, the protection of Rule 144(b)(2) requires compliance by the affiliate with the conditions [of the Rule] and also requires compliance by the broker with Rule 144(g).")

For these reasons, TDA advised customers who were affiliates that any trades in their issuer's securities required the customer to complete and submit a Form 144.[29]  (56.1 ¶62.) To inform how it should deal with its customers and to satisfy its own obligations under Rule 144(g), E*Trade asked its new customers whether they were officers or directors of public companies so that it could ensure that it had any insiders submit a Form 144 to it before trading in company shares.

When a market participant relies on a false statement to ensure its own compliance with the law, that misrepresentation is material. *E.g., SEC v. Greenstone Holdings, Inc.*, No. 10 Civ. 1302 (MGC), 2012 WL 1038570, at *5 (S.D.N.Y. Mar. 28, 2012) (holding on summary judgment that false opinion letters issued to support transfer agent's removal of restrictive legends on stock certificates were material because they "necessarily inform the transfer agent's decision"), *aff'd sub nom. SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016);  *accord Sayid*, 2019 WL 6307367, at *7 (granting summary judgment and holding that false statements to attorney

---

[29]    Ladd suggests he filed the Form himself electronically with the SEC, but cites nothing in support. (Br.at 25.)  While Ladd did have an independent obligation to complete a Form 144 pursuant to Rule 144(h) and submit it to the Commission and NYSE MKT, TDA's "Restricted-Stock Handling Guidelines, Rule 144-Affiliate," which Ladd received (among other times) on May 9, 2016, provided that TD Ameritrade "will file SEC Form 144 on your behalf."  (56.1 ¶62.)

writing opinion letters on which defendant knew transfer agent would rely were necessarily material), *aff'd*, 860 F. App'x 18, 20 (defendant's misrepresentation to lawyer writing opinion to support transfer agent's removal of restrictive legend "significantly altered the total mix of information available to [the lawyer]" and was material) (quotations omitted).[30]

Like the false statements in *Greenstone* and *Sayid* — which were ruled material as statements the recipients relied on to comply with their own legal obligations—-Ladd's false statements to TDA and E*Trade were material as important to those firms' decision to effect his May 2016 sales.

Ladd supplied false material information to E*Trade on his new account form, as he admitted. (56.1 ¶¶8, 9.) As a result, E*Trade had no way to ensure its own compliance with Rule 144(g) or Section 4(a)(4). Had E*Trade known that Ladd was an MGT affiliate, it would have required him to submit a Form 144 in order to comply with its own obligations under Rule 144(g) and that information would have revealed that Ladd's sales during the week of May 9, 2016 exceeded the volume limitations imposed by the Rule.

Ladd's false Form 144 submitted to TDA on May 25, 2016 (56.1 ¶63) was similarly material. On that form, Ladd lied about the number and timing of sales made in his E*Trade account, indicating that he intended to sell 465,171 MGT shares on May 25, 2016. And in the box seeking information about the sales Ladd had made in the prior three months, he disclosed

---

[30]     *See also In the Matter of Joseph John VanCook*, SEC Rel. No. 34-61039A, 2009 WL 4026291 at *10 (SEC Nov. 20, 2009) (finding that misrepresentations about dates of trades submitted to mutual funds were material where mutual fund was relying on information to ensure its compliance with Investment Company Act Rule 22c-1), *pet. denied VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011); *cf. SEC v. Druffner*, 517 F. Supp. 2d 502, 508-09 (D. Mass. 2007) (finding that orders to mutual fund constituted material misrepresentations where orders disguised market timing prohibited by fund policies), *aff'd sub nom. SEC v. Ficken*, 546 F.3d 45 (1st Cir. 2008); *SEC v. Gann*, No. 05 Civ. 0063, 2008 WL 857633, at *10 (N.D. Tex. Mar. 31, 2008) (same), *aff'd*, 565 F.3d 932 (5th Cir. 2009).

only those sales that he had made through his parents' account at TDA, and omitted any

disclosure of the 84,072 shares he sold between February 16 and April 30, 2016 from his

E*Trade account, or the 466,600 shares he sold out of the account between May 3 and May 17,

2016. (*Id*.)

Had Ladd submitted an accurate Form 144 to TDA on May 25, 2016 that showed the true

extent of his MGT trading through E*Trade in the last three months, and the actual dates on

which those sales were made, TDA would have seen that Ladd had not complied with Rule 144's

volume limitations in his prior sales and it would have been aware of circumstances showing that

both his past and planned sales were part of an unlawful distribution. Thus, just as a transfer

agent would not remove restrictive legends without the opinion letters attesting to the basis for

doing so in order to avoid its own liability, neither would a broker dealer like E*Trade or TDA

risk subjecting itself to Section 5 liability for effecting an unlawful distribution of MGT

securities by Ladd.

### D.   Ladd Made Each of His False Statements Intentionally or with Reckless Disregard for Their Truth

There is no dispute that Ladd made each of his false statements—in the May 9, 2016

press release; in his May 31, 2016 Form 4, and in his May 25, 2016 Form 144 and November 22,

2015 new account application— knowing that they were false, or having full and easy access to

information that contradicted them.

