# EXHIBIT F

1

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF NEW YORK

3

4       SECURITIES AND EXCHANGE COMMISSION,  )
                                             )
5                        Plaintiff,          )
                                             )
6             v.                             ) Case No.
                                             ) 18 Civ. 8175(ER)
7       BARRY C. HONIG, ROBERT LADD, ELLIOT  )
        MAZA, BRIAN KELLER, JOHN H. FORD,    )
8       GRQ CONSULTANTS, INC., and HS        )
        CONTRARIAN INVESTMENTS, LLC,         )
9                                            )
                         Defendants.         )
10      _____)

11

12                          VOLUME 1

13             VIDEOTAPED DEPOSITION OF ROBERT LADD

14                     VIA VIDEOCONFERENCE

15                 Thursday, October 15, 2020

16

17

18

19

20

21

22

23

        REPORTED BY:
24      GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR
        VICTORIA L. VALINE, CSR 3036, RMR, CRR
25      JOB NO. 201015GCH

2

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF NEW YORK

3
       SECURITIES AND EXCHANGE COMMISSION,  )
4                                           )
                      Plaintiff,            )
5                                           )
       v.                                   )  Case No.
6                                           )  18 Civ. 8175(ER)
       BARRY C. HONIG, ROBERT LADD, ELLIOT  )
7      MAZA, BRIAN KELLER, JOHN H. FORD,    )
       GRQ CONSULTANTS, INC., and HS        )
8      CONTRARIAN INVESTMENTS, LLC,         )
                                            )
9                      Defendants.          )
       _____)
10

11

12

13

14

15                    Videotaped deposition of ROBERT LADD,

16     taken on behalf of Plaintiff, all parties appearing

17     remotely via Webex, beginning at 10:07 a.m. EST and
       ending at 6:36 p.m. EST, on Thursday, October 15, 2020,
18     before GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR, and

19     VICTORIA VALINE, CSR No. 3036, RMR, CRR.

20

21

22

23

24

25

3

```
 1                A P P E A R A N C E S

 2      (All appearances via videoconference.)

 3


 4      For the Plaintiff:

 5      SECURITIES AND EXCHANGE COMMISSION
        BY: NANCY BROWN, ESQ.
 6          JACK KAUFMAN, ESQ.
            KATHERINE BROMBERG, ESQ.
 7      200 Vesey Street
        Suite 400
 8      New York, New York 10281
        (212) 336-1023
 9      BrownN@sec.gov


10


11      For the Defendant:

12      FORD O'BRIEN
        BY:  ADAM FORD, ESQ.
13           ANJULA PRASAD, ESQ.
        575 Fifth Avenue
14      Floor 17
        New York, New York 10017
15      (212) 858-0040
        aford@fordobrien.com

16


17


18      Also Present:   NANCY HOLMSTOCK, Videographer

19

20

21

22

23

24

25
```

56

1    to cut too fine a point on it, but this purports to

2    be that.  I have no way to know if E-Trade is

3    accurate, inaccurate.  I have no reason to believe

4    that it's inaccurate.  So based on what I see here,

5    that's what it is.

6         Q.   Well, when you opened the account, you

7    filled out an online application form, did you not?

8         A.   I believe so.  That's how you open your

9    account.

10        Q.   Okay.  And do you have any reason to

11   believe that the information that's reflected on

12   Ladd Exhibit 8 is not the information you supplied

13   to E-Trade on or about November 22nd, 2015?

14        A.   No.  As I said, I believe that would be

15   accurate, so I'm not disputing its accuracy.

16        Q.   All right.  So let's look at some of the

17   answers, and I'm going to focus in on the middle

18   column here.  You write, "Occupation:  Retired."

19   And then you write under "Director of policy-making

20   office of publicly owned company?  No."  And then

21   under "Employer," you leave it blank.  And each of

22   those answers to those questions was false, was it

23   not?

24        A.   Correct; they are not correct answers.

25        Q.   Because you were both a director and an

57

1     officer of MGT; correct?

2          A.    Yes.

3          Q.    And you were not retired?

4          A.    Yes.

5          Q.    And you were employed.

6          A.    Correct.

7          Q.    Okay.  Now, we've already established, I

8     think -- and, correct me if I'm wrong -- that you

9     deposited the shares held by Ladd Cap Value into

10    this account; is that right?

11         A.    Yes.

12         Q.    And so why is the account opened in your

13    name and not the name of Ladd Cap Value Partners?

14         A.    So the -- I believe it's very -- it was

15    and probably still is very difficult and

16    time-consuming to open an account in the time of

17    a -- what do you call it -- limited partner.  It's

18    probably a lot more paperwork to do.  That's about

19    the only reason I can think of.

20         Q.    And when you sold shares in that account,

21    where did the money go?

22         A.    I'm not positive.  I could have taken it

23    out.  But keep in mind I was, if not the total

24    ownership of Ladd Cap Value, it was sort of a

25    semantic name.  So I don't want my answer to

1    reflect the implication here that I somehow

2    transferred someone else's property to me.

3         Q.   Okay.  Ladd Cap had its own bank account;

4    correct?

5         A.   Yes.

6         Q.   Okay.  Now, in October 2015, as you've

7    already alluded to, you had two accounts in your

8    own name at TD Ameritrade; correct?

9         A.   I believe so.  It was an IRA and a

10   regular.

11        Q.   And you transferred some of your own

12   shares from the TDA non-IRA account into the

13   E-Trade account; is that right?

14        A.   Yes, I believe 300,000 or something.

15        Q.   All right.  Let's look at Tab 10.  Tab 10

16   is a document we have marked as Ladd Exhibit 10.

17   And it's a composite of two different months' TD

18   Ameritrade statements for the non-IRA account in

19   your name.  They are from November '15 through

20   December 2015.  Do you recognize these accountant

21   statements?

22        A.   Yes.

23             (Deposition Exhibit 10 was marked for

24             identification by the reporter and is

25             attached hereto.)

59

```
 1      BY MS. BROWN:
 2          Q.   And you recognize them as your -- is it
 3      accurately reflecting the activity in your non-IRA
 4      TD Ameritrade account for those periods?
 5          A.   Yes.
 6          Q.   Okay.  All right.  So the November
 7      statement -- and I will give you a Bates number.
 8      So it's E-Trade 90 -- oops, hold on, 974.  It shows
 9      a transfer of 300,000 shares out of that account.
10      Correct?
11          A.   Yes.
12          Q.   And you recall those being transferred to
13      the E-Trade account?
14          A.   I do.
15          Q.   Okay.  And then on page 823, it reflects a
16      second transfer on December 10th, 2015, of 23,901
17      shares, also to E-Trade; is that right?
18          A.   I don't see it yet, but -- what was that
19      Bates stamp again?  822?
20          Q.   823.
21          A.   Yeah, I see that.
22          Q.   Okay.  So is it fair to say that in your
23      E-Trade account, as you recall, you had both shares
24      belonging to Ladd Cap Value Partners and shares
25      belonging to you; is that right?
```

60

1       A.    That's correct.

2       Q.    All right.  So let's move to Tab 11, which

3   we premarked as Ladd Exhibit 11.  And for the

4   record, I will represent that these are account

5   statements produced to us from E-Trade, and they

6   span the months November 2015 through April 2016.

7       A.    Okay.

8             (Deposition Exhibit 11 was marked for

9             identification by the reporter and is

10            attached hereto.)

11  BY MS. BROWN:

12      Q.    Do you recognize these as account

13  statements that reflect the activity in your

14  E-Trade account for that period?

15      A.    Yes.

16      Q.    All right.  So we see in the November

17  statement, that is E-Trade 97, the receipt on

18  November 27 of 433,000 shares plus some, and also

19  in that same date, the receipt of 300,000 shares;

20  right?

21      A.    Yes.

22      Q.    And on E-Trade 105, we see the receipt of

23  23,901 shares; correct?

24      A.    Yes, we do.

25            (Reporter interruption.)

63

1        A.   I did not.

2        Q.   Okay.  Tell me what your understanding of

3   Rule 144 was as it related to your trading of MGT

4   securities in October or November of 2015.

5        A.   Well, what I knew and probably still know

6   about form 144, it's an archaic SEC form that is to be

7   filed contemporaneously with -- or before any sales.

8        Q.   And that applied to you because you were an

9   officer or director of MGT; is that right?

10        A.   That's right.

11        Q.   Okay.  And did you understand that Rule 144 --

12   putting aside form 144 -- Rule 144 imposed volume

13   limitations on the number of shares that you could sell

14   during a 90-day period?

15        A.   Yes.

16        Q.   And what's your understanding -- what was your

17   understanding then of how those volume limitations are

18   calculated?

19        A.   It is the greater of one percent of the

20   outstanding or the average weekly trading volume in the

21   prior four weeks.

22        Q.   And you knew that in November 2015, right?

23        A.   Correct.

24        Q.   Okay.  You knew that because you had, in fact,

25   done those calculations in connection with sales that

73

1    don't know, sitting here, yes or no, but obviously if I

2    filed it, it would be on EDGAR.

