UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION

                           Plaintiff,                          Case No. 1:18-cv-08175-ER

v.

BARRY C. HONIG,
*et al.*

                           Defendants.
-------------------------------------------------------------x

**DEFENDANT ROBERT LADD'S REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

FORD O'BRIEN LLP
Adam C. Ford
Anjula S. Prasad
Arthur Kutoroff
275 Madison Avenue
24th Floor
New York, New York 10016
*aford@fordobrien.com*
(212) 858-0040

*Attorneys for Defendant Robert Ladd*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT .................................................................................................................................5

   I.   SUMMARY JUDGMENT SHOULD BE GRANTED TO LADD, AND DENIED TO THE SEC, ON THE §
       10(B)(5) AND § 17(A)(2) CLAIMS REGARDING THE ALLEGED GROUP .....................................5

      A.  The SEC Adduced No Evidence of the Alleged Group .....................................................6

      B.  Ladd Reasonably Relied on Honig's Public Filing that Disclaimed the Existence of the
          Alleged Group...............................................................................................................12

      C.  Ladd Acted in Good Faith, Including by Relying on the Advice of Counsel.................14

          1.  Ladd made a complete disclosure to counsel..........................................................14

          2.  Ladd sought advice as to the legality of his conduct. .............................................18

          3.  Ladd received legal advice that the Alleged Group was not a 13(d) Group............20

          4.  Ladd relied on this advice from counsel. ...............................................................21

      D.  The SEC Has Adduced No Evidence that Ladd Aided and Abetted Any Violation
          Regarding the Alleged Group or Aided and Abetted Any Violation of 10(b)5 of the
          Exchange Act Rule 10-b or 17(a) .................................................................................24

  II.   SUMMARY JUDGMENT SHOULD BE GRANTED TO LADD, AND DENIED TO THE SEC, ON THE §
       10(B)(5) AND § 17(A)(2) CLAIMS REGARDING THE MAY 2016 PRESS RELEASE ..................25

      A.  MGT's May 2016 Press Release Was Not Materially Misleading................................25

      B.  Even if a Reasonable Investor Was More Interested in McAfee's Departure Date of the
          Company he Founded Than the Fact He Was Actually Joining MGT as CEO Such an
          Investor Could Easily Discover It Because It Was Known to the Market.....................29

      C.  Ladd Lacked Scienter in Publishing the May 2016 Press Release ................................32

 III.   SUMMARY JUDGMENT SHOULD BE GRANTED TO LADD, AND DENIED TO THE SEC, ON THE §
       10(B)(5) AND § 17(A)(2) CLAIMS REGARDING THE MAY 31, 2016 FORM 4...........................33

      A.  The Form 4 Was Not Materially False .........................................................................33

      B.  The SEC Adduced no Evidence of Ladd's Scienter in Drafting the May 31, 2016 Form
          4...................................................................................................................................34

IV.   SUMMARY JUDGMENT SHOULD BE GRANTED TO LADD, AND DENIED TO THE SEC, ON THE §
       10(B)(5) AND § 17(A)(2) CLAIMS REGARDING THE MAY 25, 2016 FORM 144 .....................35

       A.   The May 25, 2016 Form 144 Contains No Material Misstatement ...............................36

       B.   The SEC Adduced No Evidence of Ladd's Scienter in Drafting the Form 144 .............39

V.    SUMMARY JUDGMENT SHOULD BE DENIED TO THE SEC REGARDING THE NEW ACCOUNT
       FORM..................................................................................................................................40

       A.   The SEC Cannot Show that the Supposed Misstatements were Material. .....................40

       B.   The SEC has Adduced no Evidence of Scienter. ..........................................................41

VI.   SUMMARY JUDGMENT SHOULD BE DENIED TO THE SEC ON ITS SECTION 5 CLAIMS..............41

       A.   The May 26, 2016 Form 144 was Timely and Ladd Calculated the Volume Limitations
            Correctly ....................................................................................................................42

       B.   Section 5 Liability for Ladd Cannot be Premised on Ladd's Parents' Stock Sales ........45

VII.  SUMMARY JUDGMENT SHOULD BE DENIED TO THE SEC REGARDING THE SECTION 13(d) AND
       RULE 13d-2 CLAIMS ...........................................................................................................47

       CONCLUSION...................................................................................................................48

TABLE OF AUTHORITIES

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
   568 U.S. 455 (2013).............................................................................................29

*Auer v. Robbins,*
   519 U.S. 452 (1997).............................................................................................44

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988).............................................................................................36

*Forward Indus., Inc. v. Wise,*
   No. 14-CV-5365 JSR, 2014 WL 6901137 (S.D.N.Y. Sept. 23, 2014) .......................................6

*Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.,*
   No. 99 CIV 342 (DLC), 1999 WL 544708 (SDNY July 27, 1999)............................................8

*Greenberg v. Hudson Bay Master Fund Ltd.,*
   No. 14CV5226 DLC, 2015 WL 2212215 (S.D.N.Y. May 12, 2015) .......................................12

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,*
   95 F. Supp. 2d 169 (SDNY 2000).............................................................................8

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC,*
   783 F.3d 383 (2d Cir. 2015)...................................................................................36

*In re Am. Express Fin. Advisors Secs. Litig.,*
   672 F.3d 113 (2d Cir. 2011)...................................................................................23

*In re Lek Secs. Corp.,*
   No. 17 Civ. 1789 (DLC), 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019)....................................23

*In the Matter of Joseph John VanCook,*
   SEC Rel. No. 34-61039A, 2009 WL 4026291 (SEC Nov. 20, 2009) .....................................38

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019)........................................................................................45

*Lerner v. Millenco, L.P.,*
   23 F. Supp. 2d 337 (SDNY 1998).............................................................................8

*Morales v. Quintel Ent., Inc.,*
   249 F.3d 115 (2d Cir. 2001)....................................................................................7

*Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC,*
   No. 99 Civ. 2821 (VM), 2002 WL 31869391 (SDNY Dec. 20, 2002).......................................9

*S.E.C. v. Druffner,*
   517 F. Supp. 2d 502 (D. Mass. 2007) .......................................................................................38

*S.E.C. v. Espuelas,*
   905 F. Supp. 2d 507 (S.D.N.Y. 2012).......................................................................................24

*S.E.C. v. Ficken,*
   546 F.3d 45 (1st Cir. 2008) ........................................................................................................38

*S.E.C. v. O'Meally,*
   No. 06 CIV 6483 LTS RLE, 2010 WL 3911444 (S.D.N.Y. Sept. 29, 2010) ............................20

*S.E.C. v. Tourre,*
   950 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................................................19

*Sec. & Exch. Comm'n v. Blackburn,*
   No. CV 15-2451, 2020 WL 565551 (E.D. La. Feb. 5, 2020) .....................................................42

*Sec. & Exch. Comm'n v. Frohling,*
   851 F.3d 132 (2d Cir. 2016)........................................................................................................32

*Sec. & Exch. Comm'n v. Gallison,*
   588 F. Supp. 3d 509 (S.D.N.Y. 2022)........................................................................................32

*Sec. & Exch. Comm'n v. Honig,*
   No. 18 CIV. 8175 (ER), 2021 WL 276155 (S.D.N.Y. Jan. 27, 2021) .......................................45

*Sec. & Exch. Comm'n v. Honig,*
   No. 18 CIV. 8175 (ER), 2021 WL 5630804 (S.D.N.Y. Nov. 30, 2021) ....................................14

*Sec. & Exch. Comm'n v. Sayid,*
   860 F. App'x 18 (2d Cir. 2021) ..................................................................................................32

*Sec. & Exch. Comm'n v. Sayid,*
   No. 17 CIV. 2630 (JFK), 2019 WL 6307367 (S.D.N.Y. Nov. 25, 2019)...................................32

*SEC v. Greenstone Holdings, Inc.,*
   No. 10 Civ. 1302 (MGC), 2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012)..................................37

*SEC v. Sierra Brokerage Servs.,*
   712 F.3d 321 (6th Cir. 2013) ......................................................................................................46

*Stone v. Sutton View Cap., LLC*,
  No. 17-CV-1574 (VEC), 2017 WL 6311692 (S.D.N.Y. Dec. 8, 2017)....................................23

*United States v. Litvak*,
  889 F.3d 56 (2d Cir. 2018)..........................................................................................................26

*Wellman v. Dickinson*,
  682 F.2d 355 (2d Cir. 1982)........................................................................................................10


Statutes and Rules:

17 C.F.R. § 229.403, Instructions to Item 403, Instruction No. 3 .................................................12

17 C.F.R. § 229.403(a).................................................................................................................12

17 C.F.R. § 230.144(e)(1)(ii).......................................................................................................42

17 C.F.R. § 230.144(e)(1)(ii)(h)(3)..............................................................................................42

17 C.F.R. § 230.144(h)(2).............................................................................................................39

17 C.F.R. § 240.13d-3...................................................................................................................47

FRCP 56(f)...............................................................................................................................40, 42

Rule 144(g)....................................................................................................................................39

Robert Ladd respectfully submits this Reply Memorandum of Law in Support of his Motion for Partial Summary Judgment (the "the Ladd Motion") and in Opposition to Plaintiff's Motion for Partial Summary Judgment (the "SEC Motion").

## PRELIMINARY STATEMENT

Four and one-half years ago, the SEC trumpeted charges against "a group of prolific South Florida-based microcap fraudsters."[1]  While 19 of the 20 defendants charged settled without admitting any wrongdoing, Ladd has continued to fight the baseless allegations.  The SEC's Brief[2] establishes why he has refused to settle: there is no evidence of any wrongdoing on his behalf.  This case was supposed to be about Honig's, Brauser's, Stetson's, and Groussman's pump-and-dump scheme that Ladd aided and abetted.  But in its summary judgment papers the SEC does not even attempt to establish the underlying violation committed by the other co-Defendants occurred.  As such this court must dismiss the aiding and abetting claims against Ladd without further analysis.

In its latest brief in response to the Ladd Motion, the SEC effectively abandons its "pump and dump" theory of wrongdoing that animated this action against Ladd.  The Second Amended Complaint is replete with allegations that Ladd and the co-Defendants inflated the price of MGT[3] stock by lying to investors and then selling their shares in a classic "pump and dump."  But the

---

[1] *Securities and Exchange Commission v. Barry C. Honig, et al.,* SEC Litigation Release no. 24262 / September 7, 2018, accessible at https://www.sec.gov/litigation/litreleases/2018/lr24262.htm.

[2] Hereafter, the SEC's January 31, 2023, Memorandum of Law in Support of its Motion for Partial Summary Judgment against Defendant Robert Ladd and in Opposition to Ladd's Motion for Partial Summary Judgment, filed under docket number 321, will be referred to as the "SEC Brief."

[3] Unless otherwise noted, all defined terms shall have the meaning ascribed to them in Ladd's November 21, 2022, Memorandum of Law in Support of His Motion for Partial Summary Judgment, filed under docket number 309 (the "Ladd Opening Brief") or the SEC Brief.

SEC has no evidence that Ladd ever lied to anyone, let alone engaged in any fraud.  Incredibly ignored by the SEC is that measured at all relevant times, MGT's stock in fact traded at a value far in excess of the price it traded prior to May 2016.  Unable to prove fraud nor extract a settlement, the SEC has resorted to leveraging its bottomless resources in an effort to save face.

As the SEC Brief reveals, the SEC's case has instead been reduced to a disjointed series of claims about typos and other ministerial and immaterial errors in various documents, with one exception:  the SEC claims Ladd discovered but failed to disclose that Honig and other investors in MGT were acting as a 13(d) Group (the "Alleged Group").  But to show that the Alleged Group even existed, the SEC must show that the investors in the Alleged Group formed an agreement as contemplated by 13(d)(3) of the Securities Exchange Act.  After four years of discovery, including deposing lawyers for all relevant parties, they cannot do so.

Even if the SEC did have evidence of an agreement—which it does not—that is not enough for it to prevail because Ladd is permitted to reasonably rely on affirmative statements made by investors in MGT regarding their investment—and more importantly he is entitled to rely on the advice of his (MGT's) counsel.  Honig issued a public filing disclaiming the existence of the Alleged Group, and Ladd had a right to rely on Honig's representation. Importantly, Ladd also relied on his lawyers, who worked on the relevant deals, were aware of all relevant facts, and advised him that the Alleged Group did not exist as a 13(d) Group.  Ladd has been forced to defend not disclosing something that six lawyers have asserted did not need to be disclosed. The SEC's aiding and abetting claim on this point fails for similar reasons.

