# EXHIBIT 56

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION, )

                Plaintiff,       )

v.                            ) Case No.

BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)

MAZA, BRIAN KELLER, JOHN H. FORD,   )

GRQ CONSULTANTS, INC., AND HS       )

CONTRARIAN INVESTMENTS, LLC,       )

              Defendants.     )

_____)

VOLUME 1

VIDEOTAPED DEPOSITION OF ARTHUR MARCUS

VIA VIDEOCONFERENCE

Tuesday, June 21, 2022

Diversified Reporting Services, Inc.

(202)467-9200

```
 1         UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE COMMISSION, )
 5                   Plaintiff,         )
 6  v.                                  ) Case No.
 7  BARRY C. HONIG, ROBERT LADD, ELLIOT ) 18 Civ. 8175(ER)
 8  MAZA, BRIAN KELLER, JOHN H. FORD,   )
 9  GRQ CONSULTANTS, INC., AND HS       )
10  CONTRARIAN INVESTMENTS, LLC,        )
11                   Defendants.        )
12  _____)
13
14
15          Videotaped deposition of Arthur Marcus,
16  taken on behalf of the Plaintiff, all parties appearing
17  remotely via Webex, beginning at 10:03 a.m. EST and
18  ending at 1:25 p.m. EST, on Tuesday, June 21, 2022.
19
20
21
22
23
24          Diversified Reporting Services, Inc.
25                  (202)467-9200
```

```
                                                         Page 3
 1   APPEARANCES:

 2

 3   On behalf of the Securities and Exchange Commission:

 4        JACK KAUFMAN, ESQ.

 5        NANCY BROWN, ESQ.

 6        100 Pearl Street

 7        New York, New York

 8

 9   On behalf of the Witness:

10        SAMEER RASTOGI, ESQ.

11        Sichenzia Ross Ference

12        1185 Avenue of the Americas, 31st Floor

13        New York, NY 10036

14        212-930-9700

15

16        ADAM FORD, ESQ.

17        ANJULA PRASAD, ESQ.

18        Ford O'Brien Landy LLP

19        275 Madison, Floor 24

20        New York, NY 10016

21        212-858-0040

22

23   Also Present:

24        Robert Ladd

25
```

1  transaction?

2      A    He was kind of a go-between, my

3  understanding was.

4      Q    **Between who and who?**

5      A    Between Barry Honig, who was the lead

6  investor, and with company.

7      Q    **And when you say a go-between, was -- I**

8  **mean I asked you this before but was he representing Mr.**

9  **Honig on the transaction?**

10     A    Not to my knowledge.

11     Q    **What does a go-between mean then?  I'm just**

12  **trying to understand.**

13     A    The general -- he had the contact, so I

14  didn't pick up the phone and called Mr. Honig or there

15  were only people were have to sit in bed.  You know,

16  Harvey -- it was easy for Harvey to try and get that

17  information, I guess.

18     Q    **Did you understand Mr. Honig -- did he**

19  **convey this information to you to have Mr. Honig's --**

20     A    Mr. Honig didn't convey the information to

21  me.

22     Q    **I'm sorry.  When Mr. Kesner conveyed this**

23  **information to you, was he acting mostly in the interest**

24  **of MGT?  Or was he acting in the interest of Mr. Honig?**

25     A    I don't know.  I'd have to speculate.

Page 52

1      **Q      Why is it that you would have to speculate?**

2      A      It's what his reasoning was for being --I

3      don' have any information as to why he was acting as

4      that, so no.

5      **Q      But -- I mean, it sounds like you're saying**

6      **that he may have been acting in the interest of Mr.**

7      **Honig as opposed to MGT. I'm just trying to understand.**

8             MR. FORD:  I don't think that's what he

9      said.

10     A      I don't think that's the case either.  He

11     had familiarized with the lead investor and had a -- was

12     able to call him on the phone, and get information, and

13     get responded to.  So that -- he was the one who acted

14     as what I call the go-between.

15     **Q      So are you saying that Mr. Kesner law --**

16     **you're saying that he was not conflicted in any way.  Is**

17     **that -- is that your testimony in providing this sort of**

18     **information to you?**

19            MR. FORD:  I'm going to object to the form

20     of that.  It's not --

21            MR. KAUFMAN:  Let me rephrase it.

22     **Q      Was Mr. Kesner conflicted in any way in**

23     **providing this information?**

24     A      It's not my -- I'm not an ethics teacher

25     like that.  I don't have -- was he conflicted or not?  I

Page 65

1      A    Yeah, I'm just trying to find -- before it
2    was much louder.  I haven't been on one of these calls
3    with this service.
4           MR. KAUFMAN:  Why don't we go off the
5    record for a second while Mr. Marcus figures that out.
6           (Whereupon a discussion was held off the
7    record.)
8      **Q    Mr. Marcus, I think you said you understood**
9    **that Mr. Kesner had worked on other matters involving**
10   **Mr. Honig.  Is that right?**
11     A    Correct.
12     **Q    And did you know that Ms. Guarneri-Ferrara**
13   **had also worked on other matters involving Mr. Honig?**
14     A    At what time?
15     **Q    At this time in October 2012, did you know**
16   **that?**
17     A    I knew she had worked for Mr. Kesner.  I
18   didn't know who exactly she'd worked for.
19     **Q    And had you known at that time that Mr.**
20   **Honig had been involved in buying and selling stock of**
21   **other issuers together with the same group or a similar**
22   **group of investors, would that have affected your**
23   **analysis under 13(d) for the 5 percent requirement?**
24     A    I'm not sure because these deals all have
25   similar investors in them.  Like I said, I never knew

1  this group, but I had dealt with Iroquois in the past

2  and maybe -- and Hudson Bay but not -- so I don't know

3  that it would have.

