UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION

                           Plaintiff,                       Case No. 1:18-cv-08175-ER

v.

BARRY C. HONIG,
*et al.*

                           Defendants.
-------------------------------------------------------------x

## DEFENDANT ROBERT LADD'S RESPONSE TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO LADD'S CIVIL RULE 56.1(a) STATEMENT PURSUANT TO CIVIL RULE 56.1(d)

     Defendant Robert Ladd respectfully submits this response to the portion of Plaintiff Securities and Exchange Commission's ("SEC") Response to Defendant Ladd's Local Civil Rule 56.1(a) Statement Pursuant to Local Civil Rule 56.1(d) that includes statements of additional material facts that the SEC claims preclude Ladd's Motion for Partial Summary Judgment (the "Ladd Motion"), which was filed under docket number 320.  Ladd submits this response separately from his response to the SEC's other 56.1 statement, which was filed under docket number 323.

**A. Honig, Groussman and Stetson Acted in Concert in Connection with Their 2012 MGT Investment[1]**

70. By November 30, 2012, Barry Honig, Mark Groussman, through his entity, Melechdavid, Inc. ("Melechdavid") and John Stetson, through his entity, HS Contrarian Investments, LLC ("HSCI"), held collective beneficial ownership of more than 12% of the MGT common stock (based on the total outstanding shares MGT reported as of that date.). (Brown Decl., Ex. A (MGT November 30, 2012 S-3) at 8, 11 and nn. 4, 5, 6, 7, 12 n. 16; Tong Decl. ¶ 40).) HSCI was a fund that Stetson nominally controlled, but in which Honig was the primary equity holder. (*See* Brown Decl., Ex. B (Stetson December 7, 2011 email to Honig attaching HSCI Balance Sheet and noting Honig's equity [SD-SEC-(18Civ8175)-124668]).) Although Honig, Groussman and Stetson were acting as a group under Section 13(d)(3), MGT's November 30, 2012 Form S-3 did not aggregate the shareholdings of Honig, Groussman and Stetson, but listed their holdings individually. (Brown Decl., Ex. A.) Had it done so, the group's holdings would have amounted to 923,534, or 12.8% of MGT's outstanding common stock. (Tong Decl. ¶ 40.)

**Ladd's Response:**  Disputed.  Disputed that Honig, Groussman and Stetson were acting as a group under Section 13(d)(3).  This is a legal conclusion, not a fact.  For the reasons set forth in the memoranda of law in support of the Ladd Motion, Ladd disputes that that Honig, Groussman and Stetson were acting as a group under Section 13(d)(3).  Disputed that the email reflected in Exhibit B to the Brown Declaration (the "Brown Decl.") shows that Stetson only nominally controlled HSCI, but undisputed that this email shows that, as of December 7, 2011, Honig invested in HSCI.  Disputed that MGT had any obligation to aggregate the shares of Honig, Groussman, and Stetson in the Form S-3 reflected in Exhibit A to the Brown Decl.

---

[1] Ladd includes these titles from the SEC's own 56.1 statement for reference only.  To the extent any title can be construed as a statement of material fact, it is disputed.

Ladd provides these responses in connection with the parties' briefing on summary judgment and not for all purposes in this action. To the extent Ladd does not dispute a particular fact, Ladd does not thereby concede that any such undisputed fact constitutes a material fact, that the cited evidence is relevant, or that the cited evidence would be admissible at trial.  To the extent Ladd does not dispute the fact that a witness testified to a particular fact or assertion, or included a particular statement in a declaration, Ladd does not thereby concede that the witness is credible on that topic or that the statement is accurate or admissible.

71. Honig, Groussman and Stetson acquired their MGT holdings in an October 2012 MGT offering. Honig initiated that transaction in a June 20, 2012 email to Ladd in which he wrote:

I will be in NY next week[.] lets meet. Before then I would like you to think about how much money my group can come in with. I think $1,500,000 would be cool. It would be 3-4 investors including myself.

(Brown Decl., Ex. C [SEC-FBI-E-0045334].)

**Ladd's Response:** Undisputed that Honig sent this email. Disputed that this email shows that

Honig initiated an investment that occurred later in the year and involved other investors whom

Honig did not identify by name in this email, or any suggestion that this email is evidence that

Honig and others were investing as a group.


72. As finally structured, the October 2012 financing resulted in MGT issuing 1,380,362 units, consisting of one convertible preferred MGT share, and a 5-year warrant exercisable for two shares of MGT common stock at $3.85 per share, for total proceeds to the company of about $4.5 million. (Brown Decl., Ex. D (MGT October 26, 2012 Form 8-K).)

**Ladd's Response:** Undisputed.

73. It also included a registered direct offering of 453,942 shares of MGT common stock at $3.00 a share. (Brown Decl., Ex. E (October 12, 2012 Term Sheet [SEC-Sichenzia-E- 0020725-26]).)

**Ladd's Response:** Undisputed.

74. Honig led the negotiations for the investment on behalf of all of the investors but two of them: Hudson Bay Master Fund Ltd. ("Hudson Bay") and Iroquois. Hudson Bay had been an earlier investor in MGT. (Brown Decl., Ex. A (MGT November 30, 2012 Form S-3) at 11 n. 12.) After a series of emails between Honig and Ladd on the terms, Honig had Stetson sign and send a term sheet to Ladd on October 12, 2012. (*Id.*, Ex. F (Ladd and Honig October 11, 2012 email exchange re terms of the deal [Ladd-MGT-00002330-32]); *id.*, Ex. G (Ladd and Honig October 11, 2012 exchange re term sheets [Ladd-MGT-00002274-75]); *id.*, Ex. E (Stetson October 12, 2012 email to Ladd with fully executed term sheets for both the private placement and the registered direct [SEC-Sichenzia-E-0020720-26]).) Later, whenever Hudson Bay or Iroquois sought terms in the final documentation with which Ladd disagreed, Ladd turned to Honig to resolve the dispute. (*Id.*, Ex. H (Ladd October 14-15, 2012 email exchange with Kesner re "early money" demand for ratchet provision; Ladd responds: "Just had breakfast with BH. He agrees: ROFR on any financing, including dilutive. But no ratchets." [Ladd-MGT- 00077699-700]); *id.*, Ex. I (Ladd October 17, 2012 email to Kaplowitz responding to comments Honig was passing on for Iroquois on deal documents: "Barry needs to deal with Iroquois on this" [MGT-SEC-2022-

006042]); *id.*, Ex. J (Ladd October 19, 2012 email to MGT CFO, Traversa: "Barry just said to me to stay out of it. The animals are just baiting me. He will 'take care of it.'").)

**Ladd's Response:**  Disputed in part and undisputed in part.  Undisputed that Honig did not lead the negotiations for Hudson Bay and Iroquois but disputed that Honig led the negotiations for any other investors.  The emails cited in Exhibits F, G, and E to the Brown Decl. do not show that "Honig had Stetson sign and send a term sheet to Ladd on October 12, 2012."  Stetson is only included on one of those three emails, Exhibit E, and in that email he attached a term sheet he signed with no indication that Honig caused him to sign the document.  The emails cited in Exhibits H, I, and J do not show that "whenever Hudson Bay or Iroquois sought terms in the final documentation with which Ladd disagreed, Ladd turned to Honig to resolve the dispute." These isolated emails do not necessarily reflect any general tendency for Ladd to turn to Honig "whenever" Hudson Bay or Iroquois disagreed with Ladd.  Even with respect to these specific disagreements addressed in the emails, these emails include references to separate negotiations with Honig and Iroquois but do not show that either investor was a negotiating on behalf of another.

75. It was also Honig who determined who (apart from Hudson Bay and Iroquois) would get to participate in the investment alongside him and at what levels. (Brown Decl., Ex. K (Honig October 21, 2012 email to Ladd with investor list for both the registered direct and the convertible preferred offerings).) In that email, Honig wrote: "Below is the investor list for the preferred and the R[egistered] D[irect]," and listed the investors by the investor's name, the investor's contact information, and the allocation of the particular offering in which the investor was participating. (*Id.*) Suzanne Adams and Jill Strauss were both listed as "Hunter Adams" contacts. (*Id.*) Hunter Adams was Honig's cousin. (*Id.*, Ex. L (Kesner Tr. 139:20-140:3).) Ron Low (spelled "Lowe" by Honig) was listed as a contact of Jonathan Honig, and Jonathan Honig was listed himself as a participant in the registered direct offering, (*Id.*, Ex K.) Jonathan Honig is Honig's brother. (*Id.*, Ex. L (Kesner Tr. 58:24-59:1).) Ladd testified that Honig "chooses those people to invest with him." (*Id.*, Ex. M (Ladd Tr. 358:4-13).)

**Ladd's Response:**  Disputed.  Disputed that Honig determined who invested alongside him and at what levels.   The email reflected in Exhibit K. to the Brown Decl. merely includes a list of

investors with no indication of what, if any, role Honig had in in determining which investors

invested and at what level.  Undisputed that Ladd so testified, but Ladd also clarified in the next

sentence that he means they "all invest with the common subscription agreement."  (Ex. M (Ladd

Tr. 358:4-13).).  Undisputed that Kesner testified Hunter Adams is a "distant cousin or relative of

Barry Honig."  (Ex. L (Kesner Tr. 139:20-140:3).).  Undisputed that Kesner testified that, as far

as he's known, Jonathan Honig is Barry Honig's brother.  (*Id.* at 58:24-59:1.)  Undisputed that

Suzanne Adams and Jill Strauss were both listed as Hunter Adams contacts in the email reflected

in Exhibit K to the Brown Decl.  Undisputed that, in this email, Ron Low (spelled "Lowe" by

Honig) was listed as a contact of Jonathan Honig, and Jonathan Honig was listed himself as a

participant in the registered direct offering.

76. Honig and Stetson worked out of the same office in Florida, and Stetson worked for Honig.
(Brown Decl. Ex. M (Ladd Tr. 18:4-14); *id.*, Ex. N (Perlman Tr. 24:1-8); *id.*, Ex. O (Guarneri-
Ferrara Tr. 14:20-15:3).) Groussman also had a desk in Honig's offices, and was a long-time
Honig family friend. (*Id.*, Ex. L (Kesner Tr. 57:6-11).) Groussman and Stetson (or their entities),
and Jonathan Honig (or his entity) were all frequent co-investors with Honig and/or his entities.
Declaration of Stephen Johnson, executed January 30, 2023 ("Johnson Decl."), Ex. D (showing
the issuers in which Honig, Brauser, Groussman, Stetson, O'Rourke and Jonathan Honig all had
investments at or around the same time); *see also id.*, Ex. L (Kesner Tr. 59:25-60:13).) Brauser
(and/or his entities) had investments in over 40 of the same issuers as Honig (and/or his entities)
between 2011 and 2018. In that same period, Stetson (and/or his entities) had investments in over
65 of the same issuers as Honig (and/or his entities); Groussman (and/or Melechdavid) had
investments in over 35 of the same issuers as Honig (and/or his entities); and O'Rourke (and/or
ATG) had investments in over 70 of the same issuers as Honig (and/or his entities). (Johnson
Decl., Ex. D.) The five of them—Brauser, Groussman, Stetson and O'Rourke—were invested
together in 19 separate issuers during that same period. (*Id.*)

**Ladd's Response:**  Disputed that Honig and Stetson worked out of the same office at all times

as the statement is written. Undisputed that the testimony reflected in Exhibits M, N, O, and L

reflects the understanding of Ladd, Perlman, Guarneri-Ferrara, and Kesner about the

relationships among Honig, Stetson, and Groussman.  Undisputed that these individuals (Honig,

Brauser, Groussman, Stetson and O'Rourke) invested in other deals together.  Marcus also

testified that "even today half these deals all still have the same investors in them … there are certain people that are in every deal."  Declaration of Adam C. Ford in Support of Defendant Robert Ladd's Motion for Partial Summary Judgment ("Ford Decl."), dated November 21, 2022, filed under docket number 310, Ex. 8 (Marcus Tr. 66:9-15.)

