UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION


                               Plaintiff,                    Case No. 1:18-cv-08175-ER

v.


BARRY C. HONIG,
*et al.*


                               Defendants.
-----------------------------------------------------------------x


**DEFENDANT ROBERT LADD'S RESPONSE TO PLAINTIFF SECURITIES AND
EXCHANGE COMMISSION'S STATEMENT OF UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL CIVIL RULE 56.1 IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT AGAINST ROBERT LADD**

        Defendant Robert Ladd respectfully submits this response to the portion of Plaintiff

Securities and Exchange Commission's ("SEC") Statement of Undisputed Material Facts

Pursuant to Local Civil Rule 56.1 in Support of Plaintiff's Motion for Partial Summary Judgment

Against Defendant Robert Ladd, which was filed under docket number 323.  Ladd submits this

response separately from his response to the SEC's other 56.1 statement, which was filed under

docket number 320.

## LADD'S ROLE AS PRESIDENT AND CEO OF MGT CAPITAL INVESTMENTS, LLC[1]

1. During the time at issue (2015-May 2016), MGT Capital Investments, Inc. ("MGT") was a Delaware corporation headquartered in Durham, North Carolina.  (Ladd Amended Answer Dkt. 281 ("Answer") ¶ 43). At all relevant times, MGT's common stock was registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it is now registered under Exchange Act Section 12(g) [15 U.S.C. 78l(g)]. (*Id.*) MGT's common stock was listed on NYSE-MKT from 2007 until October 19, 2016, and it is currently quoted on OTC Link. (*Id.*)

**Ladd's Response:**  Undisputed.

2. Robert B. Ladd joined MGT in December 2010 as a Director. He was named Interim President and CEO in February 2011, and appointed President and CEO in January 2012. (Tong Decl., Ex. K (MGT's 2015 Form 10-K).)

**Ladd's Response:**  Undisputed.

3. As of May 2016, Ladd continued to act as MGT's President and CEO.  (Bromberg Decl., Ex A (MGT's Form 10-Q filed with the Commission on May 23, 2016).)

**Ladd's Response:**  Undisputed up to May 10, 2016, at which point MGT announced that John

McAfee was to become the new CEO.

## LADD'S BROKERAGE ACCOUNTS

4. Ladd held three brokerage accounts in his own name through which he traded MGT securities: an IRA account at TD Ameritrade, which he opened in December 2008; another TD Ameritrade account, which he opened in January 2013; and an account as E*Trade, which he opened in November 2015.  (Answer ¶ 166.)

---

[1] Ladd includes these titles from the SEC's own 56.1 statement for reference only.  To the extent any title can be construed as a statement of material fact, it is disputed.

Ladd provides these responses in connection with the parties' briefing on summary judgment and not for all purposes in this action. To the extent Ladd does not dispute a particular fact, Ladd does not thereby concede that any such undisputed fact constitutes a material fact, that the cited evidence is relevant, or that the cited evidence would be admissible at trial.  To the extent Ladd does not dispute the fact that a witness testified to a particular fact or assertion, or included a particular statement in a declaration, Ladd does not thereby concede that the witness is credible on that topic or that the statement is accurate or admissible.

**Ladd's Response:**  Undisputed.

5. On his 2013 TD Ameritrade account opening application, Ladd accurately stated that he was MGT's "President."  (Bromberg Decl. Ex. B (Ladd's January 14, 2013 TD Ameritrade account application [SEC-TDA-E-0000240]).)

**Ladd's Response:**  Undisputed.

6. In communications with TD Ameritrade on May 9, 2016, Ladd acknowledged that "I am the Affiliate" for MGT.  (Bromberg Decl., Ex. C (Ladd's May 9, 2016 email with TD Ameritrade [SEC-TDA-E-0000355]).)

**Ladd's Response:**  Undisputed.

7. TD Ameritrade confirmed that Ladd was an affiliate on his TD Ameritrade account. (Bromberg Decl., Ex. D (TD Ameritrade's May 9, 2016 email with Ladd [SEC-TDA-E-0000117]).)

**Ladd's Response:**  Undisputed that this email states that Ladd "would need to fill out the Rule

144 Affiliate paperwork" but disputed that this email shows "TD Ameritrade confirm[ing] that

Ladd was an affiliate on his TD Ameritrade account."

8. On November 22, 2015, Ladd submitted an application to E*Trade for a new account online. In this application, Ladd falsely omitted his affiliation with MGT: he described his "Occupation" as "Retired" and answered "No" to the question: "Director, or policy-making office of publicly-owned company?" He also left blank the information under "Employer." (Bromberg Decl., Ex. E (Ladd's November 22, 2015 account application to E*Trade [SEC-ETRADE-E-0000090]).)

**Ladd's Response:**  Undisputed that the form was completed as described except the use of the

word "falsely" is disputed.

9. Ladd admitted that the statements he made to E*Trade on his account application were false: "Q. All right. So let's look at some of the answers, and I'm going to focus in on the middle column here.  You write 'Occupation: Retired.'  And then you write under 'Director of policy-making office of publicly owned company?  No.'  And then under 'Employer,' you leave it blank.  And each of those answers was false, was it not?  A. Correct; they are not correct answers.  Q. Because you were both a director and an officer of MGT; correct? A. Yes.  Q. And you were not retired? A. Yes. Q.  And you were employed.  A. Correct."  (Bromberg Decl. Ex. F (Ladd Tr. at 56:16-57:6).)

**Ladd's Response:**  Undisputed that Ladd so testified but disputed that Ladd's answers are

evidence of scienter or intent.


10. Ladd admitted that, at the time, he understood that, as an officer or director of MGT, Section 5's Rule 144 required him to submit a Form 144 reporting his MGT stock sales "contemporaneously with—or before" any such sales. (Bromberg Decl., Ex. F (Ladd Tr. 63:5-7; *see also* 17 C.F.R. ¶ 230.144(h), setting forth this reporting requirement).  Ladd further understood that, because he was an MGT officer, he was considered an MGT "affiliate" and thus was subject to Rule 144 trading volume limitations regarding his sales of MGT stock.  (*Id.*, Ex. F (Ladd Tr. 63:2-23, 145:20-146.11); *see also id.*, Ex. G (Ladd November 19, 2022 email exchange with Barclays employee [BARC_000437-39]); *id.*, Ex. H (Ladd November 19, 2015 email exchange with Barclays employee BARC_000972-3]).)

**Ladd's Response:**  Undisputed that Ladd so testified, but disputed that the term

"contemporaneously" imposes a duty to simultaneously file a Form 144 or otherwise imposes a

duty to file on the same day.

