**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**      :
                                             :
                                  **Plaintiff,**   :
                                             :      **18 Civ. 8175 (ER)**
                          **– against –**    :
                                             :      **ECF CASE**
**BARRY C. HONIG, ROBERT LADD,**             :
**ELLIOT MAZA, BRIAN KELLER,**               :
**JOHN H. FORD, GRQ CONSULTANTS, INC., and** :
**HS CONTRARIAN INVESTMENTS, LLC,**          :
                                             :
                                  **Defendants.**  :

------------------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT ROBERT LADD

SECURITIES AND EXCHANGE COMMISSION
Nancy A. Brown
Jack Kaufman
Katherine S. Bromberg
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0106 (Kaufman)
Attorneys for Plaintiff

April 6, 2023

# <u>TABLE OF CONTENTS</u>

**Page**

**ARGUMENT** ..............................................................................................................1

**I.   SUMMARY JUDGMENT SHOULD BE GRANTED TO THE SEC ON ITS
     STRICT LIABILITY CLAIMS AGAINST LADD** ...............................................1

   A. Ladd Violated Section 5.........................................................................................1

      1.   Ladd's E\*Trade Account MGT Stock Sales Violated Section 5 ............................1

      2.   Ladd's Stock Sales in His Parents' TDA Account Violated Section 5...................4

   B. Ladd Violated Section 13(d) and Rule 13d-2 Thereunder.......................................6

**II.  SUMMARY JUDGMENT SHOULD BE GRANTED TO THE SEC ON ITS FRAUD
     CLAIMS REGARDING LADD'S FORMS 4 AND 144, LADD'S NEW ACCOUNT
     FORM, AND MGT'S FALSE PRESS RELEASE**.......................................................7

   A. Ladd's False Disclosures in His May 31, 2016 Form 4 Were Material and Knowing
      or Reckless .............................................................................................................8

   B. Ladd's False Disclosures in His Form 144 and New Account
      Application Were Material and Knowing or Reckless ...........................................9

   C. MGT's False Press Release Was Material, and Ladd Issued It with Scienter.................13

      1.   The McAfee False Statement Was Material .........................................................14

      2.   Ladd Issued the False Press Release Knowingly or Recklessly ...........................16

**CONCLUSION** ............................................................................................................18

i

## **TABLE OF AUTHORITIES**

**Page**

**CASES**

*A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir. 1967)................................................................10

*Basic v. Levinson*, 485 U.S. 224 (1988)........................................................................................10

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    533 F.3d 187 (2d Cir. 2009)............................................................................... 12-13

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ..........................................................16

*Hicks v. Baines,* 593 F.3d 159 (2d Cir. 2010)................................................................... 12-13, 16

*SEC v. Boock*, No. 09 Civ. 8261 (DLC), 2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011)........ 12-13

*Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985) ............................................................................12

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)...........................................................................17

*Routhier v. Goggins*, 229 F. Supp. 3d 299 (D. Vt. 2017) ..............................................................2

*SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290 (S.D.N.Y. 2015) ...........................................3

*SEC v. Capital Gains Bureau*, 375 U.S. 180 (1963).....................................................................10

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) .......................................................................3, 6

*SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ............................................................9

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) ..........................................................................12

*SEC v. Gallison*, 588 F. Supp. 3d 509 (S.D.N.Y. 2022).............................................................18

*SEC v. Gann*, 565 F.3d 932 (5th Cir. 2009)...............................................................................11

*SEC v. Genovese,* 17 Civ. 5821 (LGS), 2022 WL 16748779 (S.D.N.Y. Nov. 7, 2022) ......... 14-15

*SEC v. Hemp*, 16-cv-1413-JAD-PAL, 2018 WL 1220566 (D. Nev. Mar. 8, 2018) ................. 3-4

*SEC v. Honig*, No. 18 Civ. 1875 (ER),
    2021 WL 276155 (S.D.N.Y. Jan. 27, 2021) ............................................................5

*SEC v. Jakubowski,* 150 F.3d 675 (7th Cir. 1998)................................................................. 11-12

*SEC v. Longfin Corp.*, 316 F. Supp. 3d 743 (S.D.N.Y. 2018) ........................................................4

*SEC v. Morgan Keegan & Co.*, 678 F.3d 1233 (11th Cir. 2012) ....................................................15

*SEC v. Murphy*, 626 F.2d 633 (2d Cir. 1980) ...............................................................................3

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010) ........................................6

*SEC v. Sierra Brokerage Servs.*, 712 F.3d 321 (6th Cir. 2013) ....................................................6

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ..............14

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007),
    *aff'd, SEC v. Altomare*, 300 Fed. Appx. 70 (2d Cir. 2008) ................................................ 17-18

*United Housing Foundation v. Forman*, 421 U.S. 837 (1975) ................................................. 5-6

*United States v. Litvak,* 889 F.3d 56 (2d Cir. 2018) ................................................................. 14-15

*United States v. Naftalin*, 441 U.S. 768 (1979) .........................................................................10

*United States v. Rowland*, 826 F.3d 100 (2d Cir. 2016) ...............................................................2

*United States v. Schiff*, 602 F.3d 152 (3rd Cir. 2010) ...................................................................8

*VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011) ....................................................................... 10-11

