UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                             Plaintiff,

            – against –

BARRY C. HONIG, MICHAEL BRAUSER,
JOHN STETSON, JOHN R. O'ROURKE III,
ROBERT LADD, ELLIOT MAZA,
BRIAN KELLER, JOHN H. FORD,
ATG CAPITAL LLC, GRQ CONSULTANTS,
INC., HS CONTRARIAN INVESTMENTS,
LLC, GRANDER HOLDINGS, INC., *and*
STETSON CAPITAL INVESTMENTS INC.,

                             Defendants

**OPINION & ORDER**

18-cv-8175 (ER)

RAMOS, D.J.:

At all times relevant to this motion, Robert Ladd was the CEO and director of

MGT Capital Investments, Inc.[1]  The Securities and Exchange Commission ("SEC") has

alleged that he participated in a "pump and dump" scheme with defendants[2] Barry C.

Honig, Michael Brauser, John Stetson, John R. O'Rourke III, and Mark Groussman

(collectively the "Honig Group")[3] to unlawfully inflate MGT's stock price.  The SEC also

---

[1] The SEC's Second Amended Complaint refers to MGT as "Company B."

[2] The Second Amended Complaint notes that "defendants" refer to both current and former defendants (such as Mark Groussman) and does not explicitly name Groussman.

[3] Ladd is the only remaining defendant.  The SEC settled with defendant John Ford on September 21, 2018. Doc. 28.  Elliot Maza, the CEO of "Company A," and Brian Keller, the CEO of "Company C," also settled in March 2019.  Docs. 110, 113.  Honig and his company, GRQ Consultants, Inc., reached a settlement with the SEC in July 2019, Docs. 151–52, wherein he was enjoined from violating the Securities Exchange Act and the Securities Act, along with related SEC rules, and from owning, trading in, or participating in the offering of any security that has a price of less than five dollars.  Settlements have also been reached with Brauser, Stetson, O'Rourke, Groussman, and their companies — Grander Holdings, Inc., Stetson Capital Investments Inc., ATG Capital LLC, and Melechdavid, respectively.  Docs. 93, 224–29.  A partial Final Judgment on Consent was entered on March 6, 2020 with respect to HS Contrarian Investments, LLC, which is affiliated with Stetson.  Doc. 230.

alleges that Ladd fraudulently failed to disclose the existence of the group, who together owned more than five percent of his company, in violation of SEC rules.  In an Opinion and Order dated February 25, 2020, the Court granted in part and denied in part Ladd's previous motion to dismiss the SEC's fraud claims against him.  *See SEC v. Honig*, No. 18 Civ. 8175 (ER), 2020 WL 906383 (S.D.N.Y. Feb. 25, 2020) ("*Honig I*").  The Court denied Ladd's motion to dismiss regarding allegedly false statements he made on May 9, 2016 about the appointment of John McAfee as CEO of MGT.  However, the Court granted his motion, with leave for the SEC to replead, regarding his omission of the "true extent" of members of the Honig Group's beneficial ownership of MGT stock in SEC filings.

In its Second Amended Complaint ("SAC"), the SEC re-alleged its securities fraud claims based both on Ladd's statement about McAfee and his failure to disclose the beneficial ownership interest of the Honig Group.  The SEC also added new allegations of securities fraud in connection with unregistered stock sales in May 2016, and Ladd's failure to disclose changes to his own beneficial ownership of MGT on several occasions. *See* SAC, Doc. 233 at ¶¶ 247, 253.[4]  Ladd again moved to dismiss all of these fraud allegations in the SAC except for those in connection with the McAfee announcement that the Court addressed in its February 25, 2020 Order.

In an Opinion and Order dated January 27, 2021, the Court granted in part and denied in part Ladd's motion to dismiss the SAC.  *See SEC v. Honig*, No. 18 Civ. 8175

---

[4] The SEC alleges that Ladd committed fraud by violating § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, § 17(a)(2) of the Securities Act, and by aiding and abetting other violations by the Honig Group.  *See* SAC at Fifth, Sixth, Seventh and Eighth Claims for Relief.  The SEC also alleges several other strict liability violations of the securities laws based on the same conduct.  *See* SAC at Eleventh, Thirteenth, Fourteenth, and Seventeenth Claims for Relief.  Ladd did not move to dismiss the non-fraud allegations.

(ER), 2021 WL 276155 (S.D.N.Y. Jan. 27, 2021) ("*Honig II*").  Specifically, the Court granted the motion regarding the Fifth and Sixth causes of action, which related to (1) Ladd's failure to disclose stock sales on Forms 4 filed on October 7 and December 1, 2015; and (2) statements and omissions made on his father's Form 144 filed May 10, 2016.  His motion addressing all other alleged events under the Fifth and Sixth causes of action was denied.  The Court also denied his motion to dismiss claims relating to the Seventh and Eighth causes of action.

On March 25, 2021, Ladd filed an amended answer to the SAC ("Answer"), asserting seven affirmative defenses.  Doc. 281.  Approximately one month later, on April 27, 2021, the SEC moved to strike the Answer to the extent Ladd asserted any defense to any of the SEC's scienter-based (fraud) claims based on his reliance on any advice of legal counsel.  Doc. 289 at 1.  Specifically, the SEC sought to preclude the following affirmative defense, and all related references:  "Plaintiff's claims are barred in whole or in part because Defendant relied in good faith upon the judgment, advice, and counsel of professionals."  Doc. 281 ¶ 310.   In an Opinion and Order dated November 30, 2021, the SEC's motion was granted in part and denied in part.  *SEC v. Honig*, No. 18 Civ. 8175 (ER), 2021 WL 5630804 (S.D.N.Y. Nov. 30, 2021) ("*Honig III*").  Specifically, the Court granted the SEC's motion to the extent that it sought to strike Ladd's advice-of-counsel affirmative defense and any related evidence or argument; and (2) to the extent that it sought a formal withdrawal of the defense of good faith or, in the alternative, the production of privileged communications between Ladd and MGT's counsel related to the categories described above.  The Court denied the SEC's motion to the extent that it sought the production of privileged communications between Honig and his counsel.

Before the Court is Ladd's motion for partial summary judgment as to Claims Five, Six, Seven, and Eight, and the SEC's cross-motion for partial summary judgment as to Claims Five, Six, Eleven, Thirteen, and Seventeen.  For the reasons discussed below, Ladd's motion is DENIED, and the SEC's motion is GRANTED in part and DENIED in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[5]

The facts underlying this case are more fully set out in the Court's Orders in *Honig I–III*, familiarity with which is assumed.  For present purposes, the Court provides an abbreviated summary and new, relevant facts herein.

The SEC alleges that Ladd committed fraud by violating  10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, §17(a)(2) of the Securities Act, and by aiding and abetting violations of § 10(b) of the Exchange Act, Rules 10b-5(a) and (c), and §§ 17(a)(1) and (a)(3) of the Securities Act committed by Honig, Brauser, Stetson, O'Rourke, and Groussman.  The SEC also alleges several other strict liability violations of the securities laws based on the same conduct.  In support of its fraud claims, the SEC contends that Ladd allegedly provided false information in:  MGT's November 6, 2015 Form S-1 and April 14, 2016 Form 10-K as to the disclosure of all beneficial owners of more than 5% of its outstanding common stock; MGT's November 22, 2015 new account form submitted to E*Trade; MGT's May 9, 2016 Form 8-K attaching a press release announcing the appointment of McAfee as CEO of MGT; and Ladd's May 25, 2016

---

[5] Unless otherwise noted, all facts are undisputed and cite to the parties' Rule 56.1 Statements and Counterstatements, Docs. 312, 320, 323, 327, 328.

Form 144 and May 31, 2016 Form 4 in connection with his May 2016 trading of MGT stock.

### A. The Relationships Between Defendants

MGT is a capital investment company "principally engaged in the business of acquiring, developing and monetizing intellectual property assets." Doc. 310-27 (May 2016 Press Release). Ladd was the president and chief executive officer of MGT. The Honig Group consists of Honig, Brauser, Stetson, O'Rourke, and Groussman. Doc. 321 at 13.

Ladd and two of MGT's outside attorneys, Avital Perlman and Tara Guarneri-Ferrara, of the law firm Sichenzia Ross Ference LLP, ("Sichenzia") testified in depositions taken on October 15, 2020, June 15, 2022, and July 12, 2022, respectively, that Stetson worked for Honig and that he, along with O'Rourke, worked out of the same office with Honig in Boca Raton, Florida. SAC ¶ 29; Ladd Tr. at 18:4–19:20; Perlman Tr. at 27:12–21; Guarneri-Ferrara Tr. at 14:20–15:3. Another Sichenzia attorney, Harvey Kesner, testified in his deposition taken on August 8, 2022, that former defendant Groussman also had a desk in Honig's offices, and was a long-time family friend of Honig's. Kesner Tr. at 57:6–11. Groussman and Stetson co-invested with Honig frequently. *Id.* at 59:25–60:13.

Brauser, Stetson, O'Rourke, and Groussman have invested together in 19 separate issuers between 2011 and 2018. Doc. 319-4 (chart complied by a SEC Supervisory Staff Accountant showing which issuers Brauser, Stetson, O'Rourke, and Groussman had traded in at or about the same time [within weeks of each other] as Honig). In that same time period, Brauser had investments in over 40 of the same issuers as Honig; Stetson

had investments in over 65 of the same issuers as Honig; O'Rourke had investments in over 70 of the same issuers as Honig; and Groussman had investments in over 35 of the same issuers as Honig.  *Id.*

## B.  Ladd's Experience with the Honig Group

As to the relationship between Ladd and Honig, Ladd testified at his deposition taken on October 15, 2020 that he viewed Honig as a "scumbag," and by that he meant a "greedy, pushy, arrogant, stupid, little, you know, man,"  Ladd Tr. at 12:5–7, but that "aside from being a loudmouth… [Honig] did not violate securities laws."  *Id.* at 254:9–11.  Ladd also testified that he "became, and always … was, hyper-vigilant [of] anything we did with [] Honig."  *Id.* 254:11–19.  As early as November 2012, Ladd received a warning about Honig in a correspondence with David Einhorn,[6] who had left a comment on a Yahoo message board and who Ladd regarded as a "smart guy."  Doc. 318-56 (November 14, 2012 email exchange between Einhorn and Ladd).  In the exchange, Einhorn stated that Honig was a "[recidivist] stock promoter."  *Id.*  During his deposition when asked if, on the date of the email, November 14, 2012, Ladd would entertain the possibility that Honig was a recidivist stock promoter who engaged in pump and dump, Ladd responded that he recalled "the due diligence showing merely that as a broker… he had one customer complaint …. that's not a recidivist pump-and-dumper that violates securities law."  Ladd Tr. at 28:2–15.

The SEC alleges that Ladd's involvement with the Honig Group began in 2012, when Honig initiated a transaction in a June 20, 2012 email to Ladd.  Shortly thereafter,

---

[6] David Einhorn is an American investor and the president of the Greenlight Capital Inc. hedge fund. *David Einhorn*, FORBES,  https://www.forbes.com/profile/david-einhorn/?sh=18ac0f346743 (last visited Sep. 25, 2023).

Honig, Stetson,[7] and Groussman[8] acquired their MGT holdings in an October 2012 MGT offering.  The October 2012 financing resulted in MGT issuing 1,380,362 units total, consisting of one convertible preferred MGT share, and a 5-year warrant exercisable for two shares of MGT common stock at $3.85 per share, for total proceeds to the company of about $4.5 million.  It also included a registered direct offering of 453,942 shares of MGT common stock at $3.00 a share.  Ladd disputes that Honig led the negotiations for the 2012 financing on behalf of himself, Stetson, and Groussman.

In late March 2013, Honig told Ladd that he had an idea for getting rid of MGT's warrant obligations from the October 2012 convertible preferred offering.  Doc. 318-24 at 3 (Honig's March 21, 2013 email to Ladd).  Ladd rejected the idea.  *Id* at 2.  Beginning on April 2, 2013, Honig, HSCI, and Melechdavid all began submitting notices of conversion of their preferred MGT stock into MGT common stock.  Doc. 318-22 (HSCI Notice of Conversion, April 2, 2013; Honig Notice of Conversion, April 4, 2013; Melechdavid Notice of Conversion, April 8, 2013).  On April 11, 2013 defendant John Ford,[9] a stock promoter, wrote a piece on MGT for "Seeking Alpha"[10] touting the likely prospect that MGT would soon settle its ongoing patent litigation, resulting in a possible doubling of MGT's share price "within the next couple of weeks."  Doc. 318-57 (Seeking Alpha article).  Ladd considered it a "theoretical possibility" that Honig or another MGT investor compensated Ford for the article.  Def. Response to Pl. 56.1 Counterstatement, Doc. 327.  MGT's share price jumped from nearly $3.50 on April 10, 2013 to $4.50 on

---

[7] Stetson was a Managing Member of HS Contrarian Investments, LLC ("HSCI") at all relevant times.

[8] Groussman was the President of Melechdavid Inc. at all relevant times.

[9] The SEC sued Ford in this action and settled with him in September 2018.  Doc. 28.

[10] "Seeking Alpha" is a crowd-sourced content service that publishes news on financial markets.  *See* https://about.seekingalpha.com/

April 16, 2013, and there was a significant volume increase in trading between the two periods.  Doc. 317-17.

On April 26, 2013, Ladd sent out an exchange offer for the warrants.  Doc. 318-25 (Ladd's April 26, 2013 email to warrant holders with exchange offer).  That same day, Stetson returned both Honig's and HSCI's agreement to the exchange offer and notice of exercise.  Doc. 318-26 (Stetson's April 26, 2013 email to Averilla[11] and Ladd).  Groussman submitted his agreement to the exchange offer and notice of exercise less than two weeks later, on May 9, 2013.  Doc. 318-27 (Groussman's May 9, 2013 email to Averilla with attachments).  Ladd tracked certain investors' acceptance of the modification.  Doc. 318-28 (Ladd's May 20, 2013 email to transfer agent complaining about their delay in updating MGT's share count as a result of the Warrant exercises).

In late May 2013, Honig sent an email to Ladd reminding him of the actions Honig had taken throughout the prior six months to corral the members of his group to agree to terms Ladd wanted:

> When you needed the sign offs multiple times I got them… when you need[ed] $5 [million] [in] 6 months [] I got it… when you needed the warrants exercised I got it… when you wanted the share exchange done I got it … I saved your ass from being on pink sheets… I got the prag [*sic*] agre[e]ment cancelled…

Doc. 318-29 (Honig's May 29, 2013 email exchange with Ladd).  Ladd did not agree or disagree with Honig's claims.  *Id.*

Approximately two years later, in late September 2015, Honig and Ladd began discussing another financing for MGT.  In an October 1, 2015 email, Ladd told Honig he needed to raise $700,000, and set out the units to be sold for $0.25 each:  1 common

---

[11] Averilla is the MGT Controller.

MGT share, plus 2 warrants.  In that email he also set out the total number of shares outstanding, and how large a percentage of that outstanding stock would be delivered to the investors Honig brought with him, 19.9%.  Doc. 318-30 (Ladd's October 1, 2015 email to Honig).  When Ladd asked Honig who the buyers would be, Honig, copying Stetson and Brauser, responded:  Barry Honig, Mike Brauser, and OBAN.[12]  *Id.*

On October 4, 2015, Ladd sent an email to the MGT Board noting that "[t]he investor group is led by Barry Honig" and the group's ownership will be 16.7%.  Doc. 318-31 (Ladd's October 4, 2015 email to MGT Board).  On November 29, 2015, Ladd sent another email to Honig reporting that MGT's total common shares outstanding includes "your group's 2.8 million [shares]."  Doc. 318-54 at 3 (Ladd's November 29, 2015 email to Honig).  Two minutes later, Honig responded "I am not part of a group.  I invested individually[,]" to which Ladd replied, "I stand corrected."  *Id.* at 2*.*  Ladd also disputes that Honig led the negotiations for the 2015 financing on behalf of himself, Brauser, and Stetson.

