**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**SECURITIES AND EXCHANGE COMMISSION,**         :
                                                :
                   **Plaintiff,**         :
                                                :         **18 Civ. 8175 (ER)**
       **– against –**                  :
                                                :         **ECF CASE**
**BARRY C. HONIG, ROBERT LADD,**                :
**ELLIOT MAZA, BRIAN KELLER,**                  :
**JOHN H. FORD, GRQ CONSULTANTS, INC., and**    :
**HS CONTRARIAN INVESTMENTS, LLC,**             :
                                                :
              **Defendants.**          :
------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR RELIEF AGAINST DEFENDANT ROBERT LADD

SECURITIES AND EXCHANGE COMMISSION
Jack Kaufman
Katherine S. Bromberg
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-0106 (Kaufman)
Attorneys for Plaintiff

February 23, 2024

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND—THE SUMMARY JUDGMENT DECISION....................................4

   I.   Fraud Liability Findings Against Ladd...........................................................4

      A.   The False May 9, 2016 MGT Press Release ...............................4

           1.   Ladd's High Degree of Scienter .......................................4

           2.   The False Press Release Was Highly Material to MGT Investors.......................5

           3.   Ladd Profited From His False Press Release ....................6

      B.   Ladd's False May 25, 2016 Form 144 ..........................................8

      C.   Ladd's False May 31, 2016 Form 4 ..............................................9

      D.   Ladd's False E*Trade New Account Form....................................11

  II.  Other Liability Findings Against Ladd ........................................................12

      A.   Ladd's Securities Act Section 5 Violations...................................12

      B.   Ladd's Exchange Act Section 16(a) and Rule 16a-3 Violations.................................13

ARGUMENT ........................................................................................................13

   I.   Civil Money Penalties...................................................................................14

      A.   Legal Standard...............................................................................14

      B.   Penalties for Ladd's Fraud Violations...........................................15

           1.   The Egregiousness of Ladd's Conduct
               and His High Degree of Scienter .....................................16

           2    Ladd's Fraudulent Conduct Created
               a Substantial Risk of Loss to MGT Investors ..................17

i

      3.    Ladd's Conduct Was Recurrent ...........................................................18

   C.   Penalties For Ladd's Other Violations ........................................................19

      1.    Second-Tier Penalties for Ladd's Section 5 Violations ....................19

      2.    First-Tier Penalty for Ladd's Section 16(a) Violations .....................19

 II.  Officer-and-Director Bar ..................................................................................20

 III. Injunctions Against Future Violations of the Federal Securities Laws ...........................22

CONCLUSION..................................................................................................................23

# TABLE OF AUTHORITIES

**Page**

**CASES**

*CSX Corp. v. Children's Inv. Fund Mgmt.*,
    654 F.3d 276 (2d Cir. 2011) ................................................................................ 22

*SEC v. Bajic*,
    No. 20 Civ. 0007 (LGS), 2023 WL 6289953 (S.D.N.Y. Sept. 27, 2023) ................................ 14

*SEC v. Bronson*,
    14 F.Supp.3d 402 (S.D.N.Y. 2014) ........................................................................ 11

*SEC v. Caledonian Bank Ltd.*,
    145 F.Supp.3d 290 (S.D.N.Y. 2015) ...................................................................... 11

*SEC v. Colonial Inv. Mgmt. L.L.C.*,
    381 F. App'x 27 (2d Cir. 2010) ........................................................................... 15

*SEC v. Gallison*,
    No. 15-cv-5456 (GBD) (SDA),2023 WL 3090857 (S.D.N.Y. Apr. 26, 2023)............. 20, 22, 23

*SEC v. Hemp*,
    No. 16-cv-1413-JAD-PAL, 2018 WL 1220566 (D. Nev. Mar. 8, 2018) ................................ 11

*SEC v. Honig*,
    18-cv-8175 (ER), 2023 WL 6386918 (S.D.N.Y. Sept. 29, 2023).................................... passim

*SEC v. Pattison*,
    2011 WL 723600 (N.D. Cal. Feb. 23, 2011).............................................................. 15

*SEC v. Pentagon Capital Mgmt. PLC*,
    725 F.3d 279 (2d Cir. 2013) ............................................................................... 15

*SEC v. Rust*,
    No. 16 Civ. 3573 (ER), 2021 WL 2850615 (S.D.N.Y. July 8, 2021) ................................ 14, 15

**Statutes and Regulations**

15 U.S.C. § 77e ....................................................................................... 2, 12, 19

15 U.S.C. § 77q ............................................................................................. 2

15 U.S.C. § 77t..................................................................................... 14, 19, 20

15 U.S.C. § 78j(b) .......................................................................................... 2

15 U.S.C. § 78p ...................................................................................... 2, 12, 19

15 U.S.C. § 78t........................................................................................... 14

15 U.S.C. § 78u .................................................................................... 14, 19, 20

17 C.F.R. § 240.16a-3(g)(1)................................................................................. 13

17 CFR § 230.144 ......................................................................................... 11

17 CFR § 240.16a-3 ........................................................................................ 2, 12, 19

17 CFR 240.10b-5 ................................................................................................. 2

**Other Authorities**

*SEC Adjustments to Civil Monetary Penalty Amounts*, 2024 WL 111023 (SEC Release, Jan. 5,
   2024)............................................................................................................... 15

