UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION

                      Plaintiff,                        Case No. 1:18-cv-08175-ER

v.

BARRY C. HONIG,
*et al.*

                      Defendants.
------------------------------------------------------------x

## ROBERT LADD'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR RELIEF

**FORD O'BRIEN LANDY LLP**
Adam C. Ford
Anjula S. Prasad
275 Madison Avenue, 24th Floor
New York, New York 10016
*aford@fordobrien.com*
(212) 858-0040

*Attorneys for Defendant Robert Ladd*

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ........................................................................................1

II.     PROCEDURAL BACKGROUND..................................................................................2

        A.  The SEC Acknowledges Investors Did Not Lose Money as a Result of Ladd's
            Conduct ..............................................................................................................3

        B.  Ladd Did Not Profit from His MGT Stock Sales Because His Out-Of-Pocket Costs
            for the Shares Were Higher than the Sales Price ...........................................5

III.    LEGAL ARGUMENT....................................................................................................6

        A.  A Single First Tier Penalty Is Appropriate Here ...........................................6

        B.  An Officer and Director Bar Is Not Appropriate Here ................................11

        C.  The Court Should Decline to Impose an Obey the Law Injunction...........13

IV.     CONCLUSION.............................................................................................................16

# TABLE OF AUTHORITIES

*Cases:*

*In Re Moskowitz*,
  Admin. Proc. File No. 3-9435, 2002 WL 434524 Exchange Act Release
  No. 45,609 (Mar. 21, 2002) ...................................................................................................16

*SEC v. Boey*,
  No. 07–CV–39–SM, 2013 WL 3805127 (D.N.H. July 22, 2013 ...............................................16

*SEC v. Cavanagh*,
  155 F.3d 129 (2d Cir. 1998).......................................................................................................15

*SEC v. Conaway*,
  697 F. Supp. 2d 733 (E.D. Mich. 2010)......................................................................................16

*SEC v. Dang*,
  No. 20-cv-1353 (JAM), 2021 WL 1550593 (D. Conn. Apr. 19, 2021)......................................15

*SEC v. Dibella*,
  587 F.3d 553 (2d Cir. 2009)........................................................................................................16

*SEC v. Dibella*,
  No. 3:04cv1342 (EBB), 2008 WL 6965807 (D. Conn. Mar 13, 2008) .....................................16

*SEC v. Eiten*,
  No. 11-12185-GAO, 2014 WL 4965102 (D. Mass. Sept. 30, 2014).........................................11

*SEC v. Findley*,
  No. 3:20-cv-0397 (SRU), 2024 WL 707264 (D. Conn. Feb. 21, 2024) .....................................9

*SEC v. Genovese*,
  553 F. Supp. 3d 24 (S.D.N.Y. 2021) ..................................................................................10, 14

*SEC v. Gentile*,
  939 F.3d 549 (3d Cir. 2019)........................................................................................................16

*SEC v. Govil*,
  86 F.4th 89 (2d Cir. 2023) .........................................................................................1, 2, 7, 8

*SEC v. Interinvest Corp., Inc.*,
  No. CV 15-12350-MLW, 2016 WL 8711689 (D. Mass. 2016) ..................................................9

*SEC v. iShopNoMarkup.com*,
  No. 04 CV 4057, 2012 WL 716928 (E.D.N.Y Mar. 3, 2012) ....................................................13

*SEC v. Jean-Pierre*,
No. 12-cv-8886 (LGS), 2015 WL 1054905 (S.D.N.Y. Mar. 9, 2015)......................................10

*SEC v. Johnston*,
368 F. Supp. 3d 247 (D. Mass. 2019) .......................................................8, 9, 12, 13

*SEC v. Jones*,
476 F. Supp. 2d 374 (S.D.N.Y. 2007) .......................................................16

*SEC v. Kern*,
425 F.3d 143 (2d Cir. 2005)...................................................................7

*SEC v. Madsen*,
17-CV-8300 (JMF), 2018 WL 5023945 (S.D.N.Y. Oct. 17, 2018)..........................................11

*SEC v. Opulentica, LLC*,
479 F. Supp. 2d 319 (S.D.N.Y. 2007) .............................................................10, 15

*SEC. v. Palmisano*,
135 F.3d 860 (2d Cir. 1998)...................................................................7, 10

