# EXHIBIT 3

(NOTE: All Share and Per Share amounts are adjusted for simultaneous 1-500 reverse and 1-15 forward split effective on March 21, 2012)

**PURCHASES:**

| | SHARES | AMOUNT | per share | comment |
|---|---|---|---|---|
| various January 2, 2010 to August 25, 2010 | 48,014 | $ 324,094 | $ 6.7500 | open market purchases until 13D filed on 10/13/2010 |
| 8/26/2010 to 10/13/10 | 11,506 | $ 107,088 | $ 9.3071 | as reported on 13D of 10/13/2010 |
| December 9, 2010 | 195,000 | $ 1,000,000 | $ 5.1282 | private placement (SPA) from issuer |
| December 30, 2011 | 380,689 | $ 317,241 | $ 0.8333 | Rights Offering |
| Dec 28 - 29, 2011 | 9,123 | $ 9,123 | $ 1.0000 | open market purchases |
| **TOTAL PURCHASES** | **644,332** | **$ 1,757,546** | **$ 2.7277** | |

# TOTAL HOLDER
## VSTOCK TRANSFER

| Account Name | | Account Address: | | Alphasort: | LADDCAP VALUE PARTNE |
|---|---|---|---|---|---|
| LADDCAP VALUE PARTNERS, III LLC | | 335 MADISON AVENUE | | OFAC: | 9208 |
| | | SUITE 1100 | | Tax ID: | ##-###6073 |
| | | NEW YORK, NY 10017-4627 | | | |
| | | | | Withholding Status: | MISSING TIN |
| | | | | | 02/15/2011 |
| Phone: | | Email: | | | |
| | | Date Of Last Contact: 02/07/2013 | | | |

| Issue Name: MGT CAPITAL INVESTMENTS, INC. | Account #: 102-323 | Ticker: MGTI |
|---|---|---|
| Current Price: $0.00 | | CUSIP: 55302P202 |
| Total Position Shares: 0 | | |

| Certificate Numbers | Issue Date | Cancel Date | | Denomination | |
|---|---|---|---|---|---|
| 10866 | 02/15/2011 | 03/21/2012 | | 6,500,000 | **SPA purchase** |
| 10888 | 12/30/2011 | 12/30/2011 | **Rights Offering** | 17,689,648 | |
| 10893 | 12/30/2011 | 03/21/2012 | **5.0 mil were sold to then CFO** | 12,689,648 | |
| 11052 | 03/21/2012 | 03/30/2012 | | 38,379 | |
| 11221 | 03/30/2012 | 12/24/2012 | | 575,689 | STOP |
| 11356 | 12/24/2012 | 02/07/2013 | | 575,689 | |
| 11366 | 02/07/2013 | 03/18/2014 | | 511,442 | |
| | | | Total Certificated Shares: | 0 | * |

| Book-Entry | Issue Date | Cancel Date | Denomination |
|---|---|---|---|
| * BOOK * | | 03/30/2012 | -537,310 |
| * BOOK * | 03/21/2012 | | 537,310 |
| | | | 0 |
| | | Total Book Shares: | 0 * |

| Proxy Information | | | |
|---|---|---|---|
| (512-282) SPECIAL MEETING | | | |
| 07/20/2012 | YYY | | 575,689 |
| | AT:07/20/2012 05:53 PM BY:7 IN:381/1 | | |
| (511-286) MGT CAPITAL ANNUAL MEETING | | | |
| 05/18/2012 | YYYYYYY | | 575,689 |
| | AT:05/23/2012 09:45 AM BY:7 IN:338/1 | | |
| (506-2) MGT CAPITAL SPECIAL MEETING | | | |
| 03/16/2012 | Y | | 19,189,648 |
| | AT:03/16/2012 05:47 PM BY:7 IN:204/2 | | |

| date | shares | per share | total amount |
|---|---|---|---|
| 8/26/10 | 1,000 | 0.22 | $ 220 |
| 8/26/10 | 9,186 | 0.23 | $ 2,113 |
| 8/26/10 | 8,600 | 0.24 | $ 2,064 |
| 8/26/10 | 10,000 | 0.2499 | $ 2,499 |
| 8/26/10 | 10,000 | 0.24995 | $ 2,500 |
| 8/26/10 | 9,000 | 0.25 | $ 2,250 |
| 8/26/10 | 700 | 0.27 | $ 189 |
| 8/26/10 | 1,000 | 0.28 | $ 280 |
| 8/26/10 | 15,000 | 0.29891 | $ 4,484 |
| 8/26/10 | 15,000 | 0.3 | $ 4,500 |
| 8/26/10 | 10,000 | 0.3 | $ 3,000 |
| 8/26/10 | 10,000 | 0.31891 | $ 3,189 |
| 8/26/10 | 10,000 | 0.3199 | $ 3,199 |
| 8/26/10 | 1,000 | 0.27 | $ 270 |
| 8/27/10 | 2,051 | 0.2499 | $ 513 |
| 8/27/10 | 10,000 | 0.25 | $ 2,500 |
| 8/27/10 | 10,000 | 0.25975 | $ 2,598 |
| 8/27/10 | 1,000 | 0.28 | $ 280 |
| 8/27/10 | 1,000 | 0.28 | $ 280 |
| 8/27/10 | 10,000 | 0.2795 | $ 2,795 |
| 8/27/10 | 14,185 | 0.29 | $ 4,114 |
| 8/27/10 | 1,000 | 0.275 | $ 275 |
| 8/27/10 | 1,000 | 0.275 | $ 275 |
| 8/27/10 | 1,000 | 0.275 | $ 275 |
| 8/27/10 | 1,000 | 0.275 | $ 275 |
| 8/27/10 | 1,000 | 0.275 | $ 275 |
| 9/9/10 | 2,000 | 0.2689 | $ 538 |
| 9/9/10 | 2,000 | 0.269 | $ 538 |
| 9/15/10 | 200 | 0.2529 | $ 51 |
| 9/15/10 | 1,000 | 0.253 | $ 253 |
| 9/15/10 | 1,000 | 0.253 | $ 253 |
| 9/15/10 | 200 | 0.253 | $ 51 |
| 9/15/10 | 332 | 0.259 | $ 86 |
| 9/15/10 | 1,000 | 0.2879 | $ 268 |
| 9/17/10 | 1,000 | 0.26 | $ 260 |
| 9/17/10 | 200 | 0.26 | $ 52 |
| 9/17/10 | 1,000 | 0.27 | $ 270 |
| 9/17/10 | 1,000 | 0.2786 | $ 279 |
| 9/20/10 | 100 | 0.3328 | $ 33 |
| 9/20/10 | 1,000 | 0.3359 | $ 336 |
| 9/20/10 | 1,000 | 0.2933 | $ 293 |
| 9/20/10 | 600 | 0.2995 | $ 180 |
| 9/20/10 | 500 | 0.3 | $ 150 |
| 9/20/10 | 1,000 | 0.305 | $ 305 |
| 9/20/10 | 1,000 | 0.305 | $ 305 |
| 9/20/10 | 1,000 | 0.305 | $ 305 |
| 9/20/10 | 1,000 | 0.30491 | $ 305 |
| 9/20/10 | 1,000 | 0.30491 | $ 305 |
| 9/20/10 | 400 | 0.3055 | $ 122 |
| 9/20/10 | 1,000 | 0.3055 | $ 306 |
| 9/20/10 | 1,000 | 0.307 | $ 307 |
| 9/22/10 | 50,000 | 0.3 | $ 15,000 |
| 9/22/10 | 1,000 | 0.3139 | $ 314 |
| 9/23/10 | 1,000 | 0.28 | $ 280 |
| 9/23/10 | 1,000 | 0.28 | $ 280 |
| 9/23/10 | 400 | 0.28 | $ 112 |
| 9/23/10 | 1,000 | 0.298 | $ 298 |
| 9/24/10 | 7,017 | 0.295 | $ 2,070 |
| 9/24/10 | 1,000 | 0.298 | $ 298 |
| 9/24/10 | 200 | 0.298 | $ 60 |
| 9/24/10 | 1,000 | 0.2999 | $ 300 |
| 9/24/10 | 1,000 | 0.2999 | $ 300 |
| 9/24/10 | 65 | 0.3 | $ 20 |
| 9/24/10 | 100 | 0.2999 | $ 30 |
| 9/24/10 | 100 | 0.3 | $ 30 |
| 9/30/10 | 92,519 | 0.2798 | $ 25,887 |
| 9/30/10 | -100 | 0.2784 | $ (28) |
| 9/30/10 | -100 | 0.2697 | $ (27) |
| 9/30/10 | -1,000 | 0.26352 | $ (264) |
| 9/30/10 | -1,000 | 0.2633 | $ (263) |
| 9/30/10 | -1,000 | 0.25322 | $ (263) |
| 10/1/10 | 481 | 0.2999 | $ 144 |
| 10/4/10 | 700 | 0.25983 | $ 182 |
| 10/4/10 | 1,000 | 0.26629 | $ 266 |
| 10/4/10 | 1,000 | 0.2669 | $ 267 |
| 10/4/10 | 1,000 | 0.267 | $ 267 |
| 10/4/10 | 1,000 | 0.267 | $ 267 |
| 10/4/10 | 1,000 | 0.2669 | $ 267 |
| 10/4/10 | 1,000 | 0.26732 | $ 267 |
| 10/4/10 | 1,000 | 0.2672 | $ 267 |
| 10/4/10 | 1,000 | 0.2673 | $ 267 |
| 10/4/10 | 100 | 0.2674 | $ 27 |
| 10/4/10 | 1,000 | 0.26949 | $ 269 |
| 10/4/10 | 1,000 | 0.2794 | $ 279 |
| 10/4/10 | 500 | 0.2795 | $ 140 |
| 10/6/10 | 100 | 0.28 | $ 26 |
| 10/6/10 | 200 | 0.2675 | $ 54 |
| 10/8/10 | 1,200 | 0.28 | $ 336 |
| 10/12/10 | 24,712 | 0.25 | $ 6,178 |
| 10/13/10 | 6,100 | 0.25 | $ 1,525 |
| TOTAL | 383,548 | | $ 107,088 |
| post split | 11,506 | shares | 9.31 |
| | | | average price |

Morningstar® Document Research<sup>SM</sup>

# FORM SC 13D

## MGT CAPITAL INVESTMENTS INC - MGT

**Filed: October 14, 2010 (period: )**

Filing by person(s) reporting owned shares of common stock in a public company >5%

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C.  20549

**SCHEDULE 13D**

**Under the Securities Exchange Act of 1934**

---

**MGT Capital Investments Inc.**

(Name of Issuer)

---

Common Stock, $0.001 par value per share

(Title of Class of Securities)

---

55302P103

(CUSIP Number)

---

October 13, 2010

(Date of Event Which Requires Filing of this Statement)

Mr. Robert Ladd
Laddcap Value Advisors LLC

335 Madison Avenue Suite 1100
New York, New York 10017
Telephone: (212) 652-3214

with a copy to:

Seward & Kissel LLP
One Battery Park Plaza
New York, NY  10004
Telephone:  (212) 574-1200
Attn:  Edward S. Horton

---

(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box ☐.

---

Source: MGT CAPITAL INVESTMENTS INC, SC 13D, October 14, 2010

**SCHEDULE 13D**

CUSIP No. 55302P103

Page  of 2 of 13

| 1 | NAME OF REPORTING PERSONS |
|---|---|

Laddcap Value Partners LP
S.S. or I.R.S. IDENTIFICATION NO. OF ABOVE PERSONS
(Intentionally Omitted)

| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* |
|---|---|

  (a)
  (b)

| 3 | SEC USE ONLY |
|---|---|

| 4 | SOURCE OF FUNDS |
|---|---|

WC

| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) |
|---|---|

| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION |
|---|---|

United States

| | | 7 | SOLE VOTING POWER |
|---|---|---|---|
| | | | 1,484,012 |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | | 8 | SHARED VOTING POWER |
| | | | 0 |
| | | 9 | SOLE DISPOSITIVE POWER |
| | | | 1,484,012 |
| | | 10 | SHARED DISPOSITIVE POWER |
| | | | 0 |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON |
|---|---|

1,484,012

| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES* |
|---|---|

PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

| 13 | 4.56% |
|---|---|

TYPE OF REPORTING PERSON

| 14 | PN |
|---|---|

Powered by Morningstar   Document Research℠

SCHEDULE 13D

| 1 | NAME OF REPORTING PERSONS<br>Laddcap Value Associates LLC<br>S.S. or I.R.S. IDENTIFICATION NO. OF ABOVE PERSONS<br>(Intentionally Omitted) | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*<br>(a)<br>(b) | | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS<br>OO | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>United States | | |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER<br>0 |
|---|---|---|
| | 8 | SHARED VOTING POWER<br>1,484,012 |
| | 9 | SOLE DISPOSITIVE POWER<br>0 |
| | 10 | SHARED DISPOSITIVE POWER<br>1,484,012 |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>1,484,012 |
|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES* |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>4.56% |
| 14 | TYPE OF REPORTING PERSON<br>OO |

**SCHEDULE 13D**

| CUSIP No. 55302P103 | Page  of 4 of 13 |
|---|---|

**1**    NAME OF REPORTING PERSONS
Laddcap Value Advisors LLC
S.S. or I.R.S. IDENTIFICATION NO. OF ABOVE PERSONS
(Intentionally Omitted)

**2**    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*
  (a)
  (b)

**3**    SEC USE ONLY

**4**    SOURCE OF FUNDS
OO

**5**    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)

**6**    CITIZENSHIP OR PLACE OF ORGANIZATION
United States

|  | | |
|---|---|---|
| | **7**   SOLE VOTING POWER<br>0 | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | **8**   SHARED VOTING POWER<br>1,484,012 | |
| | **9**   SOLE DISPOSITIVE POWER<br>0 | |
| | **10**   SHARED DISPOSITIVE POWER<br>1,484,012 | |

**11**   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
1,484,012

**12**   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES*

**13**   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
4.56%

**14**   TYPE OF REPORTING PERSON
OO

Source: MGT CAPITAL INVESTMENTS INC, SC 13D, October 14, 2010      Powered by Morningstar® Document Research℠

SCHEDULE 13D

| 1 | NAME OF REPORTING PERSONS |
|---|---|
| | Robert Ladd |
| | S.S. or I.R.S. IDENTIFICATION NO. OF ABOVE PERSONS |
| | (Intentionally Omitted) |

| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* |
|---|---|
| | (a) |
| | (b) |

| 3 | SEC USE ONLY |
|---|---|

| 4 | SOURCE OF FUNDS |
|---|---|
| | PF |

| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) |
|---|---|

| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION |
|---|---|
| | United States |

| | | 7 | SOLE VOTING POWER |
|---|---|---|---|
| | | | 500,000 |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | | 8 | SHARED VOTING POWER |
| | | | 1,484,012 |
| | | 9 | SOLE DISPOSITIVE POWER |
| | | | 500,000 |
| | | 10 | SHARED DISPOSITIVE POWER |
| | | | 1,484,012 |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON |
|---|---|
| | 1,984,012 |

| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES* |
|---|---|

| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11) |
|---|---|
| | 6.10% |

| 14 | TYPE OF REPORTING PERSON |
|---|---|
| | IN |

SCHEDULE 13D

Introduction:

This Schedule 13D filed by Robert Ladd, with the Securities and Exchange Commission on October 13, 2010 relating to the shares (the "Shares") of common stock (the "Common Stock") of MGT Capital Investments Inc. (the "Issuer").

**Item 1.  Security and Issuer**

(a)        Name of Issuer:

MGT Capital Investments Inc.

(b)        Address of Issuer's Principal Executive Offices:

Kensington Centre, 66 Hammersmith Road
London W14 8UD
United Kingdom

(c)        Class of Security

Common Stock, par value $0.001 per share

**Item 2.  Identity and Background**

(a)        Name of Person Filing:

This statement is being filed by (i) Laddcap Value Partners LP ("Laddcap") with respect Shares beneficially owned by it; (ii) Laddcap Value Advisors LLC ("LVA") with respect to Shares beneficially owned by Laddcap; (iii) Laddcap Value Associates LLC ("LV") with respect to Shares beneficially owned by Laddcap and (iv) Robert Ladd with respect to Shares beneficially owned by Laddcap, LVA, LV and himself. LVA and LV disclaim beneficial ownership of the securities covered by this statement. Mr. Ladd disclaims beneficial ownership of the securities covered by this statement (other than with respect to 500,000 Shares owned directly by him).

(b)        Address of Principal Business Office or, if none, Residence:

The principal business address of each of Laddcap, LVA, LV and Mr. Ladd is: c/o Laddcap Value Advisors LLC, 335 Madison Avenue Suite 1100, New York, NY 10017.

(c)        Principal Occupation, Employment or Business:

Mr. Ladd serves as the managing member of LVA, which is the investment advisor of Laddcap. Mr. Ladd also serves as the managing member of LV which is the general partner of Laddcap. Laddcap is principally engaged in making investments.

(d)       Convictions or Civil Proceedings:

During the past five years, none of the Reporting Persons and, to the knowledge of the Reporting Persons, none of the executive officers, directors, general partner or managing member of the Reporting Persons, if applicable, has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors), or has been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

(e)       Citizenship:

Each of LVA and LV is a Delaware limited liability company. Laddcap is a Delaware limited partnership. Mr. Ladd is a citizen of the United States.

**Item 3.  Source and Amount of Funds or Other Consideration.**

All of the funds used in making the purchases of the Shares described in Item 5 of this Schedule 13D that may be deemed to beneficially owned by Laddcap, LVA and LV came from the working capital of Laddcap. All of the funds used in making the purchases of the Shares described in Item 5 of this Schedule 13D that may be deemed to be beneficially owned by Mr. Ladd came from his personal funds.

**Item 4.  Purpose of the Transaction.**

The Reporting Persons intend to review their investment in the Issuer on a regular basis and anticipate having discussions with representatives of the Issuer from time to time regarding its business prospects and strategy and may recommend certain courses of action to the Issuer that the Reporting Persons believe would maximize shareholder value in the Issuer. The Reporting Persons intend to closely evaluate the performance of the Issuer, including, but not limited to, its share price, business, assets, operations, financial condition, capital structure, management and prospects. The Reporting Persons reserve the right to, without limitation, acquire additional Shares, dispose of all or some of the Shares from time to time, in each case in open market or private transactions, block sales or purchases or otherwise, or may continue to hold the Shares, depending on business and market conditions, its continuing evaluation of the business and prospects of the Issuer and other factors.

Further, the Reporting Persons reserve the right to revise their plans or intentions and to take any and all actions that they may deem appropriate to maximize the value of their investment in the Issuer in light of their general investment policies, market conditions, and subsequent developments affecting the Issuer.

Other than as expressly set forth above, the Reporting Persons have no plans or proposals as of the date of this filing which, relate to, or would result in, any of the actions enumerated in clauses (a) through (j) of Item 4 of Schedule 13D.

**Item 5.  Interest in Securities of the Issuer**

The percentages used herein are calculated based upon the 32,550,590 Shares issued and outstanding as of August 5, 2010, as reported on the Issuer's quarterly report on Form 10-Q for the period ended June 30, 2010, as filed on August 5, 2010 with the Securities and Exchange Commission.

Source: MGT CAPITAL INVESTMENTS INC, SC 13D, October 14, 2010       Powered by Morningstar  Document Research℠

SCHEDULE 13D

(a)     Pursuant to Rule 13d-3 ("Rule 13d-3") of the Exchange Act of 1934, as amended, Mr. Mr. Ladd is the beneficial owner of 1,984,012 Shares as of the date hereof (representing approximately 6.10% of the outstanding Common Stock), that includes 1,484,012 shares of Common Stock owned of record by Laddcap and 500,000 Shares of Common Stock owned of record by Mr. Ladd. Mr. Ladd disclaims beneficial ownership of the securities covered by this statement (other than the 500,000 owned by him directly).

Pursuant to Rule 13d-3, each of Laddcap, LVA and LV is the beneficial owner of the 1,484,012 Shares as of the date hereof (representing approximately 4.56% of the outstanding Common Stock) that are owned of record by Laddcap.

(b)     Each of LVA, LV and Mr. Ladd share the power to vote and direct the disposition of all Shares held by Laddcap by virtue of their roles as investment advisor of Laddcap, general partner of Laddcap and managing member of the general partner of Laddcap, respectively.

Laddcap has the sole power to vote and direct the disposition of all Shares held by it. Mr. Ladd has the sole power to vote and direct the disposition of the 500,000 Shares held by him.

(c)     The transactions of the Reporting Persons with respect to the Shares within the past 60 days are set forth on Schedule B hereto.

(d)     Each of the Reporting Persons affirms that no person other than the Reporting Persons has the rights to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, the Common Stock owned by such Reporting Person.

(e)     Not applicable.

**Item 6.     Contracts, arrangements understandings and relationships with respect to securities of the Issuer**

None.

**Item 7.     Material to be Filed as Exhibits**

Exhibit 1          Schedule 13D Joint Filing Agreement dated as of October 13, 2010 among each Reporting Person.

Exhibit 2          Schedule of transactions in the Issuer's shares within the past 60 days.

Powered by Morningstar  Document Research℠

SCHEDULE 13D

## SIGNATURES

After reasonable inquiry and to the best of our knowledge and belief, we certify that the information set forth in this statement is true, complete and correct.

Dated:  October 13, 2010

LADDCAP VALUE PARTNERS LP

By:                           /s/ Robert Ladd
Name:                      Robert Ladd
Title:                        Authorized Person

LADDCAP VALUE ASSOCIATES LLC

By:    /s/ Robert Ladd
Name: Robert Ladd
Title:  Authorized Person

LADDCAP VALUE ADVISORS LLC

By:    /s/ Robert Ladd
Name: Robert Ladd
Title:  Authorized Person

/s/ Robert Ladd
Robert Ladd

SCHEDULE 13D

| CUSIP No. 55302P103 | Page of 10 of 13 |
|---|---|

Exhibit 1

### SCHEDULE 13D JOINT FILING AGREEMENT

In accordance with the requirements of Rule 13d-1(k) under the Securities Exchange Act of 1934, as amended, and subject to the limitations set forth therein, the parties set forth below agree to jointly file the Schedule 13D (including amendments thereto) to which this joint filing agreement is attached, and further agree that this Joint Filing Agreement be included as an exhibit to such joint filing. In evidence thereof, the undersigned, being duly authorized, have executed this Joint Filing Agreement this 13th day of October, 2010.

LADDCAP VALUE PARTNERS LP

By: /s/ Robert Ladd
Name: Robert Ladd
Title: Authorized Person

LADDCAP VALUE ASSOCIATES LLC

By: /s/ Robert Ladd
Name: Robert Ladd
Title: Authorized Person

LADDCAP VALUE ADVISORS LLC

By: /s/ Robert Ladd
Name: Robert Ladd
Title: Authorized Person

/s/ Robert Ladd
Robert Ladd

Source: MGT CAPITAL INVESTMENTS INC, SC 13D, October 14, 2010          Powered by Morningstar® Document Research℠

SCHEDULE 13D

Exhibit 2

## TRANSACTIONS IN THE SHARES DURING THE PAST 60 DAYS

| Date of Transaction | Number Purchased / (Sold) | Price ($) |
|---|---|---|
| 8/26/2010 | 1,000 | 0.22 |
| 8/26/2010 | 9,186 | 0.23 |
| 8/26/2010 | 8,600 | 0.24 |
| 8/26/2010 | 10,000 | 0.2499 |
| 8/26/2010 | 10,000 | 0.24995 |
| 8/26/2010 | 9,000 | 0.25 |
| 8/26/2010 | 700 | 0.27 |
| 8/26/2010 | 1,000 | 0.28 |
| 8/26/2010 | 15,000 | 0.29891 |
| 8/26/2010 | 15,000 | 0.3 |
| 8/26/2010 | 10,000 | 0.3 |
| 8/26/2010 | 10,000 | 0.31891 |
| 8/26/2010 | 10,000 | 0.3199 |
| 8/26/2010 | 1,000 | 0.27 |
| 8/27/2010 | 2,051 | 0.2499 |
| 8/27/2010 | 10,000 | 0.25 |
| 8/27/2010 | 10,000 | 0.25975 |
| 8/27/2010 | 1,000 | 0.28 |
| 8/27/2010 | 1,000 | 0.28 |
| 8/27/2010 | 10,000 | 0.2795 |
| 8/27/2010 | 14,185 | 0.29 |
| 8/27/2010 | 1,000 | 0.275 |
| 8/27/2010 | 1,000 | 0.275 |
| 8/27/2010 | 1,000 | 0.275 |
| 8/27/2010 | 1,000 | 0.275 |
| 8/27/2010 | 1,000 | 0.275 |
| 9/9/2010 | 2,000 | 0.2689 |
| 9/9/2010 | 2,000 | 0.269 |
| 9/15/2010 | 200 | 0.2529 |
| 9/15/2010 | 1,000 | 0.253 |
| 9/15/2010 | 1,000 | 0.253 |
| 9/15/2010 | 200 | 0.253 |
| 9/15/2010 | 332 | 0.259 |
| 9/15/2010 | 1,000 | 0.2679 |
| 9/17/2010 | 1,000 | 0.26 |

Source: MGT CAPITAL INVESTMENTS INC, SC 13D, October 14, 2010

**SCHEDULE 13D**

| | | |
|---|---|---|
| 9/17/2010 | 200 | 0.26 |
| 9/17/2010 | 1,000 | 0.27 |
| 9/17/2010 | 1,000 | 0.2786 |
| 9/20/2010 | 100 | 0.3328 |
| 9/20/2010 | 1,000 | 0.3359 |
| 9/20/2010 | 1,000 | 0.2933 |
| 9/20/2010 | 600 | 0.2995 |
| 9/20/2010 | 500 | 0.3 |
| 9/20/2010 | 1,000 | 0.305 |
| 9/20/2010 | 1,000 | 0.305 |
| 9/20/2010 | 1,000 | 0.305 |
| 9/20/2010 | 1,000 | 0.30491 |
| 9/20/2010 | 1,000 | 0.30491 |
| 9/20/2010 | 400 | 0.3055 |
| 9/20/2010 | 1,000 | 0.3055 |
| 9/20/2010 | 1,000 | 0.307 |
| 9/22/2010 | 50,000 | 0.3 |
| 9/22/2010 | 1,000 | 0.3139 |
| 9/23/2010 | 1,000 | 0.28 |
| 9/23/2010 | 1,000 | 0.28 |
| 9/23/2010 | 400 | 0.28 |
| 9/23/2010 | 1,000 | 0.298 |
| 9/24/2010 | 7,017 | 0.295 |
| 9/24/2010 | 1,000 | 0.298 |
| 9/24/2010 | 200 | 0.298 |
| 9/24/2010 | 1,000 | 0.2999 |
| 9/24/2010 | 1,000 | 0.2999 |
| 9/24/2010 | 65 | 0.3 |
| 9/24/2010 | 100 | 0.2999 |
| 9/24/2010 | 100 | 0.3 |
| 9/30/2010 | 92,519 | 0.2798 |
| 9/30/2010 | (100) | 0.2784 |
| 9/30/2010 | (100) | 0.2697 |
| 9/30/2010 | (1,000) | 0.26352 |
| 9/30/2010 | (1,000) | 0.2633 |
| 9/30/2010 | (1,000) | 0.26322 |
| 10/1/2010 | 481 | 0.2999 |
| 10/4/2010 | 700 | 0.25983 |
| 10/4/2010 | 1,000 | 0.26629 |
| 10/4/2010 | 1,000 | 0.2669 |
| 10/4/2010 | 1,000 | 0.267 |
| 10/4/2010 | 1,000 | 0.267 |

                Powered by Morningstar® Document Research℠

SCHEDULE 13D

| | | |
|---|---|---|
| 10/4/2010 | 1,000 | 0.2669 |
| 10/4/2010 | 1,000 | 0.26732 |
| 10/4/2010 | 1,000 | 0.2672 |
| 10/4/2010 | 1,000 | 0.2673 |
| 10/4/2010 | 100 | 0.2674 |
| 10/4/2010 | 1,000 | 0.26949 |
| 10/4/2010 | 1,000 | 0.2794 |
| 10/4/2010 | 500 | 0.2795 |
| 10/6/2010 | 100 | 0.26 |
| 10/6/2010 | 200 | 0.2675 |
| 10/8/2010 | 1,200 | 0.28 |
| 10/12/2010 | 24,712 | 0.25 |
| 10/13/2010 | 6,100 | 0.25 |

SK 21760 0002 1137122

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

Morningstar® Document Research℠

# FORM 8-K

## MGT CAPITAL INVESTMENTS INC - MGT

**Filed: December 14, 2010 (period: December 09, 2010)**

Report of unscheduled material events or corporate changes.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**
Pursuant to Section 13 OR 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **December14, 2010 (December 9, 2010)**

**MGT Capital Investments, Inc.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **0-26886** | **13-4148725** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**Kensington Centre, 66 Hammersmith Road,**
**London, United Kingdom**
(Address of principal executive offices)

**W14 8UD**
(Zip Code)

Registrant's telephone number, including area code: **011-44-20-7605-1151**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

*This Report on Form 8-K contains forward-looking statements that involve risks and uncertainties, as well as assumptions that, if they never materialize or prove incorrect, could cause the results of MGT Capital Investments, Inc. and its consolidated subsidiaries (the "Company") to differ materially from those expressed or implied by such forward-looking statements. All statements other than statements of historical fact are statements that could be deemed forward-looking statements, including any projections of revenue, gross profit, expenses, earnings or losses from operations, synergies or other financial items; any statements of the plans, strategies and objectives of management for future operations, including the rate of market development and acceptance of medical imaging technology; the execution of restructuring plans; any statement concerning developments, performance or industry rankings relating to products or services; any statements regarding future economic conditions or performance; any statements of expectation or belief; and any statements of assumptions underlying any of the foregoing. The risks, uncertainties and assumptions referred to above include the performance of contracts by suppliers, customers and partners; employee management issues; the difficulty of aligning expense levels with revenue changes; and other risks that are described from time to time in the Company's Securities and Exchange Commission reports filed after this report. The Company assumes no obligation and does not intend to update these forward-looking statements, unless required by law or regulation.*

### ITEM 1.01.  ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT

On December 9, 2010, MGT Capital Investments, Inc. (the "Company," "MGT" or the "Registrant") entered into an amended and restated securities purchase agreement (the "Amended Purchase Agreement") with Laddcap Value Partners, LP ("Purchaser"). The Amended Purchase Agreement amends and restates in its entirety a securities purchase agreement dated November 16, 2010 between the Company and Laddcap Value Partners III, LLC, an affiliate of the Purchaser (the "Original Purchase Agreement"). The Original Purchase Agreement was subject to the Company's Current Report on Form 8-K filed on November 22, 2010 with the Commission. Pursuant to the Amended Purchase Agreement, Purchaser has agreed to purchase from the Company and the Company has agreed to sell to Purchaser 6,500,000 shares of the Company's common stock (the "Common Stock") at a purchase price of approximately, $0.15.3 per share, for an aggregate purchase price of $1,000,000. The Common Stock to be purchased by Purchaser , upon issuance, constitutes approximately 16.7% of the Company's issued and outstanding Common Stock (after giving effect to such issuance). The Amended Purchase Agreement also provided that Tim Paterson-Brown would resign as a director of the Company; Robert Ladd would be appointed to the board to fill the seat created by Mr. Paterson-Brown's resignation; and Peter Venton, currently a director, would be appointed Chairman of the Board. The closing of the Amended Purchase Agreement and the issuance of the Common Stock were subject to regulatory approval from NYSE AMEX, which was obtained on December 10, 2010. The closing took place on December 13, 2010 (the "Closing Date").

Pursuant to the Amended Purchase Agreement, the Company also entered into a registration rights agreement (the "Rights Agreement") with Purchaser on the Closing Date. The terms of the Rights Agreement provide that on or after the earlier of: (i) the later of (A) the date on which the Company files its Annual Report on Form 10-K with respect to its 2010 fiscal year, (B) the date on which the Company's planned registration statement for the Medicsight Plc shares of ordinary stock owned by the Company is declared effective by the SEC, and (C) the date on which all of the assets of MGT (UK) have been disposed of, and (ii) June 30, 2011, Purchaser can request that the Company file a registration statement with the SEC (the "Registration Statement") to register the shares of Common Stock (the "Shares"). All fees and expenses of the Registration Statement shall be borne by the Company.

Prior to the entry into of the Amended Purchase Agreement, there was no material relationship between the Company and Purchaser and its affiliates, other than the entry into the Original Purchase Agreement described herein and the Current Report filed in connection with the Original Purchase Agreement.

### ITEM 3.02. UNREGISTERED SALES OF EQUITY SECURITIES.

As described in Item 1.01, which description is incorporated herein, the Company entered into and closed under an Amended Purchase Agreement with Purchaser for the private placement (the "Private Placement") of 6,500,000 shares of the Company's Common Stock at a purchase price of approximately $0.15.3 per share, for an aggregate purchase price of $1,000,000.

The Common Stock will not be registered under the Securities Act of 1933, as amended (the "Act"), in reliance on an exemption from registration under Section 4(2) of the Act, and Rule 506 promulgated thereunder, based on the fact that there will be only one purchaser and that such purchaser has sophistication in financial matters and access to information concerning the Company.

*The foregoing summaries of the Amended and Restated Securities Purchase Agreement and the Form of Registration Rights Agreement, and of the transactions contemplated thereby, do not purport to be complete and are qualified in their entirety by reference to the definitive transaction documents, copies of which are attached as exhibits to the Current Report on Form 8-K. A copy of the Press Release announcing the Private Placement is attached hereto as Exhibit 99.1.*

Powered by Morningstar® Document Research℠

**ITEM 5.2  DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS**

Mr. Paterson-Brown has tendered his resignation as the Chairman, a member of the board of directors, as the Chief Executive Officer of, and all other positions with the Company effective upon the closing under the Amended Purchase Agreement on December 13, 2010.

At the Company's December 13, 2010 board meeting, the board, in addition to accepting the above-referenced resignation of Mr. Paterson-Brown, (a) appointed Robert Ladd as a director of the Company to fill the vacancy created by Mr. Paterson-Brown's resignation; (b) appointed Peter Venton as Chairman of the Board to fill the vacancy created by the resignation of Mr. Paterson-Brown; (c) appointed Allan Rowley as Chief Executive Officer to fill the vacancy created by the resignation of Mr. Paterson-Brown; and (d) appointed Troy Robinson to as Chief Financial Officer to fill the vacancy created by Mr. Rowley being appointed Chief Executive Officer.

The following sets forth Mr. Ladd's current position at the Company and a brief description of Mr. Ladd's business experience for the past five years:

| Name | Age | Office Currently Held |
|------|-----|----------------------|
| Robert Ladd | 52 | Director |

*Robert Ladd* joined the Company on December 13, 2010 as a director. Robert is the Managing Member of Laddcap Value Advisors, LLC, which serves as the investment manager for various private partnerships, including Laddcap Value Partners LP. Prior to forming his investment partnership in 2003, Robert was a Managing Director at Neuberger Berman, a large international money management firm catering to individuals and institutions. From 1992 through November 2002, Robert was a portfolio manager for various high net worth clients of Neuberger Berman. Prior to this experience, Robert was a securities analyst at Neuberger from 1988 through 1992. Robert is a former Director of InFocus Systems, Inc. (Nasdaq – INFS, 2007 to 2009), and presently serves on the board of Delcath Systems, Inc. (Nasdaq – DCTH, since 2006). Robert has earned his designation as a Chartered Financial Analyst (1986). The board believes that Robert has the experience, qualifications, attributes and skills necessary to serve as director because of his years of experience in the securities industries.

Mr. Ladd was appointed director in accordance with the provisions of the Amended Purchase Agreement.

Mr. Ladd as a managing member of the general partner of Laddcap Value Partners, LP, the Purchaser described in ITEM 1.01 and ITEM 3.02, has an interest in the above-referenced purchase of 6,500,000 shares of the Company's Common Stock for an aggregate purchase price of $1,000,000. The information set forth under ITEM 1.01 and ITEM 3.02 is incorporated herein.

The following sets forth Mr. Venton's current position at the Company and a brief description of Mr. Venton's business experience for the past five years:

| Name | Age | Office Currently Held |
|------|-----|----------------------|
| Peter Venton | 67 | Independent Director; Audit Committee Chairman and Remuneration and Nominations Committee Member |

*Peter Venton, OBE,* was appointed an independent director of the Company and a member of the Audit Committee in November 2004; he was appointed Chairman of the Board on December 13 2010. Peter has over 30 years' experience in the computing and telecommunications industry and holds several patents in the sector. He is a former Chief Executive of Plessey Radar and of GEC-Marconi Prime Contracts. Peter currently serves as the Technical Audit Chairman for the Defence Evaluation & Research Agency and joined the board of Medicsight as an independent director in April 2007. He was also an independent director of Medicsight between November 2001 and July 2005. . The board believes that Peter has the experience, qualifications, attributes and skills necessary to serve as a director because of his years of experience in business, finance and audit.

Mr. Venton was appointed Chairman of the Board of Directors in accordance with the provisions of the Amended Purchase Agreement.

