UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
                Plaintiff,                  :
                                          :  18 Civ. 8175 (ER)
      – against –                        :
                                          :  ECF CASE
BARRY C. HONIG, ROBERT LADD,              :
ELLIOT MAZA, BRIAN KELLER,                :
JOHN H. FORD, GRQ CONSULTANTS, INC., and  :
HS CONTRARIAN INVESTMENTS, LLC,           :
                                          :
                Defendants.                 :
------------------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
<u>MOTION FOR RELIEF AGAINST DEFENDANT ROBERT LADD</u>**

SECURITIES AND EXCHANGE COMMISSION
Jack Kaufman
Katherine S. Bromberg
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-0106 (Kaufman)
Attorneys for Plaintiff

May 3, 2024

**TABLE OF CONTENTS**

                                                                                                                    **Page**

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .................................................................................................................................3

    I.  *SEC v. Govil* is Inapplicable to the Court's
       Determination of Civil Money Penalties ...........................................................................3

    II.  Applicable Precedent Supports the SEC's Civil Money Penalty Request...........................5

    III. Ladd's Fraud Created a Significant Risk of Substantial Losses to MGT Investors ............7

    IV. A Permanent Officer and Director Bar and Injunctions are Warranted...............................9

CONCLUSION..............................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Liu v. SEC*,
   140 S.Ct. 1936 (2020) ................................................................................................................. 3

*SEC v. Amerindo Inv. Advisors Inc.*,
   No. 05-cv-5231, 2014 WL 2112032 (S.D.N.Y. May 6, 2014),
   *aff'd sub nom.* 639 Fed.Appx. 752 (2d Cir. 2016) ..................................................................... 4

*SEC v. Bajic*,
   No. 20 Civ. 0007 (LGS), 2023 WL 6289953 (S.D.N.Y. Sept. 27, 2023) ............................. 4, 8

*SEC v. de Maison*,
   18-2564 (L), 21-620 (Con), 2021 WL 5936385, *2-3 (2d Cir. Dec. 16, 2021) ................ 1, 3, 4

*SEC v. Findley*,
   No. 3:20-cv-0397, 2024 WL 707264 (D. Conn. Feb. 21, 2024) ................................................ 6

*SEC v. Genovese*,
   553 F.Supp.3d 24 (S.D.N.Y. 2021) ............................................................................................ 7

*SEC v. Govil*,
   86 F.4th 89 (2d Cir. 2023) .............................................................................................. 1, 3, 4

*SEC v. Honig*,
   18-cv-8175 (ER), 2023 WL 6386918 (S.D.N.Y. Sept. 29, 2023) .............................................. 9

*SEC v. Jean Pierre*,
   No. 12-cv-8886, 2015 WL 1054905 (S.D.N.Y. Mar. 9, 2015) .................................................. 7

*SEC v. Johnston*,
   368 F.Supp.3d 247 (D. Mass. 2019) .......................................................................................... 6

SEC v. Opulentica,
   479 F.Supp.2d 319 (S.D.N.Y. 2007) .......................................................................................... 7

*SEC v. Penn*,
   No. 14-cv-581, 2021 WL 1226978 (S.D.N.Y. Mar. 31, 2021) .................................................. 4

*SEC v. Snyder*,
   Civ. No. H-03-04658, 2006 WL 6508273 (N.D. Ga. Aug. 22, 2006) ....................................... 6

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Reply Memorandum of Law in response to Defendant Robert Ladd's Memorandum of Law in Opposition to Plaintiff's Motion for Relief ("Opp.") (DE 346).[1]

