UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMISSION,

                                    Plaintiff,

               – against –

BARRY C. HONIG, ET AL.,

                                    Defendants.

**OPINION & ORDER**

18 Civ. 8175 (ER)

RAMOS, D.J.:

        The Securities and Exchange Commission ("SEC") brought this action against Brian Keller and others for securities fraud and other securities law violations in connection with a purported pump-and-dump scheme involving the stock of BioZone Pharmaceuticals, Inc. ("BioZone").  Doc. 105.  The SEC claims are brought pursuant to the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").  *Id*.  The Court entered judgment on consent ("Consent Judgment") against Keller, imposing injunctions on future violations of each of the securities laws charged, an officer and director bar, a penny stock bar, and deferring the SEC's request for monetary relief for later determination.  Doc. 113.

        The SEC moved for final judgment against Keller requesting:  (1) injunctions for any future violations of each of the securities laws charged; (2) a permanent bar from acting as an officer and director of a public company; (3) a permanent bar from participating in an offering of a penny stock—relief all of which the Court previously awarded in the Consent Judgment—and (4) an additional $125,000 in civil penalties.  Doc. 365.  In response to the SEC's motion, Keller, proceeding *pro se*, asks the Court to reduce the civil penalty requested.  Doc. 369.  For the reasons set forth below, the motion

for final judgment is GRANTED, and Keller's request for a reduction of the civil penalty is DENIED.

## I.    BACKGROUND

The Court entered the Consent Judgement against Keller on March 29, 2019, in which he agreed that, in response to any future SEC motion for civil penalties, he cannot dispute the allegations against him in the Complaint or otherwise deny any securities violations as alleged in the Complaint. Doc. 113 at 4–5. He also agreed that, in considering the SEC's motion for civil penalties, this Court must accept as true the allegations against him in the Complaint. *Id*. For purposes of this motion, the Court provides the following summary.

### A. Factual Background

Keller was the chief scientific officer and a board member of BioZone Laboratories, Inc. ("BioZone Labs," referred to in the Complaint as "Company A Labs"), a private company. Doc. 105 ¶ 83–84; Doc. 365 at 4. The company was in the business of manufacturing over-the-counter pharmaceutical products. Doc. 105 ¶ 83. One of BioZone Labs' endeavors was the development of a patented drug-delivery technology called "QuSomes," but the company lacked sufficient funding to support it fully. *Id*. ¶ 84.

Co-defendants Barry C. Honig, Michael Brauser, John Stetson, John O'Rourke III, Phillip Frost,[1] and Mark Groussman[2] (together, the "Honig Group") were frequent co-investors. *Id*. ¶¶ 55, 60. They invested "individually or through their entities, . . . alongside one another" from approximately 2011 through 2019. *Id*. Generally, their investments followed a similar pattern. *Id*. ¶ 55. Honig or Brauser identified a company to target and subsequently arranged financings granting themselves and their co-investors control in the company's outstanding common stock at lower-than-market prices. *Id*. Together the co-investors used their control to make the company's

---

[1] Frost is referred to in the Complaint as "Investor 1." Doc. 365 at 5; Doc. 105 ¶ 44.

[2] Groussman is referred to in the Complaint as "Affiliate 1." Doc. 365 at 8; Doc. 105 ¶ 45.

management decisions and determine the company's policies. *Id*. When the Honig Group decided that it was time to exit an investment, they would fabricate a publicity-generating event to boost the price of the stock, create market demand, and increase trading volume so that the Group could sell their positions. *Id*. After successfully creating an inflated market, the investors would sell their positions over a period of weeks. *Id*.

One of Honig and Brauser's target companies was BioZone Labs. *Id*. ¶ 83. Honig and Brauser approached Keller and Daniel Fischer, chief executive officer of BioZone Labs, in late 2010 with a proposal to take the company public which included raising $11–13 million to support the research and development of the QuSomes technology. *Id*. ¶ 84–85; Doc. 365 at 5. Pursuant to a letter of intent sent in January 2011, the Honig Group intended to take BioZone Labs public by reverse merger into a new entity to be known as BioZone Pharmaceuticals, Inc. ("BioZone"—as distinct from BioZone Labs—referred to in the Complaint as "Company A"), a publicly traded company that Honig, Brauser, Frost, and Stetson controlled. *Id*. ¶¶ 82–83, 85. Honig and Brauser offered 6,650,000 shares in BioZone to each of Keller, Fisher, and a research scientist employed by BioZone Labs. *Id*. ¶¶ 84–85. BioZone Labs' management signed the agreement to take the company public on February 1, 2011. *Id*. ¶ 85.