When a defendant makes a false statement and acknowledges that he knows the facts that

contradict it, scienter is established and summary judgment should be granted. *See Frohling*, 851

F.3d at 138 (affirming district court's grant of summary judgment to SEC where defendant

admitted he knew the facts that made his statements false);  *accord SEC v. Gallison*, 588 F.

Supp. 3d 509, 524-25 (S.D.N.Y. 2022) (granting summary judgment to SEC where defendant

knew the statement was "false when made"); *Sayid*, 2019 WL 6307367, at *8 (granting summary judgment where defendant raised no genuine dispute that he knew or recklessly disregarded that his statements were false), *aff'd*, 860 F. App'x 18, 20 (2d Cir. 2021).

Thus summary judgment as to Ladd's scienter is appropriate here since there is no dispute that Ladd knew that McAfee had not sold his company to Intel for $7.6 billion, and knew that when he included the McAfee description in the press release. (56.1 ¶35.) That admission alone is a sufficient basis for concluding that Ladd included that claim in the press release with scienter.

Circumstantial evidence also supports that Ladd's inclusion of the false claim was intentional. Ladd distributed the draft press release (without the false statement) widely and with plenty of time for reviewers to comment. But after he inserted the McAfee $7.6 billion claim, Ladd distributed the revised version in the early morning hours, drawing none of the reviewer's attention to the change, and giving them little time for review before his planned release "pre-market."[31] (56.1 ¶¶35-37.) In addition, after being called out on the falsity by a short-seller, Ladd's "correction" was hardly that. (56.1 ¶38.) He pointed to no misstatement in the press release itself, and wrote a statement for the Form 10-Q that revealed nothing about McAfee's separation from his company years before; instead, what Ladd included in MGT's May 23, 2016 10-Q was consistent with the press release because it portrayed the same information – that McAfee's company *was* sold to Intel for $7.6 billion. It just omitted that McAfee had long gone when it was sold. (*Id.*)

---

[31]   Ladd seems to have been inspired to add the false detail about McAfee's sale to the press release by the success of the *Small Cap Leader* piece published the prior February that highlighted how many millions of dollars Honig had earned from his sale of interClick to Yahoo. (Resp. ¶¶94-96.)

Nor is there any dispute that Ladd knew that he had not distributed his shares to his Laddcap investors for no consideration when he reported that he had in his May 31, 2016 Form 4. (56.1 ¶ 41.)  Even if he had somehow forgotten that he had sold all of those shares out of his E*Trade account, most of them in the preceding weeks of May for hundreds of thousands of dollars, Ladd acted recklessly if he did not check his account statements before signing the Form 4. *See Gallison*, 588 F. Supp. 3d at 523 (granting summary judgment for the SEC, court holds that when a defendant "had access to . . . information contradicting" his statements, he acted recklessly if he did not review it).

Circumstantial evidence supports this conclusion as well. In Ladd's view, investors would be interested in an officer's acquisition of shares. By disguising his sale of MGT stock as a "distribution" for no consideration, Ladd gave investors the false impression that he was a net acquirer of MGT stock. (56.1 ¶54.)

And Ladd knew that he concealed his affiliate status in his new account opening forms submitted to E*Trade on November 22, 2015. While he claims that his omissions were a mistake, it is hard to believe that he mistakenly typed in "retired" to the question of employment while he was then the CEO of MGT. (56.1 ¶¶8, 9.) Finally, Ladd also intentionally misstated his intended stock sales on his Form 144, submitted in final form to TDA on May 25, 2016. He could not have mistakenly believed that he would sell any MGT shares in his E*Trade account on or after May 25, 2016 (Br. at 23), because he had sold all of his MGT shares out of that account by May 17, 2016. (56.1 ¶60.) As was true with his Form 4, if he had honestly forgotten that fact, he was reckless to sign the Form 144 as submitted;  he had easy access to his E*Trade account statements to verify the information he was including.

III.   **SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S CLAIMS THAT WHEN LADD SIGNED MGT'S 2015 FORM S-1 AND 2016 FORM 10-K, LADD KNEW, OR WAS RECKLESS IN DISREGARDING, THAT HONIG, BRAUSER, GROUSSMAN, STETSON, AND O'ROURKE WERE ACTING AS AN UNDISCLOSED GROUP**

The Commission alleges that Ladd violated Exchange Act Section 10(b), and Rule 10b-5(b) thereunder, and Securities Act Section 17(a)(2) by, among other things, failing to disclose in two MGT filings what he knew, or recklessly disregarded to be true: that Honig, Brauser, Groussman, Stetson and O'Rourke were acting in concert to acquire, hold, vote and dispose of MGT stock. (SAC, Counts V and VI.) To establish its claim under Rule 10b-5(b), the Commission must prove that Ladd made an "untrue statement of a material fact or . . . omit[ted] to state a material fact . . . in connection with the purchase or sale of any security," with scienter. *Honig*, 2020 WL 906383, at *6 (quotations omitted). To establish its claim under Securities Act Section 17(a)(2), the Commission must prove that Ladd, in the offer or sale of any security, "'obtain[ed] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Id.*, at *10 (quoting 15 U.S.C. § 77q(a)(2). Section 17(a)(2) is "notably different from Section 10(b) of the Exchange Act in that Section 17(a)(2) does not require proof of scienter—only proof of negligent conduct." *Id.*

Ladd concedes that Item 403 of Regulation S-K required MGT to disclose any holder of more than 5% of the company's stock, including "any 'group' [of such holders] as that term is used in section 13(d)(3) of the Exchange Act." (Br. at 13.) He argues that summary judgment should be granted because (1) there is no evidence that Honig was acting as a group with Brauser, Groussman, Stetson and O'Rourke in 2015 and 2016; (2) if they were acting in concert, Ladd did not know it; and (3) in any case, the Commission cannot defeat his claim of good faith in justifiably relying on his SRF lawyers, who failed to advise him to disclose Honig's group

status. (Br. at 11-18.)