3         Q.   Did you have an understanding of the

4    requirements of Exchange Act Section 16 as it relates to

5    the disclosure of purchases or sales that you've made in

6    MGT securities?

7         A.   Yes.

8         Q.   What was that understanding?

9         A.   That you were to report purchases or sales

10   within 48 hours and file form 4.

11        Q.   And how did you gain that understanding?

12        A.   That's something I knew -- I knew it.

13        Q.   Now, Mr. Kaplowitz didn't have access to your

14   trading records at either E-Trade or TD Ameritrade, did

15   he?

16        A.   I don't think so.

17             I guess that's a question for Mr. Kaplowitz,

18   but he wouldn't normally have that.

19        Q.   Fair enough.

20             Did you have an understanding of the purpose

21   of form 4, like what disclosure it was meant to provide?

22        A.   Yes.

23        Q.   And what was that?

24        A.   Well, as I said, it's to disclose purchases

25   and sales by section 16 officers and directors in the

74

1     sale of their securities.

2          Q.   All right.  Let's mark Ladd Exhibit 16, which

3     is found at tab 16.

4               (Deposition Exhibit 16 marked.)

5          Q.   And I'll just explain for the record that this

6     is a composite of three form 4s.  The first one we've

7     already looked at in Exhibit 7, which is the -- yeah.

8     No.  That's the second one.

9               The second one we've already looked at in

10    Exhibit 7, that's the 12/1/2015 form 4.  The first one

11    is a 10/9/15 form 4.  And the third one is a

12    May 31, 2016, form 4.

13              Do you recognize these, Mr. Ladd?

14         A.   Yes.

15         Q.   And are they form 4s that you signed?

16         A.   Well, it's, you know, how they do it

17    electronically, but yes, I approved its issuance.

18         Q.   That's your electronic signature.

19              All right.  And is it your testimony that

20    Mr. Kaplowitz or someone at Sichenzia actually filled

21    out these forms and you then reviewed them and approved

22    them?

23         A.   Right.

24              That was normally a certain printing

25    requirement -- like SIC codes and certain ways to get it

75

1    into EDGAR.  I never bothered figuring that out.  I

2    don't have a way to input into EDGAR myself.

3        Q.   You have a service that does that, right?

4        A.   We have a service for normal filings, and how

5    the lawyer gets it filed I can't tell you for sure, but

6    he probably uses that service, communicates with them,

7    but I'm not saying that this is wrong at all.  I mean

8    it's -- I'm sure I reviewed it, and I just say

9    personally I don't file.

10       Q.   Okay.  And where did Sichenzia get the

11   information to fill out these forms?

12       A.   I think I answered that before, that generally

13   they'll get it from the person.  And as far as certain

14   calculations that they may make, they do those either on

15   their own or, you know, kind of check the previous

16   form 4s and, you know, subtract or add as needed.

17       Q.   And how do they know how to subtract or add as

18   needed?

19       A.   Based on what I tell them that I did

20   trading-wise.

21       Q.   All right.  So let's look at the first page of

22   Exhibit 16 which is the form 4 dated 10/9, and that

23   shows -- if I'm reading this correctly -- an acquisition

24   of 200,000 shares on October 7, 2015, correct?

25       A.   Yeah.

76

1          It's letter code A, but it's a grant of stock.

2     A restricted grant of stock.

3          Q.   All right.  And then in column 5 it says,

4     "Amount of securities beneficially owned following

5     reported transactions," and what's listed there is

6     373,603 shares.

7          Do you see that?

8          A.   Yes.

9          Q.   All right.  And there's a Footnote 2, and it

10    says, "Does not include 622,471 shares owned by Laddcap

11    Value Partners III LLC."

12         Do you see that?

13         A.   Yes, I do.

14         Q.   And that was accurate as of -- that

15    information was accurate as of October 9, 2015?

16         A.   Yes.  I felt it was accurate.  Maybe it was

17    off by a few shares, but I believe it's accurate.

18         Q.   All right.  And then let's go to the next one,

19    which we've looked at before, which is the

20    December 1, 2015, and it reflects a sale of 100,000

21    shares on November 30, 2015, right?

22         A.   Which tab was that?  Is that still 16?

23         Q.   Yep.  Second page.

24         A.   Right.

25         And that's -- when I was referring to

77

1    subtraction, that's how that 273,603 number is

2    generated.

3          Q.   Got it.  Okay.

4               So if we look back at your E-Trade statements

5    for November of 2015, so that's Exhibit 11, so tab 11

6    for you.

7          A.   Okay.

8          Q.   And we look at the Bates number 96, and that

9    shows sales of MGT shares on November 30, 2015, right?

10         A.   Right.  I guess that applies to the prior

11   form 4.

12         Q.   Okay.  When I add these up I get 97,790

13   shares, but you list on your form 4 at Exhibit 16 a

14   hundred thousand.

15         A.   The only thing I could say, without seeing the

16   next month, maybe one of the trades was November 1st or,

17   secondly, I made an error in my calculation.

18         Q.   All right.  But you didn't sell the remaining

19   shares from a different account, did you?

20         A.   No.  This was -- this appears to be, and I

21   have no reason to doubt this is the 100,000 shares

22   that's reflected in that form 4.

23         Q.   All right.  Let's look at the -- back to

24   Exhibit 16 now on the third page, which is the form 4

25   filed May 31st, 2016.

1    brokerage accounts, that answer is no.

2         Q.   Okay.  So that first line, again we're back to

3    Exhibit 16 which shows the distribution, it says the

4    amount of securities beneficially owned following

5    reported transactions and it's 157,300.

6              Do you see that?

7              MR. FORD:  I'm sorry.  Nancy, can you just --

8    where are we again?

9              THE WITNESS:  It's 16 --

10             MS. BROWN:  We're on the first line of the

11   May 31 form 4.

12             MR. FORD:  Thank you.

13             THE WITNESS:  I see that.

14   BY MS. BROWN:

15        Q.   All right.  So that means that Laddcap Value

16   Partners III retained 157,300 shares following the

17   distribution; is that right?

18        A.   The truth is no amount of studying this form,

19   as it applies to funds, will make me understand it then

20   or now.  So my testimony is that this is so freaking

21   confusing, that I would recommend changes in form 4

22   reporting, but that's, I think, a different issue.

23             But, you know, again when calculating the

24   numbers the lawyers, you know, take away and add, and

25   when I filed it, it did not look materially wrong.  And,

1   you know, at the end of the day, let's say the end of

2   the day, what does Laddcap own?

3           That would be, I believe, zero.  At least the

4   way a normal person would look at this form.  But again,

5   even though it says it only takes a half hour to fill

6   out these forms, let me tell you, it takes way longer.

7   Okay.

8           And then if you look at Ladd, the person, he

9   ends up showing direct ownership of 700 -- sorry, 540

10  shares.

11      Q.   All right.  So let's just stick with Laddcap

12  Value for a minute, please, if we could.  I appreciate

13  your comments, but I want to stick with this line.

14          So this form reflects, as of May 25, 2016,

15  Laddcap Value held 157,300 shares of MGT stock.

16          Would you agree with me that that's what this

17  reflects?

18      A.   Again, I see it all at the same date, so the

19  way they might have mixed the sausage out to come out

20  with the right number at the end, I really can't tell

21  you.  I don't know.

22          I mean, I can't -- I can tell you for certain

23  this was not meant to deceive the market, for example,

24  that I still had 540,000 shares, but, you know, in

25  reality I didn't.  That is certainly not my intent here.

1          I just want you to be appreciative that it was

2    an extremely complex calculation and form to fill out

3    for a -- and again, I'm not going to say to redesign,

4    but in essence, the information that it needed to convey

5    was conveyed, and at the end of the day, that's really

6    what I care about.

7          Q.   So the next line reads that on May 25, 2016,

8    157,300 shares were sold, and the footnote says that

9    they were sold by Laddcap Value, correct?

10         A.   Yes.  That's what it says.

11         Q.   Okay.  Let's look at tab 19, which we've

12   marked as Ladd Exhibit 19.

13              (Deposition Exhibit 19 marked.)

14         Q.   And this is, just for the record, a document

15   we received from E-Trade which purports to reflect

16   trading activity in the Robert Ladd account during the

17   month of May 2016.