Regarding the press release, the elephant in the room is that the entirety of the May 2016 Press Release indisputably correctly conveyed the essence of the transaction – that a world-renowned cybersecurity thought leader was to run MGT and guide its future.  In fact, Mr.

McAfee did become Executive Chairman of the company. The SEC ignores the point of the press release, instead focusing on a singular immaterial mistake in that press release. The SEC attempts to elevate inartful phraseology in May 2016 Press Release to a securities fraud by fixating on the phrase "McAfee sold his company to Intel in 2010 for $7.6 billion." As Ladd testified, he had intended to convey that McAfee founded the company that eventually sold to Intel in 2010 for $7.6 billion. This was truthful and accurate. That McAfee had left his company prior to the sale to Intel was publicly available in hundreds of published articles as well as YouTube videos by McAfee himself viewed millions of times. No reasonable investor could have believed McAfee was still at his company when it sold to Intel. His leaving before that was common knowledge. Moreover, the same drafting error Ladd made had been previously made by numerous top-tier publications. To the extent a reasonable investor would find anything important in this phrase, it is the sale price for McAfee's old company, and the SEC does not even allege there was anything inaccurate with the May 2016 Press Release's reporting of the sale amount. The SEC also fails to adduce evidence that Ladd included this imprecise terminology with scienter.

The SEC then seizes on a ministerial error in a footnote in a Form 4 from May 31, 2016, to claim that Ladd tried to mislead investors about his investment in MGT. In the footnote, Ladd stated that he distributed shares to Laddcap Value Partners III LLC ("Laddcap") limited partners for no consideration, when in fact he sold these shares. This mistake is immaterial. Since Ladd accurately disclosed that he no longer owned these shares, that material fact was accurately disclosed, and the SEC has come forward with no evidence to suggest otherwise. Indeed, the SEC's entire case is based on arguing that it is material to investors to know whether insiders acquire or dispose of shares. The Form 4 clearly disclosed disposition, the only salient fact.

In its dying breath, the SEC tacks on two additional claims against Ladd under a novel theory of securities fraud relating to Ladd's answer in a new account form he submitted to E*Trade on November 22, 2015 (the "New Account Form") and timeliness of a Form 144 Ladd submitted on May 25, 2016.  But the SEC has no basis to hold Ladd liable for securities fraud with respect to the timing of the Form 144, since the applicable regulation only requires that the form be submitting "concurrently" with the sale without specifying a specific deadline and he filed "concurrently", i.e., within a couple weeks of the sale.[4]

More fundamentally, the SEC cannot show that either the clerical errors in the New Account Form, or the timing of filing of the Form 144, were important to a reasonable investor. First, the E*Trade filing was not seen by any investors, but only his personal broker.  Rather than withdraw the claims entirely, the SEC seeks to reshape the law regarding materiality in its favor by making misrepresentations actionable if they are important to a *broker*, not to an *investor*, despite longstanding precedent holding the opposite.  With respect to the Form 144, no reasonable investor would find it material if an insider files the forms within seconds of his stock trades or within two weeks.  To the extent investors care about how insiders acquire or dispose of shares—a point with which Ladd agrees—the entire world knew Ladd disposed of his shares listed in the Form 144 by the day he filed and the stock price continued to rise for months. Plainly investors did not believe Ladd's sales reflected an overpriced stock which should be sold.

---

[4] The SEC also attempts to repackage its claims about the Form 144 as a Section 5 claim, by claiming that Ladd fails to obtain the "safe harbor" for his sales of MGT because he filed the Form 144 too late, and because he calculated the applicable volume limitations incorrectly by using the date of his filing as a basis for the calculations.  The SEC Motion on the Section 5 claims should be denied for the same reason the SEC Motion on the Form 144 should be denied: Ladd filed the form on time and calculated the volume limitations correctly.

Finally, the SEC has adduced no evidence that Ladd acted with scienter.  This alone warrants summary judgment in Ladd's favor on its fraud claims.[5]  But rather than concede that Ladd has not violated any securities laws, the SEC seeks immediate judgment on its claims that Ladd failed to report changes in his ownership MGT over 5%, despite the indisputable fact that Ladd did not own over 5% of MGT shares.  The SEC gets to its number by erroneously aggregating shares that cannot be aggregated.  The SEC simply cannot prevail in this case and summary judgment in favor of Ladd is warranted.

## ARGUMENT

### I.   SUMMARY JUDGMENT SHOULD BE GRANTED TO LADD, AND DENIED TO THE SEC, ON THE § 10(B)(5) AND § 17(A)(2) CLAIMS REGARDING THE ALLEGED GROUP

After four years of discovery, including the deposition of six lawyers representing all relevant parties, the SEC's claim that Ladd failed to disclose the existence of the Alleged Group turns out to be baseless.  There is no evidence that the members of the Alleged Group even agreed to act as a group.  But even if the SEC did present such evidence, summary judgment would still be warranted in Ladd's favor since Ladd had no reason to believe they were acting as a 13(d) Group.  Indeed, counsel for the transaction advised him that such a designation was neither necessary nor appropriate.  Ladd further relied on Honig's own Schedule 13G, which affirmatively confirmed he was not acting as a member of a group.  Moreover, even if this Court were to conclude that a strict advice-of-counsel defense is not warranted, the evidence unambiguously establishes that Ladd acted in good faith, including by relying on the advice of counsel who assured him that no such 13(d) Group existed and no such disclosure was

---

[5] The SEC has also moved for summary judgment on its Section 16(a) and Rule 16a-3 claims. Ladd does not specifically address these claims but seeks to vindicate his rights at trial.

appropriate.  The SEC has adduced no evidence in support of its aiding and abetting claims
because it has not proven any underlying violation.

**A.  The SEC Adduced No Evidence of the Alleged Group**

The claim that investors acted as a "group" under Section 13(d) requires evidence that the
investors entered into an agreement with each other.  *Forward Indus., Inc. v. Wise*, No. 14-CV-
5365 JSR, 2014 WL 6901137, at *3 (S.D.N.Y. Sept. 23, 2014).  The "[m]ere relationship"
among investors, and "proof that [they] had jointly invested together in other transactions" is not
enough to show an agreement.  *Id.* (internal quotation marks omitted).  But that is all the SEC
can show:  that certain investors had a relationship and invested together in other transactions.

Honig, Brauser, Groussman, Steton, and O'Rourke having previously invested together in
other deals does not show that they were a 13(d) Group.  Although the SEC lays heavy emphasis
on their past relationships, SEC Brief at p. 49, prior co-investments is insufficient as a matter of a
law to show that they acted as a group.  *Id.*  Even the fact that certain investors invested in the
same company, MGT, in 2012 or at any other prior time, does not show that they were acting as
a group years later.  Ladd waived his attorney-client privilege so that all six lawyers at SRF,
which represented both MGT and its investors, could emphatically testify on this point.  Avital
Perlman, a lawyer for MGT, testified that the fact that these investors had been co-investors in
the past was not "really that relevant" since often "investors invest in companies together" but
she does not "think that makes them a group."  Ford Decl., Ex. 6 (Perlman Tr. 112:24-113:5).
Arthur Marcus, another MGT lawyer, also testified that Honig and others investing together in
the past was unimportant to determining whether they are a 13(d) Group.  As Marcus explained,
he regularly sees similar investors in different deals, but that fact alone does not suggest they are
acting as a 13(d) Group, and did not view Honig as acting as part of such a group.  Supplemental

Declaration of Adam C. Ford in Support of Defendant Robert Ladd's Motion for Partial

Summary Judgment ("Supp. Ford. Decl."), dated March 17, 2023, Ex. 56 (Marcus Tr. 65:19-

66:15; 67:10-12).  Attorney Marcus further explained that even whether investors had invested in

MGT in 2012 is not particularly relevant for whether they were a 13(d) Group in 2015.  *Id.*

Marcus Tr. 76:22-77:15.  In a similar vein, Jay Kaplowitz, another MGT lawyer, testified that

more than just acquiring shares together was required to form a 13(d) Group—an agreement to

vote together was also required.  Ford Decl., Ex. 7 (Kaplowitz Tr, 16:18-17:1-13).  Harvey

Kesner, who represented MGT investors, testified on how he made 13(d) Group determinations:

> Q.   How would you make a determination of that nature, whether a group of
> investors was acting as a group under Section 13(d)? […]
>
> A.   [When] five people choose to participate in an investment together, that is not
> indicative of a group.  It's […] making investment type of decisions collectively.
> Again, you know, let's go back to the example of an underwritten offering.  You
> have 200 investors. They're all investing on the exact same terms, at the exact same
> time, exact same instrument, exact same company, share, and counsel.  I don't think
> anyone would argue that makes a group.
>
> And I think that same principle would apply when 5, 6, 7, 10, 20 investors are
> coming together in a private placement to purchase securities in a company.  It's
> what they do when they have that instrument, whether it's joining voting together,
> or electing to dispose, or -- or exit the transaction together that implicates whether
> they're a group for reporting purposes.

Ford. Decl., Ex. 9 (Kesner Tr. 118:20-120:7).  Moreover, no attorney has suggested that

the fact that the purported members of Alleged Group invested together in 2012 with respect to

the same target (MGT) has any particular significance.[6]

---

[6] The cases the SEC cites provide no support for its position.  The SEC primary relies on
*Morales v. Quintel Ent., Inc.*, to show that prior relationships among a supposed groups'
members can be used as evidence of group membership.  But in *Morales*, the potential group
members had a prior relationship, *as they were all shareholders in a closely held corporation*.
249 F.3d 115, 127-28 (2d Cir. 2001).  The SEC has adduced no evidence that the purported
members of the Alleged Group ever shared a similar close economic relationship.  The SEC also
cites motion to dismiss cases that are all distinguishable because there, the complaint alleged that

<u>That Honig, Groussman, Stetson, and O'Rourke shared offices does not show that they were a 13(d) Group.</u>  The SEC cites the fact that the Alleged Group shared an office in the same paragraph as its reference to their working together on other deals, SEC Brief at p. 49, but with no explanation of how sharing an office in this case indicates they were in a group, when the law—and MGT's and the investors' counsel—testified to the opposite.  Investors often invest in similar deals at the same time; sometimes they share office space as well.  Despite the SEC's insistence, that itself does not make a 13(d) Group.

<u>Honig was not a "lead negotiator" of the alleged "Honig Group."</u>  The SEC characterizes Honig as a "lead negotiator" for investment into MGT in 2015 to give the impression that there was a "Honig Group" with some defined structure, but it simply did not adduce any evidence to fit its narrative.  The evidence the SEC points to as showing Honig's purported leadership of the Alleged Group largely consists of emails from *Stetson, not Honig*, that merely provide charts of the allocations of the investments that the Alleged Group members made in MGT.  SEC Brief at pp. 49-50; SEC Resp. 56.1 ¶ 87; GG, Ex. HH, Ex. II.  These emails do not even suggest slightly that Ladd—or, for that matter, Stetson or anyone else—was a "lead negotiator" for any group of investors.

---

the potential group entered into an agreement, beyond simply investing together in the past. *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 174 (SDNY 2000) (finding that a complaint with allegations that a potential group had "a common plan of significantly altering [a company's] business and operations" had sufficiently alleged a 13(d) Group); *Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 CIV 342 (DLC), 1999 WL 544708, at *14 (SDNY July 27, 1999) (finding that a complaint with allegations of "a common objective and concerted conduct, consisting of a series of acquisitions, holding, and disposals, of the defendants in furtherance of that objective" were sufficient to allege a group); *Lerner v. Millenco, L.P.*, 23 F. Supp. 2d 337, 344 (SDNY 1998) (finding that a complaint that alleged members of a 13(d) Group entered into an agreement about modifying an agreement was sufficient to allege a group).

The SEC also claims that Ladd "called … on Honig to intercede" when Groussman tried to renegotiate more favorable terms for the exercise of warrants, citing to an email when Ladd refers to a negotiation with Honig over similar terms when Groussman tried to renegotiate. SEC Brief at pp. 49-50; SEC Resp. 56.1 ¶ 86; Brown Decl., Ex. FF.  At most, this exchange shows that Ladd was referring his deal with Honig as precedent for the Groussman deal.  Despite the SEC's strained attempt to mold the facts to its storyline, Honig does not adopt any suggestion that he can negotiate a deal on behalf of Groussman, and he does not provide a substantive response.  Brown Decl., Ex. FF.  There is no other evidence regarding this point.