4      **Q    Well would it have been something you would**

5  **have wanted to take into account in analyzing the 13(d)**

6  **group issue?**

7      A    Perhaps.

8      **Q    And why is that?**

9      A    Just to see if there was a pattern of all

10  these investors investing together.  But again, I don't

11  know how much I would have taken into it because you

12  know, even today half these deals all still have the

13  same investors in them.  And I don't mean these

14  investors.  I mean, there are certain people that are in

15  every deal.

16      **Q    What deals are you referring to?**

17      A    To every deal that I do today, every

18  underwritten offering, if you looked at the syndicate,

19  which we don't get into very often, but if you look at

20  who the investors actually are, you know, the same

21  people participate --

22      **Q    You just -- you just cut out.  Sorry, you**

23  **said the same people?**

24      A    Ah, the sound came back when I cut out.

25  That was great.  I said you get the same type of

1  investors all the time today.  Not these investors, but

2  it's not unusual for the same investors to invest in

3  deals.  There's a limited audience of these investors

4  and they all seem to pop up in the deals.

5      Q    **And do they invest together and also sell**

6  **at the same time?**

7      A    Not to my knowledge.  Just invest.  And

8  again, not together.  They invested in the same

9  transactions.

10     Q    **But in this transaction, did you understand**

11 **that Mr. Honig was investing together with others?**

12     A    No.

13     Q    **Was Mr. Honig represented by counsel in**

14 **this transaction?  The 2012 financing.**

15     A    Not to my knowledge.

16     Q    **And so you're saying -- well, let me ask**

17 **you on the investors side -- withdrawn.  Were there**

18 **negotiations over the 2012 financing?  The terms of the**

19 **financing.**

20     A    Yes.

21     Q    **And who were the negotiations between?**

22     A    I guess the investors.

23          MR. RASTOGI:  Don't guess.

24     A    Then --

25     Q    **One side of the transaction was MGT. Right?**

```
                                              Page 76
 1        A     You're talking about in 2012?  Or --
 2        Q     No, 2015.
 3        A     Sorry, 2015.
 4        Q     No, that's fair.
 5        A     In 2015, did I know anything about Mr.
 6   O'Rourke?  Not particularly, no.  I remember --
 7        Q     What about Michael -- What about Michael
 8   Brauser?
 9        A     Mark Groussman, his name.  Right?
10        Q     Mark Groussman, that's right.  Right.  And
11   now I'm asking you about Michael Brauser.  Does that
12   name ring a bell?
13        A     It does now, but it didn't, I don't think,
14   then.  But yes, I know who --
15        Q     How did you come to hear of Mr. Brauser?
16        A     I don't recall.
17        Q     Did you -- do you recall any of those
18   individuals being involved with investors in the 2012
19   financing?
20        A     I don't recall, but I could look at the S-1
21   if there was one.
22        Q     Is the fact that if they were involved in
23   the 2012 financing, would that affect your view as to
24   whether now, in 2015, they're involved in this
25   financing, Mr. Honig is acting or might be acting as a
```

Page 77

1   group for Section 13(d) purposes with others?  Is that
2   something you would have wanted to know?
3       A    Not particularly really.  Not by itself
4   certainly.
5       Q    I'm sorry?  Not by --
6       A    Just that fact, no.  As I said, you know,
7   if you look at all these deals, they always have certain
8   investors are in every transaction.
9       Q    But would that at least be a factor you
10  would want to know?  That there was the same investors
11  involved in different transactions?
12      A    Not particularly.
13      Q    Well would you want to -- would that lead
14  you to ask other questions?
15      A    Not particularly, no.
16      Q    Just give me a second.  Let me just go off
17  the record for a second.
18           (Whereupon a discussion was held off the
19  record.)
20      Q    Mr. Marcus, were you aware with respect to
21  the 2012 financing that one of the conditions of the
22  financing was that MGT used $300,000, one of Honig's
23  conditions, that the company use $300,000 to promote
24  MGT?
25      A    I don't have a recollection of that.

```
 1              PROOFREADER'S CERTIFICATE
 2
 3  In the Matter of:    18 Civ. 8175(ER)
 4  Witness:             Arthur Marcus
 5
 6  Date:                Tuesday, June 21, 2022
 7  Location:            New York, New York
 8
 9          This is to certify that I, Christine Boyce,
10  (the undersigned), do hereby certify that the foregoing
11  transcript is a complete, true and accurate transcription
12  of all matters contained on the recorded proceedings of
13  the investigative testimony.
14
15
16  _____      _____
17  (Proofreader's Name)              6-24-2022
18
19
20
21
22
23
24
25
```

Page 102

1            REPORTER'S CERTIFICATE

2

3   I, Michael Leichter, reporter, hereby certify that the

4   foregoing transcript is a complete, true and accurate

5   transcript of the testimony indicated, held on 6/21/22,

6   at New York, New York, in the matter of:

7   LH FINANCIAL.

8

9   I further certify that this proceeding was recorded by me,

10  and that the foregoing transcript has been prepared

11  under my direction.

12            6-24-2022

13

14

15

16

17

18

19

20

21

22

23

24

25