77. MGT looked to Honig and Stetson for the information necessary to effect the purchases by each investor in the offerings (other than Hudson Bay and Iroquois). (Brown Decl., Ex. P (Guarneri-Ferrara October 23, 2012 email to Kesner (and forwarded to Ladd), telling him that she cannot keep separate escrow accounts for each offering because "I would have no idea who is in for what –is this something Stetson is keeping track of" [Ladd-MGT-00078271])); *id.*, Ex. Q (Traversa (MGT CFO) October 23, 2012 email to Stetson, cc'ing Ladd, thanking him for his help with an investor's documentation and seeking help from him with missing wires from other investors [SD-SEC-(18Civ8175)-090239]); *id.*, Ex. R (Sandor Capital October 22, 2012 email to Stetson attaching MGT subscription "docs"); *id.*, Ex. S (Stetson October 24, 2012 email to Jill Strauss (asking her to sign and return escrow agreement)); *id.*, Ex. T (VP Bank November 2, 2012 emails with Stetson, cc'ing Ladd, regarding missing escrow agreement and needed information [Ladd-MGT-00005257-58]); *id.* Ex. U (Ladd November 15, 2012 email to Stetson asking for Bank Guttenberg and Bay Capital information).)

**Ladd's Response:**  Undisputed that in the email reflected in Exhibit U to the Brown Decl. includes an email from Ladd to Stetson asking about an address, but Ladd only asked Stetson after his own attorneys at SRF were unable to provide the address.  Otherwise disputed.  The email reflected in Exhibit P to the Brown Decl. shows that Tara Guarneri-Ferrara was not specifically tracking the amounts in escrow divided by each offering that Kesner requested.  However, Ladd, President and CEO of MGT, provided the breakdown of investment that Kesner requested in his email.  The email reflected in Exhibit T to the Brown Decl. is an email from Stetson requesting information from VP Bank and does not show MGT looking to Honig or Stetson for any information.  The emails reflected in Exhibits Q, R, and S to the Brown Decl. refer to attachments that are not provided, and the emails by themselves are not relevant to this purportedly undisputed fact.

78. Beginning on April 2, 2013, Honig, HSCI and Melechdavid all began submitting notices of conversion of their preferred MGT stock into MGT common stock. (Brown Decl., Ex. V (HSCI Notice of Conversion, April 2, 2013; Honig Notice of Conversion, April 4, 2013; Melechdavid Notice of Conversion, April 8, 2013 [Ladd-MGT-00067538]); *see also id.*, Ex. W (Jonathan Honig April 8, 2013 email to Averilla (MGT controller) re conversion for Ronald Low).)

**Ladd's Response:**  Undisputed.

79. In late March 2013, Honig told Ladd that he had an idea for getting rid of MGT's warrant obligations from the October 2012 convertible preferred offering. (Brown Decl., Ex. X (Honig March 21, 2013 email to Ladd ("I have an idea how to clean up the structure and investor base" [MGT_SEC_00007464]).) Ladd rejected the idea (*id.* [MGT_SEC_00007463]), but on April 26, 2013, Ladd sent out his own Exchange Offer for the warrants. (*See id.*, Ex. Y (Ladd April 26, 2013 email to warrant holders with Exchange Offer).) Under the terms of the Exchange Offer, if a warrant holder exercised one warrant for $3.85 (obtaining one share of common stock), he would have the right to exchange two more warrants for 5/8ths of a share of restricted common stock per warrant exchanged. (*Id.* [MGT_SEC_00010494].) Ladd's offer noted that "[p]articipation is strictly voluntary," and gave the holders 20 business days to agree or reject the exchange. (*Id.*)

**Ladd's Response:**  Undisputed.

80. That same day, Stetson returned both Honig's and HSCI's agreement to the Exchange Offer. (Brown Decl., Ex. Z (Stetson April 26, 2013 email to Averilla and Ladd attaching Honig's and HSCI's agreement to the modification).) Groussman submitted his agreement and an exercise notice on May 9, 2013. (*Id.*, Ex. AA (Groussman May 9, 2013 email to Averilla with attachments).)

**Ladd's Response:**  Undisputed.

81. Whether the investors returned the documents to him directly, or not, Ladd was monitoring the investor's acceptance and exercise under the modified agreement. (*See* Brown Decl., Ex. BB (Ladd May 20, 2013 email to transfer agent complaining about their delay in updating MGT's share count as a result of the Warrant exercises).)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that this email shows that Ladd was tracking all investors' acceptance and exercise under the modified agreement, whether the investors returned the documents to him directly or not.  Undisputed that in the email reflected in Exhibit BB to the Brown Decl., Ladd was tracking certain investors' acceptance of the modification.

82. Honig, HSCI and Melechdavid were all selling MGT shares into MGT's stock price rise generated by the false April 11, 2013 *Seeking Alpha* article on MGT, forecasting that its stock price would soon increase (described more fully at ¶ 115, *infra*). (Tong Decl. ¶ 35, and Ex. Q (MGT share price jumped from nearly $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and there was a significant volume increase in trading between the two periods); Johnson Decl. ¶ 7 and Ex. A.)

**Ladd's Response:**  Disputed that the April 11, 2013 article was false.  Disputed that any of these

exhibits show a causal connection between the sales of MGT stock and this article.


83. In a late May 2013 email to Ladd, Honig reminded him of the actions Honig had taken throughout the prior six months to corral the members of his group to agree to terms Ladd wanted. (Brown Decl., Ex. CC (Honig May 29, 2013 email to Ladd [SEC-FBI-E-0011917-18]).) Among other things, Honig claimed that it was he who had put together the financing group, and he who had ensured that the warrant holders executed the warrant exchange agreement. (*Id.*) In response, Ladd did not disagree with Honig's claims. (*Id.* [SEC-FBI-E-0011917].)

**Ladd's Response:**  Disputed that email reflects Ladd's agreement or disagreement with Honig's

claims. Ladd did not adopt these claims, and Honig did not ask Ladd whether Honig's

description of Honig's role was accurate.  Further, this email does not contain any evidence

confirming that Honig had the role he claimed to have.


## B. Honig, Brauser, Groussman, Stetson and O'Rourke Acted in Concert in Connection with Their 2015 MGT Investment

84. Honig and Ladd began discussing another financing for MGT in late September 2015. In an October 1, 2015 email, Ladd told Honig the amount he needed to raise ($700,000), and set out the units to be sold for $0.25 each: 1 common MGT share, plus 2 warrants. In that email he also set out the total number of shares outstanding, and how large a percentage of that outstanding stock would be delivered to the investors Honig brought with him: 19.9% (Brown Decl., Ex. DD (Ladd October 1, 2015 email to Honig [MGT_SEC_00008034].) When Ladd asked Honig who the buyers would be, Honig, copying Stetson and Brauser, responded: Barry Honig, Mike Brauser and OBAN. (*Id.*)

**Ladd's Response:**  Undisputed.

85. In an email to his Board of Directors, Ladd explained the serious near-term cash flow issues MGT then faced, and concluded: "Net-net we need some near term liquidity. . ." (Brown Decl., Ex. EE (Ladd October 4, 2015 email to Silverman, Holmes, and Onghai [ICM_SEC_000005588]).) Attaching a draft term sheet prepared after his discussions with

Honig, Ladd described the deal he had negotiated, and noted that the investors' percentage interest in the company would be 16.7% "post-issuance." (*Id.*) He continued:

The investor group is led by Barry Honig. . . He is certainly controversial, but his m.o. [i]s normally to make money the old fashioned way with the share price going up. Moreover, while we expect his help in finding a reverse takeover candidate, the financing by itself has no "features" such as board rights, security interests, ratchets, or any non standard anti dilution measures.

(*Id.*)

**Ladd's Response:** Dispute the characterization of the email. Undisputed that Ladd wrote this email, except disputed that Ladd's reference to needing liquidity meant MGT faced "serious near term cash flow issues ... ."

86. As in 2012, negotiations over the terms of the final documents were led on behalf of the investors by Honig. Indeed, when Groussman proposed more favorable terms for the exercise of the warrants, Ladd again turned to Honig to intercede: "I agreed with Barry on this deal. . . it is now being renegotiated. So I will leave it up to Barry whether we go with our original terms." (Brown Decl., Ex. FF (Ladd October 6, 2015 email to Honig, Groussman, Stetson and Perlman, Kaplowitz and Marcus [SEC-FBI-E-0088697-98].)

**Ladd's Response:** Disputed that Honig lead negotiations in 2012 or 2015. The email reflected in Exhibit FF to the Brown Decl. merely reflects Ladd referring his deal with Honig as precedent for his deal with Groussman. Honig does not adopt any suggestion that he can negotiate a deal on behalf of Groussman.

87. And as was true with the 2012 transaction, Honig named his co-investors and set their allocations. (*See* Brown Decl., Ex. GG (Stetson October 5, 2015 email to Ladd (attaching the names of five investors with allocations, an email he forwarded the next day to Groussman (*id.*, Ex. HH (Stetson October 6, 2015 email to Groussman)); *id.*, Ex. II (Stetson October 7, 2015 email to Ladd (listing as "final versions" GRQ Roth, Melechdavid, Grander Holdings Inc., 401K, Iroquois, Stetson Capital Investments, Inc., and ATG Capital, LLC).) GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ Roth") was Honig's entity. (*Id.*, Ex. M (Ladd Tr. 416:12-20).) Grander Holdings Inc., 401K ("Grander") was Brauser's entity. (Tong Decl, Ex. O (November 6, 2015 MGT Form S-1) at 44 n. 4.) Stetson Capital Investments, Inc. ("SCI") was Stetson's entity. (*Id.*, at 46 n. 20.) ATG Capital LLC ("ATG") was O'Rourke's entity. (*Id.,* at 46

n. 23.[2] O'Rourke worked for Honig out of Honig's offices with Stetson. (*Id.*, Ex. M (Ladd Tr. at 18:21-19:20.) He and Brauser had been frequent co-investors with Honig in the past. (Johnson Decl., Ex. D; *see also* Brown Decl., Ex. L (Kesner Tr. 59:25-60:13) (testifying that Honig, Stetson, O'Rourke, Groussman, Jonathan Honig and Brauser were frequent co- investors).)