11. Ladd also understood the specific contours of those limitations; namely, that his total MGT sales during any 90-days period could not exceed the greater of: (1) 1% of MGT's outstanding stock; or (2) MGT stock's average weekly trading volume for the four calendar weeks preceding such stock sales. (Bromberg Decl., Ex. F (Ladd Tr. 63:11-23, 145:20-146:8); *see also id.*, Ex. G (Ladd November 19, 2012 email exchange with Barclays employees [BARC_000437-39]); *see also id.*, Ex. H (Ladd November 19, 2015 email exchange with Barclays employee [BARC_000972-3]).); *see also* 17 C.R.F. 230.44(e)(1), setting forth the Rule 144 volume limitations for affiliates.)

**Ladd's Response:**  Undisputed that Ladd understood trading limitations but disputes the SEC's

legal argument, aggregation of sales, and position that Ladd exceeded the legal limitations.


12. On November 25, 2015, Ladd made a telephonic request to transfer his 300,000 shares of MGT stock from TD Ameritrade to his newly opened E*Trade Account that was noted in TD Ameritrade's internal records.  TD Ameritrade's internal records also recorded notes of a November 25, 2015 call between Ladd and TD Ameritrade, which reflected that Ladd "advised [that he] did not like [TD Ameritrade's] SEC 144 form handling."  (Bromberg Decl., Ex. I (TD Ameritrade's internal records noting Ladd's request to transfer 300,000 MGT shares and Ladd's dislike of TD Ameritrade's SEC 144 form handling [SEC-TDA-E-0000212-213]).)

**Ladd's Response:**  Undisputed that this document purports to describe the telephone calls

referenced in this paragraph.

4

13. In November and December 2015, Ladd transferred his MGT stock from TD Ameritrade to his newly opened E*Trade Account. (Answer ¶¶ 142, 166; Bromberg Decl., Ex F (Ladd Tr. 58:6-60:24)); Tong Decl. ¶ 6 n.1, Ex. C (Ladd's TD Ameritrade account statements from November 1, 2015 – December 31, 2015); *id.*, Ex. E (Ladd's Ladd's E*Trade account statements from November 1, 2015- April 30 2016).)

**Ladd's Response:**  Undisputed.

14. As of November 22, 2015, Ladd was MGT's CEO, President, its "Principal Financial Officer," and a Director.  (Tong Decl., Ex. K (MGT 2015 Form 10-K).)

**Ladd's Response:**  Undisputed.


## LADD'S MAY 2016 FINANCIAL STATUS AND MGT STOCK SALES

15. As of May 2016, Ladd was more than 60 days past due on his home mortgage payments, and his monthly credit card bills included payments on several installment loans that he had taken from on-line lenders. (Bromberg Decl., Ex. F (Ladd Tr. 193-11-194:6, 196:16-198:9)

**Ladd's Response:**  Undisputed.

16. As of the week of May 9-12, 2016, the most recent filing by MGT prior to that week was MGT's Form 10-K filed on April 14, 2016, which stated that as of April 13, 2016, MGT had 18,098,221 shares of common stock outstanding.  Accordingly, 1% of MGT's outstanding stock equaled 180,982 shares.  (Tong Decl., ¶ 18).  The four-week average volume for MGT shares from April 11, 2016 to May 9, 2016 was 392,109.  (*Id.* ¶ 19).

**Ladd's Response:**  Undisputed.

17. After the May 9, 2016 MGT press release (described below) was published, the market reacted:   on May 6, 2016 (which was the last trading day prior to May 9, 2016), trading volume in MGT common stock was 71,005 shares, and that day's closing price was about $0.36.  On May 9, 2016, MGT's stock closed at $0.49 (representing an increase of 34 percent over the prior day's close) with trading volume of more than 10 million shares.  On May 12, the MGT stock price closed at $1.52, a 317% increase over the May 6th price.  The average trading volume for the week of May 9th was 31,000,000 shares.  (Tong Decl., ¶ 37; Ex. L (OTC Markets data from April 11, 2016 – May 6, 2016)); Answer ¶ 173.)

**Ladd's Response:**  Disputed that these documents show that this price change was a reaction to

the MGT press release, but otherwise undisputed.

18. From May 9 to 12, 2016--to benefit from the sudden spike in MGT's stock price—Ladd  sold a total of 435,000 shares of MGT stock from his Ladd E*Trade Account. (Answer  ¶¶ 168, 172; Tong Decl. ¶ 8; Ex. F (Ladd's E*Trade account statement for May 1, 2016 – May 31, 2016).). Because of the precipitous rise in MGT's stock price, Ladd's sales pf 435,000 MGT shares from May 9-12 garnered total sales proceeds of $414,448.49.  (Answer ¶ 168).

**Ladd's Response:**  Disputed that these documents show the sales were "to benefit from the

sudden spike in MGT's stock price" but otherwise undisputed.

19. From February 12 through May 6, 2016, Ladd sold a total of 84,072 MGT shares in the Ladd E*Trade Account for gross proceeds of $25,018.66. (Tong Decl. ¶ 22; Ex. E (Ladd's E*Trade account statement for November 1, 2015 – April 30, 2016); *id.*, Ex. F (Ladd's E*Trade account statement for May 1, 2016 – May 31, 2016).)

**Ladd's Response:**  Undisputed.

20. In the Ladd E*Trade Account, Ladd exceeded the volume limitation through total sales of his stock during the week of May 9, 2016 and over the prior three months by 126,963 MGT shares. Adding in the 340,000 shares he sold in his parents' TDA Account (the "Ladd Parents' TDA Account") on May 12, he exceeded the volume limitation by 466,963 shares. (Tong Decl. ¶ 24.)

**Ladd's Response:**  Disputed.  The reference to "the volume limitation" appears to be a reference

to the limitations on trades under 17 CFR § 230.144.  The notion that these volume limitations

are properly calculated based on the date of a sale as opposed to the date when the Form 144 is

filed is a legal conclusion, not a fact.  For the reasons set forth in the accompanying Reply

Memorandum of Law in Support of Motion for Partial Summary Judgment and in Opposition to

Plaintiff's Motion for Partial Summary Judgment, this legal conclusion is incorrect, and Ladd did

not exceed the applicable volume limitations.  Also, Tong erroneously aggregated shares from

different accounts that as a matter of law cannot be aggregated, making his math wrong.

## LADD'S PARENTS' TD AMERITRADE ACCOUNT

21. Ladd's parents, Shirley and Seymour Ladd, opened an account at TD Ameritrade on January 2, 2015. (Bromberg Decl., Ex. K (Ladd Parents' Account Opening Application to TD Ameritrade).)