## STATUTES, REGULATIONS AND RULES

Securities Act of 1933

    Section 4(a)(1), 15, U.S.C. § 77d(a)(1)............................................................................. 3-4

    Section 5, 15 U.S.C. § 77e ................................................................................... *passim*

        Rule 144(e), 17 C.F.R. § 230.144(e)............................................................... 1-4

        Rule 144(g), 17 C.F.R. § 230.144(g) ............................................................ 9-10

        Rule 144(h), 17 C.F.R. § 230.144(h) ............................................................ 2-4

Securities Exchange Act of 1934

    Section 13(d), 15 U.S.C. § 78m(d) ...................................................................................6

Rule 13d-2, 17 C.F.R. § 240.13d-2................................................................6

**OTHER AUTHORITIES**

*Merriam-Webster* (https://www.merriam-webster.com/dictionary/concurrently)..........................2

*Notice of Adoption of Rule 144*, SEC Release No. 5223,
   1972 WL 121583, *4 (Jan. 11, 1972) .........................................................................4

*Updating Edgar Filing Requirements and Form 144 Filings,* Rel. 11070,
   2022 WL 2071989, at *6 (June 2, 2022) ..............................................................11

Pursuant to the Court's Orders entered September 15, 2022 (DE 307), January 24, 2023 (DE 314), and April 4, 2023 (DE 330), Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Reply Memorandum of Law in support of its Motion for Partial Summary Judgment against Defendant Robert Ladd. Contrary to Ladd's opposition, the Court should grant the SEC summary judgment on its non-fraud Securities Act Section 5 and Exchange Act Section 16 and 13(d) claims;[1] and on its fraud claims regarding the false May 9, 2016 MGT press release, and Ladd's false Form 4, Form 144, and new account form. Ladd's opposition misconstrues and misapplies applicable law and attempts to create fact disputes where no genuine dispute of material fact exists.

## ARGUMENT

I. **SUMMARY JUDGMENT SHOULD BE GRANTED TO THE SEC ON ITS STRICT LIABILITY CLAIMS AGAINST LADD**

A. **Ladd Violated Section 5**

The SEC's moving papers establish that Ladd violated Securities Act Section 5 regarding his May 2016 MGT stock sales in both his personal E*Trade account and in his parents' TDA[2] account. Ladd's opposition misconstrues Section 5 and its SEC Rule 144(e) safe harbor.

1. **Ladd's E*Trade Account MGT Stock Sales Violated Section 5**

Regarding his E*Trade account sales, Ladd does not dispute that he violated Section 5 if, as the SEC contends, the Court bases MGT's average weekly trading volume on the four weeks immediately preceding those sales on May 9-12, 2016. Instead, Ladd asks the Court to calculate

---

[1] Ladd does not dispute the SEC's Section 16(a) claim. (Ladd Opposition Brief ("Opp.") at 5, n.5, stating that Ladd "does not specifically address" this claim.) Thus, for the reasons set forth at pages 32-33 of the SEC's opening brief, the SEC is entitled to summary judgment on its Section 16(a) claim.

[2] The short forms used herein are those defined in the SEC's Moving Memorandum of Law (DE 321) ("SEC Br.").

MGT's trading volume based on the four-weeks preceding May 25, 2016—two weeks after Ladd's stock sales—because that was the date that Ladd chose to file his Form 144. (Opp. at 42-45.) Ladd asks the Court to accept this sleight of hand on the theory that the word "concurrently" in Rule 144(h)(3) means something other than at the same time as his stock sales. Ladd's strained and self-serving reading is contrary to the plain meaning of Rule 144, Congressional intent, and common sense.[3]

"In interpreting a statute or regulation," courts "look[] first to the statute's 'plain meaning,' as determined by dictionary definitions, 'the specific context in which that language is used,' and 'the broader context of the statute as a whole.'" *Routhier v. Goggins*, 229 F. Supp. 3d 299, 305 (D. Vt. 2017) (quoting *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016)).

First, the word "concurrently" is unambiguous, particularly in this context. According to Merriam-Webster, "concurrently" is the adverb of "concurrent," meaning: "operating or occurring at the same time." *Merriam-Webster* (available at: https://www.merriam-webster.com/dictionary/concurrently.) Thus, "concurrently" in Rule 144(h)(3) means "at the same time" as Ladd's stock sales, not two weeks later.[4]

Second, read together, the texts of Rules 144(e) and 144(h)(3) make it plain that "concurrently" refers to the date of the securities sale, not a later date of Ladd's choosing. Under Rule 144(e)(1)(ii), Ladd's MGT stock sales could not exceed the "greatest" of certain calculated amounts, including the calculation at issue:

[t]he average weekly reported volume of trading…during the four calendar

---

[3] In his opposition brief, Ladd incorrectly cites "Rule 144(e)(1)(ii)(h)(3)," which does not exist. (Opp. at 42-43.) The applicable regulations are Rule 144(e)(1)(ii) and Rule 144(h)(3).