In January 2016, after the 2015 financing had closed, Ladd agreed to Honig's request that he pay $125,000 to Drew Cicciarelli, a well-known stock promoter to promote MGT to the public.  Ladd Tr. at 198:23–199:3, 201:1–10.  That payment resulted in a piece about MGT and Honig's investment published in a newsletter called the "Small Cap Leader," on February 3, 2016.  Upon receiving an information request letter from the New York Stock Exchange ("NYSE"), asking if MGT had engaged in any promotional activity in the last twelve months, Ladd omitted MGT's payment to Cicciarelli in January 2016.  Doc. 318-60 (June 10, 2016 MGT Response to NYSE

---

[12] OBAN is an LLC created by Stetson.  SAC ¶ 137.

request for comments and further information).[13]  Ladd testified that the omission was inadvertent.  Ladd Tr. at 210:7–19.

After the close of the trading day on February 3, 2016, MGT's stock's daily trading volume saw a 7,000 percent increase from its prior day's volume, and an intraday price increase of over 60 percent.  Honig, Brauser, Stetson, O'Rourke, and Ladd all immediately began selling.

### C.  The Sichenzia Lawyers

Sichenzia represented not only MGT but also, pursuant to a waiver of conflict, Honig, his affiliates and related entities, as well as other potential groups of investors who had a pre-existing relationship with Honig and of which Honig may be deemed to be representative ("Honig Investors") as securities counsel in 2012 and 2015.  Doc. 318-61 (October 11, 2012 Waiver of Conflict of Interest Letter).  There were six Sichenzia lawyers involved in the relevant SEC filings—Avital Perlman, Jay Kaplowitz, Arthur Marcus, Harvey Kesner, Joan Wu, and Tara Guarneri-Ferrara.  Ladd argues that he relied on his Sichenzia lawyers for advice concerning the Honig Group, and therefore lacks scienter with regard to allegations that he failed to disclose the Honig Group's collective ownership and control over MGT as required.  Doc. 309 at 8, 20.

Ladd, on behalf of MGT, consented to the firm representing both the company and the Honig Investors.  Doc. 318-61.  In 2015, Sichenzia again asked Ladd to acknowledge his awareness that they represented MGT as well as Honig, Brauser,

---

[13] The request from the NYSE regarding the promotional activity was:

> 1.  Please comment on whether the Company engaged in any promotional activity in the last twelve months, and what amounts, if any, were paid to individuals or firms engaging in promotional activity.  If the Company did engage in promotional activity, please provide copies of (a) Any engagement letters/contracts entered into by the Company, (b) Copies of any public disclosures or promotional materials issued by individuals or stock promotion firms, (c) Whether any directors, officers or key executives purchased or sold MGT stock during the period when a promotional firm was engaged.

Doc. 318-60 at 4.

Stetson, O'Rourke, and Groussman.  Doc. 318-63 at 3 (December 4, 2015 Engagement Letter) ("[W]e routinely request from clients a waiver … [that] you specifically acknowledge that we have informed you that we have represented [] Honig, [] Brauser, [] Stetson, [] O'Rourke, [] Groussman … and that the Company waives any and all conflicts….").

However, Kesner testified that "[Sichenzia] would never represent an investor in a company at the same time that [the firm was] representing the issuer."  Kesner Tr. at 84:17–24.  He also testified that it was normal firm practice to use conflict waiver letter with "pro forma boilerplate" language and that "[t]there's no articulated specific potential conflict" regarding Honig as an investor.  Kesner Tr. at 177:18–19, 85:9–19.

According to his testimony, it was Ladd's understanding that Kesner was specifically Honig's attorney, and not his or MGT's.  Ladd Tr. at 368:3–7, 489:7–12, 269:8–25.  Kaplowitz testified that Kesner was "very, very loyal to [Honig]."  Kaplowitz Tr. at 87:19–88:3.  Perlman testified that she represented MGT but never disclosed to Ladd that she had also done work for Honig, Brauser, Stetson, O'Rourke, and Groussman.  Perlman Tr. at 67:14–18.  Wu joined the MGT team in 2016 and worked on very few transactions with Kesner while at Sichenzia, but did work with him on the D-Vasive transaction, discussed further below.  Wu Tr. at 34:8–18.

In short, MGT was represented specifically by Kaplowitz, Marcus, Perlman, and Wu.  Honig and his co-investors were represented by Kesner, and Guarneri-Ferrera prepared all of the deal documents for Honig and his co-investors in the 2012 transaction.

**D.  The Sichenzia's Lawyers' Analysis of the Honig Group as a 13(d) Group.**

Item 403 of SEC Regulation S-K requires that the issuer furnish information— such as the beneficial owner's name, address, and percent beneficial ownership— regarding anyone known to be a beneficial owner of more than 5% of any class of a company's stock.  The provision seeks this information "with respect to *any person*

(including any "group" as that term is used in section 13(d)(3) of the Exchange Act)."
§ 229.403(a) (emphasis added).  Therefore, Item 403's disclosure requirements apply
both to individuals and to people acting as a "group."  A Rule 13(d) group exists when
"two or more persons act as a partnership, limited partnership, syndicate, or other group
for the purpose of acquiring, holding, or disposing of securities of an issuer, such
syndicate or group shall be deemed a 'person' for the purposes of this subsection."
15 U.S.C. § 78m(d)(3), 17 C.F.R. § 240.13d-5(b)(1) (2000).

 Guarneri-Ferrera and Perlman testified that they did not recall any discussion
about the group issue.  Guarneri-Ferrera Tr. at 23:21–24; Perlman Tr. at 112:1–4.
Kaplowitz testified at his deposition taken on June 14, 2022 that he was "pretty certain"
he asked Stetson and "probably asked Ladd" if they were acting as a group.  Kaplowitz
Tr. at 65:22–67:6.  Marcus testified at his deposition taken on June 21, 2022 that he did
not discuss the issue with anyone other than receiving one email from Kesner.  In
response to an October 18, 2012 email from Honig to Kesner,[14] in which Honig identified
all the investors who would be participating with him in the October 2012 financing,
Marcus asked Kesner if the investors were acting as a group and, less than a minute later,
Kesner responded, "No!"  Doc. 318-71 at 3 (October 18, 2012 email between Kesner and
Marcus).  Marcus forwarded this email to Ladd the next day and testified that he did so
inadvertently and did not intend for Ladd to rely on it.  *Id.*; Marcus Tr. at 39:15–42:6.
Marcus asked this question because Kaplowitz asked him to, but he never discussed with
Kaplowitz why Kaplowitz wanted him to ask the question.  Marcus Tr. at 28:4–5.  He did
not challenge Kesner's answer or conduct an independent analysis of the group question,

---

[14] Kesner forwarded this email to Marcus.

other than reviewing the investors' own representations in the stock purchase agreements that they were acting independently "since we had asked the question and been told the answer was no…." *Id.* at 54:6–14.

When asked what the firm would have considered to determine whether the Honig group was acting as a 13(d) group, Kaplowitz testified that he would have taken into account the investors' business relationship and prior investments together, and that to determine whether Honig asking MGT to pay for promotional materials suggested that there was a 13(d) group, he would "have to know more than that," including "who created the material that was being disseminated, what the material that was being disseminated was, the timelines involved, [and] all sorts of things like that." Kaplowitz Tr. at 66:6–67:6, 101:8–15, 104:5–9. Marcus testified that knowing about Honig paying for promotional materials and then selling shares, would "not necessarily" have made a difference to him in determining whether the investors were acting as a 13(d) group. Marcus Tr. at 78:24–79:14. Perlman testified that having invested in the same company before would not necessarily mean they were in a group. Perlman Tr. at 112:13–22.

When asked if knowing that Honig shared an office with Stetson and O'Rourke and that they had invested in the past together as co-investors would have been a factor in considering whether they were acting as a group, Kaplowitz responded "I can't tell you definitively that it would have." Kaplowitz Tr. at 66:6–67:1. And when pushed further Kaplowitz testified that "yes [he] thinks so." *Id.* at 67:2–6.

Regarding their view on Honig's reputation, Kaplowitz testified that he was aware that "a lot of people didn't like" Honig and that "he was considered a bad guy." *Id.* at 85:2–86:11. Similarly, Marcus testified that if he had been aware that Honig was known

as a "recidivist stock promoter" in 2012 it would not have affected his views as to

whether Honig was acting with other as a group for § 13 purposes.  Marcus Tr. at 84:23–

24, 85:11–16.

### E.  MGT's November 6, 2015 Form S-1 and April 14, 2016 Form 10-K

Item 403 of SEC Regulation S-K sets forth instructions for the disclosure of

security ownership of certain beneficial owners, and its provisions are applicable to

parties making 10-K or S-1 filings.  It requires that the issuer furnish information

regarding anyone known to be a beneficial owner of more than 5% of any class of a

company's stock.  MGT filed a Form S-1 registration statement on November 6, 2015,

signed by Ladd, in which it disclosed Honig individually as a beneficial owner of more

than 5% of the company's outstanding common stock, and listed the same number of

shares as Honig disclosed in his October 16, 2015 Schedule 13G.  Doc. 317-15 at 47

(MGT November 6, 2015 Form S-1).

Under "Selling Shareholders," MGT listed those investors who had bought

common stock and warrants in the October 2015 financing, including Grander Holdings,

Inc., ATG Capital LLC, Stetson Capital Investments, and Melechdavid (the companies of

Brauser, O'Rourke, Stetson, O'Rourke, and Groussman, respectively).  *Id.* at 49.  MGT

disclosed no group affiliation for any investor and did not aggregate any investor's

holding with any other investor.  *Id.*  If the members of the Honig Group *were* acting as a

13(d) group as the SEC alleges they were, then the group would be required to file a

Schedule 13G or 13D with the SEC when the group acquired five percent or more of the

beneficial ownership of MGT.  17 C.F.R. § 240.13d-1(b)(1).

14

On April 14, 2016, MGT filed its annual report for 2015 on a Form 10-K, signed by Ladd.  Doc. 317-11 (MGT April 14, 2016 Form 10-K).  The form stated that as of April 13, 2016, MGT had 18,098,221 shares of common stock outstanding.  Ladd understood that MGT had an obligation to disclose those MGT investors who held more than 5 percent of the company's outstanding shares in its 5 percent beneficial ownership tables in its Form 10-K.  The Form 10-K did not aggregate the collective holdings of the Honig Group.

According to the SEC, if Ladd had properly disclosed that Honig, Brauser, Stetson, O'Rourke, and Groussman were acting in concert and had aggregated their holdings, he would have disclosed that the Honig Group held more than 15% of MGT's outstanding shares.  *See* Pl. Response to Def. Rule 56.1 Statement, Doc. 320 at ¶ 92.

### F.  The November 22, 2015 New Account Form Submitted to E*Trade

On November 22, 2015, Ladd submitted an online application to E*Trade for a new account.  In this application, Ladd omitted his affiliation with MGT:  he described his occupation as "Retired" and answered "No" to the question "Director, or policy-making officer of publicly-owned company?"  He also left blank the information under "Employer."  Doc. 322-5 (Ladd's November 22, 2015 account application to E*Trade).  During his deposition, Ladd confirmed that the statements he made to E*Trade on his application were incorrect and he acknowledged that he was both a director and an officer of MGT at the time he filled out the application.  Ladd Tr. at 56:16–57:6 (Q:  And each of those answers to those questions was false, was it not?  A:  Correct; they are not correct answers.).  In November and December 2015, Ladd transferred his MGT stock from TD Ameritrade, his broker, to his newly opened E*Trade Account.  *Id.* at 56:6–

60:24; *see also* Doc. 317-5 (Ladd's E*Trade account statements from November 1, 2015–April 30, 2016).

### G. The May 9, 2016 Press Release

In early April 2016 O'Rourke and Honig proposed an acquisition to Ladd of an anti-spy software company named D-Vasive, Inc., which was associated with John McAfee, the founder of a famous cyber-security company that bore his name, McAfee Associates.  Doc. 318-45 (O'Rourke's April 4, 2016 email to Ladd).  After receiving the proposal, Ladd discussed it with Honig and wrote to O'Rourke:  "[Honig] called.  Game on."  Doc. 318-46 (Ladd's April 5, 2016 email to O'Rourke).  Ladd provided O'Rourke with details of MGT's cap table[15] in an email that same day, at O'Rourke's request.

As MGT's acquisition of D-vasive was approaching agreement, Ladd began drafting a press release announcing the acquisition and the arrival of John McAfee as Chief Executive Chairman and CEO.  On May 7, 2016, Ladd circulated his draft press release to the MGT Board and to Sichenzia attorneys Kaplowitz and Wu.  Doc. 322-28 (Ladd's May 7, 2016 email to the MGT board, copying Kaplowitz, and attaching draft press release).  Late on the night of May 8, 2016, while Ladd worked with Wu and the D-Vasive lawyers, Ladd told Wu that he would "take care" of getting the press release to the printer if Wu wanted to go to bed.  Doc. 322-29 at 2 (Ladd's May 8, 2016 email to Wu).  The next morning, Ladd circulated the revised press release which included the following statement:  "Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion . . ." to the D-Vasive team at 5:19 a.m.; to the

---

[15] A cap table, or capitalization table, is a table that shows the equity ownership capitalization for a company.  Julie Young, *Capitalization (Cap) Table:  What it is, Creating/Maintaining One*, Investopedia, (April 18, 2022), https://www.investopedia.com/terms/c/capitalization-table.asp

MGT Board at 6:09 a.m.; and to Kaplowitz and Wu at 6:43 a.m., the same time he sent the press release to the printers.  Doc. 322-30 (Ladd's 5:19 a.m. email to the D-vasive team); Doc. 322-31 (Ladd's 6:09 a.m. email to the MGT Board); Doc. 322-32 (Ladd's 6:43 a.m. email to printer, copying Kaplowitz and Wu).  That statement was not included in the drafts of the press release that had been reviewed by the lawyers, the D-vasive team, or the MGT Board, and Ladd did not highlight the last minute change he made to the press release in any of these emails.

Thus, when the acquisition agreement was finalized, on May 9, 2016, Ladd issued a press release titled "John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology," announcing that John McAfee was joining MGT as its new CEO and including the statement "McAfee sold his company to Intel for $7.6 billion."  Doc. 318-47 (MGT May 9, 2016 Form 8-K); Doc. 310-27 (May 2016 Press Release); Ladd Tr. at 287:4–22.

This statement was false.  McAfee, the founder of McAfee Associates, sold his stake in the company by 1994 and was no longer a part of McAfee Associates by 2010, when the Intel Corporation purchased the company for nearly $7.7 billion.[16]  As written, the press release gave the impression that (1) John McAfee himself sold McAfee Associates to Intel for 7.6 billion, and (2) that McAfee was still with McAfee Associates at the time Intel acquired the company.

Indeed, prior to MGT's press release, multiple news outlets, including the IB Times, Newsweek, and CNN publicized the same exact false statement ("McAfee sold

---

[16] Ashlee Vance, *With McAfee Deal, Intel Looks for Edge,* N.Y. TIMES, (Aug. 19, 2010), https://www.nytimes.com/2010/08/20/technology/20chip.html; Kim Lyons, *Security Software Company McAfee Acquired for $14 Billion*, The Verge, (Nov. 8, 2021), https://www.theverge.com/2021/11/8/22769910/mcafee-private-investor-group-acquisition-software

his company to Intel in 2010 for nearly $7.7 billion.").[17]  Doc. 310-17, Doc. 310-18,

Doc. 310-19.  However, it is undisputed that there were over a dozen articles that

correctly stated that Intel purchased McAfee Associates in 2010—as opposed to the false

statement that McAfee himself sold the company to Intel or that McAfee was still

somehow connected to McAfee Associates.  Ladd 56.1 Statement ¶¶ 45–65.  These

articles were published by sources such as Time, Yahoo!, CNN Business, CBS News, and

Cybersecurity Ventures and were published between December 5, 2012 and September 9,

2015.  Eleven of the articles pre-date MGT's May 2016 press release and eleven were

published on or after May 9, 2016.  Of these articles, only three detailed the fact that

McAfee was no longer at the company when Intel acquired it.  Doc. 310-28, Doc 310-29,

Doc. 310-35.[18]

At Honig's request, Ladd authorized MGT to pay $125,000 to a stock promotion

website, *StockBeast.com*, to publish a piece on May 9, 2016, which echoed the claim in

the first paragraph of the MGT press release that McAfee had sold his company for $7.6

billion.  Doc. 148-11 ("NYSE: MGT Beastmode engaged – John McAfee driving the

Bus," *Stock Beast Report*, May 9, 2016); Ladd Tr. at 295:8–13.  Ladd chose *Stock Beast*

---

[17] In November 2012, the IB Times published an article about McAfee, titled "John McAfee, Anti-Virus Creator, Wanted for Murder of Gregory Faull," that contained the same false statement; on September 9, 2015, Newsweek published an article titled "Antivirus Pioneer John McAfee is Running for U.S. President," that contained the same false statement; and on September 14, 2015, CNN published an article titled "Why John McAfee believes he should be president," that also contained the same false statement.