The SEC respectfully submits this Memorandum of Law in support of its Motion for Relief against Defendant Robert Ladd ("Ladd") on the claims as to which the Court granted the SEC summary judgment against him on liability (DE 333), *SEC v. Honig*, 18-cv-8175 (ER), 2023 WL 6386918 (S.D.N.Y. Sept. 29, 2023) ("Summary Judgment Decision").[1] The SEC and Ladd have agreed that the Court may resolve all relief issues by deciding the SEC's motion, in accordance with the briefing schedule discussed at the Court's December 21, 2023 telephone conference and memorialized by the Court's January 9, 2024 Minute Entry. For the reasons set forth in this brief, the SEC respectfully asks the Court to award against Ladd: (1) $1,127,306 in civil money penalties; (2) a bar prohibiting Ladd from acting as an officer or director of a public company; and (3) injunctions against future violations of the federal securities laws for which the Court found Ladd liable in its Summary Judgment Decision.[2]

## PRELIMINARY STATEMENT

The SEC charges Ladd with fraud and other violations of the federal securities laws in connection with certain of his 2015 and 2016 purchases and sales of the stock of MGT Capital Investments, Inc. ("MGT"), for which Ladd served as chief executive officer and director. In its Summary Judgment Decision, the Court held Ladd liable for a number of those violations, for which the SEC now seeks relief.

Ladd's violations principally concern his participation in a May 2016 MGT pump-and-dump scheme through which he sold over 850,000 shares of his and his parents' MGT stock for

---

[1] As discussed at the Court's December 21, 2023 telephone conference in this case, the SEC is forgoing its claims against Ladd as to which the SEC did not obtain a liability determination in the Court's Summary Judgment Decision.

[2] In addition to the above requested relief, the SEC's Second Amended Complaint seeks disgorgement of Ladd's ill-gotten gains from his charged violations with prejudgment interest, and a penny stock bar. (DE 233 at 105.) The SEC, however, has determined to forgo its requests for disgorgement, prejudgment interest, and a penny stock bar against Ladd.

gross proceeds of over $1.18 million. Ladd's illegal conduct involved multiple false statements—intended both to pump up MGT's stock price and to avoid SEC regulatory reporting requirements designed to notify and protect the investing public regarding large stock sales by corporate insiders such as Ladd.

Regarding the fraud claims, the Summary Judgment Decision holds Ladd liable under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) thereunder and Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") for intentionally making the following materially false statements:

> (1) Ladd's May 9, 2016 MGT press release announcing John McAfee as MGT's new CEO and fraudulently exaggerating McAfee's past business success;
>
> (2) Ladd's May 25, 2016 Form 144 fraudulently misstating the timing and amount of Ladd's May 2016 stock sales to avoid Securities Act Section 5 sales volume limitations applicable to MGT affiliates;
>
> (3) Ladd's May 31, 2016 Form 4, also fraudulently misstating the timing and amount of Ladd's MGT stock sales; and
>
> (4) Ladd's November 2015 E*Trade new account form—through which he sold most of his MGT stock in May 2016—on which Ladd fraudulently hid from E*Trade his affiliation with MGT.

Regarding the other claims, the Summary Judgment Decision holds Ladd liable for his related violations of Securities Act Section 5 based on his unregistered May 2016 sales of: (1) 435,000 shares of MGT stock through his own E*Trade account; and (2) 340,000 shares of MGT stock through his parents' TD Ameritrade account.

In addition, the Court held Ladd liable for violating Exchange Act Section 16(a) and Rule 16a-3 thereunder—which require officers and directors of a public company to report their trades in the company's stock—by failing to report his 25 MGT stock purchases between August 20 and October 2, 2015.

Ladd's interrelated fraud and Section 5 violations were repeated, knowing, egregious, and created a substantial risk of loss to MGT stock investors. The Court found that, while fraudulently attempting to pump up MGT's stock price, Ladd—an MGT affiliate—intentionally misled financial institutions so that he could avoid Section 5's registration and reporting requirements that forbade him, as an insider, from selling such large quantities of MGT stock without making appropriate public disclosures. And Ladd did so solely for personal pecuniary gain—selling his and his parents' stock for over $1.18 million immediately after his issuance of the May 2016 false MGT press release.

In addition, new evidence establishes that Ladd has recently made other materially false and misleading public statements and omissions—this time, regarding the status of this case. MGT's December 2023 quarterly Form 10-Q filing with the SEC—which Ladd signed, and which covers the quarter ended September 30, 2023—falsely states that "no material changes" occurred in the "SEC's ongoing enforcement action against [Ladd]" and misleadingly fails to disclose this Court's September 29, 2023 Summary Judgment Decision and its liability findings against Ladd.

Ladd's repeated, egregious fraud and Section 5 violations—combined with the substantial risk of loss his conduct posed to MGT investors, and his recent material misrepresentations to investors about this action—all weigh in favor of a significant penalty to serve as a meaningful deterrent, and permanent injunctive relief to prevent such misconduct in the future. For these reasons, the SEC respectfully asks the Court to: (1) order Ladd to pay $1,127,306 in civil money penalties; (2) bar Ladd permanently from acting as an officer or director of a public company; and (3) enjoin Ladd from future violations of the federal securities laws.

## BACKGROUND—THE SUMMARY JUDGMENT DECISION

This section summarizes the Court's findings on the claims as to which the Court held Ladd liable on summary judgment.

### I.   Fraud Liability Findings Against Ladd

#### A.   The False May 9, 2016 MGT Press Release

On May 9, 2016, Ladd issued an MGT press release announcing MGT's acquisition of D-Vasive, Inc., an anti-spy software company associated with John McAfee, "the founder of a famous cyber-security company that bore his name, 'McAfee Associates.'" *Honig*, 2023 WL 6386918, at *8. The press release—titled "John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology"—also announced that McAfee was joining MGT as its new CEO. *Id.* The press release falsely stated that McAfee had "sold his company to Intel for $7.6 billion." *Id.* at *8, 25. In reality, contrary to that statement, McAfee "had sold his stake in the company by 1994 and was no longer a part of McAfee Associates by 2010, when the Intel Corporation purchased the company for nearly $7.7 billion." *Id.*

##### 1.   Ladd's High Degree of Scienter

Ladd claimed on summary judgment that he issued his false press release by "mistake." *Id.* at *9. The Court rejected that claim, agreeing instead with the SEC that "Ladd consciously misbehaved and was reckless in including the false statement in the press release"; and that "[t]here is no dispute that Ladd was aware of the inaccuracy of his statements at the time of the issuance of the press release." *Id.* at *27-28..