*SEC v. Patel*,
61 F.3d 137 (2d Cir. 1995)...................................................................12

*SEC v. Snyder,*
No. H–03–04658, 2006 WL 6508273 (S.D. Tex. Aug. 22, 2006)..................................9, 12, 13

*SEC v. Tourre*,
4 F. Supp. 3d 579 (S.D.N.Y. 2014) ......................................................16

***Statutes:***

15 U.S.C. § 77t(d)(2)(A) et seq. .................................................................................7

15 U.S.C. § 78u(d) ...................................................................................................14

15 U.S.C. § 78u(d)(1) ..............................................................................................14

15 U.S.C. § 78u(d)(3)(B)(1) ......................................................................................7

15 U.S.C. § 78u(d)(3)(B)(i) et seq ............................................................................7

15 U.S.C. § 78u(d)(5) ..............................................................................................14

15 U.S.C. § 78u(d)(6) ..............................................................................................14

17 C.F.R. § 201.1004 .................................................................................................7

Exchange Act Section 21(d)(2) ...............................................................................12

Exchange Act Section 21(d)(3) .................................................................................7

Securities Act Section 20(d)(2) .................................................................................7

Securities Act Section 20(e) ....................................................................................12

Defendant Robert Ladd submits this Response to the SEC's Motion for Relief (the "Motion").

## I.   PRELIMINARY STATEMENT

The SEC's request for relief in this matter vastly exceeds what this Court can and should impose on him given this Court's September 29, 2023 Opinion and Order on the parties' cross-motions for summary judgment (the "Order"). Accepting all of this Court's findings in the Order for purposes of this motion lays plain that the SEC's request for relief is unsupported by the record and this Court's decision. Indeed, what the SEC seeks to do in this case is a blatant and improper end-run around the Second Circuit's decision in *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023) where the court ruled that the SEC is not entitled to seek disgorgement without evidentiary proof of pecuniary investor harm. As the SEC notes in a footnote in its Memorandum of Law in Support of the Motion (the "MOL"), the Commission has unilaterally made the determination to not seek disgorgement, pre-judgment interest, or a penny stock bar against Ladd. The reason is simple: no investor lost any money as a result of Ladd's actions. Indeed, the SEC does not suggest any investor lost any money. As such, there were no victims in this case. The undisputed record establishes that every investor who purchased the shares that Ladd sold in the spring of 2016, the shares at issue here, had either unrealized or realized gain as the stock price was at all times higher than the price on the dates Ladd sold his shares—until the SEC filed its lawsuit two and a half years later.

Despite this, the Commission has decided to seek draconian relief against Ladd that includes penalties totaling $1,127,306—a penalty amount only found in cases involving significant investor loss. What the SEC attempts here is to add up various and different tier penalties to get to the number it would have sought as disgorgement, but cannot do because of

*Govil*. This Court should reject the SEC's attempt to undermine the ruling in *Govil* by repackaging disgorgement under money penalties. In any event, the SEC's calculations on Ladd's alleged profits has a glaring and fatal defect: the SEC failed to include the cost of Ladd's shares in its calculation, something the SEC has admitted in response to Ladd's interrogatories that it must do. When Ladd's cost per share is included in the calculation, he actually lost money on these sales. As such, in addition to no investors being harmed, Ladd did not make any profit on these sales. Under these circumstances, a single first tier penalty is appropriate relief, and a lifetime officer and director bar and permanent "obey the law" injunction are clearly unwarranted. For the reasons set forth below, the SEC is not entitled to the relief it requests. Ladd requests that the Court deny the SEC's requests in their entirety, or, in the alternative, modify the relief sought to fit the facts of this case and in accordance with legal precedent.

## II.    PROCEDURAL BACKGROUND

As this Court is well aware, the operative complaint in this matter alleged a far-ranging conspiracy involving Ladd and several others in which they were alleged to have engaged in a deliberate pump-and-dump scheme related to MGT shares. These allegations remained unproven throughout summary judgment ("[T]he Court denies the cross-motions for summary judgment under §§ 10(b) and 17(a)(2) on the claims related to the Form S-1 and 10-K and need not decide if Ladd acted with scienter under § 10(b) or negligence under § 17(a)(2)."). (Order at 42). The SEC made the strategic decision to forego further attempts to prove them. Ladd continues to strenuously deny these allegations.