The following sets forth Mr. Rowley's current position at the Company and a brief description of Mr. Rowley's business experience for the past five years:

| Name | Age | Office Currently Held |
|------|-----|----------------------|
| Allan Rowley | 42 | Chief Executive Officer; Director |

*Allan Rowley* joined the Company in April 2006 as Finance Director of both Medicsight and Medicexchange and was appointed the Company's Chief Financial Officer as well as a member of the Company's board of directors in August 2006. As of December 13, 2010 he resigned as Chief Financial Officer of the Company and was appointed Chief Executive Officer of the Company. As of March 19, 2009 he resigned as Finance Director of Medicsight plc and was appointed Chief Executive Officer of Medicsight plc. He resigned as finance director of MedicExchange on December 23, 2009. Prior to joining, Allan served in a corporate development role at ComMedica Limited, a UK-based medical software company specializing in Picture Archiving & Communication System ("PACS") software. In this role he worked on financing and acquisition opportunities and on commercial proposals with the sales and finance group. Before joining ComMedica, Allan was revenue controller and a director of European Finance at Bea Systems, a NASDAQ-listed US-based software company. Allan has several years of experience in public accounting in the United Kingdom and United States with Arthur Andersen and Ernst & Young, respectively. He is a member of the Institute of Chartered Accountants in England and Wales and holds a Master of Philosophy and a Bachelor of Science degree from Aberystwyth University College of Wales. The board believes that Allan has the experience, qualifications, attributes and skills necessary to serve as director because of his years of accounting experience in public practice and in commerce.

The following sets forth Mr. Robinson's current position at the Company and a brief description of Mr. Robinson's business experience for the past five years:

| Name | Age | Office Currently Held |
|------|-----|----------------------|
| Troy Robinson | 35 | Chief Financial Officer |

*Troy Robinson* joined the Company in February 2007 as Group Controller and on December 13, 2010 was appointed as its Chief Financial Officer. Troy also serves as Medicsight Plc's Chief Financial Officer and Medicsight Secretary having previously served as Group Financial Controller since February 2007. Before joining , he held senior finance positions with IVAX pharmaceuticals and HP foods (from January 2003 until May 2005 and from May 2005 until January 2007 respectively). During his tenure, Troy has played a pivotal role in both the Medicsight IPO and the subsequent global expansion of the finance function.   He is an associate of the Chartered Institute of Management Accountants and holds a Bachelor of Arts degree from Manchester Metropolitan University.

Officers are appointed by the board of directors and hold office until their successors are chosen and qualified, until their death or until they resign or have been removed from office. All corporate officers serve at the discretion of the board of directors. There are no family relationships between any director or executive officer and any other director or executive officer of the Company.

Powered by Morningstar® Document Research℠

## ITEM 9.01.  FINANCIAL STATEMENTS AND EXHIBITS

*(a)  Financial Statements of Businesses Acquired*

Not applicable.

*(b)  Pro forma Financial Information*

Not applicable.

*(c)  Shell Company Transactions*

Not applicable.

*(d)  Exhibits*

| Exhibit No. | Description |
|---|---|
| 10.1 | Conformed copy of the Amended and Restated Securities Purchase Agreement, dated as of December 9, 2010, by and between the Company and Laddcap Value Partners, LP. |
| 10.2 | Form of Registration Rights Agreement |
| 99.1 | Press Release dated December 14, 2010 |

Powered by Morningstar® Document Research℠

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**MGT CAPITAL INVESTMENTS, INC.**

By:     /s/ ALLAN ROWLEY
Allan Rowley
*Chief Executive Officer*

Date: December 14, 2010

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

Exhibit 10.1

Conformed Copy

### AMENDED AND RESTATED SECURITIES PURCHASE AGREEMENT

This Amended and Restated Securities Purchase Agreement (this "Agreement") is dated as of December 9, 2010, by and between MGT Capital Investments, Inc., a Delaware corporation (the "Company"), and Laddcap Value Partners, LP, a Delaware limited partnership company, or an Affiliate (defined below) thereof (collectively, the "Purchaser"), and amends and restates in its entirety the Securities Purchase Agreement (the "Original Agreement"), dated as of November 16, 2010, by and between the Company and the Purchaser.

WHEREAS, the Company and the Purchaser entered into the Original Agreement on November 16, 2010, and subsequently agreed to amend and restate such agreement with this Agreement, and the parties desire that this Agreement supersede the Original Agreement in all respects;

WHEREAS, subject to the terms and conditions set forth in this Agreement, the Company desires to issue and sell to the Purchaser, and the Purchaser desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and the Purchaser agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.1    Definitions. In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1.1:

"Action" shall have the meaning ascribed to such term in Section 3.1(k).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person as such terms are used in and construed under Rule 405 under the Securities Act.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

1

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

"Closing Date" means the Trading Day on which all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Securities, in each case, have been satisfied or waived, but in no event later than the Drop-Dead Date (defined below).

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Disclosure Schedules" means the Disclosure Schedules of the Company delivered concurrently herewith.

"Evaluation Date" shall have the meaning ascribed to such term in Section 3.1(s).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"GAAP" shall have the meaning ascribed to such term in Section 3.1(h).

"Indebtedness" shall have the meaning ascribed to such term in Section 3.1(cc).

"Intellectual Property Rights" shall have the meaning ascribed to such term in Section 3.1(p).

"Liens" means a lien, charge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(b).

"Permits" shall have the meaning ascribed to such term in Section 3.1(n).

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened in writing.

2

Powered by Morningstar® Document Research℠

"Purchaser Party" shall have the meaning ascribed to such term in Section 4.6.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the Closing Date, by and between the Company and the Purchaser, in the form attached hereto as Exhibit B.

"Required Approvals" shall have the meaning ascribed to such term in Section 3.1(e).

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"SEC Reports" shall have the meaning ascribed to such term in Section 3.1(h).

"Securities" means the Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Shares" shall have the meaning ascribed to such term in Section 2.1.

"Short Sales" means all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act (but shall not be deemed to include the location and/or reservation of borrowable shares of Common Stock).

"Subscription Amount" means One Million dollars ($1,000,000.00), in United States dollars and in immediately available funds.

"Subsidiary" means any subsidiary of the Company with respect to which the Company owns in excess of 50% of any class of such subsidiary's outstanding securities, and shall, where applicable, also include any direct or indirect subsidiary of the Company formed or acquired after the date of the Original Agreement, which in each case will be owned by the Company at the Closing.

"Trading Day" means a day on which the principal Trading Market is open for trading.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the OTC Bulletin Board, the OTC QB, the OTC QX, NYSE AMEX, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, or the New York Stock Exchange (or any successors to any of the foregoing).

"Transaction Documents" means this Agreement, the Registration Rights Agreement and any other documents or agreements executed in connection with the transactions contemplated hereunder.

3

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar Document Research℠

"Transfer Agent" means Standard Registrar & Transfer, and any successor transfer agent of the Company.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1     Closing.  On the Closing Date, upon the terms and subject to the conditions set forth herein, the Company agrees to sell, and the Purchaser agrees to purchase, Six Million Five Hundred Thousand (6,500,000) shares of Common Stock of the Company (the "Shares") for the Subscription Amount.  The Purchaser shall deliver to the Company, via wire transfer of immediately available funds, an amount equal to the Subscription Amount and the Company shall deliver to the Purchaser the Shares, and the Company and the Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing.  Upon satisfaction of the covenants and conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004, or such other location (including remotely by exchange of electronic or .pdf documents) as the parties shall mutually agree.

Section 2.2     Deliveries.

(a)     On or prior to the Closing Date, the Company shall deliver or cause to be delivered to the Purchaser the following:

(i)     this Agreement duly executed by the Company;

(ii)     a legal opinion of Company Counsel, substantially in the form of Exhibit A attached hereto;

(iii)     the Registration Rights Agreement, duly executed as of the Closing Date by the Company;

(iv)     a certificate evidencing the Shares, which certificate shall be registered in the name of the Purchaser and shall bear the legend referenced in Section 4.10(b) of this Agreement;

(v)     a copy of irrevocable instructions to the Company's transfer agent instructing the transfer agent to deliver the Shares, registered in the name of the Purchaser;

(vi)     a letter of resignation from Tim Paterson-Brown (with respect to his position as a member of a Board of Directors) effective as of on or before the Closing;

(vii)     a certificate duly executed by an executive officer of the Company, dated as of the Closing Date, certifying as to the matters set forth in Sections 2.3(b)(i) – (viii).

4

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

(b)      On or prior to the Closing Date, the Purchaser shall deliver or cause to be delivered to the Company the following:

(i)      this Agreement duly executed by such Purchaser; and

(ii)      the Purchaser's Subscription Amount by wire transfer to the account as specified in writing by the Company.

Section 2.3      Closing Conditions.

(a)      The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met:

(i)      the accuracy in all material respects on the Closing Date of the representations and warranties of the Purchaser contained herein (except for the representations and warranties that speak as of a specific date, which shall be made as of such date);

(ii)      all obligations, covenants and agreements of the Purchaser required to be performed at or prior to the Closing Date shall have been performed; and

(iii)      the receipt by the Company of a favorable opinion from Broadmark Capital that the transactions contemplated hereby are in the best interests of the shareholders of the Company;

(iv)      the delivery by the Purchaser of the items set forth in Section 2.2(b) of this Agreement.

(b)      The obligation of the Purchaser hereunder in connection with the Closing is subject to the following conditions being met:

(i)      the accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Company contained herein (except for the representations and warranties that speak as of a specific date, which shall be made as of such date);

(ii)      all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed;

(iii)      the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)      Tim Paterson-Brown shall have resigned from his role as a member of the Board of Directors;

(v)      the Board of Directors shall have appointed Robert B. Ladd to the Board of Directors as a replacement for Tim Patterson-Brown;

5

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010        Powered by Morningstar® Document Research℠

(vi)      the Board of Directors shall have elected Peter Venton as Chairman of the Board of Directors;

(vii)      there shall have been no Material Adverse Effect with respect to the Company since the date of the Original Agreement; and

(viii)      from the date of the Original Agreement to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission or the Company's principal Trading Market (except for any suspension of trading of limited duration agreed to by the Company, which suspension shall be terminated prior to the Closing), and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg L.P. shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities which, in the reasonable judgment of the Purchaser, makes it impracticable or inadvisable to purchase the Securities at the Closing.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1      <u>Representations and Warranties of the Company</u>.  Except as set forth in the Disclosure Schedules, which Disclosure Schedules shall be deemed a part hereof and shall qualify any representation or otherwise made herein to the extent of the disclosure contained in the corresponding section of the Disclosure Schedules or otherwise referenced in the Disclosure Schedules in such a manner that it is reasonably identifiable to which section such disclosure corresponds, the Company hereby represents and warrants as of the date of the Original Agreement and as of the Closing Date (except for the representations and warranties that speak as of a specific date, which shall be made as of such date) to the Purchaser as follows:

(a)      <u>Subsidiaries</u>.  All of the direct and indirect Subsidiaries of the Company, or entities of which the Company owns greater than 50% of the outstanding equity, are as set forth in Section 3.1(a) of the Disclosure Schedule.  The Company owns, directly or indirectly, the amount(s) set forth in Section 3.1(a) of the Disclosure Schedule of capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all such issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, and non-assessable.

6

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

(b)     <u>Organization and Qualification</u>. The Company and each of the Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted. Neither the Company nor any Subsidiary is in violation nor default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents. Each of the Company and the Subsidiaries is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in: (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business, prospects or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a "<u>Material Adverse Effect</u>") and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c)     <u>Authorization; Enforcement</u>. The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder including, without limitation, the issuance of the Shares. The execution and delivery of each of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, the Board of Directors or the Company's stockholders in connection therewith other than in connection with the Required Approvals. Each Transaction Document to which it is a party has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(d)     <u>No Conflicts</u>. The execution, delivery and performance by the Company of the Transaction Documents, the issuance and sale of the Securities and the consummation by it of the transactions contemplated hereby and thereby to which it is a party do not and will not (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected; except in the case of each of clauses (ii) and (iii), such as would not reasonably be expected to result in a Material Adverse Effect.

7

Powered by Morningstar® Document Research℠

(e)      Filings, Consents and Approvals. The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than: (i) the filings required pursuant to Section 4.3 of this Agreement, (ii) the filing with the Commission of a registration statement in accordance with the Registration Rights Agreement, (iii) application(s) to each applicable Trading Market for the listing of the Securities for trading thereon in the time and manner required thereby and (iv) such filings as are required to be made under applicable state securities laws (collectively, the "Required Approvals").

(f)      Issuance of the Securities. The Securities are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company.

(g)      Capitalization. The capitalization of the Company is as set forth in Section 3.1(g) of the Disclosure Schedule. The Company has not issued any capital stock since its most recently filed periodic report under the Exchange Act. No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents. There are no outstanding options, warrants, scrip rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents. The issuance and sale of the Securities will not obligate the Company to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities. No further approval or authorization of any stockholder, the Board of Directors or others is required for the issuance and sale of the Securities. There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.

8

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010          Powered by Morningstar  Document Research℠

(h)      SEC Reports; Financial Statements. The Company has filed all reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date of the Original Agreement (or such shorter period as the Company was required by law or regulation to file such material) (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

(i)      Material Changes; Undisclosed Events, Liabilities or Developments. Except as contemplated by the Transaction Documents, since the date of the latest audited financial statements included within the SEC Reports, except as specifically disclosed in a subsequent SEC Report filed prior to the date of the Original Agreement, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and except for this agreement (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans. The Company does not have pending before the Commission any request for confidential treatment of information. Except for the issuance of the Securities contemplated by this Agreement, no event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to the Company or its Subsidiaries or their respective business, prospects, properties, operations, assets or financial condition that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made or deemed made that has not been publicly disclosed at least 1 Trading Day prior to the date that this representation is made.

9

Source: MGT CAPITAL INVESTMENTS INC 8-K December 14, 2010

(j)      No Undisclosed Events, Liabilities, Developments or Circumstances. No event, liability, development or circumstance has occurred or exists, or is reasonably expected to exist or occur with respect to the Company, any of the Subsidiaries or their respective business, properties, liabilities, prospects, operations (including results thereof) or condition (financial or otherwise), that (i) would be required to be disclosed by the Company under applicable securities laws on a registration statement filed with the SEC relating to an issuance and sale by the Company of its Common Stock and which has not been publicly announced or (ii) could have a Material Adverse Effect.

(k)      Litigation. There is no action, suit, notice of inquiry, violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) would, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. To the knowledge of the Company, there has not been, and there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

(l)      Labor Relations. No material labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company. None of the Company's or its Subsidiaries' employees is a member of a union that relates to such employee's relationship with the Company or such Subsidiary, and neither the Company nor any of its Subsidiaries is a party to a collective bargaining agreement, and the Company and its Subsidiaries believe that their relationships with their employees are good. Except as contemplated in Section 2.3(b) of this Agreement, no executive officer (as defined in Rule 501(f) promulgated under the Securities Act) or other key employee of the Company or any of the Subsidiaries has notified the Company or any such Subsidiary that such officer intends to leave the Company or any such Subsidiary or otherwise terminate such officer's employment with the Company or any such Subsidiary. No executive officer or other key employee, to the knowledge of the Company, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of any third party, and the continued employment of each such executive officer or key employee, to the knowledge of the Company, does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Company and its Subsidiaries are in material compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours.

10

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

(m)      Compliance. Neither the Company nor any Subsidiary: (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any judgment, decree or order of any court, arbitrator or governmental body or (iii) is or has been in violation of any statute, rule, ordinance or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws relating to taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters.

(n)      Regulatory Permits. The Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses ("Permits"), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Permit.

(o)      Title to Assets. The Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them and good and marketable title in all personal property owned by them that is material to the business of the Company and the Subsidiaries, in each case free and clear of all Liens, except for Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by the Company and the Subsidiaries are to their knowledge held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance.

(p)      Patents and Trademarks. The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights necessary or material for use in connection with their respective businesses as described in the SEC Reports (collectively, the "Intellectual Property Rights"). None of, and neither the Company nor any Subsidiary has received a notice (written or otherwise) that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned, within two (2) years from the date of this Agreement. Neither the Company nor any Subsidiary has received, since the date of the latest audited financial statements included within the SEC Reports, a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person. All such Intellectual Property Rights are enforceable and to the knowledge of the Company there is no existing infringement by another Person of any of the Intellectual Property Rights. The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties.

11

(q)      Insurance. The Company and the Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are customary in the businesses in which the Company and the Subsidiaries are engaged, including, but not limited to, directors and officers insurance coverage at least equal to the aggregate Subscription Amount. Neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost.

(r)      Transactions With Affiliates and Employees. None of the officers or directors of the Company and, to the knowledge of the Company, none of the employees of the Company is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee of the Company has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $120,000 other than for (i) payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock option agreements under any stock option plan of the Company.

(s)      Sarbanes-Oxley; Internal Accounting Controls. Except as described in the SEC Reports, the Company is in material compliance with any and all applicable requirements of the Sarbanes-Oxley Act of 2002 that are effective as of the date of the Original Agreement, and any and all applicable rules and regulations promulgated by the Commission thereunder that are effective as of the date of the Original Agreement and as of the Closing Date. Except as described in the SEC Reports, the Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. The Company has established disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and designed such disclosure controls and procedures to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. The Company's certifying officers have evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by the Company's most recently filed Quarterly Report on Form 10-Q under the Exchange Act (such date, the "Evaluation Date"). The Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the effectiveness of the disclosure controls and procedures based on their evaluations as of the Evaluation Date. Since the Evaluation Date, there have been no changes in the Company's internal control over financial reporting (as such term is defined in the Exchange Act) that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

12

Powered by Morningstar® Document Research℠

(t)    <u>Subsidiary Rights</u>. The Company or one of the Subsidiaries has the unrestricted right to vote, and (subject to limitations imposed by applicable law) to receive dividends and distributions on, all capital securities of the Subsidiaries as owned by the Company or such Subsidiary.

(u)    <u>Off Balance Sheet Arrangements</u>. There is no transaction, arrangement, or other relationship between the Company or any of the Subsidiaries and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its Exchange Act filings and is not so disclosed or that otherwise could be reasonably likely to have a Material Adverse Effect. Confirm.

(v)    <u>Certain Fees</u>. No brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents. The Purchasers shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by the Transaction Documents.

(w)    <u>Investment Company</u>. The Company is not, and is not an Affiliate of, and immediately after receipt of payment for the Securities, will not be or be an Affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(x)    <u>Registration Rights</u>. Other than the rights of the Purchaser under the Registration Rights Agreement, no Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company.

(y)    <u>Listing and Maintenance Requirements</u>. The Common Stock is registered pursuant to Section 12(b) or 12(g) of the Exchange Act, and the Company has taken no action designed to terminate, or which to its knowledge is likely to have the effect of terminating, the registration of the Common Stock under the Exchange Act nor has the Company received any notification that the Commission is contemplating terminating such registration. The Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements. The Company has not received any notice of deficiency from the exchange on which its Common Stock is listed, nor is it aware of any violations of any listing requirements in respect of the rules of such exchange.

13

Powered by Morningstar® Document Research℠

(z)       Application of Takeover Protections. The Company and the Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's certificate of incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to the Purchasers as a result of the Purchasers and the Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation as a result of the Company's issuance of the Securities and the Purchasers' ownership of the Securities.

(aa)      Disclosure. Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company confirms that neither it nor any other Person acting on its behalf has provided any of the Purchasers or their agents or counsel with any information that it believes constitutes or might constitute material, non-public information  The Company understands and confirms that the Purchasers will rely on the foregoing representation in effecting transactions in securities of the Company.  All of the disclosure furnished by or on behalf of the Company to the Purchasers regarding the Company, its business and the transactions contemplated hereby, including this Agreement, the Disclosure Schedules to this Agreement and any certificate furnished in connection herewith, is true and correct and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(bb)      No Integrated Offering. Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, neither the Company, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of any applicable shareholder approval provisions of any Trading Market on which any of the securities of the Company are listed or designated.

14

---

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                    Powered by Morningstar® Document Research℠

(cc)    Solvency.  Based on the consolidated financial condition of the Company as of the Closing Date, after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder, (i) the fair saleable value of the Company's assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature, and (ii) the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its liabilities when such amounts are required to be paid.  The Company does not intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt).  The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within 6 months from the Closing Date.  Section 3.1(cc) of the Disclosure Schedule sets forth as of the date of the Original Agreement all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments.  For the purposes of this Agreement, "Indebtedness" means (x) any liabilities for borrowed money or amounts owed in excess of $75,000 (other than trade accounts payable incurred in the ordinary course of business), (y) all guaranties, endorsements and other contingent obligations in respect of indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (z) the present value of any lease payments in excess of $75,000 due under leases required to be capitalized in accordance with GAAP.  Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

(dd)    Tax Status.  Except for matters that would not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and each Subsidiary (i) has made or filed all United States federal and state income and all foreign income and franchise tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations and (iii) has set aside on its books provision reasonably adequate for the payment of all material taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction.

(ee)    Foreign Corrupt Practices.  To the knowledge of the Company, neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(ff)    Accountants.  The Company's accounting firm is EisnerAmper LLP.  To the knowledge and belief of the Company, such accounting firm is a registered public accounting firm as required by the Exchange Act.

(gg)    Purchasers' Purchase of Securities.  The Purchaser is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated thereby.  The Purchaser is not acting as a financial advisor to the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated thereby and any advice given by the Purchaser or any of its respective representatives or agents in connection with the Transaction Documents and the transactions contemplated thereby is merely incidental to the Purchaser's purchase of the Securities.  The Company's decision to enter into this Agreement and the other Transaction Documents has been based solely on the independent evaluation of the transactions contemplated hereby by the Company and its representatives.

15

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                                    Powered by Morningstar® Document Research℠

(hh)    <u>Regulation M Compliance</u>.  The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Securities.

(ii)    <u>Office of Foreign Assets Control</u>.  Neither the Company nor, to the Company's knowledge, any director, officer, agent, employee or affiliate of the Company is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("<u>OFAC</u>").

(jj)    <u>U.S. Real Property Holding Corporation</u>.  The Company is not and has never been a U.S. real property holding corporation within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended, and the Company shall so certify upon Purchaser's request.

(kk)    <u>Bank Holding Company Act</u>.  Neither the Company nor any of its Subsidiaries or Affiliates is subject to the Bank Holding Company Act of 1956, as amended (the "<u>BHCA</u>") and to regulation by the Board of Governors of the Federal Reserve System (the "<u>Federal Reserve</u>").  Neither the Company nor any of its Subsidiaries or Affiliates owns or controls, directly or indirectly, five percent (5%) or more of the outstanding shares of any class of voting securities or twenty-five percent or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.  Neither the Company nor any of its Subsidiaries or Affiliates exercises a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

(ll)    <u>Money Laundering</u>.  The operations of the Company are in material compliance with applicable financial record-keeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, applicable money laundering statutes and applicable rules and regulations thereunder (collectively, the "<u>Money Laundering Laws</u>"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company with respect to the Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                    Powered by Morningstar® Document Research℠

(mm)   <u>Environmental Matters</u>. Except as disclosed in the SEC Reports, to the knowledge of the Company, neither the Company nor any of its Subsidiaries (i) is in violation of any statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, "<u>Environmental Laws</u>"), (ii) is liable for any off-site disposal or contamination pursuant to any Environmental Laws, or (iii) is subject to any claim relating to any Environmental Laws; in each case, which violation, contamination, liability or claim has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and, to the Company's Knowledge, there is no pending or threatened investigation that might lead to such a claim.

(nn)   <u>Application of Anti-Takeover Provisions</u>. There is no control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's Certificate of Incorporation (or similar charter documents) or applicable law that would become applicable to the Purchaser as a result of the issuance of the Securities.

(oo)   <u>Shell Company</u>. The Company is not now and has not been, at any time during the past three (3) years, a shell company as defined by Rule 405 of the Securities Act and has never been an issuer subject to Rule 144(i) under the Securities Act.

Section 3.2   <u>Representations and Warranties of the Purchasers</u>. The Purchaser hereby represents and warrants as of the date of the Original Agreement and as of the Closing Date (except for the representations and warranties that speak as of a specific date, which shall be made as of such date) to the Company as follows:

(a)   <u>Organization; Authority</u>. The Purchaser is either an individual or an entity which one? duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate, partnership or limited liability company power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and performance by the Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or similar action, as applicable, on the part of the Purchaser. Each Transaction Document to which it is a party has been duly executed by the Purchaser, and when delivered by the Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of the Purchaser, enforceable against it in accordance with its terms, except: (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

17

(b)     <u>Understandings or Arrangements</u>. The Purchaser is acquiring the Securities as principal for its own account and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities (this representation and warranty not limiting the Purchaser's right to sell the Securities pursuant to a registration statement or otherwise in compliance with applicable federal and state securities laws). Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

(c)     <u>Purchaser Status</u>. At the time the Purchaser was offered the Securities, it was, and as of the date of this Agreement it is, either: (i) an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act or (ii) a "qualified institutional buyer" as defined in Rule 144A(a) under the Securities Act. The Purchaser is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

(d)     <u>Experience of the Purchaser</u>. The Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. The Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment. The Company has provided the Purchaser with access to the Company and its books and records, and the Purchaser has had the opportunity to ask questions of the Company and, as of the date of the Original Agreement, has received any information that it has requested from the Company.

(e)     <u>Certain Transactions and Confidentiality</u>. Other than consummating the transactions contemplated hereunder, and otherwise disclosed in its SEC filings, the Purchaser or any of Affiliate, has not, nor has any Person acting on behalf of or pursuant to any understanding with the Purchaser, directly or indirectly executed any purchases or sales, including Short Sales, of the securities of the Company during the period commencing August 1, 2010 and ending the latter of (i) immediately prior to the execution hereof or the (ii) the date on which the Company publicly announces the transactions contemplated by this Agreement. Other than to other Persons party to this Agreement, such Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction). Notwithstanding the foregoing, for avoidance of doubt, nothing contained herein shall constitute a representation or warranty, or preclude any actions, with respect to the identification of the availability of, or securing of, available shares to borrow in order to effect Short Sales or similar transactions in the future.

(f)     <u>Certain Fees</u>. To the knowledge of the Purchaser, no brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents.

18

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

The Company acknowledges and agrees that the representations contained in Section 3.2 shall not modify, amend or affect such Purchaser's right to rely on the Company's representations and warranties contained in this Agreement or any representations and warranties contained in any other Transaction Document or any other document or instrument executed and/or delivered in connection with this Agreement or the consummation of the transaction contemplated hereby. The Purchaser hereby further represents and warrants that, as of the date of the Original Agreement, it does not have any actual knowledge of any inaccuracy of the representations and warranties of the Company set forth in Section 3.1.

## ARTICLE IV

### OTHER AGREEMENTS OF THE PARTIES

Section 4.1    Furnishing of Information. Until the time that the Purchaser no longer owns any of the Securities, the Company covenants to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date of the Original Agreement pursuant to the Exchange Act so long as the Company is then subject to the reporting requirements of the Exchange Act. As long as the Purchaser owns Securities, if the Company is not required to file reports pursuant to the Exchange Act, it will prepare and furnish to the Purchasers and make publicly available in accordance with Rule 144(c) such information as is required for the Purchasers to sell the Securities, including without limitation, under Rule 144. The Company further covenants that it will take such further action as any holder of Securities may reasonably request, to the extent required from time to time to enable such Person to sell such Securities without registration under the Securities Act, including without limitation, within the requirements of the exemption provided by Rule 144.

Section 4.2    Integration. The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Trading Market such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

Section 4.3    Securities Laws Disclosure; Publicity. The Company shall, during or prior to the Trading Day immediately following the second business day following the date hereof, issue a press release disclosing the material terms of the transactions contemplated hereby, and issue a Current Report on Form 8-K (which shall include this Agreement as an exhibit thereto) disclosing the material terms of the transactions contemplated hereby, and including the Transaction Documents as exhibits thereto within the time required by the Exchange Act. From and after the issuance of such press release, the Company shall have publicly disclosed all material, non-public information delivered to the Purchaser by the Company or any of its Subsidiaries, or any of their respective officers, directors, employees or agents in connection with the transactions contemplated by the Transaction Documents. The Company and the Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor any Purchaser shall issue any such press release nor otherwise make any such public statement without the prior consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of the Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication.

19

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                    Powered by Morningstar® Document Research℠

Section 4.4     Use of Proceeds. The Company shall use the net proceeds from the sale of the Securities for general working capital purposes, and shall not use such proceeds for: (a) the satisfaction of any portion of the Company's debt (other than payment of trade payables in the ordinary course of the Company's business and prior practices), (b) the redemption of any Common Stock or Common Stock Equivalents or (c) the settlement of any outstanding litigation or (d) in violation of the FCPA or OFAC regulations.

Section 4.5     Indemnification of Purchasers. Subject to the provisions of this Section 4.6, the Company will indemnify and hold the Purchaser and its shareholders, members, partners, directors, managers, officers, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls the Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the shareholders, members, partners, directors, managers, officers, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling persons (each, a "Purchaser Party") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents or (b) any action instituted against a Purchaser in any capacity, or any of them or their respective Affiliates, by any stockholder of the Company who is not an Affiliate of such Purchaser, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is based upon a breach of the Purchaser's representations, warranties or covenants under the Transaction Documents or any agreements or understandings the Purchaser may have with any such stockholder or any violations by the Purchaser of state or federal securities laws or any conduct by the Purchaser which constitutes fraud, gross negligence, willful misconduct or malfeasance). If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Purchaser Party (in this regard, Gersten Savage shall be deemed to be reasonably acceptable to Purchaser). Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel. The Company will not be liable to any Purchaser Party under this Agreement (y) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed; or (z) to the extent, but only to the extent, that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by such Purchaser Party in this Agreement or in the other Transaction Documents. The indemnification required by this Section 4.6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received. The indemnity agreements contained herein shall not be an exclusive remedy but shall be in addition to any cause of action or similar right in law or in equity of any Purchaser Party against the Company or others, and (y) any liabilities the Company may be subject to pursuant to law.

20

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010        Powered by Morningstar® Document Research℠

Section 4.6    <u>Listing of Common Stock</u>. The Company hereby agrees to use commercially reasonable efforts to maintain the listing or quotation of the Common Stock on the Trading Market on which it is currently listed, and concurrently with the Closing, the Company shall apply to list or quote all of the Shares on such Trading Market and promptly secure the listing of all of the Shares on such Trading Market. The Company further agrees, if the Company applies to have the Common Stock traded on any other Trading Market, it will then include in such application all of the Shares, and will take such other action as is reasonably necessary to cause all of the Shares to be listed or quoted on such other Trading Market as promptly as possible. The Company will then take all action reasonably necessary to continue the listing and trading of its Common Stock on a Trading Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Trading Market.

Section 4.7    <u>Certain Transactions and Confidentiality</u>. The Purchaser covenants that neither it nor any Affiliate or any other Person acting on its behalf or pursuant to any understanding with it will execute any purchases or sales, including Short Sales of any of the Company's securities during the period commencing with the execution of the Original Agreement and ending at such time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.3. The Purchaser covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company pursuant to the initial press release as described in Section 4.3, the Purchaser will maintain the confidentiality of the existence and terms of this transaction and the information included in the Disclosure Schedules. Notwithstanding the foregoing and notwithstanding anything contained in this Agreement to the contrary, the Company has been informed that (i) the Purchaser does not make any representation, warranty or covenant hereby that it will not engage in effecting transactions in any securities of the Company after the Closing Date, (ii) the Purchaser shall not be restricted or prohibited from effecting any transactions in any securities of the Company in accordance with applicable securities laws from and after the Closing Date, and (iii) Purchaser shall not have any duty of confidentiality to the Company or its Subsidiaries after the issuance of the initial press release as described in Section 4.3.

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                        Powered by Morningstar® Document Research℠

Section 4.8        Transfers; Legend.

(a)        Securities may only be disposed of in compliance with state and federal securities laws. In connection with any transfer of the Securities other than pursuant to an effective registration statement, to the Company, to an Affiliate of an Purchaser or in connection with a pledge as contemplated in Section 4.08(b), the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Shares under the Securities Act

(b)        Certificates evidencing the Shares will contain the following legend, until such time as they are not required under Section 4.08(c):

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THESE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT SECURED BY SUCH SECURITIES IN ACCORDANCE WITH APPLICABLE LAW.

The Company has been informed that the Purchaser may from time to time pledge, and/or grant a security interest in some or all of the Securities pursuant to a bona fide margin agreement in connection with a bona fide margin account and, if required under the terms of such agreement or account, the Purchaser may transfer pledged or secured Securities to the pledgees or secured parties in accordance with applicable law. Such a pledge or transfer would not be subject to approval or consent of the Company and no legal opinion of legal counsel to the pledgee, secured party or pledgor shall be required in connection with the pledge, but such legal opinion may be required in connection with a subsequent transfer following default by the Purchaser transferee of the pledge. No notice shall be required of such pledge. At the Purchaser's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in connection with a pledge or transfer of the Securities. Except as otherwise provided in Section 4.10(c), any Securities subject to a pledge or security interest as contemplated by this Section 4.10(b) shall continue to bear the legend set forth in Section 4.1(b) and be subject to the restrictions on transfer set forth in Section 4.10(a).

(c)        Certificates evidencing Securities shall not contain any legend (including the legend set forth in Section 4.1(b)): (i) following a sale or transfer of such Securities pursuant to an effective registration statement (including a Registration Statement), or (ii) following a sale or transfer of such Shares pursuant to Rule 144 (assuming the transferee is not an Affiliate of the Company), or (iii) while such Securities are eligible for sale without volume limitations pursuant to Rule 144. If the Purchaser shall make a sale or transfer of Securities either (x) pursuant to Rule 144 or (y) pursuant to a registration statement and in each case shall have delivered to the Company or the Company's transfer agent the certificate representing Securities containing a restrictive legend which are the subject of such sale or transfer and a representation letter in customary form.

22

Section 4.9       Restriction on trading in the Company's Securities

For the period from the date of the Original Agreement to the Closing Date, it is understood and acknowledged by the Purchaser that: (i) each of the Purchaser and its Affiliates has been asked by the Company to agree, and the Purchaser (on behalf of its self and its Affiliates) has agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company; (ii) the Purchaser has agreed to desist from future open market or other transactions by the Purchaser, specifically including, without limitation, Short Sales or "derivative" transactions, before or after the closing of this private placement transactions; (iii) the Purchaser, and counter-parties in "derivative" transactions to which the Purchaser is a party, directly or indirectly, presently may not have a "short" position in the Common Stock, and (iv) the Purchaser shall not have any affiliation with or control over any arm's length counter-party in any "derivative" transaction.

Section 4.10      Cooperation of the Parties.

Each of the Company (subject to its exercise of the fiduciary duties owned to its shareholders) and the Purchaser agree that they will use their commercially reasonable efforts to close the transaction contemplated hereby by the Closing Date. The Company and the Purchaser further agree that they shall each provide reasonable cooperation to the other party for all necessary filings made by the Company and/or the Purchaser incident to the transactions contemplated hereby, whether before or after the Closing Date.

## ARTICLE V

## MISCELLANEOUS

Section 5.1       Termination. This Agreement may be terminated by either the Company or the Purchaser by written notice to the other party if the Closing has not been consummated on or before December 31, 2010 (the "Drop-Dead Date"); provided, however, that no such termination will affect the right of any party to sue for any breach by the other party. Subject to Section 4.11, the Company may terminate this Agreement prior to the Drop-Dead Date if (and only if) the Company receives a bonafide, written offer for a transaction at least as favorable to the Company, and on terms more favorable to the Company, as the transaction contemplated hereby (collectively, the "Company Termination Option"). In the event that the Company Termination Option has not be exercised by the Drop-Dead Date, the Company's right to exercise the Company Termination Option shall expire in its entirety, without regard to whether the Closing has (or has not) occurred by such date.

23

Powered by Morningstar Document Research℠

Section 5.2       Fees and Expenses. Each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement, provided, however, that, in the event that the Closing has not occurred on or before the Drop-Dead Date, unless such Closing has not occurred because of a breach by the Purchaser of its obligations under this Agreement, the Company shall reimburse the Purchaser for all of their reasonable out-of-pocket expenses (including reasonable legal fees) up to a maximum of $35,000.  The Company shall pay all Transfer Agent fees and stamp taxes levied in connection with the delivery of any Securities to the Purchasers.

Section 5.3       Entire Agreement. The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

Section 5.4       Notices. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the second (2nd) Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (d) upon actual receipt by the party to whom such notice is required to be given.  The address for such notices and communications shall be as set forth on the signature pages attached hereto.

Section 5.5       Amendments: Waivers. No provision of this Agreement may be waived, modified, supplemented or amended except in a written instrument signed, in the case of an amendment, by the Company and the Purchaser or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

Section 5.6       Headings. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

Section 5.7       Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Purchaser. The Purchaser may assign any or all of its rights under this Agreement to any Person to whom the Purchaser assigns or transfers any Securities.

Section 5.8       No Third-Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.6.

24

Powered by Morningstar  Document Research℠

Section 5.9    Governing Law. All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then, in addition to the obligations of the Company under Section 4.6, the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

Section 5.10    WAIVER OF JURY TRIAL . IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE PARTIES EACH KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.

Section 5.11    Survival. The representations and warranties contained herein shall survive the Closing and the delivery of the Securities.

Section 5.12    Execution. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

Section 5.13    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

25

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

Section 5.14     <u>Rescission and Withdrawal Right</u>. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) any of the other Transaction Documents, in the event that the Company or the Purchaser has materially breached any of its representations or warranties contained herein, then the Purchaser or the Company, as the case may be, may rescind or withdraw, in its sole discretion upon written notice to the other party, the transactions contemplated by this Agreement.