## **PRELIMINARY STATEMENT**

Ladd's opposition rests primarily on the false premise that the Second Circuit's decision in *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023), applies to civil money penalties. It does not. *Govil*, and its discussion of "net gain" or "net profit," applies solely to disgorgement—a separate and distinct equitable remedy subject to its own method of calculation and equitable limitations. By contrast, penalties are a legal remedy, and the amount of penalties the Court may award is set forth in Exchange Act Section 21(d)(3) and Securities Act Section 20(d)(2), which limit penalties to "the greater of": (1) the enumerated per-violation dollar amounts, which is the basis for the SEC's proposed penalty calculations in this case; and (2) Ladd's "gross pecuniary gain*"* attributable to his violations. Directly contrary to Ladd's argument, the phrase "gross pecuniary gain" refers here to a defendant's *total* fraud proceeds, not "net gains" or "net profits" applicable to disgorgement. *SEC v. de Maison*, 18-2564 (L), 21-620 (Con), 2021 WL 5936385, *2-3 (2d Cir. Dec. 16, 2021) (summary order). Thus, Ladd's alleged "net gains" from his MGT stock sales are irrelevant to the Court's consideration of the appropriate penalties to impose against him.

In any event, even if relevant, Ladd's claim that he incurred net "losses" from his MGT stock trades is baseless; it rests on inaccurate information regarding the cost basis for the MGT stock that Ladd sold in May 2016. Applying the correct cost basis information, Ladd enjoyed net gains (not losses) of over $613,000 from his sales of MGT stock in his and his parents' accounts in May 2016.

---

[1] All short forms herein are the same as those in the SEC's opening brief (DE 339).

Ladd further incorrectly asserts that the SEC's requested penalty amount is not in line with existing precedent. The decisions Ladd cites—where courts have awarded penalty amounts lower than those the SEC seeks here—expressly attributed those awards to circumstances not applicable here, including, for example, a defendant's inability to pay a larger penalty. Indeed, as further explained below, Ladd's violations are more closely aligned with those decisions in which courts awarded higher penalties.

Ladd is also incorrect that his fraudulent conduct did not "create a significant risk of substantial losses" to purchasers of MGT stock—a prerequisite for the imposition of third-tier penalties for Ladd's fraud violations. Ladd bases this claim on another false premise: that MGT stock investors did not incur losses. But Ladd's alleged calculations of so-called investor "gains" are unsupported and inaccurate. In fact, stock trading records establish that hundreds of individuals who purchased MGT stock in May 2016—when Ladd was committing fraud and dumping his own MGT stock—incurred realized losses shortly thereafter; and, that thousands more suffered losses over the next two years. At the least, the record evidence establishes the existence of a substantial risk of loss to investors who purchased MGT stock at the time of Ladd's fraudulent conduct in May 2016.

Ladd also implausibly asserts that he is unlikely to continue to violate the securities law and that, thus, the Court should not impose an officer and director bar and injunctions. Ladd attempts to sweep under the rug his most recent material false statements regarding MGT—contained in MGT's publicly-filed December 2023 Form 10-Q—in which he falsely characterized the status of this case and failed to disclose to the public this Court's Summary Judgment Decision against him. Ladd's opposition buries this fact in a footnote, in which he misleadingly accuses the SEC of "fail[ing] to inform the Court that MGT did disclose [the

Summary Judgment Decision] in its 8-K filed in February 2024." Ladd omits that MGT filed its corrective Form 8-K *a week after* the SEC informed the Court that Ladd had failed to make this material disclosure. Not only does Ladd thus mislead the Court regarding the timing of MGT's corrective Form 8-K; he does not even provide a copy of the Form 8-K, which the SEC now includes in support of this reply. (Exhibit A to Supplemental Kaufman Declaration ("Kauf. Supp. Decl.").) Ladd's prior violations, coupled with his continued flouting of SEC disclosure requirements, evince both his unfitness to serve as an officer or director of a public company and the strong likelihood that he will continue to violate the federal securities laws—necessitating the imposition of a permanent officer and director bar and injunctions against Ladd.