Following the reverse merger, Honig, Brauser, and Frost held a controlling majority of BioZone shares. *Id*. ¶ 90. With the knowledge and approval of certain members of the Honig Group and others, Honig and Brauser exercised control over the management and policies of BioZone. *Id*. For example, they installed co-defendant Elliot Maza as the new chief financial officer and director of BioZone and later elevated him to chief executive officer. *Id*. ¶¶ 88, 90. Maza routinely sought approval from Honig, Brauser, and Frost on material business decisions, sent them business updates, and sought their approval on outside financing opportunities. *Id*. ¶ 90.

In the newly public BioZone, Keller retained his original roles of chief scientific officer and member of the board of directors. *Id*. ¶ 33. He served in these positions from March 2011 to January 2014. *Id*. In his roles, Keller was aware of Honig and Brauser's control over BioZone, and that they leveraged this control to carry out the pump-and-dump scheme. *Id*. ¶¶ 91, 94. For example, on February 12, 2012, Keller wrote an email to another colleague complaining about Maza's leadership: "The real power is with [] Honig and [] Brauser. Elliot [Maza] is just a mouthpiece." *Id*. ¶ 91.

Keller actively facilitated the scheme and acted to increase the Honig Group's control. For example, Keller approved private BioZone financings arranged by Honig and Brauser that would award them millions more shares of BioZone stock. *Id*. ¶¶ 91–92. The terms approved by Keller included favorable conversion rights allowing Honig, Brauser, and other purchasers of promissory notes to convert the notes into millions of shares of BioZone common stock at pennies per share. *Id*. ¶ 92. Keller's approvals enabled Honig and Brauser to acquire more BioZone shares at greatly reduced prices. *Id*. Crucially, Keller authorized the financing terms despite the fact that they offered no meaningful benefit to BioZone's business prospects, and notably, he received millions of shares in BioZone stock as compensation. *Id*. ¶ 94. As a result of Keller's approvals, by April 1, 2013, certain members of the Honig Group and other co-investors, had amassed almost 45% of BioZone's outstanding stock. *Id*. ¶ 94–95.

Keller, acting at the direction of Stetson, also signed a false and misleading BioZone SEC Form 10-K and an amended Form 10-K in 2013 for the 2012 fiscal year. *Id*. ¶¶ 91, 95. These filings violated SEC reporting requirements by failing to disclose that Honig, Brauser, Stetson, Frost, and Groussman not only owned a substantial portion of BioZone's stock, but also that Honig and Brauser, with the approval of their co-investors, exercised extensive control over the company—facts Keller knew at the time. *Id*. ¶¶ 90–91, 95. This control and its concealment were essential to the pump-and-dump

scheme, as the public and shareholder awareness of such control would have signaled that these members of the Honig Group were dumping their stock.

Keller also knowingly contributed to the Honig Group's fraudulent promotion of BioZone stock by providing false projections to a newsletter writer tasked with portraying the company's success on the *Seeking Alpha* website, a popular investor forum.  *Id.* ¶¶ 72, 103, 109.  In a September 2013 interview with John Ford,[3] who had been hired by the Honig Group to publish a favorable article about BioZone ("*Seeking Alpha* article"),[4] Keller made misleading statements regarding the prospects of the QuSomes technology.  *Id.* ¶¶ 103, 108–09.  He claimed the company had a formulation ready for testing to be introduced into the billion-dollar injectable drug market.  *Id.* ¶ 109.  However, Keller was fully aware that by summer 2012, more than a year earlier, BioZone had shut down all research and development efforts on QuSomes and had not formulated an injectable drug and also that, by mid-2012, BioZone had stopped all efforts to develop this technology.  *Id.* ¶¶ 93, 109.  Keller even reviewed the article before publication and knew it included his misleading statements.  *Id.* ¶ 109.