## A. Ample Evidence Would Support a Jury Finding that Honig, Brauser, Groussman, Stetson and O'Rourke Acted as a Group in Acquiring, Holding, Voting and Disposing MGT Stock in 2015 and 2016

Exchange Act Section 13(d)(3) defines a "group" of investors as two or more persons who agree to act together "for the purpose of acquiring, holding, voting or disposing" of the securities. 15 U.S.C. § 78m(d)(3). Under Rule 13d-5(b)(1), "'the group formed thereby shall be deemed to have acquired beneficial ownership . . . of all equity securities of that issuer beneficially owned by any such persons.'" *Roth v. Jennings*, 489 F.3d 499, 507 (2d Cir. 2007) (quoting Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1)). Whether two or more persons are acting as a group for Section 13(d) purposes—and whether their group purpose was the acquisition, holding, voting or disposition of an issuer's equity securities—are questions of fact. *Roth*, 489 F.3d at 508. As the Second Circuit has long held, circumstantial evidence suffices to permit an inference that the requisite agreement to act in concert required by Section 13(d) existed. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 124 (2d Cir. 2001) (citations omitted) (reversing summary judgment granted to defendants and rejecting defendants' sworn denials of group status in favor of circumstantial evidence that permitted inference of group).[32]

Factors courts consider in determining whether individuals are acting together to acquire, hold, vote or dispose of an issuer's securities include (1) prior relationships among members

---

[32]    Citing Rule 13d-5(b)(2), Ladd asserts that the statute exempts groups whose goal is merely to acquire shares together. (Br. at 11.) Even if that claim were consistent with Section 13(d)(3)'s explicit language, the Rule he cites does not provide the exemption Ladd asserts. In fact the Rule applies only in certain enumerated circumstances, including that all members of the group are "persons specified in Rule 13d-1(b)(1)(ii)." 17 C.F.R. § 240.13d-5(b)(2)(i). Rule 13d-1(b)(1)(ii) makes the exemption available only to institutions like broker-dealers, banks, and registered investment advisers. *See* 17 CF.R. § 240.13d-1(b)(1)(ii)(A)-(J). There is no evidence that any member of the 2015 group was one of those types of institutions.

*Quintel*, 249 F.3d at 127 (citing the group's preexisting common relationship as sole shareholders of a closely held corporation);[33] (2) a single member of the group negotiating on behalf of the others, *Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC*, No. 99 Civ. 2821 (VM), 2002 WL 31869391, at *5-6 (S.D.N.Y. Dec. 20, 2002) (denying summary judgment to defendants where their use of one member's attorney as conduit to company for their comments on deal documents permitted inference of group activity); (3) communications among the members of the group about acquiring, holding, voting or disposing of the stock, *Wellman v. Dickinson*, 682 F.2d 355, 363-64 (2d Cir. 1982) (affirming district court's findings that agreement among defendants could be inferred from their communications among each other about their plans for their holdings, despite their denials of agreement); (4) the issuer's view of the members as a group, *Quintel,* 249 F.3d at 127 (citing the issuer's perception of the investor's group membership as relevant);[34] and (5) the subsequent actions of the members after their acquisition to hold the securities, to vote in the same way, or to dispose of the securities at or about the same time. *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14 Civ. 5226 (DLC), 2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015) (denying motion to dismiss based on evidence of concerted action to dispose of shares which indicated formation of group to acquire them). The documentary evidence shows the presence of each of these factors in Honig's

---

[33]    *Cf. Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 173, 176 (S.D.N.Y. 2000) (denying motion to dismiss, court notes the long-standing investing and personal relationships among defendants); *Glob. Intellicom v. Thomson*, 99 Civ. 342 (DLC), 1999 WL 544708, at *14 (S.D.N.Y. July 27, 1999) (citing allegation that "various of these Defendants have engaged in . . . similar transactions with other public companies" to deny motion to dismiss); *Lerner v. Millenco, LP*, 23 F. Supp. 2d 337, 344 (S.D.N.Y. 1998) (citing allegations that defendant had coordinated its investments with other members of the alleged group "on numerous prior occasions").

[34]    *Accord Schaffer*, 2002 WL 31869391 at *7 (citing issuer's view of investors as a group as factor weighing against granting summary judgment to defendants).

formation of a group to acquire, hold, vote and dispose of the MGT shares in the 2012, as well as
the 2015 transaction.