18              Do you recognize Ladd Exhibit 19?

19         A.   Yes.

20         Q.   All right.  So you can feel free to flip

21   through this, but you'll see that 147 -- the Bates

22   number 147, there are no trades in MGT stock on

23   May 25th.

24         A.   That's correct.

25         Q.   Okay.  And those shares weren't sold out of

85

```
1    your TD Ameritrade account, were they?

2         A.   I believe the dates were incorrect on the

3    form 4.

4         Q.   Well --

5         A.   The dates did not conform with the actual

6    trades at E-Trade, and yes that's an error.  But as I

7    said, by the time the form got filed, there was no

8    desire or need, frankly, to show the end result being

9    different than it is.

10        Q.   Okay.  Understood.

11             But in answering my question, those shares

12   weren't sold out of TD Ameritrade, right?

13             If they were sold, they were sold on a

14   different day out of the E-Trade account; is that right?

15        A.   That's my strong assumption right now, yes.

16        Q.   Well, again, you reviewed this form and you

17   signed it, did you not?

18        A.   Yes, I did.  But as I explained before it's

19   not as simple as it looks.  Believe me, it's complicated

20   with this pecuniary interest and all that.

21             So I was more focused on the actual economics.

22   I look at the bottom number, is that right that the

23   market knows I own that?  I'm basically out of all my

24   shares accept for 540,000 now that I own directly.

25   That's what the message --
```

1    communications.

2          MS. BROWN:  Okay.  So let me just ask a topic

3    question.

4    BY MS. BROWN:

5       Q.   Did you raise any concerns about this form 4,

6    the May 31, 2016, form 4, with Sichenzia?  And, if so,

7    when and with whom?

8       A.   I'm sure that knowing it was filed late, I

9    told Sichenzia, and they're not going to give me an

10   opinion like it doesn't matter if it's late, as long as

11   it's right.

12         And you know, the truth was there's a million

13   things going on in May, and this was like the least of

14   my concerns.  And when I realized I had inadvertently

15   not filed timely, then they put on the date that's

16   wrong, so it it sort of compounded the problem.

17         But what I'm saying again, I hate to keep

18   saying it, is that there was no fraud trying to be

19   undertaken on the market.  The fact of the matter is I

20   made mistakes and I allowed mistakes to go out in a

21   form 4.  You know, I say that.

22      Q.   All right.  So back to Exhibit 16, and again

23   the May 31, 2016 form 4.

24         The next line reflects an acquisition that the

25   footnotes explain was a grant from the company on May 26

1     documents that we will all agree reflect the trades.

2                 Nancy, we seem to have lost your video.

3                 MS. BROWN:  Yep.  I'm trying to get back in.

4     Hold on.  I'm sorry.

5                 Okay.  I seem to be back.

6     BY MS. BROWN:

7         Q.  So Mr. Ladd, will you agree with me that the

8     527,000 shares -- if, in fact, that's correct -- from

9     the E-Trade account that was sold in May 2016, except

10    for whatever may be in that line, 33,603 shares, none of

11    those sales are reflected in this form 4?

12                MR. FORD:  Nancy, your video still is not on.

13                MS. BROWN:  Now it's coming.

14                MR. FORD:  Great.  Thank you.

15                THE WITNESS:  I mean, should I take 10 minutes

16    to review this?

17                Will I need to take 10 minutes to review this

18    to see --

19    BY MS. BROWN:

20        Q.  Feel free, because I'm asking you the question

21    of whether those sales are reflected anywhere on form 4.

22    So if you need 10 minutes to be able to answer that

23    question, please take it.

24        A.  Okay.  So, I mean the form 4 does reflect

25    some, if not all, of the E-Trade shares.

97

1        Q.   Thank you.

2        A.   Again, the exact quantities might be wrong, as

3   well as the dates.

4        Q.   So why did you choose to file a form 4 on

5   May 31st?

6             What prompted you to do so?

7        A.   Excuse me.

8             Because I had realized I didn't, and I thought

9   that I should.

10       Q.   And is it true that you had also made

11  purchases and sales of your MGT stock in your E-Trade

12  account between November 2015 and April of 2016?

13       A.   I believe, from looking at the records, it was

14  purchase sales that netted out to minus 40,000 shares.

15       Q.   Really?  Okay.

16            Let's look at Exhibit 11.  Those are your

17  E-Trade statements from November 2015 through

18  April 2016.

19            Do you see that?

20       A.   Yeah.

21       Q.   And I think you've already said that you have

22  no reason to doubt that they accurately reflect your

23  trading in that account; is that right?

24       A.   Yes.

25       Q.   Okay.  So let's go through them.

1          In the November statement it shows the receipt

2     of the 300,000 and the 433,000 that we've already looked

3     at, correct?

4          A.   Yes.

5          Q.   And it also shows the sale of 97,790 shares of

6     MGT, correct?

7          A.   Right.  Right.  Such that the holdings were

8     635,000 at the end of that date.

9          Q.   Okay.  And then on the December statement --

10    and I'm at E-Trade 102 to 103, it shows that you sold a

11    total of 88,052 shares; is that right?

12         A.   Which Bates stamp again?

13         Q.   102 to 103.

14         A.   It's very small print, so...

15         Q.   Mr. Ladd, can we help you in some way?

16              I'm looking at page 102 and I see sales 11/30,

17    11/30, 11/30, 11/30.

18         A.   Right.

19              So if those totaled to 80,000, then the answer

20    is yes, I sold those shares.

21         Q.   Okay.  And you -- you didn't file a form 4 in

22    December, after the 1st of December, did you?

23         A.   I don't believe I did.

24         Q.   Okay.  Let's look at January.

25              If we look at the Bates number 110 to 111, we

1    see that you bought 1,700 MGT Capital shares and you

2    sold 8,000.

3        A.   Okay.

4        Q.   So the net -- I have the net as 7,000.  So I

5    think you bought two times in January on the 4th, one

6    for 1,700 shares, one for 8,300 shares, and then you

7    sold 8,000?

8        A.   Okay.

9        Q.   Let me have --

10            MR. FORD:  Was that a question and an answer,

11   Nancy?

12            MS. BROWN:  Well, I'm just trying -- I'm

13   trying to focus him on the actual transactions.  So

14   there were two buys and two sells.

15            MR. FORD:  Okay.  Lets just stick --

16            MS. BROWN:  Thank you.

17   BY MS. BROWN:

18       Q.   Were any of those transactions noted on a

19   form 4 that you filed in January --

20       A.   The trades --

21       Q.   -- 2016?

22       A.   Maybe I can make it even more clear.  The

23   trades that are on Bates stamp 110 --

24       Q.   Yes.

25       A.   -- those were not reported.

100

1        Q.    All right.  And the sales were?

2        A.    I said none of the trades were reported, as

3   far as I remember.

4        Q.    Okay.  Okay.  And then on page 117 to 118

5   reflects your trading activity in February.  And aside

6   from two instances of buying -- oh, no, maybe it's four

7   instances of buying, you were a net seller of MGT

8   securities during that month; is that correct?

9        A.    Yeah.  I think -- so that's what I was

10  referring to when I said negative net 40.  So that

11  probably --

12       Q.    You were referring to that one month?

13       A.    Exactly.  At least that was the month I

14  remembered.

15       Q.    Okay.  Then if we turn to March, it looks like

16  you sold 12,000 shares.  And I'm on 124.

17       A.    Okay.

18       Q.    And those shares -- those transactions weren't

19  reported either, right?

20       A.    No.

21            I -- well, just to be clear, it says that I

22  sold 5,000, 7,000, and bought 7,000.  None of those

23  trades were reported.

24       Q.    It says you sold 12,000 total, right?

25       A.    Right.  But then it shows at the bottom that I

1    bought 7,000.

2        Q.   Of Notis Global.

3        A.   You're right.  My bad.  I retract that.

4        Q.   Okay.  On page 130 --

5        A.   It's very small print.

6        Q.   -- in April --

7        A.   What Bates stamp are we at?

8        Q.   130.  That's the April statement.

9        A.   Okay.

10       Q.   And it looks like you sold only, and you sold

11   60,472 shares.

12       A.   That's the total of the sales in April, yes.

13       Q.   Okay.  And did you report any of those sales?

14       A.   I did not.

15       Q.   Thank you.

16            MR. FORD:  Nancy, we've been going for about

17   an hour and a quarter.  Do you want to take a 10-minute

18   break?

19            MS. BROWN:  It's up to you.

20            MR. FORD:  Well, I don't want to interrupt if

21   you're in the middle of something.

22            THE WITNESS:  I would rather finish this

23   section that requires tiny type to make sure I get that

24   correct, and then --

25            MR. FORD:  Okay.

1          THE WITNESS:  -- if there's another topic area

2     coming up soon, that would be an easy way to break.

3          MR. FORD:  Okay.

4          THE WITNESS:  But it's not my call.

5     BY MS. BROWN:

6          Q.   So when you filed the form 4 on May 31, 2016,

7     why did you omit all of the purchases and sales that

8     were -- we just went through that are reflected on

9     tab -- Exhibit 11 -- Ladd Exhibit 11?

10         A.   I can only speculate that I just took the May

11    sales from TD and gave those numbers over to Sichenzia

12    and forgot about the other sales, but again, there's --

13    the value of that information is pretty superfluous in

14    my opinion, but I did incorrectly not report it.

15         Q.   So I asked you why you decided to file a

16    form 4 on May 31, 2016, and I'm wondering, did it have

17    anything to do with a request from the New York Stock

18    Exchange for information about your trading in MGT

19    securities?