The SEC further points to Honig's supposed role as "lead negotiator" for the 2012 MGT financing.  SEC brief at p. 49.   But as the six MGT and investor lawyers made clear, any prior relationship among the investors in the Alleged Group in a past deal does not show that they had such a relationship in 2015 as well.  But even if it did, the SEC has failed to show that Honig was a "lead negotiator" in 2012 either.  The SEC merely points to a series of emails, primary among Ladd, Honig, and SRF, regarding the terms of the 2012 investment that do not suggest Ladd had the ability to bind any other investor.[7]

The fact that investors communicated with each other about the same deal does not show that they are part of a 13(d) Group.  The SEC loses sight of the central inquiry behind Section 13(d)—whether investors entered into an agreement with each other, *Forward Indus.,*

---

[7] The SEC cites to *Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC*, but *Schaffer* holds no differently.  No. 99 Civ. 2821 (VM), 2002 WL 31869391, at *5-6 (SDNY Dec. 20, 2002).  In *Schaffer*, the members of the potential group hired separate counsel, but one firm took the lead in drafting the agreements, incorporating comments, and distributing updates to the agreements.  *Id.* Here, it is the opposite, MGT and its investors hired the same firm in the investment, SRF, but used different counsel at the firm, and the evidence proves that multiple lawyers at SRF were responsible for coordinating comments.  *Schaffer* highlights why the result must be different here.

*Inc.*, 2014 WL 6901137, at *3—by suggesting that the mere fact that the supposed members of the Alleged Group emailed each other about MGT shows their membership in a group.  SEC Brief at p. 50.  Just as when the SEC tried to show that Honig was a "lead negotiator" for the "Honig Group," the SEC relies on ordinary course emails among investors where they attach deal documents and charts of their investment allocations in MGT.  None of these communications even indirectly refer to any agreement among the investors, and the bulk of the SEC's evidence here was from years before the 2015 investment in MGT.[8]

      <u>Ladd's use of the term "group" does not show that Honig and other investors were part of a 13(d) Group.</u>  The SEC clings to the same two emails cited in its Complaint four years ago, where Ladd referred to a "group" involving Honig.  With no additional evidence, the SEC continues to try to frame it as an admission of Ladd's view of the existence of the Alleged Group—exactly as it did before conducted discovery.  SEC Brief at 50-51.  But in both emails, Ladd was simply referring to a "group" in a colloquial context, removed from any discussion of Section 13(d).  Ford Decl., Ex. 25., Brown Decl., Ex. EE.  The SEC is unable to convert these two emails into evidence of either the Alleged Group or that Ladd's knowledge thereof.

      Moreover, context reveals that Ladd did not ultimately view Honig as part of a group even in the colloquial sense of the term.  Although Ladd refers to an "investor group … led by Barry Honig" in the first of the two emails, Honig is not copied on this email and has no opportunity to intervene to correct any misstatements.  *Id.*  In the second email exchange, which

---

[8] The SEC incorrectly relies on *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) which does not show otherwise.  In *Wellman*, the Second Circuit''s finding that there was a group when the district court "relied to a great extent on the representations made by [group members] to potential purchasers concerning the availability of the shares controlled by" the group.  *Id.*  But in Ladd's case the SEC has presented no evidence that any member of the Alleged Group made any representations to potential purchasers about the availability of each other's shares, nor were the shares here "controlled by the group."

occurred the following month, Ladd refers to "your group" when emailing Honig, but Honig promptly replies two minutes later to state: "I am not part of a group.  I invested individually." Ford Decl., Ex. 25.  Ladd confirms their understanding by replying "I stand corrected.  *Id.*[9]

> The fact that certain investors made parallel decisions does not show that they were part of a 13(D) Group.  The SEC notes that investors in the Alleged Group made certain decisions at in or around a general time frame, including converting and selling their shares, exercising warrants, and accepting an offer to modify the warrants.  SEC brief at 51-52.  But the SEC has not shown how such individual conduct—with no evidence of coordination—amounts to an agreement.  To the contrary, the pursuit of individual self-interest explains their investments decisions, especially their decision to sell their shares after the shares rose in value. SEC Resp. 56.1 ¶ 96 (noting that Ladd, Honig, Brauser, Stetson, and O'Rourke sold shares on February 3, 2016, when "MGT's stock's daily trading volume saw a 7,000 percent increase from its prior day's volume, and an intraday price increase of over 60 percent").  If anything, given the investment maxim to "buy low and sell high," it would be selling shares after a substantial *decrease* in share value that might suggest some kind of agreement to perform other than they

---

[9] The circumstances here present a sharp contrast to *Morales*, the case the SEC cites as showing that "the issuer's view of the members of a group" is relevant to whether there is a Section 13(d). SEC Brief at p. 48.  In *Morales*, the court found that "it would be reasonable to infer that [an issuer] would perceive the three [closely-held corporation] shareholders as a single unit," but at no point did the court find that a 13(d) Group existed because an issuer used the term "group" in a colloquial context to refer to its investors.  249 F.3d at 127.  The SEC also cites to *Schaffer*, where a lawyer referred to "the investors you are representing as a group" in a memorandum, and the court found the lawyer's characterization to be relevant to determining whether there is a group.  *Schaffer*, 2002 WL 31869391, at *7.  Here, as explained throughout Ladd's brief, the lawyers on the deal did <u>not</u> consider Honig and his co-investors to be part of a group and neither did Ladd.  Ladd waived privilege so that this Court could consider SRF lawyers' views as to the existence of the Alleged Group, and the evidence adduced weighs in favor of granting summary judgment to Ladd—not to the SEC.

otherwise would have.  That multiple investors sold when they could lock in profits is simply not evidence of an agreement to act in concert pursuant to a group agreement.[10]

### B.  Ladd Reasonably Relied on Honig's Public Filing that Disclaimed the Existence of the Alleged Group

Even if the SEC could prove that Honig was part of 13(d) Group, summary judgment should nonetheless be awarded to Ladd because Ladd could rely on Honig's representations in an SEC filing that Honig was not part of a group.  In other words, if Honig was actually a member of a group—for which there is no evidence—he lied not just to the SEC but to Ladd as well. Ladd only had to disclose groups that own over 5% of their securities that he knew about.  17 C.F.R. § 229.403(a) (requiring disclosure of a group "who is *known to the registrant* to be the beneficial owner of more than five percent of any class of the  registrant's voting securities.") (emphasis added).  Further, Ladd could rely on investors' Section 13(d) and 13(g) filings, unless he knew or had reason to believe that they were incomplete or inaccurate.  17 C.F.R. § 229.403, Instructions to Item 403, Instruction No. 3 ("[A] registrant may rely upon information set forth in such statements unless the  registrant knows or has reason to believe that such information is not complete or accurate … .").   Avital Perlman confirmed that Ladd had no obligation to conduct an independent investigation into whether Honig was investing as part of a group and could rely on Honig's filings (pursuant to Instructions to Item 403).  Perlman Tr. 105:18-106:13.

---

[10] The case the SEC cites here does not support its claim.  The SEC cites *Greenberg v. Hudson Bay Master Fund Ltd.*, where the court found that a complaint sufficiently alleged the existence of a 13(d) Group when it alleged far more extensive facts than alleged here, including that the defendants who were alleged to form the group owned and incorporated a company (and acquired software and intellectual property rights for the company) that was acquired in exchange for convertible shares, which the defendants converted and sold at a profit.  No. 14CV5226 DLC, 2015 WL 2212215, at *3 (S.D.N.Y. May 12, 2015).  There were no such allegations in the SEC's Complaint of such extensive coordinated activity here, let alone evidence in the record of the same.

Honig filed a Schedule 13G on October 16, 2015 (the "Honig Schedule 13G"), that did not disclose any membership in a group.  Brown Decl. Ex. OO; SEC Resp. 56.1 ¶ 90.  Tara Guarneri-Ferrara, who worked on the Honig Schedule 13G, confirmed that SRF "certainly made 13(g) and (d) filings where appropriate" and did not recall having any issues with these filings.  Ford Decl., Ex. 11 (Guarneri-Ferrara Tr. 23:1-20).  And the fact that Guarneri-Ferrara worked for the same firm that represented Ladd provided reason to trust that the filings were accurate:  if Ladd did not trust SRF, he would not have hired them.

The Honig Schedule 13G is consistent with Ladd's email exchange with Honig a month later, where Ladd refers to "your group" when emailing Honig, but Honig replies two minutes later to state: "I am not part of a group.  I invested individually," and Ladd confirmed that he "stand[s] corrected."  Ford Decl., Ex. 25.  Further, the Honig Schedule 13G is consistent with the advice he received from SRF, as described further below.

By contrast, the SEC can point to no evidence to suggest that Ladd mistrusted, or should have mistrusted, the Honig Schedule 13G.  All the SEC can do is seize on a portion of Ladd's deposition where Ladd stated that he was "hyper-vigilant" with "anything we did with Mr. Honig."  SEC Brief at 54; Brown Decl., Exhibit M (Ladd Tr. 254:11-13).  But this is just further evidence in support of finding Ladd had no reasonable basis to not rely on Honig's filing.[11]

---

[11] Moreover, in context, Ladd's testimony reveals a more nuanced view of Honig.  The SEC asked Ladd to explain Ladd's description of Honig as a controversial figure, and Ladd explained that "aside from being a loudmouth … he did not violate securities laws."  *Id.* at 253: 21-254:17. As Ladd further testified when the SEC asked if he considered Honig a "recidivist stock promoter who engaged in pump and dump," Ladd addressed concerns about Honig arising from his reputation by conducting due diligence, which revealed just one customer complaint against him.  *Id.* at 28:12-15.  Ladd explained: "To me, that's not a recidivist pump-and-dumper that violates securities law."  *Id.*  In light of this diligence, and the involvement of counsel, Ladd had no reason to disregard the Honig Schedule 13G.

### C.  Ladd Acted in Good Faith, Including by Relying on the Advice of Counsel

As Ladd has maintained since day one, he has acted in good faith and with the advice of counsel during the financing of MGT.  His good faith defense is broader than a specific advice of counsel defense.  Apart from specific advice Ladd received, Ladd also provided his lawyers with all the facts they needed to detect and address any issues with the SEC filings for the investment in MGT.  Nonetheless, not a single lawyer did, or had any reason to, suspect that any investors formed a 13(d) Group with Honig or that MGT had a legal obligation to make such a disclosure.

The SEC may disagree with how SRF conducted its representation of MGT and its investors, but the SEC cannot prevail by asserting it disagreement.  Instead, the SEC must show that Ladd should have known that the Honig Schedule 13G was incomplete or inaccurate.  That SRF knew what Ladd knew and still had no reason to doubt the accuracy of the Schedule 13G further compels a finding for summary judgment in Ladd's favor.

Nonetheless, the SEC attempts to cabin Ladd's argument that he acted in good faith into the stricter advice of counsel defense.  SEC Brief at 55-56.  To invoke this defense, "the proponent must show that he made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith."  *Sec. & Exch. Comm'n v. Honig*, No. 18 CIV. 8175 (ER), 2021 WL 5630804, at *7 (S.D.N.Y. Nov. 30, 2021) (internal quotation marks omitted).  Even if Ladd were asserting the strict advice of counsel defense and not just arguing good faith, Ladd's defense still succeeds as Ladd meets each element of the traditional advice of counsel defense.

### 1. Ladd made a complete disclosure to counsel.

Ladd provided his lawyers with everything they needed to know to decide whether there was a "Honig Group" under Section 13(d).  The SEC cannot identify a single instance in which

Ladd's legal team suggested that the Honig Schedule 13G filing was incomplete or inaccurate. Nor can the SEC identify a single fact Ladd knew but did not disclose to his legal team that would have made a difference in legal advice they provided.

      <u>The relationship between Ladd or MGT, on one hand, and Honig, on the other hand, is irrelevant to whether Honig was in a 13(d) Group with other people.</u>  The SEC has been careful to not allege that Ladd was part of the alleged "Honig Group," yet it repeatedly tries to use evidence of the relationship *between Honig and MGT* to show that Honig was in a 13(d) Group *with other investors*.  The SEC does not, and cannot, explain how the relationship between Honig and MGT determines whether Honig was part of a 13(d) Group.