**Ladd's Response:** Disputed in part and undisputed in part.  Disputed that Honig named his co-investors and set their allocations in any investment in MGT.  The emails reflected in Exhibits GG and II simply involve emails featuring charts and lists of investors with no suggestion that Honig named these investors or set their allocations.  The email reflected in Exhibit HH to the Brown Decl. refers to an attachment that is not provided, and this email by itself is not relevant to this purportedly undisputed fact.  Undisputed that these investors identified in this paragraph invested through the identified entities.  Undisputed that Brauser and Honig invested in other deals.

88. Stetson again acted as coordinator for collection and transfer of the investors' signed deal documents to MGT. (Brown Decl., Ex. JJ (Stetson October 8, 2015 email to Ladd, attaching Grander documents sent to him by Brauser's office); *id.*, Ex. KK (Ladd October 7, 2015 email to Stetson attaching counter-signed deal documents for Grander, GRQ Roth, SCI and Iroquois); *id.*, Ex. LL (Ladd October 7, 2015 email to Stetson attaching counter-signed deal documents for ATG); *id.*, Ex. MM (Ladd October 14, 2015 email to Stetson asking him to find out how Honig and Brauser wanted their shares delivered [SD-SEC-(18Civ8175)-041978]).)

**Ladd's Response:** Disputed.  The emails reflected in Exhibit JJ, KK, and LL to the Brown Decl. refer to attachments that are not provided, but appear to be merely emails forwarding documents with no reference to Stetson having a role as coordinator.  The email reflected in Exhibit MM to the Brown Decl. includes a request from Ladd to Stetson to ask specific questions

---

[2] At the last minute, LFR Trust LLC was allowed to buy 200,000 shares. (Tong Decl., Ex. O (MGT November 5, 2016 Form S-1) at 44).

of Honig and Brauser about how they wanted their shares delivered and does not show Stetson

having a role in collecting signed deal documents.

89. MGT's press release announcing the financing, issued on October 9, 2015, disclosed that the investment had been "led by Barry Honig," but did not otherwise disclose his co-investors. (Brown Decl., Ex. NN (MGT October 9, 2015 8-K, signed by Ladd, attaching press release).) It then noted that Honig is "a private investor and a specialist in corporate finance. Mr. Honig . . . was a former founder and Co-Chairman of interClick, which was acquired by Yahoo in 2011 for $280 million." (*Id.* (press release).)

**Ladd's Response:** Disputed to the extent this paragraph implies that Honig had any "co-

investors" that formed a group under Section 13 or that MGT had an obligation to disclose these

"co-investors."  Otherwise, undisputed.

90. On October 16, 2015, Honig filed a Schedule 13G disclosing his beneficial ownership through his GRQ Roth entity of 800,000 MGT shares that he had received in the October financing, plus 58,816 shares he was entitled to receive upon exercise of warrants (so long as such exercise did not push GRQ Roth above a 4.99% ownership interest in MGT). (Brown Decl., Ex. OO (Honig October 16, 2015 Schedule 13G).) He also disclosed his ownership of 333,611 shares of MGT common stock by his GRQ Consultants, Inc. 401K entity, bringing his total beneficial ownership to 1,133,611 shares, or 6.59% of MGT's then-outstanding total shares. (*Id.*)

**Ladd's Response:**  Undisputed.

91. MGT filed a Form S-1 registration statement on November 6, 2015, signed by Ladd, in which it disclosed Honig as a beneficial owner of more than 5% of the company's outstanding common stock, and listed the same number of shares as Honig disclosed in his October 16, 2015 Schedule 13G. (Tong Decl., Ex. O (MGT November 6, 2015 Form S-1) at 42.) Under "Selling Shareholders," MGT listed those investors who had bought common stock and warrants in the October 2015 financing. (*Id.*, at 44-46.) MGT disclosed no group affiliation for any investor and did not aggregate any investor's holding with any other investor. (*Id.*)

**Ladd's Response:**  Undisputed.  MGT disclosed no group affiliation for any investor and did not

aggregate any investor's holding with any other investor because there was no group affiliation,

as confirmed by no less than seven lawyers for MGT and the investors.

92. Had MGT disclosed that Honig, Brauser, Groussman, Stetson and O'Rourke were acting in concert, and had aggregated their holdings, it would have disclosed that the group held more than 15% of MGT's outstanding shares. (Tong Decl. ¶ 41.)

**Ladd's Response:**  Disputed that these investors were acting in concert or formed a group and disputed that MGT had any obligation to aggregate their holdings.  This is a legal conclusion, not a fact that can be disputed or undisputed.  As set forth in the memoranda of law in support of the Ladd Motion, these investors did not form a group under Exchange Act Section 13 group.  As such it is a legal impossibility for MGT to have disclosed a group holding more than 15% of MGT's outstanding shares.

93. After the close of the October 2015 financing, Ladd agreed to a registered direct offering of 344,278 MGT common shares each to two investors, Brauser's Grander entity and Four Kids Investment Fund, LLC ("Four Kids"), an investment vehicle managed by Jonathan Honig, Barry Honig's brother. (Brown Decl., Ex. PP (Perlman December 17, 2015 email to NYSE attaching listing application (and investor list) [SEC-Sichenzia-E-0001200]).) The beneficiaries of Four Kids were Barry Honig's children. (*Id.*, Ex. L (Kesner Tr. 59:16-19).) Jonathan Honig kept Barry Honig abreast of the Four Kids' investments. (*E.g.*, *id.*, Ex. QQ (Jonathan Honig December 8, 2015 email to Honig attaching asset listing for Four Kids [SEC- FBI-E-0037097-98]).)

**Ladd's Response:**  Disputed that these documents show Ladd's agreement to the offering, and that Jonathan Honig kept Barry Honig abreast of the Four Kid's investments beyond the actual words in the email, but otherwise undisputed.

94. In January 2016, Honig told Ladd to have MGT pay a stock promoter, Drew Ciccarelli, $125,000 to issue and send out a positive piece on MGT to his "very large mailing list – email list of people that followed his advice." (Brown Decl., Ex. M (Ladd Tr. 203:12-23).) Ladd did so because, in his view, "when a big shareholder asks you to do something, you do it," and because he did not feel like he could say no to Honig. (*Id.*, at 201:1-4).)

**Ladd's Response:**  Disputed that this first sentence is an accurate reflection of Ladd's testimony.  The cited part of the transcript summarizes Mr. Ciccarelli's public relations services without any reference to Honig telling Ladd to have MGT pay $125,000.  With respect to the second sentence, undisputed that during his deposition, Ladd was read the quoted language, was

told that he used this quoted language when speaking to the FBI, and stated "It's in quotations,

so I'm sure I said it." (*Id.*) Shortly before this testimony, however, Ladd stated that he has "no

problem saying no to Mr. Honig." (Ladd Tr. 199:18-23.)


95. On February 3, 2016, Ciccarelli's piece on MGT was published in the *Small Cap Leader*.
(Brown Decl., Ex. RR ("New Alert: MGT Capital Investments, Inc. (NYSE: MGT)," *Small Cap
Leader*, February 3, 2016).) There, the piece copies only that portion of Honig's biography from
MGT's October 9, 2015 press release (*id.*, Ex. NN) that describes Honig as a private investor and
specialist in corporate finance, and his one time positions at interClick, "which was acquired by
Yahoo in 2011 for **$280 million**." (*Id.*, Ex. RR (*Small Cap Leader*, at 3/7 (emphasis in
original)).) While MGT paid for the promotion, the newsletter did not disclose that fact.

**Ladd's Response:** Disputed. This article disclosed that "[w]e are engaged in the business of

marketing and advertising companies for monetary compensation" and "SmallCapLeader.com

has been compensated seventeen thousand five hundred dollars by a third party (Star Media

LLC) for an investor awareness campaign regarding MGT." (*Id.*)


96. After the close of the trading day on February 3, 2016, MGT's stock's daily trading volume
saw a 7,000 percent increase from its prior day's volume, and an intraday price increase of over
60 percent. (Tong Decl. ¶ 36.) Honig, Brauser, Stetson, and O'Rourke all immediately began
selling. (Johnson Decl. ¶ 8 and Ex. B.) So did Ladd. (Tong Decl., Ex. E (Ladd February 2016
E*Trade Statement, showing Ladd's sale of 40,000 shares of MGT stock on February 3, 2016.)
Ladd filed no Form 4 reflecting those sales. (Tong Decl. ¶16.)

**Ladd's Response:** Undisputed.


97. On April 14, 2016, MGT filed its annual report for 2015 on a Form 10-K, signed by Ladd.
(Tong Decl., Ex. K (MGT April 14, 2016 Form 10-K).) While MGT included Honig (together
with his GRQ Roth entity) in its 5% beneficial owners table, and reported that he held 8.6% of
MGT shares as of April 11, 2016 (*id.*, at 27), it noted that it was reporting the number of shares
he owned from Honig's own Schedule 13G. (*Id.*, at 28 n.3.) MGT did not aggregate Honig's
holdings with any other investor in his group, nor did it disclose his membership in a group. Had
MGT correctly aggregated share ownership among the members of the group (Brauser/Grander,
Groussman/Melechdavid, Stetson/SCI and O'Rourke/ATG), it would have reported that the
group owned more than 15% of MGT's outstanding shares, based on the shares ascribed to each
group member in MGT's November 6, 2015 Form S-1. (Tong Decl., Ex. O.) Indeed, in a late
Schedule 13G filing Brauser made on May 3, 2016, Brauser disclosed that he and his Grander
entity themselves owned more than 7.4% of MGT as of February 10, 2016. (Brown Decl., Ex.

ZZZ (Brauser's May 3, 2016 Schedule 13G).) MGT made no amendment to its April Form 10-K to reflect Brauser's late filing.

**Ladd's Response:**  Disputed in part and undisputed in part.  Undisputed that MGT disclosed individual investors' investment as described in the first two sentences.  Disputed that Honig and other investors were acting as a group under Section 13(d)(3) or that it would have been "correct[]" to aggregate their shares.  This is a legal conclusion, not a fact that can be disputed or undisputed.  For the reasons set forth in the accompanying memorandum of law, Ladd disputes that that Honig and other investors were acting as a group under Section 13(d)(3).  Undisputed that Brauser's individual holdings were disclosed as described in the last two sentences.