**Ladd's Response:**  Undisputed.

22. In June 2015, when Ladd's parents were in their late 80's, they granted Ladd authority to trade stock in the Ladd Parents' TDA Account. (Bromberg Decl., Ex. F (Ladd Tr. 114:17-23); *id.*, Ex. L (Trading Authorization Agreement dated June 19, 2015 [SEC-TDA-E- 0000975-77]).)

**Ladd's Response:** Undisputed.

23. As Ladd understood it, his parents granted him "full discretion" to trade in the Ladd Parents' TDA Account, including the right to direct cash payments out of the account. (Bromberg Decl., Ex. F (Ladd Tr. 119:23-122:22).) After receiving that authorization, Ladd was the only person who traded in the Ladd Parents' TDA Account. (Bromberg Decl., Ex. F (Ladd Tr. 124:2-15.))

**Ladd's Response:** Disputed in part and undisputed in part. Ladd testified that he had trading authorization over the account but was "not positive" whether he could direct money from the account to himself and never attempted to do so. (*Id.* at 122:14-24) Ladd also testified that he does not believe his father traded in the account, and does not think his brother or sister had access to the account for trading purposes. (*Id.* at 124:2-15) Ladd did not testify that he "was the only person who traded in the Ladd Parents' TDA Account" after receiving trading authorization.

24. From July through November, 2015 Ladd acquired a total of 382,863 shares of MGT stock in the Ladd Parents' TDA Account. (Tong Decl. ¶ 11; Ex. J (Account statements for the Ladd Parents' TDA Account.) The average purchase price of those shares was $0.35 per share. (*Id.*, at 40.) Ladd did not resell any of those MGT shares prior to May 12, 2016. (*Id.*)

**Ladd's Response:** Disputed. This document does not show that Ladd acquired or sold any shares of MGT stock. As the document states, these are the accounts of Ladd's parents, not Ladd.

25. Ladd had intended to sell shares in the Ladd Parents' TDA Account on May 9, the same day he began selling MGT shares from his E*Trade Account (and the same day MGT issued its press release discussed above). (Bromberg Decl., Ex. F (Ladd Tr. 140:3-11).)

**Ladd's Response:** Disputed that sales in the Ladd Parents' TDA Account would constitute sales by Ladd, but otherwise undisputed he so testified.

26. TD Ameritrade, however, refused to permit Ladd to sell MGT shares from his parents' account on May 9 because Ladd, an MGT affiliate, had not submitted the requisite Form 144 for those sales. When Ladd asked TD Ameritrade for an explanation, the bank cited Ladd's "full trading authorization" over Ladd Parents' TDA Account. (*Id.*, Ex. F (Ladd Tr. 140:12- 143:18); *id.*, Ex. C (Ladd's May 9, 2016 email with TD Ameritrade [SEC-TDA-E-0000355]); *id.*, Ex. D (TD Ameritrade's May 9, 2016 email with Ladd [SEC-TDA-E-0000117].)

**Ladd's Response:** Undisputed.

27. On May 11, Ladd submitted the Form 144 to TD Ameritrade, but falsely claimed "May 30, 2016" as the "approximate date of sale." (Bromberg Decl., Ex. M (May 11, 2016 email from Ladd to TD Ameritrade attaching Ladd's May 10, 2016 Form 144 [SEC-TDA-E- 0000225-28]).)

**Ladd's Response:** Undisputed that Ladd submitted the Form 144 to Ameritrade on May 11, but disputed that this claim was false. This document does not show it was false to claim May 30, 2016 as the approximate date of sale.

28. On May 12, 2016, Ladd sold 340,000 of the 382,863 MGT shares in the Ladd Parents' TDA Account, for total proceeds of $551,979.44. (Answer ¶ 168; Tong Decl. ¶12.) The next day, May 13, 2016, Ladd's mother paid Ladd $325,000 by personal check. (Bromberg Decl., Ex. N (May 13, 2016 $325,000 check from Ladd's mother to Ladd [SEC-BOA- 0009449]).)

**Ladd's Response:** Undisputed that, pursuant to his full trading authorization, Ladd sold 340,000 MGT shares in the Ladd Parents' TDA Account, but otherwise disputed that the evidence cited supports the first sentence. The second sentence is undisputed.

29. Also on May 12, 2016, TD Ameritrade sent Ladd's parents $325,000 in cash from their TDA Account. (Bromberg Decl., Ex. F (Ladd Tr. 127:10-12).)

**Ladd's Response:** Disputed that he so testified. When asked about the check TD Ameritrade wrote to Ladd's parents, Ladd replied "I never saw that check, but it could have been a wire, but I don't know. But TD would have sent to my parents that money, then my parents, once it's in their account, would decide to send it to me or not, but that would be the sequence." (*Id.* at 127:16-20)

30. Ladd admitted that the $325,000 that his mother paid him on May 13, 2016 "represented a big part of the profits of" Ladd's May 12 sale of 340,000 shares of MGT stock in his Parents' TDA Account (Bromberg Decl., Ex. F (Ladd Tr. 126:14-129:1).) Ladd testified that his parents

gave him the $325,000 "because they wanted to help their son" and to alleviate Ladd's "financial stress." (*Id.*, Ex. F (Ladd Tr. 127:1-7; 131:1-9).)

**Ladd's Response:**  Undisputed that he so testified.  Ladd explained that he viewed this money

from his parents as "a loan against future inheritance … ."  (*Id.* at 134:6-8)

31. Ladd testified that the $325,000 that his mother paid him constituted his parents' post-tax realized gains from the May 12 MGT stock sales in their TDA Account, and that she had not sent him the full gross proceeds from the sales in order to have money reserved to pay taxes. (*Id.*, Ex. F (Ladd Tr. 132:21 -134:4).)

 **Ladd's Response:**  Undisputed that he so testified.

32. The gross proceeds of Ladd's May 12 stock sales from his Parents' TDA Account totaled $551,979.44. The cost basis of those shares was about $119,000 (340,000 shares x $.35 average price per share), leaving Ladd's parents with realized capital gains (pre-tax) of about $432,979.44 from those sales. (Tong Decl. ¶ 12.) The $325,000 that Ladd's parents paid him from the sales proceeds thus constituted 75% of those pre-tax gains, leaving Ladd's parents with $107,979, or 25% of the gains. Ladd further admits that the cash that ultimately remained in his Parents' TDA Account could not satisfy their 2015-2106 tax liabilities resulting from their realized capital gains in that account, and he had to return over $18,000 to them to cover that tax liability. (Bromberg Decl., Ex. F (Ladd Tr. 131:2-20); *id.*, Ex. O (October 24, 2016 Ladd email exchange with Steve Ladd [LADD-MGT-00061707-09]), *id.*, Ex. P (Ladd's handwritten notes attaching an April 4, 2017 Ladd email exchange with Steve Ladd and a check from Ladd to Ladd's father for $18,042 [LADD-MGT-00066837-40]).)