[4] "Contemporaneously," the word Ladd used in testifying about when the form is due (Ladd Response to SEC's Statement Pursuant to Local Rule 56.1 (DE 328) ("Resp. to 56.1") ¶10), means the same thing. *See* https://www.merriam-webster.com/dictionary/contemporaneous ("existing, occurring, or originating during the same time").

weeks preceding the filing of the notice required by [Rule 144(h)], or if no such notice is required the date of receipt of the order to execute the transaction by the broker…

17 C.F.R. § 240.144(e)(1)(ii). Using similar language, Rule 144(h)(3) required Ladd to file the referenced "notice required by" Rule 144(h) "concurrently with…the placing with a broker of an order to execute a sale of securities…." 17 C.F.R. § 240.144(h)(3). Thus, the two Rules both contemplate that an affiliate (Ladd) calculate his permissible trading volume using the four-week period immediately preceding the date he "places" his order to sell stock, not weeks later. Indeed, Rule 144(e)(1)(ii) expressly requires using that four-week period where "no [Rule 144(h)(3)] notice is required"; it would be incongruous for the Rule to require a different four-week period—of Ladd's choosing—merely because Rule 144(h) required him to file a notice.

 <u>Third</u>, Ladd's self-serving reading is contrary to the purpose of Section 5 and its exemptions. Section 5's stock-sale registration requirements "ensure that investors receive information sufficient to make informed investment decisions." *SEC v. Caledonian Bank Ltd.*, 145 F.Supp.3d 290, 305 (S.D.N.Y. 2015). Thus, "[r]egistration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public." *SEC v. Cavanagh*, 445 F.3d 105, 115 (2d Cir. 2006). Section 5's principal exemption is Securities Act Section 4(a)(1), which exempts transactions by any person other than an "issuer, underwriter, or dealer"—in other words, all "routine trading transactions" involving "securities already issued." *SEC v. Murphy*, 626 F.2d 633, 648 (9th Cir. 1980). SEC Rule 144 is "a safe harbor from the underwriter classification" designed to "give clarity to individuals seeking to resell securities" under the Section 4(a)(1) exemption. *SEC v. Hemp*, 16-cv-1413-JAD-PAL, 2018 WL 1220566, at *3 (D. Nev. Mar. 8, 2018) (internal quotations and citations omitted). "A person satisfying the applicable conditions of the Rule 144 safe harbor is deemed not to be engaged in a distribution of

the securities and therefore not an underwriter of the securities." *Id.* The purpose of Rule 144's volume limitations is "to permit only routine trading transactions as distinguished from distributions." *Notice of Adoption of Rule 144*, SEC Release No. 5223, 1972 WL 121583, *4 (Jan. 11, 1972) ("The larger the amount of securities involved, the more likely it is that such resales may involve methods of offering and amounts of compensation usually associated with a distribution rather than routine trading transactions."). Ladd seeks to avoid the Rule 144(e) volume limitation by granting himself discretion to choose the applicable four-week calculation period and, thus, increase his permissible trading volume. Such a result would violate the Section 4(a)(1) exception and the related Rule 144(e) safe harbor—by permitting Ladd to act as an "underwriter" involved in a large unregistered "distribution" of MGT stock. *See id.*

Finally, even if the Court were to find that "concurrently" is ambiguous in Rule 144(h)(3), it "must defer" to the SEC's reasonable interpretation of that Rule—"even if the [SEC's] interpretation of its regulation was not promulgated through formal procedures prescribed by the APA, but, for example, is advanced in a legal brief." *SEC v. Longfin Corp*., 316 F. Supp. 3d 743, 762-63 (S.D.N.Y. 2018) (internal quotation marks omitted). As we explain at pages 29-30 of our opening brief—and as Ladd himself notes (Opp. at 43-44)—the SEC's Division of Corporation Finance has issued guidance that the word "concurrently" in Rule 144(h) means "the same day as the placing of a sale order or the execution of the sale." For all the reasons set forth above—contrary to Ladd's nonsensical argument—the SEC's interpretation is reasonable; indeed, it is essential to construing Rule 144(e) consistently with the broader purpose of the Rule 144 safe harbor and Securities Act Sections 5 and 4(a)(1).

## 2. <u>Ladd's Stock Sales in His Parents' TDA Account Violated Section 5</u>

Ladd argues that his sales of MGT stock in his parents' TDA account did not violate

Section 5 because—Ladd claims—he did not "control" that account. (Opp. at 45-46.) Ladd relies solely on this Court's January 2021 Order stating that Ladd's "power of attorney" over his parents' account, standing alone, was insufficient to constitute "control" for purposes of determining Ladd's father's "affiliate" status under Rule 144. Ladd's arguments miss the mark.

First, the Court's 2021 Order is inapplicable because it does not concern the SEC's Section 5 claim. Rather, it concerns a prior SEC claim—that Ladd had a duty to disclose certain information on his father's Form 144. For that purpose, the Court found insufficient the SEC's allegations that *Ladd's father* was an "affiliate" under Rule 144. *See SEC v. Honig*, 18 Civ. 8175 (ER), 2021 WL 276155, *15 (S.D.N.Y. Jan. 27, 2021). The issue now is whether Ladd violated Section 5 when, as an affiliate himself (which is undisputed), Ladd sold MGT stock through his parents' account. Unless Ladd's stock sales were registered, or unless an exemption applied, Sections 5(a) and 5(c) made it unlawful for Ladd "directly or indirectly…to sell" or "offer to sell" MGT stock. 15 U.S.C. §§ 77e(a)(1) and 77e(c). No dispute exists that Ladd's sales through his parents' account were not "registered." Furthermore, for the reasons set forth above, Ladd could not rely on the Rule 144 safe harbor, and Ladd raises no other exemption. Thus, the only issue on summary judgment is whether Ladd was a "seller" of MGT stock in his parents' account—which the Court's January 2021 Order does not address.