[18] Sam Gustin, *Fugitive Software Guru John McAfee Arrested in Guatemala, Faces Expulsion Back to Belize*, TIME, (Dec. 5, 2012) ("John McAfee sold his security business in 1994 and has had nothing to do with the company since…. In 2010, McAfee Associates, Inc. was acquired by chip giant Intel for $7.7 billion."); David Goldman, *McAfee Won't Change its Name Because of John McAfee*, CNN BUSINESS, (Dec. 20, 2012) ("McAfee sold his stake in the company in 1994 and hasn't been involved since."); DH Kass 1, *Believe it or Not: McAfee Anti-Virus Founder in U.S. Presidential Run*, CHANNEL FUTURES, (Sept. 13, 2015), https://www.channelfutures.com/sales-marketing/believe-it-or-not-mcafee-anti-virus-founder-in-u-s-presidential-run ("[Q]uestions about McAfee's eccentricity have been raised at times since he disassociated himself with the company he founded, which Intel subsequently acquired in 2010 for some $7.6 billion.").

at the suggestion of an MGT consultant because "it had the biggest circulation." *Id.* at 297:11–17.

On May 6, 2016—the last trading day prior to the issuance of the press release on May 9, 2016—trading volume in MGT common stock was 71,005 shares, and that day's closing price was $0.36. On May 9, 2016, MGT's stock closed at $0.49, an increase of 34 percent over the prior day's close, with trading volume of more than 10 million shares. Tong Decl. at ¶ 37.[19] Honig, Brauser, Stetson, O'Rourke, and Groussman began selling their MGT shares on May 9, 2016 and continued selling them through that week. Johnson Decl. at ¶ 9; *See also* Doc. 319-3.[20] Ladd did so as well. Tong Decl. at ¶¶ 21, 23.

The day after the press release was published, May 10, 2016, Ladd asserts that he first became aware of the mistake from a short-seller[21] ("except for the fact that the short pointed it out the next day, I don't understand why the immense focus on one little mistake in the initial press release"). Ladd Tr. at 294:19–20, 304:8–10. Partly in response to this, on May 23, 2016, two weeks after the initial press release, MGT filed a Form 10-Q stating that McAfee "founded McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010." Doc. 310-20 at 10 (Form 10-Q). Ladd admitted that the Form 10-Q disclosure told investors nothing about what exactly had been misstated in the May 9, 2016 press release. Ladd Tr. at 304:4–15. In his October 2020 deposition, Ladd testified that he knows now that this information is

---

[19] Ricky Tong is a Fraud Analyst with the SEC.

[20] Stephen Johnson is a Supervisory Staff Accountant with the SEC.

[21] In his response to the interrogatory, Ladd stated that the short-seller is Maj Doueidan at Geo Investing. Doc. 332-5 at 5 (Ladd's Response and Objections to the SEC's First Set of Interrogatories).

incorrect but "at the time [he] put it in, [he] unfortunately missed the mistake." *Id.* at
275:2–6.  He also acknowledged that "the way it reads in [the] release, is [as] if John
McAfee himself sold McAfee Associates to Intel for 7.6 billion all at once, like [] he was
at McAfee Associates, and that when it was sold, he was at McAfee Associate" but that
he at the time the press release was issued "[he] knew … everyone knew … that McAfee
sold his interest in McAfee Associated in the 1990s, well before the company was sold to
Intel." *Id.* at 275:9–19.

Christopher Petranis,[22] an investor who bought MGT stock on May 16, 2016
testified in a deposition taken on January 18, 2023 that the statement in the press release
was important to his decision to invest because it conveyed to him that McAfee had
enjoyed a huge success at his prior company and that he might be able to bring his talents
for creating successful companies to MGT.  Petranis Decl. at ¶¶ 2–4.

### H.  The May 25, 2016 Form 144 and May 31, 2016 Form 4 in connection with the May 2016 trading

Form 144 is a notice of proposed sale of securities which must be filed in
accordance with Securities Act Rule 144(h) when an individual who owns unregistered
shares plans to sell those shares.  17 C.F.R. § 230.144(h).  The Form must be filed when
share prices are above $50,000 altogether or when there are more than 5,000 shares being
sold during any three month period.  17 C.F.R. § 230.144(h)(2).  The Form is to be filed
"concurrently" with the execution of the sale of securities, and the person filing the notice
"shall have a bona fide intention to sell the securities … within a reasonable time" after
filing the Form.  17 C.F.R. § 230.144(h)(3).

---

[22] Petranis has worked at Golden Equities LLC, a private real estate investment and development firm, for
almost 20 years.  Petranis Decl. at ¶ 1.

Ladd filed a Form 144 on May 25, 2016 that stated that he intended to sell 41,000 MGT shares from his TD Ameritrade account, and 465,171 shares from his E*Trade account.  Def. Response to Pl's 56.1 Statement, Doc. 328 at ¶ 63.  But Ladd had already sold all of his MGT shares out of his E*Trade account by May 17, 2016.  Doc. 317-6 (Ladd's E*Trade account statement from May 1, 2016–May 31, 2016).

In Table II of the May 25, 2016 Form 144 ("Securities Sold in the Past 3 Months") Ladd reported he had sold no shares in the last three months, when in fact, he sold 77,472 shares between February 2016 and April 30, 2016, and 466,600 shares out of his E*Trade account in May.  Doc. 322-27 (Ladd's May 25, 2016 Form 144); *see also* Doc. 317-5 (Ladd's E*Trade account statements); *see also* Doc. 317-6 (Ladd's E*Trade account statement from May 1, 2016–May 31, 2016) (showing his sale of 466,600 MGT shares.).

Ladd admitted that, at the time, he understood that, as an officer or director of MGT, Rule 144 of Section 5 required him to submit a Form 144 reporting his MGT stock sales "contemporaneously with—or before" any such sales.  Ladd Tr. at 63:5–7; *see also* 17 C.F.R. § 230.144(h).  Ladd also understood that, because he was an MGT officer, he was considered an MGT "affiliate" and thus subject to Rule 144 trading volume limitations regarding his sales of MGT stock.  Ladd Tr. at 63:2–23, 145:20–146:11.  Ladd likewise understood the specific contours of those limitations:  that his total MGT sales during any 90-day period could not exceed the greater of 1% of MGT's outstanding stock or MGT stock's average weekly trading volume for the four calendar weeks preceding such stock sales.  *Id.* 63:11–23, 145:20–146:8.  Thus, Ladd was required to file a Form 144, "concurrently" with his May 9–12, 2016 stock sales from his E*Trade account, and

to calculate the Rule 144(e) volume limitation based on average trading volume for the four calendar weeks before those sales.

As of the week of May 9–12, 2016, the most recent filing by MGT prior to that week was MGT's Form 10-K filed on April 14, 2016, which stated that as of April 13, 2016, MGT had 18,098,221 shares of common stock outstanding.  Accordingly, 1% of MGT's outstanding stock equaled 180,982 shares.  Tong Decl. at ¶ 18.  The four-week average volume for MGT shares from April 11, 2016 to May 9, 2016 was 392,109.  *Id.* ¶ 19.

Section 16(a) of the Exchange Act requires a public company officer to file a Form 4 with the SEC disclosing any purchase or sale of the company's stock by the officer within two business days of the trade execution date.  Ladd testified that he understood the purpose of Form 4 is to disclose purchases and sales of an issuer's stock by the issuer's officers and directors.  Ladd Tr. at 485:21–486:1.  Ladd also knew the requirements of § 16 as it relates to the disclosure of purchases and sales he made in MGT, testifying "[t]hat you were to report purchases or sales within 48 hours and file [F]orm 4."  *Id*. at 73:3–10.

On May 31, 2016, Ladd filed a Form 4 regarding his MGT trades.  In a footnote in the first row of Table I—which asks for non-derivative acquired, disposed of, or beneficially owned securities—Ladd identified 465,171 MGT shares that he claimed to have distributed "for no consideration" pro rata to the "limited partners of Laddcap Value"[23] on May 25, 2016.  Doc. 317-1 at 4 (Forms 4 that Ladd filed on EDGAR, dated

---

[23] Laddcap Value Partners III LLC ("Laddcap") was the fund Ladd set up to acquire and hold MGT shares, and for which Ladd acted as Managing Member.  Laddcap had 17 limited partners or members at that time.

October 9, 2015, December 1, 2015, and May 31, 2016).  In the second row of Table I he claimed that Laddcap had sold 157,300 shares of MGT stock on May 25.  At his deposition, Ladd admitted that these two rows of Table I of the May 31, 2016 Form 4 were wrong.  Ladd Tr. at 484:16–24 (Q:  Can you explain how it is that Footnote 1 describes a distribution of 465,171 shares of MGT to limited partners?  A:  They were not distributed the shares in kind, but rather it was a mistake in the filing).

Although most of these 465,171 MGT shares belonged to Laddcap, Ladd deposited them in the account at E*Trade that he opened in his own name in November 2015.  Doc. 317-5 (account statements for Ladd's E*Trade account November 1, 2015– April 30, 2016); Ladd Tr. at 57:7–13.  In fact, Ladd sold the 465,171 shares of MGT for hundreds of thousands of dollars,[24] and not on May 25, 2016, but in multiple sales beginning December 2015 out of his E*Trade account.  Doc. 317-6 (Ladd's E*Trade account statement from May 1, 2016–May 31, 2016).  Ladd also admitted to only making two distributions to Laddcap's investors in 2016.  Ladd Tr. at 484:3–9 (Q:  Laddcap Value Partners did not make any distributions to any investors other than the two I've mentioned; is that right?  A:  Correct").  Lastly, on row four he claimed to have sold 33,603 shares on May 31, 2016, when in reality his TD Ameritrade IRA account statements reflect that the only sold 11,000 shares on that date.  Doc. 317-9 (Ladd's TD Ameritrade IRA Account Statements for May 2016).

Online records reflect that Ladd successfully logged into his E*Trade account on May 31, 2016, the day he filed his Form 4, three times between 10:03 a.m. and 4:14 p.m.

---

[24] *See* Ladd Tr. at 487:2–8 (Q:  And so your Form 4 of May 31, 2016 told investors that you distributed 465,000 shares for zero consideration right?  And in fact you sold the shares for hundreds of thousands of dollars, right?  A: Yes").

Doc. 332-3 (Log of Ladd's E*Trade account logins between 2015 and 2017).  In other words, Ladd had access to his E*Trade account to confirm the dates on which he sold shares of MGT.

Originally Ladd identified "someone at Sichenzia," who resulted to be Wu, as the person who prepared the Form 4 and testified that she made "certain calculations… on [her] own" and "put on the date that's wrong."  Ladd Tr. at 74:9–23, 87:5–21, 190:3–13. Ladd subsequently acknowledged that all of the information Wu included on Form 4 was information that he provided to her orally or via email.  *Id.* at 485:10–13.  Moreover, Wu testified in her deposition that she would not have filled out the Form 4 the way she did if she knew that Ladd had sold his MGT shares rather than distributed them for no consideration; she would have included the dates of sale, noted their sale price and coded them as a "sale."  Wu Tr. at 27:6–23.  She also testified that had she received information from Ladd that he had sold 435,000 MGT shares out of his E-Trade account between May 9 and May 12 that "[t]here should have been a Form 4 filed the next day if those transactions did occur," *id.* at 25:14–19, and that if she had known that Ladd had sold 435,000 shares out of his E*Trade account between May 9 and May 12 while she was preparing the May 31, 2016 Form 4, that she would have included that information.  *Id.* at 25:25–26:6.

Petranis, who bought MGT stock on May 16, 2016, testified in a deposition taken on January 18, 2023, that it would have been important for him to know Ladd had sold hundreds of thousands of shares in May and earlier for hundreds of thousands of dollars because it would have conveyed that Ladd was less than confident about MGT's prospects.  Petranis Decl. at ¶ 5.

In 2017, another investor also emailed Ladd after Ladd's sale of the MGT stock in May 2016 was made public, saying "What kind of confidence can investors have when the president of [MGT] is dumping his shares ... Why cash out now if you believe in what can be accomplished in the near future."  Doc. 322-25 (June 9, 2017 email from an MGT investor with email address "freddyigi25@gmail.com" to Ladd).

### I.   Facts Concerning the SEC's Strict Liability Claims

#### 1.   Sections 5 and 13(D)

On January 10, 2012, Ladd filed a Schedule 13D/A with the SEC reporting that he owned over 30% of MGT's outstanding stock.  Doc. 317-16 (Ladd's January 10, 2012 Schedule 13 D/A).  The form stated "Mr. Ladd has the power to vote and direct the disposition of all Common Shares held by Laddcap by virtue of his role as managing member of Laddcap."  *Id.* at 9.  However, in a Form 4 filed on June 18, 2015, Ladd specifically noted:

> Mr. Ladd, by virtue of his status as Managing Member of Laddcap Value may be deemed to beneficially own securities by Laddcap Value…. Mr. Ladd hereby disclaims beneficial ownership of the reported securities except to the extent of his pecuniary interest therein, and this report shall not be deemed an admission that he is the beneficial owner of the securities for purposes of Section 16 of the Securities Exchange Act of 1934, as amended, or for any other purpose.

Doc. 317-13 (Form 4 filed on June 18, 2015).  The SEC alleges that from June 16, 2015 to October 7, 2015, Ladd's percentage ownership of MGT's outstanding shares increased from 5.67% to 6.9%.  Ladd disputes this figure.

#### a.   Ladd's Parents' TD Ameritrade Account

Ladd's parents, Shirley and Seymour Ladd, opened an account at TD Ameritrade on January 2, 2015.  Doc. 322-11 (Ladd's Parents' Account Opening Application to TD Ameritrade).  His parents, who were in their late 80's at the time, granted him authority to trade stock in the account.  Ladd Tr. at 114:17–23; *see also* Doc. 322-12 (Trading

Authorization Agreement).  Ladd testified that his parents granted him "full discretion" to trade in the account and that he does not think his brother or sister had access to the account of trading purposes.  Ladd Tr. 119:23–122:5, 124:2–15.  From July through November 2015, the parents' TD Ameritrade account acquired a total of 382,863 shares of MGT.  Doc. 317-10 (Account statement for the parents' TD Ameritrade account).  Ladd disputes that this shows that *he* acquired or sold any shares of MGT stock.

Ladd testified that he intended to sell shares in his parents' account on May 9, 2016, the same day he began selling MGT shares from his E*Trade Account.  Ladd Tr. at 140:3–11.  However, TD Ameritrade refused to allow Ladd to sell MGT shares from his parents' account on May 9 because Ladd, an MGT affiliate, had not submitted the requisite Form 144 for those sales.  When Ladd asked TD Ameritrade for an explanation, the bank cited Ladd's "full trading authorization" over his parents' TD Ameritrade account.  *Id.* at 140:12–143:18.  Ladd submitted the Form 144 in his father's name to TD Ameritrade on May 11, with an approximate date of sale of May 30, 2016.  Doc. 322-13 (May 11, 2016 email from Ladd to TD Ameritrade attaching Ladd's May 10, 2016 Form 144).  On May 12, 2016, Ladd sold 340,000 MGT shares in the parents' account.  Answer, Doc. 281 at ¶ 168.

The next day, May 13, 2016, Ladd's mother paid Ladd $325,000 by personal check.  Doc. 322-14 ($325,000 check from Ladd's mother to Ladd).  Ladd testified that the $325,000 "represented a big part of the profits" of his May 12 sale of 340,000 shares of MGT stock in his parents' account.  Ladd Tr. at 126:14–129:1.  He also testified that the $325,000 that his mother paid him constituted his parents' post-tax realized gains from the May 12 sale in their TD Ameritrade account, and that she had not sent him the full gross proceeds from the sales in order to have money reserved to pay taxes.  *Id.* at 132:21–134:4.  He further testified that his parents gave him the $325,000 "because they wanted to help their son" and to alleviate his "financial stress," *id.* at 127:1–7, 131:1–9,

and that this served as a loan against future inheritances as opposed to a gift. *Id.* at 134:4–12.