In so finding, the Court emphasized the fact that Ladd himself surreptitiously added the false press release language on the morning of the release so as to avoid scrutiny by MGT's Board and counsel:

> Ladd inserted the [false] statement into the press release and published the
> press release without any further review from the D-Vasive team, two [MGT]
> attorneys, or the MGT Board; and…without highlighting the change in
> subsequent email communications [with such persons].

*Id.* at *27; *see also id*. at *8.

In the same vein, the Court further emphasized that Ladd had paid an on-line publication
to disseminate more widely his false McAfee statement:

> At [co-Defendant] Honig's request, Ladd authorized MGT to pay $125,000 to
> a stock promotion website, *StockBeast.com*, to publish a piece on May 9,
> 2016, which echoed the claim in the first paragraph of the MGT press release
> that McAfee had sold his company for $7.6 billion…. Ladd chose *Stock Beast*
> at the suggestion of an MGT consultant because 'it had the biggest
> circulation.'

*Id.* at *9 (record citations omitted).

Finally, the Court found that, even after an MGT short-seller notified Ladd (the next day)
that the press release contained the false McAfee statement, Ladd failed to disclose the truth. To
the contrary, he continued to mislead the public. The Court found that, "[o]n May 23, 2016, two
weeks after the initial press release, MGT filed a Form 10-Q stating that McAfee 'founded
McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010.'"
*Id.* at *9. That statement, however, "told investors nothing about what exactly had been misstated
in the May 9, 2016 press release." *Id.* at *9; *see also id.* at *27.

### 2.   The False Press Release Was Highly Material to MGT Investors.

The Court also found that Ladd's false press release was highly material to potential
MGT investors:

> The Court finds that Ladd's misstatements in the May 2016 press release are
> obviously important to a reasonable investor. Knowing that John McAfee had
> left McAfee approximately over two decades before he was to become CEO
> of MGT is [i]nformation that would affect the probable future of the company
> and which may affect an investor's desire to buy, sell, or hold the company's
> securities is material.

5

*Id.* at *27  (internal quotation marks omitted). In reaching this conclusion, the Court considered, among other things, the declaration of MGT investor Christopher Petranis:

> [T]he statement in the press release was important to [Mr. Petranis's] decision to invest because it conveyed to him that McAfee had enjoyed a huge success at his prior company and that he might be able to bring his talents for creating successful companies to MGT.

*Id.* at *10 ; *see also id.* at *26 .

Along these same lines, the Court's findings suggest that Ladd's May 9 press release greatly influenced the market for MGT stock. The Court found that, on "May 6, 2016—the last trading day prior to the issuance of the press release on May 9, 2016—trading volume in MGT common stock was 71,005 shares, and that day's closing price was $0.36." *Id.* at *9. "On May 9, 2016, MGT's stock closed at $0.49, an increase of 34 percent over the prior day's close, with trading volume of more than 10 million shares." *Id* . The trading data further shows that, on May 12, MGT's stock price closed at $1.52 per share, a 317% increase over the May 6 price. (Declaration of Ricky Tong in Support of Plaintiff's Motion for Partial Summary Judgment and in Opposition to Defendant Ladd's Motion for Partial Summary Judgment dated January 19, 2013 (DE 317) at ¶ 37 ("2023 Tong Declaration").)

### 3. Ladd Profited From His False Press Release.

The undisputed evidence further establishes that Ladd profited greatly from his false press release. As MGT's stock price shot up during the week immediately following issuance of the press release, Ladd sold hundreds of thousands of shares of his and his parents' MGT stock, for total gross proceeds of $1,184,662.69—$841,554.06 of which Ladd received personally.

From May 9-12, 2016, Ladd sold a total of 435,000 shares of MGT stock from his personal E*Trade account for total gross sales proceeds of $414,448.39. (Declaration of Ricky Tong in Support of Plaintiff's Motion for Relief against Defendant Ladd dated February 23,

2024 ("2024 Tong Decl.") ¶ 10.) From May 16-17, Ladd sold another 25,000 MGT shares from his E*Trade account for additional gross proceeds of $74,318.23. *Id.* On May 31, Ladd sold an additional 11,000 shares of MGT stock from his TD Ameritrade account for additional gross proceeds of $27,787.44. *Id.*

On May 12, 2016, Ladd also sold 340,000 shares of MGT stock from his parents' TD Ameritrade Account for gross proceeds of $551,979.44. *Honig*, 2023 WL 6386918, at *12, 33 . As the Court found, Ladd personally received $325,000 of those proceeds from his parents. *Id.* at *13, 33 . From May 16-17, Ladd sold an additional 41,683 shares of MGT stock from his parents' account for gross proceeds of $116,129.19. (2024 Tong Decl. ¶ 10.)