This Court, however, did find Ladd engaged in wrongdoing that amounts to a violation of the securities laws, and of course those findings are relevant to this motion. Specifically, this Court found that Ladd provided false information on his November 22, 2015 New Account Form

submitted to E*Trade because he (i) described his occupation as "Retired," (ii) answered "No" to the question as to whether he was a "Director, or policy-making officer of a publicly-owned company," and (iii) left blank information regarding his "Employer." These answers were false, because at the time, Ladd was the CEO of MGT. (Order at 15). This Court found that Ladd's misrepresentation "altered [E*Trade's] behavior" in that had E*Trade known that Ladd was an affiliate, it would have subjected Ladd's sales to Rule 144's notice requirements." (Order at 48).

This Court also found that with respect to the May 25, 2016 Form 144, Ladd made material misrepresentations by submitting inaccurate information on Form 144 when he omitted the shares he sold prior to May 25, 2016, and between February 2016 and April 20, 2016. Specifically, this Court found that Ladd filed a Form 144 on May 25, 2016, stating he intended to sell 506,171 shares, when in fact, he had already sold them the prior months. (Order at 52).

Finally, this Court found that MGT put out a press release announcing John McAfee was joining MGT, which included the language that McAfee had sold his company to Intel for $7.6 billion on a certain date, when in fact McAfee had sold his company at an earlier time, and it was *later* sold to Intel for that amount. (Order at 17, 58).

As to the May 31, 2016 Form 4, the Court found Ladd acted with scienter "under a theory of conscious misbehavior or recklessness" (Order at 66) because the actual dates of the trades and the number of shares listed were not accurate, since Ladd had sold shares on different days than that listed on his Form 4. *Id*.

A.  **The SEC Acknowledges Investors Did Not Lose Money as a Result of Ladd's Conduct**

The SEC acknowledges that no investor lost money in this case, as they do not seek disgorgement. And while this Court found that certain filings failed to timely report Ladd's sale of his shares and otherwise did not accurately reflect the date of the sales, there is no dispute that

the public was in fact aware of all of his MGT sales by May 31, 2016, even if the public may not have known the actual date of the sale. It is beyond dispute that even with this information publicly available, the share price of MGT continued to rise for over two years following the disclosure of Ladd's sales.

The below chart highlights the extent to which any trader who purchased MGT stock *after* Ladd's sales of stock would have received at least unrealized gains from those purchases for the next two years. As such, as acknowledged by the SEC by way of its decision to not seek disgorgement, Ladd's conduct did not result in investor losses, as illustrated in the below chart attached as Ex. 1 to the Ford Declaration.



**B.  Ladd Did Not Profit from His MGT Stock Sales Because His Out-Of-Pocket Costs for the Shares Were Higher than the Sales Price**

Just as importantly, as the SEC must acknowledge, Ladd did not actually profit from the MGT stock sales at issue. As an initial matter, the SEC states in its memo that Ladd's total gross proceeds that he received personally was $841,554.06. Memo at 6. But the SEC fails to deduct from this money Ladd's out-of-pocket costs to purchase these shares, even though in answering Ladd's Interrogatory No. 17, the SEC acknowledged that any of Ladd's alleged profit from the share of MGT sales must take into account "Ladd's out-of-pocket costs in acquiring those shares." *See* SEC Interrogatory Response No. 17; Ford Declaration Ex. 2. Ladd's out-of-pocket costs are set forth in the following chart, attached as Ford Dec. Ex. 3, all supported by documentation also attached thereto.

(NOTE: All Share and Per Share amounts are adjusted for simultaneous 1-500 reverse and 1-15 forward split effective on March 21, 2012)

| PURCHASES: | SHARES | AMOUNT | per share | comment |
|---|---|---|---|---|
| various January 2, 2010 to August 25, 2010 | 48,014 | $    324,094 | $    6.7500 | open market purchases until 13D filed on 10/13/2010 |
| 8/26/2010 to 10/13/10 | 11,506 | $    107,088 | $    9.3071 | as reported on 13D of 10/13/2010 |
| December 9, 2010 | 195,000 | $  1,000,000 | $    5.1282 | private placement (SPA) from issuer |
| December 30, 2011 | 380,689 | $    317,241 | $    0.8333 | Rights Offering |
| Dec 28 - 29, 2011 | 9,123 | $      9,123 | $    1.0000 | open market purchases |
| **TOTAL PURCHASES** | **644,332** | **$  1,757,546** | **$    2.7277** | |