Section 5.15     <u>Replacement of Securities</u>. If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction. The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

Section 5.16     <u>Remedies</u>. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

Section 5.17     <u>Saturdays, Sundays, Holidays, etc</u>. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

Section 5.18     <u>Construction</u>. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments hereto. In addition, each and every reference to share prices and shares of Common Stock in any Transaction Document shall be subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

(Signature Pages Follow)

26

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                    Powered by Morningstar  Document Research℠

       IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**MGT CAPITAL INVESTMENTS, INC.**

By:        /s/ Tim Paterson-Brown
Name: Tim Paterson-Brown
Title:CEO


By:        Allan J. Rowley
Name: Allan J. Rowley
Title: CFO


**LADDCAP VALUE PARTNERS, LP**

By:        /s/ Robert Ladd
Name: Robert Ladd
Title: Managing Member of General Partner

27

Powered by Morningstar® Document Research℠

Exhibit A

Form of Opinion

28

Source: MGT CAPITAL INVESTMENTS INC. 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

Exhibit B

Form of Registration Rights Agreement

29

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

Exhibit 10.2

REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "Agreement") is made and entered into as of is dated as of [Closing Date], between MGT Capital Investments, Inc., a Delaware corporation (the "Company"), and Laddcap Value Partners, LP, a Delaware limited partnership (or an affiliate thereof) (the "Purchaser").

This Agreement is made in connection with the Amended and Restated Securities Purchase Agreement, dated as of December 9, 2010, by and between the Company and the Purchaser (the "Purchase Agreement").

The Company and Purchasers hereby agree as follows:

1.    Definitions. Capitalized terms used and not otherwise defined herein that are defined in the Purchase Agreement will have the respective meanings given such terms in the Purchase Agreement. As used in this Agreement, the following terms have the respective meanings set forth in this Section 1:

"Advice" has the meaning set forth in Section 6(d).

"Commission Comments" means written comments pertaining solely to Rule 415 which are received by the Company from the Commission to a filed Registration Statement, a copy of which shall have been provided by the Company to the Holders, which either (i) requires the Company to limit the number of Registrable Securities which may be included therein to a number which is less than the number sought to be included thereon as filed with the Commission or (ii) requires the Company to either exclude Registrable Securities held by specified Holders or deem such Holders to be underwriters with respect to Registrable Securities they seek to include in such Registration Statement.

"Cut Back Shares" has the meaning set forth in Section 2(e).

"Demand Date" means the date on which the Purchaser provides notice to the Company of its request that the Company file the Registration Statement.

"Effective Date" means, as to a Registration Statement, the date on which such Registration Statement is first declared effective by the Commission.

"Effectiveness Date" means the earlier of: (i) the 120th day following the Demand Date; and (ii) the fifth Trading Day following the date on which the Company is notified by the Commission that the Registration Statement will not be reviewed or is no longer subject to further review and comments.

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar  Document Research℠

"Effectiveness Period" means the period commencing on the Effective Date of the Registration Statement and ending on the earliest to occur of (a) the second anniversary of such Effective Date, (b) such time as all of the Registrable Securities covered by such Registration Statement have been publicly sold by the Holders of the Registrable Securities included therein, or (c) such time as all of the Registrable Securities covered by such Registration Statement may be sold by the Holders without volume restrictions pursuant to Rule 144, in each case as determined by the counsel to the Company pursuant to a written opinion letter to such effect, addressed and acceptable to the Company's transfer agent and the affected Holders.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Filing Date" means the date that is sixty (60) days from the Demand Date.

"Holder" or "Holders" means the holder or holders, as the case may be, from time to time of Registrable Securities.

"Indemnified Party" has the meaning set forth in Section 5(c).

"Indemnifying Party" has the meaning set forth in Section 5(c).

"Losses" has the meaning set forth in Section 5(a).

"New York Courts" means the state and federal courts sitting in the City of New York, Borough of Manhattan.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Prospectus" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"Registrable Securities" means the Shares and any securities issued or issuable upon any stock split, dividend or other distribution, recapitalization or similar event, or any price adjustment as a result of such stock splits, reverse stock splits or similar events with respect to the Shares.

"Registration Statement" means the registration statement required to be filed in accordance with Section 2 and any additional registration statements required to be filed under this Agreement, including in each case the Prospectus, amendments and supplements to such registration statements or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference therein.

"Restriction Termination Date" has the meaning set forth in Section 2(b).

2

Powered by Morningstar® Document Research℠

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 415" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 424" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"SEC Restrictions" has the meaning set forth in Section 2(b).

"Securities Act" means the Securities Act of 1933, as amended.

"Shares" means the shares of Common Stock, par value $0.001 per share, issued to the Purchasers pursuant to the Purchase Agreement.

2.     Registration.

(a)     On or after the earlier of (i) the later of (A) the date on which the Company files its Annual Report on Form 10-K with respect to its 2010 fiscal year, (B) the date on which the registration statement for the Medicsight PLC shares of common stock owned by the Company is declared effective by the SEC, and (C) the date on which all of the assets of MGT (UK) have been disposed of, and (ii) June 30, 2011, the Purchaser shall have the right to request that the Company file the Registration Statement and, upon receipt such request, the Company shall prepare and file the Registration Statement on the terms and conditions set forth in this Agreement. On or prior to the Filing Date, the Company shall prepare and file with the Commission a Registration Statement on Form S-3 covering the resale of the Shares if the Company is then eligible to utilize such Form (or on such other form appropriate for such purpose) and shall cause such Registration Statement to be filed by the Filing Date for such Registration Statement and use commercially reasonable efforts to have the Registration Statement declared effective under the Securities Act as soon as possible thereafter, but in any event prior to the Effectiveness Date therefor. Such Registration Statement shall contain (except if otherwise required pursuant to written comments received from the Commission upon a review of such Registration Statement, other than as to the characterization of any Holder as an underwriter, which shall not occur without such Holder's consent) the "Plan of Distribution" attached hereto as Annex A. The Company shall use its commercially reasonable efforts to keep such Registration Statement continuously effective under the Securities Act during the entire Effectiveness Period which is applicable to it. By 5:00 p.m. (New York City time) on the Business Day immediately following the Effective Date of such Registration Statement, the Company shall file with the Commission in accordance with Rule 424 under the Securities Act the final prospectus to be used in connection with sales pursuant to such Registration Statement (whether or not such filing is technically required under such Rule). The Company hereby represents and warrants to the Purchasers that as of the date hereof the Company is eligible to use Form S-3 for the registration of the Registrable Securities.

3

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

(b)       If for any reason other than due solely to SEC Restrictions, a Registration Statement is effective but not all outstanding Registrable Securities are registered for resale pursuant thereto, then the Company shall prepare and file by the applicable Filing Date an additional Registration Statement to register the resale of all such unregistered Registrable Securities for an offering to be made on a continuous basis pursuant to Rule 415. Notwithstanding anything to the contrary contained in this Section 2, if the Company receives Commission Comments, and following discussions with and responses to the Commission in which the Company uses its commercially reasonable efforts and time to cause as many Registrable Securities for as many Holders as possible to be included in the Registration Statement filed pursuant to Sections 2(a), without characterizing any Holder as an underwriter (and in such regard uses its commercially reasonable efforts to cause the Commission to permit the affected Holders or their respective counsel to participate in Commission conversations on such issue together with Company Counsel, and timely conveys relevant information concerning such issue with the affected Holders or their respective counsel), the Company is unable to cause the inclusion of all Registrable Securities, then the Company may, following not less than three (3) Trading Days prior written notice to the Holders (i) remove from the Registration Statement such Registrable Securities (the "Cut Back Shares") and/or (ii) agree to such restrictions and limitations on the registration and resale of the Registrable Securities, in each case as the Commission may require in order for the Commission to allow such Registration Statement to become effective; provided, that in no event may the Company name any Holder as an underwriter without such Holder's prior written consent (collectively, the "SEC Restrictions"). Unless the SEC Restrictions otherwise require, any cut-back imposed pursuant to this Section 2(b) shall be allocated among the Registrable Securities of the Holders on a pro rata basis. No liquidated damages under Section 2(c) shall accrue on or as to any Cut Back Shares, and the required Effectiveness Date for such Registration Statement will be tolled, until such time as the Company is able to effect the registration of the Cut Back Shares in accordance with any SEC Restrictions (such date, the "Restriction Termination Date"). From and after the Restriction Termination Date, all provisions of this Section 2 (including, without limitation, the liquidated damages provisions, subject to tolling as provided above) shall again be applicable to the Cut Back Shares (which, for avoidance of doubt, retain their character as "Registrable Securities") so that the Company will be required to file with and cause to be declared effective by the Commission such additional Registration Statements in the time frames set forth herein as necessary to ultimately cause to be covered by effective Registration Statements all Registrable Securities (if such Registrable Securities cannot at such time be resold by the Holders thereof without volume limitations pursuant to Rule 144).

(c)       If: (i) a Registration Statement is not filed on or prior to its Filing Date covering the Registrable Securities required under this Agreement to be included therein (if the Company files a Registration Statement without affording the Holders the opportunity to review and comment on the same as required by Section 3(a) hereof, the Company shall not be deemed to have satisfied this clause (i)), (ii) a Registration Statement is not declared effective by the Commission on or prior to its required Effectiveness Date or if by the Business Day immediately following the Effective Date, the Company shall not have filed a "final" prospectus for the Registration Statement with the Commission under Rule 424(b) in accordance with the terms hereof (whether or not such a prospectus is technically required by such Rule), or (iii) after its Effective Date, without regard for the reason thereunder or efforts therefor, such Registration Statement ceases for any reason to be effective and available to the Holders as to all Registrable Securities to which it is required to cover at any time prior to the expiration of its Effectiveness Period for more than an aggregate of 20 Trading Days (which need not be consecutive) (any such failure or breach being referred to as an "Event," and for purposes of clauses (i) or (ii) the date on which such Event occurs, or for purposes of clause (iii) the date which such 20 Trading Day-period is exceeded, being referred to as "Event Date"), then the Holders are entitled to exercise such rights they may have hereunder or under applicable law.

4

Source: MGT CAPITAL INVESTMENTS INC 3-K, December 14, 2010                                      Powered by Morningstar® Document Research℠

(d)        Each Holder agrees to furnish to the Company a completed Questionnaire in the form attached to this Agreement as Annex B (a "Selling Holder Questionnaire"). The Company shall not be required to include the Registrable Securities of a Holder in a Registration Statement and shall not be required to pay any liquidated or other damages under Section 2(c) to any Holder who fails to furnish to the Company a fully completed Selling Holder Questionnaire at least two Trading Days prior to the Filing Date (subject to the requirements set forth in Section 3(a)). In addition to the foregoing, each Holder shall provide such other information to the Company as the Company may from time-to-time reasonably request.

3.        Registration Procedures.

In connection with the Company's registration obligations hereunder, the Company shall:

(a)        Not less than four Trading Days prior to the filing of a Registration Statement or any related Prospectus or any amendment or supplement thereto, the Company shall furnish to each Holder copies of the "Selling Stockholders" section of such document, the "Plan of Distribution" and any risk factor contained in such document that addresses specifically this transaction or the Selling Stockholders, as proposed to be filed, which documents will be subject to the review of such Holder. The Company shall not file a Registration Statement, any Prospectus or any amendments or supplements thereto in which the "Selling Stockholder" section thereof differs from the disclosure received from a Holder in its Selling Holder Questionnaire (as amended or supplemented). The Company shall not file a Registration Statement, any Prospectus or any amendments or supplements thereto in which it (i) characterizes any Holder as an underwriter, (ii) excludes a particular Holder due to such Holder refusing to be named as an underwriter, or (iii) reduces the number of Registrable Securities being registered on behalf of a Holder except pursuant to, in the case of subsection (iii), the Commission Comments, without, in each case, such Holder's express written authorization.

(b)        (i)        Prepare and file with the Commission such amendments, including post-effective amendments, to each Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement continuously effective as to the applicable Registrable Securities for its Effectiveness Period and prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities; (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus supplement, and as so supplemented or amended to be filed pursuant to Rule 424; (iii) respond as promptly as reasonably possible to any comments received from the Commission with respect to each Registration Statement or any amendment thereto and, as promptly as reasonably possible provide the Holders true and complete copies of all correspondence from and to the Commission relating to such Registration Statement that would not result in the disclosure to the Holders of material and non-public information concerning the Company; and (iv) comply in all material respects with the provisions of the Securities Act and the Exchange Act with respect to the Registration Statement(s) and the disposition of all Registrable Securities covered by each Registration Statement.

5

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                    Powered by Morningstar® Document Research℠

(c)        Notify the Holders as promptly as reasonably possible (and, in the case of (i)(A) below, not less than three Trading Days prior to such filing and, in the case of (v) below, not less than three Trading Days prior to the financial statements in any Registration Statement becoming ineligible for inclusion therein) and (if requested by any such Person) confirm such notice in writing no later than one Trading Day following the day (i)(A) when a Prospectus or any Prospectus supplement or post-effective amendment to a Registration Statement is proposed to be filed; (B) when the Commission notifies the Company whether there will be a "review" of such Registration Statement and whenever the Commission comments in writing on such Registration Statement (the Company shall provide true and complete copies thereof and all written responses thereto to each of the Holders that pertain to the Holders as a Selling Stockholder or to the Plan of Distribution, but not information which the Company believes would constitute material and non-public information); and (C) with respect to each Registration Statement or any post-effective amendment, when the same has become effective; (ii) of any request by the Commission or any other Federal or state governmental authority for amendments or supplements to a Registration Statement or Prospectus or for additional information; (iii) of the issuance by the Commission of any stop order suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; and (v) of the occurrence of any event or passage of time that makes the financial statements included in a Registration Statement ineligible for inclusion therein or any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to such Registration Statement, Prospectus or other documents so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(d)        Use its commercially reasonable efforts to avoid the issuance of, or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment.

(e)        Furnish to each Holder, without charge, at least one copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such Person (including those previously furnished) promptly after the filing of such documents with the Commission.

6

Source: MGT CAPITAL INVESTMENTS INC 8-K, December 14, 2010

(f)     Promptly deliver to each Holder, without charge, as many copies of each Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Persons may reasonably request. The Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(g)     Prior to any public offering of Registrable Securities, register or qualify such Registrable Securities for offer and sale under the securities or Blue Sky laws of all jurisdictions within the United States as any Holder may request, to keep each such registration or qualification (or exemption therefrom) effective during the Effectiveness Period and to do any and all other acts or things necessary or advisable to enable the disposition in such jurisdictions of the Registrable Securities covered by the Registration Statement(s).

(h)     Cooperate with the Holders to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to the Registration Statement(s), which certificates shall be free, to the extent permitted by the Purchase Agreement, of all restrictive legends, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holders may request.

(i)     Upon the occurrence of any event contemplated by Section 3(c)(v), as promptly as reasonably possible, prepare a supplement or amendment, including a post-effective amendment, to the affected Registration Statements or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

4.      Registration Expenses.

All fees and expenses incident to the performance of or compliance with this Agreement by the Company shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market on which the Common Stock is then listed for trading, and (B) in compliance with applicable state securities or Blue Sky laws), (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) Securities Act liability insurance, if the Company so desires such insurance, and (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company shall be responsible for all of its internal expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange as required hereunder.

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                    Powered by Morningstar® Document Research℠

5.    Indemnification.

(a)    Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Holder, the officers, directors, agents, investment advisors, partners, members and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (1) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Holder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto (it being understood that the Holder has approved Annex A hereto for this purpose) or (2) in the case of an occurrence of an event of the type specified in Section 3(c)(ii)-(v), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of an Advice or an amended or supplemented Prospectus, but only if and to the extent that following the receipt of the Advice or the amended or supplemented Prospectus the misstatement or omission giving rise to such Loss would have been corrected. The Company shall notify the Holders promptly of the institution, threat or assertion of any Proceeding of which the Company is aware in connection with the transactions contemplated by this Agreement.

8

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010                    Powered by Morningstar® Document Research℠

(b)      Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising solely out of or based solely upon: (x) such Holder's failure to comply with the prospectus delivery requirements of the Securities Act or (y) any untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto, or arising solely out of or based solely upon any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading to the extent, but only to the extent that, (1) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Holder expressly for use in the Registration Statement (it being understood that the Holder has approved Annex A hereto for this purpose), such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (2) in the case of an occurrence of an event of the type specified in Section 3(c)(ii)-(v), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of an Advice or an amended or supplemented Prospectus, but only if and to the extent that following the receipt of the Advice or the amended or supplemented Prospectus the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)      Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "Indemnified Party"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "Indemnifying Party") in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have proximately and materially adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010          Powered by Morningstar® Document Research℠

All fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten Trading Days of written notice thereof to the Indemnifying Party (regardless of whether it is ultimately determined that an Indemnified Party is not entitled to indemnification hereunder; provided, that the Indemnifying Party may require such Indemnified Party to undertake to reimburse all such fees and expenses to the extent it is finally judicially determined that such Indemnified Party is not entitled to indemnification hereunder).

(d)        Contribution. If a claim for indemnification under Section 5(a) or 5(b) is unavailable to an Indemnified Party (by reason of public policy or otherwise), then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in Section 5(c), any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section was available to such party in accordance with its terms.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 5(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.

The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

6.        Miscellaneous.

(a)        Remedies. In the event of a breach by the Company or by a Holder, of any of their obligations under this Agreement, each Holder or the Company, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company and each Holder agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

10

Source: MGT CAPITAL INVESTMENTS INC 8-K, December 14, 2010                                   Powered by Morningstar® Document Research℠

(b)    No Piggyback on Registrations. Neither the Company nor any of its security holders (other than the Holders in such capacity pursuant hereto) may include securities of the Company in a Registration Statement other than the Registrable Securities, and the Company shall not during the Effectiveness Period enter into any agreement providing any such right to any of its security holders.

(c)    Compliance. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Registrable Securities pursuant to the Registration Statement.

(d)    Discontinued Disposition. Each Holder agrees by its acquisition of such Registrable Securities that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in Section 3(c), such Holder will forthwith discontinue disposition of such Registrable Securities under the Registration Statement until such Holder's receipt of the copies of the supplemented Prospectus and/or amended Registration Statement or until it is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(e)    Piggy-Back Registrations. If at any time during the Effectiveness Period there is not an effective Registration Statement covering all of the Registrable Securities and the Company shall determine to prepare and file with the Commission a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-4 or Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with stock option or other employee benefit plans, then the Company shall send to each Holder written notice of such determination and, if within fifteen calendar days after receipt of such notice, any such Holder shall so request in writing, the Company shall include in such registration statement all or any part of such Registrable Securities such holder requests to be registered, subject to customary underwriter cutbacks applicable to all holders of registration rights.

(f)    Amendments and Waivers. The provisions of this Agreement, including the provisions of this Section 6(f), may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and the Holders holding at least 67% in interest of the then outstanding Registrable Securities. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of at least a majority of the Registrable Securities to which such waiver or consent relates; provided, further that no amendment or waiver to any provision of this Agreement relating to naming any Holder or requiring the naming of any Holder as an underwriter may be effected in any manner without such Holder's prior written consent.

11

Powered by Morningstar  Document Research℠

Section 2(a) may not be amended or waived except by written consent of each Holder affected by such amendment or waiver.

(g) <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the second (2nd) trading day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or upon actual receipt by the party to whom such notice is required to be given.

(h) <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of each Holder. The Company may not assign its rights or obligations hereunder without the prior written consent of each Holder. Each Holder may assign their respective rights hereunder in the manner and to the Persons as permitted under the Purchase Agreement.

(i) <u>Execution and Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and, all of which taken together shall constitute one and the same Agreement. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were the original thereof.

(j) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all Proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement (whether brought against a party hereto or its respective Affiliates, employees or agents) will be commenced in the New York Courts. Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any Proceeding, any claim that it is not personally subject to the jurisdiction of any New York Court, or that such Proceeding has been commenced in an improper or inconvenient forum. Each party hereto hereby irrevocably waives personal service of process and consents to process being served in any such Proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. If either party shall commence a Proceeding to enforce any provisions of this Agreement, then the prevailing party in such Proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred with the investigation, preparation and prosecution of such Proceeding.

12

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

(k)    <u>Cumulative Remedies</u>. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(l)    <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(m)    <u>Headings</u>. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(n)    <u>Independent Nature of Investors' Obligations and Rights</u>. The obligations of each Investor under this Agreement are several and not joint with the obligations of each other Investor, and no Investor shall be responsible in any way for the performance of the obligations of any other Investor under this Agreement. Nothing contained herein or in any Transaction Document, and no action taken by any Investor pursuant thereto, shall be deemed to constitute the Investors as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Investors are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement or any other Transaction Document. Each Investor acknowledges that no other Investor will be acting as agent of such Investor in enforcing its rights under this Agreement. Each Investor shall be entitled to independently protect and enforce its rights, including without limitation the rights arising out of this Agreement, and it shall not be necessary for any other Investor to be joined as an additional party in any Proceeding for such purpose. The Company acknowledges that each of the Investors has been provided with the same Registration Rights Agreement for the purpose of closing a transaction with multiple Investors and not because it was required or requested to do so by any Investor.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK SIGNATURE PAGES
TO FOLLOW]

13

Powered by Morningstar® Document Research℠

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**MGT CAPITAL INVESTMENTS, INC.**

By: _____
Name:
Title:

**LADDCAP VALUE PARTNERS, LP**

By: _____
Name:
Title:

14

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

Plan of Distribution

The Selling Stockholders and any of their pledgees, donees, transferees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on any stock exchange, market or trading facility on which the shares are traded or quoted or in private transactions. These sales may be at fixed or negotiated prices. The Selling Stockholders may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits Investors;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- to cover short sales made after the date that this Registration Statement is declared effective by the Commission;

- broker-dealers may agree with the Selling Stockholders to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale; and

- other method permitted pursuant to applicable law.

The Selling Stockholders may also sell shares under Rule 144 under the Securities Act, if available, rather than under this prospectus.

Broker-dealers engaged by the Selling Stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Stockholders (or, if any broker-dealer acts as agent for the Purchasers of shares, from the Purchasers) in amounts to be negotiated. The Selling Stockholders do not expect these commissions and discounts to exceed what is customary in the types of transactions involved.

The Selling Stockholders may from time to time pledge or grant a security interest in some or all of the Shares owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell shares of Common Stock from time to time under this prospectus, or under an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933 amending the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus.

15

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

Upon the Company being notified in writing by a Selling Stockholder that any material arrangement has been entered into with a broker-dealer for the sale of Common Stock through a block trade, special offering, exchange distribution or secondary distribution or a purchase by a broker or dealer, a supplement to this prospectus will be filed, if required, pursuant to Rule 424(b) under the Securities Act, disclosing (i) the name of each such Selling Stockholder and of the participating broker-dealer(s), (ii) the number of shares involved, (iii) the price at which such the shares of Common Stock were sold, (iv)the commissions paid or discounts or concessions allowed to such broker-dealer(s), where applicable, (v) that such broker-dealer(s) did not conduct any investigation to verify the information set out or incorporated by reference in this prospectus, and (vi) other facts material to the transaction. In addition, upon the Company being notified in writing by a Selling Stockholder that a donee or pledgee intends to sell more than 500 shares of Common Stock, a supplement to this prospectus will be filed if then required in accordance with applicable securities law.

The Selling Stockholders also may transfer the shares of Common Stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The Selling Stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Discounts, concessions, commissions and similar selling expenses, if any, that can be attributed to the sale of Securities will be paid by the Selling Stockholder and/or the Purchasers. Each Selling Stockholder has represented and warranted to the Company that it acquired the securities subject to this Registration Statement in the ordinary course of such Selling Stockholder's business and, at the time of its purchase of such securities such Selling Stockholder had no agreements or understandings, directly or indirectly, with any person to distribute any such securities.

The Company has advised each Selling Stockholder that it may not use shares registered on this Registration Statement to cover short sales of Common Stock made prior to the date on which this Registration Statement shall have been declared effective by the Commission. If a Selling Stockholder uses this prospectus for any sale of the Common Stock, it will be subject to the prospectus delivery requirements of the Securities Act. The Selling Stockholders will be responsible to comply with the applicable provisions of the Securities Act and Exchange Act, and the rules and regulations thereunder promulgated, including, without limitation, Regulation M, as applicable to such Selling Stockholders in connection with resales of their respective shares under this Registration Statement.

The Company is required to pay all fees and expenses incident to the registration of the shares, but the Company will not receive any proceeds from the sale of the Common Stock. The Company has agreed to indemnify the Selling Stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

16

Powered by Morningstar® Document Research℠

Annex B

## MGT CAPITAL INVESTMENTS, INC.

### Selling Securityholder Notice and Questionnaire

The undersigned beneficial owner of common stock (the "Common Stock"), of MGT Capital Corporation, Inc., a Delaware corporation (the "Company"), understands that the Company has filed or intends to file with the Securities and Exchange Commission (the "Commission") a Registration Statement for the registration and resale of the Registrable Securities, in accordance with the terms of the Registration Rights Agreement, dated as of [                          ] (the "Registration Rights Agreement"), among the Company and the Purchasers named therein. A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Registration Rights Agreement.

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate:

### QUESTIONNAIRE

**1. Name.**

    (a)    Full Legal Name of Selling Securityholder

    (b)    Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Securities Listed in Item 3 below are held:

    (c)    Full Legal Name of Natural Control Person (which means a natural person who directly or indirectly alone or with others has power to vote or dispose of the securities covered by the questionnaire):

**2. Address for Notices to Selling Securityholder:**

Telephone:
Fax:
Contact
Person:

17

Powered by Morningstar® Document Research℠

**3. Beneficial Ownership of Registrable Securities:**

Type and Principal Amount of Registrable Securities beneficially owned:

_____

_____

_____

_____

**4. Broker-Dealer Status:**

(a)    Are you a broker-dealer?

Yes ☐ No ☐

Note:  If yes, the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

(b)    Are you an affiliate of a broker-dealer?

Yes ☐ No ☐

(c)    If you are an affiliate of a broker-dealer, do you certify that you bought the Registrable Securities in the ordinary course of business, and at the time of the purchase of the Registrable Securities to be resold, you had no agreements or understandings, directly or indirectly, with any person to distribute the Registrable Securities?

Yes ☐ No ☐

Note:  If no, the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

**5. Beneficial Ownership of Other Securities of the Company Owned by the Selling Securityholder.**

*Except as set forth below in this Item 5, the undersigned is not the beneficial or registered owner of any securities of the Company other than the Registrable Securities listed above in Item 3.*

Type and Amount of Other Securities beneficially owned by the Selling Securityholder:

_____

**6. Relationships with the Company:**

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (owners of 5% of more of the equity securities of the undersigned) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

18

Powered by Morningstar® Document Research℠

State any exceptions here:

**7.** The Company has advised each Selling Stockholder that it may not use shares registered on the Registration Statement to cover short sales of Common Stock made prior to the date on which the Registration Statement is declared effective by the Commission, in accordance with 1997 Securities and Exchange Commission Manual of Publicly Available Telephone Interpretations Section A.65. If a Selling Stockholder uses the prospectus for any sale of the Common Stock, it will be subject to the prospectus delivery requirements of the Securities Act. The Selling Stockholders will be responsible to comply with the applicable provisions of the Securities Act and Exchange Act, and the rules and regulations thereunder promulgated, including, without limitation, Regulation M, as applicable to such Selling Stockholders in connection with resales of their respective shares under the Registration Statement.

The undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof and prior to the Effective Date for the Registration Statement.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items 1 through 6 and the inclusion of such information in the Registration Statement and the related prospectus. The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Registration Statement and the related prospectus.

IN WITNESS WHEREOF the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated: _____     Beneficial Owner: _____

                                      By: _____
                                      Name:
                                      Title:

19

Source: MGT CAPITAL INVESTMENTS INC, 8-K, December 14, 2010

Powered by Morningstar® Document Research℠

**PLEASE FAX A COPY OF THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE, AND RETURN THE ORIGINAL BY OVERNIGHT MAIL, TO:**

[   ]

20

Exhibit 99.1

**Press Release** Source: MGT Capital Investments, Inc. On December 14, 2010

### MGT announces Laddcap investment and board changes

NEW YORK, December 14, 2010 -- MGT Capital Investments, Inc., ("MGT"), announced today that it has entered into an Amended and Restated Securities Purchase Agreement with Laddcap Value Partners LP ("Laddcap"). This Agreement amends and restates in its entirety the original Securities Purchase Agreement dated November 16, 2010, which the Company had entered into with an affiliate of Laddcap.  The parties agreed to these amendments after discussions with the staff of the American Stock Exchange in connection with the submission of MGT's Additional Share Listing Application for AMEX approval.  Pursuant to the amended Agreements, Laddcap is purchasing 6,500,000 shares of the Company's common stock for $1,000,000; Laddcap is not purchasing any warrants.  Further, Robert Ladd will be appointed to the Company's board to fill a vacancy following the resignation of Tim Paterson Brown.

At a board meeting held on December 13, 2010, Peter Venton was appointed Chairman of the Board, Allan Rowley (formerly the Company's Chief Financial Officer) was appointed to Chief Executive Officer, and Troy Robinson was appointed to Chief Financial Officer.

Robert Ladd commented: "I am pleased to conclude the transaction stage of this investment, and look forward to helping grow shareholder value for MGT and Medicsight stockholders"

*All forward-looking statements are made pursuant to the 'safe harbor' provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are based on current management expectations that involve risks and uncertainties that may result in such expectations not being realized. Potential risks and uncertainties include, but are not limited to, the risks described in company filings with the Securities and Exchange Commission.*

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 13D/A**

Under the Securities Exchange Act of 1934
(Amendment No. 2)*

**MGT Capital Investments Inc.**
_(Name of Issuer)_

Common Stock, $0.001 par value per share
_(Title of Class of Securities)_

55302P103
_(CUSIP Number)_

December 9, 2010
_(Date of Event Which Requires Filing of this Statement)_

Mr. Robert Ladd
Laddcap Value Advisors LLC

335 Madison Avenue Suite 1100
New York, New York 10017
Telephone: (212) 652-3214

with a copy to:

Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
Attn: Edward S. Horton

_(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)_

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box.

*   The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

SCHEDULE 13D

CUSIP No. 55302P103

Page  of 2 of 13

| 1 | NAME OF REPORTING PERSONS<br>Laddcap Value Partners LP<br>S.S. or I.R.S. IDENTIFICATION NO. OF ABOVE PERSONS<br>(Intentionally Omitted) | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*<br>(a)<br>(b) | | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS<br>WC | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>United States | | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER<br>7,984,012 |
| | 8 | SHARED VOTING POWER<br>0 |
| | 9 | SOLE DISPOSITIVE POWER<br>7,984,012 |
| | 10 | SHARED DISPOSITIVE POWER<br>0 |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>7,984,012 | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES* | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>20.44% | | |
| 14 | TYPE OF REPORTING PERSON<br>PN | | |

SCHEDULE 13D

| CUSIP No. 55302P103 | Page of 3 of 13 |
|---|---|

| | |
|---|---|
| 1 | NAME OF REPORTING PERSONS<br>Laddcap Value Associates LLC<br>S.S. or I.R.S. IDENTIFICATION NO. OF ABOVE PERSONS<br>(Intentionally Omitted) |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*<br>(a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY |
| 4 | SOURCE OF FUNDS<br>OO |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>United States |

|  | | | |
|---|---|---|---|
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH | 7 | SOLE VOTING POWER<br>0 |
| | 8 | SHARED VOTING POWER<br>7,984,012 |
| | 9 | SOLE DISPOSITIVE POWER<br>0 |
| | 10 | SHARED DISPOSITIVE POWER<br>7,984,012 |

| | |
|---|---|
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>7,984,012 |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES* ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>20.44% |
| 14 | TYPE OF REPORTING PERSON<br>OO |

SCHEDULE 13D

CUSIP No. 55302P103

Page of 4 of 13

| 1 | NAME OF REPORTING PERSONS<br>Laddcap Value Advisors LLC<br>S.S. or I.R.S. IDENTIFICATION NO. OF ABOVE PERSONS<br>(Intentionally Omitted) |
|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*<br>(a)<br>(b) |
| 3 | SEC USE ONLY |
| 4 | SOURCE OF FUNDS<br>OO |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>United States |

| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH | 7 | SOLE VOTING POWER<br>0 |
|---|---|---|
| | 8 | SHARED VOTING POWER<br>7,984,012 |
| | 9 | SOLE DISPOSITIVE POWER<br>0 |
| | 10 | SHARED DISPOSITIVE POWER<br>7,984,012 |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>7,984,012 |
|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES* |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>20.44% |
| 14 | TYPE OF REPORTING PERSON<br>OO |

SCHEDULE 13D

CUSIP No. 55302P103

Page of 5 of 13

| 1 | NAME OF REPORTING PERSONS<br>Robert Ladd<br>S.S. or I.R.S. IDENTIFICATION NO. OF ABOVE PERSONS<br>(Intentionally Omitted) |
|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*<br>(a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY |
| 4 | SOURCE OF FUNDS<br>PF |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>United States |

| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH | 7 | SOLE VOTING POWER<br>500,000 |
|---|---|---|
| | 8 | SHARED VOTING POWER<br>7,984,012 |
| | 9 | SOLE DISPOSITIVE POWER<br>500,000 |
| | 10 | SHARED DISPOSITIVE POWER<br>7,984,012 |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>8,484,012 |
|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES* ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>21.7% |
| 14 | TYPE OF REPORTING PERSON<br>IN |

**Explanatory Note**

The purpose of this Amendment No. 2 to the Schedule 13D is to report the execution of an amended and restated securities purchase agreement dated December 9, 2010 (the "Amended and Restated Securities Purchase Agreement") by Laddcap Value Partners LP, as described more fully in Item 6 of this Amendment No. 2. The Amended and Restated Securities Purchase Agreement amends and restates a prior securities purchase agreement dated November 16, 2010 by and between the Issuer and an entity affiliated with the Reporting Persons that was subject to certain regulatory approvals.

**Item 1. Security and Issuer**

This Amendment No. 2 to Schedule 13D relates to the shares of common stock, par value $0.001 per share (the "Common Shares") of MGT Capital Investments Inc., a Delaware corporation (the "Issuer"). The principal executive office and mailing address of the Issuer is Kensington Centre, 66 Hammersmith Road, London W14 8UD United Kingdom.

**Item 2. Identity and Background**

    (a)    Name of Person Filing:

This statement is being filed by (i) Laddcap Value Partners LP ("Laddcap") with respect to Common Shares beneficially owned by it; (ii) Laddcap Value Advisors LLC ("LVA") with respect to Common Shares beneficially owned by Laddcap; (iii) Laddcap Value Associates LLC ("LV") with respect to Common Shares beneficially owned by Laddcap and (iv) Robert Ladd ("Mr. Ladd") with respect to Common Shares beneficially owned by Laddcap, LVA, LV, and himself. LVA and LV disclaim beneficial ownership of the securities covered by this statement. Mr. Ladd disclaims beneficial ownership of the securities covered by this statement (other than with respect to 500,000 Common Shares owned directly by him).

    (b)    Address of Principal Business Office or, if none, Residence:

The principal business address of each of Laddcap, LVA, LV, and Mr. Ladd is: c/o Laddcap Value Advisors LLC, 335 Madison Avenue Suite 1100, New York, NY 10017.

    (c)    Principal Occupation, Employment or Business:

Mr. Ladd serves as the managing member of LVA, which is the investment advisor of Laddcap. Mr. Ladd also serves as the managing member of LV which is the general partner of Laddcap. Laddcap is principally engaged in making investments.

    (d)    Convictions or Civil Proceedings:

During the past five years, none of the Reporting Persons and, to the knowledge of the Reporting Persons, none of the executive officers, directors, general partner or managing member of the Reporting Persons, if applicable, has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors), or has been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

    (e)    Citizenship:

Each of LVA and LV is is a Delaware limited liability company. Laddcap is a Delaware limited partnership. Mr. Ladd is a citizen of the United States.

Item 3. **Source and Amount of Funds or Other Consideration.**

All of the funds used in making the purchases of the Common Shares described in Item 5 of this Schedule 13D/A that may be deemed to be beneficially owned by Laddcap, LVA and LV came from the working capital of Laddcap. All of the funds used in making the purchases of the Common Shares described in Item 5 of this Schedule 13D/A that may be deemed to be beneficially owned directly by Mr. Ladd came from his personal funds.

Item 4. **Purpose of the Transaction.**

Laddcap entered into the Amended and Restated Securities Purchase Agreement with the Issuer dated December 9, 2010, which is described in more detail in Item 6 below. In connection with the Amended and Restated Securities Purchase Agreement and effective upon its closing, Mr. Ladd was also appointed as a member of the Issuer's board of directors.

The Reporting Persons have acquired the Common Shares for investment purposes. The Reporting Persons have no plans or proposals as of the date of this filing which, other than as expressly set forth herein, would relate to or would result in items described in paragraphs (a) through (j) of Item 4 of Schedule 13D.

The Reporting Persons reserve the right to acquire or dispose of the Common Shares, or to formulate other purposes, plans or proposals regarding the Issuer or the Common Shares held by the Reporting Persons to the extent deemed advisable in light of general investment policies, market conditions and other factors.

Item 5. **Interest in Securities of the Issuer**

The percentages used herein are calculated based upon a total issued and outstanding number of Common Shares of 39,050,590, reflecting 32,550,590 Common Shares issued and outstanding as of November 19, 2010, as reported on the Issuer's quarterly report on Form 10-Q for the period ended September 30, 2010, as filed on November 22, 2010 with United States Securities and Exchange Commission (the "SEC"), together with 6,500,000 Common Shares that were issued in connection with the Amended and Restated Securities Purchase Agreement.