## ARGUMENT

**I.     *SEC v. Govil* is Inapplicable to the Court's Determination of Civil Money Penalties**

Ladd asserts that the SEC's requested civil money penalties are too high because they allegedly exceed Ladd's "gross pecuniary gain" from his MGT stock sales at issue. Ladd improperly relies on *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023), which concerns "disgorgement" of a defendant's "net gain" or "net profit," not civil money penalties—a separate remedy involving the distinct concept of "gross pecuniary gain." In so arguing, Ladd ignores well-settled Second Circuit law regarding the proper calculation of SEC civil money penalties.

The Second Circuit in *Govil* reviewed solely the lower court's award of "disgorgement" but did not address civil money penalties. Citing the Supreme Court's decision in *Liu v. SEC*, 140 S.Ct. 1936 (2020), the *Govil* Court stated that a "disgorgement award" may not "exceed a wrongdoer's net profits" and is "awarded for victims." *Govil*, 86 F.4th, at 99 (quoting *Liu*, 140 S.Ct. at 1940); *see also de Maison*, 2021 WL 5936385, at *2 ("*Liu* limits disgorgement awards issued as 'equitable relief' under 15 U.S.C. § 78u(d)(5) to a 'wrongdoer's net profits.'"). *Govil*

3

held that the district court in that case had "abused its discretion" by ordering disgorgement "without finding that defrauded investors suffered pecuniary harm." *Govil*, 86 F.4th, at 98. Nothing in *Govil* or *Liu*, however, concerns civil money penalties. *See SEC v. Penn*, No. 14-cv-581, 2021 WL 1226978, at *14 n.23 (S.D.N.Y. Mar. 31, 2021) ("nothing in *Liu* disturbs the Court's power to order civil penalties").

Indeed, the Second Circuit expressly has held that civil penalties in SEC cases are *not limited* by a defendant's "net profit" or "net gain." Rather, a district court has discretion to award "the greater of" a defendant's per-violation statutory maximum or, alternatively, a defendant's "*gross pecuniary gain*." *SEC v. Bajic*, No. 20 Civ. 0007 (LGS), 2023 WL 6289953, at *4 (S.D.N.Y. Sept. 27, 2023) (emphasis added). Directly contrary to Ladd's argument, the phrase "gross pecuniary gain" here—under Exchange Act Section 21(d)(3) and Securities Act Section 20(d)(2)—refers to a defendant's *total* proceeds from his or her violations, not "net gains" or "net profits." *See de Maison*, 2021 WL 5936385, at *2 ("By emphasizing that equitable disgorgement is limited to the "*net* profits from wrongdoing,"…the Supreme Court [in *Liu*] severed any equation of disgorgement amounts from the '*gross* amount of pecuniary gain,' that constitutes the maximum civil penalty for a third-tier civil violation."); *SEC v. Amerindo Inv. Advisors Inc.*, No. 05-cv-5231, 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014), *aff'd sub nom.* 639 Fed.Appx. 752 (2d Cir. 2016) (the "civil penalties statutes focus on the *gross* amount of pecuniary gain—as opposed to disgorgement, which is focused on simple gains."). Thus, according to the Second Circuit—and directly contrary to Ladd's contention—the "civil penalty for a securities fraud offense" need not be "proportional to the disgorgement amount," regardless of whether the civil penalty imposed "exceeds the disgorgement amount" or otherwise bears any relationship to an appropriate disgorgement amount. *de Maison*, 2021 WL 5936385, at *2.

Hence, Ladd's claim that he "did not actually profit" from his MGT stock sales, even if true, is irrelevant to the Court's determination of the appropriate civil money penalties against Ladd.