The *Seeking Alpha* article played a pivotal role in advancing the pump-and-dump scheme.  It caused an immediate and positive market response, artificially inflating the price of BioZone stock. [5]  *Id.* ¶ 111–13.  The increased trading volume and artificially inflated stock price enabled the Honig Group to dump their shares on unsuspecting public

---

[3] The Court entered a final consent judgment against Ford on April 25, 2025.  Doc. 362.  Ford's articles about public companies and their prospects appeared on the website *Seeking Alpha*, where he enjoyed an investor following.  Doc 105. ¶¶ 72, 102–03.  Ford met Honig in the summer of 2012, at which time Honig offered to compensate Ford for writing about companies in which Honig invested.  *Id.* ¶ 72.  Ford accepted and, to preserve the illusion of his independence and objectivity, agreed that he would not disclose this compensation arrangement in his articles.  *Id.*

[4] After depositing their BioZone stock with a broker, Honig and O'Rourke asked Ford to focus his article on Frost—who had a significant retail investor following—and the positive but fabricated prospects of BioZone's research and development of its QuSomes drug technology.  *Id.* ¶¶ 44, 102–03.

[5] Trading volume rose from approximately 1,100 shares on September 25, 2013, to over 4.5 million shares on September 27, 2013, and to more than 6 million shares on October 2, 2013.  *Id.* ¶ 111.  The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.  *Id.*  During the manipulative trading period, shares also traded at a price of $0.58.  *Id.* ¶ 113.

investors at a profit.[6]  *Id*. ¶¶ 109–13.  Between September 23, 2013, and December 31, 2013, the Honig Group and their entities sold almost 16 million shares of BioZone stock, generating proceeds exceeding $9 million.  *Id*. ¶ 112.

### B.  Procedural Background

The SEC filed the initial Complaint on September 7, 2018.  Doc. 1.  The SEC filed an amended Complaint on March 8, 2019, alleging, among other things, that Keller participated in the fraudulent pump-and-dump scheme of BioZone stock, in violation of the anti-fraud provisions of the federal securities laws—Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 15(d) of the Exchange Act and Rule 15d-1 thereunder.  Doc. 105 at 78–81, 86–89, 95.  The amended Complaint sought, *inter alia*:  (1) permanent injunctions against Keller's further violations of the charged provisions; (2) civil money penalties; (3) a permanent bar against Keller from acting as an officer and director of a public company; and (4) a permanent bar from participating in an offering of penny stock.  *Id*. at 97–99.

The Court entered the Consent Judgment against Keller on March 29, 2019, which imposed the agreed-upon injunctions and deferred for later resolution the SEC's request for monetary relief against Keller.[7]  Doc. 113.  As relevant to this Opinion, Keller agreed in the Consent Judgment that, in response to any future SEC motion for additional relief, he cannot dispute the factual allegations in the amended Complaint or otherwise deny his securities violations as alleged in the amended Complaint.[8]  *Id*. at 4–5.

---

[6] In anticipation of the publication of the *Seeking Alpha* article, Honig distributed some of his BioZone shares to Honig Group members.  *Id*. ¶ 107.  On September 23, 2013, Honig sold some of his BioZone convertible notes to Groussman, giving him rights to convert the debt into BioZone common shares at $0.20 per share.  *Id*. ¶ 94.  On October 3, 2013, Honig also sold some of his BioZone convertible notes to Stetson and O'Rourke.  *Id*. ¶¶ 31, 55–56, 63, 64, 94.

[7] The judgment deferred for later resolution the SEC's request for awards of both "disgorgement" and a "civil money penalty."  Doc. 113 at 4–5.  The SEC has since determined not to seek disgorgement.  Doc. 365 at 3 n.3.

[8] Keller's Consent Judgment includes the following:  "[A]t any hearing held on such a motion [for disgorgement and/or civil penalties]:  (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Amended Complaint; (b) Defendant may not challenge the validity of this Consent or the Judgment; (c) solely for the purposes of such motion, the allegations of the

The SEC moved for final judgment and remedies against Keller on June 18, 2025. Doc. 365. The SEC seeks the Court's previous award and additional monetary relief in the form of $125,000 in civil penalties. *Id.* at 1. Keller responded to the SEC's motion on July 15, 2025, asking the Court to reduce the penalty requested. Doc. 369. In response, the SEC filed a memorandum of a law in support of its motion for final judgement requesting this Court to grant the non-monetary relief previously awarded and the $125,000 civil money penalty. Doc. 371 at 2.