### (1) Honig, Brauser, Groussman, Stetson and O'Rourke Were Frequent Co-Investors, and Honig, Groussman, Stetson and O'Rourke Shared Offices

Honig, Brauser, Groussman, Stetson and O'Rourke had a long-standing business and
investing relationship, frequently investing in the same issuer at the same time. Stetson and
O'Rourke worked together with Barry Honig throughout the relevant period out of the same
office. (Resp. ¶¶76; 87.)  Groussman also had an office there, and was a long-time Honig family
friend. Blue sheet analysis reflects that all five of Honig, Brauser, Groussman, Stetson and
O'Rourke (individually and through their entities) invested together in 19 issuers between 2011
and 2018.[35]  (*Id.* ¶76.)

### (2)     Honig Directed the Negotiations of Deal Terms for both the 2012 and 2015 Financings

Honig was the lead negotiator for both the 2012 and 2015 financings. (Resp. ¶¶74; 86.)
In 2012, Honig and Ladd hammered out the terms of the deal. (*Id.* ¶74.) When Iroquois and
Hudson Bay made demands for terms Ladd rejected, Honig interceded to finalize the deal. (*Id.*)
Honig decided which investors to invite to participate in 2012 and conveyed the list of investors
to Ladd together with the allocations Honig assigned to each. (*Id.* ¶75.)

Honig performed the same lead role on the 2015 financing. He identified the investors

---

[35]     Brauser (and/or his entities) invested with Honig (and/or his entities) in more than 40
issuers between 2011 and 2018. (Resp. ¶76.)  Stetson (and/or his entities) invested with Honig
(and/or his entities) in more than 65 issuers during that same period. (*Id.*)  O'Rourke (and/or his
entities) invested with Honig (and/or his entities) in more than 70 issuers during that same
period. (*Id.*)  And Groussman or his entities invested during that period with Honig (and/or his
entities) in more than 35 issuers. (*Id.*)  Kesner testified that Honig, Brauser, Stetson, O'Rourke,
Groussman, and Jonathan Honig, Honig's brother, co-invested "frequently" while he was at SRF.
(Resp. ¶87.)

who would invest with him, and he negotiated the terms of the deal. (Resp. ¶¶86-87.) When Groussman tried to renegotiate the terms Honig had agreed to, Ladd called again on Honig to intercede. (*Id.* ¶86.)

### (3)   The Group Members Communicated About the Investments

Communications among the 2012 group and the 2015 group show the members working together to effect the acquisition of securities, hold them, and to vote together. When Honig had Stetson sign the 2012 term sheet, Stetson returned it to Ladd, copying Honig. (Resp. ¶74.). And when Jonathan Honig asked Stetson whether he should exercise his friend's warrants (Lowe), Stetson told him that he, Stetson, had already done so. (*Id.* ¶80.)  Honig summarized the lead role he had played in negotiating the terms, designating the investors and marshalling his group of investors to agree to Ladd's Warrant Exchange Offer in a May 2013 email to Ladd. (*Id.* ¶83.)

Stetson acted as coordinator for closing the transaction, interacting at SRF's or MGT's request with various investors (other than Iroquois and Hudson Bay) to obtain executed documents. (Resp. ¶77.)

Communications among the group continued in the 2015 transaction. Stetson sent Groussman the list of investors and allocations that he had sent to Ladd. (Resp. ¶87.) And Stetson again acted as coordinator for closing, interacting among the investors to paper the transaction. (*Id.* ¶88.)

### (4)   MGT and Ladd Considered Honig, Brauser, Groussman, Stetson and O'Rourke as a Group in the 2015 Financing

Ladd considered Honig and his co-investors to be a group. In communicating the terms of the 2015 PIPE to his Board of Directors, Ladd pointed out that "[t]he investor group is led by Barry Honig, who participated in our 2012 PIPE." (Resp. ¶85.) He spelled out for his board what the group's overall percentage of ownership would be. (*Id.*) And in a post-closing email to

Honig, setting out MGT's budget, burn rate and cap table, and attaching a list of the company's stock holders issued by its transfer agent, Ladd twice referred to Honig and his co-investors as "your group." (*Id.* ¶111, Brown Decl., Ex. BBB ("In addition, your group's 25 cent warrants could bring in an additional $1.4 million. . . ."; "[W]e have 17.2 million common shares outstanding, including your group's 2.8 million, Iroquois at 1.3 million and my family at 1.3 million.")

> **(5)    Honig and His Co-Investors Converted and Sold Their Shares, and Exercised Their Warrants at or About the Same Time, and All Agreed to the Terms of Ladd's Warrant Exchange and Warrant Modification**

In both transactions, Honig's group acted in near lock step post-closing. In 2013, Honig and his co-investors converted and sold their shares, and exercised their warrants at or about the same time, and they uniformly accepted MGT's modification offer to their warrants. In early April 2013, immediately before and after the issuance of the false John Ford MGT tout published on April 11, 2013 in *Seeking Alpha*, Honig, Groussman and Stetson began to convert their preferred shares at or about the same time. (Resp. ¶78.) Each of them started selling the converted common stock soon thereafter into the inflated market created by the false *Seeking Alpha* piece. (*Id.* ¶82.)