20         A.   It did not.

21         Q.   Okay.  So let's look at what's behind tab 22.

22              That's a document that we've previously marked

23    as Holmes Exhibit 29.  And it is -- the cover e-mail is

24    from you to Mr. Holmes and Michael OO7, which I'm

25    guessing is Mr. Onghai; is that correct?

114

1   at that time.

2        Q.   And how many refer to your stock sales?

3        A.   Very few.

4             MS. BROWN:  Okay.  We're at a place where we

5   can take 10 minutes.  So let's take 10 minutes and we'll

6   come back at 2:47.

7             MR. FORD:  Thank you.

8             THE VIDEOGRAPHER:  The time is now 2:37.

9   Going off the record.

10            (Off the record at 2:37 p.m.  Back on the

11   record at 2:48 p.m.)

12                      --oOo--

13            THE VIDEOGRAPHER:  We're back on the record.

14   The time is 2:48.

15            MS. BROWN:  Thank you.

16   BY MS. BROWN:

17       Q.   So Mr. Ladd, your parents, Seymour and Shirley

18   Ladd, had an account at TD Ameritrade; is that right?

19       A.   Yes.

20       Q.   And on June 19, 2015, they agreed to give you

21   full trading authorization in that account; is that

22   right?

23       A.   If that's the date that shows, yes.

24       Q.   And how old were they in June of 2015?

25       A.   Late 80s.

119

1     how much can you lose, 25 cents?

2              Of course, I told her you could lose a hundred

3     percent of what you put in, but my feeling was, based on

4     where the company was, I'm the type of investor that

5     wants to minimize the down side.  So I thought at the

6     25 cent price it shouldn't go down.

7         Q.   And this was a discussion you had with your

8     mother and your father?

9         A.   I don't remember, but that's how I remember,

10    you know, it would have been five second -- I'm sorry,

11    five-minute discussion about -- and maybe not even five

12    minutes, maybe one minute.

13        Q.   And did you think the board needed to approve

14    your decision to buy MGT shares, is that why you sent

15    this e-mail marked as Holmes Exhibit 31?

16        A.   No.  I think I was just showing gung-ho

17    leadership and confidence in the company.

18        Q.   Did you have any discussion with

19    Mr. Kaplowitz, who is cc'd on this e-mail, at or about

20    this time concerning your decision to buy MGT stock?

21        A.   Not that I recall.  I don't know if he replied

22    to this e-mail or not, but...

23        Q.   At the time you were discussing the trading

24    authorization with your parents, did you and either

25    parent discuss limitations in any respect on what you

120

1    could buy or sell in the account?

2          A.    No.

3          Q.    Just fully at your discretion, was that your

4    understanding?

5          A.    Yes.

6          Q.    Did you, at any time, when you were discussing

7    the trading authorization, discuss with either parent

8    compensation that you would be earning for the trades

9    that you put in their account?

10         A.    No.

11         Q.    Did you discuss what would happen with any

12   profits that you earned on the trading in your parents'

13   account?

14         A.    No.

15         Q.    Did you discuss who would be responsible for

16   taxes associated with any profits on the trading?

17         A.    A discussion on taxes came up later, but I

18   think with respect to what you're asking, there was no

19   quote pre-discussion of taxes.

20         Q.    Okay.  I think you mentioned you have

21   siblings, I think you have a brother and a sister; is

22   that right?

23         A.    Yes.

24         Q.    Did you have discussions with either one of

25   them about the trading authorization before your parents

121

1    granted it?

2         A.   I don't believe I did.  I don't know if my

3    parents said anything, but...

4         Q.   Well, in later discussions you've had with

5    your brother or your sister, have you learned that your

6    parents did discuss with either one of them your trading

7    authorization?

8         A.   No.

9         Q.   Okay.  So let's look at that trading

10   authorization.  So turn to tab 27.  A document we've

11   marked as Ladd Exhibit 27.

12              (Deposition Exhibit 27 marked.)

13        Q.   And -- the document we received from

14   TD Ameritrade that's titled "Trading Authorization

15   Agreement."

16              Do you recognize Ladd Exhibit 27?

17        A.   Yes.

18        Q.   And what do you recognize it to be?

19        A.   It says "Trading Authorization Agreement."

20        Q.   Did you sign it?

21        A.   I would assume both myself and my parents

22   signed -- yes.  I see on the third page I signed it,

23   yes.

24        Q.   And so did both of your parents?

25        A.   Correct.

122

1        Q.   Okay.  So if you just read the first two

2   paragraphs of the first page of the exhibit to yourself.

3        A.   Okay.

4        Q.   Is that a -- is Ladd Exhibit 27 a full or

5   limited trading authorization?

6        A.   So on the second page it says "full trading

7   authorization."

8        Q.   And on the first page it says "if full trading

9   authorization is chosen, this authority includes the

10  right to request delivery of securities or monies from

11  the account in the account owner's or owners' name,"

12  right?

13       A.   Correct.

14       Q.   Okay.  And you had full trading authorization,

15  correct?

16       A.   Correct.

17       Q.   So you could direct monies out of this

18  account, could you not, to yourself?

19       A.   Apparently so, although I'm not positive.

20  Normally brokerage firms will only send out

21  distributions to same parties, but I don't know.  I

22  never tried it.  So...

23       Q.   All right.  So you never directed monies out

24  of the account to yourself?

25       A.   Correct.

124

1      A.   Not that I recall.

2      Q.   Okay.  After the full trading authorization

3  was signed, did your father do any of the trading in the

4  account?

5      A.   I don't believe so.

6      Q.   Okay.  Did you start trading in the account

7  after the authorization was executed?

8      A.   I -- I don't remember the exact timing, but I

9  at least know I bought that MGT stock.  So I'm not

10  positive when.

11      Q.   And did your brother have any access to this

12  account for trading purposes?

13      A.   I don't think he did at all.

14      Q.   How about your sister?

15      A.   No.

16      Q.   All right.  Let's look at tab 29, which we've

17  marked as Ladd Exhibit 29.

18           (Deposition Exhibit 29 marked.)

19      Q.   And it's a composite of the account statements

20  in the Seymour and Shirley account -- your parents'

21  account -- from April 1, 2015, through -- I believe it's

22  May 2016 -- yeah, through the end of May 2016.

23           Do you recognize these account statements?

24      A.   Yes.

25      Q.   I'm sorry did you say, "yes"?

126

1    parents' account at TD Ameritrade?

2        A.    Yes.

3        Q.    Okay.  And I'll represent to you, but you can

4    figure it out by looking at the account positions as of

5    April 30th, 2016, and account positions as of

6    May 31, 2016, that you sold 372,863 shares of MGT in the

7    account during May.

8              Does that sound right to you?

9        A.    Yes.

10       Q.    Okay.  Do you recall why you sold so many

11   shares during that month?

12       A.    Well, that was after the best deal we did, the

13   John McAfee deal, and I felt it was a good time to sell.

14       Q.    Okay.  Let's look at your May 12 sales.

15             May 12, and that spans from 151597 through

16   151600.

17       A.    Okay.

18       Q.    You sold about 340,000 shares of MGT stock,

19   right?

20       A.    Yes.

21       Q.    And all over $1 per share, correct?

22       A.    Yes.

23       Q.    And did you receive any proceeds of those

24   sales?

25       A.    I did not receive directly proceeds from those

127

1    sales.  I did receive money from my parents that

2    represented a big part of the profits of that trade,

3    because they were ecstatic for me, and they wanted to

4    help their son, and they didn't need their -- they

5    didn't need their money -- that money because, in

6    addition to this account, they were, as big savers, that

7    quite -- they had quite assets, quite the net worth.

8            So that's a longer answer than you wanted,

9    but...

10       Q.   So on May 13th your mother writes you a check

11   for $325,000 that you deposited; is that right?

12       A.   Yes.

13       Q.   And on that same day, TD Ameritrade wrote a

14   check to your mother and father for the identical

15   amount; is that correct?

16       A.   I never saw that check, but it could have been

17   a wire, but I don't know.  But TD would have sent to my

18   parents that money, then my parents, once it's in their

19   account, would decide to send it to me or not, but that

20   would be the sequence.

21       Q.   Well, was it the same day as your mother

22   writing the check that she got the check from

23   TD Ameritrade?

24       A.   Oh, I don't know exactly the timing.  I -- I

25   thought I deposited the check on May 25th or something,

128

1    but I'm -- you can refresh me on the timeline.

2        Q.   Sure.

3            So if you look at what's behind tab 30, which

4    we've marked as Ladd Exhibit 30.

5            (Deposition Exhibit 30 marked.)

6        A.   Okay.

7        Q.   I'll represent this was a document that was

8    produced by your parents' bank.

9        A.   Mmmm-hmmm.

10       Q.   That's a check you received from your mother

11   dated 5/13/2016, correct?

12       A.   Yes.

13       Q.   And what does it reflect on the back as to

14   when you deposited it?

15       A.   I think it says the 18th.

16       Q.   The 18th.  Okay.

17           (Deposition Exhibit 31 marked.)