      Attorney Marcus explained as much during his deposition, when the SEC asked him whether Honig's involvement in finding a reverse takeover candidate for MGT would have affected Marcus's view as to whether Honig was part of a group with other investors.  Marcus Tr. p. 81-7-10.  Marcus testified that Honig's involvement with MGT may affect whether he is affiliated with MGT but not whether he is part of a group with other investors.  Ford. Decl., Ex. 8 (Marcus Tr. p. 8116-82:7).  The SEC's arguments about the payment for promotion materials are another example of this failed tactic of conflating evidence of Honig's relationship with MGT with Honig's relationship with other investors.  Although Kaplowitz was aware MGT paid a promoter to promote MGT, including the approximate amount paid by MGT, Supp. Ford Decl., Ex. 55. (Kaplowitz Tr. 100:6-14), the SEC emphasizes that Kaplowitz did not specifically recall Honig asking Ladd to pay a stock promoter to write a piece that touted MGT.  SEC Brief at 59-60.  Similarly, the SEC claims—without any citations to the record—that Ladd never told Kaplowitz or Marcus about Ladd's suspicion that Honig paid for an article by John Ford in *Seeking Alpha* in 2013.  SEC brief at 60.  But no lawyer testified that such a fact would require

MGT to make a group disclosure.  Quite the opposite, each lawyer testified they believed they were in possession of all relevant material facts and stood by the propriety of these MGT filings.

SRF lawyers provided no reason to believe they would have come to a different conclusion, even if they knew all the details the SEC highlights.  Kaplowitz explained that, to determine whether payment for promotional materials suggests that there was a 13(d) Group, he would "have to know more than" the fact that Honig asked MGT to pay for promotional pieces, including "who created the material that was being disseminated, what the material that was being disseminated was, the timelines involved, all sorts of things like that."  Brown Decl., Ex. (Kaplowitz Tr. 104:2-9).  Similarly, Marcus testified that his 13(d) Group analysis never depends on the fact that investors sell their shares when the price increases.  Brown Decl., Ex (Marcus Tr. 78:24-79:14).  The SEC pressed Marcus on whether it would matter whether "the stock price went up because Mr. Honig engineered that to happen" and Marcus confirmed "by itself, probably not."  Ford Decl., Ex. 8 (Marcus Tr. pp. 79:15-80:3).

Receipt of a random email from an unknown short-seller about Honig is irrelevant because Ladd conducted diligence on Honig and SRF lawyers were already aware of Honig's reputation and testified it did not factor into the group analysis.  The SEC argues that Ladd forwarding to his lawyers a random email from a short-seller that reads like a post from a stock chat was required for legal advice.  According to the SEC, a single email from someone who might be named David Einhorn (no evidence was presented that this person exists or is whom he claims to be) and who characterized Honig as a "recidivous stock promotor" was the key to analyzing the group question under Rule 13(d).  Brown Decl., Ex. DDD.  This argument is absurd and can be dismissed out of hand.  When the SEC asked Ladd if he shares this characterization of Honig, Ladd explained that he conducted due diligence, which revealed just

one customer complaint against Honig.  Ladd Tr. 28:12-15.  Ladd explained: "To me, that's not a recidivist pump-and-dumper that violates securities law."  *Id.*  Ladd viewed his diligence as addressing the concerns about Honig without warranting intervention by his lawyers.

Even if Ladd forwarded this email exchange to SRF lawyers, there is no reason to believe that would have altered their work in this deal.  The SEC specifically asked Marcus whether Honig's supposed reputation was relevant to whether Honig was acting as part of a 13(d) Group and Marcus was unequivocal that this was irrelevant.  Ford Decl., Ex. 8 (Marcus Tr. 85:11-22).  Further, although Kaplowitz did not recall this specific email exchange with the so-called Einhorn, Kaplowitz was aware of Honig's reputation independently of the email, as was Kesner, Kaplowitz's colleague at SRF. Supp. Ford. Decl., Ex. 55 (Kaplowitz Tr. 85:2-11; 85:25-86:8).

<u>SRF knew the investors in the Alleged Group shared offices.</u>  The SEC highlights the fact that investors in the Alleged Group shared offices in its attempt to show existence of such a group, SEC brief at p. 49, but SRF lawyers on both sides of the deal knew that Honig and others shared offices.  Kesner, who was counsel to investors in the financing of MGT, confirmed his knowledge of investors sharing offices during his deposition.  Ford Decl. Exhibit 9 (Kesner Tr. 53:13-55:2).  Kesner further confirmed that Groussman had a desk at Honig's office, although Groussman was "rarely there."  *Id*. at 57:9-11.  Similarly, Perlman, who represented Ladd, confirmed that she understood O'Rourke "worked out of the same offices as Barry Honig."  Ford Decl., Exhibit 6 (Perlman Tr. 27:18-21).  At no point did any lawyer at SRF suggest that whether investors shared an office determined whether they formed a 13(d) Group.

<u>SRF knew about the relationships among the Alleged Group investors.</u>  Kesner confirmed during his deposition that Groussman was a "long-time family friend of the Honig family."  Ford Decl. Exhibit 9 (Kesner Tr. 57:6-8).  Further, Perlman testified that she had worked for the

investors in the Alleged Group before but did not even tell Ladd because she did not deem it

relevant.  Ford Decl., Exhibit 6 (Perlman Tr. 72:3-23).  Further, as noted above, Marcus and

Perlman testified that whether the investors in the Alleged Group invested together in the past,

including in the 2012 financing, is insignificant to determining whether there was a 13(d) Group.

The fact that some investors who are part of the Alleged Group agreed to a warrant

exchange offer would not have made a difference in SRF's group analysis.  The mere fact that

certain investors made parallel investment decisions does not signify that they formed a group,

since their decisions can be explained by individual responses to the available incentives.

Nonetheless, as part of its attempt to show that Ladd did not make a full disclosure to counsel,

the SEC claims there is no evidence that Ladd told Marcus or Kaplowitz about certain investors'

timing for accepting a warrant exchange offer, or about an email Honig sent in which he took

credit for obtaining consents to a warrant exchange offer.  SEC Brief at 60.

There is no reason to believe SRF would have given different advice had it known more

details about a warrant exchange offer.  The SEC has not even tried to show that there was an

agreement among investors in the alleged "Honig Group," or that accepting the warrant

exchange offer would be irrational or unexplainable in the absence of an agreement.

2. **Ladd sought advice as to the legality of his conduct.**

Ladd engaged SRF on behalf of MGT before the financings in 2012 and 2015, and relied

on the firm's advice regarding the complete and proper filing of all required SEC filings.  Brown

Decl. Ex. M (Ladd Tr. 436:2-5); Supp. Ford. Decl., Ex. 58 (Ladd Tr. 490:17-491:4).  SRF

prepared SEC filings on behalf of MGT, including the November 6, 2015 S-1 that the SEC faults

for listing Honig as an individual investor and relying on Honig's Schedule 13G.  Ford Decl.

Exhibit 13 (November 6, 2015 Form S-1 identifying SRF as counsel for MGT).  When asked

about whether that filing should have disclosed the Alleged Group, Kaplowitz confirmed that it should *not* have, he was "sure that we discussed it [the need to make any group disclosure] and did a good job," even if he did not recall the details.   Kaplowitz Tr. 46:3-6.  Ladd also specifically testified that he knew SRF was investigating whether the Alleged Group was a 13(d) Group.  Supp. Ford. Decl., Ex. 58 (Ladd. Tr. 493:23-494:10).

The SEC's response takes an overly narrow view of legal representation.  The SEC acknowledges that Ladd retained counsel to review MGT disclosures, but concocts the factually baseless argument that Ladd failed to personally spot the issue about whether the Alleged Group existed and required disclosure.  SEC Brief at p. 56.  This is both belied by the facts and nonsensical.  Ladd and all the lawyers testified they specifically considered whether any group disclosure needed to be made.  Moreover, MGT clearly hired SRF to seek advice with respect to ensuring all of its SEC filings were done timely, accurately and in full compliance with the law. And of course, it is the responsibility of a lawyer, not a client, to spot legal issues in public disclosures—specifically whether any group disclosure needed to be made—an issue that each lawyer testified they were well aware of and specifically focused on.  By working on and approving a filing, SRF endorsed that it is complete and accurate as to the Group disclosure. Neither Ladd, nor any other client, would have hired counsel to prepare deficient filings, and neither Ladd nor any other client would believe it was their obligation to "issue spot" filings beyond what the lawyers believed was necessary. In any event, Ladd did issue spot, contrary to the SEC's factually baseless assertions to the contrary.[12]

---

[12] The SEC cases do not help.  The SEC first cites *S.E.C. v. Tourre*, where the court limited a defendant's use of evidence of legal counsel's review of deal documents where the defendant disclaimed an advice of counsel defense but tried to argue that "the presence of lawyers is relevant to the overall context of the transaction," since "that is such a fine-grained distinction from a reliance on counsel defense, that it would likely confuse the jury."  950 F. Supp. 2d 666,

   3. **Ladd received legal advice that the Alleged Group was not a 13(d) Group.**

   As part of his representation of MGT, Kaplowitz asked Marcus to find out if Honig was

acting as part of a group.  Brown Decl., Ex. OOO (Marcus Tr. 36:22-23 ("Mr. Kaplowitz asked

me to find out if they were acting as a group.")).  In an email from October 18, 2012, Honig sent

his lawyer at SRF, Kesner, "the allocation from MGT."  Ford Decl. Exhibit 26.  Marcus asked

Kesner if "they are acting as a group" and Kesner replied "No!"  *Id.*  Marcus then forwarded this

email exchange to Ladd with no suggestion that Kesner's belief was to be doubted.  *Id.*  Ladd

confirmed that he received advice on whether Honig was acting as part of a group from Marcus.

Supp. Ford. Decl., Ex. 58 (Ladd Tr. 347:6-15).  The fact that Marcus and Kesner were colleagues

at the same firm further strengthens the presumption that Marcus—and Ladd—could rely on

Kesner.  Moreover, as Kaplowitz testified, he is sure that SRF considered the group issue, and

concluded no disclosure was necessary.  Ford Decl., Ex. 7 (Kaplowitz Tr. 46:3-6.)

   The SEC muses that SRF lawyers may not have discussed the existence of the Alleged

Group after 2012, SEC Brief at p. 57, but this is contrary to the testimony of the six lawyers.

The unrebutted testimony is that this issue was considered with respect to the 2015 filing and

those filings were accurate and proper under the law.  No group disclosure was required.

---

684 (S.D.N.Y. 2013).  The SEC is aware that Ladd made the opposite choice here, electing to
establish his good faith and the strength of his argument by fully waiving privilege and claiming
advice of counsel as part of his broader defense of good faith.  Next, the SEC cites to *S.E.C. v.
O'Meally*, where a defendant used multiple broker IDs to evade detection of market timing
activity without providing full disclosure to her employer's legal counsel.  No. 06 CIV 6483 LTS
RLE, 2010 WL 3911444, at *4 (S.D.N.Y. Sept. 29, 2010).  The court rejected an advice of
counsel defense, not only because of the lack of disclosure, but also because the legal counsel
was the in-house counsel for defendant's employer, which the Court found was not disinterested
since it gained "significant revenues from Defendant's activity and itself ultimately paid a
significant sum in settlement of market timing-related charges …"  *Id.*  Here, Ladd obtained
outside counsel—the well-respected law firm of SRF—and as noted above, made a full
disclosure to this counsel.  Further, there is no evidence that SRF was not disinterested here.

4. **Ladd relied on this advice from counsel.**

Five days later after receiving Marcus's email, Ladd responded to a New York Stock Exchange ("NYSE") request for information asking if any investors are investing in concert. Ladd copied Marcus on the reply, affirming: "Not to the company's knowledge" Brown Decl. Ex. UUU.  Ladd further testified that the answers he gave to the NYSE were "pretty well-known answers" and "as long as confirmed by counsel, that's what I would represent to the New York Stock Exchange."  Supp. Ford Decl., Ex. 58 (Ladd Tr. 351: 6-11).