98. Earlier that month, O'Rourke and Honig proposed an acquisition to Ladd of a company associated with John McAfee, the founder of a famous cyber-security company that bore his name, McAfee Associates. (*See* Brown Decl., Ex. SS (O'Rourke April 4, 2016 email to Ladd (forwarding his March 29, 2016 email to McAfee and attaching a term sheet for the purchase of the assets of D-Vasive)).) After receiving the proposal, Ladd discussed it with Honig and wrote to O'Rourke: "Barry called. Game on." (Brown Decl., Ex. TT (Ladd April 5, 2016 email to O'Rourke [MGT_SEC_00009374]).) Ladd provided O'Rourke with details of MGT's cap table in an email that same day, at O'Rourke's request, even though as proposed, the transaction contemplated no involvement by Honig or O'Rourke, or any issuance of shares to them. (*Id.* [MGT_SEC_00009373]; *see also id.*, Ex. SS (Term Sheet [MGT_SEC-00007083- 7087]).)

**Ladd's Response:**  Disputed that these documents show whether the proposed deal involved Honig or O'Rouke.  The Term Sheet reflected in Exhibit SS of the Brown Decl. did not state that it reflected all terms of the proposed deal and thus did not foreclose involvement by Honig or O'Rourke.  To the contrary, this document stated "[t]his Term Sheet constitutes merely an outline of the principal intended terms of the proposed transaction to facilitating the negotiation and preparation of the definitive documentation."

99. When the acquisition agreement was finalized, on May 9, 2016, Ladd issued a press release announcing it, titled "John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology." (Brown Decl., Ex. UU (MGT May 9, 2016 Form 8-K and Ex. 99.1 (press release)).) In the press release, Ladd wrote: "Mr. McAfee, the visionary

pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion . . . ." (*Id.* (press release); *see also id.*, Ex. M (Ladd Tr. 287:4-22).) That statement was false, as Ladd acknowledged he knew at the time. (*Id.*, Ex. M (Ladd Tr. 275:14-19.)

**Ladd's Response:**  Disputed.  Disputed that Ladd knew this statement was false or that it constitutes a false statement in the context of a truthful press release announcing John McAfee was joining MGT.  Ladd testified that he "know[s] now" that this statement in the press release is false but when Ladd "put it in, [he] unfortunately missed the mistake."  Supplemental Declaration of Adam C. Ford in Support of Defendant Robert Ladd's Motion for Partial Summary Judgment ("Supp. Ford. Decl."), dated March 17, 2023, Ex. 58 (Ladd Tr. 274:21-275:8.)  No evidence in the record supports the SEC's assertion that Ladd acknowledged he knew it at the time.  In the portion of the deposition where Ladd made the statement quoted in the paragraph, he was explaining that he had access to information about the chronology of McAfee's involvement at his former company (including a YouTube video about McAfee he mentioned during his deposition), but drafted the press release in a way that he missed the mistake.  (Ex. M (Ladd Tr. 275:14-19.).

100. Ladd authorized MGT to pay $125,000 to a stock promoter to publish a piece on May 9, 2016, which echoed in its first paragraph the MGT press release claim that McAfee had sold his company for $7.6 billion. (*See* Brown Decl., Ex. VV ("NYSE: MGT Beastmode engaged – John McAfee driving the Bus," *Stock Beast Report*, May 9, 2016); *id.*, Ex. M (Ladd Tr. 295:8-13).) Ladd chose *Stock Beast* at the suggestion of an MGT consultant who "was a little more aware of the mailing lists that had the biggest circulation." (*Id.*, Ex. M (Ladd Tr. 297:11-17).)

**Ladd's Response:**  Undisputed.

101. On May 6, 2016 (which was the last trading day prior to May 9, 2016), trading volume in MGT common stock was 71,005 shares, and that day's closing price was $0.36. On May 9, 2016, MGT's stock closed at $0.49 (representing an increase of 34 percent over the prior day's close) with trading volume of more than 10 million shares. (Tong Decl. ¶ 37.)

**Ladd's Response:**  Undisputed.

102. Honig, Brauser, Groussman, Stetson and O'Rourke began selling their MGT shares on May 9, 2016 and continued selling them through that week. (Johnson Decl. ¶ 9 and Ex. C.) Ladd did too. (Tong Decl. ¶¶ 21, 23.)

**Ladd's Response:**  Undisputed.


103. On May 10, 2016, Ladd responded to inquiries from the 2015 financing investors about exercising their warrants. He notified Honig, Brauser, Groussman, Stetson and O'Rourke (but not Iroquois) that the $.25 warrants issued in the October private placement were not exercisable under the terms of the Warrant Agreement. (Brown Decl., Ex. WW (Ladd May 10, 2016 email to Brauser, Honig, Stetson, O'Rourke and Groussman re MGT Warrants).) Ladd ultimately offered the group a modification of the Warrant Agreement: if they would pay a premium to exercise them, he would allow it. (*E.g.*, *id.*, Ex. XX (Ladd May 10, 2016 email to Honig agreeing to allow him to exercise the warrant at a premium of $0.10 a share).)

**Ladd's Response:**  Undisputed as to the first two sentences.  Undisputed that in the email

reflected in Exhibit XX to the Brown Decl., Ladd permitted Honig to exercise one million

warrants at a premium, but disputed that this email refers to any "group."  To the extent the term

"group" refers to a group under Exchange Act Section 16, this reference contains a legal

conclusion, not a fact.  For the reasons set forth in the memoranda of law in support of the Ladd

Motion, Ladd disputes that Honig and other investors were acting as a group under Section

13(d)(3). Ladd's agreement to permit investors to exercise warrants earlier was done for the

benefit of MGT, which in fact materially benefitted from the transaction.


104. Each of the Honig group— Honig, Brauser, Groussman, Stetson and O'Rourke — agreed to Ladd's modification terms and began sending in their Notices of Exercise on May 10, 2016 for whatever number of shares they could convert to without exceeding the 4.99% blockers they had inserted into the Warrant Agreements. (Brown Decl., Ex. YY (May 10, 2016 Notice of Exercise from Groussman/Melechdavid); May 10, 2016 Notice of Exercise from Stetson on behalf of Honig/GRQ Roth; May 10, 2016 Notice of Exercise from Stetson/SCI; May 12, 2016 Notice of Exercise from O'Rourke/ATG; May 12, 2016 Notice of Exercise from Paez on behalf of Brauser/Grander); Tong Decl., Ex. O (MGT's November 6, 2016 Form S-1), at 33 (describing the 4.99% exercise blockers that prohibit the exercise of any warrant that would bring the investor to more than 4.99% ownership of MGT outstanding shares).)

**Ladd's Response:** Disputed that there was a "Honig group." Undisputed that these individual investors submitted their notices of exercise. To the extent the term "Honig group" refers to a group under Exchange Act Section 16, this reference contains a legal conclusion, not a fact. For the reasons set forth in the memoranda of law in support of the Ladd Motion, Ladd disputes that Honig and other investors were acting as a group under Section 13(d)(3).

**C. Ladd's Understanding of Section 13(d), the Group Issue, MGT's Reporting Obligations under Regulation S-K, the Relationships Among Honig, Brauser, Groussman, Stetson and O'Rourke, Honig's Desire to Avoid Being Labeled as a Member of a Group, and Honig and His Group's *Modus Operandi* in Making Investments**

105. Ladd views himself as an expert on Exchange Act Section 13(d). (Brown Decl., Ex. M (Ladd Tr. at 423:9-24).) He testified: "I would modestly say I know more about 13(d) than nearly anyone else on Wall Street." (*Id.*, at 421:6-11.)

**Ladd's Response:** Disputed that Ladd has ever described himself as an expert. Undisputed that he so testified, but Ladd also clarified that "attorneys do go to school for this and get paid very high rates" and he "rel[ies] on attorneys and listen to what they say" when giving advice on Section 13(d). (Brown Decl., Ex. M (Ladd Tr. at 423:17-19).). Ladd further testified that he does not recall the specific questions that he or his lawyers received, but Ladd testified that he "follow[s] advice of counsel. So, whatever [Ladd's] actions were [Ladd is] sure they followed that advice." Ladd Tr. at 424:2-4. Further, this testimony quoted in the paragraph above was in the context of a letter from MGT to Iroquois about whether it was acting as a Section 13(d) Group unrelated to the alleged Section 13(d) involving Honig that is at issue in this proceeding.

106. In 2006, Ladd himself was accused of acting with others as an unlawful, undisclosed group under Exchange Act Section 13(d) in a case captioned *Delcath Sys., Inc. v. Robert Ladd, et al.*, 06 Civ. 6420 (LAP) (S.D.N.Y.) (DE 13 (Amended Complaint, Count I).)

**Ladd's Response:** Undisputed that the second amended complaint in this action includes these allegations. Disputed to the extent that this assertion is alleged to be a material fact. The

*Delcath* proceeding was subsequently settled without a judicial finding that Ladd was in fact a member of this group under Exchange Act Section 13(d).   *Delcath Sys., Inc. v. Robert Ladd, et al.*, 06 Civ. 6420 (LAP) (S.D.N.Y.) (DE 45 (order dismissing case because of the settlement agreement).).   Further, this alleged group was unrelated to the alleged group under Exchange Act Section 13(d) involving Honig here, which is not alleged to include Ladd as a member of the purported group.

107. More recently, in 2014, MGT accused one of its investors, Iroquois, of violating Exchange Act Section 13(d) by failing to disclose that it was acting in concert with another MGT shareholder— American Capital Management, LLC ("ACM"). In response to Iroquois' launch of a hostile takeover, MGT's CFO wrote a letter to Iroquois, in which he noted that Iroquois shared an office with ACM and that ACM's investments were managed by employees of the same investment adviser that managed the investments of Iroquois. (Brown Decl., Ex. ZZ (MGT CFO's July 3, 2014 email to J. Silverman at Iroquois and attached MGT letter to Iroquois [MGT_SEC_00015492]); *see also id.*, Ex. M (Ladd Tr. 417:8-17; 436:6-14 (Ladd explaining that while MGT's CFO signed the letter, he reviewed it and would not have "let a letter go out that was factually incorrect").) Ladd explained that in MGT's view, Iroquois and ACM shared "common voting principles, common economic interests," and should have disclosed that the two entities were acting as a group under Section 13(d). (*Id.*, Ex. M (Ladd Tr. 315:14-316:8).)

**Ladd's Response:**  Undisputed.  The letter further cited that, according to SEC filings, "ACM is a retirement vehicle for the benefit of" Iroquois personnel as showing that ACM was in fact in a Section 13 group with Iroquois.

108. Ladd understood that MGT had an obligation to disclose those MGT investors who held more than 5% of the company's outstanding shares in its 5% beneficial ownership tables in its Registration Statements and Forms 10-K. (Brown Decl., Ex. M (Ladd Tr. 428:16- 429:3).) His concern with the accuracy of MGT's disclosures in that regard informed his decision to question the accuracy of at least one investor's reported holdings in 2016. (*Id.*, Ex. M (Ladd Tr. 428:22-429:3); *id.*, Ex. AAA (Ladd January 11, 2016 email to Silverman re Iroquois holdings, questioning the accuracy of Iroquois' public disclosures).) And he knew that he could not just rely on the accuracy of the investor's own filings for their ownership. (*Id.*; Ex. M (Ladd Tr. 425:2-22.) (Ladd discovered the Iroquois/ACM issue by reviewing other sources available to him on MGT stock ownership, such as "DTC records or Broadridge," and noting that he "distrusts every investor['s]" SEC filings.)