**Ladd's Response:**  Disputed in part and undisputed in part.  The first sentence is disputed as

improper for a 56.1 statement because there is no citation.  Under Local Civil Rule 56.1(d), any

statement in a Rule 56.1 statement "must be followed by citation to evidence which would be

admissible … ."  Otherwise undisputed, provided the reference to "2015-2106" in the last

sentence is to "2015-2016."

33. Ladd also testified that, but for his parents' anticipated tax liabilities, they would have given him the entire $551,979.44 gross proceeds from the May 12 stock sales in their TDA Account: "My parents would have given me the entire amount of money. You know, they were thrilled, but that would have put them in a negative position. That was not fair." (Bromberg Decl., Ex. F (Ladd Tr. 133:19-22).) In any event, as explained above, Ladd's parents gave Ladd their entire post-tax gains from the May 12, 2016 MGT stock sales that Ladd made in their TDA Account.

**Ladd's Response:**  With respect to the first sentence, undisputed that Ladd so testified.  With respect to the second sentence, this appears to incorporate ¶ 32 by reference, so the response to ¶ 32 is incorporated herein by reference.

34. On May 16 and 17, 2016, Ladd sold an additional 41,863 MGT shares from his Parents' TDA Account, for more gross proceeds of $115,951, resulting in additional capital gains to his parents of $101,601. (Tong Decl., Ex. H (Ladd Parents' TDA Account statement for May 1, 2016 – May 31, 2016).)

**Ladd's Response:**  Undisputed that this document reflects sales of 41,863 MGT shares from the Parents' TDA Account, for more gross proceeds of $115,951, but disputed that this document shows Ladd made the sales and disputed that this document shows the amount of capital gains to Ladd's parents.

## LADD'S MATERIALLY FALSE MAY 9, 2016 PRESS RELEASE

35. As MGT's acquisition of D-Vasive was approaching agreement, Ladd began working on a press release announcing the acquisition and the arrival of John McAfee as Chief Executive Chairman and CEO. On May 7, 2016, he circulated his draft press release to the Board, two attorneys at Sichenzia Ross Ference ("SRF"), Jay Kaplowitz and Joan Wu, and others. (Bromberg Decl., Ex. BB (Ladd May 7, 2016 email to the MGT board, copying Kaplowitz, and attaching draft press release).) That draft press release said nothing about McAfee's sale of his company to Intel for $7.6 billion. (*Id.*)

**Ladd's Response:**  Undisputed.

36. Late in the night of May 8, 2016, as Ladd was working with Wu and D-Vasive's lawyers to finalize the necessary documents for announcing the transaction, Ladd told Wu that he would handle getting the press release to the printers if she wanted to go to bed. (Bromberg Decl., Ex. CC (Ladd May 8, 2016 11:00 p.m. email to Wu and Kaplowitz).)

**Ladd's Response:**  Undisputed.

37. At various times early in the early morning on May 9, 2016, Ladd circulated his revised press release that now read: "Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion . . ." (Bromberg Decl., Ex. J (MGT May 9, 2016 8-K, attaching press release).) He sent it to the D-Vasive team at 5:19 a.m. (*id.*, Ex. DD (Ladd May 9, 2016 5:19 a.m. email to D-Vasive team); he sent it to his Board at 6:09 a.m. (*id.*, Ex. EE (Ladd May 9, 2016 6:09 a.m. email to Board).; and he sent it to Kaplowitz and Wu at the same time he sent it to the

printers at 6:43 a.m. (*Id.*, Ex. FF (Ladd May 9, 2016 6:43 a.m. email to printer, copying Kaplowitz and Wu). In none of those emails did Ladd highlight the change to the description of McAfee, and he admitted that his attorneys had no responsibility for fact checking his press releases. (*Id.*, Ex. F (Ladd Tr. 281:3-282:4); *see also* Ex. GG (Kaplowitz May 9, 2016 email to Ladd, responding to Ladd's forwarding of press release to New York Stock Exchange).)

**Ladd's Response:** Disputed that Ladd "admitted that his attorneys had no responsibility for fact checking his press releases" but otherwise undisputed. Ladd testified that he does not think "fact checking is an occupation for" his attorneys but he understood that "the people that received [the press release] would be able to determine, on a high level, whether it's accurate." (Ex. F (Ladd Tr. 281:24-282:4).

38. Ladd knew the statement about McAfee selling his company to Intel for $7.6 billion was false at the time he put it in the press release. (Bromberg Decl., Ex. F (Ladd Tr. 275:14-19).) He knew then that McAfee had left his company more than a decade prior to its sale to Intel. He claims he mistakenly drafted the insert. (*Id.*, Ex. F (Ladd Tr. 275:2-6).) But when a short-seller drew his attention to the "mistake," (*id.*, Ex. F (Ladd Tr. 294:11-23)), Ladd issued no retraction or corrective disclosure. Instead, in MGT's May 23, 2016 Form 10-Q, which Ladd signed, MGT included a slightly different description of McAfee: "[McAfee] founded McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010." (*Id.*, Ex. A (MGT May 23, 2016 Form 10-Q, at 6).) Ladd admitted that the Form 10-Q disclosure told investors nothing about what had been misstated in the May 9, 2016 press release. (*Id.*, Ex. F (Ladd Tr. 304:4-15.) As for the role counsel played in crafting MGT's disclosure in the Form 10-Q, neither Wu nor Kaplowitz could recall anything about it. (*Id.*, Ex. HH (Kaplowitz Tr. 117:16-118:5; Ex. S (Wu Tr. 56:7-57:1)). Kaplowitz testified that he did not even know about the press release falsity issue until weeks later. (*Id.*, Ex. HH (Kaplowitz Tr. 119:1-3).)

**Ladd's Response:** Disputed. Disputed that Ladd knew the statement about McAfee selling his company to Intel for $7.6 billion was inaccurate at the time he put it in the press release. Ladd testified that he "know[s] *now* that … it is incorrect" but "at the time [he] put it in, [he] unfortunately missed the mistake." (Bromberg Decl., Ex. F (Ladd Tr. 275:2-6).) (emphasis added)) When Ladd stated that he "knew that" McAfee had left his company prior to the sale to Intel, he was explaining that he had access to information about the chronology of McAfee's involvement at his former company and, as an example, cited a YouTube video featuring McAfee. (*Id.* at 275:14-22.) Undisputed that Ladd stated that a short seller pointed out the

mistake in the press release, but disputed that the 10-Q disclosure was not a corrective

disclosure.  This is a legal conclusion, not a fact.