Second, the undisputed evidence establishes that Ladd was a "seller" of his parents' MGT stock. As explained in our opening brief, in addition to holding a power of attorney, Ladd admits that he enjoyed complete discretion to trade in his parents' account and, significantly, that he received the full post-tax cash proceeds of the MGT stock sales he made. (Resp. to 56.1 ¶¶21-24, 28-33.) Thus, in all practical respects, Ladd was a "seller" of MGT stock in his parents' account. Indeed, "[b]ecause securities transactions are economic in character Congress intended the

application of these statutes [the federal securities laws] to turn on the economic realities underlying a transaction, and not on the name appended thereto." *United Housing Foundation v. Forman*, 421 U.S. 837, 849 (1975). Following this reasoning, federal courts have held affiliates liable under Section 5 for executing unregistered stock sales through the accounts of others. *See SEC v. Sierra Brokerage Servs., Inc.,* 712 F.3d 321, 329-30 (6th Cir. 2013) (Rule 144(k) safe harbor unavailable to affiliate who orchestrated stock sales through nominee shareholders); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086-90 (9th Cir. 2010) (Rule 144 safe harbor unavailable to affiliate who orchestrated stock sales though an entity that affiliate purportedly had transferred to his ex-wife); *Cavanagh*, 445 F.3d, at 114 (company officers who negotiated unregistered stock sales violated Section 5 though officers had resigned their positions prior to sales).

Likewise here, Ladd attempted an end run around Section 5 by using his parents' account to acquire MGT stock, sell it at a huge profit, and receive for himself all of the post-tax sales proceeds. The Court should not permit Ladd to escape Section 5 liability merely because his name did not appear on his parents' account statement. *See id.*

### B.   Ladd Violated Section 13(d) and Rule 13d-2 Thereunder

The SEC's moving papers establish that Ladd violated Exchange Act Section 13(d) and Rule 13d-2 by failing to file an Amended Schedule 13D disclosing that, from June 16, 2015 to October 7, 2015, Ladd's (including Laddcap's) ownership of MGT's stock outstanding had increased materially—by more than 1%—*i.e.*, from 5.67% to 6.9%. Ladd's only response is that the SEC's numbers are incorrect. (Opp. at 47-48.) Ladd again is mistaken.

Ladd first argues that he was not a "beneficial owner" of Laddcap's MGT stock because he allegedly did not have "voting or investment power" regarding Laddcap's stock. Directly to

the contrary, in a Schedule 13D/A that Ladd signed January 10, 2012, he stated, "Mr. Ladd has the power to vote and direct the disposition of all Common Shares held by Laddcap by virtue of his role as managing member of Laddcap." (Declaration of Nancy A. Brown in Further Support ("Brown Suppl. Decl."), Ex. A at Item 5(b).)

Ladd next questions the SEC's calculation of his percentage ownership of MGT's common stock outstanding as of October 7, 2015. Ladd's argument raises no genuine dispute of material fact. As set forth in our moving papers, as of November 6, 2015, MGT reported 17,199,665 shares of such stock. Thus, as of that date, Ladd beneficially owned 6.9% of MGT's common stock outstanding. (Tong Decl. (DE 317) ¶¶30-31, Ex. O.) As of September 22, 2015— the last time prior to November 6 that MGT reported its common stock outstanding—MGT reported 15,241,857 such shares. (Brown Suppl. Decl. ¶4 and Ex. B at 6 (under "Dilution")). Thus, because there is no evidence that the number of MGT shares outstanding moved lower between September 22 and October 7, 2015, Ladd's ownership percentage was 7.79% on October 7 when he acquired his MGT stock—even higher than on November 7. Using either calculation, Ladd's ownership percentage during the time period at issue increased by more than 1%. (Tong Decl. ¶32; Brown Suppl. Decl. ¶¶4-5 and Ex. B.)

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED TO THE SEC ON ITS FRAUD CLAIMS REGARDING LADD'S FORMS 4 AND 144, LADD'S NEW ACCOUNT FORM, AND MGT'S FALSE PRESS RELEASE

The SEC's moving papers establish that the false statements that Ladd included on his Forms 4 and 144, his new account form, and in MGT's press release were material and knowing or reckless. None of Ladd's opposition arguments creates a triable issue of fact as to either element regarding any of these false statements.

A.   **Ladd's False Disclosures in His May 31, 2016**
     **Form 4 Were Material and Knowing or Reckless**

Regarding his false Form 4, Ladd offers only his own opinion that the difference between

selling hundreds of thousands of shares and distributing them for no consideration was

"immaterial." (Opp. at 33.) But that opinion directly conflicts with the declaration of Mr.

Petranis—the MGT investor who affirmed that he would have considered Ladd's stock sales

important because they indicated Ladd's lack of confidence in MGT's future. (Petranis Decl.