### 2. Section 16(a)

Between August 20 and October 2, 2015, Ladd made 25 individual open-market MGT stock purchases in his own TD Ameritrade account. Doc. 317-2 (Ladd's TD Ameritrade account statements from August 1, 2015–October 31, 2015). Ladd filed no Form 4 for any of those purchases, and did not otherwise publicly disclose them, as he was required to do. Tong Decl. at ¶ 13.

From November 29, 2015 to May 17, 2016, Ladd made purchases and sales of MGT stock in this E*Trade Account on more than 26 different trading days. Doc. 317-5 (Account Statements for Ladd's E*Trade account November 1, 2015–April 30, 2016). Ladd filed a Form 4 regarding the first of those trades (a sale of 97,790 shares on November 30, 2015), but he did not file a Form 4 for any of the other trades, and he did not otherwise publicly disclose them. Doc. 317-1 at 3 (reflecting a sale of 100,000 MGT shares on November 30, 2015). Those unreported trades included the 435,000 MGT shares that Ladd sold in his E*Trade Account from May 9–12, 2016. Doc. 317-6 (Ladd's E*Trade account statement from May 1, 2016–May 31, 2016.)

### J. Procedural History

On December 3, 2021, after the Court's decision in *Honig III*, the Court directed the parties to meet and confer and provide a joint status report regarding the withdrawal of the defense of good faith or a proposed discovery schedule for the production of privileged communications between Ladd and MGT's counsel. Doc. 296. On January 5, 2022, Ladd notified the Court that he would continue to assert his defense of good faith,

resulting in the waiver of the attorney-client privilege between him and MGT and MGT's counsel concerning:  (1) communications between Ladd and MGT's counsel regarding the Honig Group and its status as a "group" as well as MGT's related disclosure obligations; (2) communications between Ladd and MGT's counsel regarding MGT's May 9, 2016 Form 8-K attaching the McAfee press release containing allegedly false information; and (3) communications between Ladd and MGT's counsel regarding Ladd's Form 4 and Form 144 in connection with his May 2016 trading.  Doc. 297.  The parties agreed on a schedule for the related document production, *id.*, and the Court directed the parties to submit a proposed discovery schedule for depositions following the conclusion of the document production by April 21, 2022.  Doc. 298.

The SEC indicated that it planned to notice six current and former lawyers at Sichenzia who represented Ladd during the period of the alleged misconduct and Ladd planned to notice an additional Sichenzia lawyer who represented Honig concerning his investments in MGT.  Doc. 299.  All six of the Sichenzia lawyers involved in the transactions were deposed and discovery was completed on August 9, 2022.  The parties were granted leave to file their respective motions for summary judgment on August 15, 2022.  Doc. 305.  Ladd filed his motion for summary judgment on November 21, 2022, Doc. 308, and the SEC filed its motion for summary judgment on January 31, 2023, Doc. 315.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-

moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

The same legal standard applies when analyzing cross-motions for summary judgment.  *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quoting *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996)).  "[E]ach party's

motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc*., 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).  The Court is not required to grant summary judgment in favor of either moving party.  *See id.* (citing *Heublein Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993)).

## III.  DISCUSSION

Ladd seeks summary judgment on the Fifth, Sixth, Seventh, and Eighth Claims in the SAC, alleging, respectively:  violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Exchange Act") and Rule 10b-5(b) thereunder; violations of § 17(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77q(a)(1) and (a)(3), ("Securities Act"); aiding and abetting under the Exchange Act § 10(b), and Rule 10b-5(b) and (c); and aiding and abetting under §§ 17(a)(1) and (a)(3) of the Securities Act.  SAC ¶ 15; *see also* Doc. 309 at 7.

The SEC seeks summary judgment against Ladd on the Fifth, Sixth, Eleventh, Thirteenth, and Seventeenth Claims of the SAC.  Claims Eleven, Thirteen, and Seventeen allege, respectively, violations of § 5 of the Securities Act; one violation of § 13(d) of the Exchange Act; and one violation of § 16(a) of the Exchange Act.  Doc. 321 at 10.

Because both the SEC and Ladd move for summary judgment as to claims Five and Six, the Court discusses these claims first.

### A.  The Fraud Allegations:  Claims 5 and 6

The SEC alleges that Ladd is liable for securities fraud for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and §17(a)(2) of the Securities

Act.  Section 10(b) prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), while SEC Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact" in connection with any such purchase or sale.  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5).  To establish a violation under these provisions, the SEC must show "that the defendant (1) made one or more misstatements of material fact, or omitted to state one or more material facts that the defendants had a duty to disclose; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).

Section 17(a)(2) of the Securities Act requires proving that the defendant "obtain[ed] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order make the statements made, in light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q(a)(2). Section 17(a)(2) differs from Section 10(b) of the Exchange Act in that it does not require proof of scienter—only proof of negligent conduct.  *See SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

The SEC alleges that Ladd violated these provisions by providing materially false statements, misrepresenting, or omitting information in:  (1) the November 6, 2015 Form S-1 and April 14, 2016 Form 10-K concerning the Honig Group's holdings; (2) Ladd's November 22, 2015 new account form submitted to E*Trade; (3) the press release attached to the May 9, 2016 Form 8-K announcing the acquisition of McAfee; and (4) the May 25, 2016 Form 144 and the May 31, 2016 Form 4 in connection with his May 2016

trading.  Doc. 321 at 45–52.  With this background, the Court turns to each of the false statements or omissions at issue.

### 1. Form S-1 and 10-K

The SEC alleges that Ladd had an obligation to disclose the Honig Group's status and ownership in MGT under Item 403 of SEC Regulation S-K and knowingly failed to do so.  *See* 17 C.F.R. § 229.403.  It claims that there is ample evidence of group activity such that it should be granted summary judgment.  Doc. 321 at 33.  Ladd cross-moves for summary judgment and maintains that the Honig Group had not invested as a Rule 13(d) group, and thus he had no duty to disclose their collective holding.  Moreover, Ladd claims that the attorneys involved—counsel from the Sichenzia firm for MGT, Ladd, and the Honig Group— advised him that Honig was not operating as a Rule 13(d) group. And finally, in the event all six lawyers were mistaken, Ladd argues he acted without the necessary scienter to constitute a violation of § 10(b).  Thus, Ladd argues the Court should grant summary judgment as to the §§ 10(b) and 17(a)(2) claims regarding the representations in the Form S-1 and 10-K.  The Court first addresses whether the investors acted as a 13(d) group.

A 13(d) group is defined as "two or more persons who agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1).  In determining whether a group exists under § 13(d), one key question is whether there was *an agreement* among the relevant individuals to act together for the purpose of acquiring, holding, or selling securities.  *Quintel*, 249 F.3d at 123–24 (2d Cir. 2001).  The group's understanding to act in concert need not be formal or written, *see Wellman v. Dickinson*, 682 F.2d 355, 363 (2nd Cir. 1982), and "the parties

might not always march in lockstep...."  *Morales v. New Valley Corp.*, 999 F. Supp. 470, 475 (S.D.N.Y. 1998), *aff'd sub nom*, *Morales v. Freund*, 163 F.3d 763 (2nd Cir. 1999). Ultimately, "[w]hether the requisite agreement exists is a question of fact."  *Quintel,* 249 F.3d at 124.

However, courts have considered other factors in determining whether individuals are acting together to acquire, hold, vote or dispose of an issuer's securities including: (1) prior relationships among members, *Quintel,* 249 F.3d at 127; (2) a single member of the group negotiating on behalf of the others, *Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC*, No. 99 Civ. 2821 (VM), 2002 WL 31869391, at *5–6 (S.D.N.Y. Dec. 20, 2002); (3) communications among the members of the group about acquiring, holding, voting or disposing of the stock, *Wellman v. Dickinson*, 682 F.2d 355, 363–64 (2d Cir. 1982); (4) the issuer's view of the members as a group, *Quintel,* 249 F.3d at 127; and (5) the subsequent actions of the members after their acquisition to hold the securities, to vote in the same way, or to dispose of the securities at or about the same time, *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14 Civ. 5226 (DLC), 2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015).

The SEC alleges that there is evidence of each of these factors concerning the Honig Group in the 2015 transaction:  (1) the Honig Group members had a long-standing business and investing relationship; (2) Honig directed the negotiations of deal terms for both the 2012 and 2015 financings; (3) the Honig Group members communicated about the investments; (4) MGT and Ladd considered Honig, Brauser, Stetson, O'Rourke, and Groussman to be a group in the 2015 financing; and (5) Honig and his co-investors acted in tandem in converting and selling their shares, and

exercised their warrants at or about the same time, and all agreed to the terms of Ladd's warrant exchange and warrant modification.

First, the SEC relies on *Quintel* to argue that the fact that defendants Honig, Brauser, Stetson, O'Rourke, and Groussman were frequent co-investors and that Honig, Stetson, O'Rourke, and Groussman  shared offices, is evidence that they were acting as a 13(d) group.  The SEC also alleges that the fact that all five of them invested together in 19 issuers between 2011 and 2018 is indicative of acting as a 13(d) group.

In *Quintel*, the Second Circuit held that, contrary to the decision by the district court on a summary judgment motion, a rational trier of fact could conclude that there was sufficient evidence to support an inference that there was an agreement to act as a group among defendants.  *Quintel,* 249 F.3d at 124.  Part of the court's review of the record included an evaluation of the prior relationship between defendants.  In that case, however, the prior relationship of the defendants was that they were all shareholders in a closely held corporation.  *Id.* at 127–28.  In the instant case the investors did not have a similarly close economic relationship.  And despite offering evidence that Honig, Brauser, Stetson, O'Rourke, and Groussman invested together in 19 issuers between 2011 and 2018 and shared office space,[25] the "[m]ere relationship" among investors, and "proof that [they] had jointly invested together in other transactions" is not enough to show an agreement.  *Forward Indus., Inc. v. Wise*, No. 14 Civ. 5365 (JSR), 2014 WL 6901137, at *3 (S.D.N.Y. Sept. 23, 2014) (internal quotation marks omitted).

Second, the SEC alleges that the fact that Honig lead the negotiations on behalf of the other defendants in 2012 and 2015 is evidence that the investors worked as a 13(d)

---

[25] The Court notes that Stetson worked for Honig and that O'Rourke shared office space with them.

group.  In support of this argument, the SEC proffers a series of emails sent in 2012 and

2015 between Honig, Stetson, Groussman, and Ladd.  The SEC claims that (1) Honig had

Stetson sign and send a term sheet to Ladd; (2) Ladd turned to Honig to resolve disputes

and intercede; and (3) Honig named his co-investors and set their allocations.  *See* Pl.

Response to Def. Rule 56.1 Statement, Doc. 320 at ¶¶ 74, 86–87.  However, the emails

do not conclusively establish that Honig was leading the negotiations on behalf of the

other investors in 2012 or 2015.  In the 2012 emails between Honig and Stetson, for

example, there is no indication that Honig *caused* Stetson to sign the document.  Doc.

318-5 (Honig writing to Ladd:  "Please send back final term sheets… to myself and

[Stetson]" and Stetson sending the signed term sheet to Ladd, Honig, and others).

Further, the 2012 emails which the SEC alleges show that "Ladd turned to Honig to

resolve a dispute," merely show Ladd asking Honig for his opinion at a prescheduled

breakfast.[26]  Similarly, the 2015 emails between Honig, Groussman, and Ladd that the

SEC relies on do not evince Honig leading the negotiation (Ladd:  "I agree with [Honig]

on this deal… so I will leave it up to [Honig] whether we go with our original [terms], or

go back to the drawing board.").  Doc. 318-32 at 2.  And the 2015 email from Stetson to

Ladd with the MGT Allocations does not include Honig, let alone demonstrate his

leadership.  Doc. 318-33 (email from Stetson to Ladd that lists five entities and their

amount of shares with no other text).

---

[26] The issue Ladd discussed with Honig over breakfast was with respect to the inclusion of a most
favored nation (MFN) provision on financing.  "Ladd:  I am meeting [Honig] in the morning and
will tell him what's going on ….[Kesner], have you told [Honig] about this?  Kesner:  I haven't."
In the same email thread, the next morning, Ladd reported having breakfast with Honig and that
Honig agreed  (Ladd:  "Just had breakfast with [Honig].  He agrees:  [Right of first refusal] on any
financing, including dilutive.  But no ratchets.").  Doc. 318-8.

The SEC also argues that all defendants using one particular defendant's counsel is evidence of leadership.  In *Schaffer*, for example, the court denied defendant's motion for summary judgment when it found a triable issue of fact as to whether the three defendants acted as a group, in part, due to an "extensive pattern of reliance on the common legal services of [a law firm]" that permitted an inference of group activity. *Schaffer ex rel. Lasersight Inc.*, 2002 WL 31869391, at *6.  Despite each defendant retaining their own outside counsel, a particular defendant's counsel took the lead in drafting and distributing draft agreements.  *Id.* at *5.  The same is true of the instant case—Defendants hired the same firm, Sichenzia, for the investment.  Like in *Schaffer,* this creates "a legitimate basis upon which a rational trier of fact could reasonably infer agreement with respect to the acquisition."  *Id.* at *6.

Third, the SEC argues that communications among the defendants in 2012 and 2015 show that they worked together to effect the acquisition of securities, hold them, and to vote together.  As evidence of this, the SEC alleges that the emails show that Stetson coordinated the effort and that Honig had a "lead role" in negotiating the terms. The communications the SEC alleges show Stetson's coordination include an email discussed above in which Stetson signed the 2012 term sheet and returned it to Ladd, copying Honig, Doc. 318-5; an email from Stetson to Averilla (MGT Controller) and Ladd attaching Honig's agreement to the modification, Doc. 318-23; an October 2012 email from Robert Traversa[27] to Stetson, copying Ladd, thanking him for his help with an investor's documentation and seeking help from him with missing wires from other

---

[27] Robert Traversa was the chief financial officer of MGT at the time.  *See* Pl. Response to Def. Rule 56.1 Statement, Doc. 320 ¶ 77.

investors.  Doc. 318-17.  The SEC also submits a 2013 email in which Honig "summarized the lead role he had played."[28]  Finally, the SEC alleges that these communications continued in the 2015 transaction with Stetson sending Groussman a list of investors and allocations he had sent to Ladd, and Stetson again acting as coordinator for the closing.  Docs. 318-33, 318-34, 318-36.  While these emails are certainly consistent with the SEC's theory, they do not establish that the defendants worked together to effect the acquisition of securities, hold them, and to vote together.  Many of the emails are garden variety communications in which the defendants attach deal documents and charts of their investments in MGT and provide no text that could indicate Stetson was acting as a coordinator.  *See* Doc. 318-5, Doc. 318-33, Doc. 318-34, Doc. 318-26, Doc. 318-36.

In contrast, in *Wellman v. Dickenson,* which the SEC relies on, the court relied on the representations made by defendant to potential purchasers concerning the availability of the shares controlled by him and his representatives and their plans for their holdings. *Wellman*, 682 F.2d at 363–64.

Fourth, the SEC argues that MGT and Ladd viewed Honig and his co-investors, Brauser, Stetson, O'Rourke, and Groussman as a group in the 2015 financing.  On October 4, 2015, Ladd sent an email to the MGT Board and attorneys Perlman and Kaplowitz, noting that "[t]he investor group is led by Barry Honig…."  Doc. 318-31 at 2.

---

[28] The email from Honig stated:

> When you needed the sign offs multiple times I got them… when you need[ed] $5 [million] [in] 6 months [] I got it… when you needed the warrants exercised I got it… when you wanted the share exchange done I got it … I saved your ass from being on pink sheets… I got the prag [*sic*] agre[e]ment cancelled…

Doc. 318-29 at 2–3.

Ladd also sent another email to Honig on November 29, 2015 reporting that MGT's total common shares outstanding includes "your group's 2.8 million [shares]." Doc. 318-54 at 2. Two minutes later, Honig responded "I am not part of a group. I invested individually[,]" to which Ladd replied, "I stand corrected." *Id.*

Ladd argues that "group" is used colloquially in both of these emails, and not as a 13(d) group. Further, Ladd claims that because Honig was not copied on the first email, Doc. 318-3, Honig did not have the opportunity to correct the misstatement. But that in the second email exchange, Doc. 318-54, when he is corrected by Honig, he immediately acknowledges the understanding that Honig invested individually. The SEC relies on *Quintel* and *Schaffer* for its argument that Ladd considered Honig and his co-investors to be acting as a group. In *Quintel* the court found that "it would be reasonable to infer that [an issuer] would perceive the three shareholders as a single unit," *Quintel,* 249 F.3d at 127, but did not rule that the shareholders were a 13(d) group based on this inference. In *Schaffer*, the issuer's lawyer stated "the investors you are representing as a group" in a memorandum, and the court found the issuer's view of the investors as a group to be relevant to determining whether there is a group. *Schaffer*, 2002 WL 31869391, at *7. The Second Circuit and this District have accorded weight to an issuer's understanding that investors were operating as a group. *Id*.