Thus, Ladd personally received a total of $841,554.06 in gross proceeds from his May 2016 MGT stock sales in his and his parents' trading accounts. *Honig*, 2023 WL 6386918, at *13, 33 . Below is a chart that summarizes Ladd's May 2016 MGT stock sales through his and his parents' trading accounts:

| Summary of Ladd's total Gross Proceeds from Selling MGT Shares in May 2016 | | | | |
|---|---|---|---|---|
| Date/Totals | MGT Shares Sold | Account Name | Account No. | Proceeds |
| May 9, 2016 | 40,000 | Robert B. Ladd | E*TRADE Account | $24,766.47 |
| May 10, 2016 | 120,000 | Robert B. Ladd | E*TRADE Account | $86,003.15 |
| May 11, 2016 | 230,000 | Robert B. Ladd | E*TRADE Account | $233,248.97 |
| May 12, 2016 | 340,000 | Ladd's Parents | Ladd's Parents' TD Ameritrade Account | $551,979.44 |
| May 12, 2016 | 45,000 | Robert B. Ladd | E*TRADE Account | $70,429.80 |
| May 16, 2016 | 17,000 | Robert B. Ladd | E*TRADE Account | $46,213.20 |
| May 16, 2016 | 37,683 | Ladd's Parents | Ladd's Parents' TD Ameritrade Account | $102,409.19 |

| May 17, 2016 | 8,000 | Robert B. Ladd | E*TRADE Account | $28,105.03 |
|---|---|---|---|---|
| May 17, 2016 | 4,000 | Ladd's Parents | Ladd's Parents' TD Ameritrade Account | $13,720.00 |
| May 31, 2016 | 11,000 | Robert B. Ladd | Ladd IRA TD Ameritrade Account | $27,787.44 |
| **Total Shares Sold** | **852,683** | | | |
| **Total Proceeds** | | | | **$1,184,662.69** |

(2024 Tong Decl. ¶ 10.)

**B.     Ladd's False May 25, 2016 Form 144**

"Form 144 is a notice of proposed sale of securities which must be filed in accordance with Securities Act Rule 144(h) when an individual who owns unregistered shares plans to sell those shares." *Honig*, 2023 WL 6386918, at *10. "The Form must be filed when share prices are above $50,000 altogether or when there are more than 5,000 shares being sold during any three month period." *Id.*

"Ladd filed a Form 144 on May 25, 2016 that stated that he intended to sell 41,000 MGT shares from his TD Ameritrade account, and 465,171 shares from his E*Trade account." *Id.* That statement was false because "Ladd had already sold all of his MGT shares out of his E*Trade account by May 17, 2016." *Id.* at *10, 24. In addition Ladd falsely reported on his Form 144 that "he had sold no shares in the last three months, when in fact, he sold 77,472 shares between February 2016 and April 30, 2016, and 466,600 shares out of his E*Trade account in May." *Id.* at *10; *see also id.* at *23.

In making these false statements, the Court found that "Ladd consciously misbehaved and was reckless in failing to verify the number of shares that could be sold from his E*Trade account before filing the Form 144…" *Id.* at *24.

The Court further found that Ladd's false Form 144 statements were material to a reasonable investor. The Court cited the declaration of MGT investor Petranis:

> MGT investor Petranis testified that it would have been important for him to know Ladd had sold hundreds of thousands of shares in May and earlier ('If I had known that [ ] Ladd was a seller of MGT stock prior to my purchase, I would have questioned his confidence in the MGT D-Vasive transaction and the company's prospects for the future.').

*Id.* at *24.

### C.    Ladd's False May 31, 2016 Form 4

"Section 16(a) of the Exchange Act requires a public company officer to file a Form 4 with the SEC disclosing any purchase or sale of the company's stock by the officer within two business days of the trade execution date." *Id.* at *11. "The purpose of Form 4 is to disclose purchases and sales of an issuer's stock by that issuer's officers and directors." *Id.* at *29. On May 31, 2016, Ladd filed a Form 4 containing several false statements regarding his MGT trades (the "Form 4").

The Form 4 falsely stated that, on May 25, 2016: (1) Ladd had "distributed" 465,171 MGT shares "for no consideration *pro rata* to the limited partners of Laddcap Value [Partners III LLC]" ("Laddcap")[3]; and (2) "Laddcap had sold 157,300 shares of MGT stock on May 25." In fact, contrary to Ladd's false Form 4, Ladd had not "distributed" 465,171 MGT shares to Laddcap's investors for "no consideration"—instead, he had sold the shares "for hundreds of thousands of dollars, and not on May 25, 2016, but in multiple sales beginning in December 2015, from his E*Trade account."[4] *Id.* at *11, 28.

---

[3] Laddcap "was the fund Ladd set up to acquire and hold MGT shares, and for which Ladd acted as Managing Member. Laddcap had 17 limited partners or members at that time." *Id.* at *11 n.23.

[4] "Although most of these 465,171 MGT shares belonged to Laddcap, Ladd deposited them in an account at E*Trade that he opened in his own name in November 2015." *Id.* at *28.

In addition, Ladd falsely claimed in the Form 4 "to have sold 33,603 [MGT] shares on May 31, 2016, when in reality his TD Ameritrade IRA account statements reflect that he only sold 11,000 shares on that date." *Id.* at *11.

The Court found that Ladd's false statements resulted from at least "conscious misbehavior or recklessness." *Id.* at *30. Specifically, the Court found that, because Ladd had successfully logged into his E*Trade account three times on the day he submitted the false Form 4, he "had access to information that contradicted his statements, and at the time he submitted his Form 4, he knew that he had not sold the shares described…on the dates he listed." *Id.*

The Court further found Ladd's Form 4 misstatements "material" because "[m]ore than one investor suggested that knowing the accurate information would have considered it important in deciding how to act." *Id.* at *29. In this regard, the Court emphasized the declaration of MGT investor Petranis—who purchased MGT stock on May 16, 2016:

> By way of evidence, the SEC points to [MGT investor] Petranis' declaration which stated that it would have been important for him to know that Ladd had sold hundreds of thousands of shares in May and earlier for hundreds of thousands of dollars, because it would have conveyed that Ladd was less than confident about MGT's prospects.

*Id.* at *29; *see also id.* at *12.