This chart shows that between December 2010 and December 2011, Ladd's out-of-pocket costs for MGT shares was $1,757,546 for 644,332 shares (post-split) for an average out-of-pocket share price of $2.72 per share. Ladd sold 567,072 shares out of his personal account for a total of $555,758, meaning that Ladd's out-of-pocket expenses were higher than the sales price, resulting in a total net loss per share of about $1.70, or a total loss of $944,788.

5

The SEC's Tong Declaration notes that Ladd received a $325,000 check from his mother, following the sale of MGT shares in his parents TD Ameritrade account. Accounting for this as $325,000 in "profit" on those sales of MGT shares, Ladd still nevertheless has out-of-pocket expenses in the amount $619,788, resulting in a loss of $294,788. With the SEC accepting that out-of-pocket costs must be deducted from any profit, both parties agree that Ladd did not actually profit from the sale of these MGT shares.

As such, this Court is tasked with determining an appropriate remedy to impose against Ladd where the Court has found that he made four materially false statements in four SEC filings, including a materially misleading statement in a press release, but where the SEC acknowledges both that no investor suffered any harm, and that Ladd made no net gains. Ladd respectfully submits that the appropriate remedy in this case is a single first tier penalty for the four filings, resulting in a total civil money penalty of $11,524. Neither an officer-and-director bar nor an obey-the-law injunction is appropriate given the lack of egregiousness of the conduct and the absence of any evidence whatsoever that Ladd is likely to engage in another violation of the securities laws. Indeed, this process has been sufficiently costly and difficult—over six years of litigation and millions of dollars in legal fees—as to ward off any potential of a future violation.

## III.    LEGAL ARGUMENT

### A.  A Single First Tier Penalty Is Appropriate Here

The SEC seeks a panoply of civil penalties, totaling $1,127,306. Curiously, that amount matches almost exactly the alleged gross proceeds to Ladd and his family from the stock transactions challenged by the SEC in its Complaint. Yet the SEC has already forgone seeking disgorgement. Ladd submits to this Court that the Commission recognizes the frailty of its claim

for disgorgement in light of recent Second Circuit precedent in *Govil*. So instead of openly seeking disgorgement, it now attempts to achieve that result in the guise of recovering civil penalties. This Court should recognize the SEC's artifice and deny the requested relief for the following reasons.

The Commission builds its civil penalty request on 15 U.S.C. Section 77t(d)(2)(A) et seq. and 15 U.S.C. Section 78u(d)(3)(B)(i) et seq. Civil penalties come in three tiers ranging from the least to most serious. First tier penalties can be for any violation of the Exchange or Securities Acts. Second tier penalties are meant to address violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." Whereas third tier penalties are reserved for violations that "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *SEC. v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998) (citation omitted). As noted in *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005), "the tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."[1] That discretion is guided in part by Exchange Act Section 21(d)(3) and Securities Act 20(d)(2), which provides that civil money penalties cannot exceed the greater of the gross pecuniary gain to a defendant or the statutory imposed limit. Here, there was no pecuniary gain, and as such the amount is determined by the statutory limit.

All told, as against Ladd, the Commission seeks three third tier penalties amounting to $892,916, two second tier penalties totaling $223,228, and a single first tier penalty for

---

[1] The SEC seeks to have this Court impose the maximum penalty for violations that occurred in 2023, but this is improper. Even under the SEC's own guidance, it instructs that the date of the violation is the relevant date for determining the penalty, not the date of a court decision. See Ford Dec. Ex. 3. The pertinent maximum penalty chart is the one that was in effect at the time of the violation, Nov. 3, 2015-Present. For violations occurring after November 3, 2015 and January 15, 2014, but before March 2013, the first tier penalty for a natural person shall not exceed the greater of $10,550 per violation or the gross amount of pecuniary gain; for second tier penalties, $105,505; and for third tier penalties, $211,009. 15 U.S.C. § 78u(d)(3)(B)(1); 17 C.F.R. § 201.1004; Table IV to Subpart E.  See Ford Dec. Ex. 4.