(a)     Pursuant to Rule 13d-3 ("Rule 13d-3") of the Exchange Act of 1934, as amended, Mr. Ladd is the beneficial owner of 8,484,012 Common Shares as of the date hereof (representing approximately 21.72% of the outstanding Common Shares), that includes 7,984,012 Common Shares owned of record by Laddcap and 500,000 Common Shares owned of record of Mr. Ladd. Mr. Ladd disclaims beneficial ownership of the securities covered by this statement (other than the 500,000 owned by him directly).

Pursuant to Rule 13d-3, each of Laddcap, LVA and LV is the beneficial owner of the 7,984,012 Common Shares as of the date hereof (representing approximately 20.44% of the outstanding Common Shares) that are owned of record by Laddcap.

(b)     Each of LVA, LV and Mr. Ladd share the power to vote and direct the disposition of all Common Shares held by Laddcap by virtue of their roles as investment advisor of Laddcap, general partner of Laddcap and managing member of the general partner of Laddcap, respectively.

Laddcap has the sole power to vote and direct the disposition of all Common Shares held by it. Mr. Ladd has the sole power to vote and direct the disposition of the 500,000 Common Shares held by him.

(c)     Except for the Amended and Restated Securities Purchase Agreement described in Item 6, no transactions in the Common Shares were effected by the Reporting Persons during the past 60 days.

(d)     Each of the Reporting Persons affirms that no person other than the Reporting Persons has the rights to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, the Common Shares owned by such Reporting Person.

(e)     Not applicable.

Item 6.     Contracts, arrangements understandings and relationships with respect to securities of the Issuer

On December 9, 2010, the Issuer entered into the Amended and Restated Securities Purchase Agreement with Laddcap, which is attached hereto as Exhibit B. Pursuant to the Amended and Restated Securities Purchase Agreement, Laddcap agreed to purchase from the Issuer 6,500,000 Common Shares for an aggregate purchase price of $1,000,000. The Amended and Restated Securities Purchase Agreement amends and restates a prior agreement entered into between the Issuer and an entity affiliated with the Reporting Persons on November 16, 2010, which was entered into subject to receipt of regulatory approval. The Amended and Restated Securities Purchase Agreement contains certain registration rights contained in a registration rights agreement (the "Rights Agreement") with Laddcap. The terms of the Rights Agreement provide that, beginning upon the date of the occurrence of certain events but in no event later than June 30, 2011, Laddcap can request that the Issuer file a registration statement with the SEC (the "Registration Statement") to register the shares of Common Stock purchased pursuant to the Amended and Restated Securities Purchase Agreement. The Form of Registration Rights Agreement is attached hereto as Exhibit C to the Amended and Restated Securities Purchase Agreement.

Other than the information disclosed herein, to the knowledge of the Reporting Persons, there are no contracts, arrangements, understandings or relationships (legal or otherwise) among the persons named in Item 2 with respect to any securities of the Issuer.

Item 7.     Material to be Filed as Exhibits

Exhibit 1            Schedule 13D Joint Filing Agreement dated as of December 20, 2010 among each Reporting Person.
Exhibit 2            Amended and Restated Securities Purchase Agreement dated December 20, 2010.

**SIGNATURES**

After reasonable inquiry and to the best of our knowledge and belief, we certify that the information set forth in this statement is true, complete and correct.

Dated: December 20, 2010

LADDCAP VALUE PARTNERS LP

| By: | /s/ Robert Ladd |
| --- | --- |
| Name: | Robert Ladd |
| Title: | Authorized Person |

LADDCAP VALUE ASSOCIATES LLC

| By: | /s/ Robert Ladd |
| --- | --- |
| Name: | Robert Ladd |
| Title: | Authorized Person |

LADDCAP VALUE ADVISORS LLC

| By: | /s/ Robert Ladd |
| --- | --- |
| Name: | Robert Ladd |
| Title: | Authorized Person |

/s/ Robert Ladd

Robert Ladd

Exhibit 1

SCHEDULE 13D/A JOINT FILING AGREEMENT

In accordance with the requirements of Rule 13d-1(k) under the Securities Exchange Act of 1934, as amended, and subject to the limitations set forth therein, the parties set forth below agree to jointly file the Schedule 13D/A (including amendments thereto) to which this joint filing agreement is attached, and further agree that this Joint Filing Agreement be included as an exhibit to such joint filing. In evidence thereof, the undersigned, being duly authorized, have executed this Joint Filing Agreement this 20th day of December, 2010.

LADDCAP VALUE PARTNERS LP

By:     /s/ Robert Ladd
Name:  Robert Ladd
Title: Authorized Person

LADDCAP VALUE ASSOCIATES LLC

By:     /s/ Robert Ladd
Name:  Robert Ladd
Title: Authorized Person

LADDCAP VALUE ADVISORS LLC

By:     /s/ Robert Ladd
Name:  Robert Ladd
Title: Authorized Person

/s/ Robert Ladd
Robert Ladd

Exhibit 2

**AMENDED AND RESTATED SECURITIES PURCHASE AGREEMENT**

This Amended and Restated Securities Purchase Agreement (this "Agreement") is dated as of December 9, 2010, by and between MGT Capital Investments, Inc., a Delaware corporation (the "Company"), and Laddcap Value Partners, LP, a Delaware limited partnership company, or an Affiliate (defined below) thereof (collectively, the "Purchaser"), and amends and restates in its entirety the Securities Purchase Agreement (the "Original Agreement"), dated as of November 16, 2010, by and between the Company and the Purchaser.

WHEREAS, the Company and the Purchaser entered into the Original Agreement on November 16, 2010, and subsequently agreed to amend and restate such agreement with this Agreement, and the parties desire that this Agreement supersede the Original Agreement in all respects;

WHEREAS, subject to the terms and conditions set forth in this Agreement, the Company desires to issue and sell to the Purchaser, and the Purchaser desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and the Purchaser agree as follows:

**ARTICLE I**

**DEFINITIONS**

Section 1.1      Definitions.  In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1.1:

"Action" shall have the meaning ascribed to such term in Section 3.1(k).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person as such terms are used in and construed under Rule 405 under the Securities Act.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"Closing Date" means the Trading Day on which all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Securities, in each case, have been satisfied or waived, but in no event later than the Drop-Dead Date (defined below).

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Disclosure Schedules" means the Disclosure Schedules of the Company delivered concurrently herewith.

"Evaluation Date" shall have the meaning ascribed to such term in Section 3.1(s).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"GAAP" shall have the meaning ascribed to such term in Section 3.1(h).

"Indebtedness" shall have the meaning ascribed to such term in Section 3.1(cc).

"Intellectual Property Rights" shall have the meaning ascribed to such term in Section 3.1(p).

"Liens" means a lien, charge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(b).

"Permits" shall have the meaning ascribed to such term in Section 3.1(n).

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened in writing.

"Purchaser Party" shall have the meaning ascribed to such term in Section 4.6.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the Closing Date, by and between the Company and the Purchaser, in the form attached hereto as Exhibit B.

"Required Approvals" shall have the meaning ascribed to such term in Section 3.1(e).

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"SEC Reports" shall have the meaning ascribed to such term in Section 3.1(h).

"Securities" means the Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Shares" shall have the meaning ascribed to such term in Section 2.1.

"Short Sales" means all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act (but shall not be deemed to include the location and/or reservation of borrowable shares of Common Stock).

"Subscription Amount" means One Million dollars ($1,000,000.00), in United States dollars and in immediately available funds.

"Subsidiary" means any subsidiary of the Company with respect to which the Company owns in excess of 50% of any class of such subsidiary's outstanding securities, and shall, where applicable, also include any direct or indirect subsidiary of the Company formed or acquired after the date of the Original Agreement, which in each case will be owned by the Company at the Closing.

"Trading Day" means a day on which the principal Trading Market is open for trading.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the OTC Bulletin Board, the OTC QB, the OTC QX, NYSE AMEX, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, or the New York Stock Exchange (or any successors to any of the foregoing).

"Transaction Documents" means this Agreement, the Registration Rights Agreement and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"Transfer Agent" means Standard Registrar & Transfer, and any successor transfer agent of the Company.

ARTICLE II

PURCHASE AND SALE

Section 2.1    Closing.  On the Closing Date, upon the terms and subject to the conditions set forth herein, the Company agrees to sell, and the Purchaser agrees to purchase, Six Million Five Hundred Thousand (6,500,000) shares of Common Stock of the Company (the "Shares") for the Subscription Amount.  The Purchaser shall deliver to the Company, via wire transfer of immediately available funds, an amount equal to the Subscription Amount and the Company shall deliver to the Purchaser the Shares, and the Company and the Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing.  Upon satisfaction of the covenants and conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004, or such other location (including remotely by exchange of electronic or .pdf documents) as the parties shall mutually agree.

Section 2.2    Deliveries.

(a)    On or prior to the Closing Date, the Company shall deliver or cause to be delivered to the Purchaser the following:

(i)    this Agreement duly executed by the Company;

(ii)    a legal opinion of Company Counsel, substantially in the form of Exhibit A attached hereto;

(iii)    the Registration Rights Agreement, duly executed as of the Closing Date by the Company;

(iv)    a certificate evidencing the Shares, which certificate shall be registered in the name of the Purchaser and shall bear the legend referenced in Section 4.10(b) of this Agreement;

(v)    a copy of irrevocable instructions to the Company's transfer agent instructing the transfer agent to deliver the Shares, registered in the name of the Purchaser;

(vi)    a letter of resignation from Tim Paterson-Brown (with respect to his position as a member of a Board of Directors) effective as of on or before the Closing;

(vii)    a certificate duly executed by an executive officer of the Company, dated as of the Closing Date, certifying as to the matters set forth in Sections 2.3(b)(i) – (viii).

(b)     On or prior to the Closing Date, the Purchaser shall deliver or cause to be delivered to the Company the following:

(i)     this Agreement duly executed by such Purchaser; and

(ii)     the Purchaser's Subscription Amount by wire transfer to the account as specified in writing by the Company.

Section 2.3     <u>Closing Conditions</u>.

(a)     The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met:

(i)     the accuracy in all material respects on the Closing Date of the representations and warranties of the Purchaser contained herein (except for the representations and warranties that speak as of a specific date, which shall be made as of such date);

(ii)     all obligations, covenants and agreements of the Purchaser required to be performed at or prior to the Closing Date shall have been performed; and

(iii)     the receipt by the Company of a favorable opinion from Broadmark Capital that the transactions contemplated hereby are in the best interests of the shareholders of the Company;

(iv)     the delivery by the Purchaser of the items set forth in Section 2.2(b) of this Agreement.

(b)     The obligation of the Purchaser hereunder in connection with the Closing is subject to the following conditions being met:

(i)     the accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Company contained herein (except for the representations and warranties that speak as of a specific date, which shall be made as of such date);

(ii)     all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed;

(iii)     the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)     Tim Paterson-Brown shall have resigned from his role as a member of the Board of Directors;

(v)     the Board of Directors shall have appointed Robert B. Ladd to the Board of Directors as a replacement for Tim Patterson-Brown;

(vi)      the Board of Directors shall have elected Peter Venton as Chairman of the Board of Directors;

(vii)      there shall have been no Material Adverse Effect with respect to the Company since the date of the Original Agreement; and

(viii)      from the date of the Original Agreement to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission or the Company's principal Trading Market (except for any suspension of trading of limited duration agreed to by the Company, which suspension shall be terminated prior to the Closing), and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg L.P. shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities which, in the reasonable judgment of the Purchaser, makes it impracticable or inadvisable to purchase the Securities at the Closing.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1      <u>Representations and Warranties of the Company</u>. Except as set forth in the Disclosure Schedules, which Disclosure Schedules shall be deemed a part hereof and shall qualify any representation or otherwise made herein to the extent of the disclosure contained in the corresponding section of the Disclosure Schedules or otherwise referenced in the Disclosure Schedules in such a manner that it is reasonably identifiable to which section such disclosure corresponds, the Company hereby represents and warrants as of the date of the Original Agreement and as of the Closing Date (except for the representations and warranties that speak as of a specific date, which shall be made as of such date) to the Purchaser as follows:

(a)      <u>Subsidiaries</u>. All of the direct and indirect Subsidiaries of the Company, or entities of which the Company owns greater than 50% of the outstanding equity, are as set forth in Section 3.1(a) of the Disclosure Schedule. The Company owns, directly or indirectly, the amount(s) set forth in Section 3.1(a) of the Disclosure Schedule of capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all such issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, and non-assessable.

(b)      <u>Organization and Qualification</u>. The Company and each of the Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted. Neither the Company nor any Subsidiary is in violation nor default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents. Each of the Company and the Subsidiaries is duly qualified to conduct business and is in good

standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in: (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business, prospects or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a "Material Adverse Effect") and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c)      <u>Authorization, Enforcement</u>. The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder including, without limitation, the issuance of the Shares. The execution and delivery of each of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, the Board of Directors or the Company's stockholders in connection therewith other than in connection with the Required Approvals. Each Transaction Document to which it is a party has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(d)      <u>No Conflicts</u>. The execution, delivery and performance by the Company of the Transaction Documents, the issuance and sale of the Securities and the consummation by it of the transactions contemplated hereby and thereby to which it is a party do not and will not (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or

governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected; except in the case of each of clauses (ii) and (iii), such as would not reasonably be expected to result in a Material Adverse Effect.

(e)        Filings, Consents and Approvals.  The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than: (i) the filings required pursuant to Section 4.3 of this Agreement, (ii) the filing with the Commission of a registration statement in accordance with the Registration Rights Agreement, (iii) application(s) to each applicable Trading Market for the listing of the Securities for trading thereon in the time and manner required thereby and (iv) such filings as are required to be made under applicable state securities laws (collectively, the "Required Approvals").

(f)        Issuance of the Securities.  The Securities are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company.

(g)        Capitalization.  The capitalization of the Company is as set forth in Section 3.1(g) of the Disclosure Schedule.  The Company has not issued any capital stock since its most recently filed periodic report under the Exchange Act.  No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents.  There are no outstanding options, warrants, scrip rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents.  The issuance and sale of the Securities will not obligate the Company to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities.  No further approval or authorization of any stockholder, the Board of Directors or others is required for the issuance and sale of the Securities.  There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.

(h)     SEC Reports; Financial Statements. The Company has filed all reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date of the Original Agreement (or such shorter period as the Company was required by law or regulation to file such material) (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

(i)     Material Changes; Undisclosed Events, Liabilities or Developments. Except as contemplated by the Transaction Documents, since the date of the latest audited financial statements included within the SEC Reports, except as specifically disclosed in a subsequent SEC Report filed prior to the date of the Original Agreement, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and except for this agreement (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans. The Company does not have pending before the Commission any request for confidential treatment of information. Except for the issuance of the Securities contemplated by this Agreement, no event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to the Company or its Subsidiaries or their respective business, prospects, properties, operations, assets or financial condition that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made or deemed made that has not been publicly disclosed at least 1 Trading Day prior to the date that this representation is made.

(j)    No Undisclosed Events, Liabilities, Developments or Circumstances. No event, liability, development or circumstance has occurred or exists, or is reasonably expected to exist or occur with respect to the Company, any of the Subsidiaries or their respective business, properties, liabilities, prospects, operations (including results thereof) or condition (financial or otherwise), that (i) would be required to be disclosed by the Company under applicable securities laws on a registration statement filed with the SEC relating to an issuance and sale by the Company of its Common Stock and which has not been publicly announced or (ii) could have a Material Adverse Effect.

(k)    Litigation. There is no action, suit, notice of inquiry, violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) would, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. To the knowledge of the Company, there has not been, and there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

(l)    Labor Relations. No material labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company. None of the Company's or its Subsidiaries' employees is a member of a union that relates to such employee's relationship with the Company or such Subsidiary, and neither the Company nor any of its Subsidiaries is a party to a collective bargaining agreement, and the Company and its Subsidiaries believe that their relationships with their employees are good. Except as contemplated in Section 2.3(b) of this Agreement, no executive officer (as defined in Rule 501(f) promulgated under the Securities Act) or other key employee of the Company or any of the Subsidiaries has notified the Company or any such Subsidiary that such officer intends to leave the Company or any such Subsidiary or otherwise terminate such officer's employment with the Company or any such Subsidiary. No executive officer or other key employee, to the knowledge of the Company, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of any third party, and the continued employment of each such executive officer or key employee, to the knowledge of the Company, does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Company and its Subsidiaries are in material compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours.

(m)    Compliance.  Neither the Company nor any Subsidiary: (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any judgment, decree or order of any court, arbitrator or governmental body or (iii) is or has been in violation of any statute, rule, ordinance or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws relating to taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters.

(n)    Regulatory Permits.  The Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses ("Permits"), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Permit.

(o)    Title to Assets.  The Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them and good and marketable title in all personal property owned by them that is material to the business of the Company and the Subsidiaries, in each case free and clear of all Liens, except for Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by the Company and the Subsidiaries are to their knowledge held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance.

(p)    Patents and Trademarks.  The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights necessary or material for use in connection with their respective businesses as described in the SEC Reports (collectively, the "Intellectual Property Rights").  None of, and neither the Company nor any Subsidiary has received a notice (written or otherwise) that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned, within two (2) years from the date of this Agreement. Neither the Company nor any Subsidiary has received, since the date of the latest audited financial statements included within the SEC Reports, a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person. All such Intellectual Property Rights are enforceable and to the knowledge of the Company there is no existing infringement by another Person of any of the Intellectual Property Rights. The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties.

(q)    <u>Insurance</u>. The Company and the Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are customary in the businesses in which the Company and the Subsidiaries are engaged, including, but not limited to, directors and officers insurance coverage at least equal to the aggregate Subscription Amount. Neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost.

(r)    <u>Transactions With Affiliates and Employees</u>. None of the officers or directors of the Company and, to the knowledge of the Company, none of the employees of the Company is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee of the Company has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $120,000 other than for (i) payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock option agreements under any stock option plan of the Company.

(s)    <u>Sarbanes-Oxley; Internal Accounting Controls</u>. Except as described in the SEC Reports, the Company is in material compliance with any and all applicable requirements of the Sarbanes-Oxley Act of 2002 that are effective as of the date of the Original Agreement, and any and all applicable rules and regulations promulgated by the Commission thereunder that are effective as of the date of the Original Agreement and as of the Closing Date. Except as described in the SEC Reports, the Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. The Company has established disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and designed such disclosure controls and procedures to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. The Company's certifying officers have evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by the Company's most recently filed Quarterly Report on Form 10-Q under the Exchange Act (such date, the "<u>Evaluation Date</u>"). The Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the effectiveness of the disclosure controls and procedures based on their evaluations as of the Evaluation Date. Since the Evaluation Date, there have been no changes in the Company's internal control over financial reporting (as such term is defined in the Exchange Act) that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(t)     <u>Subsidiary Rights</u>. The Company or one of the Subsidiaries has the unrestricted right to vote, and (subject to limitations imposed by applicable law) to receive dividends and distributions on, all capital securities of the Subsidiaries as owned by the Company or such Subsidiary.

(u)     <u>Off Balance Sheet Arrangements</u>. There is no transaction, arrangement, or other relationship between the Company or any of the Subsidiaries and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its Exchange Act filings and is not so disclosed or that otherwise could be reasonably likely to have a Material Adverse Effect. Confirm.

(v)     <u>Certain Fees</u>.  No brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents.  The Purchasers shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by the Transaction Documents.

(w)     <u>Investment Company</u>. The Company is not, and is not an Affiliate of, and immediately after receipt of payment for the Securities, will not be or be an Affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(x)     <u>Registration Rights</u>.  Other than the rights of the Purchaser under the Registration Rights Agreement, no Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company.

(y)     <u>Listing and Maintenance Requirements</u>.  The Common Stock is registered pursuant to Section 12(b) or 12(g) of the Exchange Act, and the Company has taken no action designed to terminate, or which to its knowledge is likely to have the effect of terminating, the registration of the Common Stock under the Exchange Act nor has the Company received any notification that the Commission is contemplating terminating such registration.  The Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements.  The Company has not received any notice of deficiency from the exchange on which its Common Stock is listed, nor is it aware of any violations of any listing requirements in respect of the rules of such exchange.

---

(z)    Application of Takeover Protections. The Company and the Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's certificate of incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to the Purchasers as a result of the Purchasers and the Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation as a result of the Company's issuance of the Securities and the Purchasers' ownership of the Securities.

(aa)    Disclosure. Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company confirms that neither it nor any other Person acting on its behalf has provided any of the Purchasers or their agents or counsel with any information that it believes constitutes or might constitute material, non-public information. The Company understands and confirms that the Purchasers will rely on the foregoing representation in effecting transactions in securities of the Company. All of the disclosure furnished by or on behalf of the Company to the Purchasers regarding the Company, its business and the transactions contemplated hereby, including this Agreement, the Disclosure Schedules to this Agreement and any certificate furnished in connection herewith, is true and correct and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(bb)    No Integrated Offering. Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, neither the Company, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of any applicable shareholder approval provisions of any Trading Market on which any of the securities of the Company are listed or designated.

(cc)    Solvency. Based on the consolidated financial condition of the Company as of the Closing Date, after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder, (i) the fair saleable value of the Company's assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature, and (ii) the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its liabilities when such amounts are required to be paid. The Company does not intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt). The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within 6 months from the Closing Date. Section 3.1(cc) of the Disclosure Schedule sets forth as of the date of the Original Agreement all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments. For the purposes of this Agreement, "Indebtedness" means (x) any liabilities for borrowed money or amounts owed in excess of $75,000 (other than trade accounts payable incurred in the ordinary course of business), (y) all guaranties, endorsements and other contingent obligations in respect of indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (z) the present value of any lease payments in excess of $75,000 due under leases required to be capitalized in accordance with GAAP. Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

(dd) **Tax Status**. Except for matters that would not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and each Subsidiary (i) has made or filed all United States federal and state income and all foreign income and franchise tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations and (iii) has set aside on its books provision reasonably adequate for the payment of all material taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction.

(ee) **Foreign Corrupt Practices**. To the knowledge of the Company, neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(ff) **Accountants**. The Company's accounting firm is EisnerAmper LLP. To the knowledge and belief of the Company, such accounting firm is a registered public accounting firm as required by the Exchange Act.

(gg) **Purchasers' Purchase of Securities**. The Purchaser is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated thereby. The Purchaser is not acting as a financial advisor to the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated thereby and any advice given by the Purchaser or any of its respective representatives or agents in connection with the Transaction Documents and the transactions contemplated thereby is merely incidental to the Purchaser's purchase of the Securities. The Company's decision to enter into this Agreement and the other Transaction Documents has been based solely on the independent evaluation of the transactions contemplated hereby by the Company and its representatives.

(hh)       <u>Regulation M Compliance</u>. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Securities.

(ii)       <u>Office of Foreign Assets Control</u>. Neither the Company nor, to the Company's knowledge, any director, officer, agent, employee or affiliate of the Company is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(jj)       <u>U.S. Real Property Holding Corporation</u>. The Company is not and has never been a U.S. real property holding corporation within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended, and the Company shall so certify upon Purchaser's request.

(kk)       <u>Bank Holding Company Act</u>. Neither the Company nor any of its Subsidiaries or Affiliates is subject to the Bank Holding Company Act of 1956, as amended (the "BHCA") and to regulation by the Board of Governors of the Federal Reserve System (the "Federal Reserve"). Neither the Company nor any of its Subsidiaries or Affiliates owns or controls, directly or indirectly, five percent (5%) or more of the outstanding shares of any class of voting securities or twenty-five percent or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve. Neither the Company nor any of its Subsidiaries or Affiliates exercises a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

(ll)       <u>Money Laundering</u>. The operations of the Company are in material compliance with applicable financial record-keeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, applicable money laundering statutes and applicable rules and regulations thereunder (collectively, the "Money Laundering Laws"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company with respect to the Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(mm)   Environmental Matters. Except as disclosed in the SEC Reports, to the knowledge of the Company, neither the Company nor any of its Subsidiaries (i) is in violation of any statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, "Environmental Laws"), (ii) is liable for any off-site disposal or contamination pursuant to any Environmental Laws, or (iii) is subject to any claim relating to any Environmental Laws; in each case, which violation, contamination, liability or claim has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and, to the Company's Knowledge, there is no pending or threatened investigation that might lead to such a claim.

(nn)   Application of Anti-Takeover Provisions. There is no control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's Certificate of Incorporation (or similar charter documents) or applicable law that would become applicable to the Purchaser as a result of the issuance of the Securities.

(oo)   Shell Company. The Company is not now and has not been, at any time during the past three (3) years, a shell company as defined by Rule 405 of the Securities Act and has never been an issuer subject to Rule 144(i) under the Securities Act.

Section 3.2   Representations and Warranties of the Purchasers. The Purchaser hereby represents and warrants as of the date of the Original Agreement and as of the Closing Date (except for the representations and warranties that speak as of a specific date, which shall be made as of such date) to the Company as follows:

(a)   Organization; Authority. The Purchaser is either an individual or an entity which one? duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate, partnership or limited liability company power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and performance by the Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or similar action, as applicable, on the part of the Purchaser. Each Transaction Document to which it is a party has been duly executed by the Purchaser, and when delivered by the Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of the Purchaser, enforceable against it in accordance with its terms, except: (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(b)     <u>Understandings or Arrangements</u>. The Purchaser is acquiring the Securities as principal for its own account and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities (this representation and warranty not limiting the Purchaser's right to sell the Securities pursuant to a registration statement or otherwise in compliance with applicable federal and state securities laws). Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

(c)     <u>Purchaser Status</u>. At the time the Purchaser was offered the Securities, it was, and as of the date of this Agreement it is, either: (i) an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act or (ii) a "qualified institutional buyer" as defined in Rule 144A(a) under the Securities Act. The Purchaser is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

(d)     <u>Experience of the Purchaser</u>. The Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. The Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment. The Company has provided the Purchaser with access to the Company and its books and records, and the Purchaser has had the opportunity to ask questions of the Company and, as of the date of the Original Agreement, has received any information that it has requested from the Company.

(e)     <u>Certain Transactions and Confidentiality</u>. Other than consummating the transactions contemplated hereunder, and otherwise disclosed in its SEC filings, the Purchaser or any of Affiliate, has not, nor has any Person acting on behalf of or pursuant to any understanding with the Purchaser, directly or indirectly executed any purchases or sales, including Short Sales, of the securities of the Company during the period commencing August 1, 2010 and ending the latter of (i) immediately prior to the execution hereof or the (ii) the date on which the Company publicly announces the transactions contemplated by this Agreement. Other than to other Persons party to this Agreement, such Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction). Notwithstanding the foregoing, for avoidance of doubt, nothing contained herein shall constitute a representation or warranty, or preclude any actions, with respect to the identification of the availability of, or securing of, available shares to borrow in order to effect Short Sales or similar transactions in the future.

(f)     <u>Certain Fees</u>. To the knowledge of the Purchaser, no brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents.

The Company acknowledges and agrees that the representations contained in Section 3.2 shall not modify, amend or affect such Purchaser's right to rely on the Company's representations and warranties contained in this Agreement or any representations and warranties contained in any other Transaction Document or any other document or instrument executed and/or delivered in connection with this Agreement or the consummation of the transaction contemplated hereby. The Purchaser hereby further represents and warrants that, as of the date of the Original Agreement, it does not have any actual knowledge of any inaccuracy of the representations and warranties of the Company set forth in Section 3.1.

## ARTICLE IV

## OTHER AGREEMENTS OF THE PARTIES

Section 4.1   <u>Furnishing of Information</u>.  Until the time that the Purchaser no longer owns any of the Securities, the Company covenants to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date of the Original Agreement pursuant to the Exchange Act so long as the Company is then subject to the reporting requirements of the Exchange Act. As long as the Purchaser owns Securities, if the Company is not required to file reports pursuant to the Exchange Act, it will prepare and furnish to the Purchasers and make publicly available in accordance with Rule 144(c) such information as is required for the Purchasers to sell the Securities, including without limitation, under Rule 144. The Company further covenants that it will take such further action as any holder of Securities may reasonably request, to the extent required from time to time to enable such Person to sell such Securities without registration under the Securities Act, including without limitation, within the requirements of the exemption provided by Rule 144.

Section 4.2   <u>Integration</u>.  The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Trading Market such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

Section 4.3   <u>Securities Laws Disclosure; Publicity</u>.  The Company shall, during or prior to the Trading Day immediately following the second business day following the date hereof, issue a press release disclosing the material terms of the transactions contemplated hereby, and issue a Current Report on Form 8-K (which shall include this Agreement as an exhibit thereto) disclosing the material terms of the transactions contemplated hereby, and including the Transaction Documents as exhibits thereto within the time required by the Exchange Act. From and after the issuance of such press release, the Company shall have publicly disclosed all material, non-public information delivered to the Purchaser by the Company or any of its Subsidiaries, or any of their respective officers, directors, employees or agents in connection with the transactions contemplated by the Transaction Documents. The Company and the Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor any Purchaser shall issue any such press release nor otherwise make any such public statement without the prior consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of the Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication.

Section 4.4    <u>Use of Proceeds</u>. The Company shall use the net proceeds from the sale of the Securities for general working capital purposes, and shall not use such proceeds for: (a) the satisfaction of any portion of the Company's debt (other than payment of trade payables in the ordinary course of the Company's business and prior practices), (b) the redemption of any Common Stock or Common Stock Equivalents or (c) the settlement of any outstanding litigation or (d) in violation of the FCPA or OFAC regulations.

Section 4.5    <u>Indemnification of Purchasers</u>. Subject to the provisions of this Section 4.6, the Company will indemnify and hold the Purchaser and its shareholders, members, partners, directors, managers, officers, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls the Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the shareholders, members, partners, directors, managers, officers, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling persons (each, a "<u>Purchaser Party</u>") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents or (b) any action instituted against a Purchaser in any capacity, or any of them or their respective Affiliates, by any stockholder of the Company who is not an Affiliate of such Purchaser, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is based upon a breach of the Purchaser's representations, warranties or covenants under the Transaction Documents or any agreements or understandings the Purchaser may have with any such stockholder or any violations by the Purchaser of state or federal securities laws or any conduct by the Purchaser which constitutes fraud, gross negligence, willful misconduct or malfeasance). If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Purchaser Party (in this regard, Gersten Savage shall be deemed to be reasonably acceptable to Purchaser). Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel. The Company will not be liable to any Purchaser Party under this Agreement (y) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed; or (z) to the extent, but only to the extent, that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by such Purchaser Party in this Agreement or in the other Transaction Documents. The indemnification required by this Section 4.6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received. The indemnity agreements contained herein shall not be an exclusive remedy but shall be in addition to any cause of action or similar right in law or in equity of any Purchaser Party against the Company or others, and (y) any liabilities the Company may be subject to pursuant to law.

Section 4.6    <u>Listing of Common Stock</u>. The Company hereby agrees to use commercially reasonable efforts to maintain the listing or quotation of the Common Stock on the Trading Market on which it is currently listed, and concurrently with the Closing, the Company shall apply to list or quote all of the Shares on such Trading Market and promptly secure the listing of all of the Shares on such Trading Market. The Company further agrees, if the Company applies to have the Common Stock traded on any other Trading Market, it will then include in such application all of the Shares, and will take such other action as is reasonably necessary to cause all of the Shares to be listed or quoted on such other Trading Market as promptly as possible. The Company will then take all action reasonably necessary to continue the listing and trading of its Common Stock on a Trading Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Trading Market.

Section 4.7    <u>Certain Transactions and Confidentiality</u>. The Purchaser covenants that neither it nor any Affiliate or any other Person acting on its behalf or pursuant to any understanding with it will execute any purchases or sales, including Short Sales of any of the Company's securities during the period commencing with the execution of the Original Agreement and ending at such time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.3. The Purchaser covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company pursuant to the initial press release as described in Section 4.3, the Purchaser will maintain the confidentiality of the existence and terms of this transaction and the information included in the Disclosure Schedules. Notwithstanding the foregoing and notwithstanding anything contained in this Agreement to the contrary, the Company has been informed that (i) the Purchaser does not make any representation, warranty or covenant hereby that it will not engage in effecting transactions in any securities of the Company after the Closing Date, (ii) the Purchaser shall not be restricted or prohibited from effecting any transactions in any securities of the Company in accordance with applicable securities laws from and after the Closing Date, and (iii) Purchaser shall not have any duty of confidentiality to the Company or its Subsidiaries after the issuance of the initial press release as described in Section 4.3.

Section 4.8    <u>Transfers; Legend</u>.

(a)      Securities may only be disposed of in compliance with state and federal securities laws. In connection with any transfer of the Securities other than pursuant to an effective registration statement, to the Company, to an Affiliate of an Purchaser or in connection with a pledge as contemplated in Section 4.08(b), the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Shares under the Securities Act

(b)　　Certificates evidencing the Shares will contain the following legend, until such time as they are not required under Section 4.08(c):

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THESE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT SECURED BY SUCH SECURITIES IN ACCORDANCE WITH APPLICABLE LAW.

The Company has been informed that the Purchaser may from time to time pledge, and/or grant a security interest in some or all of the Securities pursuant to a bona fide margin agreement in connection with a bona fide margin account and, if required under the terms of such agreement or account, the Purchaser may transfer pledged or secured Securities to the pledgees or secured parties in accordance with applicable law. Such a pledge or transfer would not be subject to approval or consent of the Company and no legal opinion of legal counsel to the pledgee, secured party or pledgor shall be required in connection with the pledge, but such legal opinion may be required in connection with a subsequent transfer following default by the Purchaser transferee of the pledge. No notice shall be required of such pledge. At the Purchaser's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in connection with a pledge or transfer of the Securities. Except as otherwise provided in Section 4.10(c), any Securities subject to a pledge or security interest as contemplated by this Section 4.10(b) shall continue to bear the legend set forth in Section 4.1(b) and be subject to the restrictions on transfer set forth in Section 4.10(a).

(c)　　Certificates evidencing Securities shall not contain any legend (including the legend set forth in Section 4.1(b)): (i) following a sale or transfer of such Securities pursuant to an effective registration statement (including a Registration Statement), or (ii) following a sale or transfer of such Shares pursuant to Rule 144 (assuming the transferee is not an Affiliate of the Company), or (iii) while such Securities are eligible for sale without volume limitations pursuant to Rule 144. If the Purchaser shall make a sale or transfer of Securities either (x) pursuant to Rule 144 or (y) pursuant to a registration statement and in each case shall have delivered to the Company or the Company's transfer agent the certificate representing Securities containing a restrictive legend which are the subject of such sale or transfer and a representation letter in customary form.

Section 4.9    Restriction on trading in the Company's Securities

For the period from the date of the Original Agreement to the Closing Date, it is understood and acknowledged by the Purchaser that: (i) each of the Purchaser and its Affiliates has been asked by the Company to agree, and the Purchaser (on behalf of its self and its Affiliates) has agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company; (ii) the Purchaser has agreed to desist from future open market or other transactions by the Purchaser, specifically including, without limitation, Short Sales or "derivative" transactions, before or after the closing of this private placement transactions; (iii) the Purchaser, and counter-parties in "derivative" transactions to which the Purchaser is a party, directly or indirectly, presently may not have a "short" position in the Common Stock, and (iv) the Purchaser shall not have any affiliation with or control over any arm's length counter-party in any "derivative" transaction.

Section 4.10    Cooperation of the Parties.

Each of the Company (subject to its exercise of the fiduciary duties owned to its shareholders) and the Purchaser agree that they will use their commercially reasonable efforts to close the transaction contemplated hereby by the Closing Date. The Company and the Purchaser further agree that they shall each provide reasonable cooperation to the other party for all necessary filings made by the Company and/or the Purchaser incident to the transactions contemplated hereby, whether before or after the Closing Date.

## ARTICLE V

## MISCELLANEOUS

Section 5.1    Termination. This Agreement may be terminated by either the Company or the Purchaser by written notice to the other party if the Closing has not been consummated on or before December 31, 2010 (the "Drop-Dead Date"); provided, however, that no such termination will affect the right of any party to sue for any breach by the other party. Subject to Section 4.11, the Company may terminate this Agreement prior to the Drop-Dead Date if (and only if) the Company receives a bonafide, written offer for a transaction at least as favorable to the Company, and on terms more favorable to the Company, as the transaction contemplated hereby (collectively, the "Company Termination Option"). In the event that the Company Termination Option has not been exercised by the Drop-Dead Date, the Company's right to exercise the Company Termination Option shall expire in its entirety, without regard to whether the Closing has (or has not) occurred by such date.

Section 5.2   Fees and Expenses. Each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement, provided, however, that, in the event that the Closing has not occurred on or before the Drop-Dead Date, unless such Closing has not occurred because of a breach by the Purchaser of its obligations under this Agreement, the Company shall reimburse the Purchaser for all of their reasonable out-of-pocket expenses (including reasonable legal fees) up to a maximum of $35,000. The Company shall pay all Transfer Agent fees and stamp taxes levied in connection with the delivery of any Securities to the Purchasers.

Section 5.3   Entire Agreement. The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

Section 5.4   Notices. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the second (2nd) Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (d) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as set forth on the signature pages attached hereto.

Section 5.5   Amendments; Waivers. No provision of this Agreement may be waived, modified, supplemented or amended except in a written instrument signed, in the case of an amendment, by the Company and the Purchaser or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

Section 5.6   Headings. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

Section 5.7   Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Purchaser. The Purchaser may assign any or all of its rights under this Agreement to any Person to whom the Purchaser assigns or transfers any Securities.

Section 5.8   No Third-Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.6.

Section 5.9    <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then, in addition to the obligations of the Company under Section 4.6, the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

Section 5.10    <u>WAIVER OF JURY TRIAL</u>. IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE PARTIES EACH KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.