In any event, the evidence that Ladd presents of his alleged "net losses" from his May 2016 MGT stock sales establishes no such losses. Indeed, Ladd supplies no evidence regarding the prices he actually paid for the MGT stock that he sold in May 2016, thus fatally undermining his claim of "net losses." (Declaration of Ricky Tong in Further Support of Plaintiff's Motion for Remedies as to Defendant Ladd ("Tong Suppl. Decl.") ¶¶ 11-15.) To the contrary, brokerage account records establish that Ladd enjoyed net gains of over $613,000 from his May 2016 MGT stock sales. *Id.* ¶ 10. From May 9 to 17, 2016, Ladd sold 460,000 shares of MGT stock in his E*Trade account for gross proceeds of $487,740.15. *Id.* ¶ 6. Contrary to Ladd's contention, his actual cost basis for those shares—based on his E*Trade 2016 IRS Form 1099—was $175,647.51, resulting in a total net profit to Ladd of $312,092.64. *Id.* Ladd's MGT stock purchases and sales in his TD IRA account resulted in net losses of $23,799.08. *Id.* ¶ 8. Finally, Ladd received $325,000 from his sales of his parents' MGT shares on May 12-17, 2016 which, Ladd admits, constituted profit. *Id.* ¶ 9; Opp. at 6. Thus, Ladd's total net profits from his sales of MGT stock through his and his parents' accounts during May 2016 was $613,293.56.[2] (Tong Suppl. Decl. ¶ 10.)

## II.     Applicable Precedent Supports the SEC's Civil Money Penalty Request

Ladd further wrongly asserts that the amount of the SEC's civil penalty request—a per-violation penalty for each of Ladd's four fraud violations, two Section 5 violations, and Section 16(a) violation—is not commensurate with prior decisions in similar SEC cases. (Opp. at 8-10.) Ladd misreads the precedent he cites, which is consistent with the SEC's penalty requests.

---

[2] Even if Ladd had incurred "losses" on his MGT stock sales, his illegal MGT stock sales at inflated prices still would have benefitted him—by greatly reducing his alleged trading "losses."

5

For example, the court in *SEC v. Johnston*, 368 F.Supp.3d 247 (D. Mass. 2019), imposed only a "single penalty" because the defendant engaged only in a single, "isolated" category of misleading conduct. 368 F.Supp.3d, at 255. Here, by contrast, Ladd engaged in multiple instances of separate and distinct fraudulent conduct: lying about John McAfee's prior business success in the May 9, 2016 MGT press release; lying about the amount and timing of his MGT stock sales in his May 25, 2016 Form 144; brazenly misrepresenting in his May 31, 2016 Form 4 that he had "distributed" his MGT stock to Laddcap investors for "no consideration" when, in fact, he had sold that stock for his own benefit; and lying in his November 2015 E*Trade account application about his employment status to hide the fact that he was MGT's CEO and President.

To the extent the courts in the other cases Ladd cites refrained from awarding the highest permissible civil money penalties, it was not because the defendants in those cases did not engage in conduct that warranted higher penalties, as Ladd claims. Rather, those courts expressly refrained from higher penalty awards for reasons not applicable here. Thus, for example, two of the decisions Ladd cites emphasize the defendants' poor financial condition—a claim that Ladd does not make in this case. *See SEC v. Findley*, No. 3:20-cv-0397, 2024 WL 707264, at *11 (D. Conn. Feb. 21, 2024) (defendant's poor "financial status…warrants reduction from the maximum permissible civil penalty"; and "on account of [defendant's] financial condition I order that [defendant] pay a civil penalty in the amount of **$250,000**.") (emphasis in original); *SEC v. Snyder*, Civ. No. H-03-04658, 2006 WL 6508273, at *12 (N.D. Ga. Aug. 22, 2006) (defendant's future financial and emotional "hardship" stemming from SEC action and "[d]efendant's current financial situation indicate that imposing civil penalties would be inappropriate.").

Furthermore, the court in *SEC v. Opulentica* imposed a $120,000 penalty, but not because the defendant's conduct did not warrant greater monetary relief. To the contrary, the *Opulentica*

6

court ordered a reduced penalty "in view of the size of the other financial components of the judgment [including disgorgement of $433,962.10] and the unlikelihood of recovery, and taking all the facts and circumstances of the case into account…" 479 F.Supp.2d 319, 331-32 (S.D.N.Y. 2007). Here, by contrast, the SEC does not seek disgorgement, and the Court's imposition of a significant civil money penalty is necessary to deter Ladd's penchant for violating the federal securities laws.