## II.    LEGAL STANDARD

"Section 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), authorize courts to order civil monetary penalties for violations of the securities laws." *SEC v. Aly*, No. 16 Civ. 3853 (PGG), 2018 WL 4853031, at *4 (S.D.N.Y. Oct. 5, 2018). These provisions were enacted pursuant to the Securities Enforcement Remedies and Penny Stock Reform Act of 1990, with the dual goal of punishing individual violators and deterring future violations. *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395 (RWS), 2002 WL 31422602, at *1 (S.D.N.Y. Oct. 29, 2002); *see SEC v. Jadidian*, No. 08 Civ. 8079 (PGG), 2011 WL 1327245, at *8 (S.D.N.Y. Mar. 31, 2011) ("The purpose of these [civil] penalties is to create meaningful financial disincentives to participating in fraudulent conduct.").

The Securities Enforcement Remedies and Penny Stock Reform Act "provides for three tiers of civil monetary penalties, to be determined 'in light of the facts and circumstances.'" *SEC v. Paulsen*, No. 18 Civ. 6718 (PGG), 2021 WL 5014886, at *3 (S.D.N.Y. Oct. 28, 2021) (citing 15 U.S.C. § 77t(d)(2)(A); 15 U.S.C. § 78u(d)(3)(B)(i)). A first-tier penalty may be imposed for any violation. *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) (citing 15 U.S.C. § 77t(d)(2)(A)-(C); 15 U.S.C. § 78u(d)(3)(B)(i)-(iii)). A

---

Amended Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." Doc. 113 at 5.

second-tier penalty may be imposed where the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id*.  A third-tier penalty may be imposed where the defendant engaged in conduct involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and that conduct also "directly or indirectly resulted in substantial losses *or created a significant risk of substantial losses to other persons*." *Id*. (emphasis added).   Each tier provides that, for each violation, the amount of penalty "shall not exceed *the greater of* " a specified monetary amount or the defendant's "gross amount of pecuniary gain"; the amounts specified for a natural person for the first, second, and third tiers, respectively, are $5,000, $50,000, and $100,000.  15 U.S.C. § 77t(d)(2) (emphasis added); 15 U.S.C. § 78u(d)(3)(B).  For violations that occurred in September 2013, as required by the Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, the applicable per violation amounts had increased to $7,500 for first-tier violations, $80,000 for second-tier violations, and $160,000 for third-tier violations.  17 C.F.R. § 201.1001 tbl. I (2025).

"Aside from the maximum statutory restrictions, the appropriate civil penalty is within the discretion of the district court."  *SEC v. Lek Securities Corp.*, 612 F. Supp. 3d 287, 295 (S.D.N.Y. 2020) (citation modified).   In determining the appropriate civil monetary penalty, courts in this Circuit consider:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Fowler*, 6 F.4th 255, 266 (2d Cir. 2021); *see also SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).  These factors, often called the *Haligiannis* factors, are neither exhaustive nor "to be taken as talismanic." *Lek Securities Corp.*, 612 F. Supp. 3d at 295.  "Other relevant considerations include a defendant's financial condition, a

defendant's failure to admit wrongdoing, and a defendant's lack of cooperation with authorities." *Id*. at 295–96 (citation modified).   Additionally, the "brazenness, scope, and duration" of the securities violations may warrant "a significant penalty." *SEC v. Rajaratnam*, 918 F.3d 36, 45–46 (2d Cir. 2019).   In all, the "[c]ourt has broad discretion to impose the civil monetary penalties it deems appropriate in [a given] case." *SEC v. Shkreli*, No. 15 Civ. 7175 (KAM) (JRC), 2022 WL 541792, at *13 (E.D.N.Y. Feb. 23, 2022) (citing *SEC v. de Maison*, No. Civ. 18-2564, 2021 WL 5936385, at *1 (2d Cir. Dec. 16, 2021)).