In 2016, after Ladd—at Honig's direction—paid a promoter $125,000 to publish another MGT tout, Honig, Brauser, Stetson and O'Rourke sold MGT shares into the inflated market resulting from the newsletter. (Resp. ¶96.)[36]

In both 2013 and again in 2016, Honig's group uniformly elected to modify their warrant

---

[36]    That Groussman/Melechdavid did not sell in the first dump of MGT shares in February 2016 does not disqualify him from group membership. A group need only have just one of the enumerated purposes:  acquiring, holding, voting or disposing. *Roth*, 489 F.3d at 508. As a result, group members need not "always march in lockstep." *Morales v. New Valley Corp.* 999 F. Supp. 470, 475 (S.D.N.Y. 1998), *aff'd sub nom. Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999).

agreements. In 2013, Ladd sent an Exchange Offer to the 2012 investors proposing to modify the terms of the Warrant Agreements they had negotiated in the 2012 financing. (Resp. ¶79.) Honig and HSCI sent back their executed acceptances of the offer on the same day. (*Id.* ¶80.) Groussman sent in his exchange agreement for Melechdavid on less than two weeks later. (*Id.*)

And after the McAfee transaction was announced in May 2016, and MGT's stock price rose, Ladd again offered Honig's group a modification to their Warrant Agreements, offering to allow them to exercise warrants early, for a premium. (Resp. ¶103.)  Each of them agreed to pay a premium for the early opportunity to exercise the warrants for more shares, and just after, Honig, Brauser, Groussman, Stetson and O'Rourke began to exercise their warrants, sending MGT Notices of Exercise. (*Id.* ¶104.) They also began selling their shares. (*Id.*  ¶102.)

## B. Ample Evidence Would Support a Jury Finding That Ladd Knew or Recklessly Disregarded that Honig and His Co-Investors Were Acting as a Group in 2015, but Ladd's Scienter Is Classically a Jury Question

Courts typically decline to grant summary judgment on issues of scienter in securities fraud cases because a "defendant's subjective state of mind – including that he took action knowing that he was violating a legal standard or with recklessness as to that point – is a determination classically and commonly made by juries." *SEC v. AT&T, Inc.*, No. 21 Civ. 1951 (PAE), 2022 WL 4110466, at *60 (S.D.N.Y. Sept. 8, 2022) (denying cross motions for summary judgment and holding defendant's "subjective state of mind . . . is a determination classically and commonly made by juries") (citing *Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d Cir. 1984)). To defeat summary judgment, the Commission need only offer evidence from which a jury could infer scienter because it is the rare defendant who admits to having had fraudulent intent. *Nagelberg v. Meli*, No. 17 Civ. 2524 (LLS), 2022 WL 2078010, at *1 (S.D.N.Y. June 9, 2022) (denying motion for summary judgment as to defendant's scienter) (quotations omitted).

In this case, there is ample evidence which would allow a jury to infer that, by 2015 and 2016, Ladd knew or recklessly disregarded Honig's membership in a group under Section 13(d), and that Ladd knowingly or recklessly failed to disclose that status or to aggregate the group's holdings in MGT's Form S-1 and 2015 Form 10-K.

Ladd's obligation to disclose Honig's group status and ownership in MGT's November 2015 and April 2016 filings was triggered because he knew or recklessly disregarded that Honig was acting in concert with others. What Ladd did know about Honig and his membership in an undisclosed group of investors made his failure to disclose their aggregated holdings "highly unreasonable and . . . represent[ed] an extreme departure from the standards of ordinary care [because] the danger was either known to [Ladd] or so obvious that [Ladd] must have been aware of it." *S. Cherry St., LLC v. Hennessee Grp. LLC* 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks and emphasis omitted); *accord Gruber v. Gilbertson*, No. 16 Civ. 9727 (WHP), 2021 WL 2482109, at *12-13 (S.D.N.Y. June 17, 2021) (denying defendants summary judgment where sufficient evidence was offered of facts known to defendants that demonstrated their knowledge of scheme). Put another way, after Ladd's experience with Honig, Stetson and Groussman in and after the 2012 transaction, if he simply relied in 2015 and 2016 on investors' own disclosures to determine their group status, it was "[a]n egregious refusal to see the obvious, or to investigate the doubtful" and gives "rise to an inference of . . .recklessness."  (*Id.* (internal quotations and citations omitted.)[37]

---

[37]    Ladd's argument that he had no duty to investigate the truth of Honig's own Schedule 13G filings, and could rely on them to satisfy his Regulation S-K duties to disclose (Br. at 14), is refuted by the Instructions to Item 403. Instruction 3 to Item 403 permits the registrant to rely on investors' Schedule 13 filings, "*unless* the registrant knows or *has reason to believe* that such information is not complete or accurate."  17 C.F.R. § 229.403, Instructions to Item 403, Instruction No. 3 (emphasis added). Ladd had reason to believe that Honig's Schedule 13G was inaccurate, as described below, but took no steps to challenge it. Such failure to investigate in the

Given his sophistication as a Wall Street veteran, and his own expertise in Section 13(d) and its requirements (Resp. ¶¶105, 114), Ladd had ample reason to believe by 2015 that Honig's October 2015 Schedule 13G filing was inaccurate because it failed to disclose that he was acting in concert with Brauser, Groussman, Stetson and O'Rourke, particularly given his prior interactions with a Honig investment group in 2012. From the earlier transaction, Ladd did not just know that Honig led the negotiations for his investors, controlled who could participate and that Honig had secured their collective agreement to his Exchange Offer. (*Id.* ¶¶71-77; 83.)  He also knew that they had each converted their preferred stock to more saleable common shares together. (*Id.* ¶78.)