18       Q.   Then behind tab 31, Ladd Exhibit 31, which I

19   don't imagine you've seen before, which is a -- I'll

20   represent to you came also from your parents' bank.

21           If you look on the second page of that

22   exhibit, SEC-CITIZENS-E-0001110, you'll see a check from

23   TD Ameritrade, and if you look very closely it's dated

24   May 13, 2016.

25       A.   Okay.  So that answers the earlier question of

1    whether it was a wire or a check.  So they got a check.

2         Q.   Right.

3              So it's likely your mother didn't even have

4    the money in her hand, didn't have the check, before she

5    wrote you the check for $325,000; is that right?

6              MR. FORD:  I'm sorry.  You're asking him -- I

7    don't understand that question.

8              Does he know how much money was in his

9    parents' account?

10             MS. BROWN:  Sure.

11             Mr. Ladd originally thought that his parents

12   waited for the money to hit their account before they

13   sent him the check.

14             Is that still your testimony?

15             MR. FORD:  I think he said he was guessing,

16   but yes.

17             THE WITNESS:  Here -- here's either what I

18   meant to say or what I did say, and I'll frame it a

19   different way, which Adam may be mad that there's too

20   much information.

21             But if you're asking could my mother write me

22   a good check for $325,000 without first having a deposit

23   of, you know, let's say 200 or whatever the number is,

24   the answer is no.

25             / / / / /

130

1    BY MS. BROWN:

2        Q.   All right.  So since you have the ability to

3    transfer the money out of these accounts, did you ever

4    make an inquiry to TD Ameritrade about transferring the

5    monies directly to you, rather than going through this

6    circuitous path?

7            MR. FORD:  I'm sorry.  The circuitous path

8    language.

9            THE WITNESS:  Do I recall asking TD if they

10   could wire or otherwise give me, the quote full trading

11   authorization person, the money directly without going

12   through the holders or without the holders knowing?

13           I worked at Neuberger Berman for 20 years.

14   You know the answer to that.  I don't want -- I'm not

15   getting frustrated --

16   BY MS. BROWN:

17       Q.   No.  No.  No.  Mr. Ladd, I'm sorry, I want to

18   correct something right now.  I didn't suggest that you

19   were trying to do this without your parents'

20   understanding.

21       A.   Okay.

22       Q.   So please remove that from your answer.

23           My question was:  Did you discuss with

24   TD Ameritrade directing the monies directly to you?

25       A.   I don't remember doing that.

131

1       Q.   Did you ask your mother how she settled on

2    $325,000?

3       A.   I don't believe it's she settled on it, but I

4    thought that was a fair number that would help alleviate

5    my financial stress.  Certainly leave them plenty for

6    taxes.

7            So it was just a number.  Maybe it was a

8    number that I needed for my mortgage or something, but I

9    don't remember exactly.

10      Q.   So you had a conversation with your mother

11   about what the amount would be?

12      A.   I don't remember that.

13      Q.   Well, you said you thought it was a fair

14   amount.

15           Did you tell her that?

16      A.   Oh, I'm sure.  She knew the number.

17           I know you don't know me, but that's an

18   implication that crosses a line to think I would take

19   money from my parents.

20           Sending my 93-year-old father a subpoena --

21           MR. FORD:  Rob --

22           THE WITNESS:  -- that contributed to his

23   death, is --

24           MR. FORD:  Let's take a break.  Why don't we

25   take a break.  We'll come back on the record in five

132

1     minutes.

2                 THE VIDEOGRAPHER:  The time is now 3:17 p.m.

3                 Going off the record.

4                 (Off the record at 3:17 p.m.  Back on the

5     record at 3:20 p.m.)

6                             --oOo--

7                 THE VIDEOGRAPHER:  We're back on the record.

8     The time is now 3:20.

9                 THE WITNESS:  Can you hear me?  Hello?  Can

10    anyone hear me?

11                MR. FORD:  Rob, I can hear you.

12                MS. BROWN:  We can hear you.

13                THE WITNESS:  All right.  So just before we

14    start, I'll apologize for that path for losing my

15    temper, but, you know, it's sensitive with my father --

16    you know, having passed away right before COVID, the

17    whole thing.  So let's move on.

18                I know you're doing your job, so I'll do my

19    best to move things along.

20    BY MS. BROWN:

21       Q.   So -- so to return to what you were saying

22    about your discussion with your mother that you can

23    recall, you said something about you thought it was a

24    fair amount.  So fair in terms of what?

25                I mean, what did you think you had done to

133

1    merit the payment to you?  If you did.

2         A.   Oh.  No.  What I meant by "fair" is I, in no

3    way, wanted to put them in worse position, so I had to

4    ensure there was more than ample monies to pay taxes.

5              And as I subsequently found out, their social

6    security payments went up and all this, so there was a

7    whole, you know, calculation of either me owing them

8    money back or something, but that's what I meant by

9    "fair."

10             Nothing to do with an investment management

11   fee or something, it's just fair to keep them -- they

12   should not lose money from it.

13        Q.   So I'm interested in understanding why it is

14   that you didn't think it was also fair for them to keep

15   all of it?

16             MR. FORD:  I think you're twisting what he's

17   saying about fair.  He's testified that his parents

18   wanted to give him some money.

19             THE WITNESS:  My parents would have given me

20   the entire amount of money.  You know, they were

21   thrilled, but that would have put them in a negative

22   position.  That was not fair.  That's what I'm trying to

23   say.

24   BY MS. BROWN:

25        Q.   It would have put them in a negative position

134

1    how?

2         A.   Well, if they gave me the entire proceeds.

3         Q.   I see.  I see.

4              Okay.  So how did you treat the $325,000 on

5    your taxes?

6         A.   I did not treat it, I view it as a loan

7    against future inheritance that, down the road, it will

8    be sorted out.

9         Q.   Okay.  All right.

10             So tell me about your discussions, if you had

11   any, with your brother, Steven, about your parents'

12   payment to you of $325,000.

13        A.   Well, the only discussions I remember is

14   e-mails back and forth, and I believe my sister's

15   husband -- my brother-in-law -- got involved, too,

16   because he is the tax guy, and the effort was to ensure

17   that it was not unfair, at least in my definition of

18   fairness.

19        Q.   And did you have any discussions with anyone

20   about your paying the increased taxes that your parents

21   owed as a result of the profits from this account?

22        A.   Well, that's what I was referring to.

23             That the discussions with my brother and my

24   brother-in-law were undertaken to ensure that whatever

25   the number, 200,000 left, was sufficient for taxes

140

1    A.    No particular reason.  You know, just where

2  maybe money was available to pay that out of.

3    Q.    Now, you first started selling shares in your

4  parents' TD Ameritrade account in May, you first tried

5  to do so on May 9th; is that correct?

6    A.    Yes.

7    Q.    All right.  And you learned at that time that

8  you weren't allowed to do that, correct?

9    A.    Well, yes.  They required -- because they had

10  coded the stock as affiliate stock, that it required a

11  form 144.

12    Q.    All right.  So let's look at Ladd Exhibit 34,

13  which is behind tab 34.

14        (Deposition Exhibit 34 marked.)

15    Q.    And I'll represent to you this is a document

16  produced by TD Ameritrade that is dated May 9, 2016, and

17  it appears to be a message that you wrote to

18  TD Ameritrade, but you tell me.

19        Is the text a message you wrote to

20  TD Ameritrade?

21    A.    Yeah.  That refers to I am the affiliate and

22  have Power of Attorney in this account and no

23  ownership-interest.

24    Q.    All right.  And it says, "The actual owner is

25  not subject to Section 16 reporting or form 144

141

1   reporting."

2           Do you see that?

3       A.   Yeah.

4       Q.   And on what did you base that statement?

5       A.   Well, with my understanding, and maybe it's

6   wrong or right, that the shares were registered, they

7   were open market purchases.

8           And secondly, the owner of the shares was not

9   an affiliate, so that therefore, it didn't require a

10  form 144.  And I believe that the reason I ended up

11  handwriting that 144 is because Sichenzia said you don't

12  need it.  Yeah, I'm not going to write it, I don't need

13  it.

14      Q.   Okay.  So let's back up for a second.

15          So did you consult with Sichenzia before you

16  wrote this message?

17      A.   Yeah.  I mean, I definitely discussed with Jay

18  whether my father really needs to file 144, and I think

19  the conclusion is that's what TD Ameritrade wants.

20  You're not going to get anywhere without doing it, so

21  just do it.

22      Q.   So did you have this discussion with

23  Mr. Kaplowitz on May 9th?

24      A.   Oh, I have no idea.

25          MR. FORD:  Rob, just be careful about any

142

1    privileged conversations.

2              THE WITNESS:  Okay.

3              MS. BROWN:  I'm sorry.  I didn't hear that.

4              THE WITNESS:  I don't want to waive privilege,

5    he said.