The SEC fails at its attempts to show that Ladd's reliance was not in good faith.  <u>First</u>, the SEC attempts to confuse the Court by asserting that Ladd was relying on Kesner's legal advice, and that such reliance was unreasonable. But this is not Ladd's argument. Kesner was Honig's lawyer, not MGT's and there is no evidence in the record (or assertion by counsel) that Ladd was relying on Kesner's legal advice.[13]  SEC Brief at p. 59.  Ladd (and MGT) relied on Kaplowitz's and Marcus's advice.  Marcus and Kaplowitz conducted a factual investigation into the question of whether Group disclosure was required by—among other things—asking Honig's lawyer about the relevant facts, and then they provided Ladd with legal advice as to what was required to be disclosed.  Ladd did not rely on Kesner's legal advice---although he did trust and rely on his factual assertions. The argument by the SEC that MGT's lawyers were not entitled to rely on

---

[13] The SEC speculates that Honig "might" not have disclosed that he was acting in concert with others if, hypothetically, Honig confided such information in confidence.  SEC Brief at 59.  But Kesner testified that this hypothetical situation bore no resemblance to reality, rendering this speculation irrelevant.  Brown Decl., Exhibit L (Kesner, Tr. 148:3-4) ("I don't think that there's any indication that I knew that or I was told that.").  The SEC speculates that Kesner's "consideration of the group issue did not really involve Honig, Groussman and Stetson at all" merely because his deposition testimony focused on his knowledge of Hudson Bay and Iroquois. SEC Brief at p. 59.  There is no basis to conclude Kesner lacked similar knowledge of other clients and, even if he did, knowing that Iroquois and Hudson Bay were not part of an investor group is a sufficient basis for him to answer Marcus.

the statements by Kesner because he was representing the investors is baseless. Neither Kaplowitz nor Marcus had any reason to suspect their law partner was lying to them.

Second, the SEC argues that Ladd should have ignored the advice of counsel because he claimed to be an "expert" on Section 13(d). SEC brief at 59. However Ladd described his knowledge of Section 13, the proposition that he therefore was required to have ignored MGT's counsel is nonsensical. Even if Ladd claimed in a deposition to have understood the law behind Section 13 as well as anyone, Ladd plainly cited his lawyers' "superior information … regarding the investors" as a reason for his and MGT's reliance on his lawyers to assess the existence of the Alleged Group. Supp. Ford Decl., Ex. 58 (Ladd Tr. 459:1-15).

Third, the SEC suggests that Ladd should have ignored Kesner's response because Kesner was representing Honig, not Ladd, in the deal. In response, the SEC cites the general proposition that "reliance on an adversary's counsel is unreasonable," SEC Brief at 58. But Kesner was not "adversary" counsel, Kesner represented MGT! Notwithstanding Ladd signing a standard waiver of potential conflict agreement for SRF's representation of the investors, Kesner still billed time to MGT in December 2015. Supp. Ford Decl., Ex. 58 (159:14-17). Obviously Ladd could reasonably rely on all statements by SRF lawyers. Moreover, the parties were not adversaries and there was no suggestion that any parties' interest in ensuring the SEC filings were proper and complete were misaligned. Rather, here, lawyers who all worked at the same firm were representing different parties to the same deal and had an interest in ensuring the accuracy of the disclosures.[14] Any resulting litigation would implicate Ladd as well as Honig

---

[14] Kesner confirmed this understanding during his deposition, when he explained: "You're pursuing the interest of truth and accuracy. This is not an advocacy situation. You're not -- you're not taking a position for anybody." Supp. Ford Decl., Ex. 57 (Kesner Tr. 168:19-21).

and other investors (which is what is happening here), so aside from basic professional

responsibilities, the SRF attorneys all had reason to ensure the filings about Section 13(d) were

accurate (which they were, but that did not prevent this litigation).

The SEC has failed to provide evidence that Kesner was attempting to mislead his

colleague about whether Honig was investing as part of a group.[15]  Indeed, Kesner testified he

was telling Marcus (and Ladd) the truth when he asserted they were not acting as a group.[16]

---

[15]The SEC bizarrely claims "Marcus thought Kesner was responding in his personal capacity, not as a lawyer for any client," SEC Brief at p.26, which, if true, renders the SEC's position even harder to defend.  If Kesner was representing his personal view, then he was not advocating on behalf of any client, let alone a client adversarial to MGT or Ladd.  In any event, Kesner testified to the opposite, he was responding as counsel to Honig.

[16] None of the cases the SEC cites involve facts remotely similar to those here.  The SEC relies on *In re Lek Secs. Corp.*, where the court granted a motion *in limine* to preclude defendants from arguing advice of counsel where they previously denied that they would raise such a defense, did not waive privilege over the underlying documents, and where the advice of counsel was merely a letter sent to other defendants from their counsel (coupled with the vague assurance that the trading at issue "'had been thoroughly reviewed, vetted and approved by experienced and competent independent outside counsel.'")  No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *1-*4 (S.D.N.Y. Nov. 5, 2019).  Here, Ladd waived privilege, leading to the deposition of six lawyers from SRF, and produced every single email or other relevant requested document regarding the advice of counsel.  Further, the advice here was far more direct than anything at issue in *In re Lek Secs. Corp.*: a direct email from Kesner to his colleague, Marcus, that Marcus forwarded to his client Ladd.  The SEC further cites *S.E.C. v. O'Meally*, for the proposition that "counsel consulted must be disinterested and independent," but in that case a defendant tried to rely on his employer's legal department for advice when the employer "reaped significant revenues from Defendant's activity and itself ultimately paid a significant sum in settlement of market timing-related charges … ."  No. 06 CIV 6483 LTS RLE, 2010 WL 3911444, at *4 (S.D.N.Y. Sept. 29, 2010).  There is no evidence suggesting such an arrangement here, where Ladd hired an outside firm when working with Honig.  The SEC also cites *Stone v. Sutton View Cap., LLC*, where the court dismissed a fraudulent inducement claim where defendants failed to consult their own counsel in a transaction and sought to rely on the advice of a counterparty instead.  No. 17-CV-1574 (VEC), 2017 WL 631692, at *4 (S.D.N.Y. Dec. 8, 2017).  Here, Ladd hired and obtained the advice of a law firm, and there is nothing to suggest his reliance on their advice was unreasonable.  Finally, the SEC cites *In re Am. Express Fin. Advisors Secs. Litig.*, where the Second Circuit affirmed a rejection of the claim that a plaintiff delayed bringing claims against a financial services company because the company's employee told them to ignore class action notices the plaintiff received.  672 F.3d 113, 130 (2d Cir. 2011).  Here, there

---

### D. The SEC Has Adduced No Evidence that Ladd Aided and Abetted Any Violation Regarding the Alleged Group or Aided and Abetted Any Violation of 10(b)5 of the Exchange Act Rule 10-b or 17(a)

While the SEC's Second Amended Complaint charges Ladd with aiding and abetting Honig's, Brauser's, and Groussman's violations of Section 10b of the Exchange Act and Rules 10b-5(a) and (c), its brief only focuses on its aiding and abetting MGT's alleged Rule 13(a) violation. The *sine non qua* of aiding and abetting is the SEC establishing "a primary violation, actual knowledge, and substantial assistance." *S.E.C. v. Espuelas*, 905 F. Supp. 2d 507, 525 (S.D.N.Y. 2012). The SEC has failed to establish any primary violation, as such, it cannot obtain aiding and abetting liability against Ladd.

The gravamen of the SEC's Second Amended Complaint is that Ladd aided and abetted the Alleged Group's fraud violations. Indeed, Count Seven alleges that Ladd aided and abetted Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder and by aiding and abetting MGT's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder. Notwithstanding these allegations, it is remarkable the extent to which the SEC does not even attempt to establish any underlying violation of any of these laws. Not one word. Instead, the SEC focuses only on its allegations that Ladd aided and abetted Honig's and the other's violation of Rule 13(d), which should be dismissed for the reasons discussed *supra*. Without any evidence that Honig or the others violated any of these laws, Count Seven alleging Ladd aided and abetted these violations must be dismissed.

---

was no threat of litigation, and there is no reason to suggest a misalignment of interest among the parties in determining whether Honig invested as part of a group.

## II. SUMMARY JUDGMENT SHOULD BE GRANTED TO LADD, AND DENIED TO THE SEC, ON THE § 10(B)(5) AND § 17(A)(2) CLAIMS REGARDING THE MAY 2016 PRESS RELEASE

A core component of the SEC's case is transforming a minor mistake in a press release into securities fraud.  In the May 2016 Press Release, MGT truthfully published the fact that John McAfee, the world-famous technology genius, would be joining MGT.  This was the entire point of the press release, and it was indisputably accurate.  Mr. McAfee did join MGT.  In the press release, there was a clause that noted, among other things, McAfee "sold his anti-virus company to Intel for $7.6 billion."  The SEC claims this statement was fraudulent because McAfee had already left the company he founded before Intel bought it for $7.6 billion.  Brown Decl. Ex. UU.  For this imprecise terminology to lead to a § 10(b)(5) or § 17(a)(2) violation, the SEC must show that this statement is material, and it cannot do so.  If the SEC has shown anything, it is that the $7.6 billion value for the sale to Intel that mattered, not that McAfee left the company he founded prior to its sale to Intel. Nor would a reasonable investor have been fooled by the inartful phrasing, as the truth about the chronology of McAfee's involvement in the company already permeated the market.  Further, even if the SEC could show that this statement was material, the SEC cannot adduce evidence that Ladd acted with scienter, indeed, prior to the MGT press release, numerous Tier-1 publications used the same exact inartful drafting.

### A.  MGT's May 2016 Press Release Was Not Materially Misleading

After four years of ongoing discovery, the Commission has been unable to adduce any evidence to support its claim that the statement at issue in the May 2016 Press Release rises to the level of materiality.  Rather than attempting to apply the law of this Circuit on the issue of materiality, the SEC has merely drafted an affidavit that remarkably align *exactly* with a hypothetical potential investor concern articulated in this Court's February 2020 Order that the

SEC found someone to sign.  But in doing so the SEC ignores the law regarding what constitutes a "reasonable investor" and now attempts to pawn off to this Court its own self-serving affidavit as evidence that the statement was undisputedly material.  SEC Brief at p. 36.  At summary judgment, the subjective views of this lone investor are simply not relevant (and are even less so given how they contrast the views of an objective reasonable investor).

The standard for determining materiality in securities fraud cases is an objective standard, *i.e.*, based on the view of a hypothetical reasonable investor, and not a subjective standard, *i.e.*, based on the view of any particular individual or individuals.  *See United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018).  For materiality, because there must be a "substantial likelihood" that the misstated or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available,"  the testimony of a particular individual is only relevant to materiality if it is "shown to be within the parameters of the thinking of reasonable investors in the particular market at issue."  *Id*. (internal citation omitted). The Second Circuit is clear that "there must be a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in the market" since "[m]ateriality cannot be proven by the mistaken beliefs of the worst informed trader in a market."  *Id.*

Here, the SEC provides, as its only evidence of materiality, a declaration by a purported investor in MGT, Mr. Christopher Petranis (the "Petranis Decl."), in which he states he "was not aware that McAfee had left his company many years prior to its sale to Intel." Mr. Petranis also averred that as he considers investing in a company, it is "important to [him] to know whether that company's insiders are buying or selling the company's shares."  He further made statements about a "group of investors in MGT who owned more than 5% of MGT shares," indicating that he actually reviewed MGT's filings on EDGAR closely before deciding to invest

in it. But given Mr. Petrainis' statements about the research he conducts prior to investing it is
incomprehensible that Mr. Petranis appears to have not done a basic internet search of the words
"Intel," "2010," and "McAfee," for over fifty news articles published in 2010 and onwards
would have been at his disposal, containing details of the Intel transaction—*including that Mr.
McAfee was not involved*.  Clearly, he did not.  Mr. Petranis cannot define the standard for a
reasonable investor in the market at issue, as plainly, Mr. Petranis and his mistaken beliefs
confirm he is the worst informed trader in the market. The Court can disregard his affidavit.

Moreover, Mr. Petranis did not even claim that the chronology of McAfee's involvement
in his former company mattered to him, let alone explain why it mattered.  Without such an
explanation, there is no way to determine whether a particular investor's views are reasonable or
reflect "the mistaken beliefs of the worst informed trader in a market."  *Id.*  To the extent the
Petranis Declaration shows anything, it is that he did not even read the words in the press release.
Petranis's declaration claims that he "was especially influenced by *the amount of money* McAfee
reportedly made – $7.6 billion – in the sale of his company to Intel," which was a "massive
win."  Petranis, Decl. ¶ 4 (emphasis added). But the press release does not remotely suggest
McAfee made $7.6 billion in the sale to Intel.  Petranis' mistaken belief is therefore not based on
the press release. Notably, Petranis says that he was not aware of the chronology of McAfee's
departure from his company, but does not provide a basis for why that matters.