**Ladd's Response:** Undisputed. Ladd also explained that the fact "that American Capital was the retirement vehicle of Abbe and Silverman" was the reason for his suspicion that they were part of a Section 13 group. Ex. M (Ladd Tr. 425:2-22.). Ladd further testified that after resolving the concern of Iroquois holdings in the SEC disclosures, he does not recall any other issue with investors adequately disclosing their group membership. (Supp Ford Decl., Ex. 58 (Ladd Tr. at 427:24-428:11.) Further, the email reflected in Exhibit AAA to the Brown Decl. shows that Ladd was relying on advice of counsel to spot issues with investors' filings, as he stated "Sichenzia suggests (and can assist with) an updated Iroquois Section 16 filing."

109. Ladd knew that Stetson, Honig and O'Rourke shared an office and that Stetson and O'Rourke worked for Honig. (Brown Decl., Ex. M (Ladd Tr. 16:18-20; 18:12-14; 18:18- 19:4; 19:14-17).) Ladd also understood that the three often co-invested. (*Id.*, at 19:18-20.) Ladd understood from news articles that Honig and Brauser had co-invested in the past. (*Id.*, at 20:17-21:2.)

**Ladd's Response:** Undisputed, but with respect to Honig and Brauser, Ladd also testified that "they did different – different investments separately. That's all I really know." *Id.*

110. Ladd periodically reviewed MGT's Transfer Agent records, and other sources of information about who his investors were. (Brown Decl., Ex. M (Ladd Tr. 330:24-331:15; 425:2-12).) Those records recorded the holdings of various investors (*id.*), and the number of shares issued to them at various times. (*E.g.*, *id.*, Ex. BB (Ladd May 20, 2013 email to transfer agent complaining about their delay in updating MGT's share count as a result of Warrant exercises).) Ladd understood that he could not solely rely on an investor's public disclosures of what he owned and review of Transfer Agent records was a way to prevent a "secret accumulation" of MGT stock by an investor. (*Id.*, Ex. M (Ladd Tr. 330:24-331:15).)

**Ladd's Response:** Disputed in part and undisputed in part. Ladd testified that he periodically *received* NOBO (Non-Objecting Beneficial Owners) lists, not that he periodically *reviewed* them. (Brown Decl., Ex. M (Ladd Tr. 331:1-6)). Undisputed that these records record the holdings of various investors and the number of shares issued to them at various times, but disputed that the email reflected in Exhibit BB to the Brown Decl. consists of Ladd

"complaining."  Undisputed that Ladd testified that "you don't want a secret accumulation of

your stock" in the deposition transcript reflected in Exhibit M to the Brown Decl. but disputed

that Ladd addressed the extent to which he could rely on investors' public disclosures.


111. Both Ladd and Honig referred to Honig and his investors as a "group." *E.g.*, Brown Decl.,
Ex. C (June 21, 2012 Honig email to Ladd [SEC-FBI-E_0045334] (Honig asking Ladd "to think
about how much money my group can come in with.")); *id.*, Ex. EE (Ladd October 4, 2015 email
to MGT Board [ICM_SEC_00005588] (Ladd describing the term sheet for the 2015 financing
and noting that "[t]he investor group is led by Barry Honig" and that the group's ownership will
be "16.7 %"); *id.*, Ex. BBB (Ladd November 29, 2015 email to Honig) [SEC-FBI-E-0059787]
(Ladd reporting that MGT's total common shares outstanding includes "your group's 2.8 million
[shares]").)

**Ladd's Response:**  Undisputed that Ladd and Honig used the term "group" in these emails,

which did not relate to Exchange Act Section 13(d).  Further, in the email reflected in Exhibit

BBB in the Brown Decl., when Ladd refers to "your group" when emailing Honig, Honig replies

two minutes later to state: "I am not part of a group.  I invested individually."  Ladd confirms

their understanding by replying, "I stand corrected."


112. Ladd knew that Honig was sensitive to the group issue, and wanted no one to refer to him
and his co-investors as a group. Ladd understood that Honig wanted to avoid liability for short
swing profits under Exchange Act Section 16(b), which allows the disgorgement of profits from
purchases and then sales of an issuer's stock by 10% owners, with the 10% ownership trigger
calculated using the Section 13(d)(3) principles that aggregate the holdings of members of any
group under Section 13(d). (Brown Decl., Ex. M (Ladd Tr. 344:20- 345:19) ("[T]here was a
topic that, for lack of a better term, is an elephant in the room in terms of all these investors,
mainly for Section 13 purposes, need to be legally not a group; otherwise, a company like ours
could disgorge them of any profits they make on a deal.. . .I believe [the issue] was important to
them.")); *see also id.* (Ladd Tr. 346:6-24 ("And, again the impact would be one of Section 16. If
they were deemed to be a group, they would become de facto affiliates by owning more than 10
percent. At that time, any short swing profits become the property of the company.")).)

**Ladd's Response:**  Disputed that Ladd testified that Honig was "was sensitive to the group

issue, and wanted no one to refer to him and his co-investors as a group."  Undisputed that Ladd

testified that he believed potential disgorgement of profits under Section 13 was important to

Honig.  (Brown Decl., Ex. M (Ladd Tr. 344:20- 345:19.)


113. Ladd's comments on deal documents from as far back as the 2012 financing evidence his understanding of that issue. *See* Brown Decl., Ex. CCC (Ladd questioning deal provision that would give the investors voting rights: "My guess is that none of the investors want to have a vote to taint their Section 13 or Section 16 obligations.") And Honig, himself, made his desire to avoid the "group" label clear in his response to Ladd's November 29, 2015 email, in which Ladd twice called Honig and his co-investors, "your group." (*Id.*, Ex. BBB ([SEC-FBI-E-0059787-88]). Ignoring the substance of Ladd's email in which Ladd had detailed MGT's current and projected financial condition, Honig responded: "I am not part of a group. I invested individually." (*Id.* [SEC-FBI-E-0059787].)

**Ladd's Response:**  With respect to the email reflected in Exhibit CCC to the Brown Decl.,

disputed that this document reflects any "understanding" of any "issue" apart from what is

reflected in the plain language of the email.  With respect to the email reflected in Exhibit BBB

to the Brown Decl., undisputed that Honig explained he was not part of a group, but disputed that

this email reflects a "desire to avoid the 'group' label" as opposed to reality that Honig was not

part of a group under Section 16.


114. Ladd—who refers to himself as a Wall Street veteran (Brown Decl., Ex. M (Ladd Tr. 108:11-16)) — also understood that Honig's intentions were to gain control of a large quantity of MGT stock by his group of investors, to then engineer some publicity generating event, and to sell the shares at the resulting inflated prices. As early as November 2012, Ladd corresponded with a person he believed to be the famous investor, David Einhorn, about Honig's recently announced investment in MGT. (*Id.*, Ex. DDD (Ladd November 14, 2012 email exchange with David Einhorn).) In that exchange, Mr. Einhorn told Ladd: "Any involvement with Honig or Hudson Bay sends a disturbing message to investors that MGT will end up diluting thru acquisition [sic] financing with these guys. Honig is a recidivous [sic] stock promotor who as I have researched seems to govern a great % of the companies [sic] stock and then Pump the stocks on corporate news with a strategy to hedge their investments, without any regard for shareholders value. Hence I did and will again short your stock. . ." (*Id.*, Ex. DDD (Einhorn November 14, 2012 email to Ladd [Ladd-MGT-00005511]).)

**Ladd's Response:**  Disputed that Ladd "understood" Honig's intentions as described here.  The

SEC's description of Honig in this paragraph reflects the content of the email from David

Einhorn reflected in Ex. DDD to the Brown Decl., but Ladd did not adopt or even explicitly

acknowledge this description of Honig in this email.  Further, Ladd testified that he addressed

concerns about Honig arising from his reputation by conducting due diligence, which revealed

just one customer complaint against him.  Supp. Ford Decl., Ex. 58 (Ladd Tr. 28:11-15.)  Ladd

explained: "To me, that's not a recidivist pump-and-dumper that violates securities law."  (*Id*).

115. Ladd later suspected that Einhorn had accurately predicted Honig's behavior.
After the 2012 financing, John Ford wrote a piece on MGT for *Seeking Alpha* touting the likely
prospect that MGT would soon settle its ongoing patent litigation, resulting in a possible
doubling of MGT's share price "within the next couple of weeks." (Brown Decl., Ex. EEE (April
11, 2013 *Seeking Alpha*, "Is MGT About to Receive a Big Settlement?").) Ladd thought the
article was false. (*Id.*, Ex. M (Ladd Tr. at 238:11-239:6; 240:2-240:11).) And when he saw it,
Ladd suspected that Honig or another MGT investor had paid Ford to write it. (*Id.*, at 241:3-
242:16.) In fact, as Ladd knew, Ford had received MGT stock in an assignment from Stetson
soon after Ford wrote his first MGT article in November 2012. (*Id.*, Ex. FFF (November 5, 2012
*Seeking Alpha*, "Why MGT Lawsuit Could Provide a 2X Near-term Return"); *id.*, Ex. GGG
(Ladd November 21, 2012 email to MGT Controller, forwarding Stetson request for help in
assigning MGT preferred stock and warrant to John Ford); *id.*, Ex. A (November 30, 2012 MGT
Form S-3, at 11 (listing John Ford among selling stockholders)).) Ladd knew that Honig,
Groussman and Stetson had all begun converting their MGT preferred shares into common stock
immediately prior to the publication of Ford's April 11, 2013 piece. (*See* ¶ 82, *supra*.)

**Ladd's Response:**  Disputed in part and undisputed in part.  With respect to the first sentence,

disputed that Einhorn predicted Honig's behavior or that Ladd "suspected" such supposed

predictions are accurate.  No document cited here supports this assertion.  The second sentence is

undisputed.  With respect to the third sentence, undisputed that Ladd thought the premise of the

article (i.e., that MGT was in settlement talks regarding its online gaming patent was completely

false) was false, though disputed that he expressed a view as to the entirety of the article.

(Brown Decl., Ex. M Ladd Tr. 238:11-239:6; 240:2-240:11).  As Ladd stated, "I don't know

about everything else in there [besides the premise].  It's a pretty – it's quite a long article."  *Id.*

at Tr. 239:7-11.  With respect to the fourth sentence, that characterization of Ladd's testimony is

disputed.  Ladd considered it a "theoretical possibility" that Honig or another MGT investor

compensated Ford for the article.  Supp. Ford Decl., Ex. 58 (Ladd Tr. 141:3-11).  With respect to

the fifth sentence, disputed that any of these articles show Ladd's knowledge that this assignment

was compensation for the article.  With respect to the sixth and final sentence, disputed that ¶ 82

supports this assertion.  Ladd's response to ¶ 82, *supra*, is also incorporated here by reference.