Disputed that "Ladd admitted that the Form 10-Q disclosure told investors nothing about

what had been misstated in the May 9, 2016 press release."  In the cited portion of the deposition

transcript, Ladd stated that he did not make any additional disclosures, but did not address what

the disclosure told investors.  (*Id.* at 304:4-15.).  Undisputed that Kaplowitz and Wu so testified.

39. The same day Ladd issued the press release, he had MGT pay $125,000 to a stock promoter
to publish a piece heralding McAfee's arrival. (Bromberg Decl., Ex. II (*Stock Beast Report*, May
9, 2016, titled "NYSE: MGT Beastmode engaged —John McAfee driving the Bus"); *id.*, Ex. F
(Ladd Tr. 296:19-297:4).) Ladd chose *Stockbeast* at the suggestion of an MGT consultant who
"was a little more aware of the mailing lists that had the biggest circulation." (*Id.*, Ex. F (Ladd
Tr. 297:11-17).) In its first paragraph, the *Stockbeast* article echoed MGT's press release's false
claim that McAfee had sold his company for $7.6 billion. (*Id.*, Ex. II. (*Stock Beast Report*, May
9, 2016, titled "NYSE: MGT Beastmode engaged—John McAfee driving the Bus").)

**Ladd's Response:**  Undisputed.  This article also mostly addressed how MGT could address

potential cybersecurity concerns unrelated to the chronology of McAfee's involvement in the

company.

40.  Christopher Petranis, who bought MGT stock on May 16, 2016, recalls the press release's
claim that McAfee sold his company to Intel for $7.6 billion. (Petranis Decl., ¶ 2.) That
statement was important to his decision to invest because it conveyed to him that McAfee had
enjoyed a huge success at his prior company and that he might be able to bring his talents for
creating successful companies to MGT. (*Id.*, ¶¶ 3-4.)

**Ladd's Response:**  Undisputed that Petranis made these claims in his declaration.  Disputed that

Petranis' declaration has any evidentiary value. Petranis' views are those of the world's least

sophisticated investor and the court is not permitted to take them into account when considering

a "reasonable investor."  By way of limited example, Petranis claimed that he was "was

especially influenced by the amount of money McAfee reportedly made – $7.6 billion – in the

sale of his company to Intel."  *Id.* ¶ 4.   Petranis claimed that this amount of money was "a

massive win and it definitely swayed [Petranis] to buy MGT shares." *Id.* But the press release did not state that McAfee made $7.6 billion and otherwise accurately reported the amount of money involved in the sale of the company McAfee founded. Further, the press release did not address what, if any, money McAfee personally received in connection with the sale of his company. As such, Petranis' being "especially influenced" by a statement not made in the press release render's his affidavit of no evidentiary value.

## LADD's MATERIALLY FALSE FORMS 4 AND 144

### A. Ladd's Materially False Form 4 filed May 31, 2016

41. On May 31, 2016, Ladd filed a Form 4 that materially misstated his trading in MGT. On the first line of the Form, Ladd identified 465,171 MGT shares that he claimed to have distributed "for no consideration" pro rata to the "limited partners of Laddcap Value" on May 25, 2016. (Tong Decl., Ex. A (Forms 4 that Ladd filed on EDGAR, dated October 9, 2015, December 1, 2015 and May 31, 2016).)

**Ladd's Response:** Undisputed that Ladd filed this Form 4, which included the information described in this paragraph, but disputed that this form "materially misstated his trading in MGT." The term "materially misstated" is a legal conclusion, not a fact. For the reasons set forth in the accompanying Reply Memorandum of Law in Support of Motion for Partial Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment, this legal conclusion is incorrect, as the Form 4 did not materially misstate Ladd's trading in MGT.

42. Laddcap Value Partners III LLC ("Laddcap") was the fund Ladd set up to acquire and hold MGT shares, and for which Ladd acted as Managing Member. (Bromberg Decl., Ex. Q (July 4, 2016 Ladd email exchange with McAfee explaining the structure of Laddcap [MGT_SEC_00009052-53]).)

**Ladd's Response:**  Undisputed that the email states the information described in this paragraph.  Disputed that this document shows any the distribution of voting or investment power within Laddcap.

43. Laddcap had about 17 limited partners or members. (Bromberg Decl., Ex. R (Laddcap 2016 K-1s distributed to Laddcap investors in 2017); *id.*, Ex. F (Ladd Tr. at 482:17- 23).)

**Ladd's Response:**  Undisputed that Ladd testified those were the investors in Laddcap "at that time," meaning as of the tax year ending in 2016.  (*Id.*)

44. Ladd admitted that Laddcap made only two distributions to its investors in 2016 (in cash, not MGT stock), and Ladd admitted that the May 31, 2016 Form 4 was wrong when it recorded that the 465,171 MGT shares had been distributed pro rata to Laddcap's investors for no consideration. (Bromberg Decl., Ex. F (Ladd Tr. 484:3-485:2); *id.*, Ex. R (Laddcap 2016 K- 1s distributed to Laddcap investors in 2017) [Ladd-MGT-00087850; Ladd-MGT-00087874]).)

**Ladd's Response:**  Undisputed that Ladd so testified.

45. Although most of these 465,171 MGT shares belonged to Laddcap, Ladd deposited them in an account at E*Trade that he opened in his own name in November 2015. (Tong Decl., Ex. E (account statements for Ladd's E*Trade account November 1, 2015 – April 30, 2016); Bromberg Decl., Ex. F (Ladd Tr. 57:7-11).)

**Ladd's Response:**  Undisputed that Ladd testified that testified that he "deposited the shares held by [Laddcap] into this account."  (*Id.)*  Otherwise disputed that the evidence cited supports this assertion.

46. Ladd sold these 465,171 MGT shares for hundreds of thousands of dollars (Bromberg Decl., Ex. F (Ladd Tr.. 487:2-8)), and not on May 25, 2016, but in multiple sales since December 2015 out of his E*Trade account. (Tong Decl., Ex. E (account statements for Ladd's E*Trade account November 1, 2015 – April 30, 2016); *id.*, Ex. F (account statement for Ladd's E*Trade account May 1, 2016 – May 31, 2016).)

**Ladd's Response:**  Undisputed that Ladd testified that he "sold the shares for hundreds

of thousands of dollars." (Bromberg Decl., Ex. F (Ladd Tr. 487:2-8).  Otherwise disputed that

the evidence cited supports this assertion.