(DE 316), ¶ 5.) By masking the sales as a "distribution" to Laddcap investors, Ladd signaled to

investors that he was conferring on Laddcap investors stock that he arguably thought would

increase in value. To the contrary, a sale of nearly 75% of Laddcap's holdings signaled that Ladd

was simply cashing out while the price was high. *See also* SEC Br. at 12 (Ladd's Form 4

indicating to investors that he was a net acquirer of MGT stock).[5]

Ladd's argument that Mr. Petranis's views are "irrelevant"—because the stock price

failed to react after Ladd "disclosed the sale of shares" (Opp. at 34)—is supported by no

evidence at all. Ladd never corrected his misstatements in his Form 4 to disclose his sales. Thus,

at most, the fact that the stock price did not decline merely means that the market received no

disclosure to which it could react negatively. Moreover, as a matter of law, the resilience of

MGT's share price to any news is irrelevant to materiality where, as here, there is no evidence

that MGT traded in an efficient market. *United States v. Schiff*, 602 F.3d 152, 171 (3rd Cir. 2010).

S*ee also* SEC Br. at 39 n.28.

Nor is there any genuine dispute that Ladd knowingly or recklessly mischaracterized his

_____

[5] Contrary to Ladd's opposition brief (Opp. at 34), neither the Commission nor Mr. Petranis
claims that the "identity of the recipients" of Ladd's sale was material.

sales.[6] Whether Ladd thought the Form 4 was "confusing" or not (Opp. at 34), he admits that he did not fill it out; he paid his SRF lawyers to do so, and SRF's Wu testified to no confusion about how she would have recorded the sales had Ladd told her about them. (Resp. to 56.1 ¶¶51, 54.) Thus, Ladd's claimed confusion is of no moment; the misstatements on the Form resulted not from any Ladd misunderstanding of his Form 4 but from misstatements of fact that Ladd gave his lawyer.

Furthermore, whether Ladd checked his trading records is irrelevant, as he does not dispute that he could have done so before signing his Form 4. If he did not, he acted at least recklessly.[7] *SEC v. Constantin,* 939 F. Supp. 2d 288, 309 (S.D.N.Y. 2013) (defendant acted recklessly in providing false account statements to investors where he had access to their real statements on line).

**B.    Ladd's False Disclosures in His Forms 144 and New
        Account Application Were Material and Knowing or Reckless**

There is no dispute that Ladd misstated the dates on which he intended to sell MGT shares out of his E*Trade account on his Form 144 (all had already been sold prior to the date of the Form 144), and that it listed none of the sales he had made prior to May 1. (Resp. to 56.1 ¶63.) Indeed, Ladd filed the Form 144 only because he wished to sell the MGT shares remaining in his TDA IRA account, and TDA required the Form 144 to comply with its own obligations— under Rule 144(g) and Securities Act Section 4(a)(4)—to ensure that an MGT officer was not

---

[6] Ladd argues that there is no evidence that he knew his disclosure was false (Opp. at 34), but he admitted that it was. *See* Resp. to 56.1 ¶¶44, 46) (citing Bromberg Decl., Ex. F (Ladd Tr. 484:3-485:2 (Laddcap investors "were not distributed the shares in kind, but rather it was a mistake in the filing. They were sold. . .").)

[7] In fact, E*Trade's records reflect that Ladd often logged onto his account, including on May 31, 2016, the day he signed his Form 4. *See* Brown Suppl. Decl. ¶6 and Ex. C (Ladd's E*Trade log-in report).

engaged in an unlawful, unregistered distribution of securities under Securities Act Section 5. *See* SEC Br. at 40-41.

Citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988), Ladd argues that the Form 144 was not material because securities liability is confined solely to defendants who lie to investors. (Opp. at 36-38.) Ladd misreads the law.

The Supreme Court long ago rejected the argument that the antifraud provisions protect only investors from false statements. *United States v. Naftalin*, 441 U.S. 768, 771 (1979) (upholding trader's conviction for lies he told his brokers in connection with a short-selling scheme). Rejecting just the argument Ladd makes here, the *Naftalin* Court noted that "neither this Court nor Congress has ever suggested that investor protection was the *sole* purpose of the Securities Act. . . .Prevention of frauds against investors was surely a key part of that program, but so was the effort 'to achieve a high standard of business ethics . . . *in every facet of the securities industry.'" Id.*, 441 U.S. at 775 (emphasis in original) (quoting *SEC v. Capital Gains Bureau*, 375 U.S. 180, 186-87 (1963)). If the securities laws covered only misstatements that affect retail investors, then all measure of deceit would fail to violate those statutes—a "loophole in the statute that Congress simply did not intend to create." *Id.* at 777.[8]

Circuit courts since have not hesitated to impose liability for lies told only to market participants, not investors. *See*, *e.g.*, *VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011) ("We have no trouble concluding that . . . VanCook made material, untrue statements and omissions"

---

[8] Neither of the anti-fraud provisions at issue here restricts its scope to misstatements to "investors." *See A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 396 (2d Cir. 1967) ("Neither Section 10(b) nor Rule 10b-5, it appears, speaks in terms of limiting the nature of the violation to one involving fraud of 'investors'; nor is there any justification for reading such an additional requirement into the Act.").