Neither MGT nor MGT's lawyers considered the investors to be acting as a group—in fact, the Sichenzia lawyers expressly informed their clients that they did not consider the investors to be a 13(d) group. However, the SEC argues that Ladd failed to

disclose the following facts to his lawyers that would have been relevant to Kaplowitz[29]

and Marcus in assessing the group issue:

- that Ladd distrusted Honig;

- that Ladd had been warned by Einhorn that Honig was a "[recidivist] stock promoter" (Doc. 318-56);

- that Ladd suspected Honig or another MGT investor had paid Ford to write the false piece for "Seeking Alpha" in April 2013;

- that Honig and Stetson immediately and simultaneously accepted Ladd's warrant exchange offer on April 26, 2013, and that Groussman accepted less than two weeks later;

- that Honig took credit for obtaining the investors' agreement to the warrant exchange offer in an email to Ladd (Doc. 318-29); and

- that Honig had "demanded" that he have MGT pay $125,000 to a stock promoter in January 2016.

Doc. 321 at 36, 68–69.

Finally, the SEC argues that Honig and his co-investors acting in near lock step post-closing is indicative of them acting as a group. First, in 2013, Honig and his co-investors converted and sold their shares, and exercised their warrants at or about the same time, and they uniformly accepted MGT's modification offer to their warrants. Beginning on April 2, 2013—before Ford's article was published in "Seeking Alpha" on April 11, 2013—Honig, Groussman and Stetson began to convert their preferred shares at or about the same time. Each of them started selling the converted common stock soon after the piece was published. MGT's share price jumped from nearly $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013. Likewise, in 2016, after the close of the trading

---

[29] The SEC also notes that "Kaplowitz did not even know that Honig and Stetson shared offices or that they had co-invested in other issuers." Doc. 321 at 36. Ladd correctly notes that other Sichenzia lawyers, such as Kesner and Perlman, knew that Honig Group members shared office space with Honig.

day on February 3, 2016, when MGT's stock's daily trading volume saw a 7,000 percent increase from its prior day's volume, and an intraday price increase of over 60 percent, Honig, Brauser, Stetson, O'Rourke, and Ladd all immediately began selling.

Additionally, this lockstep pattern reemerged in both 2013 and 2016, when Honig's group uniformly elected to modify their warrant agreements. In 2013, Ladd sent an Exchange Offer to the 2012 investors proposing to modify the terms of the Warrant Agreements they had negotiated in the 2012 financing. Honig and HSCI sent back their executed acceptances of the offer on the same day. Less than two weeks later, Groussman sent in his exchange agreement for Melechdavid. In May 2016, after the McAfee transaction was announced in May, and MGT's stock price rose, Ladd again offered Honig's investors a modification to their Warrant Agreements, offering to allow them to exercise warrants early, for a premium. Honig, Brauser, Stetson, O'Rourke, and Groussman agreed to pay a premium and just after, began to exercise their warrants, sending MGT Notices of Exercise. They, along with Ladd, also began selling their shares on May 9, 2016 and continued selling them throughout the week.

In response, Ladd argues that the facts the SEC alleges Ladd failed to disclose, "would not have made a difference in [the] legal advice [the Sichenzia lawyers] provided," that no lawyer testified that these facts would require MGT to make a group disclosure or that they would have come to a different conclusion if they had known these facts. Doc. 325 at 22–23. Additionally, he disputes the SEC's assertion that he distrusted or should have distrusted Honig and argues that to the contrary, precisely *because* he was "hyper-vigilant" he practiced due diligence and had no reason to doubt Honig's filings.

Doc. 325 at 19; *see also* Ladd Tr. at 254:12.  Indeed, Ladd testified that "[t]o [him], [Honig is] not a recidivist pump-and-dumper that violates securities law."  *Id.* 28:14–15.

Secondly, Ladd argues that it is only logical that investors would sell their shares as the price increases, and the fact that multiple investors sold when they could lock in profits is simply not evidence of an agreement to act in concert pursuant to a group agreement.  The SEC cites *Greenberg v. Hudson Bay Master Fund Ltd.*, where the court found that a complaint sufficiently alleged the existence of a 13(d) group to survive a motion to dismiss.  *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14 Civ. 5226 (DLC), 2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015).  However, the plaintiff in *Greenberg* alleged far more extensive facts than the SEC alleges here, including that the defendants who were alleged to form the 13(d) group owned and incorporated a company that was acquired in exchange for convertible shares, which the defendants converted and sold at a profit.  *Id.* at *3 (S.D.N.Y. May 12, 2015).

In addition to selling shares and modifying their warrant agreements, the SEC has shown evidence of coordinated activity between Ladd and other Honig Group members: (1) Honig and O'Rourke proposing the acquisition of D-Vasive to Ladd; and (2) Honig directing Ladd to pay a stock promoter to have a piece published about MGT.  Regarding the payment to a stock promoter, Kaplowitz testified that in order to determine whether this suggested that there was a 13(d) group, he would "have to know more than that," including "who created the material that was being disseminated, what the material that was being disseminated was, the timelines involved, [and] all sorts of things like that" and Marcus testified that knowing this, would "not necessarily" have made a difference to him in determining whether the investors were acting as a 13(d) group.

Even with deference due to the SEC in the Court's analysis of Ladd's cross-motion for summary judgment, it is nonetheless incumbent upon the SEC to identify specific evidence sufficient to persuade a rational trier of fact that an agreement exists and, in turn, some common objective, as opposed to independent parallel action, however coincidental. *Schaffer*, 2002 WL 31869391, at \*4. While the SEC has offered evidence that suggests—perhaps even strongly so—that Honig, Brauser, Stetson, O'Rourke, and Groussman acted as a group, the totality of its evidence does not compel that conclusion. Ladd's alternative explanations—for example, that the term "group" was used colloquially—are no less plausible than the SEC's argument that the evidence indicates an agreement. *Id.* at \*5. *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F. Supp. 3d 314, 340 (N.D.N.Y. 2017) ("Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment . . . the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury."). In addition, none of the Sichenzia lawyers deposed on the issue stated definitively that the Honig "Group" constituted a group for purposes of 13(d).

Because reasonable minds could disagree as to whether the investors acted as  a 13(d) group, the Court, finds that it cannot grant summary judgment for either party. Accordingly, the Court denies the cross-motions for summary judgment under §§ 10(b) and 17(a)(2) on the claims related to the Form S-1 and 10-K and need not decide if Ladd acted with scienter under § 10(b) or negligence under § 17(a)(2).[30]

---

[30] Only Ladd moves for summary judgment on the basis of scienter. In any event, the Court agrees with the SEC that scienter issues are seldom appropriate for resolution at the summary judgment stage. *See, e.g., Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270–71 (2d Cir. 1993))); *id.* ("'Whether a given

42

2. *The E\*Trade New Account Form and May 25, 2016 Form 144*

The SEC alleges that Ladd lied to TD Ameritrade about his May 2016 sales on his Form 144 to hide that he had already exceeded his Rule 144 volume limitations. According to the SEC, he lied so that his violations would evade detection and he could continue selling the remaining MGT shares left in his TD Ameritrade IRA Account. And, subsequently, in his new account form submitted to E\*Trade, Ladd lied about his interest in MGT so that E\*Trade would not monitor his compliance with the volume limitations imposed on sales of insiders' stock under Rule 144. The SEC argues that those false statements were material to TD Ameritrade and E\*Trade because they were statements that informed them about their own obligations under Rule 144. Only the SEC moves for summary judgment as to the submission of the new account form to E\*Trade, accordingly all reasonable inferences are drawn against it. Both Ladd and the SEC cross-move for summary judgment as to the Form 144.

a. *E\*Trade New Account Form*

On November 22, 2015, Ladd submitted an online application to E\*Trade for a new account. In this application, Ladd omitted his affiliation with MGT: he described his occupation as "Retired" and answered "No" to the question "Director, or policy-making office of publicly-owned company?" He also left blank the information under "Employer." Doc. 322-5 (Ladd's November 22, 2015 account application to E\*Trade).

---

intent existed is generally a question of fact,' appropriate for resolution by the trier of fact." (quoting *Grandon v. Merrill Lynch & Co*., 147 F.3d 184, 194 (2d Cir. 1998))).

Ladd argues that these omissions or misstatements were mistakes and "clerical errors." Moreover, Ladd argues that the SEC cannot prove materiality or scienter.

First, there is no dispute that these statements were false, as Ladd was the CEO and President of MGT. During his deposition, Ladd admitted that the statements he made to E*Trade on his account application were "not correct answers." Ladd Tr. at 56:16–57:6. The SEC alleges that as a result of his misrepresentation, Ladd was able to evade his responsibility to submit a Form 144 in connection with his May 2016 sales, and relatedly, avoid Rule 144's volume limitations.

The SEC argues that the misstatements were material as a matter of law because brokers also have Rule 144 obligations and that when "a market participant relies on a false statement to ensure its own compliance with the law, that misrepresentation is material." Doc. 321 at 49. Ladd argues that securities liability is restricted to defendants who lie to investors, not brokers. Doc. 325 at 42. Under Rule 144(g), a broker is required to conduct a "reasonable inquiry" and the rule imputes to the broker all of the information required by Form 144. To satisfy its obligation under Rule 144(g), E*Trade asked its new customers whether they were officers or directors of public companies.

The SEC primarily relies on three cases in support of its materiality argument. The bedrock of the SEC's argument is *U.S. v. Naftalin,* in which the U.S. Supreme Court reversed the Eighth Circuit's finding that "the government must prove some impact of the scheme on an investor." *United States v. Naftalin*, 441 U.S. 768, 771 (1979) (quoting *United States v. Naftalin*, 579 F.2d 444, 446 (8th Cir. 1978)). Naftalin engaged in a fraudulent "short selling" scheme by placing orders with brokers to sell certain shares of stock which he falsely represented that he owned. This resulted in brokers suffering

44

substantial financial losses.  The District Court found Naftalin guilty of employing "a scheme and artifice to defraud" in the sale of securities in violation of § 17(a)(1), which makes it unlawful "for any person in the offer or sale of any securities . . . directly or indirectly . . . to employ any device, scheme, or artifice to defraud."  The Eighth Circuit vacated the conviction holding that the purpose of the Securities Act was to protect investors from fraudulent practices in the sale of securities and that since Naftalin's fraud injured only brokers and not investors, he did not violate § 17(a)(1).

While it is true that the *Naftalin* court held that there is no requirement that injury occur to a purchaser, *id.* at 773, there is a key distinction between *Naftalin* and the instant case.  *Naftalin* explicitly addresses § 17(a)(1), and Ladd is charged with violating § 17(a)(2) ("The question presented in this case is whether § 17(a)(1) of the Securities Act … prohibits frauds against brokers as well as investors.  We hold that it does.").  *Id.* at 770; SAC ¶¶ 15, 253.  The court noted that "nothing in *subsection (1)* of § 17(a) creates a requirement that injury occur to a purchaser."  *Id.* at 773 (emphasis added).

Consequently, the decision does not address materiality, which is a vital component of § 17(a)(2), the claim the SEC asserts against Ladd.  Indeed, the *Naftalin* court draws the distinction between the three subsections of § 17(a) ("As is indicated by the use of an infinitive to introduce each of the three subsections, and the use of the conjunction "or" at the end of the first two each subsection proscribes a distinct category of misconduct.")  *Id.* at 774.  Thus, the holding in *Naftalin* is not controlling on claims of violations of § 17(a)(2).

Secondly, in *SEC v. Greenstone Holdings, Inc.*, the court held on summary judgment that an attorney's opinion letter necessarily informed the transfer agent's

decision, and that this misrepresentation regarding a registration exemption under Rule 144(k) may be considered important by the reasonable investor.  *SEC v. Greenstone Holdings, Inc.*, No. 10 Civ. 1302 (MGC), 2012 WL 1038570, at \*5 (S.D.N.Y. Mar. 28, 2012).  However, in *Greenstone Holdings* the court specifically noted that the misrepresentation regarding the Rule 144(k) exemption could be material precisely because they may be considered important *by the reasonable investor.*

Third, the SEC relies on *SEC v. Sayid*, which concerns two defendants providing false statements regarding the date of a transfer agreement in two legal opinion letters they provided to a company's transfer agent.  *SEC v. Sayid*, 17 Civ. 2630 (JFK), 2019 WL 6307367 (S.D.N.Y. Nov. 25, 2019), *aff'd*, 860 F. App'x 18 (2d Cir. 2021).  Co-defendants Sayid and Reynolds were securities attorneys who were responsible for Rule 144 legal opinion letters that allowed an issuer to issue stock in unrestricted form.  *Id.* at \*4.  Sayid provided the false information to Reynolds and Reynolds subsequently wrote the two legal opinion letters containing the false information.  The Court granted summary judgment, holding that the false statements Sayid provided to Reynolds, on which Sayid knew the transfer agent would rely on, were material.  *Id.*  The court also found that Reynolds was, at the very least, reckless in not investigating the false statements and in providing the Rule 144 letters.  *Id.* at \*6, 8.  The court noted that to establish materiality under §§ 10(b) and 17(a)(2) "'there must be a substantial likelihood that the [misrepresentation] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Id.* at \*7 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  And that "[t]he fact that a statement is made in private—for example, to a transfer agent—rather than to the public

does not foreclose a statement's materiality." *Id.* (quoting *Greenstone Holdings*, 2012
WL 1038570 at *5). "Insofar as [an] attorney's opinion letter and other documents
necessarily inform the transfer agent's decision, misrepresentations in such documents
*may be considered important by the reasonable investor*." *Id.* (quoting *SEC v. Czarnik*,
No. 10 Civ. 745 (PKC), 2010 WL 4860678, at *5 (S.D.N.Y. Nov. 29, 2010)) (emphasis
added).

And, in a similar vein, the SEC cites to *VanCook v. SEC,* in which the Second
Circuit affirmed the SEC's order that found that VanCook made material, untrue
statements in placing late trading orders with mutual funds. *VanCook v. SEC*, 653 F.3d
130, 141 (2d Cir. 2011). In *VanCook*, the underlying SEC order made clear that "[t]he
late-trading scheme in which VanCook participated was material because mutual funds
and their shareholders would have wanted to know that some investors were able to
benefit from trading post-4:00 p.m., thereby potentially diluting the value of shareholder
investments." *In the Matter of Joseph John Vancook*, Release No. 61039A (Nov. 20,
2009).

The SEC also cites to two out of Circuit cases. In *SEC v. Jakubowski*, the
Seventh Circuit held that the materiality standard applies equally to defrauded issuers and
investors. *SEC v. Jakubowski*, 150 F.3d 675, 680–81 (7th Cir. 1998) (concluding that
defendant's lies were material to issuers in deciding whether to issue stock, the court
noted that "*Basic* . . . covers whatever is important enough to reasonable participants in
an investment decision to alter their behavior."). Lastly, the Fifth Circuit held that
misstatements to mutual funds were material as "reasonably calculated to influence the

decisions of an investor—institutional or otherwise—in its trading in securities." *SEC v. Gann*, 565 F.3d 932, 936–37 (5th Cir. 2009).

In the cases the SEC relies upon, materiality was measured against how important a reasonable investor considered a disclosure in making an investment decision. Thus, the Court agrees that the misstatements were "reasonably calculated to influence the decisions of an investor." *Gann* 565 F.3d at 937. The Court agrees that "[p]lacing brokers outside the aegis of § 17(a) would create a loophole in the statute that Congress simply did not intend to create," *Naftalin,* 579 F.2d at 777, and that "[t]he fact that a statement is made in private… rather than to the public does not foreclose a statement's materiality." *Sayid*, 2019 WL 6307367 at *7.