The Court further emphasized an email from another MGT investor, who emailed Ladd in 2017, after Ladd's May 2016 stock sales had been made public:

> The SEC also proffers another MGT investor's expression of concern from June 2017, after Ladd's sale of the MGT stock in May 2016 was made public. Doc. 322-25 (email from an investor to Ladd saying 'What kind of confidence can investors have when the president of [MGT] is dumping his shares... Why cash out now if you believe in what can be accomplished in the near future.')

*Id.* at *29; *see also id.* at *12.

Based on the above evidence, the Court concluded:

> By masking the sales as a 'distribution' to Laddcap investors, Ladd signaled
> to investors that he was conferring on Laddcap investors stock that he
> arguably thought would increase in value. Instead, he was a seller of the stock,
> which to the reasonable investor could signal declining confidence in the
> company's future.

*Id.* at *29.

### D.   Ladd's False E*Trade New Account Form

On November 22, 2015, Ladd submitted an online application to E*Trade to open a new account for himself. *Id.* at *7, 20. On the application, Ladd falsely described his occupation as "retired"; falsely answered "No" as to whether he was a "Director, or policymaking officer of a publicly-owned company"; and falsely left blank the "Employer" section of the form. *Id.* Ladd made those false statements while he was CEO and President of MGT, a publicly traded company. The Court thus "reject[ed]" Ladd's argument that Ladd's false statements "were mere clerical errors," as "the facts he misrepresented were all known to him at the time." *Id.* at *22.

As the Court found, the surrounding circumstances further illuminate Ladd's fraudulent motive for submitting a false account application to E*Trade, and its materiality to investors. The Court found that, had Ladd disclosed the truth to E*Trade—that he was an MGT affiliate—"it would have subjected Ladd's [MGT stock sales] to Rule 144's notice requirements." *Id.* at *22. Furthermore, "had Ladd filed a Form 144, investors would have been made aware of the sales during the week of May 9, 2016 and Ladd would not have been able to exceed the volume limitations imposed by Rule 144." *Id.*[5]

---

[5] Under the Securities Act Rule 144 "safe harbor," if re-sellers of stock comply with all of Rule 144's specific requirements, they generally are deemed not to be subject to the stock-sale registration and disclosure requirements of Securities Act Section 5. *See SEC v. Hemp*, No. 16-cv-1413-JAD-PAL, 2018 WL 1220566, at *3 (D. Nev. Mar. 8, 2018). If, however, Rule 144 is not complied with and no other Section 5 exemption applies, "securities offered for sale must be registered by filing a registration statement with the SEC." *SEC v. Bronson*, 14 F.Supp.3d 402, 407 (S.D.N.Y. 2014. "The registration requirements of Section 5 of the Securities Act ensure that

## II.   Other Liability Findings Against Ladd

In addition to finding that Ladd repeatedly committed securities fraud, the Summary Judgment Decision finds that Ladd violated certain non-scienter provisions of the federal securities laws: (1) Securities Act Section 5 and (2) Exchange Act Section 16 and Rule 16a-3 thereunder.

### A.   Ladd's Securities Act Section 5 Violations

Ladd's Section 5 violations are based on his unregistered sales of 775,000 shares of MGT stock in his and his parents' accounts during the week of May 9, 2016—immediately following the issuance of the May 9 MGT press release—which exceeded Section 5's volume limitations for sales of MGT stock by company "affiliates" such as Ladd. Section 5's volume limitations were at least one of Ladd's motivations for making his multiple false statements on his E*Trade new account form, his May 25, 2016 Form 144, and his May 31 Form 4.

The Court found that Ladd violated Section 5 through two sets of unregistered stock sales from May 9-12, 2016, immediately following the issuance of his false MGT press release: (1) his sales of 435,000 shares of his own MGT stock from his E*Trade account; and (2) his sales of an additional 340,000 shares from his parents' TD Ameritrade Account. *Id.* at *31-34; 2024 Tong Decl. ¶ 10. Ladd personally received $414,448.39 in gross sales proceeds from those sales in his E*Trade account and an additional $325,000 of the gross proceeds from his sale of MGT stock that week in his parents' account. *Honig*, 2023 WL 6386918 at *13, *33-34; 2024 Tong Decl. ¶ 10.

---

investors receive information sufficient to make informed investment decisions." *SEC v. Caledonian Bank Ltd.*, 145 F.Supp.3d 290, 305 (S.D.N.Y. 2015).

**B.**     **Ladd's Exchange Act Section 16(a) and Rule 16a-3 Violations**

"[Exchange Act] Section 16(a) requires officers and directors to report the amount of

securities of which they are the beneficial owner, as well as any changes in that ownership."

*Honig*, 2023 WL 6386918 at *35. "This includes statements disclosing changes in beneficial

ownership on Form 4." *Id.* "The Form 4 disclosures of changes in beneficial ownership must be

filed 'before the end of the second business day following the day on which the subject

transaction has been executed,' or in other words, within two business days." *Id.* (quoting 17

C.F.R. § 240.16a-3(g)(1)). Liability under Section 16(a) does not require a showing of scienter—

only "that Ladd was an officer or director of MGT, and that he did not file Section 16(a)

disclosures after an applicable triggering event." *Id.* at *36 (internal quotation marks omitted).

The Court found Ladd liable under Section 16(a) and Rule 16a-3 for making twenty-five

open market MGT stock purchases between August 20 and October 2, 2015, without filing a

Form 4 for any of those purchases. *Id.*

## ARGUMENT

The SEC respectfully seeks both monetary and injunctive relief against Ladd based on his

numerous and repeated securities law violations that the Court found on summary judgment.