$11,612—all for the same conduct over the same period of time with the same alleged purpose. Six penalties for the same exact conduct is the very definition of piling on, and in this case, a thinly disguised attempt to obtain disgorgement without evidence of the required investor pecuniary harm as outlined in *Govil*.

While going to great lengths in its attempt to justify six penalties for the same conduct, the SEC fails to indicate how their multiple penalties either are appropriate under the facts of this case or somehow serve the interests of justice. The purpose of civil penalties is to punish the wrongdoer, but also to deter others from committing similar violations. Yet, with this in mind, courts faced with far more egregious fact circumstances than present in the case at bar have limited penalty recovery to a level that more appropriately addresses the twin policy goals of civil monetary penalties.

In *SEC v. Johnston*, 368 F. Supp. 3d 247 (D. Mass. 2019), a CFO of a publicly traded pharmaceutical company was found liable for multiple misrepresentations regarding FDA approval of a drug being developed at that company. The scheme to mislead the company's investors was alleged to occur over a nine-month period and involved numerous alleged misrepresentations in press releases and earnings conference calls. *Id.* at 250. The court found that in addition to and as a result of the misrepresentations, the company lost $100 million in equity valuation when the true state of the FDA approval process was revealed, making manifest the falsity of the misrepresentations, and to the detriment of the shareholders. *Id.* at 255. For this egregious conduct, the CFO was assessed a single third tier penalty of $120,000. *Id.* Moreover, the *Johnston* court noted that in other actions involving violations of a "number of securities laws in carrying out a single scheme, it is appropriate to impose a single penalty." *Id. (citing SEC v. Interinvest Corp., Inc.,* No. CV 15-12350-MLW, 2016 WL 8711689, at *1 (D. Mass. 2016));

8

*see also SEC v. Findley*, No. 3:20-cv-0397 (SRU), 2024 WL 707264, at *1, *11 (D. Conn. Feb. 21, 2024) (multiple statements about an audit and buyback over an 11-month period involving thirteen false statements resulted in two third tier penalties totaling $250,000).

Similarly, the case at bar involves multiple securities violations as found by the Court, but all in connection with a single alleged scheme that the SEC claims occurred over the course of a few weeks. In its MOL, the SEC argues strenuously that the Court's finding that Ladd acted with "conscious misbehavior" somehow rises to the level of a high degree of scienter and egregiousness warranting multiple third tier penalties, as well as second tier and first tier penalties. That is not what this Court found, nor does repeatedly referring to conduct as egregious in a brief make it so—a conclusion that other courts have recognized.

For example, in *SEC v. Snyder,* No. H–03–04658, 2006 WL 6508273, at *2 (S.D. Tex. Aug. 22, 2006), the court addressed the importance of disclosure obligations, but stopped short of adopting the SEC's position that "the gravity and the seriousness of the disclosure requirements of public companies make the Defendant's false reporting violation, by its very nature, an egregious act." *Id.* Rejecting this position of a *per se* egregiousness standard for company disclosures, the *Snyder* court found that:

> Although the disclosure obligations of public companies are, and must be considered to be, of critical importance to financial markets and to the integrity of federal securities regulation, their importance does not inevitably mean that every violation is necessarily egregious.

*Id*. In the same vein, the *Snyder* court held that, even though Snyder was the Chief Financial Officer, one's position in a company alone is not enough to make that person's actions egregious. *Id*.

Cases in this Circuit where penalties of $1 million have been granted involve far more egregious conduct, and—most significantly—significant investor losses. For example, in *SEC v.*

*Genovese*, 553 F. Supp. 3d 24, 46–47 (S.D.N.Y. 2021), the court found a civil money penalty of $1 million was warranted, based on the defendant "defrauding at least five investors through multiple materially false statements and omissions in violation of several statutes" and "the substantial losses suffered by Genovese's victims, and the blatant nature of the violations." *Id. (citing Palmisano*, 135 F.3d at 866). Similarly, the court in *SEC v. Jean-Pierre*, No. 12-cv-8886 (LGS), 2015 WL 1054905, at *1, *11-12 (S.D.N.Y. Mar. 9, 2015) imposed a civil money penalty of $1,425,000, tying the number to the actual amount of proven investor losses, "$75,000 for each of the 19" victims. And in *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331–32 (S.D.N.Y. 2007), the defendant admitted to a principal role in a fraudulent scheme that deprived investors of $443,962.10, and further admitted to diverting at least $185,000 for his personal use. Even taking all the facts and circumstances of the case into account, the court only imposed a penalty of $120,000. *Id.*