Section 5.11    <u>Survival</u>. The representations and warranties contained herein shall survive the Closing and the delivery of the Securities.

Section 5.12    <u>Execution</u>. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

Section 5.13    <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

Section 5.14   <u>Rescission and Withdrawal Right</u>. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) any of the other Transaction Documents, in the event that the Company or the Purchaser has materially breached any of its representations or warranties contained herein, then the Purchaser or the Company, as the case may be, may rescind or withdraw, in its sole discretion upon written notice to the other party, the transactions contemplated by this Agreement.

Section 5.15   <u>Replacement of Securities</u>. If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction. The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

Section 5.16   <u>Remedies</u>. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

Section 5.17   <u>Saturdays, Sundays, Holidays, etc.</u> If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

Section 5.18   <u>Construction</u>. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments hereto. In addition, each and every reference to share prices and shares of Common Stock in any Transaction Document shall be subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

(Signature Pages Follow)

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**MGT CAPITAL INVESTMENTS, INC**

By: _____
Name:
Title:

By: _____
Name:
Title:

**LADDCAP VALUE PARTNERS, LP**

By: _____
Name:
Title:

Exhibit A

Form of Opinion

Exhibit B

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "<u>Agreement</u>") is made and entered into as of is dated as of [Closing Date], between MGT Capital Investments, Inc., a Delaware corporation (the "<u>Company</u>"), and Laddcap Value Partners, L.P, a Delaware limited partnership (or an affiliate thereof) (the "<u>Purchaser</u>").

This Agreement is made in connection with the Amended and Restated Securities Purchase Agreement, dated as of December 9, 2010, by and between the Company and the Purchaser (the "<u>Purchase Agreement</u>").

The Company and Purchasers hereby agree as follows:

1.     <u>Definitions</u>. Capitalized terms used and not otherwise defined herein that are defined in the Purchase Agreement will have the respective meanings given such terms in the Purchase Agreement. As used in this Agreement, the following terms have the respective meanings set forth in this Section 1:

"<u>Advice</u>" has the meaning set forth in Section 6(d).

"<u>Commission Comments</u>" means written comments pertaining solely to Rule 415 which are received by the Company from the Commission to a filed Registration Statement, a copy of which shall have been provided by the Company to the Holders, which either (i) requires the Company to limit the number of Registrable Securities which may be included therein to a number which is less than the number sought to be included thereon as filed with the Commission or (ii) requires the Company to either exclude Registrable Securities held by specified Holders or deem such Holders to be underwriters with respect to Registrable Securities they seek to include in such Registration Statement.

"<u>Cut Back Shares</u>" has the meaning set forth in Section 2(e).

"<u>Demand Date</u>" means the date on which the Purchaser provides notice to the Company of its request that the Company file the Registration Statement.

"<u>Effective Date</u>" means, as to a Registration Statement, the date on which such Registration Statement is first declared effective by the Commission.

"<u>Effectiveness Date</u>" means the earlier of: (i) the 120th day following the Demand Date; and (ii) the fifth Trading Day following the date on which the Company is notified by the Commission that the Registration Statement will not be reviewed or is no longer subject to further review and comments.

"<u>Effectiveness Period</u>" means the period commencing on the Effective Date of the Registration Statement and ending on the earliest to occur of (a) the second anniversary of such Effective Date, (b) such time as all of the Registrable Securities covered by such Registration Statement have been publicly sold by the Holders of the Registrable Securities included therein, or (c) such time as all of the Registrable Securities covered by such Registration Statement may be sold by the Holders without volume restrictions pursuant to Rule 144, in each case as determined by the counsel to the Company pursuant to a written opinion letter to such effect, addressed and acceptable to the Company's transfer agent and the affected Holders.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Filing Date" means the date that is sixty (60) days from the Demand Date.

"Holder" or "Holders" means the holder or holders, as the case may be, from time to time of Registrable Securities.

"Indemnified Party" has the meaning set forth in Section 5(c).

"Indemnifying Party" has the meaning set forth in Section 5(c).

"Losses" has the meaning set forth in Section 5(a).

"New York Courts" means the state and federal courts sitting in the City of New York, Borough of Manhattan.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Prospectus" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"Registrable Securities" means the Shares and any securities issued or issuable upon any stock split, dividend or other distribution, recapitalization or similar event, or any price adjustment as a result of such stock splits, reverse stock splits or similar events with respect to the Shares.

"Registration Statement" means the registration statement required to be filed in accordance with Section 2 and any additional registration statements required to be filed under this Agreement, including in each case the Prospectus, amendments and supplements to such registration statements or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference therein.

"Restriction Termination Date" has the meaning set forth in Section 2(b).

"<u>Rule 144</u>" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 415</u>" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 424</u>" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>SEC Restrictions</u>" has the meaning set forth in Section 2(b).

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Shares</u>" means the shares of Common Stock, par value $0.001 per share, issued to the Purchasers pursuant to the Purchase Agreement.

2.    <u>Registration</u>.

(a)    On or after the earlier of (i) the later of (A) the date on which the Company files its Annual Report on Form 10-K with respect to its 2010 fiscal year, (B) the date on which the registration statement for the Medicsight PLC shares of common stock owned by the Company is declared effective by the SEC, and (C) the date on which all of the assets of MGT (UK) have been disposed of, and (ii) June 30, 2011, the Purchaser shall have the right to request that the Company file the Registration Statement and, upon receipt such request, the Company shall prepare and file the Registration Statement on the terms and conditions set forth in this Agreement. On or prior to the Filing Date, the Company shall prepare and file with the Commission a Registration Statement on Form S-3 covering the resale of the Shares if the Company is then eligible to utilize such Form (or on such other form appropriate for such purpose) and shall cause such Registration Statement to be filed by the Filing Date for such Registration Statement and use commercially reasonable efforts to have the Registration Statement declared effective under the Securities Act as soon as possible thereafter, but in any event prior to the Effectiveness Date therefor. Such Registration Statement shall contain (except if otherwise required pursuant to written comments received from the Commission upon a review of such Registration Statement, other than as to the characterization of any Holder as an underwriter, which shall not occur without such Holder's consent) the "Plan of Distribution" attached hereto as <u>Annex A</u>. The Company shall use its commercially reasonable efforts to keep such Registration Statement continuously effective under the Securities Act during the entire Effectiveness Period which is applicable to it. By 5:00 p.m. (New York City time) on the Business Day immediately following the Effective Date of such Registration Statement, the Company shall file with the Commission in accordance with Rule 424 under the Securities Act the final prospectus to be used in connection with sales pursuant to such Registration Statement (whether or not such filing is technically required under such Rule). The Company hereby represents and warrants to the Purchasers that as of the date hereof the Company is eligible to use Form S-3 for the registration of the Registrable Securities.

(b)　If for any reason other than due solely to SEC Restrictions, a Registration Statement is effective but not all outstanding Registrable Securities are registered for resale pursuant thereto, then the Company shall prepare and file by the applicable Filing Date an additional Registration Statement to register the resale of all such unregistered Registrable Securities for an offering to be made on a continuous basis pursuant to Rule 415. Notwithstanding anything to the contrary contained in this Section 2, if the Company receives Commission Comments, and following discussions with and responses to the Commission in which the Company uses its commercially reasonable efforts and time to cause as many Registrable Securities for as many Holders as possible to be included in the Registration Statement filed pursuant to Sections 2(a), without characterizing any Holder as an underwriter (and in such regard uses its commercially reasonable efforts to cause the Commission to permit the affected Holders or their respective counsel to participate in Commission conversations on such issue together with Company Counsel, and timely conveys relevant information concerning such issue with the affected Holders or their respective counsel), the Company is unable to cause the inclusion of all Registrable Securities, then the Company may, following not less than three (3) Trading Days prior written notice to the Holders (i) remove from the Registration Statement such Registrable Securities (the "Cut Back Shares") and/or (ii) agree to such restrictions and limitations on the registration and resale of the Registrable Securities, in each case as the Commission may require in order for the Commission to allow such Registration Statement to become effective; provided, that in no event may the Company name any Holder as an underwriter without such Holder's prior written consent (collectively, the "SEC Restrictions"). Unless the SEC Restrictions otherwise require, any cut-back imposed pursuant to this Section 2(b) shall be allocated among the Registrable Securities of the Holders on a pro rata basis. No liquidated damages under Section 2(c) shall accrue on or as to any Cut Back Shares, and the required Effectiveness Date for such Registration Statement will be tolled, until such time as the Company is able to effect the registration of the Cut Back Shares in accordance with any SEC Restrictions (such date, the "Restriction Termination Date"). From and after the Restriction Termination Date, all provisions of this Section 2 (including, without limitation, the liquidated damages provisions, subject to tolling as provided above) shall again be applicable to the Cut Back Shares (which, for avoidance of doubt, retain their character as "Registrable Securities") so that the Company will be required to file with and cause to be declared effective by the Commission such additional Registration Statements in the time frames set forth herein as necessary to ultimately cause to be covered by effective Registration Statements all Registrable Securities (if such Registrable Securities cannot at such time be resold by the Holders thereof without volume limitations pursuant to Rule 144).

(c)　If: (i) a Registration Statement is not filed on or prior to its Filing Date covering the Registrable Securities required under this Agreement to be included therein (if the Company files a Registration Statement without affording the Holders the opportunity to review and comment on the same as required by Section 3(a) hereof, the Company shall not be deemed to have satisfied this clause (i)), (ii) a Registration Statement is not declared effective by the Commission on or prior to its required Effectiveness Date or if by the Business Day immediately following the Effective Date, the Company shall not have filed a "final" prospectus for the Registration Statement with the Commission under Rule 424(b) in accordance with the terms hereof (whether or not such a prospectus is technically required by such Rule), or (iii) after its Effective Date, without regard for the reason thereunder or efforts therefor, such Registration

(d)    Statement ceases for any reason to be effective and available to the Holders as to all Registrable Securities to which it is required to cover at any time prior to the expiration of its Effectiveness Period for more than an aggregate of 20 Trading Days (which need not be consecutive) (any such failure or breach being referred to as an "Event," and for purposes of clauses (i) or (ii) the date on which such Event occurs, or for purposes of clause (iii) the date which such 20 Trading Day-period is exceeded, being referred to as "Event Date"), then the Holders are entitled to exercise such rights they may have hereunder or under applicable law.

(e)    Each Holder agrees to furnish to the Company a completed Questionnaire in the form attached to this Agreement as Annex B (a "Selling Holder Questionnaire"). The Company shall not be required to include the Registrable Securities of a Holder in a Registration Statement and shall not be required to pay any liquidated or other damages under Section 2(c) to any Holder who fails to furnish to the Company a fully completed Selling Holder Questionnaire at least two Trading Days prior to the Filing Date (subject to the requirements set forth in Section 3(a)).  In addition to the foregoing, each Holder shall provide such other information to the Company as the Company may from time-to-time reasonably request.

3.      Registration Procedures.

In connection with the Company's registration obligations hereunder, the Company shall:

(a)    Not less than four Trading Days prior to the filing of a Registration Statement or any related Prospectus or any amendment or supplement thereto, the Company shall furnish to each Holder copies of the "Selling Stockholders" section of such document, the "Plan of Distribution" and any risk factor contained in such document that addresses specifically this transaction or the Selling Stockholders, as proposed to be filed, which documents will be subject to the review of such Holder. The Company shall not file a Registration Statement, any Prospectus or any amendments or supplements thereto in which the "Selling Stockholder" section thereof differs from the disclosure received from a Holder in its Selling Holder Questionnaire (as amended or supplemented). The Company shall not file a Registration Statement, any Prospectus or any amendments or supplements thereto in which it (i) characterizes any Holder as an underwriter, (ii) excludes a particular Holder due to such Holder refusing to be named as an underwriter, or (iii) reduces the number of Registrable Securities being registered on behalf of a Holder except pursuant to, in the case of subsection (iii), the Commission Comments, without, in each case, such Holder's express written authorization.

(b)   (i)      Prepare and file with the Commission such amendments, including post-effective amendments, to each Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement continuously effective as to the applicable Registrable Securities for its Effectiveness Period and prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities; (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus supplement, and as so supplemented or amended to be filed pursuant to Rule 424; (iii) respond as promptly as reasonably possible to any comments received from the Commission with respect to each Registration Statement or any amendment thereto and, as promptly as reasonably possible provide the Holders true and

(c)　complete copies of all correspondence from and to the Commission relating to such Registration Statement that would not result in the disclosure to the Holders of material and non-public information concerning the Company; and (iv) comply in all material respects with the provisions of the Securities Act and the Exchange Act with respect to the Registration Statement(s) and the disposition of all Registrable Securities covered by each Registration Statement.

(d)　Notify the Holders as promptly as reasonably possible (and, in the case of (i)(A) below, not less than three Trading Days prior to such filing and, in the case of (v) below, not less than three Trading Days prior to the financial statements in any Registration Statement becoming ineligible for inclusion therein) and (if requested by any such Person) confirm such notice in writing no later than one Trading Day following the day (i)(A) when a Prospectus or any Prospectus supplement or post-effective amendment to a Registration Statement is proposed to be filed; (B) when the Commission notifies the Company whether there will be a "review" of such Registration Statement and whenever the Commission comments in writing on such Registration Statement (the Company shall provide true and complete copies thereof and all written responses thereto to each of the Holders that pertain to the Holders as a Selling Stockholder or to the Plan of Distribution, but not information which the Company believes would constitute material and non-public information); and (C) with respect to each Registration Statement or any post-effective amendment, when the same has become effective; (ii) of any request by the Commission or any other Federal or state governmental authority for amendments or supplements to a Registration Statement or Prospectus or for additional information; (iii) of the issuance by the Commission of any stop order suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; and (v) of the occurrence of any event or passage of time that makes the financial statements included in a Registration Statement ineligible for inclusion therein or any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to such Registration Statement, Prospectus or other documents so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(e)　Use its commercially reasonable efforts to avoid the issuance of, or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment.

(f)　Furnish to each Holder, without charge, at least one copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such Person (including those previously furnished) promptly after the filing of such documents with the Commission.

(g)   Promptly deliver to each Holder, without charge, as many copies of each Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Persons may reasonably request. The Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(h)   Prior to any public offering of Registrable Securities, register or qualify such Registrable Securities for offer and sale under the securities or Blue Sky laws of all jurisdictions within the United States as any Holder may request, to keep each such registration or qualification (or exemption therefrom) effective during the Effectiveness Period and to do any and all other acts or things necessary or advisable to enable the disposition in such jurisdictions of the Registrable Securities covered by the Registration Statement(s).

(i)   Cooperate with the Holders to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to the Registration Statement(s), which certificates shall be free, to the extent permitted by the Purchase Agreement, of all restrictive legends, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holders may request.

(j)   Upon the occurrence of any event contemplated by Section 3(c)(v), as promptly as reasonably possible, prepare a supplement or amendment, including a post-effective amendment, to the affected Registration Statements or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

4.   Registration Expenses.

All fees and expenses incident to the performance of or compliance with this Agreement by the Company shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market on which the Common Stock is then listed for trading, and (B) in compliance with applicable state securities or Blue Sky laws), (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) Securities Act liability insurance, if the Company so desires such insurance, and (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company shall be responsible for all of its internal expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange as required hereunder.

5.   Indemnification.

(a)   Indemnification by the Company.  The Company shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Holder, the officers, directors, agents, investment advisors, partners, members and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (1) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Holder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto (it being understood that the Holder has approved Annex A hereto for this purpose) or (2) in the case of an occurrence of an event of the type specified in Section 3(c)(ii)-(v), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of an Advice or an amended or supplemented Prospectus, but only if and to the extent that following the receipt of the Advice or the amended or supplemented Prospectus the misstatement or omission giving rise to such Loss would have been corrected. The Company shall notify the Holders promptly of the institution, threat or assertion of any Proceeding of which the Company is aware in connection with the transactions contemplated by this Agreement.

(b)   Indemnification by Holders.  Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising solely out of or based solely upon: (x) such Holder's failure to comply with the prospectus delivery requirements of the Securities Act or (y) any untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto, or arising solely out of or based solely upon any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent that, (1) such untrue

(c)    statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was reviewed and expressly approved in writing by such Holder expressly for use in the Registration Statement (it being understood that the Holder has approved Annex A hereto for this purpose), such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (2) in the case of an occurrence of an event of the type specified in Section 3(c)(ii)-(v), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of an Advice or an amended or supplemented Prospectus, but only if and to the extent that following the receipt of the Advice or the amended or supplemented Prospectus the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(d)    <u>Conduct of Indemnification Proceedings</u>.  If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "<u>Indemnified Party</u>"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "<u>Indemnifying Party</u>") in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have proximately and materially adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

All fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten Trading Days of written notice thereof to the Indemnifying Party (regardless of whether it is ultimately determined that an Indemnified Party is not entitled to indemnification hereunder; provided, that the Indemnifying Party may require such Indemnified Party to undertake to reimburse all such fees and expenses to the extent it is finally judicially determined that such Indemnified Party is not entitled to indemnification hereunder).

(e)   Contribution. If a claim for indemnification under Section 5(a) or 5(b) is unavailable to an Indemnified Party (by reason of public policy or otherwise), then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in Section 5(c), any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section was available to such party in accordance with its terms.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 5(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.

The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

6.   Miscellaneous.

(a)   Remedies. In the event of a breach by the Company or by a Holder, of any of their obligations under this Agreement, each Holder or the Company, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company and each Holder agree that monetary damages would not provide    adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

(b)     No Piggyback on Registrations. Neither the Company nor any of its security holders (other than the Holders in such capacity pursuant hereto) may include securities of the Company in a Registration Statement other than the Registrable Securities, and the Company shall not during the Effectiveness Period enter into any agreement providing any such right to any of its security holders.

(c)     Compliance. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Registrable Securities pursuant to the Registration Statement.

(d)     Discontinued Disposition. Each Holder agrees by its acquisition of such Registrable Securities that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in Section 3(c), such Holder will forthwith discontinue disposition of such Registrable Securities under the Registration Statement until such Holder's receipt of the copies of the supplemented Prospectus and/or amended Registration Statement or until it is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(e)     Piggy-Back Registrations. If at any time during the Effectiveness Period there is not an effective Registration Statement covering all of the Registrable Securities and the Company shall determine to prepare and file with the Commission a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-4 or Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with stock option or other employee benefit plans, then the Company shall send to each Holder written notice of such determination and if, within fifteen calendar days after receipt of such notice, any such Holder shall so request in writing, the Company shall include in such registration statement all or any part of such Registrable Securities such holder requests to be registered, subject to customary underwriter cutbacks applicable to all holders of registration rights.

(f)     Amendments and Waivers. The provisions of this Agreement, including the provisions of this Section 6(f), may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and the Holders holding at least 67% in interest of the then outstanding Registrable Securities. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be    given by Holders of at least a majority of the Registrable Securities to which such waiver or consent relates; provided, further that no amendment or waiver to any provision of this Agreement relating to naming any Holder or requiring the naming of any Holder as an underwriter may be effected in any manner without such Holder's prior written consent.

Section 2(a) may not be amended or waived except by written consent of each Holder affected by such amendment or waiver.

     (g)   <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the second (2nd) trading day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or upon actual receipt by the party to whom such notice is required to be given.

     (h)   <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of each Holder. The Company may not assign its rights or obligations hereunder without the prior written consent of each Holder. Each Holder may assign their respective rights hereunder in the manner and to the Persons as permitted under the Purchase Agreement.

     (i)   <u>Execution and Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and, all of which taken together shall constitute one and the same Agreement. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were the original thereof.

     (j)   <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all Proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement (whether brought against a party hereto or its respective Affiliates, employees or agents) will be commenced in the New York Courts. Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any Proceeding, any claim that it is not personally subject to the jurisdiction of any New York Court, or that such Proceeding has been commenced in an improper or inconvenient forum. Each party hereto hereby irrevocably waives personal service of process and consents to process being served in any such Proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. If either party shall commence a Proceeding to enforce any provisions of this Agreement, then the prevailing party in such Proceeding shall be reimbursed by the other party for its attorney's fees and other costs and expenses incurred with the investigation, preparation and prosecution of such Proceeding.

     (k)   <u>Cumulative Remedies</u>. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

---

    (l)   <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

    (m)   <u>Headings</u>. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

    (n)   <u>Independent Nature of Investors' Obligations and Rights</u>. The obligations of each Investor under this Agreement are several and not joint with the obligations of each other Investor, and no Investor shall be responsible in any way for the performance of the obligations of any other Investor under this Agreement. Nothing contained herein or in any Transaction Document, and no action taken by any Investor pursuant thereto, shall be deemed to constitute the Investors as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Investors are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement or any other Transaction Document. Each Investor acknowledges that no other Investor will be acting as agent of such Investor in enforcing its rights under this Agreement. Each Investor shall be entitled to independently protect and enforce its rights, including without limitation the rights arising out of this Agreement, and it shall not be necessary for any other Investor to be joined as an additional party in any Proceeding for such purpose. The Company acknowledges that each of the Investors has been provided with the same Registration Rights Agreement for the purpose of closing a transaction with multiple Investors and not because it was required or requested to do so by any Investor.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK SIGNATURE PAGES TO FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**MGT CAPITAL INVESTMENTS, INC.**

By:
Name:
Title:

**LADDCAP VALUE PARTNERS, LP**

By:
Name:
Title:

Plan of Distribution

    The Selling Stockholders and any of their pledgees, donees, transferees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on any stock exchange, market or trading facility on which the shares are traded or quoted or in private transactions. These sales may be at fixed or negotiated prices. The Selling Stockholders may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits Investors;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- to cover short sales made after the date that this Registration Statement is declared effective by the Commission;

- broker-dealers may agree with the Selling Stockholders to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale; and

- other method permitted pursuant to applicable law.

    The Selling Stockholders may also sell shares under Rule 144 under the Securities Act, if available, rather than under this prospectus.

    Broker-dealers engaged by the Selling Stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Stockholders (or, if any broker-dealer acts as agent for the Purchasers of shares, from the Purchasers) in amounts to be negotiated. The Selling Stockholders do not expect these commissions and discounts to exceed what is customary in the types of transactions involved.

    The Selling Stockholders may from time to time pledge or grant a security interest in some or all of the Shares owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell shares of Common Stock from time to time under this prospectus, or under an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933 amending the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus.

Upon the Company being notified in writing by a Selling Stockholder that any material arrangement has been entered into with a broker-dealer for the sale of Common Stock through a block trade, special offering, exchange distribution or secondary distribution or a purchase by a broker or dealer, a supplement to this prospectus will be filed, if required, pursuant to Rule 424(b) under the Securities Act, disclosing (i) the name of each such Selling Stockholder and of the participating broker-dealer(s), (ii) the number of shares involved, (iii) the price at which such the shares of Common Stock were sold, (iv)the commissions paid or discounts or concessions allowed to such broker-dealer(s), where applicable, (v) that such broker-dealer(s) did not conduct any investigation to verify the information set out or incorporated by reference in this prospectus, and (vi) other facts material to the transaction. In addition, upon the Company being notified in writing by a Selling Stockholder that a donee or pledgee intends to sell more than 500 shares of Common Stock, a supplement to this prospectus will be filed if then required in accordance with applicable securities law.

The Selling Stockholders also may transfer the shares of Common Stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The Selling Stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Discounts, concessions, commissions and similar selling expenses, if any, that can be attributed to the sale of Securities will be paid by the Selling Stockholder and/or the Purchasers. Each Selling Stockholder has represented and warranted to the Company that it acquired the securities subject to this Registration Statement in the ordinary course of such Selling Stockholder's business and, at the time of its purchase of such securities such Selling Stockholder had no agreements or understandings, directly or indirectly, with any person to distribute any such securities.

The Company has advised each Selling Stockholder that it may not use shares registered on this Registration Statement to cover short sales of Common Stock made prior to the date on which this Registration Statement shall have been declared effective by the Commission. If a Selling Stockholder uses this prospectus for any sale of the Common Stock, it will be subject to the prospectus delivery requirements of the Securities Act. The Selling Stockholders will be responsible to comply with the applicable provisions of the Securities Act and Exchange Act, and the rules and regulations thereunder promulgated, including, without limitation, Regulation M, as applicable to such Selling Stockholders in connection with resales of their respective shares under this Registration Statement.

The Company is required to pay all fees and expenses incident to the registration of the shares, but the Company will not receive any proceeds from the sale of the Common Stock. The Company has agreed to indemnify the Selling Stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

Annex B

MGT CAPITAL INVESTMENTS, INC.

**Selling Securityholder Notice and Questionnaire**

The undersigned beneficial owner of common stock (the "<u>Common Stock</u>"), of MGT Capital Corporation, Inc., a Delaware corporation (the "<u>Company</u>"), understands that the Company has filed or intends to file with the Securities and Exchange Commission (the "<u>Commission</u>") a Registration Statement for the registration and resale of the Registrable Securities, in accordance with the terms of the Registration Rights Agreement, dated as of [_____] (the "<u>Registration Rights Agreement</u>"), among the Company and the Purchasers named therein. A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Registration Rights Agreement.

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate:

**QUESTIONNAIRE**

**1. Name.**

     (a)    Full Legal Name of Selling Securityholder

     (b)    Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Securities Listed in Item 3 below are held:

     (c)    Full Legal Name of Natural Control Person (which means a natural person who directly or indirectly alone or with others has power to vote or dispose of the securities covered by the questionnaire):

**2. Address for Notices to Selling Securityholder:**

Telephone:
Fax:
Contact Person:

**3. Beneficial Ownership of Registrable Securities:**

Type and Principal Amount of Registrable Securities beneficially owned:

_____

_____

_____

**4. Broker-Dealer Status:**

(a)      Are you a broker-dealer?

Yes [ ]    No [ ]

Note:      If yes, the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

(b)      Are you an affiliate of a broker-dealer?

Yes [ ]    No [ ]

(c)      If you are an affiliate of a broker-dealer, do you certify that you bought the Registrable Securities in the ordinary course of business, and at the time of the purchase of the Registrable Securities to be resold, you had no agreements or understandings, directly or indirectly, with any person to distribute the Registrable Securities?

Yes [ ]    No [ ]

Note:      If no, the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

**5. Beneficial Ownership of Other Securities of the Company Owned by the Selling Securityholder.**

*Except as set forth below in this Item 5, the undersigned is not the beneficial or registered owner of any securities of the Company other than the Registrable Securities listed above in Item 3.*

Type and Amount of Other Securities beneficially owned by the Selling Securityholder:

_____

**6. Relationships with the Company:**

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (owners of 5% of more of the equity securities of the undersigned) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

_____

State any exceptions here:

7. The Company has advised each Selling Stockholder that it may not use shares registered on the Registration Statement to cover short sales of Common Stock made prior to the date on which the Registration Statement is declared effective by the Commission, in accordance with 1997 Securities and Exchange Commission Manual of Publicly Available Telephone Interpretations Section A.65. If a Selling Stockholder uses the prospectus for any sale of the Common Stock, it will be subject to the prospectus delivery requirements of the Securities Act. The Selling Stockholders will be responsible to comply with the applicable provisions of the Securities Act and Exchange Act, and the rules and regulations thereunder promulgated, including, without limitation, Regulation M, as applicable to such Selling Stockholders in connection with resales of their respective shares under the Registration Statement.

The undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof and prior to the Effective Date for the Registration Statement.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items 1 through 6 and the inclusion of such information in the Registration Statement and the related prospectus. The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Registration Statement and the related prospectus.

IN WITNESS WHEREOF the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated: _____    Beneficial Owner: _____

By: _____
Name:
Title:

PLEASE FAX A COPY OF THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE, AND RETURN THE ORIGINAL BY OVERNIGHT MAIL, TO:

[    ]

SK 21760 0001 1150098 v4

424B3 1 v241112_424b3.htm FORM 424(B)(3)

**Filed Pursuant to Rule 424(b)(3)**
**Registration Statement No. 333-177150**

**PROSPECTUS**



**Up to**

**31,640,472 Shares of common stock Issuable Upon Exercise of Rights to Subscribe for Such Shares at $0.025 per Share**

We are distributing, at no charge, to holders of our common stock non-transferable and non-tradable subscription rights to purchase up to 31,640,472 shares of our common stock. We refer to this offering as the "Rights Offering." In this Rights Offering, you will receive one basic subscription privilege for every one share of common stock owned at 5:00 p.m., New York time, on November 21, 2011, the Record Date.

Each whole basic subscription privilege will entitle you to purchase 0.8 shares of our common stock at a subscription price of $0.025 per share (the "Subscription Price"), which we refer to as the "Basic Subscription Privilege." The per share Subscription Price was determined by a committee of our board of directors after taking in consideration the factors described below under the "Determination Of Subscription Price" section beginning on page 18 of this Prospectus. We will not issue fractional shares of common stock in the Rights Offering, and holders will only be entitled to purchase a whole number of shares of common stock, rounded up to the nearest whole number a holder would otherwise be entitled to purchase.

If you fully exercise your Basic Subscription Privilege and other stockholders do not fully exercise their Basic Subscription Privileges, you may also exercise an "Oversubscription Privilege" to purchase a portion of the unsubscribed shares at the same Subscription Price of $0.025 per share, subject to certain limitations as more fully described below. To the extent you properly exercise your Oversubscription Privilege for an amount of shares that exceeds the number of the unsubscribed shares available to you, any excess subscription payment received by the Subscription Agent will be returned promptly, without interest or penalty. If all of the rights are exercised, the total purchase price of the shares offered in the Rights Offering would be $791,011.80. The net proceeds to the Company, after deducting offering expenses of $90,090.65, would be $700,921.15.

This is not an underwritten offering. The shares of common stock are being offered directly by us without the services of an underwriter or selling agent. We are not entering into any standby purchase agreement or similar agreement with respect to the purchase of any shares of our common stock not subscribed for through the Basic Subscription Privilege or the Oversubscription Privilege. Therefore, there is no certainty that any shares will be purchased pursuant to the Rights Offering and there is no minimum purchase requirement as a condition to accepting subscriptions.

The subscription rights will expire void and worthless if they are not exercised by 5:00 p.m., New York time, on December 23, 2011 unless we extend the Rights Offering period. Our board of directors reserves the right to change the Subscription Price prior to the effective date of this Prospectus or to terminate the Rights Offering at any time, for any reason. If the Rights Offering is terminated, all subscription payments received by the Subscription Agent will be returned promptly.

Shares of our common stock are, and we expect that the shares of common stock to be issued in the Rights Offering will be, quoted on the NYSE Amex under the symbol "MGT.BC". On November 15, 2011, the closing trade price of our common stock was $0.05 per share, as reported by the NYSE Amex. We urge you to obtain a current market price for the shares of our common stock before making any determination with respect to the exercise of your rights.

**Exercising the rights and investing in our common stock involves a high degree of risk. We urge you to read carefully this Prospectus, and the "Risk Factors" section beginning on page 11 of this Prospectus, the section entitled "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2010, and all other information included or incorporated herein by reference in this Prospectus in its entirety before you decide whether to exercise your rights.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this Prospectus. Any representation to the contrary is a criminal offense.**

The date of this Prospectus is November 21, 2011

# TABLE OF CONTENTS

*The following table of contents has been designed to help you find information contained in this Prospectus. We encourage you to read the entire Prospectus.*

|  | Page |
| --- | --- |
| ABOUT THIS PROSPECTUS | i |
| QUESTIONS AND ANSWERS RELATED TO THIS RIGHTS OFFERING | 1 |
| PROSPECTUS SUMMARY | 6 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 6 |
| RISK FACTORS | 11 |
| USE OF PROCEEDS | 18 |
| DETERMINATION OF SUBSCRIPTION PRICE | 18 |
| DILUTION | 18 |
| CAPITALIZATION | 19 |
| THE RIGHTS OFFERING | 20 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES | 28 |
| PLAN OF DISTRIBUTION | 30 |
| DESCRIPTION OF SECURITIES TO BE REGISTERED | 30 |
| EXPERTS | 31 |
| LEGAL REPRESENTATION | 31 |
| DESCRIPTION OF BUSINESS | 32 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS CERTAIN MARKET INFORMATION | 35 |
| MATERIAL CHANGES | 37 |
| INCORPORATION OF CERTAIN INFORMATION BY REFERENCE | 37 |
| DISCLOSURE OF COMMISSION POSITION ON INDEMNIFICATION FOR SECURITIES ACT LIABILITIES | 38 |
| WHERE YOU CAN GET MORE INFORMATION | 38 |

## ABOUT THIS PROSPECTUS

You should rely only on the information contained or incorporated by reference in this Prospectus.  We have not authorized anyone to provide you with additional or different information.  If anyone provides you with additional, different or inconsistent information, you should not rely on it.  We are not making an offer to sell securities in any jurisdiction where the offer or sale is not permitted.  You should assume that the information in this Prospectus is accurate only as of the date on the front cover of this Prospectus, and any information we have incorporated by reference is accurate only as of the date of the document incorporated by reference, in each case, regardless of the time of delivery of this Prospectus or any exercise of the subscription rights.  Our business, financial condition, results of operations and prospects may have changed since such dates.

## QUESTIONS AND ANSWERS RELATED TO THE RIGHTS OFFERING

The following are examples of what we anticipate may be common questions about the Rights Offering. The answers are based mostly on selected information from this Prospectus. The following questions and answers do not contain all of the information that may be important to you and may not address all of the questions that you may have about the Rights Offering. This Prospectus contains more detailed descriptions of the terms and conditions of the Rights Offering and provides additional information about us and our business, including potential risks relating to the Rights Offering, our business, and our shares of common stock.

Exercising the rights and investing in our securities involves a high degree of risk. We urge you to carefully read the section entitled "Risk Factors" beginning on page 11 of this Prospectus and all other information included or incorporated by reference in this Prospectus in its entirety before you decide whether to exercise your rights.

### Q: What is a Rights Offering?

A: A Rights Offering is a distribution of subscription rights on a *pro rata* basis to all stockholders of a company to buy a proportional number of additional securities at a given price. We are distributing to holders of our common stock as of 5:00 p.m., New York time, on November 21, 2011 the "Record Date," at no charge, non-transferable and non-tradable subscription rights to purchase shares of our common stock. You will receive one basic subscription privilege for every share of our common stock you owned as of 5:00 p.m., New York time, on the Record Date. Each basic subscription privilege carries with it a basic subscription privilege and an oversubscription privilege (see below). The subscription rights will be evidenced by subscription rights certificates which may be physical certificates and/or electronic instruments issued through the facilities of the Depository Trust Company (the "DTC").

### Q: Why are we engaging in a Rights Offering and how will we use the proceeds from the Rights Offering?

A: The purpose of this Rights Offering is to raise equity capital in a cost-effective manner that allows all stockholders to participate and maintain their proportional ownership interest in the Company. The net proceeds from the Rights Offering will be used for general corporate purposes, including, but not limited to, the purchase of some or all the outstanding shares of Medicsight, the Company's majority owned subsidiary.

### Q: What will be the proceeds of the Rights Offering?

A: If we sell all the shares being offered, we will receive gross proceeds of $791,011.80. We are offering shares in the Rights Offering with no minimum purchase requirement and no standby commitment. As a result, there is no assurance we will be able to sell all or any of the shares being offered, and it is not likely that all of our stockholders will participate in the Rights Offering. We reserve the right to limit the exercise of rights by certain stockholders in order to protect against an unexpected "ownership change" for federal income tax purposes. This may affect our ability to receive gross proceeds of up to $791,011.80 in the Rights Offering.

### Q: What is the basic subscription privilege?

A: A basic subscription privilege evidences a right to purchase 0.8 share of our common stock at a Subscription Price of $0.025 per share for each share of common stock owned on the Record Date. A holder may exercise any number of his/her/its rights. For example, if you own 1,000 shares of our common stock on the Record Date, then you will have the right to purchase between 1 to 800 shares of our common stock at an aggregate price of $0.025 to $20, respectively. We will not issue fractional shares of common stock in the Rights Offering, and holders will only be entitled to purchase a whole number of shares of common stock, rounded up to the nearest whole number a holder would otherwise be entitled to purchase.

If you are a beneficial owner that holds your shares of common stock through a broker, dealer, bank, trustee, depository or other nominee who uses the services of the DTC (each, a "Nominee"), then DTC will credit the account of the Nominee with one (1) right for every one (1) share of common stock you own on the Record Date. Shares of common stock held through a Nominee are referred to as shares which are held in "street name".

1

**Q: What is the oversubscription privilege?**

A: We do not expect that all of our stockholders will exercise all of their basic subscription privilege. If you fully exercise your basic subscription privilege, the oversubscription privilege entitles you to subscribe on a pro rata basis for additional shares of our common stock unclaimed by other holders of rights in this offering at the same subscription price per share. "Pro rata" means in proportion to the aggregate number of shares of our common stock that all subscription rights holders who have requested to purchase pursuant to their respective oversubscription privileges. For example, if X shareholder subscribes for 20 shares and Y shareholder subscribes for 30 shares pursuant to their oversubscription privileges, and there are only 30 shares available for oversubscription, X would receive the right to purchase 20/50 of the 30 shares available for oversubscription and Y would receive the right to purchase 30/50 of the 30 shares available for oversubscription. Payments in respect of the oversubscription privilege are due at the time payment is made for the basic subscription privilege. Any excess Subscription Price payments will be returned, without interest or deduction, promptly after the expiration date of the Rights Offering.

We will not issue fractional shares of common stock in the Rights Offering, and holders will only be entitled to purchase a whole number of shares of common stock, rounded up to the nearest whole number a holder would otherwise be entitled to purchase.

**Q: Who will receive subscription rights?**

A: Holders of our common stock will receive one non-transferable basic subscription privilege for each share of common stock owned as of 5:00pm New York City time on November 21, 2011, the Record Date.