Finally, contrary to Ladd's assertions, the defendants' conduct at issue in *SEC v. Genovese* and *SEC v. Jean Pierre*—in which the Court ordered relatively high penalty amounts—was similar to, and similarly egregious as, Ladd's fraudulent conduct in this case. *See SEC v. Genovese*, 553 F.Supp.3d 24, 44 (S.D.N.Y. 2021) (individual defendant "misrepresented his background and expertise, as well as the nature of [his investment vehicle entity], to induce investments"); *SEC v. Jean Pierre*, No. 12-cv-8886, 2015 WL 1054905, at *1, 3 (S.D.N.Y. Mar. 9, 2015) (defendant attorney issued false opinion letters to Pink Sheets and various stock transfer agents in order to remove restrictive legends from stock certificates so that transfer agents and Pink Sheets would permit sale of otherwise restricted stock).[3]

### III. Ladd's Fraud Created a Significant Risk of Substantial Losses to MGT Investors

As the SEC explains in its opening brief, to obtain third-tier penalties against Ladd for his fraud violations, the SEC must show, *inter alia*, that Ladd's violations "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses" to MGT investors.

---

[3] Ladd erroneously claims that the *Jean Pierre* court calculated the defendant's penalty based on "the actual amount of proven investor losses." (Opp. at 10.) In fact, the court based the penalty not on "investor losses" but, rather, on the number of "companies for which [the defendant] wrote [false opinion] letters." *Jean Pierre*, 2015 WL 1054905, at *12 (Magistrate Judge Report and Recommendation). Indeed, directly contrary to Ladd's erroneous reading, the *Jean Pierre* Court expressly noted "the absence of evidence of any monetary loss to innocent third parties." *Id.*

7

*See Bajic*, 2023 WL 6289953, at *4. Based solely on an MGT stock price chart, Ladd falsely asserts that his fraud violations do not satisfy this requirement because, according to Ladd, "any trader who purchased MGT stock *after* Ladd's sales of stocks would have received at least unrealized gains from those purchases for the next two years." This statement is demonstrably false. In fact—and consistent with Ladd's stock price chart—MGT stock trading records demonstrate that many MGT investors suffered realized losses during both the period immediately following Ladd's and MGT's issuances of false statements during May 2016 and the period "*after* Ladd's sales of stocks." Thus, at the very least, Ladd's conduct resulted in a significant risk of substantial losses to MGT investors.

Contrary to Ladd's assertions, approximately 298 investors who purchased MGT stock between May 9, 2016, and May 31, 2016, sold their entire positions by May 31, 2016, and incurred total realized losses of $537,904.14. (Tong Suppl. Decl. ¶ 17.) An additional 116 investors who purchased MGT stock between May 9, 2016, and May 31, 2016, sold their entire positions between June 1, 2016, and March 31, 2019, for total realized losses of $190,893.75. (*Id.* ¶ 18.)  Also, over 27,000 investors made their first purchase of MGT shares between June 1, 2016, and June 1, 2018, and those investors sold their MGT stock for total realized losses of more than **$47,000,000**.[4] (*Id.* ¶ 20.)