The penalty statutes do not define what constitutes a "violation" for the purposes of imposing a "per violation" remedy.   *Fowler*, 6 F.4th at 264–65.   Courts may consider whether all of the defendant's violations were "part of a single scheme" to constitute one violation.   *SEC v. Collector's Coffee, Inc.*, No. 29 Civ. 4355 (VM), 2025 WL 752221, at *18 (S.D.N.Y. March 10, 2025) (holding that because individual violations all arose from one scheme, a single third-tier penalty was appropriate).

## III.         DISCUSSION

The SEC filed a motion for final judgment and remedies seeking the Court's previously awarded relief and additional civil penalties.   Doc. 365.   Keller requests a reduction of the monetary penalty requested.   Doc 369.

### A.  Tier Level-Penalty

The SEC asks for a $125,000 third-tier civil monetary penalty for Keller's violations—less than the statutory maximum of $160,000 for a single third-tier violation. Doc. 365 at 1; 17 C.F.R. § 201.1001 tbl. I (2025).   The SEC seeks a third-tier penalty against Keller because his actions were egregious, knowing, repeated, and caused substantial losses or, at the least significant risk of substantial losses, to investors.   Doc. 365 at 9–11.   The SEC asserts that Keller's conduct was intentional, as "he knowingly misrepresent[ed] the status of BioZone's QuSomes technology for Ford's *Seeking Alpha* article."   *Id*. at 10–11.   The SEC contends that as a result of Keller's falsehoods, investors

who purchased BioZone stock after the publication of the article "were harmed because the[y] purchase[d BioZone stock] at artificially inflated prices." *Id*. at 10. The SEC points out that after the publication, trading volume increased allowing the Honig Group to sell their stock at the post-publication price jump and profit substantially. *Id*. at 7–8. The SEC contends that counter to the forecast in the *Seeking Alpha* article, investors were unaware that the stock price would inevitably fall. *Id*. at 10.

The SEC also argues that Keller had knowledge, as an officer and director of BioZone, a public company, that Honig and Brauser controlled BioZone decision making, yet still signed at least two SEC filings that failed to disclose this control. *Id*. at 10. These 2012 fiscal year filings were submitted to the SEC in 2013 with Keller's approval. *Id*. at 7; Doc. 105 ¶ 90. The Court thus determines Keller's violations of securities laws constitute one violation and the SEC's tier level determination for the violation is appropriate.

### B. Penalty Amount

Keller asks for a reduction in the penalty alleging lack of financial gain, and disputing his involvement in the scheme. Doc. 369. Keller contends that the stock he obtained from the sale of BioZone Labs to the Honig Group eventually became "worthless." *Id*. He also argues that in his role as chief scientific officer he was "unaware and uninvolved in the stock or stock transactions," and so deserves a less severe penalty than the penalty imposed on individuals who were "mastermind[s]" of the fraud scheme and "realized substantial profits." *Id*. Keller argues that the aforementioned mitigating factors justify a reduced civil penalty amount. *Id*.

In response, the SEC argues that Keller's argument that he was "unaware and uninvolved in the stock or stock transactions" is meritless because the Consent Judgement precludes him from challenging the Complaint's allegations including those of knowledge and involvement in the fraudulent scheme. Doc. 371 at 1–2. The SEC

therefore asserts that the Court must accept as true the allegations against Keller as per the Consent Judgment. *Id.*

In addition, the SEC argues that even if Keller lacked awareness and involvement in the stock fraud scheme, he knowingly contributed in other ways. *Id.* at 1–4. For example, Keller facilitated the Honig Group's control of BioZone, signed false SEC filings that did not disclose that control to the public, and knowingly gave false information to Ford, the author of the *Seeking Alpha* article that was intended to bolster the BioZone stock. *Id.*

The SEC also rejects Keller's argument that his penalty is "disproportionately severe compared to others who engaged in the . . . scheme and realized substantial profits." Doc. 369; *see* Doc. 371 at 4–5. The SEC argues that the $125,000 penalty against Keller is lower than the monetary penalties the Court approved against six of the seven other defendants. *Id.* at 4–5. Specifically, Maza's penalty, Keller's primary co-conspirator, was set at $578,095. Doc. 363. The penalties approved for the remaining defendants are also all greater than Keller's except for Ford's.[9] Doc. 371 at 4–5. Moreover, the SEC highlights that defendants Frost, Brauser, Stetson, O'Rourke, and Groussman also paid additional disgorgement and prejudgment interest fees which Keller is not being asked to pay.[10] *Id.*

Finally, the SEC argues that the requested penalty is consistent with the purpose of civil penalties, which is to punish the individual and deter future violations of securities laws. *Id.* at 5.