But more than that, in 2013, Ladd suspected that Honig had engaged in a pump-and-dump in MGT securities—just as he had been warned by David Einhorn that Honig would do. (Resp. ¶¶114-15.) Ladd saw the false Ford piece in *Seeking Alpha* in April 2013 and he suspected that Honig (or another large investor) had paid John Ford to write it. (*Id.* ¶115.) Honig, Groussman and Stetson took full advantage of that pump and dumped their newly-converted shares into the inflated market the *Seeking Alpha* tout created. (*Id.* ¶82.)

Despite what he called his "hyper-vigilan[ce]" in dealing with Honig (Resp. ¶117), Ladd signed MGT's November 6, 2015 Form S-1 listing Honig as an individual investor, and cited to Honig's October 10, 2015 Schedule 13G as the basis for MGT's disclosure of Honig's beneficial ownership. (Resp. ¶91.) No evidence shows that he questioned Honig or anyone else about the Schedule 13G's accuracy, even though Honig had again led the negotiations for the deal, and again picked the investors—two of whom were part of Honig's 2012 group: Groussman and

---

face of doubtful facts may amount to recklessness itself, as a matter of law. *E.g.*, *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 448 (E.D.N.Y. 2016); *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 494-95 (S.D.N.Y. 2002)

Stetson. (*Id.* ¶¶84; 86-87.) Ladd himself believed the 2015 Honig investors were acting as a group: He told both his Board and Honig that in contemporaneous communications. (*Id.* ¶¶85; 111.)

At the same time, Ladd had a motive *not* to investigate any uncertainty he might have had about Honig's group status with others. He knew Honig did not want to be associated with other investors for fear of Section 16(b) claw backs of any short swing profits he might earn. (Resp. ¶112.)  Not confronting Honig about his Schedule 13G served Ladd's purposes; he was relying on Honig's usefulness in in pushing MGT's stock price up with the presentation of a reverse merger candidate (as he told his Board) or some other publicity-generating event. (*Id.* ¶85.)

If Ladd's hyper-vigilance did not lead him to question the accuracy of Honig's October 2015 Schedule 13 filing when the MGT Form S-1 was filed, he knew or was reckless in not knowing that Honig and his co-investors were acting in concert by April 2016 when MGT filed its 2015 Form 10-K. By that time, Ladd himself had helped Honig create the publicity-generating event into which Honig, Brauser, Stetson and O'Rourke dumped at least some of their MGT shares, (Resp. ¶94) and each of Honig's co-investors sold shares into the inflated market. (*Id.* ¶96.) [38]

## C.  Any Reliance Ladd Placed on SRF's Failure to Advise Him to Disclose Honig's Group Status Was Misplaced and Unreasonable

If Ladd relied on SRF lawyers to advise him on Honig's group status, that reliance was misplaced and unjustified, and therefore does not establish Ladd's good faith defense to an inference of scienter. To establish an advice-of-counsel reliance defense, Ladd must show that

---

[38]     While the *Small Cap Leader* contained no falsity in its text, it failed to disclose that MGT had paid for its publication and distribution. (*Id.* ¶95.)

he:

> sought the advice of a lawyer as to what he could lawfully do in the future; .
> . .fully and honestly laid all material facts of which he ha[d] knowledge
> before the lawyer; and . . .in good faith, . . . honestly followed such advice,
> relying upon it and believing it to be correct.

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir. 1989); *accord*

*Markowski v. SEC*, 34 F.3d 99, 105 (2d Cir. 1994) (citing *SEC v. Savoy Indus., Inc.* 665 F.2d

1310, 1314 n. 28 (D.C. Cir. 1981)). Whether a defendant can establish each of those elements

can be, as here, a factual question inappropriate for resolution on summary judgment. *Nokaj v. N.*

*E. Dental Mgmt., LLC,* No. 16 Civ. 3035 (KMK), 2019 WL 634656, at *13 (S.D.N.Y. Feb. 14,

2019) (denying summary judgment to defendant because his advice-of-counsel defense raised

factual issues of defendant's full disclosure to counsel).

     As a starting point, Ladd makes no attempt to argue that he can satisfy any of the

elements of an advice-of-counsel defense. He offers no evidence that he asked Kaplowitz or

Marcus for advice about the group issue. Thus, even if he simply relies on the fact that he serially

copied Kaplowitz and/or Marcus on emails, or that Kaplowitz was retained to review MGT's

filings, as evidence that he relied on the lawyers to spot the issue and require disclosure, that

argument will not suffice. *See SEC v. Tourre*, 950 F. Supp. 666, 684 (S.D.N.Y. 2013) (rejecting

defendant's attempt to present evidence or argument about the review of disclosure language by

lawyers, recognizing that a jury could mistakenly understand that fact to mean the lawyers

"'bless[ed] the sufficiency of that disclosure"); *see also SEC v. O'Meally*, No. 06 Civ. 6483

(LTS), 2010 WL 3911444, at *4 (S.D.N.Y. Sept. 29, 2010) (denying summary judgment in part

because defendant offered no evidence that he "requested advice as to the legality of the

practices challenged here").