6              MR. FORD:  I -- I was just reminding him to

7    not disclose any attorney/client privileges, but if he

8    can answer.  He has answered, and I think continued to

9    answer.  I was just reminding him.

10   BY MS. BROWN:

11       Q.   Okay.  Well, I'm trying to get to the date on

12   which you had this conversation with Mr. Kaplowitz about

13   your -- the requirement that you submit a form 144 for

14   trades in your father's account.

15             So can you give us any kind of estimate of

16   when that conversation occurred?

17       A.   My estimate would be on or around this date

18   here.

19       Q.   All right.  And was that a communication by

20   telephone or by e-mail?

21       A.   I don't recall.

22       Q.   So what was TDA's response to this message, if

23   there was one?

24       A.   I think it was the equivalent of pound sand.

25   File that form --

143

1      Q.   All right.

2      A.   -- or the stock can't get sold.

3      Q.   All right.  So let's look at Ladd Exhibit 35,

4   which is behind tab 35.

5           (Deposition Exhibit 35 marked.)

6      Q.   And this is the document produced to us by

7   TD Ameritrade.  It's from TD Ameritrade, and it looks to

8   be addressed to you.

9           Do you recognize it?

10     A.   Yeah.

11     Q.   And is that something you received from

12   TD Ameritrade on May 9th?

13     A.   Yeah.

14     Q.   And they write to you, "Thank you for

15   contacting TD Ameritrade.  The account is restricted due

16   to you having a full trading authorization.  To be able

17   to trade the shares you would need to fill out the

18   form 144 affiliate paperwork."

19           So my question to you is:  Did that make sense

20   to you that the reason was because you had full trading

21   authorization?

22     A.   That answer is, it did not at the time, and

23   even at this minute I'm confused, but that's all I can

24   say.

25           They also know that people conflate the word

```
 1    attachments at or around May 9, 2016?

 2         A.   Yes.

 3         Q.   So looking at the guidelines, the 5th bullet

 4    down --

 5         A.   Could I just -- could I just pause one second?

 6    Can you close that blind?  Sorry.

 7              MR. FORD:  Can we hold on one second?

 8              THE VIDEOGRAPHER:  Did you need to go off the

 9    record?

10              MS. BROWN:  I guess so.

11              THE WITNESS:  He's closing the blind.

12              THE VIDEOGRAPHER:  The time is 3:43 p.m.

13              We are off the record.

14              (Off the record at 3:43 p.m.  Back on the

15    record at 3:44 p.m.)

16                          --o0o--

17              THE VIDEOGRAPHER:  The time is now 3:44 p.m.

18              We are on the record.

19    BY MS. BROWN:

20         Q.   All right.  So I was pointing you to the 5th

21    bullet down that says, "For listed and NASDAQ

22    securities, you may only sell a limited number of shares

23    during the preceding 90 days.  Whichever following

24    calculation results in a higher amount would be the

25    formula used.  One percent of the outstanding shares,"
```

1    or "the average weekly volume based on the preceding

2    four calendar weeks."

3            Do you see that?

4        A.   I do see that.

5        Q.   And that was consistent with your

6    understanding of those volume limitations, correct, for

7    affiliates?

8        A.   For affiliates, yes.

9        Q.   So you understood that for your trading you

10   were subject to those volume limitations, correct?

11       A.   For my personal trading, yeah.

12       Q.   And did you discuss with anyone whether those

13   rules applied to your sales of MGT stock held in your

14   father's account?

15       A.   Yes.  Those are the same discussions as

16   before.  Is my father an affiliate?  That is the

17   question.

18       Q.   And that was --

19       A.   Does he require -- right.  And that conclusion

20   was, no.  Notwithstanding TD Ameritrade's insistence

21   that he is.

22            So I believe that was a superfluous form 144,

23   but, you know, it didn't disrupt the market as far as

24   providing wrong information, so I let it go.

25       Q.   And just in your prior answer you used the

1              UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF NEW YORK

3                    -  -  -

4   SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
5                                    )
                       Plaintiff,    )
6                                    ) Case No.
         vs.                         ) 18 Civ. 8175(ER)
7                                    )
    BARRY C. HONIG, ROBERT LADD,     )
8   ELLIOT MAZA, BRIAN KELLER,       )
    JOHN H. FORD, GRQ CONSULTANTS,   )
9   INC. and HS CONTRARIAN           )
    INVESTMENTS, LLC,                )
10                                   )
                       Defendants.   )
11  _____)

12

13

14

15           VOLUME 2 - PAGES (173 - 335)

16           VIDEOTAPED DEPOSITION OF

17                  ROBERT LADD

18         VIA REMOTE VIDEOCONFERENCE

19           FRIDAY, OCTOBER 16, 2020

20

21

22

23
    Stenographically Reported by:
24  Victoria L. Valine, CSR, RMR, CRR, RSA
    California CSR License No. 3036
25  Job No. 201016VV

                                                    173

```
 1                    REMOTE APPEARANCES:

 2

 3  FOR PLAINTIFF:

 4          UNITED STATES SECURITIES AND EXCHANGE
            COMMISSION
 5          BY:  Nancy Brown, Esq.
                 Katherine Bromberg, Esq.
 6                 Jack Kaufman, Esq.
            200 Vessey Street, Suite 400
 7          New York, New York  10281
            BrownN@sec.gov
 8          BrombergK@sec.gov
            KaufmanJ@sec.gov

 9

10  FOR DEFENDANT ROBERT LADD:

11          FORD O'BRIEN
            Attorneys at Law
12          BY:  Adam Ford, Esq.
                 Anjula Prasad, Esq.
13          575 Fifth Avenue, Floor 17
            New York, New York 10017
14          (212) 858-0040
            Aford@fordobrien.com

15

16

17                      --o0o--

18

19

20

21  Videographer:  Sarah Howard

22

23    (All parties appeared remotely via videoconference.)

24

25
                                                        174
```

```
 1    it with a sale?

 2              MR. FORD:  Asked and answered.

 3              THE WITNESS:  Because I physically don't put

 4    that code in.  That's counsel that chooses a code.

 5    BY MS. BROWN:

 6        Q.   And you didn't correct it?

 7        A.   I don't have the knowledge to correct it.

 8        Q.   I'm sorry.  You don't have the knowledge to

 9    correct it, is that what you said?

10        A.   Mmmm-hmmm.

11        Q.   Okay.  Can you describe what your financial

12    condition was in May 2016, your personal financial

13    condition?

14        A.   Um -- if you ask me questions about it, yes.

15        Q.   Well, did you -- did you suffer financial

16    difficulties in May 2016?

17        A.   Yes.  We were moving.  I owed money on a

18    mortgage -- I mean, nothing that the real world would

19    care about, but yes.

20        Q.   And did you, in fact, bounce the $23,000

21    check?

22        A.   Say that again, please.

23        Q.   Didn't you, in fact, bounce a $23,000 check?

24        A.   Refresh my memory, please, but I don't write

25    bad checks, and I would assume if it temporarily didn't
```

193

1  cover, it was satisfied within a reasonable period of

2  time, but --

3     Q.   Okay.  And were you in arrears on your

4  mortgage?

5     A.   Yes.  I think I was 60 days delinquent and

6  three months.

7     Q.   Okay.  Let me share with you something that is

8  not in your binder --

9         MS. BROWN:  Adam, I should have said this

10  before, but I put the marked exhibits in the marked

11  exhibit folder.  Let me just say one caveat, which is

12  that just because they are called marked exhibits, we

13  may not show him everything.  And we'll deal with that

14  sort of after the deposition, if that's acceptable to

15  you --

16        MR. FORD:  Okay.

17        MS. BROWN:  -- I think that's what we

18  contemplate in our stip.

19        MR. FORD:  That's fine.

20        MS. BROWN:  Okay.

21  BY MS. BROWN:

22     Q.   So Mr. Ladd -- and I'm going to blow this up

23  for you, I just want to sort of orient you if I can.

24        Do you see what I'm showing you here?

25     A.   It appears to be the checking account

                                                          194

```
 1            Can I see the check?  To whom it was?
 2       Q.   I -- yeah.  I don't have that here, but would
 3  you agree with me that that's what this line at least --
 4       A.   Yes.  That lines says --
 5       Q.   -- is telling us?
 6       A.   Yes.  I know it doesn't necessarily matter,
 7  but you use the word "bounce the check" to make me sound
 8  like a deadbeat bouncer or whatever, but that check says
 9  it was returned.  It could have been returned for other
10  reasons other than non-sufficient funds.  I don't see it
11  saying it was in a -- whatever it is.
12       Q.   Fair enough.
13       A.   But we could look at it more.
14       Q.   Fair enough.
15       A.   Okay.
16       Q.   All right.  So let's keep going down here.
17  What it looks like is you have some credit card debt,
18  Nordstrom's, Saks, Macy's, Bloomingdale's,
19  Bloomingdale's, right?
20       A.   Yes.  Pretty typical, yes.
21       Q.   Macy's, Target, American Express?
22       A.   Okay.
23       Q.   Then I see something called SoFi.  What's
24  that?
25       A.   That's one of those online lenders.  So that
```

196

1   would have been an installment loan from them.