The SEC's argument here is premised on this purported investor's plain misreading of
what the press release actually said.  The language at issue is: "Mr. McAfee, the visionary
pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion."  Petranis
appears to have misread the article to come to the mistaken belief that McAfee personally made
$7.6 billion dollars, where no reasonable reading of the press release could lead anyone to have

that belief.  The price a company is sold for bears little if any relation to the amount of money a founder *received* in the sale.  Petranis was therefore "especially influenced" by his own inability to objectively read the written words, none of which could lead a reasonable investor to believe that the "amount of money McAfee reportedly made" was $7.6 billion.  Courts are clear that the mistaken belief of the world's most uninformed investor cannot be the standard of materiality.  Mr. Petranis is the world's most uninformed investor—his views are irrelevant to any analysis.

The SEC's reference to Ladd's recollection of a short seller immediately identifying the mistaken phraseology of the 2016 Press Release is no more illuminating, and certainly is not conclusive evidence of materiality.  SEC Brief at p. 36.  In fact, the widespread visibility of short seller publications during this period provided for a very robust "mix of information" for investors.  Although this unidentified short seller now takes center stage in the SEC's case, the SEC displayed a marked incuriosity about this person during the deposition, asking barely any questions about the short seller.  Now that discovery has closed, the SEC has still failed to even identify the name of the short seller, let alone provide any explanation of whether this individual found the chronology important or why. Without more information, the SEC's reference to this short seller is irrelevant to materiality.

Moreover, if the SEC intends for its claim that the *fact of Ladd's recollection of his drafting the press release* is evidence of materiality to be taken literally, it provides no support that Ladd's memory controls the standard of materiality.  If anything, Ladd's testimony reveals how unimportant the typo is, since Ladd testified that "except for the fact that the short pointed it out the next day, I don't understand why the immense focus on one little mistake in the initial press release," since the challenged language was not even the focal point of the press release— which was the truthful statement that McAfee was joining MGT—and was only "maybe 10

words in an otherwise long press release, long 8-K, everything else." Bromberg Decl., Exhibit F (Ladd Tr. 294:16-18).  In other words, in the context of all the information available about the deal described in the 2016 Press Release, the imprecise wording about McAfee's involvement is too minor a detail to matter to a reasonable investor.  This statement alone is more elucidating than any explanation of materiality the SEC has provided.

Finally, the SEC's reference to an article that includes the claim that McAfee sold his company to Intel also includes no explanation for why the chronology of McAfee's involvement matters.  Bromberg Decl. Ex. ll.  This article briefly refers to this sale as one of a litany of facts when providing the background of McAfee's biography, but setting aside this background, the main thesis of the article is that MGT is developing solutions to "invasive apps" that compromise users' cybersecurity.  *Id.*  At no point does the article claim that McAfee's departure date from his prior company was important for investors.

    B.   **Even if a Reasonable Investor Was More Interested in McAfee's Departure Date of the Company he Founded Than the Fact He Was Actually Joining MGT as CEO Such an Investor Could Easily Discover It Because It Was Known to the Market**

As discussed above, a reasonable investor that was interested in the chronology of McAfee's involvement in the company he founded, the investor could have easily discovered it from a cursory review of the available material.  In its February 25, 2020 Order, the Court previously declined to dismiss the SEC's claims arising from the May 2016 Press Release at the motion to dismiss stage.  Since determining whether "news of the truth credibly entered the market … is a matter for … a summary-judgment motion … ," the evidence Ladd has adduced in the three years since provides ample reason to find in Ladd's favor.  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013) (internal quotations and alterations omitted).

In addition to the articles submitted with Ladd's motion to dismiss briefing, Ladd has adduced over a dozen articles that were available prior to and temporally close to the May 2016 Press Release that accurately described the chronology of McAfee's involvement in his original company.  But the SEC simply disregards the wealth of articles produced by Ladd in support of his truth on the market defense by asserting, in a footnote, that the articles cited by Ladd use "the passive voice" to describe the sale of McAfee's company (*i.e.*, the company McAfee founded '*was sold to* Intel'), and are therefore "irrelevant" or "offer no 'truth' about McAfee's connection to the company at the time of the sale."  (SEC Brief p. 46, n.26).  This casual dismissal of crucial evidence is fatal to the SEC's motion.

News in the market about Mr. McAfee was cumulative, beginning as early as the 1990's when Mr. McAfee's revolutionary technology hit the scene.  The reporters in the thirteen 2015 articles cited by Mr. Ladd referred to the sale of Mr. McAfee's eponymous company to Intel in a passive voice because the market was flooded with information *beginning in 2010* about the sale of that company to Intel in 2010—including how Mr. McAfee was *not* part of that transaction.  The "passive voice" used by reporters in the 2015 articles cited by Ladd regarding the sale of Mr. McAfee's company to Intel referred to an event well-known globally, which occurred in 2010 with the technology giant Intel, in which hundreds of news articles reported the details of—zero of which stated that John McAfee was involved at the time of that transaction.

Ladd confined the articles submitted to support his truth on the market theory to a timeframe close to the May 2016 Press Release based on this Court's ruling at the motion to dismiss stage that "the truthful information [in the market regarding McAfee's departure from his company] was much further in the past" than in cases cited by Ladd. (February 25, 2020 Order, p. 14).  But Ladd was only able to find news articles published in 2015—since Ladd was

not responsible for disseminating news about McAfee at that time—so close prior to the May 2016 press release, which contained facts about the "vintage" news about the sale to Intel that occurred in 2010, only because of Mr. McAfee's independent notoriety, and the compelling fact that in 2015, this technology genius was planning to run for president the following year.  Yet the 2015 articles *still* contained information about the purchase by Intel in 2010 of the company he founded.  Again, Ladd's May 2016 Press Release was to tell the public that this international icon would be joining Mr. Ladd's significantly lesser-known MGT—not to reveal information about John McAfee to which the world was already privy.

Returning to Mr. Petranis: It is simply not plausible that a reasonable investor, one capable of navigating a company's SEC filings to determine whether an investment would be prudent, would rely solely on internet articles he may have seen a year prior to his stock purchase in 2015 about Mr. McAfee; Mr. Petranis was admittedly "especially influenced by the amount of money McAfee reportedly made – $7.6 billion – in the sale of his company to Intel."  Petranis Decl. ¶ 4.  Such excitement would warrant at the very least an internet search of "John McAfee" by a reasonable investor, which search would have generated countless articles about the dark and colorful life of Mr. McAfee—including that he left McAfee and Associates in 1994.  By 2016, news disseminated through the internet was forever stored there and available to the public based on a search terms containing the date the news *occurred*, rather than in chronological order of when the articles appeared in the news, as is the case with traditional hard copy print.  In other words, since the alleged misstatement in the May 2016 Press Release was regarding the sale of McAfee's company to Intel in 2010, substantially far more articles *published in 2010* than articles *published in 2015* containing details about the 2010 transaction were available on the

internet *in 2016* to any reasonable investor able to conduct a basic internet search. Mr. Petranis

is clearly not a reasonable investor, and his declaration can be ignored by this Court.

### C. **Ladd Lacked Scienter in Publishing the May 2016 Press Release**

The SEC has adduced no evidence that the inartful phraseology in the Press Release was

intentional. To the contrary, Ladd explained during his deposition that now realizes the phrasing

was incorrect, but missed this mistake when he drafted the Press Release. Supp. Ford Decl., Ex.

58 (Ladd Tr. 274:21-275:8) ("I know now that it -- when you read it, it is incorrect. At the time I

put it in, I unfortunately missed the mistake."). In the deposition the SEC cites as its sole

evidence of Ladd's scienter, Ladd was merely stating that he had access to information (e.g., the

YouTube video) about the chronology of McAfee's involvement at his former company, but

drafted the press release in a way that he missed the mistake. Further, the fact that even some

news organizations made the identical mistake before the May 2016 Press Release demonstrates

how even those acting in good faith can misstate the chronology of McAfee's involvement.

Ladd Opening Brief at 20-21 (citing articles printing similar statements about McAfee's sale).[17]

---

[17] The circumstances here are completely different than those in the cases the SEC cites to show
that Ladd had scienter here. The SEC cites to *Sec. & Exch. Comm'n v. Frohling*, where the
Second Circuit found that no rational factfinder could fail to find that a defendant – a securities
counsel who was involved in 11 opinion letters regarding a securities offering – knew that the
letters he signed were false, not only because of his deposition testimony but also because he
received "numerous emails" by the founder of his company suggesting that the letters were
inaccurate. 851 F.3d 132, 137-38 (2d Cir. 2016). The SEC also cites to *Sec. & Exch. Comm'n v.
Gallison*, where, aside from any deposition testimony, the Court found that a defendant's
conduct – instructing a transfer agent to remove restrictions from stock and transferring it to a
brokerage account – demonstrated that his statement about the ownership about these shares was
false. 588 F. Supp. 3d 509, 525 (S.D.N.Y. 2022). Finally, the SEC cites to *Sec. & Exch.
Comm'n v. Sayid*, where the court found that a defendant was reckless in disregarding various red
flags, including red flags raised via email, in determining the date of a document. No. 17 CIV.
2630 (JFK), 2019 WL 6307367, at *9 (S.D.N.Y. Nov. 25, 2019), *aff'd*, 860 F. App'x 18 (2d Cir.
2021). Here, the SEC cannot point to any evidence suggesting Ladd was aware that the May
2016 Press Release contained an inaccurate chronology that was intentionally inserted in the
middle of an entirely truthful press release announcing that McAfee was joining MGT, as he did.

### III. SUMMARY JUDGMENT SHOULD BE GRANTED TO LADD, AND DENIED TO THE SEC, ON THE § 10(B)(5) AND § 17(A)(2) CLAIMS REGARDING THE MAY 31, 2016 FORM 4

The SEC's claims regarding the May 31, 2016 Form 4 are relics of its apparently abandoned allegations that Ladd's sales of MGT stock in May 2016 was part of a "pump and dump" scheme.  The SEC's initial theory was that Ladd's filing of his Form 4 was "the final step in his and his co-Defendants' fraudulent MGT pump and dump scheme" that "Ladd facilitated [] through his issuance of a materially false May 9, 2016 press release—designed to pump up artificially MGT's stock price."  Dkt. 271, SEC Ltr.  Now that discovery has closed and the SEC has failed to adduce any evidence of a "pump and dump" scheme, let alone one that Ladd participated in, the SEC once again focuses its case on a clerical error, just as for the May 2016 Press Release.  Here, the SEC claims that a footnote in which Ladd misidentified the recipient of MGT shares he no longer possessed was material, but cannot explain why investors would find the identity of the recipient material.  Further, the SEC has adduced no evidence that this error was committed with scienter—and the core point of the statement that MGT shares were disbursed was accurate.

### A. The Form 4 Was Not Materially False

The only allegedly material misstatement the SEC can point to is the fact that the form represents Ladd's sales of MGT stock as a distribution to Laddcap investors for zero consideration.  That footnote was erroneous, since the sale was not in fact a sale to Laddcap investors, and since Ladd in fact received consideration for the sale.  But the difference between selling shares and distributing them for no consideration is immaterial.  As Ladd explained in his deposition, "[t]he net impact to ownership was the same in that the shares were not controlled by

me." Supp. Ford Decl., Ex. 58 (Ladd Tr. 487:10-11).  Nor can the SEC claim that the identity of

the recipients – Laddcap investors, as opposed to other investors – is material because the SEC

has adduced no evidence that investors were aware of the identity of the Laddcap investors.

The Petranis declaration, made by the world's most uninformed investor, that the SEC

cites offers no support for its theory.  The SEC merely cites this declaration for the generic

proposition that "trading by an issuer's officer in the issuer's stock is important to him when he

is deciding to buy or sell that company's stock because it conveys to him what kind of

confidence that officer has in the company's future."  SEC Brief at 39.  This sentiment is

irrelevant because Ladd disclosed the sale of the shares—and the share price continued to rise for

months after the disclosure.  At no point does Petranis claim that the recipient of the shares that

Ladd no longer controls was material to him or would be material to a reasonable investor.

### B. The SEC Adduced no Evidence of Ladd's Scienter in Drafting the May 31, 2016 Form 4

Despite four years of discovery, the SEC still cannot adduce any evidence that Ladd

acted with scienter with respect to the May 31 2016 Form 4.  The SEC merely offers the

conclusory statement that there is no "dispute that Ladd knew that he had not distributed his

shares to his Laddcap investors for no consideration when he reported that he had in his May 31,

2016 Form 4."  SEC Brief at p. 45; SEC 56.1 ¶ 41.  The only support the SEC can adduce here is

a citation to its own 56.1 statement, which cites various Forms 4 but with no reference to Ladd's

deposition or any other evidence.  The SEC's avoidance of the record is understandable, since

the SEC failed to adduce any evidence that Ladd knew this footnote was false.