116. In January 2016, after the 2015 financing had closed, Ladd agreed to Honig's demand that
he send $125,000 to a stock promoter to promote MGT to the public. (Brown Decl., Ex. M (Ladd
Tr. at 198:23-199:3; 201:1-10).) That payment resulted in a piece about MGT and Honig's
investment published in a newsletter called the *Small Cap Leader*, on February 3, 2016. (*Id.*, Ex.
RR (February 3, 2016 the -*Small Cap Leader,* "New Alert: MGT Capital Investments, Inc.").)
MGT's payment for the promotion was not disclosed in this disclaimer. (*Id.*) When Ladd was
asked by the New York Stock Exchange ("NYSE") to list all promotions MGT had paid for
during 2016, he omitted MGT's payment to the stock promoter in January 2016. (*Id.*, Ex. HHH
(June 10, 2016 MGT Response to May 23, 2016 NYSE request for comments and further
information [MGT_SEC_00024987]).) Ladd testified that the omission was inadvertent. (*Id.*, Ex.
M (Ladd Tr. 210:7-19).)

**Ladd's Response:**  Disputed that Ladd characterized Honig's request as a "demand" but

otherwise undisputed.  The *Small Cap Lender* article also disclosed that "[w]e are engaged in the

business of marketing and advertising companies for monetary compensation" and

"SmallCapLeader.com has been compensated seventeen thousand five hundred dollars by a third

party (Star Media LLC) for an investor awareness campaign regarding MGT."


117. Ladd had an unfavorable view of Honig's integrity. He testified that Honig was a
"scumbag," which he defined as a "greedy, pushy, arrogant, stupid, little, you know man."
(Brown Decl., Ex. M (Ladd Tr. at 12:1-8).) He understood Honig to have a "public persona . . .
[as] a promoter of crap." (*Id.*, at 253:21-254:4.) From his review of "many, many articles by
short sellers," Ladd understood that Honig's reputation was that "he makes money only for
himself, not for stockholders." (*Id.*, at 254:5-8.) Ladd believed that "everything needs to be in
writing with Honig." (*Id.*, at 389:13-25.) In Ladd's view, as he dealt with Honig, he "became,
and always will, always was, hyper-vigilant [sic] anything we did with Mr. Honig." (*Id.*, at
254:11-13.)

**Ladd's Response:**  Disputed that these quotes provide an accurate characterization of Ladd's

view of Honig's integrity.  Ladd explained that Honig was "a loudmouth" but "did not violate

securities laws." (Brown Decl., Ex. M (Ladd Tr. at 254:9-11).)  Ladd further testified that he

addressed concerns about Honig arising from his reputation by conducting due diligence, which

revealed just one customer complaint against him.  (Ladd Tr. 28:11-15.)  Ladd explained: "To

me, that's not a recidivist pump-and-dumper that violates securities law."  (*Id.*)

118. On the specific question of whether Honig was acting with his co-investors as a group, Ladd
learned early on that Honig was possibly being investigated by the SEC for acting as a member
of an undisclosed group. As Ladd was seeking NYSE approval for issuance of shares in
connection with the 2012 financing, he learned of a rumor that the SEC was investigating the
group status of Honig, Hudson Bay and Iroquois, and Ladd discussed that rumor with his NYSE
contact, Mr. Machado. (Brown Decl., Ex. M (Ladd Tr. at 468:22- 470:22).)

**Ladd's Response:**  This characterization of Ladd's testimony is disputed.  Ladd explained that

he recalled "the New York Stock Exchange approving, but questioning, the deals where those

three investors co-invested."  (Brown Decl., Ex. M (Ladd Tr. at 469:3-5).)  Ladd also explained

that he determined that each of the alleged group members at issue in those rumors "is so

separately greedy that they do not work together in terms of any coordinated efforts. They're all,

you know, self-enriching."  (*Id.* at 470:20-22.)

**D. The Roles of Kaplowitz, Marcus, Perlman,[3] Wu, Kesner and Guarneri-Ferrara**

119. From Ladd's perspective, Harvey Kesner, a partner at SRF, represented Honig and the
investors (other than Hudson Bay and Iroquois) in the 2012 financing, and Honig and all of the
investors in the 2015 financings. (Brown Decl., Ex. M (Ladd Tr. 354:1-3; 359:12-17; 368:3-8;
489:7-12).) Ladd understood that Kesner did not represent him or MGT. (*Id.*, at 269:8- 25.)
Contemporaneous Ladd emails confirm that understanding. (*E.g.*, *id.*, Ex. I (Ladd October 17,
2012 email to Kaplowitz noting that the documents for the 2012 transaction "were prepared by
the lead investor"); *id.* (Kesner October 17, 2012 email to Kaplowitz and Marcus conveying "the
comments on the documents below" from his meeting with Honig [MGT-SEC-2022- 006042-
43]).) One example that confirms Ladd's understanding that Kesner's interests were aligned with
Honig, and not MGT, is the Ladd October 1, 2015 email to Honig and Stetson in which he
declares: "Harvey just killed the deal . . . he insists on a make whole if we ever sell stock lower

---

[3] At the time, Perlman was known as Avital Even-Shoshan.  (Brown Decl., Ex. N (Perlman Tr. 31:25-32:4)).

than 25 cent . . . i.e., ratch[]et." (Brown Decl., Ex. DD.) As both Kesner and Ladd knew, ratchets were provisions that protected investors, and gave no benefit to the issuer. (*See* Brown Decl., Ex. H (Kesner October 14, 2012 email to Ladd among others [Ladd-MGT- 00077700] ("If the company values itself less than is indicated by the $3 per unit this raise and accepts lower money, the investors 'arguably' overpaid and are being penalized for coming in early and helping the co.").)

**Ladd's Response:**  Disputed in part and undisputed in part.  With respect to the first sentence,

undisputed that Ladd testified that Kesner represented unidentified investors, including Honig, in

2012 and 2015, but disputed that Ladd identified each investor that Kesner represented or did not

represent in either deal.  The second sentence is undisputed.  With respect to the third sentence,

disputed that the reference to documents "prepared by the lead investor" in the email reflected in

Exhibit I to the Brown Decl. "confirm" any specific understanding of which attorney represented

whom in the 2012 or 2015 transactions.  With respect to the fourth and fifth sentences, disputed

that Kesner has any interest in this deal, separate from the interests of his clients.


120. SRF confirmed for Ladd that Kesner's loyalties lay with Honig and not him in getting Ladd to execute a conflict waiver in 2012 and again in 2015. In the 2012 conflict waiver letter, SRF disclosed that the firm was currently representing Barry Honig, "and/or his affiliates and related entities (the "Affiliates"), as well as other potential groups of investors who have a pre-existing relationship with Mr. Honig and of which Mr. Honig may be deemed to be representative. . . . In light of our ongoing representation of the Honig Investors, we are requesting your consent on behalf of the Company to our firm's representation of the Company and the Honig Investors." (Brown Decl., Ex. III (SRF October 11, 2012 email to Ladd [Ladd- MGT-00002466]).)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that this conflict waiver

confirmed for Ladd that Kesner's loyalties lay with Honig, since the actual language of the

waiver requested Ladd's consent on behalf of the Company to SRF's representation of the

Company *and* the Honig Investors.  Further disputed that this conflict waiver indicates any actual

conflict between Ladd and Honig.  Kesner testified that this language contained "pro forma

boilerplate" and "[t]here's no articulated specific potential conflict."  (Kesner Tr. 85:11-86:2,

177:18-19.)  Undisputed that the conflict waiver letter reflected in Ex. III of the Brown Decl.

contained the quoted language in Paragraph 120.


121. SRF asked Ladd to sign a similar, but different letter, in 2015, one that Kaplowitz remembered was drafted by Kesner. (Brown Decl., Ex. JJJ (Kaplowitz Tr. 129:18- 130:8); *id.*, Ex. KKK (Engagement Letter, dated December 4, 2015.) In that letter, which Ladd signed, SRF told Ladd: "[W]e have informed you that we have represented Barry Honig, Michael Brauser, John Stetson, John O'Rourke, Mark Groussman, . . ., their respective affiliates, and certain other investors in [MGT] and [SRF] may represent others who are investors in [MGT] and [you acknowledge] that [MGT] waives any and all conflicts with respect thereto . . . that could exist or arise as a result of such representation or ownership (subject to the above prohibition of representation of parties wherein an interests [sic] that may be directly adverse to you exist [sic]." (*Id.* (December 5, 2015 Engagement Letter [SEC-Sichenzia-E-0014767]).)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that this conflict waiver

indicates any actual conflict between Ladd and Honig.  Kesner testified that this language

contained "pro forma boilerplate" and "[t]here's no articulated specific potential conflict."  Supp.

Ford Decl., Ex. 57 (Kesner Tr. 85:11-86:2, 177:18-19.)  Undisputed that the conflict waiver letter

reflected in Ex. JJJ of the Brown Decl. contained the quoted language in Paragraph 121 and was

signed by Ladd. Further undisputed that Kaplowitz testified as reflected in Paragraph 121.


122. Email traffic around both transactions reflects that Honig, too, thought he and his investors were represented by Kesner. *See, e.g.,* Brown Decl., Ex. LLL (Honig October 16, 2012 email to Stetson directing him to have Kesner put certain terms in the deal documentation with MGT); *id.*, Ex. I (Kesner October 17, 2012 email to Kaplowitz and Marcus reporting comments on deal documents made to him by Honig [MGT-SEC-2022-006043-45]). While Kesner appears to have had less of a role in the 2015 financing, Honig called on him to make his October 2015 Schedule 13G filing on his behalf, disclosing his MGT holdings, showing that he believed Kesner represented him in at least that aspect of the 2015 investment. (*Id.*, Ex. MMM (Honig October 9, 2015 email to Kesner (advising that he needs "MGT . . . holding filed"); *id.*, Ex. OO (Honig October 16, 2015 Schedule 13G filing); *id.*, Ex. NNN (SRF October 15, 2015 email to SEC printer attaching draft Schedule 13G for Honig, and cc'ing Kesner and Perlman, but not Ladd).) Kesner could not answer the question of whose interests he represented in reviewing a Schedule 13G —whether it was the filer's or the issuer's who might have paid for the submission—but he acknowledged that the information to complete the form (including whether the filer was a member of a group) would have come from Honig, not MGT. (*Id.*, Ex. L (Kesner Tr. 168:12-170:2).)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that this email traffic reflects Honig's belief that he and his Investors were represented specifically by Kesner, rather than that they were represented by the law firm SRF.  Disputed that the email reflected in Ex. MMM to the Brown Decl. reflects that Honig believed that specifically Kesner, rather than the law firm SRF, represented him.  Disputed that Kesner "could not answer the question of whose interests he represented in reviewing a Schedule 13G."  Kesner explained "[y]ou're pursuing the interest of truth and accuracy.  This is not an advocacy situation.  You're not – you're not taking a position for anybody."  *Id.* at 168-19-21.  Undisputed that Kesner testified that the information to complete the form would have come from Honig, not MGT.