47. Ladd sold no MGT shares at all on May 25, 2016 (Bromberg Decl., Ex. F (Ladd Tr. 84:14-85:9)), and he had sold his last MGT share out of the E*Trade account on May 17, 2016. (Tong Decl., Ex. F (account statement for Ladd's E*Trade account May 1, 2016 – May 31, 2016).)

**Ladd's Response:**  Undisputed, but disputed that this discrepancy is material.

48. On Line 2 of his May 31, 2016 Form 4, Ladd claimed that Laddcap had sold 157,300 shares of MGT stock on May 25. (Tong Decl., Ex. A (May 31, 2016 Ladd Form 4).) But because Ladd sold no shares at all on May 25, and he had sold his last MGT share out of the E*Trade account where his Laddcap shares were held on May 17, 2016, Line 2 was also false.

**Ladd's Response:**  Undisputed, but disputed that this discrepancy is material.

49. Ladd admitted that Line two was false. (Bromberg Decl., Ex. F (Ladd Tr. 84:7- 85:9).)

**Ladd's Response:**  Undisputed that Ladd so testified.

50. Ladd's representation on Line 4 of the shares he claimed to have sold on May 31, 2016 was also incorrect. On his Form 4, Ladd recorded that he had sold 33,603 shares on that date. (Tong Decl., Ex. A (May 31, 2016 Ladd Form 4).) But his TDA IRA account statements (the only account in his name that held MGT shares as of May 31, 2016) reflect that he sold only 11,000 shares on that date. (Tong Decl. ¶9, Ex. I (Ladd IRA TDA Account statements for May 2016).)

**Ladd's Response:**  Disputed that this document shows that this was the only account in Ladd's

name that held MGT shares as of that date and disputed that this discrepancy is material, but

otherwise undisputed.

51. Ladd's lawyer at SRF Wu helped prepare Ladd's May 31, 2016 Form 4's. (Bromberg Decl., Ex. S (Wu Tr. 7:10-10:11).) Ms. Wu testified that if, while preparing Ladd's May 31, 2016 Form 4, she had known that Ladd had sold his MGT shares rather than distributed them for no consideration, she would have included the dates of sale, noted their sale price and coded them as a "sale." (*Id.*, Ex. S (Wu Tr. 27:6-23).)

**Ladd's Response:**  Undisputed that she so testified.

52.  Ms. Wu testified that had she received information from Ladd that he had sold 435,000 MGT shares out of his E-Trade account between May 9 and May 12 that "[t]here should have been a Form 4 filed the next day if those transactions did occur." (*Id.*, Ex. S (Wu Tr. 25:14- 19).)

**Ladd's Response:** Undisputed that she so testified but disputed that Wu's testimony is evidence of materiality or when the Form 4 was required to be filed under applicable law.

53. Ms. Wu also testified that if she had known that Ladd had sold 435,000 shares out of his E*Trade account between May 9 and May 12 while she was preparing the May 31, 2016 Form 4 that she would have included that information: "Yes, it will be a late reporting, but if I was provided with those information, I would – I would have include[d] those information in this Form 4." (*Id.*, Ex. S (Wu Tr. 25:25 – 26:6).)

**Ladd's Response:** Undisputed that she so testified but undisputed that Wu's testimony is evidence of materiality or when the Form 4 was required to be filed under applicable law.

54. Ladd identified his SRF lawyers as the preparers of his Form 4, and testified that they make "certain calculations . . . they do those either on their own, or, you know, kind of check the previous from 4s and, you know, subtract or add as needed" and "then they put on the date that's wrong." (Bromberg Decl., Ex. F (Ladd Tr. 74:2-75:20; 82:15-83:10; 87:5-21; 190:3- 13).) After he had waived privilege and Ms. Wu (his SRF lawyer) testified, Ladd admitted that he was the source of information for the Form 4 and that he had conveyed his trading activity to Ms. Wu via email or orally. (Bromberg Decl., Ex. F (Ladd Tr. 478:10-24; 485:10-17).)

**Ladd's Response:** Undisputed that he so testified.  Ladd also explained that he "obviously relied on counsel to file this form" 4, which Ladd characterized as "so freaking confusing." (Supplemental Declaration of Adam C. Ford in Support of Defendant Robert Ladd's Motion for Partial Summary Judgment, dated March 17, 2023, Ex. 58 (Ladd Tr. 82:20-21; 190:7-13))

55. Ladd understood that the information disclosed in Form 4 is material to investors. He testified that the purpose of the Form 4 is to disclose purchases and sales of an issuer's stock by that issuer's officers and directors. (*Id.*, Ex. F (Ladd Tr. 485:21-486:1).) Ladd also knew the requirements of Exchange Act Section 16 as it relates to the disclosure of purchases and sales he made in MGT: Ladd testified "[t]hat you were to report purchases or sales within 48 hours and file form 4." (*Id.*, Ex. F (Ladd Tr. 73:3-10).) Although disclosure of an officer's sale of stock, as well as his purchases, is required by Exchange Act Section 16 on Form 4, Ladd testified that "insider sales are less relevant" to investors. (*Id.*, Ex. F (Ladd Tr. 486:2-14).) Ladd testified that investors were more interested in whether insiders were acquiring shares "as a method for finding undervalued stocks[;] . . .as they say, there's 99 . . .reasons that people sell stock but only one way they buy it." (*Id.*, Ex. F (Ladd Tr. 486:8-14).)

**Ladd's Response:** Undisputed that Ladd so testified, but disputed that Ladd testified that Form

4 is material to investors or that any of this testimony is evidence of materiality.

56. Ladd's account statements reflect, as he testified, that he sold 466,600 MGT shares between May 1 and May 17, 2016 in his E*Trade account, and that only some of those sales are reflected on his Form 4. (Bromberg Decl., Ex. F (Ladd Tr. 96:1-97:3).) He also admitted that none of his earlier purchases and sales since December 2, 2015 in his E*Trade account were disclosed on any Form 4 at all. (*Id.*, Ex. F (Ladd Tr. at 102:6-14).)

**Ladd's Response:** Undisputed that Ladd testified that "the form 4 does reflect

some, if not all, of the E-Trade shares," *id.* 96:24-25, but otherwise disputed that the cited

testimony supports the assertions in this statement.