in placing late trading orders with mutual funds); *SEC v. Gann*, 565 F.3d 932, 936-37 (5th Cir. 2009) (finding misstatements to mutual fund material as "reasonably calculated to influence the decisions of an investor—institutional or otherwise—in its trading in securities.").[9] And in *SEC v. Jakubowski*, the Seventh Circuit expressly rejected Ladd's reading of *Basic v. Levinson*, holding that the materiality standard applies equally to defrauded issuers and investors. 150 F.3d 675, 680-81 (7th Cir. 1998) (concluding that defendant's lies were material to issuers in deciding whether to issue stock, court noted that "*Basic* . . . covers whatever is important enough to reasonable participants in an investment decision to alter their behavior.").[10]

Thus, Ladd's false Form 144 was material. TDA asked Ladd for the Form because, pursuant to Rule 144(g), it had to satisfy itself that its customer was not engaged in an unlawful, unregistered distribution of securities in violation of Section 5. Ladd knew that TDA tracked the Rule 144 trading volume limitations applicable to him because TDA had told him that. *See* Brown Suppl. Decl., Ex. D (TDA May 26, 2016 call notes reflecting notification to Ladd of number of shares he could sell under Rule 144 based on Ladd's false May 26, 2016 Form 144 disclosures). And Ladd also knew that, had he told TDA that he had already lost the protections of Rule 144 due to his excessive sales of MGT stock out of his E*Trade account, TDA would

---

[9] Ladd makes the unsupported claim that "a mutual fund is more analogous to a collection of investors," but fails to explain how a mutual fund is any different from a broker or a transfer agent *vis-a-vis* investors and the materiality standard. (Opp. at 38 n. 18.)

[10] Even under Ladd's restrictive reading, materiality is established here. Investors see and analyze Forms 144, even though the SEC did not publish them electronically in 2016. *See* "Updating Edgar Filing Requirements and Form 144 Filings," Rel. 11070, 2022 WL 2071989, at *6 (June 2, 2022) (adopting release relating to Rule 144 amendments, explaining that one commenter "stated that the importance of the information contained in Form 144 is demonstrated by the activities of third party vendors that" scan the paper submissions and "disseminate Forms 144 to clients that pay for the information.") Indeed, at least one investor saw Ladd's Form 144, tweeting that it was "slightly bullish" that Ladd's Form 4 indicated that he had sold "only 190,903 shares of the 465K he had registered with Form 144." (56.1 ¶58.)

have protected itself from liability by prohibiting him from selling the remaining MGT shares in his TDA IRA account.

Just as material is the new account form Ladd submitted to E*Trade. Ladd falsely told E*Trade that he was "retired" because he knew that, had he told the truth, E*Trade would have considered him an affiliate and subjected his sales to Rule 144's notice requirements and volume limitations. E*Trade relied on that misrepresentation and "altered their behavior," *Jakubowski*, 150 F.3d at 681—there is no evidence that E*Trade requested a Form 144 from Ladd prior to accepting his sell orders. That is sufficient to establish materiality.

Ladd's scienter is also established, despite his repeated claim that his misstatements on his new application form and Form 144 were mere "mistakes." (Opp. at 38, 40.) "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Neither "speculation or conjecture as to the true nature of the facts," nor "conclusory allegations or denials . . . create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

Ladd's claim of "mistake" regarding his Form 144 is unsupported and contradicted by his own admissions about what he knew. As the Court held in *SEC v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016), a defendant's denial of intent will not defeat summary judgment where the facts he misrepresented—that he sold (not "distributed") his shares between May 9 and May 17 (not on "May 25")—were all known to him at the time. (Resp. to 56.1 ¶¶18, 44, 46, 47.)[11]

---

[11] Irrespective of his denials, Ladd's false Form 144 statements establish scienter as a matter of law. "Facts showing motive and opportunity to commit fraud, such as that a defendant 'benefitted in some concrete and personal way from the purported fraud,' establish actual intent." *SEC v. Boock*, No. 09 Civ. 8261 (DLC), 2011 WL 3792819, at *23 (S.D.N.Y. Aug. 25, 2011) (granting summary judgment to SEC) (quoting *ECA, Local 134 IBEW Joint Pension Trust of*

Ladd's denial of intent regarding his new account form is equally unavailing. Ladd supposes that he claimed he was "retired" because he might have "intended for his parents" to use the account. (Opp. at 41.) But that is just the kind of "speculation or conjecture as to the true nature of the facts"—unsupported by any evidence—that the Second Circuit has called insufficient "to create a genuine issue of material fact." *Hicks,* 593 F.3d at 166. And Ladd's speculation that E*Trade must have known that he was employed because he listed an annual income that was "high for a retired person" (Opp. at 41) is similarly unsupported and speculative.[12]

That Ladd intended to lie to E*Trade on the new account form is supported by the lack of any evidence that he submitted a Form 144 for any of his trades in that account, despite admitting that he knew that he needed to do so. (Resp. to 56.1 ¶¶9, 10.) If Ladd's failure to inform E*Trade of his affiliate status truly was a mistake, he offers no reason why he nonetheless did not comply with the rules to which he knew affiliates were subject under Rule 144(h)—namely that they submit Forms 144 "contemporaneously with—or before" their stock sales (Resp. to 56.1 ¶10).

## C.   MGT'S False Press Release Was Material, and Ladd Issued It With Scienter

Ladd does not dispute the falsity of MGT's May 9, 2016 false press release statement: "Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion…" (Opp. at 25.) Rather, he argues that the McAfee statement was not "material,"

---

*Chicago v. JP Morgan Chase Co.*, 533 F.3d 187, 198 (2d Cir. 2009)). Ladd does not dispute that he sold hundreds of thousands of shares between February 12 and May 12, 2016, and earned hundreds of thousands of dollars from those sales. (Resp. to 56.1¶¶18, 19.) With his concrete and personal benefit from the scheme established, so too is his intent.