In the instant case, Ladd's misrepresentations on the new E*Trade account form "altered [E*trade's] behavior" in that had E*Trade known that Ladd was an affiliate, it would have subjected Ladd's sales to Rule 144's notice requirements. *Jakubowski*, 150 F.3d at 680–81. And had Ladd filed a Form 144, investors would have been made aware of the sales during the week of May 9, 2016 and Ladd would not have been able to exceed the volume limitations imposed by Rule 144.

The issue of materiality is a mixed question of law and facts, and only when "the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 439 (1976) (internal quotations omitted). In the instant case, it is obvious that investors would have found Ladd's misstatements important.

Regarding scienter and negligence, the Court rejects Ladd's assertions that describing his occupation as retired, answering "no" to being a director of a publicly-owned company, and leaving blank the information under "employer" were mere clerical errors. Doc. 325 at 46. In any event, Ladd's denial of intent will not defeat summary judgment where the facts he misrepresented were all known to him at the time. *SEC v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016). Thus, the Court finds that Ladd's material misstatements on the E*Trade account form were made with scienter. Because the Court has found that the SEC has met the higher standard of scienter, the Court finds that Ladd also acted negligently. *See SEC v. Sason,* 433 F. Supp. 3d 496, 510 (S.D.N.Y. 2020) (citing *SEC v. Wey*, 246 F. Supp. 3d 894, 917 (S.D.N.Y. 2017)).

Accordingly, the SEC's motion for summary judgment on Ladd's false statements on his new account form to E*Trade is granted.

### b. Form 144

The SEC alleges that as a result of his misrepresentation on his E*Trade new account form, Ladd was able to evade his responsibility to submit a Form 144 in connection with his May 2016 sales, and relatedly, avoid Rule 144's volume limitations. Ladd's Form 144, filed on May 25, 2016 stated he intended to sell 41,000 MGT shares from his TD Ameritrade account and 465,171 shares from his E*Trade account, for a total of 506,171 MGT shares.[31] Def. Response to Pl's 56.1 Statement, Doc. 328 at ¶ 63. The SEC argues that had Ladd filed an accurate Form 144, TD Ameritrade would have

---

[31] In Table II of the May 25, 2016 Form 144 ("Securities Sold in the Past 3 Months") Ladd reported he had sold no shares in the last three months, when in fact, he sold 77,472 shares between February 2016 and April 30, 2016, and 466,600 shares out of his E*Trade account in May. Doc. 322-27 (Ladd's May 25, 2016 Form 144); *see also* Doc. 317-5 (Ladd's E*Trade account statements); *see also* Doc. 317-6 (Ladd's E*Trade account statements for May 2016) (showing his sale of 466,600 MGT shares.).

seen that Ladd had not complied with Rule 144's volume limitations in his prior sales and it would have not subjected itself to Rule 144 liability.

There is no dispute that Ladd submitted inaccurate information on the Form 144 when he omitted the shares he sold prior to May 25, 2016 or between February 2016 and April 30, 2016. As to Ladd's stated intention to sell 506,171 MGT shares on May 25, 2016, the SEC argues that because Ladd in fact sold 11,000 shares on May 31, 2016, six days later, Ladd made a material misstatement about the number of shares and the timing of the sale.[32] SAC ¶ 177; *see also* Doc. 321 at 51. Ladd, in turn, contends that the SEC has no evidence that he did not intend to sell the shares as listed on the Form 144 and that, in any event, under Rule 144(h)(3)[33] "the person filing the notice shall have a bona fide intention to sell the securities… within a reasonable time after filing such notice." 17 C.F.R. § 230.144(h)(3).

As an initial matter, the Court agrees that six days is a "reasonable time after filing" the Form 144, and thus Ladd's statement on the Form 144 that he intended to sell on May 25 is not a misstatement under the statute. *See Kusnier v. Virgin Galactic Holdings, Inc.*, No. 21 Civ. 03070 (ARR) (TAM), 2022 WL 16745512, at *24 (E.D.N.Y. Nov. 7, 2022) (holding that, in the context of deciding when a trade is "contemporaneous" under Second Circuit caselaw "a few days" is a "reasonable period of time"); *see also In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.,* 763 F. Supp. 2d 423, 508–09 (S.D.N.Y. 2011) (concluding that "five trading days appears to be

---

[32] The difference between Ladd's intended sale of 506,171 shares and his actual sale of 11,000 shares is approximately 500,000 shares (495,171).

[33] Ladd incorrectly cites to 17 C.F.R. § 230.144(h)(2). Doc. 309 at 29.

a reasonable period of time within which sales and purchases will be considered contemporaneous" under Second Circuit caselaw).  In the context of securities conversions, New York courts have interpreted a "reasonable time" to be anywhere between 7 and 60 days.  *Bache & Co. v. Int'l Controls Corp.*, 339 F. Supp. 341, 351 (S.D.N.Y.), *aff'd*, 469 F.2d 696 (2d Cir. 1972) (collecting cases); *see also Matter of Sterling Nav. Co., Ltd.*, 6 B.R. 616, 617 (Bankr. S.D.N.Y. 1980).

The Court finds that Ladd's misstatement regarding the number of shares he sold prior to May 25, 2016 and between February 2016 and April 30, 2016 is material.  As discussed above, for a misrepresentation to be material, a statement must be material to a reasonable investor.  MGT investor Petranis testified that it would have been important for him to know Ladd had sold hundreds of thousands of shares in May and earlier ("If I had known that [] Ladd was a seller of MGT stock prior to my purchase, I would have questioned his confidence in the MGT D-Vasive transaction and the company's prospects for the future.").  Petranis Decl. ¶ 5.  The testimony of an individual investor is sufficient to prove materiality.  "[The investor's] testimony confirms that some reasonable investors placed much greater weight on the company's quarterly earnings."  *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023, *23–24, 26–27 (S.D.N.Y. Jan. 27, 2009) (finding materiality based, in part, on the testimony of "a portfolio manager at a growth-oriented mutual fund" who invested in the subject company).

Despite Ladd's speculation that Petranis is "the worst informed trader in the market," Doc. 325 at 33, he offers scant evidence that casts doubt on Petranis' reasonableness.  "A fraud claim may not properly be dismissed summarily on the ground that the alleged misstatements were not material unless they would have been *so*

*obviously unimportant* to a reasonable investor that reasonable minds could not differ on the question of their importance." *Azrielli v. Cohen L. Offs.*, 21 F.3d 512, 518 (2d Cir. 1994) (emphasis added).  Ladd has failed to establish that the misstatement was obviously unimportant to the reasonable investor.

Thus, Ladd was not able to demonstrate a lack of genuine issue of fact regarding the materiality of the shares Ladd sold prior to May 25, 2016 and between February 2016 and April 30, 2016.

Regarding scienter and negligence, Ladd argues that "the SEC has no evidence in its possession that Ladd did not intend to sell the shares as listed." Doc. 309 at 29. However, it is undisputed that Ladd had already sold all of his MGT shares out of his E*Trade account by May 17, 2016.  Consequently, he had knowledge that it would be impossible to sell shares out of his E*Trade account.

To survive a motion for summary judgment, the SEC must provide admissible evidence that Ladd was aware of facts or had access to (1) information contradicting his statements, or (2) facts demonstrating that he failed to review or check information that he had a duty to monitor. *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511–12 (S.D.N.Y. 2018) (internal quotations omitted).  Conscious misbehavior is conduct that is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

Ladd knew it would have been impossible for him to sell any MGT shares out of the E*Trade account on May 25, 2016, as he indicated he intended to on the Form 144.

Moreover, Ladd had access to his E*Trade account statements at the time he filled out the Form 144 and could have easily verified that there were no shares left in the account. *See SEC v. Constantin*, 939 F. Supp. 2d 288, 309 (S.D.N.Y. 2013) (finding that a defendant who "had access to, and regularly reviewed" his clients' accounts online must have been aware of the accurate information contained therein and concluding that the defendant had the requisite scienter to be liable).

Thus, the Court finds that Ladd consciously misbehaved and was reckless in failing to verify the number of shares that could be sold from his E*Trade account before filing the Form 144, and scienter is established. *See Sayid,* 2019 WL 6307367, at *8 (granting summary judgment where defendant raised no genuine dispute that he knew or recklessly disregarded that his statements were false), *aff'd*, 860 F. App'x 18, 20 (2d Cir. 2021). Because the Court has found that the SEC has met the higher standard of scienter, the Court finds that Ladd also acted negligently. *See Sason,* 433 F. Supp. 3d 496, 510 (citing *SEC v. Wey*, 246 F. Supp. 3d 894, 917 (S.D.N.Y. 2017)).

Accordingly, the SEC's motion for summary judgment for the § 10(b) and Rule 10b-5(b), and § 17(a)(2) claims concerning the May 25, 2016 Form 144 are granted and Ladd's motion for summary judgment is denied.

Consequently, the Court need not determine negligence under § 17(a)(2) or scienter under § 10(b) or Rule 10b-5(b). Accordingly, both the SEC and Ladd's motions for summary judgment are denied as to the Form 144 application under §§ 17(a)(2) and 10(b), and Rule 10b-5(b).

### 3. *The May 2016 Press Release*

On May 9, 2016, MGT announced that John McAfee was joining MGT as its new

CEO.  In the press release, Ladd wrote:  "McAfee sold his company to Intel for $7.6 billion."  In reality, Intel purchased the company founded by McAfee in 2010 for $7.6 million, and McAfee had left the company over a decade prior, in 1994.  As written, the press release gave the impression that John McAfee himself sold McAfee Associates to Intel for 7.6 billion and as if McAfee was at McAfee Associates at the time Intel acquired the company.  The SEC argues that Ladd knew that statement was false when he made it, but he included it to persuade investors that McAfee would bring the same success to MGT that he had earned at his own company and to push MGT's share price higher.

Ladd, who also cross-moves for summary judgment, maintains that the truth of this matter was already known to the market, making the misstatement immaterial as a matter of law, and precluding any finding of scienter, or even negligence.  There is no dispute that the statement at issue was inaccurate and that the press release was disseminated in connection with the purchase or sale of securities.  *SEC v. Thompson*, 238 F. Supp. 3d at 591.  Thus, the SEC must establish that the misstatement was material to establish liability under §§ 10(b) and 17(a)(2) and that Ladd made the misstatement with scienter to establish liability under § 10(b) or negligent conduct under § 17(a)(2).  Likewise, Ladd must show that there is insufficient evidence to establish materiality, scienter, or negligent conduct.

   a.  *Materiality*

In support of its argument that the statement is material, the SEC points to three pieces of evidence:  (1) that MGT investor Petranis cited his review of the press release and the importance he placed on the claim about McAfee's success when deciding to invest; (2) the fact that a short-seller raised the falsity of the press release publicly; and (3) the prominent placement of the claim in the *Stock Beast* piece published on May 9, 2016, for which MGT paid $125,000.  Ladd in turn argues that (1) Petranis' views are

those of "the worst informed trader in the market"; (2) the fact that McAfee had left his company prior to the sale to Intel was common knowledge and no reasonable investor could have believed McAfee was still at his company when it sold to Intel and;  (3) the same drafting error was made previously by "numerous top-tier publications."

A misstatement in a securities transaction is material so long as there is "a substantial likelihood that a reasonable investor would find the ... misrepresentation important in making an investment decision."  *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (quoting *United States v. Villar*, 729 F.3d 62, 89 (2d Cir. 2013)).  The standard of a "reasonable investor," is an objective one.  *Id.*  "The reasonable investor in a market in which many individual investors trade will be deemed to be somewhat less schooled and sophisticated…" *Id.* at 65.  While "[i]nvestor testimony about the materiality of a given representation to an investment decision is relevant," *SEC v. Genovese*, 17 Civ. 5821 (LGS), 2022 WL 16748779, at *3 (S.D.N.Y. Nov. 7, 2022), the testimony of a particular individual is only relevant to materiality if it is "shown to be within the parameters of the thinking of reasonable investors in the particular market at issue."  *Litvak,* 889 F.3d at 65 (internal citation omitted).

The Second Circuit is clear that there must be a "nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in the market" since "[m]ateriality cannot be proven by the mistaken beliefs of the worst informed trader in a market."  *Id.*  In the instant case, the SEC relies on the declaration from MGT investor Petranis.  He interpreted the language at issue, "Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion,"  to mean that McAfee personally made $7.6 billion dollars ("I was especially influenced by the amount

of money McAfee reportedly made—$7.6 billion—in the sale of his company to Intel.").
Petranis Decl. at ¶ 4. Ladd argues that this is an unreasonable interpretation and
therefore, this testimony is irrelevant. However, "[m]inor idiosyncrasies in the investors'
views go at most to the weight of the evidence and not its admissibility." *Genovese*, 2022
WL 16748779 at *3. Accordingly, the Court will consider the Petranis testimony.

The SEC also alleges that "the fact that Ladd recalls a short-seller raising the
falsity of the press release publicly is additional evidence that Ladd's false claim was
material to investors." Doc. 321 at 45. And, in a footnote the SEC argues that the
prominent placement—in the first paragraph—of the claim at issue in the *Stock Beast*
piece is indicative that "the author of the piece… deduced that investors would consider
that information important." Doc. 321 at 45 n.25.

The Court finds that a reasonable juror could find the misstatement about McAfee
to be material. To defeat a motion for summary judgment, Ladd "must set forth
significant, probative evidence on which a reasonable fact-finder could decide in its
favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 256–57 (1986)). Ladd fails to do so.

Ladd first presents a "truth on the market" defense. Secondly, Ladd argues that
the exact imprecise wording Ladd used had also pervaded the marketplace without
anyone suggesting that the slight difference in wording was a material misstatement.
Doc. 309 at 25. These two arguments are contradictory and unconvincing.

The "truth on the market" doctrine instructs that "a misrepresentation is
immaterial if the information is already known to the market because the
misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228

F.3d 154, 167 (2d Cir. 2000).  Ladd argues that because John McAfee was a "world-famous" celebrity, by the time the press release was published, facts surrounding his departure from McAfee were public and known to the reasonable investor.  In support of this, he offers over a dozen articles that correctly state that McAfee sold his company to Intel in 2010 and three articles that further clarify that McAfee had nothing to do with McAfee Associates at the time of the press release.

However, Ladd's argument fails because only three of the articles that Ladd proffers pre-date the press release *and* correctly state that McAfee left his company prior to 2010.  Thus, it cannot be said that the information was already known to the market, such that the date of McAfee's departure known to the reasonable investor.   Moreover, the last of the articles with the correct information was published in September 2015, over a year before the press release, by a British on-line news source, which focused on McAfee's libertarian party presidential run, not his business dealings.[34]  Because of the scale of the publication, its date, and the focus of the article, this article is not likely to have caused the information to be known to the market.  *Compare with In re Yukos Oil Co. Secs. Litig.*, No. 04 Civ. 5243 (WHP), 2006 WL 3026024, at *22 (S.D.N.Y. Oct. 25, 2006) (pointing to articles from "two major international newspapers" that focused on and detailed the matters allegedly undisclosed by the company, the court held that "no reasonable investor could have been misled"); *see also White v. H&R Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *6 n.3 (S.D.N.Y. July 28, 2004) (citing "the

---

[34] DH Kass 1, *Believe it or Not: McAfee Anti-Virus Founder in U.S. Presidential Run,* CHANNEL FUTURES, (Sept. 13, 2015), https://www.channelfutures.com/sales-marketing/believe-it-or-not-mcafee-anti-virus-founder-in-u-s-presidential-run ("[Q]uestions about McAfee's eccentricity have been raised at times since he disassociated himself with the company he founded, which Intel subsequently acquired in 2010 for some $7.6 billion.").

torrent of articles published around the country" four months prior to the allegedly false press release that should have put investors on inquiry notice).

There is thus insufficient evidence for the Court to hold that the true information had been disseminated into the market with a "'degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.'" *Honig I* at *7 (quoting *Ganino*, 228 F.3d at 168).

Ladd's last argument, that there were articles pre-dating the press release that included the *same* misrepresentation weakens, rather than supports, Ladd's "truth on the market" defense. These articles indicate misinformation about John McAfee was still being reported, weakening any argument that the other articles were sufficient to counterbalance Ladd's misinformation. Those articles prove that the market was not "saturated" (*Yukos Oil*, 2006 WL 3026024 at *21) with the true facts of McAfee's separation from his company in 1994, long before the sale in 2010. *See Honig I* at *7.