Specifically, the SEC requests that the Court enter a final judgment against Ladd that includes:

(1) $1,127,306 in civil money penalties; (2) a bar prohibiting Ladd from acting as an officer or

director of a public company; and (3) injunctions against future violations of the federal

securities laws for which the Court found Ladd liable in its Summary Judgment Decision. As

discussed below, these remedies are appropriate.

I.     **Civil Money Penalties**

    A.     **Legal Standard**

In SEC enforcement actions, district courts "have discretion in determining the appropriate amount of any penalty." *SEC v. Rust*, No. 16 Civ. 3573 (ER), 2021 WL 2850615, at *3 (S.D.N.Y. July 8, 2021) (Ramos, J.). "The purpose of civil monetary penalties is to punish the individual violator and deter future violations of the securities laws." *Id.* (internal quotation marks omitted).

Under Exchange Act Section 21(d)(3) and Securities Act Section 20(d)(2), civil money penalties are "not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of the violation, or (ii) a specified amount per violation, depending on whether the violation falls in the first, second or third penalty tier." *SEC v. Bajic*, No. 20 Civ. 0007 (LGS), 2023 WL 6289953, at *4 (S.D.N.Y. Sept. 27, 2023).

Exchange Act Section 21(d)(3) and Securities Act Section 20(d)(2) set forth the three tiers of per-violation monetary penalties:

> A first-tier penalty may be imposed for any violation of the Exchange Act or the Securities Act. 15 U.S.C. § 77t(d)(2)(A) ; 15 U.S.C. § 78u(d)(3)(B)(i) . A second-tier penalty may be imposed if the violation 'involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.' 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii). And a third-tier penalty may be imposed when, in addition to meeting the requirements of a second-tier penalty, the 'violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.' 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).

*Id.* at *4.

For the period November 3, 2015, through the time the Court issued its Summary Judgment Decision, the maximum inflation-adjusted per-violation amounts applicable to individuals for each civil penalty tier were: (1) $11,162 for first-tier violations; (2) $111,614 for

second-tier violations; and (3) $223,229 for third-tier violations. *See SEC Adjustments to Civil Monetary Penalty Amounts*, 2024 WL 111023, at *1-2 (SEC Release, Jan. 5, 2024) ("SEC Release").[6]

Courts have counted violations by various methods, including by the number of false statements or violative transactions.  *See, e.g.*, *SEC v. Pentagon Capital Mgmt. PLC,* 725 F.3d 279, 288 n.7 (2d Cir. 2013) (vacating and remanding for further consideration district court's civil penalty award, but finding "no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation."); *SEC v. Colonial Inv. Mgmt. L.L.C.*, 381 F. App'x 27, 28 & 32 (2d Cir. 2010) (summary order) (affirming penalty of $25,000 for each of the defendant's eighteen violative transactions); *SEC v. Pattison*, No. C–08–4238 EMC, 2011 WL 723600, at *5 (N.D. Cal. Feb. 23, 2011) ("The Court may assess a penalty for each distinct violation, *e.g.*, each time [d]efendant falsified a record.").

Factors courts consider in determining whether to impose a civil penalty, and what amount to impose, include:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Rust*, 2021 WL 2850615, at *4.

## B.     Penalties for Ladd's Fraud Violations

Ladd repeatedly lied—both directly to potential MGT investors and on bank regulatory

---

[6] The most recent, 2024 inflation-adjusted maximum penalties for each tier are higher than the amounts listed above. *See* SEC Release, 2024 WL 111023, at *2. However, for the purpose of seeking civil money penalties against Ladd in this case, the SEC relies not upon the 2024 amounts but, rather, upon the maximum penalty amounts that were in effect as of September 2023, when the Court issued its Summary Judgment Decision.

forms designed to protect them—with one goal in mind: to sell hundreds of thousands of shares of MGT stock at artificially inflated prices while evading sales volume limitations and reporting requirements designed to protect potential MGT investors. Ladd's fraud violations were therefore egregious, involved a high degree of scienter, created a substantial risk of harm to MGT investors and potential investors, and were repeated, as described in more detail below. For these reasons, the Court should order the maximum third-tier per-violation penalty ($223,229) for each of Ladd's four sets of false statements for which the Court held him liable for securities fraud: (1) Ladd's E*Trade new account application; (2) Ladd's false May 2016 MGT press release; (3) Ladd's May 25, 2016 false Form 144; and (4) Ladd's May 31, 2016 false Form 4. Therefore, a total of $892,916 ($223,229 x 4) in civil money penalties for Ladd's four sets of fraud violations is appropriate.

        1.    <u>The Egregiousness of Ladd's Conduct and His High Degree of Scienter</u>

Regarding egregiousness and scienter, Ladd repeatedly made blatant false statements that he either knew were false or that amounted to "conscious misbehavior." *Honig*, 2023 WL 6386918, at *20-31. Thus, for example, Ladd brazenly misrepresented on his E*Trade new account form that he was retired when, in fact, he was MGT's CEO. As the Court found, Ladd did so to avoid alerting E*Trade of his MGT affiliate status—which, had he been honest with E*Trade, would have precluded him from selling large blocks of MGT stock through that account (as he did in May 2016). *See Honig*, 2023 WL 6386918, at *22.

In the same vein, Ladd falsely stated the timing and volume of his May 2016 MGT stock sales on his May 25 Form 144 and his false May 31 Form 4. Again, Ladd sought to evade Section 5's sales volume limitations regarding his sales of hundreds of thousands of shares of MGT stock that month. *See id.* at *24. In addition, the Court found that Ladd filed his false Form

4 to avoid disclosing to potential MGT stock purchasers that MGT's CEO was dumping hundreds of thousands of MGT stock sales immediately after making a major positive announcement about the company. *Id.* at *29.