Yet the SEC here seeks over $1 million in penalties without any investors having lost any money whatsoever. While the Commission uses words like "brazenly misrepresented" and "repeatedly lied" to then state conclusively that Ladd's actions were clearly egregious and made with a high degree of scienter, the fact remains that these filing errors, even accepting them as material misstatements and violations of the securities laws, are not the type of conduct that without causing any investor harm or profit to Ladd, warrant such a high civil money penalty.

Moreover, the SEC's argument that Ladd created a "significant risk of substantial losses," another tenet of a third tier penalty finding, is wholly unsubstantiated and refuted by the SEC's own acknowledgment that no investors were harmed, and that it is not entitled to even a single dollar in disgorgement. Without such proof, the Commission fails to meet its burden to justify imposition of any third tier penalties, and this Court should not simply infer that such a risk

existed because the SEC says so. *SEC v. Madsen*, 17-CV-8300 (JMF), 2018 WL 5023945, at *4 (S.D.N.Y. Oct. 17, 2018) ("Although all Section 10(b) or Rule 10b-5 frauds could be said to create *some* 'risk' of *some* 'harm' to investors, the Remedies Act reserves third tier penalties for those frauds that create a *significant* risk of *substantial* losses.") (citation omitted); *SEC v. Eiten*, No. 11-12185-GAO, 2014 WL 4965102, at *2 (D. Mass. Sept. 30, 2014) ("The SEC argues that Eiten's false reports could have resulted in investor losses, but has not demonstrated any amount of actual losses that were substantial."). Accordingly, the SEC fails to meet the burden to warrant imposition of any third tier penalties against Ladd, and none should be ordered against him.

As to the second tier penalties sought by the Commission, the SEC seeks two such penalties, again all arising from the same limited facts and timeframe in connection with the same alleged scheme. For reasons already noted, multiple penalties for the same conduct are not appropriate, and Ladd further contends no second tier penalty is appropriate. However and in the alternative, should the Court find that Ladd should be subject to a second tier penalty, Ladd requests that it be a single second tier penalty at the statutory minimum.

Finally as to the first tier penalty, having found securities violations against Ladd, Ladd concedes that the first tier penalty may apply. If this Court so concludes, Ladd requests that a single first tier penalty at the minimum statutory amount be ordered against him for all of the challenged conduct.

### B.  An Officer and Director Bar Is Not Appropriate Here

Staying with its theme of seeking the most draconian remedies against Ladd, the SEC further seeks a permanent officer and director bar (the "O&D Bar") against Ladd, despite having given up on its permanent penny stock bar request. As with the civil penalty analysis, the

Commission overstates its case and fails to meet its burden to demonstrate why a permanent O&D Bar is appropriate. Put simply, it is not. And Ladd's position is well supported by case law.

The bar sought by the SEC arises from two statutory sources: Section 20(e) of the Securities Act, and Section 21(d)(2) of the Exchange Act. The SEC in its MOL correctly cites the multiple factors courts must consider in determining whether to impose an O&D Bar, specifically:

1) egregiousness of the underlying securities law violation;
2) is the defendant a repeat offender or recidivist;
3) the defendant's role when he engaged in the fraud;
4) degree of scienter;
5) economic stake in the violation; and
6) likelihood the misconduct will recur.

*SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995). Importantly, the *Patel* court held that while these factors are considered "useful," a court need not apply all of these factors in a given case. *Id.* "A district court should be afforded substantial discretion in deciding whether to impose a bar to employment in a public company." *Id.*

Ladd refers the Court to his arguments above concerning the egregiousness and scienter factors. As to repeat offender status, Ladd has no prior offenses and is in no way subject to being considered a recidivist. The Court is aware of Ladd's role in the company when the acts occurred, but as noted in the *Snyder* case, a C-level position is in no way dispositive in this analysis. *Snyder*, 2006 WL 6508273, at *2.