**Q: Am I required to subscribe in the Rights Offering?**

A: No. You may exercise any number of your subscription rights, or you may choose not to exercise subscription rights at all.

**Q: What happens if I choose not to exercise my subscription rights?**

A: If you choose not to exercise your subscription rights you will retain your current number of shares of common stock of the Company. However, the percentage of the common stock of the Company that you own will decrease and your voting rights and other rights will be diluted if and to the extent that other stockholders exercise their subscription rights. For more information see "DILUTION" beginning on page 18 of this Prospectus.

**Q: May I transfer or trade my subscription rights if I do not want to purchase any shares?**

A: No. The rights are non-transferrable. Should you choose not to exercise your rights, you may not sell, give away or otherwise transfer your rights. However, rights will be transferable to affiliates of the recipient and by operation of law, for example, upon the death of the recipient. The rights are also non-tradable. There will be no "trading day" on the Amex (or any other stock market) for the subscription rights.

**Q: How do I exercise my subscription rights?**

A: As soon as practicable after the Record Date we will send a subscription rights certificate to each holder of our shares of common stock that on the Record Date is registered in our stockholder register maintained by VStock Transfer, LLC, the transfer agent of our shares of common stock, which is also acting as the Subscription Agent for the Rights Offering (the "Subscription Agent"). The subscription rights certificate will evidence the number of rights issued to each holder and will be accompanied by a copy of this Prospectus.

If you are a registered stockholder, you may exercise your subscription rights by properly completing and executing your subscription rights certificate and delivering it, together with the full Subscription Price for each share of common stock you subscribe for, to the Subscription Agent on or prior to the expiration date.

If you choose to exercise your oversubscription privilege, as well as your basic subscription privilege, you must: (a) indicate that on the back side of your subscription rights certificate; and (b) make payment in respect of the oversubscription privilege at the same time payment is made for the basic subscription privilege.

If you use the mail, we recommend that you use insured, registered mail, return receipt requested. If you cannot deliver your subscription rights certificate to the Subscription Agent on time, you may follow the guaranteed delivery procedures described under "The Rights Offering - Guaranteed Delivery Procedures" beginning on page 24 of this Prospectus.

If you are a beneficial owner of our shares of common stock and hold them through a Nominee rather than in your own name, we will ask such Nominee to notify you of the Rights Offering. To indicate your decision, you should complete and return to your Nominee the form entitled "Beneficial Owner Election Form" sufficiently in advance of the expiration of the subscription period in order to ensure timely delivery of a subscription rights certificate reflecting your exercise. See also "The Rights Offering- Subscription by Beneficial Owners" beginning on page 22.

2

**Q: To whom should I send my forms and payment?**

A: If your shares are held in the name of a Nominee, then you should send your subscription documents, subscription rights certificate and payment to that record holder. If you are the record holder, then you should send your subscription documents, subscription rights certificate and payment by hand delivery, first class mail or courier service to VStock Transfer, LLC, the Subscription Agent. The address for delivery to the Subscription Agent is as follows:

If delivering by Hand/Mail/Overnight Courier:
VStock Transfer, LLC
77 Spruce Street, Suite 201
Cedarhurst, NY 11598
+1 (212) 828-8436

Your delivery other than in the manner or to the address listed above will not constitute valid delivery.

**Q: After I exercise my rights, can I change my mind and cancel my purchase?**

A: No. Once you exercise and send in your subscription rights certificate and payment you cannot revoke the exercise of your subscription rights, even if you later learn information about the Company that you consider to be unfavorable and even if the market price of our shares of common stock falls below the $0.025 per share Subscription Price. You should not exercise your subscription rights unless you are certain that you wish to purchase additional shares of our common stock at a price of $0.025 per share. See "The Rights Offering—No Revocation or Change."

**Q: Are there any conditions to my right to exercise my subscription rights?**

A: Yes. The Rights Offering is subject to certain limited conditions. Please see "The Rights Offering—Conditions to the Rights Offering."

**Q: If I exercise my subscription rights, when will I receive the shares of common stock that I purchased in the Rights Offering?**

A: We will deliver certificates representing the shares of our common stock purchased in the Rights Offering as soon as practicable after the expiration of the Rights Offering and after all pro rata allocations and adjustments have been completed. Beneficial owners of our shares of common stock whose shares are held by their Nominee, rather than in their own name, will have any shares of common stock acquired in the Rights Offering credited to the account of such Nominee on such date. We will not be able to calculate the number of shares to be issued to each exercising holder until 5:00 p.m., New York City time, on the third business day after the expiration date of the Rights Offering, which is the latest time by which subscription rights certificates may be delivered to the Subscription Agent under the guaranteed delivery procedures described under "The Rights Offering—Guaranteed Delivery Procedures" section of this Prospectus.

**Q: Will the shares that I receive upon exercise of my rights be tradable on the Amex?**

A: Our shares of common stock are listed on the Amex under the symbol "MGT". The underlying shares to be issued in the Rights Offering will also be listed for trading on the Amex. Such underlying shares issued to "Affiliates" of the Company will bear an appropriate restricted legend.

**Q: Will I be charged a sales commission or a fee if I exercise my subscription rights?**

A: We will not charge a brokerage commission to rights holders for exercising their subscription rights. However, the transfer agent may charge processing and mailing fees, and if you exercise your subscription rights through a broker, dealer or nominee, you will be responsible for any fees charged by your Nominee.

**Q: What are the material United States Federal income tax consequences of exercising my subscription rights?**

A: A holder should not recognize income or loss for United States Federal income tax purposes in connection with the receipt or exercise of subscription rights in the Rights Offering. For a detailed discussion, see the "Material United States Federal Income Tax Consequences" section of this Prospectus. You should consult your tax advisor as to the particular consequences to you of the Rights Offering.

**Q: Is exercising my subscription rights risky?**

A: The exercise of your subscription rights involves significant risks. Exercising your rights means buying additional shares of our common stock and should be considered as carefully as you would consider any other equity investment. Among other things, you should

carefully consider the risks described under the "Risk Factors" section of this Prospectus and all other information included in this Prospectus before deciding to exercise your subscription rights.

**Q: Has the board of directors made a recommendation regarding the Rights Offering?**

A: Neither we, nor our board of directors, Subscription Agent, or our Information Agent is making any recommendation as to whether or not you should exercise your subscription rights. You are urged to make your decision based on your own assessment of our business and the Rights Offering, after considering all of the information herein, including the "Risk Factors" section of this document.

3

**Q: May the Officers, Directors and Significant Stockholders of the Company participate in the Rights Offering?**

A: Our officers, directors and greater than 5% beneficial stockholders may participate in the Rights Offering, but none of them are obligated to so participate. Such shares issued to "Affiliates" of the Company will be issued with the appropriate restrictive legends and will be subject to the "short swing profit" provisions of Section 16 the Securities and Exchange Act of 1934, as amended.  None of the foregoing persons has indicated that he will exercise his rights.

**Q: Does the Company need to achieve a certain participation level in order to complete the Rights Offering?**

A: No. We may choose to consummate the Rights Offering regardless of the number of shares actually purchased.

**Q: When will the Rights Offering expire?**

A: The subscription rights will expire and will have no value, if not exercised prior thereto, at 5:00 p.m., New York City time, on December 23, 2011, unless we decide to extend the Rights Offering expiration date until some later time. See "The Rights Offering—Expiration of the Rights Offering and Extensions, Amendments and Termination" beginning on page 21 of this Prospectus. The Subscription Agent must actually receive all required documents and payments before the expiration date.

If you hold your shares through a Nominee, you will be required to comply with the procedural requirements of such Nominee, including the procedures relating to the last time by which you may be required to provide notice of your intention to exercise your rights. For further information see "The Rights Offering-Subscription by Beneficial Owners" beginning on page 22 of this Prospectus.

If you do not timely exercise your rights in accordance with the procedures applicable to you, your ability to exercise the rights and purchase the shares of common stock will expire and you will lose your rights under the Rights Offering.

**Q: How many shares will be outstanding after the Rights Offering?**

A: The number of shares of common stock that will be outstanding after the Rights Offering will depend on the number of shares that are purchased in the Rights Offering. If we sell all of the shares being offered, then we will issue 31,640,472 shares of common stock. In that case, we will have 71,191,062 shares of common stock outstanding after the Rights Offering. This would represent an increase of approximately 80% in the number of outstanding shares of common stock. There is no assurance that all of the subscription rights will be exercised.

**Q. How will this Rights Offering affect the price of our shares on the Amex?**

A. You should not assume or expect that after the completion of the Rights Offering our shares of common stock will trade at or above the Subscription Price in any given time period. The market price of our shares of common stock may decline during or after the Rights Offering, and you may not be able to sell the shares purchased in the Rights Offering at a price equal to or higher than the Subscription Price.

**Q: How was the $0.025 per share Subscription Price established?**

A: A Special Committee of our board of directors determined that the Subscription Price should be designed to, among other things, provide an incentive to our current stockholders to exercise their rights. Other factors considered in setting the Subscription Price included the amount of proceeds desired, our need for equity capital, alternatives available to us for raising equity capital, the historic and current market price and liquidity of our common stock, the pricing of similar transactions, the historic volatility of the market price of our common stock, the historic trading volume of our common stock, our business prospects, our recent and anticipated operating results and general conditions in the securities market. The Subscription Price does not necessarily bear any relationship to the book value of our assets, net worth, past operations, cash flows, losses, financial condition, or any other established criteria for valuing the Company. You should not consider the Subscription Price as an indication of the value of the Company or our common stock.

**Q: Can the board of directors cancel, terminate, amend, or extend the Rights Offering?**

A: Yes. We have the option to extend the Rights Offering and the period for exercising your subscription rights, although we do not presently intend to do so. Our board of directors may cancel the Rights Offering at any time for any reason. If the Rights Offering is cancelled, all subscription payments received by the Subscription Agent will be returned promptly, without interest or penalty. Our board of directors reserves the right to amend or modify the terms of the Rights Offering at any time, for any reason.  See "The Rights Offering—Expiration of the Rights Offering and Extensions, Amendments and Termination."

**Q: What if I have other questions?**

A: If you have other questions about the Rights Offering, please contact our information agent, Alliance Advisors, L.L.C., by telephone at +1 877-777-8211 (U.S. or Canada Toll Free) or +1 973-873-7779 (Worldwide Collect).

 **FOR A MORE COMPLETE DESCRIPTION OF THE RIGHTS OFFERING, SEE "THE RIGHTS OFFERING" BEGINNING ON PAGE 20.**

5

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

*This Prospectus contains forward-looking statements and information relating to our business that are based on our beliefs as well as assumptions made by us or based upon information currently available to us. These statements reflect our current views and assumptions with respect to future events and are subject to risks and uncertainties.  No forward-looking statement can be guaranteed, and actual results may vary materially from those anticipated in any forward-looking statement. Forward-looking statements are often identified by words like: "believe," "expect," "estimate," "anticipate," "intend," "project" and similar expressions or words which, by their nature, refer to future events. In some cases, you can also identify forward-looking statements by terminology such as "may," "will," "should," "plans," "predicts," "potential" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks in the section entitled Risk Factors beginning on page 11, that may cause our or our industry's actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. In addition, you are directed to factors discussed in the section entitled Description of Business beginning on page 32, and as well as those discussed elsewhere in this Prospectus.*

*The aforementioned factors do not represent an all-inclusive list. Actual results, performance or achievements could differ materially from those contemplated, expressed or implied by the forward-looking statements contained in this Prospectus. In particular, this Prospectus sets forth important factors that could cause actual results to differ materially from our forward-looking statements. These and other factors, including general economic factors, business strategies, the state of capital markets, regulatory conditions, and other factors not currently known to us, may be significant, now or in the future, and the factors set forth in this Prospectus may affect us to a greater extent than indicated. All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements set forth in this Prospectus and in other documents that we have filed with the Securities and Exchange Commission including Quarterly Reports on Form 10-Q, Annual Reports on Form 10-K and Current Reports on Form 8-K.*

*These forward-looking statements speak only as of the date of this Prospectus. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, or achievements. Except as required by applicable law, including the securities laws of the United States, we expressly disclaim any obligation or undertaking to disseminate any update or revisions of any of the forward-looking statements to reflect any change in our expectations with regard thereto or to conform these statements to actual results.*

*The Company's main operating currency is UK sterling (£).*

## PROSPECTUS SUMMARY

*You should read the following summary together with the more detailed information elsewhere in this Prospectus, including our consolidated financial statements and the notes to those consolidated financial statements and the section entitled "Risk Factors, regarding us and the shares of common stock being offered for sale by means of this Prospectus.*

*Unless the context indicates or requires otherwise,  (i) the term "MGT" refers to MGT Capital Investments, Inc., a holding company, and its wholly owned subsidiaries-MGT Capital Investments (UK) Limited, MGT Capital Investments Limited and MGT Investments (Gibraltar) Limited; (ii) the term "Medicsight" refers to Medicsight Ltd. a majority owned subsidiary and its wholly owned subsidiaries; and (iii) the terms "we," "our," "ours," "us",  the "Company" and the "Group" refer collectively to MGT Capital Investments, Inc. and its subsidiaries.*

6

**DESCRIPTION OF THE COMPANY AND BUSINESS**

MGT is a holding company.  We hold a controlling interest in Medicsight consisting of 83.75 million shares (53.85%) of the 155.5 million issued share capital of Medicsight. We also have wholly owned subsidiaries MGT Capital Investments (UK) Limited, MGT Capital Investments Limited and MGT Investments (Gibraltar) Limited.

Medicsight and its wholly owned subsidiaries is a medical technology company focusing on medical imaging software development and medical hardware devices. Medicsight was listed on the AIM Market of the London Stock Exchange (Ticker symbol "MDST") until September 22, 2011 and develops and commercializes enterprise-wide Computer-Aided Detection ("CAD") applications which analyze Computer Tomography ("CT") scans to assist radiologists in the early detection and measurement of colorectal polyps and lung lesions. The Company has also developed an automated carbon dioxide ($CO_2$) insufflation device (MedicCO$_2$LON) which it commercializes through a global distributor. Medicsight currently has limited revenue.

In November 2008 Medicsight submitted the ColonCAD™ 510(k) application to the Food and Drug Administration ("FDA") for clearance in the United States of America ("USA"). After review by the FDA, which included several additional submissions by Medicsight and informal meetings with representatives, we were informed in May 2011 that the Medicsight ColonCAD™ application protocol interface ("API") had received clearance from the FDA.

MGT was originally incorporated as a Utah corporation in 1977 and was re-incorporated in Delaware in 2000.  In January 2007 the Company changed its name from Medicsight Inc. to MGT Capital Investments, Inc.

Our principal executive office is located at 26/28 Hammersmith Grove London W6 7BA, United Kingdom, telephone 011-44-207-605-1151, facsimile 011-44-207-605-1171.

**Summary of the Offering**

*The following summary describes the principal terms of the Rights Offering, but is not intended to be complete. See the information in the section entitled "The Rights Offering" in this Prospectus for a more detailed description of the terms and conditions of the Rights Offering.*

| | |
|---|---|
| Rights Granted | We will distribute to each stockholder of record on November 21, 2011, at no charge, one non-transferable and non-tradable basic subscription privilege for each share of our common stock then owned. The rights will be evidenced by subscription rights certificates. If and to the extent that our stockholders exercise their right to purchase our shares of common stock we will issue up to 31,640,472 shares and receive gross proceeds of up to $791,011.80 in cash in the Rights Offering. |
| Basic Subscription Privilege | Each basic subscription privilege will entitle the holder to purchase 0.8 shares of our common stock for $0.025 per share, the Subscription Price, which shall be paid in cash. We will not issue fractional shares, but rather will round up the aggregate number of shares you are entitled to receive to the nearest whole number. |
| Oversubscription Privilege | We do not expect that all of our stockholders will exercise all of their basic subscription privileges. If you fully exercise your basic subscription privilege, the oversubscription privilege entitles you to subscribe on a pro-rata basis for additional shares of our common stock unclaimed by other holders of rights in this offering at the same Subscription Price per share. "Pro rata" means in proportion to the aggregate number of shares of our common stock that all subscription rights holders who have requested to purchase pursuant to their respective oversubscription privileges. The Subscription Agent will return any excess payments by mail without interest or deduction promptly after the expiration of the subscription period. |
| Subscription Price | $0.025 per share, which shall be paid in immediately available funds. |
| Record Date | 5:00 p.m., New York City time on November 21, 2011. |
| Commencement Date of Subscription Period | 5:00 p.m., New York City time on November 29, 2011. |
| Expiration Date of Subscription Period | 5:00 p.m., New York City time, on December 23, 2011, subject to extension or earlier termination. Subject to the foregoing, any rights not exercised at or before December 23, 2011 will have no value and expire without any payment to the holders for those unexercised rights. |
| Non-Transferability of Rights | The subscription rights are not transferable, other than to affiliates of the recipient or by operation of law. |
| Non-Tradability of Rights | The subscription rights are not tradable. There will be no "trading day" on the Amex or any other stock market for the subscription rights. |
| Amendment, Extension and Termination | We may extend the expiration date at any time after the Record Date. We may amend or modify the terms of the Rights Offering. We also reserve the right to terminate the Rights Offering at any time prior to the expiration date for any reason, in which event all funds received in connection with the Rights Offering will be returned without interest or deduction to those persons who exercised their subscription rights. |
| Fractional Shares | We will not issue fractional shares, but rather will round up the aggregate number of shares you are entitled to receive to the nearest whole number. |

| | |
|---|---|
| Procedure for Exercising Rights by Record Holders | You may exercise your subscription rights by properly completing and executing your subscription rights certificate and delivering it, together with the Subscription Price for each share of common stock for which you subscribe, to the Subscription Agent on or prior to the expiration date.

If you use the mail, we recommend that you use insured, registered mail, return receipt requested. If you cannot deliver your subscription rights certificate to the Subscription Agent on time, you may follow the guaranteed delivery procedures described under "The Rights Offering — Guaranteed Delivery Procedures" beginning on page 24. |
| Procedure for Exercising Rights by Beneficial Holders | If you are a beneficial owner who holds our shares of common stock in street name through a Nominee, we will ask your Nominee to notify you of the Rights Offering. If you wish to exercise your rights, you will need to have your Nominee act for you. To indicate your decision, you should complete and return to your Nominee the form entitled "Beneficial Owners Election Form". You should receive this form from your Nominee with the other Rights Offering materials. You should contact your Nominee if you believe you are entitled to participate in the Rights Offering but you have not received this form. For more information see "The Rights Offering - Subscription by Beneficial Owners" beginning on page 22 of this Prospectus. |
| No Revocation | Once you submit the form of subscription rights certificate to exercise any subscription rights, you may not revoke or change your exercise or request a refund of monies paid. All exercises of rights are irrevocable, even if you subsequently learn information about us that you consider to be unfavorable. |
| Payment Adjustments | If you send a payment that is insufficient to purchase the number of shares requested, or if the number of shares requested is not specified in the subscription rights certificate, the payment received will be applied to exercise your subscription rights to the extent of the payment. If the payment exceeds the amount necessary for the full exercise of your subscription rights, including any oversubscription privileges exercised and permitted, the excess will be returned to you as soon as practicable in cash. You will not receive interest or a deduction on any payments refunded to you under the Rights Offering. |
| Dilution & Certain Anti-Dilution Rights and Adjustments | If you choose not to exercise your subscription rights you can still retain your current number of shares of common stock, however, the percentage of the shares of common stock that you own will decrease and your voting rights and other rights will be diluted if and to the extent that other stockholders exercise their subscription rights.

For more information see "DILUTION" beginning on page 18 of this Prospectus. |
| Material United States Federal Income Tax Consequences | A holder will not recognize income or loss for United States Federal income tax purposes in connection with the receipt or exercise of subscription rights in the Rights Offering. For a detailed discussion, see "Material United States Federal Income Tax Consequences" beginning on page 28. You should consult your tax advisor as to the particular consequences to you of the Rights Offering. |
| Issuance of our common stock | We will issue certificates representing shares purchased in the Rights Offering as soon as practicable after the expiration of the Rights Offering. |
| Conditions | See "The Rights Offering—Conditions to the Rights Offering." |
| No Recommendation to Rights Holders | An investment in shares of our common stock must be made according to your evaluation of our business and the Rights Offering and after considering all of the information herein, including the "Risk Factors" section of this Prospectus. Neither we nor our Board of Directors, Subscription Agent or Information Agent are making any recommendation regarding whether you should exercise your subscription rights. |

| | |
|---|---|
| Use of Proceeds | The proceeds from the Rights Offering will be used for general corporate purposes, including, but not limited to, the purchase of some or all the outstanding shares of Medicsight, the Company's majority owned subsidiary. In the event that we do not obtain all or a portion of the maximum proceeds from this Rights Offering, we will need to obtain additional financing. If we are unable to raise funds to satisfy our capital needs on a timely basis, we may be required to cease operations. |
| Subscription Agent | VStock Transfer, LLC. The Subscription Agent's main role is to send this Prospectus and the ancillary offering documents to our stockholders who are eligible to participate in the Rights Offering and to collect all of the completed subscription rights certificates and related payments from such stockholders. |
| Information Agent | Alliance Advisors, L.L.C. The Information Agent's main role is to answer any stockholders questions and provide further information about the Rights Offering. |
| NYSE Amex trading symbol | Shares of our common stock are currently listed for quotation on the NYSE Amex exchange under the symbol "MGT.BC", and any shares issued to you in connection with the rights offering will be eligible for trading on the NYSE Amex exchange. |

## RISK FACTORS

*Investing in our securities involves a high degree of risk. You should carefully consider the specific risks described below, the risks described in our Annual Report on Form 10-K for the fiscal year ended December 31, 2010 and any risks described in our other filings with the Securities and Exchange Commission, pursuant to Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") before making an investment decision. See the section of this Prospectus entitled "Where You Can Find More Information." Any of the risks we describe below or in the information incorporated herein by reference could cause our business, financial condition, results of operations or future prospects to be materially adversely affected. Our business strategy involves significant risks and could result in operating losses. The market price of our common stock could decline if one or more of these risks and uncertainties develop into actual events and you could lose all or part of your investment. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition, results of operations or future prospects. Some of the statements in this section of this Prospectus are forward-looking statements. For more information about forward-looking statements, please see the section of this Prospectus entitled "Cautionary Note Regarding Forward-Looking Statements."*

*We cannot assure you that the Company will be successful in commercializing any of the Company's products, or if any of the products are commercialized, that they will be profitable for the Company. The Company has only had a limited operating history and has just commenced generating revenue from operations upon which an evaluation of its prospects can be made. The Company's prospects must be considered keeping in mind the risks, expenses and difficulties frequently encountered in the establishment of a new business in a constantly changing industry. There can be no assurance that the Company will be able to achieve profitable operations in the foreseeable future if at all. The Company has identified a number of specific risk areas that may affect the Company's operations and results in the future; these statements, like all statements in this Prospectus, speak only as of the date of this report (unless another date is indicated), and we undertake no obligation to update or revise the statements in light of future developments.:*

### Risks Related to the Rights Offering

**IF YOU DO NOT EXERCISE YOUR SUBSCRIPTION RIGHTS, YOUR OWNERSHIP INTEREST WILL BE DILUTED UPON THE COMPLETION OF THE RIGHTS OFFERING.**

The Rights Offering will result in the Company having more shares of its common stock issued and outstanding. To the extent that you do not exercise your rights under the Rights Offering and the Company's shares being offered pursuant thereto are purchased by other stockholders, your proportionate ownership and voting interest in the Company will be reduced. As such, the percentage that your original shares represent of our outstanding common stock after the Rights Offering will be diluted.

**THE PRICE OF OUR COMMON STOCK IS VOLATILE AND MAY DECLINE EITHER BEFORE OR AFTER THE RIGHTS OFFERING EXPIRES.**

The market price of our common stock is subject to fluctuations in response to numerous factors, including factors that have little or nothing to do with us or our performance as a company. These fluctuations could materially reduce our stock price and include, among other things:

- actual or anticipated variations in our operating results and cash flow;

- the nature and content of our earnings releases, and our competitors' and customers' earnings releases;

- changes in financial estimates by securities analysts;

- business conditions in our markets, the general state of the securities markets and the market for common stock in companies similar to ours;

- the number of shares of our common stock outstanding;

- changes in capital markets that affect the perceived availability of capital to companies in our industries;

- governmental legislation or regulation;

- currency and exchange rate fluctuations; and

- general economic and market conditions.

In addition, the stock market historically has experienced significant price and volume fluctuations which, at times, are unrelated to the operating performance of any particular company.  We do not have control over these fluctuations, which may occur irrespective of our operating results or performance and may cause a decline in the market price of our common stock.

**THE SUBSCRIPTION PRICE DETERMINED FOR THE RIGHTS OFFERING IS NOT NECESSARILY AN INDICATION OF THE FAIR VALUE OF OUR COMMON STOCK.**

The Subscription Price for the shares of our common stock pursuant to the Rights Offering is $0.025 per share of our common stock. The Subscription Price was determined by members of a special committee of our board of directors and represents a discount to the market price of a share of common stock on the date that the Subscription Price was determined. Factors considered by the special committee included the market price of the common stock before the announcement of the Rights Offering, the business prospects of our Company and the general condition of the securities market.  No assurance can be given that the market price for our common stock during the Rights Offering will continue to be above or even equal to the Subscription Price or that a subscribing owner of rights will be able to sell the shares of common stock purchased in the Rights Offering at a price equal to or greater than the Subscription Price.

**ONCE YOU AGREE TO SUBSCRIBE TO OUR SHARES PURSUANT TO THE RIGHTS OFFERING, YOU ARE COMMITTED TO BUYING SHARES OF OUR COMMON STOCK AT A PRICE WHICH MAY BE ABOVE THE PREVAILING MARKET PRICE.**

Once you exercise your subscription rights, you may not revoke the exercise of such rights. The trading price of our common stock may decline before the Rights Offering is concluded or before the subscription rights expire. If you exercise your subscription rights and, thereafter, the trading price of our common stock decreases below the Subscription Price, you will have committed to buying shares of our common stock at a price above the prevailing market price, in which case you will have an immediate, unrealized loss.  No assurance can be given that following the exercise of your subscription rights, you will be able to sell your shares of common stock at a price equal to or greater than the Subscription Price paid for such shares.  As such, you may lose all or part of your investment in our common stock. Further, until the certificate representing the shares purchased under the Rights Offering is delivered to you, you will not be able to sell such shares of our common stock.

**IF YOU DO NOT ACT PROMPTLY AND FOLLOW THE SUBSCRIPTION INSTRUCTIONS, YOUR EXERCISE OF SUBSCRIPTION RIGHTS MAY BE REJECTED.**

Stockholders who desire to purchase shares in the Rights Offering must act promptly to ensure that all required forms and payments are actually received by the Subscription Agent before 5:00 p.m., New York time, on December 23, 2011, the expiration date of the Rights Offering, unless extended by us, in our sole discretion. If you are a beneficial owner of shares, but not a record holder, you must act promptly to ensure that your broker, bank, or other nominee acts for you and that all required forms and payments are actually received by the Subscription Agent before the expiration date of the Rights Offering. We will not be responsible if your broker, custodian, or nominee fails to ensure that all required forms and payments are actually received by the Subscription Agent before the expiration date of the Rights Offering. If you fail to complete and sign the required subscription forms, send an incorrect payment amount or otherwise fail to follow the subscription procedures of the Rights Offering, the Subscription Agent may reject your subscription or accept it only to the extent of the payment received. Neither we nor the Subscription Agent undertakes to contact you concerning an incomplete or incorrect subscription form or payment, nor are we under any obligation to correct such forms or payment. We have the sole discretion to determine whether a subscription exercise properly follows the subscription procedures.

**SIGNIFICANT SALES OF OUR COMMON STOCK, OR THE PERCEPTION THAT SIGNIFICANT SALES THEREOF MAY OCCUR IN THE FUTURE COULD ADVERSELY AFFECT THE MARKET PRICE FOR OUR COMMON STOCK.**

The sale of substantial amounts of our common stock could adversely affect the price of these securities. Sales of substantial amounts of our common stock in the public market, and the availability of shares for future sale could adversely affect the prevailing market price of our common stock and could cause the market price of our common stock to remain low for a substantial amount of time.

**WE MAY CANCEL THE RIGHTS OFFERING AT ANY TIME IN WHICH EVENT OUR ONLY OBLIGATION WOULD BE TO RETURN YOUR EXERCISE PAYMENTS.**

We may, in our sole discretion, decide not to continue with the Rights Offering or cancel the same, in which case our only obligation would be to return to you, without interest or penalty, all subscription payments received by the Subscription Agent.

**Risks Related to the Effect of a Reverse Stock Split of Our Common Stock Followed by a Forward Stock Split of Our Common Stock**

**DUE TO THE PENDING REVERSE STOCK SPLIT AND FORWARD STOCK SPLIT IT MAY NOT BE ADVISABLE TO PARTICIPATE IN THE RIGHTS OFFERING**

The Company's board of directors has recommended that the following proposal be considered by the Company's stockholders at the annual meeting of stockholders tentatively scheduled to be held in February 2012: "to consider and act upon a proposal to give the board the authority, at its discretion, to effect a reverse split of the Company's common stock, at an exchange ratio of not less than 1-for-200 shares of the Company's outstanding common stock, and not more than 1-for-1,000 shares of the Company's outstanding common stock with the exact exchange ratio to be determined by the board, immediately followed by a forward split of the Company's outstanding common stock, at an exchange ratio ranging between 10-for-1 shares of the Company's outstanding common stock, and 30-for-1 shares of the Company's outstanding common stock, with the exact exchange ratio to be determined by the board, by filing at any time prior to December 31, 2012 a Certificate of Amendment to the Company's Certificate of Incorporation."

Assuming the Company's stockholders approve and the board subsequently decides to effect a 1-for-1,000 reverse stock split followed by a 10-for-1 forward stock split (resulting in a 1 for 100 reverse/forward stock split) it might not be advisable for you to participate in the Rights Offering unless you plan to maintain share ownership of at least 1,000 shares of the Company's common stock.

**Risks Related to Our Common Stock**

**ADDITIONAL ISSUANCES OF OUR SECURITIES WILL DILUTE YOUR STOCK OWNERSHIP AND COULD AFFECT OUR STOCK PRICE.**

As of November 15, 2011, there were 39,550,590 shares of our common stock issued and outstanding. Our Certificate of Incorporation authorizes the issuance of an aggregate of 75,000,000 shares of common stock The market price of our common stock could fall in response to the sale or issuance of a large number of shares, or the perception that sales of a large number of shares could occur.

**OUR STOCK PRICE AND TRADING VOLUME MAY BE VOLATILE, WHICH COULD RESULT IN LOSSES FOR OUR STOCKHOLDERS.**

The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our common stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our common stock.  We cannot predict the potential impact of these periods of volatility on the price of our common stock. The Company cannot assure you that the market price of our common stock will not fluctuate or decline significantly in the future.

**WE MAY NOT CONTINUE TO MEET THE LISTING STANDARDS OF THE NYSE AMEX MARKET.**

The staff of NYSE Amex has notified the Company that it is not in compliance with the following NYSE Amex continued listing standards: Section 1003(a)(i) of the Company Guide, resulting from stockholders' equity on March 31, 2011 of less than $2.0 million and losses from continuing operations and/or net losses in two of its three most recent fiscal years; Section 1003(a)(ii) of the Company Guide with stockholders' equity of less than $4.0 million and losses from continuing operations and/or net losses in three of its four most recent fiscal years; and Section 1003(a)(iii) with stockholders' equity of less than $6.0 million and losses from continuing operations and/or net losses in its five most recent fiscal years.

On August 23, 2011, the Exchange accepted the Company's plan of compliance submitted to the Exchange in response to the deficiency letter. The Exchange granted the Company an extension until December 8, 2012 to regain compliance with Sections 1003(a) (i)-(iii) of the Exchange's Company Guide. However, there is no assurance of success throughout this process. The Company would have the right to appeal any such determination. However, there is no assurance of success throughout this process.

The Exchange further notified the Company that its common stock had fallen to a low trading price for a significant period of time and that the Company was therefore not in compliance with Section 1003 (f)(v) of the Company Guide. The Company was given until February 23, 2012 to comply with this Section. The Exchange noted that MGT could regain compliance by effectuating a reverse-split of its common stock prior to February 23, 2012. The Company intends to call a stockholder meeting to approve a reverse stock split. There is no assurance that if approved by the Company's stockholders and if effectuated by the Company's board, that such reverse stock split will bring the Company into compliance with the NYSE Amex's listing standards.

**IF OUR COMMON STOCK IS DELISTED FROM THE NYSE AMEX MARKET, THE COMPANY WOULD BE SUBJECT TO THE RISKS RELATING TO PENNY STOCKS.**

If our common stock were to be delisted from trading on the NYSE Amex Market and the trading price of the common stock were below $5.00 per share on the date the common stock were delisted, trading in our common stock would also be subject to the requirements of certain rules promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These rules require additional disclosure by broker-dealers in connection with any trades involving a stock defined as a "penny stock" and impose various sales practice requirements on broker-dealers who sell penny stocks to persons other than established customers and accredited investors, generally institutions. These additional requirements may discourage broker-dealers from effecting transactions in securities that are classified as penny stocks, which could severely limit the market price and liquidity of such securities and the ability of purchasers to sell such securities in the secondary market. A penny stock is defined generally as any non-exchange listed equity security that has a market price of less than $5.00 per share, subject to certain exceptions.

**DISCOVERY OF RELATED PARTY TRANSACTIONS**

In July 2011, the Company became aware of certain alleged irregularities at the Company and Medicsight relating to the fiscal years 2010 and earlier. On July 11, 2011, the Company and Medicsight created special committees of their respective boards to investigate the alleged irregularities. The investigation is ongoing and to date has uncovered potential related party transactions that were previously undisclosed. Based on the initial findings of the investigation, Medicsight's CEO, Allan Rowley was suspended by the Board of Medicsight. Mr. Rowley subsequently tendered, and the board of directors accepted, his resignation on July 26, 2011 as CEO and Director of Medicsight. The Company has determined that despite the discovery of several transactions that would trigger out of period adjustments ("OPA"), when taken either individually or cumulatively, the potential OPA's would be immaterial from both a qualitative or quantitative point of view, and the Company's financial statements do not require restatement at this time. Management is confident that the Company's financial statements will not require a material restatement as a result of any additional irregularities that may be uncovered in the future; however, no assurance can be made that the Company's financial statements will not require restatement as a result of the discovery of additional irregularities. The Company cannot predict with certainty when the investigation will be completed.

**WE DO NOT INTEND TO DECLARE DIVIDENDS ON OUR COMMON STOCK.**

We will not distribute dividends to our stockholders until and unless we can develop sufficient funds from operations to meet our ongoing needs and implement our business plan. The time frame for that is inherently unpredictable, and no stockholder should expect to receive dividends in the near future, or at all.

**Risks Related to Our Business**

**WE MAY BE UNABLE TO DEVELOP OUR EXISTING OR FUTURE TECHNOLOGY.**

Our Medicsight CAD system may not deliver the levels of accuracy and reliability needed to make it a successful product in the market place.  Additionally, the development of such accuracy and reliability may be indefinitely delayed or may never be achieved.  Failure to develop this or other technology could have an adverse material effect on the Company's business, financial condition, results of operations and future prospects.

**THE MARKET FOR OUR TECHNOLOGY MAY BE SLOW TO DEVELOP, IF AT ALL**.

The market for the Medicsight CAD products may be slower to develop or smaller than estimated or it may be more difficult to build the market than anticipated.  The medical community may resist Medicsight CAD products or be slower to accept them than we anticipate.  Revenues from Medicsight CAD may be delayed or costs may be higher than anticipated which may result in the Company requiring additional funding.  Medicsight's principal route to market is via commercial distribution partners.  These arrangements are generally non-exclusive and have no guaranteed sales volumes or commitments.  The partners may be slower to sell our products than anticipated.  Any financial, operational or regulatory risks that affect our partners could also affect the sales of our products.  In the current economic environment, hospitals and clinical purchasing budgets that are reliant on external debt finance may result in purchasing decisions being delayed.  If any of these situations were to occur this could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects.

**WE MAY BE SLOW TO RECEIVE REQUIRED REGULATORY APPROVALS FROM RESPECTIVE GOVERNMENT REGULATORS, IF WE RECEIVE THEM AT ALL.**

The Medicsight CAD system is subject to regulatory requirements in the USA, Europe, Japan, China and our other targeted markets.  Necessary regulatory approvals may not be obtained or may be delayed.  We may incur substantial additional cost in obtaining

regulatory approvals for our products in our targeted markets. Any delays in obtaining the necessary regulatory approvals increase the risk that our competitors' products are approved before our own.  The failure to obtain these approvals on a timely basis and/or the associated costs could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects.

**THE MEDICAL IMAGING MARKET WE OPERATE IN IS HIGHLY COMPETITIVE**.

There are a number of groups and organizations, such as software companies in the medical imaging field, MDCT scanner manufacturers, screening companies and other healthcare providers that may develop a competitive offering to the Medicsight CAD products.  In addition, these competitors may have significantly greater resources than MGT.  We cannot make any assurance that they will not attempt to develop such offerings, that they will not be successful in developing such offerings or that any offerings they may develop will not have a competitive edge over Medicsight CAD products. With delayed regulatory approvals and/or disputed clinical claims we may not have a commercial or clinical advantage over competitors' products.  Should a superior offering come to market, this could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects.