Ladd also falsely claims that "the public was in fact aware of all of [Ladd's] MGT [stock] sales by May 31, 2016, even if the public may not have known the actual date of the sale." (Opp. at 3-4.) Ladd apparently refers here to his May 31, 2016 Form 4, in which he falsely stated that

---

[4] The MGT stock price chart that Ladd supplies merely shows MGT's stock prices during the two years following his fraudulent May 9, 2016 press release. That chart is consistent with the MGT trading data that the SEC submits. Ladd's chart shows MGT's stock price spiking upward shortly after the May 9 press release and then precipitously declining, thus likewise establishing that Ladd's violations resulted in "a significant risk of substantial losses" to MGT investors.

he had "distributed 'for no consideration'" 465,171 shares of MGT stock "pro rata to the 'limited partners of Laddcap Value' on May 25, 2016." *SEC v. Honig*, No. 18-cv-8175 (ER), 2023 WL 6386918, at *28 (S.D.N.Y. Sept. 29, 2023). As the Court found on summary judgment, Ladd *did not* thus disclose that he had sold his MGT stock. Rather, Ladd's Form 4 misled the public by falsely stating that he had "distributed" his stock to Laddcap's limited partners. As the Court further found on summary judgment, Ladd thereby falsely "signaled to investors that he was conferring on Laddcap investors stock that he arguably thought would increase in value" when, "[i]nstead, he was a seller of the stock, which to the reasonable investor could signal declining confidence in the company's future." *Id.* at *29.

## IV. A Permanent Officer and Director Bar and Injunctions are Warranted

For the reasons set forth in the SEC's opening brief (DE 339, at 20-23), the Court should impose against Ladd a permanent officer and director bar and permanent injunctions against future violations of the charged securities laws. This relief is appropriate and necessary because Ladd's fraudulent conduct was repeated and egregious; Ladd acted with a high degree of scienter; and Ladd's prior and recent material false statements and omissions evince a strong likelihood that he will continue to violate the securities laws in the future.

Ladd opposes this relief primarily based on his unsupported and incredible contention that he is unlikely to continue to violate the federal securities laws. Despite his repeated prior and recent deceptive conduct regarding MGT, Ladd unabashedly claims that he is now "focused on…maintaining good governance policies wherever he works"; that "there are no allegations that Ladd has engaged in any other violation of the securities laws"; and that he "is in no way subject to being considered a recidivist."[5] (Opp. at 12-13, 16.)

---

[5] Ladd claims to rely upon "his Declaration submitted in support of his Response" (Opp. at 12-13), but no such Ladd declaration appears on the Court's docket.

Such claims would be dubious enough given the Court's multiple fraud findings against Ladd. But Ladd's most recent material false statements and omissions in MGT's December 2023 Form 10-Q—regarding the status of this case (SEC Opening Brief at 21-22)—undermine his claims of redemption. Ladd's recent deceptive conduct, which he does not deny, firmly establishes, to the contrary, that he is *not* "focused on maintaining good governance"; that he continues to flout the federal securities laws; and that he very much is "subject to being a recidivist."

Moreover, far from taking any responsibility for this recent false statement, footnote 2 of Ladd's Opposition—his sole response to his recent false conduct—misleadingly suggests that Ladd filed a corrective Form 8-K prior to the SEC's motion for relief. (Opp. at 14 n.2.) In fact, the opposite is true. The SEC filed its motion for relief on February 23, 2023. A week later, on February 29, Ladd filed MGT's corrective Form 8-K. (Kauf. Supp. Decl., and Ex. A thereto.) Ladd nonetheless attempts to mislead the Court regarding this matter. In any event, Ladd's past and recent flouting of the disclosure requirements of the federal securities laws amply justify, and necessitate, the Court's imposition of a permanent officer and director bar and permanent injunctions to prevent Ladd's likely continued violations of those laws and therefore to protect investors.

## **CONCLUSION**

For the foregoing reasons and those set forth in the SEC's opening brief, the SEC respectfully requests that the Court grant the SEC's Motion for Relief Against Defendant Robert Ladd.

Dated: May 3, 2024
      New York, NY

Respectfully submitted,

<u>/s/ Jack Kaufman</u>
Jack Kaufman
Katherine Bromberg
100 Pearl Street, Suite 20-100
New York, NY 10004
(212) 336-0106 (Kaufman)
Attorneys for Plaintiff Securities and Exchange Commission