---

[9] Ford was ordered to pay $100,000. Doc. 362. Frost was ordered to pay $5,000,000. Doc. 77. O'Rourke was ordered to pay $260,000. Doc. 228. Brauser was ordered to pay $160,000. Doc. 224. Stetson was ordered to pay $160,000. Doc. 227. Groussman was ordered to pay $160,000. Doc. 93.

[10] Frost was ordered to pay $433,181.06 in disgorgement and $90,206.46 in prejudgment interest. Doc. 77. O'Rourke was ordered to pay $765,128 in disgorgement and $129,198 in prejudgment interest. Doc. 228. Brauser was ordered to pay $844,914.32 in disgorgement and $170,853.84 in prejudgment interest. Doc. 224. Stetson was ordered to pay $837,509.98 in disgorgement and $157,159.30 in prejudgment interest. Doc. 227. Groussman was ordered to pay $1,051,360 in disgorgement and $170,554.78 in prejudgment interest. Doc. 93.

The Court concludes that a $125,000 monetary penalty is appropriate, considering both the egregiousness of Keller's violations and other mitigating circumstances. Per the *Haligiannis* factors, Keller's conduct was egregious. On at least two occasions, Keller, in his capacity as an officer and director of BioZone, signed two SEC filings without disclosing the Honig group's control over the company despite his knowledge. Doc. 105 ¶¶ 91, 95. He also knowingly provided false information about the status of BioZone's QuSome technology to be used in the *Seeking Alpha* article, and reviewed and approved the article he knew contained materially misleading information. *Id*. ¶ 109. His actions resulted in substantial loss or, at least, a significant risk of substantial loss to innocent investors because they caused a positive market response that caused the investing public to buy BioZone stock at an artificially high price, which fell quickly after December 2013. *Id*. ¶¶ 109–12. Keller's actions were egregious, knowing, repeated and resulted in substantial loss or, at least, a significant risk of substantial losses, to investors. All factors weigh towards finding that a $125,000 penalty, substantially less than the statutory maximum of $160,000 for a single third-tier violation, is appropriate.

Under the *Haligiannis* last factor, a court can consider a defendant's financial position or inability to pay as a mitigating factor to reduce a penalty. *SEC v. Findley*, 718 F. Supp. 3d 125, 142 (D. Conn. 2024) (finding that defendant's poor "financial status . . . warrants reduction from the maximum permissible civil penalty"); *see also SEC v. Snyder*, No. 03 Civ. 04658 (KPE), 2006 WL 6508273, at *12 (S.D. Tex. Aug. 22, 2006) (finding that "[d]efendant's current financial situation indicate that imposing civil penalties would be inappropriate"). Courts can reduce penalties if defendants endure bankruptcy or have a limited net worth. *SEC. v. Svoboda*, 409 F. Supp. 2d 331, 348 (S.D.N.Y. 2006). However, Keller does not argue that a reduction should be granted due to his overall financial position. He argues that the stock he received as compensation for the sale of BioZone Labs ultimately became worthless because the BioZone stock was

transferred to another company.[11]  Doc. 369.  Importantly, here, Keller focuses narrowly on the present-day low value of the stock he received instead of arguing that a lesser penalty is warranted due to his financial position.