     In any event, even if Ladd had asked for advice, and received it, any reliance Ladd put on

his SRF lawyers for a determination that Honig was not acting in concert with Brauser, Groussman, Stetson and O'Rourke, was not in good faith. As Ladd knew, Kaplowitz and Marcus relied on a single denial of group status from Honig's own lawyer in 2012, never discussed it further, and were unaware of facts that Ladd knew that called that conclusion into question.

### (1)   After Kesner's 2012 Email Denial of Honig's Group Status, There Is No Evidence that the Topic Was Ever Discussed or Considered by Anyone Again

There is no evidence that anyone at SRF—or Ladd—discussed or even considered the question of whether Honig was acting in concert with others after Kesner's terse denial of Honig's group status in a 2012 email to Marcus. It does not appear that anyone on the MGT team even discussed Kesner's response after receiving it, or asked him for the basis for his conclusion. (Resp. ¶¶131-37.) Thus, while Ladd saw evidence of acting in concert from Honig, Groussman, and Stetson following the 2012 financing, and even suspected that Honig had engineered an MGT pump and dump in April 2013, there is no evidence that Honig's group status was ever reconsidered by anyone.

### (2)   Neither Ladd, Marcus Nor Kaplowitz Could Rely on Honig's Lawyer for Advice

If Ladd relied on Kesner's 2012 denial, his reliance was unreasonable. Ladd understood throughout that Kesner represented Honig, and that Kesner did not represent Ladd or MGT. (Resp. ¶119.) Kaplowitz, too, had no doubt that Kesner's loyalties lay with Honig. (*Id.* ¶123.) SRF, the firm, told Ladd the same thing, making him sign two separate conflict waivers that detailed the firm's representation of Honig and others. (*Id.* ¶¶120-21.) While Marcus was not sure whom Kesner represented, he read Kesner's denial of Honig's group status as Kesner's personal view, not as a response from someone representing MGT. (*Id.* ¶¶124; 131.) While Kesner maintained that he was acting as a go-between between Honig and MGT's lawyer, he has

asserted elsewhere that he "has never served as counsel for MGT." (*Id.*  ¶¶125, 127.)[39]  From the

2012 email exchange that Marcus had with Kesner, all that Ladd could reasonably derive is that

Honig's lawyer had told MGT's lawyers that Honig and his co-investors did not act as a group in

acquiring MGT's shares in the 2012 transaction.

But because that is all Ladd could derive from that email, if he relied on Kesner's advice,

or relied on Kaplowitz or Marcus relying on it, that reliance was unjustified, because reliance on

an adversary's counsel is unreasonable, and cannot support good faith. *In re Lek Secs. Corp.* No.

17 Civ. 1789 (DLC), 2019 WL 5703944, at *1, 4 (S.D.N.Y. Nov. 5, 2019) (rejecting broker's

claim that it had relied on representations made by its customer's counsel); *O'Meally*, 2010 WL

3911444, at *4 (denying summary judgment and holding that the lawyer consulted must be

"disinterested and independent") (citations omitted). In cases where a fraud claimant asserts

reasonable reliance on the misleading statements of a lawyer for a counter-party, courts

"'routinely [hold] that it is unreasonable for a party to rely on the advice of adversary counsel []

when both parties are aware that adverse interests are being pursued.'" *Stone v. Sutton View

Capital LLC*, No. 17 Civ. 1574 (VEC), 2017 WL 6311692, at *3 (S.D.N.Y. Dec. 8, 2017)

(quoting *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 257 (S.D.N.Y. 2008)); *see*

---

[39]      Kesner's and Marcus's testimony that Kesner was merely acting as a go-between of the
two clients in the transaction (Resp. ¶¶124-25) at best raises an issue of fact as to which client
Kesner represented. The truth appears to be closer to what Kaplowitz alluded to in his testimony:
that Kesner was involving himself as a nominal lawyer for MGT so that he could monitor and
protect the interests of Barry Honig. Indeed, that is what MabVax (Company C in the
Commission's complaint) alleged that Kesner was doing in a now-withdrawn lawsuit against
SRF and Kesner, *MabVax Therapeutics Holdings, Inc. v. Sichenzia Ross Ference LLP, et al.*, No.
3:18 Civ. 02494 (WQH) (S.D. Cal.) (DE 1-2 (Complaint), at ¶¶3-4) (alleging that MabVax had
retained Kesner and relied on him for Section 13(d) advice not knowing that Kesner's advice
was designed to protect Honig and his group of co-investors, in derogation of the duties he owed
his client, MabVax).

*also In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 130 (2d Cir. 2011) (affirming district court's rejection of investor claim that he had relied on advice from his adversary's lawyer as "unreasonable").

No different result should be reached here where Ladd acknowledged that Kesner represented his counter-party — the investors— and he had signed a waiver in which the fact that a conflict did or might exist between MGT and Kesner's clients was spelled out. (Resp. ¶¶119, 120-21.) This is especially true where Ladd was not unsophisticated, considered himself an expert on Section 13, had experience with the group analysis under Section 13 in defending one claim and asserting another, and questioned other investors' Schedule 13 filings when he suspected they might be inaccurate.  (*Id.* ¶114 (Ladd referring to himself as "a Wall Street veteran"); (*id.*, ¶105 (Ladd calling himself an expert on Exchange Act 13(d) and noting: "I would modestly say I know more about 13(d) than nearly anyone on Wall Street."); *id.* ¶¶106-108.) The unreasonableness of relying on Kesner's denial was confirmed by two pieces of testimony from Kesner himself: (1) even if he had known that Honig was acting in concert with others, he might not have disclosed it to MGT's lawyers (*id.* ¶135); and (2) his consideration of the group issue did not really involve Honig, Groussman and Stetson at all; Kesner assumed that the investors did not act as a group because Hudson Bay and Iroquois would never enter into documentation that would allow them to become a group with any other investor. (*Id.* ¶134.)