2       Q.   Okay.  And how many installment loans were you

3   carrying in May 2016?

4       A.   I don't recall.  But looking here I see

5   LendingClub, they're the same.  And then there's another

6   company called Prosper.  So...

7       Q.   Okay.  So there are two LendingClubs and

8   you're paying them -- the first one is you're paying

9   them 1,100, the second one you're paying 500, and then

10  Prosper you're paying another 1,100, and Prosper again

11  for 331, right?

12      A.   Yes.

13      Q.   And then we see some car payments, VW Credit,

14  Ford Credit, Lexus Financial?

15      A.   Yes.

16      Q.   Correct?

17      A.   Yes.

18      Q.   All right.  So can you tell me what your total

19  outstanding installment loan was with all of these

20  LendingClub, and SoFi, and Prosper as of May 2016?

21      A.   I can't.  I could try to help answer the

22  question with my knowledge that -- I'll just answer no.

23           MR. FORD:  Rob, do you want me to get you a

24  calculator and then you could just type in these

25  numbers?

197

```
 1              THE WITNESS:  No.  I think she asked me what
 2   the outstanding balance is.  So --
 3              MS. BROWN:  Right.
 4              MR. FORD:  Nancy, not the monthly payment?
 5              THE WITNESS:  Right.  So what I was trying to
 6   say is that these loans are generally restricted to
 7   about 30,000 each, so I would say 90,000 potentially.
 8   The reason the payments are so high is because they have
 9   amortizations of only three years.
10   BY MS. BROWN:
11        Q.   Okay.  So you can put that aside.
12              All right.  So now we're going to move to the
13   next binder.  Do you have that?
14        A.   I think we have to open that now.
15              MR. FORD:  Nancy, do you want me to open the box?
16              MS. BROWN:  If you would, please.
17              I'm not sure you guys are aware we're not
18   going to be coming back to binder number 1 frequently,
19   but we may do so, so I would keep it not far away.
20              THE WITNESS:  Okay.  I have that binder.
21              MS. BROWN:  Great.  Thank you.
22   BY MS. BROWN:
23        Q.   So Mr. Ladd, who is Drew Cicciarelli?
24              MS. BROWN:  And for the Court Reporter, that's
25   C-I-C-C-I-A-R-E-L-L-I.
```

198

1       A.   Yes.

2       Q.   And you knew that that was not, in fact, true,

3  correct?

4       A.   I know now that it -- when you read it, it is

5  incorrect.  At the time I put it in, I unfortunately

6  missed the mistake.

7       Q.   And what part of it do you now know to be

8  inaccurate?

9       A.   Well, the way it reads in this release, is if

10  John McAfee himself sold McAfee Associates to Intel for

11  7.6 billion all at once, like that he was at McAfee

12  Associates, and that when it was sold, he was at McAfee

13  Associates.

14      Q.   And at the time this press release was issued,

15  you knew that McAfee sold his interest in McAfee

16  Associates or Inc. in the 1990s well before the company

17  was sold to Intel; isn't that correct?

18      A.   I knew that.  I think everyone knew that, but

19  yes.

20           The funny story is the highest viewed YouTube

21  video was how to -- how to uninstall McAfee anti-virus

22  done by John McAfee.

23      Q.   Right.

24      A.   So...

25      Q.   All right.  So I think you've just described

                                                        275

1      A.   At least my attorneys, the printing company,

2  and the New York Stock Exchange.

3      Q.   Okay.  And of those three groups of

4  individuals that you've mentioned, which of them, if

5  any, had a responsibility for fact checking your press

6  release?

7      A.   I don't think fact checking is an occupation

8  for any of those people.

9      Q.   Did you, at the time, think that that was an

10 occupation for any of those people?

11     A.   No.  I -- I say that thinking in my head of

12 what a fact checker is, and what I'm referring to is

13 someone who will -- what the accountants would call tick

14 and tie every little word.

15          I don't want that to imply that the overall

16 veracity of the -- for example, we had no deal with

17 McAfee.  I am certain our attorneys would say don't send

18 out that press release.

19     Q.   Right.  So could you --

20     A.   They might not know, but...

21     Q.   So you relied on people to fact check to the

22 extent that they were aware of the facts; is that what

23 you're saying?

24     A.   I'm saying that the people that received it

25 would be able to determine, on a high level, whether

281

```
 1   it's accurate.
 2       Q.   And by "it," you mean the entire press
 3   release, correct?
 4       A.   Yes.  I'm sorry.  The entire press release.
 5       Q.   All right.  Thank you.
 6            So let's look at Ladd Exhibit 72, which is
 7   behind tab 72.
 8            (Deposition Exhibit 72 marked.)
 9       Q.   And that's an e-mail from Grady Kittrell to
10   Robert Ladd dated May 6, 2016.  And it says "Forward:
11   Proposed PR Attached."
12            Do you recognize Ladd Exhibit 72 as an e-mail
13   Mr. Kittrell sent you?
14       A.   Yes.
15       Q.   And as you read this e-mail, is he sending
16   back to you a draft of the press release with comments
17   supplied by Mr. Sandler?
18       A.   Yes.  That's what it appears.
19       Q.   All right.  And Mr. Sandler was who?
20       A.   He was the owner/operator of the incubator in
21   Opelika.
22       Q.   And he's currently in jail, is he not?
23       A.   I believe he is, yes.
24       Q.   So the draft that Mr. Kittrell forwards to
25   you, which is on the back of this exhibit, that didn't
```

282

1    Mr. Kaplowitz on it?

2        A.   I mean, that would be the protocol, so I -- I

3    hope I did.  I assume I did.

4        Q.   Okay.  Well, if you look at the last page of

5    the exhibit, it looks like a reference below your

6    signature block to the attachment and it says, "PR

7    9 May 2016 FINAL."

8             Does that refresh your recollection that you

9    were attaching the press release?

10       A.   Yes.

11       Q.   Okay.  And does seeing this e-mail from

12   Mr. Kaplowitz, refresh your recollection about any

13   conversation you had with him about any changes to the

14   press release between the draft he had seen earlier and

15   the draft he was seeing the morning of May 9th?

16       A.   It doesn't.  And just so you are aware, that's

17   maybe 10 words in an otherwise long press release, long

18   8-K, everything else.

19             So except for the fact the short pointed it

20   out the next day, I don't understand why the immense

21   focus on one little mistake in the initial press

22   release.  I just -- like why do you think everybody was

23   paying attention to that one line?

24       Q.   I appreciate your question, but I'm --

25   personally I'm not --

                                                      294

1    at it.  Well, if I am ever watching and see this answer

2    come up, 'this man is the most universally known name in

3    cyber security.  Sold his startup company to Intel for

4    $7.6 billion.  Is frequently on CNBC, Fox News,

5    Bloomberg, 'Wall Street Journal' and recently became the

6    CEO of a $9 million company and renamed it after --

7    renamed it after himself,' I will hit the buzzer, wager

8    all of my money, and say 'Alex, who is John McAfee?'"

9            Do you see that?

10       A.   Yes.

11       Q.   So, in fact, Stockbeast, an entity that you

12   retained, included that false statement from the press

13   release in the first paragraph of this piece; did it

14   not?

15       A.   Yes.  And I would add that many news outlets

16   erroneously say that as well.  It's not that it was

17   never said before, but that statement that he wrote is

18   not correct.

19       Q.   And then if we look at the disclaimer that

20   comes with the piece, it's on page 6 of 8, the one, two,

21   third full paragraph begins, "Stockbeast is oftentimes

22   compensated to feature certain companies.

23   Stockbeast.com has been compensated for this report/news

24   updates/social media/corporate communications on MGT the

25   sum total of $125,000 from the issuer MGT for a

                                                          296

1    two-month MGT contract."

2          Was that an accurate statement of how much MGT

3    had paid for Stockbeast services?

4        A.   Yes.

5        Q.   Did you review a draft of this Stockbeast

6    article, Holmes Exhibit 28, prior to its publication?

7        A.   No.

8        Q.   Did you have a discussion with anyone, prior

9    to its publication, that it was about to come out?

10       A.   No.

11       Q.   And how did you come to retain Stockbeast?

12       A.   Um --

13       Q.   Whose suggestion was it?

14       A.    I believe that was the suggestion of an

15   employee or consultant of ours named Steve Schaffer who

16   was a little more aware of the mailing lists that had

17   the biggest circulation.

18       Q.   And how do you --

19       A.   But that didn't matter much.

20       Q.   Okay.  Thank you.

21          How did you -- what was your understanding of

22   how it was that he was aware of which publications had,

23   I guess you're saying, a good mailing list?

24       A.   How Steve was?

25       Q.   Mmmm-hmmm.  Yes.

                                                          297

1      Q.   And did you discuss that change with anyone?

2      A.   Oh, sure.  That was -- that was vetted inside

3  out.