At his deposition, Ladd explained that the phraseology in the footnote was a mistake.

When the SEC tried to ask him about the amount of shares allocated to Laddcap, Ladd

characterized Form 4 as "so freaking confusing, that [he] would recommend changes in form 4

reporting … ."  Bromberg Decl., Exhibit F (Ladd Tr. 82:-20-22).  Further, Ladd testified that "there's a million things going on in May," aside from the Form 4.  *Id.* at 87:12-14.

The SEC's sole argument about Form 4 is that Ladd should have checked his records before signing the Form 4 and realized it was inaccurate before signing it.  SEC Brief at 45.  But the SEC cites to no evidence about when Ladd checked his records and the extent of his review of his records.  In effect, the SEC is asking the Court to assume scienter from the mere fact that Form 4 was filled out incorrectly, which would negate the scienter requirement entirely. The case the SEC cites here, *Sec. & Exch. Comm'n v. Gallison*, 588 F. Supp. 3d 509, 523 (S.D.N.Y. 2022), does not let the SEC off the hook from having to show scienter beyond merely pointing to an error on a form.  In *Gallison*, as noted above, the court found that an individual knew shares had not been returned to the issuer because he had instructed the issuer's transfer agent to remove restrictive legends on the stock and transfer them to other brokerage accounts. *Id.* at 525.  The SEC can point to no comparable evidence of scienter here.

### IV. SUMMARY JUDGMENT SHOULD BE GRANTED TO LADD, AND DENIED TO THE SEC, ON THE § 10(B)(5) AND § 17(A)(2) CLAIMS REGARDING THE MAY 25, 2016 FORM 144

In the end, the SEC seeks a fundamental shift in the regulation of securities by seeking to redefine the entire standard of materiality through its fraud claim with respect to Ladd's Form 144.  As Ladd established in his opening brief, nothing in Ladd's May 25, 2016 Form 144 would have been material to a reasonable investor.  Ladd Opening Brief at 22-25.  The SEC does not contest this point at all and does not even attempt to argue that this form was material to investors.  Instead, the SEC advances a novel theory of materiality:  that these forms were not material to *investors* but rather to Ladd's *brokers*.   The SEC's attempt to redefine the law in its favor is refuted by decades of precedent.

Finally, the SEC has adduced no evidence that Ladd acted with scienter in connection with this form.  Filing this form is proper when the seller of securities has the intention to make a sale, and there is no evidence suggesting Ladd lacked the intent to do so when filling out the form.

### A.  The May 25, 2016 Form 144 Contains No Material Misstatement

The SEC has effectively abandoned any claim that any purported inaccuracy in the Form 144 was material for investors.  Indeed, plainly it was not since the price of MGT shares continued to rise for months after it disclosed Ladd's stock shares. Instead, the SEC claims that the Form 144 was material for Ladd's broker, TD Ameritrade ("TDA"), because it concealed Ladd's supposed breach of the trading volume limitations.  SEC brief at p. 43.  The SEC's attempt to salvage its claims regarding the Form 144 fails for at least three reasons.

First, the SEC cannot evade the requirement that, to be material, a statement must be material to a reasonable *investor*, not a reasonable *broker*.  The United States Supreme Court has held that "materiality depends on the significance the *reasonable investor* would place on the withheld or misrepresented information."  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) (emphasis added).  *See also IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("A statement or omission is material if there is a substantial likelihood that *a reasonable shareholder* would consider it important in deciding how to act.")  (internal quotation marks omitted) (emphasis added).  This investor-focused standard is consistent with the intent of the Securities Exchange Act of 1934: "to protect investors against manipulation of stock prices."  *Basic Inc.*, 485 U.S. at 230.

If successful, the SEC's attempt to circumvent this limitation of its own enforcement power would dramatically expand the scope of the SEC's authority by allowing it to bring claims based on interactions with brokers that no investor, let alone a reasonable investor, would know

about, let alone find material.  Should the SEC seek such an expansion of its authority, it should respect the separation of powers and do so through the typical political process, including by appealing to Congress to alter the statutory basis for its authority given longstanding Supreme Court precedent on this issue.

Unless and until the SEC does so, the current Supreme Court precedent controls and precludes the claims based on the May 25, 2016 Form 144.  The SEC does not even attempt to cite any controlling precedent that supports the SEC's attempt to expand its authority to alleged misstatements to brokers.  Instead, it cites two district court opinions with inapposite facts, that cannot and do not even purport to alter the existing standard of materiality.

The SEC cites to *SEC v. Greenstone Holdings, Inc.*, where the court held that opinion letters issued to support transfer agent's removal of restrictive legends on stock certificates were material.  No. 10 Civ. 1302 (MGC), 2012 WL 1038570, at *5 (S.D.N.Y. Mar. 28, 2012).   The court noted that "[t]he fact that a statement is made in private—for example, to a transfer agent—rather than to the public does not foreclose a statement's materiality," but emphasized that the opinion letters in *Greenstone* "inform[ed] the transfer agent's decision" to remove the restrictive legend.  *Id.*  The court was clear that the statements could be material because they "may be considered important *by the reasonable investor*."  *Id.* (internal quotation mark omitted and emphasis added).  In other words, reasonable investors care about whether shares can be sold to the public, and since restrictive legends indicate that stock certificates may not be sold to the public, a reasonable investor would care about any opinion letter that would lead to the removal of a restrictive legend.  *Id.*  The other case the SEC cites here, *Sec. & Exch. Comm'n v. Sayid*, No. 17 CIV. 2630 (JFK), quotes similar language from *Greenstone Holdings* and reiterates that an attorney's opinion letter to a transfer agent may material, but only because misrepresentations

in such documents may be considered important by the reasonable investor."  2019 WL 6307367, at *7 (S.D.N.Y. Nov. 25, 2019), *aff'd*, 860 F. App'x 18 (2d Cir. 2021) (internal quotation mark omitted).[18]

At no point did the court suggest that opinion letters that would lead to the removal of a restrictive legend would be material absent any impact on a reasonable investor.  Rather than seeking to overturn established precedent that views materiality from the perspective of a reasonable investor, the court in *Greenstone Holdings, Inc.* affirmed and applied this precedent. Because the SEC cannot show, and does not even attempt to show, that Ladd's purported mistakes in filing the Form 144 (namely, the timing of the filing and the calculation of trading volume) would be material to a reasonable investor's investment decision, the SEC's claims fail.

Second, even if the impact on a broker can by itself be a basis to find the purportedly "false" Form 144 material, the SEC cannot establish any liability for Ladd.  The SEC does not even attempt to claim that the fact that Ladd filed the Form 144 on May 25, as opposed to May 9-12, was material for his broker, TDA.  Thus, no claim that Ladd filed the Form 144 late can be the basis for liability.  Instead, the SEC merely claims that the purportedly incorrect calculation of the applicable volume limitation was material to TDA because it would have revealed that

---

[18] The other sources the SEC cites here are not to the contrary. The SEC cites an out-of-circuit district court case where the court held that misrepresentations regarding market timing activities were material to mutual funds because these activities were contrary to the mutual funds' policies. *S.E.C. v. Druffner*, 517 F. Supp. 2d 502, 508 (D. Mass. 2007), *aff'd sub nom. S.E.C. v. Ficken*, 546 F.3d 45 (1st Cir. 2008).  But a mutual fund is more analogous to a collection of investors than a collection of brokers.  Further, to bootstrap its own views into the law, the SEC cites its own order in an administrative proceeding.  *See also In the Matter of Joseph John VanCook*, SEC Rel. No. 34-61039A, 2009 WL 4026291, at *10 (SEC Nov. 20, 2009).  This order does not support the SEC's position here at any rate, however.  That order stated that the practice of allowing some investors to trade on post-4:00 p.m. information was material to mutual funds and their shareholders, who are just other investors.  *Id.*  At no point did either the orders in *Druffner* or *VanCook* state that state that a statement on a form that investors would not see can be considered material from the perspective of a broker alone.

"Ladd had not complied with Rule 144's volume limitations in his prior sales," which purportedly subjected TDA to Section 5 liability.  SEC Brief at 42.  But the SEC has failed to identify any action (or omission) of the broker that it took (or omitted taking) because of Ladd's calculation of his volume limitations.

As the SEC concedes, under Securities Act Section 4(a)4, brokers have a safe harbor from Section 5 liability for their part in effecting transactions.  SEC brief at p. 40.  To receive this exemption, brokers need only conduct a "reasonable inquiry" to ensure that it is unaware of circumstances showing that the seller "is an underwriter with respect to the securities or that the transaction is a part of a distribution of securities of the issuer."  Rule 144(g).  Regardless of whatever answers Ladd gave TDA, TDA still performed the "reasonable inquiry" that it needs to conduct to be protected by the safe harbor from Section 5 liability under Rule 144(g).  The SEC has not claimed that any answers Ladd gave undermined the reasonableness of TDA's inquiry, and the SEC has not even claimed to be pursuing any enforcement action against any of Ladd's brokers.  Thus, even if liability is possible because information is material to a broker rather than an investor, there would be no liability here.

Lastly, Ladd did not exceed his volume limitations, as noted below in Section VI.

### B.  The SEC Adduced No Evidence of Ladd's Scienter in Drafting the Form 144

Filing a Form 144 is appropriate when an affiliate of an issuer has "a bona fide intention to sell the securities referred to in the notice within a reasonable time after the filing of such notice." 17 C.F.R. § 230.144(h)(2).   The SEC has adduced no evidence that Ladd lacked such a bona fide intention.  Instead, the SEC merely speculates that Ladd must have intended to mislead because he sold all his MGT shares out of that account by May 17, 2016.  SEC Brief at p. 54.

Further, there is a mismatch here between the part of the Form 144 that the SEC claims is materially misleading (the timing of the form and the calculation of the trading volume) and the action that the SEC claims was intentional (stating his intent to sell shares when he already sold the shares previously).  The SEC has no evidence that Ladd knew or should have known that the Form 144 was due to be filed on the same date as the May 9-12 trades.  As noted above, if the SEC claims that Ladd filed the Form 144 on the wrong date, or using the wrong date for the trading volume calculation, this "mistake" is the result of the language of the rule itself, which requires that Ladd file the form "concurrently" with a sale rather than on any specific date.

## V. SUMMARY JUDGMENT SHOULD BE DENIED TO THE SEC REGARDING THE NEW ACCOUNT FORM

The SEC continues its campaign of moving for summary judgment based on typos by elevating clericals errors on the New Account Form Ladd submitted to E*Trade on November 22, 2015.  In this form, Ladd mistakenly described his "Occupation" as "Retired," and answered "No" to the question: "Director, or policy-making office of publicly-owned company?" He also left blank the information under "Employer."  Bromberg Decl., Ex. E.  But the SEC's attempt to elevate these clerical errors into securities fraud suffers from the same flaws as the SEC's other fraud claims:  it cannot prove materiality or scienter.  Thus, were the Court inclined to grant summary judgment with respect to this form, it should do so for Ladd under FRCP 56(f).

### A.  The SEC Cannot Show that the Supposed Misstatements were Material.

The SEC claims that the false information in the new account form was material because, if Ladd revealed that he was an affiliate of MGT, E*Trade would have required him to submit a Form 144 in connection with his sales in May 2016, and that that would have purportedly revealed Ladd's trading in excess of the applicable volume limitations.

The SEC's theory for materiality for the new account form is a regurgitation of its other attempts to expand materiality for its benefit and should be rejected for similar reasons.  <u>First</u>, the SEC's attempt to recast the reasonable broker, rather than the reasonable investor, as the central figure for determining materiality fails for the reasons stated above in Section IV.  Since no investor, let alone a reasonable investor, would have seen this form, no error in the new account form can be considered material.

<u>Second</u>, as also noted above in Section IV, brokers only have an obligation to conduct a reasonable inquiry under Rule 144(g).  The SEC has not even claimed that the new account form fails to ask the right questions of Ladd, and the fact that a broker does not receive accurate information in response to an inquiry does not make the inquiry unreasonable.

<u>Third</u>, Ladd did in fact submit a Form 144 in connection with the sales from May 2016, and did not in fact exceed his volume limitations, as noted below in Section VI.