123. Kaplowitz, MGT's longstanding counsel, understood that Kesner represented Honig (Brown Decl., Ex. JJJ (Kaplowitz Tr. 22:8-22:13)), calling Kesner "very, very loyal to Barry [Honig]." (*Id.*, at 87:19-88:3.) As Kaplowitz put it: "I will tell you that no matter who was represented [sic] MGT, it was often me and other people I asked for help, but if it involved Barry, then Harvey would have his nose in it or have a say in it or want to get involved in it." (*Id.*, at 23:10-22.)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that Kaplowitz's testimony reflected that he understood that Kesner represented Honig.  The plain text of the email only indicates that Kesner would want to have a say or get involved if it involved Barry.  Disputed that this testimony shows any actual conflict between Ladd and Honig but undisputed that Kaplowitz so testified.

124. Marcus, a non-equity SRF partner (Brown Decl., Ex. OOO (Marcus Tr. 9:1-13)), understood that simultaneous representation of opposite sides of a transaction was "clearly . . . a conflict of interest." (*Id.*, at 24:25-25:10.) Perhaps as a result, and because he did not recall knowing about the conflict waiver that SRF sought from Ladd in the 2012 transaction (*id.*, at 22:8-13), Marcus saw Kesner as merely acting as a go-between between Honig and MGT, in 2012. (*Id.*, at 50:24-51:6; *see also id.*, at 14:5-7 (testifying that he was not "sure" if Kesner did any work for MGT).) Marcus had only a limited role in the 2015 financing and the D-Vasive acquisition in 2016. (*Id.*, at 17:3-7; 90:5-14.)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that there's any indication that Marcus's understanding—that SRF's representation of both sides of a transaction was "clearly . . . a conflict of interest" —resulted in his seeing "Kesner as merely acting as a go-between Honig and MGT in 2012." As Kesner testified, SRF attorneys used conflict waiver letters contained language that was "pro forma boilerplate" and that "[t]here's no articulated specific potential conflict."  (Kesner Tr. 85:11-86:2, 177:18-19.)  Disputed that this testimony shows any actual conflict between Ladd and Honig but undisputed that Marcus so testified.

125. Like Marcus, Kesner understood that SRF policy prohibited simultaneous representation of the two sides of a transaction. (Brown Decl., Ex. L (Kesner Tr. 84:20-24 ("We would never represent an investor in a company at the same time that we were representing the issuer. That's something we would not do.")).) Kesner testified that his role in the 2012 financing was limited to helping Kaplowitz acclimate to the firm after his recent arrival (*id.*, at 101:25-102:6), and that he was acting as go-between between Honig and Kaplowitz since he understood that Honig did not like Kaplowitz. (*Id.*, 124:2-9; 124:25-125:4.) Kesner maintained that as he reviewed the deal documents, he had no party's interest in mind. (*Id.*, at 102:12-16 ("I had no one's particular interest in mind other than the interest of seeing a transaction get documented for our client, MGT.").)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that Kesner's testimony reflects that he understood that SRF policy prohibited simultaneous representation of the two sides of a transaction.  Kesner testified that SRF generated conflict waiver letters containing language that was "pro forma boilerplate" and "[t]here's no articulated specific potential conflict."  Disputed that this testimony shows any actual conflict between Ladd and Honig but undisputed that Marcus so testified.

126. But Kesner made clear that his loyalties throughout the 2012 and 2015 financings lay with Honig. When asked whether he would have revealed to MGT confidential information supplied to him by Honig about whether Honig was acting in concert with other MGT investors, Kesner acknowledged that he was not sure that he would have. (Brown Decl., Ex. L (Kesner Tr. 147:9-148:10).)

**Ladd's Response:** Disputed. Kesner testified that he would have to consult with his partners about what to do if he has "a confidential piece of information from one of my clients concerning another of my clients" when asked about this "very specific" scenario. (Brown Decl., Ex. L (Kesner Tr. 147:16-21).) But Kesner explained this was a "raw hypothetical" and there is no evidence that he "knew that or [he] was told that." (*Id.* at Tr. 148-2-10.) When addressing the actual, as opposed to hypothetical, circumstance of Kesner's representation, Kesner stated "You're pursuing the interest of truth and accuracy. This is not an advocacy situation. You're not – you're not taking a position for anybody." (*Id.* at 168-19-21.)

127. In an Amended Complaint that Kesner filed in a defamation action he brought against two journalists (and which was transferred from the Southern District of Florida to the Southern District of New York), *Kesner v. Buhl,* No. 20 Civ. 3454 (PAE) (S.D.N.Y), Kesner asserted: "Kesner has never served as counsel for MGT." (Brown Decl., Ex. YYY (Excerpts from Amended Complaint (DE 36)) at Paragraph 14.) Besides attesting to the truth of all the facts alleged in the Amended Complaint (*id.* (DE 49-1), Kesner added to them in a subsequent filing, maintaining that no one from SRF represented MGT during the period alleged by the Commission in this action; that Kaplowitz had represented the company during that period, and that he had only joined SRF later; and that when Kaplowitz arrived at SRF, he was instructed by the executive committee of the firm to decline further representation of MGT. (*Id.* (DE 150-1, at Paragraph 15a) (relevant excerpts from Kesner's Local Rule 56.1 Response in opposition to Defendant's motion for summary judgment).)

**Ladd's Response:** Disputed that any documents from this defamation action show the scope of SRF's representation of MGT or any other client in any of the transactions relevant to this litigation. Undisputed that the documents from this litigation were as described. Disputed to the extent that this assertion is alleged to be a material fact.

128. Ladd, Kaplowitz and Marcus believed that Tara Guarneri-Ferrara—the associate on the 2012 transaction —was Kesner's associate. *See* Brown Decl., Ex. PPP (October 14, 2012 email exchange between Ladd and Kaplowitz and Marcus (Ladd at 5:21 a.m.: "[W]ho is Tara?" [MGT-SEC-2022-005864]); *id.*, Ex. QQQ (Kaplowitz October 14, 2012 email to Ladd at 7:03 a.m.: she is the "associate working with h[arvey]." [MGT-SEC-2022-005868]); *see also id.*, Ex. I (Ladd October 17, 2012 email to Kaplowitz (noting that the documents for the 2012 transaction "were

prepared by the lead investor.") [MGT-SEC-2022-006042]; *see also id.*, Ex. M (Ladd Tr. 359:6-17).)

**Ladd's Response:**  Disputed that these documents show Ladd expressing a view as to whom

Tara Guarneri-Ferrara was working for.   Undisputed that these documents show Kaplowitz and

Marcus believed that Tara Guarneri-Ferrara was Kesner's associate.


129. Perlman testified that she represented MGT, but she did not disclose to Ladd or Kaplowitz the years of work for Honig, Stetson, O'Rourke, Groussman and Brauser that Kesner had brought her while she was a solo practitioner. (Brown Decl., Ex. N (Perlman Tr. 26:18- 31:11; 41:8- 45:3; 67:14-24; 68:3-22).) As she testified, Kesner was the main source of her work while she was a solo practitioner. (*Id.*, Ex. N (Perlman Tr. 48:22-25.).)

  **Ladd's Response:**  Undisputed that she so testified.

130. Wu joined the MGT team in 2016 and represented MGT on the D-Vasive acquisition. (Brown Decl., Ex. RRR (Wu Tr. 33:14-22).) She had worked on very few transactions with Kesner while at SRF. (*Id.*, at 34:16-18.)

  **Ladd's Response:**  Undisputed that she so testified.


**E. MGT's Lawyers (and Ladd) Relied on a Single 2012 Email from Kesner in Determining Whether Honig Was Acting with Others as a Group**

131. In response to an October 18, 2012 email from Honig to Kesner (which Kesner forwarded to Marcus) in which Honig identified all those investors who would be participating with him in the October 2012 financing, and their allocations (Brown Decl., Ex. SSS), Marcus asked Kesner: "Are they acting as a group?" (Id. [MGT-SEC 2022-000086]). Less than a minute later, Kesner responded "No!" (Id.) Marcus forwarded the email exchange to Ladd the next day, although he said he did so inadvertently, and did not intend Ladd to rely on it. (Id. [MGT-SEC-2022-000085-86]; Brown Decl., Ex. OOO (Marcus Tr. 39:15-40:1; 41:21-42:1).)

**Ladd's Response:**  Disputed in part and undisputed in part.  Undisputed that Marcus sent the

email to Ladd, but this characterization of Marcus's testimony is disputed.  Marcus stated that he

did not recall whether he intended to send Ladd this email chain.  (*Id.* at 40:2-12.)  Marcus

further testified that the "No!" was important because it related to Section 13.   (*Id.* at 41:1-12.)

Marcus also testified that he did not discuss "this group issue" with Ladd after sending this

email, so he did not have any conversation with Ladd to suggest that Ladd should not rely on this email.  (*Id.* at 41:7-11.)

132. Marcus testified that he asked the question because Kaplowitz asked him to, (Brown Decl., Ex. OOO (Marcus Tr. 36:18-23)), but he never discussed with Kaplowitz why he wanted Marcus to ask the question. (*Id.*, at 29:6-8.) Marcus understood that Kesner was expressing his personal view (*id.*, at 53:2-53:7), and, in answering the question, Marcus believed that Kesner did not act as a lawyer for MGT. (*Id.*, at 28:4-8.) Marcus did not challenge Kesner's response (*id.*, at 54:6-15), and he did no independent analysis of the group question, other than reviewing the investors' own representations in the stock purchase agreements that they were acting independently. (*Id.*, at 53:15-54:1.) Marcus testified that, to his recollection, there were no further discussions with anyone about Kesner's response or the issue. (*Id.*, at 41:7-20.)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that any further independent analysis was necessary beyond the process Marcus utilized.  Disputed that any further discussions about Kesner's response or the issue of whether Honig was investing as part of a group were necessary.  Marcus also testified that he did not have any further discussions on the topic since he had "asked the question and been told the answer was no."  (*Id.* at 54:11-15.) Further, Marcus testified that he did not know whom Kesner was representing, and he would have to speculate when answering questions about Kesner's client or clients in this deal since he does not "have any information as to why he was acting[.]" Supp. Ford Decl., Ex. 56 (Marcus Tr. 51:22-52:4.)  Disputed that Marcus's lack of recollection of specific conversations shows that no such conversations occurred, but undisputed that Marcus testified so.

133. Although Kaplowitz testified that it was part of his practice to discuss the group issue in connection with reviewing a client's registration statement (Brown Decl., Ex. JJJ (Kaplowitz Tr. 47:8-47:11)), he recalled no specific conversation in connection with either of Honig's investments or the MGT registration statements that followed. (*Id.*, at 62:7-62:13; 45:8- 46:6.) Kaplowitz recalled nothing about the Firm's work on MGT's 2015 Form 10-K, filed April 14, 2016 (Tong Decl., Ex. K), or whether the Firm had even been retained to review it. (Brown Decl., Ex. JJJ (Kaplowitz Tr. 97:18-98:6).)