57. Ladd's misleading May 31, 2016 Form 4 gave investors the misleading impression that Ladd was a net acquirer of MGT stock. Because he concealed his sale of hundreds of thousands of shares in his E*Trade account – calling them a distribution for no consideration to Laddcap's investors – it appeared that he had sold only 157,300 on behalf of Laddcap, and 33,000 shares of his own, while acquiring 300,000 restricted shares in a grant from the company, making him a net acquirer. (Tong Decl., Ex. A (May 31, 2016 Ladd Form 4, at 1, Line 2).) The impression that insiders were acquiring not selling their shares was furthered by the Forms 4 filed by Robert Holmes and Michael Onghai, MGT's other directors. (Bromberg Decl., Ex. T (Holmes's May 31, 2016 Form 4 (showing stock grant of 400,000 shares)); Ex. U (Onghai's May 31, 2016 Form 4 (showing sale of 6,545 shares and stock grant of 300,000).)

**Ladd's Response:** Undisputed that the Form 4 documents reflected in Exhibits T and U to the

Bromberg Decl. show acquisitions of MGT shares, but other disputed.  The fact that the Form 4

described sales as pro rata distributions to the "limited partners of Laddcap Value" does not

support the contention that Ladd was a "net acquirer of MGT stock."  The Form 4 represented

that Ladd disposed of the shares, and the fact that the recipients were the limited partners of

Laddcap Value does not change that Ladd represented he no longer owned the shares.  As Ladd

explained in his deposition, "[t]he net impact to ownership was the same in that the shares were

not controlled by me."  (Bromberg Decl, Ex. F (Ladd Tr. 487:10-11).

58. Investors viewed the Ladd, Onghai and Holmes Forms 4 as reflecting insider confidence in the company's prospects. One investor noted that "it is slightly bullish that Ladd sold only 190,903 shares of the 465K he had registered with Form 144." (Bromberg Decl., Ex. V (June 1,

2016 tweet from Michael Goode @goodetrades).) Another investor tweeted: "$MGT as of May 26, 20[16] 1 million shares were picked up between the directors. Insider buying and restricted, sweet baby jesus. Here we go!!" (*Id.*, Ex. W (May 31, 2016 tweet from DC @Mr_guns6).) And yet another investor observed that Ladd "Acq'd: 300000 o.oo/s; Disp'd: 33603 2.53/s." (*Id.*, Ex. X (May 31, 2016 tweet from LargeVoid Bot @LargeVoidBot).)

**Ladd's Response:** Undisputed that these tweets included the text identified here, but disputed

that these tweets show the general opinion of any investors in MGT including the three

individuals who have not been deposed or provided information regarding their tweets.  As the

SEC is well-aware, individuals include false and materially misleading information regarding

stocks in tweets for a variety of reasons.  Random tweets have no evidentiary value as they are

not reliable evidence of anything.

59. Knowing the truth about Ladd's sale of stock would have been material to Mr. Petranis, who invested in MGT on May 16, 2016 after seeing Ladd's May 9, 2016 press release. He has affirmed that had he known that Ladd had sold hundreds of thousands of shares in May and earlier for hundreds of thousands of dollars, that would have been important information to him because it would have conveyed that Ladd was less than confident about MGT's prospects. (Petranis Decl. ¶ 5.)

**Ladd's Response:** Undisputed that Petranis made these claims in his declaration.  But disputed

that Petranis' declaration has any evidentiary value or is reliable given that Petranis' statements

conflict with the general view of the market's reaction to Ladd's stock sales.  MGT stock

continued to go up for months after the full disclosure of all of Ladd's stock sales and only went

down after the SEC filed its lawsuit.

60. And at least one other investor emailed Ladd after seeing Ladd's sale of MGT stock in 2017: "What kind of confidence can investors have when the president of mgti is dumping his shares. . . Why cash out now if you believe in what can be accomplished in the near future." (Bromberg Decl., Ex. Y (June 9, 2017 email from an MGT investor to Ladd [SEC- SSLivingston-E-0080668]).)

**Ladd's Response:** Undisputed that an individual sent this email, but disputed that this email

shows that the individual who sent the email sent it after seeing Ladd's sale of MGT stock in

2017, and disputed that a random email from an unknown person who was not deposed has any evidentiary value.

### B. Ladd's Materially False Form 144

61. Ladd filed no Form 144 before any of his sales from E*Trade account.

**Ladd's Response:**  Disputed as improper for a 56.1 statement because there is no citation. Under Local Civil Rule 56.1(d), any statement in a Rule 56.1 statement "must be followed by citation to evidence which would be admissible … ."

62. For Ladd's TD Ameritrade Account and Ladd's Parents' TDA Account, Ladd knew he would have to file Form 144s, and that TD Ameritrade would submit that form to the Commission. TD Ameritrade's "Restricted-Stock Handling Guidelines, Rule 144-Affiliate," which Ladd received (among other times) on May 9, 2016, provided that TD Ameritrade "will file SEC Form 144 on your behalf." (Bromberg Decl., Ex. D ((TD Ameritrade's May 9, 2016 email with Ladd [SEC-TDA-E-0000117]); *id.*, Ex. AA (Ladd's May 25, 2016 Form 144 with a mailing label showing transmission to the SEC by TD Ameritrade).)

**Ladd's Response:**  Disputed that these documents show that Ladd "knew he would have to file Form 144s, and that TD Ameritrade would submit that form to the Commission."  There is no citation to any testimony by Ladd or any other evidence that he was aware of any particular requirements or practice by TD Ameritrade.

63. Ladd submitted two Forms 144 to TD Ameritrade. (Bromberg Decl., Ex. Z (Ladd's May 24, 2016 Form 144); *id.*, Ex. AA (Ladd's May 25, 2016 Form 144).) In both, Ladd both misstated the number of shares he intended to sell and the dates on which he intended to sell them. On both Forms, Ladd recorded an intention to sell 41,000 MGT shares from his TD Ameritrade account on May 24 and May 25, 2016, and 465,171 shares from his E*Trade account on May 24 and May 25, 2016. But Ladd had no intention to sell any shares from his E*Trade account because that account had no MGT shares left to sell by May 25, 2016. (Tong Decl., Ex. F (Ladd E*Trade account statement for May 2016, showing zero holdings of MGT at the end of May 2016 [SEC-ETrade-E-0000136] and showing last sale of MGT on May 17, 2016 [SEC- ETrade-E-0000144-147]).) On the second page of the May 24, 2016 Form 144 at SEC-TDA- E0000004 under Table II – Securities Sold in the Past 3 Months – Ladd simply falsely wrote, "NONE." (Bromberg

Decl., Ex. Z (Ladd's May 24, 2016 Form 144).) And on the second page of the May 25, 2016 Form 144 at SEC-TDA-E-0000339 under Table II – Securities Sold in the Past 3 Months – Ladd listed none of the sales he had made in the month of May, prior to May 25, 2016, or the 466,600 shares he had sold out of his E*Trade account in May, or the 77,472 shares he had sold between February 2016 and April 30, 2016. Bromberg Decl., Ex. AA (Ladd's May 25, 2016 Form 144); *see also* Tong Decl., Ex. E (Ladd E*Trade account statements [SEC- ETrade-E-0000118-0000131 showing the sale of 77,472 MGT shares between February 16 and April 30, 2016); *id.*, Ex. F (Ladd E*Trade account statements for May 2016 (showing his sale of 466,600 MGT shares.)