[12] Ladd's argument also fails to explain how E*Trade could have gleaned that he was an MGT officer, and so, an affiliate.

and that he made an unintentional "mistake." (*Id.*) But Ladd fails to counter—as he must on summary judgment—the indisputable evidence of the press release's materiality. Furthermore, given his knowledge of the press release's falsity, Ladd's bald claim of "mistake" cannot create a genuine fact dispute on summary judgment regarding his scienter.

### 1.  The McAfee False Statement Was Material

Contrary to Ladd's arguments, the unrefuted declaration of MGT investor Christopher Petranis establishes the materiality of the false press release. Ladd's only response is to attack Mr. Petranis's alleged lack of due diligence. Such arguments, however, are irrelevant in SEC enforcement actions such as this. Nor does Ladd dispute the additional materiality evidence— that an MGT short-seller brought to his attention the press release's false statement regarding McAfee (Bromberg Decl. Ex. F at 294:11-23), and that the same false statement featured prominently in a *Stock Beast Report* that Ladd caused MGT to purchase and have published the same day as the press release (56.1 ¶39; SEC Br. at 36, n.25).

Ladd first incorrectly asserts—contrary to settled law—that the Court should not consider the Petranis declaration because it represents the view of an individual investor. But courts regularly permit the SEC to prove materiality through individual investor testimony. *See SEC v. Genovese,* 17 Civ. 5821 (LGS), 2022 WL 16748779, at *3 (S.D.N.Y. Nov. 7, 2022) ("[i]nvestor testimony about the materiality of a given representation to an investment decision is relevant unless the investor's views are 'erroneous or idiosyncratic'"); *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023, *23 and 26-27 (S.D.N.Y. Jan. 27, 2009) (Lynch , J.) (testimony of portfolio manager who had invested in subject company sufficient to prove materiality).[13]

---

[13] Ladd's reliance on *United States v. Litvak* is misplaced. There, the Second Circuit vacated the conviction of a stock trader because the Government's investor witness held views that were "indisputably incorrect"—the investor considered the trader his agent despite legal advice to the

Ladd next attacks Mr. Petranis's alleged failure to do "basic internet research" regarding the false McAfee statement. (Opp. at 26-27, 31-32.) Any such "due diligence" argument, however, is inapplicable to an SEC enforcement action. As Ladd himself notes, materiality is an "objective" standard, while "due diligence is a distinct and subjective element of a private action under Rule 10b–5, unrelated to the objective materiality test." *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1253 (11th Cir. 2012). Thus, "because due diligence focuses on whether the carelessness of a plaintiff should preclude his recovery, it is properly considered only in a private action brought by an investor, not an SEC enforcement action." *Id.* (internal quotation marks omitted). Therefore, any "internet search" that Mr. Petranis allegedly should have done—or any other "due diligence"—is irrelevant to the materiality analysis in this SEC case.

Ladd's only other complaint regarding the Petranis declaration—Mr. Petranis's supposed belief that McAfee received the entire $7.6 billion from the Intel sale (Opp. at 27)—is a mere quibble and beside the point. The plain thrust of the false statement at issue—which Mr. Petranis understood and explains—was to tout McAfee's outsized success in selling his company to Intel—a claim that was indisputably false and indisputably material.[14]

Moreover, to establish a genuine dispute of fact on summary judgment, Ladd must proffer more than mere innuendo or "speculation" regarding the Petranis declaration—he must

---

contrary, and his testimony therefore was not probative of the views of a reasonable investor. 889 F.3d 56, 69 (2d Cir. 2018); *see also Genovese,* 2022 WL 16748779, at *3 (distinguishing *Litvak*). Here, by contrast, Ladd proffers no evidence or argument of anything unreasonable about the Petranis declaration.

[14] To counter the evidence that a short seller also had identified the false McAfee statement as materially misleading, Ladd can only attack the SEC for failure to "even identify [his] name." (Opp. at 28.) That criticism has no bearing on the materiality inquiry. In any event, it is wrong. In fact, Ladd identified the "short seller" in response to the SEC's interrogatories in this case. (Brown Suppl. Decl., Ex. E (Ladd Interrogatory Resp. 4).)

offer his own contrary evidence regarding its "reasonableness" or, at least, a contrary investor declaration—which Ladd fails to do. *See Hicks,* 593 F.3d at 166. Ladd offers no contrary evidence that casts doubt on the material facts set forth in the Petranis declaration, and he otherwise raises no genuine dispute regarding its reasonableness.