Ultimately, the materiality inquiry asks whether a fact "would have been viewed ... as having significantly altered the total mix of information" if it had been available. *See TSC Indus.*, 426 U.S. at 449. The Court finds that Ladd's misstatements in the May 2016 press release are "obviously important" to a reasonable investor. Knowing that John McAfee had left McAfee approximately over two decades before he was to become CEO of MGT is "[i]nformation that would affect the probable future of the company and which may affect an investor's desire to buy, sell, or hold the company's securities is material." *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 761 (S.D.N.Y. 2022) (quoting *SEC v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 703 (S.D.N.Y. 2005) (internal citation omitted).

Accordingly, the Court finds that the misstatements in the May 2016 press release are material.

  b.  *Scienter and negligence*

Ladd circulated a draft of the press release to the D-vasive team, two Sichenzia attorneys and the MGT Board.  Importantly, however, that draft did not contain the statement at issue.  Rather, Ladd inserted the statement into the press release and published the press release without any further review from the D-vasive team, two Sichenzia attorneys or the MGT Board; and he did so without highlighting the change in subsequent email communications.

There is no dispute that Ladd was aware of the inaccuracy of his statements at the time of the issuance of the press release.  *See* Ladd Tr. 275:2–19 (Ladd testifying in his deposition that he knows now that this information is incorrect but "at the time [he] put it in, [he] unfortunately missed the mistake" and that he knew "at the time the press release was issued that McAfee sold his interest in McAfee Associated in the 1990s, well before the company was sold to Intel.").

Ladd alleges that he was notified of his error the very next day by a short-seller.  Two weeks after the initial press release and after having received this notification, MGT filed a Form 10-Q stating that McAfee "founded McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010."  Doc. 310-20 at 10 (Form 10-Q).  There was no explicit mention in the Form 10-Q of precisely what had been misstated in the May 2016 press release.

Negligence in this context is "the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances."

*SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015).  Ladd failed to use reasonable care by (1) including information in the press release that had never been reviewed by counsel before it was scheduled to go to the printer, (2) not alerting the parties that had previously reviewed the draft of the change; (3) not correcting the misstatement sooner after having been notified by the short-seller of the falsity of his statement; (4) not making the misstatement and the accompanying correction clear in the Form 10-Q.

To prove scienter under § 10(b) at the summary judgment stage, the SEC "must produce evidence (1) showing that the defendants had motive and opportunity to commit fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Yorkville Advisors,* 305 F. Supp. 3d at 511–12 (citation omitted).  The SEC argues that Ladd consciously misbehaved and was reckless in including the false statement in the press release.  The Court agrees.

Conscious misbehavior is conduct that is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d at 142.  To survive a motion for summary judgment, the SEC must provide admissible evidence that Ladd was aware of facts or had access to (1) information contradicting his statements, or (2) facts demonstrating that he failed to review or check information that he had a duty to monitor.  *Yorkville Advisors,* 305 F. Supp. 3d at 511–12 (citation omitted).  Ladd's denial of intent will not defeat summary judgment where the facts he misrepresented were all known to him at the time.  *Frohling*, 851 F.3d at 138.

As noted above, it is undisputed that Ladd knew that his statement was inaccurate. In fact, he testified that "everyone knew" that McAfee had sold his shares in McAfee Associates in the 1990s.  Ladd Tr. at 275:9–19.  Thus, scienter is established and granting SEC's motion for summary judgment is warranted.  *See SEC v. Gallison*, 588 F. Supp. 3d 509, 524–25 (S.D.N.Y. 2022) (granting summary judgment to the SEC where defendant knew the statement was "false when made"); *Sayid,* 2019 WL 6307367, at *8 (granting summary judgment where defendant raised no genuine dispute that he knew or recklessly disregarded that his statements were false), *aff'd*, 860 F. App'x 18, 20 (2d Cir. 2021).

Accordingly, the SEC's motion for summary judgment for the § 10(b) and Rule 10b-5(b), and § 17(a)(2) claims concerning the May 2016 press release are granted and Ladd's motion for summary judgment is denied.

### 4.  *The May 31, 2016 Form 4*

On May 31, 2016, Ladd filed a Form 4 regarding his trading in MGT that was prepared by Wu with information given to her by Ladd.  In a footnote in the first row of Table I Ladd identified 465,171 MGT shares that he claimed to have distributed "for no consideration" pro rata to the "limited partners of Laddcap Value" on May 25, 2016. Doc. 317-1 at 4.  In the second row of Table I he claimed that Laddcap had sold 157,300 shares of MGT stock on May 25.  *Id.*  And on the fourth row of Table I Ladd recorded that he sold 33,603 shares on May 31.  *Id.*  Although most of these 465,171 MGT shares belonged to Laddcap, Ladd deposited them in an account at E*Trade that he opened in his own name in November 2015.  Ladd sold these 465,171 MGT shares for hundreds of thousands of dollars, and not on May 25, 2016 as the Form 4 stated, but in multiple sales

beginning in December 2015 out of his E*Trade account. However, since Ladd sold no shares at all on May 25, and he only sold 11,000 MGT shares on May 31, 2016, the three rows outlined above contained inaccurate statements. He also admitted that Laddcap had made only two distributions to its investors in 2016 and that the Form 4 was wrong when it recorded that the 465,171 MGT shares had been distributed pro rata to Laddcap's investors for no consideration. Thus, there is no dispute that Ladd provided inaccurate statements on Form 4.

The parties have cross-moved for summary judgment as to the false statements on the Form 4. The SEC argues that the statements were material because, by misrepresenting his sales of hundreds of thousands of shares of MGT stock on and before May 2016 as "a distribution" to Laddcap investors for zero consideration, Ladd gave investors the false impression that he was a net acquirer of MGT stock in that period. Doc. 321 at 48. In support of its materiality argument the SEC points to the function of Form 4 and Petranis' declaration. Ladd argues that the SEC is factually wrong and that even if there was an error on the form, it was not material.

### a. Materiality

The purpose of Form 4 is to disclose purchases and sales of an issuer's stock by that issuer's officers and directors. The SEC alleges that when Ladd concealed his sale of hundreds of thousands of shares in his E*Trade account—calling them a distribution for no consideration to Laddcap's investors—it misled investors to believe Ladd was the net acquirer of MGT stock. According to the SEC, investors acted accordingly, seeing the Forms 4 as reflecting insider confidence in the company's prospects. By way of evidence, the SEC points to Petranis' declaration which stated that it would have been important for him to know that Ladd had sold hundreds of thousands of shares in May

and earlier for hundreds of thousands of dollars, because it would have conveyed that Ladd was less than confident about MGT's prospects.  The SEC also proffers another MGT investor's expression of concern from June 2017, after Ladd's sale of the MGT stock in May 2016 was made public.  Doc. 322-25 (email from an investor to Ladd saying "What kind of confidence can investors have when the president of [MGT] is dumping his shares... Why cash out now if you believe in what can be accomplished in the near future.")

In support of his motion for summary judgment, Ladd argues that the SEC bases its allegation on three inaccuracies that are simply immaterial:  (1) that he sold 157,300 shares of MGT stock on May 25, 2016 (an incorrect date); (2) that he omitted the sales he made in the May 9–12 period, immediately following the May 2016 press release; and (3) the representation that Ladd "sold" the MGT stock as a distribution to Laddcap investors for zero consideration.[35]  Ladd contends that the accurate information that he does provide in his Form 4 is what matters:  he accurately represented to the market that those shares were part of his beneficial ownership, which is the purpose of a Form 4.  Doc. 309 at 28.  And if he was "off by two weeks" (by stating that he sold the 157,300 shares on May 25 when he really sold them several days earlier) that is immaterial.  As to the false information regarding the distribution, Ladd agrees that it was erroneous, since the sale was not in fact a sale to Laddcap investors, and since Ladd in fact received consideration for the sale, but that the difference between selling shares and distributing them for no consideration is immaterial for purposes of Form 4.  Doc. 325 at 39.

The Court holds that the misstatements on the Form 4 were material.  More than one investor suggested that knowing the accurate information would have considered it important in deciding how to act.  *See IBEW Local Union No. 58 Pension Tr. Fund &*

---

[35] Ladd in fact sold the 465,171 shares of MGT for hundreds of thousands of dollars.  *See* Ladd Tr. at 487:2–8 (Q:  And so your Form 4 of May 31, 2016 told investors that you distributed 465,000 shares for zero consideration right?  And in fact you sold the shares for hundreds of thousands of dollars, right?  A: Yes").

*Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). There is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). As Ladd himself acknowledged, the purpose of Form 4 is to disclose purchases and sales of an issuer's stock by that issuer's officers and directors. By masking the sales as a "distribution" to Laddcap investors, Ladd signaled to investors that he was conferring on Laddcap investors stock that he arguably thought would increase in value. Instead, he was a seller of the stock, which to the reasonable investor could signal declining confidence in the company's future.

> b.   *Scienter and negligence*

There is also no genuine dispute that Ladd provided the incorrect information on rows 1 and 4 on the Form 4. His misrepresentation on row 2 is, at the least, reckless. Ladd admitted his disclosure on Form 4 was inaccurate and Wu testified that it was Ladd that provided her with the wrong information. As the Court held in *Frohling*, 851 F.3d at 138, a defendant's denial of intent will not defeat summary judgment where the facts he misrepresented were all known to him at the time. *See also Gallison*, 588 F. Supp. 3d at 524–25 (granting summary judgment to the SEC where defendant knew the statement was "false when made"); *Sayid,* 2019 WL 6307367, at *8 (S.D.N.Y. Nov. 25, 2019) (granting summary judgment where defendant raised no genuine dispute that he knew or recklessly disregarded that his statements were false), *aff'd*, 860 F. App'x 18, 20 (2d Cir. 2021). Ladd confirmed that rows one and two contained incorrect information concerning the date the shares were sold. *See* Ladd Tr. at 84:20–85:9 (Q: "There are no trades in MGT stock on May 25" A: "That's correct …. I believe the dates were incorrect

on the [F]orm 4 …. The dates did not conform with the actual trades … and yes, that's an error."); *see also id.* at 484:3–485:2 (Q:  Can you explain how it is that Footnote 1 describes a distribution of 465,171 shares of MGT to limited partners?  A:  They were not distributed the shares in kind, but rather it was a mistake in the filing).

Scienter is a mental state "embracing intent to deceive, manipulate, or defraud." *Yorkville Advisors, LLC*, 305 F. Supp. 3d at 511 (citation omitted).  At the summary judgment stage, the SEC "must produce evidence (1) showing that the defendants had motive and opportunity to commit fraud, *or* (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (internal quotations omitted) (emphasis added).  Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Id.*  Opportunity consists of "the means and likely prospect of achieving concrete benefits by the means alleged." *Id.*

Conscious misbehavior is conduct that is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." *Id.*  To survive a motion for summary judgment under this theory, the SEC must provide admissible evidence that Ladd was aware of facts or had access to (i) information contradicting his statements, *or* (ii) facts demonstrating that Ladd failed to review or check information that he had a duty to monitor. *Id.* (emphasis added).  The SEC must also identify specific information that Ladd knew, had access to, or had a duty to review. *Id.*

The Court finds that the SEC has proved scienter under a theory of conscious misbehavior or recklessness.  Ladd successfully logged into his E*Trade account on May 31, 2016, the same day he submitted the Form 4, three times between 10:03 a.m. and 4:14 p.m.  *See* Doc. 332-3 (Log of Ladd's E*Trade account logins between 2015 and 2017).  Thus, Ladd had access to information that contradicted his statements, and at the time he submitted the Form 4, he knew that he had not sold the shares described in rows 1 and 4 on the dates he listed.

Even if Ladd did not access his account statements, at the very least, he would be acting recklessly by not doing so before signing the Form 4.  *See Gallison*, 588 F. Supp. 3d at 523 (granting summary judgment for the SEC, when holding that when a defendant "had access to . . . information contradicting" his statements, he acted recklessly if he did not review it).

Although the Second Circuit "has not had occasion to consider what standard of care governs a negligence claim under Sections 17(a)(2)"  *Ginder*, 752 F.3d at 574, some district courts have held that "[u]nder these provisions, the definition of negligence is 'the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances.'"  *Cole*, 2015 WL 5737275, at *6 (quoting Instructions of Law to the Jury at 13, *SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. July 31, 2012)).  "Such negligence may consist either of doing something that a reasonably careful person would not do under like circumstances, or in failing to do something that a reasonably careful person would do under like circumstances."  *Id.* (internal quotations omitted).

The Court finds that a reasonably careful person would have consulted their brokerage account to confirm the dates that they sold shares of stock in filling out a Form 4. *See Constantin*, 939 F. Supp. 2d at 309 (finding that a defendant who "had access to, and regularly reviewed" his clients' accounts online must have been aware of the accurate information contained therein and concluding that the defendant had the requisite scienter to be liable).

Accordingly, SEC's motion for summary judgment as to Ladd's §§ 10(b) and 17(a)(2) liability is granted as to the Form 4.  Ladd's motion for summary judgment is denied.

### B.  Aiding and Abetting:  Claims 7 and 8

Ladd moves for summary judgment as to aiding and abetting the fraud allegations, arguing that because the SEC has not established an underlying securities violation, the claims must be dismissed.  The SEC alleges that Ladd aided and abetted in the "pump-and-dump" scheme carried out by Honig, Brauser, Stetson, O'Rourke, and Groussman by issuing the May 9, 2016 press release that contained false statements and failing to disclose the Honig Group's stock ownership in the 2015 Form 10-K and the November 6, 2015 Form S-1.  SAC ¶¶ 258, 263.

In order for Ladd to be liable as an aider and abettor in this case, the SEC must prove:  "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation."  *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).  The primaries in this instance are Honig, Brauser, Stetson, O'Rourke, Groussman and others who were violating §§ 17(a)(1), (a)(3) and 10(b).

All other defendants in this case, with the exception of Ladd, have settled without admitting any wrongdoing. *See* Docs. 28, 76–78, 92–94, 110, 113, 151–52, 224–30. The SEC argues that in making its arguments about Ladd's violations "the Commission has presented a wealth of evidence that supports its claims that Honig, Brauser, Stetson, O'Rourke, and Groussman were all acting in concert in connection with the 2015 investment in MGT." Doc. 321 at 70. The SEC argues that there is substantial evidence that Ladd had knowledge of the violations and that he substantially assisted: he knew that the group was engaged in the activities but wished to keep it a secret and, knowing this, failed to disclose the investors' group status, and participated in the 2016 pump by issuing a false May 2016 press release—so that he could sell his own stock for substantial gains. *Id.*

Because the Court has found that there is a genuine dispute as to whether the Honig Group was investing as a Rule 13(d) group, the Court cannot grant Ladd summary judgment because he could not aid and abet the underlying securities law violation by members of the Honig Group with regard to the press release, 2015 Form 10-K, or the November 6, 2015 Form S-1. Accordingly, Ladd's motion for summary judgment is denied.

### C.  The SEC's Strict Liability Claims:  Claims 11, 13, and 17

The SEC moves from summary judgment on the Securities Act § 5 and Exchange Act §§ 13(d) and 16(a) claims.

*1.  Section 5 Violation*

*a.  Ladd's E\*Trade Account*

First, the SEC alleges that Ladd violated § 5 by engaging in the unregistered sale of MGT stock when he failed to file a Form 144 for his May 9–12, 2016 stock sales from

his E*Trade account.  *See* 15 U.S.C.A. § 77e ("it shall be unlawful for any person, directly or indirectly … to [sell] or deliver … unregistered securities…").  To make its *prima facie* claim, the SEC need only establish that Ladd engaged in unregistered MGT stock sales, then the burden shifts to Ladd to prove an express exemption from registration applicable to the particular sales at issue.  The parties disagree as to the meaning of "concurrently" as used in the regulation that dictates when the Form 144 should be filed:

> The Form 144 shall be signed by the person for whose account the securities are to be sold and shall be transmitted for filing *concurrently* with either the placing with a broker of an order to execute a sale of securities in reliance upon this rule or the execution directly with a market maker of such a sale. Neither the filing of such notice nor the failure of the Commission to comment on such notice shall be deemed to preclude the Commission from taking any action that it deems necessary or appropriate with respect to the sale of the securities referred to in such notice.  The person filing the notice required by this paragraph shall have a *bona fide intention to sell the securities referred to in the notice within a reasonable time after the filing of such notice.*

17 C.F.R. § 230.144(h)(3) (emphasis added).  The SEC argues that "concurrently" means that Ladd was required to file the Form 144 "at the latest… the same day as his May 9–12 stock sales."  Doc. 321 at 39.  In support of its interpretation it cites to its own website. *See SEC Rule 144 Compliance and Disclosure Interpretation*, (http://sec.gov/corpfin/securities-act-rules, at Question 136.09) (last updated Nov. 6, 2017) (stating that the Form 144 is to be filed "the same day as the placing of a sale order or the execution of the sale").