Finally, in issuing his false May 9, 2016 MGT press release Ladd plainly intended to dump his and his parents' MGT stock at greatly inflated prices. Immediately following that release—from May 9-12, 2016—MGT's stock price rose 317%. (2023 Tong Decl. (DE 317) ¶ 37.) During those same four days, Ladd dumped 775,000 shares of his and his parents' MGT stock for total gross proceeds that week of $966,427.83. As the Court found, it was no coincidence or "mistake" (as Ladd argued) that Ladd's false press release greatly exaggerated the past business success of MGT's newly-announced CEO. To the contrary, as the Court found, Ladd surreptitiously added that language to the press release at the last minute, plainly intending to help boost MGT's stock price. *See Honig*, 2023 WL 6386918 at *27-28.

### 2. Ladd's Fraudulent Conduct Created a Substantial Risk of Loss to MGT Investors.

As the Court also found, all of Ladd's false statements created a substantial risk of loss to MGT investors.

Regarding the E*Trade new account form, for example, the Court found, "it is obvious that investors would have found Ladd's misstatements important" because, had Ladd accurately filled out the form, investors would have been aware of Ladd's enormous MGT stock sales in early May 2016, and Ladd would not have been able to exceed Rule 144's stock sale volume limitations. *Honig*, 2023 WL 6386918, at *22.

In discussing Ladd's false May 31, 2015 Form 4, the Court similarly noted that "more than one [MGT] investor suggested that knowing the accurate information [regarding Ladd's May 2016 stock sales] would have considered it important in deciding how to act." *Id.* at *29.

Likewise, the Court found that Ladd's intentional failure to disclose his May 2016 MGT stock sales on his May 25, 2016 Form 144 was potentially detrimental to anyone considering investing in MGT stock. Had investors known that Ladd was selling large amounts of MGT stock immediately after announcing the MGT D-Vasive merger transaction, they may have questioned Ladd's confidence in the transaction, as well as MGT's future prospects. *Id.* at *24.

And the Court likewise found Ladd's false May 2016 MGT press release "obviously important to a reasonable investor" because the fact that John McAfee had left McAfee twenty years before MGT's May 2016 announcement that he would be its new CEO was "[i]nformation that would affect the probable future of the company and which may affect an investor's desire to buy, sell, or hold the company's securities." *Id.* at *27.

For the foregoing reasons, Ladd's repeated fraudulent conduct was egregious, highly intentional, and created substantial risk to the investing public.

3.    Ladd's Conduct Was Recurrent.

Finally, Ladd's fraud violations were repeated and varied. Indeed, Ladd made multiple false statements on his E*Trade new account application, his May 25, 2016 Form 144, and his May 31, 2016 Form 4. And he did so to hide the fact that he was selling hundreds of thousands of MGT shares immediately after he issued his false press release.

In addition, as further explained at pages 21-22 below, Ladd continues to make materially false statements and omissions to the public regarding MGT, most recently in MGT's latest quarterly Form 10-Q filed with the SEC, in which he materially misstates the status of this case, omitting to disclose this Court's Summary Judgment Decision liability findings against him.

For the foregoing reasons, the SEC respectfully requests that the Court award civil money penalties totaling $892,916 for Ladd's fraudulent conduct.

18

C.    <u>**Penalties For Ladd's Other Violations**</u>

In addition to awarding $892,916 in civil penalties for Ladd's fraudulent conduct, the SEC respectfully requests that the Court award a total of $234,390 in penalties for Ladd's violations of Securities Act Section 5, Exchange Act Section 16(a), and Rule 16a-3.

1.    <u>Second-Tier Penalties for Ladd's Section 5 Violations</u>

The Court should award two second-tier penalties for each of Ladd's two sets of Section 5 violations ($111,614 for each violation): (1) his sales of his own MGT stock during the week of May 9-12; and (2) his sales from his parents' account. A $223,228 penalty ($111,614 x 2) for Ladd's two sets of Section 5 violations is appropriate.

Second-tier penalties are appropriate for Ladd's two Section 5 violations because they involved Ladd's "deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii). As the Court found, Ladd was familiar with Rule 144's volume limitation on sales by affiliates—a limitation that Ladd intentionally tried to evade through his fraudulent conduct. *Honig*, 2023 WL 6386918, at *10. Despite his knowledge of these requirements, the circumstances establish that Ladd deliberately exceeded his allowed stock sales volume during the week of May 9-12 in order to capitalize on MGT's enormous stock price increase immediately after Ladd issued his false MGT press release.

2.    <u>First-Tier Penalty for Ladd's Section 16(a) Violations</u>

Finally, the SEC requests a single, $11,162 first-tier penalty for Ladd's Exchange Act Section 16 and Rule 16a-3 violations—which arise from Ladd's failure on at least 25 occasions to file a Form 4 for his purchases of MGT stock in 2015. Theoretically, the SEC could request a penalty as high as $11,162 for each of Ladd's 25 individual violations of these provisions. However, in light of the significant penalties the SEC seeks for Ladd's other violations in this

case, a single first-tier penalty of $11,162 in total for all twenty-five occasions on which Ladd failed to file the required Form 4 for his MGT stock purchases is appropriate.

Adding together the penalties for Ladd's fraud violations ($892,916), his Section 5 violations ($223,228), and his Section 16(a) violations ($11,162), the SEC respectfully requests that the Court award total penalties of $1,127,306.

## II.     Officer-and-Director Bar

Pursuant to Securities Act Section 20(e), 15 U.S.C. § 77t(e), and Exchange Act Section 21(d)(2), 15 U.S.C. § 78u(d)(2), the Court should permanently bar Ladd from acting as an officer or director of a public company.