Perhaps the most important and compelling factor is the consideration of whether the conduct is likely to recur. *See Johnston,* 368 F. Supp. 3d at 252–53; *see generally Snyder,* 2006 WL 6508273, at *1. Ladd understands the gravity of the liability finding against him. He is a first-time offender. And he is focused on providing proper leadership and maintaining good

governance policies wherever he works as demonstrated by his Declaration submitted in support of this Response.

A permanent bar is simply not appropriate here. Take the CFO in *Johnston.* Despite his CFO role and active participation over many months in misleading disclosures at his public company, after a fulsome review of the facts and law, the court there ordered a two year O&D Bar against him. *Johnston,* 368 F. Supp. 3d at 253. And in the *Snyder* case, despite a jury finding him liable for numerous securities violations, the court refused to impose an O&D Bar of any length against the Chief Accounting Officer for several reasons, including the lack of egregiousness and the isolated, first-time nature of the CAO's violative conduct. *Snyder*, 2006 WL 6508273, at *9. On the same basis, the *Snyder* court did not impose a permanent injunction. *Id*.  Another similar case is *SEC v. iShopNoMarkup.com*, No. 04 CV 4057, 2012 WL 716928 (E.D.N.Y Mar. 3, 2012), in which the court went through all of the *Patel* factors and rejected the SEC's request for an O&D Bar, despite the fact that the defendant, Yeroush (who was at various times the President and a Board member of the defendant company) had entered into a Consent Judgment on the Section 5 and 17(a) provisions of the 33 Act and Section 10(b) and Rule 10b-5 of the 34 Act, with consent to an obey the law injunction.

Accordingly, Ladd requests that this Court deny in its entirety the SEC's request for a permanent O&D Bar. And because the analysis concerning permanent injunctions mirrors that of an O&D Bar analysis, Ladd further requests that the Court deny the request for a permanent injunction against him as sought by the Commission.

### C.  The Court Should Decline to Impose an Obey the Law Injunction

The SEC seeks an obey the law injunction against Ladd, although neither the Second Amended Complaint nor its Motion for Remedies appear to provide under what authority it seeks

13

this relief. Pursuant to 15 U.S.C. § 78u(d), Congress has authorized the SEC to seek injunctive relief, setting forth the parameters of the SEC's power. Specifically, § 78u(d)(1) authorizes the SEC to seek an injunction "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a [securities law violation] . . .." Thus, where an individual is "engaged or about to engage" in a securities law violation, the SEC may "bring an action" in federal court "to enjoin such acts or practices, and upon a proper showing," obtain a "permanent or temporary injunction." *Id.* Where a proceeding is brought under §78u(d)(1), courts are further authorized to prohibit an individual who was participating in an penny stock offering from "participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine." 15 U.S.C. § 78u(d)(6).

The SEC is explicitly not seeking a penny stock bar here. The SEC seeks an injunction under § 78u(d)(1), but has failed to allege the statutory prerequisites to obtaining this relief, and this Court did not make any findings in its Order granting Summary Judgment in part that would permit this remedy to be imposed. Namely, the Second Amended Complaint fails to allege that Ladd is "engaged or about to engage" in a securities violation, and this Court has not found otherwise. To the contrary, any alleged misconduct occurred eight years ago.[2] To the extent the SEC may be seeking an injunction under § 78u(d)(5), the Court must then consider whether the SEC may properly seek an injunction under § 78u(d)(5), which permits the Commission to seek, and any Federal court to grant, equitable relief that may be appropriate or necessary for the

---

[2] The SEC inserts a new allegation that MGT's September 30, 2023 10-Q failed to mention this Court's September 29, 2023 Summary Judgment Order. This is not a fact in the record or found by the Court and in any event, it fails to inform the Court that MGT did disclose this event in its 8-K filed in February 2024. There is no evidence in the record of Ladd engaging in any wrongful conduct since 2016 as alleged in the SAC.

benefit of investors in any action or proceeding brought or instituted by the Commission under any provision of the securities laws.