14

**WE ARE A DEVELOPING COMPANY WITH LIMITED REVENUES FROM OPERATIONS**.

We have incurred significant operating losses since inception and have only recently commenced generating revenues from operations.  As a result, we have generated negative cash flows from operations and have an accumulated deficit as of June 30, 2011.  We are operating in a developing industry based on new technology and our primary source of funds to date has been through the issuance of securities and borrowed funds.  There can be no assurance that management's efforts will be successful or that the products we develop and market will be accepted by consumers.  If our products are ultimately unsuccessful in the market, this could have a material adverse effect on our business, financial condition, results of operations and future prospects.

**WE FACE FINANCIAL RISKS AS WE ARE A DEVELOPING COMPANY.**

We have incurred significant operating losses since inception and have limited revenue from operations. As a result, we have generated negative cash flows from operations and our cash balances continue to reduce. While we are optimistic and believe appropriate actions are being taken to mitigate this, there can be no assurance that attempts to reduce cash outflows will be successful and this could have a material adverse effect on our business, financial condition, results of operations.

**OUR CURRENT CORPORATE STRUCTURE MAY PLACE US IN AN UNFAVORABLE MARKET POSITION VIS-À-VIS OUR COMPETITORS.**

MGT's corporate structure may make it more difficult or costly to take certain actions.  We conduct our business through Medicsight, a U.K. company which is 53.85% owned by the MGT and through Medicsight's subsidiaries in the U.K., the U.S., Japan and Gibraltar.  Although MGT and Medicsight share some directors and management, they are required to comply with corporate governance and rules applicable to companies in the United Kingdom and the USA.  Should MGT propose to take any action, such as a transfer or allocation of assets or liabilities between MGT and its subsidiaries, MGT would have to take into consideration the potentially conflicting interests of MGT's stockholders and the non-controlling stockholders.  This may deter MGT from taking such actions that might otherwise be in the best interest of MGT or cause MGT to incur additional costs in taking such actions.  The subsidiary companies would not be able to pay dividends or make other distributions of profits or assets to MGT without making pro-rata payments or distributions to the respective non-controlling stockholders.  Although neither the subsidiary nor MGT has plans to pay dividends or make distributions to its stockholders, MGT's corporate structure may deter its subsidiary from doing so in the future.  If at any point we are ultimately unable to resolve any of these conflicts, this could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects.

**THE PROTECTION OF OUR INTELLECTUAL PROPERTY MAY BE UNCERTAIN, AND WE MAY FACE POSSIBLE CLAIMS OF OTHERS.**

Although we have received patents and have filed patent applications with respect to certain aspects of our technology, we generally do not rely on patent protection with respect to our products and technologies.  Instead, we rely primarily on a combination of trade secret and copyright law, employee and third-party non-disclosure agreements and other protective measures to protect intellectual property rights pertaining to our products and technologies.  Such measures may not provide meaningful protection of our trade secrets, know-how or other intellectual property in the event of any unauthorized use, misappropriation or disclosure.  Others may independently develop similar technologies or duplicate our technologies.  In addition, to the extent that we apply for any patents, such applications may not result in issued patents or, if issued, such patents may not be valid or of value.  Third parties could, in the future, assert infringement or misappropriation claims against us with respect to our current or future products and technologies, or we may need to assert claims of infringement against third parties.  Any infringement or misappropriation claim by us or against us could place significant strain on our financial resources, divert management's attention from our business and harm our reputation.  The costs of prosecuting or defending an intellectual property claim could be substantial and could adversely affect our business, even if we are ultimately successful in prosecuting or defending any such claims.  If our products or technologies are found to infringe the rights of a third party, we could be required to pay significant damages or license fees or cease production, any of which could have a material adverse effect on our business.  If a claim is brought against us, or we ultimately prove unsuccessful on the claims on our merits, this could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects.

**WE MAY FAIL TO ATTRACT AND RETAIN QUALIFIED PERSONNEL**.

There is intense competition from other companies, research and academic institutions, government entities and other organizations for qualified personnel in the areas of our activities.  If we fail to identify, attract, retain and motivate these highly skilled personnel, we may be unable to continue our marketing and development activities, and this could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects.

**IF WE DO NOT EFFECTIVELY MANAGE CHANGES IN OUR BUSINESS, THESE CHANGES COULD PLACE A SIGNIFICANT STRAIN ON OUR MANAGEMENT AND OPERATIONS.**

To manage our growth successfully, we must continue to improve and expand our systems and infrastructure in a timely and efficient manner.  Our controls, systems, procedures and resources may not be adequate to support a changing and growing company.  If our management fails to respond effectively to changes and growth in our business, including acquisitions, this could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects**.**

15

**WE FACE RISKS ARISING FROM FOREIGN CURRENCY EXCHANGE.**

As our main operating currency is U.K. sterling and its financial statements are reported in U.S. dollars, MGT's assets and liabilities and results of operations are affected by movements in the $:£ exchange rate.  Should there be large or unexpected fluctuations in the $:£ exchange rate, this could have a material effect on the Company's business, financial condition, results of operations and future prospects.  We currently do not engage in hedging activities to minimize the effect of adverse movements in the exchange rate.

**WE MAY NOT BE ABLE TO QUICKLY REALIZE OUR INVESTMENTS AND RECEIVABLES AT THE VALUE AT WHICH WE HAVE RECORDED THEM.**

We have a number of investments and receivables held at both at market value and at cost.  There is a risk that we may not be able to swiftly realize these investments and receivables at the fair value or cost at which they are recorded in the financial statements.  If we are unable to quickly realize these investments and receivables at prices we believe to be fair, this could have a material effect on the Company's business, financial condition, results of operations and future prospects.

**IT MAY BE DIFFICULT FOR STOCKHOLDERS TO RECOVER AGAINST THOSE OF OUR DIRECTORS AND OFFICERS THAT ARE NOT RESIDENTS OF THE U.S.**

One of our directors is a resident of the United Kingdom. In addition, our significant operating subsidiary, Medicsight, is located in the United Kingdom. If one or more stockholders were to bring an action against us in the United States and succeed, either through default or on the merits, and obtain a financial award against a director of the Company, that stockholder may be required to enforce and collect on his or her judgment in the United Kingdom, unless the director owned assets which were located in the United States. Further, stockholder efforts to bring an action in the United Kingdom against its citizens for any alleged breach of a duty in a foreign jurisdiction may be difficult, as prosecution of a claim in a foreign jurisdiction, and in particular a foreign nation, is fraught with difficulty and may be effectively, if not financially, unfeasible.

**BECAUSE WE HAVE INTERNATIONAL OPERATIONS, WE WILL BE SUBJECT TO RISKS OF CONDUCTING BUSINESS IN FOREIGN COUNTRIES.**

International operations constitute a significant part of our business, and we are subject to the risks of conducting business in foreign countries, including:

- difficulty in establishing or managing distribution relationships;

- different standards for the development, use, packaging and marketing of our products and technologies;

- our ability to locate qualified local employees, partners, distributors and suppliers;

- the potential burden of complying with a variety of foreign laws and trade standards; and

- general geopolitical risks, such as political and economic instability, changes in diplomatic and trade relations, and foreign currency risks and fluctuations.

No assurance can be given that we will be able to positively manage the risks inherent in the conduct of our international operations or that such operations will not have a negative impact on our overall financial operations.

<b>General market risks</b>

**WE MAY NOT BE ABLE TO ACCESS CREDIT.**

We face the risk that we may not be able to access credit, either from lenders or suppliers, or have facilities reduced or terminated.  Failure to access credit from any of these sources could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects.

**RECENT GLOBAL ECONOMIC TRENDS COULD ADVERSELY AFFECT OUR BUSINESS, LIQUIDITY AND FINANCIAL RESULTS.**

Recent global economic conditions, including disruption of financial markets, could adversely affect us, primarily through limiting our access to capital and disrupting our clients' businesses.  In addition, continuation or worsening of general market conditions in economies

important to our businesses may adversely affect our clients' level of spending and ability to obtain financing, leading to us being unable to generate the levels of sales that we require.  Current and continued disruption of financial markets could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects.

16

**WE MAY NOT BE ABLE TO MAINTAIN EFFECTIVE INTERNAL CONTROLS.**

If we fail to maintain the adequacy of our internal accounting controls, as such standards are modified, supplemented or amended from time to time, we may not be able to ensure that we can conclude on an ongoing basis that we have effective internal controls over financial reporting in accordance with Section 404 of the Sarbanes Oxley Act of 2002. Failure to achieve and maintain an effective internal control environment could cause us to face regulatory action and also cause investors to lose confidence in our reported financial information, either of which could have a material adverse effect on the Company's business, financial condition, results of operations and future prospects. As discussed in Item 9A of our Annual Report on Form 10-K for the year ended December 31, 2010, we identified the following material weaknesses: The Company did not properly identify and track matters requiring shareholder approval and notifications. Additionally, as discussed in our Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2011, the Company identified an additional material weakness: The Company did not identify all related party relationships.

17

## USE OF PROCEEDS

The net proceeds from this Rights Offering will be used for general corporate purposes, including, but not limited to, the purchase of some or all the outstanding shares of Medicsight, the Company's majority owned subsidiary.

In the event that we do not obtain all, or we obtain only a portion, of the maximum proceeds from this Rights Offering, we will need to pursue additional sources of capital to fund our operations, which may consist of equity or debt financing. If we are unable to raise funds to satisfy our capital needs on a timely basis, we may be required to cease operations.

## DETERMINATION OF SUBSCRIPTION PRICE

Our Board of Directors created a Special Committee comprised of independent directors to determine the Subscription Price. The Special Committee will consider a number of factors, including the price at which our stockholders might be willing to participate in the Rights Offering, historical and current trading prices for our common shares, the need for liquidity and capital, and the desire to provide an opportunity to our stockholders to participate in the Rights Offering on a pro rata basis. In conjunction with its review of these factors, the Special Committee is currently reviewing our history and prospects, including our prospects for future earnings, our current financial condition and regulatory status, and a range of discounts to market value represented by the Subscription prices in various prior rights offerings of public companies.

The Subscription Price will not necessarily be related to our book value, net worth or any other established criteria of value and may or may not be considered the fair value of our common shares to be offered in the Rights Offering. You should not assume or expect that, after the Rights Offering, our common shares will trade at or above the Subscription Price and we cannot assure you that our common shares will trade at or above the Subscription Price in any given time period.  We also cannot assure you that you will be able to sell common shares purchased during the Rights Offering at a price equal to or greater than the Subscription Price. Accordingly, we urge you to obtain a current quote for our common shares before exercising your subscription rights.

## DILUTION
### (in thousands, except per-share amounts)

Purchasers of our common stock in the rights offering will experience an immediate dilution of the net tangible book value per share of our common stock.  Our net tangible book value as of September 30, 2011 was approximately $(1,794) or $(0.045) per share of our common stock (based upon 39,551 shares of our common stock outstanding).  Net tangible book value per share is equal to our total net tangible book value, which is our total tangible assets less our total liabilities, divided by the number of shares of our outstanding common stock.  Dilution per share equals the difference between the amount per share paid by purchasers of shares of common stock in the rights offering and the net tangible book value per share of our common stock immediately after the rights offering.

Based on the aggregate offering of a maximum of 31,640 shares and after deducting estimated offering expenses payable by us of $90, and the application of the estimated $701 of net proceeds from the rights offering, our pro forma net tangible book value as of September 30, 2011 would have been approximately $(1,093) or $(0.015) per share.  This represents an immediate increase in pro forma net tangible book value to existing shareholders of $0.030 per share and an immediate dilution to purchasers in the rights offering of $0.040 per share.

The following table illustrates this per-share dilution (assuming a fully subscribed for rights offering of 31,640 shares of common stock at the subscription price of $0.025 per share:

| | | |
|---|---|---|
| **Subscription price per share** | $ | 0.025 |
| **Net tangible book value per share prior to the Rights Offering** | $ | (0.045) |
| **Increase in net tangible book value per share attributable to the Rights Offering** | $ | 0.030 |
| **Pro forma net tangible book value per share after the Rights Offering** | $ | (0.015) |
| **Dilution in net tangible book value per share to purchasers** | $ | 0.040 |

## CAPITALIZATION
### (in thousands, except per-share amounts)

The following table sets forth our historical and pro forma capitalization as of November 15, 2011. The pro forma information gives effect to a net assumed $701 equity raise from this Rights Offering.

For purposes of this table, we have assumed that $701 net is raised in this Rights Offering. However, it is impossible to predict how many rights will be exercised in this offering and therefore how much proceeds will actually be raised.

This table should be read in conjunction with our consolidated financial statements and the notes thereto which are incorporated by reference into this Prospectus.

|  | (Unaudited) September 30, 2011 | |
|  | Actual | Pro-forma |
|---|---|---|
| **Stockholders' equity (deficit):** |  |  |
| Common stock, $0.001 par value: 75,000,000 shares authorized; 39,550,590 shares issued and outstanding (actual) and 71,191,062 shares issued and outstanding (pro-forma) at September 30, 2011. | 40 | 72 |
| Additional paid-in capital | 282,535 | 283,204 |
| Accumulated other comprehensive loss | (4,747) | (4,747) |
| Accumulated (deficit) | (279,622) | (279,622) |
| Total stockholders' equity (deficit) | (1,794) | (1,093) |
| Non-controlling interest | 5,580 | 5,580 |
| **Total capitalization** | $ 3,786 | $ 4,487 |

(1)      Pro forma balance reflects $791 of gross proceeds from the Rights Offering, less approximately $90 of offering costs.

**THE RIGHTS OFFERING**

**Subscription Rights**

*Basic Subscription Privilege*

We will distribute, at no charge, to each holder of our shares of common stock who is a record holder of our shares of common stock on the Record Date, which is November 21, 2011, one non-transferable and non-tradable basic subscription privilege for each share of common stock owned on the Record Date. The basic subscription privileges will be evidenced by subscription rights certificates. Each basic subscription privilege will entitle the rights holder to purchase 0.8 shares of our common stock at a price of $0.025 per share, the Subscription Price, which shall be paid in immediately available funds, upon timely delivery of the required documents and payment of the Subscription Price. We will not issue fractional shares, but rather will round up the aggregate number of shares you are entitled to receive to the nearest whole number. See below "Fractional Securities".

If rights holders wish to exercise their basic subscription privilege, they must do so prior to 5:00 p.m., New York City time, on December 23, 2011, the expiration date for the Rights Offering, subject to extension. After the expiration date, the subscription rights will expire and will have no value. See below "Expiration of the Rights Offering and Extensions, Amendments and Termination." You are not required to exercise any or all of your subscription rights. We will deliver to the holders who participate in the Rights Offering the shares purchased as soon as practicable after the Rights Offering has expired.

The rights will be evidenced by subscription rights certificates which will be mailed to stockholders. The subscription rights will not be transferable other than by operation of law or tradable on any stock exchange or market.

There is no minimum subscription amount in the Rights Offering.

*Oversubscription Privilege*

Subject to the allocation described below, each basic subscription privilege also grants the holder an oversubscription privilege to purchase additional shares of our common stock that are not purchased by other rights holders pursuant to their basic subscription privileges. You are entitled to exercise your oversubscription privilege only if you exercise your basic subscription privilege in full.

If you wish to exercise your oversubscription privilege, you should indicate the number of additional shares that you would like to purchase in the space provided on your subscription rights certificate, as well as the number of shares that you own without giving effect to any shares to be purchased in this offering. When you send in your subscription rights certificate, you must also send the full Subscription Price in immediately available funds for the number of additional shares that you have requested to purchase (in addition to the payment in immediately available funds due for shares purchased through your basic subscription privilege). If the number of shares remaining after the exercise of all basic subscription privileges is not sufficient to satisfy all requests for shares pursuant to oversubscription privileges, you will be allocated additional shares (subject to elimination of fractional shares) on a pro rata basis in the proportion which the number of shares you subscribed for through your oversubscription privilege bears to the total number of shares that all oversubscribing stockholders subscribe for through their oversubscription privileges. If the prorated amount of rights allocated to you in connection with your oversubscription right is less than your oversubscription request, the Subscription Agent will return any excess payments by mail without interest or deduction promptly after the expiration of the subscription period.

As soon as practicable after the expiration date, the Subscription Agent will determine the number of shares of common stock that you may purchase pursuant to the oversubscription privilege. You will receive these shares as soon as practicable after the expiration date and after all allocations and adjustments have been effected. If you request and pay for more shares than are allocated to you, the Subscription Agent will refund the overpayment, without interest or deduction. In connection with the exercise of the oversubscription privilege, Nominees who act on behalf of beneficial owners will be required to certify to us and to the Subscription Agent as to the aggregate number of subscription rights exercised, and the number of shares of common stock requested through the oversubscription privilege, by each beneficial owner on whose behalf the Nominee is acting.

Nominee holders of rights, including DTC members, will be required to certify to the Subscription Agent before any oversubscription right may be exercised with respect to any particular beneficial owner as to (a) the number of rights exercised pursuant to its basic subscription privilege and (b) the number of rights subscribed for pursuant to the oversubscription right of such beneficial owner.

*Fractional Securities*

We will issue only whole numbers of securities in the Rights Offering. Accordingly, if you are entitled to receive a fraction of a subscription right in the Rights Offering, we will round it up to the nearest whole number. With respect to shares of common stock

registered on our stockholder register maintained by our transfer agent, VStock Transfer, LLC, including those held in the name of DTC, such rounding will be made with respect to each record and beneficial stockholder.

20

**Expiration of the Rights Offering and Extensions, Amendments and Termination**

You may exercise your subscription rights at any time prior to 5:00 p.m, New York City time, on December 23, 2011, the expiration date for the Rights Offering. If you do not exercise your subscription rights before the expiration date of the Rights Offering, your subscription rights will expire and will have no value. We will not be required to issue shares of our common stock to you if the Subscription Agent receives your subscription rights certificate or payment, after the expiration date, regardless of when you sent the subscription rights certificate and payment, unless you send the documents in compliance with the guaranteed delivery procedures described below.

Subject to applicable law and the rules and/or guidelines of Amex, we may, in our sole discretion, extend the time for exercising the subscription rights. We may extend the expiration date at any time after the Record Date. If the commencement of the Rights Offering is delayed for a period of time, the expiration date of the Rights Offering may be similarly extended. We will extend the duration of the Rights Offering as required by applicable law, and may choose to extend the duration of the Rights Offering for any reason. We may extend the expiration date of the Rights Offering by giving oral or written notice to the Subscription Agent on or before the scheduled expiration date. If we elect to extend the expiration date of the Rights Offering, we will issue a press release announcing such extension no later than 9:00 a.m., New York City time, on the next business day after the most recently announced expiration date. In no event will we extend the expiration date beyond 90 days from the date we distribute the rights.

We reserve the right, in our sole discretion, to amend or modify the terms of the Rights Offering (including the Subscription Price) until the effective date of this Prospectus. We also reserve the right to terminate the Rights Offering at any time prior to the expiration date for any reason, in which event all funds received in connection with the Rights Offering will be returned without interest or deduction to those holders who exercised their subscription rights as soon as practicable.

Any rights not exercised at or before the expiration date of the Rights Offering will have no value and expire without any payment to the holders of those unexercised rights. We will not honor your exercise of subscription rights if the Subscription Agent or the Company receives the documents relating to your exercise after the Rights Offering expires, regardless of when you transmitted the documents.

**Conditions to the Rights Offering**

Without prejudice to the generality of the immediately above paragraph, we may terminate the Rights Offering, in whole or in part, if at any time before the completion of the Rights Offering there is any judgment, order, decree, injunction, statute, law or regulation entered, enacted, amended or held to be applicable to the Rights Offering that in our sole judgment would or might make the Rights Offering or its completion, whether in whole or in part, illegal or otherwise restrict or prohibit completion of the Rights Offering. We may waive any of these conditions and choose to proceed with the Rights Offering even if one or more of these events occur. If we terminate the Rights Offering, in whole or in part, all affected subscription rights will expire without value and all subscription payments received by the U.S. Subscription Agent will be returned without interest or deduction, as soon as practicable. See also "Expiration of the Rights Offering and Extensions, Amendments and Termination". Any termination of the Rights Offering will be followed as promptly as practicable by a public announcement.

**Non-Transferability and Non-Tradability of the Rights**

The subscription rights granted to you are non-transferable and, therefore, may not be assigned, gifted, purchased, sold or otherwise transferred to anyone else except by operation of law; for example, a transfer of rights to the estate of the holder upon the death of the holder would be permitted. If the rights are transferred as permitted, evidence satisfactory to us that the transfer was proper must be received by us or the Subscription Agent prior to the expiration date of the Rights Offering. The subscription rights are also non-tradable and, therefore, there will be no "trading day" on the Amex or any other stock market for the subscription rights.

**No Revocation or Change**

Once you submit the subscription rights certificate to exercise any subscription rights, you may not revoke, cancel or change your exercise or request a refund of monies paid. All exercises of rights are irrevocable, even if you subsequently learn information about us that you consider to be materially unfavorable. You should not exercise your rights unless you are certain that you wish to purchase additional shares of our common stock at the Subscription Price.

**Method of Exercising Subscription Rights**

Your subscription rights will not be considered exercised unless the Subscription Agent receives from you or your Nominee, as the case may be, all of the required documents properly completed and executed and your full Subscription Price payment in immediately available funds, as provided herein, prior to the expiration date of the Rights Offering. Rights holders may exercise their rights as follows:

### Subscription by Registered Holders

Rights holders who are registered holders of our common stock may exercise their subscription privilege by properly completing and executing the subscription rights certificate together with any required signature guarantees and forwarding it, together with payment in full in cash, of the Subscription Price for each share of the common stock for which they subscribe, to the Subscription Agent at the address set forth under the subsection entitled "Delivery of Subscription Materials and Payment," on or prior to the expiration date.

Completed subscription rights certificates and related payments must be received by us prior to 5:00  p.m., New York City time on December 23, 2011.

### Subscription by DTC Participants

We expect that the exercise of your subscription rights may be made through the facilities of DTC. If your subscription rights are held of record through DTC, you may exercise your subscription rights by instructing DTC, or having your Nominee instruct DTC, to transfer your subscription rights from your account to the account of the Subscription Agent, together with certification as to the aggregate number of subscription rights you are exercising and the number of shares of our common stock you are subscribing for under your basic subscription privilege and your oversubscription privilege, if any, and your full subscription payment.

### Subscription by Beneficial Owners

If you are a beneficial owner of shares of our common stock and hold them through a Nominee, rather than in your own name, or will receive subscription rights through a Nominee (including a member of the DTC), we will ask your Nominee to notify you of the Rights Offering. If you wish to exercise your subscription rights, you will need to have your Nominee act for you. If you hold certificates of shares of our common stock directly and would prefer to have your Nominee act for you, you should contact your Nominee and request it to effect the transactions for you. To indicate your decision with respect to your subscription rights, you should complete and return to your Nominee the form entitled "Beneficial Owners Election Form" sufficiently in advance of the expiration date of the Rights Offering in order to ensure timely delivery of a subscription rights certificate reflecting your exercise. You should receive the "Beneficial Owners Election Form" from your Nominee with the other Rights Offering materials. If you wish to obtain a separate subscription rights certificate, you should contact the Nominee as soon as possible and request that a separate subscription rights certificate be issued to you.

You should contact your Nominee if you do not receive the foregoing form but you believe you are entitled to participate in the Rights Offering. A rights holder's subscription rights will not be considered exercised unless we or the Subscription Agent (as applicable) receives from such rights holder or his/her/its Nominee, as the case may be, all of the required documents and such holder's full Subscription Price payment. We are not responsible if you do not receive the foregoing form from your Nominee or if you receive it without sufficient time to respond.

### Nominee Holders

If you are a Nominee for securities who holds shares of our common stock for the account of others as of the Record Date, you should notify the respective beneficial owners of such shares of the Rights Offering as soon as possible to find out their intentions with respect to exercising their subscription rights. You should obtain instructions from the beneficial owners with respect to their subscription rights, as set forth in the instructions we have provided to you for your distribution to beneficial owners. If a beneficial owner so instructs, you should complete the appropriate subscription rights certificates and submit them to the Subscription Agent with the proper payment. If you hold shares of our common stock for the account(s) of more than one beneficial owner, you may exercise the number of subscription rights to which all such beneficial owners in the aggregate otherwise would have been entitled had they been registered record holders of our shares of common stock on the Record Date, provided that you, as a Nominee record holder, make a proper showing to the Subscription Agent by submitting the form entitled "Nominee Holder Certification" that we will provide to you with your Rights Offering materials. If you did not receive this form, you should contact the Subscription Agent to request a copy.

### General

All questions as to the timeliness, validity, form, eligibility (including times of receipt and matters pertaining to beneficial ownership) and the acceptance of subscription forms and the Subscription Price will be determined by us, which determinations will be final and binding. No alternative, conditional or contingent subscriptions will be accepted.

We reserve the right to reject any exercise if such exercise is not in accordance with the terms of the Rights Offering or not in proper form or if the acceptance thereof or the issuance of our shares of common stock thereto could be deemed unlawful. We reserve the right to waive any deficiency or irregularity with respect to any subscription rights certificate. Subscriptions will not be deemed to have been received or accepted until all irregularities have been waived or cured within such time as we determine in our sole discretion. We will not

be under any duty to give notification of any defect or irregularity in connection with the submission of subscription rights certificates or incur any liability for failure to give such notification.

22

*Subscription rights certificates received after 5:00 p.m., New York City time, on December 23, 2011, the expiration date of the Rights Offering, will not be honored, and we will return your payment to you as soon as practicable, without interest or deduction.*

**Method of Payment**

Payments must be made in full in:

- U.S. currency by:

  - check or bank draft in U.S. Dollars drawn on a U.S. or UK bank, or postal telegraphic or express, payable to "VStock Transfer, LLC, as Subscription Agent for MGT Capital Investments, Inc.";

  - money order payable to "VStock Transfer, LLC, as Subscription Agent"; or

  - wire transfer of immediately available funds directly to the account maintained by VStock Transfer, LLC as Subscription Agent, for purposes of accepting subscriptions in this Rights Offering at:

    **Citibank, N.A.**
    **ABA # 021000089**
    **Account # 9995799340 VStock Transfer, LLC F/B/O MGT Capital Investments, Inc. Subscription, with reference to the rights holder's name.**

We may, in our sole discretion, agree to accept other forms of payment requested by you. However, because uncertified personal checks may take at least five business days to clear, you are strongly urged to pay, or arrange for payment, by means of certified or cashier's check or money order.

The Subscription Agent will be deemed to receive payment upon:

- clearance of any uncertified check deposited by the subject agent;

- receipt by the Subscription Agent of any certified bank check draft in U.S. Dollars drawn upon a U.S. or UK bank;

- receipt by the Subscription Agent of any U.S. Postal money order; or

- receipt by the Subscription Agent of any appropriately executed and irrevocable wire transfer payable in U.S. Dollars.

You should read the instruction letter accompanying the subscription rights certificate carefully and strictly follow it. DO NOT SEND SUBSCRIPTION RIGHTS CERTIFICATES OR PAYMENTS TO US. Except as described below under "Guaranteed Delivery Procedures," we will not consider your subscription received until the Subscription Agent has received delivery of a properly completed and duly executed subscription rights certificate and payment of the full Subscription Price. The risk of delivery of all documents and payments is on you or your nominee, not us or the Subscription Agent.

The method of delivery of subscription rights certificates and payment of the subscription amount to the Subscription Agent will be at the risk of the holders of rights, but, if sent by mail, we recommend that you send those certificates and payments by overnight courier or by registered mail, properly insured, with return receipt requested, and that a sufficient number of days be allowed to ensure delivery to the Subscription Agent and clearance of payment before the expiration of the subscription period.

Unless a subscription rights certificate provides that the shares of common stock are to be delivered to the record holder of such rights or such certificate is submitted for the account of a bank or a broker, signatures on such subscription rights certificate must be guaranteed by an "Eligible Guarantor Institution," as such term is defined in Rule 17Ad-15 of the Exchange Act of 1934, as amended, subject to any standards and procedures adopted by the Subscription Agent. See "Medallion Guarantee May be Required."

Subscription rights certificates received after 5:00 p.m., New York City time, on December 23, 2011, the expiration date of the Rights Offering, will not be honored, and we will return your payment to you as soon as practicable, without interest or deduction.

**Medallion Guarantee May Be Required**

Your signature on each subscription rights certificate must be guaranteed by an eligible institution, such as a member firm of a registered national securities exchange or a member of the Financial Industry Regulatory Authority, Inc., or a commercial bank or trust company

having an office or correspondent in the United States, subject to standards and procedures adopted by the Subscription Agent, unless:

- your subscription rights certificate provides that the shares of common stock are to be delivered to you as record holder of those subscription rights; or

- you are an eligible institution.

23

**Delivery of Subscription Materials and Payment**

If you are a holder of our shares of common stock that are registered on our stockholder register maintained by our transfer agent, you should deliver your subscription rights certificate and payment of the Subscription Price in cash and/or securities, as provided herein, or, if applicable, notice of guaranteed delivery (see immediately below), to the Subscription Agent by one of the methods described below:

If delivering by Hand/Mail/Overnight Courier:
**VStock Transfer, LLC**
**77 Spruce Street, Suite 201**
**Cedarhurst, NY 11598**
**+1 (212) 828-8436**

Your delivery other than in the manner or to the address listed above will not constitute valid delivery.

**Guaranteed Delivery Procedures**

The Subscription Agent will grant you three business days after the expiration date to deliver the subscription rights certificate if you follow the following instructions for providing the Subscription Agent notice of guaranteed delivery. On or prior to the expiration date, the Subscription Agent must receive payment in full in cash, as provided herein, for all shares of common stock subscribed for through the exercise of the basic and oversubscription privilege, together with a properly completed and duly executed notice of guaranteed delivery substantially in the form accompanying this Prospectus either by mail or overnight carrier, that specifies the name of the holder of the rights and the number of shares of common stock subscribed for. If applicable, it must state separately the number of shares of common stock subscribed for through the exercise of the basic and oversubscription privilege and a member firm of a registered national securities exchange, a member of the Financial Industry Regulatory Authority, Inc., or a commercial bank or trust company having an office or correspondent in the United States must guarantee that the properly completed and executed subscription rights certificate for all shares of common stock subscribed for will be delivered to the Subscription Agent within three business days after the expiration date. The Subscription Agent will then conditionally accept the exercise of the rights and will withhold the certificates for shares of common stock until it receives the properly completed and duly executed subscription rights certificate within that time period.

In the case of holders of rights that are held of record through DTC, those rights may be exercised by instructing DTC to transfer rights from that holder's DTC account to the Subscription Agent's DTC account, together with payment of the full Subscription Price. The notice of guaranteed delivery must be guaranteed by a commercial bank, trust company or credit union having an office, branch or agency in the United States or by a member of a Stock Transfer Association approved medallion program such as STAMP, SEMP or MSP.

Notices of guaranteed delivery and payments should be mailed or delivered to the appropriate address set forth above under "Delivery of Subscription Materials and Payment."

**Calculation of Subscription Rights Exercised**

If you do not indicate the number of subscription rights being exercised, or do not forward full payment in cash and/or securities, as provided herein, of the total Subscription Price payment for the number of subscription rights that you indicate are being exercised, then you will be deemed to have exercised your basic subscription privilege with respect to the maximum number of subscription rights that may be exercised with the aggregate Subscription Price payment in cash and/or securities, as provided herein, you delivered to the Subscription Agent. If we do not apply your full Subscription Price payment to your purchase of shares of our common stock, we or the Subscription Agent will return in cash the excess amount to you by mail, without interest or deduction, as soon as practicable after the expiration date of the Rights Offering.

**Escrow Arrangements**

The Subscription Agent will hold funds received in payment of the Subscription Price in a segregated account until the Rights Offering is completed or withdrawn and terminated.

**Determinations Regarding the Exercise of Your Subscription Rights**

We will decide all questions concerning the timeliness, validity, form and eligibility of the exercise of your subscription rights. We, in our sole discretion, may waive, in any particular instance, any defect or irregularity, or permit, in any particular instance, a defect or irregularity to be corrected within such time as we may determine. We will not be required to make uniform determinations in all cases. We may reject the exercise of any of your subscription rights because of any defect or irregularity. We will not accept any exercise of subscription rights until all irregularities have been waived by us or cured by you within such time as we decide, in our sole discretion.

Our interpretations of the terms and conditions of the Rights Offering and determinations in connection with the Rights Offering and your subscription rights will be final and binding.

24

Neither we, nor the Subscription Agent or the Information Agent, will be under any duty to notify you of any defect or irregularity in connection with your submission of subscription rights certificates and we will not be liable for failure to notify you of any such defect or irregularity. We reserve the right to reject your exercise of subscription rights if your exercise is not in accordance with the terms of the Rights Offering or in proper form. We will also not accept the exercise of your subscription rights if the issuance of shares of our common stock to you could be deemed unlawful under any applicable law.

### Rights of Subscribers

You will have no rights as a stockholder with respect to shares of common stock you subscribe for in the Rights Offering until such shares of common stock are issued to you.

### No Recommendation

An investment in shares of our common stock must be made according to your evaluation of your own best interests and after considering all of the information herein, including the "Risk Factors" section of this Prospectus. Neither we nor our Board of Directors, the Subscription Agent or the Information Agent, are making any recommendation regarding whether you should exercise your subscription rights.

### Shares of common stock Outstanding after the Rights Offering

The number of shares of common stock that will be outstanding after the Rights Offering will depend on the number of shares that are purchased in the Rights Offering. If we sell all of the shares being offered, then we will issue approximately 31,640,472 shares of common stock. In that case, we will have approximately 71,191,062 shares of common stock outstanding after the Rights Offering. This would represent an increase of approximately 80% in the number of outstanding shares of common stock. However, we do not expect that all of the subscription rights will be exercised.

### Fees and Expenses

Neither we, nor the Subscription Agent, will charge a brokerage commission to subscription rights holders for exercising their rights. However, the Subscription Agent may charge processing and mailing fees and if you exercise your subscription rights through a Nominee, you will be responsible for any fees charged by your Nominee.

### Questions About Exercising Subscription Rights

If you have any questions or require assistance regarding the method of exercising your subscription rights or requests for additional copies of this Prospectus or any document mentioned herein, you should contact the Subscription Agent at the address and telephone number set forth above under "Delivery of Subscription Materials and Payment".

### Subscription Agent

The Subscription Agent for this Rights Offering is VStock Transfer, LLC. We will pay all fees and expenses of the Subscription Agent related to the Rights Offering (exclusive of such fees relative to processing and mailing that the Subscription Agent may charge) and we expect to agree to indemnify the Subscription Agent from certain liabilities that it may incur in connection with the Rights Offering.

### Information Agent

The information agent for this Rights Offering is Alliance Advisors, L.L.C. We will pay all fees and expenses of the information agent related to the Rights Offering and we expect to agree to indemnify the information agent from certain liabilities that it may incur in connection with the Rights Offering. The information agent can be contacted at the following address and telephone number:

Alliance Advisors, L.L.C.
200 Broadacres Drive, 3rd Floor
Bloomfield, NJ 07003
877-777-8211 (U.S. or Canada Toll Free)
973-873-7779 (Worldwide Collect)
or
E-mail: pcasey@allianceadvisorsllc.com

**Subscription Price**

Our Board of Directors created a Rights Offering Special Committee comprised of independent directors to determine the Subscription Price. The Special Committee considered a number of factors, including the price at which our stockholders might be willing to participate in the Rights Offering, historical and current trading prices for our common shares, the need for liquidity and capital, and the desire to provide an opportunity to our stockholders to participate in the Rights Offering on a pro rata basis. In conjunction with its review of these factors, the Special Committee reviewed our history and prospects, including our prospects for future earnings, our current financial condition and regulatory status, and a range of discounts to market value represented by the subscription prices in various prior rights offerings of public companies. The Subscription Price will not necessarily be related to our book value, net worth or any other established criteria of value and may or may not be considered the fair value of our common shares to be offered in the Rights Offering. You should not assume or expect that, after the Rights Offering, our common shares will trade at or above the Subscription Price. The Company can give no assurance that our common shares will trade at or above the Subscription Price in any given time period.

We also cannot assure you that you will be able to sell common shares purchased during the Rights Offering at a price equal to or greater than the Subscription Price. We urge you to obtain a current quote for our common shares before exercising your subscription rights.

**Determinations Regarding the Exercise of Your Subscription Rights**

We will decide all questions concerning the timeliness, validity, form and eligibility of the exercise of your subscription rights and any such determinations by us will be final and binding. We, in our sole discretion, may waive, in any particular instance, any defect or irregularity, or permit, in any particular instance, a defect or irregularity to be corrected within such time as we may determine. We will not be required to make uniform determinations in all cases. We may reject the exercise of any of your subscription rights because of any defect or irregularity. We will not accept any exercise of subscription rights until all irregularities have been waived by us or cured by you within such time as we decide, in our sole discretion. Our interpretations of the terms and conditions of the Rights Offering will be final and binding.

Neither we, nor the Subscription Agent, will be under any duty to notify you of any defect or irregularity in connection with your submission of subscription rights certificates and we will not be liable for failure to notify you of any defect or irregularity. We reserve the right to reject your exercise of subscription rights if your exercise is not in accordance with the terms of the Rights Offering or in proper form. We will also not accept the exercise of your subscription rights if our issuance of shares of our common stock to you could be deemed unlawful under applicable law.

**No Revocation or Change**

Once you submit the form of subscription rights certificate to exercise any subscription rights, you may not revoke or change your exercise or request a refund of monies paid. All exercises of rights are irrevocable, even if you subsequently learn information about us that you consider to be unfavorable. You should not exercise your rights unless you are certain that you wish to purchase additional shares of our common stock at the Subscription Price.