First, the Court finds Keller's expression of remorse lacking.  Courts may weigh a defendant's level of culpability when determining civil penalties by assessing whether the defendant is remorseful, cooperative with the investigation or if they actively engaged in fraudulent behavior.  *SEC v. Genovese*, 53 F. Supp. 3d 24, 46–47 (S.D.N.Y. 2021); *see also SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (citing the defendant's penchant for "blaming others, including the SEC for his own conduct" and "downplaying of the violations for which he is liable" as additional relevant factors warranting the imposition of a civil penalty).  While he claims to "acknowledge the seriousness of the violations," he stops short of accepting full responsibility for his actions.  Doc. 369.  For example, Keller denies his involvement in the fraudulent scheme despite having previously entered into the Consent Judgment, which expressly bars him from disputing his participation in the scheme.  *Id*.; *see* Doc. 113 at 4–5.  Additionally, he seeks to minimize his role by ascribing blame to other defendants whom he characterizes as the "masterminds" and primary financial beneficiaries while disregarding that he also received millions of BioZone stock during his tenure.  Doc. 369; *see* Doc. 105 ¶ 94.  This deflection undermines a finding of genuine remorse.

Although Keller contends that his civil penalty is disproportionally severe compared to those imposed on other "mastermind" defendants who, unlike him, profited from the scheme, the penalty to be imposed on him is the lowest of those imposed on the other defendants except Ford.  Doc. 369.  Moreover, while courts can reduce the severity

---

[11] BioZone sold its assets to another company controlled by the Honig Group (referred to as "Company M" in the Complaint) by the end of 2013.  Doc. 105 ¶¶ 118, 121.  Subsequently, Honig and Brauser arranged a reverse merger of BioZone with CoCrystal Pharma, Inc. (referred to as "Private Company" in the Complaint).  *Id*. ¶ 122.  Under the merger agreement, BioZone shareholders owned 40% of the newly combined entity shares and the owners of the CoCrystal Pharma owned 60% of the shares.  *Id*.

of civil penalties by considering the disgorgement and prejudgment interest already imposed on the defendant to ensure that penalties are not unduly harsh, Keller is not required to pay those penalties.  *SEC. v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 568–69 (S.D.N.Y. 2009), *aff'd*, 438 F. App'x 23 (2d Cir. 2011).  Almost all co-defendants who were unjustly enriched were ordered to pay disgorgement fees and prejudgment interest, whereas Keller was not subject to such remedies.[12]  Doc. 365 at 3.  As the SEC notes, Keller's purported lack of financial gain was already factored into the penalty determination.  Doc. 371 at 2.

Although Keller does not argue for a reduction of his civil penalty amount based on the cumulative effect of other remedies already imposed, the Court has discretion to consider such reduction based on the imposition of other remedies.  *Universal Express, Inc.*, 646 F. Supp. 2d at 568–69; *SEC v. Bronson*, 246 F. Supp. 3d 956, 978–79 (S.D.N.Y. 2017).  Courts have recognized that when combined with remedies like disgorgement, permanent injunctions and penny stock bars may sufficiently serve punitive and deterrent purposes, potentially warranting a lower civil penalty.  *Universal Express, Inc.*, 646 F. Supp. 2d at 568.  The difference in Keller's case, however, is that the SEC is not seeking disgorgement and prejudgment interest against him.  Doc. 365 at 3.  In *Bronson*, the defendant received a penalty reduction because he was ordered to pay millions in disgorgement and prejudgment interest, was enjoined from engaging in further violations of securities laws and trading in penny stocks, and notably had recently declared bankruptcy, indicating his ability to pay monetary penalties was limited.  246 F. Supp. 3d at 978–79.  Here, the Court finds that the injunctions imposed on Keller do not "lessen the responsibility of the [civil] fine to provide a retributive and deterrent effect," and so a civil penalty amount reduction is not appropriate.  *SEC v. Credit Bancorp, Ltd.,* No. 99 Civ. 11395 (RWS), 2002 WL 31422602, at *4 (S.D.N.Y. Oct. 29, 2002).

---

[12] *See supra* note 10. Only Ford and Maza were not ordered to pay disgorgement or prejudgment interest. Doc. 362; Doc. 363.

IV.    **CONCLUSION**

For the foregoing reasons, the SEC's motion for final judgment is GRANTED, and Keller's request for a civil penalty amount reduction is DENIED.  The Court imposes civil penalties in the amount of $125,000, a permanent injunction against future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 15(d) of the Exchange Act and Rule 15-d-1 thereunder, a bar from acting as an officer and director of a public company, and a bar from participating in an offering of a penny stock.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 364.

It is SO ORDERED.

Dated:    December 3, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.