### (3)    Ladd Did Not Make Full Disclosure to Kaplowitz of What He Knew About Honig and His Group

By 2015, Ladd knew a great deal about Honig and his group of investors that he did not share with his lawyers at SRF either in connection with the 2015 financing or MGT's subsequent SEC filings.

Ladd failed to disclose to Kaplowitz or Marcus the email exchange he had with Mr.

Einhorn, who had labeled Honig a recidivist stock promoter and pump and dumper. Ladd never told Kaplowitz or Marcus that he suspected that Honig (or another MGT investor) had paid Ford for his piece on MGT for *Seeking Alpha* in April 2013—the premise of which Ladd thought was "completely false." There is no evidence that Ladd told Kaplowitz or Marcus about Honig and Stetson's immediate and simultaneous acceptance of Ladd's Warrant Exchange Offer on April 26, 2013 or Melechdavid's acceptance less than two weeks later, nor about Honig's email to Ladd in which Honig took credit for obtaining the investors' agreement to the Warrant Exchange Offer.[40] Kaplowitz had no memory of knowing that Honig had told Ladd to pay a stock promoter $125,000 to write a piece touting MGT which appeared in the *Small Cap Leader* in February 2016, or that that piece drove MGT's stock price higher. (Resp. ¶¶138-40.)[41]

### D. The Evidence that Supports the Commission's Primary Violation Against Ladd for Intentional or Reckless Failure to Disclose Honig's Group Status Also Supports Its Claim for Aiding and Abetting the Violations Asserted Against Honig, Brauser, Groussman, Stetson and O'Rourke

Ladd is liable for aiding and abetting the Exchange Act Section 10(b) and Securities Act Section 17(a) claims against Honig, Brauser, Groussman, Stetson and O'Rourke for their concealment of their undisclosed holdings in MGT, and their pump-and-dump scheme with

---

[40]     Perlman may have known a great deal herself about Honig's past transactions with Brauser, Groussman, Stetson and O'Rourke. (Resp. ¶129.) But she testified that she did not disclose to Ladd or Kaplowitz the history of her work for them because she did not think it was relevant. (*Id.*) She also testified that she had never considered the requirements of Section 13(d) as it relates to disclosure by an issuer of the group status of any group of shareholders. (Resp. ¶137.)

[41]     Ladd's claim (Br. at 4-5) that the SRF lawyers "emphatically testified that they were aware of all material facts necessary to determine that Honig and the others were not acting as a Rule 13(d) group," is belied by the testimony of Kaplowitz and Marcus described above. It is also unsupported by the 56.1 statement references to which he cites. (Br. at 5, citing to Ladd's 56.1 ¶¶3-4 (Perlman testifying that it is the investor's responsibility to disclose group status and Marcus testifying that he had asked Kesner about Honig's group status and been told "the answer was no.") Neither excerpt supports Ladd's contention that all the SRF lawyers were aware of all material facts, let alone that all of them testified "emphatically" to anything.

respect to its stock.  Ladd's only argument in support of his motion for summary judgment on this count is that "the SEC has obtained no evidence in this case to establish an underlying violation of the securities laws by Honig or anyone who co-invested with him. " (Br. at 25.)

Quite the contrary, the Commission has presented a wealth of evidence that supports its claims that Honig, Brauser, Groussman, Stetson and O'Rourke were all acting in concert in connection with the 2015 investment in MGT (*see* Point III.A and B, *supra*); that Ladd knew that they were so engaged but wished to keep it a secret (*see* Point III. B, *supra)*; that Ladd knew Honig was paying newsletter writers, or forcing MGT to do so, to run the stock price up so that Honig and his group could sell their shares at inflated prices (*id.*); and that Ladd, knowing all of this (1) failed to disclose the investors' group status, and (2) participated in the 2016 pump by issuing a false May 2016 press release—all so that Ladd himself could sell his own stock for substantial gains. As he did. (Point I.B, *supra*.)

With all of this, substantial evidence would support a jury's conclusion that Ladd "associated himself with the venture, that [Ladd] participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *SEC v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012) (internal alterations and quotation marks omitted). Ladd's Motion should be denied on this Count as well.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the SEC's Motion for Partial Summary

Judgment against Defendant Ladd in all respects, and deny Ladd's Motion for Partial Summary

Judgment.in its entirety.

Dated:  January 31, 2023                    Respectfully submitted,
        New York, NY

                                            s/ Nancy A. Brown
                                            Nancy A. Brown
                                            Jack Kaufman
                                            Katherine Bromberg
                                            100 Pearl Street, Suite 20-100
                                            New York, NY 10004-2616
                                            (212) 336-1023 (Brown)
                                            Attorneys for Plaintiff Securities and Exchange
                                            Commission