4      Q.   Okay.  Did you make any additional disclosures

5  that would point out what had been erroneous in the

6  original press release?

7      A.   I did not.

8           And I should also state that, with the

9  exception of that one short seller, that no one else

10 brought that to our attention.

11          And we were doing it mainly because we know

12 that short seller contacted the SEC and tried to whistle

13 blow, you know, a giant fraud based on one small

14 misstatement.  That's why we took a lot of care and

15 effort into doing this language in the 10-Q.

16     Q.   I may have misunderstood your prior testimony,

17 but I thought you said that there were lots of short

18 sellers who wrote pieces about the error in the press

19 release; is that not your testimony?

20     A.   Oh, if I did, I'm not sure.

21          But short sellers are also notorious for

22 having brothers and sisters in six different languages,

23 but --

24     Q.   I'm sure they're notorious, Mr. Ladd, but what

25 I'm trying to find out is what you knew at the time.

304

1                 UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF NEW YORK

3                         --o0o--

4    SECURITIES AND EXCHANGE          )
      COMMISSION,                     )
5                                     )
                  Plaintiff,          )
6                                     ) Case No.
          vs.                         ) 18 Civ. 8175 (ER)
7                                     )
      BARRY C. HONIG, ROBERT LADD,    )
8    ELLIOT MAZA, BRIAN KELLER,       )
      JOHN H. FORD, GRQ CONSULTANTS,  )
9    INC. and HS CONTRARIAN           )
      INVESTMENTS, LLC                )
10                                    )
                  Defendants.         )
11   _____)

12

13

14

15                    DEPOSITION OF

16                     ROBERT LADD

17            VOLUME 4 - PAGES (406-506)

18            VIA REMOTE VIDEOCONFERENCE

19             FRIDAY, AUGUST 5, 2022

20

21

22

23

      Stenographically Reported by:
24   Victoria L. Valine, CSR, RMR, CRR, RSA
      California CSR License No. 3036
25   Job No. 220805VV

407

```
 1                    REMOTE APPEARANCES:

 2

 3    FOR PLAINTIFF:

 4           SECURITIES AND EXCHANGE COMMISSION
              BY:  Nancy A. Brown, Esq.
 5                 Jack Kaufman, Esq.
              100 Pearl Street, Suite 20-100
 6           New York, New York  10004
                212-336-1023
 7           BrownN@SEC.gov

 8

      FOR DEFENDANT ROBERT LADD:
 9

                FORD O'BRIEN, LLP
10            Attorneys at Law
                BY:  Adam Ford, Esq.
11                 Anjula Prasad, Esq.
              575 Fifth Avenue, Floor 17
12           New York, New York  10017
                212-858-0040
13           AFord@fordobrien.com

14

15

16

17

18

          (All parties appeared remotely via videoconference.)
19

20

21

22

23

24

25
```

```
 1        A.    -- at the time.

 2        Q.    I apologize.

 3              Did you ever come to learn that she had worked

 4   for Mr. Kesner at his prior firm?

 5        A.    Again, at the -- her testimony a few weeks

 6   ago.

 7        Q.    All right.  So let's talk about your Form 4

 8   filings.

 9        A.    Mmmm-hmmm.

10        Q.    Did you ever deliver trading records to Joan

11   Wu or anyone else at Sichenzia for the preparation of

12   your May 31, 2016 Form 4?

13        A.    Deliver trading records?  I don't remember.

14        Q.    What documents did you give Ms. Wu to fill out

15   the Form 4?

16        A.    I don't remember.  I think just emails.

17        Q.    You mean you just had email correspondence

18   with her, is that what your recollection is?

19        A.    Yes.

20        Q.    Do you recall in any of those emails actually

21   conveying to her records of your trading or other

22   records in connection with your 2016 trading in MGT

23   securities?

24        A.    I don't remember.

25        Q.    Can you name the investors in Laddcap Value
```

482

1    knows or recognizes any that are missing.

2         Asking him to scroll through -- I know you

3    said the document is not that long, but it's 50 pages.

4    So what you're asking him to do is scroll through a

5    50-page document, pluck out --

6         MS. BROWN:  You know what --

7         MR. FORD:  -- whatever it is and remember

8    whether anyone's missing.  It's a very difficult

9    question.  If there's another way to ask it that

10   would --

11        MS. BROWN:  Sure.

12        MR. FORD:  -- drive it home.  For example, if

13   he knows someone --

14        MS. BROWN:  Sure.  Sure.  Let's just walk

15   through it.

16   BY MS. BROWN:

17        Q.   So the first one is the Bates number 87866.

18   And that's a K-1 issued to Laddcap Value Partners LP,

19   correct?

20        A.   Yes.  So during this discussion I went down

21   the side tabs every four pages, and I looked at who the

22   K-1s went to, and, to the best of my recollection, those

23   were the investors at that time in Laddcap.

24        Q.   Thank you.

25             And so can you tell us, in having scrolled

484

1      incorrectly, B-U-K-I-E-T, and that appears on 87850.

2          A.   Yes.

3          Q.   All right.  And so if, in fact, I'm correct

4      and there are no other indications of distributions in

5      2016 for any of these investors, that would mean that in

6      2016 Laddcap Value Partners did not make any

7      distributions to any investors other than the two I've

8      mentioned; is that right?

9          A.   Correct.

10         Q.   All right.  So if we could look at Ladd

11     Exhibit 16.

12         A.   Yes.

13         Q.   If you look at the last page of the exhibit,

14     that's your Form 4 for May 31, 2016, correct?

15         A.   The last page?  Yes.

16         Q.   All right.  So can you explain how it is that

17     Footnote 1 describes a distribution of 465,171 shares of

18     MGT to limited partners that do not appear in the K-1s?

19         A.   So the only partners that demanded cash got

20     paid those cash payments in 2016.  It was subsequently

21     paid out in future years, and they were not -- I think,

22     as I've testified before, they were not distributed the

23     shares in kind, but rather it was a mistake in the

24     filing.  They were sold by the --

25         Q.   All right.

485

1      A.   -- partnership, and the cash proceeds were

2   held and then distributed over the ensuing years.

3      Q.   Okay.  And so your understanding in filling

4   out the K-1s is that the distributions should not be

5   reflected until they're actually paid out; is that

6   right?

7      A.   I -- that is how they are filled out, that

8   they're taxable or otherwise change the basis of the

9   person when they're paid out.

10      Q.   All right.  So -- so the information that

11   Ms. Wu included on Form 4 was all information that you

12   provided her orally; isn't that right?

13      A.   Or in email.  I don't recall.

14      Q.   But is it your recollection that you provided

15   her no trading records or other documents in order for

16   her to fill out the Form 4?

17      A.   Correct.

18      Q.   I'm sorry?

19      A.   Correct.

20      Q.   Thank you.

21      Now, you previously testified that Form 4's

22   purpose was to disclose purchases and sales by

23   Section 16 officers and directors in the sale of their

24   security.

25      Do you recall that?

```
1        A.   I -- I'm sure I said it.  It's correct, yes.

2        Q.   And why, if at all, would investors find it

3    important whether a Section 16 officer or director

4    bought or sold securities?

5             MR. FORD:  Objection to form.

6             You can answer if you -- based on your

7    understanding.

8             THE WITNESS:  There are some investors who

9    track mostly insider purchases as a method of finding

10   undervalued stocks.

11            Insider sales are less relevant in that, as

12   they say, there's 99 ways to -- reasons that people sell

13   stock but only one way they buy it.  So that would be,

14   you know, the usefulness to the investor.

15   BY MS. BROWN:

16       Q.   So is it your testimony that an investor would

17   not find important sales made by officers or directors?

18            MR. FORD:  I'm going to object to the form.

19   What investor?

20            MS. BROWN:  Any investor.

21            MR. FORD:  Do you have any idea what any

22   investor would think?

23            THE WITNESS:  As I testified, insider

24   purchases is the only strategy I've seen that, you know,

25   is followed.
```

487

1    BY MS. BROWN:

2        Q.   And so your Form 4 of May 31, 2016 told

3    investors that you distributed 465,000 shares for zero

4    consideration, right?

5        A.   Correct.

6        Q.   And, in fact, you sold the shares for hundreds

7    of thousands of dollars, right?

8        A.   Yes.

9        Q.   So why didn't you tell investors that?

10       A.   The net impact to ownership was the same in

11   that the shares were not controlled by me.  Between

12   myself and my partners we had an understanding they

13   would get the cash out in the next year or so.

14            So, in my view, it was creating the correct

15   numbers to the investor.  And -- but it's very

16   complicated when it gets down to fund reporting.  As you

17   may be aware that it's -- you know, these pecuniary

18   interests and all that thing, but I wanted to convey

19   correctly that there was no further ownership.

20       Q.   Okay.  So is it your testimony that no

21   investor would care that you actually received cash

22   consideration for the sale of those shares?

23            MR. FORD:  Object to form.

24            THE WITNESS:  I -- my testimony would be that

25   would be the least important bit of information that