## B.  The SEC has Adduced no Evidence of Scienter.

The SEC has adduced no testimony or other evidence suggesting that Ladd filled out this form incorrectly with scienter.  Thus, the SEC cannot rule out other potential explanations for why he filled out the new account form incorrectly, including the possibility that he intended for his parents – who were retired – to use the account.  Also, the plain language of the form suggests that he was not trying to mislead anyone.  In the form, Ladd stated that he receives $100,000 to $200,000 in annual income, which is high for a retired person.  If Ladd wanted to give the impression that he was retired, he would not have listed having such a high income.

## VI.   SUMMARY JUDGMENT SHOULD BE DENIED TO THE SEC ON ITS SECTION 5 CLAIMS

The SEC's attempt to obtain summary judgment on its Section 5 claim all results from its overly restrictive interpretation of one word, "concurrently," in a regulation that requires a Form

144 to be filed "concurrently" with a sale of securities.  The SEC interprets a regulation's reference to this form being filed "concurrently" with sales to mean it must be filed on the same day as these sales.  The SEC offers no support for its interpretation besides its own *ipse dixit*. The SEC's attempt to reshape the law in its favor should be rejected.

Further, the SEC attempts to include Ladd's parents' sales as his own for purposes of calculating his trading volume under this regulation.  Even if there were sufficient evidence for the SEC to establish that Ladd controlled his parents' account – there is not – that would not matter, since Ladd still would not exceed the permitted trading volume.   Since the SEC's claims fail as a matter of law, no trial is necessary.  Were the Court inclined to award summary judgment, such judgment would be appropriate under FRCP 56(f) for Ladd, even though Ladd did not initially move for summary judgment on this claim.

### A.  The May 26, 2016 Form 144 was Timely and Ladd Calculated the Volume Limitations Correctly

Under 17 CFR § 230.144(e)(1)(ii)(h)(3), an affiliate of an issuer must file a Form 144 "concurrently" with the placing of an order for the sale of securities with a broker to benefit from a "safe harbor" from the requirement to register the sale of securities.  Further, under 17 CFR § 230.144(e)(1)(ii), the total sales of the affiliate of an issuer over the preceding three months cannot exceed, among other things, the average weekly reported trading volume of the issuer's stock over "the four calendar weeks preceding the filing of" Form 144.

As an affiliate of MGT, Ladd filed a Form 144 in connection with sales of MGT stock from May 9-12, 2016.[19]  Docket 243-3.  Since he filed the Form 144 on May 25, 2016, he used

---

[19] Since he filed this Form 144, the SEC's reference to *Sec. & Exch. Comm'n v. Blackburn,* No. CV 15-2451, 2020 WL 565551, at *7 (E.D. La. Feb. 5, 2020), does nothing to advance its position that Ladd cannot claim the benefit of filing Form 144 since he did not file it on the same

May 25, 2016 as the date when calculating the "four calendar weeks' preceding the sale.  Ladd

brief at p. 22, n.10.  The SEC does not dispute that, when calculating the four weeks from May

25, 2016, Ladd did not exceed the trading volume limitation.

The SEC claims that Ladd does not obtain the benefit of the Form 144, and thus the safe

harbor, for two related reasons:  he did not file the form "concurrently" with his May 9-12, 2016

sales of MGT shares and he calculated the trading volume limitation based on date he filed the

Form 144, which was not the same day as the day of the underlying sales.  SEC Brief at 30-31.

But there was nothing wrong with Ladd using May 25, 2016 as the date of filing the Form 144

and the date to use when calculating past trading volume.

The SEC's argument relies on the assumption that when 17 CFR § 230.144(e)(1)(ii)(h)(3)

required a Form 144 to be filed "concurrently" with a sale, the form must be filed at the same

day as the form.  SEC Brief at 29-30.  But the regulation does not define "concurrently" as "the

same day."  This regulation even suggests that the word "concurrently" is meant to be construed

broadly, as it only requires that the person filing this notice have a "bona fide intention" to sell

the securities "within a reasonable time after the filing of such notice."  The use of the phrase

"reasonable time" suggests that the time period is flexible, and not fixed at any specific date.  If

the SEC seeks to define "concurrently" to mean "on the same day" then it should seek the

amendment of the rule and not retroactively impose a new and more restrictive interpretation via

litigation, and then impose this new rule on Ladd without any notice of the change.

The only support the SEC cites for its interpretation of "concurrently" as 'the same day"

as the sale is a citation to the SEC's only website.  SEC Brief at 29-30 (citing *SEC Rule 144*

---

day as the sales.  SEC Brief at p. 30.  In *Blackburn*, the defendant could not claim the benefit of
filing a Form 144 because he did not file a Form 144 at all.  *Blackburn*, 2020 WL 565551, at *7.

*Compliance and Disclosure Interpretation*, http://sec.gov/corpfin/securities-act-rules, at

Question 136.09) (last updated Nov. 6, 2017)).  The relevant portion should be quoted in full:

> Question: Rule 144(h) provides that the Form 144 shall be transmitted for fili"g "concurrenly" with either the placing of a sale order with a broker or the execution of the sale directly with a market maker. Does "concurrently" mean that the Form 144 should be transmitted for filing on the same day as the placing of a sale order or the execution of the sale?

> Answer: Yes. For example, if a person is filing a Form 144 by mail, he or she meets the requirements of Rule 144(h) if the Form is mailed on the same day as the placing of a sale order or the execution of the sale. The envelope should be addressed to the Commission's Office of the Secretary. [Mar. 4, 2011]

*Id.*  This one-word conclusory response ("Yes.") offers no explanation for why

"concurrently" should be read as "the same day" rather than allowing flexibility to file the Form

144 within a reasonable time after the sale.[20]  The SEC's stance is only defensible if it seeks for

the Court to just defer to its *ipse dixit*, despite the SEC's failure to defend its stance.  To the

extent that is the SEC's position, it is inconsistent with established law and should be rejected.

There are some circumstances where a court should defer to agency interpretations of

regulations, but these circumstances are not present here.  This deference – often referred to as

"*Auer* deference," in light of *Auer v. Robbins*, 519 U.S. 452 (1997) – only applies when there is

(1) a genuinely ambiguous regulation (2) that implicates an agency's substantive expertise and

(3) that the agency actually interprets by taking an "authoritative or official position, rather than

any more ad hoc statement" using (4)  "fair and considered judgment," rather than a "convenient

---

[20] The SEC's assertion that "Ladd admits that he was aware of this requirement at the time" mischaracterizes Ladd's testimony.  SEC Brief at 29-30.  Ladd merely testified that he was aware he had to file a Form 144 "contemporaneously with—or before" sales of MGT shares. Brown Decl., Ex. F (Ladd Tr. 63:5-7).  The SEC offers no explanation for why "contemporaneously" is more likely to mean "same day" than "concurrently."

litigating position" or a position that "creates unfair surprise to regulated parties." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-19 (2019) (internal quotation marks omitted).

The SEC's *ipse dixit* does not meet any of these conditions. Here, the word "concurrently" is not by itself ambiguous. Instead, it deliberately sets forth a flexible standard for when to file the Form 144. Further, the interpretation of the word "concurrently" does not implicate the SEC's expertise in securities laws. The SEC is in no better interpretation than the Court to interpret the word "concurrently." There is also no indication that the SEC's website reflects the views of the SEC's Commissioners or otherwise reflects the views of SEC leadership, such that it can be considered a fair and considered judgment of the SEC. Finally, the SEC here is taking a convenient litigating position that allows it to bring enforcement actions against anyone who does not file a Form 144 on the same day as a trade. Aside from the conclusory reference on the SEC's website, there is no notice to regulated parties that they can be subject to an enforcement action just by filing a Form 144 the day after the conduct a trade. Were the Court inclined to view *Auer* deference as applicable here, it should decline to follow *Auer* entirely, which should be overruled for the reasons stated by Justices Gorsuch and Kavanaugh in *Kisor*, *id.* at 2424-49 (Gorsuch, J., and Kavanugh, J., concurring).

**B. Section 5 Liability for Ladd Cannot be Premised on Ladd's Parents' Stock Sales**

In the same week that Ladd made his MGT stock sales from his E-Trade account, his parents sold 340,000 shares of MGT. To inflate the amount of the sales for purposes of the volume limitations, the SEC attempts to include sales from Ladd's parents' account as Ladd's sales because Ladd had trading authorization over the account. SEC Brief at 31.

The Court has already rejected the SEC's claim that Ladd's trading authorization over his parents' account shows that he controlled it. *Sec. & Exch. Comm'n v. Honig*, No. 18 CIV. 8175

(ER), 2021 WL 276155, at *15 (S.D.N.Y. Jan. 27, 2021) ("[T]he SAC does not set forth ... authority showing that such power of attorney is sufficient to constitute "control" as a matter of law.").  The SEC has still failed to cite any authority supporting its contention that this authorization is sufficient to show that he controls the account, and its brief does not even acknowledge that the Court has already rejected this claim.  Nor has the SEC put forth any explanation to challenge the only reasonable inference for Ladd's trading authorization: given Ladd's parents' advanced age – they were in their late 80s by 2015, SAC 56.1 ¶ 22 – they allowed Ladd to use the TDA website on their behalf, rather than learning the interface themselves. The SEC's attempt at a second bite at the apple to aggregate Ladd's sales with those of his parents is based on assuming Ladd's parents' decision to share their gains with their son shows Ladd's purported "control" of the account.  But Ladd explained during his deposition that his parents gave him some money around the time of the sales to assist him with a mortgage payment or similar financial obligations.  Brown Decl., Ex. F (Ladd Tr. 131:1-9).  This was not a gift, he explained, but rather a loan against future inheritances, and Ladd did not pay taxes on it. *Id.* at 134:4-12.[21]  The fact that Ladd's parents were willing to share their inheritance with him, and provide it in the form of an advance, does not mean he controlled their account, either directly or indirectly.  During the deposition, Ladd rejected the SEC's insinuation that he used a "circuitous path" to obtain money from the sale, and explained that he had no memory of asking TDA to transfer money to him directly rather than using his parents' account.  *Id.* at 130:1-25.

---

[21] The circumstances here are distinct from those of the case the SEC cites here, *SEC v. Sierra Brokerage Servs.*, 712 F.3d 321, 329-330 (6th Cir. 2013).  In that case, when determining the overall sales under Section 5, the court aggregated an individual's sales with 33 other individuals over whom he held stock powers.  *Id.*  The court provided no indication that these individuals shared the kind of intimate familial relationship that Ladd did with his parents.

Further, even if Ladd's parents' sales were aggregated with his own, he would still not have exceeded the applicable volume limitations.  As explained in Ladd's opening brief, Ladd's trading volume was permissible as long as it did not exceed the average weekly trading volume for the four-week period preceding May 25, 2016, which was 122,111,628.  Ladd Opening Brief at p. 22, n.10.  His parents sold 340,000 MGT shares, whereas Ladd sold 435,000 MGT shares, leading to a total of 775,000 – which is still well under 122,111,628.

## VII. SUMMARY JUDGMENT SHOULD BE DENIED TO THE SEC REGARDING THE SECTION 13(d) AND RULE 13d-2 CLAIMS

Under Exchange Act Section 13(d) and Rule 13d-2, persons who beneficially owns over 5% of a company must report the purchase or sale of 1% or more of this company's stock. Beneficial ownership requires "1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, 2) Investment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3.

The SEC claims that Ladd should have reported the change of his MGT ownership from 5.67% to 6.9% from June to October 2015, SEC Brief at 34; Tong. Decl. ¶ 31, but the SEC's claims are based on two baseless assumptions.  First, the SEC calculates the total shares as of October 2, 2015 using the shares from November 4, 2015, but with no evidence that the number of outstanding shares was the same on both days.  Tong. Decl. ¶ 31.  Second, the SEC approximately doubles the number of Ladd's shares by combining his shares with Laddcap's.  *Id.* But the SEC has adduced no evidence about Laddcap's distribution of voting or investment power.  It has not cited to any Laddcap governing documents, let alone evidence that Ladd has such control over Laddcap that he may be deemed the beneficial owner of Laddcap's shares.

47

**CONCLUSION**

For the foregoing reasons, Ladd respectfully requests that the Court grant the Ladd

Motion and deny the SEC Motion in its entirety.

Dated: March 18, 2023

<div style="margin-left: 50%;">

Respectfully submitted,

FORD O'BRIEN LANDY LLP

 /s/ Adam Ford
Adam C. Ford
Anjula S. Prasad
Arthur Kutoroff
275 Madison Avenue
24th Floor
New York, New York 10016
*aford@fordobrien.com*
(212) 858-0040

*Attorneys for Defendant Robert Ladd*

</div>