**Ladd's Response:**  Disputed that Kaplowitz's lack of recollection of specific conversations shows that no such conversations occurred.  Kaplowitz testified that he was "sure that we discussed it [the need to make any group disclosure] and did a good job," even if he did not recall the details.  (Kaplowitz Tr. 46:3-6.)

134. Kesner explained that his emphatic "No!" in response to Marcus' group question was a reaction to what he thought was a "stupid question." (Brown Decl., Ex. L (Kesner Tr. 142:6-143:15).) He testified that he determined the answer was no because of the involvement of Hudson Bay and Iroquois in the 2012 financing; according to Kesner, those two investors "would never enter into documentation that would allow them to become a group. . .with any other party on this list." (*Id.*) Later, Kesner insisted that the group determination cannot be made at the investment stage. It is "acting in concert for purposes of voting or disposition of securities that largely is the arbiter, based upon the literature, of what is a group." (*Id.*, at 143:16-144:16.) Kesner offered that MGT's lawyers should have asked questions about group membership of the investors in preparing the November 30, 2012 Form S-3 (*id.*, Ex. A) by issuing a selling shareholder questionnaire. (*Id.*, Ex. L (Kesner Tr. 153:4-155:11).) The selling shareholder questionnaire provided to investors in the 2012 financing asked no questions about whether the investors were acting in concert with others. (*Id.*, Ex. TTT (Hudson Bay October 22, 2012 Selling Securityholder Notice and Questionnaire).) Even so, there is no evidence that any such questionnaire was sent out by SRF or MGT in connection with the November 6, 2015 Form S-1 Registration statement. (Tong Decl., Ex. O.)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that Kesner's reference to group determination not being made at the investment stage or his reference to a shareholder questionnaire undermines determination that Honig was not acting as part of a group.  Kesner explained that he was "a hundred percent" sure that Hudson Bay was structured to "prevent[] group formation" and "[s]ame answer for Iroquois."   (Brown Decl., Ex. L (Kesner Tr. 142:8-21).)  Undisputed that the questionnaire reflected in Exhibit TTT to the Brown Decl. does not specifically ask about membership in a Section 13 group, but disputed that this one questionnaire is necessarily identical to all other questionnaires sent to investors.

135. Kesner had no recollection of ever discussing the group issue after Marcus' October 18, 2012 inquiry— which was when Honig, Groussman and Stetson were acquiring the MGT stock. (Brown Decl., Ex. L (Kesner Tr. 149:21-25).) But Kesner also testified that if he had had

confidential information from Honig that Honig was acting as a group with any of the investors, he might have not shared that information with Marcus or Kaplowitz in any event because it "would be a confidential piece of information from one of my clients concerning another of my clients . . .it would raise a difficult ethical dilemma. . . . " (*Id.* (Kesner Tr. 147:9- 148:6).)

**Ladd's Response:**   Disputed that Kesner's lack of recollection of specific conversations shows that no such conversations occurred.  Disputed that Kesner's discussion of a hypothetical piece of confidential information related to the actual circumstances of this actual transaction.  When asked about this hypothetical scenario involving "a confidential piece of information," Kesner also explained this was a "raw hypothetical" and there is no evidence that he "knew that or [he] was told that." (*Id.* at Tr. 148-2-10.)  When addressing the actual, as opposed to hypothetical, circumstance of Kesner's representation, Kesner stated "You're pursuing the interest of truth and accuracy.  This is not an advocacy situation.  You're not – you're not taking a position for anybody."  (*Id.* at 168-19-21)


136. When Ladd was asked by the NYSE in October 2012 whether any of the investors in the October 2012 financing were acting in concert, in an email on which Marcus was copied, Ladd answered "no, not to the company's knowledge," less than 20 minutes after receiving the NYSE's inquiry. (Brown Decl., Ex. UUU (Ladd October 23, 2012 email to Machado at the NYSE, cc'ing Marcus [Ladd-MGT-00004736]; *id.* (Machado October 23, 2012 email to Ladd, cc'ing Marcus, asking whether any investors were "acting in concert" [Ladd-MGT-00004736-37].) Neither Kaplowitz nor Marcus could recall any consultation with Ladd prior to Ladd's response to the NYSE. (*Id.*, Ex. JJJ (Kaplowitz Tr. 95:15-18); *id.*, Ex. OOO (Marcus Tr. 58:1-22).)

**Ladd's Response:**   Disputed in part and undisputed in part.  Undisputed that Ladd sent this email.  Five days before Ladd replied "no, not to the company's knowledge" on October 23, 2012, Ladd received the email from Marcus in which Kesner replied "No!" after Marcus asked "[a]re they acting as a group."   (Brown Decl., Ex. UUU and Ex SSS)  Ladd further testified that the answers he gave to the NYSE were "pretty well-known answers" and "as long as confirmed by counsel, that's what I would represent to the New York Stock Exchange."  Supp. Ford Decl.,

Ex. 58 (Ladd. Tr. 351: 6-11.)  Disputed that Kaplowitz's and Marcus's lack of recollection of

specific conversations shows that no such conversations occurred.


137. Neither associate, Tara Guarneri-Ferrara (from the 2012 transaction) or Avital Perlman
(from the 2015 transaction, including the November 6, 2015 MGT S-1 and the MGT 2015 Form
10-K),[4] could remember any discussions about the group issue. (Brown Decl., Ex. O (Guarneri-
Ferrara Tr. 23:21-24); *id.*, Ex. N (Perlman Tr. 62:14-25; 111:25-112:4).) Neither associate ever
performed a group analysis for Section 13(d) purposes while at the firm. (*Id.*, Ex. O (Guarneri
Ferrara Tr. 47:4-9); *id.*, Ex. N (Perlman Tr. 62:14-25).)

**Ladd's Response:**  Disputed that Guarneri-Ferrara's and Perlman's lack of recollection of

specific conversations shows that no such conversations occurred.


### F. Ladd Failed to Disclose Information to MGT's Lawyers That Was Relevant to an Analysis of the Group Issue

138. Kaplowitz did not know that Honig, Stetson and O'Rourke worked out of the same office.
(Brown Decl. Ex. JJJ (Kaplowitz Tr. 62:14-16; 64:20-23).) Nor could he recall knowing that the
three had co-invested together on earlier transactions. (*Id.*, at 62:17-21; 64:24- 65:8; *see also id.*,
at 67:25-68:3 (no recollection of knowing that Groussman had co-invested with Honig.).) And he
testified that both sets of facts would have been incorporated in his group analysis if he had
known them. (*Id.*, at 67:2-6.) Kaplowitz also testified that he did not know that Ladd distrusted
Honig (*id.*, at 79:3-6); he did not recall knowing that Ladd had been told by David Einhorn that
Honig was a recidivist stock promoter (*id.*, at 83:8-11); he did not know that Honig had paid
John Ford to write a promotional piece about MGT (*id.*, at 92:20-25); and he did not recall
knowing that Honig had told Ladd to pay a stock promoter to publish a piece about MGT in
February 2016, and that Honig had sold MGT shares after the piece pushed the stock higher. (*Id.*,
at 100:6-101:7; 102:2-105:5.)

**Ladd's Response:**  Disputed in part and undisputed in part.  Disputed that Kaplowitz stated that

working out of the same office was a consideration relevant to whether these investors formed a

group under Section 13(d).  With respect to their history of co-investment, Kaplowitz testified

---

[4] As reflected in contemporaneous emails (Brown Decl., Ex. VVV), Perlman worked on
Amendment No. 2 to MGT's 2015 Form S-1 (Perlman January 8, 2016 email to MGT auditors re
amendment to MGT's November 6, 2015 Form S-1 [Ladd-MGT-00098909]), and saw at least
one draft of MGT's 2015 Form 10-K (MGT auditors April 14, 2014 email to Perlman and others
[SEC-Sichenzia-E-0001119].)

that he "think[s]" he would have taken it into account in determining whether they acted as a group whether "Mr. Honig and Mr. Stetson and Mr. Honig and Mr. O'Rourke had this business relationship and prior investments together" but Kaplowitz stated he "can't tell [the SEC] definitely that it would have" factored into his determination of whether there was a group. (Brown Decl. Ex. JJJ (Kaplowitz Tr. 66:6-67:5).)  Disputed that Kaplowitz's testimony shows that Ladd distrusted Honig.  Disputed that Kaplowitz's lack of recollection of specific conversations shows that no such conversations about Einhorn occurred.  Kaplowitz also testified that he was aware that Honig "was considered to be a bad guy," he was aware that "people didn't like him," and Kesner and "other partners" knew this.  Supp. Ford Decl., Ex. 55 (Kaplowitz Tr. 86:3-15.)  Undisputed that Kaplowitz testified as described about Honig's activities with respect to the promotion that John Ford wrote.  Kaplowitz also testified that, to be relevant to determining whether there was a Section 13 group, he would "have to know more than" the fact that Honig asked MGT to pay for promotional pieces, including "who created the material that was being disseminated, what the material that was being disseminated was, the timelines involved, all sorts of things like that."  (*Id.* at Tr. 104:2-9.)


139. Marcus, too, testified that he did not know about Ladd's distrust of Honig (Brown Decl., Ex. OOO (Marcus Tr. 83:20-22)), about his exchange with Einhorn (*id.*, at 84:2-22), about Honig's payment to John Ford to write favorably about MGT and the later sale of stock in April 2013 (*id.*, at 78:24-79:22), or about Honig's demand that Ladd pay a promoter in 2016 to write an article about MGT that pushed the stock's price up. (*Id.*, at 87:24-88:24).

**Ladd's Response:**  Disputed.  Disputed that Marcus's testimony shows that Ladd distrusted Honig.  Disputed that Marcus's lack of recollection of specific events shows that he was not informed of these events.  Disputed that this testimony show that this article "pushed the stock's price up."  Marcus also testified that "people thought [Honig] was a bad investor" and that "somebody could hurt a company if you put him in there."  (*Id.* at 83:112.)  Marcus further

testified with respect to the email from Einhorn: "I don't even see that it talks at all about a group."  (Ford. Decl. 8 (Marcus Tr. 85:11-22.))  Marcus also testified that, had he known about Honig paying for promoting MGT and then selling shares, that would not necessarily have made a difference to him determining whether there was a Section 13(d) group.  (*Id.* at 78:24-79:14.)

Dated:  March 17, 2023

Respectfully submitted,

FORD O'BRIEN LANDY LLP

 /s/ Adam Ford
Adam C. Ford
Anjula Prasad
Arthur Kutoroff
575 Fifth Ave, Fl. 24
New York, NY 10017
Tel: (212) 858-0040
aford@fordobrien.com