**Ladd's Response:**  Disputed that any of these documents show what intention Ladd had or did

not have at any time, but otherwise undisputed that forms include the information that they

include.

## LADD'S SECTION 16(a) AND RULE 16a-3 VIOLATIONS

64. Between August 20 and October 2, 2015, Ladd made over 25 individual open- market MGT stock purchases in the Ladd TDA Account. (Tong Decl., Ex. B (account statements for Ladd TDA account August 1, 2015 – October 31, 2015).) Ladd filed no Forms 4 or 5 for any of those purchases (and did not otherwise publicly disclose them). (*Id.* ¶ 13.)

**Ladd's Response:**  Undisputed.  But disputed the amount of such sales were material.

65. On October 9, 2015, Ladd filed a Form 4 reporting his October 7, 2015 receipt of 200,000 MGT shares. The Form 4 states that he received those shares "as partial compensation for the [sic] Mr. Ladd's services as President and Chief Executive Officer of [MGT]." (Tong Decl. ¶ 14 (Ex. A (October 9, 2015, December 1, 2015 and May 31 2016 Forms 4).)

**Ladd's Response:**  Undisputed.

66. Between November 29, 2015 through May 17, 2016, Ladd made purchases and sales of MGT stock in the Ladd E*Trade Account on over 26 different trading days. (Tong Decl., Ex. E (account statements for Ladd's E*Trade account November 1, 2015 – April 30, 2016; *see also* Bromberg Decl., Ex. F (Ladd Tr. 97:10-101:14 (Ladd admitting that he disclosed none of his purchases or sales between December 2015 and April 2016));Tong Decl., Ex. F (account statement for Ladd's E*Trade account May 1, 2016 – May 31, 2016).)

**Ladd's Response:**  Disputed that Ladd testified that he disclosed none of his purchases or sales

between December 2015 and April 2016, but otherwise undisputed.

67. Ladd disclosed only one of these transactions on a Form 4 filed December 1, 2015. (Tong Decl., Ex. A, at 2 (reflecting a sale of 100,000 MGT shares on November 30, 2015).) As Ladd admitted, that disclosure was inaccurate. (Bromberg Decl., Ex. F (Ladd Tr. 76:18-77:17).) Ladd actually sold only 97,790 MGT shares on that date. (Tong Decl., Ex. E (Ladd E*Trade Statement for November 2015, at [SEC-ETrade-E-0000102-03]).)

**Ladd's Response:**  Undisputed.  But disputed that the difference between a sale of 100,000

MGT shares and 97,790 shares is material.

## LADD'S SECTION 13(D) AND RULE 13D-2 VIOLATION

68. On January 10, 2012, Ladd filed a Schedule 13D/A with the SEC reporting that he owned over 30% of MGT's outstanding stock. (Tong Decl., Ex. P (Ladd's January 10, 2012 Schedule 13 D/A)).)

**Ladd's Response:**  Undisputed.

69. The Schedule 13D/A Ladd field on January 10, 2012 is the last Schedule 13D filing that Ladd made in MGT publicly filed with the Commission. (Tong Decl., ¶ 33.)
From June 16, 2015 to October 7, 2015, Ladd's percentage ownership of MGT's outstanding shares increased from 5.67% to 6.9%. (Tong Decl., ¶31.) This percentage increase occurred because Ladd acquired additional MGT stock during this time. (*Id.* ¶¶ 27-28, Ex. B (Ladd TDA account statement for August 1, 2015 – October 31, 2015); *id.*, Ex. D (Ladd TDA IRA account statement for August 1, 2015 – August 31, 2015).) Indeed, Ladd acquired enough additional MGT shares during this time to increase his MGT ownership percentage by more than 1%, despite the fact that number of MGT's outstanding shares also increased during this same time. (*Id.* ¶¶ 26; 30; *id.*, Ex. N (MGT's May 5, 2015 Form 10-Q); *id.*, Ex. O (MGT's November 6, 2015 Form S-1).)

**Ladd's Response:**  The first sentence is undisputed but otherwise disputed.  The SEC's

calculations are based on two assumptions for which it does not offer evidence: (1) that the total

outstanding shares of MGT did not change between October 2, 2015 and November 4, 2015 and

(2) that Ladd can be deemed to beneficially own shares held by Laddcap.  The SEC states these

assumptions explicitly in paragraph 31 of the Tong Declaration, which explains that the SEC's

determination that Ladd owned 6.9% of MGT's outstanding shares of common stock results

from combining the "564,901 MGT shares [that Ladd owned] directly [...] with the shares held

by Laddcap," to result in the determination that Ladd "beneficially owned 1,187,372 shares, or

6.9% of MGT's outstanding common stock (using the total outstanding share number MGT reported as of November 4, 2015)."

*First,* the number of common shares outstanding as of November 4, 2015 was 17,199,655.  (Tong Decl., ¶30; *id.*, Ex. O).  But the SEC does has not presented evidence that the number of shares on October 2, 2015, was the same as on November 4, 2015.  As such, there is no evidence in the record as to the amount of outstanding shares as of November 4, 2015.

*Second,* further, the SEC has adduced no evidence that Ladd beneficially owned Laddcap.  To the contrary, in an SEC filing, Ladd specifically stated that, notwithstanding his role as Managing Member of Laddcap, "Mr. Ladd hereby disclaims beneficial ownership of the reported securities except to the extent of his pecuniary interest therein, and this report shall not be deemed an admission that he is the beneficial owner of the securities for purposes of Section 16 of the Securities Exchange Act of 1934, as amended, or for any other purpose."  (Tong Decl., Ex. M (Form 4 filed on June 18, 2015)).  Excluding shares owned by Laddcap, the number of shares Ladd owned (564,901) is approximately 3.28% of the total number of outstanding shares (17,199,655), not 6.9%.

Dated: March 17, 2023

Respectfully submitted,

FORD O'BRIEN LANDY LLP

 /s/ Adam Ford
Adam C. Ford
Anjula Prasad
Arthur Kutoroff
575 Fifth Ave, Fl. 24
New York, NY 10017
Tel: (212) 858-0040
aford@fordobrien.com