Ladd also attempts to resurrect his "truth on the market" defense (Opp. 30-31). As we explain at pages 37-39 of our opening brief, the evidence that Ladd proffers cannot support such a defense. That is, it is insufficient to allow a reasonable fact-finder to conclude that, in early May 2016—when MGT issued the press release—accurate information regarding McAfee and his non-involvement with the Intel sale was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively" the contrary false information contained in the press release. *See Ganino v. Citizens Utility Co.*, 228 F.3d 154, 167 (2d Cir. 2000). No such "corrective" information was conveyed to the public at or near the time of the May 9, 2016 press release, and Ladd offers no evidence to the contrary. As we note at page 37 of our opening brief, only three of the articles that Ladd proffers (1) pre-date the press release; *and* (2) were issued after 2013; *and* (3) correctly state that McAfee left his company prior to 2010. The last of those articles, however, came out in September 2015, eight months prior to the press release. (Ford Decl. Exs. 30, 34, and 35.) On this thin evidentiary basis, no reasonable fact-finder could conclude that, as of early May 2106, the correct information about the Intel sale had been conveyed to the public with the "degree of intensity" required "to counter-balance effectively" the press release's contrary false statement at issue.[15]

---

[15] As also discussed in our opening brief (SEC Br. at 37, n.26), the other articles that Ladd cites were either published even earlier or contain irrelevant or non-corrective information—such as that McAfee's company was sold to Intel in 2010 for $7.6 billion—without clarifying that McAfee was not, in fact, involved in that sale. (SEC Br. at 37, n.26.) Thus, far from acting as a "corrective," the other articles Ladd cites bolstered the false impression that McAfee himself had

### 2.   <u>Ladd Issued the False Press Release Knowingly or Recklessly</u>

Ladd's opposition likewise fails to identify a genuine dispute of fact regarding his intent, thus requiring summary judgment for the SEC on this claim.

Ladd testified that, at the time MGT issued the press release, he knew that McAfee had left his company in the 1990's, well before the Intel sale—information that directly contradicted the press release. (56.1 ¶38; Bromberg Decl. Ex. F at 275:14-19—at the time of the press release, "I knew that [McAfee had left the company long before the Intel sale]—I think everyone knew that.").[16] Ladd also does not dispute that he personally added the false language to the press release—just prior to its publication. (Resp. to 56.1 ¶¶36-37.) Thus, Ladd either must have known that the McAfee statement was false when he caused MGT to issue the press release or, at the least, recklessly disregarded its falsity. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (scienter established by showing defendant's "knowledge of facts or access to information contradicting [his or her] public statements"); *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) (Lynch, J.), *aff'd, SEC v. Altomare*, 300 Fed. Appx. 70 (2d Cir. 2008) ("Representing information as true while knowing it is not, [or] recklessly misstating information…are all circumstances sufficient to support a conclusion of scienter."). That Ladd failed to correct his falsity after it was pointed out to him—indeed, that he perpetuated it in MGT's subsequent Form 10-Q (56.1 ¶38)—extinguishes any potential doubt that Ladd issued the false press release intentionally.

---

sold his company to Intel for $7.6 billion—precisely the false impression that Ladd disseminated by adding the false McAfee statement to MGT's May 2016 press release.

[16] Ladd's attempt to retract this admission in response to the SEC's 56.1 (*see* Resp. to 56.1 ¶38) not only contradicts his testimony but contradicts his Response to the SEC's Requests to Admit. (Brown Suppl. Decl., Ex. F, at 6 ("Defendant avers that prior to May 9, 2016, Defendant knew that McAfee had not sold his company to Intel for $7.6 billion.").)

Ladd claims that the "phraseology" of the McAfee press release was a "mistake" on his part. (Opp. at 32.)  But Ladd's claim of "mistake"—without any explanation—cannot save him on summary judgment, as it does not alter the undisputed fact that he was aware of contrary information. As Courts in this Circuit have found on summary judgment, in the face of such knowledge, a defendant must do more than baldly claim "mistake" or that he acted in "good faith." *See SEC v. Gallison*, 588 F. Supp. 3d 509, 524-25 (S.D.N.Y. 2022) (granting SEC summary judgment where defendant "must have known" the statement was "false when made"); *Universal Express,* 475 F. Supp. 2d, at 426-27 (granting SEC summary judgment against company CEO and counsel for issuing false press releases—despite defendants' claims of "good faith"—where defendants' conduct was "at the least reckless" because they demonstrated no "reasonable belief in the truth of their [false] statements"). Ladd's conduct regarding the press release was knowing or reckless as a matter of law. *Id.*

Ladd attempts to distinguish *Gallison*—noting that circumstantial evidence established the *Gallison* defendant's knowledge of the falsity at issue. *Gallison*, 588 F. Supp. 3d, at 524-25; (Opp. at 32 n.17). To establish Ladd's scienter, however, the SEC need not look to circumstantial evidence; Ladd admittedly *knew*—indeed, he claims "everyone knew"—of information that directly contradicted the false statement at issue. (56.1 ¶38; Bromberg Decl. Ex. F at 275:14-19.) By nonetheless issuing the false press release, Ladd's actions were indisputably knowing or at least reckless—requiring summary judgment for the SEC. *See Gallison*, 588 F. Supp. 3d, at 524-25; *Universal Express,* 475 F. Supp. 2d, at 426-27.

## CONCLUSION

For all these reasons, and those set forth in the SEC's moving papers, the Court should grant the SEC's Motion for Partial Summary Judgment against Defendant Ladd in all respects.

Dated:  April 6, 2023
       New York, NY

Respectfully submitted,

*/s/ Jack Kaufman*
Nancy A. Brown
Jack Kaufman
Katherine Bromberg
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0106 (Kaufman)
Attorneys for Plaintiff Securities and Exchange Commission