Ladd claims to have filed a timely Form 144 in connection with the May 9–12 sales when he filed it on May 25, 2016.  Doc. 243-3 (Form 144 filed on May 25, 2016 that lists sales made on "May 12 to May 17, 2016" in Table II).  He argues that the

regulation does not define "concurrently" as "the same day" and that it even suggests that the word "concurrently" is meant to be construed broadly, as it only requires that the person filing this notice have a "bona fide intention" to sell the securities "within a reasonable time after the filing of such notice." Ladd argues that the use of the phrase "reasonable time" suggests that the time period is flexible, and not fixed at any specific date.  Notably, Ladd testified that, at the time, he understood that, as an officer or director of MGT, § 5 required him to submit a Form 144 reporting his MGT stock sales "contemporaneously with—or before" any such sales.

When faced with a question of statutory interpretation, a court's starting point "is the statute's plain meaning, if it has one."  *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000) (internal citation omitted); *see also Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 450 (2002) ("The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.") (internal quotation marks and citations omitted).  Congress having provided no definition for the term "concurrent," the Court must consider its "ordinary, common-sense meaning." *Dauray*, 215 F.3d at 260 (citing *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir. 1992)). Concurrent is defined as "operating at the same time; covering the same matters," by Black's Law Dictionary.[36]  Merriam Webster defines it as "operating or occurring at the same time; running parallel; or acting in conjunction,"[37] and Oxford Dictionary defines it

---

[36] *Concurrent*, BLACK'S LAW DICTIONARY (11th ed. 2019), *available at* Westlaw.

[37] *Concurrent*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/concurrent (last visited Aug. 21, 2023).

as "existing or happening at the same time."[38]  Indeed, the word Ladd used to express his understanding of his duties under § 5, "contemporaneous," is defined similarly.  Black's Dictionary defines it as "living, occurring, or existing at the same time," Merriam-Webster defines it as "existing, occurring, or originating during the same time," and Oxford Dictionary defines it as "happening or existing at the same time."[39]  The word "concurrent" is not ambiguous in this context.  Because the word "concurrently" cannot be said to be genuinely ambiguous, the Court need not defer to the SEC's interpretation of the word.  Deference to agency interpretations of regulations, applies only if the regulation at issue "is genuinely ambiguous."  *Kisor v. Wilkie,* 139 S. Ct. 2400, 2415 (2019).

 Contrary to Ladd's interpretation, if anything, the flexibility of the regulation suggests that a Form 144 can be filed *before* the security is sold, not after—let alone weeks later as he did here.  "The person filing the notice required by this paragraph shall have a bona fide intention to sell the securities referred to in the notice *within a reasonable time after the filing* of such notice." 17 C.F.R. § 230.144(h)(3) (emphasis added).

Thus, because Ladd did not file the Form 144 concurrently with the sales, the SEC has established its *prima facie* claim that the sales were unregistered and the burden shifts to Ladd to prove an express exemption from registration.  Under 17 CFR §

---

[38] *Concurrent*, OXFORD LEARNERS DICTIONARY.COM, https://www.oxfordlearnersdictionaries.com/us/definition/american_english/concurrent (last visited Aug. 21, 2023).

[39] *Contemporaneous*, BLACK'S LAW DICTIONARY (11th ed. 2019), *available at* Westlaw; *Contemporaneous*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/contemporaneous (last visited Aug. 21, 2023); *Contemporaneous*, OXFORD LEARNERS DICTIONARY.COM, https://www.oxfordlearnersdictionaries.com/us/definition/english/contemporaneous?q=contemporaneous (last visited Aug. 21, 2023).

230.144(e)(1)(ii)(h)(3), an affiliate of an issuer must file a Form 144 "concurrently" with

the placing of an order for the sale of securities with a broker to benefit from a "safe

harbor" from the requirement to register the sale of securities.  Further, under 17 CFR §

230.144(e)(1)(ii), the total sales of the affiliate of an issuer over the preceding three

months cannot exceed, among other things, the average weekly reported trading volume

of the issuer's stock over "the four calendar weeks preceding the filing of" Form 144.

Ladd's argument that he is exempt under the "safe harbor" exemption must fail because

he did not file the Form 144 concurrently with the May 9–12, 2016 sale.  Moreover, he

also failed to comply with Rule 14(e)'s volume limitation.[40]

### b.  Ladd's parents' TD Ameritrade account

Secondly, the SEC alleges that in addition to his MGT stock sales from his

E*Trade account, Ladd violated § 5 by selling an additional 340,000 MGT shares

through his parents' TD Ameritrade account.  From July through November, 2015 Ladd's

parents' TD Ameritrade account acquired a total of 382,863 shares of MGT.  Ladd

submitted a Form 144 in his father's name to TD Ameritrade on May 11, 2016, with an

approximate date of sale of May 30, 2016.  Instead, it was the next day, May 12, 2016,

---

[40] Under Rule 144(e), the 435,000 MGT shares Ladd sold exceeded the trading-volume limitation for company officers such as Ladd.  The sales could not exceed the greater of:  (a) 1% of MGT's most recently reported stock outstanding; or (b) subject to certain inapplicable exceptions, the stock's "average weekly reported volume of trading . . . during the four calendar weeks preceding the filing of the notice required by paragraph (h) [of Rule 144]."  17 C.F.R. §230.144(e)(1)(i) and (ii).  Ladd's sale of 435,000 shares, together with his sales of 84,072 shares over the prior three months in the E*Trade account, exceeded both 1% of MGT's outstanding shares (180,982) and MGT's average weekly trading volume during the preceding four calendar weeks (392,109 shares).  The Court rejects Ladd's argument that the four-week period used to calculate the average weekly trading volume is the four calendar weeks preceding his later submission of Form 144, May 25. 2016.  Doc. 309 at 28 n.10.  Ladd was required to file his Form 144 *concurrently* with his May 9–12 stock sales, not more than two weeks later.  Thus, Ladd needed to calculate his permissible trading volume based on the four weeks preceding the date Ladd actually sold the shares, which is also the required date for the Form 144 filing.

that Ladd sold 340,000 MGT shares in his parents' account for $551,979.44 in total proceeds.  The next day, May 13, 2016, he received $325,000 from his mother.

The SEC argues that Ladd exercised sole use of his parents' TD Ameritrade account, personally sold MGT stock from that account on May 12, 2016, and that those sales inured solely to his personal pecuniary benefit.  Doc. 321 at 19.  Because of this, the SEC argues, the Court should find that Ladd sold that stock "directly or indirectly" for § 5 purposes.  Ladd disputes having direct or indirect control over his parents' account. Doc. 325 at 52.  Thus, the issue before the Court is whether Ladd controlled his parents' TD Ameritrade account.

Acknowledging that Rule 144 does not define "control," the Second Circuit has found that Rule 405 of Regulation C establishes a definition of "affiliate" identical to that of Rule 144[41] and defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise."  *SEC. v. Kern*, 425 F.3d 143, 149 (2d Cir. 2005) (quoting 17 C.F.R. § 230.405); *see also United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (stating that control is "a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved.").

Under this definition, the Court finds that the evidence on the record reflects that Ladd was directly in control of his parents' TD Ameritrade account.  Courts have held affiliates such as Ladd liable under § 5 for executing unregistered stock sales through

---

[41] Under Rule 144 an "affiliate" is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  17 C.F.R. § 230.144(a)(1).

others' accounts.  *See SEC v. Sierra Brokerage Servs., Inc.,* 712 F.3d 321, 329–30 (6th

Cir. 2013) (Rule 144(k) safe harbor unavailable to affiliate who orchestrated stock sales

through nominee shareholders); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072,

1086–90 (9th Cir. 2010) (Rule 144 safe harbor unavailable to affiliate who orchestrated

stock sales though an entity that the affiliate purportedly had transferred to his former

wife); *SEC v. Cavanagh*, 445 F.3d 105, 114 (2d Cir. 2006) (company officers who

negotiated unregistered stock sales violated Section 5 though officers had resigned their

positions prior to sales).

It is undisputed that Ladd had authority to trade stock in the account with "full

discretion."  *See* Doc. 322-12 (Trading Authorization Agreement); *see also* Answer, Doc.

281 at ¶ 168.  It is also undisputed that Ladd received $325,000 from his mother, which

he admitted constituted proceeds of his May 12 MGT stock sales and his parents' post-

tax realized gains from the sale.[42]  *See Sierra Brokerage Servs.*, 712 F.3d at 329–330

(holding that where nominee shareholders' stock was controlled by an affiliate, and the

affiliate retained profits from the sale, the sales of nominees' stock violated Section 5).

Moreover, Ladd cannot not claim the safe harbor provided by Rule 144(e)

because, in combination with the sales from his E*Trade account, he exceed the

permissible volume limitation for the week of May 9.  Thus, the SEC's motion for

summary judgment is granted as to Ladd's parents' TD Ameritrade account.

---

[42] The cost basis of the shares Ladd sold from his parents' TD Ameritrade account was approximately $119,000 (340,0000 shares x $0.35 average price per share), amounting to realized capital gains (pre-tax) of approximately $432,979.44.  Tong Decl. at ¶ 12.  Thus, the $325,000 that Ladd's parents paid him from the sales proceeds constituted 75% of those pre-tax gains and 100% of the gains post-tax.  Doc. 321 at 18, 40.

2. *Section 13(d) Filing Violation*

The SEC alleges that Ladd violated Exchange Act § 13(d) and Rule 13d-2 by failing to report the material changes in the percentage of his ownership of MGT stock during time periods when he owned over 5% of MGT's outstanding stock.  Doc. 321 at 42.  Section 13(d)(1) requires a stock purchaser acquiring beneficial ownership of 5% or more of a company's securities to disclose his ownership to the SEC by filing a Schedule 13D.  17 C.F.R. § 240.13d–1(a)).  Beneficial ownership requires "(1) voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3.  Section 13(d) does not "require a showing of scienter to establish liability."  *Telenor East Invest AS v. Altimo Holdings & Investments Ltd*., 567 F. Supp. 2d 432, 442 (S.D.N.Y. 2008).

The SEC argues that there is no genuine dispute that:  (1) from June 16, 2015 to October 7, 2015, Ladd's ownership of MGT's stock outstanding increased from 5.67% to 6.9%; (2) this ownership percentage change was material (greater than 1%); and (3) Ladd filed no amended Schedule 13D disclosing this material change (or any other amended Schedule 13D).  Ladd disagrees and contends that there is a genuine dispute as to whether Ladd's ownership of MGT stock increased from 5.67% to 6.9% because (1) the SEC calculates the total shares as of October 2, 2015 using the shares from November 4, 2015, but with no evidence that the number of outstanding shares was the same on both days; and (2) the SEC combines Ladd's shares with Laddcap's, without providing evidence that Ladd is a beneficial owner of Laddcap.  Doc. 325 at 53.

Regarding voting power over Laddcap shares, Ladd admitted to having voting power in a Schedule 13D/A he signed on January 10, 2012.  The form stated "Mr. Ladd

has the power to vote and direct the disposition of all Common Shares held by Laddcap

by virtue of his role as *managing member* of Laddcap." Doc. 317-16 at 9 (Ladd's

January Schedule 13 D/A) (emphasis added). However, there is a genuine dispute

regarding whether Ladd was a beneficial owner of Laddcap. The January 10 Schedule

13D/A also states:

> Pursuant to Rule 13d-3 of the Exchange Act of 1934, as amended, Mr. Ladd
> is the beneficial owner of 21,477,746 Common Shares as of the date hereof
> (representing approximately 30.56% of the outstanding Common Shares),
> that includes 20,727,746 Common Shares owned of record by Laddcap and
> 750,000 Common Shares owned of record by Mr. Ladd. Mr. Ladd disclaims
> *beneficial ownership* of the securities covered by this statement (other than
> the 750,000 owned by him directly).

*Id*. 6 (emphasis added). Moreover, in a Form 4 filed on June 18, 2015, Ladd specifically

noted in a footnote:

> Mr. Ladd, by virtue of his status as *Managing Member* of Laddcap
> Value may be deemed to beneficially own securities by Laddcap
> Value…. Mr. Ladd hereby *disclaims beneficial ownership* of the
> reported securities except to the extent of his pecuniary interest
> therein, and this report shall not be deemed an admission that he is
> the beneficial owner of the securities for purposes of Section 16 of
> the Securities Exchange Act of 1934, as amended, or for any other
> purpose.

Doc. 317-13 (Form 4 filed on June 18, 2015) (emphasis added). Thus, there is a genuine

dispute as to whether Ladd is the beneficial owner of Laddcap. Because the SEC bases

its argument, in part, on the combination of Ladd's shares with Laddcap's shares, and

there is a genuine dispute regarding that underlying fact, the Court is unable to grant

summary judgment for the SEC and its motion as to the § 13 violation is denied.

### 3. *Section 16(a) Violation*

The SEC alleges that Ladd violated § 16(a) and Rule 16a-3 thereunder by failing

to file the required reports regarding his purchases and sales of MGT stock in 2015 and

2016 and seeks summary judgment as to this claim.[43]   Section 16(a) requires officers and directors to report the amount of securities of which they are the beneficial owner, as well as any changes in that ownership.   *See Whiting v. Dow Chem. Co.*, 386 F. Supp. 1130, 1134 (S.D.N.Y. 1974).   This includes statements disclosing changes in beneficial ownership on Form 4.   *See* 17 C.F.R § 240.16a-3.   The Form 4 disclosures of changes in beneficial ownership must be filed "before the end of the second business day following the day on which the subject transaction has been executed," or in other words, within two business days.   17 C.F.R. § 240.16a-3(g)(1).

To establish a violation of these provisions, the SEC must show that Ladd was an officer or director of MGT, "and that he did not file Section 16(a) disclosures after an applicable triggering event."   *See SEC v. E-Smart Tech.*, 85 F. Supp. 3d 300, 326 (D.D.C. 2015).   Scienter is not required.   *See SEC v. Verdiramo,* 890 F. Supp. 2d 257, 274 n.14 (S.D.N.Y. 2011) (stating that no showing of scienter is required to establish violations of § 16(a)).   "[S]mall acquisitions" of less than $10,000 in aggregate market value within the prior six months need not be reported on a Form 4.   17 C.F.R. § 240.16a–3(f)(1)(ii); 17 C.F.R. § 240.16a–6(a); *SEC v. Nutra Pharma Corp.,* No. 18 Civ. 5459 (JS)(ST), 2022 WL 3912561, at *13 (E.D.N.Y. Aug. 31, 2022).

It is undisputed that between August 20 and October 2, 2015, Ladd made 25 individual open-market MGT stock purchases in his own TD Ameritrade Account and did not file a Form 4 for any of those purchases.   Under § 16(a) Ladd, as an officer of MGT, was required to file a Form 4 within two business days of each purchase or sale of

---

[43] Ladd does not specifically address these claims but seeks to vindicate his rights at trial.  Doc. 325 at 11 n.5.

MGT stock.  Accordingly, the SEC is granted summary judgment as to Ladd's violations of § 16(a) and Rule 16a-3 thereunder.

## IV.    CONCLUSION

For the reasons set forth above, Ladd's motion for summary judgment is DENIED.  The SEC's motion for summary judgment is GRANTED in part and DENIED in part.  Regarding the Fifth and Sixth Causes of action, the SEC's motion for summary judgment with respect to the E*Trade account form, the May 25, 2016 Form 144, the May 2016 press release, and the May 31, 2016 Form 4 is granted.  The motion for summary judgment is denied with respect to the Forms S-1 and 10-K.

The SEC's motion for summary judgment for the Eleventh and Seventeenth Causes of action is GRANTED, but DENIED as to the Thirteenth Cause of action.

The parties are instructed to appear before the Court for a conference on November 3, 2023 at 10 a.m.  The parties shall dial (877) 411-9748 and enter access code 3029857# when prompted.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 308 and 315.

It is SO ORDERED.

Dated:    September 29, 2023
      New York, New York

_____
EDGARDO RAMOS, U.S.D.J.