In SEC enforcement actions, the Court has "substantial discretion in deciding whether to impose a bar to employment in a public company." *SEC v. Gallison*, No. 15-cv-5456 (GBD) (SDA), 2023 WL 3090857, at *3 (S.D.N.Y. Apr. 26, 2023). In determining whether to impose an officer-and-director bar, courts consider the following factors:

> (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

*Id.*

For the same reasons set forth above regarding the SEC's request for civil money penalties, and for the following additional reasons, Ladd's violative conduct warrants the Court's imposition of a permanent bar against Ladd from serving as an officer or director of a public company. As explained above, Ladd's conduct was egregious, repeated, and intentional, and Ladd committed his violations solely for substantial personal pecuniary gain.

In addition, as noted above, Ladd was MGT's CEO and director during the period of his violations. Furthermore, Ladd signed MGT's latest quarterly financial disclosure document,

dated December 13, 2023 ("Form 10-Q"), as MGT's "President, Chief Executive Officer and

Acting Chief Financial Officer *(Principal Executive Officer, Principal Financial Officer and*

*Principal Accounting Officer).*" (Declaration of Jack Kaufman, Ex. A, MGT Dec. 13, 2023 Form

10-Q at 29.) MGT's December 2023 Form 10-Q states that, currently, "MGT conducts

cryptocurrency activities at a company-owned and managed Bitcoin facility in LaFayette,

Georgia." *Id.* at 5. Thus, Ladd continues to run MGT, a public company, increasing the

likelihood that misconduct will recur.

Furthermore, Ladd continues to make materially false public statements on behalf of

MGT. On December 13, 2023, MGT filed its quarterly report (Form 10-Q) with the SEC for the

period ended September 30, 2023. (*Id.* at 29.) The Court issued its Summary Judgment Decision

in this case on September 29, 2023, a day before the end of the Form 10-Q reporting period. Yet,

not only does MGT's Form 10-Q fail to report the Court's liability findings against Ladd, it

repeatedly misstates the status of this proceeding:

> [MGT] will require additional funding to grow its operations. Further,
> depending upon operational profitability, [MGT] may also need to raise
> additional funding for ongoing working capital purposes. There can be no
> assurance however that [MGT] will be able to raise additional capital when
> needed, or at terms deemed acceptable, if at all. **[MGT's] ability to raise**
> **additional capital is impacted by the volatility of Bitcoin mining**
> **economics and the SEC's ongoing enforcement action against our Chief**
> **Executive Officer, both of which are highly uncertain, cannot be**
> **predicted, and could have an adverse effect on the Company's business**
> **and financial condition.**
>
> ***
>
> **Legal proceedings**
>
> From time-to-time, we may be involved in litigation relating to claims arising
> out of our operations in the normal course of business. **During the period**
> **covered by this report, there were no material changes to the description**
> **of legal proceedings set forth in our Annual Report on Form 10-K, as**
> **filed with the SEC on March 31, 2023.**

\*\*\*

> [MGT] will need to raise additional capital to fund operating losses and grow its operations. There can be no assurance however that [MGT] will be able to raise additional capital when needed, or at terms deemed acceptable, if at all. **[MGT's] ability to raise additional capital will also be impacted by the volatility of Bitcoin and the ongoing SEC enforcement action against [Ladd], both of which are highly uncertain, cannot be predicted and could have an adverse effect on [MGT's] business and financial condition.**

(*Id.* at 3 at 6, 18, 24, 27 (emphasis added).)

Thus, Ladd continues to have the opportunity to violate the federal securities laws. Moreover, his prior, repeated, egregious, and entirely self-serving violations make him a likely candidate to engage in such future violations. For the reasons stated herein, and in the Court's Summary Judgment Decision, the Court should not permit Ladd to continue to act as an officer or director of a public company.

## III. Injunctions Against Future Violations of the Federal Securities Laws

Finally, the SEC respectfully requests that the Court permanently enjoin Ladd from engaging in future violations of the federal securities laws for which it found him liable on summary judgment: Exchange Act Sections 10(b) and 16(a) (and Rules 10b-5 and 16a-3 thereunder) and Securities Act Sections 5 and 17(a)(2).

 "The primary consideration for imposing [such] an injunction is whether there is a reasonable likelihood that the wrong will be repeated." *See Gallison,* 2023 WL 3090857, at \*3 (internal quotation marks omitted); *see also CSX Corp. v. Children's Inv. Fund Mgmt.*, 654 F.3d 276, 284 (2d Cir. 2011) ("The District Court was within its discretion in concluding that people who have lied about securities matters can reasonably be expected to attempt securities laws violations in the future."). In determining the likelihood of future securities violations, courts consider:

[t]he likelihood of future violations, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*Gallison,* 2023 WL 3090857, at *3.

For the same reasons set forth above regarding the SEC's requests for the imposition of an officer-and-director bar, a reasonable likelihood exists that Ladd will continue to violate the federal securities laws. Ladd's violations were egregious and repeated, and he continues to head MGT, a public company. Indeed, Ladd's recent false and misleading public statements and material omissions in MGT's December 2023 Form 10-Q—omitting mention of this Court's summary judgment liability findings against him—further underscore the likelihood that Ladd will continue to violate the federal securities laws and the need for this Court to enjoin him permanently from doing so.

## <u>CONCLUSION</u>

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's Motion for Relief Against Defendant Robert Ladd and order Ladd to pay civil penalties totaling $1,127,306, permanently bar him from serving as officer or director of a public company, and permanently enjoin him from committing future securities law violations.[7]

---

[7] The Commission will submit a proposed final judgment promptly after the Court's resolution of this motion.

Dated:  February 23, 2024
        New York, NY

Respectfully submitted,

*s/ Jack Kaufman*

Jack Kaufman
Katherine Bromberg
100 Pearl Street, Suite 20-100
New York, NY 10004
(212) 336-0106 (Kaufman)
Attorneys for Plaintiff Securities and Exchange
Commission