The Second Circuit Court of Appeals instructs that the SEC must demonstrate a "substantial likelihood of future violations of illegal securities conduct" to warrant such injunctive relief. *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). When determining whether there is a sufficient likelihood that a defendant will violate the securities laws in the future, courts consider: "(1) the degree of scienter involved; (2) the isolated or persistent nature of the past fraudulent acts; (3) the defendant's appreciation of his wrongdoing; and (4) the defendant's opportunities to commit future violations." *Opulentica, LLC*, 479 F. Supp. 2d at 329; *see also Cavanagh*, 155 F.3d at 135; *SEC v. Dang*, No. 20-cv-1353 (JAM), 2021 WL 1550593, at *6 (D. Conn. Apr. 19, 2021) (applying *Cavanagh* factors to violations of Section 206 of the Advisers Act); *Genovese*, 553 F. Supp. 3d at 45.

As Judge Hardiman of the Third Circuit admonished:

> SEC injunctions come with serious collateral consequences. *Commonwealth Chem.*, 574 F.2d at 99; *Am. Bd. of Trade*, 751 F.2d at 535. They can lead to administrative sanctions and disabilities, *see* Thomas J. Andre, Jr., The Collateral Consequences of SEC Injunctive Relief: Mild Prophylactic or Perpetual Hazard?, 1981 U. Ill. L. Rev. 625, 643–68, and collaterally estop defendants in subsequent private litigation, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331–33, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Enjoined defendants suffer harm to their personal and business reputations. *See Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412, 423 n.5, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) ("The moment you bring a public proceeding against a broker-dealer who depends upon public confidence in his reputation, he is to all intents and purposes out of business." (quoting Milton V. Freeman, Administrative Procedures, 22 Bus. Law 891, 897 (1967))); *Warren*, 583 F.2d at 122; ABA Committee on Federal Regulation of Securities, Report of the Task Force on SEC Settlements, 47 Bus. Law. 1083, 1091, 1149–50 (1992). And when a court bans a defendant from his industry, it imposes what in the administrative context has been called the "securities industry equivalent of capital punishment." *Saad v. S.E.C.*, 718 F.3d 904, 906 (D.C. Cir. 2013) (quoting *PAZ Sec., Inc. v. S.E.C.*, 494 F.3d 1059, 1065 (D.C. Cir. 2007)).

*SEC v. Gentile*, 939 F.3d 549, 566 (3d Cir. 2019).

As a result, case law supports such an exercise of discretion: courts routinely deny injunctions even after a finding of a securities law violation where substantial time has elapsed without additional wrongdoing. *See, e.g.*, *SEC v. Jones*, 476 F. Supp. 2d 374, 384–85 (S.D.N.Y. 2007) (denying injunction where "several years have passed since Defendants' alleged misconduct apparently without incident"); *SEC v. Tourre*, 4 F. Supp. 3d 579, 598 (S.D.N.Y. 2014) (denying injunction where four years had elapsed, and defendant began pursuing new career); *cf. In Re Moskowitz*, Admin. Proc. File No. 3-9435, 2002 WL 434524, at *8, Exchange Act Release No. 45,609 (Mar. 21, 2002) (finding passage of six years since "violative conduct militates against issue of a cease-and-desist order"); *SEC v. Boey*, No. 07–CV–39–SM, 2013 WL 3805127, at *3 (D.N.H. July 22, 2013) (finding permanent injunction not warranted where "[t]welve have passed since [defendant's] fraudulent conduct, and the SEC does not argue that he has engaged in any additional illegal conduct"); *SEC v. Dibella*, No. 3:04cv1342 (EBB), 2008 WL 6965807, at *13 (D. Conn. Mar 13, 2008), *aff'd*, 587 F.3d 553 (2d Cir. 2009) (finding "the passage of nearly 10 years without another violation weighs heavily against an injunction"); *SEC v. Conaway*, 697 F. Supp. 2d 733, 773 (E.D. Mich. 2010) (denying injunction where ten years had elapsed).

Over six years have elapsed since the allegations here and there are no allegations that Ladd has engaged in any other violation of the securities laws.

## IV.    CONCLUSION

For the foregoing reasons, Ladd respectfully requests this Court impose a single first tier penalty against him.

Dated: April 12, 2024
      New York, NY

Respectfully submitted,

FORD O'BRIEN LANDY LLP

By:    <u>/s/ Adam C. Ford</u>
        Adam C. Ford
        Anjula S. Prasad
        aford@fordobrien.com
        275 Madison Ave, Fl. 24
        New York, New York 10017
        (212)-858-0040
        *Attorneys for Robert Ladd*