**Non-Transferability of the Rights**

The subscription rights granted to you are non-transferable and non-tradable and, therefore, may not be assigned, gifted, purchased, sold or otherwise transferred to anyone else. Notwithstanding the foregoing, you may transfer your rights to any affiliate of yours and your rights also may be transferred by operation of law; for example, a transfer of rights to the estate of the recipient upon the death of the recipient would be permitted. If the rights are transferred as permitted, evidence satisfactory to us that the transfer was proper must be received by us prior to the expiration date.

**Rights of Subscribers**

You will have no rights as a stockholder with respect to shares you subscribe for in the Rights Offering until certificates representing shares of common stock are issued to you. You will have no right to revoke your subscriptions after you deliver your completed rights certificate, payment in cash and/or securities, as provided herein, and any other required documents to the Subscription Agent.

**No Board Recommendation**

An investment in shares of our common stock must be made according to your evaluation of your own best interests and after considering all of the information herein, including the "Risk Factors" section of this Prospectus. Neither we nor our Board of Directors are making any recommendation regarding whether you should exercise your subscription rights.

**Shares of common stock Outstanding After the Rights Offering**

Based on the 39,550,590 shares of our common stock currently outstanding, and the potential that MGT may issue as many as 31,640,472 shares pursuant to this Rights Offering,  71,191,062 shares of our common stock may be issued and outstanding following the Rights Offering, which represents an increase in the number of outstanding shares of our common stock of approximately 80%.

26

**Fees and Expenses**

Neither we, nor the Subscription Agent, will charge a brokerage commission to subscription rights holders for exercising their rights. However, the Subscription Agent may charge processing and mailing fees and if you exercise your subscription rights through a broker, dealer or nominee, you will be responsible for any fees charged by your Nominee.

**Questions About Exercising Subscription Rights**

If you have any questions or require assistance regarding the method of exercising your subscription rights or requests for additional copies of this document or any document mentioned herein, you should contact the Subscription Agent at the address and telephone number set forth above under "Delivery of Subscription Materials and Payment."

**Other Matters**

We are not making the Rights Offering in any state or other jurisdiction in which it is unlawful to do so, nor are we distributing or accepting any offers to purchase any shares of our common stock from subscription rights holders who are residents of those states or of other jurisdictions or who are otherwise prohibited by federal or state laws or regulations to accept or exercise the subscription rights. We may delay the commencement of the Rights Offering in those states or other jurisdictions, or change the terms of the Rights Offering, in whole or in part, in order to comply with the securities law or other legal requirements of those states or other jurisdictions. Subject to state securities laws and regulations, we also have the discretion to delay allocation and distribution of any shares you may elect to purchase by exercise of your subscription rights in order to comply with state securities laws. We may decline to make modifications to the terms of the Rights Offering requested by those states or other jurisdictions, in which case, if you are a resident in one of those states or jurisdictions or if you are otherwise prohibited by federal or state laws or regulations from accepting or exercising the subscription rights you will not be eligible to participate in the Rights Offering.

## MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

The following summary describes the material U.S. federal income tax consequences of the receipt and exercise (or expiration) of the subscription rights or, if applicable, the Oversubscription Privilege, acquired through the Rights Offering and owning and disposing of the shares of common stock received upon exercise of the subscription rights. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated thereunder and administrative and judicial interpretations thereof, all as currently in effect and all of which are subject to differing interpretations or to change, possibly with retroactive effect. No assurance can be given that the IRS will not assert, or that a court will not sustain a position contrary to any of the tax consequences described below.

This summary is for general information only and does not purport to discuss all aspects of U.S. federal income taxation that may be important to a particular holder in light of his, her, or its particular circumstances or to holders that may be subject to special tax rules, including, but not limited to, partnerships or other pass-through entities, banks and other financial institutions, tax-exempt entities, employee stock ownership plans, certain former citizens or residents of the United States, insurance companies, regulated investment companies, real estate investment trusts, dealers in securities or currencies, brokers, traders in securities that have elected to use the mark-to-market method of accounting, persons holding subscription rights or shares of common stock as part of an integrated transaction, including a "straddle," "hedge," "constructive sale" or "conversion transaction," persons whose functional currency for tax purposes is not the U.S. dollar, and persons subject to the alternative minimum tax provisions of the Code.

This summary applies to you only if you are a U.S. holder (as defined below) and receive your subscription rights in the Rights Offering, and you hold your subscription rights or shares of common stock issued to you upon exercise of the subscription rights or, if applicable, the Oversubscription Privilege, as capital assets for tax purposes. This summary does not apply to you if you are not a U.S. Holder.

We have not sought, and will not seek, a ruling from the IRS regarding the federal income tax consequences of the Rights Offering or the related share issuances. The following summary does not address the tax consequences of the Rights Offering or the related share issuance under foreign, state, or local tax laws.

You are a U.S. holder if you are a beneficial owner of subscription rights or common stock and you are:

- An individual who is a citizen or resident of the United States for U.S. federal income tax purposes;

- A corporation (or other business entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United Sates, any state thereof or the District of Columbia;

- An estate the income of which is subject to U.S. federal income tax regardless of its source; or

- A trust (a) if a court within the United States can exercise primary supervision over its administration and one or more U.S. persons are authorized to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) receives the subscription rights or holds the shares of common stock received upon exercise of the subscription rights or, if applicable, the Oversubscription Privilege, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Such a partner or partnership is urged to consult its own tax advisor as to the U.S. federal income tax consequences of receiving and exercising the subscription rights and acquiring, holding or disposing of our shares of common stock.

**EACH RECIPIENT OF RIGHTS IN THE RIGHTS OFFERING SHOULD CONSULT THE RECIPIENT'S OWN TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE RIGHTS OFFERING AND THE RELATED SHARE ISSUANCES THAT MAY RESULT FROM SUCH RECIPIENT'S PARTICULAR CIRCUMSTANCES.**

**Taxation of Subscription Rights**

*Receipt of Subscription Rights*

Your receipt of subscription rights pursuant to the Rights Offering should not be treated as a taxable distribution with respect to your existing shares of common stock for U.S. federal income tax purposes. Under Section 305 of the Code, a common stockholder who receives a right to acquire shares of common stock generally will be treated as having received a taxable dividend under the following circumstances: 1) if such stockholder's proportionate interest in the earnings and profits or assets of the corporation is increased and any other stockholder receives a distribution of cash or other property; or 2) the Rights Offering affords any stockholder the right to receive cash or other property in lieu of the right to acquire additional shares. For purposes of the above, "stockholder" includes holders of

warrants, options and securities which are convertible into common shares. The application of this rule is very complex and subject to uncertainty. We believe, however, that pursuant to Section 305 of the Code and the Treasury Regulations issued thereunder, the receipt of subscription rights should generally not be taxable to a stockholder because the subscription rights are being offered pro-rata to existing holders of common shares, and no stockholder will be offered cash or other property in lieu of such rights.

28

*Tax Basis in the Subscription Rights*

If the fair market value of the subscription rights you receive is less than 15% of the fair market value of your existing shares of common stock on the date you receive the subscription rights, the subscription rights will be allocated a zero basis for U.S. federal income tax purposes, unless you elect to allocate your basis in your existing shares of common stock between your existing shares of common stock and the subscription rights in proportion to the relative fair market values of the existing shares of common stock and the subscription rights determined on the date of receipt of the subscription rights. If you choose to allocate basis between your existing shares of common stock and the subscription rights, you must make this election on a statement included with your tax return for the taxable year in which you receive the subscription rights. Such an election is irrevocable.

However, if the fair market value of the subscription rights you receive is 15% or more of the fair market value of your existing shares of common stock on the date you receive the subscription rights, then you must allocate your basis in your existing shares of common stock between your existing shares of common stock and the subscription rights you receive in proportion to their fair market values determined on the date you receive the subscription rights.

The fair market value of the subscription rights on the date the subscription rights will be distributed is uncertain. Fair market value is defined as the price at which property would hypothetically change hands between a willing buyer and a willing seller, where neither is under any compulsion to buy or sell.  Fair market value is a factual determination which depends on all relevant facts and circumstances.  In determining the fair market value of the subscription rights, you should consider all relevant facts and circumstances, including the fact that the rights offered are non transferable.

*Exercise of Subscription Rights*

Generally, you will not recognize gain or loss on the exercise of a basic subscription privilege. Your tax basis in a new share of common stock acquired when you exercise a basic subscription privilege will be equal to your adjusted tax basis in the basic subscription privilege, if any, plus the Subscription Price. The holding period of a share of common stock acquired when you exercise your subscription rights will begin on the date of exercise.

*Expiration of Subscription Rights*

If you allow subscription rights received in the Rights Offering to expire, you should not recognize any gain or loss for U.S. federal income tax purposes, and you should re-allocate any portion of the tax basis in your existing shares of common stock previously allocated to the subscription rights that have expired to the existing shares of common stock.

**Taxation of Shares of common stock**

*Distributions*

Distributions with respect to shares of common stock acquired upon exercise of subscription rights will be taxable as dividend income when actually or constructively received to the extent of our current or accumulated earnings and profits as determined for U.S. federal income tax purposes. To the extent that the amount of a distribution exceeds our current and accumulated earnings and profits, such distribution will be treated first as a tax-free return of capital to the extent of your adjusted tax basis in such shares of common stock and thereafter as capital gain. We currently do not make any cash distributions on our shares of common stock.

*Dispositions*

If you sell or otherwise dispose of the shares of common stock acquired upon exercise of the subscription rights, you will generally recognize capital gain or loss equal to the difference between the amount realized and your adjusted tax basis in the shares of common stock assuming that you hold the shares as a capital asset. Such capital gain or loss will be long-term capital gain or loss if your holding period for the shares of common stock is more than one year. Long-term capital gain of an individual is generally taxed at favorable rates, however such rates may be subject to change in the 2011 tax year. The deductibility of capital losses is subject to limitations.

*New Legislation Relating to Foreign Accounts*

Newly enacted legislation may impose withholding taxes on certain types of payments made to "foreign financial institutions" and certain other non-U.S. entities after December 31, 2012. Among other requirements, the new legislation imposes a 30% withholding tax on dividends on, or gross proceeds from the sale or other disposition of, our shares of common stock paid to a foreign financial institution unless the foreign financial institution enters into an agreement with the U.S. Treasury to undertake to identify accounts held by certain U.S. persons or U.S.-owned foreign entities, report annually certain information about such accounts and withhold 30% on payments to account holders whose actions prevent it from complying with these requirements. In addition, the legislation imposes a 30% withholding tax on the same types of payments to a foreign non-financial entity unless the entity certifies that it does not have any substantial U.S. owners or furnishes identifying information regarding each substantial U.S. owner. You should consult your tax advisors regarding this legislation.

*Health Care and Reconciliation Act of 2010*

On March 30, 2010, President Obama signed into law the Health Care and Reconciliation Act of 2010, which requires certain U.S. stockholders who are individuals, estates or trusts to pay a 3.8% tax on, among other sources, dividends on stock and capital gains from the sale or other disposition of stock for taxable years beginning after December 31, 2012. U.S. stockholders should consult their tax advisors regarding the effect, if any, of this legislation on their ownership and disposition of our common stock.

**Information Reporting and Backup Withholding**

You may be subject to information reporting and/or backup withholding with respect to dividend payments on or the gross proceeds from the disposition of our shares of common stock acquired through the exercise of subscription rights. Backup withholding may apply under certain circumstances if you (1) fail to furnish your social security or other taxpayer identification number ("TIN"), (2) furnish an incorrect TIN, (3) fail to report interest or dividends properly, or (4) fail to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct, that you are not subject to backup withholding and that you are a U.S. person. Any amount withheld from a payment under the backup withholding rules is allowable as a credit against (and may entitle you to a refund with respect to) your U.S. federal income tax liability, provided that the required information is furnished to the IRS. Certain persons are exempt from backup withholding, including corporations and financial institutions. You are urged to consult your own tax advisor as to your qualification for exemption from backup withholding and the procedure for obtaining such exemption.

## PLAN OF DISTRIBUTION

As soon as practicable after the Record Date for the Rights Offering, we will distribute the rights, subscription rights certificates, and copies of this Prospectus to individuals who owned shares of common stock as of 5:00 p.m., New York time, on November 21, 2011.  If you wish to exercise your rights and purchase shares of common stock pursuant to the Rights Offering, you should complete the subscription rights certificate and return it with payment for the shares, to the Subscription Agent at the following address:

**VStock Transfer, LLC**
**77 Spruce Street, Suite 201**
**Cedarhurst, NY 11598**
**+1 (212) 828-8436**

For more information, please see the section of this Prospectus entitled "The Rights Offering."  If you have any questions, you should contact the Information Agent, Alliance Advisors, L.L.C., by telephone at +1 877-777-8211 (U.S. or Canada Toll Free) or +1 973-873-7779 (Worldwide Collect).

We do not know of any existing agreements between any stockholder, broker, dealer, underwriter, or agent relating to the sale or distribution of the shares of common stock underlying the rights.

## DESCRIPTION OF SECURITIES TO BE REGISTERED

**Number of Authorized and Outstanding Shares**. Our Certificate of Incorporation authorized the issuance of an aggregate of 75,000,000 shares of common stock, par value $0.001 per share.

As of November 15, 2011, the Company had 39,550,590 shares of common stock issued and outstanding.

**Dividend Rights**. The holders of outstanding shares of common stock are entitled to receive dividends out of assets legally available therefore at such times and in such amounts as the Board of Directors of the Company may from time to time determine. We have never

declared or paid cash dividends on our common stock, and our board of directors does not intend to declare or pay any dividends on the common stock in the foreseeable future.

**Voting Rights**. Holders of shares of common stock are entitled to one vote for each share on all matters to be voted on by the stockholders. Holders of common stock have no cumulative voting rights. Accordingly, the holders of in excess of 50% of the aggregate number of shares of common stock issued and outstanding will be able to elect all of our directors and to approve or disapprove any other matter submitted to a vote of all stockholders.

Directors are elected and/or re-elected at the annual meeting of stockholders and each serves until the next succeeding annual meeting of stockholders and/or until his or her successor have been duly elected and qualified, or until his or her earlier resignation, removal or death. Directors are elected by a plurality of votes. A separate vote for the election and/or re-election of directors is held at each annual meeting for each directorship having nominees for election and/or re-election at such annual meeting.

The Board of Directors may issue additional shares of common stock without future stockholder action, subject to certain limitations imposed by the Amex.

**Liquidation Rights**. Upon liquidation, the holders of the shares of common stock are entitled to receive pro rata all of the assets of the Company available for distribution to such holders.

**Preemptive Rights**. Holders of common stock have no preemptive rights to purchase our common stock.

**Redemption rights**. No redemption rights exist for shares of common stock.

**Sinking Fund Provisions**. No sinking fund provisions exist for shares of common stock.

**Further Liability for Calls**. No shares of common stock are subject to further call or assessment by the Company.

**Potential Liabilities of Stockholders to State and Local Authorities**.  No material potential liabilities are anticipated to be imposed on stockholders under state statues.

**INTERESTS OF NAMED EXPERTS AND COUNSEL**

The audited consolidated financial statements of MGT Capital Investments, Inc. as of December 31, 2010 and the year then ended, have been incorporated by reference in this Prospectus from the Company's Annual Report on Form 10-K filed with the SEC on April 15, 2011 in reliance upon the report of EisnerAmper LLP, independent registered public accountants, upon the authority of said firm as experts in accounting and auditing in giving said report.

The audited consolidated financial statements of MGT Capital Investments, Inc. as of December 31, 2009 and the year then ended, have been incorporated by reference in this Prospectus from the Company's Annual Report on Form 10-K filed with the SEC on April 15, 2011 in reliance upon the report of Amper, Politziner & Mattia, LLP, independent registered public accountants, upon the authority of said firm as experts in accounting and auditing in giving said report.

Neither EisnerAmper LLP or Amper, Politziner & Mattia, LLP were employed on a contingency basis or had, or is to receive, in connection with the offering, a substantial interest, directly or indirectly, in the Company, nor was it with the Company as a promoter, managing or principal underwriter, voting trustee, director, officer or employee.

**LEGAL REPRESENTATION**

Gersten Savage LLP ("Gersten"), at 600 Lexington Avenue, New York, NY 10022, has passed upon the validity of the securities being offered hereby. Gersten Savage LLP was not hired on a contingent basis. Gersten is not nor will it be a promoter, underwriter, voting trustee, director, officer, or employee of the issuer.

31

## DESCRIPTION OF BUSINESS

MGT is a holding company. We hold a controlling interest in Medicsight consisting of 83.75 million shares (53.85%) of the 155.5 million issued share capital of Medicsight. We also have wholly owned subsidiaries MGT Capital Investments (UK) Limited, MGT Capital Investments Limited and MGT Investments (Gibraltar) Limited.

Medicsight and its wholly owned subsidiaries is a medical technology company focusing on medical imaging software development and medical hardware devices. The Company, formerly listed on the AIM Market of the London Stock Exchange, develops and commercializes enterprise-wide Computer-Aided Detection ("CAD") applications which analyze Computer Tomography ("CT") scans to assist radiologists in the early detection and measurement of colorectal polyps and lung lesions. The Company has also developed an automated carbon dioxide ($CO_2$) insufflation device (MedicCO$_2$LON) which it commercializes through a global distributor. Medicsight currently has limited revenue.

### Medicsight

Medicsight is an industry leader in the development of CAD and image analysis software to assist radiologists in the early detection and diagnosis of disease. The Group's focus continues to be on developing CAD software applications and related other technologies and products that help clinicians in the early detection of potential colonic polyps when analyzing medical images generated from CT) scanners.

### Product development

*ColonCAD*

Medicsight's core technology is the proprietary ColonCAD™ algorithm that is integrated (using application protocol interface ("API") technology) into visualization workstations for radiologists to use when reviewing a patient's colon CT scan data.

The CAD algorithm assists the radiologist as they search for polyps in the CT scan image data. The radiologist uses the visualization software to review the patient's CT scan images on the screen and search for polyps (potentially pre-cancerous lesions on the wall of the colon). After a full review the radiologist then activates the Medicsight ColonCAD™ software - which immediately displays "CAD marks" on the images, drawing the radiologist's attention to potential polyps and other regions of interest. The radiologist then assesses each marked region in order to make the final decision as to the presence or absence of a polyp.

Clinical studies have demonstrated that radiologists assisted by Medicsight's ColonCAD™ technology have a significantly higher sensitivity for the detection of patients with polyps in CT colonography compared to unassisted reading (i.e. traditional reading without the use of ColonCAD™).

Medicsight launched ColonCAD 4.0 in March 2009. This release significantly reduced the number of false-positive CAD marks presented to a radiologist reviewing a patient data set. Medicsight has further developed its ColonCAD technology and on March 24, 2011 released a 64bit version of the software. Further improvements in sensitivity and reduction of false-positive CAD marks remain in development.

Medicsight's ColonCAD™ has been developed and validated using a large database of CT scans from hospitals around the world and has been assessed in many clinical studies, the results of which have been published in peer-reviewed publications and presented at leading radiology conferences.

*MedicCO$_2$LON*

In addition to the computer aided detection software applications, Medicsight has developed an automated $CO_2$ insufflation device called MedicCO$_2$LON.

Each patient that has a CT colon scan requires their colon to be insufflated (distended) with either $CO_2$ gas or room air administered prior to the acquisition of their CT colonography images. MedicCO$_2$LON is designed to provide good quality insufflation, which is essential for the acquisition of high quality images from the CT colonography examination. Without a good quality "insufflated image", CT images are poor quality and difficult to review by clinicians.

*Longer term projects*

Some longer term colon related opportunities that we continue to research include:

- Prone and supine registration technology – currently clinicians review two data sets for each patient. This registration project aims to "register" the two data sets, including polyps and regions of interest in to one patient data set – reducing clinical review time.

32

- Optical endoscopy – we have a research subsidiary, MedicEndo Limited working with leading London academic and clinical centers, Medicsight is researching the use of CAD and other image analysis technologies in the field of optical endoscopy, with a view to these technologies combining information in real time (i.e. as a clinician examines a patient) from sources of patient data.

- Other projects in early stages of R&D include prepless and reduced-prep CAD and flat lesion detection.

*Intellectual Property*

Medicsight continues to develop its intellectual property portfolio to protect the core technology in its CAD and other products.  During 2010 patents were granted in the UK and US covering aspects of Medicsight CAD algorithms (for both Colon and Lung) as well as image processing methods related to the identification of the boundary of lesions. Medicsight currently has 12 patents granted and 29 pending in various territories.

**Regulatory approvals and submissions**

*US Food and Drug Administration clearance*

In November 2008 Medicsight submitted the ColonCAD™ 510(k) application to the Food and Drug Administration ("FDA") for clearance in the United States of America ("USA").  In December 2008 we received an Additional Information ("AI") letter from the FDA and submitted our response to the FDA's enquires in March 2009.

During the summer of 2009 we had a number of informal meetings and discussions with the FDA as they performed their review of our 510(k) submission.

On January 5, 2010 we received our second AI letter from the FDA, in which the FDA requested further technical details regarding the clinical trials and data analyses undertaken in our 510(k) submission. After working closely with the clinical, statistical and legal advisors, the Company sent a comprehensive response to the FDA on June 2, 2010.

Following this response the FDA asked a series of informal questions including a request for additional statistical analysis on the submission data. The Company completed the analysis and responded to the FDA on March 7, 2011. In May 2011, we were informed that the Medicsight ColonCAD™ API had received clearance from the FDA. The clearance enables Medicsight to implement its US sales and marketing strategy, a primary objective in the development of its business.

*Japanese Ministry of Health, Labour and Welfare*

In November 2007 we submitted our MedicRead Colon application to the Ministry of Health, Labour and Welfare ("MHLW") regulatory authorities in Japan.

 During 2009 and 2010 we attended a number of meetings with ministry officials, demonstrated the product, answered specific questions regarding the product application and formally responded to questions from the MHLW.  Following completion of the submission review and quality audit phases the authorities are performing the reliability audit phase of their review and have requested some additional data from the Company in order to complete their review.

In late July 2011, Medicsight was informed by the MHLW that several statistical data errors were encountered in their review of the application for approval of its MedicRead software for use in CT Colonography procedures.  Following informal guidance from MHLW, during August 2011, the Company decided to withdraw the current submission and is assessing the next course of action.  In the meantime, the Board of Directors of Medicsight decided to close the Tokyo office as part of an overall program of expense reduction and corporate simplification.

*Other regulatory territories*

In November 2009, we submitted MedicRead 3.0 (our visualization workstation which includes version 4.0 of the Medicsight ColonCAD API) to the Chinese State Food and Drug Administration ("SFDA") for approval. On October 13, 2010 the application was approved.

On March 25, 2011 version 4.1 of the Medicsight ColonCAD API was CE marked in Europe, which certifies that the product has met European Union health, safety, and environmental standards. On the same day, the Company released the product to its partners for sale in Europe.

*MedicCO$_2$LON*

In February 2010 our MedicCO$_2$LON automated CO$_2$ insufflation device was CE marked in Europe.

In partnership with our distribution partner MEDRAD Inc. in August 2010 we submitted MedicCO$_2$LON to the Ministry of Health, Labour and Welfare ("MHLW") regulatory authorities in Japan for approval. We are currently awaiting feedback.

We are currently preparing a submission to the Chinese State Food and Drug Administration ("SFDA") for approval. In March 2011 we submitted MedicCO$_2$LON to the Therapeutic Goods Administration ("TGA") in Australia for approval and we are currently awaiting feedback.

**Clinical Activity**

Medicsight's Clinical Development team continued their work supported by a network of global medical luminaries.

Scientific presentations of Medicsight's CAD research were also made at the annual European Congress of Radiology (held in Vienna during March 2010), at the 20th Annual Meeting of the European Society of Gastrointestinal and Abdominal Radiology "ESGAR" (Dresden, Germany, June 2010) and the annual Radiological Society of North America "RSNA" conference (Chicago, USA, December 2010).

Medicsight continued to sponsor of a number of international CT colonography training workshops, including those delivered by leading US proponents of CT colonography, Professor Perry Pickhardt (University of Wisconsin Medical School) and Judy Yee, MD (Associate Professor and Vice Chair of Radiology at the University of California, San Francisco). Medicsight again supported the bi-annual ESGAR CTC training workshops; held in Amsterdam (Netherlands) and Cascais (Portugal) during 2010. These workshops train radiologists to interpret CTC images using the latest visualization and CAD technology and are fundamental to the increasing acceptance and implementation of CT colonography and CAD as a routine imaging examination for investigation of the colon.

**Commercial progress**

Medicsight's primary route to market is via partnerships with global advance visualization companies, Picture Achieve Communication System (PACS) suppliers and other Own Equipment Manufacturers ("OEM").

Medicsight currently has partnership agreements with Vital Images Inc., TeraRecon Inc., Viatronix Inc., Toshiba Medical Visualization Systems (previously Barco NV), Infinitt, Ziosoft Inc., Intrasense SAS and Alma IT Systems.

We continue to work closely with our existing partners in order to increase market awareness and drive additional demand for our CAD software. In addition we continue to seek new partners to bring the product to market.

In January 2010 we signed a global distribution agreement for MedicCO$_2$LON with MEDRAD Inc. The product was CE marked in February 2010 and launched in Europe in March 2010 at the European Congress of Radiology held in Vienna, and has subsequently generated sales. We work closely with MEDRAD and look forward to additional sales once the product receives regulatory approval in other territories.

**Revenue and Growth Strategy/Cost Cutting Measures**

Revenues remain limited and have risen as a result of increased sales of the CAD and MedicCO$_2$LON products— Medicsight recorded revenues of $540 in 2010 compared to $180 in 2009. Medicsight ended 2010 with net assets of $9,478 including $8,256 of cash and short term deposits. At December 31, 2010 all of our liquid assets were held as short term cash balances, mainly in sterling. Post year end, we continue to hold our surplus cash on short term deposit.

The Company anticipates European license sales will continue to increase marginally and MedicCO$_2$LON sales will be higher in 2011 in line with our commercial agreements.

As cost cutting measures, Medicsight management, in addition to closing the Tokyo office described above, has decided to close several other subsidiaries in Australia, China and the UAE citing the unjustifiably high legal, regulatory and accounting costs of maintaining such entities. However, in order to better exploit the recent U.S. Food and Drug Administration's approval of ColonCAD, the Company has opened a U.S. subsidiary (Medicsight, Inc.) in New York.

**Competition**

The Company's competitors can be divided into two categories: (a) multidetector computed tomography ("MDCT") scanner manufacturers such as GE, Hitachi, Philips, Siemens and Toshiba; and (b) independent CAD software providers.

A number of MDCT manufacturers offer CAD solutions that are available in European markets, however currently the only FDA approved CAD solutions are Siemens Lung CAD and iCAD's VeraLook.

In the CAD vendor market, there are a number of small, independent software providers, which include:

- im3D (Italy) — have developed a Colon CAD product that is CE marked but not FDA cleared;

34

- Median Technologies (France) — have developed a Colon CAD product and a Lung CAD (CAD-lung) — both have been CE marked but do not have FDA clearance;

- Mevis Medical Solutions AG (Germany) — have a Lung CAD product that is FDA approved; and

- iCAD Inc. (USA) — have developed a Colon CAD product which is CE marked and FDA approved; and

- Cadens Imaging (Canada) — have also developed a Colon CAD product which is CE marked and has been submitted to the FDA for approval.

## Patents and Trademarks

Protection of our proprietary technology and our rights over that technology, from copy or unchallenged and improper use, is essential to our future success. Any challenges to, or disputes concerning, our core technology may result in great expense to us, delays in bringing products to market and disruption of our focus on our core activities. They may also result in loss of rights over our technology or the right to operate in particular markets due to adverse legal decisions against us.

Medicsight has filed patent applications in the United Kingdom, the United States, the European Patent Office, Japan, South Korea, Australia, Canada, and under the International Patent Cooperation Treaty (which currently has 128 member countries) covering our core technologies and their applications.  We have recently filed new patent applications covering technology of both Medicsight CAD and intend to continue filing new applications in the future.  Two patents have been granted in the US covering aspects of Medicsight CAD technology.  Although prior art searches have been carried out, we cannot provide assurance that any or all of the pending patents will be granted or that they will not be challenged, or that rights granted to us will actually provide us with advantage over our competitors.  Medicsight actively reviews third party patents and is not currently aware of any that our products will infringe.

"Medicsight" ® , "Medicsight Colon Screen" ® , "Medicsight Lung Screen" ® , "Medicsight Colon CAR" ® , "Medicsight Lung CAR" ® , "Medicsight Computer Assisted Reader" ® , "Medicsight See More, Save More" ®  and "Lung CAR" ®  have been registered as trademarks in the United Kingdom.  "Medicsight" ®   has also been registered in the United States, the European Union, Australia, China and a number of other countries.  "MedicRead" ®  has been registered as a trademark in the European Union.  These trademarks are important to the corporate identity in connection with Medicsight CAD.

Failure to register appropriate patents, copyrights or trademarks in any jurisdiction may impede our ability to create brand awareness in our products, result in expenses in pursuing our rights with respect to our intellectual property, or result in lost revenues due to intellectual property disputes. Where we may be required to purchase licenses from sellers with prior rights in any country, we cannot assure you that we will be able to do so at a commercially acceptable cost.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

The following table sets forth certain information regarding beneficial ownership of the Company's common stock as of November 15, 2011:

- each person known by the Company to be the beneficial owner of more than 5% of the outstanding common stock;

- each person serving as a director, a nominee for director, or executive officer of the Company; and

- all executive officers and directors of the Company as a group.

Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission. In general, a person who has voting power and/or investment power with respect to securities is treated as a beneficial owner of those securities. For purposes of this table, shares subject to outstanding warrants and options exercisable within 60 days of the date of this Annual Report are considered as beneficially owned by the person holding such securities. To our knowledge, except as set forth in this table, the persons named in this table have sole voting and investment power with respect to the shares shown.

Percentage beneficially owned is based upon 39,550,590 shares of common stock issued and outstanding as of November 15, 2011.

| Name and address of Beneficial Owner | Number of Shares Beneficially Owned | Percentage of Common Equity Beneficially Owned |
|---|---|---|
| **5% Beneficial Owners** | | |
| **Directors and Officers** | | |
| Robert Ladd | 8,484,012(1) | 21.7% |
| Neal Wyman | 100,000** | —* |
| Peter Venton (2) | 116,666** | * |
| Richard Taney | 100,000** | —* |
| Richard W. Cohen | 100,000** | —* |
| Robert Traversa | 100,000 | —* |
| Tim Paterson-Brown (3) | 2,000,000 | 5.1% |
| Allan Rowley (4) | — | — |
| Troy Robinson (5) | — | — |
| Total Current Officers and Directors as a Group (5 persons) | 8,884,012 | 22.5% |

\* Less than 1%.

\*\* On March 7, 2011, the Board approved the issuance of 100,000 restricted shares of common stock, vesting one-third each six months from date of issue, to each of Messrs. Traversa, Wyman, Venton, Taney, and Cohen. The unvested shares are subject to forfeiture if the applicable director is not a director of the Company at the time the restricted shares are to vest.

Addresses for the above directors and officers are care of the Company at 26/28 Hammersmith Grove, London W6 7BA, United Kingdom.

(1) Mr. Ladd owns 500,000 shares of Common Stock directly. Mr. Ladd may also be deemed to be the beneficial owner of an additional 7,984,012 shares of Common Stock held by Laddcap Value Partners L.P., a Delaware limited partnership (the "Partnership"), by virtue of his ability to vote or control the vote or dispose or control the disposition of the shares of Common Stock held by the Partnership through his position as managing member of Laddcap Value Associates, LLC and Laddcap Value Advisors, LLC, each a Delaware limited liability company that serves as the general partner and investment advisor of the Partnership, respectively.

(2) Mr. Venton resigned on August 16, 2011. Upon his resignation, the Board modified the terms of his restricted stock to allow it to continue to vest.

(3) Mr. Paterson-Brown resigned on December 13, 2010.

(4) Mr. Rowley resigned on February 7, 2011.

(5) Mr. Robinson resigned on March 8, 2011.

## CERTAIN MARKET INFORMATION

The Company's common stock is traded on the NYSE Amex stock exchange (www.nyse.com) under the symbol "MGT.BC". The following table sets forth the range of high and low sales prices per share of our common stock for the four quarterly periods of 2011 and for each quarterly period during 2010 and 2009.

|  | High | Low |
|---|---|---|
| **2011** | | |
| Fourth Quarter* | $   0.06 | $   0.04 |
| Third Quarter | 0.18 | 0.05 |
| Second Quarter | 0.31 | 0.18 |
| First Quarter | 0.44 | 0.25 |
| **2010** | | |
| Fourth Quarter | 0.29 | 0.20 |
| Third Quarter | 0.33 | 0.15 |
| Second Quarter | 0.44 | 0.21 |
| First Quarter | 0.37 | 0.23 |
| **2009** | | |
| Fourth Quarter | 0.54 | 0.30 |
| Third Quarter | 0.76 | 0.27 |
| Second Quarter | 0.52 | 0.28 |
| First Quarter | 1.11 | 0.20 |

*On November 15, 2011 the Company's common stock closed on the NYSE AMEX US stock exchange at $0.05 per share.

As of November 15, 2011 there were 705 holders of record of the Company's common stock.

### Dividends

The Company has never declared or paid cash dividends on its common stock. The Company currently intends to retain earnings, if any, to support its growth strategy and does not anticipate paying cash dividends in the foreseeable future. Payment of future dividends, if any, will be at the discretion of the Company's Board of Directors after taking into account various factors, including the Company's financial condition, operating results, current and anticipated cash needs and plans for expansion.

## MATERIAL CHANGES.

N/A

## INCORPORATION OF CERTAIN INFORMATION BY REFERENCE

The SEC allows us to "incorporate by reference" into this Prospectus the information that we file with the SEC. This means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is deemed to be part of this Prospectus. We incorporate by reference the documents set forth below, which we already have filed with the SEC:

- Our Annual Report on Form 10-K for the fiscal year ended December 31, 2010 filed with the SEC on April 15, 2011;

- Our Quarterly Reports on Form 10-Q for the quarters ended, March 31, 2011, June 30, 2011 and September 30, 2011 filed with the SEC on, respectively, May 13, 2011, August 15, 2011 and November 10, 2011; and

- Our Current Reports on Form 8-K filed with the SEC on February 4, 2011, February 11, 2011, February 24, 2011, March 11, 2011, April 5, 2011, May 19, 2011, May 26, 2011, June 14, 2011, July 11, 2011, July 27, 2011, August 22, 2011, August 29, 2011, September 16, 2011, October 4, 2011 and November 10, 2011 (in each case only to the extent filed and not furnished).

You may obtain a copy of any or all of the reports or documents that have been incorporated by reference (other than exhibits to such documents unless such exhibits are specifically incorporated by reference in any such documents) in the "SEC Filings" section of our website at http://www.mgtci.com/sec.cfm. (However, any other information contained on our website is not incorporated into this Prospectus.) We will also provide, upon written or oral request, to each person, including any beneficial owner, to whom a Prospectus is delivered, a copy of any or all of the reports or documents that have been incorporated by reference (other than exhibits to such documents unless such exhibits are specifically incorporated by reference in any such documents) at no cost. Requests can be made at the address or phone number indicated below:

MGT Capital Investments, Inc.
26/28 Hammersmith Grove, London W6 7BA
United Kingdom
telephone 011-44-207-605-1151
facsimile 011-44-207-605-1171
Attention: Secretary

### DISCLOSURE OF COMMISSION POSITION ON INDEMNIFICATION FOR SECURITIES ACT LIABILITIES

Section 145 of the Delaware General Corporation Law authorizes us to indemnify any director or officer under prescribed circumstances and subject to certain limitations against certain costs and expenses, including attorneys' fees actually and reasonably incurred in connection with any action, suit or proceedings, whether civil, criminal, administrative or investigative, to which such person is a party by reason of being one of our directors or officers if it is determined that the person acted in accordance with the applicable standard of conduct set forth in such statutory provisions.

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Act") may be permitted to directors, officers and controlling persons of MGT pursuant to the foregoing provisions, or otherwise, we have been advised that, in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in such Act and is, therefore, unenforceable.

### WHERE YOU CAN GET MORE INFORMATION

In accordance with the Securities Act of 1933, as amended, we are filing with the SEC a registration statement on Form S-1, of which this Prospectus is a part, covering the securities being offered in this offering. As permitted by rules and regulations of the SEC, this Prospectus does not contain all of the information set forth in the registration statement. For further information regarding both our Company and the securities in this offering, we refer you to the registration statement, including all exhibits and schedules, which you may inspect without charge at the public reference facilities of the SEC's Washington, D.C. office, 100 F Street, N.E., Washington, D.C. 20549, on official business days during the hours of 10am and 3pm, and on the SEC Internet site at http:\\www.sec.gov. Information regarding the operation of the public reference rooms may be obtained by calling the SEC at 1-800-SEC-0330.

38

**You should rely only on the information contained in this Prospectus. We have not authorized any dealer, salesperson or other person to give you different information. This Prospectus does not constitute an offer to sell nor an offer to buy the securities referred to in this Prospectus in any jurisdiction where the offer or sale is not permitted. The information contained in this Prospectus and the documents incorporated by reference are correct only as of the date shown on the cover page of these documents, regardless of the time of the delivery of these documents or any sale of the securities referred to in this Prospectus.**



**31,640,472**
**Shares**
**of**
**Common Stock**

**PROSPECTUS**

**November 21, 2011**

39